FLORENCE T. NAKAKUNI #2286
United States Attorney
District of Hawaii

LESLIE E. OSBORNE, JR. #3740
Chief, Criminal Division
LAWRENCE L. TONG #3040
Assistant U.S. Attorney
QUINN P. HARRINGTON
Trial Attorney – Tax Division
Office of the United States Attorney
Prince Kuhio Federal Building
300 Ala Moana Blvd Ste 6100
Honolulu, HI 96850
(808) 541-2850
Email: Les.Osborne@usdoj.gov
Email: Larry.Tong@usdoj.gov
Email: Quinn.P.Harrington@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 14-00826 SOM |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S TRIAL BRIEF; |
| | ) | CERTIFICATE OF SERVICE |
| vs. | ) | |
| | ) | Date: June 23, 2015 before |
| ALBERT S.N. HEE, | ) | Chief Judge Susan Oki Mollway |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States submits this memorandum to aid the Court in presiding over the trial in this case.

### A. FACTUAL BACKGROUND

Defendant was the sole shareholder of Waimana Enterprises, Inc. (WEI). WEI was the parent company of Sandwich Isles Communications, Inc. (SIC) and ClearCom, Inc. (CCI), which provided internet and telephone services in the State of Hawaii.  The charges in this case grow out of (1) defendant's usage of WEI to pay substantial personal expenses of approximately $2.75 million on his behalf, (2) his failure to report the receipt of those payments as income on his personal income tax returns, and (3) WEI's false deduction of the payments as purported business expenses.  The case also involves charges that defendant caused WEI, SIC, and CCI to claim false deductions for capital lease expenses that were not paid.

Defendant's scheme to have WEI pay his personal expenses ran between 2002 and 2014, and included the payment of the following expenses.

Defendant had WEI pay approximately $92,000 for his personal massages. Defendant directed his employee to characterize the expenses as "consulting fees," which caused WEI's tax preparers to deduct the payments as if they were legitimate business expenses.

2

Defendant used WEI to pay the college tuition and living expenses for his three children. The payments started in 2004 when defendant's eldest child was a student at the Massachusetts Institute of Technology (MIT). Initially, defendant had WEI write checks totaling approximately $33,523 directly to MIT, and characterized it as a deductible "educational expense" on WEI's books. When WEI's accountant questioned the payments, future tuition payments were classified as a "loan to shareholder." Defendant was advised that the "loan" should be documented with a promissory note. Defendant nonetheless did not sign a promissory note stating the amount of the loan, the interest rate, or the terms of repayment. Instead, between 2005 and 2012, he directed WEI to issue additional payments totaling approximately $718,559.09 for tuition payments and living expenses for his eldest daughter, and for his two other children, who attended Santa Clara University.

Defendant made no repayments of these amounts until 2012, after the IRS had initiated a criminal investigation and questioned whether the "loan to shareholder" was a sham.

Defendant also had WEI buy a house in Santa Clara for over $1.3 million. Although the house was termed a "corporate retreat," it was used as college housing for defendant's children. The children did not pay rent to WEI and, in fact, rented out rooms to others, so as to generate money for their own living

3

expenses. At trial, the government will present evidence that the fair market rental value of the house was approximately $4,500/month. Defendant thereby received a benefit of approximately $243,000 for a 54-month period during which he did not have to pay for his children's housing. That benefit was not reported as income on his personal income tax returns.

Defendant also had WEI enrich himself and family in other ways, all based on the false claim that they were legitimate employees of the company. While attending college full-time on the mainland, defendant's three children were put on WEI's payroll, and paid a salary and fringe benefits, including retirement contributions. Defendant put his wife on WEI's payroll, so that she too could receive a salary and benefits. In total, WEI paid approximately $722,550.39 in wages to defendant's children, $590,201 in wages to his wife, and $443,103 for employee benefits for the wife and children. These amounts were deducted as legitimate business expenses, when in fact defendant's wife and children did little or no work for WEI.

Based on the guise that his family members were WEI employees, defendant had WEI pay for numerous family expenses and meals. Defendant used his personal credit card to incur expenses, and directed WEI to reimburse him for so-called business expenses. Defendant was reimbursed for approximately $121,878 in credit card charges for personal expenses, which included the following: (1) a

4

trip to France/Switzerland made by his wife, daughter, and that daughter's then-boyfriend, which he termed an "inspection" done for CCI; (2) a trip made by defendant's wife and two daughters to President Barack Obama's inauguration; (3) a trip to Disneyworld by defendant's two daughters; (4) a four day trip to the Mauna Lani Bay resort on the Big Island for his family, characterized as a "stockholders meeting," even though defendant was WEI's sole shareholder; (5) a trip to Tahiti by defendant's wife, two daughters, and son that he termed an "investigation" of an underwater cable; and (6) sundry other expenses including restaurant charges with defendant's family members.  These reimbursements were deducted by WEI as if they were legitimate business expenses and supported by directions or memoranda signed by defendant.  Defendant failed to report the receipt of this money as income on his personal income tax returns.

