```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3                              )
     UNITED STATES OF AMERICA,  )   CR 14-00826 SOM
 4                              )
             Plaintiff,         )   Honolulu, Hawaii
 5       vs.                    )   June 24, 2015
                                )   9:00 A.M.
 6   ALBERT S. N. HEE,          )
                                )
 7           Defendant.         )
                                )
 8   _____)

 9              TRANSCRIPT OF JURY TRIAL (DAY 2)
              BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10               UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:        LAWRENCE L. TONG
                                Office of the U.S. Attorney
13                              PJKK Federal Bldg.
                                300 Ala Moana Blvd. Ste. 6100
14                              Honolulu, HI 96850

15                              QUINN P. HARRINGTON
                                U.S. Dept. of Justice
16                              Tax Division
                                601 D St., N.W. Room 7029
17                              Washington, DC 20004

18   For the Defendant:         STEVEN TOSCHER
                                KURT K. KAWAFUCHI
19                              LACEY STRACHAN
                                Hochman salkin Rettig Toscher
20                                & Perez
                                9150 Wilshire Blvd., Ste. 300
21                              Beverly Hills, CA 90212

22   Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
                                United States District Court
23                              300 Ala Moana Blvd. Ste. C285
                                Honolulu, HI 96850
24                              (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).
```

```
 1                              INDEX

 2

 3    EXAMINATION

 4    Witness Name                                       Page

 5    Kristy Morgan
```
```
 6        Direct By Mr. Tong ...................................    8

 7        Cross By Mr. Toscher ................................   33

 8        Re-Direct By Mr. Tong...............................   40

 9    Nancy Henderson

10        Direct By Mr. Harrington ...........................   47

11        Cross By Mr. Toscher ...............................  124

12        Re-Direct By Mr. Harrington.........................  134

13    Judith Ushio

14        Direct By Mr. Tong .................................  136

15    Diane Doll

16        Direct By Mr. Tong .................................  147

17        Cross By Mr. Toscher ...............................  157

18        Re-Direct By Mr. Tong..............................  161

19    David Chinaka

20        Direct By Mr. Tong .................................  163
```
```
21

22

23    EXHIBITS

24    Exhibit                                            Page

25
```

```
 1    1-2 thru 1-30, 1-30A, 1-31 thru 1-56 Entered into      14
 2    Evidence
 3    1-57 Entered into Evidence                             32
 4    4-1, 4-2, 4-2A thru 4-57A, 4-58 Entered into           42
 5    Evidence
 6    4-59, 4-59A thru 4-81A, 4-82 Entered into Evidence     42
 7    4-82A thru 4-82Q, 4-84 thru 4-121 Entered into         42
 8    Evidence
 9    4-122 thru 4-129 Entered into Evidence                 42
10    5-1 Entered into Evidence                              43
11    6-1 Entered into Evidence                              44
12    3-2A thru 3-2II, 3-3, 3-91 thru 3-109 Entered into     46
13    Evidence
14    9-1 thru 9-4 Entered into Evidence                     46
15    11-51 Entered into Evidence                           155
16    8-2 Entered into Evidence                             162
17    11-2 thru 11-12, 11-14 thru 11-17 Entered into        171
18    Evidence
19    11-21 thru 11-24, 11-27, 11-28 Entered into Evidence  171
20    11-32 thru 11-43, 11-43A Entered into Evidence        171
21    11-44 thru 11-47, 11-49 thru 11-58 Entered into       171
22    Evidence
23
24
25
```

1   WEDNESDAY, JUNE 24, 2015              9:07 O'CLOCK A.M.

2       (In open court without the jury:)

3          THE COURT:  You can be seated.

4          The jury's not here, and I know you haven't made your

5   appearances yet, but I did want to raise, before they came in,

6   one thing.  If all the parties agree, I offer to take photos of

7   every witness.  We then print it up on stickers with the

8   witness' name, and we pass these stickers out.  Counsel can

9   have a copy of everything.  But we give a sticker of each

10  witness with the witness' name to every juror.  They paste it

11  in their notebooks.  And, you know, in a trial of three weeks,

12  that might be helpful to them.

13         If anybody objects, I won't do it.  But if everybody

14  thinks it's a good idea, we will do that.

15         So, Mr. Tong?

16         MR. TONG:  Your Honor, we've always thought that was

17  a great idea.

18         THE COURT:  Okay.

19         MR. TOSCHER:  Your Honor, that's fine.  Thank you.

20         THE COURT:  Okay.  Then that's what we'll do.  I

21  forgot to ask you folks about that yesterday.

22         And did you guys get this calendar that we made?

23  Okay.  So I'm going to talk about that first thing with the

24  jurors.

25         I should put on the record, too, you cannot use those

1   pictures for anything outside of this courtroom.  Can't share

2   them.  I did tell the jurors their pictures, you know, they

3   wouldn't be photographed.  But the one thing you can use them

4   for, which attorneys in my courtroom have used them for in

5   other cases, is sometimes during closing argument people like

6   to put a picture of the witness on the screen to remind jurors

7   this witness said such and such.  And that is all right, and if

8   you want to do that, we offer to give you, at the end of the

9   trial, a compilation of those pictures just so you have that

10  option.  But that's the only use you can make of them other

11  than just sticking them in your notebooks, too.

12       (Jury enters.)

13          THE CLERK:  Criminal 14-826 SOM, United States of

14  America versus Albert Hee.  This case has been called for

15  Further Jury Trial.

16          Counsel, please make your appearances for the record.

17          MR. TONG:  Good morning, Your Honor.  Good morning,

18  ladies and gentlemen.  Larry Tong for the United States.  With

19  me is Quinn Harrington of the Department of Justice, Christina

20  Sorley, and also Special Agent Greg Miki of the IRS.  Good

21  morning.

22          THE COURT:  Good morning.

23          MR. TOSCHER:  Good morning, Your Honor.  Steven

24  Toscher for the Defendant Albert Hee.

25          Good morning, ladies and gentlemen.  My client is

 1   here with me, Albert Hee; my associates, Lacey Strachan and

 2   Kurt Kawafuchi.

 3        THE COURT:  Good morning.  You can be seated.

 4        Welcome back, ladies and gentlemen.  We're about to

 5   begin with presentation of witnesses.

 6        There are a couple of administrative things before we

 7   do that.  One, I passed out a calendar to you, just so you can

 8   kind of plan your lives.  I don't know how long this trial will

 9   actually last; so if we're lucky, we won't need all these days

10   that are marked as trial days through the end of July.  If

11   we're unlucky, I have to give you the August calendar, but it

12   won't be very far into August.

13        And the other thing that I, obviously, have no

14   control over, but you would control, is how long it would take

15   you to deliberate.  So whenever these courtroom proceedings end

16   and you start deliberating, then where it says no trial,

17   actually you could come to court and deliberate.  So, for

18   example, if, you know, all the witnesses were done, I gave you

19   the law -- just let's pick a date -- July 24, then even though

20   the next Monday, July 27, is a no-trial day, I would ask that

21   you come to court.  You would be in the jury room -- there's a

22   separate deliberation room -- and you would deliberate.  You

23   just wouldn't be in this courtroom.  Okay.  So I give you that

24   slight adjustment.

25        The other thing is, although you will not have your

1   pictures taken or be filmed, I do have a procedure where to

2   help you remember who witnesses are we take a digital photo of

3   witnesses -- every witness.  We then print up the witness'

4   picture with the witness' name.  We put these on self-adhesive

5   stickers, and we give you a sticker.  You can paste it into our

6   notebook so that, when you're reviewing, you can remember, oh,

7   yeah, that's the one, you know, that said such and such.  So we

8   will be doing that throughout this trial, and my courtroom

9   manager will probably use her trusty cell phone to do that.

10          Speaking of cell phones, I do let you folks hold on

11   to your cell phones while you're here in the trial, but you

12   need to, first of all, silence them and, second of all, store

13   them in your pocket, in your handbag, whatever.  You cannot

14   take them out and check your e-mail or text message anybody

15   during the proceeding.  You need to be paying total attention

16   to the evidence, okay.  But the reason I let you hold onto it

17   is because the breaks are short, you have lives, and during the

18   breaks you can just pull them up when you're not in this

19   courtroom, and you can do your business.  I realize that would

20   be more convenient for you.

21          However, when you deliberate, at the beginning of

22   your deliberation day, we actually collect those.  You cannot

23   take them into your actual deliberations when you're trying to

24   reach a verdict.

25          Okay.  So with those administrative things, Mr. Tong,

1    who's the government's first witness?

2            MR. TONG:  The government calls Kris Morgan.

3        (Witness photographed.)

4            THE CLERK:  Please raise your right hand.

5        (Witness sworn.)

6            THE CLERK:  Thank you.  Please be seated.  Please

7    state your name and spell your last name.

8            THE WITNESS:  Kristy Morgan, K-r-i-s-t-y

9    M-o-r-g-a-n.

10                    <u>DIRECT EXAMINATION</u>

11   BY MR. TONG:

12   Q    Good morning.

13   A    Good morning.

14   Q    Could you please tell us the nature of your employment.

15   A    I work for the Internal Revenue Service in Ogden, Utah.

16   Q    What is your position?

17   A    My title is the court witness coordinator.

18   Q    And how long have you been with the IRS?

19   A    For 30 years.

20   Q    How long have you been in your present position?

21   A    I was selected in 2009 as the coordinator.

22   Q    What are your duties as the court witness coordinator?

23   A    My main responsibility is to assist the special agent and

24   the attorneys in preparation for trial and secure tax returns

25   and documents that are maintained in the normal course of

1   business.  I certify those documents, then testify on behalf of

2   the commissioner as a custodian of record regarding those

3   specific documents.

4   Q    Have you also been designated by the commissioner as a

5   representative to explain how different IRS forms or used?

6   A    Yes.

7   Q    As well as the policies of the IRS?

8   A    Correct, yes.

9   Q    Now, are you familiar with a form called a Form 1040?

10  A    Yes, I am.

11  Q    What is that form?

12  A    That's an individual income tax return.

13  Q    And what is it used for?

14  A    It is used to report your income, your wages, money that

15  you've made, any deductions that are allowable, and you compute

16  your tax and any payments that were made, and then, hopefully,

17  at the end of that you get a refund on the payments.

18  Q    Are you also familiar with something called a Form 1120?

19  A    Yes.

20  Q    What is that form?

21  A    That's a corporate business type tax return.

22  Q    So from your answer, would it be true that a corporation

23  also has to file a tax return with the IRS?

24  A    That's correct.

25  Q    And what type of information is a corporation required to

1   give to the IRS on a Form 1020 -- 1120?

2   A    On the 1120 they would report income from the business and

3   any deductions, costs to run that business, and would also

4   compute a tax for the business.

5   Q    Now, does the IRS have something called the Information

6   Return Processing System?

7   A    They do.

8   Q    Could you tell us what that is?

9   A    That is what is called a third-party information.  For

10  instance, when you get your W-2, on that will be written "This

11  may be supplied to the Internal Revenue Service."  We will

12  secure different types of income information from financial

13  institutions, from employers, banks, as far as what was paid.

14  Those are kept by social security number and year, and then we

15  can go in and pull that information to see how much money was

16  earned, what interest was earned, mortgage interest that was

17  paid, and compare that to a tax return.

18  Q    And why would the IRS want to do that?

19  A    That's, basically, one of the things that the IRS will do

20  is compare tax returns with the information provided by the

21  employers or banks to make sure that the tax returns are

22  correct.

23  Q    Now, does the IRS maintain copies of individual tax

24  returns that are filed?

25  A    Yes.

1    Q     What about corporate tax returns?

2    A     Yes, they maintain those.

3    Q     What about the information it receives through this

4    program you just described, the Information Return Processing

5    System?

6    A     Yes.  All those records are maintained by the IRS.

7    Q     And are all of those records within your care, custody,

8    and control?

9    A     They are.

10   Q     Have we asked you in this particular case to review

11   certain tax returns and items filed with the IRS?

12   A     Yes.

13   Q     I'm going to direct your attention to three binders that

14   appear to your left.  If we could start with the binder that

15   would include Exhibits 1-2 through 1-11.  Would you please

16   review those, please.

17   A     (Witness complying.)  1-2 through 1-11?

18   Q     Yes, ma'am.

19   A     Yes.

20   Q     Do you recognize these documents?

21   A     I do.

22   Q     What are they?

23   A     These are certified tax returns, individual income tax

24   returns, for Albert and Wendy Hee for tax years 2003 through

25   2012.

1   Q      Would they be Form 1040 individual tax returns?

2   A      Yes, they are.

3   Q      Now, if you could turn to another series, Exhibits 1-12

4   through 1-24 in the binder in front of you.

5   A      1-12 through 1-20?

6   Q      24.

7   A      That's got to be in the other binder.

8          Okay.

9   Q      Do you recognize those documents?

10  A      I do.

11  Q      What are they?

12  A      These are certified corporate income tax returns, the form

13  is 1120, for Waimana Enterprises for 2003 through tax period

14  2012.

15  Q      Okay.  Now, if I can direct your attention to Exhibits

16  1-25 through 1-30.

17  A      1-25 through 1-30?

18  Q      And I want to add one more, Exhibit 1-30A, as in alpha.

19  A      1-30A?  Yes.

20  Q      Do you recognize that series of documents?

21  A      I do.

22  Q      And what are they?

23  A      They are certified records of Sandwich Isles

24  Communication, Inc., for 2003, '4, '5, '6, '7, and '8; and then

25  the last record, 1-30A, is a certified record of ClearCom,

1  Inc., for 2002.  All Form 1120s.

2  Q    Okay.  And how about Exhibits 1-31 through 1-36?

3  A    1-31 through 1-36 are certified records for ClearCom,

4  Inc., for the tax periods 2003 through 2008, also Form 1120s.

5  Q    Okay.  Miss Morgan, now the next series would be exhibits

6  1-37 through 1-42.  Could you please review those and tell us

7  what they are.

8  A    These are certified individual income tax returns for

9  Adrianne Hee, tax period 2006 through 2011.

10  Q    Okay.  If we could turn to Exhibit 1-43, would you please

11  review and identify that document.

12  A    1-43 is a printout of the IRP information for Adrianne

13  Hee, tax period 2012.

14  Q    I'm not sure I understand what IRP is.

15  A    I'm sorry, that is the Information Return Processing.

16  Q    What type of information appears on Exhibit 1-43?

17  A    That is printout of wage information from an employer.

18  Q    Is the employer identified?

19  A    It is.  There's two employers.  One is Rhode Island School

20  of Design.  The second employer is Waimana Enterprises, Inc.

21  Q    Okay.  Now, if you could review Exhibits 1-44 through

22  1-49.  Could you please tell us what those records are.

23  A    1-44 through 1-49 are certified individual income tax

24  returns Forms 1040 for Breanne Hee, tax periods 2006 through

25  2011.

1    Q    Okay.  And one final series of exhibits.  Exhibits 1-50

2    through 1-56.  Would you please examine those and tell us what

3    they are.

4    A    1-50 through 1-56 are certified individual income tax

5    returns for Charlton Hee for the periods 2006 through 2012.

6    Q    Okay.  Miss Morgan, I want to ask you a few questions with

7    regard to all of the exhibits that you've just identified.

8    Does the IRS have a regular practice of keeping documents of

9    the sort you've just identified?

10   A    Yes, they do.

11   Q    Are those records kept in the ordinary course of the IRS's

12   activity?

13   A    Yes.

14   Q    Are the exhibits in front of you true and correct copies

15   of records maintained by the IRS?

16   A    Yes, they are.

17              THE COURT:  We would ask that Exhibits 1-2 through

18   1-30, Exhibit 1-30A, Exhibits 1-31 through 1-56 be received.

19              MR. TOSCHER:  Defense has no objection, Your Honor.

20              THE COURT:  All right.  Then all of those exhibits

21   are received in evidence.  Those are Exhibits 1-2 through 1-30,

22   Exhibit 1-30A, and Exhibits 1-31 through 1-56.

23   BY MR. TONG:

24   Q    And, Miss Morgan, can you determine whether the tax

25   returns that are those exhibits were actually filed with the

1   IRS?

2   A    Yes, I can.

3   Q    Were they, in fact, filed?

4   A    Yes, they were filed.

5   Q    And how do you know that?

6   A    With the what is called a document locator number.  Each

7   processed return has a unique number assigned when it's

8   accepted, and that number appears at the top right-hand corner

9   of the return.

10  Q    Okay.  I'm going to ask you to look at Exhibit 1-2.

11            And, Your Honor, with the Court's permission I'd like

12  to put the cover page up on the screen.

13            THE COURT:  You may do that.

14            MR. TONG:  Can the jury see that from that distance?

15            Okay.

16  Q    It appears that the cover page is a blue document; is that

17  correct?

18  A    Yes.

19  Q    With a gold seal at the bottom?

20  A    Correct.

21  Q    Can you describe what that cover page represents.

22  A    That's the official certification that I have created for

23  this tax return, stating that it is a true and correct copy of

24  official record maintained by the Internal Revenue Service.

25  Q    Could we zoom in on the certification, please.

1                 And I'm pointing with a laser at the certificate of

2    official record.  Is that the certification that you've just

3    described?

4    A    It is.

5    Q    Does it describe the document that follows?

6    A    Yes.  It gives a -- who -- the document was filed.  It

7    gives a social.  It gives an address and the year and the

8    number of pages.

9    Q    In case the jury is wondering, there are some

10   blackened-out spots on these returns; is that correct?

11   A    Correct.

12   Q    Why does it appear in that format?

13   A    Basically, because part of the responsibility of the

14   Internal Revenue Service is to protect taxpayer information.

15   So we provide just certain parts of that information.

16   Q    This appears to reflect a Form 1040; is that correct?

17   A    Correct.

18   Q    And is the Form 1040 actually part of Exhibit 1-2?

19   A    It is.

20   Q    May we look at the first page of the tax return, which has

21   a Bates number of 06 in the bottom right-hand corner.  Do you

22   see that document, Miss Morgan?

23   A    I do.

24   Q    If we could zoom in on the top half, please.

25                 You mentioned earlier there's a document locator

1    number; is that correct?

2    A    Correct.

3    Q    Where does that appear?

4    A    That appears at the top of the return beginning with the

5    numbers 89.

6    Q    And that shows that it was filed; is that correct?

7    A    That's correct.

8    Q    Where on this form -- well, let me back up a second.  You

9    mentioned the 1040 is the form used by individual taxpayers;

10   correct?

11   A    Yes.

12   Q    So at the end of the year when you get your W-2, you fill

13   out a form like this?

14   A    Yes.

15   Q    And send it to the IRS in some fashion; correct?

16   A    Correct.

17   Q    Where does the name of the taxpayer appear on this form?

18   A    The very top of the return is what we call the ANSSI

19   (phonetic) section, or where the name, address, social security

20   number appears.

21   Q    And in this case it references Albert Hee and Wendy Hee;

22   is that correct?

23   A    Correct.

24   Q    Is there something on this form that also indicates who

25   the dependents of the taxpayers are?

1   A     Yes.  The next part where it's entitled exemptions is

2   where you would put children, for instance, or someone that

3   lives in your home that you're providing care for.  Those are

4   the exemptions.

5   Q     So in this case there are three names identified; is that

6   correct?

7   A     Correct.

8   Q     How would the IRS interpret this to mean?

9   A     This would be children that are living in the home that

10   qualify as exemptions for this tax return.

11   Q     Okay.  Is there a place on the form that essentially

12   requires the taxpayer to identify the amount of wages or income

13   that they earned?

14   A     Yes.  The income amounts are -- on a 1040 are lines 7

15   through 21 on this document.  Wages are reported on line 7.

16   Q     I'm pointing at line 7.  There's a section that says

17   "Attach forms W-2."  Do you see that?

18   A     Yes.

19   Q     Tell us what a W-2 form is.

20   A     That is the information supplied to you by your employer

21   to where you would get the information to fill out your tax

22   return, and that's the supporting document you need to include

23   with this tax return.

24   Q     And does a W-2 appear for Albert Hee and Wendy Hee as part

25   of this tax return, which is Exhibit 1-2?

1   A     Yes.  They are attached, their W-2s, yes.

2   Q     All right.  If you could take a look at the W-2 for

3   Miss Hee, which appears at Bates number 05, please.

4              And Miss Morgan, so that I'm not confusing, when I

5   reference a Bates number, do you understand that to be the

6   little number that appears in the lower right-hand corner of

7   the document?

8   A     Yes, I do.

9   Q     Do we have a W-2 form on the screen right now?

10  A     Yes.

11  Q     Can you walk us through what this form represents and how

12  the IRS would interpret it.

13  A     The very first box that we would be looking at would be C,

14  who is the employer identified.  In box B they put their

15  employer identification number.  Box 1 would be the wages that

16  are paid to the employee, who was Wendy Hee.  Box 2 is the

17  federal withholding that the employer paid over to the IRS to

18  apply to taxes.  The next box 3 is the social security wages,

19  which is information provided to social security.  4 is the

20  social security tax that's withheld.  5 is the Medicare wages.

21  And 6 is the Medicare tax that's withheld.  The other -- the

22  boxes are filled in, if applicable, if there was tips or

23  something like that.  The bottom shows the state identification

24  number in box 15.  And 16 is the state wages, the state income

25  taxes withheld.

1  Q    And where does the employee's name appear on the document?

2  A    That is in box E.

3  Q    Okay.  And are these documents normally submitted with

4  individual tax returns for those who are employed by others?

5  A    Yes.

6  Q    Now, if I can turn you to signature page of Exhibit 1-2,

7  which has Bates number 12 in the bottom right.  If we can blow

8  up the bottom third.

9         Okay.  Is there something called a "jurat" on this

10  page?

11  A    There is.

12  Q    And what is that?

13  A    That jurat is actually a statement that as a taxpayer you

14  sign stating that you have reviewed this tax return, all the

15  attachments, all the schedules, and it is true and correct.

16  And you sign that under penalties of perjury.

17  Q    And what is the significance of that jurat to the IRS?

18  A    The IRS then looks at you as the taxpayer saying all the

19  information that I supplied on this tax return is correct, an

20  honest tax return has been filed.

21  Q    Now, this particular tax return appears to have signatures

22  on it, three of them; is that correct?

23  A    Yes.

24  Q    And there's a block called "Sign Here"; correct?

25  A    Yes.

1    Q    And who is required to sign in that section?

2    A    That would be the people filing the tax return, which is

3    Albert Hee and Wendy Hee, would sign the tax return.

4    Q    Now, I see there's a section below that that is called

5    "Paid Preparer Use Only"; is that correct?

6    A    Yes.

7    Q    What is that section used for?

8    A    The person that actually prepared this tax return on

9    behalf of the Hees would also sign as a preparer, identifying

10   themself as participating in helping file the tax return.

11             THE COURT:  Can I make a suggestion.  If you just

12   move the mike -- pick up the base and put it to your left, then

13   when you are turned to talk about the exhibit we'll hear you

14   better.

15             MR. TONG:  Thank you, Your Honor.

16   Q    And does the use of a paid preparer affect the taxpayer's

17   obligations to provide information to the IRS?

18   A    No.  It still is the responsibility of the taxpayer, the

19   information on this tax return, solely the taxpayer's

20   responsibility.

21   Q    And in what you called the jurat there appears to be a

22   statement that reads "Declaration of preparer other than

23   taxpayer is based on all information of which preparer has any

24   knowledge."

25   A    Yes.

1    Q    What's the significance of that certification to the IRS?

2    A    Basically, the IRS understands that as the information

3    that you provided to the preparer is the information he

4    received.  He's using what you provided for filing of this tax

5    return.

6    Q    Now, there appears to be a box in the lower right-hand

7    corner that says preparer's SSN or PTIN.  Do you see that?

8    A    Yes.

9    Q    What does that represent?

10   A    That PTIN represents a preparer tax identification number.

11   Q    And what's the significance of that?

12   A    Basically, the IRS will provide every person that's

13   preparing a tax return with a PTIN.  And it's again safety

14   against possible account information being stolen, stolen I.D.

15   information.  Instead of the preparer using their social, they

16   now can have the PTIN to where they provide that information to

17   the IRS, to their client so the client doesn't have access to

18   their personal social security information.

19   Q    How does a paid preparer go about getting a PTIN?

20   A    They would apply with the IRS.  The IRS would in turn do

21   some research and issue that PTIN.  And then in turn they would

22   use that in filing their tax returns.

23   Q    Okay.  Miss Morgan, I'm going to change the topic and move

24   to a different area right now.  Let's talk about the filing of

25   tax returns.  How is a taxpayer able to file a tax return?

1  A    The tax returns can be received either paper documents or

2  electronically.

3  Q    And with regard to paper, I assume you mean they're mailed

4  to some IRS facility; is that correct?

5  A    That's correct.

6  Q    What do you mean that a tax return can be filed

7  electronically?

