1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3                                )
     UNITED STATES OF AMERICA,   )  CR 14-00826 SOM
4                                )
              Plaintiff,         )  Honolulu, Hawaii
5         vs.                    )  June 25, 2015
                                 )  9:00 A.M.
6    ALBERT S. N. HEE,           )
                                 )
7              Defendant.        )
                                 )
8    _____)

9               TRANSCRIPT OF JURY TRIAL (DAY 3)
              BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:          LAWRENCE L. TONG
                                  Office of the U.S. Attorney
13                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd. Ste. 6100
14                                Honolulu, HI 96850

15                                QUINN P. HARRINGTON
                                  U.S. Dept. of Justice
16                                Tax Division
                                  601 D St., N.W. Room 7029
17                                Washington, DC 20004

18   For the Defendant:           STEVEN TOSCHER
                                  KURT K. KAWAFUCHI
19                                LACEY STRACHAN
                                  Hochman salkin Rettig Toscher
20                                 & Perez
                                  9150 Wilshire Blvd., Ste. 300
21                                Beverly Hills, CA 90212

22   Official Court Reporter:     Debra Kekuna Chun, RPR, CRR
                                  United States District Court
23                                300 Ala Moana Blvd. Ste. C285
                                  Honolulu, HI 96850
24                                (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).

```
 1                          INDEX

 2

 3    EXAMINATION

 4    Witness Name                                    Page

 5    David Chinaka

 6        Direct By Mr. Tong ..................................    4

 7        Cross By Mr. Toscher ...............................   37

 8        Re-Direct By Mr. Tong..............................   64

 9        Re-Cross By Mr. Toscher ...........................   87

10    Lynn Tamanaha

11        Direct By Mr. Harrington ..........................   88

12        Cross By Mr. Toscher ..............................  100

13        Re-Direct By Mr. Harrington.......................  106

14    Daniel Nakandakari

15        Direct By Mr. Harrington ..........................  109

16    Lynn Yasaka

17        Direct By Mr. Harrington ..........................  122

18        Cross By Mr. Toscher ..............................  136

19        Re-Direct By Mr. Harrington.......................  139

20    Carlton Siu

21        Direct By Mr. Tong ................................  140

22        Cross By Mr. Toscher ..............................  158

23        Re-Direct By Mr. Tong.............................  167

24    Harold Johnston

25        Direct By Mr. Tong ................................  174
```

1      Cross By Mr. Toscher .................................. 197

2      Re-Direct By Mr. Tong................................. 202

3  Robert Kihune

4      Direct By Mr. Tong ................................... 204

5      Cross By Mr. Toscher ................................. 215

6      Re-Direct By Mr. Tong................................. 226

7

8

9  EXHIBITS

10  Exhibit                                                    Page

11  7-1 Entered into Evidence                                  112

12  7-1A Entered into Evidence                                 114

13  7-2 Entered into Evidence                                  115

14  7-3 Entered into Evidence                                  116

15  7-5 Entered into Evidence                                  119

16  7-4 Entered into Evidence                                  121

17  15-1 Entered into Evidence                                 185

18  15-3, 15-4 Entered into Evidence                           189

19

20

21

22

23

24

25

1   THURSDAY, JUNE 25, 2015              9:08 O'CLOCK A.M.

2         THE CLERK:  Criminal 14-826 SOM, United States of

3   America versus defendant Albert Hee.  This case has been called

4   for Further Jury Trial.

5         Counsel, please make your appearances for the record.

6         MR. TONG:  Good morning, Your Honor.  Good morning,

7   ladies and gentlemen.  Larry Tong and Quinn Harrington for the

8   United States.  With us is Special Agent Greg Miki for the IRS

9   and Christina Sorely of the Department of Justice.

10        THE COURT:  Good morning.

11        MR. TOSCHER:  Good morning, Your Honor.  Good

12  morning, ladies and gentlemen of the jury.  Steven Toscher for

13  defendant Albert Hee, who is with me, together with Lacey

14  Strachan and Kurt Kawafuchi.  Good morning.

15        THE COURT:  Okay.  We have Mr. Chinaka still on the

16  stand; so let's continue with his examination.

17                  DIRECT EXAMINATION (Resumed)

18  BY MR. TONG:

19  Q    Good morning, sir.

20  A    Good morning.

21  Q    Yesterday you mentioned in your testimony a form number

22  8879?

23  A    Yes.

24  Q    What is that form?

25  A    That would be the authorization from the taxpayers to

```
 1   electronically file their returns.

 2   Q    Okay.  I want to make sure I have the right form; so may

 3   we show Exhibit 11-7, page 1027, please.

 4           Can you see that form on the screen?

 5   A    Uh-huh.

 6   Q    And is that the form that you were referring to yesterday?

 7   A    Yes.

 8   Q    May we take a look at the top portion of that form,

 9   please.  And the number of the form that you referenced appears

10   at the top left:  8879.  Is that correct?

11   A    That's correct.

12   Q    What is this form used for?

13   A    Again that's the signature authorization for the

14   taxpayer's granting us authority to file the returns

15   electronically.

16   Q    May we please see the bottom half of the form.  Maybe if

17   we can go a little bit higher to capture the taxpayer's pin

18   number.

19           Okay.  Mr. Chinaka, this portion of the form,

20   basically, is the signatures; is that correct?

21   A    That's correct.

22   Q    And there's a signature in the middle of the page that

23   appears where I'm pointing; is that correct?

24   A    Yes.

25   Q    And whose signature would that be?
```

```
 1   A     That would be Mr. Hee's.

 2   Q     And those are the types of authorization forms that you

 3   would maintain in your files before actually transmitting the

 4   tax returns; is that correct?

 5   A     That's correct.

 6   Q     Thank you.  Now, we spoke yesterday about your engagement

 7   by the defendant.  And I believe you mentioned that you also

 8   prepared corporate tax returns; is that correct?

 9   A     Yes.

10   Q     And when did you start preparing the corporate tax returns

11   for the defendant's company?

12   A     The company itself, probably did it from, I believe, in

13   the '80s, late '80s.  I personally did not start doing the

14   returns until approximately 2007.  I may have signed the

15   returns, but I did not prepare the returns one or two years

16   prior to that.

17   Q     Okay.  And when your partner Carlton Siu retired, who took

18   over the responsibility of preparing the corporate tax returns

19   for the defendant?

20   A     I would have done it myself or someone on my staff.

21   Q     Okay.  And you testified a bit yesterday about an

22   engagement letter.  Do you remember those questions and

23   answers?

24   A     Yes.

25   Q     And was it your regular practice to use an engagement
```

1    letter before preparing a corporate tax return?

2    A    Yes.

3    Q    And may we show Exhibit 1158, page 11013, please.

4              Okay.  Mr. Chinaka, do you recognize that document?

5    A    Yes.

6    Q    And if we could zoom in on the top half, please.  That's

7    your letterhead; is it not?

8    A    That's correct.

9    Q    And the date stated is September 9 of 2009; is that

10   correct?

11   A    Yes.

12   Q    And what tax year would that relate to?

13   A    That would probably be the 2008 year.

14   Q    Okay.  And it's addressed to the board of directors of

15   Waimana Enterprises; is that correct?

16   A    Yes.

17   Q    Yet the salutation says "Dear Al"; correct?

18   A    That's correct.

19   Q    Who's "Al"?

20   A    Mr. Hee.

21   Q    So you understood Mr. Hee to be equivalent to the Board of

22   Directors of Waimana Enterprises?

23   A    He is the President of the company and on the Board.

24   Q    And if we could go to the bottom half of the letter,

25   please.  First off, I don't want to go through each provision

1    as we did yesterday, but would it be a fair statement that a

2    corporate engagement letter also set forth the obligations of

3    you and your client?

4    A    That's correct.

5    Q    And again in the middle of this letter there is a

6    paragraph that is underlined; correct?

7    A    That's correct.

8    Q    And what is the purpose of advising a client that your

9    work does not include errors -- I'm sorry, procedures designed

10   to discover errors, fraud, or illegal acts?

11   A    That is, essentially, because this is a tax engagement and

12   it is not an audit of financial statements.

13   Q    For the reasons you stated yesterday --

14   A    Yes.

15   Q    -- right?

16        And if we could look at the next paragraph, there's a

17   statement in the first sentence that "Management -- would that

18   refer to the company?

19   A    Yes.

20   Q    -- "Management is responsible for the proper recording of

21   transactions in the books of account," and it ends with "and

22   for the substantial accuracy of the financial records."  Do you

23   see that?

24   A    Yes.

25   Q    What does that mean?

```
1    A    Essentially, based upon the information in the books of
2    records of account, we would prepare the returns, but
3    management is responsible to ensure that all the information is
4    recorded in the books.
5    Q    What does it mean to have information, quote, recorded?
6    A    Essentially, it would be maintained in some accounting
7    package, generally a general ledger, we will have the
8    transactions, and, essentially, it's supported by invoices,
9    checks, and deposits.
10   Q    Okay.  And you mentioned a general ledger.  Can you tell
11   us laypeople, in lay terms, what a general ledger is.
12   A    The general ledger is mainly a recording of all the
13   transactions into various accounts, income and expenses, and
14   also on the balance sheet for a corporation.
15   Q    So it's sort of whenever a check is written it would have
16   to appear in the ledger?
17   A    Yes.
18   Q    Whenever money comes in, it would appear in the ledger?
19   A    Yes.
20   Q    And you mentioned a recording in the accounts.
21   A    Yes.
22   Q    What is an account?
23   A    Well, essentially, you're going to have -- normally, in
24   accounting it's a double entry procedure; so you're going to
25   have -- cash going in and out will come out of the cash
```

 1   account, which will be a summary of all the transactions in the

 2   cash account.  And then we record it against either an income

 3   or expense, depending upon whether if it's money coming in or

 4   money going out.

 5   Q    And when the transactions are recorded, would they be

 6   broken down into different types of categories?

 7   A    Yes.

 8   Q    What types of categories would appear?

 9   A    If it was something like for expenses, it would be, like,

10   rent, consulting fees, professional fees, general excise tax.

11   If it's for income side where the money's coming in, it would

12   be for management fees, interest income, consulting fees, or

13   whatever you have.

14   Q    Okay.  So the ledger that would be given to you would show

15   all of the transactions and then somehow break them into

16   categories of the sort you just described.

17   A    Yes.

18   Q    And who would decide where to put a particular

19   transaction?

20   A    Initially, it would be done by the client.

21   Q    And when you received the books and records, would they

22   reflect that kind of categorization?

23   A    Yes.

24   Q    So that under your letter is the representation to you, as

25   the tax preparer, that that's what these expenses are for.

1    A    Yes.

2    Q    And to clarify, because we were talking personal taxes

3    somewhat yesterday, would you be supplied with all of the

4    source documentation?

5    A    No.  It would not be required.

6    Q    And in preparing the tax return would it be your normal

7    practice to examine each underlying document?

8    A    No.

9    Q    So if something were represented to you to be a business

10   expense and there would be a payee, how would you treat it for

11   tax purposes?

12   A    Essentially, we would take the classification, unless we

13   determine that there is some clarification requested.

14   Q    Okay.  And before we leave the letter here, there's the

15   statement we will not verify the information you give us; is

16   that correct?

17   A    Yes.

18   Q    And is that pretty much what you're explaining right now?

19   A    Yes.

20   Q    And so we're clear, if we could see the second page of

21   Exhibit 1158, please.  And that bears two signatures, does it

22   not, Mr. Chinaka?

23   A    Yes.

24   Q    And whose signature is here?

25   A    That's my signature.

1    Q    And do you recognize the signature on behalf of Waimana

2    Enterprises?

3    A    That would be Mr. Hee's signature.

4    Q    Thank you.

5         All right.  May we have the lights, please.

6         Now, you talked about the general ledger.  Where

7    would you get the general ledger from Waimana Enterprises?

8    A    We would ask for the general ledger.

9    Q    And did you have a point of contact within Waimana?

10   A    Waimana would be either Nancy Henderson, or it may have

11   been Abby Tawarahara.

12   Q    So you, as the outside accountant, would, basically, say

13   give me the ledger, the books.

14   A    Yes.

15   Q    And it would come over to you.

16   A    Yes.

17   Q    And then you would work on it.

18   A    Yes.

19   Q    And just to set the stage a little, you didn't work at

20   Waimana; right?

21   A    That's correct.

22   Q    You have other clients?

23   A    Yes.

24   Q    Did you have -- about how many clients did you have, just

25   out of curiosity, back in the time frame we're talking here?

1    A    About 500 plus individual returns and 150 business

2    returns.

3    Q    And where would you prepare tax returns?  Your office or

4    your client's office?

5    A    Primarily, in my office.

6    Q    So you get the information in, and you stay in your

7    office, prepare the return, and then send it out.

8    A    That's correct.

9    Q    Now, there's all this talk about a general ledger.  Maybe

10   if we can take a look at a document, Exhibit 11-54, page 1626.

11   And if we could look at the top half to start, please.

12          Do you recognize this document?

13   A    Yes.

14   Q    All right.  Let's -- first off, there's a heading that

15   says Waimana Enterprises, Inc.; is that correct?

16   A    Yes.

17   Q    And to the left of that there's a client number; is that

18   correct?

19   A    Yes.

20   Q    Is that the client number -- what does that represent?

21   A    That would be our internally generated client number that

22   would be assigned to the client.

23   Q    And there's a date here; correct?

24   A    Yes.

25   Q    And what would that represent?

1    A    The date that this particular report was printed.

2    Q    Okay.  And the report has the title YTD General Ledger,

3    does it not?

4    A    Yes.

5    Q    What does that mean?

6    A    That's the year-to-date general ledger.

7    Q    And are you able to tell what year it refers to?

8    A    December 31, 2004.

9    Q    So would that be the calendar year 2004?

10   A    Yes.

11   Q    Right.  And right above that it says page 42; correct?

12   A    Yes.

13   Q    So would it be a fair statement that a general ledger of

14   Waimana would contain many entries and many pages?

15   A    Yes.

16   Q    This is just one page.

17   A    That's correct.

18   Q    All right.  And you mentioned earlier that there were

19   categories that the expenses or other items would be booked;

20   correct?

21   A    That's correct.

22   Q    And I see here there's a bunch of numbers, 66500

23   professional fees.  Would that be one such category that you

24   were describing for us?

25   A    Yes.

1    Q    And there's a list of people, including yourself; correct?

2    A    That's correct.

3    Q    And what to you, as an accountant, does a list of this

4    sort represent?

5    A    Those are payments classified as professional fees.

6    Q    By who?

7    A    Who classified them?

8    Q    Yeah, who classified them?

9    A    It would be part of the company.

10   Q    In this case Waimana.

11   A    Waimana.

12   Q    All right.  Now, if we could look at the last group of

13   entries entitled "consulting fees," do you see that category?

14   A    Yes.

15   Q    67100; correct?

16   A    Yes.

17   Q    And this is another category set up in Waimana's books; is

18   that correct?

19   A    That's correct.

20   Q    And it appears to show a number of payments, it looks

21   like, to two individuals; correct?

22   A    Yes.

23   Q    One, a group to Tom Okamura; correct?

24   A    That's correct.

25   Q    And the other, to an individual named Diane Doll; correct?

1   A     That's correct.

2   Q     If we can carryover to the next page, which is 1627, at

3   the top do you see that same category carrying over to this

4   page?

5   A     Yes.

6   Q     And there seems to be a sum total of those consulting

7   fees; correct?

8   A     Yes.

9   Q     To you, as an accountant, if you were to get a general

10  ledger like that, how would you treat it?

11  A     Essentially, classified on the tax return as consulting

12  fees.

13  Q     And can we go back to the prior page, please.  So with

14  regard -- the bottom section, please, if you would.

15          With regard to each payment, before classifying it as

16  consulting fees on the tax return, would you ask for every

17  check?

18  A     No.

19  Q     Would you ask for every invoice?

20  A     No.

21  Q     Would you ask for a thorough description of the nature of

22  the consultation provide?

23  A     Only if it looked unusual.

24  Q     And did you see anything unusual about any of these

25  payments?

```
 1   A     No.

 2   Q     Now, at the time of this -- let me withdraw that.

 3         Do you recall your company at some point preparing

 4   1099 forms for Waimana Enterprises?

 5   A     Over the years, yes, we did.

 6   Q     And can you explain to the jury what a 1099 form would be

 7   and how you would go about preparing it?

 8   A     A form 1099 is required for payments made to individuals

 9   exceeding $600 paid during the year.

10   Q     And whose obligation is it to file that form?

11   A     That would be the client's.

12   Q     And by client do you mean the person making the payment?

13   A     The company making the payments.

14   Q     Not the person receiving the payment.

15   A     No.

16   Q     And if you were to see -- I don't need the document, but

17   if you were to see payments of the sort we were just

18   describing, the consulting fees, on the general ledger, what

19   use, if any, would you make of those amounts for purposes of a

20   1099?

21   A     The 1099 amount should match what was paid out.

22   Q     And if we could go back quickly to Exhibit 1154, page

23   1626.  And if we could see the bottom portion, please.

24         Could you tell us what the total of the amounts paid

25   to Diane Doll, as reflected on Waimana's general ledger, for
```

1     that year were.

2     A     2,000, so $4,000 -- oh, $10,000.

3     Q     Okay.  I'm sorry for challenging you, but since you were

4     an accountant, I thought I could take the chance.

5     A     Yeah.

6     Q     $10,000?

7     A     Yes.

8     Q     All right.  And if we could now see Exhibit 1151, page

9     1165, please.  Top half would be great.  Thanks.

10           And do you recognize that form?

11    A     Yes.

12    Q     1099 form?

13    A     That's a 1099 form.

14    Q     What does this particular form show for the same calendar

15    year we've just been looking at?

16    A     The payments made to Diane Doll.

17    Q     And the amount?

18    A     $10,000.

19    Q     Okay.  And that would be part of the service you would

20    provide to Waimana; correct?

21    A     That's correct.

22    Q     If we could have the lights, please.

23           I'm sorry, I'm actually going to go to an exhibit

24    first.  If we could look at Exhibit 1-19, page 544, please.

25           If we could look at the next page, please.

```
 1                 This appears to be a tax return; is that correct,
 2    Mr. Chinaka?
 3    A    Yes.
 4    Q    And if we could just -- well, no need to zoom in.  Can you
 5    read from there that it's for Waimana Enterprises?
 6    A    Yes.
 7    Q    And do you recognize the signatures that appear at the
 8    bottom?
 9    A    Yes.
10    Q    And is the one I'm pointing at yours, David Chinaka?
11    A    Yes.
12    Q    And this is a corporate tax return that you prepared on
13    behalf of Waimana; is that correct?
14    A    That's correct.
15    Q    I just want to ask you a couple of questions.  If we could
16    look at the section that has line 26, please.
17                 Okay.  This is in a section that's generally entitled
18    deductions; is that correct?
19    A    That's correct.
20    Q    What is a deduction?
21    A    It would be an expense item.  It would be a deduction
22    against income.
23    Q    And in lay terms does that, basically, reduce your taxes?
24    A    Yes, ultimately.
25    Q    Because what you earn is the income; right?
```

1    A     Right.

2    Q     And what you pay in order to run your business is the

3    expense?

4    A     Yes.

5    Q     And you subtract the expense from the income to come up

6    with a number that the IRS will tax; correct?

7    A     Yes.

8    Q     And here, for this particular year, what is the amount of

9    the other deductions claimed by Waimana?

10   A     452,296.

11   Q     All right.  And there appears to be a computer-generated

12   statement.  "See STMT 3."  Do you see that?

13   A     That is statement number 3.

14   Q     What is the statement supposed to do?

15   A     It will provide a detail of what is makes up that total.

16   Q     So if we go to statement 3, we're going to see what adds

17   up to $452,296?

18   A     Yes.

19   Q     Okay.  Let's take a look at statement 3 on Bates number

20   565, please.  And if we could look at the bottom.  Thank you.

21              Is this statement 3?

22   A     Yes.

23   Q     And is this part of the tax return we were just looking

24   at?

25   A     That's correct.

1    Q    And tell us how this sort of information -- well, wait a
2    minute.  Let me withdraw that.
3              What's the total amount here?
4    A    Four hundred thousand -- 452,296.
5    Q    And that's the same number that appeared on the cover page
6    or page one of the tax return; correct?
7    A    That's correct.
8    Q    And there's a column entitled "Description"; correct?
9    A    Yes.
10   Q    And what is underneath that?
11   A    That would be a listing of all the deductions that are not
12   on a separate line item; so it's in the other deduction.
13   Q    And what is the purpose of including a statement of this
14   sort on the tax return?
15   A    It's in order to give the detail of what's in a other
16   deduction line.
17   Q    So would it be a fair statement that it would provide the
18   Internal Revenue Service with additional information about the
19   nature of the deductions claimed by the taxpayer?
20   A    Yes.
21   Q    These are different categories.  Who would decide what
22   categories to use?
23   A    It would come from the general ledger description, or it
24   may come -- we may combine smaller amounts into a miscellaneous
25   other deduction.

1   Q    So, for example, here there's a heading "Consulting Fees";

2   correct?

3   A    Yes.

4   Q    And that would have come from Waimana's general ledger;

5   correct?

6   A    Yes.

7        MR. TONG:  Okay.  Now, Miss Fujinaga, I promise you I

8   won't have an exhibit for a minute or so.  Thank you.

9   Q    Mr. Chinaka, during your time of your engagement with

10  Waimana was there a time that you learned that the company had

11  paid tuition expenses for the defendant's children?

12  A    Yes.

13  Q    And how did you learn about that?

14  A    It was during the audit conducted by the Internal Revenue

15  Service.

16  Q    Okay.  And when did that audit begin?

17  A    After July of 2008.

18  Q    Okay.  And prior to that time you did not know that

19  tuition expenses had been paid.

20  A    Yes, I did not know.

21  Q    And let's back up a little so I have it clear.  Until

22  Mr. Siu left, is it true that he had primary responsibility for

23  the corporate tax returns?

24  A    Yes.

25  Q    And when again did Mr. Siu leave?

1    A      2008.

2    Q      So you weren't involved on a day-to-day basis on every

3    corporate tax return; correct?

4    A      That's correct.

5    Q      And do you know how your company responded when it learned

6    that tuition expenses had been paid by Waimana?

7    A      For the years prior to 2008, which came out in the audit,

8    it would have -- it was classified as a loan -- expenses were

9    classified as loan to shareholder.

10   Q      Are you familiar with that concept?

11   A      Yes.

12   Q      And what effect does that have in terms of the obligations

13   of the taxpayer or the person who supposedly is getting the

14   money?

15   A      Essentially, it's not a deduction on the corporate tax

16   return.  It's no longer going to be a deduction.  So it's going

17   to be classified as a loan to shareholder with the intent that

18   it will be repaid.

19   Q      And do you, as a CPA, understand that there are certain

20   indicators or features of whether or not it's a true loan?

21   A      Yes.

22   Q      And explain to us what some of those indicators would be.

23   A      Indicators would be -- the primary indicator would be

24   intent.  And to document the intent you may have a loan

25   document.

1   Q    And when you say "intent," do you mean whether the person

2   taking the money had the intent at that time to repay it?

3   A    Yes.

4   Q    And when you say you could have a loan document, what do

5   you mean?

6   A    You would have a promissory note or a loan document

7   stating the dollar amount and the interest rate, if any, and

8   repayment schedules.

9   Q    And from an accounting standpoint, why would that matter?

10  A    Essentially, that would determine as to when the payment's

11  going to be coming due or not.

12  Q    And why would it -- go ahead.

13  A    In case they -- you determine that you're not going to pay

14  it back, if this was a shareholder loan, that would be

15  consequences on both the corporate books and the individual.

16  Q    Okay.  What consequences would there be?

17  A    The company would then be able to take a loss on the loan

18  because you're not going to get it repaid, and you're going to

19  have income to the shareholder.

20  Q    Okay.  So if a person -- the shareholder got money from

21  the company and didn't intend to repay it, it would be deemed

22  income by the IRS; correct?

23  A    It's possible.

24  Q    And do you remember talking to the defendant about the

25  need to document the loan to shareholder?

1   A    I did not talk to Mr. Hee initially.

2   Q    Initially.

3   A    Yeah, because I was not the person in charge.

4   Q    And so we need to talk to Mr. Siu about that?

5   A    Yes.

6   Q    All right.  Do you remember talking to him later?

7   A    Not specifically.

8   Q    Okay.  Let me see if I can show you something and see if

9   it will help you remember.  Turn to the binder in front of you,

10  please.

11          Could you please turn to Exhibit 21F in the binder in

12  front of you, Mr. Chinaka.  Do you see that document?

13  A    Yes.

14  Q    All right.  And just take a look at page 16.  And go ahead

15  and read -- (conferring).

16          Exhibit 21C, please.  And when you get there, if you

17  could look up so we can make sure we're on the same document.

18  A    Okay.

19  Q    And is Exhibit 21C a transcript of testimony that you gave

20  before the federal grand jury in this courthouse?

21  A    Yes.

22  Q    And that was a proceeding similar to the one we're in

23  today; is that correct?

24  A    Yes.

25  Q    I mean, not quite as big a courtroom, but you were a

 1   witness, you swore to tell the truth, and it was a solemn

 2   proceeding; correct?

 3   A     Yes.

 4   Q     And that was about two years ago; is that correct?

 5   A     That's correct.

 6   Q     And if you could kindly look at page 16, and maybe read to

 7   yourself starting at about line 12.

 8   A     (Witness complying.)

 9   Q     And go to the end of the page.

10   A     Okay.

11   Q     Okay.  And having read that, does that refresh your

12   recollection of whether you spoke to the defendant concerning

13   the advisability of having documentation for the loan?

14   A     Yes.

15   Q     And with refreshed memory can you tell us did you speak to

16   him about documenting the loan?

17   A     No.  It was done by Mr. Siu and Mr. Hee earlier.

18   Q     Okay.  And take a look at lines 19 and 20.

19   A     Uh-huh.

20   Q     Okay.  Do you recall telling Mr. Hee, when you took over

21   the account in 2008, about the need to document the loan?

22   A     I may have had the conversation.

23   Q     Okay.  You don't recall at this point.

24   A     I don't recall at this time.

25   Q     Okay.  And let me ask you about this proceeding.  This was

1    a proceeding in front of the grand jury; correct?

2    A    Yes.

3    Q    And there was a court reporter present, just as there is

4    the young lady in front of you; correct?

5    A    Yes.

6    Q    And the questions that were asked and the answers given

7    were typed up into a transcript; correct?

8    A    That's correct.

9    Q    And let me read to you, basically, lines 19 through 22.

10   You were asked -- I'm sorry, the grand juror asked you, "Did

11   you say that you did?"  And you answered, "I did that when I

12   took over the account when my partner retired."  And you said,

13   "And so that's back in 2008."  Correct?

14   A    Yes.

15   Q    That's the testimony you gave.

16   A    That's correct.

17   Q    And that was preceded by a question, and let me see if I

18   asked it -- read it correctly.  Starting at line 14, grand

19   juror asked you, "Did you say that you did talk with Mr. Hee

20   directly about the need to have some type of documentation for

21   the loan?"  And your answer is, "Yeah."  Is that correct?

22   A    That's correct.

23   Q    And that's the testimony you gave --

24        MR. TOSCHER:  Objection, Your Honor.  I think there

25   was a mischaracterization of the answer.  It says, "Yeah,

1    but --"

2              THE COURT:  Okay.

3              MR. TONG:  Oh, okay, okay.

4    Q    I'll tell you what, just so we're clear, let me read the

5    entire section, and then I'll ask you if I read it correctly.

6              Starting with line 12, grand juror asks, "Yeah, a

7    clarification.  I don't know if I understood you right.  Did

8    you say that you did talk with Mr. Hee directly about the need

9    to have some type of documentation for the loan or --"  You

10   responded, "Yeah, but --"  Grand juror, "Did you say that you

11   did or --"  You responded, "I -- I -- I did that when I took

12   over the account when my partner retired."  Grand juror says,

13   "Uh-huh."  Then you responded, "And so that's back in 2008."

14             Did I read that correctly?

15             MR. TOSCHER:  Objection, Your Honor.  I think counsel

16   should read the rest of the clause.

17             THE COURT:  Okay.  Go ahead.

18             MR. TOSCHER:  Just for completeness, Your Honor.

19             MR. TONG:  May I just ask him whether I read it

20   correctly to that point?

21             THE WITNESS:  Yes.

22   BY MR. TONG:

23   Q    Okay.  And then the rest of the clause is, "But we've had

24   him, you know, from way before, and that -- that would have

25   been discussed with Mr. Siu and Mr. Hee earlier."

1    A    Yes.

2    Q    I read that correctly?

3    A    Yes.

4    Q    And that's accurate testimony; is that correct?

5    A    Yes.

6    Q    So in lay terms, you talked to him in 2008, but Mr. Siu

7    talked to him earlier.

8    A    Yes.

9    Q    Now, did you ever see a promissory note prepared to

10   reflect the loan to shareholder on Waimana's books?

11   A    Not that I recall.

12   Q    Okay.  And whose obligation would it be to prepare a

13   promissory note?

14   A    It would ultimately be the company.

15   Q    Why wouldn't it be the accountant's obligation?

16   A    We're not part of the company.

17   Q    Now, you mentioned earlier about the tax consequences if a

18   loan were deemed to be not a loan; correct?

