```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                       FOR THE DISTRICT OF HAWAII

 3                                  )
     UNITED STATES OF AMERICA,      )  CR 14-00826 SOM
 4                                  )
              Plaintiff,            )  Honolulu, Hawaii
 5         vs.                      )  June 26, 2015
                                    )  9:00 A.M.
 6   ALBERT S. N. HEE,             )
                                    )
 7              Defendant.          )
                                    )
 8   _____)

 9                TRANSCRIPT OF JURY TRIAL (DAY 4)
                BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:        LAWRENCE L. TONG
                                Office of the U.S. Attorney
13                              PJKK Federal Bldg.
                                300 Ala Moana Blvd. Ste. 6100
14                              Honolulu, HI 96850

15                              QUINN P. HARRINGTON
                                U.S. Dept. of Justice
16                              Tax Division
                                601 D St., N.W. Room 7029
17                              Washington, DC 20004

18   For the Defendant:         STEVEN TOSCHER
                                KURT K. KAWAFUCHI
19                              LACEY STRACHAN
                                Hochman salkin Rettig Toscher
20                                & Perez
                                9150 Wilshire Blvd., Ste. 300
21                              Beverly Hills, CA 90212

22   Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
                                United States District Court
23                              300 Ala Moana Blvd. Ste. C285
                                Honolulu, HI 96850
24                              (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).
```

1                              INDEX

2

3       EXAMINATION

4       Witness Name                                        Page

5       Charlton Hee

6           Direct By Mr. Tong .....................................    5

7           Cross By Mr. Toscher ...................................   35

8           Re-Direct By Mr. Tong..................................   45

9           Re-Cross By Mr. Toscher ...............................   48

10      Frank Molinari

11          Direct By Mr. Tong .....................................   50

12          Cross By Mr. Toscher ...................................   76

13          Re-Direct By Mr. Tong..................................   81

14          Re-Cross By Mr. Toscher ...............................   83

15      Danielle Yanagihara

16          Direct By Mr. Harrington .............................   85

17          Cross By Mr. Toscher ...................................  100

18      Deanna Awa

19          Direct By Mr. Harrington .............................  106

20          Cross By Mr. Toscher ...................................  110

21          Re-Direct By Mr. Harrington.........................  112

22

23

24      EXHIBITS

25      Exhibit                                             Page

| 1 | 16B, 16C, 16D Entered into Evidence | 14 |
| 2 | 16G, 16H Entered into Evidence | 19 |
| 3 | 16A Entered into Evidence | 20 |
| 4 | 16E, 16F Entered into Evidence | 65 |
| 5 | 16I, 16J Entered into Evidence | 65 |
| 6 | 17B thru 17O Entered into Evidence | 66 |
| 7 | 17A Entered into Evidence | 71 |
| 8 | 12-1 thru 12-5 Entered into Evidence | 85 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   FRIDAY, JUNE 26, 2015                    9:09 O'CLOCK A.M.

2          THE CLERK:  Criminal 14-826 SOM, United States of

3   America versus defendant Albert Hee.  This case has been called

4   for Further Jury Trial.

5          Counsel, please make your appearances for the record.

6          MR. TONG:  Good morning, Your Honor.  Larry Tong --

7   good morning, ladies and gentlemen.  I'm sorry.  Larry Tong and

8   Quinn Harrington for the United States.  With us is Special

9   Agent Greg Miki and Christina Sorely of the Department of

10  Justice.  Good morning.

11         THE COURT:  Good morning.

12         MR. TOSCHER:  Good morning, Your Honor.  Good

13  morning, ladies and gentlemen.  Steven Toscher for defendant

14  Albert Hee, who is present with me in court, and Lacey Strachan

15  and Kurt Kawafuchi.

16         THE COURT:  Okay.  Good morning.  You can sit down.

17         And who is the government calling at this time?

18         MR. TONG:  The government calls Charlton Hee.

19         THE COURT:  Charlton Hee.  Okay.

20         And just to let the jurors know, I'm not sure exactly

21  what the time will be, but we are expecting to end early today.

22  We'll just have to see how things proceed, but I don't think

23  we're expecting that we will fill the day until 4:00.

24         Am I correct?

25         MR. TONG:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  We'll see how it goes, but that's

 2    the expectation.

 3         (Witness photographed.)

 4              THE CLERK:  Please raise your right hand.

 5         (Witness sworn.)

 6              THE CLERK:  Thank you.  Please be seated.

 7              Please state your name and spell your last name.

 8              THE WITNESS:  Charlton E-ola-koa-kupa'a-i-ke-one-

 9    kulaiwi Roylo Hee.  Last name is Hee, H-e-e.

10                        DIRECT EXAMINATION

11    BY MR. TONG:

12    Q    Good morning, Mr. Hee.

13    A    Good morning.

14    Q    We normally ask witnesses to spell their last name, but in

15    this case could you kindly spell your Hawaiian name.

16    A    Okay.  E-o-l-a-k-o-a-k-u-p-a-'okina-a-i-k-e-o-n-e.

17              THE COURT:  Okay.

18              THE WITNESS:  K-u-l-a-i-w-i.

19    BY MR. TONG:

20    Q    And do some people know you as Kupa'a?

21    A    That's correct.

22              THE COURT:  It just so happens that in this courtroom

23    you have a court reporter and a law clerk who had no trouble

24    with your middle name at all.  Go ahead.

25              THE WITNESS:  That's encouraging.
```

```
 1              MR. TONG:  I'll take the heat for that, Your Honor.

 2   Q    And I gather you live here on O'ahu; is that correct?

 3   A    Yes.

 4   Q    And could you tell us how old you are.

 5   A    I am 25, 26.  I'm going to be 26 in August.

 6   Q    Without giving the specific date could you tell us the

 7   year in which you were born.

 8   A    1989.

 9   Q    And I want to ask you a little bit about your family

10   members.  Who is your father?

11   A    My father is Albert Hee.

12   Q    And you see him in court today, I assume.

13   A    Yes, I do.

14   Q    Is he the individual standing up?

15   A    Yes.

16   Q    Thank you.  And who is your mother?

17   A    My mother is Wendy Hee.

18   Q    And her -- she goes by Wendy Roylo Hee also; is that

19   correct?

20   A    Yes, that's correct.

21   Q    And who is your father's father, your paternal

22   grandfather?

23   A    My father's father is Charles Hee.

24   Q    And do you presently reside with your grandfather?

25   A    Yes, I do.
```

1    Q    And what does Charles Hee, your grandfather, do for a

2    living?

3    A    He's retired.  He used to work at the Board of Water

4    Supply.

5    Q    And how long has he been retired?

6    A    Somewhere around 20 years, I believe.

7    Q    Now, do you have any siblings?

8    A    Yes.  I have two older sisters.

9    Q    Which -- what's the name of the oldest sister?

10   A    My eldest sister is Adrianne Ho'oulu-no-na-lani Roylo Hee.

11   Q    In light of the court's comments, I'm not going to ask you

12   to spell that.  Does she go by Ho'o?

13   A    Yes.

14   Q    And how much older is she than you?

15   A    I believe three years.

16   Q    You said you have a second sister?

17   A    Yes.

18   Q    What is her name?

19   A    That's Breanne Ehu-kai-o-liko-i-ka-makani Roylo Hee.

20   Q    Does she go by Liko?

21   A    Yes.

22   Q    And how much older than you is she?

23   A    I believe she's two years older than me.

24   Q    Now, let's talk a little bit about you.  Tell us where you

25   went to high school.

1   A      Attended Kamehameha Schools, Kapalama.

2   Q      I'm sorry.  When did you graduate?

3   A      2008.

4   Q      And what did you do after graduating from Kamehameha?

5   A      I attended Santa Clara University.

6   Q      Okay.  And for what period of time did you attend Santa

7   Clara University?

8   A      From the fall of 2008 to the spring of 2012.

9   Q      Did you receive a degree?

10  A      Yes.

11  Q      What was the degree in?

12  A      I received a Bachelor's of Science in environmental

13  science, and I completed all credits for a Bachelor's of Arts

14  in studio art.

15  Q      Let's talk about each one.  What is environmental science?

16  A      So environmental science, as opposed to environmental

17  studies, is more of the hard sciences; so ecology,

18  conservation, biology, remediation.  Environmental studies is

19  more the environmental law, environmental policy.

20  Q      Okay.  And you mentioned that you also had a degree in

21  studio art; is that correct?

22  A      Yes, that's correct.

23  Q      And what kind of studio art did you study?

24  A      I focused mainly on three-dimensional; so sculpture,

25  ceramics.

```
 1              THE COURT:  Can you get a little closer to your
 2   microphone.  Thank you.
 3              MR. TONG:  You can also pull it closer to you, if
 4   that would be easier.
 5              THE WITNESS:  That's okay.
 6   BY MR. TONG:
 7   Q    So you focused on three-dimensional things; correct?
 8   A    Yes.
 9   Q    Just so we all understand, what would a two-dimensional
10   type of art be?
11   A    So drawing, painting, computer arts.
12   Q    So the three-dimensional would have depth.
13   A    Yes.
14   Q    And were you a full-time student when you attended Santa
15   Clara University?
16   A    Yes.
17   Q    And when did the school year start and when did it end?
18   A    So we were on quarters; so I believe it started in
19   September, and it would end around June.
20   Q    And by "quarter," that means there were three terms for
21   each academic calendar year; is that correct?
22   A    Yes, that's correct.
23   Q    So there would be one in the fall; right?
24   A    Yes.
25   Q    One in the winter?
```

```
 1    A      Yes.

 2    Q      And one in the spring.

 3    A      Yeah.

 4    Q      And the fall term would be September to when?

 5    A      September until Christmas break; so December.

 6    Q      And then when would the winter term be?

 7    A      Winter term was January till spring break, I believe; so

 8    it's January to March.

 9    Q      Okay.

10    A      Something like that.

11    Q      And how about spring term?

12    A      Spring term was March to June.

13    Q      And each year you would attend all three terms; correct?

14    A      Yes.

15    Q      What would you normally do during your four years at Santa

16    Clara when there was a break, such as Christmas or summer?

17    A      I would usually return home.

18    Q      How many of your summers did you return home?

19    A      So I stayed up one summer for summer school.  So at least

20    three.  I believe three.

21    Q      Okay.  And when you returned home during breaks, who would

22    pay for your airfare?

23    A      I usually paid for my airfare.

24    Q      And where would you get the money to pay for the airfare?

25    A      Out of my personal savings account.
```

1   Q     And were you earning money at the time you were attending

2   Santa Clara University?

3   A     Yes, I was.

4   Q     Okay.  And we'll get back to that in a minute.

5         Let's talk about your tuition.

6   A     Okay.

7   Q     Who paid for your tuition while you were a student at

8   Santa Clara?

9   A     So I believe it was one of my father's companies.

10  Q     You did not personally pay for it; correct?

11  A     No.

12  Q     And how did you learn that one of your father's companies

13  was paying for your college tuition?

14  A     So my sophomore year there was a discrepancy in the

15  payments.  I was receiving scholarships from the school,

16  multiple scholarships, and there was an overpayment on the

17  account.  And me not knowing much about where the tuition was

18  coming from, I asked the bursar's office to send the check back

19  to my parents' house in Kailua.  And when the check came to the

20  house in Kailua, my mother had given me a call to ask what the

21  check was for and why the school was sending me money.

22  Q     And what was that check for?

23  A     Again, it was a surplus on the account.

24  Q     Okay.  Do you recall what caused the surplus?

25  A     So the bursar's office, they -- I don't know if it's

1    intentional or what, but the scholarship money would kick in

2    after you make the initial payment; so it was always a surplus.

3    And I guess the accountants or whoever was paying or

4    responsible for sending the check didn't take into account the

5    scholarships.

6    Q    Okay.  I want to see if I got this straight.  So one of

7    your dad's companies paid the tuition; correct?

8    A    Yes.

9    Q    And then you learned you were eligible for a scholarship.

10   Was it for art?

11   A    So that's a separate scholarship that I earned or that

12   started kicking in my junior and senior year.  Heading in my

13   freshman year, I was receiving a scholarship based on my

14   ethnicity and, I believe, my academics.

15   Q    And when the scholarship kicked in, it created an

16   overpayment on your account.

17   A    Yes.

18   Q    Which caused you to call your mom.

19   A    Yes.

20   Q    And that's how you found out that one of the companies was

21   paying your tuition; correct?

22   A    Yes.

23   Q    And what did you do with the surplus that Santa Clara was

24   applying to your account?

25   A    Nothing.  We let the check sit, and the amount was

```
 1    credited back into my -- into my account for the next semester.

 2    Q     Okay.  Now, Mr. Hee, where did you live while you were a

 3    student at Santa Clara University?

 4    A     At a house off campus.

 5    Q     Okay.  And was the address 386 Monroe Street in Santa

 6    Clara?

 7    A     Yes.

 8    Q     And let me direct you to the little white binder to your

 9    left.  It has your name on it.  And if you could kindly open

10    it, there are some pictures that are marked -- there are some

11    tabs.  You see the tabs?

12    A     Yes.

13    Q     And underneath the tabs are various pictures; is that

14    correct?

15    A     Yes.

16    Q     All right.  And each picture has a little sticker there

17    with a number.  It says 16 and then an alpha designation.  Do

18    you see that?

19    A     Yes.

20    Q     I want to ask you to look at three pictures:  16B, as in

21    boy; 16C, as in Charlie; and 16D, as in David.

22    A     Okay.

23    Q     Have you reviewed those three pictures?

24    A     Yes.

25    Q     And what do they show?
```

1   A    They show the front porch before the fence and after the

2   fence.

3   Q    I think I kind of asked a bad question.  Do those

4   pictures -- are those pictures of the house you lived in while

5   you were a student at Santa Clara?

6   A    Yes.

7   Q    All right.  And do they fairly and accurately depict the

8   general appearance of the house?

9   A    Somewhat, yes.

10  Q    Well, the structure --

11  A    Yes.  Yes.

12  Q    -- is fairly depicted; correct?

13  A    Yes.

14            MR. TONG:  We would ask that Exhibit 16B, C, and D be

15  received.

16            MR. TOSCHER:  No objection, Your Honor.

17            THE COURT:  All right.  Those three exhibits are

18  received.

19            MR. TONG:  And may we see Exhibit 16B, please.

20  Q    We're going to put it up on the screen, Mr. Hee.  You're

21  free to look at the screen or the binder.

22  A    Okay.

23  Q    And there's, actually, two houses in this picture.  Which

24  of the two did you live in?

25  A    It would be the one on the left.

1   Q    So where my laser pointer is; is that correct?

2   A    Yes.

3   Q    And can we see Exhibit 16C, please.  And is this a picture

4   of the front of the house?

5   A    Yes.

6   Q    And you sort of made a -- your body language suggested

7   there might have been some differences in the appearance from

8   when you lived there and how it appears here; correct?

9   A    Yes.

10  Q    Tell us, generally, the differences.

11  A    The yellow construction tape.

12  Q    Okay.  So it was a more finished product when you lived

13  there; is that correct?  There was no construction tape like

14  that.

15  A    So I made that face because I -- I worked on the house as

16  I lived there, and I don't remember doing that.

17  Q    Okay.  Tell us, generally, the layout of the house.

18  A    So the front left is a -- I would describe it as a game

19  room.

20  Q    Before you go on, when you say "front left," do you mean

21  here?

22  A    Yeah, first floor.

23  Q    So as the jurors and we are looking at it on our left.

24  A    Okay.  Yes.

25  Q    So the first floor on the left would be a game room?