In addition to defendant's personal expenses scheme, count one of the second superseding indictment alleges that defendant corruptly endeavored to obstruct the IRS through false capital lease deductions taken by WEI, CCI and SIC.  In May 2002, defendant caused CCI to enter into a lease with the Honolulu Board of Water Supply (BWS) for the right to run telephone lines through abandoned water mains.  CCI agreed to pay the BWS a total of $48.75 million over thirty years.  The payments included a guaranteed payment of $5 million in May 2007, less any previously paid licensing and usage fees already paid under the

5

lease. Defendant then had CCI sublease the rights to the abandoned water mains to SIC. In exchange for obtaining the right to use the abandoned water mains, SIC agreed to make payments to CCI equaling the same $48.75 million paid by CCI to BWS. Based upon the timing and amount of the lease agreements, the return preparers for CCI and SIC booked the capital lease as a corporate asset, and computed and deducted the depreciation, amortization and lease interest expenses as business expenses on corporate tax returns for the years 2002 through 2007.

In August 2005, defendant entered into an amendment between CCI and the BWS that extended the deadline to make the guaranteed $5 million payment. Defendant did not alter the CCI-SIC agreement, and SIC continued to make all payments to CCI under their original agreement.

Beginning in April 2013, defendant advised BWS that he disputed CCI's obligation to make the $5 million payment then due in December 2013. Defendant instructed his employees not to make the payment. Defendant thereafter advised BWS that CCI was not obligated to make the guaranteed payment in December. Defendant did not inform his return preparers that he disputed the obligation and that he did not plan to have CCI make the payment required under the lease.

Between 2002 through 2012, CCI paid licensing and usage fees, but failed to make the balance of the $5 million payment under its lease agreement with BWS. During that same time period, the tax returns of WEI, SIC, and CCI claimed a total

of $28.8 million of business deductions for depreciation, amortization and lease interest expenses based upon the assumption that that $5 million guaranteed payment would be made. In truth and fact, no such payment was made by CCI to the BWS. The false deductions caused WEI, SIC, and CCI to underpay their federal taxes by approximately $3.6 million.[1]

Defendant's failure to advise his accountants of the repudiation of the $5 million obligation occurred after the IRS had initiated an audit into his companies, and later a criminal investigation which could lead to the computation of his tax liabilities and potential criminal charges.

B. APPLICABLE LAW

1. Corruptly Endeavoring to Obstruct the Due Administration of the Internal Revenue Laws

Count one charges defendant with a violation of 26 U.S.C. § 7212(a). To prove that charge, the government must prove:

a. First, the defendant endeavored to obstruct or impede the Internal Revenue Service's lawful functions to assess and collect income taxes, and investigate possible criminal violations of the internal revenue laws; and

---

[1] The abandoned water main scheme is part of count one only, and has no effect on counts 2 through 7, which deal with the filing of false personal income tax returns.

7

    b. Second, the defendant's effort had a reasonable tendency to obstruct or impede the due administration of the internal revenue laws; and

    c. Third, the defendant acted knowingly and corruptly, that is, with the intention to obtain an unlawful benefit for himself or someone else.

The government will prove that defendant endeavored to obstruct and impede the due administration of the internal revenue code through a scheme to have WEI pay his personal and family expenses. Defendant falsely characterized the payments as business expenses in the books and records of his company. Defendant acted "corruptly" within the meaning of 26 U.S.C. § 7212(a) because he acted with the intent to provide a financial benefit to himself and his family. *United States v. Workinger*, 90 F.3d 1409, 1414 (9th Cir. 1996) (defining "corruptly" within the context of § 7212(a)). By using his companies to pay for his family's expenses, and the filing of false personal and corporate income tax returns, defendant impeded the IRS in its function of assessing and calculating income taxes.

Defendant also corruptly endeavored to obstruct the Internal Revenue laws by causing his return preparers to take deductions for the BWS lease even though he unilaterally changed the terms of the lease and eventually refused to make required payments under the lease.