8  A    Electronically would be where you would either from your

9  own personal home computer you can file a return or you would

10  seek a professional to do that for you.  The data from the tax

11  return is transmitted electronically.  That data is stored

12  electronically with the IRS.  If we need a print, then it can

13  be printed out on a familiar, for instance, 1040 form so that

14  we have a copy of a tax return in that format.

15  Q    And is a paid preparer allowed to file returns

16  electronically on behalf of clients?

17  A    Yes, if they properly put in the information to become a

18  preparer with the IRS.

19  Q    Is there a process that they're supposed to follow with

20  regard to the filing of electronic tax returns?

21  A    Yes, there is.

22  Q    What is the process?

23  A    They do again make an application to be an electronic

24  return originator.  They have to have the proper software, and

25  they have to be cleared through the IRS, and a password to get

1    into the system to transmit those tax returns.

2    Q    What requirement, if any, is there for them to obtain

3    authorization from a taxpayer before submitting the return?

4    A    The electronic preparer should secure either the

5    taxpayer's signature to transmit for them the tax return, or

6    the taxpayer would come into the office, once the return is

7    prepared, and they would actually sign with what's called a pin

8    number to sign their tax return to send it to the IRS.

9    Q    Does an electronic tax return contain the same information

10   that a paper return would contain?

11   A    It does.

12   Q    And how does it look when you print it out?

13   A    It has an acknowledgement at the top, telling IRS

14   employees that this is a printout just so that the tax return

15   does not get processed a second time.  Other than that, it

16   looks, basically, the same as the paper 1040 return.

17   Q    May we see the second page of Exhibit 1-8, please.

18        And directing your attention to the top of this

19   document, are you able to determine whether this document was

20   filed in paper or electronic format?

21   A    This was an electronic tax return.

22   Q    How do you know that?

23   A    With the printout at the top, the TRPRT, Tax Return Print

24   Do Not Process.  Also, the document locator number tells me

25   it's an electronically filed tax return.

1    Q    And with regard to the highlighted TRPRT, Print Do Not

2    Process language, why does that appear there?

3    A    So that an employee of the IRS doesn't make a mistake and

4    send it through the second time.  That could cause problems for

5    both the IRS and the taxpayer.

6    Q    And if we could look at the bottom of the second page of

7    the return, which is Bates number 106, please.

8         Do you see that document in front of you,

9    Miss Morgan?

10   A    I do.

11   Q    And this one does not appear to have physical signatures;

12   is that correct?

13   A    Not in that part of the tax return.

14   Q    Where does the signature appear in an electronic tax

15   return?

16   A    Electronic tax return signatures are on the last page of

17   the document, which is Bates 118.

18   Q    If we may go there, please, and zoom in on the top half,

19   if we could, please.

20        And explain to the jury, if you would, how this

21   constitutes a signature.

22   A    Basically, the taxpayer will create a pin number almost

23   the same as you would if you go to a bank, you input your pin

24   number to access your account.  This is a pin number you create

25   and you put into the tax format once you've looked at

1   everything and made sure that it's correct.  It is considered

2   your signature when you input that pin number.

3   Q    Okay.  And then below the highlighted section there's an

4   entry that says signature date, and then there's a date that

5   appears below that; is that correct?

6   A    Right.

7   Q    What does that represent?

8   A    That's the date -- actual date that the tax return was

9   signed, just as if you signed a paper return and dated that

10  return.

11  Q    Now, if a return were filed electronically, how would the

12  IRS get wage information on a W-2?

13  A    That information is transmitted to the IRS by the

14  electronic return originator.  And also then again we receive

15  it through the employer.

16  Q    If we could look at Bates number 109 of Exhibit 1-8.  Tell

17  us what that document is.

18  A    This is a printout of the W-2 that was filed with the tax

19  return.

20  Q    And does it contain, basically, the same information as

21  the hard copy that you described earlier?

22  A    It does.

23  Q    Employer, employee, and amounts that were paid and

24  deducted.

25  A    Correct.

1   Q    I notice this W-2 also has the heading do not process; is

2   that correct?

3   A    Correct.

4   Q    Is that for the same reasons that you previously

5   described?

6   A    It is.

7   Q    Is there any kind of certification on an electronic tax

8   return that you regard as the equivalent of the jurat?

9   A    There is a certification, yes.

10  Q    If I could direct you to page 117 of this tax return.

11  Tell us whether this is the certification.

12  A    This is actually the perjury statement that's filed and

13  signed with the tax return.

14  Q    If we could see maybe the top third, please.

15       And it starts out with the title "perjury statement";

16  is that correct?

17  A    It does.

18  Q    And looking at the first sentence:  I declare that the

19  information contained in this electronic tax return is the

20  information furnished to me by the taxpayer.  Do you see that

21  sentence?

22  A    Yes.

23  Q    Who is making this certification?

24  A    That is the preparer of the tax return.

25  Q    The paid preparer that you described earlier?

1   A     The paid preparer, yes.

2   Q     Are you familiar with whether or not this certification

3   would appear and be shown to the preparer before the submission

4   of the return?

5   A     That is part of the program.  It has to be signed under

6   penalty of perjury before it can be transmitted.

7   Q     Okay.  Now, Miss Morgan, we've been talking about personal

8   income tax returns so far; is that correct?

9   A     Yes.

10  Q     You testified earlier that some of the exhibits that we

11  showed you were actually corporate income tax returns; is that

12  correct?

13  A     Yes.

14  Q     Let's take a look at one of those, Exhibit 1-20, please.

15  And if we could look at the cover page and maybe zoom in on the

16  description, please.

17         If you could describe to the jury what this is.

18  A     This identifies the type of tax return, the corporate

19  income tax return, Form 1120, the name of the business, the

20  employer identification number, the address, the tax period

21  this was for, and how many pages are included in the corporate

22  income tax return.

23  Q     So it looks like the certification says this return is 161

24  pages long; is that correct?

25  A     That is correct.

1   Q    So I gather corporate tax returns are a bit longer than

2   individual tax returns?

3   A    They are.

4   Q    And do corporate tax returns -- if we could see the first

5   page of this, please.  And if we could zoom in on the top,

6   please.

7        Is the taxpayer identified on the first page of

8   Exhibit 1-20?

9   A    Yes.  The first part of the return identifies the name of

10  the business.

11  Q    And in this case it is identified as Waimana Enterprises,

12  Incorporated; is that correct?

13  A    Yes.

14  Q    And there's a statement "and subsidiaries."  Do you see

15  that?

16  A    Yes.

17  Q    What does that mean?

18  A    That means there's additional information regarding other

19  businesses that are part of Waimana.

20  Q    Is there a portion of this tax return that describes what

21  other businesses are part of Waimana?

22  A    They should be identified in the tax return, yes.

23  Q    Could you turn to Bates number 589, please, and tell us if

24  that page identifies the subsidiaries.

25  A    589?  It does identify the affiliates, yes.

1    Q    Okay.  Looking at the top, what is a common parent

2    corporation?

3    A    That is the main company that these businesses work under.

4    Q    And there's a section below it in part 1 that says

5    subsidiary corporations; is that correct?

6    A    Yes.

7    Q    And what does that section represent?

8    A    Those are other businesses that are affiliated with

9    Waimana that their income flows to Waimana.

10   Q    Okay.  And does a corporate tax return also identify the

11   owner of the corporation?

12   A    It does identify the shareholders, yes.

13   Q    Could you look at page 576 of Exhibit 1-20 and tell us

14   whether the owner of Waimana is identified.

15   A    It identifies the officer as Albert Hee owns 100 percent

16   of the business.

17   Q    Am I pointing to where it says percent of corporation

18   stock owned?  Is that the section you're referencing?

19   A    Yes.

20   Q    Now, Miss Morgan, are you familiar with something called

21   an IRS 1099 Miscellaneous Form?

22   A    I am, yes.

23   Q    What is that form?

24   A    If you are doing some type of work and are not an

25   employee, for instance, receiving a W-2, and that person pays

1    you money for your work -- an example would be if you're a

2    contractor and you hire a plumber to do some work, you -- he's

3    not an employee; so you're going to pay him with a 1099 to show

4    how much money that person earned.  Then you'll file the 1099

5    also with the Internal Revenue Service.

6    Q    Okay.  And if you could turn to Exhibit 1-57, please.

7    Could you review that and tell us what it is.

8    A    1-57 is a copy of a 1099 Miscellaneous that was issued to

9    Diane Doll from Waimana Enterprises for 2009.

10   Q    If you could actually look at the entire exhibit.  There

11   may be several pages.

12   A    Oh, there is.  I'm sorry.

13           For 2009.  Same type of document for 2010, for 2011,

14   and 2012.

15   Q    And does this appear in hard copy or electronic format?

16   A    This is an electronic printout.

17   Q    Does the IRS regularly maintain information provided to it

18   concerning 1099 Miscellaneous Forms?

19   A    Yes.

20   Q    Are they kept in the ordinary course of the IRS's

21   activity?

22   A    They are, yes.

23   Q    Are these records that are Exhibit 1-57 true and correct

24   copies of records on file with the IRS?

25   A    Yes.

1        MR. TONG:  We would ask that 1-57 be received.

2        MR. TOSCHER:  No objection, Your Honor.

3        THE COURT:  Then it is received.

4   BY MR. TONG:

5   Q    And if we could just see the first page of Exhibit 1-57,

6   please.  And if we could zoom in on the bottom half, please.

7        All right.  Miss Morgan, can you just put into lay

8   terms what this document shows and maybe direct us where the

9   information is provided.

10  A    First of all, the tax year shows in the middle of the

11  first line identified with TY 2009.  So each document will

12  identify a year there.  If you go down one, two, about four

13  lines, you see the payee, who is identified as Diane Doll.  The

14  name of the person receiving the money is the payee.  Then

15  towards the bottom you'll see the payor.  That identifies the

16  business or the person that is paying Diane Doll.  This shows

17  Waimana Enterprises, Inc., paid nonemployee compensation of

18  $8,000 in 2009.

19  Q    Okay.  And there's this little IRMF acronym again in the

20  top line.

21  A    Yes.

22  Q    That's the electronic system you have for the reporting of

23  information of the source; is that correct?

24  A    Correct.

25        MR. TONG:  Your Honor, may I have one moment?

1              THE COURT:  Yes.

2              MR. TONG:  No further questions.

3              THE COURT:  Okay.  Is there cross-examination of this

4    witness?

5              MR. TOSCHER:  Yes, Your Honor.

6              THE COURT:  Okay.

7                        CROSS-EXAMINATION

8    BY MR. TOSCHER:

9    Q    Good morning, Miss Morgan.

10   A    Good morning.

11   Q    You testified originally about what you did for the IRS.

12   Are you a certified public accountant?

13   A    No.

14   Q    Are you what's referred to as an enrolled agent?

15   A    No.

16   Q    Are you familiar with Circular 230 of the IRS?

17   A    I know of the publication, but not really familiar with

18   it, no.

19   Q    It's what regulates CPAs, preparers, and enrolled agents.

20   Are you familiar with that at all?

21   A    No.

22   Q    So you're not familiar with the fact that Circular 230

23   imposes certain duties on CPAs?

24   A    No.

25   Q    The -- of all the -- you were responsible for gathering

1    the tax returns that are the exhibits that we talked about --

2    you talked about before?

3    A    Correct.  Yes.

4    Q    Okay.  And you assured that these were the tax returns of

5    the IRS's records.

6    A    I did.

7    Q    Now, I noticed on the list that there are no payroll tax

8    returns of any of the entities; is that correct?

9    A    I did not certify any payrolls, no.

10   Q    Were you asked to search for payroll tax returns?

11   A    No.

12   Q    You do know from your experience and work that any entity

13   that employs people have to file payroll tax returns.

14   A    Yes.  There is a requirement, yes.

15   Q    Do you know what form that is?

16   A    They file the 940s and 941s.

17   Q    Okay.  And they file those quarterly, the 940s; correct?

18   A    Correct.

19   Q    And annually the 941s; correct?

20   A    Can, yes.

21   Q    And it reports all of the wages of the employees; correct?

22   A    Yes.

23   Q    Was there any reason why those weren't part of the

24   exhibits that you were asked to search for?  Did anybody tell

25   you not to pull those?

1    A    No.  I just pulled the requested tax returns.

2    Q    You just pulled what you were asked to pull.

3    A    Correct.

4         MR. TOSCHER:  Now, I'm going to ask through prior

5    arrangement for the government to republish, if they would,

6    Exhibit 1.2.

7         MR. TONG:  1-2?

8         MR. TOSCHER:  1-2.  Thank you.

9    Q    Could you go to the signature page, please.

10        Now, would you please zero in on the preparer of the

11   return.  I just want to point out, and you will see,

12   Miss Morgan, the preparer is Carlton Siu of Chinaka & Siu; is

13   that correct?

14   A    It is yes, yes.

15   Q    And I believe you testified before as to the jurat that

16   the preparer is making a certification as well; is that

17   correct?

18   A    Stating the information is from the taxpayer, yes.

19   Q    Right.  And based upon all information of which the

20   preparer has knowledge; correct?

21   A    Yes.

22   Q    So if the preparer had certain knowledge of something, he

23   has a duty to be aware of that and pursue and utilize that

24   information, doesn't he?

25   A    That I don't know.

1   Q     But it says it right there:  any knowledge the preparer

2   has.

3   A     What knowledge he has.

4   Q     Right.  He's responsible for what he knows in the

5   knowledge; correct?

6   A     That's what the jurat says is that -- about his knowledge,

7   yes, provided by the taxpayer.

8   Q     Right.  Is based upon all -- I know we're talking about --

9   it says declaration of preparer is based upon all information

10   of which the preparer has knowledge.  It's not just limited to

11   provided by the taxpayer.  I understand the taxpayer has to

12   provide it, but that's what it says.

13   A     That's what the statement says.

14   Q     The preparer's responsible for what his knowledge is;

15   correct?

16   A     According to the statement on the jurat.

17   Q     And the statement, that's the IRS's statement; right?

18   A     That's the statement on the return, yes.

19   Q     All right.  Right.  Now, that does have significance

20   regarding obligations under Circular 230 that regulates

21   preparers, but you're not familiar with any of those.

22   A     That's correct.  I'm not.

23   Q     So we'll go on.

24         MR. TOSCHER:  Now, I would ask that the government

25   publish Exhibit 1.45 -- 1-45.  I apologize.  That's the same

1   certification -- could you go to the signature page, please.

2          Okay.  It's hard to read.  I will -- okay.  Thank you

3   very much.

4   Q    Now, 1-45, Miss Morgan, is Breanne Liko Hee's tax return

5   for the year 2007.  Do you have it there?

6   A    I do, yes.

7   Q    And the preparer is Carlton Siu, the same preparer who did

8   Mr. Hee's return.

9   A    Correct.  According to the return, yes.

10  Q    Same preparer.

11  A    Yes.

12  Q    So for purpose of the jurat we were talking about before,

13  I think we can say that Mr. Siu had knowledge of what was being

14  put on Breanne's return that year; correct?

15  A    Correct.

16  Q    All right.  Now, could you turn to -- or let's see Exhibit

17  1-16, please.

18          What is Exhibit 1-16, Miss Morgan?

19  A    1-16?  This is a certified copy of a corporate tax return

20  of Waimana Enterprises for 2005.

21  Q    Can we look at the signature page, please.  And could we

22  go to the signature line.

23          Now, this is -- again this is Chinaka & Siu CPAs.

24  A    Correct.

25  Q    That's the same preparer of Mr. Hee's individual return?

1   A    Correct.

2   Q    And the -- one of the -- Adrianne's return -- or Breanne's

3   return, excuse me, that we looked at a second ago.

4   A    Yes.

5   Q    Have you looked at all these returns that were just put

6   into evidence, and have you noticed that for most of the years

7   Chinaka & Siu was the return preparer for Mr. Hee and his wife,

8   all of the children, and the corporation?  Did you notice that?

9   A    Yes.

10  Q    Now, does it -- well, strike that.

11           In looking at the children's individual return, can

12  we go back to Exhibit 1-45, please.

13           Okay.  This is Breanne's return for 2007.  Can we

14  look at the first page, please.  And if we look at the wages,

15  line 7, reported.  Can you blow that up, please.  $28,000.

16           And can we go to the W-2.  And can we make that to

17  where it's readable.  Okay.  The next W-2, please, the one from

18  Waimana.  Thank you.

19           So this 2007 W-2 filed with the Internal Revenue

20  Service for Breanne Hee; correct?

21  A    That's correct.

22  Q    And it reflects the wages paid and also the federal income

23  tax withheld.

24  A    Correct.

25  Q    And if we wanted to look at how much tax she paid, we

1    would actually go look at her tax return; correct?

2    A    Correct.

3    Q    And all this was disclosed to the Internal Revenue

4    Service; right?

5    A    Yes.

6    Q    Nothing is hidden here.  This is all part of the Internal

7    Revenue Service's records; correct?

8    A    This is what was filed with the Service, yes.

9         MR. TOSCHER:  One moment, Your Honor.

10   Q    Can we go to what was published before 1-57?  That's the

11   1099 issued to Diane Doll.  So 1-57 -- I'll wait for you to get

12   it.  This is what was reported to the IRS from Waimana

13   regarding payments to Diane Doll; is that correct?

14   A    Correct.

15   Q    And the -- Diane Doll gets that 1099 for purposes of

16   reporting on her income tax return.

17   A    Yes.  It should be sent to her, too.

18   Q    So every year -- and I think there are a number of 1099s.

19   I don't know if you had a chance to look.  Did Waimana issue a

20   1099 every year to Miss Doll?

21   A    The record shows that there was one issued for 2009, '10,

22   '11, '12.

23   Q    And the issuance of a 1099, that normally shows a taxpayer

24   is complying with the rules, aren't they?

25   A    It shows the record was received by the IRS.

1   Q     Taxpayers are -- not every taxpayer who pays somebody

2   complies with the 1099 requirement, do they?

3   A     That I don't know.

4   Q     You don't know?

5   A     I can only say what the record shows in this case.

6   Q     Okay.  That's fair.  But we are clear that every year that

7   we have a 1099 Waimana told the IRS that they paid Diane Doll;

8   is that correct?

9   A     They filed this 1099, yes.

10          MR. TOSCHER:  Okay.  Thank you.  No further

11   questions.

12          THE COURT:  Okay.  Is there any further re-direct?

13          MR. TONG:  Very briefly, Your Honor.

14          If we could see the 1099 form again, please.  Exhibit

15   1-57, please.  If we could zoom in on the bottom.

16                    RE-DIRECT EXAMINATION

17   BY MR. TONG:

18   Q     So this document Mr. Toscher was just talking about is the

19   1099 Miscellaneous Form, showing that Waimana paid Diane Doll

20   certain amounts; is that correct?

21   A     Yes.

22   Q     And you referenced earlier that this form could be used if

23   a contractor paid a plumber as a subcontractor; correct?

24   A     Correct.

25   Q     But does the form itself indicate what the services were

1    for?

2    A    No.   No.   Just the fact that this money was paid.

3    Q    So this doesn't say whether it was for plumbing work or

4    for massage therapy, does it.

5    A    It does not.

6          MR. TONG:   Thank you.   I have nothing further.

7          THE COURT:   Re-cross?

8          MR. TOSCHER:   Nothing further, Your Honor.

9          THE COURT:   Okay.   Then the witness is excused.   You

10   may step down and leave the courtroom.

11        (Witness excused.)

12        THE COURT:   And, Mr. Tong, who's your next witness?

13        MR. HARRINGTON:   Your Honor, at this time we'd like

14   to read some stipulations into the record.

15        THE COURT:   Okay.   Go ahead.

16        So I will tell the jurors that a stipulation is an

17   agreement by the parties to a particular matter, and you are to

18   take that as proven.   Okay.

19        Go ahead.

20        MR. HARRINGTON:   Thank you, Your Honor.

21        So the first stipulation is a stipulation concerning

22   the records of Waimana Enterprises.   And the United States and

23   Defendant Albert S.N. Hee, through their attorneys, hereby

24   stipulate that the exhibits listed on the attached list,

25   Attachment A, are true and correct copies of business records

1    maintained by Waimana Enterprises, Inc., in Hawai'i.  All the

2    exhibits are records that were regularly made and created at or

3    near the time of the record by someone with knowledge.  The

4    records were kept by Waimana Enterprises, Inc., in the ordinary

5    course of its business activities, and the making of the

6    records was a regular practice of its business activities.  The

7    parties agree that such exhibits are authentic for purposes of

8    Rule 901 of the Federal Rules of Evidence, are records of a

9    regularly conducted activity within the meaning of FRE 803(6),

10   and may be admitted into evidence without the need for

11   foundational testimony, subject to any relevancy or other

12   non-foundational objections.

13          And the exhibits that are in Attachment A are 4-1,

14   4-2, including 4-2A through 4-57A, 4-58, 4-59, including 4-59A

15   through 4-81A, 4-82, 4-82A through 4-82Q, 4-84 through 4-121.

16          And if -- Your Honor, just one brief moment.

17       (Counsel conferring.)

18          MR. HARRINGTON:  And, finally, 4-122 through 4-129.

19   And we would ask that those exhibits be received into evidence.

20          MR. TOSCHER:  Your Honor, we've agreed to the

21   stipulation, and we have no objection to the admission of those

22   into evidence.

23          THE COURT:  Okay.  Let me make sure the courtroom

24   manager got it all.

25          And those are received.  Okay.

 1             MR. HARRINGTON:  Thank you.  Okay.  There's a few

 2    more.

 3             We have a stipulation concerning records of ClearCom,

 4    Inc.  And that stipulation reads:  The United States and

 5    Defendant Albert S.N. Hee, through their attorneys, hereby

 6    stipulate that the exhibits listed on the attached list,

 7    Attachment A, are true and correct copies of business records

 8    maintained by ClearCom, Inc., in Hawai'i.  All the exhibits are

 9    records that were regularly made and created at or near the

10    time of the record by someone with knowledge.  The records were

11    kept by ClearCom, Inc., in the ordinary course of its business

12    activities, and the making of the records was a regular

13    practice of its business activities.  The parties agree that

14    such exhibits are authentic for purposes of 901 of the Federal

15    Rules of Evidence, are records of a regularly conducted

16    activity within the meaning of FRE 803(6), and may be admitted

17    into evidence without the need for foundational testimony,

18    subject to any relevancy or other non-foundational objections.

19             And on Attachment A there is Exhibit 5.1 -- 5-1, and

20    we would ask that 5-1 be received into evidence.

21             THE COURT:  Okay.

22             MR. TOSCHER:  Your Honor, we agree with the

23    stipulation, and no objection to the admission of 5-1.

24             THE COURT:  Then that exhibit is received.

25             MR. HARRINGTON:  The next stipulation is a

1   stipulation concerning records of Sandwich Isles

2   Communications.  The United States and Defendant Albert S.N.

3   Hee, through their attorneys, hereby stipulate that the

4   exhibits listed on the attached list, Attachment A, are true

5   and correct copies of business records maintained by Sandwich

6   Isles Communications, Inc., in Hawai'i.  All the exhibits are

7   records that were regularly made and created at or near the

8   time of the record by someone with knowledge.  The records were

9   kept by Sandwich Isles Communications, Inc., in the ordinary

10  course of its business activities, and the making of the

11  records was a regular practice of its business activities.  The

12  parties agree that such exhibits are authentic for purposes of

13  Rule 901 of the Federal Rules of Evidence, are records of

14  regularly conducted activity within the meaning of FRE 803(6),

15  and may be admitted into evidence without the need for

16  foundational testimony, subject to any relevancy or other

17  non-foundational objections.

18          And on Attachment A there's Exhibit 6-1.  And we

19  would ask that Exhibit 6-1 be received into evidence.

20          MR. TOSCHER:  Your Honor, we agree with the terms of

21  the stipulation and have no objection to it going into

22  evidence.

23          THE COURT:  All right.  It is received.

24          MR. HARRINGTON:  And just one more moment.

25          (Counsel conferring.)

1          MR. HARRINGTON:   Okay.   We have just two more.

2          The next stipulation is a stipulation concerning

3   records of Hawaii National Bank.   The United States and

4   Defendant Albert S.N. Hee, through their attorneys, hereby

5   stipulate that the exhibits listed on the attached list,

6   Attachment A, are true and correct copies of business records

7   maintained by Hawaii National Bank.   All of the exhibits are

8   records that were regularly made and created at or near the

9   time of the record by someone with knowledge.   The records were

10   kept in the ordinary course of Hawaii National Bank's business

11   activities, and the making of the records was a regular

12   practice of its business activities.   The parties agree that

13   such exhibits are authentic for purposes of Rule 901 of the

14   Federal Rules of Evidence, are records of a regularly conducted

15   activity within the meaning of FRE 803(6), and may be admitted

16   into evidence without the need for foundational testimony,

17   subject to any relevancy or other non-foundational objections.

18          And what's contained on Attachment A are Exhibits

19   3-2A through --

20          MR. TOSCHER:   I'm sorry.   Go ahead.

21          MR. HARRINGTON:   Okay.   So starting again at 3-2A and

22   going through 3-2II, 3-3, and then 3-91 through 3-109.   And we

23   would ask that those exhibits be received into evidence.