19   A    That's correct.

20   Q    And I believe you said it could be considered income to

21   the shareholder, meaning they got money; correct?

22   A    Yes.

23   Q    And would a shareholder then have an obligation to report

24   that income on their personal income tax returns?

25   A    If at that time it was written off, yes.

1    Q    And you testified earlier that you prepared the personal

2    income tax returns for the defendant Albert Hee and his wife;

3    correct?

4    A    That's correct.

5    Q    And was there anything on any of his personal income tax

6    returns reporting as income the amounts that were booked by

7    Waimana as a loan to shareholder?

8    A    No.

9    Q    I'm going to shift topic slightly.  Let's talk about the

10   three children.  And I believe you said that you prepared the

11   income tax returns for the defendant's three children; correct?

12   A    That's correct.

13   Q    Did there come a time where you learned that they were

14   being paid by Waimana?

15   A    Yes.

16   Q    How did you learn about that?

17   A    Because we prepare their individual returns.  They receive

18   W-2s from Waimana.

19   Q    And did you have an understanding of what that work was

20   for?

21   A    I did not.

22   Q    Okay.  Did you have any discussions with Mr. Hee directly

23   about what the work was for?

24   A    No.

25   Q    And who had the primary contact with Mr. Hee through the

1   years up till 2008?

2   A    It would be the staff accountants or, ultimately, at the

3   beginning would be Mr. Siu until I took over.

4   Q    Now, over the years did you have discussions with Mr. Hee

5   about business expenses generally?

6   A    Yes.

7   Q    And about how often would you have such discussions?

8   A    Once or twice a year.

9   Q    And tell us the nature of the discussions that you would

10  have.

11  A    It was either to -- in the preparation of the tax returns

12  it was to determine -- essentially, let him know that he's

13  familiar with what are deductible or not deductible.

14  Q    I may not have caught all of that.  Do I understand that

15  you're saying you had discussions to assure yourself, as a CPA,

16  that he understood what was deductible?

17  A    Yes.

18  Q    And how would you go about having those discussions?

19  A    I would come down and talk to him.

20  Q    Okay.  And this would happen once or twice a year;

21  correct?

22  A    Yes.

23  Q    Did you have an understanding of whether he seemed to

24  understand what legitimate business expenses were?

25  A    Yes.

1   Q    Did he?

2   A    He did.

3   Q    Now, let me ask you about a particular e-mail which

4   appears as Exhibit 11-57.  I don't know if that's in your

5   binder.  If we could --

6            THE COURT:  Do you have 11-57?

7            THE WITNESS:  No, not in the binder.

8            THE COURT:  We'll get it for you.  Hold on one

9   second.

10  BY MR. TONG:

11  Q    Mr. Chinaka, if it's easier, that's a thick file.  We can

12  look on the screen.

13            Okay.  If we could look at the bottom half, please.

14  This appears to be an e-mail chain; is that correct?

15  A    Yes.

16  Q    So to get the context maybe if we can start at the bottom.

17            This appears to be an e-mail from Abby T. of Sandwich

18  Isles; is that correct?

19  A    Yes.

20  Q    And who is that?

21  A    That would be Abby Tawarahara.

22  Q    Tawarahara?

23  A    I believe so.

24  Q    And it's addressed to who?

25  A    It would be addressed to my company.

1   Q    Okay.  And, basically, this has to do with work done for

2   consolidated financials; is that correct?

3   A    That's correct.

4   Q    Explain what your role in that process was.

5   A    I prepared the consolidated financial statements for the

6   companies.

7   Q    For what purpose?

8   A    I don't recall the exact purpose, but it was asked by the

9   client to prepare.

10   Q    The header says "for loan."  Do you see that?

11   A    Yeah.

12   Q    And is it typical that, if a corporation wants a line of

13   credit with a bank, they would have to show financial

14   statements?

15   A    Yes.

16   Q    And sometimes they would have to have an outside

17   accountant say that the statements are what?

18   A    Fairly presented.

19   Q    Okay.  And do you recollect from time to time you've done

20   that sort of work for Waimana?

21   A    Yes.

22   Q    Does that appear to be the subject matter of this e-mail?

23   A    That's correct.

24   Q    Okay.  And here's an e-mail from your company to the woman

25   we just tried to pronounce her name, Abby Tawarahara; correct?

1   A    Yes.

2   Q    And it says, "We are still waiting for Al."  Who's "Al"?

3   A    That would be Mr. Hee.

4   Q    "To call us regarding his wanting to categorize jewelry as

5   artwork."  Do you see that?

6   A    Yes.

7   Q    And you remember that was an issue at some point; correct?

8   A    That's correct.

9   Q    How to categorize something as a business expense;

10  correct?

11  A    Well, it was not considered an expense.  It would have

12  been considered an asset to be depreciated, if necessary.

13  Q    So you were trying to figure out where to put it on the

14  financial statements; correct?

15  A    That's correct.

16  Q    And you were going to report it as something that the

17  company had, an asset; correct?

18  A    That's correct.

19  Q    And if it's an asset, what does depreciation do?

20  A    Depreciation will represent the wear and tear of the item.

21  Q    So that results in a deduction; correct?

22  A    Yes.

23  Q    And a deduction lowers taxes; correct?

24  A    That's correct.

25  Q    All right.  So in this case there was a request for Al to

1    call us about his desire to categorize jewelry as an asset;

2    correct?

3    A    That's correct.

4    Q    And the response appears at the top -- I'm sorry.

5    Basically, Abby says to Mr. Hee, "Please give David a call";

6    correct?

7    A    That's correct.

8    Q    And if we could now look at the top e-mail.  And is that

9    the January 30, 2009 e-mail from Mr. Hee to you?

10   A    To my company, yes.

11   Q    Well, it's addressed to David, though; is that correct?

12   A    Yes.

13   Q    And David is you; correct?

14   A    That's correct.

15   Q    And it says, The jewelry should be classified as art, as

16   they are primarily, quote, historical preban ivory pieces

17   manufactured in Hawai'i, period, closed quote; correct?

18   A    Yes.

19   Q    Then it goes on to describe Mr. Hee's intent as purchasing

20   them with the intention that they eventually will be displayed

21   in his offices and/or worn to functions by representatives of

22   Waimana; correct?

23   A    Yes.

24   Q    And he concludes by saying a good example was the

25   Presidential Inauguration at which Wendy and my daughters wore

1    some of this, quote, "art"; correct?

2    A     Yes.

3    Q     And when you got that e-mail, what did you do with it?

4    A     Reclassified the artwork -- the jewelry as art.

5    Q     So would that exchange sort of illustrate how a client

6    might give you information that would bear on how you would

7    classify things for tax purposes?

8    A     Yes.

9    Q     Would it also be representative of the type of exchange

10   you would have with Mr. Hee over the years concerning how to

11   categorize different things?

12   A     Yes.

13   Q     And those are the types of discussions you said you would

14   have once or twice a year.

15   A     Yes.

16   Q     Which led you to believe he understood what a deduction

17   was.

18   A     Yes.

19             MR. TONG:  May I have a moment, Your Honor?

20             THE COURT:  Yes.

21        (Counsel conferring.)

22             MR. TONG:  I have no further questions.

23             MR. TOSCHER:  Good morning, Mr. Chinaka.

24             THE WITNESS:  Good morning.

25             MR. TOSCHER:  May it please the court.

1                        CROSS-EXAMINATION

2    BY MR. TOSCHER:

3    Q    Mr. Chinaka, you testified under Mr. Tong's questioning

4    regarding the preparation of taxes.  He took you through the

5    engagement letter on the 1040 and on the 1120.  And the focus

6    of his questions were the preparation of tax returns; correct?

7    A    Yes.

8    Q    And your answers really were focused on just the

9    preparation of tax returns; is that correct?

10   A    That's correct.

11   Q    And you talked about you've been -- you're Chinaka & Siu

12   and have been representing Mr. Hee and his entities, I think

13   you said, since 1980?

14   A    Approximately.

15   Q    And we know that you were working through 2008.  Are you

16   still doing work for Mr. Hee?

17   A    I am preparing his personal income tax returns.

18   Q    So from 1980 to 2015, that's a fairly long engagement with

19   an accountant, isn't it?

20   A    Yes.

21   Q    It shows a good relationship with the client, doesn't it?

22   A    Yes.

23   Q    Now, and I know things have changed over the years; so I'm

24   going to try to be a little, you know, be specific.  But

25   let's -- could you tell the jury -- and going back to, let's

```
 1   see, a relevant period, 2000, 2003, you know, when you started.
 2   Chinaka & Siu CPAs, there was you, David Chinaka?
 3   A    Yes.
 4   Q    There was another name we've heard, Carlton Siu?
 5   A    That's correct.
 6   Q    And then I think we heard another -- a word -- another
 7   name, Lynn Tamanaha?
 8   A    Yes.
 9   Q    And Gayle Yasaka?
10   A    Lynn Yasaka.
11   Q    Lynn Yasaka.  I apologize.  I'm going to try to get it.
12            Now, were all the names I just gave you all involved
13   with working on the Hee matters and the corporate tax returns,
14   et cetera?
15   A    Yes.
16   Q    And were there other staff accountants -- you mentioned
17   staff accountants during your direct testimony.
18   A    There would be other staff accountants that were employed
19   by the company that may have worked on some portion of the
20   engagement.
21   Q    So is it fair to say that sort of the hierarchy in terms
22   of -- there's a lot of people involved.  There's David Chinaka.
23   There's Carlton Siu.  We're going to talk about the respective
24   roles.  Then there's the two Lynns.  And then there's staff
25   accountants under them.  So there's a lot of people involved.
```

1   A    Yes.

2   Q    Okay.  Just so we have it set.

3            THE COURT:  Can I get a clarification?  I thought he

4   said there were staff accountants employed by the company.  By

5   "company" did you mean your company?

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.

8            MR. TOSCHER:  Thank you, Your Honor.

9   Q    So going back -- let's look at the 2003 time frame.  What

10  services did Chinaka & Siu render to Mr. Hee and his companies?

11  A    Mr. Hee would have -- we would have prepared his

12  individual returns -- individual income tax returns.  We would

13  also have done the corporate tax return for Waimana.

14  Q    Okay.  You also did during this period of time some

15  certified audits?

16  A    We would have done a certified audit of Waimana

17  Enterprises and subsidiaries.

18  Q    I'm sorry, Waimana and --

19  A    And their subsidiaries.

20           THE COURT:  We can turn up his mike a little bit.

21           You can keep going.  We'll just push the volume up on

22  the computer here.

23  BY MR. TOSCHER:

24  Q    So just to make sure I heard that.  During this period of

25  time, in addition to the tax returns, you performed certified

1    audits.

2    A    Yes.

3    Q    At Waimana and its subsidiaries.

4    A    Yes.

5    Q    And the subsidiaries, if you recall, Mr. Chinaka?

6    A    It would be ClearCom, Ho'opa'a Insurance Company, Sandwich

7    Isles.

8    Q    Okay.  Now, in addition, we're going to go back to the

9    certified audits.  The certified audits that you did, that was

10   what you referred to on direct yesterday regarding the scrutiny

11   that you have to go through?

12   A    Yes.

13   Q    Now, in addition to that, Chinaka & Siu also -- the

14   general ledger that was up there on the board before, and we'll

15   go back to it in a second.  I'll get the exhibit up.

16        In fact, let's do that now.  But that was prepared by

17   your staff, wasn't it?

18   A    Yes.

19   Q    So let's -- just for clarification, can we put up 11-58,

20   please.  Oh, that's not it.  I'm sorry.  I will find it, Your

21   Honor.

22        Not 11-58.  What number is it?

23        Thank you.  Sorry.  11-54, please.  I'm sorry, the

24   page number.  Page 1626.

25        Okay.  Maybe we can dim the lights a little bit.

1          I think this is what we looked at before.  That is

2   the general ledger we looked at before, Waimana Enterprises

3   with the client number, December 31, '04.

4   A    Yes.

5   Q    December 31, 2004.

6   A    2004.

7   Q    Now, I just want to make sure -- I didn't get it clearly

8   during your testimony with Mr. Tong, and the jury may have been

9   confused as to who prepared this.  This was actually you

10  guys -- I'm sorry, forgive me.  Chinaka & Siu prepared the

11  general ledger for Waimana, did it not?

12  A    Yes.

13  Q    Not the company.

14  A    Not this one.

15  Q    Not this one.

16  A    Yes, that's correct.

17  Q    Just want to make sure that's clear that this was prepared

18  by Chinaka & Siu.  And we'll talk about how that gets prepared.

19  Okay?

20  A    (Nods head.)

21  Q    Thank you.

22          Okay.  You can unpublish that.  Thank you.

23          Now, could you describe for the jury again, or tell

24  me, you testified there was a much higher level of scrutiny of

25  things that are reviewed when you do a certified audit;

1    correct?

2    A    Yes.

3    Q    And I believe you did a certified audit, and I'll pull up

4    the documents, in 2004?

5    A    Yes.

6    Q    2005?

7    A    I believe so.

8    Q    2006?

9    A    I'm not sure exactly until when.

10   Q    Okay.  That's fine.  So tell us the scrutiny you go

11   through, the things you review when you do a certified audit.

12   A    A certified audit would require us to review supporting

13   documentation, such as invoices, canceled checks, receipts,

14   deposits, loan documents, leases.  And, essentially, you do it

15   on a test base.  It's a random basis.  You don't look at every

16   single document, but on a random basis you'll test certain

17   documents.

18   Q    But there's a lot of scrutiny; is there not?

19   A    There's a lot more scrutiny in a financial statement

20   audit -- certified audit than it is on a tax return.

21   Q    Much more; correct?

22   A    Much more.

23   Q    Now, the -- so when you prepare a certified audit -- and

24   that's a financial statement of the company.

25   A    Yes.

1    Q     And it shows assets; correct?

2    A     Yes.

3    Q     And liabilities?

4    A     Yes.

5    Q     So when you prepare that audit, and it reflects an asset

6    on the return, you, basically, have done your due diligence to

7    determine that is a real asset on the return.

8    A     Yes.

9    Q     And if there's a liability -- I'm sorry, not the return.

10   The financial statement.  If there's a liability reflected on

11   that financial statement, you've done due diligence, everything

12   you believe you needed to do for certified audit purposes to

13   determine that's a real liability.

14   A     Yes.

15   Q     And when you do that certified audit, Chinaka & Siu, the

16   accounting firm, are certifying that you've looked at this in

17   detail in accordance with accounting principles that govern

18   certified public accountants; is that correct?

19   A     That's correct.

20   Q     Now, you testified before on direct that up to a certain

21   point in time Carlton Siu was the main contact point --

22   A     Yes.

23   Q     -- with the client.

24   A     (Nods head.)

25   Q     And would you -- and then later you took over the role of

1   the tax returns.  And I think -- sorry.  Go ahead.

2   A    Yes.

3   Q    And I think you said probably in 2008.

4   A    Yes.

5   Q    Okay.  You've got to talk for the record, okay.  Sorry.

6        But prior to that time when you got involved in the

7   tax returns, your primary role -- wasn't your primary role

8   doing these certified audits?

9   A    That's correct.

10  Q    And Mr. Siu's primary roll up to that point was taking

11  care of the taxes.

12  A    That's correct.

13  Q    But you guys talk to each other during this period of

14  time?

15  A    Yes.

16  Q    Something comes up in the audit, you talk to Carlton.  If

17  something comes up on the taxes, he talks to you.

18  A    That's correct.

19  Q    And that's because things regarding the taxes may impact

20  your audit; right?

21  A    That's correct.

22  Q    You have to account for potential tax issues in your

23  audit; isn't that right?

24  A    That's correct.

25  Q    If you discovered information during your audit that

1   impact the taxes, you would tell Carlton, or Mr. Siu.

2   A    Yes.

3   Q    Now, Mr. Tong covered the issue regarding the tuition

4   payment in 2004.

5   A    Yes.

6   Q    Do you recall that topic?

7   A    Yes.

8   Q    And I just want to make sure -- and you may not have been

9   directly involved at the time, but I want to make sure it's

10  clear.  I believe -- and if you don't have any, you don't

11  have -- only state what your personal knowledge is -- is that

12  information came over from Miss Henderson showing the staff

13  accountants that there was a payment to MIT tuition for Ho'o.

14  Do you remember that?

15  A    Yes.

16  Q    Okay.  And it just said "tuition, educational expenses."

17  A    Yes.

18  Q    And staff accountants are charged, either the staff or

19  Lynns, if there's an issue regarding that, to raise it to the

20  partner level:  you or Carlton -- I'm sorry, Mr. Siu.

21  A    That's correct.

22  Q    And this issue never got raised with you at that time.

23  A    That's correct.

24  Q    Okay.  This is the 2004 deduction, but this would have

25  been in 2005.

1    A    That's correct.

2    Q    And do you recall that originally it got classified as

3    "educational expenses," and then the staff changed it to

4    another characterization on the tax return.

5    A    That's correct.

6    Q    And that's why maybe the partners missed it in your

7    review?

8    A    That's possible, yes.

9    Q    Okay.  Well, but the point was there was a deduction on

10   the 2004 tax return, and that was an error by your accounting

11   firm, wasn't it?

12   A    Yes.

13   Q    A good-faith error on your part.

14   A    Yes.

15   Q    You just missed it.

16   A    That's correct.

17   Q    Now -- and I just want to make sure that's clear.

18        Later in preparing the 2006 tax return the accounting

19   staff did see these payments for tuition and educational

20   expense.

21   A    Yes.

22   Q    They were properly described in the information that came

23   over from Waimana?

24   A    That's correct.

25   Q    And then it got raised to the partner level by the staff

1    accountants.

2    A    That's correct.

3    Q    And is it your -- did you talk to Mr. Hee at that time, or

4    was it Mr. Siu who talked to Mr. Hee?

5    A    It would still be Mr. Siu.

6    Q    Okay.  But you do know that there was a change in the

7    accounting for the tuition payments at that time; correct?

8    A    Yes.

9    Q    And Chinaka & Siu -- and we'll talk to Mr. Siu -- advised

10   Mr. Hee that, no, you can't deduct the tuition; correct?

11   A    That's correct.

12   Q    And Chinaka & Siu advised Mr. Hee "You should treat it as

13   a shareholder loan"; isn't that correct?

14   A    That's correct.

15   Q    And from that point forward all the payments for the

16   tuition were treated as a shareholder loan.

17   A    That's correct.

18   Q    And we'll talk to Mr. Siu about that a little more.

19         So these are one of the discussions that you talk

20   about once in a while when either you or Mr. Siu might talk to

21   Mr. Hee, and this was a discussion regarding the tuition.

22   A    That's correct.

23   Q    And your firm told him, "Stop; you can't deduct the

24   tuition."  And Mr. Hee followed your advice, did he not?

25   A    Yes.

1   Q    And your firm advised him, "Treat it as a shareholder

2   loan"; correct?

3   A    That's correct.

4   Q    And that's what's custom when people are paying

5   nondeductible expenses.  You advise your clients to treat it as

6   a loan, don't deduct it; right?

7   A    That's correct.

8   Q    So he followed your advice on treating it as a loan as

9   well.

10  A    Yes.

11  Q    Okay.  So, Mr. Chinaka, staying with the shareholder loan

12  for a second -- could I have you publish 4-82?  I hope I got it

13  right.

14        Yes.  This is the schedule in the government's

15  exhibits regarding the loan to shareholder.  And I don't know

16  if you can see it close enough up there, but this is a summary

17  of the Waimana books and records showing that the transactions,

18  as you've said, that point forward are treating all these

19  payments as shareholder loans; correct?

20  A    That's correct.

21  Q    And can you scroll to the next page.  And this continues

22  on from 2007 all the way through, and the balance is building

23  up.

24        And go to the next page, please, 3 of 4.

25        And right here we show -- actually, I can't really

1    read it.  I'm sorry.

2            So, basically, what I'm getting at is that Chinaka &

3    Siu knew that these were characterized as loans, and you

4    thought that was proper; correct?

5    A    Yes.

6    Q    And you never told Mr. Hee anything of the contrary, did

7    you?

8    A    No.

9    Q    And each year you did the tax returns -- the corporate tax

10   returns during 2004, '5, '6, '7, and '8 -- that's the last one

11   you did.

12   A    (Nods head.)

13   Q    -- you reflected that shareholder loan on the Form 1120,

14   did you not?

15   A    Yes.

16   Q    And you thought that was proper.

17   A    Yes.

18   Q    And during each of those years Chinaka & Siu, whether it

19   was you signing the return or Mr. Siu, did Mr. Hee's tax

20   returns, individual tax returns.

21   A    Yes.

22   Q    And you never told him you have to report that loan on

23   your tax return, did you?

24   A    No.

25   Q    The topic never even came up.

1   A    Never came up.

2   Q    And that's because you thought what you were doing was

3   absolutely proper.

4   A    Yes.

5        MR. TOSCHER:  Can I ask to be published Exhibit

6   11-55?  I think it's 2680-88.

7        Okay.  Can you go back a page?  I'm sorry, 2680

8   through 80.  Thank you.  2680 Bates stamp number.

9   Q    Okay.  Now --

10       THE COURT:  Counsel, can you get a little closer to

11  the microphone, please.

12       MR. TOSCHER:  I'm sorry, Your Honor.

13  Q    We're looking at Exhibit 11-55 where you have the Bates

14  number of 2680.

15       Mr. Chinaka, if you can read that -- hopefully, you

16  can -- tell me what this piece of paper is.

17  A    That's our -- what we call a docket, and it indicates the

18  individuals in the firm, my company, that prepared, typed,

19  reviewed -- this is a financial statement audit.

20  Q    Can you tell from this page whether it was a certified

21  audit?

22  A    It would be a certified audit.

23  Q    This is one of those certified audits where you scrutinize

24  a lot of things.

25  A    Yes.

1    Q    Can you go to the next page, please.  Next page, please.

2    Well, before we do that, that's what it says:  "Waimana

3    Enterprises and subsidiaries financial statements and

4    independent auditor's report."

5              THE COURT:  You're pretty far from the microphone.

6              MR. TOSCHER:  I apologize, Your Honor.

7    Q    It talks about two different things:  financial statements

8    and an independent auditor's report.  Explain the significance

9    of the independent auditor's report to the jury, Mr. Chinaka.

10   A    In order to do a certified audit and -- we have to

11   maintain an independence of the client, both in fact and

12   appearance.  If we are not independent, we cannot issue an

13   opinion on the financial statements.

14             So by saying that there's a report attached to the

15   financial statements, it sets forth that we, as a firm, are

16   saying that the financial statements are fairly presented in

17   accordance to generally accepted accounting principles, and

18   it's fairly presented; that there's no material errors in the

19   financial statements; and that the independent auditor's report

20   is the only thing that we actually control.

21   Q    I'm sorry.  If we could turn to the next page, please.

22             That's your independent auditor's report.

23   A    That's correct.

24   Q    And just going to this section, I'll read it to you:  "In

25   our opinion the financial statements referred to above present

1    fairly, in all material respects, the financial position of

2    Waimana and its subsidiaries and the results of its operations

3    in conformity with U.S. generally accepted accounting

4    principles."  Correct?

5    A    That's correct.

6    Q    And on this financial statement for 2005 that reflects the

7    loan to shareholder we were referring to before, does it not?

8    A    Yes.

9    Q    And you're certifying that's an accurate asset on the

10   company's liability.

11   A    That's correct.  Balance sheet.

12   Q    Balance sheet.  Thank you.  I know just enough accounting

13   to be dangerous.

14        Now, do you recall when you were doing your audits --

15   and I think you said '05, '06, '07 -- that you actually wanted

16   to verify the validity of the shareholder loan?

17   A    Yes.

18   Q    And did you verify the validity of the shareholder load?

19   A    There was no written documentation; however, we did talk

20   to Mr. Hee, determined that it is a valid -- the intent is

21   there:  it was going to be repaid.

22   Q    So you found it was a valid loan for financial statement

23   purposes, even if there was no promissory note; correct?

24   A    Yes.

25   Q    And based upon discussions with Mr. Hee, and you took into

1    account all the other information you knew as well; correct?

2    A    That's correct.

3    Q    There didn't have to be a promissory note, did there,

4    Mr. Chinaka.

5    A    No.

6    Q    Okay.  Can we go to 11-56, please, page 5312.

7          Okay.  Mr. Chinaka --

8          THE COURT:  Counsel, can you get closer to the

9    microphone, please.  You're not going to get on the record

10   otherwise.  She's hooked into the mikes.

11         MR. TOSCHER:  Thank you, Your Honor.

12   Q    Could you describe what 11-56, 5312 is, Mr. Chinaka.

13   A    Again, this would be a docket that shows the individuals

14   that prepared, reviewed, typed the financial statements.

15   Q    Okay.  And this is for a different year, is it not?

16   A    Yes.

17   Q    And this looks like -- can you tell what year that is?

18   Does that say it's for 12/31/06?

19   A    Yes.

20   Q    And the report date says 12/10/07.

21   A    That's correct.

22   Q    So this is, basically, almost a year after the taxable

23   year; correct?

24   A    That's correct.

25   Q    And describe for the jury what all these signatures are

1    here.  Seems like there's a lot of people involved signing off.

2    What is that all about?

3    A     Essentially, those are the individual staff members that

4    would have performed the individual tasks, such as who prepared

5    the financial statement, who reviewed the financial statement,

6    who typed the financial statements.  And we have read and

7    proofreading to make sure there's no typographical errors.

8    Q     Right.

9    A     And then we have a final review and then who would then

10   sign the return -- the financial statements.

11   Q     Right.  A lot of time is spent, is it not?

12   A     Yes.

13   Q     And a lot of client cost to do this; correct?

14   A     Yes.

15   Q     Much more than the preparation of a tax return.

16   A     That's correct.

17   Q     Can we go to the next page, please.  And this is the

18   independent -- the financial statements and independent

19   auditor's report for 2006; correct?

20   A     That's correct.

21   Q     We can take that down now.

22         And can you put up 11-57, please.  To page 7507,

23   please.

24         Okay.  And if we could just go -- we'll go very

25   quickly here.  This -- can you tell from looking at this, this

1    is the certified audit for 12/31/07, Mr. Chinaka?

2    A    Yes.

3    Q    Okay.  And can we go down just two pages, please.

4         And again this is -- so we did do -- you did do a

5    certified audit report for Waimana and its subsidiaries for the

6    year 12/31/07; is that correct, sir?

7    A    That's correct.

8    Q    Okay.  Thank you very much.

9         Mr. Chinaka, focusing on the shareholder loan again,

10   it's common, is it not, in your practice to treat items as

11   shareholder loans, even if there's not a promissory note?

12   A    Yes.

13   Q    You try to get clients to do it, but sometimes they don't;

14   right?

15   A    That's correct.

16   Q    And it doesn't affect the validity of the loan in your

17   judgment, does it?

18   A    It does not.

19        MR. TOSCHER:  Your Honor, I'm about to go into

20   another topic.  When is the Court anticipating --

21        THE COURT:  Why don't you go ahead and start on it,

22   and we'll probably go until at least 10:30.

23        MR. TOSCHER:  Thank you, Your Honor.

24   Q    Mr. Chinaka, you testified on direct about the employment

25   of Mr. Hee's children at the company.  Do you recall that?

1   A     Yes.

2   Q     Now, the -- Chinaka & Siu did the individual tax returns

3   for Mr. and Mrs. Hee; correct?

4   A     That's correct.

5   Q     And did the individual tax returns for the children;

6   correct?

7   A     That's correct.

8   Q     And they did the payroll tax returns for Waimana; isn't

9   that correct?

10  A     That's correct.

11  Q     Okay.  So Chinaka & Siu knew that the children were put on

12  payroll when they started attending college; correct?

13  A     Yes.

14  Q     And they knew they were full-time students when they were

15  being put on payroll; is that correct?

16  A     Yes.

17  Q     And is it your recollection that no one ever raised that

18  issue -- no one ever raised that issue with Mr. Hee, did they.

19  A     No.

20  Q     And that's because it's -- is it common practice for

21  closely-held businesses to employ their family?

22  A     Yes.

23  Q     And in this case it's absolutely clear that Chinaka & Siu

24  knew the kids were full-time students.

25  A     Yes.

1    Q    You knew they were living in Santa Clara because your

2    staff was communicating with them.

3    A    That's correct.

4    Q    And just nobody ever raised the issue with Mr. Hee as to

5    whether this could potentially be improper.

6    A    No.

7         MR. TOSCHER:  Let me turn to one other quick topic,

8    Your Honor.

9    Q    Mr. Chinaka, do you recall when -- you were involved, were

10   you not, in the IRS audit?

11   A    Yes.

12   Q    And, in fact, your firm was the original representative in

13   the audit -- the IRS audit?

14   A    Yes.

15   Q    And am I correct that that started in 2008?

16   A    That's correct.

17   Q    And were you aware that the audit had been going on

18   regarding one of the other entities, Sandwich Isles?

19   A    Yes.

20   Q    Even prior to that.

21   A    Yes.

22   Q    And that would have been in -- well, we'll leave it to

23   that.

24         So in 2008 is it fair to say that, at least

25   initially, your firm took primary responsibility of dealing

1   with the Internal Revenue Service?

2   A    That's correct.

3   Q    And throughout the course -- excuse me -- of your dealings

4   with the Internal Revenue Service did you make efforts to fully

5   cooperate?