```
1    A    Yes.  And we converted that into a bedroom.

2              The first floor on the right was a dining room.  That

3    was more of a storage area.  As you go into the house, there's

4    a staircase that goes up to the second floor.  If you travel

5    back further in the first floor, you have the kitchen on the

6    right, have the living room in the back right corner.

7    Q    Okay.

8    A    You have -- if you go under and around the stairway,

9    there's a bathroom and a washing room; so washing machine,

10   dryer, sink.  There's also a computer room that we converted

11   into a bedroom.

12             You go upstairs.

13   Q    Let me stop you there.  Let's stay on the downstairs for a

14   moment.  You sound like an architect, and I'm trying to keep up

15   with you.

16   A    Sorry.

17   Q    No, no.  That was meant as a compliment.

18             So you said that there was a computer room on the

19   first floor; correct?

20   A    Yes.

21   Q    And you converted that to a bedroom.

22   A    Yes.

23   Q    There was also a game room on the first floor; correct?

24   A    Yes.

25   Q    And that was converted to a bedroom.
```

1    A    Yes.

2    Q    During the time you lived there.

3    A    Yes.

4    Q    Were there any other bedrooms on the downstairs floor?

5    A    No.

6    Q    Okay.

7    A    No.  Sorry.

8    Q    Now, let's go upstairs, and tell us what's upstairs.

9    A    So immediately after you come off the flight of stairs,

10   ahead of you is the master bedroom, which included a bathroom

11   and a closet.  As you come towards the front of the house, the

12   front right is a bedroom.  Front left is also a bedroom.

13   Between the front left and the back of the house is a bathroom

14   and then another bedroom.

15   Q    Okay.  So there were a total of how many bedrooms on the

16   upstairs level?

17   A    That would be four.

18   Q    So four upstairs and two downstairs.

19   A    Yes.

20   Q    Okay.  Now, let's go to Exhibit 16D, please.

21         Mr. Hee, I'm going to direct your attention to the

22   structure that appears at the end of the driveway.  Do you see

23   that?

24   A    Yes.

25   Q    And what is that?

```
 1   A    So that's 388 Monroe Street.

 2   Q    And that's part of the same property; is that correct?

 3   A    Yes.

 4   Q    And is that like a separate structure?

 5   A    Yes.  It's a one-bedroom, one-bathroom.  It's a cottage.

 6   Q    Okay.  Is that almost like a guesthouse or 'ohana housing

 7   as we might know it here?

 8   A    Yes.

 9   Q    Did it have its own kitchen facility?

10   A    Yes.

11   Q    So someone could actually live there separately, if they

12   wanted to.

13   A    Yes.

14   Q    And was there also a garage?

15   A    Yes.  So between -- if you head down the driveway, between

16   the two structures is a garage.

17   Q    Okay.  Could you take a look at a few other pictures that

18   are in front of you in the 16 series.  Take a look at -- please

19   direct your attention to Exhibit 16G, as in golf, and 16H, as

20   in hotel.

21              Do you see those two pictures, Mr. Hee?

22   A    Yes.

23   Q    Do those two pictures fairly and accurately depict the

24   appearance of the guesthouse in the back and the backyard?

25   A    Yes.
```

1          MR. TONG:  We would ask that 16G and H be received,

2     please.

3          MR. TOSCHER:  No objection, Your Honor.

4          THE COURT:  They are received.

5          MR. TONG:  All right.  And if we can look at Exhibit

6     16G, please.

7     Q    Mr. Hee, is this the guesthouse that you were just

8     describing at the back of the property?

9     A    Yes.

10    Q    With the one bedroom.

11    A    Yes.

12    Q    And separate kitchen facility --

13    A    Yes.

14    Q    -- right?

15         And may we see -- well, there's a structure to the

16    left of this guesthouse.  What is that?

17    A    That would be the garage.

18    Q    And if we can take a look at 16H, please.

19         What does this picture show?

20    A    This is the complete back of the property or the lot, and

21    that's the backyard of the smaller house.

22    Q    Now, did you live in that house for the entire four years?

23    A    Yes, the 386.

24    Q    Okay.  And so we understand, 386 is the main house in

25    front; is that correct?

 1   A     Yes.

 2   Q     And 388 is the guesthouse in the back; correct?

 3   A     Yes.

 4   Q     And without showing the picture, is it true there are two

 5   mailboxes in front of the property?

 6   A     Yes.

 7   Q     One for each of the units; correct?

 8   A     Yes.  Correct.

 9   Q     All right.  Now, you stayed in Santa Clara for about four

10   years plus; correct?

11   A     Yes.

12   Q     And did you become generally familiar with the area

13   surrounding the house?

14   A     Yes.

15   Q     All right.  Could you take a look at Exhibit 16A, as in

16   alpha.

17   A     Okay.

18   Q     And does that exhibit generally show the location of the

19   house and the surrounding streets?

20   A     Yes, it does.

21               MR. TONG:  We would ask that Exhibit 16A be

22   received.

23               MR. TOSCHER:  No objection, Your Honor.

24               THE COURT:  It is received.

25   BY MR. TONG:

1    Q    And if we can put that up on the screen, please.

2          And maybe we can -- this is like an aerial view of

3    the surrounding area; correct, Mr. Hee?

4    A    Yes.

5    Q    And this is Monroe Street where your house was located; is

6    that correct?

7    A    Yes.

8    Q    And the arrow points to where your house was; is that

9    correct?

10   A    Yes.

11   Q    Now, the map seems to indicate that Santa Clara University

12   is a little higher on the map to the right; is that correct?

13   A    Yes.

14   Q    And is that where the university was located?

15   A    Yes.

16   Q    And when you attended Santa Clara University, how would

17   you generally get from the house to school?

18   A    Skateboard or walk.

19   Q    Okay.  All right.  If we can take the exhibit down.

20          Okay.  Now, who owned the house that we've just been

21   looking at?

22   A    I believe Waimana.

23   Q    And Waimana is your father's company; is that correct?

24   A    Yes.

25   Q    And did you pay rent to Waimana during the time you lived

1    in that house?

2    A    No, I did not.

3    Q    Now, you were there for four years; correct?

4    A    Yes.

5    Q    And you mentioned your sister Breanne, also known as Liko,

6    was a couple years older than you; is that correct?

7    A    Yes.

8    Q    Do you know where she went to college?

9    A    She also went to Santa Clara.

10   Q    And how many years ahead of you was she in school?

11   A    She was three years ahead of me in school.

12   Q    So was there a time when the two of you lived together at

13   that house?

14   A    Yes.

15   Q    And can you tell us, were there many people that lived in

16   the house during the four years you were there?

17   A    Yes, there were.

18   Q    Okay.  Can we go maybe year by year and you can describe

19   who lived at the house with you?

20   A    Okay.

21   Q    Let's start with your freshman year, which I think you

22   said started in 2008.

23   A    Yes.

24   Q    Okay.

25   A    So freshman year it was my sister Liko, her classmate Noe,

1    Noe's softball teammate Emily, and myself.

2    Q    Okay.  And do you recall Liko, your sister, living with

3    anyone else at the time?

4    A    So Mika, her now husband, would come by from time to time

5    from Berkeley.

6    Q    Okay.  And Mika is also known as Jonathan; correct?

7    A    Yes.

8    Q    Last name Kane?

9    A    Yes.

10   Q    And at the time in 2008 through 2009, were they married?

11   A    No.

12   Q    He was at Berkeley you said?

13   A    Yes.

14   Q    And did anyone else live in the house your freshman year?

15   A    No.

16   Q    Let's turn to your sophomore year.  That would be 2009 to

17   2010; right?

18   A    Yes.

19   Q    Could you tell us who lived in the house during that year?

20   A    My sophomore year:  so it was Liko and I again.

21   Q    Okay.

22   A    Mika was still coming around.  I think Noe had stayed for

23   about half the year.  And then she had moved out, and two of my

24   classmates had moved in.  That would be Josh and Murphy.

25   Q    And I assume each of these individuals had a separate

1    room; is that how it worked?

2    A    Yes.

3    Q    And what about your junior year?  Who lived at the house?

4    A    So my junior year Josh and Murphy stayed.  Four more of my

5    classmates moved in; so that would be Elizabeth, Ashley, Kira,

6    and Brennan.  And I believe Liko and Mika were still in the

7    house.

8    Q    And they were actually in the back house, weren't they?

9    A    So my junior year Mika and Liko were in the master bedroom

10   together.

11   Q    Okay.

12   A    Yes.

13   Q    And were they married at that time?

14   A    No, I don't believe so.

15   Q    Okay.  And where were you living?  Which room were you

16   living in at that time?

17   A    I -- so the first half of the year I was in the computer

18   room.  That's downstairs.  And then when Noe had moved out from

19   the upstairs, I had moved upstairs.

20   Q    Now, you mention a lot of names.  I just want to see if I

21   have an accurate head count.

22   A    Yeah.

23   Q    There's Josh.  There's Murphy.  There's Elizabeth.

24   There's Ashley.  There's Kira.  There's Brennan.  There's Liko.

25   There's her then boyfriend, Jonathan.  And then there's you.

1    Correct?

2    A    Yes.

3    Q    So nine people?

4    A    Yes.

5    Q    And how about your senior year?

6    A    My senior year Liko and Mika had moved into the back

7    house, and two others had moved in aside from the, I guess,

8    what was that?  Seven from my junior year.  Would be Agi

9    (phonetic) and Aaron had moved in.  So there's still nine in

10   the front.

11   Q    Okay.  So nine people in the front house and two in the

12   back?

13   A    Yes.

14   Q    So eleven people.

15   A    Yes.

16   Q    Now, I think you mentioned earlier that -- maybe I didn't

17   ask you.  Did you pay rent to your father for living in the

18   house?

19   A    You had asked earlier, and I said no.

20   Q    Thank you.  Did you charge rent to any of the people who

21   lived at the house with you?

22   A    Yes.

23   Q    And what was the amount of rent that was charged?

24   A    So I believe my sister was charging them 650.

25   Q    Okay.  And by "sister" you mean Liko; is that correct?

1    A     Yes.

2    Q     And when you say "650," are you referring to that amount

3    per occupant?

4    A     Yes.

5    Q     Okay.  Now, I'm going to change subjects.  I'll stay with

6    the four years at Santa Clara but a different topic.

7          Were there times when your father would visit you

8    when you were a student at Santa Clara?

9    A     Yes.

10   Q     And can you tell us about how many times each year he

11   visited you.

12   A     It was at least twice a year.

13   Q     And what were the circumstances under which he would

14   visit?

15   A     A lot of the times it was either a trip to or from the

16   East Coast, and he'd stop over for three days, maybe a little

17   more.

18   Q     And would he stay in the house when he visited?

19   A     Yes.

20   Q     And tell us where he generally would stay.

21   A     So my freshman and sophomore year I believe he stayed in

22   the back house.  And my junior and senior year he would stay in

23   the master bedroom where I was staying.

24   Q     And when he would stay in the master bedroom, where would

25   you stay?

1    A    On the couch.

2    Q    And I think you gave us a pretty good picture of the

3    layout of the house, but I don't think I asked you.  Was there

4    any separate room reserved for his exclusive use?

5    A    Aside from the bedroom, no.

6    Q    And the bedroom would be where you were sleeping normally;

7    correct?

8    A    Yes.

9    Q    Now, did you have access to a car while you were in

10   college?

11   A    Yes.

12   Q    What kind of a car was it?

13   A    It was a Buick Enclave.

14   Q    And I'm not familiar with the type of car that is.

15   A    It's an SUV.

16   Q    And did you buy the Buick Enclave?

17   A    No, I did not.

18   Q    Do you know who did?

19   A    So the summer before I moved up, my sister Liko and my

20   father had bought the car.

21   Q    And do you have knowledge of who paid for the car?

22   A    I have knowledge of the ownership, and that would be

23   Waimana.

24   Q    And was the Buick Enclave available to you and your sister

25   during the time you lived at the Monroe Street place?

1   A    Yes.

2   Q    So you had the keys, and you could use it for whatever

3   purpose you wanted.

4   A    Yes.

5   Q    Now, during the time you were living in Santa Clara, were

6   you receiving money from Waimana?

7   A    Yes, I was.

8   Q    Do you recall the amount that you were receiving?

9   A    I believe it was somewhere from 45 to 50,000.

10  Q    And how would that money be given to you?

11  A    It was a direct deposit.

12  Q    So it would just show up in your account.

13  A    Yes.

14  Q    Do you recall getting a raise when you graduated?

15  A    Yes.

16  Q    And what did your pay go up to, if you recall?

17  A    I believe that's when it went up to 50,000.

18  Q    Now, you say you graduated in 2012; correct?

19  A    Yes.

20  Q    And what did you do immediately after graduating?

21  A    I had a job at the Art Department, and I continued on

22  until the end of the summer.  And in -- so that ended in

23  August, and I had traveled back home in September.

24  Q    When you say "Art Department," are you referring to Santa

25  Clara University?

1    A      Yes.

2    Q      So you just worked there in the area where you had been

3    studying; correct?

4    A      Yes.

5    Q      And you returned in September of 2012 you said.

6    A      Yes.

7    Q      By the way, do you know who is living in the Santa Clara

8    house now?

9    A      I believe it's Santa Clara graduates and a few of

10   Mika's -- Jonathan's, what would you say, students or I guess

11   people that he had coached.

12   Q      Okay.  And was there a time when Jonathan's parents

13   actually lived in the Santa Clara house?

14   A      Yes.

15   Q      Where did they live?

16   A      So they were living in the back house.  I believe they

17   moved in the summer after I graduated.

18   Q      Okay.  Now, you say that you returned in the late summer,

19   early fall of 2012; is that correct?

20   A      Yes.

21   Q      And have you continued your interest in art and sculpture?

22   A      Yes.

23   Q      In fact, that's a passion for you, is it not?

24   A      Occupation.

25   Q      You're not passionate about it?

1    A    I'm passionate, but I made it an occupation as well.

2    Q    All right.  And describe how you have pursued that

3    occupation.

4    A    So coming home in September I had connected with an art

5    teacher from my high school at Kamehameha.  I asked if I could

6    bolster my resume, get teaching experience so that I could

7    apply for a master's in fine arts.  I also participated in

8    group shows.  I've had two solo shows since I've been home.

9    I've participated in three murals, community murals.  I've

10   started my own art studio company.  And I'm also freelancing as

11   an artist.

12   Q    And you've done all these activities since you returned in

13   2012.

14   A    Yes.

15   Q    And did there come a time when you worked for a company

16   called 808 Urban?

17   A    Yes.

18   Q    That's one of the companies you just referenced; correct?

19   A    Yes.

20   Q    And tell us what you did for 808 Urban.

21   A    So 808 Urban, we, as artists, were asked to design and

22   produce a mural for Kamehameha Schools, and 808 Urban was the

23   company that took care of the liability insurance and the

24   paperwork so that we could do what we like to do.

25   Q    And did you actually at some point do a mural at Matsumoto

1   Shave Ice?

2   A     Yes.

3   Q     Now, you say that you hope to get a master's degree; is

4   that correct?

5   A     That was correct.

6   Q     It no longer is.

7   A     It's on the back burner.

8   Q     Now, the various positions or things you've done in art

9   and sculpture in the last three years, were they paid

10  positions?

11  A     Some were paid.  Some were volunteer.

12  Q     During that same period of time were you also being paid

13  by Waimana Enterprises?

14  A     Yes.

15  Q     And what duties have you been performing for Waimana

16  Enterprises between 2012 and the present?

17  A     I'd say similar duties to what I've been doing since 2004.

18  It's working on the weekends out at the Mililani property.  I

19  was asked to work full time for a while in December of 2012 as

20  a field technician in which I had to stop what I was doing,

21  install telephone cables, emergency phone lines, things like

22  that.

23  Q     Let me see if I can break that down.  You started by

24  saying the duties that you have now are similar to those that

25  you've had since 2004.  Right?