   2. <u>False Tax Returns</u>

  Counts 2 through 7 charge defendant with filing false personal income tax returns for the years 2007 through 2012, in violation of 26 U.S.C. § 7206(1).  In order to prove any such charge, the government must prove each of the following elements beyond a reasonable doubt:

 a. The defendant made and subscribed a return, statement, or other document that he or she knew was false as to a material mater;

 b. The return, statement, or other document contained a written declaration that it was made under the penalties of perjury; and

 c. In filing the false tax return, the defendant acted willfully.

*United States v. Bishop*, 412 U.S. 346, 350 (1973); *United States v. Pirro*, 212 F.3d 86, 89 (2d Cir. 2000); *United States v. Scholl*, 166 F.3d 964, 979-80 (9th Cir. 1999); Ninth Circuit Model Criminal Jury Instruction - 9.39 (2010 Edition).

  Defendant signed and filed joint federal income tax returns between 2007 and 2012, knowing they each failed to report hundreds of thousands of dollars in income. Each return carried the requisite jurat, and falsely underreported income received by the defendant.  Defendant knew that the reported income failed to include the value made by WEI to benefit himself and his family.

C. <u>OTHER ISSUES</u>

1. <u>Testimony Concerning Acts of Defense Counsel</u>.

As the Court knows, defendant's attorneys were actively involved during the investigation of the case. On January 26, 2015, the government moved to disqualify counsel for the defendant based on the grounds that (1) Kurt Kawafuchi of the firm acted as custodian of records in response to various grand jury subpoenas, (2) Kawafuchi gave advice to accountants of defendant's companies concerning the pay off the alleged "loan to shareholder" at issue in this case, and provided a statement attached to a consolidated tax return filed by defendant's companies. Doc. 28-1, p. 2-7. It is anticipated that the controller for SIC will testify that Kawafuchi instructed her to calculate the balance of the alleged "loan to shareholder" and to pay the amount owed. Doc. 28-1, p. 6.

In response to that motion, defendant acknowledged that Kawafuchi was "the lawyer for Mr. Albert Hee and his company Waimana Enterprises, Inc. and all its subsidiaries (e.g. Sandwich Isles Corporation, Clearcom, Inc., and Ho'opa'a Insurance Corporation)." Doc. 36, p. 3.[2] Defendant did not deny that Kurt Kawafuchi made the statements in the government's motion but claimed that the advice would be privileged. Doc. 36, p. 4. Defendant did not explain why legal

---

[2] Kawafuchi recently stated that the law firm is not now representing defendant's business entities and stated that he was unaware whether the entities had an attorney at this time.

10

advice between defendant and his attorneys known by a third party, the controller of the company, would be privileged.

The Court denied the government's motion to disqualify. Doc. 42. The Court relied on defense counsel's representation that they would stipulate to the business record foundation of defendant's companies' records, which they have now done. On the potential reliance defense issue, defendant stated on the record that he waived any reliance defense based on the representation of defense counsel and waived any potential conflicts. Doc. 42, p. 3.

While defendant has waived any reliance defense based on his attorneys' advice, the government anticipates that witnesses may testify about Kawafuchi's advice on several matters. The matters include: (1) calculating interest on the "loan to shareholder" in 2012, and directing that it be paid; (2) providing a form to be attached to the 2009 WEI consolidated Form 1120 tax return; (3) providing information about the use of the Santa Clara residence by defendant's children to return preparers who were preparing the 2011 WEI consolidated federal income tax return; and (4) disclosing to return preparers on or around May 7, 2013, that defendant's children and wife were on WEI's payroll.

There may be other areas where Kawafuchi may be mentioned. The government objects to any evidence that forms the basis of a reliance defense,

11

given defendant's waiver, and reserves the right to call Kawafuchi if it becomes necessary given the trial testimony.

### 2. Potential Hostile Witnesses

The Court is also aware that most of the witnesses are defendant's family members, employees, or consultants. All are represented by two attorneys. Kawafuchi has listed the address of one of those attorneys as his own local address, apparently to satisfy the rules concerning participation of local counsel at trial. Virtually all of the witnesses have declined to meet with the government to review documents or discuss their trial testimony. The government raises the issue solely to alert the Court that some testimony may be particularly laborious. It may also involve the use of prior investigative reports and grand jury testimony that the witnesses may not have reviewed, either to refresh recollection or for purposes of past recollection recorded.