24          MR. TOSCHER:   Agree to stipulation and no objection

25   to the admission, Your Honor.

1            THE COURT:  All right.  Then admitted.

2            MR. HARRINGTON:  Okay.  And the last one is a

3    stipulation concerning records of Old Republic Title Company.

4    The United States and Defendant Albert S.N. Hee, through their

5    attorneys, hereby stipulate that the exhibits listed on the

6    attached list, Attachment A, are true and correct copies of

7    business records maintained by Old Republic Title Company.  All

8    the exhibits are records that were regularly made and created

9    at or near the time of the record by someone with knowledge.

10   The records were kept in the ordinary course of Old Republic

11   Title Company's business activities, and the making of the

12   records was a regular practice of its business activities.  The

13   parties agree that such exhibits are authentic for purposes of

14   Rule 901 of the Federal Rules of Evidence, are records of a

15   regularly conducted activity within the meaning of FRE 803(6),

16   and may be admitted into evidence without the need for

17   foundational testimony, subject to any relevancy or other

18   non-foundational objections.

19           The exhibits on Attachment A are 9-1 through 9-4, and

20   we would ask that those exhibits also be received into

21   evidence.

22           MR. TOSCHER:  We agree with the stipulation, and no

23   objection to admission into evidence, Your Honor.

24           THE COURT:  All right.  Then admitted.

25           MR. HARRINGTON:  And that is what we have as far as

 1    stipulations, Your Honor.  If now's a good time for a break, we

 2    can do that, or we can call our next witness.

 3              THE COURT:  Let's call the next witness.

 4              MR. HARRINGTON:  Okay.  The government would call

 5    Nancy Henderson.

 6         (Witness photographed.)

 7              THE CLERK:  Please stand and raise your right hand.

 8         (Witness sworn.)

 9              THE CLERK:  Thank you.  Please be seated.  Please

10    state your name and spell your last name.

11              THE WITNESS:  Nancy Henderson, H-e-n-d-e-r-s-o-n.

12                        DIRECT EXAMINATION

13    BY MR. HARRINGTON:

14    Q    Good morning, Miss Henderson.

15    A    Good morning.

16    Q    Let's start talking just a little bit about your

17    background first.  Could you tell the members of the jury what

18    your educational background is.

19    A    A high school degree and an Associate of Arts.

20    Q    Okay.  And are you currently employed?

21    A    I am.

22    Q    Where are you employed?

23    A    Waimana Enterprises.

24    Q    And how long have you worked at Waimana Enterprises?

25    A    Fifteen years.

1    Q    So what are your duties at Waimana Enterprises?

2    A    I assist the president.

3    Q    Okay.  And who is the president?

4    A    Albert Hee.

5    Q    And have your duties always maintained the same at Waimana

6    Enterprises?

7    A    No.

8    Q    Okay.  Let's start from when you first started working at

9    Waimana Enterprises.  What were your duties when you first

10   started working there?

11   A    I was an administrative assistant.

12   Q    Okay.  And so what did you do as an administrative

13   assistant?

14   A    Supported the executive staff in whatever they needed help

15   with.

16   Q    Okay.  And so how did those duties change over the course

17   of your employment?

18   A    I started supervising the admin staff several years later.

19   Q    And do you remember what year that was?

20   A    I don't recall.

21   Q    Okay.  And so have those been your duties since then, or

22   did they change in another occasion?

23   A    I started working part-time several years ago.

24   Q    So how did your duties change when you started working

25   part-time?

1    A     I was no longer supervisor, just assisting Mr. Hee.

2    Q     And so at the time you've been at Waimana, who's been your

3    supervisor?

4    A     Mr. Hee.

5    Q     At all times you were there?

6    A     Uh-huh.

7    Q     And so if you were to see Mr. Hee, would you recognize

8    him?

9    A     Yes.

10   Q     Is Mr. Hee in the courtroom today?

11   A     Yes.

12   Q     Could you please identify where Mr. Hee is located in the

13   courtroom and what he's wearing.

14   A     He's standing up.

15   Q     Okay.  So where was Waimana offices located when you first

16   started?

17   A     On Bishop Street, Pauahi Tower.

18   Q     How long were they located there?

19   A     Let's see, 2013.

20   Q     And so did they move in 2013?

21   A     The end of 2013, yes.

22   Q     And where are the offices located now?

23   A     In Mililani.

24   Q     Okay.  So before the offices moved, how many people worked

25   at Waimana Enterprises?

```
 1   A     Maybe 10 people.

 2   Q     And so what is the business that Waimana Enterprises is

 3   involved in?

 4   A     Utility development.

 5   Q     Okay.  Does Waimana Enterprises own any other companies?

 6   A     Yes.

 7   Q     Okay.  What companies does it own?

 8   A     Sandwich Isles Communications, ClearCom.

 9   Q     And who is in charge of those companies?

10   A     Who owns them?

11   Q     Yes.

12   A     I'm not sure.

13   Q     Okay.  So how did the offices -- do you know where

14   Sandwich Isles' offices were located?

15   A     Currently?

16   Q     At the time.  Before Waimana moved where were their

17   offices located?

18   A     On Bishop Street, Pauahi Tower.

19   Q     I'm sorry.  So did they all share -- did Waimana share an

20   office with the other entities?

21   A     Yes, yes.

22   Q     Okay.  And so who owns Waimana Enterprises?

23   A     Albert Hee.

24   Q     Okay.  And he's always owned Waimana Enterprises?

25   A     As far as I know.
```

1   Q    And who's considered the number one person at Waimana

2   Enterprises?

3           MR. TOSCHER:  Objection, Your Honor.  I think it's

4   vague "number one person."  I don't think that's appropriate.

5           MR. HARRINGTON:  I'll rephrase.

6           THE COURT:  Okay.

7   BY MR. HARRINGTON:

8   Q    So who was the person who had final authority on any

9   decision?

10  A    Mr. Hee.

11  Q    So in addition to working with Mr. Hee, did you have any

12  personal relationship with him?

13  A    A social relationship?

14  Q    Yes.

15  A    Yes, I suppose so.

16  Q    So how did you first meet Mr. Hee?

17  A    Through my husband.

18  Q    Okay.  And how did your husband know Mr. Hee?

19  A    He worked with Mrs. Hee.

20  Q    Your husband worked with Mrs. Hee?

21  A    Yes.

22  Q    Okay.  And where did they work together?

23  A    Office of Hawaiian Affairs.

24  Q    Okay.  And so do you know Mrs. Hee as well?

25  A    Yes.

```
 1   Q     Do you know how long Mr. Hee and Mrs. Hee have been
 2   married?
 3   A     No.
 4   Q     Do you know if Mrs. Hee was on the payroll at Waimana?
 5   A     Yes.
 6   Q     And do you know how much she was paid?
 7   A     At the time that I was involved with it, $65,000 a year.
 8   Q     So you said at the time you were involved.  Do you know
 9   what year that was?
10   A     Prior to 2009.
11   Q     Okay.  And so when you were working in 2009, how often
12   would you see Mrs. Hee in the office?
13   A     Occasionally.
14   Q     What do you mean by "occasionally"?  How frequently?
15   A     Maybe once every couple months.
16   Q     Would you ever see her doing any work in the office?
17   A     I did at one time, yes.
18   Q     At one time?
19   A     Uh-huh.
20   Q     Do you know what she was doing?
21   A     I don't know what she was doing.
22   Q     Other than that one time that you identified, did you ever
23   see her perform any work at the company?
24   A     No.
25   Q     And who told you to put Mrs. Hee on the payroll?
```

1   A    Mr. Hee.

2   Q    Who told you how much she should be paid?

3   A    Mr. Hee.

4   Q    And do you know what year she was put on the payroll?

5   A    2000.

6   Q    And did she receive a salary all the way from 2000 until

7   2009?

8   A    As far as I know.

9   Q    Let's talk about how payments were made by Waimana

10  Enterprises.  Who had check-signing authority at Waimana

11  Enterprises?

12  A    Mr. Hee and Mr. Kihune.

13  Q    Who would sign the checks usually?

14  A    Either one of those two.

15  Q    Okay.  So who would you go to first, if you had a check

16  that needed to be signed?

17  A    Mr. Hee.

18  Q    Would it be fair to say that he signed most of the checks

19  for Waimana?

20  A    Yes.

21  Q    If somebody wanted to have Waimana issue a check, what was

22  the procedure within the office?

23  A    They would ask either one of us.

24  Q    And so what would they ask you to do?

25  A    They didn't really do that.  They would have to get

1    approval from Mr. Hee.

2    Q    They would get approval from Mr. Hee?

3    A    Uh-huh.

4    Q    So did Mr. Hee make his own requests for payments?

5    A    Yes.

6    Q    And who would approve those requests for payments?

7    A    No one else.

8    Q    So Mr. Hee would.  Okay.

9    A    Uh-huh.

10   Q    If I could direct you to -- it's the third binder there.

11   We can also put it up on the screen.  It's Exhibit 4-101.

12          And so you'll see it's in the binder.  It's also on

13   the screen.  Whatever is easier for you to take a look at.  I

14   just want to ask you some questions about this.

15          THE COURT:  I don't think -- this is not in evidence,

16   is it?

17          MR. HARRINGTON:  It was one of the stipulations.

18          THE COURT:  Oh, I'm sorry.

19          MR. HARRINGTON:  Yeah, sorry.

20          So are we okay putting it on the screen?

21          THE COURT:  Yes.

22   BY MR. HARRINGTON:

23   Q    Okay.  So this is a document titled a check request.  Are

24   you familiar with this piece of paper?

25   A    Yes.

1    Q    Could you tell the jury what this was used for.

2    A    It was a form that was filled out prior to requesting a

3    check be cut for payment.

4    Q    Okay.  And it says requested by Albert Hee.

5    A    Yes.

6    Q    Does that mean that he made this request?

7    A    Yes.

8    Q    And so it says the vendor is Diane Doll.  Do you see that?

9    A    Yes.

10   Q    So who is Diane Doll?

11   A    She was his masseuse.

12   Q    And down at the bottom -- I'm sorry, excuse me.  In the

13   middle it says amount, and it says $2,000; do you see that?

14   A    Yes.

15   Q    And at the very bottom there's two signatures.  And do you

16   recognize those signatures?

17   A    Yes.

18   Q    And whose signatures are those?

19   A    Mr. Hee.

20   Q    It's his signature in both places on the signature and

21   approved by?

22   A    Yes.

23   Q    If we could turn just one page to Bates WEI ending in

24   number 2.  And on the screen you'll see there's a check to

25   Diane Doll for $2,000.

1           I'm sorry, it's just the very next page.

2    A    Uh-huh.  Yes.

3    Q    And so is that the check that would be issued after this

4    first piece of paper was submitted?

5    A    Yes.

6    Q    Okay.  And so how were payments to Diane Doll classified

7    in the records of Waimana?

8    A    Consulting services.

9    Q    Okay.  And who told you to classify them as consulting

10   services?

11   A    Mr. Hee.

12           THE COURT:  Okay, Counsel.  We probably should take a

13   break now.  So we'll take about a 10-minute break, and then

14   we'll resume.

15       (Court recessed at 10:33 A.M., until 10:49 A.M.)

16           THE COURT:  Okay.

17           MR. HARRINGTON:  Your Honor, there was one thing I

18   forgot to say before the break.  Could we have the record

19   reflect that Miss Henderson identified the defendant as

20   Mr. Hee.

21           THE COURT:  Yes.

22           MR. HARRINGTON:  Thank you.

23           THE COURT:  It so reflects.  And, in fact, we have

24   some little stickers; so we'll pass them out.  But you can go

25   ahead with your questioning while we're doing that.

1             MR. HARRINGTON:   Okay.   Thank you.

2    Q    So, Miss Henderson, I think right before the break we were

3    looking at Exhibit 4-101, and it was a check request.   And I

4    wanted to talk a little bit more about what the scope of your

5    duties was when you were employed at Waimana.   Were you in

6    charge of processing all check requests for Waimana?

7    A    Yes.

8    Q    And for what period of time are you responsible for that?

9    A    2000 to 2000 and -- through 2008.

10   Q    Okay.   So what changed in 2008?   Were you still doing some

11   check requests but not all of them?

12   A    2009 the accounting came in-house.

13   Q    Okay.

14   A    So it was done by somebody assisting me.

15   Q    Would you still create check requests after that date?

16   A    I would, yes.

17   Q    And the check request we were looking at in 4-101, that's

18   dated September 7, 2010?

19   A    Yes.

20   Q    So that was after 2009?

21   A    Yes, but I probably did this.

22   Q    Can you tell the jury a little bit about how this will be

23   prepared.   Did you actually type up the entries in the fields

24   here?

25   A    Yes.

1   Q     And who would ask you to fill it out?

2   A     Mr. Hee.

3   Q     And did you ever ask Mr. Hee why he was requesting this

4   check?

5   A     Well, he would tell me who it was for, and I knew that she

6   was his masseuse.

7   Q     And I believe you said earlier that he told you to put it

8   down in the record as a consulting fee?

9          MR. TOSCHER:  Objection, Your Honor.  I think it

10  was --

11         THE COURT:  Okay.  You want to rephrase?  I'll

12  sustain that.

13         MR. TOSCHER:  You want me to state my reasons, Your

14  Honor?  I think it was a mischaracterization of --

15         MR. HARRINGTON:  I can just -- let me try a different

16  question.

17  Q     Okay.  So how did Mr. Hee tell you to put this down in the

18  books and records in the company?  What type of expense?

19  A     Consulting fees.

20  Q     Okay.  And so did you ask him why he would be paying his

21  masseuse consulting fees?

22  A     No.

23  Q     And do you know if Diane Doll provided any consulting

24  services?

25  A     She was his masseuse.

1   Q    And so how often would Mr. Hee ask you to write a check to

2   Diane Doll?

3   A    Well, it wasn't regularly scheduled.  Maybe once a

4   quarter.

5   Q    And would it be for $2,000 each time?

6   A    Yes.

7   Q    And so that would be $8,000 a year?

8   A    Yes.

9   Q    And then we were looking at the check, which is the second

10  page here, and would you actually prepare this check?

11  A    Yes.

12  Q    And so you would type in Diane Doll?

13  A    Yes.

14  Q    Now, how long -- for what period of time was Mr. Hee

15  requesting these checks?  Do you know when it started?

16  A    When I started:  2000.

17  Q    And from 2000 all the way until when?

18  A    Until I stopped doing it regularly:  I guess 2009, 2010.

19          THE COURT:  Can the witness make sure to talk right

20  into the mike.  Thank you.

21          THE WITNESS:  Okay.

22  BY MR. HARRINGTON:

23  Q    And if you could look at the Bates ending page 15.  And

24  it's another check request, and it's dated May 18, 2012.

25  A    Where are we?

1   Q    The page number at the bottom, that's called the Bates
2   number.  And the last two digits should be 1-5 is the page I'm
3   asking you to take a look at.
4   A    Okay.
5   Q    Okay.  And do you see this check request?
6   A    Yes.
7   Q    And it's dated May 18, 2012?
8   A    Yes.
9   Q    Did you prepare this check request?
10  A    I don't know.  I did not cut the check.
11  Q    You did not write the check?
12  A    No.
13  Q    Do you know if you prepared the check request?
14  A    I don't remember.
15  Q    Okay.  Can you identify the signature at the bottom?
16  A    Mr. Hee.
17  Q    So if you didn't process this check request, do you know
18  who did?
19  A    Could have been Gayle Honda.
20  Q    And who is Gayle Honda?
21  A    Gayle is the one who has -- was assisting me in check
22  processing.
23  Q    And do you know what her title was at the company?
24  A    She's a bookkeeper.
25  Q    And so I'm not sure if earlier when we were talking --

1   what was your title when you were working at Waimana?

2   A    Office manager.

3   Q    And were you an office manager the whole time you were

4   working at Waimana?

5   A    No, not in the latter years -- I mean, not in the

6   beginning.

7   Q    So when you were working full time at Waimana, did Wendy

8   Hee have an office at Waimana Enterprises?

9   A    No.

10   Q    Did she have a desk?

11   A    No.

12   Q    Did she have any space that was assigned to her on the

13   floor of the company?

14   A    No.

15   Q    Do you know if Mr. Hee has any children?

16   A    Yes.

17   Q    And who are his children?

18   A    Adrianne, Breanne, and Charlton.

19   Q    And do you know if Adrianne Hee attended college?

20   A    Yes.

21   Q    And what college did she attend?

22   A    MIT.

23   Q    And who paid for her tuition at MIT?

24   A    Waimana.

25   Q    And who decided that Waimana would make the payment for

1    her tuition?

2    A    Mr. Hee.

3    Q    Now, how did that process work?  Did he ask you to make

4    the payment?

5    A    Yes.

6    Q    And did he tell you how it should be recorded in the

7    records of the company?

8    A    I had asked him how to record it, and he said to record it

9    as an educational expense.

10   Q    And did you ask him why it would be recorded as an

11   educational expense?

12   A    I don't remember if I did.

13   Q    Did he explain why he was paying it as an educational

14   expense?

15   A    He did, yes.

16   Q    And what did he say?

17   A    That one of the other employees had their education paid

18   by the company.

19   Q    Do you know the name of that employee?

20   A    Judy Ushio.

21   Q    And did he provide any details of what educational

22   payments were made for Judy Ushio?

23   A    No.

24   Q    And so did Waimana Enterprises pay for the tuition for

25   Adrianne Hee for her whole time attending MIT?

1   A    As far as I know, yes.

2   Q    And how did that process work?

3   A    He would give me a statement.

4   Q    A statement from MIT?

5   A    Yes.

6   Q    And would he tell you to then issue a check?

7   A    Yes.

8   Q    And then who would sign the check when you would prepare

9   it?

10  A    Mr. Hee.

11  Q    Okay.  I'm going to ask you to take a look at Exhibit

12  3-103.  It's in the first binder.  And we'll also have it

13  pulled up on the screen for you, if that's easier to look at.

14           And so is that a check to Massachusetts Institute of

15  Technology?

16  A    Yes.

17  Q    And you prepared this check?

18  A    Yes.

19  Q    Is that Mr. Hee's signature on the check?

20  A    Yes.

21  Q    And at the bottom on the "for" line there's a student I.D.

22  number, and then there's in parentheses WEI.  What does that

23  refer to?

24  A    That it was a Waimana expense.

25  Q    And so that meant it was paid for by the company.

1    A      Yes.

2    Q      And if you could refer to Exhibit 4-82I.  It's actually in

3    the second binder.  And again we'll pull it up on the screen

4    for you.  And if we turn to the second page of that exhibit.

5           Okay.  And you mentioned that you received a

6    statement.  Is this the type of statement that you would

7    receive?

8    A      Yes.

9    Q      And at the bottom there's some handwriting there.  Is that

10   a signature at the bottom?

11   A      Yes.

12   Q      And whose signature is that?

13   A      Mr. Hee.

14   Q      And what does it say next to the signature?

15   A      "Okay."

16   Q      Is that his handwriting as well?

17   A      Yes.

18   Q      So is that how the process would work?  He'd hand this to

19   you and he would sign it off and write "Okay," and then you

20   prepare a check?

21   A      Yes.

22   Q      And was there any other approval process?

23   A      No.

24   Q      So were the payments made to MIT always put in the company

25   records as educational expenses?

```
 1   A     No.  At some point it was changed.

 2   Q     Okay.  And what was it changed to?

 3   A     Loan to shareholder.

 4   Q     Now, did you ever see a promissory note for that loan?

 5   A     I did not.

 6   Q     And if I could direct your attention now to 4-820.  And if

 7   we could zoom up on the top part of the check.

 8         Okay.  And this is a check to Lerner Associates, and

 9   at the bottom it has Adrianne Hee's name.  Do you see that?

10   A     Yes.

11   Q     So what was this check for?

12   A     Rent.

13   Q     Rent for Adrianne Hee?

14   A     Yes.

15   Q     Who asked you to prepare this check?

16   A     Mr. Hee.

17   Q     Is that his signature on the check?

18   A     It is.

19   Q     Was this a regular payment that would be made by the

20   company?

21   A     Yes.

22   Q     If you page through this exhibit, there's a number of

23   them.  So this was made every month?

24         Go ahead and take your time to page through there.

25   A     Yes.
```

1    Q     Okay.  And if I could now direct your attention to 4-82P.

2    And if we could zoom up on the check, please.

3              So this is a check it says for RI School of Design.

4    Do you see that?  So what was this check for?

5    A     Adrianne also attended Rhode Island School of Design.

6    Q     And do you know what the Rhode Island School of Design is?

7    A     It's where she went to graduate school.

8    Q     Is it located in Rhode Island?

9    A     I believe so, yes.

10   Q     So who asked you to write this check?

11   A     Mr. Hee.

12   Q     And is that his signature on the check?

13   A     Yes.

14   Q     And if we could turn to 4-82Q.  And if we could zoom up on

15   the check, please.

16              And so this is a check to the WoodenBoat School it

17   says for Adrianne Hee.  What was this check used for?

18   A     She attended a class there.

19   Q     Do you know what class it was?

20   A     I'm not sure.

21   Q     Do you know what people learn about at the WoodenBoat

22   School?

23   A     No.

24   Q     Do you know where it's located?

25   A     Maine.

1   Q    The state of Maine?

2   A    Yes.

3   Q    And so who asked you to write this check?

4   A    Mr. Hee.

5   Q    Okay.  Now, whose signature is on that check?

6   A    Mr. Kihune.

7   Q    Okay.  And was Mr. Kihune also somebody who would sign

8   checks from time to time?

9   A    Yes.

10  Q    So when would you go to Mr. Kihune to sign a check?

11  A    If Mr. Hee wasn't available.

12  Q    Okay.  Now, did Breanne Hee attend a college?

13  A    Yes.

14  Q    What college did she attend?

15  A    Santa Clara University.

16  Q    Okay.  And who paid for that tuition?

17  A    Waimana.

18  Q    And who asked you to have Waimana -- excuse me.  Let me

19  back up for a second.

20           Did you prepare checks to pay that tuition?

21  A    I did.

22  Q    And who asked you to prepare those checks?

23  A    Mr. Hee.

24  Q    Okay.  I'm going to direct your attention to 4-82L.  If we

25  could pull that up on the screen as well.  And if we could turn

1    to the second page.  The number at the bottom, the last three

2    digits are 935.

3              And this is a -- at the top it says Santa Clara

4    University.  Do you recognize this document?

5    A    I do.

6    Q    Okay.  And what was this -- how did you receive this

7    document?

8    A    Mr. Hee gave it to me.

9    Q    And do you recognize the handwriting?  It looks like

10   there's a signature on there.

11   A    Yes.

12   Q    And whose signature is that?

13   A    Mr. Hee.

14   Q    And above it, what does that say?

15   A    "Okay."

16   Q    So there's also a stamp on this document that I think we

17   may have seen elsewhere as well, and it says "Paid."  So how

18   did that stamp appear on this document?

19   A    The check number.

20   Q    In handwriting?

21   A    Yes.

22   Q    Okay.  So that was the check number?

23   A    Yes.

24   Q    And would you stamp this paid after you wrote the check?

25   A    Yes.

1    Q    And after the check was submitted?

2    A    Yes.

3    Q    Okay.  And we've also seen WEI on previous things.  I

4    think you may have said it referred to Waimana.  Do you know --

5    what do those initials stand for exactly?

6    A    Waimana Enterprises, Inc.

7    Q    What did it mean if there was written a check number and

8    WEI?

9    A    That it was a Waimana check.

10   Q    Okay.  If you direct your attention to Exhibit 4-82E.  And

11   this is a student account printout.  And at the top, if we

12   could zoom up to the top part of the page, it says Breanne Hee.

13   Do you recognize this document?

14   A    I don't remember it.

15   Q    Okay.  Let's zoom up to the bottom part of the page.

16   There's some handwriting at the bottom.

17   A    Yes.

18   Q    It says "Payment via AmEx."  Whose handwriting is that?

19   A    Mr. Hee.

20   Q    And so what does it mean when it says "Payment via AmEx"?

21   A    It was a credit card charge.

22   Q    And then is that his signature at the bottom?

23   A    Yes.

24   Q    So do you know what credit card was used for this payment?

25   A    American Express.

1    Q    And whose name was on the American Express card?

2    A    Mr. Hee.

3    Q    And so if it was made by the American express card, would

4    Waimana reimburse Mr. Hee for this payment?

5    A    Yes.

6    Q    Let's turn to 4-82F.  You'll see that this is a rental

7    contract.  At the top Breanne Hee is one of the tenants.  Do

8    you recognize this document?

9    A    No, I don't remember this document.

10   Q    Let's turn to the fourth page of the exhibit, and the last

11   three digits are 817.  Do you see that check?

12   A    Yes.

13   Q    Okay.  And so this is a check directly to Breanne Hee.

14   And under "for" it says "apartment rent."  So what was this

15   check used for?