6   A    Yes.

7   Q    Is it fair to characterize that you and the client, but

8   you, the representative, was asked -- were asked for voluminous

9   information from the IRS?

10          MR. TOSCHER:  Objection.  This is beyond the scope of

11   the direct.

12          THE COURT:  Hold on.

13          Okay.  Sustained.  I don't recall Mr. Tong's direct

14   going into this subject.  Sustained.

15   BY MR. TOSCHER:

16   Q    Okay.  Let me go to another topic.

17          During your course of dealings with Mr. Hee and the

18   company in terms of preparing the tax returns, the financial

19   statements we talked about, the payroll tax returns, was

20   Mr. Hee and all of his staff always fully cooperative in

21   providing you information?

22   A    Yes.

23   Q    And you're aware, are you not, that during -- this is a

24   long period of time -- your staff members would frequently ask

25   for information from Mr. Hee and the people -- his staff that

 1   was helping him; correct?

 2   A    That's correct.

 3   Q    And they were always fully cooperative with you, were they

 4   not?

 5   A    Yes.

 6   Q    Never tried to conceal anything from you.

 7   A    No.

 8            MR. TOSCHER:  Your Honor, if I could have just one

 9   minute here to look at my notes.

10            THE COURT:  Okay.  You need to have a break?

11            MR. TOSCHER:  If we could break now, that's what I

12   would request; so I can check my notes, see if there's anything

13   else.

14            THE COURT:  Okay.  We're going to take a 10-minute

15   break.

16       (Jury excused.)

17            THE COURT:  Okay.  I'll see everybody in a little

18   while.

19            Counsel, can you start thinking about how you want

20   the jurors to have access to exhibits during deliberations.  So

21   they can have all these binders, but I have in the past allowed

22   a court Elmo like this one right here, similar, to go into the

23   jury deliberation room so they can put something on the screen,

24   put it up, and they can all look at it at the same time.  But

25   in a case like this it may also be helpful to see if, working

 1    with the court's IT staff, we could have a computer that is not

 2    internet accessible.  All the admitted exhibits could be on a

 3    thumb drive, and they could scroll through them.

 4              There's actually a program that would make this easy.

 5    We don't have this program yet.  But they can make a copy of

 6    their exhibits, the ones that are admitted.  This would require

 7    also counsel to agree on the exhibit list, which normally would

 8    not go into the deliberation room, and you would need to make

 9    sure it didn't have inflammatory descriptions of the exhibits

10    and so forth.  Just running my eye over the exhibit list, I

11    don't think there are such things:  smoking gun letter or

12    something like that, you know.

13              So think about it because this might be a case where

14    we should do that.  I would give an instruction to the jurors

15    ahead of time that, if they had technical problems, they needed

16    to put that in writing.  I would like -- in other words, there

17    can be a little tutorial by court staff about how to use it,

18    but if problems arise, my preference would be that the jurors

19    communicate the technological problems in writing as opposed to

20    having, you know, a court staff person go into the deliberation

21    room in the course of deliberations.  Sometimes that is

22    required because they need to show some problem.

23              But, anyway, think about it and how we might go about

24    that because it might be a good thing to do in a case like

25    this.  I just put that into your head.  We're actually quite a

1    long way from doing that, but if we decide that that's what we

2    should do, it's probably going to take a little work on the

3    part of the staff people that both sides have plus court staff.

4    Okay?  Thank you.

5            MR. TONG:  Thank you, Your Honor.

6            MR. TOSCHER:  Thank you, Your Honor.

7        (Court recessed at 10:31 A.M., until 10:50 A.M.)

8            MR. TOSCHER:  Thank you, Your Honor.  May it please

9    the Court, ladies and gentlemen.

10   Q    Mr. Chinaka, on direct testimony with Mr. Tong he reviewed

11   with you a series of e-mails regarding the treatment of some

12   artwork that was going to be displayed in the offices of

13   Waimana.  Do you recall that?

14   A    Yes.

15   Q    And the discussion or the e-mail with Mr. Hee was about

16   how it should be appropriately handled for tax purposes;

17   correct?

18   A    Yes.

19   Q    And the determination of how it was going to be handled

20   for tax purposes, that was a judgment that Chinaka & Siu made;

21   is that correct?

22   A    Yes.

23   Q    And when you told him how it would be handled, he followed

24   your advice; isn't that correct?

25   A    That's correct.

1   Q    And that's one of those instances, when a topic comes up,

2   he discusses it with you, and you're the one making the

3   determination on the tax treatment; isn't that correct?

4   A    That's correct.

5   Q    Now, can we have Exhibit 11-57 displayed.  This is the

6   2007 certified audit.  Next page, please.

7           THE COURT:  Hold on.  I think Counsel -- okay.  Go

8   ahead.

9           MR. TOSCHER:  Sorry.

10          Can we go to the next page, please.  One more.  Next

11  page.  Or let's see.  I'm sorry, please go to 7507.  It's a

12  very big exhibit.

13          Thank you.  And now flip down to one page, please.

14  Thank you.

15  Q    Okay.  So this is -- again we reviewed this earlier, and

16  I'll be brief.  The 2007 certified statement for Waimana and

17  its subsidiaries; correct?

18  A    That's correct.

19  Q    Now, we didn't talk about this before, but as part of your

20  certified audit, we briefly touched upon it.  You're

21  responsible for determining, as part of that certified audit,

22  whether all tax liabilities are being appropriately accounted

23  for or reserved; right?

24  A    That's correct.

25  Q    So you have to make a determination that, if there's an

1    additional liability, whether you need to put that on the

2    financial statement to make sure it's accurate.

3    A    That's correct.

4    Q    And you did that in this case.

5    A    Yes.

6    Q    And you were thorough in this case?

7    A    Yes.

8    Q    Now, also part of your examination, do you recall that

9    you, as a CPA doing a certified audit, have to make an

10   assessment, a judgment, as to whether management of the company

11   is prone to unreasonable or unnecessary business risks, such as

12   tax evasion?

13   A    Yes.

14   Q    Do you recall that judgment made?

15   A    Yes.

16   Q    And do you recall your judgment was "No"?

17   A    That's correct.

18   Q    Can we turn to page 7517 of the same exhibit.

19   A    (Witness coughing.)

20        THE COURT:  Would you like some water?  We can give

21   you some water.  You have some?

22   BY MR. TOSCHER:

23   Q    7517.  Next page, please.

24        Next page.  Let's see.  Go down one more, 7519.

25        Okay.  I think the question is -- could we blow that

1     up a little bit?  Thank you very much.

2              "Is management prone to taking unreasonable or

3     unnecessary business risks, such as tax evasion?  Does the

4     client insist on overly aggressive tax positions or otherwise

5     increase the firm's liability exposure?"  And your judgment,

6     Mr. Chinaka, was "No"; is that correct?

7     A    That's correct.

8              MR. TOSCHER:  I have no further questions, Your

9     Honor.

10             THE COURT:  Okay.

11                        RE-DIRECT EXAMINATION

12    BY MR. TONG:

13    Q    Mr. Chinaka, let's start with this loan to shareholder

14    account.  You say that it was created after you advised the

15    defendant -- or your company advised the defendant that he

16    couldn't deduct the MIT educational expenses; correct?

17    A    Yes.

18    Q    And it's not uncommon for a closely-held corporation to

19    extends loans to shareholders; correct?

20    A    That's correct.

21    Q    And "closely-held" means like a company that is owned by

22    very few people; correct?

23    A    That's correct.

24    Q    And you say that ultimately the question in your mind was

25    whether there was an intent to repay; correct?

1  A    That's correct.

2  Q    And you advised Mr. Hee that the clearest way to document

3  intent was to do a promissory note; correct?

4  A    That's correct.

5  Q    And you never saw such a promissory note; correct?

6  A    That's correct.

7  Q    But based on verbal discussions, from an accounting

8  standpoint you felt it was okay to characterize it as a loan to

9  shareholder; correct?

10  A    That's correct.

11  Q    And, by the way, when was he supposed to pay that amount

12  back?

13  A    It depended upon circumstances.

14  Q    And what was the interest rate?

15  A    It would have been the market rate at the time.

16  Q    And how do you know all this?

17  A    As far as --

18  Q    This is how you would have drafted the terms of a note; is

19  that correct?

20  A    I don't draft -- I'm not an attorney; so I don't draft

21  notes.

22  Q    So, basically, you're talking about it from an accounting

23  standpoint that that's how you would treat it if you were asked

24  to do it; correct?

25  A    Yes.

1    Q    But in the absence of a note you don't know exactly what
2    the agreement is between the person getting the money, in this
3    case Mr. Hee, and the company giving the money, in this case
4    Waimana; is that correct?
5    A    Yes.
6    Q    And Mr. Toscher said, "Well, he followed your advice.  He
7    put it as a loan to shareholder."  Right?
8    A    That's correct.
9    Q    Did he follow your advice to do a promissory note?
10   A    No.
11   Q    Now, with regard to the loan to shareholder you said that
12   you saw the amounts on the books; correct?
13   A    Yes.
14   Q    And is it true that those amounts grew and grew?
15   A    That's correct.
16   Q    And, in fact, even after your last certified audit in 2007
17   it grew to about $763,000; correct?
18   A    I don't know the exact number.
19   Q    All right.  Let's take a look at Exhibit 4-82, please.
20         Do you recognize the document that is being shown on
21   the screen?
22   A    Yes.
23   Q    All right.  Is that a -- basically, a spreadsheet of the
24   loan to shareholder account?
25   A    That's correct.

1  Q    And just so we're clear, there's a category number and an

2  account "loan to shareholder"; correct?

3  A    Yes.

4  Q    By the way, just so we're clear, Mr. Hee was the only

5  shareholder of the company; is that correct?

6  A    Yes.

7  Q    So everything that appears on this document reflects money

8  going from the company on behalf of Mr. Hee's personal

9  expenses; correct?

10  A    Yes.

11  Q    I mean, if it were business, it would be somewhere else;

12  right?

13  A    Yes.

14  Q    And the balance appears in the column in the right; is

15  that correct?

16  A    Yes.

17  Q    All right.  Let's scroll down, if we could, to the -- let

18  me find the page.

19       Well, actually let's start at the top.  The account

20  appears to have been established in 2006; is that correct?

21  A    Yes.

22  Q    With the MIT payment that I think is right here; correct?

23  A    Yes.

24  Q    All right.  And it then continues in chronological order,

25  does it not?

1  A    Yes.

2  Q    And if we could look at the fourth page, which is Bates

3  number 4, at the bottom third it appears that this is for year

4  2012 and '13; is that correct?

5  A    Yes.

6  Q    And the balance grew to the point where the repayment was

7  $736,000; is that correct?

8  A    Yes.

9  Q    And all of that represented money going from Waimana to

10  the defendant Albert Hee; correct?

11  A    Yes.

12  Q    All without a promissory note.

13  A    That's correct.

14  Q    All with just a verbal -- I mean, from an accounting

15  standpoint you relied on a verbal statement it will be paid.

16  A    Yes.

17  Q    Okay.  And the payment appears to have been in 2013;

18  correct?

19  A    Yes.

20  Q    And refresh my memory when the IRS started auditing

21  Mr. Hee?

22  A    They started in 2008.

23  Q    Now, I'm curious about the educational expenses that

24  started this whole thing.  Why would the payment of an

25  educational expense on behalf of a child not be a valid

1   business deduction?

2   A    Essentially, they're not -- it's more -- it's considered

3   to be a personal expense.

4   Q    Okay.  And is it true that the only way in which that

5   could be paid is if the company had a company-wide policy

6   offering the payment of educational expenses on behalf of all

7   employees?

8   A    Yes.

9   Q    And you knew of no such policy at Waimana; is that

10  correct?

11  A    That's correct.

12  Q    Now, you talked -- or maybe I should say Mr. Toscher

13  talked quite a bit about these certified audits that your

14  company performed.

15  A    Yes.

16  Q    Remember those questions?

17          You said, I think, that these were certified audits

18  of financial statements of the company; is that correct?

19  A    Yes.

20  Q    And the purpose of that was to give an opinion that the

21  financial statements fairly reflected the condition of the

22  company; is that correct?

23  A    Yes.

24  Q    And what type of information would appear on the financial

25  statements?

1   A     Essentially, it would have all the company's assets,

2   liabilities, stockholder equity, and the revenues and expenses.

3   Q     So to put it in lay terms, just so I'm clear, this isn't a

4   certified audit of a tax return, is it?

5   A     No.

6   Q     It's not a certified audit of every line on a tax return

7   with review of all supporting documents, is it?

8   A     It is not.

9   Q     This is a different type of audit; correct?

10  A     It's an audit of the financial statements.

11  Q     Which is different.

12  A     Yes.

13  Q     All right.  And may we turn your attention to Exhibit

14  11-57, please.

15            Okay.  Excuse me.  And in particular page --

16            THE COURT:  Hold on.  Hold on.  The mike.

17            MR. TONG:  So sorry, Your Honor.

18            THE COURT:  The problem is not whether we can hear

19  you or not.  The problem is the court reporter is hooked into

20  the mikes.

21            MR. TONG:  I can see the look she's giving me, Your

22  Honor.  I feel the pain.

23  Q     All right.  If we could look at page 3 of that exhibit,

24  which is Bates number 7509, please.

25            Mr. Chinaka, do you see that document in front of

1    you?

2    A    Yes.

3    Q    And if we could look at the top, this is again on your

4    letterhead, is it not?

5    A    Yes.

6    Q    And it is entitled Independent Auditor's Report; correct?

7    A    That's correct.

8    Q    And is this the report that you issued after auditing the

9    balance sheet of Waimana and its subsidiaries for the year

10   2007?

11   A    That's correct.

12   Q    Okay.  And let's take a look at the second paragraph, if

13   we could.  And, in particular, I'm curious about the sentence

14   that begins "An audit also includes examining on a test basis

15   evidence supporting the amounts and disclosures in the

16   consolidated financial statements."  Do you see that sentence?

17   A    Yes.

18   Q    And I didn't read the whole thing; right?

19   A    That's correct.

20   Q    What does it mean when you do an audit on a "test" basis?

21   A    You would be examining on a random basis certain

22   supporting documentation, but you don't look at every single

23   invoice, check, deposit, receipt.

24   Q    So you do it on the basis of a random examination of

25   certain items; correct?

1    A    That's correct.

2    Q    And if the items that were in the books weren't examined

3    by you, you wouldn't know about it, would you.

4    A    That's correct.

5    Q    And if we could turn to page 3 of that exhibit -- or

6    excuse me.  Page 7511 of the exhibit, please.  If we could blow

7    that up.

8              This is, essentially, the consolidated statement of

9    income that you prepared as a result of your audit; is that

10   correct?

11   A    That's correct.

12   Q    And let's talk about the numbers.  What were the revenues

13   of the companies that year?

14   A    That's 43,220,939.

15   Q    And the expenses of the company?

16   A    40,847,213.

17   Q    And the category expenses has some subcategories; is that

18   correct?

19   A    That's correct.

20   Q    And let's say "cost of operations."  Do you see that

21   category?

22   A    Yes.

23   Q    That has a number of $10,472,000 and change; is that

24   correct?

25   A    That's correct.

1   Q    And cost of operations would include things such as travel

2   and the like; is that correct?

3   A    It could be in there, or it could be in the management in

4   general.

5   Q    All right.  And if you added up those two categories, you

6   would have about $22,700,000 in expenses for that year; is that

7   correct?

8   A    That's correct.

9   Q    Now, as part of your certified audit of the company, would

10  you drill down and look at every supporting invoice that

11  comprises that $27 million?

12  A    Yes.

13  Q    Every single invoice?

14  A    No.  I mean, we'll do it on a test basis.

15  Q    On a test basis.

16  A    Yes.

17  Q    So if you saw one that -- I mean, you would do a test

18  basis, but not every single invoice; correct?

19  A    That's correct.

20  Q    What I'm trying to get at is we showed you tax returns

21  earlier where some deductions were taken; correct?

22  A    That's correct.

23  Q    Like, for example, consulting expenses; correct?

24  A    That's correct.

25  Q    And some of those payments were to a woman named Diane

 1   Doll; correct?

 2   A    Yes.

 3   Q    And did you know Diane Doll was a massage therapist at the

 4   time you prepared the tax returns?

 5   A    No.

 6   Q    How could you not know if you did a certified audit?

 7   A    We didn't do a certified audit for that year.

 8   Q    Well, you did do certified audits for some other years

 9   where she was listed as consultant; correct?

10   A    Yes.

11   Q    How could you not have determined that she was a massage

12   therapist?  I'm just trying to understand.

13   A    It's not unusual.

14   Q    Because?

15   A    It's not an unusual business expense.

16   Q    Massage therapy?

17   A    Is not an unusual business expense.

18   Q    So you're saying that that's a deductible expense?

19   A    It can be.

20   Q    Didn't you yesterday say you didn't know about the

21   deduction of those expenses until the audit?

22   A    That's correct.

23   Q    And what are the requirements for massage therapy to be

24   deductible?

25   A    Essentially, they would have to be a legitimate business

1    expense -- business purpose.

2    Q    Okay.  And isn't it true that for it to be deductible you

3    would need to have massage therapy as an employee benefit

4    available to all employees?

5    A    If you're going to consider that to be an employee

6    benefit.  If it's considered to be sort of necessary in order

7    to do it for medical reasons, then it would not have to be

8    given to all employees.

9    Q    Okay.  And just to be clear, you were never told that she

10   was a massage therapist; correct?

11   A    That's correct.

12   Q    So you were never asked "Is that a deductible expense?";

13   correct?

14   A    That's correct.

15   Q    All right.  The ledger you were shown, your company

16   created the ledger?

17   A    The general ledger?

18   Q    Yes.

19   A    Yes.

20   Q    All right.  And where would you get the information to

21   create the general ledger?

22   A    That was extracted from Waimana's Quicken files.

23   Q    It was what from their QuickBook files?

24   A    It was extracted based upon what was -- the reports from

25   the Quicken files.  Quicken files does not generate a general

1   ledger, nor does it put it into assets and liabilities.   It

2   only records the check register.

3   Q     So, basically, you would get the equivalent of a check

4   register from Waimana, indicating all of the expenses in a

5   category; correct?

6   A     That's correct.

7   Q     And then you would use software to generate that document

8   we showed.

9   A     That's correct.

10   Q     So really the information on the document came from the

11   documents maintained by Waimana; correct?

12   A     That's correct.

13   Q     You just printed it in that format.

14   A     Yes.

15   Q     Now, Mr. Toscher asked you about putting the kids on the

16   payroll.   You remember that testimony?

17   A     Yes.

18   Q     And you said that you never talked to Mr. Hee about that;

19   is that correct?

20   A     That's correct.

21   Q     All right.   May I direct your attention again to the grand

22   jury testimony you gave in August of 2014, which I think is

23   Exhibit 21F.

24         Do you have that in front of you, Mr. Chinaka?

25   A     Yes.

1   Q    Okay.  Let me turn your attention to page 16, starting at

2   line 25, and going through page 17, line 9.

3            MR. TOSCHER:  Excuse me, Your Honor.  Can I ask

4   counsel to state the pages again for me.  I'm not following it.

5            MR. TONG:  Certainly, Your Honor.  Page 16, line 25,

6   through page 17, line 9.

7   Q    Have you read that?

8   A    Okay.

9   Q    And that's the testimony you gave; is that correct?

10  A    Yes.

11  Q    And isn't it true that on that date you testified that you

12  did ask whether the children actually worked.

13  A    That's correct.

14  Q    And you were also asked whether you knew they got a salary

15  for the whole year; correct?

16  A    That's correct.

17  Q    And your response was "Not specifically."

18  A    That's correct.

19  Q    And you would have asked whether the children actually

20  worked because you would want to know whether they performed

21  services justifying the company's deduction of wages on their

22  behalf; correct?

23  A    Yes.

24  Q    Because, if they did nothing, you can't deduct a wage;

25  right?

1    A    Yes.

2           MR. TOSCHER:  I apologize, Your Honor.  Can I --

3    Mr. Tong, could you show me the pages you're looking at.

4        (Counsel conferring.)

5           MR. TOSCHER:  Okay.  I apologize.  One moment, Your

6    Honor.

7           Okay.  I have it now, Your Honor.  Thank you.

8           THE COURT:  Okay.  Mr. Tong, you can proceed.

9    BY MR. TONG:

10   Q    Now, Mr. Chinaka, there was some discussion between you

11   and Mr. Toscher about how open the communication was between

12   you and your client; is that correct?

13   A    Yes.

14   Q    And, by the way, he's still your client; correct?

15   A    Yes.  For individuals.

16   Q    I'm sorry?

17   A    For individual tax returns.

18   Q    Okay.  And the reason you're no longer doing the corporate

19   tax returns is --

20   A    I believe it's because of the -- another firm took over

21   the preparation of tax returns in connection with doing the --

22   representing the company for the audit, IRS audit.

23   Q    It's also because Sandwich Isles is a regulated company;

24   is that correct?

25   A    We never did the tax returns for Sandwich Isles.

1    Q    Well, your last tax return was for Waimana, and it was a

2    consolidated return; correct?

3    A    That was for the financial statements.

4    Q    Okay.  Now, I believe your testimony was that Mr. Hee and

5    his company gave you whatever information you requested;

6    correct?

7    A    Yes.

8    Q    All right.  Let's take a look at Exhibit 11-58, which

9    comes from your files, page 9126.

10          Do you have that document in front of you, by the

11   way?

12   A    No.

13   Q    You may want to see if you can get it, if possible.

14          THE COURT:  Hold on.  We'll get it.  I think it's in

15   the other binder that you did have in front of you.  But

16   they'll also put it up on the screen for you; so -- it's

17   because of me you have the binders.  I make them bring a hard

18   copy.

19          So go ahead.

20   BY MR. TONG:

21   Q    All right.  11-58, page 9126, is up on the screen.

22          Do you have that in front of you also, Mr. Chinaka?

23   A    No.

24   Q    Okay.

25          MR. TONG:  Your Honor, I think I can probably locate

1    it over there --

2                    THE COURT:  Okay.

3                    MR. TONG:  -- if I may.

4                    THE COURT:  So, Mr. Chinaka, you will know that you

5    will have had a weightlifting workout by the time you step down

6    with all these binders you need to open and shut and move;

7    so --

8    BY MR. TONG:

9    Q    And we're looking at a page 9126 in the lower right-hand

10   corner.

11   A    Okay.

12   Q    Okay.  And this came from your work papers; is that

13   correct?

14   A    That's correct.

15   Q    And you know that because you reviewed your papers before

16   coming to court; correct?

17   A    That's correct.

18   Q    And this is a request for reimbursement form from Waimana;

19   is that correct?

20   A    That's correct.

21   Q    And it categorizes a portion of the payment to "loan to

22   shareholder"; is that correct?

23   A    Yes.

24   Q    And from a personal Visa card; correct?

25   A    That's correct.

1   Q     For Mr. Hee.

2   A     Yes.

3   Q     Okay.  And the purpose of the expenditure was for

4   inspection of an undersea cable; is that right?

5   A     Yes.

6   Q     All right.  Now, if we can flip to the bottom, there

7   appears to be an approval down here; is that correct?

8   A     Yes.

9   Q     As well as the allocation of payments to two different

10  companies; correct?

11  A     That's correct.

12  Q     Now, there was a reference, if we could go to the top

13  again, that says "See attached breakdown of costs."  Do you see

14  that?

15  A     Yes.

16  Q     Could you look to the next page in your work papers and

17  see whether the costs are broken down there.

18  A     Okay.

19  Q     Are they there?

20  A     Yes.

21  Q     All right.  Can we see the next page, please.

22        And this is not for the same amount, is it?  This is,

23  actually, for a portion of the amount -- can we blow up the

24  amount, please.

25        All right.  This is for a different reimbursement;

1    correct?

2    A    Yes.

3    Q    All right.  So there's no attached breakdown in your file,

4    is there.

5    A    That's correct.

6    Q    So you just got the request for reimbursement form -- if

7    we could go back to it, please -- which just tells you there's

8    a request for reimbursement; correct?

9    A    That's correct.

10   Q    Now, you didn't have the opportunity to review Waimana's

11   files concerning those expenditures, did you?

12   A    Not in the course of the tax returns.

13   Q    How about in doing the audit?

14   A    But that depends on because it's done on a test basis.  I

15   may or may not have looked at it.

16   Q    So from -- oh, all right.  Well, let's examine that.

17         Let's take a look at Waimana's files, which is

18   Exhibit 4-107.  Why don't you keep yours open so we can compare

19   them.  4-107, starting at page 3133.

20         All right.  If we can zoom in on the top of the

21   check, please.  This is a check dated May the 5th of 2008 to

22   Mr. Hee --

23   A    Uh-huh.

24   Q    -- in the amount of $5,051.56; correct?

25   A    That's correct.

1   Q    And how does that amount compare to the request for

2   reimbursement that appeared in your file?

3   A    That would match the -- match the reimbursement request.

4   Q    So from that you can conclude that this check was in

5   payment of the reimbursement request that your files contain.

6   A    Yes.

7   Q    And if we can go to the second page of Waimana's file,

8   page 3134 of Exhibit 4-107, that's actually the same request

9   that appeared in your file; correct?

10  A    Yes.

11  Q    Now, Waimana's file on page 3135, the following page, has

12  a breakdown.  If we could blow that up, please.  And that

13  breakdown does not appear in your file; correct?

14  A    That's correct.

15  Q    And Waimana's file on page 3136, which is Exhibit 4-107,

16  has credit card statements.  Do you see that?

17  A    Yes.

18  Q    And that does not appear in your file, does it?

19  A    That's correct.

20  Q    And the next page, page 3137, in Waimana's file has more

21  credit card charges; is that correct?

22  A    That's correct.

23  Q    And if we can look at the middle of the charge card

24  statement, on March 21 there appears to be a airline ticket for

25  Adrianne Hee.  You know who she is; correct?

1    A     Yes.

2    Q     And it looks like it was from Boston to LAX to San Jose

3    and then back to Boston; correct?

4    A     That's correct.

5    Q     Right around spring break; correct?

6    A     Yes.

7    Q     And that credit card statement with those types of charges

8    did not appear in your file, did they.

9    A     That's correct.

10   Q     So you had no occasion or reason to audit or question

11   those; is that correct?

12   A     That's correct.

13   Q     And, in general, the company did not provide you with

14   detailed credit card statements showing what every charge

15   incurred was for; is that correct?

16   A     As part of the audit, no, I did not.

17   Q     Or as part of the tax returns; right?

18   A     No.

19   Q     Okay.  Let me re-ask that.

20             THE COURT:  Yeah.

21   BY MR. TONG:

22   Q     Would the company provide you with detailed credit card

23   statements in order for you to prepare the tax returns?

24   A     For Waimana, yes.

25   Q     They did.

1    A     Yes.

2    Q     Every month?

3    A     It may not be every month.  It would probably be by at

4    least at the end of the year.

5    Q     So as part of your tax returns, you would review the

6    credit card statements.

7    A     We would have questions as far as what charges were put on

8    the credit card statement.

9    Q     Oh, I'm sorry.  Would you get all of the credit card

10   statements?

11   A     We normally would ask for the credit card statements.

12   Q     Okay.  Let's take a look at Exhibit 4-9.

13          Is this the type of statement that you would get at

14   Waimana -- I'm sorry, at your firm?

15   A     Yes.

16   Q     Every year.

17   A     Yes.

18   Q     All right.

19          MR. TONG:  May I have one moment, Your Honor.

20          (Counsel conferring.)

21   BY MR. TONG:

22   Q     And, Mr. Chinaka, let's turn to page 2498.

23          THE COURT:  So I don't think he has that in front.

24          MR. TONG:  I'm sorry.  Let's put it on the screen, if

25   we could.

1          MR. TOSCHER:  Excuse me, Your Honor.  What exhibit

2     number is Counsel on?

3          MR. TONG:  4-9.  And let's focus on the bottom of the

4     statement.

5     Q    So do I understand you to be saying that, as part of the

6     preparation of the corporate tax return, you would get a credit

7     card statement for every charge incurred by Waimana before you

8     would prepare the return?

9     A    Yes.

10    Q    And what would you do when you saw a charge of the nature

11    that said it was for travel to Switzerland for Wendy Hee?

12    A    It would -- we would have to take a look and see how it

13    was classified.

14    Q    Okay.  Well, this says "Travel CCI Marine"; correct?

15    A    Right.

16    Q    Wouldn't you look at the books and see whether it was

17    classified as a business expense?

18    A    Yes.

19    Q    And if it was, what would you do?

20    A    Put it as a business expense.

21    Q    So whatever the books reflected you would put in as a

22    business expense.

23    A    Yes.

24    Q    Let's look at the next page, please, which is the same

25    exhibit, 4-9, 2499.  And if we could look at the top third.

1          So here's another charge for travel to Switzerland,

2    and it reflects a ticket for Jonathan Kane; correct?

3    A    Yes.

4    Q    And if it were classified as travel for business expense,

5    what would you do with it?

6    A    It would be classified as a business expense.

7    Q    So again you rely on how the client classified it, and you

8    would classify it that way.

9    A    Yes.

10          MR. TONG:  May I have one moment?

11          THE COURT:  Yes.

12      (Counsel conferring.)