```
 1   A     Yes.

 2   Q     So 2004 would be about ninth grade?

 3   A     Yes.

 4   Q     And what would you do when you were a ninth grade student

 5   for Waimana?

 6   A     On weekends my father would take us out -- well, at that

 7   time I believe the Mililani property was starting to roll and

 8   get more activities happening there.  So he'd take us out on

 9   the weekends, and we'd work, drive tractors to cut the grass.

10   If there was buildings that needed to go up, we'd help in that

11   manner.  So --

12   Q     And would you do that generally in the summers during your

13   high school?

14   A     So two summers during my high school -- during the time I

15   was in high school, I actually worked full-time out there.  And

16   a couple of summers I volunteered or interned at a fish pond in

17   Kane'ohe.  And another summer I went to summer school.

18   Q     So two of your four summers you actually worked at the

19   Waimana property.

20   A     Yes.

21   Q     And you say that your present duties are similar to the

22   ones you had back in high school.

23   A     Yes.

24   Q     And are you receiving pay from Waimana at the present

25   time?
```

```
 1   A    Yes.

 2   Q    What is your rate of pay?

 3   A    I believe it's 50,000.

 4   Q    Okay.  Per year?

 5   A    Yes.

 6   Q    So you're on salary.

 7   A    Yes.

 8   Q    Now, I want to turn your attention a little bit to the

 9   family again.  I don't think I asked you.  What does your

10   mother -- let me back up.

11        Tell us about your mother's education.

12   A    So she graduated from -- well, she went to school -- I

13   guess it's St. Marks or something in Waialua.  She went to

14   Maryknoll for a little while.  Then she went to Kamehameha

15   Schools, graduated class of '73.

16        After Kamehameha Schools she went to Wesleyan on the

17   East Coast.  She got a bachelor's.  I don't know in what.  And

18   then she -- shortly after she went to Harvard and got a

19   master's in -- I believe it's planning.

20   Q    Okay.  And are you familiar with her work history?

21   A    Somewhat.

22   Q    Okay.  Do you know where she has worked?

23   A    Yes.

24   Q    Where has she worked?

25   A    I believe after graduating from Harvard she was hired by
```

1  the state.  She worked at OHA.  She worked at U.H.  She worked

2  at Academy of the Pacific, a small school up in Kalihi.

3  Q    Okay.  And was there ever a time when she, basically,

4  stayed at home, took care of the family and the house?

5  A    Yes.

6  Q    And when did that occur?

7  A    So that was after she had worked at AOP.  I believe that's

8  sometime when I started high school.

9  Q    Okay.  Actually, were you in seventh grade when that

10 occurred?

11 A    That might be true.

12 Q    Okay.  And how long did it last?  From when you were

13 seventh grade until when?

14 A    Sorry.  Seventh grade until, I guess, recently, 2013.

15 Q    Okay.  And just so we're clear because I'm not a math

16 major, seventh grade would have been what year for you?  You

17 grad in 2008; right?

18 A    2001 or 2000.  2001.

19 Q    And during that period of time she was, basically, taking

20 care the family at home; correct?

21 A    To my knowledge, yes.

22         MR. TONG:  May I have one moment, Your Honor?

23         THE COURT:  Yes.

24         MR. TONG:  Thank you, Mr. Hee.  I have no further

25 questions.

1          MR. TOSCHER:  May it please the Court.  Ladies and

2     gentlemen.

3                          CROSS-EXAMINATION

4     BY MR. TOSCHER:

5     Q     Good morning, Mr. Hee.

6     A     Good morning.

7     Q     Now, you testified on direct you've been employed and

8     received a salary from Waimana since -- is it middle school or

9     junior high?

10    A     I received salary since 2008, but I have received payments

11    on hourly wages prior to that.

12    Q     Thank you for clarifying that.  Before you -- you went on

13    salary in 2008.  Before that you received an hourly wage?

14    A     Yes.

15    Q     And that was for work during high school out at the

16    Mililani property?

17    A     Yes.

18    Q     Okay.  So could you describe the Mililani property and how

19    it fits into the business of Sandwich Isles and Waimana,

20    please.

21    A     So when -- at the time that the Mililani property was

22    purchased, which, I believe, was the early 2000s, SIC, Sandwich

23    Isles, was completing the fiber optic networks on the different

24    islands with servicing Hawaiian Homelands.  And my father was

25    looking for a place to centralize that network and run all the

1    cables into one location, and that would be Mililani.

2    Q    Thank you.  Then when you graduated high school in 2008,

3    that's when you were put on salary; is that correct?

4    A    I believe it was a little bit earlier.

5    Q    Now, was it always -- was it your understanding that you

6    were going to be involved and with your siblings take over the

7    company?

8    A    Yes.  I mean, we were raised around the company.  My

9    father would always talk to us.  I mean, even at a young age we

10   were always listening to my parents talk about the company.

11   Especially when we were in elementary, the company was going

12   through some hard times, and my father was trying to describe

13   what he was building for us, for our family, for my kids, for

14   their kids, and what it meant to just the Hawaiian community.

15   Q    Was he trying to instill an obligation in you, do you

16   think?

17   A    I don't know if he was trying, but he did.  So --

18   Q    All right.  Let's try -- I know we're going back a long

19   time.  Do you remember -- I'm trying to isolate an incident

20   when you were in middle school and you were being tested for

21   college suitability.

22   A    Yes.

23   Q    Tell us what was -- how you were being tested and then the

24   ensuing discussion with your father.

25             MR. TONG:  Well, I object to the latter part.  It's

1    hearsay.

2         THE COURT:  Sustained.

3         MR. TOSCHER:  Let me rephrase.

4    Q    Tell us about the testing, what was done, and then I'll

5    follow up with a question on that.

6    A    Okay.  So in, I believe, eighth grade, it was part of a, I

7    guess, career assignment.  We had to take tests to kind of see

8    where our logic was leading us.  Mines led to math and science.

9    And that was kind of worrisome for me being that my father had

10   a business, we were raised to eventually run that business, and

11   I didn't see what math and science would do for me in college

12   in terms of running a business.

13        So I approached my father, and we talked about this.

14   We talked about how this would fit into the company.

15   Q    Okay.  You wanted to know from him how your focus on math

16   and science would fit in with your involvement with the

17   company.

18   A    Yes.  Specifically, oceanography and marine biology.

19   Q    Now, let me -- you testified on direct before regarding

20   your salary and the present salary.  And I think there may be a

21   little confusion as to the number.  That's when you graduate.

22        Were you receiving a -- do you recall what your

23   salary was when you first started going on salary?

24   A    I believe it was around 25,000, maybe $30,000.

25   Q    Okay.  And it was raised over this period of time until

1    graduation when you graduated from college.

2    A    Yes.  Yes.

3    Q    You talked a bit about on direct testimony the Santa Clara

4    house.  Did you -- what were your -- did you view yourself as

5    having responsibilities for taking care of the Santa Clara

6    house?

7    A    Yes.  There was a lot to be done at the house.

8    Q    Okay.  What were those responsibilities?

9    A    So in those exhibits we previously saw, it was upkeep of

10   the structure itself, upkeep of the lawns, upkeep of the

11   landscape.  There's problems with plumbing.  The sinks were

12   leaking.  The actual plumbing under the house involving the

13   sewage, there were missing pipes.  And the dryer vent wasn't

14   there so the lint would pile up in the laundry room.  Changing

15   light bulbs, the more simpler things.

16   Q    So this was a relatively new house when it was purchased,

17   was it not?

18   A    I believe it was brand new.

19   Q    Brand new.  But it seems like there was a lot of work to

20   be done?

21   A    Yeah.

22   Q    And why was that?

23   A    It was just poorly made.

24   Q    Other than your maintaining the property, who had

25   responsibility for the renters in the house?

1  A    So Liko, my sister, took care of the bills -- paying the

2  bills, calling in professionals if I couldn't do the job, or if

3  I screwed up.  She took care of collecting the rent.  She took

4  care of purchasing items for the house, things of that nature.

5  Q    Okay.  Mr. Tong took you through the names of the various

6  students that lived in the house before.  It seemed like there

7  were quite a few.  Were they sharing rooms when there was 11 or

8  12 people there?

9  A    Yes.  So Ashmo and -- I'm sorry, Ashley.  Ashley and

10 Brennan were a couple; so they were sharing a room.  Aaron and

11 Agi my senior year were sharing a room.  Everyone else, it kind

12 of worked out that they had their own rooms.

13 Q    Now, I know it changed over the period of time you were

14 there.  The first couple of years you were there, your freshman

15 and sophomore year, was the back house or the guest house, was

16 that empty for your father's use when he would come up to Santa

17 Clara?

18 A    Yes.

19 Q    And later on after, I guess, the junior year, that's when

20 Liko and Mika moved in?

21 A    Yes.

22 Q    And when your father came up for visits, then his room --

23 your room became his room.

24 A    Yes.

25      MR. TOSCHER:  Now, can we publish 16B, please.

1   Q     Now, this was not a picture of when you lived there, was

2   it, Mr. Hee?

3   A     Probably not.

4   Q     Let me just ask you this question.  When you were living

5   there, were you also the gardener?

6   A     Yeah.

7   Q     Okay.  You notice the fence on the left-hand side?

8   A     Yes.

9   Q     Do you know who built that fence?

10  A     I did.

11  Q     That was one of the projects you did.

12  A     Yes.

13  Q     Okay.  You can take it down.

14        Now, focusing when your father did visit you, did you

15  both work on projects around the house together?

16  A     Yes.  So if there were projects that were a little out of

17  my comfort zone or my knowledge base, I would kind of save them

18  for when he would visit.  One of them was the roof.  We put a

19  roof over a pavilion in the backyard between the garage and the

20  front house.  Another was the actual plumbing when we found

21  out -- when we found out that the clean-out -- clean-out pipes,

22  I guess, were missing.  Another was the sinks, actually pulling

23  out a lot of the plumbing in the sinks to find out what was

24  wrong with it.

25  Q     Okay.  Now, you testified -- I'm not sure I heard the --

1   how many times do you estimate your father visited a year?

2   A    It was at least twice during the school year.

3   Q    Were there more visits than twice?  You said at least

4   twice.

5   A    Yeah, at least twice.  Some years it was maybe more,

6   depending on what he was involved with and what needed to be

7   done in Washington.

8   Q    All right.  He would be stopping on his way back to the

9   East Coast.

10  A    Yes.

11  Q    And that was -- he was going to Washington for what type

12  of business?

13  A    So it was either my junior or senior year he had to

14  testify in front of a committee -- I think Senator Akaka was

15  the head of the committee -- on -- I think all the companies

16  similar to Sandwich Isles across the nation were receiving

17  budget cuts, and they all service rural areas that serve

18  indigenous peoples.  So he had to testify on why projects and

19  companies, such as Sandwich Isles, were so important to the

20  people that they serve.

21  Q    Let me -- focusing on your time at college, you said you

22  started out and you described in the environmental science

23  program, and that's what you got your basic degree in.

24  Correct?

25  A    Yes.

1   Q    And but then you took on a second major in arts.

2   A    Yes.

3   Q    Do you still have -- are you interested in both areas

4   still?

5   A    Yes.

6   Q    The -- now, I'm not sure it was clear.  Did you ever apply

7   for the master's program?

8   A    Yes, I did.  And I got denied.

9   Q    The -- you graduated Santa Clara in 2012, you worked in

10  the Art Department there till about August, and then you

11  returned to Honolulu.

12  A    Yes, that's correct.

13  Q    Now, you described that you were working -- you were doing

14  some volunteer work and doing some working -- I'm sorry,

15  volunteer work and then later working at the school in the Art

16  Department.  Did there come a time that either your father or

17  sister contacted you regarding doing some work for the company?

18  Coming back on a certain project?

19  A    Yes.

20  Q    And I think you testified on direct that you were called

21  upon to help install some telephone lines?

22  A    Yes, that's correct.

23  Q    Tell us what that entailed, what you did, how long it was.

24  A    So it was a full-time -- it was a full day.  You start at,

25  like, 7:30.  And because it was a project that needed to be

1   done quickly, we'd stay out till maybe 5:00, five o'clock.  It

2   was out at Nanakuli at the charter school right to the left of

3   the highway.  I forget the name of it.  But that was one

4   location.

5           This was -- this involved like pulling lines,

6   telephone lines, through attics, through conduits --

7   underground conduits, connecting them to switches, installing

8   the actual hardware, the phone lines, the phone themselves,

9   trouble shooting.  If we screwed up on a connection, then we

10  got to figure out which wire was which, things of that

11  nature.

12  Q    Okay.  When you were called to take on that project, how

13  long did the project last?

14  A    One to two months.

15  Q    Okay.  At the time you were called -- do you recall who

16  called you?  Was it your dad or your sister?

17  A    I believe it was my sister acting on the orders of my

18  father.  That's usually how it happens.  My father tells my

19  sister to tell me something, or my father tells me.  I can't

20  distinguish in that instance who it was.

21  Q    And when you say your sister, which sister are you

22  talking?

23  A    That's Liko.

24  Q    Liko.  Now, at the time you received the call, where were

25  you working or what were you doing?

1   A    So I was -- at that time I was a guest artist at

2   Kamehameha Schools.  I wasn't officially a teaching assistant.

3   So I was going up during class time, working on personal

4   projects and also helping students in their wheel-throwing

5   classes.

6   Q    Okay.  And were you being paid, or were you volunteering?

7   A    I was a volunteer.

8   Q    And did you have to leave that position when you got the

9   call?

10  A    Yes.

11  Q    And how did you feel about that?

12  A    I mean, I was kind of bummed, but it's expected.  I knew I

13  was on call.  I know that, if the company needs me to work,

14  I'll work.  So --

15  Q    Now, describe a little bit about your experience in

16  working and dealing with the other employees you were working

17  with when you were doing the project as a field tech?

18         MR. TONG:  I object to the relevance, Your Honor, and

19  also beyond the scope.

20         MR. TOSCHER:  Your Honor, I think --

21         THE COURT:  I'll allow it.  Overruled.

22         THE WITNESS:  So a lot of these field techs, or at

23  least the ones I was working directly under, they're retirees

24  from Hawaiian Tel.  There's one in particular that doesn't

25  really give a lot -- give a crap who I am or who I'm related

1    to.  So he was genuine towards me in the fact that I didn't

2    know anything about pulling lines and connecting phones.

3            But there are others that, I mean, I'm the boss's

4    son; so they're going to be nervous.  It didn't feel genuine.

5    It didn't feel like a genuine work environment, which is to be

6    expected.

7    BY MR. TOSCHER:

8    Q    And is that one of the reasons that you didn't want to

9    work at the company after that for the present time?

10   A    Yeah.  So, currently, I have a full-time position that's

11   not with the company.  It's with DLNR.  And I sought out this

12   position because I wanted -- I wanted experience working in an

13   office or anywhere, just working, without having to worry about

14   them knowing who I am, without having to worry about special

15   treatment or bias.

16   Q    So if the company called you today, would you leave your

17   present job and go back to the company?

18   A    Yeah, I would have to.

19   Q    And why do you say you would have to?

20   A    I mean, that's how I was raised.  The company is part of

21   my duty as part of my life; so, if it needed me, it needed me.

22           MR. TOSCHER:  I have no further questions, Your

23   Honor.

24           THE COURT:  Okay.  Mr. Tong.

25                       RE-DIRECT EXAMINATION

1    BY MR. TONG:

2    Q    Mr. Hee, I think you testified that your father instilled

3    an obligation in you to work for the company; is that correct?

4    A    Yes, that's correct.

5    Q    And you never considered yourself a management trainee,

6    though, did you.

7    A    No.

8    Q    And you were asked that in the grand jury, and you said

9    even as of a year ago you never considered yourself a

10   management trainee; right?

11   A    I believe they asked if I had heard of a management

12   trainee program, and I said, No, I did not hear of a management

13   trainee program.

14   Q    So to clarify, you had never heard of a program for

15   management trainee that included you; is that correct?

16   A    Yes.

17   Q    Now, I believe you testified that you, essentially, did

18   upkeep of the Santa Clara property during the four years you

19   were there; correct?

20   A    Yes.

21   Q    And you described the upkeep that you did; right?

22   A    Yes.

23   Q    And also the work that your sister Breanne did in

24   collecting rent and paying the bills; correct?

25   A    Yes.

1    Q    And during that time each of you was being paid at least

2    $20,000 a year; is that correct?

3    A    Yes.

4    Q    I think you talked a little bit about your dad's visits.

5    And if I understood you, normally he would stop at Santa Clara

6    after he had business in Washington, D.C.; is that correct?

7    A    Yes.

8    Q    Or before he went to D.C. for business.

9    A    Yes.

10    Q    And you said that you're presently working for the DLNR

11    full time?

12    A    Yes.

13    Q    So we're clear, that would be the State of Hawai'i

14    Department of Land and Natural Resources?

15    A    Yes, that's correct.

16    Q    What are you doing for them?

17    A    I am in the Division of Forestry and Wildlife.  I work in

18    a small program, the snail extinction prevention program.  I'm

19    a field technician.  We manage and are trying to stabilize the

20    native tree snail populations that exist on the Wai'anaes and

21    the Ko'olaus up in the summits.

22    Q    Is that a full-time position?

23    A    Yes.

24    Q    How long have you had that job?

25    A    I began there mid-February of this year.

1    Q    So about four months.

2    A    Yes.

3    Q    And without telling us how much, are you being paid a

4    salary?

5    A    Yes.

6    Q    And are you still receiving a salary from Waimana?

7    A    Yes.

8    Q    And that is to be on call as needed; is that correct?

9    A    Yes.

10   Q    This may sound random, but you mentioned that you applied

11   for a master's degree.

12   A    Yes.

13   Q    And it didn't quite work out.

14   A    No.

15   Q    When did you apply to gain admission to a program?

16   A    I believe it was 2013 February.

17   Q    So about two years ago.

18   A    Yes.

19         MR. TONG:   Thank you.   I have nothing further.

20         MR. TOSCHER:   Thank you, Your Honor.

21                    RE-CROSS-EXAMINATION

22   BY MR. TOSCHER:

23   Q    Mr. Tong asked you on redirect your knowledge of a

24   management training or management trainee program.   During this

25   period of time in high school and in college, were you being

1    trained by your father to take over the company?

2              MR. TONG:  Objection, Your Honor.  He's not aware of

3    a program.  No foundation.  Otherwise, it's a hearsay

4    statement.

5              MR. TOSCHER:  No.  Different --

6              THE COURT:  I'm going to sustain that particular

7    objection.  You may be able to get what you want with

8    rephrasing.

9    BY MR. TOSCHER:

10   Q    During this period -- I'm going to try to rephrase, Your

11   Honor, because I don't -- were you being trained by your

12   father?

13   A    Yes.

14   Q    Okay.  Now, Mr. Tong just asked you about your current

15   job.  Have there been instances since you've been working at

16   that job that you've been called back to do projects at the

17   company?

18   A    I've worked on a few projects.  They're usually on the

19   weekends.  But I was helping to roof the pump house, which is

20   going to be the offices for the administration of the Waimana

21   and SIC out in Mililani.

22             MR. TOSCHER:  No further questions, Your Honor.

23             THE COURT:  Mr. Tong.

24             MR. TONG:  No, Your Honor.  Thank you.

25             THE COURT:  Okay.  Then the witness is excused.  You

1    may step down and leave the courtroom.

2         (Witness excused.)

3              THE COURT:  And, Mr. Tong, you can call your next

4    witness.  Who will it be?

5              MR. TONG:  Frank Molinari, Your Honor.

6              THE COURT:  All right.

7         (Witness photographed.)

8              THE CLERK:  Please raise your right hand.

9         (Witness sworn.)

10             THE CLERK:  Thank you.  Please be seated.

11             Please state your name and spell your last name.

12             THE WITNESS:  My name is Frank Richard Molinari,

13   M-o-l-i-n-a-r-i.

14             MR. TONG:  Thank you, Your Honor.

15                        DIRECT EXAMINATION

16   BY MR. TONG:

17   Q    Good morning, sir.

18   A    Good morning.

19   Q    How are you employed?

20   A    I work for the Internal Revenue Service out of San

21   Francisco, California.

22   Q    And what is your position with the IRS?

23   A    Yes.  I'm a lead appraiser with the engineer group of San

24   Francisco.

25   Q    How long have you been with the IRS?