Rule 611 of the Federal Rules of Evidence gives this Court discretion to "exercise reasonable control over the mode and order of examining witnesses" with the intent to "(1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Rule 611(c) explicitly permits the use of leading questions on direct examination of witnesses who are "identified with an adverse party" or are "hostile" witnesses. The original 1972 Advisory Committee Notes recognized the

12

long history of allowing leading questions when the witness is "hostile, unwilling, or biased" and when the witness's "recollection is exhausted."

A witness identified with an adverse party may be examined by leading questions even without a specific showing of actual hostility. *See, e.g., United States v. Mizell Memorial Hospital*, 744 F.2d 1467, 1477-78 (11th Cir.1984). The exception for "hostile" witnesses is intended to permit the use of leading questions for witnesses who are not identified with an adverse party, but are hostile, unwilling or biased. For example, courts have permitted the government to use leading questions during the direct examination of a criminal defendant's girlfriend. *United States v. Hicks*, 748 F.2d 854, 859 (4th Cir. 1984). Similarly, the government's leading, direct examination of a defendant's close friend was permitted even though there was no contemptuous or surly behavior by the witness. *United States v. Brown*, 603 F.2d 1022 (1st Cir. 1979).

In the instant case, the government may call witnesses with divided loyalties. These witnesses may be either "identified with an adverse party," such as employees and family members of the defendant, or "hostile" within the meaning of Rule 611(c).

    3.   <u>Possible Attempts to Raise Decided Issues</u>

Defense counsel has shown a penchant for seeking to relitigate issues already decided by this Court. For example, counsel has filed motions in limine

13

seeking to limit testimony as if a bill of particulars were ordered (which it was not) and to exclude evidence concerning the abandoned water main scheme. Although defendant has not disclosed the theory of his defense at this stage, the government notes that legal issues that have been decided by this Court should not be part of his defense. Specifically, defendant raised a *Tweel* issue as part of a motion to dismiss this case. That motion was denied by this Court. Doc. 81. Defendant may attempt to examine government witnesses to elicit testimony concerning the internal fraud referral practices of the IRS. Depending on the nature and context of such questions, the United States may object and seek to have such evidence excluded on relevance or other grounds.

    4.    <u>Limitations on Scope of Cross-Examination</u>

Relatedly, the government may call witnesses to testify on specific subjects and to offer limited testimony. As an initial matter, because the government plans to strictly limit the scope of such direct examinations, the government will only be required to disclose statements related to that specific testimony. *See* 18 U.S.C. 3500(b) (restricting disclosures to "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."); *United States v. Calhoun*, 542 F.2d 1094, 1103 (9th Cir. 1976). Second, defense counsel's cross examination of such witnesses should be

14

similarly limited to "the subject matter of the direct examination" and matters of credibility. Fed. R. Evid. 611(b).

### 5. Status of Exhibits

The government provided an initial draft exhibit list and copies of all of those listed exhibits on May 18, 2015. Prior to that date, in January and February of 2015, the government provided discovery disclosures that included nearly all of those exhibits. The government is currently refining its exhibit list and any amendments to the list will be provided to defendant, but the government believes that all potential documents have already been provided to defendant as part of one of the above-listed disclosures.

Despite making a request for discovery, defendant has not provided disclosure of any documents or exhibits to the government at this stage. The government has raised this issue with defendant who has acknowledged that defendant is required to provide reciprocal discovery as required by the Federal Rules of Criminal Procedure. The government has also informed defendant that the government will object to the introduction of any evidence that was not properly disclosed in accordance with those rules.

///

DATED:  June 5th, 2015, in Honolulu, HI.

          Respectfully submitted,

          FLORENCE T. NAKAKUNI
          United States Attorney
          District of Hawaii


      By /s/ Quinn P. Harrington
          LESLIE E. OSBORNE, JR.
          LAWRENCE L. TONG
          Assistant U.S. Attorneys
          QUINN P. HARRINGTON
          Trial Attorney - Tax Division

          Attorneys for Plaintiff
          UNITED STATES OF AMERICA

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the dates and by the methods of service noted below, the true and correct copy of the foregoing was served on the following at his last known address:

Served electronically through CM/ECF:

STEVEN TOSCHER, ESQ.
toscher@taxlitigator.com

EDWARD M. ROBBINS, ESQ.
robbins@taxlitigator.com

KURT KAWAFUCHI, ESQ.
kawafuchi@taxlitigator.com

Attorneys for Defendant
ALBERT HEE

DATED:  June 5th, 2015, in Honolulu, HI.

/s/ Quinn P. Harrington
Trial Attorney
U.S. Department of Justice
Tax Division