16   A    Pay apartment rent.

17   Q    And pay whose apartment rent?

18   A    Breanne.

19   Q    It says WEI.  What did that indicate?

20   A    Waimana check.

21   Q    And so if you turn to the page right before that, Bates

22   number ending 816.

23   A    Yes.

24   Q    And so at the top of this page there's an e-mail.  Do you

25   recognize this e-mail?

```
 1   A     Yes.

 2   Q     Okay.  And who is this e-mail from?

 3   A     Mr. Hee.

 4   Q     What's Mr. Hee telling you to do?

 5   A     To pay the rent for September.

 6   Q     And to pay whose rent?

 7   A     Huh?

 8   Q     To pay whose rent?

 9   A     Breanne Hee.

10   Q     And so were these regular payments that were made every

11   month?

12   A     Yes.

13   Q     Do you know if Charlton Hee attended a college?

14   A     Yes.

15   Q     And what college did he attend?

16   A     Santa Clara University.

17   Q     And so if we could turn to Exhibit 4-82L, and we are going

18   to go to the Bates number ending 977.

19         And so did you prepare this check?

20   A     Yes.

21   Q     And who told you to prepare this check?

22   A     Mr. Hee.

23   Q     Okay.  And this is a check to Santa Clara University, and

24   under the memo it says "undergrad tuition."

25   A     Yes.
```

1    Q    Now, do you know if defendant's children were ever put on

2    the payroll of Waimana?

3    A    Yes.

4    Q    Okay.  And when did that happen?

5    A    I don't remember what year.

6    Q    Okay.  Let me see if I can show you an exhibit that might

7    help.

8         So if you could turn to Exhibit 4-118.  And do you

9    recognize this document?

10   A    Yes.  Yes.

11   Q    Okay.  And what is this document?

12   A    That was a new hire checklist.

13   Q    Okay.  And it's for Adrianne Hee?

14   A    Yes.

15   Q    Now, is this for her working over the summer?

16   A    Yes.

17   Q    Okay.  So did you -- so the children -- do you know if all

18   their children worked over the summer for Sandwich Isles?

19   A    Other children?

20   Q    Of Mr. Hee, his other children.

21   A    Yes.

22   Q    And do you know what they did during the summer?

23   A    They worked at the Mililani property.

24   Q    Okay.  And what's the Mililani property?

25   A    It's where the Network Operation Center was, and the

1  children helped maintain the property.

2  Q    Is it a number of acres?  How big is it?

3  A    It's 160 acres.

4  Q    Do you know what they did to help maintain the property?

5  A    They cut grass, weed, paint.

6  Q    And they did that during the summers?

7  A    Yes.

8  Q    Okay.  And if you could look to the page that has Bates

9  number ending 86.  And this is a memo dated February 10th,

10  2006.  Let me know when you find it.

11  A    86?

12  Q    Correct.

13  A    986?

14  Q    No, it should just be -- we're in Exhibit 4-118, and the

15  full Bates would be WEI 02 and then a string of zeroes and 86.

16  And it should be in the third binder.  And again it's Exhibit

17  4-118.

18          It's also on the screen if it's easier for you to see

19  what's on the screen.

20  A    Yeah.

21  Q    So in February of 2006 were Adrianne and Breanne Hee

22  attending college?

23  A    I'm not sure when they started college.

24  Q    Well, if we -- I can probably help you with that.  If we

25  go back to Exhibit 3-103.  And we can pull it up on the screen.

```
 1   And if we could zoom up on the check, please.  That's a check
 2   to --
 3   A     Okay.  '04.
 4   Q     So was Adrianne Hee attending college?
 5   A     Yes.
 6   Q     And then for Breanne Hee, if we turn to Exhibit 4-82L and
 7   the first page of that exhibit -- and if we could zoom up to
 8   the top -- there's a check to the housing office, and it's for
 9   January of 2008.
10   A     '08?
11   Q     I'm sorry.  Hold on.  We're going to actually go to page
12   943.  And do you see that page?
13   A     2006.
14   Q     Okay.  And so again going back to Exhibit 4-118 and page
15   86.  So were both children attending college in February of
16   2006?
17   A     Yes.
18   Q     And it says that they are going to both be paid an annual
19   salary of 24,000.  Do you see that?
20   A     Yes.
21   Q     Who told you to put Adrianne and Breanne Hee on the
22   payroll of Waimana?
23   A     Mr. Hee.
24   Q     And who set the rate of pay?
25   A     Mr. Hee.
```

1   Q     And at this time they were both attending college on the

2   mainland?

3   A     Yes.

4   Q     And so what was the 401(k) program for?

5   A     That was their profit-sharing -- the 401(k) program for

6   the employees.

7   Q     Was that a retirement account?

8   A     Yes.

9   Q     And did they receive any other benefits as part of their

10  payments?

11  A     They would have received the same -- whatever benefits

12  were eligible to the other employees.

13  Q     And so would that be health care?

14  A     Yes.

15  Q     Long-term disability?

16  A     Yes.

17  Q     So the children were able to take advantage of any of the

18  benefits that people working full time at the company received?

19  A     Yes.  But at this time they were probably covered by their

20  father as students.

21  Q     So while the children were attending college during the

22  year, did you ever see them in the offices at Waimana?

23  A     Mostly during the summer.

24  Q     During the school year did you ever see them in the

25  offices?

1   A    On breaks, Christmas.

2   Q    Any other times?

3   A    Not that I recall.

4   Q    Did they have an office assigned at the office?

5   A    No.

6   Q    A desk?

7   A    No.

8   Q    Any work space?

9   A    No.

10  Q    And did you ever see them performing any work during the

11  school year?

12  A    Not that I recall.

13  Q    And when Charlton Hee went to Santa Clara University, was

14  he also put on the payroll of Waimana?

15  A    He was at some point.  I don't remember when.

16  Q    Now, do you know if when Charlton Hee and Breanne Hee were

17  attending Santa Clara, were they attending school there at the

18  same time?

19  A    Yes.

20  Q    And do you know where Charlton Hee lived when he first

21  moved to Santa Clara?

22  A    I believe they lived together.

23  Q    Okay.  And where did they live?

24  A    In Santa Clara.

25  Q    Okay.  Did they live in a house?

1   A    Yes.

2   Q    And who purchased the house that they lived in?

3   A    Waimana.

4   Q    And who decided that Waimana would buy a house in Santa

5   Clara?

6   A    Mr. Hee.

7   Q    And did you talk to him about the purchase of a house?

8   A    I don't understand the question.

9   Q    Did he tell you why he was purchasing the house?

10  A    They were doing business with a company that was located

11  close-by.

12  Q    Who was doing business with the company?

13  A    Waimana.

14  Q    And so what was the house used for by Waimana?

15  A    It was going to be used for Mr. Hee to stay in when he was

16  doing business with this company.

17  Q    And is that what Mr. Hee told you?

18  A    Yes.

19  Q    And how many times did Mr. Hee visit that property?

20  A    Oh, several times a year.

21  Q    So would that be less than five times a year?

22  A    Perhaps.

23  Q    And during that entire period of time, defendant's

24  children lived in the house?

25  A    Yes.

1    Q     Did they pay any rent?

2    A     Not that I know of.

3    Q     And did any other students live in the house?

4    A     I believe there was one -- at least one other.

5    Q     But you're not sure how many?

6    A     No.

7    Q     And did the children live there through the entire time

8    they were living in Santa Clara?

9    A     Mr. Hee's children?  As far as I know.

10   Q     Correct.

11         Do you know how close the house is to Santa Clara

12   University?

13   A     No.

14   Q     So if we could turn to Exhibit 4-100.  And if we turn to

15   the fourth page of that exhibit.  On this one the Bates number

16   is actually on the left-hand side of the page, but the last

17   four digits are 1162.

18         Do you see it?  I'm sorry.

19   A     Yes.

20   Q     And so at the top of this it says "sales price."  Do you

21   see that?

22   A     Yes.

23   Q     Do you know what this document was used for?

24   A     This was for the purchase of the house.

25   Q     The house in Santa Clara?

1    A    Yes.

2    Q    And it says sale price of $1.3 million.  Do you see that?

3    A    Yes.

4    Q    And so were you involved in the purchase of this house?

5    Did you prepare the check or prepare --

6    A    I did.

7    Q    And how did that process work?  Was it a wire transfer?  A

8    check?

9    A    I don't remember.

10   Q    Well, who told you to make the payment?

11   A    Mr. Hee.

12   Q    Did defendant's children always receive the same salary

13   from Waimana?

14   A    Do you mean did they get raises?

15   Q    Correct.

16   A    I believe so.

17   Q    And so the first document we looked at said 24,000.  Do

18   you know how much their salary was increased to?

19   A    I don't remember.

20   Q    Okay.  If we could turn to Exhibit 4-94 and the Bates

21   number at the bottom 755.

22         Do you see that document?

23   A    Yes.

24   Q    Okay.  And it says it's employee totals and for Adrianne

25   Hee, and the total pay is $52,000.  Do you see that?

1  A   Yes.

2  Q   So do you know when her salary was increased to $52,000?

3  A   I don't remember.

4  Q   Do you know if she was -- in 2008 to 2009 do you know if

5  she was working at the offices of Waimana?

6  A   Not that I recall.

7  Q   Did she have an office or desk assignment?

8  A   No.

9  Q   Okay.  So if you could please turn to -- it's the third

10  binder.  It's Exhibit 4-120.  And if we could go to Bates

11  number 354.

12       Now, do you recognize the signature on this document?

13  A   Yes.

14  Q   And whose signature is that?

15  A   Mr. Hee.

16  Q   Okay.  And it says Charlton Hee's salary is increased to

17  $50,000 a year?

18  A   Yes.

19  Q   Do you know when Charlton Hee graduated from college?

20  A   Not offhand.

21  Q   Was it in 2012?

22  A   It's possible.

23  Q   So you said -- I believe earlier we talked about how

24  payments for the tuition for the children was categorized on

25  the records of the company?

1   A   Yes.

2   Q   And you said initially it was as an educational expense?

3   A   Yes.

4   Q   But I think you said that that changed later on?

5   A   Yes.

6   Q   So how was it categorized later on?

7   A   Loan to shareholder.

8   Q   Okay.  And who told you to categorize it that way?

9   A   I think it was our accountant.

10  Q   You think it was?  Do you remember a conversation with the

11  accountant?

12  A   No.  I don't recall the conversation.

13  Q   Would you usually talk to the accountants?

14  A   Yes.

15  Q   Was it possible Mr. Hee told you to change it to loan to

16  shareholder?

17  A   No, I don't believe so.

18  Q   So if you could turn to Exhibit 4-82.

19          Did you find it?

20  A   Yes.

21  Q   Okay.  So could you describe for the jury what this

22  document is.

23  A   I don't know.

24  Q   So how did Waimana keep track of its expenses?

25  A   I entered payments into QuickBooks or Quicken, and then

1    the information was sent to our accountants.

2    Q    So what would you do when you would enter those

3    transactions into QuickBooks?  What information would you put

4    down?

5    A    Oh, the date, the check number, the payee, the amount,

6    what company the expense was being charged to.

7    Q    Would you put down what the type of expense was, like

8    consulting expenses?

9    A    Yes.

10   Q    And so all that information would be put into the

11   QuickBooks records?

12   A    Into QuickBooks.

13   Q    So when you would write a check to, say, Santa Clara

14   University, what would you enter down into QuickBooks?

15   A    Loan to shareholder.

16   Q    And what other information?

17   A    I might put in Breanne Hee's fall tuition.

18   Q    And so was that one of your duties and responsibilities

19   was maintaining those records at the company?

20   A    Yes.

21   Q    And so was that always your duty and responsibility, or

22   was it something that you only did for a period of time?

23   A    For a period of time.  I no longer do that.

24   Q    Okay.  When did you stop doing that?

25   A    2009.

1   Q    So who did --

2   A    Around 2009.

3   Q    So who performed that function after 2009?

4   A    Gayle Honda.

5   Q    And who would tell you what information to put down into

6   the system?

7   A    Well, usually, the information was on the invoice.

8   Q    On like what we looked at with the Diane Doll check

9   request?

10  A    No, that had -- no.  Most of the payables had invoices,

11  and there would be information on the invoice.

12  Q    And you would enter that information into the system?

13  A    Yes.

14  Q    And so when you would mark down a check and it would go

15  loan to shareholder, did you ever enter any payments to the

16  company to pay off that loan?

17  A    No.

18  Q    So the balance just kept growing over time?

19  A    Yes.

20  Q    And do you know how high the balance got before payment

21  was ever made?

22  A    I don't remember.

23  Q    So when did you first become aware that the IRS was

24  initiating an audit into Waimana Enterprises?

25  A    I believe it was 2008.

1   Q    And when did you learn that there was a criminal

2   investigation?

3   A    I don't remember.

4   Q    You don't remember.

5   A    (Nods head.)

6   Q    Don't put this on the screen, but if you could look in

7   your binder to -- it's the third binder.  It's Exhibit 27

8   Alpha.  It should be all the way in the back.

9   A    Which one is it?  27?

10  Q    Correct.  Yeah.  It's all the way in the back of binder

11  number 3.

12  A    Here it is.  Yes.

13  Q    And it's a memorandum of interview dated November 15th,

14  2011?

15  A    Yes.

16  Q    So does that refresh your recollection of when you learned

17  about a criminal investigation?

18  A    Yes.

19  Q    So it was in 2011?

20  A    (Nods head.)

21  Q    Okay.

22  A    Yes.

23         MR. TOSCHER:  Excuse me, Your Honor.  Can I ask

24  counsel for the exhibit number again because I didn't hear it.

25         MR. HARRINGTON:  27A.

1          MR. TOSCHER:  27A.  Thank you.

2    BY MR. HARRINGTON:

3    Q    So let's go back to 4-82.  And I just want to try again

4    here.  Is this something that would be produced from

5    QuickBooks?

6    A    Yes.

7    Q    And so if we go to the page 4 of this exhibit, and if we

8    can zoom up to the bottom third.

9          And do you see an entry, and it's dated January 9th,

10   2013?

11   A    Okay.  Yes.

12   Q    Okay.  And is that when the loan to shareholder had a

13   payment made on it?

14          MR. TOSCHER:  Objection, Your Honor.  I think the

15   record speaks for itself, the document.  The witness has

16   already said she left the accounting function in 2009.

17          THE COURT:  You want to rephrase that or --

18          MR. HARRINGTON:  I'll actually point you to another

19   document.

20          THE COURT:  Okay.

21          MR. HARRINGTON:  If you could look to Exhibit 4-104.

22   It's in the third binder.

23          THE COURT:  Do her binders have numbers?  Mine

24   don't.

25          MR. HARRINGTON:  Oh, they don't?

```
 1            THE COURT:  So when you're referring to the third
 2   binder, I'm not sure -- I mean, I can tell by looking at the
 3   tabs, but is she able to tell what you mean?
 4            MR. HARRINGTON:  I think we forgot to mark them as 1,
 5   2, 3.
 6            THE COURT:  I don't actually have 1, 2, 3.  Okay.
 7            Have you found it?
 8            THE WITNESS:  I have.  Thank you.
 9            THE COURT:  Okay.  Go ahead.
10   BY MR. HARRINGTON:
11   Q    So if we could look at the second page of that exhibit,
12   it's 7484.
13   A    Yes.
14   Q    Now, is that your signature?
15   A    It is.
16   Q    Okay.  And it says it's for a repayment of shareholder
17   loan?
18   A    Yes.
19   Q    And the date is December 31st, 2012?
20   A    Yes.
21   Q    And if you turn to the first page, is that the check that
22   was received?
23   A    Yes.
24   Q    So you received this check and deposited it?
25   A    Yes.
```

1    Q    And so that was -- that payment was made at the end of the

2    year in 2012; is that right?

3    A    Yes.

4              MR. HARRINGTON:   If I could have one moment, Your

5    Honor.

6         (Counsel conferring.)

7    BY MR. HARRINGTON:

8    Q    So earlier you said that your duties changed in 2009?

9    A    Yes.

10   Q    But we just saw a document that was dated 2012.

11   A    Yes.

12   Q    So you were still performing some of these functions in

13   2012?

14   A    Yes.

15   Q    Okay.   Earlier we mentioned an American Express credit

16   card.

17   A    Yes.

18   Q    So did Waimana Enterprises have a credit card in its own

19   name?

20   A    It did not.

21   Q    So whose credit card would Waimana Enterprises use?

22   A    Mr. Hee.

23   Q    And was that always the case?

24   A    Yes.

25   Q    Okay.   I'd like to direct you to 4-22.

```
 1   A     Did you say 22?

 2   Q     Yes.  4-22, please.

 3              THE COURT:  I think it's way at the back of one of

 4   the binders.

 5              THE WITNESS:  Did you find it?

 6              THE CLERK:  Yeah.

 7              MR. HARRINGTON:  Were you able to find it?  Thank

 8   you.  Sorry about all the binders.

 9   Q     So how did Waimana use Mr. Hee's credit card?  How did

10   this process work?

11   A     The credit card was separated into three different

12   sections or accounts.  We used one of the accounts for office

13   expenses and travel.  One of the accounts was for his wife.

14   And he used the first account --

15   Q     And would he --

16   A     -- for company expenses.

17   Q     And so where would the statements come?  Would they be

18   delivered to the office?

19   A     They would be mailed to the office.

20   Q     Okay.  And what would happen once the statement came to

21   the office?

22   A     We would go through it to determine which expenses

23   belonged where.

24   Q     And who would go through it?  Would it be you and --

25   A     Mr. Hee and myself.
```

1    Q    You and Mr. Hee?

2    A    (Nods head.)

3    Q    Was anyone else present?

4    A    No.

5    Q    And so would he tell you which expenses were business

6    expenses?

7    A    Yes.

8    Q    And he'd tell you which expenses were personal expenses?

9    A    Yes.

10   Q    After that process would you prepare a form like Exhibit

11   4-22?

12   A    Yes.

13   Q    Okay.  And if we can zoom up at the top, please.

14             Okay.  And so this was his request for reimbursement?

15   A    Yes.

16   Q    And you prepared this form?

17   A    Yes.

18   Q    But he told you what to put on the form.

19   A    Yes, for his section.

20   Q    And at "Approved," do you recognize that signature?

21   A    Yes.

22   Q    And whose signature is that?

23   A    Mr. Hee.

24   Q    Okay.  I want to take a look at a couple more pages in

25   this exhibit.  If you could go to the Bates number ending 3362.

1    And if we could zoom up on the middle part.

2              Okay.  So whose handwriting is on this document?

3    A    That's mine.

4    Q    So this is what he would tell you to write down on the

5    document?

6    A    (Nods head.)

7    Q    And so, for example, there's a transaction.  It's

8    August 2d, 2009.  And there's the names Al and Ho'o.  And who

9    does that refer to?

10   A    Adrianne Hee.

11   Q    And Mr. Hee?

12   A    Yes.

13   Q    And there's a charge for $185?

14   A    Yes.

15   Q    And so was this paid as a business expense?

16   A    Yes.

17   Q    And did that mean that those were two -- the two

18   individuals who were at that meal?

19   A    Yes.

20   Q    Did Mr. Hee tell you why he was paying that as a business

21   expense?

22   A    It had to do with Paniolo Cable.

23   Q    Is that what he told you?

24   A    Yes.

25   Q    And in 2009 was Adrianne Hee living in Hawai'i?

1    A    No.

2    Q    Was she living on the East Coast?

3    A    Yes.

4    Q    Okay.  And if we could turn to the Bates number ending

5    3352.  And do you recognize this document?  It looks like

6    it's -- it looks like it's a similar statement.  Is this for

7    the same month?

8    A    I don't think so.  Same year.

9    Q    Okay.  Let's take a look again at page 3362.  And if we

10   zoom up at the top, it has a closing date of 8/30/2009.  And

11   then if we could go to page 3352 again.  And it appears it's

12   the same closing date.

13   A    Oh, yes.

14   Q    So would you get multiple statements for the credit card?

15   Do you remember how that worked?

16   A    Not usually, no.  I would pull the statement online -- and

17   I think that's what this is here -- so I could go through the

18   statement with him before we got the written statement from in

19   the mail.

20   Q    So the one with the handwriting is the first one you would

21   go down.

22   A    Yes.

23   Q    And then the one would come in the mail, and it looked

24   like the one on 3352?

25   A    Yes.

1  Q    Okay.  And so if you look at this statement, it looks like

2  there's some typewriting towards the right-hand side.  Did that

3  originally appear on the statement?

4  A    No.

5  Q    And who put that information on?

6  A    I did.

7  Q    And was that also at Mr. Hee's direction?

8  A    Well, I would just type it in because it's easier to read.

9  Q    But the categories that were listed, were those categories

10 directed by Mr. Hee?

11 A    Yes.  Well, the Costco gas -- there were some that were

12 recurring every month, such as gas.

13 Q    But other ones, like, for example, this meal with Mr. Hee

14 and Adrianne Hee, he told you to add that as a business

15 expense?

16 A    Yes.

17 Q    And then if we go back to the first page again -- and,

18 actually, let's go to the second page.  And if we can blow up

19 the bottom part.  And so again we see a "Paid" stamp.  What

20 does that "Paid" stamp indicate?

21 A    That tells you the date that the check was cut, when the

22 payment was made, the check number, the bank, and then the

23 company.

24 Q    So just taking a step back for a second, why would Waimana

25 be writing a check for Mr. Hee's credit card statement?  What

1  would they be paying for?

2  A    The charges that appear on the left-hand side, that's how

3  they all got charged off to the different companies, and

4  Waimana made the payment, did the reimbursement.

5  Q    And then if we could take a look at 4-22A.  And if we

6  could blow up the check.

7          And so is this the check that would be generated?

8  A    Yes.  It would be like that, yes.

9  Q    And this is the check for that monthly statement?

10 A    Yes.

11 Q    Okay.  And it was made out to Mr. Hee personally?

12 A    Yes.

13 Q    So then who would actually pay the balance on the credit

14 card?

15 A    Mr. Hee.

16 Q    Okay.  Were you involved in helping in that process?

17 A    Yes.

18 Q    So just to see if I can get this straight, the statement

19 would come in the mail?

20 A    Yes.

21 Q    He would tell you what was a business expense?

22 A    Yes.

23 Q    The company would write a check for the amount of those

24 business expenses?

25 A    The company would write a check to reimburse him.

 1   Q     For the amount of those expenses?

 2   A     Yes.

 3   Q     He would get this check into his bank account?

 4   A     Yes.

 5   Q     And then you would write a check to pay the statement

 6   balance?

 7   A     Yes.  Yes.

 8   Q     So is that Mr. Hee's signature?

 9   A     Yes.

10   Q     Did Mr. Hee ever request reimbursements for balances on

11   other credit cards?

12   A     There were two that were used for company, primarily two.

13   The American Express is one of them.

14   Q     Let me direct you to 4-59.  If we could zoom up at the

15   top.

16           Now, this is an AmEx Optima card?

17   A     Yes.  Yes.   Three cards.

18   Q     So is this a separate --

19   A     Yeah, there was Centurion Optima.

20   Q     And what was this Optima card used for?

21   A     Primarily, cash withdrawals.

22   Q     And who would be withdrawing cash?

23   A     Mr. Hee.

24   Q     And so if we could zoom up at the bottom part of this

25   page.  And is that Mr. Hee's signature on this approval?

1    A     Yes.

2    Q     And if we -- it says total reimbursement requested $1700.

3    Is that how much he requested?

4    A     On this reimbursement, yes.

5    Q     Did anyone else submit requests like this for cash

6    withdrawals from ATMs?

7    A     Not that I'm aware of.

8    Q     And if we turn to page 16277 of this exhibit.  And this is

9    not the best thing to read, but are these ATM receipts?

10   A     Yes.

11   Q     And are these the only receipts that he would provide?

12   A     Yes.

13   Q     And if we'd go to the first page again, please.  And if we

14   could zoom up on the middle part.

15         Okay.  And it says travel dates January 14th through

16   January 20th.  Do you see that?

17   A     Yes.  Yes.

18   Q     So he was requesting $1700 of cash for a week-long trip?

19   A     Yes.

20   Q     And if we could turn to Exhibit 4-107, please.  I know

21   that your binders are not labeled, but it's in another binder.

22   And it should be one of the first exhibits in that binder.

23         And do you see that document?

24   A     Yes.

25   Q     Okay.  And if you'd turn to the second page, and if we

```
 1   zoom up at the top.  And it says Personal Visa.  Is this the

 2   third credit card you were talking about?

 3   A     No.

 4   Q     It's not the third credit card?

 5   A     No.

 6   Q     So what is this request used for?

 7   A     This was his personal credit card.

 8   Q     Okay.  And is he requesting money from the company to pay

 9   his personal credit card?

10   A     Oh.  Yes.

11   Q     And if we turn -- excuse me.  Before we turn the page, if

12   we look down at the bottom of this page, is that Albert Hee's

13   signature again?

14   A     Yes.

15   Q     And if we turn to 3136 --

16   A     (Nods head.)

17   Q     -- do you recognize this statement?

18   A     Yes.

19   Q     Okay.  Whose handwriting is on the side of this statement?

20   A     Mr. Hee.

21   Q     And if we could turn to the next page to 3137.  Do you see

22   that?

23   A     Yes.

24   Q     And again the handwriting on the side of the page, whose

25   handwriting is that?
```

1   A    Mr. Hee.

2   Q    Okay.  And I see that it says "CC" next to it.  What does

3   "CC" refer to?