13          MR. TONG:  I have nothing further.

14          THE COURT:  Okay.  Re-cross.

15                    RE-CROSS-EXAMINATION

16   BY MR. TOSCHER:

17   Q    Mr. Chinaka, as part of your duties as you were preparing

18   the tax returns, if you did see something which was

19   questionable, you would raise it with the client, would you

20   not?

21   A    Yes.

22   Q    And it would be your duty to do so --

23   A    Yes.

24   Q    -- right?  Similar to the way we talked about when you

25   spotted a year later the tuition payment; correct?

 1   A    That's correct.

 2              MR. TOSCHER:  Okay.  No further questions, Your

 3   Honor.

 4              MR. TONG:  Nothing further.

 5              THE COURT:  Okay.  Then the witness is excused.  You

 6   may step down and leave the courtroom.

 7        (Witness excused.)

 8              THE COURT:  And I will invite the government to call

 9   its next witness.

10              MR. HARRINGTON:  The government calls Lynn

11   Tamanaha.

12        (Witness photographed.)

13              THE CLERK:  Please raise your right hand.

14        (Witness sworn.)

15              THE CLERK:  Thank you.  Please be seated.

16              Please state your name and spell your last name.

17              THE WITNESS:  Lynn Tamanaha, T-a-m-a-n-a-h-a.

18                        DIRECT EXAMINATION

19   BY MR. HARRINGTON:

20   Q    Good morning, Miss Tamanaha.

21   A    Good morning.

22   Q    Let's start first with a little bit of your background.

23   What's your educational background?

24   A    I have my BBA from the University of Hawai'i.

25   Q    Okay.  And what year did you receive that?

1    A    It was in 2000.

2              THE COURT:  Hold on.  We can move a little.

3              MR. TOSCHER:  I'm fine moving back.

4              THE COURT:  It's okay.  Yeah, can we move the lectern

5    a little bit.

6              MR. HARRINGTON:  You want it this way?

7              THE COURT:  Yeah, but watch out, there's a -- yes,

8    there are little things.  Then Mr. Toscher can stay at his

9    place.

10             MR. TOSCHER:  Thank you, Your Honor.

11             THE COURT:  Okay.

12   BY MR. HARRINGTON:

13   Q    And are you a licensed CPA?

14   A    Yes.

15   Q    And what year did you become licensed?

16   A    2002, I think.

17   Q    Okay.  And have you worked for the company called Chinaka

18   & Siu?

19   A    Yes.

20   Q    So what years did you work for Chinaka & Siu?

21   A    From 1998 through 2014 -- '13?  No.

22   Q    Okay.  Where did you work after that?

23   A    At -- I'm working at ONTS now.

24   Q    Okay.  And so when you were working at Chinaka & Siu, did

25   you work with a company called Waimana?

1  A     Yes.

2  Q     Okay.  And how long did you work on -- for the -- on the

3  returns for the company of Waimana?

4  A     About over 10 years.

5  Q     And so what were your duties in working on the Waimana

6  returns?

7  A     Pretty much to do the correspondences, to look at the

8  check registers, to assist staff.

9  Q     And so when you're saying "assist staff," could you

10  elaborate a little bit.

11  A     Oh, to help them with the coding, and if they needed to

12  get documentations from the client, then I would get that from

13  the clients for them.

14  Q     And so would that be something that would occur throughout

15  the year, or was this just when you were preparing the tax

16  return?

17  A     Throughout the year.

18  Q     So what were your duties when you were actually preparing

19  the tax return?

20  A     Just to put it together and -- to put the numbers together

21  and input it and give it to the partners.

22  Q     So what information would Waimana provide to you?

23  A     They gave us -- initially, they gave us just the check

24  registers, bank reconciliations.

25  Q     You said "initially"; so what period of time was that?

1    A     Then after that they changed to a QuickBook system.   Then

2    they gave us a CD-ROM disk.

3    Q     So let's break that down a little bit.  You said at the

4    beginning they would give you a check register.   What

5    information would be on the check register?

6    A     Oh, all the checks and the deposits.

7    Q     And so what would you do with that information?

8    A     We would -- it was already classified.  So we would take

9    the information and assign a GL-coding number to it and then

10   input it in our general ledger system.

11   Q     Okay.  Let's break that down one at a time.

12         So you said it was already classified.

13   A     Yes.

14   Q     So what do you mean by the payments were classified?

15   A     The payment was already classified, say, to office expense

16   or to some kind of expense category.  So we would take that

17   account and just classify it to a general ledger number.

18   Q     Okay.  And so step 2 you mentioned you would put it to an

19   account.

20   A     Yes.

21   Q     What do you mean by that?

22   A     Oh, just to classify it to a general ledger number so that

23   we could input it into our computer system.

24   Q     So let's take an example.

25   A     Okay.

1   Q     If there was a payment made, and it was called a

2   consulting fee --

3   A     Uh-huh.

4   Q     -- would that be the classification that the client would

5   give you?

6   A     Yes.

7   Q     And then what would be the coding number that you would

8   put on it?

9   A     We would look at our chart of account numbers, and it

10  would say "Consulting Expense, account number 6000."  So it

11  would be account number 6000.

12  Q     And then you would take that information and put it on --

13  A     Into the system.

14  Q     Okay.  And so the -- all of that information of what the

15  initial payment was for would come from the client?

16  A     Yes.

17  Q     And would you ever change how items were categorized on --

18  from the checkbook register to the system?

19  A     If it was needed.

20  Q     Okay.  And when would it be needed?

21  A     I guess if we saw something that was incorrect.

22  Q     Can you give us an example of something that would seem

23  incorrect that maybe you would request clarification on.

24  A     Maybe like a car loan payment or -- usually, we would ask

25  for the breakdown on the principal and the interest; so that we

1   were probably correct.

2   Q    What if you just saw a payment to somebody that was

3   labeled as "Consulting"?  Would you necessarily make a change

4   or inquire about it?

5   A    Not necessarily.  I think it would depend.

6   Q    Okay.  So it would depend, but it wasn't automatic.  You

7   weren't always asking what a payment was for.

8   A    No.

9   Q    Do you recall any expenses for consulting fees for an

10  individual named Diane Doll?

11  A    Yes.

12  Q    Do you know who Diane Doll is?

13  A    Yes.

14  Q    And do you know what her occupation is?

15  A    Now I do.

16  Q    Okay.  So what do you understand her occupation to be?

17  A    She's a massage therapist.

18  Q    And you said now you understand; so when did you become

19  aware of her occupation?

20  A    During the IRS interview.

21  Q    When was the IRS interview; do you remember?

22  A    Around 2011.

23  Q    So you didn't ever find out what her occupation was from

24  Waimana or anyone working at Waimana; is that right?

25  A    No.

1    Q    Okay.  You found out from the IRS?

2    A    Yes.

3    Q    So just to back up for one second because I think you also

4    mentioned that you went into -- they used QuickBooks?

5    A    Yes.

6    Q    And that changed a little bit how the procedure operated?

7    A    They changed a little.  Then the client started inputting

8    some general ledger -- I'm sorry.  Journal entries into the

9    system, and then they could give us a CD ROM instead of a check

10   register -- a printed check register.

11   Q    Let's see if I understand.  So the QuickBooks, would it be

12   fair to say it was a more robust program?  Had more information

13   on it?

14   A    Yes.

15   Q    So they would give you the CD with the QuickBooks file?

16   A    Uh-huh.

17   Q    And those expenses would again already be categorized by

18   the client?

19   A    Yes.

20   Q    Was it the same process where you would rely on those

21   categorizations, unless there was a question that came up.

22   A    Yes, uh-huh.

23   Q    So the system was pretty much the same.  It was just two

24   different ways of getting the information from the client?

25   A    Yes.

1   Q     Did you work on any of the personal returns for --

2   A     No.

3   Q     Let me make sure the record's clear.  I'm going to finish

4   the question.

5   A     Sorry.

6   Q     Any personal returns for anyone in the Hee family?

7   A     No.

8   Q     Okay.  Did you become aware at any time that Waimana

9   Enterprises had purchased a property in Santa Clara,

10  California?

11  A     Yes.

12  Q     And when did you become aware of that?

13  A     When I was looking through the register, and then I

14  probably noticed a payment.

15  Q     Do you recall what payment it was?

16  A     I think it was a down payment.

17  Q     So the down payment to purchase the property?

18  A     Yes.

19  Q     And so what was your understanding -- let me back up.

20        What did you do when you saw the down payment?

21  A     Then I asked the accountants what that was for, and I

22  asked for documentation.

23  Q     You asked the accountants.  Would that be people in your

24  own office that you asked?

25  A     At the client's office.

1    Q     At the client's office.  So you asked the client?

2    A     Uh-huh.

3    Q     And what did the client tell you was the purpose of that

4    property?

5    A     It was to be used for the employees.

6    Q     Okay.  And did you -- they provide any other detail beyond

7    that?

8    A     And then they also gave us the escrow document for the

9    purchase of the house.

10   Q     And so they told you it was to be used by the employees.

11   Did they tell you which employees would be using it?

12   A     No.

13   Q     Did you ask any follow-up questions?

14   A     No.

15   Q     So you relied on the fact that the client told you that it

16   would be used for employees?

17   A     Yes.

18   Q     And so once you got that information, how did you classify

19   the expense in the records of the company?  I'm sorry, the

20   asset in the records of the company?

21   A     As an investment property.

22   Q     Now, in your time working on Waimana returns did that

23   classification ever change?

24   A     No.

25   Q     Were you ever aware that Mr. Hee's children were living in

 1    the property?

 2    A     No.

 3    Q     Did anyone at Waimana ever tell you or provide you any

 4    detail of what employees would be staying at the property?

 5    A     No.

 6    Q     And is that something you would ask for, or would you just

 7    rely on what they would tell you the property would be used

 8    for?

 9    A     We would just rely on what they would tell us.

10    Q     So were you ever aware of any tuition payments being made

11    by Waimana for Mr. Hee's children?

12    A     Yes.

13    Q     Could you tell us the details of that.

14    A     There were tuition payments, and then I guess when I

15    double-checked with the partners, they said they would be a

16    personal expense.

17    Q     Okay.  So let's take that one step at a time.  You were

18    looking at the information provided by Waimana?

19    A     Yes.

20    Q     So what did you see that jumped out at you?

21    A     It probably said "tuition payment" or something for one of

22    the Hee kids.

23    Q     Okay.  Do you remember what year you noticed that?

24    A     No, I don't remember that.

25    Q     And so you noticed it, and you went up to the partner

1    level to ask a question about it?

2    A    Yes.

3    Q    And did you take any action after that?

4    A    No.

5    Q    And do you remember how tuition expenses were categorized

6    after that?

7    A    As a loan to shareholder.

8    Q    Did you ever talk to the client about the details of that

9    loan or any information?

10   A    No.

11   Q    So you just rely on the fact that it was categorized as a

12   loan to shareholder by the client?

13   A    Yes.

14   Q    And were you aware that defendant Mr. Hee's children were

15   working -- or excuse me.  Were receiving a salary from Waimana

16   Enterprises?

17   A    I really didn't pay attention to the salary.

18   Q    So you weren't involved in the payroll process?

19   A    No, not really.

20   Q    Were you aware of the details of any trips to Europe taken

21   by members of the Hee family when you were working on the

22   Waimana returns?

23   A    No.

24   Q    Let me ask you about that.  When you would get the

25   QuickBooks or the Quicken or the check register, how would

```
 1   travel and meals and expenses show up on those records?  What
 2   would it look like?
 3   A    It would just show up as a travel expense, and there would
 4   be a total.
 5   Q    So it would just say "travel expense" and then a dollar
 6   figure.
 7   A    Uh-huh.
 8   Q    Would it provide any detail of what the trip was?
 9   A    No.
10   Q    Would it provide who was on the trip?
11   A    No.
12   Q    So you would just rely on the fact that it was a travel
13   expense, and that was the categorization.  You'd rely on that
14   from the client?
15   A    Uh-huh.
16        MR. HARRINGTON:  Okay.  If I can just have one
17   moment.
18        (Counsel conferring.)
19   BY MR. HARRINGTON:
20   Q    So let me just make sure.  I'm not sure I did a good
21   enough job of getting out exactly what your role was in
22   preparing the tax return.  Would you prepare the draft of the
23   tax return?
24   A    You mean the inputting and -- is that what you mean?
25   Q    Let me see if I can ask it this way.  So we talked about
```

1  how you would kind of create the general ledger statement.

2  A    Yes.

3  Q    And so how would those get put on the tax return?  How

4  does that process work?

5  A    Oh, and then from that information, then we would take

6  that and input it into the tax -- there was a tax software

7  program.

8  Q    Oh, okay.  So you would take that information.  Then you

9  would put it in the tax software program?

10  A    Yes.

11  Q    And then that would generate a draft of a return?

12  A    Yes.

13  Q    What would happen to the draft of the return at that

14  point?

15  A    After we printed a draft, then we give it to the partner

16  for review.

17  Q    Did you have any role with it after that?

18  A    No, that's it.

19          MR. HARRINGTON:   Okay.  I don't have any further

20  questions.

21                        CROSS-EXAMINATION

22  BY MR. TOSCHER:

23  Q    Good morning, Miss Tamanaha.

24  A    Good morning.

25  Q    You were asked some questions by Mr. Harrington regarding

```
 1    payments to Diane Doll --

 2    A    Yes.

 3    Q    -- do you recall that?

 4    A    Uh-huh.

 5    Q    And do you recall early on, maybe back in the 2000s when

 6    you were doing the return, you had a discussion with

 7    Miss Henderson regarding Diane Doll?

 8    A    Yes.

 9    Q    And do you recall her telling you that it was for -- what

10    was it for?

11    A    Health consultant.

12    Q    Excuse me?

13    A    Health consulting.

14    Q    "Health consulting."

15    A    Yes.

16    Q    Not just "consulting."

17    A    I think it was a health consultant.

18    Q    And did that -- did you raise that to the level of the

19    partner?

20    A    No, I don't think so.

21    Q    Okay.  But on the books you just put it down in the

22    consulting category.

23    A    Yes.

24    Q    Not a special health consulting category.

25    A    No.
```

1    Q    Okay.  And it wasn't raised with any of the partners.

2    A    No.

3    Q    Now, you testified on direct before there was a change in

4    the various procedures.

5    A    Uh-huh.

6    Q    From initially you said it was just like a check register,

7    Quicken, and then it went to a QuickBooks --

8    A    Yes.

9    Q    -- which is more detailed.

10   A    Yes.

11   Q    Do you know why that transition happened?  And did you

12   assist Miss Henderson in --

13   A    We made the recommendation that she should go with a

14   better software program that could reflect assets, liabilities,

15   and not just income and expense type of account.

16   Q    Right.  Nancy Henderson was primarily doing all the

17   recordkeeping for Waimana; right?

18   A    Yes.

19   Q    They just did not have a big staff at Waimana, did they.

20   A    Yes.

21   Q    Correct?

22   A    That's correct.

23   Q    And you assisted Nancy where you could; isn't that right?

24   A    Yes.

25   Q    She would call you with questions?

 1   A     Yes.

 2   Q     And sometimes if you got information from her, and I think

 3   you testified before, if it was not clear at all, you'd call

 4   her; right?

 5   A     Yes.

 6   Q     And she would provide the information to the best of her

 7   ability; correct?

 8   A     Yes.

 9   Q     Now, and if something stood out to you, you would ask her

10   about it.

11   A     Yes.

12   Q     Okay.  And, in fact, if something concerned you as a CPA,

13   you would raise it to the partner level.

14   A     Yes.

15   Q     Now, you were questioned a little bit about the reporting

16   of the MIT tuition originally in 2004, and then I think you

17   testified, you know, it was overlooked and then it was caught

18   the later year.

19   A     Yes.

20   Q     And from that point you elevated it to the partner at that

21   point.

22   A     Yes.

23   Q     And then were you aware of what discussions the partner

24   had with the client on that?

25   A     With the client?

1   Q    Yes.

2   A    No, I don't.

3   Q    But what you knew was from that point you were going to be

4   classifying it as a shareholder loan?

5   A    Yes.

6   Q    And did you receive that direction from Mr. Siu?

7   A    Yes.

8   Q    Okay.  He was one of the partners; correct?

9   A    Yes.

10   Q    Okay.  Now, the original -- when the information came over

11   from Nancy in the QuickBooks -- and you may have reviewed this

12   before -- it just said "MIT Tuition --

13   A    Yes.

14   Q    -- "Ho'o"; right?

15   A    Uh-huh.

16   Q    And it just got missed the first year.

17   A    Correct.

18   Q    And that happens in the course of your work:  you miss

19   things.  Right?

20   A    Yes, we did.

21   Q    And then once it got caught the later year, you raised it

22   to the partner level, and it got corrected.

23   A    Yes.

24   Q    Can I ask that 11-53 be published, page 425.  Can we go to

25   the third entry 304 right on top there, if we have the right

1   page.

2          Miss Tamanaha --

3   A    Yes.

4   Q    -- can you read that?  Can you identify -- this comes

5   from -- I will represent to you that was produced by Chinaka &

6   Siu.  But tell us, what does this look like to you?  Do you

7   recall what this looks like, this form?  Does that look like

8   something that came over from Nancy Henderson?

9   A    Yes.

10  Q    And that's the -- 2003, that would have been Quicken, not

11  QuickBooks?

12  A    Yes.

13  Q    And in this year -- and it may be different throughout.

14  I'm not trying to trick you.  "Diane Doll," there is no

15  category.  It just says "WEI."  Is that correct?

16  A    Yes.

17  Q    And what does "WEI" stands for?

18  A    Waimana Enterprises, Inc.

19  Q    So there is no categorization on that.

20  A    Yes.

21  Q    Now, you can take that down now.  Thank you.

22          Now, one of the -- as part of your due diligence

23  process, would you say that there's sort of a bias to

24  categorize something as "Consulting Fees" so you make sure you

25  issue a 1099?

1    A    Yes.

2    Q    Because you want to make sure you report it to the

3    government; right?

4    A    Uh-huh.

5         MR. TOSCHER:  I have no further questions, Your

6    Honor.

7         THE COURT:  Okay.  Re-direct.

8                    RE-DIRECT EXAMINATION

9    BY MR. HARRINGTON:

10   Q    So you were asked about, you know, we saw a ledger up

11   there and what was included on there.  And, you know, you'd

12   see -- and I think you testified previously you'd see meals and

13   entertainment and those type of entries.

14   A    Uh-huh.

15   Q    Would you review every single credit card statement from

16   the client?

17   A    No.

18   Q    And because that would take, I assume, a very long time to

19   do.

20   A    Uh-huh.

21   Q    So you would just rely on --

22        THE COURT:  Can the witness answer "yes" or "no"

23   instead of "uh-huh."

24        THE WITNESS:  Oh, I'm sorry.

25        THE COURT:  It will be clearer.

1              THE WITNESS:  Okay.  Sorry.

2    BY MR. HARRINGTON:

3    Q    Because, I mean, what we saw there was just -- in fact, if

4    we could put that back on the screen.  And if we could zoom up

5    to the top half again.

6              There's no detail on what any of those reimbursements

7    on that credit card are for; is that right?  At the top?

8    A    That's correct.

9    Q    So you just rely on the fact that they say it's

10   reimbursable.

11   A    Yes.

12   Q    And you also mentioned that sometimes you miss things

13   during the year, like the "educational expense."

14   A    Yes.

15   Q    And wouldn't it be fair to say that you might miss it

16   because it's the client's responsibility to tell you what

17   they're taking as deductions if something's borderline?

18   A    Depends.  I guess sometimes it's the accountant's fault,

19   and sometimes it's the client's fault if they don't get the

20   information to the accountant.

21   Q    But it depends because sometimes the client may know

22   they're doing something wrong; would you agree with that?

23             MR. TOSCHER:  Objection, Your Honor.  Leading.

24   Suggestive.  Argumentative.

25             THE COURT:  Sustained.

1    BY MR. HARRINGTON:

2    Q    But it's the client's responsibility to provide you

3    accurate information; right?

4    A    Yes.

5    Q    And to provide you honest information.

6    A    Yes.

7            THE COURT:  Anything -- oh, he might not be done.

8            MR. HARRINGTON:  I think we're good.  Thank you, Your

9    Honor.

10           THE COURT:  Okay.  Mr. Toscher, did you have further

11   questions?

12           MR. TOSCHER:  No further questions, Your Honor.

13           THE COURT:  Okay.  Then the witness is excused.  You

14   may step down and leave the courtroom.

15       (Witness excused.)

16           THE COURT:  And maybe we should take our lunch break

17   now and come back at 1:00 P.M., okay?

18       (Jury excused.)

19       (Court recessed at 11:48 A.M., until 1:09 P.M.)

20           THE COURT:  Okay.  Who's the next witness?

21           MR. HARRINGTON:  The government calls Daniel

22   Nakandakari.

23       (Witness photographed.)

24           THE CLERK:  Please raise your right hand.

25       (Witness sworn.)

1          THE CLERK:  Thank you.  Please be seated.

2          Please state your name and spell your last name.

3          THE WITNESS:  Daniel Nakandakari,

4    N-a-k-a-n-d-a-k-a-r-i.

5          THE COURT:  It can't fit when you take a standardized

6    test, can it.  You fill in all the little boxes.

7          Okay.  Go ahead.

8                        DIRECT EXAMINATION

9    BY MR. HARRINGTON:

10   Q    Good afternoon, Mr. Nakandakari.  Let's start with a

11   little bit of your background.  Could you tell us what your

12   educational background is.

13   A    I have a finance degree from the University of Southern

14   California, and I have accounting degree from Chaminade.

15   Q    And what's your current occupation?

16   A    I'm a computer audit specialist with the IRS.

17   Q    And how long have you been in that position?

18   A    Since 2004.  About 11 years.

19   Q    What were you doing before that?

20   A    I was a revenue agent.  I was an auditor for the IRS.

21   Q    How long were you in that position?

22   A    About 14 years.  13, 14 years.

23   Q    Were you asked to review any computer records of Waimana

24   Enterprises?

25   A    Yes.

1  Q    And if you could please turn to your binder to Exhibit

2  4-1.

3              Okay.  And are those disks that you reviewed?

4  A    Yes.

5  Q    Could you tell the jury what was contained on those disks.

6  A    These are the computer accounting records for Waimana.

7  Q    And could you tell the jury a little bit about what those

8  records were, what type of file it was.

9  A    They came from a QuickBooks program, an accounting program

10 called QuickBooks.

11 Q    Could you just give -- we've heard a little bit about

12 QuickBooks, and I'm sure the jury is excited to hear more.  But

13 could you just give a little background about what QuickBooks

14 is used for.

15 A    It's an accounting program where the company can create

16 accounts and then post their transactions, checks and expenses

17 or assets.  It's an accounting program.

18 Q    And were you asked to look for particular transactions in

19 that program?

20 A    Yes.

21 Q    And were you asked to look for particular transactions

22 regarding an American Express Centurion card?

23 A    Yes.

24 Q    Were you given any documents to help you look for those

25 transactions?

1    A    Yes.  I was given documents, the statements, and also

2    reimbursement request documents.

3    Q    If we could pull up Exhibit 4-2, and you can also see it

4    in your binder there.  And so was this an example of one of the

5    statements that you received?

6    A    Yes.

7    Q    So what did you do with this statement to look for records

8    in QuickBooks?

9    A    This reimbursement request would give me the time, the

10   date, the year, and then the amounts, and also sometimes the

11   check number that I could then search on.

12   Q    And so once you performed those searches, what did you do

13   with that information on QuickBooks?

14   A    Transferred it to an Excel and gave it to the special

15   agent.

16   Q    The jury may already know, but what type of program is

17   Excel?

18   A    It's a spreadsheet, Microsoft spreadsheet program.

19   Q    And did you add any information?

20   A    No.

21   Q    Okay.  So did all the information that you received out of

22   QuickBooks, was that transferred exactly over into the Excel

23   spreadsheets?

24   A    Yes.

25   Q    And don't publish this, but if you could turn to Exhibit

1  7-1.  And is this an accurate copy of the Excel spreadsheet

2  that you created?

3  A    Yes.

4  Q    And is all the data on that information received from the

5  QuickBooks?

6  A    Yes.

7          MR. HARRINGTON:  We'd ask that Exhibit 7-1 be

8  introduced into evidence as a summary exhibit.

9          THE COURT:  Is there any objection?

10          MR. TOSCHER:  Yeah, I'm checking right now, Your

11  Honor.  I'm sorry.

12          THE COURT:  No.  Go ahead.  Take your time.

13          MR. TOSCHER:  No objection, Your Honor.

14          THE COURT:  All right.  Then that exhibit is

15  received.

16  BY MR. HARRINGTON:

17  Q    And could we put on 7-1, please.

18          And so this is where you're looking at before, and

19  could you just explain a little bit about what appears on this

20  exhibit.

21  A    This is the QuickBooks accounting records, tells you the

22  account and then the different categories or fields that the

23  company would create.  In this case transactions, date, little

24  description memo column, and then, of course, the amount.

25  Q    And in the amount I notice towards the bottom there's some

1   numbers that are in parentheses.  What does that indicate?

2   A    In accounting, parentheses are credits.

3   Q    So what do you mean by "credits"?

4   A    For a cash account a credit would be taking away money.

5   Q    So would that be the company issuing a check?

6   A    Right.  Correct.

7   Q    And were you asked to search those QuickBook records for

8   any transactions about a Visa credit card?

9   A    Yes.

10  Q    Okay.  And were you given any documents to help you

11  perform those searches?

12  A    Yes.  Similar documents.

13  Q    Okay.  Could we pull up Exhibit 4-107.  And if we could

14  actually go to the second page of that exhibit, please.

15       And so is this one of the documents that you used?

16  A    Yes.

17  Q    Okay.  And did you follow the same process where you

18  searched for information on QuickBooks and put it onto an Excel

19  spreadsheet?

20  A    Yes.

21  Q    If you could take a look in your binder at 7-1A, please.

22       And is this the result of your searches on the

23  QuickBook records?

24  A    Yes.

25  Q    Okay.  And is this information that was obtained solely

1    from the records of QuickBooks?

2    A    Yes.

3    Q    And you didn't add any additional information?

4    A    No.

5         MR. HARRINGTON:  I'd ask that Exhibit 7-1A be

6    received into evidence as a summary exhibit.

7         MR. TOSCHER:  No objection, Your Honor.

8         THE COURT:  Received in evidence.

9    BY MR. HARRINGTON:

10   Q    Okay.  If we could publish 7-1A.

11        And is this the same idea where you're listing down

12   what would appear in the QuickBooks records of transactions?

13   A    Yes.

14   Q    Okay.  And did you perform any searches for another

15   American Express card involving cash reimbursements?

16   A    Yes.

17   Q    If you could turn in your binder towards 7-2, please.

18        And as you're looking at 7-2, is this an accurate

19   copy of the Excel spreadsheet that you created pulling that

20   information?

21   A    Yes, it is.

22   Q    Did you add anything to the information, or is this all

23   information that came from the QuickBooks records?

24   A    I didn't add anything.  This is all QuickBooks records.

25        MR. HARRINGTON:  I'd ask that Exhibit 7-2 be received

1    into evidence as a summary exhibit.

2              MR. TOSCHER:  No objection, Your Honor.

3              THE COURT:  Received in evidence.

4    BY MR. HARRINGTON:

5    Q    If we could publish 7-2, please, and if we could zoom up.

6              And again this is information that would be contained

7    on the QuickBooks records of Waimana?

8    A    Yes, it is.

9    Q    And I don't think I clarified this before, but each one of

10   the ones I showed you before is multiple pages; is that right?

11             If we turn to the second page.  We've just been

12   showing the first page.

13   A    Oh, yes, yes, yes.

14   Q    Okay.  And did you perform any searches of the QuickBook

15   records about payments to Diane Doll?

16   A    Yes.

17   Q    Okay.  And how did you perform those searches?

18   A    Just on her name or parts of her name.

19   Q    And did you follow the similar process of exporting

20   information you found onto an Excel spreadsheet?

21   A    Yes, I did.

22   Q    If you look at Exhibit 7-3, and if you could page through

23   that exhibit and, when you're finished, if you could look up,

24   please.

25   A    Okay.

1  Q    Okay.  Is that an accurate copy of the information that

2  you retrieved from the QuickBooks records and put into Excel?

3  A    Yes, it is.

4  Q    And that's all original information from the QuickBook

5  records?

6  A    Yes.

7         MR. HARRINGTON:  Okay.  I would ask that Exhibit 7-3

8  be received into evidence as a summary exhibit.

9         MR. TOSCHER:  No objection, Your Honor.

10        THE COURT:  Received in evidence.

11 BY MR. HARRINGTON:

12 Q    And if we could pull page 2 of Exhibit 7-3, please.

13        And again this is a document showing how payments

14 were made to Diane Doll as reflected in the QuickBooks; is that

15 correct?

16 A    Yes, it is.

17 Q    If we could turn to page 39, Bates number 39, please.  And

18 if we could zoom up.

19        And again this is all original information.  You

20 didn't add any information to this record; is that right?

21 A    Correct.  This is original information.

22 Q    So in the QuickBooks it listed it as "Consulting Fees"; is

23 that right?

24 A    Yes, yes.

25 Q    Okay.  Did you perform any searches for tuition payments

1    to MIT University?

2    A    Yes, I did.

3    Q    How did you perform that search?

4    A    On the initials MIT or on the post -- name of the school:

5    Massachusetts Institute of Technology.

6    Q    And did you follow the same process where you exported

7    that information into an Excel spreadsheet?