```
 1    A    I've been with the IRS for seven years, since 2008.

 2    Q    How long have you been in your present position?

 3    A    Since January of 2015.

 4    Q    And what did you do during the balance of your seven years

 5    with the IRS?

 6    A    Yes.  I was a senior real estate appraiser, same position,

 7    in San Francisco.

 8    Q    And in your capacity as a lead appraiser, what do you do?

 9    A    I review real estate appraisals for the Internal Revenue

10    Service.  I also prepare real estate appraisals for the

11    Internal Revenue Service for estate and gift purposes, for

12    income tax purposes, noncash charitable contributions.

13    Q    All right.  And can you tell us a little bit about what

14    your formal education consists of?

15    A    Yes.  I have three years of college, and I have a

16    professional designation in the real estate.

17    Q    Okay.  And did you get a degree from your three years of

18    college?

19    A    No, I didn't.

20    Q    You say you have experience in the appraisal business; is

21    that correct?

22    A    That's correct.

23    Q    And how long have you been engaged in the real estate

24    appraisal business?

25    A    30 years.
```

1    Q    And can you tell us, generally speaking, maybe by

2    category, the type of work that you've done over the last 30

3    years.

4    A    Yes.  I've prepared appraisals and reviewed appraisals for

5    residential properties, commercial properties, vacate land, and

6    special-purpose properties.

7             THE COURT:  Mr. Tong, can you shift the mike a little

8    because you're not talking directly into it.

9             MR. TONG:  I'm always doing that, Your Honor.  I

10   apologize.

11            Every time you say that I look up, and I get those

12   dagger eyes.

13   Q    Sorry, Mr. Molinari.  I lost my concentration.

14   A    That's okay.

15   Q    So 30 years in the business; correct?

16   A    Yes.

17   Q    And tell us the types of organizations for which you have

18   worked.

19   A    Yes.  I started out in the real estate appraisal business

20   working for major banks, Great Western Bank out of California,

21   Savings of America out of California.  And then in 1990 I went

22   out on my own and started my own company:  Prestige Appraisal

23   Service.

24   Q    How long were you with Prestige Appraisal Services?

25   A    I was with Prestige until 2003 when I moved to California

1   and went to work with Ameriquest Mortgage Corporation out of

2   Orange County, California.  And then I went back to work with

3   Prestige when Ameriquest laid me off in 2006.

4   Q    Okay.  And starting with when you began in appraising work

5   to the present, how long have you continuously been in that

6   field?

7   A    30 years.

8   Q    Do you hold any professional licenses?

9   A    Yes.  I hold the state certified general license for the

10  state of California, the state certified general license for

11  real estate appraising for the state of Florida.

12  Q    When did you obtain those licenses?

13  A    So the Florida license was obtained in 1990, and the

14  California license was obtained in 2003.

15  Q    What do you have to do in order to obtain licenses of that

16  sort?

17  A    Yes.  You have to take numerous classes, real estate

18  appraisal classes, you have to show experience work to a review

19  panel that goes over your work, and then you have to pass a

20  test and then you're awarded the designation.

21  Q    What does the designation authorize you to do?

22  A    The designation authorizes me to appraise -- I'm sorry.

23       VOICE IN AUDIENCE:  Sorry, Your Honor.  I didn't know

24  it was on.

25       THE COURT:  Okay.  Go ahead.

```
 1                THE WITNESS:  Yes.
 2   BY MR. TONG:
 3   Q    Tell us again what the designation --
 4   A    I have two designations.  One is the SRA that was awarded
 5   with the Appraisal Institute, which is a professional society
 6   of appraisers located in Chicago.  That designation allows me
 7   to appraise residential properties.  And then I have a CVA
 8   designation.  That's a business valuation designation that
 9   allows me to appraise businesses.
10   Q    And about how many appraisals have you done over the last
11   30 years?
12   A    Well over a thousand.
13   Q    And what types of appraisals have you done?
14   A    I've prepared reports for, obviously, single-family
15   residences, commercial properties, income properties, apartment
16   buildings, vacant land, agricultural land, fair market rent
17   studies, and special-purpose properties like a church or a
18   sailing club.
19   Q    Over your career have you sometimes taught others about
20   the appraisal business?
21   A    Yes.  I've been an instructor for probably 25 of those 30
22   years, I've taught classes for the Appraisal Institute, and I
23   also had my own real estate appraisal school in south Florida
24   that I had that I taught classes.  And now I teach classes for
25   the IRS around the country, seminars.
```

```
1    Q      Have you testified in court before?

2    A      Yes, I have.

3    Q      And have you ever been qualified as an expert witness?

4    A      Yes, I have.

5    Q      On how many occasions?

6    A      Four.

7    Q      And would that be in the field of real estate valuation?

8    A      Yes, that's correct.

9    Q      What courts have qualified you in that field?

10   A      So Tax Court in San Francisco; District Court in Miami;

11   Circuit Court in Miami Dade; and Circuit Court in Amador

12   County, California.

13          MR. TONG:  Your Honor, we would offer Mr. Molinari as

14   an expert in the field of real estate appraisal.

15          MR. TOSCHER:  No objection, Your Honor.

16          THE COURT:  All right.  Then he is allowed to give

17   his opinions in the area of real estate appraisal.

18   BY MR. TONG:

19   Q    Okay.  Mr. Molinari, were you asked to appraise the fair

20   market rent value of a property located at 386 Monroe Street,

21   Santa Clara, California?

22   A    Yes.

23   Q    And what period of time were you asked to give that

24   appraisal for?