4   A    ClearCom.

5   Q    What did it mean when he wrote "CC" on this statement?

6   A    That the charge would be a ClearCom expense.

7   Q    So does that mean ClearCom would be paying for these

8   expenses?

9   A    Yes.

10  Q    Now, I realize this was awhile ago, but do you know what

11  these charges were for, if you could take a look at that page?

12  A    Some of them were for -- looks like book supplies on the

13  second page.

14  Q    Okay.

15  A    I think this is about a trip, transaction fees.

16  Q    Was that an international trip?

17  A    Yes.

18  Q    Okay.  And was that trip in Europe?

19  A    Yes.

20  Q    And do you know who went on that trip?

21  A    I don't know.

22       MR. HARRINGTON:  Your Honor, now is a good time for a

23  break, if you want to, or I can keep going.

24       THE COURT:  Well, they probably want to eat lunch.

25       So we're going to take a lunch break.  And I'll have

1    the trial resume at 1:15; so you should be back in the jury

2    lounge before then so that Miss Fujinaga can come and get you

3    and we can start at 1:15.

4         (Court recessed at 11:56 A.M., until 1:17 P.M.)

5              THE COURT:  We can go on the record now.

6              Juror number 12, sitting right here, front row, far

7    left, Miss Abalos, says that she has a family situation and

8    wants to be excused, I think.  Maybe I can get a report from

9    the courtroom manager.

10              Her daughter just got a job, has a young child, and

11    is having trouble getting child care.  So Miss Abalos is

12    raising the possibility that she be excused from jury duty to

13    provide this child care.  Did I correctly --

14              THE CLERK:  Yes.

15              THE COURT:  -- describe what we know so far?

16              Okay.  It's not clear to me, like, what the

17    daughter's work hours are, you know.  So, for example, if it's

18    just child care in the afternoon and we could accommodate that

19    or not.  Would you like to bring Miss Abalos in and we could

20    ask her, or would you like to send the courtroom manager up?

21              Counsel, do you have any suggestion?  I'm happy to

22    entertain them.

23              MR. TONG:  Your Honor, I think we could use a little

24    more information.  As to how we get it, I leave that to Your

25    Honor's discretion.

 1                    THE COURT:  Yeah, it is my discretion, but I'm
 2      letting you weigh in.
 3                    MR. TONG:  If you want Miss Fujinaga to talk to her
 4      privately because that would be less intrusive, that's fine.
 5      We accept whatever is conveyed to us.  But, you know, I hate to
 6      lose a juror this early.
 7                    THE COURT:  I know.  But, you know, it's because none
 8      of them can bear to miss a minute of this scintillating
 9      evidence; so, you know.
10                    MR. TONG:  I'm glad the record doesn't reflect the
11      tone of voice.
12                    THE COURT:  Okay.  But you know.
13                    MR. TOSCHER:  Are we talking about me or Mr. Tong?
14                    THE COURT:  I think he's talking about me, you know,
15      really.
16                    MR. TONG:  Oh, no, Your Honor.  I was talking about
17      Mr. Toscher.
18                    THE COURT:  No?  Okay.
19                    MR. TOSCHER:  I'm in agreement with Mr. Tong.  The
20      courtroom administrator, that's fine.  It would be less
21      intrusive.
22                    THE COURT:  Yeah, I know it's less intimidating.
23                    So, Miss Fujinaga, go out and use your best, you
24      know, secret-revealing skills to get as much information as you
25      can.

1            She's very good at that, actually.

2            Take her away from the other jurors; so we don't get

3    a raft of other excuses.

4            Okay.  We'll go off the record.

5       (Discussion off the record.)

6       THE COURT:  Okay.  We'll go back on the record.

7            So I have a report from the courtroom manager that

8    Miss Abalos' daughter just got a job at Hickam.  This is

9    something she mentioned when we had voir dire.  And the

10   daughter has to leave home.  They live in Kane'ohe.  Well, I

11   don't know that.  Miss Abalos lives in Kane'ohe.  I don't know

12   where the daughter lives.  The daughter leaves her home at 6:00

13   in the morning and will return home about 4:00 in the

14   afternoon.  So it's our trial day.

15           So how would counsel propose to address this?  If she

16   were excused, then we would move Rochelle Denigro into seat

17   number 12.

18           MR. TONG:  Judge, the only question I have is has the

19   daughter already started the job, or -- I mean, are we talking

20   like at some point within the anticipated completion of the

21   trial -- Toni's nodding.

22           THE COURT:  She started the job and discovered

23   that --

24           MR. TONG:  Okay.

25           THE COURT:  This is difficult.  She has two -- the

1   daughter has two children:  a one-year-old and a two-year-old.

2   So I'm not exactly sure of why trouble developed, but, you

3   know, maybe whoever was watching the two kids couldn't hack it.

4   Just a suggestion as to why we have this sudden problem.

5          MR. TONG:  I know that, if I had the choice of

6   watching a one- and two-year-old child or sitting through this

7   trial --

8          THE COURT:  You would choose this jury; right?

9          MR. TONG:  -- particularly with Mr. Toscher's

10  scintillating cross-examinations.

11         MR. TOSCHER:  Objection.

12         THE COURT:  So what does the government --

13         MR. TONG:  In fairness, I don't know how we can

14  impose on her.  I mean, if that's the case.  I'm just

15  disappointed that the conflict should arise on the first day of

16  testimony.

17         THE COURT:  How about defense counsel?

18         MR. TOSCHER:  I would hate to -- let me check.  I'm

19  looking, Your Honor, through some of my notes.  I don't want to

20  impose -- I'm sorry, Your Honor, I didn't want to sit.

21         I don't want to impose upon her, but can I have just

22  a few minutes to consult?

23         THE COURT:  Yes, you can have a few minutes.  Yes.

24         MR. TOSCHER:  Your Honor, I concur with Mr. Tong that

25  we hate to lose a juror so quick, but we'll be okay with it.

```
 1              THE COURT:  Then Miss Abalos is excused.
 2              I'm going to ask the courtroom manager to notify both
 3    Miss Abalos and the jury pool staff.  Then after that's
 4    occurred, we can bring the jurors up.  And after they've taken
 5    their seats, we'll move Miss Denigro into seat number 12.
 6    Okay?
 7              MR. TOSCHER:  Thank you, Your Honor.
 8              THE COURT:  Technically, I should move everybody up.
 9    You know, alternate number 2 would sit in the seat of alternate
10    number 1.  It's okay to leave them since they're probably
11    comfortable the way they are.
12              MR. TONG:  The seat has probably conformed to them.
13              THE COURT:  It probably has.  They've sunken deeply
14    into them.
15         (Discussion off the record.)
16         (Jury enters.)
17              THE COURT:  Okay.  So I've had to excuse Miss Abalos
18    from this trial because she had a family situation arise.  And
19    that's why we choose alternates.
20              So, Miss Denigro, you are alternate number 1.  Can
21    you pick up your things and sit in this empty chair, which is
22    seat number 12.  You've changed your status here.  And as much
23    as the other alternates would like to join you, I urge the rest
24    of the jurors to avoid family emergencies, at least till this
25    trial is over, please, to the extent you can.  These things are
```

1    not always in your control, but we definitely hope you'll all

2    be here with us.

3           Okay.  Back to counsel.  And if you can bring the

4    witness back in.

5        (Witness enters.)

6           THE COURT:  Okay.  Counsel, whenever you're ready.

7    BY MR. HARRINGTON:

8    Q    Good afternoon, Miss Henderson.  So we were last looking

9    at Exhibit 4-107.  If we could pull that up on the screen,

10   please.

11          And if we could actually turn to the third page of

12   that exhibit.  The number at the bottom is 3135.  And if we

13   could zoom up maybe the top half of that, too, so we can see

14   because I kind of want to understand how this form was filled

15   out.

16          So starting at the top, I see personal CCI and WEI.

17   What do each of those mean?

18   A    The personal were those expenses that Mr. Hee told me were

19   personal.  The ones under CCI would be charged off to ClearCom,

20   and the ones under WEI would be charged off to Waimana.

21   Q    So each of these numbers, did they represent a particular

22   charge on the credit card statement?

23   A    Yes.

24   Q    So if we could turn to page 3137.  And if we could zoom up

25   to about the top third of the page.

1            And so at the bottom here do you see the entry that's

2    3/21 and 3/25 and it says United Air?  Do you see that?  Okay.

3    And so it has Adrianne Hee.  Is that a plane ticket for

4    Miss Hee?

5    A    Looks like a plane ticket.

6    Q    Do you recognize those codes at the bottom?  Looks like

7    BOS, LAX, SJC.  Do you know what those refer to?  Do those

8    refer to airports?

9    A    Yes.

10   Q    Is that a charge for Adrianne Hee to take a plane flight?

11   A    Looks like that, yes.

12   Q    And is that between Boston and San Jose, California; do

13   you know?

14   A    Yes.

15   Q    So was that expense paid for by the business?

16   A    Yes.

17   Q    And do you know that because, if you look at 3135, back to

18   that chart, it appears on that chart under CCI?

19   A    Yes.

20   Q    And we were talking about on page 3137.  I think we saw

21   there were some international charges.  Do you remember that?

22   A    Yes.

23   Q    Those were also paid by the business?

24   A    Yes.

25   Q    Okay.  And if you could turn to Exhibit 4-9.  And that's

1   going to be in a different binder, one of the first tabs on

2   that binder.

3   A     What page is that?

4   Q     It should be Exhibit 4-9 the first page.  It should be --

5   if you look at the front of the binders, I think, is actually

6   where it says what binder number it is on the very front of it.

7   I know it's not on the spine of the binder.

8   A     Okay.

9   Q     Okay.  Thank you.  And so this is another request for

10  reimbursement for the American Express Centurion?

11  A     Yes.

12  Q     And this was submitted by Mr. Hee?

13  A     Yes.

14  Q     And that's his signature at the top?

15  A     Yes.

16  Q     And if you could turn to the last page of that exhibit,

17  it's Bates number 2504.  Do you see that?

18  A     Yes.

19  Q     And whose handwriting is that?

20  A     Mr. Hee.

21  Q     Is the "N" referring to you?

22  A     Yes.

23  Q     It says personal travel, and what does "SB" stand for,

24  "S/B"?

25  A     Should be.

1    Q    Changed -- does it say "charged"?

2    A    "Charged".

3    Q    To "CC inspection"?

4    A    Yes.

5    Q    So what was this note telling you to do?

6    A    He wanted to attach a schedule.

7    Q    He wanted to --

8    A    Accounting to attach a schedule.

9    Q    He wanted -- I'm sorry, I didn't follow that.  What was he

10   asking you to do?

11   A    Need to -- it looks like "schedule attachment."

12   Q    Was he asking you to categorize certain expenses?

13   A    Yes, I think he was.

14   Q    Okay.  And was he asking you to charge those expenses to

15   the business?

16   A    To ClearCom.

17   Q    To ClearCom; so to the business?

18   A    Uh-huh.

19   Q    So the business paid for those expenses?

20   A    Yes.

21   Q    And so this is attached to this credit card statement for

22   that American Express Centurion; is that right?

23   A    Yes.

24   Q    Okay.  And if you could turn to page 2498.  And if we

25   could zoom up on the bottom third of that page, please.  And do

1   you see an entry that's February 21st, 2008, for Hawaiian

2   Airlines?

3   A     Yes.

4   Q     And is that Wendy Hee's name next to "passenger name"?

5   A     Yes.

6   Q     And that's a trip from Honolulu to San Jose?

7   A     Yes.

8   Q     It says Travel CCI Marine France inspection.

9   A     Yes.

10  Q     For $1300?

11  A     Yes.

12  Q     So the business paid for that expense?

13  A     Yes.

14  Q     And who told you to have the business pay for that

15  expense?

16  A     Mr. Hee.

17  Q     Did you ask him why a plane flight to San Jose would be

18  charged as a France inspection?

19  A     They were going to do an inspection in France on the

20  cable.

21  Q     Is that what he told you?

22  A     Yes.

23  Q     Did you ask him why Wendy Hee was going on that trip?

24  A     No.

25  Q     Why didn't you ask him?

1        MR. TOSCHER:  Objection.  Argumentative.

2        THE COURT:  Why is it argumentative?  Wasn't the

3    question Why didn't you ask him?  So --

4        MR. TOSCHER:  Sort of assumes.  Your Honor, I'll

5    stand on my objection.

6        THE COURT:  Okay.  Overruled.  Go ahead.

7    BY MR. HARRINGTON:

8    Q    You want me to repeat the question?

9    A    Yes.

10   Q    So why didn't you ask him?

11   A    Why would I ask him?

12   Q    Is that because you relied on what Mr. Hee told you?

13   A    Yes.

14   Q    Okay.  So if you look at the bottom of this page, there's

15   another ticket, and it's between Switzerland and Paris for

16   Wendy Hee.  Do you see that at the bottom?

17   A    Yes.

18   Q    That's also marked as Marine France inspection.  Do you

19   see that?

20   A    Yes.

21   Q    If we could turn the page to 2499.  And if we could zoom

22   up at the top of that page, please.

23        And so there's additional tickets, and it looks like

24   it's passenger name Breanne Hee.  That's Mr. Hee's daughter;

25   right?

1   A   Yes.

2   Q   And there's also a name Jonathan Kane.  Do you know who

3   Jonathan Kane is?

4   A   Yes.

5   Q   And who's Jonathan Kane?

6   A   Breanne's husband.

7   Q   Were they married at the time?

8   A   I don't believe so.

9   Q   So the business paid for Breanne Hee's ticket and Jonathan

10  Kane's ticket between Switzerland and France?

11  A   That's correct.

12  Q   If we could turn to the next exhibit, which is 410.  It

13  should just be the next exhibit in this binder.

14       And if you could turn to page 2519.  And if we could

15  zoom up to about the top third of the page so we can see it a

16  little better.  And now do you see the expenses?  It says

17  Travel CCI Undersea Expense?  Do you see that?

18  A   Yes.

19  Q   Did Mr. Hee tell you to categorize those expenses?

20  A   Yes.

21  Q   And do you see a charge on 3/24/2008 for the opera?

22  A   Yes.

23  Q   That was also charged to the business?

24  A   Yes.

25  Q   And do you know if anyone else went on this trip besides

1    Wendy Hee, Breanne Hee, and Jonathan Kane?

2    A    I think Adrianne went also.

3    Q    Anybody else?

4    A    I don't know.

5    Q    If we could turn to Exhibit 4-20.  And this is another

6    reimbursement request signed by Al Hee for the American Express

7    Centurion; is that right?

8    A    Yes.

9    Q    If we could turn to the page 19539, please.  If we could

10   zoom up to the center of that page, please.

11             And do you see an entry at 6/4/2009 for Saks Fifth

12   Avenue?

13   A    I do.

14   Q    That's a $1200 sport coat.  Do you see that?

15   A    Yes.

16   Q    And it says "office expense WEI"?

17   A    Yes.

18   Q    So did Mr. Hee tell you to categorize it that way?

19   A    Yes.

20   Q    So the business paid for that?

21   A    Yes.

22   Q    And if we could turn to 4-21, please, 4-21, which should

23   be the next exhibit.  And if we could get to page 2913, please.

24   And if we could zoom up in the center, please.

25             Okay.  Do you see the entry for 7/27/2009 for

 1   Kincaid's?

 2   A    Yes.

 3   Q    Is that a restaurant in Honolulu?

 4   A    It is.

 5   Q    Is that your handwriting?

 6   A    Yes.

 7   Q    Okay.  And it says "family."  What does that refer to?

 8   A    Dinner with his family.

 9   Q    Okay.  And it says WEI?

10   A    Yes.

11   Q    So now just getting a picture -- and I know we talked

12   about this a little bit already, but when you sat down, you

13   said you printed this off of the internet first, and you would

14   sit down in a room with Mr. Hee?

15   A    (Nods head.)

16   Q    And he would tell you -- I'm sorry, you've got to answer

17   verbally.  Sorry.

18   A    I'm sorry?

19   Q    You were nodding your head.  Let me start over again.

20             Okay.  So to kind of get a picture of this, we went

21   over this a little bit before, but you would print this off of

22   the internet; right?

23   A    Yes.

24   Q    Then you would sit down with Mr. Hee?

25   A    Yes.

1   Q    And he would tell you what to write down.

2   A    Yes.

3   Q    And no one else was in the room with you?

4   A    No.

5   Q    Okay.  So -- and again I think we talked about this a

6   little bit before, but, eventually, you would type it in.  And

7   if you would just give me one second.

8             So if you turn to page 19670 and if we could zoom up

9   to the center of the page there, please.  And you see again

10  there's a charge at Kinkaid's in Honolulu.  Do you see that on

11  7/27?

12  A    Yes.

13  Q    And is that the same charge we saw on the printed-out

14  version?

15  A    Yes.

16  Q    Okay.  And on the printed-out version it said "family,"

17  but now we have written "meals and entertainment," and we have

18  a list of names.

19  A    Yes.

20  Q    So could you identify who all those individuals are?

21  A    It's Mr. Hee, Mrs. Hee, Breanne, Charlton.  His children.

22  Q    Okay.  And it says "management and ownership training."

23  Who told you to write that down?

24  A    Mr. Hee.

25  Q    So the business paid for this expense?

1    A     Yes.

2    Q     And if you could go back to Exhibit 4-13.  Thankfully

3    we're still in the same binder.  It's just earlier.

4           And if we could turn to -- this is again another

5    reimbursement request for Albert Hee for the Centurion that he

6    signed; is that right?

7    A     Yes.

8    Q     If we could turn to 18412.  And if we could zoom up on the

9    bottom half of that page, please.

10          Okay.  And you see are these plane tickets on the

11   statement?

12   A     Yes.

13   Q     Okay.  And it looks like it was Charlton Hee and Adrianne

14   Hee; do you see that?

15   A     Yes, uh-huh.

16   Q     And again it's written "Travel WEI."  What did that mean?

17   A     The travel was expensed to Waimana.

18   Q     So the business paid for it?

19   A     Yes.

20   Q     And Mr. Hee told you to have the business pay for it?

21   A     Yes.

22   Q     If we could now turn to Exhibit 4-24.  Again we're in the

23   same binder.  And if we could turn to page 2985, please.  And

24   if we could blow up the top part of that page, please.  And do

25   you see another plane flight for Adrianne Hee?

1   A     Yes.

2   Q     It's written down as an advisory board meeting?

3   A     Yes.

4   Q     It says date of departure is November 26.  Do you see

5   that?

6   A     Yes.

7   Q     Do you know if that was around Thanksgiving that year?

8   A     I don't know.

9   Q     And so this plane flight was paid for by the business?

10  A     Yes.

11  Q     And if we could go to 4-26, please.  And if we could go to

12  3705, please.  And if we could zoom up on the top third of the

13  page, please.

14          And do you see an expense on December 2d, 2009, the

15  second one down, at Wolfgang's Steakhouse in Honolulu?

16  A     Yes.

17  Q     And is that a local restaurant?

18  A     Yes.

19  Q     It lists Al, Wendy, and Breanne.  So those are the people

20  who ate at that meal?

21  A     Yes.

22  Q     It's a charge of $437?

23  A     Yes.

24  Q     That was also billed to the company?

25  A     Yes.

 1   Q     At Mr. Hee's direction?

 2   A     Yes.

 3   Q     Did he explain why there was an advisory board meeting on

 4   that day?

 5   A     No.

 6   Q     Again staying in the same binder, it's the last exhibit in

 7   this binder.  It's 4-42.

 8         And this is another reimbursement request by Albert

 9   Hee, approved by Albert Hee, for the American Express

10   Centurion; is that right?

11   A     Yes.

12   Q     And if we could turn to page 23405.  If we could zoom up

13   on the top half of that page, please.

14         So do you see the charges on June 15th for the Mauna

15   Lani Bay?

16   A     Yes.

17   Q     Okay.  And do you know where that is?

18   A     That's on the Big Island.

19   Q     Is that a resort property?

20   A     Yes.

21   Q     And it says Al, Wendy, Adrianne, Breanne, Charlton?

22   A     Yes.

23   Q     So is that who was at that resort?

24   A     Yes.

25   Q     Okay.  And it says "stockholders' meeting"?

1   A     Yes.

2   Q     I think earlier you said Mr. Hee was the only stockholder

3   for the company, though; right?

4   A     Yes.

5   Q     We have a charge for $5,280?

6   A     Yes.

7   Q     If you could turn to the next page.  And if you zoom up on

8   the top half of the page again, please.

9         There's another charge on 6/27.  Is that at the same

10  resort?

11  A     Oh.  Yes.

12  Q     And that's a $10,000 charge?

13  A     Yes.

14  Q     And it says "Travel WEI"?

15  A     Yes.

16  Q     So the company paid for that expense as well?

17  A     Yes.

18  Q     And Mr. Hee told you have the company pay for it?

19  A     Yes.

20  Q     Do you remember members of Mr. Hee's family traveling to

21  Tahiti in 2010?

22  A     I do.

23  Q     Did the company pay for that trip?

24  A     Yes.

25  Q     Okay.  And who ordered that the company pay for that trip?

1    A    I'm sorry?

2    Q    And who ordered that the company pay for that trip?

3    A    Mr. Hee.

4    Q    If we could take a look at Exhibit 4-33, please.  And if

5    we could go to the last page of that exhibit, please, which is

6    3832.

7          And so this says Attachment 1 to American Centurion

8    statement.  Do you see that?

9    A    Yes.

10   Q    So was this attached to the credit card request

11   reimbursement?

12   A    It was, yes.

13   Q    And whose signature is at the bottom?

14   A    Mr. Hee.

15   Q    And did he write this memo?

16   A    He wrote the purpose of the trip.

17   Q    So he's the one who said the purpose of the trip was to

18   investigate the submarine communications cable system?

19   A    Yes.

20   Q    And the travelers, those are members of his immediate

21   family; is that right?

22   A    Yes.

23   Q    Okay.  This is the first time we've seen a statement like

24   this.  Do you know why he wrote this particular statement?

25   A    No.

1    Q    So just to be clear, it says $7,000 was billed to the

2    ClearCom account.  Do you see that?

3    A    Yes.

4    Q    Does that mean that the company paid for those expenses?

5    A    Yes.  That's what it would mean.

6    Q    And could we please turn to Exhibit 3 -- I'm sorry.  Same

7    exhibit, page 3812.  And if we could zoom up on the bottom half

8    of that page.

9           So this is another version that you printed out from

10   the internet, this statement?

11   A    Yes.

12   Q    And whose handwriting is there?  Is that --

13   A    That's mine.

14   Q    So you see there's a trip, Disney Reservations Orlando,

15   for a little under $5,000.

16   A    Uh-huh.

17   Q    And it says "personal," but then that's crossed out.  Did

18   you cross out "personal"?

19   A    Yes.

20   Q    And why did you do that?

21   A    Because it was a Waimana charge.

22   Q    Okay.  And who told you it was a Waimana charge?

23   A    Mr. Hee.

24   Q    And is that your handwriting or his handwriting when it

25   says "WEI"?

1    A    That's mine.

2    Q    And you'll see we also have on 6/29 just two entries down

3    there's another $2300 charge.  It also says "personal" and

4    "WEI."  Is that the same?

5    A    Yes, yes.

6    Q    So, originally, somebody called it personal but then --

7    I'm sorry?

8    A    Yes.

9    Q    And then it was changed to a business expense?

10   A    Yes.

11   Q    Did you ask Mr. Hee why a trip to DisneyWorld would be a

12   business expense?

13   A    I did not.

14   Q    Did you feel like it was part of your job to ask those

15   kind of questions?

16   A    No.

17   Q    And let's go to the first page of this exhibit.  And if we

18   could zoom up at the top first.  And so this is Attachment 2.

19   And this is a memo to you.  Do you remember this memorandum?

20   A    Vaguely, yes.

21   Q    Okay.  Is that Mr. Hee's signature?

22   A    Yes.

23   Q    Okay.  And again it looks sort of similar as the other one

24   we saw.  It says, Travelers, Adrianne Hee and Breanne Hee.

25   A    Yes.

1   Q    So were those the two who went to DisneyWorld?

2   A    Yes.

3   Q    That was the same month that they went to Tahiti?

4   A    Oh, I don't -- oh.  It's around the same time.

5   Q    And it says the purpose of the trip is to see how federal

6   funds, including -- and it says RUS.  What does "RUS" refer to?