8    A    Yes, I did.

9    Q    If you could look in Exhibit 7-4 in your binder, please.

10           And is that an accurate copy of the Excel spreadsheet

11   that you created based on the information in the QuickBook

12   records?

13   A    Yes, it is.

14   Q    And this is all original QuickBooks information?

15   A    Yes, it is.

16   Q    And you didn't add any information to this chart; is that

17   right?

18   A    I didn't add any information.

19           MR. HARRINGTON:  I'd ask that Exhibit 7-4 be received

20   into evidence, Your Honor, please.

21           MR. TOSCHER:  Your Honor, we object.  We think

22   there's some surplusage information on there that maybe we want

23   to examine at sidebar.

24           THE COURT:  Okay.  I'm going to reserve on this one.

25   You may be able to go to other areas.  We can resolve it later.

1          So that number was?

2          MR. HARRINGTON:  7-4.

3          THE COURT:  7-4?

4          MR. HARRINGTON:  Correct.

5          THE COURT:  I'm reserving judgment on that.  Okay.

6   BY MR. HARRINGTON:

7   Q    Did you perform any searches for a Santa Clara property in

8   the QuickBooks records?

9   A    Yes, I did.

10  Q    How did you perform that search?

11  A    Based on information from the special agent, closing

12  documents, things like that.

13  Q    Did you use particular terms to search for transactions in

14  QuickBooks?

15  A    Yes.  Some of the fields had, you know, "Santa" or "Clara"

16  or something like that, yes.

17  Q    If you could look at Exhibit 7-5, please, in your binder.

18          And is this an accurate copy of the Excel spreadsheet

19  that you created based on information you pulled out of the

20  QuickBook records for Santa Clara based on your searches?

21  A    Yes, it is.

22  Q    Okay.  And did you add any information to this document?

23  Is this all original QuickBooks records?

24  A    This is original records.  I didn't add anything.

25          MR. HARRINGTON:  And I'd ask that Exhibit 7-5 be

1    received in evidence as a summary exhibit.

2              MR. TOSCHER:  No objection, Your Honor.

3              THE COURT:  7-5 is received.

4    BY MR. HARRINGTON:

5    Q    And if we could show 7-5, please.  And if we could zoom

6    up.

7              And again this was all information that was in the

8    QuickBooks records originally; is that right?

9    A    Yes.

10             MR. HARRINGTON:  Just one moment, Your Honor, please.

11             Your Honor, I don't know if we want to address 7-4

12   now or --

13             THE COURT:  My suggestion is, if you have other

14   questions on other exhibits of this witness --

15             MR. HARRINGTON:  I do not have other questions.

16             THE COURT:  You do not?  Okay.

17             7-4.  I'll see counsel at the bench.

18        (At sidebar on the record:)

19        (Counsel conferring.)

20             THE COURT:  Wait.  She can't hear you; so how about

21   we move over a little bit.

22             MR. TOSCHER:  Okay.

23             THE COURT:  Okay.  Go ahead.

24             MR. TOSCHER:  Your Honor, my concern was that this is

25   QuickBook --

     1            THE COURT:  I'm sorry.  I can hardly hear you.

     2            MR. TOSCHER:  I just don't know what these balances

     3     are, and they're very big, and they don't seem to relate at all

     4     to these numbers right here.  This is the charges, and then we

     5     have these balances.  It doesn't --

     6            THE COURT:  Oh, okay.

     7            MR. HARRINGTON:  I'd be happy to ask some more

     8     questions about it.

     9            THE COURT:  Do you know what it is?

    10            MR. HARRINGTON:  I think what it is is it's the

    11     Waimana account, and so things that were billed to the Waimana

    12     account.  And that's why it's so large when it was just a WEI

    13     expense.

    14            THE COURT:  So this is what you think -- you want

    15     this whole balance --

    16            MR. TOSCHER:  Yeah.  I want --

    17            THE COURT:  -- out because he thinks it doesn't

    18     relate to showing how tuition payments to MIT were booked.

    19            MR. HARRINGTON:  I mean, you know --

    20            THE COURT:  Why do you need that for this

    21     particular --

    22            MR. HARRINGTON:  I think it's just because that's the

    23     way they all appeared.  Not all of them, I guess, but some of

    24     them had a running balance along the edge.

    25            But they, frankly, aren't part of anything we're

1    trying to prove; so if we want to just "X" them out, we can do

2    that, too.

3            MR. TOSCHER:  I think that's the easiest way.

4            THE COURT:  Okay.  So excising out the last column,

5    which says "balance," and you can reflect that later.  So, in

6    other words, you can't publish it in this way.  You can

7    question him about it without questioning him about the

8    balance.

9            Okay.  Conditionally admitted, is that okay?

10           MR. TOSCHER:  That's fine, Your Honor.

11           THE COURT:  No objection if we take out that balance

12   column?

13           MR. TOSCHER:  Yes, Your Honor.

14           THE COURT:  Okay.

15       (In open court on the record:)

16           THE COURT:  Okay.  Exhibit 7-4 is going to be revised

17   a little, and in revised format will be admitted without

18   objection.

19           MR. HARRINGTON:  And I don't have any other questions

20   as long as that's okay.  Thank you.

21           THE COURT:  Okay.

22           MR. TOSCHER:  No questions, Your Honor.

23           THE COURT:  Okay.  Then you can step down and leave

24   the courtroom.

25       (Witness excused.)

1          THE COURT:  And the government may call its next

2     witness.

3          MR. HARRINGTON:  Your Honor, at this time we'll call

4     Lynn Yasaka.

5        (Witness photographed.)

6          THE CLERK:  Please raise your right hand.

7        (Witness sworn.)

8          THE CLERK:  Thank you.  Please be seated.

9          MR. HARRINGTON:  Your Honor, if I can approach to

10    give her a binder?

11         THE COURT:  Yes.

12         MR. HARRINGTON:  Thank you.

13         THE CLERK:  Please state your name and spell your

14    last name.

15         THE WITNESS:  Lynn Yasaka, Y-a-s-a-k-a.

16                    DIRECT EXAMINATION

17    BY MR. HARRINGTON:

18    Q    Good afternoon, Miss Yasaka.

19    A    Hi.

20    Q    Let's talk a little bit about your background first.

21    What's your current occupation?

22    A    I'm an accountant.

23    Q    Where are you working?

24    A    At Tax Advisors Group, Inc., LLC.

25    Q    And how long have you been working there?

 1   A     About a year.  I was -- sorry.  About a year.  We broke

 2   off from Chinaka & Company.

 3   Q     Okay.  So how long did you work for Chinaka & Company?

 4   A     About 20 years.

 5   Q     But you're not working there at the moment?

 6   A     No.

 7   Q     And are you a licensed CPA?

 8   A     No, I'm not.

 9   Q     So could you tell the jury a little bit about what a staff

10   accountant does at a firm.

11   A     Tax-wise or just any job?

12   Q     Well, let's back up for a second.  I'm sorry, I should ask

13   first, were you a staff accountant at Chinaka & Siu?

14   A     Yes.

15   Q     So what were your duties as a staff accountant?

16   A     I guess we had bookkeeping work, getting information from

17   the client and putting it into some kind of general ledger,

18   trial balance; prepare the tax returns, business and individual

19   returns.  I did -- I prepared payroll.  And also I guess help

20   out administrative work.

21   Q     So you worked on both personal tax returns and payroll

22   projects as well?

23   A     Yes, that's correct.

24   Q     So when you were working on a personal tax return, what

25   would be your responsibilities in preparing that return?

1    A    Obtain the information from the client, or they would drop

2    it off, and then put it onto an organizer, like a sheet where

3    you just fill in all the numbers.  And that assists you in

4    putting it into the computerized tax program.

5    Q    So you would take the information that the client would

6    provide and put it into the computer program?

7    A    Yes.

8    Q    So what would happen at that point?  What would the

9    computer program do?

10   A    It would just place all the numbers that you would input

11   into the correct part of the tax return.

12   Q    So then it would generate a draft of a tax return?

13   A    Yes, that's correct.

14   Q    Would you review that tax return after it was generated?

15   A    Yes.

16   Q    So then so what would happen after you reviewed the tax

17   return?

18   A    Then it would go to the next reviewer.

19   Q    So what would be the next level at Chinaka & Siu while you

20   were working there?

21   A    There would be a tax manager or supervisor or even the

22   partner in charge, depending who's available.

23   Q    So would that be the last level of review, or would it

24   sometimes go through multiple levels past --

25   A    Sometimes two reviews.

1    Q    So if you were to think about how much time each person

2    would spend on the process, who would be working on the return

3    for the majority of that period of time?  Who put in the most

4    hours?

5    A    I would.

6    Q    And I know that this may vary a lot, but say on your

7    standard individual tax return, how much time would the next

8    level of review spend reviewing the work?

9    A    I guess maybe 15 minutes to half an hour.

10   Q    And what about for corporate returns?  Was it the same

11   process at Chinaka & Siu?

12   A    Yes, it was.

13   Q    Would it be the same thing where the staff accountant

14   would spend the majority of the time working on the project?

15   A    Yes, that's correct.

16   Q    What about if you had -- say an issue came up with some

17   information a client gave, and there were some follow-up

18   questions.  Who would be the one who would actually go back to

19   the client and ask the questions?  Would it be the staff

20   accountant, or would it be the partner?

21   A    It would normally be the partner.

22   Q    But it would depend on the circumstances, I assume?

23   A    Yes, I guess what level you're at.

24   Q    And so you talked about payroll as well.

25   A    Yes.

1    Q    So let me ask you a little bit about the payroll process.

2         I guess just a general question.  You know, some

3    people -- some firms are doing payroll in-house, some are doing

4    accountants.  So what would an accounting firm do with payroll

5    information?

6    A    It's normally the client would send in the, I guess, the

7    salary or the time sheets, time cards, and we would prepare the

8    pay stubs.  I guess it varies.  Some firms prepare the actual

9    paycheck, but we would just normally prepare the pay stubs and

10   send that out to the client with proper payroll taxes that need

11   to be paid.

12   Q    So it sounds like you're talking about what would happen

13   with hourly employees; is that right?

14   A    Yeah, hourly employees have time sheets.  Depending on the

15   client.  Salaried employees, we're told how much they're going

16   to be making.  We just generate a pay stub whenever it comes

17   up.

18   Q    So when you -- did you ever work with the client Waimana

19   Enterprises?

20   A    Yes, I did.

21   Q    Okay.  Did you work on their payroll?

22   A    Yes, I did.

23   Q    Did you have anything to do with their preparation of tax

24   returns for Waimana Enterprises?

25   A    No.

1    Q     So it was just payroll for Waimana?

2    A     Yes.  That's correct.

3    Q     So how would they provide you payroll information?

4    A     They would send us the -- send me the hourly wages -- I'm

5    sorry, the total hours worked per pay period.  And there were

6    some hourly employees.  There were some salaried.  But we

7    already knew the salaried employees.  So when she send us the

8    hourly rate time sheets, we combine the two and send them in.

9    Prepare the payroll at one time.

10   Q     You said "she" would send them.  Who are you referring to?

11   A     Nancy.

12   Q     Nancy Henderson?

13   A     Nancy Henderson, yes.

14   Q     Was that your primary contact at Waimana?

15   A     Yes.

16   Q     Did you have any other people that you dealt with at

17   Waimana?

18   A     No, I don't believe so.

19   Q     So let's again take it one piece at a time.  So for hourly

20   employees would you get time cards or just --

21   A     Normally, the total hours just, you know, written.  But

22   for, say, summer employees they would have actually a time

23   sheet.

24   Q     And then what about for employees who were paid a yearly

25   salary?  Would you get monthly reports?

1   A    A yearly or --

2   Q    Yeah, someone who is not paid by the hour.  Somebody who

3   had a yearly salary.

4   A    Okay.  Yes, we would -- I'm sorry?

5              MR. TOSCHER:  Objection, Your Honor.  Confusing.

6              THE COURT:  Yes.  I think when you say yearly salary,

7   it sounds like they might get paid once a year.

8              MR. HARRINGTON:  I understand.

9              THE COURT:  Which is a really good budgeting thing

10  for somebody to get paid once a year and figure out all their

11  bills.

12             MR. HARRINGTON:  I understand.  Let's back up for a

13  second.

14             THE WITNESS:  Yes.

15  BY MR. HARRINGTON:

16  Q    So there are employees that were paid an hourly rate.

17  A    Yes.

18  Q    At Waimana?

19  A    Yes.

20  Q    So then there are employees who were paid a set amount for

21  the whole year?

22  A    Yes, uh-huh.

23  Q    So would the information you'd receive monthly from

24  Waimana differ between those two different types of employees?

25  A    The salary, the ones that were paid at a set amount, that

1    wouldn't differ, and so we would prepare that payroll along

2    with the hourly employees.

3    Q    Just a moment.  Let me get in order here.

4         So you have a binder in front of you?

5    A    Yes.

6    Q    And if you could please open in the binder.  It should be

7    in the first tab, I believe, and it's 4-18 -- 4118, excuse me.

8    4-118.

9    A    Okay.  Yes.

10   Q    And it should be a memorandum dated -- or a fax dated

11   June 13, 2005.

12   A    Yes.

13   Q    It's page 89.

14   A    Yes.  Okay.

15   Q    Okay.  And if we could zoom up a little bit.  And

16   whatever's easier for you, if you want to look at the screen or

17   at the binder.

18         So is this a fax that you received from

19   Miss Henderson?

20   A    Yes.

21   Q    Okay.  So do you know who Adrianne, Breanne, and Charlton

22   are?

23   A    Yes.  I know of them.  I mean, they're the children.

24   Q    The children of --

25   A    Yeah.

1   Q     -- of whom?

2   A     Mr. Hee.

3   Q     And so is this the type of information you would receive?

4   I think it says there's an hourly salary and that they were

5   going to be hired at an hourly rate?

6   A     Yes.

7   Q     Then if we could turn to the next tab, and it's exhibit

8   4-119.  And it's the second page that you have in your binder,

9   and the numbers at the bottom are and 199.

10          Okay.  And if we could zoom up at the center.  Again

11  do you recognize this as a fax to you from Miss Henderson?

12  A     I don't have that.  What tab is that?  I'm sorry.

13  Q     It should be the second tab.  It should be the tab that's

14  labeled 4-119, and it should be the second page in there.

15  A     Oh, second page.

16          MR. TOSCHER:  Excuse me, Your Honor.  Can we ask

17  counsel to give us a Bates number because it's multiple

18  pages.

19          THE COURT:  Yes.

20          MR. HARRINGTON:  It's Bates number WEI 02199.

21          THE WITNESS:  Okay.  Yes.

22          MR. TOSCHER:  Thank you.

23  BY MR. HARRINGTON:

24  Q     So do you recognize this as a fax you received from

25  Miss Henderson?

1   A    Yes.

2   Q    So since this probably speaks better than I do, this is

3   what we were talking about; right?  It's showing the number of

4   hours an employee would be paid?

5   A    Yes.

6   Q    So what would you do with that information?

7   A    Just input it into our payroll program and generate the

8   pay stub.

9   Q    And would you verify that each employee actually worked

10  that many hours?

11  A    No.

12  Q    So you just rely on what the client told you?

13  A    Yes, that's correct.

14  Q    So the next tab is Exhibit 4-118.  And in your binder

15  there's one page, and the Bates number is WEI 02 and the last

16  two digits are 86.

17  A    Okay.

18  Q    And do you see that document?

19  A    Yes.

20  Q    So do you recognize this as a fax from Miss Henderson to

21  you?

22  A    Yes.

23  Q    Okay.  And so it says that Mr. Hee's daughters would be

24  put on the payroll as of February 10th, 2006 -- excuse me.

25  Effective January 3, 2006, at a salary of $24,000.

1    A    Yes.

2    Q    And so what would you do on your end of the process once

3    you received this fax?

4    A    Okay.  Since it's an annual salary, meaning they would be

5    paid the entire year, again we input it into the computer and

6    generate a pay stub, dividing it by the number of pay periods

7    for the year.

8    Q    And so would you take any steps to verify whether the

9    employees that are listed in here would actually perform any

10   work for the company?

11   A    No.

12   Q    So you would just rely on the representation from the

13   client?

14   A    Yes.

15   Q    So I think earlier you mentioned that you also worked on

16   individual income tax returns?

17   A    Yes.

18   Q    So did you assist in preparing the individual income tax

19   returns for the Hee family?

20   A    Yes.

21   Q    So how many returns were involved in that process?

22   A    At the beginning just one because it was the parents, and

23   the kids were dependent.  As they got older, when they, I

24   guess, earned wages or -- we would prepare a separate return

25   for each of them; so four all together.

1    Q     And so what years were you preparing those returns?

2    A     What years --

3    Q     Let me ask it this way.  I know it may have been a while

4    ago.

5    A     Yeah.

6    Q     Did you work on their returns the entire time you were at

7    Chinaka & Siu?

8    A     No.  It was assigned to different employees at the firm at

9    the beginning until the firm became -- our firm became smaller;

10   then I started working on their return each year.

11   Q     And you don't remember what year that was, though?

12   A     No.

13   Q     Were you preparing the returns in the decade of 2000 to

14   2010?

15   A     Probably, yes.

16   Q     What about 2010 time that you left Chinaka & Siu?  Were

17   you preparing their returns during that period of time?

18   A     Yes.

19   Q     And so we talked a little bit earlier about what type of

20   information you'd receive.  So what would you receive from --

21   let's start with Mr. Hee and Mrs. Hee before you'd prepare

22   their tax return?

23   A     I would receive their -- say their W-2s; 1099s, interest

24   income, dividend income; maybe mortgage interest statements.

25   Q     And how would you receive that information?  Would they

1   send you an e-mail, or would they fill out a form?

2   A   No.  Nancy would send me anything that was under Mr. Hee's

3   name.  And anything else that I was missing that was in the

4   combined tax return, I would ask -- I would, I guess, e-mail

5   Mrs. Hee or fax --

6   Q   Fax?

7   A   -- fax Mrs. Hee to send that information to me.  So she

8   sent it separately from him.

9   Q   Just to make sure I understand, Mrs. Henderson would send

10   you a packet of information initially?

11   A   Yes, with just Mr. Hee's information:  any W-2s, any 1099

12   interest, dividends that were under his name.  If it was a

13   joint account, I believe she had sent that to us as well.

14   Q   Then you'd also receive information from Mrs. Hee?

15   A   Yes, if there were interest income statements under her

16   name only.

17   Q   Let's take a look at should be the next tab.  It's 11-3,

18   and the Bates number on this one is CHAL, and the last three

19   digits are 638.

20        And do you recognize this as a memorandum that you

21   received from Mr. Hee?

22   A   Yes.

23   Q   So it says, "Enclosed are the following," and there's a

24   list of items.  So is this the type of information that would

25   be provided?

1    A    Yes.

2    Q    And other than what's on here, did he provide you any

3    other information to put on his tax return?

4    A    No.

5    Q    And if we turn to the next tab, which is Exhibit 11-4, and

6    the Bates number is CHAL 744.  And again this is another -- you

7    recognize this as a memorandum that Mr. Hee sent you in 2006

8    for the 2005 return?

9    A    Yes.

10   Q    And again this is all the information that was provided?

11   A    Yes.

12   Q    Now, for either of those years did you ask for follow-up

13   information, or did you rely on what was provided?

14   A    Follow-up.  If I was missing a statement that was, say,

15   from a bank in the previous year, then I would ask do you still

16   have that account open?  I would ask Nancy.

17   Q    Just to make sure I understand, say, if in 2004 he had an

18   account at Hawaii National Bank but it wasn't there in 2005,

19   you may double-check to make sure?

20   A    Yes, that's correct.

21   Q    And if you could turn to the next exhibit, which is 11-6,

22   and the Bates number is CHAL 927.

23         And again would you recognize this as a statement

24   from 2008 that Mr. Hee sent to you about his tax return for

25   2007?

1    A    Yes.

2    Q    And again this was the information he provided you to

3    prepare the return?

4    A    Yes.

5    Q    Okay.  And what was the process you used in preparing the

6    children's tax returns?  If it was different among the

7    different three children, let me know.  But, otherwise, what

8    would you rely on when you were preparing the children's

9    returns?

10   A    I would ask for the basic information, which would be a

11   W-2, a 1099 for interest earned.  And Mrs. Hee would -- I would

12   request that from Mrs. Hee, and she would send it in.

13   Q    Okay.  So Mrs. Hee would help provide the information for

14   the children?

15   A    Yes.

16   Q    And so if they gave you a W-2, you would report that W-2

17   on the tax return?

18   A    Yes.

19              MR. HARRINGTON:  Just one moment, please.

20              I don't have any further questions.

21                        CROSS-EXAMINATION

22   BY MR. TOSCHER:

23   Q    May it please the court.

24              Good afternoon, Miss Yasaka.

25   A    Hi.

1   Q     You were asked by Mr. Harrington regarding doing the

2   payroll for Waimana.

3   A     Yes.

4   Q     Did that also include the payroll tax returns?

5   A     Yes.  The quarterly, yes.

6   Q     The quarterly.  Those are the Forms 941?

7   A     Yes.

8   Q     So not only preparing the payroll, but also doing the

9   payroll tax returns to the Internal Revenue Service.

10  A     Yes, that's correct.

11  Q     Now, you were responsible, or your involvement, for the

12  individual tax returns of Mr. and Mrs. Hee and the children;

13  correct?

14  A     Yes, that's right.

15  Q     And not Waimana, not the corporate return.

16  A     No.

17  Q     And do you know who did that at the firm?

18  A     The Waimana?

19  Q     Yes.

20  A     That would be Lynn and Carlton.  Lynn Tamanaha.

21  Q     And Carlton --

22  A     Siu.

23  Q     -- Siu.  Thank you.

24        Now, while you were preparing the kids' returns and

25  the payroll, you were aware that they were getting a salary;

1    correct?

2    A    Yes, that's correct.

3    Q    And you were aware that they were attending school full

4    time in Santa Clara; isn't that correct?

5    A    Yes.

6    Q    In fact, in preparing the returns you actually did some

7    analysis as to potential tuition credits and dependency

8    exemptions; isn't that right?

9    A    Yes.

10   Q    Did the question ever come up as to a problem with paying

11   the kids a salary?

12   A    No.

13   Q    It never came up at all, did it.

14   A    No.

15   Q    Now, in the course of your responsibilities in doing the

16   tax returns, if you spotted what you thought was a problem,

17   what would you do?

18   A    I would go to the partner in charge --

19   Q    Okay.

20   A    -- and ask.

21   Q    And if you see something -- and the partners rely upon the

22   staff to do that for them?

23   A    Make the decision?

24   Q    No.  To come to them if there's a problem.

25   A    Yes.

1            MR. TOSCHER:  I have no further questions, Your

2   Honor.

3                    RE-DIRECT EXAMINATION

4   BY MR. HARRINGTON:

5   Q    You were asked about who prepared the Waimana tax returns,

6   and I think you said Carlton Siu and Lynn Tamanaha; is that

7   correct?

8   A    Yes.

9   Q    So we talked a little about how the process worked with

10  the staff attorney -- not staff attorney, sorry.  Staff

11  accountants.  Who would have spent the bulk of the time working

12  on the tax return between Lynn Tamanaha and Carlton Siu?

13  A    That would be Lynn.

14           THE COURT:  I don't have any further questions.

15           MR. TOSCHER:  No questions, Your Honor.

16           THE COURT:  Okay.  Then the witness is excused.  You

17  can step down and leave the courtroom.

18  (Witness excused.)

19           MR. TONG:  The government calls Carlton Siu.

20           THE COURT:  Okay.

21  (Witness photographed.)

22           THE CLERK:  Please raise your right hand.

23  (Witness sworn.)

24           THE CLERK:  Thank you.  Please be seated.

25           Please state your name and spell your last name.

1          THE WITNESS:  My name is Carlton Siu.  Last name is

2    spelled S-i-u.

3                        DIRECT EXAMINATION

4    BY MR. TONG:

5    Q     Good afternoon.  What is your occupation?

6    A     I'm a CPA.

7    Q     And is that a public accountant -- Certified Public

8    Accountant?

9    A     Yes.

10   Q     And tell us your educational background.

11   A     I went to University of Hawai'i for two years.  Then I

12   finished off at Ohio State University where I got my bachelor's

13   degree.  That's all.  No graduate school or anything like that.

14   Q     When did you go into the public accounting field?

15   A     '82 about.

16   Q     Okay.  And are you presently licensed as a CPA?

17   A     Yes.

18   Q     In what state?

19   A     Hawai'i.

20   Q     And how long did you remain in that field after starting

21   in 1982?

22   A     I was licensed -- I became licensed in about '82.  I sort

23   of retired in 2008 and moved to state of Washington for two

24   years, and I wasn't licensed in the state of Washington.  I

25   came back in 2010, and I believe I re-established my license

 1    either '11 or 2012, something like that.

 2    Q    Here in Hawai'i.

 3    A    In Hawai'i, yes.

 4    Q    So during the time you were in Washington you were not a

 5    practicing accountant; is that correct?

 6    A    I did tax returns but not as a CPA.

 7    Q    Okay.  And let's take the period say mid '80s to 2008 when

 8    you left for Washington.  Okay?

 9    A    Yes.

10    Q    You have that in mind?

11    A    Yes.

12    Q    Where did you practice?

13    A    I had my own firm, multiple firms:  Chinaka & Siu CPAs,

14    and then it was changed to Chinaka Siu & Company CPAs.

15    Q    Because your name is in the title, I assume you were an

16    owner of the firm?

17    A    Yeah, principal or partner.

18    Q    And what happened to the records that you had when you

19    retired in 2008?

20    A    It was retained by the existing partner after I left.

21    Q    Would that be David Chinaka?

22    A    Yes.

23    Q    How are you presently occupied?

24    A    I'm a CPA.

25    Q    Yeah, bad question.  What's the name of your company now?

1   A    C. Siu Consulting, LLC.

2   Q    And you're the owner; correct?

3   A    Yes.

4   Q    Now, do you know someone named Albert Hee?

5   A    Yes.

6   Q    And how do you know him?

7   A    Previously, he was my client while I was at Chinaka --

8   when I had my other businesses, he was my client.

9   Q    Okay.  And if you were to see Mr. Hee, would you recognize

10  him?

11  A    Yes.

12  Q    Do you see him in court today?

13  A    Yes.

14  Q    Could you identify him by where he's seated and what he's

15  wearing?

16  A    Suit (indicating) sitting behind you.

17  Q    He's the gentleman standing up?

18  A    Yes.

19       MR. TONG:  May the record reflect the identification

20  of the defendant, Your Honor.

21       THE COURT:  It so reflects.

22  BY MR. TONG:

23  Q    And you say that the Defendant Albert Hee was your client;

24  is that correct?

25  A    Yes.

1   Q    Did you bring him to the firm?

2   A    He was referred to me; so, yes.

3   Q    But within the firm you were the partner in charge; is

4   that correct?

5   A    Yes.

6   Q    And what kind of work did you do for Mr. Hee?

7   A    I primarily did taxes.

8   Q    What kind of taxes?

9   A    I was involved with both corporate and individual.

10  Q    Okay.  And do you recall the name of his company?

11  A    The major company was Waimana Enterprises.

12  Q    Okay.  And when you say you primarily did taxes, what do

13  you mean by that?  What else did you do for him?

14  A    We did general ledger, bookkeeping, coming out with the

15  trial balance for the returns.

16  Q    And do you recall a time when your firm was engaged to do

17  an audit of financial statements?

18  A    Yes, there was a time when the firm -- we did do an audit.

19  Q    And who was responsible for that work?

20  A    David Chinaka.

21  Q    You weren't the person in charge of that work; correct?

22  A    No.

23  Q    Was Mr. Chinaka actively involved in the preparation of

24  the tax returns that you handled?

25  A    Usually not.

1    Q    So you were the primary guy on the tax returns, and he was

2    the primary guy on the --

3    A    Audit side.

4    Q    -- financial statements.

5    A    Yes.

6    Q    Okay.  Now, I'm not going to show them to you, but I'm

7    just going to ask, did you have a practice of using engagement

8    letters?

9    A    Yes.

10   Q    And what's the purpose of using engagement letters?

11   A    Basically, it's like a contract.  It specifies what our

12   duties are to the client and what the client's duties are to us

13   as a firm.

14   Q    And, generally speaking, how do you divide those duties?

15   What is the client's duties and what are yours?

16   A    Basically, the client's duties is to make sure they're

17   representing things to us correctly, that they're maintaining

18   the necessary supporting documents.  Our duties are to put it

19   all together.  If we notice something wrong, we'll try to find

20   out and try to correct it.  But, basically, put the books

21   together, or whatever we're assigned to do.  Sorry.

22   Q    And with regard to corporate returns how would you get the

23   information necessary to prepare a return?

24   A    Usually, it varied, but at the beginning we were getting

25   copies of the check register, and we would input it into our

1    own general ledger system.  As the years evolved, they went to

2    Quicken.  They gave us a copy of Quicken and a hard copy.  And

3    they eventually went to QuickBooks where we just get a copy of

4    the data file and work with that.

5    Q    So when you say they would give you the equivalent of a

6    check register initially, what do you mean by that?

7    A    With a manual check register, Ekonomik check register, I

8    think that's what they call it, if that's what they used.  They

9    would record the disbursements, description as to what it is.