25   A    Yes.  I was asked to give the fair market rent value
```

1   starting in June of 2008 and ending in March of 2015.

2   Q     Okay.  And do you have a normal procedure of how you go

3   about performing a fair market rent evaluation?

4   A     Yes, I do.

5   Q     Did you follow that procedure in this instance?

6   A     Yes, I did.

7   Q     Could you describe, generally, what you do first.

8   A     Yeah, so first we have to identify the problem or the

9   assignment.  In this case it was to establish the fair market

10  rent for this house in Santa Clara.

11          And so once I establish what the assignment is, then

12  I move on to the scope of work:  What is it going to take to

13  accomplish that valuation assignment?  The scope of work can

14  include research on the subject property, on the county tax

15  records to find out how large it is, what kind of physical

16  characteristics it has, what the zoning is, where it's located.

17  And then I also do research in that same phase for

18  comparable -- in this case comparable rental properties, where

19  I search real estate databases looking for comparable rented

20  properties.

21          Then there's also -- in that same scope of work, I

22  have to figure out if I'm going to visually view the

23  properties.  Where is the subject?  Where do I have to go to

24  look at the property?  Can I get inside the property, or is it

25  something I have to do from the outside?  And then also I have

1    to do the same for the comparable properties, which in all

2    cases -- most cases you can only see from the outside.

3              And then the third step of that process is putting

4    that all together in the final reconciliation and the analysis,

5    basically looking at the numbers and analyzing the market

6    trends.  And in this case it was the fair market trends:  What

7    were the rental properties going for in those years in that

8    time period?  What was the demand and supply?  And then coming

9    up with a fair market rent for each year.

10   Q    And have you conducted an analysis which generally follows

11   the procedures you've just described?

12   A    Yes.

13   Q    You've talked about comparable properties.  Is that part

14   of what an appraiser uses?

15   A    Yes.

16   Q    And can you explain to the jurors how you go about doing

17   that kind of analysis.

18   A    So the comparable properties, I guess, hypothetically,

19   would be like your house.  If you wanted to go buy a house and

20   you had many houses to choose from, and you finally found one,

21   but you weren't sure if it was priced right; so you would go

22   maybe on a Sunday and look at other open houses to see how

23   those houses compare to the one that you're looking at.  So if

24   you found a house that was larger than yours, then you know

25   that your house would probably sell for a little bit less.  If

1    you found a house that was smaller, then your house would sell

2    for more.

3              So that's the basic premise is to find -- compare

4    apples to apples, so to speak.  But not every house is the

5    same; so we try to find the most similar with size, age,

6    condition, and location, and then we go from there to see,

7    well, what are the differences, and then we reconcile that into

8    a value at the end.  But the first step is to go and try to

9    find those properties that are as most similar as we can that

10   were rented in that time period.

11   Q    Okay.  And you mentioned earlier that in doing that

12   analysis you need to find out information about the -- what you

13   call the subject property.

14   A    That's correct.

15   Q    And the subject property in this case would be the Monroe

16   Street property whose address I gave you earlier; correct?

17   A    Yes.

18   Q    And did you go about and determine the characteristics of

19   that property?

20   A    Yes.  So we -- appraisers, we have an online subscription

21   to a third-party database that collects tax records from the

22   county courthouses, and so I was able to go online and look up

23   the subject property and find the property characteristics from

24   the tax assessor, from the building department.  I was also

25   able to find some permit records that was on the subject

1    property.  I looked at some maps that were printed off the

2    internet of where it was, basically, located and also a tax map

3    that showed where the exact lot was located and how big the lot

4    was.

5           And then I also do the same thing for the comparable

6    properties where we research the comparable properties in those

7    same databases.

8    Q    Okay.  Now, without dimming the lights, can you look at

9    your binder at Exhibit 16A and tell us if that's an aerial map

10   of where the property is located.

11   A    Yes.  That's correct.

12   Q    That's a map that you prepared as part of your analysis;

13   is that correct?

14   A    Yes.

15   Q    What was the point of, essentially, preparing a map of

16   that sort?

17   A    Well, anytime that we're trying to identify a property, we

18   start at a wide angle; so we start at a larger scope, meaning

19   where is it located within the city?  And this map was chosen

20   because it really showed the boundaries of the neighborhood

21   with Camino -- El Camino Real to the north and Stevens Creek to

22   the south.  And then it showed -- there's an arrow that

23   actually points to where the subject is located, and it shows

24   you the streets.  It shows you other landmarks.  There's Santa

25   Clara University.  That's about a mile to the northwest, I

1   think.  And then there's a Catholic cemetery, and there's other

2   landmarks that show exactly where, in relationship to shopping,

3   schools, and employment centers, what's the location of the

4   subject property.

5   Q    You mention that you then try to find out a little more

6   detail about what the property is, like its size and so forth;

7   correct?

8   A    Yes, that's correct.

9   Q    And did you do that in this case?

10  A    Yes, I did.  The records that I got from public records

11  showed that -- gave the size of the house, the year built, the

12  tax assessment for the house.  It also gave the lot size.  I

13  believe it gave the owner's name.  It gave the parcel

14  identification number, the legal description, and the prior

15  sale -- any prior sales history also.

16  Q    And were you able to determine the size of the particular

17  property?

18  A    Yes, I was.

19  Q    What was the size?

20  A    I think it was 2,854 square feet for the main house, and

21  then it had an accessory building in the back of about 600

22  square feet, more or less.  And then it also had a -- what

23  looked like a two-car garage.

24  Q    And when you say "accessory building," would that be

25  something like a guesthouse?

1    A     Yes, a guesthouse.

2    Q     And were you able to determine when the property -- or

3    when the house was built?

4    A     Well, the permit records showed that it was demolished.

5    There was a permit pulled in 2007, I believe, that showed that

6    the house was demolished.  It was an older house.  And then

7    this newer improvements were built.  And I think they gave it

8    an effective age of 2008 is when I think it was finalized, the

9    permits.

10   Q     And what did you do next after looking at all this data?

11   A     Well, after I looked at the subject data and tried to

12   figure out what exactly am I working with here, what am I going

13   to value, what am I going to use to value this subject

14   property, I started to do my next step, which is to look for

15   comparable properties in the sales comparison approach, what I

16   referred to earlier about looking for other similar dwellings.

17         And so we have a system through the Multiple Listing

18   Service that the realtors use, the local realtors, that I have

19   access to also that we use for searches to find these

20   comparable properties.  And so I had to go back into the

21   archive section because I started to go back from I think it

22   was a little bit before 2008 all the way to 2015 to look for

23   these properties for those years.

24   Q     Okay.  And the purpose of that was to find a property that

25   was similar in size or location or area you said?

A Yes. I usually start out with a general search just to see if I can find any rental listings. Usually, rentals are harder to find than sales. Regular listings, even going back to 2008, are easier to find because there's millions of them that sell every day throughout the country, but listed -- rental listings are very difficult to find because they're not as made public record. They're harder to find. And the realtors don't usually put them on MLS because the commission isn't as big; so they don't have enough money to put it online.
But given that, there were some on there that I did find. I think I found 16 comparables, and I used 14 of the 16, and the other two were too small. The hardest part was trying to find something that was as large as the subject property.
Q So it sounds like through your analysis you have the subject property on the one hand and 14 others that you were going to compare it to; is that correct?
A That's correct.
Q After identifying that group of residences, what did you do?
A Then I made notes on the physical characteristics from the MLS sheets that I had. So I looked at each comparable property, printed out the slides, looked at the data sheets, and then I -- the next step in my process is to go look at the properties. I want to go see -- it's one thing to have a piece of paper in front of me. I want to go verify the information

1    to make sure that it is what they say it is.  And so my next

2    process was to go inspect not only the comparable properties

3    but the subject property from the street and see where the

4    locations were.

5    Q    So you went out to the property located on Monroe Street;

6    correct?

7    A    That's correct.

8    Q    And if you can look in the binder in front of you, please.

9              THE COURT:  Why don't we -- since we're going to look

10   at a new exhibit, why don't we take a break now.  Okay?  And

11   then we'll come back in 10 or 15 minutes.

12             (Jury excused.)

13             THE COURT:  Mr. Tong, did you have witnesses other

14   than the present one?

15             MR. TONG:  We have a stipulation to some records and

16   then two more witnesses.  I think we'll go at least till noon,

17   maybe into the afternoon.

18             THE COURT:  Okay.

19             MR. TONG:  Thank you, Your Honor.

20        (Court recessed at 10:51 A.M., until 10:58 A.M.)

21             THE COURT:  Sorry to keep everyone waiting, but it

22   was kind of related to this case.  I was dealing with asking a

23   colleague to handle a Naturalization Ceremony so that I don't

24   have to take off from this trial to do that.  So thank you for

25   waiting.

1          Go ahead.

2          MR. TONG:  Thank you, Your Honor.

3    Q    Mr. Molinari, I think we left off just when you were

4    describing that you physically viewed the property to be

5    appraised and the comparables; correct?

6    A    That's correct.

7    Q    And did you go to all of those 15 properties?

8    A    Yes.  It was the subject property and 14 comparable

9    properties.

10   Q    Okay.  And so we're clear, the subject property is the

11   Monroe Street property that we asked you to appraise?

12   A    That's correct.

13   Q    Okay.  And if you could look in your binder at Exhibits

14   16A through D, which are already in evidence.  Are those

15   photographs?

16   A    Yes, they are.

17   Q    And do they show the property that you were asked to

18   appraise?

19   A    Yes, they do.

20   Q    And you physically went there; correct?

21   A    Yes.

22   Q    So could you look at Exhibits 16E, 16F, and tell us

23   whether those are also pictures of the property that you

24   appraised.

25   A    Okay.  16E is a street scene.

1    Q     I'm sorry.  You're right.

2    A     16F is a rear photograph that was obtained from the MLS

3    data sheet back -- going back to the 2008 prior sale.

4    Q     And 16E you say is a street view of the street where the

5    property's located.

6    A     That's correct.

7    Q     And do those two photographs fairly and accurately depict

8    the appearance of the property?

9    A     That's correct.

10          MR. TONG:  We would ask that 16E and F be received.

11          MR. TOSCHER:  No objection, Your Honor.

12          THE COURT:  All right.  Received in evidence.

13   BY MR. TONG:

14   Q     Turning now to 16I and 16J, do you recognize those two

15   photographs?

16   A     Yes.  16I is the park across the street from the subject

17   property, and 16J is also the park but a little bit to the

18   right of the subject, looking out across the way.

19   Q     And do those two photographs fairly and accurately depict

20   the appearance of the location that you've just described?

21   A     Yes.

22          MR. TONG:  We would ask that Exhibit 16I and J be

23   received.

24          MR. TOSCHER:  No objection, Your Honor.

25          THE COURT:  All right.  Received.

1  BY MR. TONG:

2  Q    All right.  Mr. Molinari, you mentioned you also went out

3  and looked at all of the comparable properties; correct?

4  A    That's correct.

5  Q    And did you take photographs of the various comparable

6  properties or otherwise obtain photographs?

7  A    Yes.

8  Q    And if you could look through the series of photographs

9  that are marked as Exhibits 17B, as in boy, through 17O, as in

10 Oscar.

11 A    Yes.  There's 14 photos, yes.

12 Q    And do those 14 photographs fairly and accurately depict

13 the appearance of the comparable properties that you used for

14 your analysis?

15 A    Yes.

16         MR. TONG:  We would ask that Exhibit 17B through 17O

17 be received in evidence.

18         MR. TOSCHER:  No objection, Your Honor.

19         THE COURT:  Those exhibits are received.

20 BY MR. TONG:

21 Q    Now, Mr. Molinari, after looking at all the comparables

22 and the subject property, what did you do?

23 A    After I viewed the -- both the subject property and the

24 comparable properties, I went back to my office -- well, during

25 the visualization of those properties, I took notes of where

1   they were located and looked at the sheets that I had on each

2   property from the MLS.  And then after I was done with the

3   inspections, I went back to my office and started to compile

4   all the information that I had from my scope of work, which

5   included my research on the subject property, the physical

6   characteristics of the subject property, the market area of

7   Santa Clara, the rental market trends for Santa Clara.  That

8   was all in my research.  I started to compile all that

9   information together, along with the comparable property

10  information that I observed, and started to formulate an

11  opinion of the fair market rent.

12  Q   And have you actually compiled some charts that show the

13  pictures of the different properties involved?

14  A   Yes, I did.

15          MR. TONG:  And, Your Honor, may I use the easel?

16          THE COURT:  Yes.  Okay.  But wait.  Has this one

17  been -- which exhibit number is it?

18          MR. TONG:  It's actually a blowup of the exhibits

19  that are already in evidence, Your Honor.  And, Mr. Toscher, I

20  believe, has seen them.

21          MR. TOSCHER:  Yes, Your Honor.

22          THE COURT:  Okay.

23  BY MR. TONG:

24  Q   Mr. Molinari, just so we get oriented, I'm showing a

25  chart.  Can you see that?

1          THE COURT:  Can the jurors see it?  Do you want the

2    witness to come down?  That might be helpful.

3          MR. TONG:  Yes.  If you wouldn't mind,

4    Mr. Molinari.

5          THE COURT:  And, Mr. Tong, we're going to hook you up

6    also.  Or we can give you both handheld.

7          MR. TONG:  We have to stay away from each other, as I

8    recall.

9          THE COURT:  Yes.  Sorry.

10          MR. TONG:  This is the mike; right?

11    Q    Mr. Molinari, tell you what, I'll switch with you, if the

12    Court is okay with that.

13          Tell us what -- I woke everybody up.  Tell us what

14    appears on that chart.

15    A    So on the easel here is the pictures of the subject

16    property.  Some of the pictures were taken by me on the date of

17    the inspection, and some of the pictures were obtained from the

18    MLS history sheet from the prior sale in 2008.

19          THE COURT:  Okay.  Wait, now.  I'm a little worried

20    about whether the jurors on this -- can you see, too?

21          Okay.  Thank you.

22    BY MR. TONG:

23    Q    The chart appears to contain nine different photographs of

24    the property; is that correct?

25    A    Yes.  The property and across the street of the property.

 1    Q    Why does it matter what's across the street from the

 2    property?

 3    A    Well, I was trying to get -- to show the view from the

 4    subject front yard of what's around the property.  It's always

 5    important to know not only where the lot is located but what

 6    else is located around it.

 7    Q    Did you also create a chart of the comparable properties?

 8    A    Yes, I did.

 9    Q    Do you see that chart, Mr. Molinari?

10    A    Yes, I can see it.  Thank you.

11         THE COURT:  You might want to just hook it onto

12    your -- yeah.

13         MR. TONG:  Testing.

14    Q    What does that chart consist of?

15    A    These are photographs of the comparable properties that I

16    used in my report to establish the fair market rent.

17    Q    And does each photograph represent one of the 14

18    properties that you used?

19    A    Yes.

20    Q    Okay.  And where are those 14 properties located?

21    A    12 properties are located in Santa Clara, the same city as