7   A    Rural Utilities Service.

8   Q    It says, "including RUS funds have been used to develop

9   DisneyWorld."  Do you see that?

10  A    Yes.

11  Q    Did he explain to you how this would be a business expense

12  for his company?

13  A    I don't remember.

14  Q    And did Mr. Hee author this document?

15  A    Yes.

16  Q    And do you know why he wrote this particular document?

17  A    No.

18       (Counsel conferring.)

19  BY MR. HARRINGTON:

20  Q    And if we could just go back on the same exhibit back to

21  3812.

22  A    I'm sorry?

23  Q    It's the same exhibit; so it's Exhibit 4-33 and back to

24  the page 3812.  If we could pull that up on the screen and

25  again zoom up at the bottom part.

1          So why was it originally written "personal" for the

2     trip to DisneyWorld?

3     A    I don't remember.

4     Q    If you could turn to -- this is going to be in a separate

5     binder.  And it's Exhibit 4-82M, as in mountain.  And if we

6     could zoom up on the top part of that, please.

7          And so this is a check from Waimana to Mazai

8     (phonetic) Buick.  Do you see that?

9     A    Yes.

10    Q    So what was this check used for?

11    A    To purchase a Buick Enclave.

12    Q    And where was that car located?

13    A    In Santa Clara.

14    Q    Was this the same time that the company bought the house

15    in Santa Clara?

16    A    About the same time, I think.

17    Q    And the same time that Charlton Hee was starting college

18    in Santa Clara?

19    A    Possibly.

20    Q    And did Mr. Hee tell you why Waimana needed to buy a car

21    on the mainland?

22    A    No.

23    Q    I actually have an exhibit that's not in your binder.

24         MR. HARRINGTON:  Your Honor, do you want me to

25    approach?

1           THE COURT:  Do you have copies?

2           MR. HARRINGTON:  I do.

3           THE COURT:  Do you have it?

4           MR. TOSCHER:  I don't know.

5           THE COURT:  Okay.  Give it to the courtroom manager

6    so she can put a number on it so the record is not confused.

7           MR. HARRINGTON:  There is a number on it.

8           THE COURT:  What number is it?

9           MR. HARRINGTON:  It's Exhibit 4 dash -- it just

10   wasn't part of her binder.  It's already one of the exhibits

11   that was moved into evidence, but I just wanted her to have

12   it.

13          THE COURT:  Okay.  4-123.

14          Okay.  Go ahead.

15          MR. HARRINGTON:  I'm sorry.  I need one copy.  Thank

16   you.

17   Q    Okay.  And if we could look at page 2 of this exhibit.

18   And if you want to read it and then look up when you're

19   finished.

20          And so, first, who is Lynn Tamanaha?

21   A    Lynn is one of the accountants we used.

22   Q    And did you write this memo?

23   A    Yes.

24   Q    And if you look at the first paragraph, the second to last

25   sentence, it says the car is intended for Al's use when he's on

1    the mainland.  Do you see that?

2    A    Yes.

3    Q    Is that what Mr. Hee told you to say?

4    A    Yes.

5    Q    So that's what then you told the accountants?

6    A    Yes.

7    Q    And do you know if Mr. Hee's children used that vehicle

8    while they were in Santa Clara?

9    A    I don't know.

10   Q    So if you could turn to Exhibit 4-119.  It's in another

11   binder, I believe.  And we're going to turn to page 246.  It's

12   kind of a thick document, but we're going to go straight to

13   246, please.  And if we could zoom up at the top.

14            And is this an e-mail from Breanne Hee to you?

15   A    Yes.

16   Q    And it says the Buick's registration is already taken care

17   of.  Do you know what she's referring to?

18            THE COURT:  It says it's almost taken care of.  I may

19   have misheard you, but I thought you said "already taken care

20   of," but I'm reading it as "almost taken care of."

21            MR. HARRINGTON:  Agreed.  Agreed.

22   Q    It says the Buick's registration is almost taken care of.

23   Do you see that?

24   A    Well, Liko handled the renewal of the car registration

25   since it was in Santa Clara.

1    Q    And Kupa'a is Charlton Hee?

2    A    Yes.

3              MR. HARRINGTON:  Just one moment, Your Honor.

4         (Counsel conferring.)

5    BY MR. HARRINGTON:

6    Q    And as part of that e-mail there was a copy of a marriage

7    certificate?

8    A    Yes.

9    Q    And do you know why Miss Hee was sending you a copy of a

10   marriage certificate?

11   A    I think she needed it to add her husband to medical

12   coverage.

13             MR. HARRINGTON:  Okay.  I don't have any further

14   questions.  Thank you.

15             THE COURT:  Okay.

16             Mr. Toscher.

17                    CROSS-EXAMINATION

18   BY MR. TOSCHER:

19   Q    Good afternoon, Miss Henderson.

20   A    Good afternoon.

21   Q    Mr. Harrington questioned you on the procedures for

22   reimbursement of the various expenses.  Do you recall who set

23   up those procedures?

24   A    I don't understand your question.

25   Q    In other words, you described a procedure for submitting

1   reimbursements, characterizations between companies.  Was that

2   set up with the assistance of Chinaka & Siu early on?

3   A    When I would sit down with Mr. Hee or --

4   Q    No.  I'm talking about is the paperwork, preparing it with

5   the attachments for the credit card forms, allocating among the

6   companies.  Did you come up with that on your own, or did the

7   accountants assist you in that?

8   A    We came up with that on our own.

9   Q    Now, how long have you been with the company,

10  Miss Henderson?

11  A    Fifteen years.

12  Q    Okay.  The -- and you indicated you went to part-time in

13  2009, or is that more recently?

14  A    2013.

15  Q    2015.

16  A    '13.

17  Q    '13, okay.  The -- now the reimbursement forms, and we're

18  going to put one up on the screen in a second, were those

19  standard forms used throughout the company?

20  A    No.

21  Q    They weren't?

22  A    No.

23  Q    They were just used for Waimana?

24  A    It's just a spreadsheet that because there were so many

25  charges they didn't really fit on the standard reimbursement

1    form.

2    Q    Okay.  Now, the government talked about it there were a

3    number of expenses relating to the children and management

4    training.

5    A    Yes.

6    Q    Were you aware that Mr. Hee was trying to train the

7    children to take over the company?

8    A    I was.

9    Q    And how far back does that go in terms of your

10   understanding of that trying to happen?

11   A    As far back as I can remember.

12   Q    Okay.  Going back to the beginning when you first started

13   being employed there?

14   A    Yeah.  Yeah.

15   Q    And when was that?

16   A    I started with the company in January of 2000.

17   Q    Okay.  And there were discussions regarding training the

18   kids going back all the way to then?

19   A    Yeah.  Yes.

20   Q    And --

21   A    Not formal discussions.

22   Q    Not formal discussions, but it would come up?

23   A    Yes.

24   Q    All the time?

25   A    Often enough.

1   Q    Okay.  And what was the vision for the kids taking -- what
2   was your understanding of Mr. Hee's vision of the kids taking
3   over the company?
4   A    That they would eventually take over the company, yeah.
5   Q    Okay.  Now, can we put up -- no, we don't need to put it
6   up.
7        Now, I'm going to turn to the topic of Diane Doll.
8   A    Okay.
9   Q    You testified she was Mr. Hee's masseuse.
10  A    Yes.
11  Q    Were you aware of physical problems Mr. Hee had that he
12  was trying to treat with massages?
13  A    Yes.
14  Q    Could you describe those for the jury, what your
15  understanding of them were?
16  A    I believe he had back problems and allergies, asthma.
17  Q    What about stress-related problems?
18  A    Oh, yes, stress.
19  Q    You said, "Oh, yes," very quickly.  Was Mr. Hee under a
20  lot of stress in your observation?
21  A    Yes.
22  Q    Why was that?
23  A    Well, there were always -- there was always something
24  going on in the company:  funding (nodding).
25  Q    Okay.  Now, was it common knowledge within the company

```
 1    that Mr. Hee was getting massages?

 2    A    I believe so.  It was not a secret.

 3    Q    It wasn't concealed from anybody.

 4    A    No.

 5    Q    The -- now, going back, the government talked to you about

 6    characterizing that as consulting services.  Do you remember

 7    when the topic came up with the accountants about how to

 8    characterize that, going back to almost 2002 or 2003?

 9    A    Well, I remember getting a letter from the accountants

10    asking what that was --

11    Q    Okay.  They inquired.

12    A    -- or how to code it.

13    Q    And who were the accountants; do you recall?

14    A    That was from Lynn Tamanaha.

15    Q    At what firm was she at?

16    A    Chinaka & Siu.

17    Q    Chinaka & Siu.

18    A    Uh-huh.

19    Q    Do you recall that you responded to them?

20    A    I do.

21    Q    And do you recall you told them it was for health

22    consulting?

23    A    Yes.

24    Q    All right.  Did they do any further inquiry as to what

25    that was about?
```

1    A     Not that I recall.

2    Q     I'm going to turn to another topic.

3          You testified earlier in 2008 when the Santa Clara

4    house was purchased, and I think you said "they," referring to

5    Waimana, were doing business with a company close-by.  Do you

6    recall the name of that company?

7    A     Siometrix.

8    Q     And what do you recall about Siometrix?  Tell the jury

9    what you understand what Siometrix was doing.

10   A     There was a lab base there that was -- my understanding

11   was that they were developing anthrax detection, and Waimana

12   had made an investment in this company.

13   Q     Okay.  And do you know the magnitude of the investment or

14   not?

15   A     I don't remember.

16   Q     Now, I think you said -- forgive me.  You started with the

17   business around 2000?

18   A     Yes.

19   Q     How many people were employed at that time?  And tell us

20   Waimana, Sandwich Isles, and ClearCom because those are the

21   really three main companies; right?

22   A     (Nods head.)

23              THE COURT:  Can you answer out loud.

24              THE WITNESS:  Yes.

25   BY MR. TOSCHER:

1   Q     It's just an estimate.

2   A     There are about 13 people in Sandwich Isles, and I would

3   guess there were five in Waimana, five or six.

4   Q     Okay.  So you're still there.  How large did it grow to,

5   both Waimana, Sandwich Isles, and ClearCom, over the period of

6   time?

7   A     I would say Waimana got to maybe 20 employees, Sandwich

8   Isles as many as 75, 80.

9   Q     And during this period of time --

10          THE COURT:  Hold on.  You asked her about three

11   companies, but she's only answering about --

12          THE WITNESS:  Oh, when I started --

13          MR. TOSCHER:  Thank you, Your Honor.  Thank you.

14          THE WITNESS:  When I started there were no employees

15   in ClearCom.

16   BY MR. TOSCHER:

17   Q     And what about when you -- what about in 2013 when you

18   went part-time?

19   A     Oh --

20   Q     If you don't know, that's fine.

21   A     I don't know.

22   Q     Now, Mr. Harrington asked you about -- I think he showed

23   you a memo to refresh your recollection regarding -- or the IRS

24   audit, and I think you said you recalled the IRS audit started

25   in approximately 2008.

1    A    Yes.

2    Q    Now, were you involved in assisting the company Waimana in

3    providing documents to the IRS --

4    A    Yes.

5    Q    -- during the audit?  Was it very time-consuming for you?

6    A    Yes.

7    Q    Did you produce a lot of documents?

8    A    I'm sorry?

9    Q    Did you and the company produce a lot of documents to the

10   Internal Revenue Service?

11   A    Yes.

12   Q    Did you try to be open and forthright with the Internal

13   Revenue Service throughout that process?

14   A    Yes.

15   Q    I don't think we need to publish this, Miss Henderson, and

16   I'll just ask you some questions.

17         You were asked some questions regarding some charges

18   charged to ClearCom regarding underseas cable; do you recall

19   that?

20   A    Yes.

21   Q    Okay.  Can you describe -- do you understand how the

22   underseas cable fits in with the business here?

23   A    Yes.

24   Q    Will you tell that to the jury what your understanding is.

25   A    Well, the company laid an undersea cable to connect all of

1    the islands.

2    Q    Okay.  Now, there was also a mention of a trip to France.

3    A    Yes.

4    Q    And it also related to the underseas cable.  Do you know

5    anything about that trip, what happened there?

6    A    What I recall is they went to look at the ship that was

7    going to lay the cable.

8    Q    Okay.  Do you know if they went and actually inspected the

9    factory in France?

10   A    I don't know.

11   Q    Miss Henderson, do you know if the children, when they

12   were in Santa Clara, had their own car?

13   A    I believe Liko did.

14   Q    Okay.  Now, Miss Henderson, you were the one who was

15   primarily involved in providing information to the accountants

16   Chinaka & Siu; correct?

17   A    Yes.

18   Q    And you were dealing with Lynn Tamanaha?

19   A    Yes.

20   Q    And Gayle Yasaka?

21   A    Lynn Yasaka.

22   Q    I apologize.  Okay.  Trying to get it right.

23        Now, you would send them information from the

24   companies?  From Waimana?

25   A    Yes.

1    Q    And, frequently, they would send back requests for

2    additional information?

3    A    Yes.

4    Q    And you responded to all those requests; isn't that

5    correct?

6    A    Tried to.

7    Q    And throughout all the times you were doing that you were

8    always trying to provide the accountants all the information

9    they had asked for; is that correct?

10   A    Yes.

11        MR. TOSCHER:  Your Honor, I'm just about done here.

12   Q    Miss Henderson, do you ever recall telling Lynn Tamanaha

13   that Diane Doll was a masseuse?

14   A    Yes.

15   Q    Do you recall when --

16   A    I don't.

17   Q    -- you told her?  You don't.

18   A    No (shakes head).

19   Q    But you feel very confident that you informed

20   Miss Tamanaha that Miss Doll was a masseuse.

21   A    Yes.  I recall we had a phone conversation.

22   Q    Now, I think the testimony before was that Mr. Hee was the

23   sole stockholder of Waimana; is that correct?

24   A    Yes.

25   Q    Are you aware of whether there have been any transfers of

1    the ownership to the children?

2    A    I believe there have been, yes.

3            MR. TOSCHER:  I have no further questions, Your

4    Honor.

5            THE COURT:  Okay.  Mr. Harrington, do you have

6    re-direct?

7            MR. HARRINGTON:  I do.

8                    RE-DIRECT EXAMINATION

9    BY MR. HARRINGTON:

10   Q    Just briefly.  You mentioned that Mr. Toscher asked you

11   about a transfer of ownership of the company.  Do you know when

12   that took place?

13   A    I don't know.

14   Q    Do you know if Mr. Hee was the 100 percent shareholder in

15   2011?

16   A    I don't know.

17   Q    You were asked a few questions about Diane Doll and

18   conversations you had with some of the accountants, but you

19   couldn't remember when you had that conversation; is that

20   right?

21   A    No.  No.

22   Q    Do you know if it was after the IRS audit was initiated?

23   A    I'm not sure.

24   Q    And you were asked about inspection of an undersea cable

25   and a ship in Europe?

1   A     Yes.

2   Q     Do you know if that ship was located in Switzerland?

3   A     I don't think it was.

4   Q     And that's where part of that trip was.  It was in

5   Switzerland, wasn't it?

6   A     I think there's some expenses from Switzerland, yes.

7   Q     You were also asked a little bit about what you provided

8   to the accountants, and we saw all these credit card

9   statements.  Would you send those credit card statements to the

10  accountants every month?

11  A     They would get at least the reimbursement sheet for all

12  the reimbursements from other employees as well.  I can't

13  remember if the backup -- the actual statement was sent on a

14  routine basis, but it would have been provided had they asked

15  for it.

16  Q     And the statement what we're talking about is where it

17  actually has the identity of the different charges?

18  A     Correct.

19  Q     Okay.  And you're not sure whether the accountants ever

20  received those statements?

21  A     Not on a routine basis.

22  Q     And you were asked a little bit about Sandwich Isles.  Was

23  Judy Ushio the first employee at Sandwich Isles?

24  A     I don't know.

25  Q     But she was the one that Mr. Hee said that he paid for her

 1   educational expenses; right?

 2   A    Correct.

 3           MR. HARRINGTON:  Thank you.  No further questions.

 4           THE COURT:  Re-cross.

 5           MR. TOSCHER:  Nothing further, Your Honor.

 6           THE COURT:  Okay.  Then the witness can step down and

 7   leave the courtroom.  You're excused.

 8       (Witness excused.)

 9           THE COURT:  And who's the government's next witness?

10           MR. TONG:  Government calls Judith Ushio.

11       (Witness photographed.)

12           THE CLERK:  Please raise your right hand.

13       (Witness sworn.)

14           THE CLERK:  Thank you.  Please be seated.

15           Please state your name and spell your last name.

16           THE WITNESS:  Judith Smith Ushio, U-s-h-i-o.

17                       DIRECT EXAMINATION

18   BY MR. TONG:

19   Q    Good afternoon.

20   A    Hi.

21   Q    Could you please tell us where you live.

22   A    My address is 41 --

23           THE COURT:  Oh, no, wait, wait, wait.

24           MR. TONG:  I'm sorry.  Bad question.

25   Q    What city do you live in?

1    A    Colorado Springs, Colorado.

2    Q    And what do you do for a living?

3    A    I'm the midwest division manager at GVNW Consulting.

4    Q    Could you repeat the name of the company again, please.

5    A    GVNW Consulting.

6    Q    And what is the nature of that company's business?

7    A    It's a consulting company with rural telephone companies

8    in financial regulatory planning type of things for rural

9    telephone companies throughout the country.

10   Q    How long have you been employed by that company?

11   A    Since January 1st, 2014.

12   Q    What was your employment immediately before that?

13   A    Sandwich Isles Communications.

14   Q    Where is that company located?

15   A    In Honolulu, Hawai'i.

16   Q    And when were you an employee of Sandwich Isles

17   Communications?

18   A    I started in October 1997, and my last day was

19   December 31st, 2013.

20   Q    So I'm not an accountant, but my math says that's about 13

21   years?  16 years?

22   A    A little more than that.  Yeah, that sounds better.

23   Q    And tell us the nature of the business of Sandwich Isles

24   Communications.

25   A    It's to provide telephone service to people on Hawaiian

1    Homelands.

2    Q    Who was the owner of Sandwich Isles Communications?

3    A    Waimana Enterprises.

4    Q    Who was the owner of Waimana Enterprises?

5    A    Albert Hee.

6    Q    And during your employ at Sandwich Isles Communications

7    did you meet with Mr. Hee?

8    A    Yes, I did.

9    Q    If you were to see him again, would you recognize him?

10   A    Yes, I would.

11   Q    Do you see him in court today?

12   A    I do.

13   Q    Could you kindly identify him by where he's sitting and

14   what he's wearing.

15   A    He's standings now in a tan suit and a salmon-colored

16   shirt.

17         MR. TONG:  May the record reflect the identification

18   of the defendant.

19         THE COURT:  It so reflects.

20   BY MR. TONG:

21   Q    And, Miss Ushio, where were SIC's offices located?

22   A    When I left, they were in Mililani.

23   Q    And where were they when you began working for SIC?

24   A    In Pauahi Tower here in town in Honolulu.

25   Q    Is Pauahi Tower on Bishop Street?

 1   A     Yes.

 2   Q     Did SIC share offices with anyone else?

 3   A     In the beginning there was an attorney's firm that had

 4   part of the floor, and then Sandwich Isles, being a part of

 5   Waimana, Waimana was also there and other affiliated companies.

 6   Q     What floor were you folks located on?

 7   A     We were on the 27th floor.

 8   Q     So I'm trying to get a visual picture of this.  You'd go

 9   up to the 27th floor.  You'd get out.  Would there be a door

10   saying "Waimana" or "Sandwich Isles"?

11   A     No.  When you came out the elevator, you went right --

12   there was a reception desk, and on the desk there were logos,

13   logos of the companies.

14   Q     Directing you in a particular direction, I guess.

15   A     Yeah, it was just kind of all together, I guess.

16   Q     Were the offices of Sandwich Isles next to those of

17   Waimana?

18   A     Yes.

19   Q     Were there doors between them?  I mean, were they

20   segregated, or is it contiguous office space?

21   A     Continuous office.

22   Q     And when you joined Sandwich Isles Communications, how

23   many employees did it have?

24   A     I believe I was the first official.  There were other

25   people that had been working with Waimana and doing some

1    things, but I think I was the first official employee.

2    Q    Could you give the jury some idea of the different

3    positions that you had with Sandwich Isles.

4    A    Yes.  When I started with the company, the first thing is

5    to help set up the back office, basically, the accounting

6    system, Human Resources.  When we got customers, I set up the

7    customer service department.  Came to contract administration

8    officers, we started contracting with different contractors,

9    became the controller, then took over the construction

10   engineering to build up the fiber optic network throughout the

11   state.  Once that was well underway, became the operations

12   manager and managed the daily operations of the company.

13        When I left my title was director of corporate

14   services, which was -- mainly dealt with interdepartmental type

15   of projects.  When different people from different parts of the

16   company worked together on projects, then I'd be involved.

17   Q    So from the way you just described it, would I be correct

18   in saying you rose through the ranks to positions of greater

19   authority?

20   A    I suppose, yes, that would be accurate.

21   Q    If we focus on your last two positions, operations manager

22   and director of corporate services, who did you report to at

23   SIC?

24   A    I reported to Bob -- Robert Kihune, reported directly to

25   him.  In those last two -- in those last two positions I would

1    have, yeah.

2    Q    And what was Mr. Kihune's position within Sandwich Isles

3    Communications?

4    A    He was the Chief Executive Officer.

5    Q    And who did he report to, if you know?

6    A    I suppose the Board of Sandwich Isles.

7    Q    Okay.  And who was on the Board of Sandwich Isles?

8    A    I believe it was Albert Hee and Robert Kihune to the best

9    of my knowledge.

10    Q    And when you left SIC, about how many employees were there

11    at the company?

12    A    I'm really not sure.  I think somewhere maybe 60.

13    Q    Now, let me shift gears to day-to-day operations.  Were

14    there times when you incurred business expenses on behalf of

15    Sandwich Isles?

16    A    Yes, generally, if I were to travel.

17    Q    And if you traveled on company business, would you be

18    reimbursed?

19    A    Yes.

20    Q    Could you give us a sense of the process that was in place

21    for reimbursement of business charges.

22    A    Yes.  We had a policy that we followed for that purpose in

23    the company.  Basically, we would have to -- we had set per

24    diems that we could get that did not need to be documented with

25    receipts.  Anything else would have to have receipts.

1             We'd fill out a form, submit it to accounting.

2    Accounting would have to get the approvals of our immediate

3    supervisors, managers.  Depending on where one was in the

4    company and how many levels there were, everyone would need to

5    approve that expense, any expense in the company, really, and

6    until it was finally approved by the CFO of the company.

7    Checks would be cut, and then Mr. Kihune would sign the

8    checks.

9    Q    Okay.  And Mr. Kihune was the CEO of the company at the

10   time.

11   A    Yes.

12   Q    So would it be a fair statement that in order to get

13   reimbursed you would have to fill out forms, provide receipts,

14   and give some justification of what company business you were

15   on?

16   A    That's correct.

17   Q    Were there ever times when you combined business and

18   personal expenses?

19   A    If that ever happened it would be like say you had a

20   rental car and say you stayed an extra couple days or something

21   like that.  Anytime anything like that would happen, then you'd

22   still have to note on the expense what the legitimate business

23   part was and then cut a personal check to the company to pay

24   for the personal.

25   Q    So you would have to allocate for your accounting

1  department what portion was business and what portion was

2  personal.

3  A     That's correct.

4  Q     And if it were personal, you would have to write your own

5  check reimbursing the company.

6  A     Yes.

7  Q     By the way, do you know who Mr. Kihune would have approve

8  his expenses?

9  A     I don't know.

10  Q     Now, I think I neglected to ask your educational

11  background.  Could you tell us where you went to college?

12  A     I went to Brigham Young University when I was much

13  younger, and then I just graduated from the University of

14  Phoenix in 1999.

15  Q     Respecting your comment and not asking the year, how many

16  years of college did you have under your belt when you joined

17  SIC?

18  A     I completed two years at BYU, and I had just started at

19  Phoenix a couple months before I started at SIC.

20  Q     So I gather you attended the University of Phoenix while

21  you were working full time at SIC?

22  A     Yes.  It was an evening type of school.

23  Q     You said you ultimately got your degree; is that correct?

24  A     Yes.

25  Q     What was the field of study?

1    A    Business management.

2    Q    And how did you pay the expenses?

3    A    Took out a student loan and still paying on it.

4    Q    You're still paying on your student loan.

5    A    Yes.

6    Q    Did there ever come a time when you talked to the

7    Defendant Albert Hee about the possibility of the company

8    paying for your educational expenses?

9    A    Yes, in a light-hearted banter type of way.  I knew people

10   that had had, including my daughter, who had their education

11   paid for by their company, and so I would say things like

12   wouldn't it be nice if this company would pay for my education,

13   my college expenses.  And he'd kind of laugh and say, "Yes,

14   wouldn't that be nice."  It was always just sort of a banter

15   about it.  It was never -- at least to my recollection never a

16   serious type of request.  I never submitted anything to ask him

17   to reimburse me.  It never got to that point.  It was much

18   lighter than that.