10   Probably a coding is on there, too.  We usually give them a

11   chart of accounts, and we just use that to input into our

12   general ledger system.

13   Q    So when you say there's a coding present, what do you

14   mean?

15   A    Classifications.  Either they wrote down what it's

16   specifically for, or they may have put down an account number,

17   if we gave them the chart of accounts.  I don't really recall

18   already.

19   Q    But from an accounting standpoint "coding" means the type

20   of expenditure it is; correct?

21   A    Classification of the expenditure, yes.

22   Q    So, for example, whether it would be business versus

23   something else; correct?

24   A    Yes.  Or type of expense.

25   Q    Or even more specifically what time of expense it would

1   be; correct?

2   A    Yes.

3   Q    And who would you rely upon to do the coding of expenses?

4   A    Generally, their staff -- Waimana staff did it.  We looked

5   it over.  If anything wasn't coded or sometimes they miss

6   something, we'd ask them what it was, or sometimes we'd ask for

7   support if we didn't know what it was specifically.  Like they

8   may have bought a computer, and we would need documentation as

9   to what kind of computer so we could identify it in our fixed

10  assets system.

11  Q    And to use your example, you might want to know what type

12  of computer it is so that you could record it as an asset; is

13  that what it is?

14  A    Yes.

15  Q    And depreciate it; correct?

16  A    Yes.

17  Q    What about regular expenses:  meals, entertainment, and

18  the like?

19  A    We don't usually question that.  They've been generally

20  told that they got to have documentation as to what the purpose

21  is.  If they declare it as an entertainment expense, we just

22  record it as entertainment expense.

23  Q    And you said earlier, I think, actually a couple of times,

24  they have to maintain documentation; correct?

25  A    Support, yes.

1    Q    And what kind of support documentation would there be?

2    A    Receipts.

3    Q    Would Waimana normally provide to you, as the partner in

4    charge, all of their receipts when they first gave you their

5    books?

6    A    No.  Only when we requested something that needed further

7    clarification we would ask for a receipt.

8    Q    And in the absence of a receipt how would you decide where

9    to put the different expenses on a tax return?

10   A    Basically, a discussion.  If we didn't have a receipt,

11   which usually didn't happen too often, but it's basically some

12   discussion as to what the expense was for and so forth.

13   Q    Okay.  But a minute ago you said you wouldn't ask for

14   receipts unless a question arose; correct?

15   A    Right.

16   Q    So if you got a ledger that said it was a business

17   expense, and it was coded in some way, how would you treat

18   that?

19   A    If it was coded that way, we would accept it.

20   Q    Okay.  Now, do you recall a time when you learned that

21   Waimana had made tuition payments for one of the children of

22   the defendant?

23   A    Yes.

24   Q    And how did you learn about that?

25   A    Basically, I remember one time it was -- I don't know when

1   the actual first -- when I first noticed the expense, but I

2   know the discussion of tuition was brought up at one point of

3   time.  That would have been maybe 2005, 2006.  I don't remember

4   exactly.  The actual seeing the disbursements, I don't recall

5   when that happened.

6   Q    And you learned about it from Lynn Tamanaha; is that

7   correct?

8   A    It could have been, or it could have been IRS meetings.  I

9   don't really remember.

10  Q    Okay.  Let's back up one second.  I forgot to ask who at

11  your company was primarily responsible for doing the initial

12  input of all the data on Waimana's tax returns?

13  A    It varied.  It could have been Lynn Tamanaha.  It could

14  have been Lynn Yasaka.  Those are the two primary accountants

15  assigned to it.  Occasionally, there could have been -- one of

16  the supervising managers may have done it in case they're busy

17  or so forth.

18        The actual data inputting, actually entering it into

19  the system, could have been done by Lynn Y. -- sorry, Lynn

20  Yasaka or Lynn Tamanaha or could have been done by admin person

21  because they're just inputting numbers, basically.

22  Q    So, basically, your staff would take the records given to

23  them and then input it into some kind of software program.

24  A    Yes.

25  Q    And that would occur before you saw anything related to

1   the return?

2   A    Yes.

3   Q    And then when would you, as the partner in charge,

4   actually see the draft of the return?

5   A    Usually, I would review the trial balance first, and then

6   once the trial balance is okayed or reviewed or approved, then

7   it goes back to be prepared into the tax return format.  And

8   then at some point in time I would see a draft and review it,

9   then send it back to review any -- to clear any review notes,

10  and then it would be finalized afterwards.

11  Q    Let me just see if I got that right.  The information

12  comes in from the client --

13  A    Yes.

14  Q    -- with the coding of the expenses?

15  A    Yes.

16  Q    It goes to the staff accountant?

17  A    Yes.

18  Q    They prepare a trial balance?

19  A    They put the information in and come up with a trial

20  balance, yes.

21  Q    And then the trial balance comes to you.

22  A    Yes.

23  Q    Then you approve it.

24  A    Yes.

25  Q    It goes back to the staff accountants or someone else.

1    A    Yes.

2    Q    And then a draft is prepared.

3    A    Of the tax return, yes.

4    Q    And from the sound of it, within your firm you spent less

5    time on a particular tax return than the staff accountants

6    would; is that fair to say?

7    A    Generally, yes.

8    Q    Because you're in charge of multiple clients, I assume.

9    A    Yes.

10   Q    And getting back to the tuition, at some point you learned

11   that the company had charged as a business expense a payment to

12   MIT for tuition for one of the defendant's children; is that

13   correct?

14   A    Yes.

15   Q    And how did you respond upon learning that?

16   A    Well, I know that when -- I'm not sure what happened on

17   that very first time it happened, but at certain point we

18   started classifying it as "loan to -- "loan from shareholder --

19   "due from shareholder."  Sorry.

20   Q    "Loan to shareholder"?

21   A    Yeah, "loan to shareholder," basically, because it's not a

22   deductible expense.

23           From what I understand during his interviews, one

24   year the tuition expenses were deducted, and that was probably

25   just didn't know about it till too late and then never amend

1    the returns for that.

2    Q    So you learned after the fact that they had been deducted,

3    and you never amended the returns.

4    A    Yeah.  I'm not sure when we found that out, but --

5    Q    Okay.  But you started reclassifying that -- expenses of

6    that sort as a loan to the shareholder.

7    A    I don't know if it was reclassifying, but we started

8    recording it as "loan to shareholder."

9    Q    And who was the shareholder?

10   A    Al Hee.

11   Q    What does it mean to have a company make a loan to a

12   shareholder?

13   A    Basically, the shareholder owes the company; it has to be

14   reimbursed.

15   Q    Are you familiar with criteria that are generally accepted

16   as what a valid loan requires?

17   A    Well, we always recommend that the client sets up

18   promissory notes.  In general practice, a lot of small

19   businesses would -- we recommend it, but they don't always do

20   it:  set up at least an annual promissory note.  It's almost

21   impossible to record a promissory note for every transaction;

22   so we kind of recap it for the year.

23   Q    So your normal practice is to recommend that the

24   shareholder create a promissory note at least on an annual

25   basis; is that correct?

1    A    Normally, yes.

2    Q    When you say it's too difficult to do it each transaction,

3    I assume by that you mean it might be too difficult to have a

4    separate note for every single advance.

5    A    Yes.

6    Q    So you think just aggregate them by year is your normal --

7    A    Yes.

8    Q    And do you remember talking to the defendant about the

9    need or the recommendation that he have a promissory note?

10   A    Yes.

11   Q    And did you speak to him personally?

12   A    Yes.

13   Q    And did that occur at about the time you learned that this

14   MIT tuition had been charged as a business expense?

15   A    I don't remember exactly when, but as soon as -- it's kind

16   of standard procedure.  As soon as any loan to shareholder

17   occurs on any of my clients' books, that's an automatic thing

18   that goes out, saying, you know, you should set up a promissory

19   note that's just to document that you owe the company back that

20   money.

21   Q    And why is it important to document that you owe the

22   company money?

23   A    It's just precautionary as to what the consequences are of

24   not having it.  To be honest, I've never seen something happen

25   if somebody didn't have a promissory note, in my own

1    experience.

2    Q    What are the consequences if you don't have a promissory

3    note?

4    A    I'm not really sure.  As long as they pay it back, I've

5    never worried about it.

6    Q    Well, isn't it true that the shareholder has some risk if

7    he doesn't have a promissory note?

8    A    I guess it's a possibility it could be declared as income

9    to him, yes.

10   Q    And that would be the primary consequence; correct?

11   A    Yes.

12   Q    Now, did you ever see a promissory note documenting the

13   amounts owed by the defendant for the money advanced to him by

14   Waimana?

15   A    No.

16   Q    So you gave him the advice, but, apparently, you didn't

17   see it followed through on.

18   A    I don't know if he actually did one or not.  But I never

19   looked for one.

20   Q    Saw it.

21   A    Yeah.

22   Q    Now, do you recall discussing with the defendant whether

23   tuition payments were deductible?

24   A    Yes.

25   Q    How did that discussion take place?

1    A    He asked about it.  I told him the only way it would be
2    deductible is if it became a company-wide employee benefit.  In
3    other words, it can't be only for one specific person.  If it's
4    offered as a company benefit, then, theoretically, tuition
5    payments would be deductible.
6    Q    As a company benefit, do you mean if the company offered
7    to every employee the opportunity to have --
8    A    Yes.
9    Q    -- their educational expenses paid?
10   A    Yes.
11   Q    And in the absence of that, it would not be deductible.
12   A    Yes.
13   Q    And you gave the defendant that advice; is that correct?
14   A    Yes.
15   Q    Did you ever see any evidence that such a company-wide
16   benefit existed at Waimana?
17   A    No.
18   Q    Now, Mr. Siu, did there come a time when you learned that
19   Waimana was paying for the services of a massage therapist?
20   A    I only found out about that through the IRS interviews.
21   Q    And do you recall when those interviews occurred?
22   A    Since 2011.
23   Q    Okay.  In other words, it was after the time you left
24   Chinaka & Siu --
25   A    Yes.

1   Q      -- is that correct?

2   A      Yes.

3   Q      During the time you were preparing Waimana's tax returns

4   did you know that Waimana was paying for the services of a

5   massage therapist?

6   A      No.

7   Q      And as an accountant, can a company take as a business

8   deduction payments made to a massage therapist?

9   A      The only way I would say it would be possible, again if

10  it's offered to the whole company as an employee-wide benefit.

11  Q      So it can't be done selectively just for one individual.

12  A      As far as it can -- no.

13  Q      And would it matter whether or not the individual had any

14  kind of medical conditions?

15  A      It shouldn't.  I'm really not sure about that.

16  Q      But from the tax standpoint, would it matter?

17  A      If he had had a medical letter saying that the doctor says

18  he's required to be -- his leg massaged every day, then maybe

19  it would be allowed.  I'm not sure.  I have to look -- I have

20  to do some research to verify that.

21  Q      You testified once before about these matters; right?

22  A      Uh-huh.

23  Q      Isn't it true that during your earlier testimony you said

24  it's not enough to deduct it just because there may be an

25  underlying medical reason for the therapy?

1    A    Yes.

2    Q    That was your testimony before?

3    A    Right.

4    Q    Now, during the time you met with Mr. Hee -- excuse me.

5         During the time you prepared tax returns on behalf of

6    the defendant Albert Hee did you have meetings with him

7    periodically?

8    A    Yes.

9    Q    And how often would the two of you meet?

10   A    Well, definition of "meeting" could be the phone or person

11   to person.  Maybe three or four times a year I'd actually visit

12   him down at the office.  And not necessarily only for taxes.

13   Could be any general accounting thing or so forth.

14   Q    But the meetings would generally concern accounting; is

15   that correct?

16   A    Yes.

17   Q    And did you view that as part of your role as an

18   accountant?

19   A    Yes.

20   Q    And what was the nature -- well, would you from time to

21   time discuss what expenses would be deductible by a business?

22   A    No, not -- maybe it's possible.  I don't remember what we

23   specifically talked about.

24   Q    And during the meetings did you come to an opinion on

25   whether Mr. Hee had knowledge about accounting?

1    A    He knows -- the kind of questions he was asking, it's like

2    the topic is there, but he may not know it hundred percent; so

3    he's trying to get clarification on it.

4    Q    So he would ask you for clarification of things.

5    A    Yeah, right.

6    Q    And in the grand jury you said that Mr. Hee has above

7    average knowledge about accounting.

8    A    Yeah.  The way -- what I meant on that, he knows how to

9    run a business.  He's not a tax expert, in the sense of like

10   preparing a tax return and so forth.  It's almost the same

11   where I prepared my staff before was that my key thing is make

12   sure you know that there's a possible topic, and if it flags

13   you, to check it.  Al Hee was something like that.  He knows

14   something is there, but he may not necessarily know the answer

15   to it; so he needs clarification; he would ask for it.

16   Q    And he knew that he could call you about clarification;

17   correct?

18   A    Yes.

19   Q    And that was your job.

20   A    Yes.

21   Q    Now, did there come a time when you learned that Mr. Hee's

22   three children were being paid by Waimana?

23   A    Yes.

24   Q    And can a company just pay anyone money and call it wages?

25   A    As long as they're working.

```
 1   Q    I'm sorry?

 2   A    As long as they're working.

 3   Q    So you would agree that in order to be paid, and for the

 4   company to deduct as wages those payments, the employee would

 5   have to be providing services.

 6   A    Yes.

 7             MR. TONG:  May I have a moment, Your Honor?

 8             THE COURT:  Yes.

 9        (Counsel conferring.)

10   BY MR. TONG:

11   Q    And, Mr. Siu, with regard to the children, you recall

12   talking to Mr. Hee about the need for them to be working.

13   A    Yes.

14   Q    What did you tell him?

15   A    It's okay to pay for them as long as they're doing work.

16             MR. TONG:  Thank you.  I have nothing further.

17             THE COURT:  Okay.

18                         CROSS-EXAMINATION

19   BY MR. TOSCHER:

20   Q    Good afternoon, Mr. Siu.

21   A    Hello.

22             MR. TOSCHER:  May it please the Court.

23   Q    Do you recall when you first started representing Mr. Hee,

24   Mr. Siu?

25   A    As a client?
```

1    Q    Yes.

2    A    Yes.

3    Q    What year?

4    A    Roughly about '86 -- '86, '87.

5    Q    Okay.  And he continued to be your client until when?

6    A    Until I left the firm, 2008.

7    Q    Okay.  And why did you leave the firm at that point?

8    A    Basically, as semi-retirement.  I was moving -- I

9    relocated to the state of Washington where the rest of my

10   family is.

11   Q    Okay.  And did your partner David Chinaka pick up the

12   responsibilities at that time?

13   A    Yes.

14   Q    Now, Mr. Tong asked you about you're a Certified Public

15   Accountant, a CPA; correct?

16   A    Yes.

17   Q    Can you describe to the jury what you have to do to become

18   a Certified Public Accountant?

19   A    Basically, what I had to go through:  four years of

20   college, bachelor's degree, pass the uniform -- AICPA Uniform

21   CPA test, and then I believe I needed at least two years of

22   work experience back then.  I'm not sure what it is now.

23   Q    Okay.  I don't want to cut you -- I'm told the CPA exam is

24   very difficult?

25   A    Yes.

1  Q    And there are multiple parts to it; isn't that correct?

2  A    Yes.

3  Q    Taxes?

4  A    Yes.

5  Q    Auditing?

6  A    Auditing, business law -- sheesh, I'm not sure.  It was

7  like two and a half days.

8  Q    A lot.

9  A    Yeah.

10  Q    And not every accountant is a Certified Public Accountant;

11  correct?

12  A    No.

13  Q    Not everybody who prepares tax returns is a Certified

14  Public Accountant?

15  A    No.

16         THE COURT:  Okay.  So you might want to clarify those

17  answers because you're saying not everybody is something, and

18  he's saying no.

19         MR. TOSCHER:  Thank you, Your Honor.

20         THE COURT:  So it's not all that clear if he means,

21  no, not everybody is or, no, that's not right.

22  BY MR. TOSCHER:

23  Q    Mr. Siu, you don't have to be a certified public

24  accountant in order to prepare tax returns; is that correct?

25  A    Yes.

1  Q    And a certified public accountant is a fairly high

2  designation in the accounting field?

3  A    Yes.

4  Q    It means something important; correct?

5  A    Yes.

6  Q    Now, you talked before about the way you train your staff

7  to raise certain issues, if they come about.  That's the way

8  they're brought to your attention; right?

9  A    Yes.

10  Q    Now, we talked about -- or Mr. Tong questioned you

11  regarding payments to Diane Doll for massages?

12  A    The -- supposing the masseur.

13  Q    The masseuse.

14  A    Yes.

15  Q    And if your staff would have told you -- if you would have

16  saw in the trial balance that you reviewed "Health Consulting,"

17  would that have caused you to inquire further?

18         MR. TONG:  Objection, Your Honor.  There's no

19  foundation for that question.  Assumes facts not in evidence.

20         MR. TOSCHER:  I would disagree, Your Honor.

21         THE COURT:  Well, you want to present -- tell me what

22  exhibit number.

23         MR. TOSCHER:  Your Honor, there's been much

24  testimony.

25         THE COURT:  I'm going to allow it.  Overruled.

 1   BY MR. TOSCHER:

 2   Q    So if your staff had put something in the books as "Health

 3   Consulting," would that have caused you to inquire further?

 4   A    Yes.

 5   Q    What would you have inquired -- what would you have done?

 6   A    Find out what it was.

 7   Q    Now, did your staff ever tell you that there was something

 8   called "Health Consulting"?

 9   A    No.

10   Q    Did you ever see anything in the books that said "Health

11   Consulting"?

12   A    No.

13   Q    And if you would have, you would have inquired further.

14   A    Yes.

15   Q    You would try to find out and determine whether it was

16   deductible; correct?

17   A    Yes.

18   Q    And you testified before with Mr. Tong that whether it was

19   deductible or not, business, medical, on the stand here you

20   said you weren't sure; you'd have to go research it.  Right?

21   A    Yes.

22   Q    And maybe -- or Mr. Tong represented that you previously

23   said in the grand jury that maybe it wasn't deductible.

24   A    Uh-huh, yes.

25   Q    You're not sure here today, are you, sir?

1    A    Yes.  I would have to research it.  I'm not really sure.

2    Q    You're not sure.  Okay.

3         Now, just to clarify a couple of items.  It's a fact,

4    isn't it, Mr. Siu, that when preparing -- when your office was

5    preparing the 2005 return, that's when the issue came up

6    regarding the deductibility of tuition?

7    A    It's possible.

8    Q    Okay.  You're not sure.

9    A    Yeah, I don't remember.

10   Q    Okay. And when it did come to your attention, that's when

11   you decided to look at it, and that's when you talked to

12   Mr. Hee; correct?

13   A    I'm not sure.  I don't remember who initiated the

14   conversation, to be honest.  But a discussion was done at some

15   points in time with regards to the deductibility of tuition,

16   yes.

17   Q    And once that discussion happened to where you concluded

18   it wasn't going to be deductible, the treatment of the tuition

19   payments changed by the company, did it not?

20   A    Yes.  It went to "loan to shareholders."

21   Q    Right.  And that's what you advised Mr. Hee to do:  not

22   deduct it, start treating it as a loan to shareholder.  Is that

23   correct?

24   A    Yes.

25   Q    And that's what's done generally in the practice when

1   clients of closely-held corporations are paying for items that

2   you do not believe are deductible; correct?

3   A      Yes.

4   Q      And that's what happened here.  From that point forward

5   they were treated as "loans to shareholder."

6   A      Yes.

7   Q      And I think you testified on direct that you explained to

8   Mr. Hee that that meant it would have to be reimbursed or

9   repaid to the company; is that right?

10  A      Yes.

11  Q      Now, you testified before on direct that you advise

12  clients to have promissory notes.  But it's still a loan, is it

13  not, whether there's a promissory note or not?

14  A      Yes.

15  Q      And that's the way you treated it on the tax returns you

16  filed?

17  A      Yes.

18  Q      So on Waimana's tax returns for '04, '05, '06, '07 -- I

19  know you left later -- you recorded the shareholder loan, the

20  loan to Mr. Hee, for these payments; is that correct?

21  A      Yes.

22  Q      And you thought that was absolutely proper.

23  A      Yes.

24  Q      And you never raised the issue with Mr. Hee as to whether

25  that could possibly be income to him, did you?

1    A    Never raise it, no.

2    Q    Now, you testified before regarding Mr. Hee as knowing his

3    business.

4    A    Yes.

5    Q    And if he had discussions with you regarding a tax issue,

6    let's say the deductibility of tuition, in that case he

7    listened to what you had to say and he followed your advice;

8    isn't that correct?

9    A    Yes.

10   Q    He stopped deducting it; correct?

11   A    Yes.

12   Q    And he started treating it as a shareholder loan.

13   A    Yes.

14   Q    And that was your advice, sir.

15   A    Yes.

16   Q    Now, you were involved for quite a period of time in

17   preparing Mr. Hee's tax returns and the corporate tax returns

18   for Waimana; is that correct?

19   A    Yes.

20   Q    Was Mr. Hee and the company always very cooperative with

21   you?

22   A    Yes.

23   Q    Always providing you all information you asked for?

24   A    Yes.

25   Q    Never concealed anything?

```
 1    A     No.

 2    Q     Now, let's talk a little bit about the payment of the

 3    salaries to the children.

 4            Now, you knew and your firm knew that, when they were

 5    paying salaries, these children were full-time students in

 6    Santa Clara, did you not?

 7    A     Yes.

 8    Q     And you may have mentioned that there had to be some work,

 9    but don't you view training somebody for the future as relevant

10    for business purpose for deducting those salaries?

11    A     As a general practice, yes.  Succession planning is

12    important.

13    Q     Now, you never had a discussion with Mr. Hee about this,

14    though, just so we're clear.

15    A     No.

16    Q     But if you knew that this was about training his children

17    to take over the company, that would be something you might

18    want to go research; correct?

19    A     Yes.

20            MR. TOSCHER:  One moment, Your Honor.

21            Your Honor, could I have one moment to talk to my

22    counsel here?

23            THE COURT:  Yes.

24            MR. TOSCHER:  No further questions, Your Honor.

25            THE COURT:  Okay.  Mr. Tong.
```

1                    RE-DIRECT EXAMINATION

2    BY MR. TONG:

3    Q    Mr. Siu, I think you mentioned briefly that Mr. Chinaka

4    did financial audits for Waimana; correct?

5    A    Yes.

6    Q    And do you recall when those audits stopped?

7    A    I don't remember exactly.

8    Q    Did they stop before you left the company?

9    A    It wasn't done every year; so I don't recall how often it

10   was done.  Maybe only once -- maybe one or two years.  I don't

11   really recall.

12   Q    It wasn't an annual thing.

13   A    No.

14   Q    All right.  Now, you were asked some questions about this

15   loan to shareholder and whether recording it on the books made

16   it a loan.  You remember those questions?

17   A    Yes.

18   Q    And, ultimately, whether it was a true loan depends on

19   whether there was an intent to repay; is that correct?

20   A    Yes.

21   Q    Now, you were asked whether Waimana ever concealed

22   anything from you.  Do you remember that question?

23   A    Yes.

24   Q    Well, you never went to Waimana's offices and went through

25   every file to see whether everything was given to you, did you.

1    A    No.

2    Q    Now, with regard to the training for the future of the

3    children, do you remember those questions?

4    A    Yes.

5    Q    And you don't really know what training, if any, occurred

6    with regard to the children; correct?

7    A    No.

8    Q    You just told the defendant that in order to pay the

9    children they have to be doing some work?

10          THE COURT:  Counsel, I didn't understand that last

11   answer.  It was "You don't know; correct?"  And he said, "No."

12   So what does that answer mean?  No, I don't know, or --

13          THE WITNESS:  I don't know what kind of training was

14   done.

15          MR. TONG:  Thank you.

16   Q    And again on the loan-to-shareholder question, you did

17   discuss with Mr. Hee why a promissory note was required;

18   correct?

19   A    Yes.

20   Q    And in the grand jury you said you can only go so far:  "I

21   won't draft the note for him."  Correct?

22   A    Yes.

23   Q    And that's your position; right?

24   A    Yes.

25   Q    It's not your job as a CPA to draft a note; correct?

 1   A    Yes.

 2           MR. TONG:  Thank you.  I have nothing further.

 3           MR. TOSCHER:  No questions, Your Honor.

 4           THE COURT:  Okay.  Then the witness can step down.

 5   You're excused, and you can leave the courtroom.

 6       (Witness excused.)

 7           THE COURT:  And why don't we take a break and come

 8   back in about 10 minutes and go till four o'clock.

 9       (Jury excused.)

10           THE COURT:  Okay.  You can be seated.

11           Mr. Tong, you had an issue.

12           MR. TONG:  Your Honor, before we break I just want to

13   raise for the Court we have a little bit of a problem.  And

14   this has not happened to me before; so I'm very embarrassed by

15   the whole thing.  But we have witness unavailability issues.

16           We have a couple more witnesses today.  We have a

17   number of witnesses flying in from the mainland.  The good news

18   is this is going much faster than we expected.  It was

19   unpredictable for the reasons I think we previously expressed

20   to the Court.  We didn't know whether witnesses would have a

21   recall of the events since we weren't able to meet with

22   virtually all of them.

23           The good news is I think we have about three more

24   days in our case, and that's it, as opposed to the three weeks

25   originally thought.  The bad news is with the unavailability of

1  witnesses who are under subpoena, but one of whom left town,

2  and two others who are coming in, I don't think we're going to

3  be able to go the entire day tomorrow.

4         I think we'll have about another hour today, and I

5  raise it with the Court because I am humbly asking whether the

6  Court would consider going dark tomorrow so that we could just

7  have continuous testimony starting Tuesday with the

8  representation that I really think we're going to be done in

9  three days.

10        THE COURT:  Okay.  Why couldn't we go for part of the

11  day tomorrow?

12        MR. TONG:  We could.  I just -- I want to raise the

13  issue with the Court because I'm really embarrassed by it, and

14  I don't want -- I take seriously the Court's admonition have

15  your witnesses ready.  We're happy to go as long as --

16        THE COURT:  Yeah, I hear you that you think, Well,

17  gee, we can finish sooner than we feared.  At the same time, I

18  would prefer to do as much as possible when we can do it

19  because you never know whether some other witness might be

20  unavailable another time, and, you know, we may be pushed over

21  longer than we now hope.

22        So we'll go as far as we can today.  I'd like to

23  still come in tomorrow, but can your witnesses that are here

24  for tomorrow come in the morning?

25        MR. TONG:  Yes.

```
1              THE COURT:  Okay.  Then that's my preference.
2              MR. TONG:  Thank you.
3              THE COURT:  Did you want to be heard on this?
4              MR. TOSCHER:  I will go with the Court's preference,
5    of course.  But can I just make -- I just need to say this to
6    the Court.  Mr. Tong has raised a number of times not being
7    able to talk to the witnesses.  Most of these witnesses were
8    interviewed by -- during the grand jury process five to six
9    times; so I just -- I just can't leave that unanswered at this
10   point.
11             THE COURT:  But I think he's worried it was a while
12   back.
13             MR. TOSCHER:  It was over a long --
14             THE COURT:  Yeah, it was over a long time.
15             MR. TOSCHER:  I just didn't want it -- it was said --
16   this is the third time, and I've held my tongue.
17             THE COURT:  No, so I noted that, for example,
18   Mr. Chinaka had gone multiple times before the grand jury, but,
19   you know, he probably didn't go in the last six months, for
20   example, so --
21             MR. TOSCHER:  That's correct.  I just wanted -- I
22   didn't know what the court -- there was a lot, I would say.
23             THE COURT:  Okay.  Anyway, we're going to take a
24   little break, and then I'll come back.  And who's the next
25   witness?
```

 1                MR. TONG:  The next witness is Harold Johnston, Your

 2    Honor.

 3                THE COURT:  Okay.  Thank you.

 4          (Court recessed at 2:36 P.M., until 2:49 P.M.)

 5                THE COURT:  Okay.  The witness can come forward.

 6                MR. TOSCHER:  Your Honor, before that may we have a

 7    brief sidebar?

 8                THE COURT:  Okay.  Wait.

 9          (At sidebar on the record:)

10                MR. TOSCHER:  Okay.  The next witness they're calling

11    is Mr. Johnston, and the proffer Mr. Tong gave me, it's to

12    demonstrate that Sandwich Isles, when they loaned him money,

13    had promissory notes for that.

14                Okay.  We think that's just improper.  It's not habit

15    or routine evidence, and it's just not relevant to Mr. Hee's

16    intent with Waimana to repay the loan or all the other things

17    they're saying.  They did it this way here.  We just think it's

18    not proper character -- I mean, it's 406.  It's not routine and

19    habit; so it doesn't come in.

20                So what's the relevance on the issue of whether this

21    loan obligation is valid in this case because a third party

22    with Sandwich Isles entered into this loan?

23                THE COURT:  I don't think what you're arguing goes to

24    admissibility.  I think it goes to the weight of the evidence.

25    You can certainly argue, you know, you heard the accountant say

1    it's not required and so forth.

2         MR. TOSCHER:  I think -- I don't think it's relevant.

3    I think -- and it's prejudicial under 403.  I don't see how

4    it's relevant, Your Honor.