22    the subject property.  One property is located in Campbell,

23    California; and the other property's located in Saratoga,

24    California.

25    Q    And it would appear that some of those properties might be

1    bigger or smaller than the one you were asked to evaluate; is

2    that correct?

3    A     That's correct.

4    Q     Some might be newer or older than the one you were asked

5    to evaluate; is that correct?

6    A     Yes, that's correct.

7    Q     And do you take that into account in your analysis?

8    A     Yes, I do.

9    Q     Does the location of the particular properties that you

10   evaluated matter?

11   A     Yes, it does.

12   Q     Why does that matter?

13   A     Well, specifically, for fair market rent it matters,

14   especially for Santa Clara because of the college.  Most of the

15   rental market is derived because of the college kids renting

16   out rooms, and so the proximity to the college matters for that

17   particular place for Santa Clara.

18   Q     And for the college, are you referring to Santa Clara

19   University?

20   A     Yes, I am.

21   Q     Now, as part of your analysis, did you create an aerial

22   view showing the location of the property you were evaluating

23   as well as the comparable ones?

24   A     Yes.

25   Q     And is that the chart over in the corner there?

 1   A    Yes, I believe so.

 2            MR. TOSCHER:  Your Honor, I wanted to ask counsel a

 3   question.  What's the exhibit number of the next chart?

 4            MR. TONG:  I'm going to show it to him.  It's 17A.

 5            MR. TOSCHER:  Is 17A in?

 6            MR. TONG:  It is not in yet.

 7            MR. TOSCHER:  So but --

 8            THE COURT:  You two want to confer?

 9            MR. TOSCHER:  Yeah, I'll just go --

10            THE COURT:  You're miked up, though, Mr. Tong; so --

11            Do you need a mike?

12            MR. TONG:  Don't talk into the mike.

13            MR. TOSCHER:  Your Honor --

14            THE COURT:  17A is not yet in.

15            MR. TOSCHER:  Is not in.  He can offer it, and it can

16   be published.

17            THE COURT:  So are you agreeing it can be received?

18            MR. TOSCHER:  Yes, Your Honor.

19            THE COURT:  Then I'll just receive it.  That will be

20   easier.  17A is received in evidence.

21   BY MR. TONG:

22   Q    Mr. Molinari, could you please describe what 17A is.

23   A    So this is a comparable sales map that pinpoints where the

24   subject property is, generally speaking.  It's a large map

25   because it had to be zoomed out to reach all the comparable

1    properties in one map.  And then it lists each one by the

2    number, rental comparable 1, all the way through 14, comparable

3    2, 6.  And this shows the market area, basically, of the San

4    Jose/Santa Clara area.

5    Q    And there are different rental numbers that appear on the

6    chart, which is 17A; is that correct?

7    A    Rental --

8    Q    Rental number 1.

9    A    Yes.  They were all labeled 1 to 14.

10   Q    And do they correspond to the photographs that are on the

11   chart that we saw earlier, the Exhibit 17 series?

12   A    Yes.

13   Q    And one of them is red; do you see that?

14   A    Yes.

15   Q    Why is one different than the others?

16   A    That's to show that this is the subject property, the

17   property that I'm valuing.  And these are the comparable

18   properties that I'm comparing to the red property, subject

19   property.

20   Q    Now, did you ultimately analyze all of the data concerning

21   all of those properties?

22   A    Yes, I did.

23   Q    And did you come to a conclusion as to the fair market

24   rental value of the property on Monroe Street?

25   A    Yes, I did.

1    Q    And are you able to state that conclusion from where you

2    are, or do you need to resume the stand?

3    A    I don't have the report in front of me, but, yes, I did

4    have a conclusion.

5    Q    What did you conclude as to the fair market value of the

6    property on Monroe Street?

7    A    So the fair market conclusion for June 16, 2008, was

8    $5,000 per month.

9    Q    And how about June 2009?

10          THE COURT:  You need to go back to --

11          THE WITNESS:  Yeah, I would rather look at the

12   report.

13          THE COURT:  Absolutely.  So why don't you hand that

14   handheld mike back to court staff.

15       (Witness resumes the witness stand.)

16   BY MR. TONG:

17   Q    Okay.  Mr. Molinari, you reached a conclusion for June

18   2008 the value was $5,000 a month; correct?

19   A    That's right.

20   Q    What about for June 2009?

21   A    I believe it was 4800 a month.

22   Q    How about June 2010?

23   A    I think it was 4700 a month.

24   Q    How about June 2011?

25   A    I can't say for sure because I don't -- there were six

1   years, and I don't have them in front of me.

2   Q    Do you have your report in front of you?

3   A    No, I don't.

4           MR. TONG:  May I approach, Your Honor?

5           THE COURT:  Yes.  So you're handing the -- you have a

6   copy of that?

7           MR. TOSCHER:  I believe I do, Your Honor.  I believe

8   I do.

9           Can I ask counsel, that's the copy that you provided

10  me?

11          MR. TONG:  Yes.

12          THE WITNESS:  Can you start at the beginning again.

13  BY MR. TONG:

14  Q    Okay.  Why don't you just go ahead and tell us your

15  opinions as to the fair market rental value of the property for

16  the years June 20th, 2008 through March 25, 2015.

17  A    Okay.  So June 16, 2008, the fair market rental was $5,000

18  per month.  June 16, 2009, the fair market rent was $4,800 per

19  month.  June 16th, 2010, the fair market rent was $4,800 per

20  month.  June 16, 2011, the fair market rent was $4,700 per

21  month.  June 16th, 2012, the fair market rent was $5,100 per

22  month.  June 16th, 2013, the fair market rent was $5,300 per

23  month.  June 16, 2014, the fair market rent was $6,000 per

24  month.  And March 25th the estimated fair market rent was

25  $6,150.

 1   Q     Now, I notice that you were using the date June 16 quite a
 2   bit; is that correct?
 3   A     Yes.
 4   Q     And is it true that June 16, 2008, is the date on which
 5   the property was sold to Waimana Enterprises?
 6   A     Yes.
 7   Q     And the numbers you gave us fluctuated; is that correct?
 8   A     That's correct.
 9   Q     Why would there be fluctuations of that sort?
10   A     Well, there was -- the market was going pretty well in
11   2005, '6, '7, and started to slow down in 2008.  And then after
12   the market turned down in September of 2008 the market started
13   to change.  There was all of a sudden an oversupply of housing.
14   There was foreclosures.  There was Real Estate Owned, REO,
15   properties for sale, and the rent started to go down also for a
16   couple years.  And then the market started to pick back up, and
17   then that's when you'll see that the rents started to increase.
18   Q     Now, Mr. Molinari, you're from the Bay Area.
19   A     Yes.  I live in the Sacramento area.  My office is in San
20   Francisco, the Bay Area.
21   Q     Are you familiar with the Bay Area, though?
22   A     Yes.
23   Q     The peninsula?
24   A     Oh, absolutely.
25   Q     And about how far is Menlo Park, California, from this

1    property on Monroe Street in Santa Clara?

2    A    I think Menlo Park is about 17 miles away.

3         MR. TONG:  Thank you.  I have nothing further.

4         MR. TOSCHER:  May it please the Court, ladies and

5    gentlemen.

6                        CROSS-EXAMINATION

7    BY MR. TOSCHER:

8    Q    Good morning, Mr. Molinari.

9    A    Good morning.

10   Q    Now, the opinions you gave before as to the fair rental

11   value, that was a valuation for renting the entire house, was

12   it not?

13   A    It was a rental for -- yes, it was.

14   Q    The entire property.

15   A    The entire property.  That's correct.

16   Q    And it assumed as well that whoever's going to be renting

17   it had exclusive use.  There would be no other person using the

18   property.  Is that correct?

19   A    That could be correct, yes.

20   Q    And assumed no other restrictions on the property.

21   A    That's correct.

22        THE COURT:  Okay.  Hold on.  You're constantly moving

23   the mike away from you in increments one inch at a time.

24   You've done it about four times.  So, yeah, put it back.

25        MR. TOSCHER:  I don't know why I'm doing that, Your

1    Honor.  I apologize.

2    Q    You did not value, did you, the fair rental value of a

3    single room, did you.

4    A    No, I did not.

5    Q    And that would be a much different value, would it not?

6    A    There could be, yes.

7    Q    Well, not could be.  It would be a much different value

8    for one room in the house, would it not, Mr. Molinari?

9    A    For one room versus the whole house?

10   Q    Yes, sir.

11   A    Yes.

12   Q    And it would be a much, much lower number than the rental

13   for the entire house, wouldn't it.

14   A    Yes.

15   Q    The -- in the course of your evaluation -- and you

16   mentioned it before -- you studied the market for the property

17   surrounding this specific Monroe Street property, is it not?

18   A    Yes.

19   Q    And you concluded in your report, did you not, that when

20   it was purchased by Waimana in June 2008, that the purchase

21   price represented the fair value for that property?

22   A    Yes, I did.

23   Q    And you also -- your report contains a study of the

24   property -- of the values of the property over the next seven

25   years, I believe.

1    A    It was the values of the market area, yes.

2    Q    The market values of the property.

3    A    There were no market values given in the report.  It was

4    the study of the zip code.

5    Q    Okay.  But there's a study in your report of the market

6    values.  You reviewed that, did you not?

7    A    Yes, market values.

8    Q    And you're very familiar with the property in the

9    geographic area based upon your experience and your study for

10   this report; correct?

11   A    Yes.

12   Q    And after this property was purchased by Waimana there was

13   a very, very significant drop in values of property, was it

14   not -- was there not?

15   A    I don't know if it was a significant drop.

16   Q    Well, based upon your report, up in the Bay Area, this

17   area in San Jose, a 30 percent or 40 percent drop in value?

18   A    There could be in some places, yes.

19   Q    Okay.  Well, I -- I'm just referring to your report.

20   Maybe if you have it up, there you might want to look at it.

21   A    Okay.

22   Q    And when the house was purchased, you have it about at

23   $463 per square foot.  And then I'm looking at your chart here.

24   By 2011 it dropped all the way down to $347.

25   A    Yes, that's correct.

1    Q    That's a substantial drop, is it not?

2    A    It's a drop, yes.

3    Q    Now, that ties in with the foreclosures you talked about.

4    A    Yes.

5    Q    And that was right around the time of the big stock market

6    crash, wasn't that right?

7    A    The stock market was September of 2008, yes.

8    Q    Right.  And that really impacted the property values.

9    A    Yes, in some cases.

10   Q    And if someone purchased the house -- Waimana purchased it

11   at the peak of the market, did they not?

12   A    It was at the higher end, yes.

13   Q    Okay.  And it makes good business sense, does it not,

14   for -- if there was a big drop in value, to hold that for a

15   period of time.

16   A    I mean, that all depends.  Some people did sell their

17   property at foreclosure.

18   Q    They had to; correct?

19   A    In some cases, yes.

20   Q    Now, based upon 17A this property has -- would you say

21   this property has a convenient location to the San Jose

22   airport?

23   A    Yes.

24   Q    Okay.  So if we're talking -- you didn't -- again let me

25   just make sure.  You didn't do any evaluation whatsoever of

1    what one room in that house would rent for.

2    A    That's correct.

3    Q    And your evaluation doesn't take into account, for

4    instance, if someone would have to vacate their room at a

5    certain time, if somebody else was going to use the property.

6    A    Right.  That's correct.

7    Q    Would it be a fair rule of thumb, Mr. Molinari, if we

8    wanted to try to value what the value of one room was, based

9    upon the square footage of that room, compared to the whole

10   house?  Would that be a fair way to do it?

11   A    No, I don't think so.

12   Q    Would it be less?

13   A    No.  I think you would use a per-room maybe unit of

14   measure versus the square foot.

15   Q    Mr. Molinari, the prospect for the value of the subject

16   property, it's been increasing over the last four years, has it

17   not?

18   A    The prospect for the full fair market value?

19   Q    Yes.

20   A    Fair market value of the property?

21   Q    Yes.

22   A    I would say so, yes.

23   Q    And in your judgment the prospect for it continuing to go

24   up in value, based upon the patterns over the last couple of

25   years?

1   A    It could continue, yes.

2   Q    You think it's a positive outlook.

3   A    I don't know if it's a positive outlook.  There's a lot of

4   negatives in the market right now at this point, if you're

5   talking about today; so I'm not quite sure how far you're

6   looking ahead.

7   Q    But for the last three or four years it's been going back

8   up in value; correct, sir?

9   A    That's correct.

10            MR. TONG:  I object, Your Honor.

11            THE COURT:  Withdrawn?

12            MR. TOSCHER:  No, Your Honor, not withdrawn.

13            THE COURT:  No, no.  I'm talking to Mr. Tong.

14            MR. TONG:  No.  I was objecting, but he answered.  I

15   was objecting to the relevance of this sales trend.

16            THE COURT:  But you don't need a ruling from me.

17            MR. TONG:  No, I do not at this point, Your Honor.

18            THE COURT:  Okay.

19            MR. TOSCHER:  One moment, Your Honor.

20            THE COURT:  All right.

21            MR. TOSCHER:  No further questions, Your Honor.

22            THE COURT:  Okay.

23                      RE-DIRECT EXAMINATION

24   BY MR. TONG:

25   Q    Mr. Molinari, you were asked questions about the fair

1   market sales value of the property; correct?

2   A    Yes.

3   Q    And, actually, you were asked to assess the fair market

4   rental value of the property; correct?

5   A    That's correct.

6   Q    Now, there was some talk about the relationship between

7   rooms and rental; correct?

8   A    Yes.

9   Q    And, in general, if there were more rooms in a property,

10  what would that do to the fair rental value of the property?

11  A    Well, if they were rentable rooms and somebody could sleep

12  there, then they probably -- it would be more.  The more

13  sleepable rooms, the more rent.

14  Q    So with regard to the property you evaluated, if a

15  computer room were converted into a bedroom, how would that

16  affect the fair rental value of the property?

17  A    Yeah, it would go up.

18  Q    Because there's one more room to rent.

19  A    Yes.

20  Q    And if a game room were converted to a bedroom, how would

21  it affect the fair rental value of the property?

22  A    It would add another room that you could rent out, and it

23  would increase in the market rents.

24  Q    And does the fair rental value change over a summer if the

25  house were not being rented to people?

1    A    It could, yes.

2    Q    Okay.  And why is that?

3    A    I mean, if it laid vacant and there was nobody in it?

4    Q    Yeah, but I'm not talking about the income.  I'm talking

5    about the fair rental value of a property.  Do you make those

6    distinctions about whether it sits empty or not?

7    A    I mean, if there's demand, then the rental stays the same.

8    Q    So your answer is it depends on demand.

9    A    Right.  It depends.

10         MR. TONG:  Thank you.  I have nothing further.

11         MR. TOSCHER:  Just one further question, Your Honor.

12                    RE-CROSS-EXAMINATION

13   BY MR. TOSCHER:

14   Q    Mr. Molinari, you're familiar with the area.

15         THE COURT:  Don't move the mike away.

16   BY MR. TOSCHER:

17   Q    I think you testified before that Menlo Park was

18   approximately 17 miles from the subject property?

19   A    Give or take, I think.

20   Q    Okay.  And anybody who would be flying into the area for

21   business, they either have to fly into the San Jose airport or

22   the San Francisco airport; isn't that correct?

23         MR. TONG:  Beyond the scope.

24         THE COURT:  Beyond the scope.  Sustained.

25         MR. TOSCHER:  Thank you, Your Honor.

1           THE COURT:  Okay.  Anything more?

2           MR. TONG:  No, Your Honor.

3           THE COURT:  Then you are excused.

4           THE WITNESS:  Thank you.

5           THE COURT:  You may step down and leave the

6   courtroom.

7      (Witness excused.)

8           THE COURT:  And, Mr. Tong, who's your next witness?

9           MR. HARRINGTON:  Your Honor, first we have -- we

10  wanted to move some exhibits in evidence.

11          THE COURT:  Okay.  Go ahead.

12          MR. TONG:  Your Honor, may I move this?

13          THE COURT:  Yes.  Please do.  Thank you.

14          MR. TONG:  Thank you.

15          THE COURT:  So are you going to be reading from

16  stipulations?

17          MR. HARRINGTON:  Not this time.

18          THE COURT:  Not this time.  Okay.

19          MR. HARRINGTON:  I think we're going to shortcut it

20  because I spoke to defense counsel, and we've agreed to the

21  authenticity of the business records that are contained in

22  Exhibits 12-1 through 12-5.  And then we're going to offer

23  those evidence to be admitted into evidence.

24          THE COURT:  Okay.  12-1 to 12-5.

25          Okay.  Is there an objection?