19   Q    But let's talk about your daughter first.  When her

20   company paid for her educational expenses, that was not

21   Sandwich Isles Communications.

22   A    That's correct, yes.

23   Q    And you had this banter with the defendant, Mr. Hee,

24   concerning wouldn't it be nice if the company were to pay for

25   your tuition; correct?

1    A    Yes.

2    Q    And how did he respond to that?

3    A    And he -- you know, it was just very light banter, "Yes,

4    wouldn't that be nice," type of thing.

5    Q    Did he offer to pay?

6    A    No.

7    Q    Did he pay anything toward your educational expenses?

8    A    No.

9    Q    Now, I believe you said that at one point you worked in

10   the Human Resources department of Sandwich Isles

11   Communications; is that correct?

12   A    Very early days.

13   Q    Did you become familiar, both from that position and your

14   later employment, with corporate procedures and personnel

15   benefits, employee benefits?

16   A    Yes.

17   Q    Let's talk about massages for a minute.  Did Sandwich

18   Isles Communications or Waimana have any policy in place where

19   the company would pay for massages on behalf of its employees?

20   A    I don't recollect a policy to that effect.

21   Q    Do you recall employees getting free massages at the

22   company's expense?

23   A    I know that from time to time people would come in and

24   time was offered to -- that employees could take advantage of

25   getting massages.  Usually, they were short-term:  15 minutes

1   or 30 minutes.  I don't remember if there was a charge for it.

2   I just don't remember that.  I didn't pay that much attention

3   to it because I wasn't interested.  I never took advantage of

4   that.

5           I mean, a long time ago, I think probably around year

6   2000 or something, someone came in the office and we were

7   offered massages.  I did have one then.  That was, yeah, a long

8   time ago.

9           But I do know from time to time people come in, but

10  whether or not it was free or not, I don't remember.

11  Q    And you never took advantage of it, other than the way you

12  just described.

13  A    That's correct.

14          MR. TONG:  Thank you.  I have nothing further.

15          MR. TOSCHER:  One minute, Your Honor.  Excuse me.

16          No questions, Your Honor.

17          THE COURT:  Okay.  Then the witness is excused.  You

18  may step down and leave the courtroom.

19      (Witness excused.)

20          THE COURT:  And why don't we start your next witness.

21          MR. TONG:  Government calls Diane Doll.

22      (Witness photographed.)

23          THE CLERK:  Please stand and raise your right hand.

24  Please raise your right hand.

25      (Witness sworn.)

1          THE CLERK:  Thank you.  Please be seated.

2          Please state your name and spell your last name.

3          THE WITNESS:  Okay.  My name is Diane.  Last name is

4    Doll, D-o-l-l.

5                        DIRECT EXAMINATION

6    BY MR. TONG:

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    Could you please tell us your occupation.

10   A    I am a massage therapist.

11   Q    Are you licensed in any state?

12   A    I am.  In the State of Hawai'i.

13   Q    How long have you been licensed?

14   A    Thirty years.

15   Q    Could you tell us what a massage therapist does.

16   A    A massage therapist works on, you know, the anatomy of the

17   body, particularly muscles, mostly just muscles and tendons.

18   Q    Does a massage therapist diagnose illnesses?

19   A    No, they do not.

20   Q    Does a massage therapist prescribe medications?

21   A    No, they do not.

22   Q    And in the course of your practice have you come to know

23   someone named Albert Hee?

24   A    Yes.

25   Q    If you were to see Mr. Hee again, would you recognize him?

1    A    I would.

2    Q    Do you see him in court today?

3    A    I do.

4    Q    Could you identify him by where he's seated and what he's

5    wearing.

6    A    Behind you at a desk.

7         MR. TONG:  May the record reflect the identification

8    of the defendant.

9         THE COURT:  It so reflects.

10   BY MR. TONG:

11   Q    And, Miss Doll, how long have you known the Defendant

12   Albert Hee?

13   A    Oh, I'd say about 14, 15 years.

14   Q    How did you first meet him?

15   A    Via massage, the club that I worked in.

16   Q    And what club was that at the time?

17   A    It was the Clark Hatch Fitness Center.

18   Q    Is that here in downtown Honolulu?

19   A    Yes, it is.  At the Topa Financial Center.

20   Q    How is it that you met him at the Clark Hatch Fitness

21   Center?

22   A    I think someone referred him to come and see me.

23   Q    What happened after that first meeting?

24   A    I worked on him and continued -- he continued to come to

25   see me.

1    Q    Okay.  Let's focus on the time frame 2002 through 2012.

2    A    Yes.

3    Q    Do you have that in mind?

4    A    Yes.

5    Q    That's about a 10-year period of time.

6    A    Yes.

7    Q    Did you have regular contact with Mr. Hee?

8    A    Only when he came to get a massage.

9    Q    And how often did he come to get a massage?

10   A    Twice a week.

11   Q    And where did the massages take place?

12   A    At my office at the Kaka Professional Center.

13   Q    Okay.  And what, you rented a space over there?

14   A    No, I rent a space there, and he would -- yes, and he

15   would come to see me at the Kaka Professional Center.

16   Q    How long did each massage last?

17   A    About two hours.

18   Q    And tell the jury what happens during a two-hour massage.

19   Describe a typical session.

20   A    Okay.  A typical session is that, you know, the client

21   comes in; they lie down on the table.  And also I ask them, you

22   know, where they need the specific work done, like what muscles

23   are sore, where does he need the most focus.  Then I go from

24   there.  So I start, you know, massaging.

25            And, typically, I start people facedown because most

1    the time people's backs need it the most, the backside.  And

2    then, you know, halfway through, like I said, an hour goes by,

3    I have them turn over so they're face up, and then I work on

4    the front part of the body with the legs, the feet, typically,

5    shoulders, head, neck.

6    Q    And I see you sort of making motions with your hands.  I

7    gather you do the majority of the massaging with your hands?

8    A    Yes, typically.  Hands, elbows, mostly.  It's all about

9    leverage, you know, so you just really have to know how to use

10   that leverage.  So, yeah, hands.  That and elbows are the main

11   tools.

12   Q    And with regard to the defendant Mr. Hee, did you have

13   much conversation with him during your sessions?

14   A    No, I did not.  He mostly would fall asleep.  I mean,

15   massage is very relaxing, and he would just fall asleep.

16   Q    Now, how much --

17   A    For the most part.

18   Q    Did you charge a fee for these services?

19   A    Yes, I did.

20   Q    How much was your fee?

21   A    Oh, I think I charged 60, 65, I think it was.  It's been a

22   long time, but that would -- that was it.

23   Q    60, $65.

24   A    No.  Actually, I'm trying to remember now how that went

25   because, you know, he paid me by check.  So I was charging at

1    that time $60 for the hour; so for two hours, 120.

2    Q    And how would you normally be paid?

3    A    By check.

4    Q    Did you give him any kind of invoice?

5    A    No, I did not.

6    Q    How often would you receive a check from him?

7    A    Bimonthly.

8    Q    Okay.

9         MR. TONG:  Your Honor, may I approach the witness?

10        THE COURT:  You're giving her a binder?  You have

11   this --

12        MR. TOSCHER:  Yes, Your Honor.

13   BY MR. TONG:

14   Q    Miss Doll, do you have a binder in front of you of

15   documents?

16   A    Yes, I do.

17   Q    All right.  Could you kindly take a look at the documents

18   that have been marked as Exhibits 3-2A --

19   A    Okay.

20   Q    -- through 3-2II.

21   A    Okay.  I'm sorry, sir, excuse me, did you say 2II?

22   Q    Yes.  3-2II.

23   A    I have E, F, H -- I'm sorry, I'm looking at 3-2I?

24   Q    Yes.

25   A    Okay.

 1   Q    Do you recognize those documents?

 2   A    The checks, I'm sorry?

 3   Q    Those are checks; is that correct?

 4   A    Yes.

 5   Q    Are they checks made payable to you?

 6   A    Yes.

 7   Q    Okay.  Let's take a look at one of those checks.  If we

 8   could please see Exhibit 3-2G, as in golf.

 9          And, Miss Doll, you can look down in your binder, or

10   you can look on the screen to your right, whichever is easier

11   for you.

12   A    This is better.

13   Q    If we can focus in on the top of the check, please.

14   A    Okay.  That's better.

15   Q    Can you see that more easily?

16   A    Yes.  Thank you.

17   Q    This is a check drawn on an account of Waimana Enterprises

18   made payable to Diane Doll for $2,000; is that correct?

19   A    Yes.

20   Q    What was that check for?

21   A    For massage services.

22   Q    And would that be true of all of the checks that we --

23   I've just had you look at?

24   A    Yes.

25   Q    And in the memo portion of this check it says WEI.  Do you

1    have any idea what that referred to?

2    A    Waimana Enterprise.

3    Q    Okay.  And how would you receive checks of this sort?

4    A    Oh, when he would come to, you know, get the massage and

5    the two months had been up, he'd give me a new check.

6    Q    When you say "he," who are you referring to?

7    A    Albert Hee.

8    Q    So he would come to your office, and when there was a

9    massage, he would give you a check periodically; is that

10   correct?

11   A    Yes.

12   Q    Did you provide any services to Mr. Hee other than the

13   personal massages?

14   A    No.

15   Q    Did you provide any services to any other Waimana

16   Enterprises employees?

17   A    No, I did not.

18   Q    Did you provide any massage services or services of any

19   kind to any of the defendant's companies?

20   A    No, I did not.

21   Q    Now, Miss Doll -- Miss Doll, let me ask you, how did you

22   keep track of the amount of the payments that were being made

23   to you by Waimana Enterprises?

24   A    Oh, well, you know, I would always write them down and --

25   but mostly because the checks -- everything was so consistent,

1    I mean, you know, after a while I just didn't -- I didn't

2    always write it down in my appointment book because it was a

3    steady thing twice a week for all that time.  But, typically, I

4    would write it down in my notes.

5    Q    Do you recall receiving 1099 Forms?

6    A    Yes, I do.

7    Q    And did you ever have a discussion with the defendant

8    about your receiving 1099 Forms?

9    A    No.

10   Q    Did he tell you he was going to 1099 you?

11   A    Yes, he did.

12   Q    And did you understand what that meant?

13   A    I did.

14   Q    What was your understanding of what that meant?

15   A    My understanding that it would be, you know, recorded, you

16   know, basically, payments for IRS, you know, ultimately.

17   Ultimately.

18   Q    And do you recall Mr. Hee telling you he would 1099 you

19   before you first received a 1099 Form?

20   A    Yes.

21   Q    Now, if you could -- if you could, Miss Doll, could you

22   turn to your binder and look at Government's Exhibit 11-51.

23   A    11-51?

24   Q    Yes.

25   A    All right.  Okay.

1    Q    Do you recognize those documents?

2    A    I do.

3    Q    And what are they?

4    A    These are 1099s.

5    Q    I think you may have to keep your voice up a little bit.

6    I see the court reporter sort of straining.

7    A    Oh, I'm sorry.  Sorry.  My apologies.

8              These are 1099s.

9    Q    And are those 1099 Forms that you received from Waimana

10   Enterprises?

11   A    Yes.

12   Q    For the massage services that you provided to the

13   defendant.

14   A    Yes.

15             MR. TONG:  We would ask that Exhibit 11-51 be

16   received in evidence.

17             MR. TOSCHER:  No objection, Your Honor.

18             THE COURT:  All right.  11-51 is received.

19   BY MR. TONG:

20   Q    And if we can just turn to page 2 of that document, which

21   has Bates number 1165 in the lower right-hand corner.

22   A    Okay.

23   Q    We have it on the screen, Miss Doll, if that might help.

24   A    Yes.  Thank you.

25   Q    Is this a representative sample of the type of documents

1    that appear in Government's Exhibit 11-51?

2    A    Yes, it is.

3    Q    And how often would you receive a 1099 Form of this sort

4    from Waimana Enterprises?

5    A    Oh, at the end of the year.

6    Q    And it shows the payor in the upper left-hand corner;

7    correct?

8    A    Yes.

9    Q    And your name as the recipient; correct?

10   A    Yes.

11   Q    And how would you use documents of this sort?

12   A    I'm sorry, pardon me?

13   Q    How would you use documents of this sort?

14   A    You know, I (shrugging).

15   Q    Did you use them for your personal tax returns?

16   A    Oh, yes, absolutely.  I'm sorry.

17   Q    And there's a box 7 here that sets forth an amount of

18   compensation?

19   A    Yes.

20   Q    What did that number represent?

21   A    What I was getting paid.

22   Q    Now, were you familiar with the nature of Waimana's

23   business?

24   A    Not really specifically, no.

25   Q    And during your massages did you attempt to give Mr. Hee

1   any advice on how to run his business?

2   A    No, I did not.

3   Q    Or any business consulting services?

4   A    No, I did not.

5   Q    Or any information about his competitors?

6   A    No.

7          MR. TONG:  Thank you.  I have nothing further.

8                    CROSS-EXAMINATION

9   BY MR. TOSCHER:

10  Q    Good afternoon, Miss Doll.

11  A    Good afternoon.

12  Q    Could you describe for the jury the type of ailments or

13  conditions you were treating Mr. Hee for.

14  A    Basically, it was, you know, stress.

15  Q    And how does stress -- do you know what caused the stress?

16  A    Oh, well, yes, I think he -- as far as I know, he's very

17  busy, and that, typically, you know, ends up being stressful on

18  people's bodies.  And, yeah, I just remember working -- he was,

19  like I said, always would go to sleep for quite a while because

20  of the stress.

21  Q    Could you talk up just a little more into the microphone.

22  A    Sorry.

23  Q    That's okay.

24  A    Yes.  I would work on, you know, basically, you know, his

25  whole body, muscles for the back.  Mostly on the backside just

 1   because that stress, you know, your shoulders -- head, neck,

 2   shoulders get really stressed out when you are, you know, a

 3   very busy individual and have a lot of stress in your life.

 4   Q    Do you recall any other ailments other than stress or any

 5   other manifestations of the stress that you were treating with

 6   over the years?

 7   A    Well, I know Al had a heart attack.

 8   Q    Okay.  And tell me what massage therapy -- how would that

 9   fit in with that condition?

10   A    Oh, well, yeah, I mean, there again the whole purpose for

11   massage is for stress reduction, and that's exactly what it

12   does.

13   Q    In the course of your business -- well, let me go back.

14   And you mentioned before on direct that you're certified by the

15   State of Hawai'i?

16   A    Yes.

17   Q    Tell us a little bit about the type of training you had to

18   do or that you've done regarding massage therapy.

19   A    Okay.  Yes.  I -- prior to moving to Hawai'i I became a

20   massage therapist in Chicago at the Chicago School of Massage

21   Therapy, which at that time and still is the leading massage

22   therapy school in the country.  And so that was a program that

23   was about a year and a half long, and when I graduated I moved

24   over here.

25   Q    Okay.  Any other courses, postgraduate, online, you can

1    tell us about?

2    A    Yeah, I did a lot of different extracurricular courses for

3    mostly injuries, any type of thing that was going to help to --

4    there again, anybody who came in with a, you know, tweak or a

5    strain or whatever, you were able to, you know, figure it out

6    and work on those areas and help them get better.

7    Q    Okay.  In your experience over the years do businesses

8    provide massage therapy services to their employees?

9    A    You know, that I don't know a lot about because I've been

10   on my own.  Basically, when I moved here, I got a job right

11   away in a facial salon.  And from there it was a lot of women,

12   and it just was word of mouth for me; so I kind of -- that's

13   what it's been for all these years, and I feel very blessed by

14   that.  So strictly it's been word of mouth; so I don't know

15   about, you know, other companies.

16   Q    Okay.  The -- now, you've been interviewed by the

17   government in this case?

18   A    I have.

19   Q    When they first contacted you, did they call you?

20   A    No.  They showed up at my door.

21   Q    What time was it?

22   A    9:30.

23        MR. TONG:  Objection.  Relevance.  Also beyond the

24   scope.

25        MR. TOSCHER:  Withdrawn, Your Honor.

1          THE COURT:  You know, maybe we need to take a short

2    break.  Okay.  10 minutes.  Unless you're going to finish your

3    cross-examination.

4          MR. TOSCHER:  Let's take a little break.  I'll be

5    done shortly, but I don't want to --

6          THE COURT:  Only because, you know, the jurors are

7    all thinking we're going to take a break, we're going to take a

8    break.

9          MR. TOSCHER:  I'm fine.  Let's take a little break.

10          THE COURT:  Okay.  Ten minutes.

11          (Court recessed at 2:55 P.M., until 3:19 P.M.)

12    BY MR. TOSCHER:

13    Q    Miss Doll, just one last question.  Do you recall Mr. Hee

14    suffering allergies and ever going into what I think is

15    anaphylactic shock?

16    A    Yes, I do.

17    Q    Can you tell us, the jury, what you know about that?

18    A    Well, I remember -- that was a while back.  He -- Al, had,

19    I think, called me and said that he wasn't going to make the

20    appointment because the night before he went into anaphylactic

21    shock.

22    Q    What is anaphylactic shock?

23    A    Basically, it's when you have an allergy to something, and

24    your body responds negatively towards it.

25          MR. TOSCHER:  No further questions, Miss Doll.

 1              MR. TONG:  Briefly, Your Honor.

 2              THE COURT:  So you have to really pay attention when

 3    the lawyer says "briefly," like about three days' worth of

 4    questions.  When a lawyer says, "I have one," it's maybe two,

 5    but sometimes it's way more than that; so you should pay

 6    attention to those things.

 7              MR. TONG:  I didn't say how many questions.

 8              THE COURT:  I know.  I know.  But it's always

 9    suspicious when they say "briefly."

10              MR. TONG:  Okay.  Miss Doll, you see the pressure I'm

11    under and the stress I'm feeling.  I could use a massage, too.

12              MR. TOSCHER:  No objection.

13                        RE-DIRECT EXAMINATION

14    BY MR. TONG:

15    Q    Let me just ask some questions of you.  Okay.

16              First off, as a massage therapist, you don't directly

17    treat heart attacks; is that correct?

18    A    No, I do not.

19    Q    And you don't directly treat anaphylactic shock; is that

20    correct?

21    A    Correct.

22    Q    And Mr. Toscher asked you about your knowledge of

23    corporations retaining massage therapists.  You remember those

24    questions?

25    A    Yes.  Yes.

1    Q    And I believe your answer was that was something you're

2    not familiar with; correct?

3    A    Correct.  Personally; correct.

4    Q    And have you personally received corporate checks for your

5    massage services, except from Mr. Hee?

6    A    No.

7    Q    And there is one document I want to show you.  Could you

8    look at Exhibit 8-2, please.

9    A    8-2?

10   Q    Yes.

11   A    Oh, I'm there.

12   Q    Okay.  And do you recognize Exhibit 8-2 as another 1099

13   Form you received from Waimana Enterprises?

14   A    Yes, I do.

15              MR. TONG:  Thank you.  We would ask that Exhibit 8-2

16   be received.

17              MR. TOSCHER:  No objection, Your Honor.

18              THE COURT:  All right.  That exhibit is received.

19              MR. TONG:  And with that I was brief, Your Honor.  I

20   have nothing further.

21              THE COURT:  Okay.  Then --

22              MR. TOSCHER:  Nothing further.

23              THE COURT:  -- re-cross?  No?

24              MR. TOSCHER:  Nothing further.

25              THE COURT:  Then the witness is excused.  You may

1    step down and leave the courtroom.

2         (Witness excused.)

3              THE COURT:  And the government can call its next

4    witness.

5              MR. TONG:  Government calls David Chinaka.

6         (Witness photographed.)

7              THE COURT:  I have a question.  Is this witness

8    wearing the same shirt as Mr. Hee?

9              THE CLERK:  No.

10             THE CLERK:  Please stand and raise your right hand.

11        (Witness sworn.)

12             THE CLERK:  Thank you.  Please be seated.

13             Please state your name and spell your last name.

14             THE WITNESS:  David Mitsuo Chinaka, C-h-i-n-a-k-a.

15                          DIRECT EXAMINATION

16   BY MR. TONG:

17   Q    Good afternoon, sir.

18   A    Hi.

19   Q    Could you please tell us your occupation.

20   A    I'm a CPA.

21   Q    And what does "CPA" stand for?

22   A    Certified Public Accountant.

23   Q    Are you licensed to practice accounting in any particular

24   state?

25   A    State of Hawai'i.

1    Q      How long have you been licensed?

2    A      Since 1981.

3    Q      Could you tell the jury your educational background.

4    A      I graduated from the University of Hawai'i at Manoa with a

5    bachelor's degree in business administration, major in

6    accounting.

7    Q      And how are you presently employed?

8    A      I have my own CPA firm.

9    Q      How long have you had your own CPA firm?

10   A      That would be a year and -- a year and three months.

11   Q      Okay.

12   A      Previous to that I was with other CPA firms.

13   Q      Okay.  Let's take it from the present and sort of move

14   backwards.  What is the name of the firm that you own right

15   now?

16   A      David M. Chinaka, CPA, Inc.

17   Q      And I gather you are the sole owner of that company?

18   A      That's correct.

19   Q      And you said that was for about a year and three months?

20   A      Yes.

21   Q      What company were you with prior to that?

22   A      That would be Chinaka & Company CPAs, Inc.

23   Q      And for what period of time did that company exist?

24   A      That would be from July 1st, 2010.

25   Q      Up until a year ago?

1  A    Until April of 2014.

2  Q    Okay.  And prior to July of 2010 what company were you

3  affiliated with?

4  A    That would be Chinaka & Company CPAs, LLP.

5  Q    Okay.

6  A    And that was from July 1st, 2008, till July 2010.

7  Q    And how about the firm immediately before that?

8  A    Chinaka & Company CPA -- I'm sorry, Chinaka Siu & Company

9  CPAs, Inc.

10 Q    So it sounds like the name Chinaka is common to all of

11 those companies; correct?

12 A    That's correct.

13 Q    And that's you.

14 A    Yes.

15 Q    Because you were a partner or owner of all of those

16 companies; correct?

17 A    That's correct.

18 Q    And at some point Chinaka Siu & Company was the company

19 with which you were affiliated; correct?

20 A    That's correct.

21 Q    And who was the Siu in that company?

22 A    That would be Carlton Siu.

23 Q    And why did the Siu name drop out of the various company

24 names that you've referenced?

25 A    Mr. Siu retired in 2008.

1    Q    And then you've had the series of companies since then?

2    A    Yes.

3    Q    Okay.  Now, Mr. Chinaka, do you know someone named Albert

4    Hee?

5    A    Yes.

6    Q    And how do you know Mr. Hee?

7    A    He was originally a client of Chinaka Siu & Company, and I

8    took over servicing his personal individual returns and the

9    company returns upon Mr. Siu's retirement.

10   Q    And if you were to see Mr. Hee, would you recognize him?

11   A    Yes.

12   Q    Do you see him in court today?

13   A    Yes.

14   Q    Could you identify him by where he's seated and what he's

15   wearing.

16   A    He's wearing a red aloha shirt, standing.

17            MR. TONG:  May the record reflect the identification

18   of the defendant, please.

19            THE COURT:  It so reflects.  He stood up for this.

20   BY MR. TONG:

21   Q    And I'm not sure we resolved whether you both have the

22   same shirt.  Did we resolve that?

23   A    Yes.

24   Q    Now, how did Mr. Hee first come to your firm?

25   A    That would have been from -- Mr. Siu would have been the

 1   initial contact.

 2   Q    Okay.  And would Mr. Siu have been the principal partner

 3   in charge of his account?

 4   A    Initially, yes.

 5   Q    Of all of that work initially.

 6   A    Yes.

 7   Q    And during the time you have known the defendant Albert

 8   Hee can you describe generally the nature of work that your

 9   company has performed for him or his family members or

10   entities?

11   A    We've prepared the individual tax returns and, as needed,

12   the corporate tax returns.

13   Q    And did there come a time when you also prepared

14   individual tax returns for members of the family?

15   A    Yes.

16   Q    And do you recall the names of the members of the family?

17   A    Yes.

18   Q    What are those names?

19   A    Adrianne, Breanne, and Charlton.

20   Q    And what relationship, if any, was there between those

21   three individuals and the defendant Albert Hee?

22   A    Those are his children.

23   Q    Okay.  And you mentioned that you did some corporate tax

24   returns; correct?

25   A    That's correct.

1    Q    Do you recall the names of the companies owned by the

2   defendant?

3    A    The one that we would have done the tax returns would be

4   for ClearCom.

5    Q    Did you ever do returns for a company called Waimana

6   Enterprises?

7    A    We would have done the -- we would have done the Waimana

8   Enterprises corporate income tax return; that's correct.

9    Q    Okay.  And as a CPA, I assume you're familiar with the

10  number of the form that would be filed for a corporation like

11  Waimana.

12   A    Yes.

13   Q    And what form is that?

14   A    Form 1120.

15   Q    Now, Mr. Chinaka, before coming to court today you were

16  served with a subpoena to appear; is that correct?