5         MR. TONG:  The relevance is obvious.  I mean, the

6    accountants have told them that you need to document the loans

7    in order to avoid the consequences.  We're going to have

8    promissory notes, three or four of them, both before that

9    advice was given and after the advice was given.  And

10   Mr. Johnston's going to say every time he borrowed money from

11   Sandwich Isles Mr. Hee insisted that he sign a promissory note

12   before any funds were advanced him.  We're going to have the

13   promissory notes, which have all the terms of repayment just in

14   the form that the accountant said Mr. Hee should have done for

15   himself.

16        THE COURT:  Okay.  Overruled.  But I understand your

17   argument, but I do think it goes to the weight.  I don't think

18   it's unduly prejudicial, which is the standard, not just

19   prejudicial.  And I think it has relevance.  Although, I will

20   agree with you that standing alone it's certainly not going to

21   prove their case, but I think it goes to the weight of it.

22   Thank you.

23        MR. TOSCHER:  Okay.  Thank you, Your Honor.

24        (In open court on the record:)

25        (Witness photographed.)

1          THE CLERK:  Please raise your right hand.

2     (Witness sworn.)

3          THE CLERK:  Thank you.  Please be seated.

4          Please state your name and spell your last name.

5          THE WITNESS:  My name's Harold Johnston, Jr.  My last

6     name is spelled J-o-h-n-s-t-o-n.

7                         DIRECT EXAMINATION

8     BY MR. TONG:

9     Q     Good afternoon, sir.

10    A     Good afternoon.

11    Q     And could you tell us what is your occupation?

12    A     My occupation:  I currently work for Sandwich Isles

13    Communications.  I'm the director of planning and strategy.

14    Q     And how long have you had that position?

15    A     I've been in that position about three years now.

16    Q     How long have you worked for Sandwich Isles

17    Communications?

18    A     I worked for Sandwich Isles initially from 1998 until May

19    of 2001, and I've been back with Sandwich Isles since I believe

20    it was February of 2005.

21    Q     Okay.  And what is the nature of Sandwich Isles' work?

22    A     The nature of the work as a company?

23    Q     Yes.

24    A     Sandwich Isles' is a regulated telephone company.  We

25    provide service to the beneficiaries, lessees, and the -- on

1    the Hawaiian Homelands.  So we provide the same kinds of

2    telephone services that the larger telephone company Hawaiian

3    Telcom does, but we only serve Hawaiian Homelands.

4    Q    And when you say "regulated," who regulates the company?

5    A    We're regulated by the Hawai'i PUC and by the FCC.

6    Q    So that would be the Public Utilities Commission; correct?

7    A    Yes.  The Hawai'i Public Utilities Commission and the

8    Federal Communications Commission.

9    Q    Okay.  And does that mean that the company is subject to

10   periodic reviews by both of those organizations?

11   A    The subject is definitely subject to reviews, not only

12   annually but also, you know, throughout -- throughout carrying

13   out its businesses.

14   Q    And the reviews would include a review of financial

15   records; is that correct?

16   A    Yes.  I'm -- it does, but I'm not involved in any of the

17   financial aspects of the company.

18   Q    Okay.  Let's talk about how you came to be involved with

19   Sandwich Isles.  How were you first approached?

20   A    I was approached -- I had my own company that I had

21   started up in 1996, a telecommunications business called Summit

22   Communications.  I was approached in late 1997, I believe, by

23   the CEO of Sandwich Isles at the time, Vice Admirable Retired

24   Robert Kihune.  And he invited me to lunch and just wanted to

25   get to know me, said that he was in the telecom business also

1    for Sandwich Isles Communications.  And we talked about our

2    different businesses, and that was it.  That's the first

3    meeting, late 1997.

4              I subsequently had another meeting with Admiral

5    Kihune.  And then I believe it was in early 1998 I had -- I met

6    with both Admiral Kihune and Albert Hee just to talk about our

7    businesses and get to know each other.

8    Q    Let me break down your answer a little bit.  You said you

9    were then engaged in directing a company called Summit

10   Communications; is that correct?

11   A    That's correct.

12   Q    Was that a company here in Honolulu?

13   A    That was a company here in Honolulu, yes.

14   Q    And that also was in the communications field; is that

15   correct?

16   A    It was.

17   Q    And what was your interest in that company?

18   A    I was the President and the CEO of the company and also

19   the major shareholder.

20   Q    And Admiral Kihune then approached you about getting to

21   know you; correct?

22   A    That's correct.  We were just talking about -- we had some

23   of the similar backgrounds, and we were talking about the

24   companies, what kind of work we did.

25   Q    And what are the similarities in the backgrounds that you

1    shared?

2    A    Well, we both grew up here in Hawai'i.  We're both native

3    Hawaiian.  We both graduated from the Kamehameha Schools, and

4    we both graduated from the United States Naval Academy.

5    Q    And after your meetings with Admiral Kihune you were

6    introduced to Albert Hee; is that correct?

7    A    Yes, I was.

8    Q    And what relationship did Albert Hee have to Sandwich

9    Isles Communications?

10   A    Albert Hee was the President of Sandwich Isles

11   Communications.

12   Q    And who owned Sandwich Isles Communications?

13   A    Mr. Hee was the primary owner of Sandwich Isles

14   Communications.

15   Q    Is Sandwich Isles Communications a subsidiary of some

16   other company?

17   A    Sandwich Isles is a subsidiary of Waimana Enterprises.

18   Q    And who is the owner of Waimana Enterprises?

19   A    Mr. Hee.

20   Q    And we've mentioned him a few times, but if you were to

21   see Mr. Hee, I assume you would recognize him.

22   A    Yes.

23   Q    Do you see him in court today?

24   A    Sure.

25   Q    Can you identify him by where he's standing.

1    A    Yes.  He's standing right now.

2              MR. TONG:  We would ask that the record reflect the

3    identification of the defendant.

4              THE COURT:  It so reflects.

5    BY MR. TONG:

6    Q    Now we're at the point where you've met Mr. Hee; correct?

7    A    Yes.

8    Q    Had you known him before that time?

9    A    No, I did not.

10   Q    And what was the purpose of your meeting?

11   A    Mr. Hee asked if I would be interested in coming over to

12   run Sandwich Isles Communications as its general manager.

13   Q    Were you interested?

14   A    I told him at our initial meeting that, no, I was not; I

15   had my responsibilities to my own company and to my employees

16   and to the shareholder investors in my company.  But I would

17   help them in any way I could, but I wasn't able to come over

18   and join his company.

19   Q    Okay.  And what happened after you told Mr. Hee that?

20   A    We had a subsequent meeting, and Mr. Hee was telling me

21   about the need, his interest in having me come on over to join

22   his company.  The company was just getting started.

23   Operationally, it had some service commitments to make.  And he

24   said that he would be willing to loan me -- because during our

25   conversations he knew that I was also raising funds to keep --

1  for Summit Communication's growth.  But he would be interested
2  in loaning me funds for -- that would be placed into Sandwich
3  Isles -- I'm sorry, Summit Communications.
4  Q    So you had a conversation, and as an inducement to an
5  employment, he offered to lend you money that could be used for
6  your company; correct?
7  A    Yes, that's correct.
8  Q    And what was the amount of the loan that you discussed?
9  A    It was $450,000.
10 Q    And after that offer was made, did you agree?  Turn it
11 down?  What did you do?
12 A    My board happened to be meeting in Honolulu at that time
13 or shortly thereafter.  I told Mr. Hee I would discuss it with
14 my board of directors, which I did, explained the offer to
15 them.  The board asked me to set up a meeting with Mr. Hee.
16       That meeting took place in Sandwich Isles' offices
17 downtown, and Mr. Hee explained that he was interested in
18 having me come over to join him and that he was willing to loan
19 money to me directly.  Not to the board, but the money would be
20 available to me.
21 Q    So he made the offer of lending the $450,000 directly to
22 you.
23 A    Yes.
24 Q    And the money was going to be used for your company.
25 A    Absolutely.

 1   Q    And did your board discuss that proposal?

 2   A    Well, the board went back to Summit's offices.  I recused

 3   myself.  The board was somewhat concerned with my leaving, but

 4   they approved my letting me go over to work for Sandwich Isles

 5   with some conditions.

 6   Q    Okay.  And the main condition was what?

 7   A    Main condition was that I would continue to serve as

 8   Summit's CEO in terms of providing strategy and direction to

 9   the company and assistance in fundraising for the company.

10   Q    So, in essence, you would be serving two different

11   companies; correct?

12   A    Yes.

13   Q    And did you then communicate to Mr. Hee the fact that you

14   were accepting his offer of employment?

15   A    Yes, I did.

16   Q    And was there any kind of documentation that was drawn up

17   to set forth the terms of your employment?

18   A    There was a --

19             THE COURT:  Hold on.

20             THE WITNESS:  There was documentation for the --

21             MR. TONG:  Excuse me, Mr. Johnston.  We'll wait for

22   Mr. Chang to get his phone.

23             THE COURT:  Okay.  This is a super no-no for

24   everybody.  We have all these signs around the courthouse.

25             Okay.

1    BY MR. TONG:

2    Q    Are you comfortable proceeding?

3    A    Yes, I am.

4    Q    Mr. Chang is your attorney; is that correct?

5    A    I'm okay.

6    Q    Now, I got distracted by the phone, but I believe we were

7    talking about whether there was an employment agreement.

8    A    There was an employment agreement, yes.

9    Q    Could you kindly turn to the binder to your left and look

10   at Exhibit 15-1.  And the cover page actually should be

11   removed, but if you look at the rest of that document, do you

12   recognize it?

13   A    Yes, I do.

14   Q    And turning to page 6 of that document, are there a couple

15   of signatures?

16   A    Yes.  Yes, there are.

17   Q    Whose signatures appear on that?

18   A    It's my signature as employee, and it's Albert Hee's as

19   President of Sandwich Isles Communications.

20   Q    And is that the employment agreement that the two of you

21   agreed upon?

22   A    Yes.

23   Q    Does that employment agreement include the terms of an

24   employee loan?

25            You can take a look at the bottom of page 2, carrying

1    on to page 3.

2    A     Yes, it does.

3              MR. TONG:  We would ask that Exhibit 15-1 be

4    received.  We will remove the cover page, Your Honor.

5              MR. TOSCHER:  No objection, Your Honor.

6              THE COURT:  All right.

7              MR. TOSCHER:  Subject to my prior statement in the

8    bench conference but --

9              THE COURT:  Does this one include the --

10             MR. TONG:  (Nods head.)

11             THE COURT:  Okay.  Then with that revision of this

12   exhibit --

13             MR. TOSCHER:  Yeah, Your Honor, okay.  That will

14   be -- so I don't have to stand up again because I'm not going

15   to -- I have a continuing objection that we discussed.

16             THE COURT:  Okay.  Got it.  So there was some

17   material removed from the earlier Exhibit 7-4, was it?

18             MR. TONG:  Yes, Your Honor.

19             THE COURT:  So analogous information on other

20   exhibits will be removed.  And with the revision, meaning the

21   removal of that analogous information, I will receive the

22   exhibit without objection, but it may not be published if the

23   amount -- the material to be redacted has not yet been

24   redacted.

25             MR. TOSCHER:  Your Honor, I apologize.

1        THE COURT:  No?

2        MR. TOSCHER:  I confused the Court.

3        THE COURT:  Oh, I thought it was the same summary

4    kind of thing.

5        MR. TOSCHER:  It was the second bench conference.

6    I'm having too many bench conferences.  So it was -- you got it

7    now?

8        THE COURT:  Got it.

9        MR. TOSCHER:  Okay.

10       THE COURT:  I thought it was the other exhibit.

11       MR. TONG:  Your Honor, if I understand it, the Court

12   is --

13       THE COURT:  I got it.

14       MR. TONG:  -- receiving it over objection.

15       THE COURT:  Yes.  Received over objection.  But I

16   will say that on this subject, having put the position on the

17   record and my having ruled, you need not repeat.  Can I get the

18   exhibit number so that the record is really clear that your

19   objection at the most recent bench conference will apply

20   whenever he offers these things.

21       Okay.  So what exhibit numbers are we talking about?

22       MR. TONG:  15-1, 15-3, 15-4, and Exhibit 4-103.

23       THE COURT:  Okay.  So for all of those exhibit

24   numbers --

25       MR. TOSCHER:  4-103, I think, is probably already in

1    evidence, Your Honor.

2              THE COURT:  That's already in?

3              MR. TONG:  It is.

4              THE COURT:  Okay.  Then you don't object to that one;

5    right?

6              MR. TOSCHER:  I don't.  That's correct.

7              THE COURT:  And the other exhibit numbers he just

8    listed will be offered subject to your objection.  You may have

9    additional objections, which I will rule on at the time, but

10   you need not repeat the objection that was the subject of the

11   most recent bench conference.

12             MR. TOSCHER:  Thank you, Your Honor.

13             THE COURT:  Okay.  I think I've got it.

14             Mr. Tong, you've probably forgotten your question.

15   For sure everybody else has.

16             MR. TONG:  Was it that obvious?  I'm sorry.

17             THE COURT:  What is the question?

18             MR. TONG:  I'm wandering around asking my colleagues.

19   Q   Here's what I propose to do, Mr. Johnston.  Let's put on

20   the screen to your right page 2.  It's actually the first page

21   of the employment agreement, Bates number 2, Exhibit 15-1.

22             And feel free to look either at the document in front

23   of you or on the screen, whichever you prefer, sir.

24             THE WITNESS:  I can't see that; so I'll stick with

25   the one here.

1          THE COURT:  Although, they can blow things up, too.

2          THE WITNESS:  I can see this more clear.

3          THE COURT:  So wait.  This one's already in evidence?

4          MR. TONG:  Your Honor just received it.

5          THE COURT:  I don't think that I formally received

6    it.  I actually was saying he didn't have to repeat the

7    objection.

8          I will deem it -- okay.  She needs to know.

9          Received.  Okay.  15-1.

10         MR. TONG:  May we show it, then, Your Honor?

11         THE COURT:  Yes.  Yes.  You're not going to show --

12         MR. TONG:  I will not sure the first page, which will

13   be removed.

14         THE COURT:  Okay.

15   BY MR. TONG:

16   Q    So if we could highlight the top.  The top of the document

17   is titled Employment Agreement; is that correct, Mr. Johnston?

18   A    Yes.

19   Q    And the date of the agreement was May 30 of 1998; correct?

20   A    Yes.

21   Q    And this is the agreement that you had with Sandwich Isles

22   Communications; correct?

23   A    That's correct.

24   Q    And I believe you testified it was signed by Sandwich

25   Isles on behalf of the defendant Albert Hee; is that correct?

1   A    I'm sorry.  Would you repeat that, please.

2   Q    Who signed the agreement on behalf of Sandwich Isles?

3   A    I signed the agreement as employee, and Mr. Hee signed it

4   as the President of Sandwich Isles Communications.

5   Q    Okay.  And I'm going to direct your attention to the next

6   page of the document, which is Bates number 3.  And at the

7   bottom there is a heading called Employment Loan.  Do you see

8   that?

9   A    Yes.

10  Q    And that section recites the fact that Sandwich Isles was

11  willing to lend to you, the employee, $450,000 as an inducement

12  to go to work for them; is that correct?

13  A    That's correct.

14  Q    All right.  And if we may see page 4, Bates page 4.  And

15  if we could see the top half of the document, please.

16         And this is the next page of the document on the

17  screen; is that correct, Mr. Johnston?

18  A    I'm sorry.  You're on page 4?

19  Q    Yes.  Page 3 of the document, the Bates number is 4 in the

20  lower right-hand corner.

21  A    Oh, I'm sorry.  Okay.

22  Q    And this document, basically, recites the terms of the

23  loan that was being given to you; correct?

24  A    That's correct.

25  Q    And it appears to reference a nonrecourse promissory note,

1  which is referred to by the word "note"; is that correct?

2  A    That's correct.

3  Q    And was there a separate promissory note given to you to

4  sign?

5  A    I believe there -- I believe there was.

6  Q    Okay.  And we'll get to that note in a moment.

7  A    Okay.

8  Q    And the document we're showing, your Employment Agreement,

9  says that the loan was good for five years; is that correct?

10  A    That's correct.

11  Q    And who did you negotiate the term of the loan with?

12  A    I had Summit's attorney actually negotiate the Employment

13  Agreement on behalf of Summit's board of directors.

14  Q    Okay.

15  A    And I assume that he negotiated it with Sandwich Isles'

16  legal counsel.

17  Q    Okay.  And this document, the Employment Agreement, also

18  sets forth the interest that would be charged on the loan; is

19  that correct?

20  A    That's correct.

21  Q    And the interest, basically, was the cost of the loan to

22  Sandwich Isles plus 1 percent; correct?

23  A    That's correct.

24  Q    So Sandwich Isles, essentially, was making one percent on

25  the promissory note, the loan?

1    A    That's correct.

2    Q    Paragraph 4.4 is entitled Payment.  Do you see that

3    paragraph?

4    A    Yes.

5    Q    And am I correct that that paragraph sets forth your

6    agreement on when you would have to make payments to Sandwich

7    Isles?

8    A    That's correct.

9    Q    And if we can go to the last page of the document.  That's

10   the one that contains the signatures.

11            I believe you testified that's your signature on the

12   document; is that correct?

13   A    That's correct.

14   Q    And you recognize that signature as belonging to the

15   defendant Albert Hee; is that correct?

16   A    Yes.

17   Q    Now, a moment ago we talked about how there would be a

18   separate note.  Could you kindly turn to Exhibit 15-3 in your

19   binder.

20            THE COURT:  Okay.  So let me just make sure, were

21   there other objections other than what we discussed at the

22   bench conference from the defense?

23            MR. TOSCHER:  No, Your Honor.

24            THE COURT:  Okay.  Then, Mr. Tong, tell me again the

25   numbers:  15-2, 15-3, 15-4, 15-5, is that --

1          MR. TONG:  4-103 is in evidence already.

2          THE COURT:  Yeah, no, no, no.

3          MR. TONG:  15-3 and 15-4, Your Honor.

4          THE COURT:  15-3 and 15-4.  Okay.  Received.

5          Go ahead.

6   BY MR. TONG:

7   Q     You recognize Exhibit 15-3?

8   A     Yes.

9   Q     And is that the promissory note that was referred to in

10  the Employment Agreement?

11  A     Yes.

12  Q     And how do you recognize it as such?

13  A     It's quite a few years ago, but this is the promissory

14  note, and it has my signature on it.

15         MR. TONG:  Okay.  And we would ask that 15-3 be

16  received in its entirety.

17         THE COURT:  Already received, yeah.  15-3 and 15-4,

18  he says he has no objections other than what I've ruled on; so

19  received.

20         MR. TONG:  Okay.  If they're received, great.

21  Q     May we see 15-3, please.  And the top of the document,

22  please.

23         And again the date of this document is the same date

24  as your Employment Agreement; is that correct, Mr. Johnston?

25  A     I'm not sure.  That one's dated May 30th.  I think the

1   Employment Agreement may have come before.

2   Q    Okay.

3   A    Employment Agreement was actually dated May 26.

4   Q    So four days after your Employment Agreement.

5   A    Four days after the Employment Agreement.  I had actually

6   started working for Sandwich Isles prior to that.

7   Q    But had you received the $450,000 before the promissory

8   note was signed?

9   A    I don't recall the exact dates that the promissory note --

10  that the funds were distributed.  They were distributed over a

11  period of time within a few months, I believe.

12  Q    Okay.  And this note is signed by you; correct?

13  A    That's correct.

14  Q    As the maker of the note; correct?

15  A    That's correct.

16  Q    And it recites your promise to pay to Sandwich Isles

17  $450,000; correct?

18  A    That's correct.

19  Q    And it sets forth various terms of the note; is that

20  correct?

21  A    Yes.

22  Q    And the heading Interest -- if we can see what follows

23  below that -- has an interest rate set forth; is that correct?

24  A    Yes.

25  Q    And how it would be calculated; correct?

1    A    Yes.

2    Q    And if we can go to the last page, paragraph 16 talks

3    about security that you are giving to assure that you would

4    repay; is that correct?

5    A    Yes.

6    Q    And do you recall being asked to take out a life insurance

7    policy?

8    A    Yes.

9    Q    Which would be pledged to Sandwich Isles; correct?

10   A    Yes.

11   Q    So in lay terms that means that, if the terrible should

12   happen and you would pass, Sandwich Isles would collect the

13   loan through a policy that you would provide to them; correct?

14   A    A little bit variation in that the insurance policy was

15   actually passed on to Summit Communications, but it was based

16   on my life.

17   Q    So, in other words, as security to Sandwich Isles, there

18   would be a life insurance policy.

19   A    That's correct.

20   Q    Which would provide funds.

21   A    That's correct.

22   Q    Now, you went to work for Sandwich Isles; right?

23   A    Yes, I did.

24   Q    And were there other times when you borrowed money from

25   Sandwich Isles?

1  A     There was -- there was one other time before -- I believe

2  there's one other time, possibly two.  The arrangement with

3  Sandwich Isles:  Summit was growing fast and needed funds;

4  that, if additional funds were needed from time to time, that

5  Sandwich Isles would consider an additional loan amount.

6  Q     Okay.  And take a look at Exhibit 15-4, which is in

7  evidence.  And if we can display that, please.

8         Do you recognize that document, Mr. Johnston?

9  A     That's correct.

10  Q     And the date of this is September 3, 1998; correct?

11  A     That's correct.

12  Q     And it's another promissory note; correct?

13  A     Yes, it is.

14  Q     And it, basically, reflects a request from you for a

15  short-term loan from Waimana Enterprises; correct?

16  A     That's correct.

17  Q     For $20,000; correct?

18  A     Yes.

19  Q     And was that request approved?

20  A     It was.

21  Q     And who approved the request?

22  A     Mr. Hee.

23  Q     All right.  And did you have to sign this note as a

24  condition of getting the funds?

25  A     That's correct.

1    Q     And does the note say under what terms it would be repaid?

2    A     Yes.

3    Q     Within 90 days; correct?

4    A     That's correct.

5    Q     At a certain interest rate; correct?

6    A     That's correct.

7    Q     And, in fact, am I correct that you pledged your salary to

8    repay the loan, if it were not repaid within 90 days?

9    A     That's correct.

10   Q     And did you draft this note?

11   A     No.

12   Q     Was it given to you for your signature?

13   A     Yes.

14   Q     And just so we're clear, you asked for a loan, they said

15   "Yes," but they gave you the note and said "Sign here."

16   A     Yes.

17   Q     And take a look at the following page of the same exhibit,

18   15-4.  Do you recognize that check?

19   A     Yes.

20   Q     And is that the check that was issued to you after --

21   A     I don't recognize the check exactly, but this represents

22   the funds that were transmitted to me for Summit

23   Communications.

24   Q     Fair enough.  So all of it happened on the same day.  You

25   signed the promissory note, and you got the check.  Is that

1    correct?

2    A    That's correct.

3    Q    So I assume you, basically, went to someone at Sandwich

4    Isles, and the check and the note were available to you.

5            THE COURT:  Do you mean "Waimana"?

6    BY MR. TONG:

7    Q    Waimana.  Excuse me.

8    A    Yeah, I don't recall if the check was picked up on the

9    same day or not, but it was made available to me, yes.

10   Q    Now, you mentioned earlier that there may have been

11   another loan.

12           Could you take a look at Exhibit 4-103, which should

13   be in your binder.

14   A    I'm sorry.  I'm having a little trouble finding this.

15   It's 4 dash -- what exhibit is this in?

16   Q    4-103.

17           THE COURT:  Your binder.  It will be more in the

18   front of the binder than you were just looking.  You were in

19   Chapter 15.  Now we're going to Chapter 4.

20           MR. TONG:  But we're not going backwards.

21           THE COURT:  No?

22           MR. TONG:  No.

23           THE COURT:  Is it not there?  It might not be there.

24   We'll pull it out for you, if it's not there.

25           MR. TONG:  Your Honor, we have an extra copy.

1            THE COURT:  Okay.  It might be easier for you to work

2    with this copy.

3            MR. HARRINGTON:  Your Honor --

4            THE COURT:  This is 4-103 already in evidence.

5    BY MR. TONG:

6    Q    Please take a look at the whole exhibit, and then maybe

7    you can look up when you're done.

8    A    Okay.

9    Q    Okay.  And the cover page appears to be a document on

10   Waimana Enterprises letterhead; is that correct?

11   A    That's correct.

12   Q    And it says "Al for signature"; correct?

13   A    That's correct.

14   Q    And the purpose of this document is authorization for a

15   loan to you; is that correct?

16   A    That's what it says, yes.

17   Q    Okay.  Well, you remember needing $20,000 and borrowing it

18   from Waimana.

19   A    Yes.

20   Q    And that would have occurred in May of 2010; is that

21   correct?

22   A    Yes.

23   Q    All right.  And then if you could look at the next page,

24   which is Bates number 81 of Exhibit 4-103.

25            That's a promissory note; is that correct?

1    A    That's correct.

2    Q    And again it reflects your signature; correct?

3    A    Yes.

4    Q    And the note-holder, meaning the person who loaned you the

5    money, has a signature here, too; correct?

6    A    Yes.

7    Q    And whose signature is that?

8    A    That's Al Hee's.

9    Q    And this again sets forth the rate of -- the manner in

10   which the loan would be repaid; correct?

11   A    That's correct.

12   Q    And under Security again there's a reference to the

13   assignment of life insurance proceeds.  Do you see that?

14   A    That's correct.

15   Q    And is that the life insurance policy that you testified

16   about earlier?

17   A    I don't recall.

18   Q    Okay.  But there was a life insurance policy; correct?

19   A    I believe there was.

20   Q    All right.  And if you could look at the next page,

21   please, which is Bates number 82 of the same exhibit.

22        Is that another promissory note?

23   A    Yes.

24   Q    And without going through each provision, it, basically,

25   obligates you to repay the loan in a certain fashion at a

1    certain interest rate; correct?

2    A    Yes.  The two notes totaled, I believe, $20,000, which was

3    the amount needed.

4              MR. TONG:  Okay.  I have nothing further.

5                      CROSS-EXAMINATION

6    BY MR. TOSCHER:

7    Q    May it please the Court.  Ladies and gentlemen.

8              Good afternoon, Mr. Johnston.

9    A    Good afternoon.

10   Q    You testified before on direct about Sandwich Isles being

11   a regulated telephone company.

12   A    That's correct.

13   Q    And Sandwich Isles, as a regulated company, is subject to

14   a lot of regulatory oversight?

15   A    Yes, it is.

16   Q    You mentioned the Hawaiian Public Utilities Commission?

17   A    That's one.

18   Q    Federal Communications Commission?

19   A    And the Federal Communications Commission, yes.

20   Q    Are there others?

21   A    Well, we also have a license with the Department of

22   Hawaiian Homelands, and they provide oversight to make sure

23   that we're properly serving the beneficiaries and lessees on

24   Hawaiian Homelands.

25   Q    There's a lot of oversight by the government.

1    A    Yes, there is.

2    Q    Now, when you were testifying before when Mr. Hee was

3    trying to get you to come over to the company from Summit, it

4    sounded like that it just wasn't your decision.  You had to go

5    to third parties:  the Board of Summit?

6    A    I had a board of directors, and I would never leave the

7    company without approval of the board, or if it were not in the

8    best interest that we thought at the time of Summit

9    Communications.

10   Q    So you were dealing -- these board members were third

11   parties that you had to, basically, get their blessing about --

12   with from?

13   A    Yes.

14   Q    And it sounded like, given all the lawyers involved from

15   the Summit side, there was a great deal of formality going on.

16   A    There was.  As I said, I recused myself from the board

17   meeting where they had this discussion as to whether it was or

18   was not a good thing for Summit Communications.  If I may just

19   elaborate a little bit.

20   Q    Absolutely.

21   A    In addition to the funding, Sandwich Isles was also going

22   to begin operations, operating telephone companies, and it did

23   not have the technical staff.  Summit had technicians, and so

24   one of the other attractions was that, in addition to the

25   funding, that Sandwich Isles would also provide some outsource

1    contracts to Summit so that Summit could support the operations

2    that Sandwich Isles was required to perform.

3    Q    Okay.

4    A    And that's all that my board considered.

5    Q    All part of the deal.

6    A    Yes.

7    Q    And you wanted the board -- you recused yourself.  You

8    wanted these third-party board members to make that decision.

9    A    Yes.

10   Q    And then the lawyers got involved on Summit's side, and

11   the lawyers on Sandwich Isles' side, and they drew up all the

12   papers.

13   A    Summit's lawyer drafted the Employment Agreement and

14   negotiated I'm not sure whom with, but he drafted agreements to

15   make sure that it was consistent with what the board wanted and

16   also my direction.

17   Q    Right.  And the loan was a substantial loan:  450,000.

18   A    Yes, it was.

19   Q    And you could understand how a regulated utility like

20   Sandwich Isles would want to document that when it's loaning to

21   a third-party company, such as Summit; correct?

22   A    I would assume.

23   Q    I think the lawyers would insist upon it, wouldn't they?

24   A    I'm sorry, would you repeat the question?

25   Q    The lawyers for Sandwich Isles would probably insist on

1  it.

2  A    I would assume.

3  Q    Now, if we can have published 15.3, please.

4  A    Yes.

5  Q    This is the -- it says Nonrecourse Promissory Note,

6  Mr. Johnston.  Do you see that?

7  A    Yes.

8  Q    And do you understand what a Nonrecourse Promissory Note

9  is, sir?