```
 1                 MR. TOSCHER:  No objection, Your Honor.

 2                 THE COURT:  Okay.  Then I will receive into evidence

 3      12-1 to 12-5.

 4                 Anything else?

 5                 MR. HARRINGTON:  No, Your Honor.  At this time we'll

 6      call Danielle Yanagihara.

 7           (Witness photographed.)

 8                 THE CLERK:  Please raise your right hand.

 9           (Witness sworn.)

10                 THE CLERK:  Thank you.  Please be seated.

11                 Please state your name and spell your last name.

12                 THE WITNESS:  Danielle Yanagihara,

13      Y-a-n-a-g-i-h-a-r-a.

14                          DIRECT EXAMINATION

15      BY MR. HARRINGTON:

16      Q    Good morning, Miss Yanagihara.

17      A    Hi.

18      Q    So let's start with a little bit of your background.

19      Could you please tell the jury about your educational

20      background.

21      A    I graduated from UH-Manoa in December 2006 with a degree

22      in business administration in accounting and started working

23      after that.

24      Q    And are you a licensed CPA?

25      A    Yes.
```

1   Q     And how long have you been a licensed CPA?

2   A     I think it was either 2009 or 2010 that I got my license.

3   Q     And so where did you begin working after you graduated

4   from college?

5   A     KMH, LLP.

6   Q     And is that still where you're working?

7   A     Yes.

8   Q     And I assume KMH are initials?

9   A     Yeah, I think from the founding original partners.

10  Q     And it's an accounting firm?

11  A     Yes.

12  Q     So what is your title at KMH?

13  A     Tax manager.

14  Q     And have you always been a tax manager, or did you start

15  out at a different position?

16  A     Started as staff.

17  Q     Is that the full title?  Are you staff accountant?

18  A     Yeah, tax staff.

19  Q     And so what does someone who's tax staff, what functions

20  do you perform?

21  A     Typically, they're tasked with preparing tax returns,

22  gathering information from clients and stuff.

23  Q     Would it be fair to say that you're the main contact at

24  the accounting firm for collecting information?

25  A     As a staff?

1    Q    As a staff.

2    A    Usually, actually, I think it's the in-charge or a senior

3    that will be the main client contact, but the staff will have

4    some dealings with the client, too.

5    Q    Okay.  And so when you're preparing a return, I guess

6    what's the first step in the process?

7    A    Typically, an information request is sent out to the

8    client requesting information, such as financial statements and

9    any other documents that we think we might need.  And that is

10   sent to the client.  The client will respond and send the

11   information to us.  The staff will prepare a return based on

12   the information given, go through and make sure we have

13   everything we need.  If there's any questions, either they will

14   send it or they'll send it up to the senior on the engagement,

15   and they'll send it to the client for follow-up.  And then once

16   the returns are prepared, the senior usually does a first-level

17   review, and then a manager or supervisor does a second-level

18   review, and then the partner or principal will do a high-level

19   review.

20   Q    So breaking that down one step at a time, you said there

21   was a request for information from the client?

22   A    Uh-huh.

23   Q    Who would usually send that request?

24   A    It will either be the staff or the senior, typically.

25   Q    And then who receives the information from the client?

1   A     Usually, the person who sends it; so either the staff or

2   the senior.

3   Q     And then who processes that information?

4   A     The staff will normally do the initial process through.

5   Q     And now the jury's heard from some other accountants; so

6   correct me if I'm wrong, but do you usually take that

7   information and put it into a computer program?

8   A     Yes.

9   Q     And so then what happens once that's processed through the

10  computer program?

11  A     So in our software for, like, company returns normally

12  there's a finalized tax trial balance that we use, and that

13  then gets imported into our other software to actually generate

14  the tax returns.

15  Q     And once those tax returns are generated, who does the

16  first review of the tax returns?

17  A     Well, we do ask staff to self-review their work first, and

18  then the in-charge or senior will do the first-level review.

19  Q     Now, you said the phrase "senior" a few times.  Does that

20  mean a partner, or could that just be senior staff?

21  A     It's a senior associate; so, yeah, the next level above a

22  staff.

23  Q     And then after the senior looks at it, does the partner

24  sign off on the return?

25  A     Usually, we'll try to have a supervisor or manager also do

1    a second-level review before the partner or principal does the

2    sign-off.

3    Q    And how long does the partner spend reviewing the return

4    on a typical corporate tax return?

5    A    Maybe like an hour.

6    Q    So did you work on any corporate returns for Waimana

7    Enterprises?

8    A    Yes.

9    Q    Okay.  And what year -- let's start -- let's say it this

10   way:  Which tax return was the first one that you worked on for

11   Waimana Enterprises?  Which year?

12   A    The 2009.

13   Q    And so would that be a Form 1120?

14   A    Yes.

15   Q    Now, was that a consolidated tax return?

16   A    Yes.

17   Q    So what does that mean that it's a consolidated tax

18   return?

19   A    So for the consolidated corporate return there's other

20   subsidiaries that are wholly-owned by Waimana that were

21   included in that reporting.  So it included Sandwich Isles,

22   ClearCom, Ho'opa'a Insurance, and Kekauluohi, I think was the

23   last one.

24   Q    It's okay.  And so would that consolidated return reflect

25   management fees between the companies?

1  A    Yes.

2  Q    And so if you were working on the 2009 return, does that

3  mean that you were working on it in 2010?

4  A    Yes.

5  Q    And do you remember about when Waimana first became a

6  client, what time of the year in 2010?

7  A    Later during the year, like maybe August-ish.

8  Q    August.  Somewhere around August.

9  A    Yeah, around August.

10  Q    And when was the return actually filed?

11  A    Around the September 15 deadline.

12  Q    And now is September 15 the regular deadline, or is that

13  an extended deadline?

14  A    It's an extended deadline.

15  Q    So what's the usual deadline for filing a corporate tax

16  return?

17  A    For calendar year, March 15.

18  Q    So Waimana was a new client.  And so was that a short

19  period of time to prepare the tax return:  between August and

20  September?

21  A    For their size company, yes.

22  Q    So who owns Waimana Enterprises?

23  A    At the time or currently?

24  Q    Let's start with when they first became a client.

25  A    Albert Hee.

1    Q    And was he the hundred percent shareholder?

2    A    Yes.

3    Q    So the way you answered that question, it sounds like that

4    may have changed?

5    A    Yes.

6    Q    Do you know when that changed?

7    A    I don't remember the exact date.

8    Q    Okay.  Let me see if I can help you out with an exhibit.

9         So there's a binder in front of you.  I'm also going

10   to put things on the screen; so whatever is easier for you to

11   see.

12        If we could go to 12-5.  And it is going to be KMH

13   2012 and page 240.  And if we could blow up the top half there,

14   please.

15        Again, if the screen's easier for you.

16   A    Just look at that.

17   Q    Okay.  So would you recognize this as an e-mail that looks

18   like maybe you printed, and it's an e-mail dated February 11,

19   2013?

20   A    Yes.

21   Q    And it's from S.S. -- S. Sumida.  Is that somebody who

22   works at Waimana?

23   A    At the time, yes.

24   Q    And so it says there's an ownership change as of

25   12/31/2012?

1    A    Yes.

2    Q    So this is the ownership change that you were talking

3    about?

4    A    Correct.

5    Q    Before that date Mr. Hee was the hundred percent

6    shareholder?

7    A    Correct.

8    Q    So when Waimana first became a client, did you start the

9    regular process where you requested information from the

10   client?

11   A    I think just because of the shortened time span there

12   wasn't really a formal information request.  It was kind of

13   just get everything at once as much as possible.

14   Q    So you asked for as much as you could get at the time?

15   A    Yeah.

16   Q    So would you say -- would it be accurate to say it wasn't

17   really a complete production of all the material you needed?

18   A    Yeah.  Yes.

19   Q    So you had to file the return even though you hadn't

20   received all the information?

21   A    Correct.

22   Q    And so when you're preparing the return, did you have any

23   time to check all the underlying documents?

24   A    No.  I think we may have requested certain items, but by

25   the time we received them or received answers to some of our

1   questions, there wasn't enough time to incorporate everything.

2   Q    And so just to be clear, you were preparing the tax return

3   for Waimana?

4   A    Correct.

5   Q    Were you performing an audit of Waimana?

6   A    No.

7   Q    Did you ever perform an audit of Waimana?

8   A    No.

9   Q    And so what was the process in 2010 for -- I'm sorry, for

10  the 2010 returns?  I guess it would be in 2011.  Was it a

11  similar process in preparing the return?

12  A    Yeah, I think so.

13  Q    Okay.  And so let me clarify that a little bit.  Did you

14  find yourself in a time crunch in preparing the return in 2011

15  as well?

16  A    I believe not as bad, but a little bit, yes.

17  Q    And so were you not able to obtain all the information you

18  needed to prepare the return?

19  A    Well, that and then this process -- the investigation had

20  started; so I think we were thinking that there was a chance we

21  would need to amend.  So we, you know, did the best we could

22  with what we had.

23  Q    So when you say "amend," you're talking about filing an

24  amended tax return after the other one was filed?

25  A    Correct.

1    Q    And so what about preparing the 2011 return in 2012?   Is

2    that the same process where there's a time crunch?

3    A    Not as bad again.  I think for 2011 there were just some

4    last-minute changes that we had to kind of make it towards the

5    end right before the deadline.

6    Q    And so again were you not really presented with all the

7    information you needed to do a complete tax return that you

8    were confident in?

9    A    I think we were aware that there were possible outstanding

10   issues from this investigation; so again we kind of did the

11   best we could with what we knew.

12   Q    You said you became aware of some outstanding issues.

13   Maybe we can talk about a few of those.

14        When did you become aware of the use of the Santa

15   Clara property by Waimana?

16   A    It was during the preparation of that 2011 tax return.

17   Q    So that would be in 2012.

18   A    During, yeah, 2012.

19   Q    So what did you become aware of?

20   A    That there -- the property was being rented and that two

21   of the Hee children were living there.

22   Q    Okay.  So you weren't informed of this when you were

23   preparing the 2009 tax return?

24   A    No.

25   Q    Or what about the 2010 tax return?

1   A      No.

2   Q      So the first time you found out about it was in 2012 when

3   you were preparing the 2011 tax return.

4   A      Yes.

5   Q      So what did you do with the information that there had

6   been some rental activity on the Santa Clara property?

7   A      Just based on the timing to try to get the return done,

8   and to be conservative, we recorded an adjustment to recognize

9   the income -- the rental income, and we, I guess, disallowed or

10  took out the expenses related to the property.

11  Q      Do you remember if you learned about this on practically

12  the day before the tax return was due?

13  A      It was extremely close to the deadline.

14  Q      So I want to show you another document.  And this is --

15  again I'm going to pull it up on the screen, but it may be --

16  if you would also like, you can look it up in the binder.

17          And what it is is 12-2 KMH 209, and the Bates number

18  is 569.  And this is very small; so we're going to see if this

19  blows up and you can read this better.

20          Miss Sorley, if we could get the bottom third of the

21  page, please, and cut off the other part, and maybe we can

22  actually read what this says.  That looks a little better.

23          And so if you -- this is a chain of e-mails, and you

24  see it's in 2010; so would that be the preparation of the 2009

25  tax return?

1   A    Yes.

2   Q    If you look at entry number 6, there's a question.  It

3   says:  Is WEI accruing interest income on account 13100 loan to

4   stockholder?  And there's an answer provided, No.  Do you see

5   that?

6   A    Yes.

7   Q    So is that a question that you asked of Waimana

8   Enterprises to provide information on?

9   A    Yeah, this was our, I guess, information request.

10  Q    So the answer that was provided was no; is that right?

11  A    Yes.

12  Q    What does it mean to accrue interest on loan to

13  stockholder?

14  A    So, normally, for loans there has to be some sort of

15  interest -- or there should be some sort of interest income and

16  expense being recognized.

17  Q    Okay.  So a normal loan will always have interest that

18  goes along with the loan, and that would be reflected in the

19  books and records?

20  A    Typically, and then I guess the IRS requires some sort of

21  interest recognition.

22  Q    Okay.  And the answer you got was that that wasn't taking

23  place at Waimana?

24  A    Yes.

25  Q    So we're talking again about, you know, requests for

1    information; so I want to show you another chain of e-mails

2    from 2010.  This is going to be exhibit -- I'm sorry, for the

3    2010 returns; so this will be e-mails in 2011.

4            This is Exhibit 12-3.  And the first one I want you

5    to take a look at is KMH 2010, and it is Bates number 81.  And

6    just give me one second here.

7            Okay.  So if we could zoom up on the top part of this

8    page, please.

9            And so is this another e-mail that you received in

10   September 2d, 2011?

11   A    Yes.

12   Q    And if we could actually now turn to page 83, please, of

13   that same exhibit.  And I'm sorry, if we could go -- let's go

14   back to 82.  I apologize.

15           I apologize the formating's a little funny here, but

16   this is how it was produced to us.  So if we could zoom up on

17   about the top half of the page, please.

18           And so this is -- it looks like an e-mail saying "I

19   thought the questions looked familiar.  Apologize.  I thought

20   this was sent a while ago."

21           Then if we could get to the bottom part of the page,

22   please.  And so it looks like there's a series of questions.

23   And sometimes as we know in e-mails they get broken up a little

24   oddly.  But if you would review this and the next page, and do

25   these look like requests for information that you had sent to

```
1    Waimana?

2    A     Yes.

3    Q     If we could turn to page 83, please.

4          And if we could zoom up on that top third where

5    number 3 is, and there's a question.  And the question is:

6    "Are personal expenses of shareholders/employees included as

7    business expenses on the financials?  If yes, attach a detailed

8    schedule, including account numbers."  Do you see that?

9    A     Yes.

10   Q     Is that a request for information that you sent to

11   Waimana?

12   A     Yes.

13   Q     Okay.  The response in that parentheses, is that the

14   response you received from Waimana?

15   A     Yes.

16   Q     And it says, "Per Janeen.  No, personal expenses are not

17   being run through."  Do you see that?

18   A     Yes.

19   Q     So based on that representation, you were given the

20   impression that there were no personal expenses on the books of

21   the company?