17   A    That's correct.

18   Q    Were you also served with a list of documents to bring to

19  court today?

20   A    Yes.

21   Q    And are you the custodian of the records of your company

22  at the present time?

23   A    Yes.

24   Q    And when Mr. Siu left your company, did you retain

25  possession of the records that existed at that time?

1   A    Yes, I did.

2   Q    And is a copy of the subpoena served upon you right there

3   to your left?

4   A    Yes, it is.

5   Q    All right.  And am I correct that we gave you a list of

6   the documents that had been marked as government's exhibits and

7   asked for you to review them to determine whether or not they

8   are your company's records?

9   A    That's correct.

10   Q    And have you done so?

11   A    Yes, I have.

12   Q    And directing your attention to that list, did we ask you

13   to review Exhibits 11-2 through 11-12?

14   A    Yes.

15   Q    And did we ask you to review Exhibits 11-14 through 11-17?

16   A    Yes.

17   Q    Did we also ask you to review Exhibits 11-21 through

18   11-24?

19   A    Yes.

20   Q    Did we also ask you to review Exhibits 11-27 through

21   11-28?

22   A    Yes.

23   Q    Did we also ask you to review Exhibits 11-32 through

24   Exhibit 11-43?

25   A    Yes.

1   Q     Did we ask you to review Exhibit 11-43A, as in apple?

2   A     Yes.

3   Q     Did we also ask you to review Exhibits 11-44 through

4   11-58?

5   A     Yes.  But, however, 11-48 is missing.

6   Q     Okay.  If the list says reserved, it's not there; correct?

7   A     No, it's missing what's stated in the document.

8   Q     Oh.  Okay.  We'll carve out 11-48 at the moment.

9         THE COURT:  You're talking about 11-44 to 11-47 and

10  then 11-49 to 11-58?  Is that what you're doing?

11        MR. TONG:  Yes, Your Honor.

12        THE COURT:  Okay.

13  BY MR. TONG:

14  Q     And you've reviewed all of those documents?

15  A     Yes, I have.

16  Q     And have you confirmed that they, in fact, are records

17  that came from your company's files?

18  A     Yes.

19  Q     And are those records concerning the preparation of the

20  tax returns that you prepared for Mr. Hee, his family members,

21  and his companies?

22  A     Yes.

23  Q     And are those records that you regularly maintain in your

24  files?

25  A     That's correct.

1    Q     In the ordinary course of your business?

2    A     Yes.

3           MR. TONG:  We would ask that the exhibits that I went

4    through be received in evidence, Your Honor.

5           MR. TOSCHER:  No objection, Your Honor.

6           THE COURT:  Okay.  So I'm receiving 11-2 through

7    11-12, 11-14 to 11-17, 11-21 to 11-24, 11-27 to 11-28, 11-32 to

8    11-43, 11-43A, and 11-44 to 11-47, and 11-49 to 11-58.

9    Received.

10          MR. TONG:  Thank you.

11   Q     Mr. Chinaka, we'll put aside 11-48 for the time being,

12   maybe come back to it later.

13          Let's talk generally about how you, as an accountant,

14   go about preparing a tax return.  Okay?

15   A     Okay.

16   Q     Where do you get the information necessary to fill into a

17   tax return?

18   A     It would normally come from the client.

19   Q     Okay.  Is there any other way that you could get it?

20   A     Depending upon whether we're engaged to do another

21   service, like an audit or a review.

22   Q     Let's focus right now on the preparation of a tax return.

23   Where would the information for the tax return come from?

24   A     It would be provided by the client.

25   Q     And how would you get the information needed for a return

1    from a client?

2    A    It would be what we would call an organizer that would

3    have all the information that's necessary for the tax return,

4    and we would ask for supporting documentation, such as W-2s and

5    1099s.

6    Q    So you would have a list of questions asking the client

7    various things, and then you would ask them to provide

8    supporting information; correct?

9    A    That's correct.

10   Q    And are you familiar with something called an engagement

11   letter?

12   A    Yes.

13   Q    What is an engagement letter?

14   A    An engagement letter is normally signed by the parties,

15   and it outlines the responsibilities and duties regarding the

16   preparation of the tax returns.

17   Q    Has it been your practice as a CPA to use engagement

18   letters at the beginning of your services?

19   A    It's done for every year.

20   Q    And have you used it every year from, say, 2000 to the

21   present?

22   A    Yes.

23   Q    All right.  I'm going to ask that an exhibit be put up on

24   the screen.  You can look at the screen or in the binder to

25   your left.

1            May we see Exhibit 11-3, please.  Page 582, I'm

2    sorry.

3            Mr. Chinaka, for your reference I'm sure you figured

4    this out:  the bottom right-hand corner of each document has a

5    unique number.  So I'm looking at the one that ends with 582.

6    Do you have that in front of you?

7    A    Yes.

8    Q    And do you recognize the document which appears on page

9    582 of Exhibit 11-3?

10   A    Yes.

11   Q    What is that?

12   A    That is an engagement letter for the 2005 -- I'm sorry,

13   2004 returns.

14   Q    Okay.  If we could zoom in on the portion of the letter

15   above the body where -- "Dear Client" and above, please.

16           Okay.  First off, Mr. Chinaka, I'm pointing at the

17   letterhead here.  It says Chinaka Siu & Company.  Do you see

18   that?

19   A    Yes.

20   Q    I gather that's the letterhead of your company; is that

21   correct?

22   A    That's correct.

23   Q    And you just mentioned the time frame.  The date of this

24   letter is January 7, 2005; correct?

25   A    That's correct.

1    Q    And it's addressed to Albert and Wendy Hee; is that
2    correct?

3    A    That's correct.

4    Q    That would be the defendant Albert Hee; correct?

5    A    Yes.

6    Q    And it says "Dear Client"; correct?

7    A    Uh-huh.

8    Q    Now, you just, basically, said this is a letter in 2005,
9    but for what year did it relate to?

10   A    2004.

11   Q    Because you would prepare the tax return for a given year
12   in the beginning of the following year; is that correct?

13   A    That's correct.

14   Q    And you said this is your engagement letter; correct?

15   A    That's correct.

16   Q    Now, the heading says "Important.  Please read carefully.
17   This letter must be signed before the start of any tax
18   preparation work."  Do you see that?

19   A    Yes.

20   Q    Why does that heading appear on your engagement letter?

21   A    We do not normally start the work until we have a signed
22   engagement letter.

23   Q    And I assume there are reasons why you defer your work
24   until you have the letter; is that correct?

25   A    That's to make sure that there's understanding between the

1    two parties.

2    Q    In your mind that's an important thing before you start

3    the work; correct?

4    A    Yes.

5    Q    Now, if we can take a look at the first paragraph of the

6    letter, please.  And this, basically, thanks them for their

7    business, the first sentence; is that correct?

8    A    Yes.

9    Q    And then the second sentence reads:  "To ensure a thorough

10   understanding of the nature and extent of the services we agree

11   to perform, your responsibilities, and our fee arrangements we

12   set forth in the following paragraph our understandings"; is

13   that correct?

14   A    That's correct.

15   Q    And why do you advise clients of their responsibilities in

16   an engagement letter?

17   A    Because, essentially, in tax preparation engagement we do

18   not audit the records.

19   Q    Okay.  And what is -- is there a difference between doing

20   an audit of records versus the preparation of a tax return?

21   A    During the preparation of a tax return you do not --

22   you're not required to undertake an audit, which would be

23   examining source documentation, as required under the standards

24   for an audit.

25   Q    Okay.  And when you talk about "source documentation,"

1    what are you referring to?

2    A    Those would be things like paid invoices, receipts,

3    canceled checks, deposits.

4    Q    Okay.  So if a client told you something was an expense,

5    you wouldn't ask for the invoice supporting it.

6    A    No.

7    Q    Unless there were an audit.

8    A    Yes.

9    Q    But for the preparation of a tax return you wouldn't go

10   that deep.

11   A    That's correct.

12   Q    Okay.  Now, if we can look at the second paragraph,

13   please.  This is for an individual tax return; correct?

14   A    That's correct.

15   Q    And there would be a separate engagement letter for a

16   corporate tax return; is that correct?

17   A    That's correct.

18   Q    Looking at the second paragraph, the second -- the end of

19   the first sentence says you will prepare the returns from

20   information furnished to us by you; correct?

21   A    That's correct.

22   Q    Why does that appear in your engagement letter?

23   A    Because, essentially, we are under no obligation to audit

24   the information.  So the information is going to be provided by

25   the client, and we will -- based upon that information we

1    prepare the tax returns.

2    Q    That's your way of saying, look, we're going to do it just

3    based on what you give us.

4    A    Yes.

5    Q    Right?  And then the next sentence after the highlighted

6    one says "We are enclosing a tax organizer to guide you in

7    gathering the information for us"; correct?

8    A    That's correct.

9    Q    And that's the questionnaire that you described earlier;

10   is that correct?

11   A    Yes.

12   Q    All right.  May we go to the third paragraph, please.

13           If we can highlight the first sentence, please, it

14   says:  "It is your responsibility to provide us with all the

15   information required for the preparation of complete and

16   accurate returns."  Do you see that sentence?

17   A    Yes.

18   Q    Why is that included within your engagement letter?

19   A    It sets forth the responsibility of the taxpayer.

20   Q    Okay.  And what responsibility is that?

21   A    That they are to provide us with all the information

22   necessary to prepare a complete and accurate return.

23   Q    If, hypothetically, you were to receive incomplete

24   information, how would that affect the preparation of a tax

25   return?

1    A    We would not -- unless we become aware of the incomplete

2    information, it would be based upon -- the tax return would be

3    based upon the information provided to us.

4    Q    Okay.  So let's just give a real simple explanation -- or

5    example, rather.  If somebody had two jobs and got two W-2

6    forms and they only gave you one, how would that affect the

7    preparation of your tax return?

8    A    It would not be on the tax return.

9    Q    The one that was missing wouldn't show up.

10   A    That's correct.

11   Q    Now, looking again at the second paragraph, there's a

12   sentence at the end that appears to be both in bold and

13   underlined.  Do you see that?

14   A    Yes.

15   Q    And it reads -- let me see if I can read it correctly --

16   "You have the final responsibility for the income tax returns,

17   and, therefore, you should review them carefully before you

18   sign and file them."  Do you see that sentence?

19   A    Yes.

20   Q    Am I right in assuming that that must be important to you

21   if it were in bold and underlined?

22   A    Yes.

23   Q    And why is that sentence in this engagement letter?

24   A    That's to set forth the responsibility of the taxpayer to

25   review the returns before they sign and file them.

1   Q    Okay.  And as a CPA, are you authorized to file a return

2   without having your client review it?

3   A    You may -- you may file it, but --

4   Q    Are you supposed to file it?

5   A    Our policy in our firm is not to file.

6   Q    Unless the taxpayer reviews and tells you that's accurate.

7   A    Yes.

8   Q    Now, if we may look at the next paragraph, there's a big

9   word there.  I want to ask you what it means.

10        This says "Our work in connection with the

11  preparation of your income tax returns does not include any

12  procedures designed to disclose defalcations or other

13  irregularities should any exist."  What does that sentence

14  mean?

15  A    Essentially, in the preparation of income tax returns we

16  would not be -- we don't look for any defalcations or

17  irregularities, and we can't be responsible for finding it,

18  for, essentially, not disclosing it.

19  Q    And the "D" word is the one I'm interested in.  What is a

20  "defalcation" in lay terms?

21  A    That would be a misappropriation of assets.

22  Q    Something taken or criminal even.

23  A    Yes.

24  Q    And this engagement letter says you don't have any

25  procedures designed to find that; correct?

1    A    That's correct.

2    Q    All right.  If we could go to the second page, which is

3    page 583 of Exhibit 11-3, please.  And if we could look at the

4    first paragraph.

5          I'm actually going to look at the second sentence,

6    which reads, "We will not verify the information you give us."

7    And then the next sentence says, "However, we may ask you for

8    clarification of some of the information."  Do you see that?

9    A    Yes.

10   Q    What are those two sentences intended to convey?

11   A    We are under no obligation to verify such information, but

12   if it comes through during the analytical review comparison to

13   prior years, we may ask for clarification of something that may

14   not be there before.

15   Q    When you say you have no obligation to verify, what does

16   that mean?

17   A    Essentially, we're not doing an audit of the tax returns;

18   therefore, we're not going to be looking for source

19   documentation.

20   Q    Just so we're clear, you've used the phrase "source

21   documentation" a couple of times.  Explain what that would be.

22   A    That would be invoices, receipts, canceled checks,

23   deposits.

24   Q    And, finally, if we can go to the third page of this

25   letter, the last page, which is 584.  It appears that there are

1    signatures that are on this document; is that correct?

2    A    Yes.

3    Q    And do you recognize any of those signatures?

4    A    Yes.

5    Q    Whose signatures appear here?

6    A    That would be my signature, Mr. Siu's signature, and then

7    the client signing as "Accepted By."

8    Q    And would it be your company's normal practice and

9    procedure to have a signed engagement letter ideally before you

10   start work?

11   A    That's correct.

12        MR. TONG:  May we have the lights?  I think the end

13   of the day I'm having a hard time seeing.  Thank you.

14   Q    All right.  Mr. Chinaka, once you have an engagement

15   letter of that sort signed and returned to you, can you

16   describe the process by which your company would prepare a tax

17   return.

18   A    As long as we have all the information that's we ask

19   for -- in other words, the W-2s, the 1099s, the data

20   organizer -- we then prepare the returns.

21   Q    And how would you go about preparing the returns?

22   A    Essentially, we have a tax program that we will enter the

23   information from the organizer into the tax program to prepare

24   the returns.

25   Q    And, by the way, from the period of, say, 2002 to about

1    2012 did you have other people working in your firm?

2    A    The normal procedure would be to have a staff accountant

3    prepare the initial data entry, and it would be reviewed by a

4    partner.

5    Q    And did you have staff accountants in the firm during

6    those years I mentioned?

7    A    Yes.

8    Q    Was one of them Lynn Tamanaha?

9    A    Yes.

10   Q    And Lynn Yasaka?

11   A    Yes.

12   Q    And are they still employed with your company?

13   A    Not with my company now, but they are with CPA firms.

14   Q    And after the staff accountant input the information, what

15   would the partner do with that information?

16   A    They would review the tax return.

17   Q    And after the partner reviewed the tax return, what would

18   happen to it?

19   A    It would be sent to production to assemble -- print and

20   assemble the returns for the partner's signature.

21   Q    Once it was assembled for the partner's signature, what

22   would happen to the return?

23   A    Then it may be sent to the client for review.  If there's

24   any questions, they would answer the questions.  And if there

25   were no questions and the return is acceptable, they would say

1    go ahead and finalize the returns.  The returns would be

2    printed in final copy, signed by the partner, and sent to the

3    client to sign.

4    Q    And how would the return ultimately be filed?

5    A    That would be the up to the client as to how to file the

6    returns.

7    Q    What are the options?

8    A    They can either manually paper file the returns, or they

9    can ask us to electronically file the returns.

10   Q    And when you say "paper file," is that the equivalent of

11   sending it to the IRS?

12   A    Mailing it to the IRS.

13   Q    You said they can also have the option of electronically

14   filing the return; correct?

15   A    That's correct.

16   Q    Are there procedures in your company concerning how tax

17   returns would be filed electronically?

18   A    There is a Form 8879, which has to be signed by the

19   taxpayers, authorizing us to electronically file the returns.

20   Once that is received, we can then electronically file the

21   returns with the taxing authorities.

22   Q    Okay.  And just run us through quickly on how you would

23   electronically file a tax return on behalf of a client.

24   A    Our tax software allows us to electronically file the tax

25   returns with the Internal Revenue Service and the state tax

1    office.  So we would file electronically.  Doesn't require

2    actual signatures.  The returns are filed and -- to the IRS and

3    the state tax office.

4    Q    Would you file a return electronically with the IRS

5    without the authorization of your client?

6    A    No.

7    Q    And would that practice have been in place during the

8    entire time 2000 to the present?

9    A    Yes.

10   Q    And were there different ways in which you could obtain

11   the authorization of a client?

12   A    It would either be mailed back to us -- the form would be

13   mailed back to us, e-mailed back to us, or faxed back to us.

14   Q    Okay.  If we could see Exhibit 11-6, page number 880,

15   please.  880.

16         Again, feel free to look in your binder, Mr. Chinaka,

17   or we can blow it up here.  Let's look at the -- perfect.

18   Thank you.

19         Page 880 appears to be an e-mail; is that correct?

20   A    That's correct.

21   Q    And you recognize that as coming from your company files;

22   is that correct?

23   A    That's correct.

24   Q    And who is this e-mail from and who is it to?

25   A    The file would be -- this is from Jodie Kubo, who is our

1    tax manager.

2    Q    Actually, please take a look at 880, which, I think, may

3    be the second page.  I think we'll do it chronologically, if

4    that works for you.  Bottom right-hand corner in front of you.

5    A    That's okay.

6         That would be from myself.

7    Q    It says, "Mahalo, David Chinaka"; right?

8    A    Yes.

9    Q    Who is it addressed to?

10   A    It's addressed to Mr. Hee and his wife.

11   Q    What is the purpose of this e-mail in September of 2008?

12   A    That would be a draft copy of the tax returns.

13   Q    And there appear to be a couple of PDF documents attached

14   to your e-mail; is that correct?

15   A    That's correct.

16   Q    And what do those documents represent?

17   A    Those are draft copies of the tax returns.

18   Q    What were you asking Mr. Hee to do in this e-mail?

19   A    To review the tax returns.

20   Q    Did you expect him to respond to you?

21   A    Yes.

22   Q    All right.  And did you receive such a response?

23        Now you can look at the first page of Exhibit 11-6

24   and see if that helps you.

25   A    Yes.

1    Q    May we go to page 879, please.  And we should read from
2    the bottom up; right?  Because that's chronological order.
3    A    Yes.
4    Q    All right.  If we can focus on the bottom, that appears to
5    be another version of the same e-mail that you sent; is that
6    correct, Mr. Chinaka?
7    A    Yes.
8    Q    And did you receive a response that appears higher on that
9    same page?
10   A    Yes.
11   Q    And who was the response from?
12   A    That would be from Mr. Hee.
13   Q    Okay.  And how did you interpret that response?
14   A    That he reviewed it and that he approved it.
15   Q    Okay.  And is that sort of representative of how you might
16   get authorization from a client to file a return once it had
17   been reviewed?
18   A    Yes.
19   Q    And then the top, just out of curiosity, introduces a new
20   player, Jodie Kubo, who is a recipient of the whole e-mail
21   chain; correct?
22   A    That's correct.
23   Q    Explain that for us, if you would.
24   A    Essentially, Jodie Kubo was my tax manager.
25   Q    And what was -- it looks like you didn't use too many

1    words.  You're obviously not a lawyer.  But you just sort of

2    sent this along with no instructions.  What was she supposed to

3    do?

4    A    Essentially, she understood that we asked for the approval

5    of the tax returns from the client, and the client responded.

6    Q    And what was supposed to happen after the client

7    responded?

8    A    We then would finalize the return for signature.

9    Q    And did you then file the tax return for that particular

10   year?

11   A    Yes.

12   Q    Now, that e-mail was dated September 24, 2008; is that

13   correct?

14   A    Yes.

15   Q    All right.  Let me direct your attention now to Exhibit

16   11-6, the same exhibit, but page 875.  Do you have that

17   document in front of you?

18   A    No, but I'll look -- I'll look from there.

19   Q    Okay.  This is page number 875 of Exhibit 11-6, and if we

20   could focus on, say, the top half.

21          Do you recognize this document?

22   A    Yes.

23   Q    Okay.  And what is this document?

24   A    That is part of the form 8879 in which says that they

25   authorize us to file their returns electronically.

1   Q    Okay.  And the Form 8879 is an IRS form; correct?

2   A    That's correct.

3   Q    And the purpose is what?

4   A    That is to have the taxpayer sign off that they authorize

5   us to file their returns electronically.

6   Q    So it's sort of the electronic equivalent of the old

7   handwritten signature.

8   A    That's correct.

9   Q    And there's a statement here -- well, first it says do not

10  submit to the IRS; correct?

11  A    That's correct.

12  Q    So what are you, as a CPA, supposed to do with it?

13  A    We retain it in the files.

14  Q    And then there's something called an ERO declaration;

15  correct?

16  A    Yes.

17  Q    What's an ERO?

18  A    That's the electronic return originator, which is,

19  essentially, the person that's doing the electronic filing.

20  Q    So in this case that would be?

21  A    Myself.

22  Q    And this is your declaration to the IRS; correct?

23  A    It's actually for the benefit of the taxpayer.

24  Q    Okay.  And, in fact, the first sentence says you declare

25  that the information contained in this electronic tax return is

1    the information furnished to me by the taxpayer; correct?

2    A    Yes.

3    Q    And there is a statement at the bottom:  "I am signing

4    this return by entering my pin below"; is that correct?

5    A    That's correct.

6    Q    What's a "pin"?

7    A    That's a unique identifier number assigned to a specific

8    ERO.

9    Q    Okay.

10   A    That's my equivalent of my signature.

11   Q    And at the bottom third of the page there are some numbers

12   here; is that correct?

13   A    Yes.

14   Q    And what does this part of the section -- or what does

15   this section of the document relate to?

16   A    It relates to the identifying information for the tax

17   return.

18   Q    Now, after you, as a CPA, file a document electronically

19   do you receive any acknowledgement from the IRS?

20   A    Yes.

21   Q    Could you kindly turn to page 876 of that exhibit, which

22   is the next page.  Exhibit 11-6.

23        And if we could see the top half, please.  What is

24   this document?

25   A    That would be the acknowledgement that the returns were

 1   filed electronically from the Internal Revenue Service.

 2   Q    And is this the sort of acknowledgement that you would

 3   receive when your return was successfully transmitted?

 4   A    That's correct.

 5   Q    And can you tell by examining this document whether it

 6   relates to the tax return for the defendant Albert Hee?

 7   A    Yes.

 8   Q    And all these boxes that are checked, does that come from

 9   the IRS in this format?

10   A    Yes.

11         MR. TONG:  Your Honor, I'm going to move to a new

12   area.  I don't know if you want me to continue or --

13         THE COURT:  Okay.  No, no, we can stop now because I

14   suspect this witness will be on for quite a while longer;

15   right?

16         MR. TONG:  He will.

17         THE COURT:  Okay.  Then I will see you tomorrow at

18   nine o'clock, and we'll continue with Mr. Chinaka on the stand.

19   Okay?

20         So leave your notebooks on the chair.  Remember not

21   to pay attention to any news reports.  Don't listen to them.

22   Don't read them.  Cut out any articles from the newspaper.

23   Have somebody cut them out for you.  And don't discuss the

24   case.

25         (Jury excused.)

1          THE COURT:  Okay.  Just a couple things with Counsel.
2   Wait until the witness leaves.
3          (Witness excused.)
4          THE COURT:  Okay.  Tomorrow I put on the calendar,
5   you know, that we have to end by a certain time because I have
6   an out-of-court meeting that I need to attend by 4:30; so I
7   need time to get there.
8          I did get today a motion concerning the defense
9   expert witnesses, and does the defense want an opportunity to
10  respond in writing to this?
11         MR. TOSCHER:  Yes, Your Honor.  I've just glanced at
12  it very quickly at the lunch break, but, yes, we would like an
13  opportunity.  I think the Court -- I think it was very limited,
14  but it only has to be addressed before we start putting on our
15  case and our expert; so, hopefully, we can respond sometime
16  next week.
17         THE COURT:  Okay.  I'll give you till Monday --
18         MR. TOSCHER:  Okay.
19         THE COURT:  -- Monday at 10:00 A.M. to file your
20  response.
21         The government can respond orally.  My proposal is
22  that we discuss this on June -- well, we could do June 30.  I
23  think I might move it to July 1.  Okay.  So we'll discuss it on
24  July 1 at 8:30 in the morning before the jury comes in, and
25  that should be still in the government's case in chief, I'm

1    assuming, certainly before you would have to put on your expert

2    witness.  Okay?

3                 MR. TOSCHER:  Yes, Your Honor.

4                 THE COURT:  Okay.  Did either side need to raise

5    anything else with me before we leave?

6                 MR. TOSCHER:  I don't think so, Your Honor.

7                 THE COURT:  No?

8                 MR. TOSCHER:  I'm good.

9                 MR. TONG:  We're good.  Thank you, Your Honor.

10                THE COURT:  Then I'll see you at nine o'clock

11   tomorrow morning.  Thank you.

12         (Court recessed at 4:03 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9            DATED at Honolulu, Hawaii, August 1, 2015.

10

11                                    /s/ Debra Chun
                                      _____

12                                    DEBRA KEKUNA CHUN

13                                    RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25