10  A    Not in the technical accounting terms.  I'm not a CPA or

11  an accountant.  But I assume that it means that I'm obligated

12  to pay.

13  Q    I think -- can we scroll down to paragraph 8, please.

14  A    I'm sorry?

15  Q    I'm sorry, Mr. Johnston.  Can I have you scroll down to

16  paragraph 8?  Next page.  I'm sorry.  Could we zero in on

17  paragraph 8.

18        If you read that, notwithstanding any contrary

19  provisions -- are you familiar with this provision,

20  Mr. Johnston?

21  A    You know, I haven't seen this for quite a few years,

22  but --

23  Q    Okay.  You're -- I think it looks to me like your lawyers

24  did a really good job protecting you because what it says is

25  that, notwithstanding any provisions in the loan documents,

1   they agree that the payment of such loan shall be enforced only

2   against the collateral -- that's the life insurance we talked

3   about -- and no deficiency in any foreclosure or proceedings

4   shall ever be asserted against you, the maker of the note, for

5   payment.

6          In other words, so what you're saying, your

7   recollection, you don't recall that the only security was the

8   insurance policy.  You thought you had an obligation to repay.

9   A    Yes.

10  Q    So you don't really even worry about what the document

11  says.  You had a personal obligation to repay.  Correct?

12  A    To be very honest about it --

13  Q    Please.

14  A    -- this same note, same terms and conditions, was -- were

15  passed on to Summit Communications; so I had this note payable

16  to Sandwich Isles Communications, and Summit had an identical

17  note payable to me.  And so my collateral was really Summit

18  Communications.

19  Q    Has the loan been repaid?

20  A    No.  No, it hasn't.

21  Q    And are you making payments on it?

22  A    Yes, I am.

23  Q    This loan was originally in 1998, sir?

24  A    Yes.

25  Q    And how much has been paid to date?

1   A    I'm not sure of the exact amount.

2   Q    Okay.  Long time but you still consider it an obligation

3   of yours to pay back, sir.

4   A    Yes.  Yes, I do, and I am paying the note out of payroll

5   deduction every -- twice a month.

6         MR. TOSCHER:  No further questions, Your Honor.

7                     RE-DIRECT EXAMINATION

8   BY MR. TONG:

9   Q    Mr. Johnston, the board approval that you talked about, I

10  gather there were people other than yourself on the board of

11  directors; correct?

12  A    Yes, there were.

13  Q    So it's a group of people.

14  A    Yes.

15  Q    And they met without you because the proposed action

16  concerned you; correct?

17  A    I'm sorry.  Would you repeat that, please.

18  Q    There was a time when the board was asked to approve your

19  Employment Agreement with Sandwich Isles Communications;

20  correct?

21  A    That's correct.

22  Q    And you recused yourself from that decision; correct?

23  A    Yes.

24  Q    And "recused" means you did not participate in the

25  decision; correct?

1    A    That is correct.

2    Q    So the other board members made that decision; correct?

3    A    Yes.

4    Q    And how was Summit's financial situation during the years

5    following the signing of that note that we discussed?

6    A    Summit at the time I went over to Sandwich Isles in 1998

7    at the time of the board meeting was doing well.  It was

8    definitely in the start-up mode.  The company had started in

9    1996.  It was growing fast.  It looked very, very good.  The

10   company got in financial trouble subsequently, and ended up

11   filing for a Chapter 11, then eventually went into a Chapter 7.

12   Q    And is that a primary reason why the note has not been

13   paid as of now?

14   A    I was a creditor to -- of Summit's in its bankruptcy

15   filings.  I had assumed that the -- the note was discharged in

16   bankruptcy, and I had also assumed that my note to Sandwich

17   Isles was also discharged when Summit went into bankruptcy.

18   Q    So you thought the bankruptcy did away with the

19   obligation.

20   A    Yes, I did.

21   Q    Okay.  Thank you.

22        MR. TONG:  I have nothing further.

23        MR. TOSCHER:  Nothing further, Your Honor.

24        THE COURT:  Okay.  Then the witness is excused.  You

25   may step down and leave the courtroom.

1           THE WITNESS:  Thank you.

2      (Witness excused.)

3           THE COURT:  And, Mr. Tong, for today -- oh, you might

4  have someone?

5           MR. TONG:  I think we can finish, Your Honor.

6           THE COURT:  You can proceed?  You are proceeding?

7  Yeah, okay.

8      (Witness photographed.)

9           THE CLERK:  Please raise your right hand.

10     (Witness sworn.)

11          THE CLERK:  Thank you.  Please be seated.

12          Please state your name and spell your last name.

13          THE WITNESS:  My name is Robert Kalani Uichi Kihune,

14  and my last name Kihune is spelled K-i-h-u-n-e.

15                    <u>DIRECT EXAMINATION</u>

16  BY MR. TONG:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    Could you please give the jury a sense of your

20  professional background.

21  A    Could you repeat that again.  I got to apologize because I

22  have a hearing disability from the military, being too -- in

23  the Vietnam War and near guns.  So sometimes I can't hear

24  exactly what you said.

25          THE COURT:  Would it help if you used these earphones

```
 1   we have?  I don't know --
 2              THE WITNESS:  I have a hearing aid.
 3              THE COURT:  Oh, you have it in?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Okay.  We'll do our best.
 6              Go ahead.
 7   BY MR. TONG:
 8   Q    What is your present occupation?
 9   A    I'm retired.
10   Q    Okay.  How long have you been retired?
11   A    Since September of 2013.
12   Q    What was your primary occupation when you were working?
13   A    Before I retired I was the CEO of Sandwich Isles
14   Communications, and before that I was with the Kamehameha
15   Schools as a trustee for the Kamehameha Schools.
16   Q    And how about before that?
17   A    I was the executive director at the Natural Energy Lab in
18   Kona.
19   Q    And before that?
20   A    I was in the Navy.
21   Q    Okay.  What did you do for the United States Navy?
22   A    What did I -- could you say it again.
23   Q    Let me start in a different direction.  Okay.  Tell us
24   your educational background.
25   A    I was educated at the Kamehameha Schools for high school,
```

1    and I went to the United States Naval Academy at Annapolis.

2    And then I went to the post-graduate school in Monterey and got

3    an engineering degree in communications electronics.

4    Q    And then you served in the United States Navy.

5    A    Yes, I did.

6    Q    How many years?

7    A    35 years.

8    Q    And what was your last rank?

9    A    Vice-Admiral, three-star.

10   Q    As a three-star Admiral in the Navy, what were your

11   duties?

12   A    I had three different jobs as a three-star.  I was the

13   Commander of the Naval Service Forces in the Pacific Fleet in

14   one job.  Then I went to Washington, D.C., to be the head of

15   the Surface Navy.  Basically, it's called the Assistant Chief

16   of Naval Operations for Surface Warfare, and where I was

17   responsible for all of the ship building and weapons system

18   building for the Navy.  Then from there I went to another

19   three-star job, which was the Chief of Naval Education and

20   Training in Pensacola, Florida.

21   Q    When did you retire from the U.S. Navy?

22   A    I retired in June of 1994.

23   Q    And did you then have the various positions that you just

24   testified about?

25   A    Yes.

1    Q    Was one of those positions at Sandwich Isles

2    Communications?

3    A    Yes.

4    Q    And do you recall when you worked for Sandwich Isles?

5    A    Yes.  I started in -- I started with Waimana Enterprises

6    in January of 1996 and started off assisting the owner to try

7    to get a power purchase agreement for a power plant that was

8    being built in Kawaihae.  And when that one did not go well, he

9    asked me to take over because somebody else had started

10   Sandwich Isles Communications.  So I started it in 1998.  And

11   then I left in 2013.

12   Q    And what was your position with Sandwich Isles

13   Communications?

14   A    I was the Chief Executive Officer.

15   Q    Now, you just referenced that you started at Waimana

16   Enterprises; correct?

17   A    Yes.

18   Q    What relationship was there between Waimana and Sandwich

19   Isles Communications?

20   A    Sandwich Isles was a subsidiary of Waimana Enterprises.

21   Q    So Waimana Enterprises owned Sandwich Isles.

22   A    That's correct.

23   Q    And who was the owner of Waimana Enterprises?

24   A    Al Hee.

25   Q    Do you see Al Hee in the courtroom today?

1  A     Yes.

2  Q     Could you identify him by where he's --

3  A     He's standing right there.

4        MR. TONG:  Thank you.  May the record reflect the

5  identification of the defendant.

6        THE COURT:  It does so reflect.

7  BY MR. TONG:

8  Q     Now, Admiral Kihune, could you tell us where did Sandwich

9  Isles generate its revenue?

10  A     We generated our revenue through the recoveries that we

11  got from the infrastructure and the operations of the company.

12  We were what you call a rural telephone company that was part

13  of the 1996 Telecommunications Act and which allowed 1100

14  companies like us throughout the United States to serve in

15  rural areas, which was high cost, and which promised these

16  rural people the telecommunication services that were equal to

17  those in urban areas and at costs that were comparable to urban

18  areas.  So that's how we did our business.

19  Q     Is it true you received some federal funds?

20  A     We received federal loans, yes.

21  Q     And did the receipt of federal loans mean that you were

22  subject to some regulation?

23  A     Very strict regulations.

24  Q     And how did those very strict regulations reflect on your

25  bookkeeping practices?

1    A    I'm not -- I never kept the books myself, but I had many

2    discussions with our accountants that worked for me that we

3    were going to comply exactly with the regulations.   And we had

4    consultants that we hired to oversee all of those things, and

5    we were audited practically every year by some kind of --

6    either the rural utility service or somebody from the federal

7    government.

8    Q    Is it true, Admiral, that you and Al Hee had an agreement

9    that you would keep Sandwich Isles Communications very clean on

10   its books?

11   A    That's correct.

12   Q    Now, I'm going to change topics on you.   I just want to

13   ask a little bit about Sandwich Isles and the reimbursement

14   processes.

15        You were the Chief Executive Officer; correct?

16   A    That's correct.

17   Q    And who did you report to?

18   A    I reported to Al Hee.

19   Q    And were there times when you had to make business trips?

20   A    Yes, I did.

21   Q    Was there a process that you had to follow to be

22   reimbursed?

23   A    Could you repeat that question?

24   Q    Was there a reimbursement process for business trips?

25   A    Oh, yes.

1    Q    And tell us, generally, what that process was.

2    A    I got back, and whatever the cost for the travel and the

3    meals and other costs that were associated with the trip were

4    submitted back to the administrative people for reimbursement.

5    Q    Okay.  There's a binder to your left.  If you could kindly

6    look at Exhibit 4-122, sir.

7              And that's in evidence so may we display it, Your

8    Honor?

9              THE COURT:  You may.

10             THE WITNESS:  4-122?

11             MR. TONG:  122, sir.

12             THE WITNESS:  Okay.

13   BY MR. TONG:

14   Q    Do you have that in front of you?

15   A    Yes.

16   Q    And we're also going to put it on the screen to you to

17   your right; so whichever works better for you, sir.

18   A    That's fine.

19   Q    This document is entitled Request For Reimbursement;

20   correct?

21   A    That's correct.

22   Q    And the name that appears there is yours; is that correct?

23   A    That's correct.

24   Q    And if we can show -- it's for travel during the period of

25   four days in February of 2003; correct?

```
 1   A     That's correct.

 2   Q     And the form requires you to say the purpose of the

 3   travel; correct?

 4   A     That's correct.

 5   Q     And in this case it was meetings with individuals in

 6   Washington, D.C.; is that correct?

 7   A     Right.

 8   Q     May we see the bottom half of that page?

 9   A     Yes.

10   Q     And there's a breakdown of various amounts; correct?

11   A     That's correct.

12   Q     Lodging, transportation, and other expenses; correct?

13   A     Yes.

14   Q     And there's a signature that appears next to the word

15   "Signature."  Do you see that?

16   A     Yes.

17   Q     Whose signature is that?

18   A     That's mine.

19   Q     And does that, basically, represent the type of form that

20   you would prepare and sign in order to be reimbursed?

21   A     That's correct.

22   Q     And there's a signature below you next to the line

23   "Approved."  Do you see that, sir?

24   A     Yes.

25   Q     And whose signature is that?
```

1   A    That's Al Hee's.

2   Q    So am I correct in assuming that this is the type of form

3   that you, as the head of Sandwich Isles, would fill out for

4   Mr. Hee's approval for reimbursement?

5   A    That's correct.

6   Q    And the document also includes some receipts, does it not?

7   A    That's correct, yeah.

8   Q    And if we can see page 2, please.

9   A    Page --

10  Q    Page 2 that has taxicab receipts; correct?

11  A    Right.

12  Q    And am I correct in interpreting this that these are

13  taxicab receipts that you had for transportation during that

14  trip?

15  A    Looks like them, yes, that's correct.

16  Q    I mean, you recognize your signature; right?

17  A    That's my signature.

18  Q    And then there appears to be a guest receipt in the upper

19  right-hand corner; is that correct?

20  A    That's correct, yeah.

21  Q    All right.  And if we can look at the next page, which is

22  Bates number 800 in the lower right-hand corner.

23  A    Okay.

24  Q    What does that document represent, Admiral Kihune?

25  A    Are you talking about the Marriott Hotel, the bill?

1  Q    Right.

2  A    Yeah.

3  Q    Right.  Is that the bill that you received for your

4  business lodging?

5  A    To my best -- to my knowledge, that's the bill.

6  Q    Okay.  And it has your name at the upper, left-hand

7  corner; correct?

8  A    Right.

9  Q    And then the next page of the document is actually a

10 memorandum from you; is that correct?

11 A    That's correct.

12 Q    To Nancy.  Who is Nancy?

13 A    Nancy is Al's secretary.

14 Q    So you would normally submit requests for reimbursement to

15 Nancy Henderson for Al Hee's approval; is that right?

16 A    That's correct.

17 Q    Without going through all of this, you, essentially,

18 attached all of your receipts that you sought reimbursement

19 for; correct?

20 A    That's correct.

21 Q    Even describing what the name of the restaurant was and

22 who you attended with; correct?

23 A    That's correct.

24 Q    And then you were reimbursed; is that right?

25 A    That's -- I believe I was.

1   Q    Now, Admiral Kihune, were there times when you used a

2   credit card provided by Waimana?

3   A    I didn't use the credit card myself.  Basically, for

4   instance, some of the airfare were placed -- I made the

5   reservation -- or my secretary made the reservation, and it was

6   billed to Al Hee's card.

7   Q    And were there times when a portion of those charges were

8   for your personal expenses?

9   A    I don't recall that.  Not for personal expense.  I don't

10  recall that part.

11  Q    Do you ever recall ever writing checks to Waimana to

12  reimburse them for expenses that they incurred on your behalf?

13  A    They incurred on my behalf?

14  Q    Yeah.

15  A    I may have, but I don't recall right off the top of my

16  head.

17  Q    Let me just show you one check and see if it jogs your

18  memory.  It's Exhibit 3-109 up on the screen.

19  A    Okay.

20  Q    And if we could look at the top.  This appears to be a

21  check drawn on your account, and I assume your wife, made

22  payable to Waimana Enterprises; correct?

23  A    Yes.

24  Q    And do you know what that check might have been for?

25  A    I -- off the top of my head, I can't remember, no.  But

1    when I do that, I -- normally, it's something that I spent on

2    personal stuff that I needed to reimburse back to the company.

3    Q    Okay.  So if somehow the company paid for something that

4    was personal for you, you would reimburse the company.

5    A    Yes.  So I would reimburse the company.

6              MR. TONG:  Thank you.  I have nothing further.

7              THE COURT:  Okay.

8                          CROSS-EXAMINATION

9    BY MR. TOSCHER:

10   Q    Good afternoon, Admiral Kihune.  You testified on direct

11   with Mr. Tong that you first started, I think, doing business

12   with Waimana in 1996?

13   A    That's correct.  January '96.

14   Q    And you mentioned you were assisting the owner regarding a

15   power purchase agreement.  "Owner," you meant Mr. Hee?

16   A    That's Mr. Hee; right.

17   Q    Could you tell us -- let's just forward to when you

18   started working for Sandwich Isles Communications.  How did

19   that come about?  Who recruited you?

20   A    The -- there was another guy that was working on the

21   Sandwich Isles paperwork and trying to establish Sandwich

22   Isles.  And he had -- about the time that it was obvious that

23   our power purchase agreement with Hawaiian Electric was not

24   going to go forward, Al asked me -- because I told him, I said,

25   you know, my job was done, that I may have to go -- I'm going

1    to go look for something else.  And that's when Al said, "No.

2    How about staying here and running Sandwich Isles."  And so I

3    took over whatever had been done by my predecessor.

4    Q    And do you recall his name?

5    A    His name was David Ushio.

6    Q    And did Mr. Hee discuss with you the vision of the company

7    before you took the job?

8    A    Yes, he did.

9    Q    And --

10   A    This is before I took the job.  Yes, he did.

11   Q    Before you took the job, yes.  And could you tell the jury

12   what the vision of the Sandwich Isles Communications was.  What

13   was it trying to do?

14   A    Well, let me put it in my own words.

15   Q    Please.

16   A    Al said that the goal of Waimana Enterprises and its

17   subsidiaries -- and Sandwich Isles was a subsidiary -- was to

18   improve the well-being of native Hawaiians because native

19   Hawaiians were overrepresented in nearly all of the negative

20   indicators of well-being, you know, incarceration, drug and

21   alcohol abuse, child and spouse abuse, unemployment,

22   homelessness, and excessive high school dropouts.

23            So Sandwich Isles Communications was started in

24   support of that goal with a mission to provide affordable,

25   state-of-the-art, broadband telecommunication services on a

1    particularly -- well, on unserved and underserved rural areas
2    but specifically -- because that's what our license said -- to
3    native Hawaiians on Hawaiian Homelands.
4    Q    And this was in 1998?
5    A    He actually told me all this before I joined him in
6    January of 1996.
7    Q    Okay.  And -- okay.  So before you joined.  And what was
8    the two-year period between 1996 when you had that conversation
9    and 1998 when you became CEO?
10   A    I was heavily involved in trying to assist Al in building
11   a power plant in Kawaihae.
12   Q    You testified on direct that Sandwich Isles, the regulated
13   utility, was subject to very strict regulations; is that
14   correct?
15   A    That's correct.
16   Q    And Sandwich Isles had -- you didn't -- you said you
17   weren't involved in the accounting or bookkeeping, but did they
18   have a large accounting staff?
19   A    They were sufficient for the size that we were at that
20   time.  And it just kept on growing as we began accumulating
21   more loans and as we did more work for infrastructure in the
22   Hawaiian Homelands.
23   Q    So starting in 1998 how many employees were there at
24   Sandwich Isles?
25   A    You know, to the best of my knowledge, it was only about

1    three of us in 1998 when we started this thing.

2    Q    And what did it grow to when you retired in 2013?

3    A    I estimated about a hundred.

4    Q    A hundred.  Okay.

5         Mr. Tong asked you about a discussion you had with

6    Mr. Hee regarding Sandwich Isles, and I think the words

7    Mr. Tong used was "keep it very clean."  Was this a discussion

8    you had with Mr. Hee?  Was it clear that you guys were going to

9    comply with the law?

10   A    In my discussions with Mr. Hee, he agreed that Sandwich

11   Isles should be a separate entity that would only have all of

12   the projects we were doing that were regulated, and the

13   telephone side was regulated.

14   Q    Right.

15   A    And there were some discussions about trying to put the

16   unregulated kind of telecommunications in with Sandwich Isles,

17   but in the end I think we both agreed that let's keep Sandwich

18   Isles with only the regulated programs.

19   Q    And that was -- you believe that was a good business

20   judgment.

21   A    It was good business, but it also -- because having been

22   named in the Navy for 35 years and knowing what the federal

23   audit program was like -- I ran programs in the Navy for

24   building ships and so on -- I told Al that we're going to have

25   to keep this company absolutely clean because you're going to

1    be audited on every turn.

2    Q    And he was in agreement with that.

3    A    He was in agreement with that.

4    Q    Okay.  Now, in 1998 when you started with the company,

5    what was the status of the Sandwich Isles network?  Had it

6    started yet?

7    A    No.  We had zero on the ground.  And so my first job was

8    to start a subdivision in Waimanalo.

9            MR. TOSCHER:  And, Your Honor, I did want to take the

10   Admiral through the build-out using the graphic I had if --

11   without objection?

12           THE COURT:  I'm sorry?

13           MR. TONG:  No objection, Your Honor.

14           THE COURT:  Okay.  Then go ahead.

15           MR. TOSCHER:  Admiral, I don't know if you've seen

16   this before.  What I wanted to do, I thought this would assist

17   the jury.

18           THE COURT:  Hold on.  Microphone.  Hold on.

19           And, Mr. Tong, you're welcome to come and stand in

20   this corner over here so you can see.

21           Do you need some help on the mike?  I don't know that

22   the jury can see this.  You might need to move it back.

23           Well, can the witness see that?

24           MR. TOSCHER:  I apologize, Your Honor.  I do have

25   some graphics to put up, but I wasn't really prepared for

1    Admiral Kihune today.

2            THE COURT:  So let me suggest this.  Move it back

3    against the government's counsel table because I need to make

4    sure the jurors can see this.

5            Can the jurors see it?  Yeah?  Okay.

6            MR. TOSCHER:  Thank you.  Can you hear me, Miss Court

7    Reporter?  You can't hear me.

8            THE COURT:  You can put that in your pocket.

9            Yeah, okay.

10           MR. TOSCHER:  Can you hear me now?

11           Okay.  Thank you very much, Your Honor, for the --

12   BY MR. TOSCHER:

13   Q    Admiral, can you see this graphic of the island chain?

14           THE COURT:  Do you want him to walk down?

15           MR. TOSCHER:  Could I ask you to do that, sir?

16           THE COURT:  And we're going to give him a handheld

17   mike.

18           MR. TOSCHER:  That would be great.  I just want the

19   jury to understand the undertaking that happened and how it

20   happened.

21           THE CLERK:  I don't know if two -- we can try, but

22   there might be feedback.

23           THE COURT:  I know.  Okay.  This is a little bit of a

24   problem.  Let's try it.

25           MR. TOSCHER:  Thank you.

1          THE COURT:  So the two of you -- this is really
2     complicated.  Okay.  The two of you cannot stand right next to
3     each other.  Our experience is this microphone and that
4     microphone will cause feedback, and we won't be able to hear
5     anyone.  So you need to stand --
6          MR. TOSCHER:  Okay.  How about over there, Admiral?
7     No.  Admiral, right over here.  That way you can see the chart
8     and the jury.  I apologize.  I just didn't know we'd get --
9          THE COURT:  Okay.  Go ahead.
10          MR. TOSCHER:  Thank you, Your Honor.
11     Q    Now, Admiral, we see --
12          THE COURT:  Do you want a laser pointer?  But, you
13     know, this is really dangerous because he's standing right
14     there.
15          MR. TOSCHER:  You don't want me to have a pointer.
16     Q    The brown areas on the various islands are Hawaiian
17     Homelands' communities.  Maybe you could start with the first
18     one that was built out and just to give the jury the sense of
19     what happened, how long it took, so they understand in terms of
20     the background.
21     A    The first one was at Waimanalo, and it's right up here.
22     And it was a small subdivision.  And, of course, we were at
23     that point inexperienced as far as putting, you know,
24     underground cables and so on, but we had some very dedicated
25     people working with us.  We weren't a very big company.  And we

1    installed that, I think, in a pretty short time and did pretty

2    well with the people at Waimanalo.

3    Q    And what was the next project?

4    A    I'm trying to remember what the next project was, but I

5    believe the next project was Kalawahine up in Papakolea.   I

6    think that was the second one.

7    Q    How many communities are connected now, Homeland

8    communities?

9    A    Well, the intent is to connect all of the Hawaiian

10   Homelands, and there's about 70 plus parcels of Hawaiian

11   Homelands throughout the islands.

12   Q    70 plus throughout all the --

13   A    Yes.  That was the -- that is the objective.

14   Q    And how many are connected today, sir?

15   A    Off the top of my head, I just can't tell you how many are

16   really connected, but I got to go through your --

17   Q    That's fine.  If you don't know off the top, I don't want

18   you to guess.

19          So can you tell us what you know about the project of

20   connecting the various islands -- the Hawaiian Islands in the

21   communities and the challenges there.  How did that come

22   about?

23   A    Are you talking about the undersea cables?

24   Q    Yes, sir.  The undersea cables.

25   A    That was a challenge because the -- first of all, there

1  wasn't enough capacity on the lines that other servers had; so

2  we had to go to the RUS and try to convince them that this was

3  something that we needed.  And after much negotiations we

4  finally -- they finally agreed that, yeah, go ahead and start

5  putting it in.

6          But because of the high cost in Hawai'i, and nobody

7  believed that this thing was going to cost this much, they

8  finally came over and they made many, many, many trips, did

9  audits on us, and because we were near the highest of the

10  telephone companies at that time.  And after visiting us so

11  many times they finally succumbed to the fact that Hawai'i is

12  quite costly.

13  Q    So who -- which company was taking the lead in building or

14  contracting for these underseas cables of the group; do you

15  recall?

16  A    Well, the undersea cable is leased by Sandwich Isles, and

17  we don't own the undersea cable.  And so what had to be done

18  was the Waimana Enterprises worked out a -- and created a

19  company that would develop the undersea cable separately from

20  Sandwich Isles.

21  Q    Okay.  Do you know who manufactured the actual underseas

22  cable and what discussions there were, would be the type of

23  cable that would be used that you can tell the jury about?

24  A    You know, if I haven't seen so many of the manufacturers,

25  I think I'd be wrong if I pinpointed any single one of them; so

1    I'd like to not just answer your question on that one.

2    Q    And do you know what type of fiber was used in the

3    build-out in the cable?

4    A    When you say what type of --

5    Q    The type of -- the fiber -- the type of cable fiber that

6    was ultimately used.  Or I may be getting too technical for

7    you.

8    A    No.  When we talk fiber, it's fiber.  And I'm just trying

9    to ascertain what your question really is saying.

10   Q    Right.  In terms of -- I understand there are different

11   grades.

12   A    No, there are different grades of fiber, yes.

13   Q    And is it correct that they were trying to build out the

14   most capacity they could possibly do?

15   A    Yes.  The intent was not to rebuild this thing again in 50

16   years or 75 years; so you're trying to get the highest level of

17   technology that was available to us at that time to put

18   undersea.

19   Q    So this was really intended to be a very long-term

20   project.

21   A    That's what we intended to do:  to have a very long

22   long-term project.

23         MR. TOSCHER:  Your Honor, I'm done with having the

24   Admiral explain.

25         Thank you very much, Admiral.

1          THE COURT:  Can you give me an estimate of how much

2    longer you have because this is the day when I indicated we

3    need to end by ten after 4:00 because I need to be somewhere

4    else.

5          MR. TOSCHER:  Can I go look at my notes for a second,

6    Your Honor?  I'm cognizant of that.  Thank you.

7          THE COURT:  Okay.  You can come back up.

8    BY MR. TOSCHER:

9    Q    Admiral, did you have any discussions with Mr. Hee over

10   the course of time regarding his vision for bringing -- or his

11   idea of bringing his children into the company?

12   A    To bring --

13   Q    His children.

14   A    I'm sorry.  I still can't hear you real good.

15         MR. TOSCHER:  I think it's because I have violated

16   the two microphone rule.  Thank you.

17         Sorry, Your Honor.

18   BY MR. TOSCHER:

19   Q    Sandwich Isles was going to be -- Sandwich Isles

20   Communications -- a long-term project we talked about.

21   A    Right.

22   Q    And did you have -- were you aware that Mr. Hee was trying

23   to bring his children into the company?

24   A    Yes, I was aware of that.

25   Q    Was it a -- was it a constant topic about training his

1    children and bringing them into the company?

2              MR. TONG:  Your Honor, I object.  This calls for a

3    hearsay response.

4              THE COURT:  Okay.  Sustained.

5              MR. TOSCHER:  Okay.  All right.  He's already

6    answered the question.  I don't want to violate the rule, Your

7    Honor.

8              Your Honor, I have no further questions.

9              THE COURT:  Okay.

10             MR. TONG:  Promise.

11                      RE-DIRECT EXAMINATION

12   BY MR. TONG:

13   Q    Admiral Kihune, you testified earlier that Sandwich Isles

14   Communications received federal loans; correct?

15   A    That's correct.

16   Q    And that's why Sandwich Isles was regulated; correct?

17   A    That's correct.

18   Q    And Waimana did not receive the same type of federal

19   loans, did it.

20   A    No.

21   Q    So Waimana was not subject to the same regulation as

22   Sandwich Isles.

23   A    That's correct.

24             MR. TONG:  Thank you.  I have nothing further.

25             THE COURT:  Okay.  Thank you very much.  The witness

1    can step down and leave the courtroom.  Thank you.  You're

2    excused.

3         (Witness excused.)

4            THE COURT:  Ladies and gentlemen, we are adjourning

5    for the day.  And tomorrow morning I will see you at nine

6    o'clock.  We'll have a new witness on the stand.

7         (Jury excused.)

8         (Court adjourned at 4:07 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              COURT REPORTER'S CERTIFICATE

2         I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9         DATED at Honolulu, Hawaii, August 2, 2015.

10

11                              /s/ Debra Chun

12                              DEBRA KEKUNA CHUN

13                              RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25