22   A     Yes.

23   Q     And who is Janeen?

24   A     I believe she's the in-house counsel.

25   Q     At Waimana?
```

1    A    I'm not exactly sure which of the entities.

2    Q    Okay.  But for one of the Waimana entities?

3    A    Yes.

4    Q    Okay.  And if we could please turn to -- this is going to

5    be Exhibit 12-4 -- excuse me, 12-3.  I apologize, 12-4.

6         And it's KMH 2011332.  And if we could -- if we could

7    go back one page, please, so we can see the beginning of the

8    e-mail chain.

9         Okay.  And if we could again zoom up at the top part.

10   And this is a -- this is another e-mail that you received as

11   part of your preparation, and it says 2012.  It's for the 2011

12   tax return?

13   A    Yes.

14   Q    And if you could turn to page 67, please.  I apologize.

15   Sorry.  Hold on just one second.

16        Okay.  Let me switch to a different topic.  I don't

17   want to continue on that topic.

18        So let me ask you about this.  So when did you first

19   become aware that children were receiving salaries from the

20   Waimana entities -- the children of Mr. Hee were receiving

21   salaries?

22   A    I believe it was from counsel during this investigation.

23   Q    So did you know about it in 2010 when you were preparing

24   the 2009?

25   A    No.

1   Q     And what about in 2011?

2   A     No.

3   Q     In 2012?

4   A     I can't remember when exactly we had that discussion.

5   Q     But you didn't find out from the client.  You said you

6   found out from counsel?

7   A     Yes.

8   Q     And what about when did you learn that the wife of Mr. Hee

9   was being paid a salary by the company?

10  A     Same thing.  During discussions with counsel.

11        MR. HARRINGTON:  And if I could have just one moment,

12  Your Honor.

13        (Counsel conferring.)

14        MR. HARRINGTON:  I have no further questions at this

15  time.

16        MR. TOSCHER:  Your Honor, if we're going to break at

17  noon, my preference is not to have my cross-examination

18  interrupted.

19        THE COURT:  My preference is you start.

20        MR. TOSCHER:  Then I shall start.

21        May it please the Court.  Ladies and gentlemen.

22                    CROSS-EXAMINATION

23  BY MR. TOSCHER:

24  Q     Good morning.

25  A     Hi.

1   Q     Now, you testified --

2              THE COURT:  Now, why did you just do that?

3              MR. TOSCHER:  I thought I was bringing it closer to

4   me.

5              THE COURT:  Okay.

6   BY MR. TOSCHER:

7   Q     -- about the accrual of interest on a shareholder loan.

8   A     Yes.

9   Q     Under the Internal Revenue Code rules, if a company loans

10  money to a shareholder and it's not documented at all, you're

11  required to impute or accrue interest.

12  A     Yes.

13  Q     And the code -- actually, there's a code section which

14  says, when there's a loan and there's no note and no interest

15  stated, you're required to pick a certain rate; isn't that

16  right?

17  A     Yes.

18  Q     And that's set forth in the regulations.

19  A     Yes.

20  Q     And if it's just -- if there's no term on it, you treat it

21  as just a demand loan?

22  A     Yes.

23  Q     And it's -- demand loans now, what are the interest rates?

24  A     I don't know exactly, but it's really low.

25  Q     Very low.

 1   A     Yes.

 2   Q     So just so we're clear, where there's a loan from a

 3   stockholder -- I'm sorry, from a company to a shareholder and

 4   there is no note, the Internal Revenue Code provides for that

 5   situation.

 6   A     Yes.

 7   Q     And you impute that the small amount of interest we talked

 8   about.

 9   A     Yes.

10   Q     The -- now, there was some testimony regarding you were

11   learning about some issues during the course of the examination

12   of the IRS, and I think you said there were some consideration

13   of some amendments to the tax return.

14   A     Yes.

15   Q     And is it your normal policy that, when you spot these

16   issues, if you're under examination, you would normally just

17   hold back on any adjustments until the agent is complete?

18   A     Yes.

19   Q     And one of those adjustments you would have done would

20   have been to accrue that interest on the shareholder loan.

21   A     Correct.

22   Q     Now, another adjustment you were considering was -- and I

23   think you testified is to how to account for the rental income

24   or the rental activity on the Santa Clara property.

25   A     Yes.

1   Q    Now, you testified that you were determining the amount of

2   income and the amount of expenses, but then you were being

3   conservative.

4   A    Yes.

5   Q    So I think -- is what you were saying is that, even

6   accounting for whatever rent there was and the expenses, there

7   was no taxable income to the corporation?

8   A    Had we, I think, taken the rental income and the

9   applicable deductions, there would have been no impact.  But to

10  be conservative we picked up the income and disallowed the

11  expenses; so overall the company recognized a little bit of

12  income on that rental for 2011.

13  Q    Very small.

14  A    Very small.

15  Q    So you, actually -- if you had all the income and all the

16  expenses, there would be no income, but you were very

17  conservative and reported a small amount of income.

18  A    Yes.

19  Q    And that's because the audit was going on and you wanted

20  to be overly conservative.

21  A    Yes.

22             MR. TOSCHER:  I have no further questions, Your

23  Honor.

24             THE COURT:  Mr. Tong, did you have anything more?

25             I'm sorry.  I'm so sorry, Mr. Harrington.

1           MR. HARRINGTON:  No, it's no problem at all.

2           THE COURT:  We don't switch around here per witness;

3    so go ahead.

4           MR. HARRINGTON:  No, Your Honor.  I don't have any

5    further questions.

6           THE COURT:  Okay.  And Mr. Tong didn't either.

7           So you are excused, and you can leave the courtroom.

8           And we're going take a lunch break, and come back at

9    1:15.  Okay?

10          MR. HARRINGTON:  Your Honor, our next witness we

11   anticipate being really short; so I don't want to make the

12   jury --

13          THE COURT:  They might want to have a late lunch?

14   Okay.

15          Well, why don't I let the witness go ahead and step

16   down while we have this discussion.

17      (Witness excused.)

18          THE COURT:  Let's get a time estimate.  If it's

19   really short, you may well want to just have a late lunch

20   because then you'll be excused for the day, I think.

21          THE COURT:  So, Mr. --

22          MR. HARRINGTON:  I mean --

23          THE COURT:  Okay.  Mr. Harrington, that will be the

24   only other witness for today; right?

25          MR. HARRINGTON:  Yes.

1          THE COURT:  Okay.  Why don't you two confer.

2          MR. TOSCHER:  Your Honor --

3          THE COURT:  Hold on.  I think there's a staff person

4    who -- no.  Did she want to give a note or -- no?  Okay.

5          Go ahead.

6          MR. TOSCHER:  Your Honor, Mr. Harrington has stated

7    that he's not going to be very long.  It's likely that I will

8    not be very long.  So it's up to the Court's discretion as to

9    how she would like to do it.

10          THE COURT:  So my question is what does "not very

11    long" mean?

12          MR. HARRINGTON:  I think a good estimate would be,

13    for me, less than 10 minutes.

14          THE COURT:  Okay.

15          MR. TOSCHER:  10 minutes.

16          THE COURT:  Okay.  So if you can stand it, we're

17    going to barrel right through and see if we can let you go for

18    the whole day.

19          Let's call the witness.

20          MR. HARRINGTON:  Thank you, Your Honor.  We call

21    Deanna Awa.

22       (Witness photographed.)

23          THE CLERK:  Please raise your right hand.

24       (Witness sworn.)

25          THE CLERK:  Thank you.  Please be seated.

```
 1              Please state your name and spell your last name.
 2              THE WITNESS:  Deanna Kiemi Awa.  Last name is spelled
 3    A-w-a.
 4                        DIRECT EXAMINATION
 5    BY MR. HARRINGTON:
 6    Q    Good morning, Miss Awa.
 7    A    Good morning.
 8    Q    So let's start with just a little bit of your background.
 9              Where did you attend college?
10    A    University of Hawai'i at Manoa.
11    Q    What year did you graduate?
12    A    1992.
13    Q    And what was your degree in?
14    A    A bachelor's degree in both accounting and finance.
15    Q    And so where did you work after you graduated?
16    A    After I graduated I worked for Arthur Anderson, which is a
17    public accounting firm.
18    Q    And where did you work after Arthur Anderson?
19    A    After Arthur Anderson I worked for a company called
20    Fiberglass Hawai'i.  And then after Fiberglass Hawai'i I worked
21    at KMH.
22    Q    And how long have you been working at KMH?
23    A    I've been working at KMH, LLP, since 2004.
24    Q    And what is your -- let's start in 2004.  What was your
25    position at KMH?
```

1    A    At that point in time I was a senior manager.

2    Q    And how long were you a senior manager?

3    A    I was a senior manager until 2012.

4    Q    Okay.  And so what's your title now?

5    A    Now I'm a principal.

6    Q    So still at KMH, though.

7    A    Correct.

8    Q    And, in general, when you're preparing a tax return for a

9    client, do you rely on what the client tells you to be honest?

10   A    Yes.

11   Q    And when you're preparing a tax return, is that different

12   than what's conducted in an audit?

13   A    Well, with regards to an audit we would, you know, request

14   information also from the client, and we would rely what the

15   client is providing is honest and truthful.

16   Q    Either way you're relying on the client to provide honest

17   and truthful, accurate information?

18   A    Correct.

19   Q    But an audit you may be requesting more information?

20   A    Depending on what the audit is, yes.

21   Q    So did you ever work with a client called Waimana

22   Enterprises?

23   A    Yes.

24   Q    Okay.  And what work did you do for Waimana Enterprises?

25   Was it an audit or was it just preparing the tax return?

1   A     Initially, we were engaged to assist in the IRS audit, and

2   then we were then engaged to prepare tax returns.

3   Q     So the first step was to help engage in the IRS audit; so

4   would that be helping provide information and that sort of

5   thing to the IRS?

6   A     That's correct.

7   Q     So then you were engaged to prepare tax returns.

8   A     Correct.

9   Q     And when you sign an engagement with a client, you use

10  what's called an engagement letter; is that right?

11  A     Yes.

12  Q     And the jury's seen several engagement letters; so I don't

13  think I'm going to show them another one.  But the main point

14  of the engagement letter is that the client provides honest and

15  accurate information?

16  A     Correct.

17  Q     So when you were preparing the Waimana tax returns, how

18  much time did you have to complete those returns?

19  A     The first year that we prepared the return was for the

20  2009 tax year.  I believe that we were engaged to prepare that

21  return in August of 2010.  And a corporate return, to the

22  extent that it's extended, would be due in September; so,

23  basically, about a month to prepare the return.

24  Q     And was that a short period of time to try to collect all

25  the information?

1  A    It is a short period of time, yes.

2  Q    So did you have a difficult time gathering information

3  from Waimana?

4  A    To the extent that we requested information, we got the

5  necessary documents from the client.  But through the process,

6  obviously, there is some back and forth with regards to we have

7  subsequent questions, and we ask additional questions and ask

8  for more information, et cetera.  And given the fact that we,

9  basically, had about a month to prepare, you know, we had to

10  finish up the return with the information that we got.

11  Q    So I guess a better way of saying it is you had trouble

12  getting enough information in time from Waimana.

13  A    Correct.

14  Q    And you said that was for the 2009 return.  Was that the

15  same case in 2010 -- for the 2010 return?

16  A    If I recollect, yes.

17  Q    What about the 2011 tax return?

18  A    I do believe so.  It was a short -- relatively short time

19  period.  I don't recall if it was exactly a month, but in

20  general a pretty quick turnaround time.

21  Q    What about 2012?

22  A    I think it was probably the same, yeah.

23  Q    Okay.  Just one moment.

24       MR. HARRINGTON:  No further questions, Your Honor.

25       THE COURT:  Okay.

1          MR. TOSCHER:  May it please the Court.  Ladies and

2     gentlemen.

3                         CROSS-EXAMINATION

4     BY MR. TOSCHER:

5     Q     Good morning.

6     A     Good morning.

7     Q     Can I ask for the publication of Exhibit 12-2, pages 590

8     to 594.

9          Miss Awa, can you see that on the screen up there?

10    A     I actually can't.  I apologize.

11    Q     Thank you very much.

12         This is in evidence.  Do you recognize this as an

13    engagement agreement between KMH, your company, and Waimana

14    Enterprises?

15    A     Yes.

16    Q     Okay.  And could you go to the second page, please.  And

17    could you highlight the first paragraph under the standards of

18    preparers.

19         Now, I'm going to read it to you and just -- then I'm

20    going to ask you a question of it just to be make sure.

21         It says:  During 2008 Congress amended the Internal

22    Revenue Code to enact the substantial authority doctrine for

23    tax purposes.  Now tax preparers need to believe that there is

24    33 percent chance of success to be able to sign a return

25    without additional disclosure.  This is much more lenient than

1    the rules placed in 2007, which require a preparer to

2    reasonably believe that there's a greater than 50 percent

3    chance that a reported position was proper.

4              Now, are you familiar with this part of your

5    engagement agreement, Miss Awa?

6    A    Yes.

7    Q    And you are familiar with the IRS rules underlying this

8    part of your engagement agreement?

9    A    Yes.

10   Q    And what you're trying to communicate is that, as long as

11   there's a one-out-of-three chance that you will ultimately be

12   held to be right, you're allowed to that position on the

13   return; isn't that right?

14   A    That's correct.

15   Q    You don't have to be a hundred percent sure.

16   A    That's correct.

17   Q    You don't have to be 50 percent sure.

18   A    That's correct.

19   Q    Just one out of three.

20   A    Correct.

21   Q    And then you avoid any civil penalties; is that correct?

22   A    That's correct.

23   Q    Okay.  Now, you were questioned by Mr. Harrington

24   regarding you mentioned KMH's involvement during the audit, and

25   you testified as to the return preparation process.  But let's

1    focus on the return preparation process.

2           I think you testified that throughout there was back

3    and forth, but the taxpayer always provided you all the

4    information you requested?

5    A    That's correct.

6    Q    Were they completely cooperative throughout all the

7    process of preparing the returns?

8    A    Yes.

9    Q    Did they ever try to conceal anything from you?

10   A    No.

11          MR. TOSCHER:  I have no further questions, Your

12   Honor.

13          THE COURT:  Okay.

14                    RE-DIRECT EXAMINATION

15   BY MR. HARRINGTON:

16   Q    Just want to refer again to what Mr. Toscher was talking

17   about.  This is talking about what a taxpayer needs to believe;

18   right?

19   A    Correct.

20   Q    So that's what you need to believe when you're preparing a

21   return.

22   A    Correct.

23   Q    And that's relying on the client giving you accurate

24   information.

25   A    Correct.

1   Q     So what that's talking about is your obligations, not what

2   the client is supposed to do; is that correct?

3   A     That's how I would interpret that.

4             MR. HARRINGTON:  Okay.  Thank you.

5             MR. TOSCHER:  No further questions, Your Honor.

6             THE COURT:  Okay.  Then the witness is excused.  You

7   may step down and leave the courtroom.

8             And that's it for today; is that right?

9             MR. HARRINGTON:  Yes, Your Honor.

10            THE COURT:  The jurors are extremely disappointed

11  because they were seriously looking forward to a full day.

12            But you're excused for the day.  And remember that we

13  don't have -- you can go ahead.

14       (Witness excused.)

15            THE COURT:  We don't have trial on Mondays; so the

16  next time I will see you will be at nine o'clock next week

17  Tuesday morning, and at that point we'll have a new witness on

18  the stand.  Okay?

19            So leave all your notebooks on your chairs.  Remember

20  not to read, listen to, or look up anything about this case.

21       (Jury excused.)

22            THE COURT:  Can I talk for a few minutes with the

23  attorneys about schedule.

24            Is the government able to give me any kind of

25  estimate on when the government's case in chief might end?

1              MR. TONG:  May I have one moment, Your Honor?

2         (Counsel conferring.)

3              MR. TONG:  Your Honor, I would estimate that we would

4    be done by Wednesday.  Two more days.

5              THE COURT:  Okay.  And I know they're not done yet;

6    so I know you can't commit to what you might be thinking about

7    putting on as a defense.  But are you able to give me a rough

8    estimate based on what we have so far?

9              MR. TOSCHER:  It would be rough, Your Honor.  I

10   just -- I'm trying to think if -- let's see, number of our

11   days?

12             THE COURT:  Yes.

13             MR. TOSCHER:  I think maybe three to five.

14             THE COURT:  Okay.

15             MR. TOSCHER:  I'm just not -- I'm really not sure yet

16   as to -- we've been moving very quickly.

17             THE COURT:  I'm just trying to figure out when I need

18   to resolve jury instructions.  We can wait a little on this.

19             Okay.  I mean, depending.  So, for example, if all

20   the evidence closed on next week Friday, just for example --

21             MR. TONG:  Your Honor, I think that's the 3d of

22   July.

23             THE COURT:  I'm sorry, 3d of July, yeah.  Then it

24   just so happens Monday, July 6th, is pretty full for me.  We

25   might let the jurors have a day off and do jury instructions on

1    Tuesday, the 7th, maybe.  Then we could have closing and

2    deliberate for the rest of the week.  We might get a verdict

3    then by the 10th.  I don't know, but just possibly.

4            It's not unusual for me to settle jury instructions

5    at the end of a trial day and just we all stay late and do

6    that.  Sometimes because I often will do some things off the

7    record, too, we can possibly come in on a weekend.  Although, I

8    hesitate to use that July 4th weekend.  There's all kinds of

9    things, but I have some -- first, I promised to perform a

10   wedding.  That's one thing.

11           Second, actually, and the more important, I actually

12   was hoping to keep that free because I have a funeral service.

13   My cousin was the woman who was killed not too long ago in an

14   auto accident while she was driving.  So we have -- there are

15   things I would like to pay attention to over the week.  But,

16   anyway, sometimes I do do that, and, you know, we can talk

17   about that next week as we go further into the week and figure

18   out what we need to do.

19           Okay.  I just wanted to get a sense.

20           Thank you.  I will see you next week Tuesday,

21   June 30, nine o'clock.

22        (Court adjourned at 12:13 P.M.)

23

24

25

```
 1                  COURT REPORTER'S CERTIFICATE

 2         I, Debra Kekuna Chun, Official Court Reporter, United

 3  States District Court, District of Hawaii, do hereby certify

 4  that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5  true, and correct transcript of the stenographically reported

 6  proceedings held in the above-entitled matter and that the

 7  transcript page format is in conformance with the regulations

 8  of the Judicial Conference of the United States.

 9         DATED at Honolulu, Hawaii, August 2, 2015.

10

11                               /s/ Debra Chun

12                               DEBRA KEKUNA CHUN

13                               RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25
```