1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3                                    )
     UNITED STATES OF AMERICA,       )  CR 14-00826 SOM
4                                    )
             Plaintiff,              )  Honolulu, Hawaii
5        vs.                         )  June 30, 2015
                                     )  9:00 A.M.
6    ALBERT S. N. HEE,               )
                                     )
7            Defendant.              )
                                     )
8    _____)

9              TRANSCRIPT OF JURY TRIAL (DAY 5)
              BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:          LAWRENCE L. TONG
                                  Office of the U.S. Attorney
13                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd. Ste. 6100
14                                Honolulu, HI 96850

15                                QUINN P. HARRINGTON
                                  U.S. Dept. of Justice
16                                Tax Division
                                  601 D St., N.W. Room 7029
17                                Washington, DC 20004

18   For the Defendant:           STEVEN TOSCHER
                                  KURT K. KAWAFUCHI
19                                LACEY STRACHAN
                                  Hochman salkin Rettig Toscher
20                                  & Perez
                                  9150 Wilshire Blvd., Ste. 300
21                                Beverly Hills, CA 90212

22   Official Court Reporter:     Debra Kekuna Chun, RPR, CRR
                                  United States District Court
23                                300 Ala Moana Blvd. Ste. C285
                                  Honolulu, HI 96850
24                                (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).

1                                    INDEX

2

3       EXAMINATION

4       Witness Name                                          Page

5       Adrianne Hee

6           Direct By Mr. Tong ...................................   9

7           Cross By Mr. Toscher ................................  51

8           Re-Direct By Mr. Tong...............................  68

9           Re-Cross By Mr. Toscher .............................  71

10      Susan Mitsuyoshi

11          Direct By Mr. Harrington ...........................  76

12          Cross By Mr. Toscher ................................ 154

13

14

15      EXHIBITS

16      Exhibit                                               Page

17      X Marked for Identification                           161

18

19

20

21

22

23

24

25

```
 1    TUESDAY, JUNE 30, 2015                9:00 O'CLOCK A.M.

 2         (In open court without the jury:)

 3              THE CLERK:  Criminal 14-826 SOM, United States of

 4    America versus Albert Hee.  This case has been called to

 5    Address Jury Issue.

 6              Counsel, please make your appearances for the record.

 7              MR. TONG:  Good morning, Your Honor.  Larry Tong,

 8    Quinn Harrington, Christina Sorely, and Greg Miki for the

 9    United States.

10              THE COURT:  Good morning.

11              MR. TOSCHER:  Good morning, Your Honor.  Steven

12    Toscher for defendant Albert Hee, who is present with me in

13    court.  We're in court together with Lacey Strachan and Kurt

14    Kawafuchi.

15              THE COURT:  Okay.  You had matters you wanted to

16    raise?

17              MR. TOSCHER:  Yes, Your Honor, we wanted to --

18              THE COURT:  So if you can let opposing counsel know

19    and call sooner, then we won't delay the jury, which is

20    something I know I expressly asked of counsel before trial

21    started, but, you know, when you do it as you walk in, then

22    it's a little hard.  We're going to delay the jury now.

23              Do these have to be addressed right now?

24              MR. TOSCHER:  Your Honor, it will be very quick.  I

25    spoke with counsel and informed them of the issues.  If we can
```

1    just take a few minutes.

2              THE COURT:  Okay.

3              MR. TOSCHER:  Okay.  We informed the government one

4    of the government's witnesses, Mr. Hee's daughter Liko, had her

5    baby this morning.  It was -- she went into the hospital last

6    night premature, but it was born this morning.  And we informed

7    the government, and the government will let you know -- I'm

8    trying to find out what the government's schedule is, when

9    they're going to rest, because things have been changing, and

10   that's sort of the main topic.

11             The one formality, procedurally -- and we can deal

12   with scheduling in a second -- the government has announced to

13   the Court that they're not pursuing the BWS, Board of Water

14   Supply, allegations, paragraphs 15 through 21, and I think we

15   should have something more formal on the record with the

16   government agreeing to strike those allegations.

17             THE COURT:  It's on the record.

18             MR. TONG:  It's on the record.  Mr. Toscher wasn't

19   there.  Mr. Kawafuchi was there.  It's on the record.  It's in

20   the minutes.

21             MR. TOSCHER:  Your Honor, I wasn't there, and it was

22   just -- I don't think -- okay.  If that's adequate, if it's

23   clear, then --

24             MR. TONG:  I think it is.  When you have four lawyers

25   and one of them appears in court, presumably they have

1    authority to act on behalf of the defense.

2              MR. TOSCHER:  Absolutely, Your Honor.

3              THE COURT:  It's already on the record.

4              MR. TOSCHER:  Okay.  Then that's fine, Your Honor.  I

5    just wanted to confirm that.  I didn't know how informal that

6    was.  But that's fine.

7              With that, Your Honor, I've also let the government

8    know, and the issue is, when we get the government's tax

9    computations, which we have not received yet, that we would

10   request some time to be able to review them before we have to

11   cross-examine the government's summary expert.

12             So I wanted to let the Court know those scheduling

13   issues, and I think I would just request that the government

14   let us know -- I had a brief conversation with Mr. Tong as to

15   when they expect to finish, what remaining witnesses, because

16   we're trying to get ready for our defense.

17             THE COURT:  Okay.  So last time he said he thought

18   they would rest tomorrow, as I recall.  So you, presumably,

19   should be ready to put on the beginning of your case tomorrow,

20   if that's still holding true.

21             MR. TONG:  Yes, Your Honor, it is.

22             MR. TOSCHER:  Yes, Your Honor.  And we're starting to

23   get our witnesses to have witnesses ready tomorrow.  And I

24   believe --

25             THE COURT:  Okay.  So what's happening with the

1   government reaction to Mr. Hee's becoming a grandfather?  Or

2   maybe you already are a grandfather.  I don't know.

3            THE DEFENDANT:  Second one, Your Honor.

4            THE COURT:  Second one?  Okay.

5            MR. TONG:  Your Honor, just to be clear, we actually

6   were notified late yesterday about 5:00 P.M. by Mr. Purpura.

7   We did not hear anything from Mr. Toscher until this morning.

8            But we did review our evidence, and I believe we will

9   call Adrianne Hee this morning and reassess, reconfirm, but at

10  that point we probably will not see the need to call the other

11  daughter.

12           THE COURT:  Okay.

13           MR. TONG:  And after that, assuming we have the

14  evidence in and subject to a check of the exhibit list, I

15  believe we'll be ready to go to the summary witness Susan

16  Mitsuyoshi.

17           THE COURT:  And --

18           MR. TONG:  And as to the timing of how long she'll

19  need for the schedules, Mr. Harrington will be dealing with

20  that witness; so he would probably be in a better position to

21  address any issues the Court may have.

22           THE COURT:  Okay.

23           MR. HARRINGTON:  Yes, Your Honor.  We already have

24  the schedules prepared, and, of course, it's subject to there

25  being perhaps some unanticipated testimony from Miss Hee, who

1    is going to testify this morning.  But we don't anticipate that

2    being an issue.  We have all the schedules prepared right now,

3    and we anticipate that at the end of close of testimony from

4    Miss Hee we'll be able to take a look at them, make sure

5    everything is in order, and turn it over and begin her

6    testimony.

7            THE COURT:  So as long as you have a chance to review

8    this before cross-examination.  I mean, the summary witness may

9    take a while.  I mean, typically, it's a tedious thing --

10           MR. HARRINGTON:  Yes, Your Honor, probably be a few

11   hours we anticipate.

12           THE COURT:  So will that be enough?

13           MR. TOSCHER:  Your Honor, as soon as I see them,

14   I'll diligent effort to go through them, but I would just like

15   the time to be able to go through them.

16           THE COURT:  Okay.  Well, some reasonable time.

17           MR. TOSCHER:  Of course, Your Honor.

18           One other quick -- I'm sorry, Your Honor.  I assume

19   from Mr. Tong's statement -- I had an issue regarding Mr. Tong

20   had indicated they may be calling the government's Special

21   Agent Mr. Miki.  May I assume now that the government is not

22   going to call Special Agent Miki?

23           MR. TONG:  Yes.

24           THE COURT:  Okay.

25           MR. TONG:  We may call him in rebuttal, but not at

1    this point.

2              MR. TOSCHER:  Thank you, Your Honor.

3              THE COURT:  We'll deal with rebuttal later.

4              MR. TOSCHER:  Yes, Your Honor.  I just want to make

5    sure I know so we can start preparing.

6              THE COURT:  Okay.

7              MR. TOSCHER:  Thank you, Your Honor.

8              THE COURT:  So we're going to bring the jury in, and

9    then you can have your next witness on the stand.

10         (Jury enters.)

11             THE CLERK:  Please be seated.

12             Criminal 14-826 SOM, United States of America versus

13   Albert Hee.  This case has been called for Further Jury Trial.

14             Counsel, please make your appearances for the record.

15             MR. TONG:  Good morning, Your Honor.  Good morning,

16   ladies and gentlemen.  Larry Tong and Quinn Harrington for the

17   United States.  With us are Christina Sorely, our technical

18   assistant, and Special Agent Greg Miki of the IRS.  Good

19   morning.

20             MR. TOSCHER:  Good morning, Your Honor.  Good

21   morning, ladies and gentlemen.  Steven Toscher for defendant

22   Albert Hee, who is present with me in court, together with

23   Lacey Strachan and Kurt Kawafuchi.

24             THE COURT:  Okay.  Good morning.  You can all be

25   seated.

```
 1              Welcome back, ladies and gentlemen.  I don't know if
 2    you've thought about any of us during the break, but I promise
 3    you that the people sitting at those tables have thought of
 4    nothing else but you while you have been out of their view.  So
 5    they're ready to go and continue with this trial.
 6              Counsel, you can bring in your next witness.
 7              MR. TONG:  Government calls Adrianne Hee.
 8         (Witness photographed.)
 9              THE CLERK:  Please raise your right hand.
10         (Witness sworn.)
11              THE CLERK:  Thank you.  Please be seated.
12              Please state your name and spell your last name.
13              THE WITNESS:  Adrianne Ho'oulu-no-na-lani Roylo Hee,
14    H-e-e.
15                         DIRECT EXAMINATION
16    BY MR. TONG:
17    Q    Good morning.
18    A    Good morning.
19    Q    Do you also go by the name Ho'o?
20    A    I do.
21    Q    And where do you presently live?
22    A    In Brooklyn, New York.
23    Q    Are you originally from O'ahu?
24    A    Yes, I am.
25    Q    What year were you born in?
```

```
 1  A    1986.

 2  Q    And your present age?

 3  A    Twenty-nine.

 4  Q    Who is your father?

 5  A    Albert Hee.

 6  Q    Do you see him in court today?

 7  A    Yes.

 8  Q    Is he the individual standing up?

 9  A    Yes.

10        MR. TONG:  May the record reflect the identification

11  of the defendant.

12        THE COURT:  Yes, it so reflects.

13  BY MR. TONG:

14  Q    And, Miss Hee, who is your mother?

15  A    Wendy Hee.

16  Q    Does she use the middle name or her maiden name Roylo?

17  A    Yes.

18  Q    Same name you have in yours?

19  A    Yes.

20  Q    And who is your paternal grandfather?

21  A    Charles Hee?

22  Q    Yeah, your dad's dad.

23  A    Yeah.

24  Q    And how about your father's mother?  What was her name?

25  A    Roselani Hee.
```

1   Q     And I gather she is no longer with us; is that correct?

2   A     Yes.

3   Q     Do you have any siblings?

4   A     I have two.

5   Q     What are their names?

6   A     Whole name or what I call them?

7   Q     Why don't you tell us -- tell us the whole name.

8   A     My sister is Breanne Ehu-kai-o-liko-i-ka-makani Roylo Hee.

9   And my brother is Charlton E-ola-koa-kupa'a-i-ke-one-kulaiwi

10  Roylo Hee.

11  Q     And is it true you know your sister by the shortened name

12  Liko?

13  A     Yes.

14  Q     And your brother by the name Kupa'a.

15  A     Yes.

16  Q     And what are their ages?  Or it looks like I'm

17  confusing --

18  A     I think Liko is 27, and I think Kupa'a is 25.

19  Q     So two-year gaps between each of you, give or take.

20  A     Give or take.

21  Q     Okay.  Now, can you tell us about your educational

22  background, starting with high school.  Where did you go to

23  high school?

24  A     I went to Kamehameha.

25  Q     And what year did you grad?

```
 1   A    2004.

 2   Q    Did you go to college after that?

 3   A    I did.

 4   Q    Where did you go?

 5   A    I went to the Massachusetts Institute of Technology, MIT.

 6   Q    Where is MIT located?

 7   A    In Cambridge, Massachusetts.

 8   Q    When did you start at MIT?

 9   A    2004.

10   Q    Did you get a degree from MIT?

11   A    I did.

12   Q    What year did you earn that degree?

13   A    2009.

14   Q    So it took you five years at Cambridge to get the degree;

15   is that correct?

16   A    Yes.

17   Q    And what was the degree in?

18   A    It's a Bachelor's of Science in Architectural Studies.

19   Q    Were you a full-time student while you were working -- I'm

20   sorry.  Let me start again.

21          Did you take courses on a full-time basis at MIT?

22   A    Yes, I did.

23   Q    And were the courses given on a semester or trimester

24   basis?

25   A    Semester.
```

1   Q    So can you give the jury an idea of when the fall semester

2   would start and end.

3   A    Probably around the end of August/September, and then it

4   would end in December.

5   Q    And how about the spring semester?

6   A    The spring would start in February and end around early

7   June.

8   Q    And during your time as a student at MIT, I gather you

9   lived in the Cambridge area.

10  A    I did.

11  Q    Did you come home during breaks?

12  A    I did.

13  Q    And how often each year would you come home?

14  A    At least twice a year.

15  Q    And that would be for Christmas break?

16  A    Yes.  Normally, for Christmas and then summer.

17  Q    Now, how did you pay for your tuition at MIT?

18  A    My father's company paid for it initially, and then it was

19  transferred into a shareholder loan that he later paid off.

20  Q    Okay.  And you didn't know how it was being paid

21  initially, did you.

22  A    I just understood that the company was paying for it.

23  Q    And his company is Waimana Enterprises; correct?

24  A    It is.

25  Q    And you mentioned the shareholder loan.  I gather that's

```
 1    information you acquired at some later time during an
 2    investigation; correct?
 3    A    It was told later that it was a shareholder's loan.  I
 4    don't think it was because of this investigation.
 5    Q    Okay.  You didn't know it at the time the payments were
 6    being made, though; right?
 7    A    No.
 8    Q    You just knew that Waimana was making the payments.
 9    A    Yes.
10    Q    You didn't know -- I mean, how the payments were being
11    treated for tax purposes; right?
12    A    No.
13    Q    And you were a student, and all you cared about is being
14    able to study; right?
15    A    Yes.
16    Q    Now, what about your housing?  How was that paid for while
17    you were at MIT?
18    A    Waimana also paid for it.
19    Q    And were you in on-campus housing, or did you move off
20    campus?
21    A    I was on campus for the first four years, and then the
22    last year I moved off.
23    Q    The entire five years Waimana paid for those costs;
24    correct?
25    A    Yes.
```

1   Q    What about your books?

2   A    They also covered those.

3   Q    So pretty much Waimana Enterprises paid all of the costs

4   associated with your study at MIT.

5   A    Yes, room and board.

6   Q    Now, while you were an undergraduate student, was there a

7   time when you studied abroad?

8   A    Yes, for a summer.

9   Q    And which university did you study with?

10  A    I studied with MIT after the first summer there in

11  Venice -- not in Venice, outside the Venice area.  And then the

12  next summer I studied with Arizona State University.

13  Q    And that was some kind of program Arizona State offered to

14  allow you to study in Europe; correct?

15  A    Yes.

16  Q    And would that have been in the summer of 2007?

17  A    Might have been.

18  Q    Okay.  And where did you study on that Arizona State

19  University program?

20  A    That program was in Barcelona, Paris, and then Amsterdam.

21  Q    What did you study during that summer?

22  A    It was design.

23  Q    And so it was related to your architectural studies, I

24  gather.

25  A    It was.

```
 1   Q    And who paid the tuition for the summer you spent abroad

 2   with Arizona State University?

 3   A    I believe Waimana did.

 4   Q    And how about the travel expenses?

 5   A    I believe Waimana did, too.

 6   Q    How about your living expenses over that summer?

 7   A    It was included in the costs of the tuition.

 8   Q    Okay.  Now, while you were at MIT is it true that you were

 9   on the payroll of Waimana Enterprises?

10   A    Yes.  Starting in 2006.

11        MR. TONG:  Okay.  And if we could show the jury

12   Exhibit 4-118, page 86, please.

13   Q    Miss Hee, we're going to put a document up on the screen.

14   I don't know if you can see it from where you are.  We'll try

15   to blow it up.

16        Can you read that?

17   A    Yes.

18   Q    I think you just testified that you were put on the

19   payroll in January of 2006; is that correct?

20   A    Yes.

21   Q    And the stated salary on this document is $24,000 a year;

22   is that correct?

23   A    It is.

24   Q    Is that consistent with your memory of what you were

25   getting paid while you were a student at MIT?
```

1   A    I believe so, yes.

2   Q    And let me do the calculation here.  I believe you said

3   you started at MIT in the fall of 2004?

4   A    Yes.

5   Q    So this would have been the winter semester of your

6   sophomore year; correct?

7   A    Yes.

8   Q    And is it true you continued to receive pay in that amount

9   throughout your time at MIT?

10  A    It is.

11  Q    Now, this document -- by the way, you know who Nancy

12  Henderson is; right?

13  A    I do.

14  Q    She was your dad's office manager or assistant; correct?

15  A    Yes, she was.

16  Q    And the document says you, Adrianne Hee, would be

17  enrolling in the 401(k) program.  Do you see that reference?

18  A    Yes, I do.

19  Q    You know what a 401(k) program is?

20  A    Yes.  It's a retirement account.

21  Q    It says you would be contributing 12 and a half percent of

22  your wages towards your retirement; correct?

23  A    It does.

24  Q    Did you, in fact, make those contributions, or rather have

25  them withheld from your salary?

1    A    Yes.

2    Q    Now, you said that you graduated from MIT in 2009; is that

3    correct?

4    A    Yes, it is.

5    Q    What happened to your salary with Waimana upon your

6    graduation?

7    A    It increased.

8    Q    Do you recall the amount to which it increased?

9    A    I believe it increased to 50,000.

10   Q    Per year?

11   A    Yes.

12   Q    And was the graduation in May or June of 2009?

13   A    June.

14   Q    And what did you do immediately upon your graduation?

15   A    I worked at a program in the Berkshires called BUTI,

16   Boston University Tanglewood Institute.

17   Q    So you stayed in Boston.

18   A    It's outside of Boston, but, yes, it's in Massachusetts.

19   Q    Just so I'm clear, I'm not real familiar with Boston.

20   Cambridge is sort of a smaller community that is adjacent to

21   Boston; is that correct?

22   A    It is.  But this particular job wasn't near Boston.  It

23   was two hours outside.

24   Q    And you say that it was the Tanglewood Institute; is that

25   correct?

```
 1   A     Boston University Tanglewood Institute, yes.

 2   Q     That's part of the Boston University College of Fine Arts,

 3   is it not?

 4   A     Yes.

 5   Q     And what does the Tanglewood Institute do?

 6   A     It's a music program for children, ranging from

 7   intermediate up through high school, that are particularly

 8   gifted, and they're taught by the Boston Symphony Orchestra for

 9   the summer.

10   Q     And did you work there over the summer of 2010?

11   A     No.  2009.

12   Q     I'm sorry.  Excuse me.  My bad.

13   A     Okay.

14   Q     The summer of 2009?

15   A     Yes.

16   Q     And what was your job with the Tanglewood Institute?

17   A     I was a transportation manager.

18   Q     What did you do as a transportation manager?

19   A     I coordinated -- there were approximately 350 students,

20   and I coordinated their transportation to various venues they'd

21   rehearse at.  And I also did the payroll of these outside

22   contractors that we'd use to bus them.

23   Q     So I gather you lived in Cambridge or somewhere in the

24   Boston area while you had that job; is that true?

25   A     I lived out there at Tanglewood, yes.
```

1    Q     Now, what did you do after your employment with Tanglewood

2    Institute?

3    A     I worked at the Huntington Theatre Company.

4    Q     Tell us what the Huntington Theatre Company is.

5    A     It's a mid-sized non-profit theatre in the Boston area.

6    Q     Before I move on to Huntington Theatre, your employment

7    with the Boston University Tanglewood Institute lasted what,

8    how many weeks, roughly?

9    A     It was for the summer; so maybe two and a half months.  So

10   it's 10 weeks.

11   Q     And you mentioned that after that you went to the

12   Huntington Theatre Company; correct?

13   A     I did.

14   Q     Tell us what the Huntington Theatre Company is.

15   A     It's a mid-sized non-profit theatre in the Boston area.

16   Q     What was your job for the Huntington Theatre Company?

17   A     I was one of the people that built sets and props and then

18   installed them for the productions.

19   Q     What was your title, if you call?

20   A     I was a professional intern, I believe.

21   Q     And how long did you work for that organization?

22   A     I worked there for the season; so September -- August,

23   September through June.

24   Q     And when you say "season," I gather you mean a season of

25   different shows or productions; correct?

1   A     Yes.

2   Q     Now, while you were a student at MIT, did you also work in

3   the theater department there?

4   A     I did.

5   Q     And what did you do for the theater department of MIT?

6   A     Similar.  I built sets and props and helped install them.

7   Q     Were the jobs with Tanglewood Institute, Huntington

8   Theatre, and MIT paying jobs?

9   A     Yes, they were.

10  Q     So I'd like to direct your attention to a tax return,

11  which is Exhibit 1-40.  It's to your left.  And we'll also put

12  it up on the screen.  If we could take a look at that, please.

13           If we could look at the first page of the tax return,

14  which is page 190, please.

15           You see that in front of you, Miss Hee?

16  A     I do.

17  Q     Let's zoom in on the top half, please.

18           And, Miss Hee, this is a tax return for calendar year

19  2009; correct?

20  A     Yes.

21  Q     That's the year in which you graduated from MIT; correct?

22  A     It is.

23  Q     As well as the year in which you had the employments that

24  you just referenced; is that correct?

25  A     It is, yes.

1  Q    And it appears that it was filed with your Kailua address;

2  is that correct?

3  A    Yes.

4  Q    And it looks like on line 7, if we could go to 7, please,

5  you're reporting income of $57,510; is that correct?

6  A    Yes.

7  Q    And let's go to page 2 just to confirm that this is your

8  return.  This is page 191.  And if we could look at the bottom

9  part.

10         There's a signature block.  Do you see that?

11  A    Yes.

12  Q    And whose signature is that?

13  A    It looks like mine.

14  Q    And you listed your occupation as a student; correct?

15  A    Yes.

16  Q    And the date of the signing?

17  A    It says 5/11/2010.

18  Q    Okay.  Now, I want to move forward a few pages to the

19  first page with your W-2s, which is at Bates number 193.  If we

20  may display that, please.

21         If we can zoom in on the top half, please.  I'm going

22  to start with the one in the upper left-hand corner.

23         This W-2 shows that you earned income from the

24  trustees of Boston University; is that correct?

25  A    Yes.

1   Q     And the income was about $5200; correct?

2   A     Yes.

3   Q     Would that be the wages you earned for the Tanglewood

4   Institute?

5   A     Yes.

6   Q     As a transportation manager?

7   A     Yes.

8   Q     And to the right there's another W-2, indicating that you

9   received money from the Huntington Theatre Company in the

10  amount of $5,105; correct?

11  A     Yes.

12  Q     And would that be the income that you earned as an intern

13  for the Huntington Theatre Company?

14  A     Yes.

15  Q     For the season in 2009; correct?

16  A     Yes.

17  Q     And the bottom, if we may go to the bottom, is a W-2 from

18  MIT, your school; is that correct?

19  A     Yes.

20  Q     And it shows income in the amount of $1214 and change;

21  correct?

22  A     Yes.

23  Q     And would that be the income that you earned in their

24  theater department while working?

25  A     Yes.

1   Q     Now, if we can go to the next page, Bates number 194, this

2   is another W-2 that's attached to your tax return for 2009; is

3   it not?

4   A     Yes.

5   Q     And it shows your employer as Waimana Enterprises;

6   correct?

7   A     Yes.

8   Q     That's your father's company.

9   A     Yes.

10  Q     And the amount of pay indicated was actually in the lower

11  box.  I can't read the number.  Number 5.  Shows $52,108, does

12  it not?

13  A     It does.

14  Q     And how were those payments being made to you?

15  A     I'm sorry?

16  Q     Did you get them by direct deposit?

17  A     Oh.

18  Q     Did you receive a check?

19  A     Yes.

20  Q     How would you actually receive the money?

21  A     Direct deposit.

22  Q     And, finally, if we can look at the last page, this

23  appears to be an envelope, does it not?

24  A     It does.

25  Q     And the upper left-hand corner has a return address?

1    A     It does.

2    Q     And it says Providence, Rhode Island; correct?

3    A     It does.

4    Q     If I recall correctly, the date of the tax return was May

5    of 2010; correct?

6    A     I think so, yes.

7    Q     And you're a little younger than I am so you may be able

8    to do this.  Can you look at the stamp date in the upper

9    right-hand corner there and tell us what date is on that stamp.

10   A     July 15th.

11   Q     Of 2010; correct?

12   A     Yes.

13   Q     So would it be fair for us to conclude from that that, as

14   of July 15 of 2010, you were living in Providence, Rhode

15   Island?

16   A     Yes.

17   Q     So you had moved from Massachusetts to Rhode Island.

18   A     I had.

19   Q     What brought about that move?

20   A     I was beginning my master's program at the Rhode Island

21   School of Design.

22   Q     Okay.  And what kind of school is that?

23   A     It's an art and design school.

24   Q     And when did you attend the Rhode Island School of Design?

25   A     From September 2010 until June of 2013.

1    Q    And again how were you -- excuse me.  Were you a full-time

2    student?

3    A    Yes, I was.

4    Q    And what was your major?

5    A    Furniture design.

6    Q    And did you obtain a degree?

7    A    I did.

8    Q    What was your degree in?

9    A    Master's of Fine Arts.

10   Q    When did you receive your degree?

11   A    In 2013.

12   Q    And again would the academic calendar have gone roughly

13   from September to December of each year and then January to

14   May, give or take?

15   A    Yes.

16   Q    And I believe you said that your degree was actually in

17   furniture design?

18   A    It was, yes.

19   Q    Can you explain to the jury what's involved in furniture

20   design.

21   A    We take an object that we'd like to design.  We imagine

22   it.  We draft it.  We either construct it ourselves, or we work

23   with outside manufacturers a lot of times, and we produce these

24   pieces.

25   Q    And who paid for your tuition at the Rhode Island School

1   of Design?

2   A    I believe Waimana did.

3   Q    You did not personally pay for it, did you?

4   A    No, I didn't.

5   Q    And did you live on campus?

6   A    No.  I lived off campus.

7   Q    And who paid the rent for your housing?

8   A    Waimana.

9   Q    And who paid the expenses that you incurred while you were

10  a student at Rhode Island School of Design?

11  A    I mostly paid for them myself.

12  Q    Were you receiving a salary from --

13  A    I was.

14  Q    -- Waimana Enterprises?

15  A    Yes.

16  Q    While a full-time student; is that correct?

17  A    Yes.

18  Q    Now, while you were a student at Rhode Island School of

19  Design, did there come a time when you attended an institute

20  called the WoodenBoat School?

21  A    Yes.

22  Q    Where is that institution located?

23  A    It's in Maine.

24  Q    And when did you attend that school?

25  A    One of the summers that I was there.

1   Q    Okay.  Let me show you a document that may help you.  It

2   should be in your binder.  It's Exhibit 4-82Q.

3          May we display that, please.  The second page,

4   please.

5          Actually, let's start with the first page, please.

6          Do you have that in front of you, Miss Hee?

7   A    No.  I'm not quite sure where it is.

8   Q    Okay.  Well, let's look at the screen.

9          Can you read that check?

10  A    Yes.

11  Q    And the date on the check appears to be February 18, 2011.

12  Does that refresh your memory of when you think you attended

13  the WoodenBoat School?

14  A    That summer, I believe, yes.

15  Q    And it's a check drawn on Waimana Enterprises' account

16  made payable to the school in the amount of $2,000; is that

17  correct?

18  A    Yes.

19  Q    And the memo indicates that it was a deposit for you; is

20  that correct?

21  A    Yes.

22  Q    Now, if I can look at the next page, let's direct your

23  attention there.  This is an application that you filled out;

24  is that correct?

25  A    Yes.

1    Q     Is that your handwriting?

2    A     That is.

3    Q     It has that sort of block design.  I guess people in

4    architecture tend to do that; is that correct?

5    A     Yes, they do.

6    Q     And, basically, it asks for information about you, and you

7    said you were living in Providence, Rhode Island; correct?

8    A     Uh-huh.

9    Q     And your occupation was "student"; correct?

10   A     Yes.

11   Q     Now, may we see the bottom part where Miss Hee wrote in

12   her experience.

13                This is your handwriting; correct?

14   A     Yes.

15   Q     And it was in response to a question asking you to set out

16   the experience and how it would relate to your studies;

17   correct?

18   A     Yes.

19   Q     And you said you were completing a master's degree in

20   furniture design; correct?

21   A     Yes.

22   Q     Okay.  Now, let's look at the upper right, and maybe you

23   can describe what courses you were taking.

24   A     It says Fundamentals of Boat Building and Build Your Own

25   Northeaster Dory.

 1   Q    Can you describe what those courses were about.

 2   A    I only took actually the first course, and they brought

 3   you through the traditional methods of wooden boat building.

 4   Q    And you spent the summer in Maine; is that correct?

 5   A    Two weeks.

 6   Q    Two weeks.  Now, after spending the two weeks in Maine in

 7   2011, I assume you returned to the Rhode Island School of

 8   Design; correct?

 9   A    Yes.

10   Q    Let me ask you to look at Exhibit 4-86.  And if we could

11   blow up the top half, please.

12          This is a document -- go ahead and look in your

13   binder, if you'd like.

14   A    I don't seem to have any of the 80s, but --

15   Q    Okay.  Are you able to read it from where you are?

16   A    No, I'm not.

17   Q    Okay.

18          THE COURT:  We can give you the document.  Hold on.

19          And you might be able to read it now.  They kind of

20   have a better blowup.

21          THE WITNESS:  Thank you.

22   BY MR. TONG:

23   Q    Are you able to see that document now?

24   A    Yes.

25   Q    Okay.  And it's a document from your dad's company;

1    correct?

2    A    Yes, it is.

3    Q    And it talks about the compensation and benefits paid for

4    the period July 1, 2010, through June 30, 2011; correct?

5    A    Yes.

6    Q    That's an entire fiscal year; correct?

7    A    Yes.

8    Q    And the employee name is you; is that correct?

9    A    Yes.

10   Q    The hire date is the 2006 date that we earlier discussed

11   when you went on salary at 24,000 a year; is that correct?

12   A    Yes.

13   Q    And under compensation there is a total paid by the

14   company of $57,999; is that correct?

15   A    Yes.

16   Q    And for the July 2010 through June 30, 2011 period you

17   were at the Rhode Island School of Design; is that correct?

18   A    Yes.

19   Q    Pursuing your Master's Of Fine Arts; correct?

20   A    Yes.

21   Q    And this document says that your compensation was based on

22   pay for 2,008 hours worked for the company, does it not?

23   A    It says that, yes.

24   Q    But you were physically in Rhode Island; correct?

25   A    I was.

 1   Q     And you didn't devote 2,008 hours of your time to company

 2   business during that calendar year, did you?

 3   A     No.

 4   Q     Now, if we can go to the bottom part of that document.

 5   Maybe if we can just go from the health and retirement benefits

 6   down, please.

 7         Are you able to read that, or do you want us to blow

 8   it up a little more?

 9   A     I think that's good.

10   Q     Okay.  This section is health and retirement benefits;

11   correct?

12   A     Yes.

13   Q     And when you went on salary with Waimana, you remember

14   filling out some forms giving you certain benefits.

15   A     Yes.

16   Q     Do you recall the types of benefits that were given to

17   you?

18   A     Medical and the retirement.

19   Q     Okay.  Life insurance as well?

20   A     Yes.

21   Q     Disability insurance?

22   A     Yes.

23   Q     And 401(K), the retirement that you mentioned; is that

24   correct?

25   A     Yes.

1   Q    And, basically, they're listed here under the column

2   Health and Retirement Benefits; correct?

3   A    They are.

4   Q    And the total paid is listed at $22,284; correct?

5   A    It is.

6   Q    And that sort of comprised the fringe benefits that you

7   were receiving for being on Waimana's payroll; is that correct?

8   A    Yes.

9   Q    And then the section below that, Employee Paid Deductions,

10  do you know what those relate to?

11  A    The amount I paid.  Right?

12  Q    I think you faded a little.  I didn't hear it.

13  A    The amount that I paid.

14  Q    Oh, thank you.  So those were the amounts that were taken

15  out of your paycheck before the money was electronically

16  deposited to you in Rhode Island.

17  A    Yes.

18  Q    And it says at the bottom total compensation and benefits

19  for that year:  $85,364.  Correct?

20  A    Yes.

21  Q    Okay.  Miss Hee, I believe you testified that you obtained

22  your degree from Rhode Island School of Design in 2013;

23  correct?

24  A    I did.

25  Q    Have you had any employment in the East Coast since then?

1   A   I have.

2   Q   And are you presently employed on the East Coast?

3   A   I am.

4   Q   What is your employment?

5   A   The company I work for?

6   Q   Yes.

7   A   David Stark Design & Production.

8   Q   David Stark?

9   A   Design & Production.

10  Q   And how long have you had that particular position?

11  A   Since October or November of last year.

12  Q   2014 to now.

13  A   Yes.

14  Q   So we would be looking at maybe seven months?

15  A   Yes.

16  Q   Eight months?

17  A   Yes.

18  Q   And what do you do for the David Stark Design & Production

19  Company?

20  A   I'm an associate technical designer.

21  Q   I probably should ask what the company itself does.

22  A   We produce a variety of events from the design through the

23  production, such as charitable galas like the Robin Hood

24  Foundation the New York Public Library puts on.  We also do

25  private events for corporations like Bridgewater.  And we do

1    product launches for companies like JC Penney's and Target.

2    Q    So you do design and production work to make these special

3    events even more special.

4    A    Yes.

5    Q    And I gather that would be something that your degrees in

6    furniture design and architectural studies would help; is that

7    correct?

8    A    Yes.

9    Q    And prior to your position with the David Stark Design &

10   Production Company, where did you work?

11   A    I worked at Parsons, a new school for design.

12   Q    And where is the Parsons School for Design located?

13   A    It's in Manhattan.

14   Q    And what does the Parsons School for Design do?

15   A    It's an educational institute specifically for design.

16   Q    What was your position with the Parsons School?

17   A    I was a technician there.

18   Q    And what does a technician at the Parsons School do?

19   A    We make sure that the students know how to properly use

20   the equipment.

21   Q    And how long did you have that particular position?

22   A    From January of that year until I left for David Stark.

23   Q    So that would be January of 2014 up until November of 2014

24   when you took another position.

25   A    Yes.

1   Q     Have you also worked at a company called Puppet Heap?

2   A     Yes, I did an internship there.

3   Q     Tell us what Puppet Heap does.

4   A     They produce puppets for film and television.  So they

5   have the contract with Disney to make The Muppets.

6   Q     And where is Puppet Heap located?

7   A     It's in Hoboken, New Jersey.

8   Q     And when did you work for Puppet Heap?

9   A     From January till around June of that same year.

10            THE COURT:  It's Puppet Heap, H-e-a-p?

11            THE WITNESS:  Yes.

12            MR. TONG:  Thank you, Your Honor.

13   Q     So you had the job with Puppet Heap and the job with --

14   with the Parsons School at the same time.

15   A     Yes.

16   Q     So you were working part-time gigs simultaneously.

17   A     Yes.

18   Q     And I gather your background in design and architectural

19   studies was of assistance in your employment at Puppet Heap.

20   A     Yes.

21   Q     In what way?

22   A     The owner there really wanted to incorporate more

23   computer-aided fabrication methods.  The puppets are

24   traditionally sculpted by hand, and he wanted to try and bring

25   in computer processes like CNC milling and 3D printing to see

1    if it would create a more economical product.

2    Q    Now, Miss Hee, you actually have a website, do you not?

3    A    I do.

4    Q    And your website sets out information about your

5    background and your many accomplishments, does it not?

6    A    I believe it does.

7    Q    Okay.  And one of the things that appears on your website

8    is a resume; correct?

9    A    If it's still there, yes.

10   Q    Okay.  Well, maybe you can turn to the binder to your

11   left, the thinner one, and look at Exhibit 24C, as in Charlie.

12          Do you have that document in front of you,

13   Miss Hee?

14   A    I do.

15   Q    And is that the resume that you posted online?

16   A    Looks like it.

17   Q    Okay.  What -- if you're not sure, please feel free to

18   take a minute and review it.

19   A    Yeah.

20   Q    That's your resume; correct?

21   A    It was mine at the time of posting, yes.

22   Q    When was this posted?

23   A    I don't remember.  I haven't touched that website in a

24   while.

25   Q    But we're talking what, in the last two years or so?

1    A    I think, yeah, around the time I graduated.

2    Q    Okay.  Well, I mean, look at the section entitled

3    "Experience."  Do you see that?

4    A    Uh-huh.

5    Q    And it identifies your most recent experience as working

6    as a part-time technician for the Parsons School; correct?

7    A    It does.

8    Q    And it gives the time of employment as 2014 to present;

9    correct?

10   A    Yes, it does.

11   Q    So would it be fair to assume that this version of the

12   resume was prepared in 2014 or later?

13   A    Yes.

14   Q    Okay.  And there's a section with education; correct?

15   A    There is.

16   Q    And is it true that that section identifies each of the

17   institutions that you've testified about this morning?

18   A    Yes.

19   Q    Rhode Island School of Design?

20   A    Yes.

21   Q    MIT?

22   A    Yes.

23   Q    Arizona State University?

24   A    Yes.

25   Q    And WoodenBoat School; correct?

1    A    Yes.

2    Q    Then there's a section called "Experience"; is there not?

3    A    There is.

4         MR. TONG:  Your Honor, I have another copy.  I'm

5    sorry.  May I hand this to Miss Fujinaga.

6         THE COURT:  Thank you.

7    Q    And, Miss Hee, under "Experience" you essentially listed

8    your jobs; is that right?

9    A    Not all of them, but some of them, yes.

10   Q    Okay.  And it included Parsons.

11   A    Yes.

12   Q    Let me count how many first.  1, 2, 3, 4, 5, 6, 7, 8, 9,

13   10, it lists 11 different employments, does it not?

14   A    Yes.

15   Q    And it included Parsons; correct?

16   A    Yes.

17   Q    Working for the Furniture Design Master Thesis Show for a

18   company called the New Clarity; correct?

19   A    Yes.

20   Q    Working for the Rhode Island School of Design Furniture

21   Department?

22   A    Yes.

23   Q    Working for MIT Mechanical Engineering Department?

24   A    Yes.

25   Q    Working for the Huntington Theatre Company; correct?

1   A     Yes.

2   Q     That's one of the ones we already discussed; correct?

3   A     Yes.

4   Q     Working for the Boston University's Tanglewood Institute;

5   correct?

6   A     Yes.

7   Q     That was for one summer in 2009; correct?

8   A     Yes.

9   Q     Working for the MIT Theatre Company; correct?

10  A     Yes.

11  Q     That's what we discussed also earlier.

12  A     Yes.

13  Q     Working for the MIT Architecture Department; correct?

14  A     Yes.

15  Q     Working for the Archaeological Institute of America; is

16  that correct?

17  A     Yes.

18  Q     And all of those were from 2006 through 2014; correct?

19  A     Yes.

20  Q     And then we have an entry here that says you worked for

21  Sandwich Isles Communications; is that correct?

22  A     Yes.

23  Q     And the term that you put down for the period in which you

24  were employed was 2004 through 2008 summers; is that correct?

25  A     Yes.

1    Q     And what position did you indicate you held with Sandwich

2    Isles Communications during those summers?

3    A     That I was a workhand.

4    Q     Did you describe the duties that you performed on behalf

5    of that company?

6    A     Yes.

7    Q     And what did you say?

8    A     It says:  Operated heavy machinery, including bulldozers,

9    tractors, and skid steer loaders, charged with the upkeep of a

10   3,000-square-foot nursery, and the implementation of an

11   irrigation system.

12   Q     And there's no reference on your resume to any employment

13   with Sandwich Isles Communications other than the summers of

14   2004 through 2008; is that correct?

15   A     Not this one, no.

16   Q     Well, you also have a LinkedIn, don't you?

17   A     I do.

18   Q     And LinkedIn is like an online resume, too, is it not?

19   A     It is.

20   Q     And on that resume you listed all of your jobs; correct?

21   A     Not all of them.  The ones I chose, yes.

22   Q     The ones you chose.  And you listed Sandwich Isles as a

23   workhand; correct?

24   A     Yes.

25   Q     And only for summer; correct?

 1   A     Yes.

 2   Q     Now, Miss Hee, I want to direct your attention to July of

 3   2010; so that would be right before you started at Rhode Island

 4   School of Design.

 5   A     Yes.

 6   Q     Do you have that time in mind?

 7   A     Sure.

 8   Q     And do you recall the month of July?

 9   A     Yes.

10   Q     Okay.  That's kind of a bad question.  You remember your

11   sister, Liko, getting married?

12   A     Oh, yes.

13   Q     And that was on July 4th of 2010; is that correct?

14   A     It was.

15   Q     Were you present?

16   A     Yes.

17   Q     Where was the wedding?

18   A     It was here at Kamehameha at the chapel there.

19   Q     And was there a reception?

20   A     There was.  At Bishop Museum.

21   Q     And do you recall making a trip later in that same month?

22   A     Yes.

23   Q     And was the trip to Tahiti?

24   A     It was.

25   Q     And how did that trip come about?

1   A    For a long time I'd been wanting to go to Tahiti; so I

2   proposed the idea of going to a festival named Heiva.

3   Q    And tell us what the "Heiva" is.

4   A    Heiva is the equivalent of the Tahitian Merry Monarch.

5   Q    Okay.  And so it was like a hula festival.

6   A    Yes, their version.

7   Q    Tahitian hula.  I'm sorry, I spoke over you.

8   A    Yes.  Their version, yes.

9   Q    And when you say you proposed that trip, what do you mean?

10  A    I said I wanted to go to Tahiti and see Heiva.

11  Q    And they also have craft fairs; correct?

12  A    They do.

13  Q    And your intent in going there was to see the Heiva and

14  the craft fairs; correct?

15  A    Yes.  That's what I wanted to do, yes.

16  Q    And you also ultimately got a tattoo while you were there;

17  correct?

18  A    I did.

19  Q    And who went on that particular trip in July of 2010?

20  A    My mother, my sister, and my brother.

21  Q    So that would be Charlton Kupa'a Hee; your mother, Wendy

22  Roylo Hee; and your sister, Breanne Liko Hee.

23  A    Yes.

24  Q    Now, I think you said that Breanne had just gotten

25  married; correct?

```
1   A    She did.

2   Q    And her husband's name is?

3   A    Mika Kane.

4   Q    Also known as Jonathan Kane?

5   A    Oh, yes.

6   Q    I'm sure you all call him Mika, though; correct?

7   A    (Nods head.)

8   Q    But did he go on the trip with you?

9        THE COURT:  Can you answer out loud.

10       THE WITNESS:  Sorry.  No nodding.

11       THE COURT:  Right.

12       THE WITNESS:  Sorry.

13       THE COURT:  So what was your answer?

14       THE WITNESS:  Sorry.  Yes, that's his name.

15       THE COURT:  Okay.

16  BY MR. TONG:

17  Q    And how did you pay for that trip?

18  A    I believe my father did.

19  Q    Is it true that you used his credit card to book the trip?

20  A    Yes.

21  Q    And you mentioned earlier that you proposed the idea of

22  going there to see the -- is it Heiva?

23  A    Yes.  Heiva.

24       THE COURT:  Can you spell it.

25       THE WITNESS:  I believe it's H-e-i-v-a.
```

```
 1                THE COURT:  Thank you.
 2                THE WITNESS:  Yes, Heiva.
 3   BY MR. TONG:
 4   Q    Did there come a time when the idea of seeing a cable came
 5   up?
 6   A    Yes.  My father said that there was a company that he was
 7   considering doing business with, and he wanted us to see a
 8   landing site.
 9   Q    And landing site in lay terms is where the cable comes out
10   of the water?
11   A    Yes.
12   Q    And comes onto the land.
13   A    Yes.
14   Q    And the idea of seeing the cable came up after you
15   proposed the trip; is that correct?
16   A    Sure.
17   Q    I'm sorry?
18   A    I mean, I don't recall the exact conversation, but, yes,
19   I'm sure.
20   Q    Just so we're clear:  you proposed the trip first.
21   Correct?
22   A    Yes.
23   Q    Then the idea --
24   A    And then he said to go and see the cable after, yes.
25   Q    I mean, it wasn't your idea to go there solely to see the
```

1    cable; right?

2    A    No.

3    Q    And when you got there, did you try to see this cable

4    landing site?

5    A    We did.

6    Q    And how did you do that?

7    A    We rented a car and drove to the other side of the island

8    to the spot that we were told was the site of the landing.

9    Q    And was the location of the cable marked in some way?

10   A    Not that we could see.

11   Q    Did you find the cable?

12   A    No.

13   Q    And did you have anyone to guide you to see the cable?

14   A    No.  My father told us the location that it was supposed

15   to come out of the water; so we drove there, and we looked.

16   Q    And when you say "we," who was in this rental car trying

17   to find this cable landing?

18   A    My mother, my brother, and my sister and I.

19   Q    So the four of you.

20   A    Yes.

21   Q    And in your studies at Rhode Island, you didn't study

22   anything about cables, did you?

23   A    No.

24   Q    That wasn't a trick question.  I was just trying to make

25   sure.  I mean, furniture design is a different field from

1   inspecting, say, fiber optic cable; correct?

2   A    Yes.

3   Q    After your Tahiti trip did you return to Hawai'i?

4   A    I believe so, yes.

5   Q    Do you recall going to Walt Disney World later that same

6   month?

7   A    Yes.

8   Q    About how long after the Tahiti trip was that?

9   A    I'm not sure.  All I know it was the same summer.

10  Q    By the way, the Tahiti trip, how long did that last?

11  A    A week.

12  Q    And the four of you were present the entire time?

13  A    Yes.

14  Q    And who paid for the trip?

15  A    I used my father's credit card.

16  Q    Okay.  Moving forward again to Disney World, you say that

17  you went to Disney World later that month; correct?

18  A    Yes.

19  Q    Who did you go to Disney World with?

20  A    My sister, her husband, and a friend of mine.

21  Q    And the husband would be Jonathan Mika Kane.

22  A    Yes.

23  Q    So was that sort of like a delayed honeymoon for the

24  July 4, 2010 wedding?

25  A    I never thought of it that way because I was present.

1   That would be a little awkward, but I suppose.

2   Q    And how did you folks pay for that particular trip?

3   A    My father also gave us his card.

4   Q    And who made the arrangements?

5   A    I did.

6   Q    All right.  And if I can direct you to an exhibit, Exhibit

7   4-33.  Do you have that in the binder there?

8           And if we can go to page 3797, please.  And if we can

9   focus on the charges at the bottom.

10          Miss Hee, do you see the document that's on the

11   screen right now?

12   A    Yes.

13   Q    This is Exhibit 4-33, page 3797.  There's a number in the

14   corner there.  And I'm using the laser to point to a charge on

15   June the 29th of 2010 --

16   A    Uh-huh.

17   Q    -- for Disney reservations and lodging; is that correct?

18   A    Yes.

19   Q    You recall making arrangements for lodging at the Disney

20   complex using your dad's card?

21   A    I do.

22   Q    And the charge was $4,789 and change; is that correct?

23   A    It is.

24   Q    Does that sounds about right in terms of a charge that you

25   incurred during that trip?

1  A     Yeah, seems right.

2  Q     And two items down but on the same date there's another

3  charge for Disney reservations/lodging; is that correct?

4  A     There seems to be, yes.

5  Q     And that was for $2,369 and change; is that correct?

6  A     It is, yes.

7  Q     When you went to Disney, did -- did you have two different

8  rooms?

9  A     We did.

10  Q     One for you and your friend.

11  A     Uh-huh.

12  Q     And one for the newlyweds.

13  A     Yes.

14  Q     And if we can go to the next page, please.  And if we

15  could look at -- may I have one moment, Your Honor.

16          If we could see the bottom third of the page, please.

17          Directing your attention, Miss Hee, to a charge on

18  July the 6th that says "WDW dine tickets."  Do you see that

19  charge?

20  A     Yes.

21  Q     For $271; is that correct?

22  A     Yes.

23  Q     Do you recall purchasing Walt Disney World dining tickets

24  when you were there in Disney World?

25  A     I think we booked a package.

1    Q     And the package included various services for what we call

2    the Magic Kingdom, I guess?

3    A     Yes.

4    Q     That would include dining; is that correct?

5    A     Yes.  It included meals.

6    Q     And would it also include, if I can point up two entries

7    higher, July 4th tickets to the amusement park; is that

8    correct?

9    A     Yes.

10   Q     Do you recall buying tickets for admission to the

11   different Disney parks?

12   A     I remember it being part of the package, yes.

13   Q     So we're clear, Disney World is the one that has different

14   parks; right?

15   A     It's the one in Florida, yes.

16   Q     Right.  But, I mean, there are different parks with

17   different entrances; is that right?

18   A     Yes.  But I think the one in California has two parks now;

19   so --

20   Q     And Disney World, I think, has even more, as I recall.  Is

21   that your recollection?

22   A     Yes.

23   Q     So you would buy tickets that, basically, give you the

24   right to enter the park; is that correct?

25   A     Yes.

1   Q     And ride the rides.

2   A     Yes.

3   Q     All of the entertainment rides and other things; correct?

4   A     Yes.

5         MR. TONG:  Your Honor, may I have a moment?

6         THE COURT:  Okay.

7   (Counsel conferring.)

8         MR. TONG:  I have nothing further, Your Honor.

9         THE COURT:  Okay.  Hold on.

10        MR. TOSCHER:  May it please the Court.  Ladies and

11  gentlemen of the jury.  Good morning.

12                      CROSS-EXAMINATION

13  BY MR. TOSCHER:

14  Q     Good morning, Miss Hee.

15  A     Good morning.

16  Q     Miss Hee, will you describe your understanding of the

17  nature of the business of Waimana Enterprises, Sandwich Isles,

18  and Clearcom Communications.

19  A     Sure.  They're utility companies.  Waimana was originally

20  started as a hydroelectric company when my father was doing a

21  project in Kawaihae, Sandwich Isles is a telecom company that

22  operates on Hawaiian Homelands, and ClearCom is also a telecom

23  company, but it operates off of Hawaiian Homes.

24  Q     Could you tell the jury what your understanding is of the

25  primary mission of the group of companies.

1    A     The mission of the group is to serve the native Hawaiians

2    on these homelands.

3    Q     And serve them in what way?

4    A     When the government issued the lands, they're very

5    scattered, and a lot of them are in less desirable areas.  And

6    so they're spread out across the islands.  And at the time the

7    telephone companies here found it uneconomical to go into these

8    areas because there wasn't a high enough density of population

9    to make money, and so these companies were started to provide

10   service to these areas that would not have service otherwise.

11   Q     What is Paniolo Cable Company?

12             MR. TONG:  Your Honor, this is beyond the scope.

13             MR. TOSCHER:  Your Honor, it relates to the overall

14   business.

15             THE COURT:  I can't see that it's on her resume; so I

16   don't think she was asked to describe the overall business.

17   I'll sustain the objection.

18   BY MR. TOSCHER:

19   Q     Miss Hee, are you now an owner of Waimana Enterprises?

20   A     Yes, through a trust.

21   Q     Do you have an understanding why your involvement of the

22   company is important to the mission of Sandwich Isles?

23             MR. TONG:  Objection.  Calls for hearsay.

24             THE COURT:  Sustained.

25   BY MR. TOSCHER:

1   Q     Miss Hee, you testified you're currently on salary with

2   Waimana; is that correct?

3   A     Yes, I am.

4   Q     Let me go back to when you first started working for

5   Waimana or Sandwich Isles.  Mr. Tong referenced it going

6   through one of your resumes.

7          Do you know when you first started working for

8   Waimana or Sandwich Isles?

9   A     In the summer when I was in high school.

10  Q     Okay.  And tell us the nature of the work you did while

11  you were there.

12  A     At the time we had just acquired the property in Mililani,

13  and so it was still very raw.  It used to be a pineapple

14  plantation.  So I'd go there and I'd take the tractor out, and

15  I'd cut the grass.

16  Q     Did your other siblings work there with you?

17  A     They did.

18  Q     Initially, or did they come later?

19  A     I think they came slightly later, yes.

20  Q     Did you ever while you were there supervise other

21  employees?

22  A     I did, yes.

23  Q     Will you tell the jury, what is the Mililani property

24  referred to?  What is its name?

25  A     We call it the NOC, the Network Operation Center.

1  Q    Can you tell the jury how this fits in with the business
2  of the companies.
3            MR. TONG:  Again, objection.  Foundation.  Calls for
4  hearsay.
5            THE COURT:  "Fits in with the business of the
6  companies."
7            MR. TOSCHER:  Your Honor, if -- I'll wait for you to
8  ask me if you want me to respond.
9            THE COURT:  I'm sustaining this objection.
10           MR. TOSCHER:  You're sustaining the objection.
11           THE COURT:  Yes.
12  BY MR. TOSCHER:
13  Q    Okay.  Could you tell the jury what the purpose is of the
14  Mililani property.
15           MR. TONG:  Same objection, Your Honor.  Foundation
16  and hearsay.
17           MR. TOSCHER:  Your Honor, could we have a sidebar.  I
18  think --
19           THE COURT:  No, you can't have a sidebar.  I don't
20  know that this falls within the scope of the direct exam
21  either; so I'm not going to let her answer.
22           MR. TOSCHER:  Okay.
23  Q    Miss Hee, even before you started working for the company,
24  while you were in high school did you have an understanding
25  that you would become a part of the company?

1          MR. TONG:  Objection, Your Honor.  That does call for

2     hearsay.

3          THE COURT:  Sustained.

4          MR. TOSCHER:  Your Honor, may I address the Court?

5     I'm not asking -- I would like just to state my opposition to

6     the objections because I don't think it does call for hearsay.

7     We're asking what the witness' understanding is, not what

8     somebody told them.

9          THE COURT:  I'll do this.  She can answer yes or no

10     whether she had an understanding about what, if any, role she

11     would play, but it's a yes or no.  Then you ask the next

12     question.  We'll go from there.

13          MR. TOSCHER:  Okay.

14     Q    Even before you started working for the company did you

15     have an understanding that you'd be part of the business?

16     A    Yes.  Sorry.

17          THE COURT:  Okay.  Fine.

18          THE WITNESS:  I'm sorry.

19          THE COURT:  What's the next question?

20          MR. TOSCHER:  Okay.

21          THE COURT:  I had actually wanted you to ask whether

22     you would be part of the business because otherwise you're

23     building in her understanding into the question, and that's why

24     I wanted you to go step by step.

25          MR. TOSCHER:  I apologize, Your Honor.

1           THE COURT:  What's the next question?

2   BY MR. TOSCHER:

3   Q    When you were working in high school, Miss Hee, were you

4   paid by the hour?

5   A    I was.

6   Q    And do you recall when you were first placed on salary?

7   A    In 2006.

8   Q    What was your understanding as to why you were put on

9   salary?

10          MR. TONG:  Objection.  That calls for hearsay.

11          MR. TOSCHER:  Same --

12          THE COURT:  I know.  But, you know, to the extent

13   that her understanding is based on what somebody else told her,

14   I'm not going to let her answer.  If you want to lay a

15   foundation that she had some independent way to know this, you

16   can go ahead and do that.  I'm sustaining this objection.

17          MR. TOSCHER:  Thank you, Your Honor.

18   Q    When you were placed on salary, Miss Hee, it was after you

19   had already started at MIT?

20   A    It was, yes.

21   Q    And were you told what -- why you were placed on salary?

22          THE COURT:  This is a yes or no.

23          MR. TOSCHER:  Yes, I understand.

24          THE COURT:  A yes or no.  Okay.  That's all you have

25   to say.

1              THE WITNESS:  Yes.

2              THE COURT:  All right.

3    BY MR. TOSCHER:

4    Q    And did you understand when you were put on salary that

5    you had certain obligations to the company?

6    A    Yes.

7              MR. TONG:  Again I object and move to strike the

8    answer.

9              THE COURT:  Sustained.  Right.  Stricken.  Disregard

10   her answer.

11             Unless you can lay a foundation that she had an

12   independent source that doesn't rely on what somebody told her,

13   I'm not going to let her answer.

14             MR. TOSCHER:  I understand, Your Honor.  I think this

15   is offered for what her understanding is, and I don't

16   believe -- with all due respect, Your Honor, I don't think it's

17   a hearsay issue.  I think it's important as to what Miss Hee's

18   understanding of what her role and whether -- she would learn

19   it, of course, through a number of sources.

20             THE COURT:  Okay.  You can lay a foundation about the

21   source of her understanding.  We might have to consider

22   relevance issues, depending how she answers.  But unless I know

23   that the source of her understanding is not what somebody told

24   her, I'm not going to let her answer.  So you can go ahead and

25   lay a foundation if you want, and then she may be able to

1    answer some things.

2    BY MR. TOSCHER:

3    Q    Miss Hee, these understandings -- your understandings, was

4    that based upon discussions you had with other people?

5    A    Yes.

6    Q    And did that include discussions with your father?

7    A    Yes.

8    Q    Now, at the time you were put on salary, you were

9    attending MIT.

10   A    I was.

11   Q    Was there a reason you chose MIT?

12   A    There was.

13   Q    Could you tell the jury what that reason was.

14   A    My father told me a story in high school that he had

15   actually wanted to go to MIT, and his football coach told him,

16   "Nah, Hawaiians, they don't go to MIT.  You should go to the

17   Naval Academy."  So that's why I wanted to go.

18   Q    Now, at the time you were -- started to become put on

19   salary when you were at MIT, did you understand that you were

20   in a management training program?

21            MR. TONG:  Objection.  Hearsay.

22            THE COURT:  Sustained.  You cannot answer.

23            MR. TOSCHER:  Your Honor, I just want to tell the

24   witness I'm going to go at it another way, but listen for the

25   court's objection because I'm not trying to --

1          THE COURT:  I know.

2          MR. TOSCHER:  I'm trying my best.

3          THE COURT:  We're threading our way here, yeah.

4          MR. TOSCHER:  Yeah, and I'm -- I don't want to --

5    okay.

6    Q     Did somebody tell you you were in a management training

7    program?

8    A     Yes.

9    Q     Okay.  What was your understanding of your obligations

10   when you were employed and in the management training program?

11         THE COURT:  Okay.

12         MR. TONG:  Again I object.  It calls for a recitation

13   of an out-of-court statement.  Hearsay.

14         MR. TOSCHER:  Your Honor, but not offered for the

15   truth of the assertion but what her understanding is.

16         THE COURT:  On that point I'm not sure that you're

17   really drawing a distinction.  Sustained.

18         MR. TOSCHER:  But just for the record, Your Honor,

19   it's offered for her understanding and state of mind.

20         THE COURT:  I know.  But it's not relevant what her

21   understanding was, unless you can show some connection to the

22   issues in this case.  And to the extent that connection is

23   something someone told her, then I am concerned about the

24   hearsay.

25         MR. TOSCHER:  Okay.  And, Your Honor, we think --

1    okay.  I'm not going to argue with the court.

2    Q    Could you tell the jury what your obligations were after

3    being put on salary at Waimana?

4             MR. TONG:  Your Honor, I object.

5             THE COURT:  Same thing.  Same ruling.  You cannot

6    answer.

7    BY MR. TOSCHER:

8    Q    Miss Hee, during the time you were on the East Coast and

9    attending school that was covered on Mr. Tong's examination,

10   did you attend some Waimana/SIC business-related activities?

11   A    I did.

12   Q    Do you recall going on a trip to Connecticut?

13   A    Yes.

14            MR. TONG:  Your Honor, I object.  That's beyond the

15   scope.

16            MR. TOSCHER:  Your Honor, Mr. Tong covered a number

17   of trips about -- trying to infer that she wasn't doing things

18   regarding business.

19            THE COURT:  Okay.  I need to stop.  When was the

20   trip?

21            MR. TOSCHER:  The question from the court was when

22   was the Connecticut trip?

23            THE COURT:  Yes.  When was the trip?

24            THE WITNESS:  It was while I was on the mainland.

25            THE COURT:  Do you remember the year?

```
 1              THE WITNESS:  I remember meeting my father.

 2              THE COURT:  Hold on.  Hold on.  Not the question.

 3              THE WITNESS:  Sorry.  No, the year.

 4              THE COURT:  Do you remember -- if you don't remember,

 5    that's okay.

 6              THE WITNESS:  I don't remember the year.  I'm sorry.

 7              THE COURT:  Unless you can lay a foundation, it is

 8    beyond the scope.  Sustained.

 9    BY MR. TOSCHER:

10    Q    Miss Hee, do you recall where you were living at the time

11    of the Connecticut trip?

12    A    I recall I was living in Providence, I believe.

13    Q    Providence.

14    A    I believe it was in Providence.

15    Q    I'm just trying to get a date for the Judge, who wants to

16    have relevance.  And that would have been a time that you were

17    attending the --

18    A    Rhode Island School of Design.

19              MR. TOSCHER:  Your Honor, with that I'm going to ask

20    the question again.

21    Q    Did you go on a trip with your father to Connecticut

22    during that period of time?

23              MR. TONG:  Objection.  Relevance.  Beyond the

24    scope.

25              MR. TOSCHER:  Your Honor, it's --
```

```
 1              THE COURT:  He definitely asked about trips.  I don't
 2    think, though, that that opens the door to every trip she ever
 3    took.  I mean, it's his direct; so he gets to limit the scope
 4    as he pleases.  You can call her as a witness in your case in
 5    chief if you want and ask her all manner of things, as you
 6    know, without being limited to the scope of what he does.
 7    Sustained.
 8              MR. TOSCHER:  Okay.  So the Court's ruling at this
 9    point anything regarding a trip, regardless of how we think
10    it's relevant, if Mr. Tong did not question the witness --
11              THE COURT:  Unless you can show me how it falls
12    within the scope of his direct -- and by that I mean it can't
13    just be another trip just because he asked about a few trips.
14    So, yes, I'm going to disallow -- but you're free to call
15    her.
16              MR. TOSCHER:  I understand.  Let me just respond and
17    tell you why I believe it is --
18              THE COURT:  I --
19              MR. TOSCHER:  No?  Okay.  Then I won't respond.
20              THE COURT:  Okay.
21              MR. TOSCHER:  I will follow the Court's wishes.
22    Q    Could you describe for the jury, while you were in school
23    at MIT or Rhode Island, the types of Waimana or SIC business
24    activities you were engaged in.
25    A    Yes.  While I was in school, I would go down to
```

1   Washington, D.C., or New York or Connecticut or a suburb of

2   Boston to attend different meetings that Waimana had there.

3   Q    Okay.  And == all right.  And was your father at those

4   meetings with you?

5   A    He was.

6   Q    Were you ever given any materials to prepare before you

7   went -- to read, review before you went on those meetings?

8            MR. TONG:  Objection, Your Honor.  Relevance and

9   beyond the scope.

10            THE COURT:  I'm going to allow this one.  It's a yes

11   or no, though.

12            THE WITNESS:  Yes.

13   BY MR. TOSCHER:

14   Q    Okay.  Let me turn to a trip which Mr. Tong did cover, and

15   that was the trip to Tahiti.

16            You mentioned that after you had raised the issue you

17   wanted to go, you learned or your father told you that he

18   wanted to look -- you to look for a cable landing; is that

19   correct?

20   A    That's correct.

21   Q    Okay.  Did he -- do you remember -- could you tell us a

22   little bit more about that.  Why was the cable landing relevant

23   to the Waimana business?

24            MR. TONG:  Objection.  That calls for the recitation

25   of a hearsay statement.  Plus foundation.

 1                THE COURT:  Okay.  Sustained.

 2    BY MR. TOSCHER:

 3    Q    Do you know the business reason why or what kind of

 4    business Waimana would be doing with a Tahitian company, Miss

 5    Hee?

 6                THE COURT:  Hold on.

 7                MR. TONG:  Objection.  Foundation.  Beyond the scope.

 8    Relevance.  And calls for hearsay.

 9                MR. TOSCHER:  Your Honor, I asked her "Did she know?"

10                THE COURT:  That assumes there was the thing that

11    you're asking whether she knew; so sustained.

12                MR. TOSCHER:  Okay.

13    Q    Miss Hee, did you engage in any business activities

14    related to Waimana when you were in Tahiti?

15                MR. TONG:  Objection.  Foundation as to knowledge of

16    what is business and what isn't on her part.

17                THE COURT:  I'm going to let you answer yes or no.

18                THE WITNESS:  Yes.

19    BY MR. TOSCHER:

20    Q    And would you tell the jury what those activities were.

21                MR. TONG:  Objection, Your Honor.  Foundation.  And

22    it's based on a hearsay statement.  Also beyond the scope.

23                MR. TOSCHER:  Your Honor --

24                THE COURT:  I don't think it's beyond the scope.

25                MR. TOSCHER:  It's based upon what she did when she

1    was there, Your Honor.

2              THE COURT:  Other than looking for this cable

3    landing, this is a yes or no.  Did you do any other work that

4    you thought was work you were doing for Waimana?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  Go ahead.

7    BY MR. TOSCHER:

8    Q    Will you tell the jury what the other activity was

9    relating to Waimana.

10   A    We looked for the headquarters of a company named Honotua.

11   Q    Can you explain your understanding as to why you were

12   looking for the headquarters of Honotua?

13             MR. TONG:  Again, Your Honor, foundation.  And it's

14   based on a hearsay statement.

15             THE COURT:  Sustained.

16   BY MR. TOSCHER:

17   Q    Did your father go on this trip to Tahiti with you,

18   Miss Hee?

19   A    No, he didn't.

20   Q    Regarding the two areas you just mentioned, the cable

21   landing and the location of the company Honotua, did you have

22   discussions with your father about that before you went on the

23   trip?

24   A    Yes.

25   Q    Now, let me turn to the other trip Mr. Tong talked about:

1    the Orlando Disney World trip.  Did you engage in any

2    business-related activities on that trip?

3    A    We went to see --

4              MR. TONG:  Well, I object --

5              THE COURT:  Hold on.  Just a yes or no.

6              THE WITNESS:  I'm sorry.

7    BY MR. TOSCHER:

8    Q    Can you answer that yes or no, Miss Hee.

9    A    Yes.

10   Q    Could you tell the jury what those business-related

11   activities were.

12             MR. TONG:  Same objection, Your Honor.  It depends on

13   a hearsay statement:  what was told to her as to what was

14   business and what was not.  It's also beyond the -- well,

15   foundation and hearsay.

16             THE COURT:  Okay.  I'm going to sustain that

17   particular objection.  What is not objectionable, because I

18   think the door was opened, is for you to ask her everything she

19   did.  Okay.  So --

20             MR. TOSCHER:  Yes, Your Honor.

21   Q    Could you summarize your activities when you were on the

22   trip to Orlando, please.

23   A    We flew in.  We landed.  We stayed.  We visited a number

24   of the parks.  One of them had a exhibit that was put on by

25   Raytheon.  Can I keep going?

```
 1                THE COURT:  Yes.  Keep going.
 2                THE WITNESS:  Sorry.  Raytheon, it's a company out of
 3   Boston that's a big defense contractor, and we have business
 4   with them.
 5   BY MR. TOSCHER:
 6   Q     Anything else you can recall when you were there?
 7   A     We saw the area, and it was -- and how it used to be this
 8   very deserted place, and that this resort really made that
 9   whole town possible.
10   Q     Right.  Was there a reason you stayed there a whole week?
11   A     I believe that was the length of the tour we booked.
12   Q     Was your father on that trip with you?
13   A     No, he wasn't.
14   Q     I believe this was covered on direct, Miss Hee.  Did you
15   receive a raise from Waimana when you graduated MIT?
16   A     I did.
17   Q     The -- now, you're receiving a full-time salary from
18   Waimana presently; is that correct?
19   A     I am.
20   Q     Would you explain to the jury why you've not come back to
21   Hawai'i and why you're also working these other jobs?
22   A     The lifestyle here, it's a much slower pace, obviously,
23   than New York City.  And right now in this point in my life I'm
24   not quite ready for that pace.  I know that day will come, and
25   I expect it to come in 10 years or so.  And so now I really
```

1    would like to experience as much as I can before I come home,

2    settle down, and just work here for the rest of my life.

3    Q    If your father called you next week and said "Quit your

4    position in New York," would you come home?

5              MR. TONG:  Objection.  Beyond the scope of direct.

6              THE COURT:  Sustained.

7    BY MR. TOSCHER:

8    Q    Now, have any of your siblings come back to take a

9    day-to-day operational role in the companies?

10             MR. TONG:  Objection.  Relevance.  Beyond the scope.

11             THE COURT:  Okay.  Sustained.

12   BY MR. TOSCHER:

13   Q    Miss Hee, even though you're in New York, do you

14   frequently have discussions with other family members regarding

15   the business activities of Waimana?

16             MR. TONG:  Objection.  Relevance and beyond the

17   scope.

18             THE COURT:  Sustained.

19             MR. TOSCHER:  I have no further questions, Your

20   Honor.

21             THE COURT:  Okay.  Wait.  Let's see if he has more.

22             THE WITNESS:  Oh, okay.

23                        RE-DIRECT EXAMINATION

24   BY MR. TONG:

25   Q    Miss Hee, this Raytheon exhibit that you visited at Disney

1    World, that's an exhibit within the park; is that correct?

2    A    It is.

3    Q    And what does it show?

4    A    I believe it's in, like, Tomorrowland or something.  And

5    it was built awhile ago, and it was just to kind of highlight

6    Raytheon as a company.

7    Q    So it, essentially, is Raytheon's opportunity to tell the

8    public the kind of products that they have; correct?

9    A    Yes.

10   Q    And I gather because it's in Disney World, it was intended

11   to appeal to a broad group of people; correct?

12   A    Yes.

13   Q    You would see grandmas and grandpas go to that exhibit;

14   right?

15   A    Yes.

16   Q    Mothers and dads go there; right?

17   A    Yes.

18   Q    Kids of all ages?

19   A    Yes.

20   Q    So this wasn't like a special exhibit or offering offered

21   to you in connection with Waimana Enterprises; right?

22   A    No.

23   Q    Your park admission got you in; right?

24   A    Yes.

25   Q    Now, you testified very briefly about these trips that you

 1    made while you were on the East Coast attending school;

 2    correct?

 3    A    Yes.

 4    Q    And all of those trips, essentially, you made with your

 5    father; correct?

 6    A    Yes.

 7    Q    And he, essentially, conducted some meetings; correct?

 8    A    Yes.

 9    Q    And, essentially, your job was to watch what happened;

10    correct?

11    A    I was to listen and to meet the parties involved and

12    understand how these things happen.

13    Q    Okay.  But you were a student, and you didn't give

14    presentations, did you.

15    A    No.

16    Q    And it sounds like the Tahiti trip was your idea, and then

17    the concept of the cable came up later; right?

18    A    Yes.

19    Q    And is it true that in the grand jury you made the

20    statement that your father does not separate business from

21    personal?

22    A    I did.

23            MR. TONG:  Thank you.  I have nothing further.

24            THE COURT:  Okay.  Mr. Toscher, did you have any

25    more?

1            MR. TOSCHER:  Your Honor, I just may come address the

2    Court.  Since Mr. Tong questioned her about the trips that

3    occurred during this time that he didn't cover, will the Court

4    permit me now to go into those trips?  They are -- and, if not,

5    then I will sit down.

6            THE COURT:  No, I think he went into them; so -- but

7    he's following up on you.  He found a way to tie them in; so

8    she did give some answers.  He can follow up.  You can follow

9    up, too.

10           MR. TOSCHER:  Thank you, Your Honor.

11           THE COURT:  Yeah, go ahead.

12                         RE-CROSS-EXAMINATION

13   BY MR. TOSCHER:

14   Q    Focusing on the Connecticut trip, Miss Hee, will you tell

15   the Court the purpose of that trip you took and how it related

16   to the business, please.

17           MR. TONG:  Well, again, Your Honor, that's -- I think

18   calls for a hearsay response.

19           MR. TOSCHER:  She went on the trip, Your Honor.

20           THE COURT:  Yes.  But now you're asking her to say

21   the purpose of a trip, which it seems to me has to have as its

22   source somebody telling her something.  Again, if you can lay a

23   foundation that it's not a hearsay problem --

24           MR. TOSCHER:  Okay.

25           THE COURT:  -- I'm going to let you follow up.

```
 1                  MR. TOSCHER:  Thank you, Your Honor.

 2                  THE COURT:  But right now I don't have that.

 3     BY MR. TOSCHER:

 4     Q    Okay.  Tell us what you did on the trip to Connecticut,

 5     Miss Hee.

 6     A    We drove up to a manufacturer of a fuel cell that we had

 7     recently acquired here at a government auction, and we wanted

 8     to bring it back to --

 9                  THE COURT:  Hold on.  Hold on.  Just wanted to know

10     what you did, not your purpose.  Okay?

11                  THE WITNESS:  Okay.  Sorry.

12                  THE COURT:  So you told us what you did.

13     BY MR. TOSCHER:

14     Q    And tell us why -- well, you visited the manufacturer.

15     What business was that manufacturer in?

16     A    They manufacture and upkeep fuel cells.

17     Q    And the purpose of visiting them, what kind of business

18     were you conducting with the fuel cell company, Miss Hee?

19                  THE COURT:  I'm sorry?

20     BY MR. TOSCHER:

21     Q    What type of business were you attempting to conduct with

22     the fuel cell company you were visiting?

23                  MR. TONG:  I object.  That assumes facts not in

24     evidence that she was intending to do anything.

25                  MR. TOSCHER:  I'm just asking what she was doing
```

1    there, Your Honor.

2              THE COURT:  Well, okay.  But you're asking a little

3    more about this.  I'll sustain that.  You might be able to get

4    this in, if you lay a foundation.

5    BY MR. TOSCHER:

6    Q    How do -- how does a fuel cell relate to the business of

7    Sandwich Isles?

8    A    We purchased this fuel cell to, hopefully, power the

9    property, the NOC, and to power the switches there, which run

10   off of DC batteries.  So we wanted to use the fuel cell to

11   power the batteries, and the batteries to power the switches

12   for the telecom system.

13   Q    And why a fuel cell?

14   A    Because it's more eco-friendly than burning petroleum, and

15   it also would allow us independence from the surges that would

16   occur through HECO and allow us a continuous source of power

17   for the telecom company, which is essential for communications.

18   Q    During the period of time you were in school, Miss Hee,

19   did you attend trips -- did you go on trips to Washington,

20   D.C.?

21             MR. TONG:  Your Honor, that's beyond the scope of

22   cross -- or redirect, rather.

23             THE COURT:  Hold on.  How much more do you think you

24   have?  I only ask because we're at 10:30, and if you think you

25   have more than a minute, then I'm going to want to take a

1    break.

2              MR. TOSCHER:  I think let's take a break, Your Honor.

3              THE COURT:  Okay.  So I'll see you folks in ten

4    minutes.

5         (Jury excused.)

6              THE COURT:  Okay.  So we're going to take a break,

7    but I did want to tell Mr. Toscher my courtroom manager says

8    that your colleague did notify her about your request to meet

9    early, 8:18 or something.  I didn't hear about it until later;

10   so I thought you hadn't notified the Court earlier.  But one

11   thing that might help is I'm not sure that Mr. Tong knew about

12   it at the same time; so if he's not here, then really I can't

13   proceed until he gets here.

14             MR. TOSCHER:  Your Honor, for the record I notified

15   Mr. Tong and Mr. Harrington by e-mail before I even approached

16   the Court to see when their availability was.

17             THE COURT:  Okay.  So I guess they didn't pick it up.

18             MR. TONG:  Oh, no, Your Honor.  We responded

19   immediately.

20             MR. TOSCHER:  Yeah, they did.  They did, Your

21   Honor.

22             MR. HARRINGTON:  It was at about 8:10 or so we

23   received it.

24             MR. TOSCHER:  And we were all here at 8:45.

25             THE COURT:  Yeah, yeah, yeah, but I don't know

1  because I know she came to talk to me at 8:45, and I don't

2  think they were here yet.

3          MR. TOSCHER:  But, Your Honor, I will say I should

4  have done yesterday or earlier in the morning.

5          THE COURT:  No, no, but I didn't realize that there

6  had been that at 8:18, which is enough time really.  So thank

7  you.  She's clarified that for me.  If that was you, thank you.

8  Okay.

9      (Court recessed at 10:32 A.M., until 10:50 A.M.)

10          THE COURT:  Okay.  Almost done, though, I know.  Go

11  ahead.

12          MR. TOSCHER:  May it please the Court.  Ladies and

13  gentlemen.  Your Honor, no further questions.

14          THE COURT:  Okay.  You're not disappointed, ladies

15  and gentlemen of the jury, to hear that I'm sure.

16          Okay.  Did you have anything more?

17          MR. TONG:  Oh, no, Your Honor.

18          THE COURT:  Then the witness is excused.  You can

19  leave the courtroom.

20      (Witness excused.)

21          THE COURT:  And your next witness?

22          MR. HARRINGTON:  Yes, Your Honor.  If I could just

23  have one second.

24          THE COURT:  Okay.

25          MR. HARRINGTON:  Your Honor, we call Susan

 1   Mitsuyoshi.

 2          THE COURT:  Okay.  Thank you.

 3      (Witness photographed.)

 4          THE COURT:  Okay.  So the courtroom manager stepped

 5   out for an instant; so guess what?  I'm going to swear you in.

 6          Oh, here she is.  Good.  I was about to swear in the

 7   witness.  I hope I would do it correctly.  But good, the expert

 8   came back.

 9          THE CLERK:  Can't do anything without me.

10          Please raise your right hand.

11      (Witness sworn.)

12          THE CLERK:  Thank you.  Please be seated.

13          Please state your name and spell your last name.

14          THE WITNESS:  My name is Susan Mitsuyoshi,

15   M-i-t-s-u-y-o-s-h-i.

16                        DIRECT EXAMINATION

17   BY MR. HARRINGTON:

18   Q    Good morning, Miss Mitsuyoshi.  How are you?

19   A    Good.  Good morning.

20   Q    Could you please tell us about your educational background

21   after high school.

22   A    I have a bachelor's degree in elementary education at the

23   University of Hawai'i at Manoa.

24   Q    And have you completed any other education after you

25   obtained your bachelor's degree?

1  A     I did.  I've taken accounting courses, 24 credits of

2  accounting courses.

3  Q     Where are you presently employed?

4  A     I'm employed at the Internal Revenue Service here in

5  Honolulu.

6  Q     And how long have you been employed at the Internal

7  Revenue Service?

8  A     For about 28 years.

9  Q     And what's your current title?

10  A     My current title is an Internal Revenue Agent.

11  Q     How long have you been an a Internal Revenue Agent?

12  A     For 20 years.

13  Q     Could you please tell the jury a little bit about the

14  duties of an Internal Revenue Agent with the Internal Revenue

15  Service?

16  A     As an Internal Revenue Agent, I examine or audit income

17  tax returns, such as individuals, partnerships, and corporate

18  returns.

19  Q     So could you talk a little bit about the process of

20  conducting an audit of a corporate or a personal return.

21  A     We get assigned a case, and we look over the case file.

22  And then we contact the taxpayer, notifying them that they are

23  under audit, and request records in order for me to conduct the

24  audit.

25  Q     And did you have to complete any training to become a

1   revenue agent?

2   A    Yes, I did.

3   Q    So what was that training?

4   A    There were four phases of training.

5   Q    So could you take us through the four phases, starting

6   with the first.

7   A    Okay.  That would be for individual tax returns, Form

8   1040, and then the next phase would be for business returns,

9   such as the Schedule C, self-employed businesses.  The next

10  phase would be for corporations.  And the last phase would be

11  for partnerships and S corporations.

12  Q    And how long do those phases of training take?

13  A    Usually, each phase is about four to six weeks.

14  Q    And do you have to continue to take training while you're

15  a revenue agent?

16  A    Yes, I do.  Every year we are offered continuing

17  professional education up to 40 hours a year.

18  Q    Okay.  And what classes would you take as part of that

19  continuing education?

20  A    Well, there are some mandatory courses that we need to

21  take, and it's usually what's current.  For instance, we

22  usually take courses to learn about the current tax law

23  changes.  And if there's anything new happening -- I'm sure

24  this year we have to take courses on the Affordable Care Act.

25  And then other than the mandatory, we get to choose other

1    courses we wanted to take.

2    Q    And they would be tax-related courses?

3    A    Yes, they would be.

4    Q    So how long have you been involved in auditing information

5    for the Internal Revenue Service?

6    A    Actually, prior to being a revenue agent, I was a tax

7    auditor.  And a tax auditor primarily sees taxpayers in the

8    office, and I would only audit individual income tax returns.

9    Q    But then after you became a revenue agent you worked on

10   corporate tax returns as well?

11   A    Correct.

12   Q    And how many audits have you been involved in?

13   A    Throughout the years, probably over 500 audits.

14   Q    Have you ever testified as a summary witness before?

15   A    Yes, I have.

16   Q    And how many times?

17   A    Nine times.

18   Q    And where -- what court was that in?

19   A    Here in Hawai'i.

20   Q    And in the Hawai'i District Court, the federal court?

21   A    Yes.

22   Q    And have you ever been qualified as an expert witness

23   before?

24   A    Yes, I have.

25   Q    And how many times?

1    A    One time.

2    Q    And in what court was that?

3    A    Here in Hawai'i.

4    Q    In the federal court?

5    A    Yes.

6         MR. HARRINGTON:  Your Honor, at this time we tender

7    Miss Mitsuyoshi as an expert in computation of income and in

8    taxes.

9         MR. TOSCHER:  No objection, Your Honor.

10        THE COURT:  Okay.  Then she may testify on her

11   computation of income and taxes.

12   BY MR. HARRINGTON:

13   Q    Have you been present during the entire course of this

14   trial?

15   A    Yes, I have.

16   Q    And have you listened to the testimony of every witness?

17   A    Yes, I have.

18   Q    And have you reviewed every exhibit that's been entered

19   into evidence?

20   A    Yes, I have.

21   Q    Okay.  And going over those a little bit, did you review

22   the exhibits in the 11 series, which would be the records from

23   Chinaka & Siu's accounting firm?

24   A    Yes, I have.

25   Q    Did you review the exhibits in the 12 series, which would

1   be the records from KMH?

2   A    Yes, I did.

3   Q    Did you review the records in the Exhibit 4 series, which

4   were the records from Waimana Enterprises?

5   A    Yes, I did.

6   Q    And in the Exhibit 4 series, are there a series of credit

7   card statements?

8   A    Yes, there is.

9   Q    And just for clarification, did those credit card

10  statements in Exhibit 4, did those all appear in Exhibit 11,

11  the records from Chinaka & Siu?

12  A    No.  They did not.

13  Q    And were there any credit card statements that were in

14  Exhibit 4 in the KMH files in Exhibit 12?

15  A    There were no credit card statements in the KMH files.

16  Q    Now, did you prepare a number of schedules reflecting the

17  evidence in this case?

18  A    Yes, I did.

19  Q    Okay.  And is the information in those schedules drawn

20  from the exhibits and the testimony in this case?

21  A    That is correct.

22          MR. HARRINGTON:  Your Honor, at this time I'd ask to

23  hand out copies of the schedules to the members of the jury and

24  to the Court.

25          THE COURT:  Have you had a chance to look them over?

1          MR. TOSCHER:  No, Your Honor.  They were just handed

2    to me.  But I think he's got to beforehand -- if Counsel said

3    he wanted to hand them to the jury, I think he's got to get

4    them foundational and admitted first.

5          THE COURT:  Although, were you using these as

6    demonstrative?

7          MR. HARRINGTON:  They're being used as

8    demonstratives.  At the close we may try to move some of them

9    into evidence, but we're using them as demonstrative.

10         THE COURT:  Okay.  Then, Mr. Toscher, how about we

11   take an early lunch, and we can go a little longer than normal

12   and -- would that help?  And then we can resume after the lunch

13   break?  Or if there are issues --

14         MR. TOSCHER:  I think right now it's just -- it's the

15   summary schedules.  I don't know.

16         THE COURT:  Let's go off the record.  Can counsel

17   confer.

18         MR. TOSCHER:  Thank you, Your Honor.

19      (Counsel conferring.)

20         MR. TOSCHER:  Your Honor, I've consulted with

21   Counsel, and I would just suggest Counsel proceeds and --

22   because I'm going to need more than just a quick lunch to

23   review all this, and there is a lot here.

24         THE COURT:  Okay.  So you want him to distribute --

25   it's okay with you?

1            MR. TOSCHER:  No, I don't think they should be

2    distributed.  Especially, these are not in the nature of

3    demonstrative, most of these; these are computational.  So we

4    would object, yes, Your Honor.

5            THE COURT:  Yes, you're objecting to distributing it.

6            You can see if you can lay a foundation.  We'll go

7    from there.  Because actually right now we don't know what it

8    is; so --

9    BY MR. HARRINGTON:

10   Q    Okay.  So let's talk a little bit about the schedules that

11   you prepared.

12           And, actually, if we could get you a copy of the

13   schedule for her to look at?

14           THE COURT:  Yes, that's fine.  Thank you.

15   BY MR. HARRINGTON:

16   Q    Okay.  So let's turn to the first page.  And this is a

17   table of contents.  And perhaps you could just go through this

18   table of contents and describe what each schedule represents.

19   A    Okay.  My first schedule is the summary of tax due and

20   owing for Albert Hee and Waimana Enterprises.  So, basically,

21   it's just a summary schedule pulling together the taxes owed by

22   Mr. Hee and by his company Waimana.

23   Q    So what's Schedule 2?

24   A    The second schedule is only the computation for the tax

25   due and owing for Mr. Hee only.

1   Q    So -- I'm sorry.  So 1 is the overall picture, and 2 is

2   specifically for the personal taxes of Mr. Hee?

3   A    That is correct.

4   Q    And what about Schedule 2A?

5   A    2A would pull summary information from other schedules

6   regarding the personal expenses that were paid by Waimana for

7   the personal use -- for the personal benefit of Mr. Hee, and

8   also pulling information regarding the personal use of that

9   property in Santa Clara.

10  Q    And then so what about the next schedule?

11  A    The third schedule has to do with the taxes that were due

12  and owing for the business Waimana Enterprises.

13  Q    And so what about Schedule 4?

14  A    4, this would be a schedule of Waimana payments to Diane

15  Doll.

16  Q    And Schedule 5?

17  A    This would be a schedule for the MIT tuition payments for

18  Adrianne Hee that was paid by Waimana.

19  Q    Okay.  And Schedule 6?

20  A    Schedule 6 would be the summary of the personal expenses

21  that were reimbursed to Mr. Hee by Waimana.

22  Q    And so would that be using the credit cards that we saw in

23  evidence from the Exhibit 4 series?

24  A    That is correct.

25  Q    And what about Exhibit 7?

1   A    This is a schedule of cash withdrawals made by Mr. Hee,

2   which were reimbursed by Waimana.

3   Q    And Schedule 8?

4   A    This is a schedule of the wage payments to the Hee

5   children paid by Waimana.

6   Q    And Schedule 9?

7   A    This is a schedule of wage payments made to Wendy Hee paid

8   by Waimana.

9   Q    And Schedule 10?

10  A    This is a schedule of employment benefits paid by Waimana

11  for Wendy Hee and the children.

12  Q    And the next schedule?

13  A    This is a schedule of income disguised as loans to

14  shareholder for Mr. Hee.

15          MR. TOSCHER:  Objection, Your Honor, to

16  characterization on this list.

17          THE COURT:  Okay.  You think it's a

18  mischaracterization?

19          MR. TOSCHER:  Well, yes.  This is just supposed to be

20  a summary.  It says "disguised."

21          THE COURT:  Okay.  I'm going to sustain that.  Go

22  ahead.  But he isn't offering the actual exhibit right now;

23  right?

24          MR. TOSCHER:  Okay.  You're right, Your Honor.

25          THE COURT:  Okay.  So that may well be a good

1    objection, but a little premature right now.  Okay?  So go

2    ahead.

3    BY MR. HARRINGTON:

4    Q    Okay.  And the last schedule, please.

5    A    This is the schedule of the fair market rent of the Santa

6    Clara house that was used by the Hee children.

7    Q    So we went through a lot schedules there, and let's kind

8    of break down how you would create one of these schedules and

9    what information you would be -- you would be drawing from.

10        So if we could turn to, let's say, tab 4, which is a

11   schedule of payments to Diane Doll.

12   A    I would create this schedule based upon the testimony --

13   and in this case Diane Doll did testify -- and I would also

14   look at documents that were entered into evidence.

15   Q    And so looking at this chart, there's a series of columns,

16   and I see the last column to the right says "Exhibit Number."

17   Could you please explain what that refers to.

18   A    That would relate to the actual exhibit that was entered

19   into evidence.

20   Q    And then there's a description of evidence.  What does

21   that refer to?

22   A    It's a description of what I looked at and what I used to

23   make a determination as far as why I put that item on this

24   schedule.

25   Q    And then there's also a line for "Deducted on Tax Return."

1   What does that refer to?

2   A   This refers to how Waimana deducted the expenses or the

3   payments to Diane Doll.  And in this case Waimana deducted the

4   payments to Diane Doll as a consulting fee.

5   Q   So what documents did you use to determine that that's how

6   they characterized it on their tax return?

7   A   Well, if you look at the description of evidence, I based

8   it upon Miss Doll's testimony, I looked at the copy of a check

9   paid to Diane Doll, I looked at Waimana's printout of the

10  general ledger, showing how the payments to Diane Doll was

11  booked.  I looked at -- this is a financial record.  It's a

12  statement of income and expenses of Waimana.  I looked at

13  Waimana's trial balance.  And I also traced it to Waimana's --

14  in this case an amended return for 2003.

15  Q   Okay.  And then so there's also line that says "Booked on

16  Return Preparer's Financial Statements."  Could you explain

17  what's on that column.

18  A   I reviewed the financial statements -- or the return

19  preparer's financial statements of either -- in this case it

20  would be Chinaka & Siu or KMH.  And I looked for these payments

21  to Diane Doll and how they had classified her payments on their

22  financial statements that they prepared, which in turn was --

23  were used to prepare the tax return.

24  Q   And again you're drawing from information that was

25  admitted into evidence?

1    A    That is correct.

2    Q    And what about it says "Booked on WEI's QuickBooks General

3    Ledger"?  Where did you obtain that information, and what does

4    that column represent?

5    A    That represents -- if you recall Daniel Nakandakari, he

6    pulled information from Waimana's QuickBooks, and he prepared

7    schedules from the QuickBooks.  And I pulled that information,

8    and I looked to see how WEI classified the expense as to Diane

9    Doll.

10   Q    So then there's also a column for "Amount."  Where did

11   you -- what does that column represent?

12   A    That represents the amount that was on the canceled check.

13   And it also corresponded to the entries on QuickBooks and --

14   which in turn transferred to the return preparer's financial

15   statements.

16   Q    So you mentioned reference to a canceled check.  So did

17   you review all the canceled checks that were admitted into

18   evidence?

19   A    Yes, I did.

20   Q    There's also a line that says "Memo on Check."  Would that

21   be referring to on the memo line of a check, what was contained

22   on that information?

23   A    That is correct.

24   Q    Okay.  Then there's also a column for "Payor" and there's

25   a column for "Payee."  Could you just briefly describe where

1  you obtained that information.

2  A    That information would have been gotten from the canceled

3  check.

4  Q    Is that also where you obtained the check number and the

5  date?

6  A    That is correct.

7  Q    So we just went through Schedule 4.  And did you use,

8  essentially, the same process to prepare all of the following

9  schedules, which would be 4 through 12?

10  A    That is correct.  There's some schedules after 4 which

11  would be summary -- summaries of a schedule that follows.

12  Q    So you'd prepare the initial schedule in the same way; is

13  that right?

14  A    That is correct.

15  Q    And then you'd create another summary of the information

16  contained on that summary?

17  A    That is correct.

18  Q    Okay.  So once you had all of these schedules, how do

19  these relate to the computations of taxes found in 1 through 3?

20  A    I took the information from these Schedules 4 through 12,

21  and then I prepared another summary, which would be probably 2A

22  and 3A.  And based upon those summaries, I would run a

23  computation as far as what -- in this case we called it as

24  constructive dividends, and run a computation for the taxes

25  owed by Mr. Hee and Waimana.

1  Q    So to follow it through, you would find amounts in 4

2  through 12, and then you'd take those amounts, calculate new

3  taxes due and owing?

4  A    That is correct.

5         MR. HARRINGTON:  Your Honor, I think we'd like to

6  mark this entire schedule as Exhibit 18 just to make sure that

7  we're on the same page for the record.

8         THE COURT:  So you want the whole booklet or --

9         MR. HARRINGTON:  Correct.  The whole booklet to be

10  marked as 18.

11         THE COURT:  Okay.  We'll mark it as 18.  Okay.

12         MR. HARRINGTON:  And then I would ask again to be

13  able to use this document as a demonstrative device to help in

14  Miss Mitsuyoshi's expert testimony.

15         THE COURT:  Okay.  That may occur, but I do want to

16  make sure that Mr. Toscher has a chance to review it and to

17  check in case he thinks that there's some problem with any of

18  them.

19         So I renew my suggestion that we take an early lunch.

20  And I understand it's not enough time to look at everything,

21  but maybe you and Mr. Harrington could confer on exactly which

22  ones he'll focus on right after lunch, and so you could focus

23  on those, and maybe we can make some headway this afternoon.

24  What do you think about that suggestion?

25         MR. TOSCHER:  That's very good, Your Honor.  I

 1    appreciate that.  We'll just take you up on that.

 2            THE COURT:  Okay.  So we're going to take an early

 3    lunch.  Why don't we break until 1:00.  It's a little longer

 4    lunch, but I want you to eat lunch plus have some time.

 5            So we'll break until 1:00.  I know it's a little

 6    longer, but I'm hoping that will let us proceed somewhat this

 7    afternoon.  Okay?

 8        (Jury excused.)

 9            THE COURT:  Okay.  And we might as well address your

10    concerns, Mr. Toscher.  So the number you were concerned

11    about --

12            MR. TOSCHER:  Number 11.

13            MR. HARRINGTON:  I think it's Schedule 11.  Is that

14    what it was?

15            THE COURT:  Okay.  Schedule 11.

16            So can't we take out the word "disguised" and use a

17    word like "characterized" or something like that?

18            MR. HARRINGTON:  Yeah, that's no problem.  I mean, we

19    could also even try to print out new copies of this first

20    page.

21            THE COURT:  Yeah, so what would you suggest,

22    Mr. Toscher?

23            Everybody can sit down.  This will be about three

24    minutes.  You can leave if you -- so "characterize"?  Would

25    that be okay?

 1            MR. TOSCHER:  Or schedule of income "based" upon

 2   loans to shareholder.

 3            MR. HARRINGTON:  Your Honor, I think we could just

 4   say schedule of income "booked" as loans to shareholder.

 5            THE COURT:  Okay.  "Booked" as loans.  Is that okay?

 6            You want to think about it?

 7            MR. TOSCHER:  Yeah, I mean, I don't want to get into

 8   an argument over it, Your Honor.  Let me think about it.  I

 9   don't want to waste the Court's time.

10            THE COURT:  Why don't you folks see if we can do

11   that.

12            But while we're at it, there are those little notes

13   at the bottom of Schedule 11, and I'm a little worried that,

14   you know, this says this was not a bona fide loan in note 3.

15   You know, maybe it has to be this is not being treated as a

16   bona fide loan, or something like that.  I don't know.  But why

17   don't you folks make sure you -- if you're going to make any

18   changes, that you're okay on the language of the notes.

19            MR. TONG:  I'm sorry, Your Honor.  What note was

20   that?

21            THE COURT:  Note number 3 was the one I'm looking at

22   in Schedule 11.

23            MR. HARRINGTON:  Is it page 105?

24            THE COURT:  Oh, hold on.  105, yes.  So there are

25   these little notes at the bottom of 105, and it says The loan

    1    repayment --

    2                MR. TONG:  Oh, oh, I see.

    3                THE COURT:  You got it?

    4                MR. TONG:  Yeah.  We got confused because if you look

    5    higher on the page, Your Honor, there's actually one that says

    6    note 3.  We were looking in the wrong place.

    7                THE COURT:  Oh, sorry.

    8                MR. TONG:  Number 3 at the bottom of the page.

    9                THE COURT:  Okay.  I shouldn't call it a note, then.

   10    Okay.  Got it.

   11                Anyway, if that's okay with everybody, fine.  But in

   12    case you are going to be working on Schedule 11 anyway, you

   13    might want to make sure everything else is okay.

   14                And I should tell the whole defense team my judicial

   15    assistant, who has been working with me for 25 years and bosses

   16    me around mercilessly, has insisted that I -- to use her

   17    word -- "unscold" you about the timing of when you told me to

   18    come because she says that it happens that court staff had come

   19    to talk to me about something before trial, she didn't want to

   20    interrupt us; so she said that's why I didn't know that you had

   21    asked quite early for me to come in early, and that is not your

   22    fault.  And she was quite concerned that I unscold you.

   23                MR. TOSCHER:  Thank you, Your Honor.

   24                THE COURT:  So consider yourselves unscolded,

   25    please.

1          MR. TOSCHER:  Thank you.

2          THE COURT:  And I'll see you at one o'clock.

3      (Court recessed at 11:21 A.M., until 1:36 P.M.)

4          THE COURT:  I thank the jurors for their patience.  I

5  think the attorneys have done a lot over the lunch period.

6          Okay.  Mr. Harrington, you can resume.  At this point

7  you are offering what?

8          MR. HARRINGTON:  Well, just to back up for a

9  second -- first of all, good afternoon.

10         THE WITNESS:  Good afternoon.

11         MR. HARRINGTON:  I just was going to ask just a

12  couple more foundation questions and then offer.

13         THE COURT:  Okay.

14         MR. TOSCHER:  Your Honor, I don't want to interrupt.

15  Can I ask Mr. Harrington --

16         THE COURT:  To move a little?

17         MR. TOSCHER:  -- to move to the left or the right,

18  whatever he prefers.

19         MR. HARRINGTON:  This way?

20         MR. TOSCHER:  That's fine.  Thank you.

21         THE COURT:  Okay.

22  BY MR. HARRINGTON:

23  Q    Okay.  So we were talking about the schedules that you

24  prepared, and those schedules are in front of you?

25  A    Yes, they are.

1    Q    And do those schedules fairly and accurately summarize the

2    exhibits and testimony that you've reviewed?

3    A    That is correct.

4    Q    And they're based on the exhibits that have been admitted

5    and the testimony in this case?

6    A    That is correct.

7    Q    And to the testimony you heard while you were sitting in

8    court?

9    A    That is correct.

10   Q    Now, would it help the jury to follow your testimony and

11   listen to your opinions if they were able to review the

12   schedules during your testimony?

13   A    Yes, it would.

14         MR. HARRINGTON:  Your Honor, at this time I would

15   like to ask permission to hand out the schedules as

16   demonstratives for the jury to review during her testimony.

17         THE COURT:  Okay.  Do you need them all at once?  I

18   mean, I don't care if they're in a booklet.  Or can we ask them

19   to look at only one tab at a time?

20         MR. HARRINGTON:  The plan, Your Honor, was they would

21   get the whole booklet, and then I'll be directing to specific

22   tabs.

23         THE COURT:  Okay.  So which tab are you starting

24   with?

25         MR. HARRINGTON:  The first tab that I would start

1    with would probably be Schedule 4.

2         THE COURT:  Are you ready with Schedule 4?

3         MR. TOSCHER:  Your Honor, our request -- these are

4    just demonstrative of the testimony.  Our preference and strong

5    request is we go exhibit by exhibit.

6         THE COURT:  I don't mind giving them a binder each to

7    follow, but, ladies and gentlemen of the jury, I'm instructing

8    you only to look at the document with the tab that I instruct

9    you to look at.  So there are a whole bunch of tabs in the

10   folder each of you will get, but you cannot just go browsing

11   through.  Okay?  You can only look at the tab that I give you

12   the number for.

13        MR. TOSCHER:  Thank you, Your Honor.

14        THE COURT:  So with that, is Exhibit 4, as a

15   demonstrative aid, objected to or not?

16        MR. HARRINGTON:  Your Honor, if I could just clarify

17   to make sure the record is clear, it's Exhibit 18, tab 4.

18        THE COURT:  Yes, yes.  So the whole folder we're

19   calling Exhibit 18.  I'm sorry.  I called it Exhibit 4.  Tab 4.

20   Okay.

21        MR. TOSCHER:  Exhibit 18, the whole folder, as a

22   demonstrative?

23        THE COURT:  Well, no, no, no.  I'm only asking if

24   you're okay with tab 4 of Exhibit 18.

25        MR. TOSCHER:  Okay.

1            THE COURT:  So the procedure I propose to follow is

2    to give the jurors the whole Exhibit 18 but direct them to look

3    at this time only at tab 4.

4            MR. TOSCHER:  And tab 4 -- I want to make sure I have

5    the same tab 4.  That's payments to --

6            THE COURT:  It has that page 22 at the bottom.

7            MR. TOSCHER:  Yes, Your Honor.

8            THE COURT:  That one?  So any problem with tab 4?

9            MR. TOSCHER:  No, Your Honor.

10           THE COURT:  Okay.  Good.  We're going to get these

11   really scintillating binders now.

12           Mr. Tong.

13           MR. TONG:  Thank you.

14           THE COURT:  So you can open it only to tab 4.

15           MR. HARRINGTON:  Actually, while they're handing them

16   out, Your Honor, I actually might want to start at the title,

17   the table of contents, at the very beginning.  So I don't know

18   if --

19           THE COURT:  Mr. Toscher, little amendment.  So

20   Mr. Harrington proposes to show them the cover sheet -- don't

21   open it yet, folks -- with the Table of Schedules.

22           MR. TOSCHER:  I think Mr. Harrington made the

23   correction we talked about, Your Honor.

24           THE COURT:  Let's see.  Okay.  Hold on.  Let me look.

25           MR. TOSCHER:  That's fine.

```
 1              THE COURT:  Yes.  Okay?

 2              MR. TOSCHER:  Thank you, Your Honor.

 3              THE COURT:  So with that --

 4              MR. TOSCHER:  Yes.

 5              THE COURT:  So you want to tell them only the first

 6  page; right?

 7              MR. HARRINGTON:  Correct.

 8              THE COURT:  So you can open your binders to only the

 9  first page, which is sort of a table of contents.

10              Are you all okay?  Do you have that?

11              Okay.  Go ahead.

12  BY MR. HARRINGTON:

13  Q    Thank you.  And we talked a little bit about this before

14  the break, but if you wouldn't mind just explaining what this

15  Title of Schedules represents on the first page.

16  A    Would you like me to go through each schedule?

17  Q    Yeah, and just talk a little bit about how the schedules

18  relate to each other.

19  A    Schedule 1 is the lead schedule, which would be the tax

20  due and owing for Albert Hee and Waimana Enterprises.

21              And Schedule 2 would have to do with the tax due and

22  owing for Albert Hee.

23              Schedule 3 would be the schedule of tax due and owing

24  for Waimana Enterprises.

25              So Schedule 1 would be the summary of Schedule 2 and
```

1    3.

2            Schedule 4 would have to do with the payments to

3    Diane Doll.

4            Schedule 5 would have to do with the payments to MIT

5    for tuition payments for Adrianne Hee.

6            Schedule 6 would have to do with selected expenses

7    that were reimbursed to Albert Hee by Waimana, and this has to

8    do with the credit card expenses.

9            Schedule 7 would have to do regarding the cash

10   withdrawals by Albert Hee.

11           Schedule 8 has to do with the wage payments that were

12   made to the Hees -- to the Hee children.

13           And Schedule 9 is the schedule of wage payments to

14   Wendy Hee.

15           Schedule 10 would be the employment benefits paid by

16   Waimana for Wendy Hee and the children.

17           Schedule 11 is amounts booked as loans to shareholder

18   for Mr. Hee.

19           And Schedule 12 is a schedule of the fair market rent

20   of the Santa Clara house that was used by the Hee children.

21           MR. HARRINGTON:  Okay.  And at this time if everybody

22   could turn to tab 4.

23           THE COURT:  Yes, you may do that.

24   BY MR. HARRINGTON:

25   Q    And this is another schedule that we spoke a little bit

1   about before the break, but now that the jurors are looking at

2   it, could you describe how you obtained the information on this

3   schedule.

4   A     I obtained the information to prepare the schedule based

5   on Diane Doll's testimony and also exhibits that were entered

6   into evidence, such as a records from WEI -- sorry.   Waimana

7   and canceled checks from Waimana.

8   Q     And so again going through the columns in here, there's

9   Exhibit Number, which I think is fairly self-explanatory, but

10  there's also -- in the middle there's "Booked on Return

11  Preparer's Financial Statement."   Could you just again say what

12  that column -- where you derive that information from.

13  A     I got that information from the return preparer.   In this

14  case in the beginning from 2003 through 2008 that would be from

15  Chinaka & Siu's records.   And from 2009 through 2012 that would

16  have been from KMH, who was the return preparer for Waimana.

17  Q     And so when it says "Consulting Fees," where was that

18  listed in the exhibits?

19  A     This would have been listed on the trial balance, their

20  statement of income and expenses, basically their financial

21  statements that were prepared by the return preparer, the CPAs.

22  Q     And then there's a column for deducted on tax returns.

23  And could you explain how you determined how the transaction

24  was reflected on the tax return.

25  A     I traced -- from the financial statements I traced that to

1    Waimana's tax return, and I found an entry which showed that

2    Waimana deducted the payments to Diane Doll as Consulting Fees.

3    Q    And in -- it looks like the earlier columns there's Date,

4    Check Number, and Payee.  Did you actually review the checks

5    that were in evidence to Diane Doll?

6    A    Yes, I did.

7    Q    Okay.  And there's an Amount column.  And it looks like at

8    the bottom there's a total.  Could you describe how the Amount

9    column works going through the pages.

10   A    The amounts were actually from the actual check.  So what

11   I did was I totaled the amounts per year.  So in 2002, for

12   example, that amount I took from a 1099 Miscellaneous.  In 2003

13   there were four checks to Diane Doll that totaled $6,000.  In

14   2004 there were five checks that totaled $10,000.

15   Q    And you're looking at page 23?

16   A    Correct.

17   Q    And so what about 2005?

18   A    2005 there are four checks that total to $8,000.

19        Next page, 2006, there were five checks to Diane Doll

20   for $10,000.

21        Next page, 2007, there were five checks to Diane Doll

22   totaling $10,000.

23        The next page 2008, five checks to Diane Doll

24   totaling $10,000.

25        2009, four checks to Diane Doll totaling $8,000.

1              2010, the next page, five checks to Diane Doll
2    totaling $10,000.
3              2011, the next page, four checks to Diane Doll
4    totaling $4,000.
5              2012, two checks to Diane Doll totaling $8,000.
6              And the total for 2002 through 2012 was $96,000.
7    Q    And so in this later column on page 30, the entries for
8    "Booked on WEI's QuickBooks" and "Booked on Return Preparer's,"
9    does that work the same as on the first page where you derive
10   that information?
11   A    That is correct.
12   Q    So what was the tax effect of the Diane Doll payments, in
13   your opinion?
14   A    The tax effect to Waimana was that Waimana deducted this
15   as a business expense; so, therefore, the taxable income to
16   Waimana was reduced by the payments to Waimana.  So they didn't
17   pay the full amount of tax because they took this as a
18   deduction.
19   Q    And so was that an appropriate deduction for Waimana to
20   take?
21   A    No, it wasn't.
22   Q    And why is that?
23   A    Because this was not what we considered an ordinary and
24   necessary business expense for business purposes.
25   Q    And so could you talk a little bit about what an ordinary

1   and necessary business expense is.

2   A    Okay.  An ordinary expense would be something that is

3   common and accepted in the industry.  And a necessary expense

4   would be an expense that is helpful and applicable in the trade

5   of business, in this case Waimana's trade of business.

6   Q    And so where do massage payments fit into the definition

7   of ordinary and necessary?

8   A    It does not.

9   Q    And why is that?

10  A    Because it's not common and it's not accepted in the trade

11  for a business like Waimana to be paying massage expenses for

12  the shareholder.

13  Q    And so would massage payments ever be something that could

14  be deducted or reflected on a tax return?

15  A    It could.

16  Q    And how could it?

17  A    If massage services were available to all employees, then

18  possibly the corporation would be able to take a deduction.

19  However, massage services are considered a fringe benefit, and

20  all fringe benefits are included as income to the person

21  receiving the massages, unless specifically excluded by law.

22  And there was no exclusion for massage payments.

23  Q    So to follow that all the way, even if it is something

24  that the business could provide to all employees, it would

25  still have to be income for the person who receives the

1    massage?

2    A    That is correct.

3         MR. HARRINGTON:   Okay.  I'd like to turn to another

4    tab, which would be tab 5.

5         THE COURT:   Hold on, folks.  Don't turn yet.

6         Mr. Toscher?

7         MR. TOSCHER:   That's fine, Your Honor.

8         THE COURT:   Okay.  Then you get to turn to exciting

9    tab 5.

10        Mr. Harrington, back to you.

11   BY MR. HARRINGTON:

12   Q    Okay.  And could you describe what tab 5, the schedule

13   here, represents, please.

14   A    This would be a schedule of MIT tuition payments for

15   Adrianne Hee paid by Waimana.  So this is a listing of four

16   checks that were paid to the Massachusetts Institute of

17   Technology for the -- for Adrianne Hee's tuition, dorm charges,

18   and for a dining plan.

19   Q    And so again this format looks familiar, but could you

20   talk about where you obtained the information for column 8 and

21   9, please.

22   A    Column 8 would be information that I found in the return

23   preparer's general ledger.  And again in 2004 it would have

24   been Chinaka & Siu's general ledger.  And column 9 I trace that

25   expense to Waimana's tax return.  And in this case they

1  deducted it as office expense for three of the payments, and

2  one payment was deducted as a travel expense.

3  Q    And the payment as a travel expense would be the dorm

4  charges; is that right?

5  A    That is correct.

6  Q    And so how did the information actually appear on

7  Chinaka's records on the general ledger?  What information was

8  disclosed on those documents?

9  A    If you look at column 8, they received the information

10  from Waimana, and it was booked as an educational expense for

11  three of the checks, and for one of the checks it was a travel

12  expense.

13  Q    And again, looking at Column 1, 2, and 3, did you review

14  the checks -- the physical checks themselves?

15  A    Yes, I did.

16  Q    And so those checks reflect the actual checks from Waimana

17  that were made payable to MIT?

18  A    That is correct.

19  Q    So what was the tax effect of Waimana paying these

20  expenses and how they treated them on their books?

21  A    Again Waimana took the total of $33,523 as a business

22  expense, and so it would have reduced their taxable income and,

23  in turn, reduced the tax that they reported on their tax

24  return.

25  Q    And what was the proper tax treatment for this expense?

1   A    Well, this clearly is a personal expense, and the proper

2   treatment would have been to declare a dividend and pay it to

3   Mr. Hee.

4   Q    So taking that one piece at a time, could you describe a

5   little bit about what it means to declare a dividend and how

6   that process works for a corporation.

7   A    For a corporation, if they have earnings, it's like equity

8   into the company.  As the years go by, if there's profits, the

9   company has equity.  So out of the equity, the earnings from

10  the corporation, a dividend can be declared, and the dividends

11  are declared for the shareholder.

12  Q    So what happens when a dividend is declared?  Does the

13  corporation get a tax deduction for declaring a dividend?

14  A    No, the corporation does not get a tax deduction for a

15  dividend.

16  Q    And what happens to the person who receives the dividend?

17  What do they have to do?

18  A    They have to report that as income, as dividend income.

19  Q    And so when they report it as income, does that mean they

20  pay taxes on it?

21  A    Yes, that is correct.

22  Q    So what was it about this expense that led you to believe

23  that it's not an appropriate educational expense deduction by

24  Waimana?

25  A    Well, there was testimony from Adrianne Hee that it was

1   clearly for her, and she was the only person in which Waimana

2   was offering educational expenses.  There was no educational

3   program offered to any of the employees.  And, in fact, we

4   heard testimony from Judy Ushio, who was going to school at the

5   time.  And I knew it was kind of like a banter, she said, but

6   she probably would have wanted Waimana to pay some of her

7   educational expenses.

8          MR. TOSCHER:  Objection, Your Honor.  Speculation.

9          THE COURT:  Okay.  Sustained.

10  BY MR. HARRINGTON:

11  Q    So let's talk a little bit about an educational program

12  and how it could be set up at a company.  Could you describe

13  how -- you started to describe it, but let's talk just

14  generally about how an educational program could be set up

15  within the tax laws.

16  A    For a company?

17  Q    Correct.

18  A    If a company decides to set up an educational program, it

19  would have been offered to all employees and not in this case

20  to the daughter of the owner of the business.

21  Q    And so -- and if there was an educational program that a

22  company had, would you have to be an employee for that company

23  to participate in it?

24  A    Yes, you would have to be an employee.

25  Q    And so what was the tax effect of these payments made to

1  MIT?

2  A    And again Waimana took the tuition payments, dorm charges,

3  dining plan, as a business deduction; and, therefore, it

4  reduced the taxable income on Waimana's tax return and, in

5  turn, reduced the amount of tax that should have been reported.

6  Q    And I think we already covered it, but let's just make

7  sure we're clear.  And if it was appropriately booked, it

8  should have been a dividend; is that what you said?

9  A    That is correct.

10  Q    And the dividend would have increased the shareholder's

11  tax liability?

12  A    That is correct.

13          MR. HARRINGTON:  I'd like to turn -- not yet, but I'd

14  like to turn to tab 11.

15          THE COURT:  Hold on.

16          MR. TOSCHER:  No objection as a demonstrative, Your

17  Honor.

18          THE COURT:  Then you can turn, ladies and gentlemen,

19  to tab 11.

20  BY MR. HARRINGTON:

21  Q    Okay.  And could you please tell the members of the jury

22  about what tab 11, the schedule of amounts Booked as Loans to

23  Shareholder, represents.

24  A    The company's records reflected a loan to shareholder, and

25  in this case the sole shareholder of the company is Mr. Hee.

1    And looking at the entries into this loan to shareholder

2    account, business -- excuse me.  Personal expenses for and on

3    half of Mr. Hee were included in this account.

4    Q    So let's take the chart one step at a time.  It looks like

5    row 1 says Loan to Shareholder beginning balance, then there's

6    years.  Could you describe to the jury where you derived that

7    information.

8    A    I derived this information from the balance sheet because

9    the loan to shareholder is considered an asset to the

10   corporation.  It's like the company loaning someone money.  So

11   that's what it is.

12             And, basically, what I looked at, I looked at the

13   balance sheet of the tax return, and I also looked at the

14   return preparer's financial records to see what the increases

15   every year in the loan balance.

16   Q    And then on line 2 there's an ending balance figure.

17   Could you talk about where you derived that information.

18   A    And again I looked at the loan to shareholder balance on

19   the Waimana's tax return, and I also looked at the return

20   preparer and Waimana's records to look at the ending balance,

21   which, basically, took into account all the additions to this

22   account.

23   Q    So could you talk a little bit about what the tax effect

24   of treating these transactions as a loan to shareholder were

25   for both the corporation and for the defendant.

1   A    No tax effect because the corporation does not take a

2   deduction for any of these payments made on -- that was booked

3   as a loan to shareholder.  And, likewise, the shareholder, in

4   this case Mr. Hee, does not -- does not report any income, if

5   this was a true loan.

6   Q    So in your experience conducting audits what are the

7   indicia you look at to determine whether something is a true

8   loan?

9   A    What we would look at is whether or not there is a

10  promissory note, and the promissory note would show the intent

11  of the person borrowing the money to repay.  And on the

12  promissory note would include interest, the length of the loan,

13  and some kind of repayment schedule.

14  Q    And so have you heard -- was there any evidence in the

15  record that you've reviewed of there being a promissory note

16  for this loan?

17  A    There was no evidence of a promissory note.

18          MR. TOSCHER:  Your Honor, I would move to strike the

19  testimony regarding the evidence of the standard of no

20  promissory note as legally insufficient.

21          THE COURT:  Well, all she said was there was no

22  evidence that she would look to see if there was a promissory

23  note.  She didn't really say it was a requirement; so --

24          MR. TOSCHER:  I think she did say -- I'm sorry, Your

25  Honor.  I think that's what I heard, that that's what she

1    looked to:  whether there was a promissory note.

2              THE COURT:  Yeah, she said that would show the intent

3    to borrow and repay.  That's what she said she would look to

4    for evidence of that.

5              I think this is subject for cross-examination.

6    Overruled.

7              MR. TOSCHER:  Thank you, Your Honor.

8    BY MR. HARRINGTON:

9    Q    And so based on your review, what did you consider to be

10   the proper tax treatment of the payments that were booked as

11   loans?

12   A    In this case because there was no promissory note --

13   that's the first thing we look at to see whether or not this is

14   a bona-fide loan.  And again we look at the years.  This ranged

15   from 2005 to 2012.  And I saw no evidence of any kind of

16   repayments.  The balance continued to increase.  I considered

17   this as a constructive dividend or a disguised dividend in

18   which Waimana paid the personal expenses for Mr. Hee.

19   Q    And again what would the tax effect be, if it was

20   considered to be a dividend to Mr. Hee?

21   A    Mr. Hee would have to report the dividend on his personal

22   tax return, and the corporation would not be able to take a

23   deduction for a dividend.

24   Q    So by reporting it on his tax return, that would mean that

25   he would have to pay taxes on that amount?

1    A     That is correct.

2            MR. HARRINGTON:   And the next one I'd like to look to

3    is tab 7, but not yet for the jury.

4            MR. TOSCHER:   No objection, Your Honor.

5            THE COURT:   Okay.   You can turn to tab 7, ladies and

6    gentlemen.

7    BY MR. HARRINGTON:

8    Q     So tab 7 is titled Schedule of Selected Cash Withdrawals.

9    Could you explain to the jury what information is summarized in

10   this schedule.

11   A     Information summarized in this schedule would be

12   information from the American Express Optima account.   And

13   you've heard testimony from Nancy Henderson that stated that

14   this account was used for cash withdrawals.   So, basically, on

15   the statement it was clear that ATM withdrawals were made.

16   Q     And so let's take this because this one's a little bit

17   longer, and we've got lots of columns at the top.   Could you

18   describe a little bit to the jury what each of these columns

19   represents and where you were able to obtain information on

20   those columns.

21   A     As you recall, whenever someone requested for

22   reimbursement, they would fill out this reimbursement sheet.

23   And if you look in the most left-hand column after item number,

24   there would be a date on the reimbursement sheet, and then the

25   date that the cash was withdrawn would be on their

1   reimbursement sheet.  And also at times there were actual

2   copies of the ATM withdrawal receipts.  The description of the

3   expense is, basically, what it is.  It was actually -- this is

4   actually coming from the reimbursement sheet.

5            What I did next was I looked at the withdrawal slip

6   from the ATM, and I notated where the withdrawal was made.  And

7   the next several columns on the reimbursement sheet itself

8   would be account numbers where the withdrawals would be booked.

9   Q    Okay.  Let's talk a little bit about what those account

10  numbers mean.  What did you understand those account numbers to

11  mean?

12  A    Well, if you see 62,500, the first item, that is -- they

13  were booking it to Travel Expense under Sandwich Isles.

14  Q    And then so the other categories would be the same type of

15  information that would be on the request for reimbursement

16  sheet?

17  A    That is correct.  I took it straight off the reimbursement

18  sheets.

19  Q    Okay.  And over on the side there's a notation on request

20  for reimbursement.  Where did you obtain that information?

21  A    I obtained that information from the reimbursement sheet

22  itself.  There was a notation as far as the dates of travel and

23  where the travel took place.

24  Q    And then there's a check number and a check date and a

25  check amount.  What does that refer to?

1   A     That actually reflects to a check paid by Waimana to

2   Albert Hee.

3   Q     So did you actually review the physical checks themselves

4   that were paid from Waimana's bank account to Albert Hee?

5   A     Yes, I did.

6   Q     And it says "Payor."  And if you look through the

7   schedule, are all of these checks for Albert Hee?

8   A     That is correct.

9   Q     And in your review of the exhibits in evidence in this

10  case did you see any cash reimbursements -- cash -- requests

11  for reimbursements for cash by anyone other than Mr. Hee?

12  A     No, I did not.

13  Q     And did you come to totals on the total amounts that were

14  reimbursed?

15  A     Yes, I did.

16  Q     And could you direct the jury to where those numbers are

17  located.

18  A     Okay.  For the first year, if you could turn to page -- if

19  you could turn to page 84, at the very top there's a total of

20  cash withdrawals of $8,732.75.  The other three amounts on that

21  line had to do with the transaction fees whenever an ATM

22  withdrawal was made.

23  Q     And so it looks like we don't have any entries for 2008;

24  is that right?

25  A     That is correct.

1    Q    Were there any records of any requests for reimbursement

2    for 2008?

3    A    I didn't see any.

4    Q    So with 2009 what was the total amount?

5         I believe it's on page 87.

6    A    Okay.  87.  The total amount for 2009 was $9,335.

7              THE COURT:  Can I see counsel at the bench?

8         (At sidebar on the record:)

9              THE COURT:  I see 4 and 5.

10             MR. HARRINGTON:  Did we miss --

11             THE COURT:  I think they still say "disguised," but I

12   thought they were supposed to say "booked."

13             MR. HARRINGTON:  I apologize, yeah.

14             MR. TOSCHER:  We were supposed to take it out.

15             THE COURT:  I remember discussing those specifically.

16        So why don't I tell them -- I can tell them to cross

17   the word out and to write "booked," and then we can give a

18   replacement page tomorrow morning.  But I'm going to tell them

19   that word doesn't belong there.

20             MR. HARRINGTON:  Yeah.

21             MR. TOSCHER:  Yeah, that was -- I missed that.

22             MR. HARRINGTON:  I apologize.  We just missed it.

23   That's fine with me.

24             THE COURT:  Okay.

25        (In open court on the record:)

```
 1            THE COURT:  Okay.  I'm going to ask the members of
 2   the jury to make a correction on tab 11.  So if you look at the
 3   right-hand corner, bottom corner, you will see it says 104 of
 4   107.  I'm on that page in tab 11.  Do you see it?
 5            The bottom right-hand corner of tab 11 has little
 6   numbers on the pages.  It says 104 of 107.  Are you there?
 7            Okay.  And then you'll see there is an item number,
 8   and item 4 says "Income disguised as loan to shareholder."  I
 9   ask that you take your pens and you cross out that word
10   "disguise," okay, and you write in the word "booked,"
11   b-o-o-k-e-d.  Because that's how we're going to talk about
12   this.
13            And can you do the same for item 5.  Cross out that
14   word, write in the word "booked."  Okay?
15            Okay, Counsel.  Go ahead.
16   BY MR. HARRINGTON:
17   Q    So I think we left off at 2009, and you provided the total
18   amount.  So let's look at the total amount for 2010, which I
19   believe is on page 89.
20   A    Okay.  That's correct.
21   Q    And what was the total amount?
22   A    The total amount for 2010 was 5,422.
23   Q    So could you talk a little bit about why you created this
24   schedule and how cash reimbursement requests should work under
25   the Internal Revenue Code.
```

 1   A      Internal Revenue Code Section 274 is very clear that there
 2   is a requirement for travel that there would be receipts
 3   required to justify what the expense was for.  The only
 4   receipts that were provided were ATM withdrawal slips.  There's
 5   no notation as far as what the expense is for.  So I -- you --
 6   the code section is very clear that there is that requirement
 7   in order for the expense to be a deductible business expense
 8   Q      When you're talking about "receipts," are you talking
 9   about like from a restaurant or from a hotel for travel
10   receipts?
11   A      That's correct.  Any kind of receipts.
12   Q      So what was the tax effect of these being reimbursed by
13   the company?
14   A      Again Waimana took these amounts as a deduction -- a
15   business deduction; and, therefore, the taxable income on
16   Waimana's tax return was reduced by the total amounts per year.
17   And again the tax paid was less because they took this as a
18   business deduction.
19   Q      And what was the proper tax treatment for these
20   transactions?
21   A      Again the beneficiary of these cash withdrawals was
22   Mr. Hee; so the proper tax treatment would have been a
23   constructive dividend or a disguised dividend to Mr. Hee.
24   Q      And again that would be an amount that he would need to
25   pay taxes on?

 1   A      That is correct.

 2             MR. HARRINGTON:   Okay.   The next tab I want to turn

 3   to is tab 8.

 4             THE COURT:   Okay.   Hold on, ladies and gentlemen.

 5             Mr. Toscher?

 6             MR. TOSCHER:   No objection, Your Honor.

 7             THE COURT:   Okay.   You can turn, then, to tab 8.

 8   BY MR. HARRINGTON:

 9   Q      So could you please describe for the jury what is

10   contained on tab 8.

11   A      This is a schedule of wage payments to the three children,

12   Adrianne, Breanne, and Charlton, paid by Waimana for the

13   years --

14   Q      And where did you get this information from?

15   A      I got this information from the W-2s that were attached to

16   the tax returns of the three children.

17   Q      And so again looking at the columns here, we have years at

18   the top, and then it looks like on row 1, is that for Adrianne

19   Hee?

20   A      That's correct.

21   Q      And row 4 is for Breanne Hee?

22   A      Correct.

23   Q      And row 7 is for Charlton Hee?

24   A      Correct.

25   Q      So each of the numbers corresponds to what was on their

1    W-2; is that what you said?

2    A    Correct.

3    Q    Okay.  And I also see that there's numbers in parentheses.

4    What do those represent?

5    A    Charlton Hee and Adrianne Hee had testified that during

6    the summers they would work at the Mililani facility, and they

7    were paid hourly wages, which was in addition to their salary.

8    So I considered the work at Mililani as actual work services

9    being rendered for the company, and so, therefore, those

10   amounts are included in the W-2.  So I looked at their

11   personnel files and I looked for any kind of time sheets that I

12   could find, and if you were to look at the subsequent

13   schedules, you'll see my computation where I figured out what

14   they would have been paid while working during the summers at

15   Mililani.

16   Q    And so the amounts that are on 1, 4, and 7, those are the

17   total amounts from the W-2?

18   A    That's correct.

19   Q    And so other than the figures that you have in

20   parentheses, what was your opinion on the proper tax treatment

21   of those payments?

22   A    The children did not provide any kind of services rendered

23   to Waimana.  You've heard testimony that they were full-time

24   students.  They were away from here in Hawai'i.  They were

25   going to school on the mainland.  So, therefore, they were not

```
 1   employees.  So wages were paid to him for not doing any work.
 2   Again they did do work while they worked at Mililani; so I gave
 3   them credit for that amount that they actually worked at
 4   Mililani.
 5   Q    So taking a step back for a second, what is the standard
 6   under the Tax Code for an appropriate wage payment by a
 7   company?
 8   A    The person would have to render services.  They would have
 9   to do something.  They would have to actually work, do work.
10   Q    And is that the same standard as the ordinary and
11   necessary that you were talking about before?
12   A    That is correct.
13             MR. HARRINGTON:  So if we can, I'd like to look at
14   tab 8A next.
15             THE COURT:  Okay.  Hold on.
16             MR. TOSCHER:  No objection, Your Honor.
17             THE COURT:  Okay.  Then the jurors can look at tab
18   8A.
19   BY MR. HARRINGTON:
20   Q    And so you were talking before, I think you mentioned "in
21   your later schedules."  Could you talk a little bit about how
22   this schedule handled the hourly wages.
23   A    What I did was I looked in the personnel files for each of
24   the children, and they would actually turn in time sheets when
25   they worked at the Mililani center.  And what I did was I
```

1    looked at how many hours they were being paid, I looked at what

2    the hourly rate of pay was, and I multiplied that, and I came

3    up with the amount of payments that were made to them for work

4    done at Mililani.

5    Q    And so it looks like there's multiple columns for each

6    child, the first one for Adrianne Hee.  So did they have

7    separate time sheets?

8    A    Yes, they did have separate time sheets.

9    Q    And did you review all of the personnel files that were in

10   evidence?

11   A    I did.

12   Q    And this is all the information you're able to find about

13   their hourly wages?

14   A    That is correct.

15   Q    And so let's turn to page 98.  And could you talk a little

16   bit about the last line, the totals there.  Is that Charlton

17   Hee?

18   A    Are you talking about the last three entries?

19   Q    On page 98 there's a total at the bottom.  Does that refer

20   to Charlton Hee's total salaries for those years?

21   A    Total salaries for work done at Mililani.

22   Q    And then so these refer back, to some degree, to the

23   number that was in the parentheses on the previous schedule?

24   A    That is correct.

25        MR. HARRINGTON:  Okay.  I would like to, if I can,

1    turn to tab 8B, as in boy.

2              THE COURT:  Mr. Toscher?

3              MR. TOSCHER:  No objection, Your Honor.

4              THE COURT:  Okay.  The jurors can look at 8B.

5    BY MR. HARRINGTON:

6    Q    And this is a one-page schedule.  Could you please tell

7    the jury what's contained on this schedule.

8    A    Again I went through the personnel files, and I looked

9    at -- a lot of times there were fax transmittals which would

10   state Adrianne Hee is being paid so many dollars per hour.

11   Likewise, for the other two children.  And I gathered that

12   information because, of the total wages on the W-2, that amount

13   included the work done in Mililani.  So again that work was

14   considered services rendered; so that was real work.

15   Q    And so what was the -- what's the difference, I guess,

16   just in laymen's terms between 8A and 8B?

17   A    8B would be just the hourly rate, where I got that

18   information.  8B would be the computation based upon the hours

19   worked and the hourly rate of pay.

20             THE COURT:  Wait.  Wait, now.  There might be some

21   confusion in the record.  I think she said 8B both times.

22             MR. HARRINGTON:  Okay.  Let's try again.

23   Q    So let's talk about the difference what 8A does and what

24   8B does.

25   A    Okay.  8B would be information that I gathered from

1    information in their personnel files, which would show their

2    hourly rate of pay and the dates in which it was applicable

3    because sometimes the rates did change.  8A would be a

4    computation based on the number of hours on the time sheets or

5    faxes, and I just multiplied that by their hourly rate of pay.

6    Q    Okay.  And turning back to tab 8, if we could go to page

7    93, which, I believe, is the second page of that schedule.  And

8    could you please describe to the jury what the total amounts

9    that you computed were.

10   A    The total amounts for the three children, is that what

11   you're asking me?

12   Q    Yes.

13   A    Okay.  So the total amount of wage payments for the three

14   Hee children for the years 2006 through 2012 totaled $682,156.

15   Q    That's again that figure is giving them credit for the

16   hourly wages that they worked at Mililani?

17   A    That is correct.

18   Q    Now, what was the tax effect for Waimana for paying these

19   wages and deducting them as expenses?

20   A    And again Waimana took that as a business deduction; so it

21   decreased its taxable income and, likewise, decreased the

22   amount of taxes that they paid.

23   Q    And what would be the proper tax treatment?

24   A    This would be again a dividend to Mr. Hee.  He decided

25   that he wanted to, I guess, pay his children, and so the checks

1  actually went out -- or the direct deposit actually went out to

2  the children.  So it's for his benefit; and, therefore, the tax

3  treatment would have been a constructive dividend.

4  Q    So again why is that a constructive dividend for Mr. Hee?

5  A    Because he is the shareholder of the company.  He is the

6  owner of the company.  And these payments were for the benefit

7  of him as far as paying the children.  It's for his benefit.

8           MR. HARRINGTON:  And the next one is tab 9.

9           THE COURT:  Mr. Toscher?

10           MR. TOSCHER:  No objection, Your Honor.

11           THE COURT:  The jurors can look at tab 9.

12  BY MR. HARRINGTON:

13  Q    And could you please describe what's contained on tab 9.

14  A    This schedule includes wage payments made to Wendy Hee,

15  who is Mr. Hee's wife, by Waimana for the years 2003 through

16  2012.

17  Q    And where did you get this information?

18  A    I got this information from the form W-2 that was attached

19  to the Hees' joint tax return.

20  Q    So line number 3 has a total, and is that the total amount

21  that you computed?

22  A    That is correct.

23  Q    And how much is that figure?

24  A    For the years 2003 through 2012 Wendy Hee was paid

25  $590,201.

1    Q    So again was this a similar tax effect as payments to the

2    children?

3    A    That's correct.

4    Q    So did you form an opinion about whether this was the

5    proper tax treatment for these payments?

6    A    This was not the proper tax treatment.  There was

7    testimony that Wendy Hee was staying at home taking care of the

8    family.  She did not provide any services for the company.  So,

9    therefore, again the payments were made for the benefit of

10   Mr. Hee and should be treated as constructive dividend to

11   Mr. Hee.

12            MR. HARRINGTON:  And so the next tab would be tab 10.

13            MR. TOSCHER:  No objection, Your Honor.

14            THE COURT:  Okay.  The jurors can look at tab 10.

15   BY MR. HARRINGTON:

16   Q    And could you please describe for the jury what is

17   contained on this schedule.

18   A    This schedule is -- contains the employee benefits paid by

19   Waimana for Wendy Hee and the Hee children.

20   Q    So where did you get this information?

21   A    I got this information from documents in Waimana.  It had

22   to do with this payroll, labor, employee totals that would have

23   been printed at the end of the year every year.

24   Q    And so did they have a printout for each employee at the

25   company?

 1   A    Yes, they did.

 2   Q    And so let's start with -- it looks like the first one is

 3   for Wendy Hee, and there's a variety of employment benefits.

 4   Let's start with Retirement Plan Discretionary Contribution.

 5   What's that?

 6   A    This was a profit-sharing program that was offered to

 7   full-time employees.  And again I believe they had to work a

 8   minimum of -- I think you saw the one for Breanne Hee -- over

 9   2,000 hours a year in order to be eligible for this

10   profit-sharing.

11   Q    And it looks like it was $7500 a year with some years not

12   having a distribution; is that right?

13   A    That is correct.

14   Q    Okay.  And the next line is a life insurance provided by

15   SIC.  What does that mean?

16   A    Life insurance policy for Wendy Hee was provided by the

17   company.

18   Q    And so what did the dollar figures represent in 2009

19   through 2012?

20   A    This was payments made to a life insurance company for the

21   benefit of Wendy Hee.

22   Q    And what about long-term care?  What does that refer to?

23   A    Again life -- long-term care insurance paid to a company

24   for the benefit of Wendy Hee.

25   Q    And so these are $6,412, looks like, per year; so what

 1   amount would that be?  Is that the premium?

 2   A    Yes.

 3   Q    And who paid the premium?

 4   A    The premium was paid by Waimana.

 5   Q    I see there's also long-term disability care.  What does

 6   that represent?

 7   A    Again long-term disability insurance was paid by Waimana

 8   for Wendy Hee.

 9   Q    And then there's a 401(K) employer match.  What does that

10   represent?

11   A    This was a matching program that they had.  You've heard

12   the testimony from Breanne that she contributed 401(K) from her

13   wages.  This is the actual employer match; so this is in

14   addition.

15   Q    Let's just make sure the record's clear.  You said

16   "Breanne."  Is there --

17   A    I'm sorry.  I'm sorry.  Adrianne.

18            THE COURT:  Okay.  Yeah.

19            MR. HARRINGTON:  Thank you.

20   Q    So turning to Adrianne, Adrianne is the next individual

21   listed on here.  And I see that there is similar entries, but

22   it looks like there's HDS Single Coverage.  What does that

23   refer to?

24   A    HDS would be Hawai'i Dental Service; so this would be

25   dental insurance paid by Waimana for Adrianne Hee.

 1   Q    And what about HMAA Single Employee Coverage?

 2   A    This would be for medical insurance paid by Waimana for

 3   the benefit of Adrianne Hee.

 4   Q    And I think I may have skipped one with Wendy Hee, but

 5   there's also Critical Illness both on Adrianne and Wendy Hee.

 6   And what does that refer to?

 7   A    It's some kind of Critical Illness insurance policy paid

 8   by Waimana for the benefit of Wendy Hee and Adrianne Hee.

 9   Q    So starting on page 101, it looks like we have totals for

10   Wendy Hee.  And so are these computations you performed of all

11   the payments that were made?

12   A    That is correct.

13   Q    Okay.  And, for example, it looks like on 2010 it was

14   24,000 for Wendy Hee?  $24,346.67?

15   A    That is correct.

16   Q    And Adrianne Hee, looks like on page 102, were those the

17   same type of computations you performed?

18   A    That is correct.

19   Q    And for Breanne Hee we have a column for 2011 that's

20   filled out.  Is that the total for $39,714?

21   A    That is correct.

22   Q    But it's blank on 2012.  Could you talk about why that's

23   blank?

24   A    There was evidence in the documents that Breanne Hee

25   returned to Hawai'i in early 2012.  Because the fact that she

1    did return back to Hawai'i, I did not include any employee

2    benefits paid because she could have worked for the company

3    as -- and provided services for Waimana.  So that would have

4    been a deductible business expense to Waimana.

5    Q    And if we turn to page 103 --

6         THE COURT:  Can -- hold on one sec.  I just wanted to

7    tell the jurors:  If you're writing notes, you should write

8    those notes in your little notepads, not in Exhibit 18.  Okay?

9    Because it's your notepads that you can take with you later.

10        Okay.  Go ahead.

11        MR. HARRINGTON:  Thank you.

12   Q    And if we turn to page 103 on line -- excuse me, row 40,

13   there's a total.  And what does this total represent?

14   A    This would be the total employee benefits paid by Waimana

15   for Wendy Hee and the three children of Mr. Hee.

16   Q    And so in 2010 it was $101,000 in payments?

17   A    That is correct.

18   Q    And in 2011 it was $106,478?

19   A    That is correct.

20   Q    Okay.  So what was the tax effect of Waimana making all of

21   these payments as employee benefits?

22   A    And again Waimana took a business deduction that reduced

23   their taxable income and, in turn, reduced the taxes that they

24   paid.

25   Q    And what was the proper tax treatment for these payments?

1   A     Mrs. Hee and the three children provided no services to

2   the company; so, therefore, they were not employees.  The

3   payments were made on their behalf; so, therefore, the benefits

4   paid by Waimana would be considered a constructive dividend to

5   Mr. Hee.

6   Q     And again he would have to pay taxes on that amount, if it

7   was a constructive dividend?

8   A     Mr. Hee would have to pay taxes on that amount.

9   Q     And so you heard some testimony about -- from Adrianne Hee

10  about maybe some various tasks she performed throughout the

11  year.  Based on those, what was your opinion about whether she

12  was an ordinary and necessary employee of the company?

13  A     Again she was a full-time student.  She worked summers.

14  She was in the East Coast.  She did accompany her father on

15  some meetings; however, it was very sporadic.  She was there to

16  listen to the meetings.  There was no evidence that she

17  contributed to the meetings.  She didn't present any kind of

18  projects or she didn't present anything at the meetings.  So,

19  therefore, I did not consider that as services rendered when

20  she accompanied her father to those meetings.

21             MR. HARRINGTON:  So next schedule would be tab 12.

22             THE COURT:  Hold on while we wait.  Okay?

23             MR. TOSCHER:  No objection, Your Honor.

24             THE COURT:  Okay.  You can look at tab 12.

25  BY MR. HARRINGTON:

1    Q    So could you please explain to the jury what's on tab 12.

2    A    This is a schedule of the fair market rent of the Santa

3    Clara house that was purchased by Waimana and used exclusively

4    by the children of Mr. Hee.

5    Q    So when did you get the information to have the fair

6    market value of the rent?

7    A    We -- as you recall, Frank Molinari testified that he

8    determined what the fair market rent would have been for this

9    house during these years.

10    Q    And so what was the tax treatment used by Waimana to take

11    into consideration the house?  How did they treat the house on

12    their tax books?

13    A    I believe there was some e-mails as to whether or not this

14    was an asset or an investment.  I think, ultimately, they

15    treated this as an investment property.  So they did not

16    depreciate the property.  They just kept it on the books as an

17    investment.

18    Q    When you said "kept it on the books," did that have any

19    effect on the amount of taxes that were owed by the company?

20    A    No.  It just sat on the balance sheet as an asset.

21    Q    Did it have any effect on the taxes of Mr. Hee, the way it

22    was used by the company?

23    A    No.  But the way it was used by the company?

24    Q    The way it was booked by the company as its own records.

25    A    If it just sat on the books as an investment, no.

1   Q    So what was the proper tax treatment of the property?

2   A    The proper tax treatment for the rent, or the way the

3   property was booked on the balance sheet?

4   Q    Let's start with the use of the property.

5   A    Okay.

6   Q    What was the proper tax effect for how the property was

7   used?

8   A    Okay.  The property was clearly used personal.  The

9   children stayed there while going to Santa Clara University.

10  The other individuals that stayed in the house were Santa Clara

11  students.  The value of the children using the house is a fair

12  rental value; so the fair rental value should have been

13  included as income by Mr. Hee.

14  Q    And you say "included by income by Mr. Hee."  Do you mean

15  on his tax return?

16  A    Correct.

17  Q    And would that be a dividend as well?

18  A    That would be a dividend.

19  Q    So let's look at the actual figures you have here.  Looks

20  like 2008 you have $30,000?

21  A    That's correct.

22  Q    And going on, but then in 2011 you have a number in

23  parentheses.  Could you describe to the jury how you performed

24  those calculations.

25  A    You heard testimony by the accountants at KMH that later

1    in the years, I think, I guess, in 2011 or 2012, probably 2012,

2    that they were notified by counsel that the property was being

3    used by the children.  So what KMH did was they tried to

4    calculate the rent that was being collected by Breanne Hee.  So

5    these amounts on line 12 were actually reported as income by

6    Waimana; so, therefore, since it was reported by Waimana, I

7    gave -- I backed it out of the fair rental value.

8    Q     So that reduced the amount that would be a dividend?

9    A     That's correct.

10          MR. HARRINGTON:  So the next tabs would actually be

11   maybe easier to review them this way:  would be 6 through 6D.

12          THE COURT:  Okay.  So hold on.

13          MR. TOSCHER:  I'm sorry --

14          MR. HARRINGTON:  6 through 6D.

15          MR. TOSCHER:  Okay.  We're going to start with 6,

16   though?

17          MR. HARRINGTON:  We can start with 6, but --

18          THE COURT:  Okay.  But he's just warning you he's

19   going to go several; so if you want to look at several right

20   now.

21          MR. TOSCHER:  No objection on 6, Your Honor.

22          THE COURT:  What about the -- you want to look at 6A

23   now?

24          MR. TOSCHER:  If you do the court, yes, I would be.

25          No objection, Your Honor.

1              THE COURT:  For 6 through 6D.

2              MR. TOSCHER:  Yes, Your Honor.

3              THE COURT:  Okay.  And you're starting with 6,

4     Mr. Harrington?

5              MR. HARRINGTON:  Yes.

6              THE COURT:  The jurors can look at tab 6.

7     BY MR. HARRINGTON:

8     Q    So starting with tab 6, could you describe what is

9     contained on that schedule.

10    A    Schedule 6 is a summary of selected expenses reimbursed to

11    Mr. Hee by Waimana.  And these were expenses having to do with

12    his American Express credit card.

13    Q    Again you said this is a total summary?

14    A    A total summary for the years 2007 through 2012.

15    Q    So if we turn to 6B, as in boy, would that be where more

16    detail is located?

17    A    Yes.

18    Q    Okay.  So if we turn to 6B, could you talk about how you

19    created this schedule.

20    A    I created the schedule by looking at reimbursement sheets

21    that were filled in by Mr. Hee and also looking at the canceled

22    check -- the reimbursement canceled check that Waimana paid to

23    Mr. Hee, and also the American Express credit card statement.

24    Q    And so just to -- these were -- the information on here

25    was all obtained from the credit card statements and

1    reimbursement requests?

2    A    That is correct, and the canceled check.

3    Q    So let's take a look at this.  I know this is very small

4    font here.  There's a lot of information.  But let's start with

5    the reimbursement sheet date, the date expense charge, and the

6    description of expense.  Could you talk about where you got

7    that information.

8    A    I got that information from the actual reimbursement sheet

9    that was prepared by Mr. Hee.

10   Q    Okay.  And then we have a whole line of columns here, and

11   I think we saw account numbers before.  So how did you know

12   what column to put the dollar amount in?

13   A    It was actually put on the reimbursement sheet or at times

14   a spreadsheet was attached to the sheet.

15   Q    And that would say which dollar figure for which account?

16   A    Yes.

17   Q    And then -- and then there's a column.  It's -- I'd say

18   it's about two-thirds of the way down.  It says Notation on

19   AmEx Statement/Reimbursement Sheet.  Some of these are blank,

20   but, if you look down on row 9, there's an entry there.  And

21   could you talk about where you obtained that information.

22   A    On the actual American Express statement there's this

23   notation.  If you recall, Nancy Henderson stated that after

24   talking to Mr. Hee she would actually type in an explanation on

25   the American Express statement.

1    Q    So for the one on row 9 you have an entry that refers to a

2    note; is that what that is?

3    A    That is a note.  If I could clarify, that column would

4    include notations on the American Express statement or the

5    reimbursement sheet.

6    Q    Okay.  And so looking at 9 again it says Hawaiian Airlines

7    Ticket for Wendy Hee.  Was that from the statement itself as

8    well?

9    A    From the American Express statement, yes.

10   Q    And then on description of evidence column, could you

11   describe a little bit about how you can trace this back to the

12   exhibits themselves.

13   A    I actually looked at the reimbursement sheet.  There's a

14   date for the American Express Centurion card in this case, the

15   statement itself.  And in this case there was actually a

16   handwritten note attached and a copy of the canceled check in

17   which Waimana reimbursed Albert Hee.  Because, as you recall,

18   Mr. Hee used his personal credit card, and so he would turn in

19   his reimbursement sheet and request that expenses be reimbursed

20   to him personally.

21   Q    Okay.  In looking at this first page again there seem to

22   be a good number of charges at Costco Santa Clara.  So why are

23   those expenses listed on this schedule?

24   A    Santa Clara -- Breanne Hee was living in that -- going to

25   the University of Santa Clara at the time.  And when you go to

1    Costco, you're buying personal items.  So there was no evidence

2    that there was any business expenses or any kind of business

3    purpose regarding those purchases; so I considered that as a

4    personal expense paid by Mr. Hee.

5    Q    Okay.  And if we turn to page 36, please.  And you see the

6    top number, and I believe it's listed as row number 21.  It

7    says Le Grand Hotel Paris, and it has a travel expense of

8    $2,682.  Why did you include that expense on this schedule?

9    A    If you recall, there was testimony that Wendy Hee, Breanne

10   Hee, and her then boyfriend traveled to France.  There was no

11   business purpose for the travel.  And again I've considered

12   Wendy Hee and Breanne Hee as -- they weren't employees; so,

13   therefore, any expenses in which they traveled to Europe would

14   be considered a business -- a personal expense paid on behalf

15   of -- for Mr. Hee.

16   Q    And again there's a notation on AmEx statement.  It says

17   Travel CCI Undersea France/Inspection of Cable.  Was that from

18   the American Express statement?

19   A    Yes, it was.

20   Q    So when you were creating this schedule, what was the

21   general process you used to determine what expenses to put on

22   the schedule?

23   A    I looked at the reimbursement sheet.  I looked at the

24   American Express statement itself.  I determined that, if the

25   travel expense had to do with Mrs. Hee or the children, they

1    were not employees of the company; and, therefore, those

2    expenses were personal.

3    Q    Okay.  And if we turn to page 48.  And if you look at the

4    bottom of that -- and it looks like it's row 141 -- there's an

5    expense at Zippy's for $67, and it lists Al Hee and Charles

6    Hee.  So why did you include that expense?

7    A    Charles Hee is Mr. Hee's father.  And there was testimony

8    that Charles Hee has been retired for 20 years, and he is not

9    an employee of the company.

10   Q    And so when would a dinner out at Zippy's be an expense

11   that a company could pay for?  What is -- what are the rules

12   about that?

13   A    Well, if an employee entertained a client, they discuss

14   business over the meal, a receipt is provided.  Again Code

15   Section 274 is -- lays out the requirements in order to take a

16   business deduction for meals and entertainment.  They would

17   have to state who was present at the meal, the date, the time,

18   the amount.  And in this case it is Mr. Hee and his father

19   having a meal at Zippy's.

20   Q    And you consider that to be a personal expense?

21   A    Yes.  Charles Hee is Mr. Hee's father.  There has been no

22   evidence that he works or provides any kind of services.  There

23   is no business relationship between Mr. Hee and his father.

24   Q    And if we could turn to page 49, please.  And there's item

25   number 144, and it says Hawaiian Air for Breanne Hee, San Jose

1    to Honolulu.  Do you see that?

2    A    Yes, I do.

3    Q    And the notation on AmEx is Ownership and Management

4    Training.  Was that also on the credit card statement itself?

5    A    Yes, it was.

6    Q    So why did you include this expense on this schedule?

7    A    Again Breanne Hee was going to Santa Clara University.

8    She was a full-time student.  She was not providing any kind of

9    services rendered to the company.  She was not an employee.

10   And, therefore, there is no business purpose for this airline

11   ticket; and, therefore, it's a personal expense.

12           THE COURT:  Mr. Harrington, I wonder if we can take a

13   break now.  Then we'll come back and go until 4:00.

14           MR. HARRINGTON:  Absolutely.

15           THE COURT:  Okay.

16       (Jury excused.)

17       (Court recessed at 2:51 P.M., until 3:09 P.M.)

18           THE COURT:  Okay.

19   BY MR. HARRINGTON:

20   Q    So we were looking at tab 6B, and I want to turn your

21   attention to page 56, please.

22           And so if you look at line -- excuse me, row 217,

23   there's Disney Reservations.  Do you see that?

24   A    Yes, I do.

25   Q    Just to make sure we're all clear how these schedules

1    work, at the very far right column there's an exhibit number.

2    Is that the exhibit number you used to get the information to

3    put on this line?

4    A    That's correct.

5    Q    If we could actually briefly just pull up the exhibit so

6    we can be sure what we're all talking about here.

7         Christina, you mind pulling that up, please.  And if

8    we could zoom up the bottom part.

9         So again the typewritten information, where does that

10   appear on the schedule?

11   A    That would appear in the column Notation on American

12   Express Statement/Reimbursement Sheet.

13   Q    Okay.  And that's also where you would get the amount and

14   the other information that filled the column?

15   A    That is correct.

16   Q    So if the jury was looking for these particular charges,

17   they would look at Exhibit 4-33?

18   A    That is correct.

19        MR. HARRINGTON:  Okay.  We can take that down,

20   please.

21   Q    And so what was it about that expense that made you put it

22   on this chart?

23   A    Well, you've heard testimony from Adrianne Hee that she

24   and her sister, Breanne, and Breanne's husband, Jonathan, and a

25   friend of Adrianne went to Disney World.  And this particular

1    expense was for lodging.  And they went there to visit

2    Disneyland.  There was no business purpose given.  And again

3    Breanne and Adrianne are not considered employees of Waimana;

4    and, therefore, the expenses for the Disney World trip would be

5    considered personal.

6    Q     Okay.  And if we could turn to page 63, please.  And if

7    you see rows 277 with the Mauna Lani Bay.  Do you see that?

8    A     Yes, I do.

9    Q     So why was that expense included in this chart?

10   A     If you look in the column Notation on American Express

11   Statement/Reimbursement Sheet, it states Al, Wendy, Adrianne,

12   Breanne, Charlton Hee, Stockholders Meeting.  The only

13   stockholder for Waimana is Albert Hee.  So the other

14   individuals, who were his wife and children, were not

15   stockholders.

16   Q     In 2011?

17   A     That is correct.

18   Q     And so did you prepare a schedule that created a total of

19   all the expenses that you listed in this schedule of credit

20   card expenses?

21   A     Yes, I did.

22   Q     And which number is that?

23   A     That would be Schedule 6.

24   Q     Okay.  So if we could turn to tab 6, please.

25             And so could you describe for the jury what's

 1   contained on this chart.

 2   A    This would be the summary of Schedule 6A for the years

 3   2007 through 2012.

 4   Q    And so for 2008 the total amount was $40,000?

 5   A    Yes.  Look in column 14.  That's where you're getting the

 6   numbers from.

 7   Q    So the grand total for all the years, which is just 2007

 8   through 2012, what's the grand total?

 9   A    The grand total was $119,909.

10   Q    And again what was the impact tax-wise on Waimana for how

11   it booked the expenses?

12   A    Waimana booked this as a business expense.  And again it

13   reduced Waimana's taxable income and, in turn, reduced the

14   taxes that Waimana paid.

15   Q    And what was the proper tax treatment for those expenses?

16   A    Again this would be a constructive dividend to Mr. Hee

17   because these were personal expenses paid on his behalf.

18   Q    And so did you prepare schedules calculating the corporate

19   tax effect for the proper tax treatment that you testified

20   about?

21   A    Yes, I did.

22   Q    And which schedule numbers are those?

23   A    That would be Schedule 3, the 3 series.

24        MR. HARRINGTON:  Okay.  And that's the next one I'd

25   like to look at is the 3 series.

1               THE COURT:  Okay.

2               MR. TOSCHER:  No objection, Your Honor.

3               THE COURT:  Okay.  Then the jurors can -- are you

4    going with 3 first?

5               MR. HARRINGTON:  I think I'm actually going to start

6    with 3A.

7               THE COURT:  3A?  Okay.  3A.  You can look at 3A.

8    BY MR. HARRINGTON:

9    Q    So looking at 3A, can you describe for the jury how this

10   schedule works with the other schedules.

11   A    Okay.  This is a summary schedule.  So, for instance, we

12   went over each item.  Remember, we talked about Diane Doll

13   payments by Waimana, MIT payments for Adrianne Hee, the

14   personal expenses paid for Mr. Hee from the American Express

15   statements, the cash withdrawals from the Optima American

16   Express card that Waimana reimbursed Mr. Hee, the Waimana

17   payments for the wages for the children of Mr. Hee, the Waimana

18   payments for the wages for Wendy Hee, and the employee benefits

19   paid for Wendy Hee and the children.  And so this is just a

20   summary of those schedules that we went over, and if you look

21   in the right-hand column, that's the schedules that I pulled

22   the totals from.

23   Q    Okay.  And looking at row number 7, there's a total.  And

24   is that the total for the cost of the employee benefits of

25   $404,000 for the children and wife?

1   A     That's correct.  For the years 2005 through 2012.

2   Q     And so the first tax year on here is 2003; is that right?

3   A     That is correct.

4   Q     Why is that the first tax year?

5   A     That is the first tax year that we had records for for the

6   payments from Waimana.

7   Q     So that was the year you could use to calculate the

8   corporate taxes?

9   A     That is correct.

10  Q     And so the total figure on total line 8 is $1,941,948.94;

11  is that right?

12  A     That is correct.

13  Q     Okay.  So what did you do with these total figures on the

14  actual tax return?  Which schedule would you like to refer to

15  next?

16  A     I'd like to refer you to Schedule 3.

17  Q     Okay.  So if we turn to 3.

18        So if you could describe for the jury what's taking

19  place on Schedule 3.

20  A     The schedule looks at the adjustments to Waimana.  And,

21  basically, these are expenses paid and deducted as a business

22  expense, and these were personal expenses for Albert Hee.  And

23  a schedule, basically, takes into account all the adjustments,

24  compares the total adjustment to the taxable income per the

25  return, and figures out the corrected tax, and, basically,

1    computes the tax due and owing by Waimana.

2    Q    So before we get to the total, could you please describe

3    to the jury what Schedules 3B and 3C are calculating.

4    A    Schedules 3B and 3C takes into account the net operating

5    losses for Waimana.  A net operating loss is whenever a

6    corporation has a loss, they're entitled to carry it back and

7    forward to offset income.  So that's what one schedule is.  And

8    also for charitable contributions a corporation is limited to

9    10 percent contribution deduction based on taxable income.  And

10   so when I made all these adjustments, it caused adjustments to

11   the net operating losses, carries backs and carries forwards,

12   and likewise the contribution deduction that they're allowed.

13   Q    And what about Schedule 3D?

14   A    Schedule 3D is the computation of earnings and profits for

15   Waimana.  As I explained earlier, profits and earnings would be

16   what the earnings are for the corporation and the ability of

17   the corporation to pay dividends.  So the dividends would come

18   out of the equity, the profits of the company.  So I would take

19   into account this calculation to determine whether or not the

20   constructive dividend could be considered a dividend.  If there

21   wasn't enough earnings and profits, it would be a return of

22   capital.  A return of capital is what the shareholder would

23   have put into the company, and anything in excess of that would

24   be a capital gain to the shareholder.

25   Q    It's a mouthful.  Would it be fair to say that those

1   schedules are, basically, computations you have to make because

2   you change one number, it changes other numbers, and so on and

3   so forth throughout the return?

4   A    That is correct.

5   Q    So turning back to Schedule 3, would you please go through

6   how Schedule 3 -- what is on it and where it shows the amount

7   of taxes that should be due and owing.

8   A    Okay.  If you look at line 2, these were personal expenses

9   paid for the benefit of Albert Hee.  And Waimana actually took

10  a deduction for the personal expenses.  And if you look on the

11  right-hand column, column 14, we just went over Schedule 3A,

12  and that's where I got the totals from.  And then lines 3

13  through 6 are adjustments to the net operating loss deduction

14  and charitable contributions that I just talked about.  And on

15  line 7, that would be the total adjustments.  Line 8, I would

16  compare the taxable income per return.

17  Q    So just to stop for a second.  I may be the only one who

18  wants to ask this question, but "per return," does that mean

19  what was actually on the return that Waimana filed?

20  A    That is correct.

21  Q    And so what's contained on corrected taxable income?

22  A    So what I did is I added the total adjustment to the

23  taxable income per return, and we get the corrected taxable

24  income.

25  Q    And so then there's -- the next line is "Tax."

1    A    I computed the tax on the corrected taxable income, and

2    that is the amount on lines 10 and 11.

3    Q    And then line 12 is Corrected Tax Liability?

4    A    That is correct.

5    Q    And so what does it mean when it says Less Tax Per Return

6    for line 13?

7    A    That is the actual tax reported on Waimana's corporate

8    return.

9    Q    And so did that reduce the corrected tax liability?  In

10   other words, were they getting credit for the amount of taxes

11   they'd actually paid, Waimana?

12   A    That is correct.

13   Q    So the tax due and owing, is that a total for each of the

14   years?

15   A    That's correct.

16   Q    And so the total in 12, is that for the years 2003 through

17   2012?

18   A    Can you repeat the question?

19   Q    I'm sorry.  In column 12 --

20   A    Okay.  Sorry.

21   Q    Yeah, no problem.  There's a total.  And so is that the

22   total for 2003 through 2012?

23   A    That's correct.

24   Q    And it's $288,539?

25   A    Correct.

1   Q      And so is that the amount of taxes that should have been

2   paid by Waimana?

3   A      Yes.

4   Q      And did you do calculations on Mr. Hee's individual tax

5   returns?

6   A      Yes, I did.

7          MR. HARRINGTON:  Okay.  The next schedules I would

8   want to look at would be 2 and 2A.

9          MR. TOSCHER:  No objection, Your Honor.

10          THE COURT:  Okay.  Then which one are you starting

11   with?

12          MR. HARRINGTON:  Let's start at 2A.

13          THE COURT:  Okay.  The jurors can look at 2A.

14   BY MR. HARRINGTON:

15   Q      And so could you please describe for the jury what's

16   contained on 2A.

17   A      This schedule is a summary of the selected expenses paid

18   by Waimana for the benefit of Mr. Hee and for the use of the

19   Waimana property in Santa Clara.  So, basically, this schedule

20   is just a summary of all the other schedules that we've gone

21   through.

22   Q      And so looking at line number 6, it says WEI payments for

23   wages for Wendy Hee reclassified as constructive dividends and

24   was given credit for reporting wages on personal tax returns.

25   So what's the tax effect of that?  Could you please explain

1   that for the jury.

2   A    Okay.  Wendy Hee's wages were reported on the joint return

3   of the Hees.  Wage income is considered ordinary income; so it

4   doesn't get the benefit of qualified dividends.  Qualified

5   dividends are taxed at a lower rate, usually 15 percent.

6        So what I did was I considered Mrs. Hee's wages as a

7   dividend to Mr. Hee.  Then I gave credit to the Hees for the

8   wages that was already reported on tax returns.  So, basically,

9   I'm reclassifying the wages from ordinary income, which is

10  taxed at a higher rate, to qualified dividends, which was taxed

11  at a lower rate.

12  Q    So for that particular entry the tax liability would

13  actually go down?

14  A    Yes.

15        THE COURT:  Okay.  So the jurors should stay on the

16  page they're on.  But, Counsel, can you look at item 8.  Shall

17  we do the same?

18        MR. HARRINGTON:  Yes.  That would be my --

19        MR. TOSCHER:  Sorry.

20        THE COURT:  So I propose to handle it the same way.

21        MR. TOSCHER:  Oh, I thought you wanted me to come up.

22  That's fine, Your Honor.

23        THE COURT:  No.  Is that okay?  Can I do that now?

24        MR. HARRINGTON:  Yes.  Absolutely.

25        THE COURT:  Can you look at the next page.  In item 8

1   we need the same correction.  Cross out the word "disguised."

2   That word should not be there.  Put it out of your minds.  And

3   put the word "booked."

4           Okay.  Back to you, Counsel.

5   BY MR. HARRINGTON:

6   Q    All right.  So if you turn to that page, page 4, there's a

7   total at line 12?

8   A    That's correct.

9   Q    Okay.  And again if you look above it, that's composed of

10  all the other items that we looked at.  There's Santa Clara

11  property, personal expenses, everything like that?

12  A    That's correct.

13  Q    And the total under column 13 is -- is that $2,371,727.17?

14  A    Yes.

15  Q    Okay.  So what would happen to that figure for tax

16  purposes?  How should have that been reflected on Mr. Hee's

17  personal tax return?

18  A    So line 12 would be constructive dividends that Mr. Hee

19  would need to report on his individual tax returns.

20  Q    And so if we turn to tab 2.  And are these calculations

21  you performed to determine the correct tax liability for the

22  2003 through 2012 years?

23  A    That is correct.

24  Q    Okay.  And could you please just take the jury through how

25  you performed these calculations.

1    A    Okay.  If you look at item 2, that would be the

2    constructive dividends for the personal expenses paid by

3    Waimana for the benefit of Mr. Hee.

4              In 2007 -- if you recall, I explained what earnings

5    and profits meant.  In that year Waimana did not have adequate

6    earnings and profits.  So the total amount of dividends for

7    2007, $121,400 would be considered a dividend.  And on the

8    balance sheet the value of the stock was a thousand dollars.

9    So it's what we consider return of capital, basically the

10   company paying back Mr. Hee for the $1,000 value of the stock.

11   And anything in excess would be capital gains, and that would

12   be the $122,587.

13   Q    So again there's a line 4, Less Wendy Hee Wages Reported

14   on the Joint Returns.  Is that also getting credit for the

15   taxes that were paid?

16   A    For the wages that was reported.

17   Q    And so we have -- if you want to go through the next lines

18   to see how you got to total adjustments.

19   A    Okay.  Line 6 and 7, whenever you increase the adjusted

20   gross income on an individual tax return, there will be

21   limitations to the itemized deduction and the exemption.  So it

22   starts phasing out.  So that's what line 6 and 7 would be, the

23   phase-outs, because of the increase to the item -- excuse me,

24   the adjusted gross income.

25   Q    And so then you have taxable income per return.  Is that

1   what was originally reported on their tax returns?

2   A    Yes.

3   Q    Then we have Corrected Taxable Income at line 10?

4   A    Yes.

5   Q    So how do those numbers relate to each other?

6   A    I took the total adjustments and I added it to the taxable

7   income per the return, and that's what should have been

8   reported on the joint individual tax return.

9   Q    And then we have at line 16 Total Corrected Tax Liability.

10  So what does that line represent?

11  A    That represents the tax on the corrected taxable income.

12  Q    For what your calculations were based on the proper tax

13  treatment of all the expenses we were looking at?

14  A    Yes.

15  Q    And so then there's Less Tax Per Return and Tax Due and

16  Owing.  Can you please explain those two lines.

17  A    Less Tax Per Return is what was reported on the joint

18  individual income tax returns.  So the difference is the Tax

19  Due and Owing from the adjustments above.

20  Q    So in 2003 there's a number in parentheses.  What does

21  that mean?

22  A    It actually reduced the tax in 2003.  My computation

23  actually showed that the tax owed was less than the tax that

24  was reported on the return.

25  Q    Then so for later years, though, we have a positive

1    figure?

2    A    Yes.

3    Q    Okay.  And so lines 19 through 22, can you explain to the

4    jury what those adjustments are.

5    A    The children filed tax returns reporting the wages that

6    they received for work that they did not do; so they paid taxes

7    on those wages.  Because I am considering the wages paid by

8    Waimana to the children as a dividend to Mr. Hee, I reduced the

9    corrected tax due and owing owed by Mr. Hee by the taxes that

10   were reported and paid on the children's tax returns.

11   Q    So again you were giving him credit for taxes that were

12   already paid?

13   A    That's correct.

14   Q    So then we have a total due and owing on line 23, and you

15   have an entry for each year.  And the total amount for 2003

16   through 2012 is $259,632?

17   A    That is correct.

18             MR. HARRINGTON:  Okay.  If I can just have one

19   moment, please.

20             And there is one last schedule:  tab 1.

21             MR. TOSCHER:  No objection, Your Honor.

22             THE COURT:  Okay.  The jurors can look at tab 1.

23   BY MR. HARRINGTON:

24   Q    So could you please describe what is contained on Schedule

25   1, please.

1   A     This is the summary of the individual income taxes that

2   are -- that are owed by Mr. Hee and by Waimana.  It's just a

3   summary totaling the tax owed by year.

4   Q     So taking the corporate and the individual and combining

5   them together?

6   A     Correct.

7   Q     So for the 2003 through 2012 years, the total is $548,171?

8   A     That is correct.

9          MR. HARRINGTON:  I don't have any further questions

10  at this time.

11         MR. TOSCHER:  May it please the Court.  Ladies and

12  gentlemen.

13                         CROSS-EXAMINATION

14  Q     Good afternoon.

15  A     Good afternoon.

16  Q     I want to ask you a few questions regarding your resume

17  and qualifications.

18         It appears that all of your experience -- work

19  experience is just with the Internal Revenue Service?

20  A     I have some prior work experience.

21  Q     Okay.  But it's -- I don't think it's listed on your

22  resume that was provided.

23  A     It's only a couple years after I graduated from college.

24  Q     Okay.  So you left it off.

25  A     Yes.

1   Q     The private work experience.  But a vast majority of your

2   experience is just with the Internal Revenue Service.

3   A     That's correct.

4   Q     Okay.  And the other experience -- strike that.

5         It appears you've never worked for an accounting

6   firm?

7   A     That's correct.

8   Q     It also appears that you're not a licensed certified

9   public accountant?

10  A     That's correct.

11  Q     Have you ever sat for the certified public accounting

12  test?

13  A     No.

14  Q     In looking at your college degree, it was in education; is

15  that correct?

16  A     Correct.

17  Q     And then you studied and took courses in accounting.  And

18  that's the way you started your accounting knowledge?

19  A     Well, actually, I was a tax auditor.

20  Q     So you took accounting classes when you were a tax auditor

21  for the IRS?

22  A     Actually, I started before then.

23  Q     You started the accounting courses before being a tax

24  auditor.

25  A     Yes.

1   Q    Okay.  So it's fair to say substantially all of your work

2   experience is with the Internal Revenue Service.

3   A    Yes.

4   Q    And if I recall correctly, you started out as an

5   administrative position with the Criminal Investigation

6   Division; is that correct?

7   A    That's correct.

8   Q    And then you moved over to being a tax auditor and then a

9   revenue agent?

10  A    That's correct.

11  Q    And that's on the civil side; correct?

12  A    That's correct.

13  Q    Now, an expert witness disclosure was made to us of your

14  testimony or the subject matters.  Are you familiar with that?

15  A    No.

16  Q    Okay.  It was provided to us by the government.  It's in

17  the name of Selina Mann?

18  A    Okay.  I'm not Selina Mann.

19  Q    I know you're not Selina Mann, but it was represented to

20  us that this was the subject of your testimony.

21  A    Okay.

22  Q    Okay.  And are you familiar with Miss Mann?

23  A    Yes.

24  Q    Okay.  You've worked with her on this case?

25            MR. HARRINGTON:  Objection, Your Honor.  Relevance.

1              MR. TOSCHER:  Your Honor, can we have a sidebar?  I

2    want to determine whether we received the disclosure required

3    by the rules of this witness.  It was represented to us that --

4              THE COURT:  Okay.  We'll have a sidebar.

5         (At sidebar on the record:)

6              THE COURT:  Okay.  So what happened?

7              MR. TOSCHER:  We received the disclosure when the

8    Court ordered it, and it was provided to us, and we were told

9    that, while it had the name Selina Mann, we should consider it

10   Miss Mitsuyoshi's disclosure.  And she, apparently, doesn't

11   know anything about it.

12             MR. HARRINGTON:  I don't think she said she doesn't

13   know anything about it.

14             I don't think she said she doesn't know anything

15   about it.  What happened was we disclosed two experts because

16   we still had the other theory involved in the case.  Once the

17   case got simplified, we made the decision to have Susan

18   Mitsuyoshi testify as a expert in a summary witness, and we

19   told defense counsel that the statement written by Selina Mann

20   would be her expert statement for purposes of the disclosure.

21             THE COURT:  Okay.

22             MR. TOSCHER:  And we asked for something in her name,

23   but they declined to do it.  But she has not stated this is her

24   disclosure.

25             MR. HARRINGTON:  I think we actually --

```
 1              MR. TOSCHER:  I think -- excuse me.  I'm sorry.
 2              THE COURT:  So you want to show it to her and ask her
 3    if that's a summary of her opinion?  I'll let him do that.
 4              MR. TOSCHER:  I --
 5              THE COURT:  Because if she says it is, then there's
 6    no problem; right?
 7              MR. TOSCHER:  That's correct.
 8              THE COURT:  Okay.  Why don't you do that.
 9              MR. TOSCHER:  Okay.
10         (In open court on the record:)
11              THE COURT:  So why don't we call this something.
12    It's not going to come into evidence, but just so we can talk
13    about the document.  Let me check with --
14              MR. TOSCHER:  Your Honor, can I go back.
15              THE COURT:  Absolutely.
16              Are you not able --
17              MR. TOSCHER:  I made some extra copies, Your Honor,
18    and I can't find the copies.
19              THE COURT:  Because there's just not enough paper in
20    the case; so, you know.  I'm joking.
21              MR. TOSCHER:  I'm sorry.
22              THE COURT:  You don't have to laugh at my joke
23    really.
24              MR. TOSCHER:  No.  I want to laugh at your jokes.
25    I'm trying to listen.
```

 1          Your Honor --

 2          THE COURT:  Yes.  If you do have a copy --

 3          MR. TOSCHER:  I do have a copy.

 4          THE COURT:  Why don't I give you the handheld mike to

 5  make sure if you need to stay close enough to hand it back and

 6  forth.

 7          MR. TOSCHER:  Thank you, Your Honor.

 8          May I approach the witness, Your Honor?

 9          THE COURT:  Yes, yes.

10  BY MR. TOSCHER:

11  Q    Do you see this disclosure by Selina Mann?  Are you

12  familiar with it?  Have you ever seen it before?

13  A    I have seen it.

14  Q    Did you work with her on it?

15  A    No.

16  Q    So this is not your disclosure?

17  A    Correct.

18          THE COURT:  I think she's saying she didn't work on

19  that; that's not something she did.  I think if you ask her to

20  read it, that might --

21          MR. TOSCHER:  Okay.

22          THE COURT:  -- maybe promote the discussion.

23          MR. TOSCHER:  Your Honor, can you give me a second to

24  find a clean copy.

25          THE COURT:  Yes.  I see.  You don't have a clean

1    copy, do you?

2              MR. TOSCHER:  I do, Your Honor.  I just --

3              THE COURT:  You have one?  I thought Mr. Tong or

4    Mr. Harrington might have one, but hold on.

5              MR. TOSCHER:  Too many briefcases, Your Honor.

6              May I?

7              THE COURT:  Yes.

8    BY MR. TOSCHER:

9    Q    I'm going to hand you what is referred to as a disclosure.

10   It says "By Selina Mann."  Will you please review it.

11   A    Okay.

12             THE COURT:  And then if you want to, you can go back

13   to the lectern, if you have your marked-up copy, and then we

14   can take that handheld.

15             MR. TOSCHER:  Thank you, Your Honor.

16             THE COURT:  If you're going to be on this for a

17   while, I wonder if I shouldn't at least put an exhibit sticker,

18   not that it's going to come into evidence, but that we can talk

19   about it.

20             MR. TOSCHER:  Thank you, Your Honor.

21             THE COURT:  What shall we call this?  Let me check

22   with the courtroom manager.  She'll give me a number.

23             THE CLERK:  I guess 19 is government's, but I don't

24   know --

25             THE COURT:  Okay.  Why don't we just call it Exhibit

1    X for lack of anything else.  Is that okay?

2              MR. TOSCHER:  That's fine, Your Honor.

3              THE COURT:  Okay.  We're going to call this Exhibit

4    X, okay.

5              Okay.  Back to you.

6    BY MR. TOSCHER:

7    Q    Have you had an opportunity to review the disclosure?

8    A    Yes.

9    Q    What's been marked as Exhibit X?

10   A    Yes.

11   Q    Is this the disclosure of the summary of your opinions?

12   A    Yes.

13   Q    You hesitated.  These are not your opinions, are they.

14   A    I didn't prepare this.

15   Q    Okay.

16             THE COURT:  I think the question had to do with the

17   substance, not with whether you made the document.

18             THE WITNESS:  (Nods head.)

19             THE COURT:  Am I right?

20   BY MR. TOSCHER:

21   Q    That's correct.  Is this a summary of the opinions and the

22   basis of your opinions?

23   A    Yes.

24   Q    Okay.  And did you review it before it was disclosed?

25   A    This --

1          THE COURT:  This Exhibit X?  Is that what you mean?

2          MR. HARRINGTON:  Yes, Exhibit X, Your Honor.

3          THE WITNESS:  I kind of quickly reviewed it.

4   BY MR. TOSCHER:

5   Q    You quickly reviewed it now.

6   A    No.  Prior.

7   Q    Prior to.  Okay.  So you did review it, and that is a

8   summary of your opinions.

9   A    Yes.

10  Q    Okay.  And the reasons for your opinions.

11  A    Uhm, I mean, I have my own knowledge, too.

12  Q    Right.  But the rules require a disclosure of the expert's

13  opinions.

14         THE COURT:  Okay.  Hold on.

15         MR. TOSCHER:  Sorry, Your Honor.

16         THE COURT:  So really we're just talking about

17  whether the substance is a summary of the opinions that you

18  hold.

19         THE WITNESS:  Okay.  So, yes.

20         MR. TOSCHER:  Okay.  All right.

21         Your Honor, I will reserve on an appropriate motion

22  regarding this.  I don't think we need to do it right now --

23         THE COURT:  Okay.

24         MR. TOSCHER:  -- unless --

25         THE COURT:  Okay.  But you have 10 more minutes or

1   so; so if -- are you able to proceed and then we can take up

2   your matter?

3              MR. TOSCHER:  You know, in thinking about it, Your

4   Honor, I don't want to waive any objection on it, and so --

5              THE COURT:  It won't be waived.

6              MR. TOSCHER:  It won't be waived.

7              THE COURT:  It won't be waived.  If you can proceed,

8   I'd like to use the time the jury's here.  I will not deem it

9   waived.

10             MR. TOSCHER:  Okay.  Thank you, Your Honor.

11   Q    Now, the disclosure and the basis of your opinion, it

12   talks about a number of different Internal Revenue Code

13   sections there; isn't that correct?

14   A    That's correct.

15   Q    And I think there were seven different Internal Revenue

16   Code sections?

17   A    On this document?

18   Q    Yes, on the disclosure, the basis of the substance of your

19   opinion.

20             MR. HARRINGTON:  Objection, Your Honor.  This

21   document's not in evidence.  I don't know why --

22             MR. TOSCHER:  I'm entitle --

23             THE COURT:  It's okay.  I mean, he's --

24             MR. TOSCHER:  Trying --

25             THE COURT:  I think he can ask about it.  He's not

1    asking for the content of it right now.

2              So you're asking whether this --

3              MR. TOSCHER:  As the basis of her opinion, she relied

4    upon what I counted as seven different Internal Revenue Code

5    sections, Your Honor.

6              THE COURT:  Okay.  Are you able to answer?

7              THE WITNESS:  Yes, there are seven Internal Revenue

8    Code sections on this document.

9    BY MR. TOSCHER:

10   Q    All right.  Now, I think, in looking at your resume or CV,

11   you discuss the training and relying upon a lot of different

12   things to come to your positions regarding the tax law.  And I

13   think you mentioned the code, Internal Revenue Code; correct?

14   A    Yes.

15   Q    Internal Revenue regulations?

16   A    Yes.

17   Q    Rulings?

18   A    Yes.

19   Q    You also looked at case law, too; correct?

20   A    Yes.

21   Q    And you might also look to internal IRS memoranda;

22   correct?

23   A    Yes.

24   Q    A lot of different things to look at and rely upon.

25   A    Yes.

1   Q    And is it fair to say you agree with me that the tax law

2   is very complex?

3   A    Yes.

4   Q    Now --

5         THE COURT:  Counsel, can you move the -- tilt the

6   mike a little so you're talking right into it.

7         MR. TOSCHER:  I'm afraid to touch it, Your Honor.

8         THE COURT:  You're afraid to touch it?

9         MR. TOSCHER:  No, I've got it.

10        THE COURT:  It's inanimate.

11        MR. TOSCHER:  I'm not going to use my hands.  I was

12  getting into trouble.

13  Q    Now, I believe you testified on direct you were -- used

14  the words for a business expense -- and I'm focusing on a

15  business expense -- "ordinary and necessary."

16  A    Yes.

17  Q    Do you remember that?

18  A    Yes.

19  Q    And I think you defined "ordinary" or testified as

20  "ordinary" as common and accepted.

21  A    Yes.

22  Q    Okay.  And "necessary" as helpful and appropriate?

23  A    Yes.

24  Q    You would agree with me whether something is common and

25  accepted and helpful and appropriate, a lot of disagreements

 1   among CPAs and tax professionals, aren't there?  A lot of cases

 2   regarding that?

 3   A     It depends on the deduction.

 4   Q     Okay.  It's not -- you're aware of there are a lot of

 5   cases where people have disagreed with the Internal Revenue

 6   Service, or the Internal Revenue Service has disagreed with

 7   people on the meaning of those terms; right?

 8   A     Yes.

 9   Q     Now, if -- and let me just, an example.  If -- by the way,

10   your opinions and statements and computations are just based

11   upon what you've tried to understand and absorb as the evidence

12   so far; is that correct?

13   A     Evidence and testimony.

14   Q     Yeah.  When I meant "the evidence," I meant testimony and

15   documents.  That's correct.  Right.

16            So the -- and if there was evidence that massages are

17   provided to employees to help relieve work stress and that it's

18   good for business, that would fit within your common and

19   accepted category, wouldn't it?

20   A     It's not a common and accepted --

21   Q     Okay.  Your position is that it's not common and not

22   accepted.  That's your understanding.

23   A     Yes.

24   Q     That's the basis of your opinion.

25   A     Yes.

1    Q    Okay.  And what I'm trying to suggest is that, if it was

2    common and utilized by corporate America or government

3    organizations, that would change your opinion, would it not?

4    A    No.

5    Q    Okay.  So no matter whether it's common or accepted,

6    nothing -- it would not change your opinion?

7    A    It can be common for massage services to be provided to

8    corporate America and governmental companies.  However, it's

9    not a deductible business expense.

10   Q    And we can debate whether it's deductible; but I was just

11   trying to focus on common and accepted, helpful and appropriate

12   because I think there are a lot of different standards going

13   on.  So my question was, if it was -- if corporate America and

14   government organizations found that there was a good business

15   purpose to provide massage services or facilities for that,

16   that would make it common and accepted, wouldn't it?

17   A    No, I don't think it's a common occurrence.

18   Q    Okay.  So I guess what I'm -- I don't want to belabor the

19   point.  You don't believe it's common.

20   A    That's correct.

21   Q    Okay.  Would you concede for me that relief of stress in

22   the workplace would be helpful?

23   A    Yes.

24   Q    And appropriate?

25   A    Appropriate, yes, but not -- there's no business purpose

1    for the massages.

2    Q    Okay.  I'm not going to argue, but I would -- I'm going to

3    respectfully disagree and maybe bring you around to my way of

4    thinking.  If I want to make sure the chief executive of a

5    company or an employee is working at his or her peak

6    performance, I really want to make sure we reduce the stress

7    level, don't we?

8    A    Sure.

9    Q    Okay.  You agree with that.

10           Excuse me, Your Honor.

11           That would make it a pretty good business purpose,

12   would it not?

13   A    Yes.  However, it would not be a business deduction.

14   Q    Okay.  And we'll get into that part later.

15           So let me ask just an overall question regarding your

16   computations.  You made determinations for your computations as

17   to, one, let's talk about the corporate tax, okay, because I

18   don't want to confuse the issue.  And you made a determination

19   that you concluded, based upon a lot of reasons -- and we'll

20   talk about all the issues -- that something was not deductible;

21   correct?

22   A    Yes.

23   Q    Okay.  And you also determined to include in your

24   computations in this criminal case that it was intentional;

25   correct?

1    A    Yes.

2    Q    Okay.  So -- and as part of your process and procedure,

3    and the basis of your opinion, you've concluded both of those

4    things in order to put it into your computations; is that

5    right?

6              MR. HARRINGTON:  Objection, Your Honor.  Her

7    testimony on direct was not about the state of mind of the

8    defendant.

9              MR. TOSCHER:  Your Honor, may I respond?

10             THE COURT:  Well --

11             MR. TOSCHER:  She's attacked --

12             THE COURT:  Why don't we adjourn for the day, and

13   then we can have a lovely discussion.

14             MR. TOSCHER:  Thank you, Your Honor.

15             THE COURT:  Okay.  So I'll see you folks at nine

16   o'clock tomorrow.

17        (Jury excused.)

18             THE COURT:  Okay.  So after the witness has left the

19   courtroom, I'll turn it over to you, Mr. Toscher.

20             Hold on.

21             MR. TOSCHER:  Your Honor, may I go back to my --

22             THE COURT:  You may.

23        (Witness excused.)

24             THE COURT:  Okay.  Counsel.

25             MR. TOSCHER:  Yes, Your Honor.  Clearly, the basis of

1    her opinion, and she testified, is that these were false

2    deductions or that these were willful understatements.  And if

3    one looks at the disclosure the government provided us, that's

4    pretty much what it says.  And that's the way I prepared for

5    this, and I think that's the basis of her testimony.  She's

6    asking these jurors to say that these are intentional

7    violations of the tax law on areas, as the Court can see,

8    there's a lot of area, a lot of gray area.

9            I have concern, Your Honor.  I think, you know, it

10   was represented to me that this was her disclosure -- now, I'm

11   switching to another topic, but I'm not going to switch to the

12   other topic, if the Court doesn't want me to.

13           THE COURT:  No.  You can go ahead.

14           MR. TOSCHER:  I think I'm entitled to move to strike

15   all of her testimony because the government didn't follow the

16   rules.  I asked for disclosure.  We got Selina Mann's.  And

17   then we were told that, well, maybe it's Miss Mitsuyoshi.  And

18   I said, okay -- we told them, "Put it in writing.  Tell us."

19   And they said, "We don't need to.  This is going to be her

20   testimony."  And then I think the questioning of her, either

21   that's her disclosure or it's not her disclosure.  If it's her

22   disclosure, she's got to stick with it and the rules.  And, if

23   not, we respectfully move to strike her testimony.

24           THE COURT:  Well, do you think she's deviated from

25   that disclosure so far?

1            MR. TOSCHER:  I think we haven't gone into it.  No,

2    we're just touching it.  I don't think so.  But the disclosure

3    talks about false deductions or intentional stuff, and I want

4    to question her on it.  That's the basis of their case.  And

5    the government doesn't want me to question on it.

6            THE COURT:  Okay.  I'll hear from the government.  It

7    may be she made an assumption and was -- maybe was told to make

8    an assumption without her, as an expert witness, determining

9    whether the assumption was correct or not.  So it's possible to

10   say a deduction is inappropriate without saying it was

11   deliberate.  I mean, I don't know.

12           MR. HARRINGTON:  There's clearly two points on the

13   table.  First, on the disclosure issue, that's not exactly how

14   I would recollect what happened.  What happened is we sent an

15   e-mail, and we had the statement.  And, yes, it says Selina

16   Mann at the top.  And we said either Susan Mitsuyoshi or Selina

17   Mann will be testifying as our expert witness or expert and

18   summary witness, and we said the statement will apply to both

19   of them.

20           We had several conversations with Mr. Toscher about

21   it.  At one point he said could you provide a statement with

22   her name on it.  We said we can do that if you want to; we can

23   put her name at the top.  And nothing came of it.  He didn't

24   ask for that.

25           And the reality of the situation is that the

1    disclosures that we received from defense counsel, they're not

2    signed or prepared by their experts either; so I'm a little

3    surprised at the position being taken by defense counsel.

4            THE COURT:  Well, okay.  But, I mean, if you made a

5    disclosure, I don't hear from Mr. Toscher any particular

6    concern about, you know, whose resume am I looking at and I'm

7    being sandbagged by some person with an unusual background or

8    something.  What I hear is his concern that she adopt what's in

9    the disclosure that was provided to him.

10           MR. HARRINGTON:  Well, and I'm not really sure what

11   the concern is.  The disclosure just goes through the business

12   expenses that we talked about.  So the disclosure isn't, you

13   know, it's not tied to any particular person.  It's just going

14   through the different items that we talked about and that we

15   went over in the testimony.

16           THE COURT:  Okay.  So let's stick on this issue

17   first.  It may be that there comes a point where she disavows

18   something, but if she hasn't done that so far, I'm not so sure

19   what your concern is at this point about whose name was on

20   there.  So, as I say, you know, if somebody came with a

21   particularly odd background, or, you know, gee, if only I'd

22   known it was that person who was involved in this notorious

23   case or something, you know, but I don't hear you making that

24   argument because her background is probably not so, you know,

25   unusual that it's causing you to have concern about that.

1          MR. TOSCHER:  That is absolutely correct, Your

2   Honor.

3          THE COURT:  Okay.

4          MR. TOSCHER:  What I'm concerned with is her

5   disavowing the basis and substance of the opinion.

6          THE COURT:  I haven't heard that yet.  If it

7   happens --

8          MR. TOSCHER:  Okay.

9          THE COURT:  -- then I can see your point.  But what I

10  think is she was somewhat confused about whether you were

11  asking her "Did you write this?  Is this how you would have put

12  it?" versus "Is this the substance of what your opinion is?"  I

13  think she was trying to be very careful because she's under

14  oath, but I didn't actually hear her disavow the substance.

15         MR. TOSCHER:  I think I agree with that, Your Honor,

16  but I was observing sort of a distancing.

17         THE COURT:  Yeah, I think she was concerned not to

18  give the impression that this was how she would have put

19  things, these were the words she would have used.  That's the

20  sense I got.  I don't know.

21         MR. HARRINGTON:  I mean, that's what I would agree

22  with.  I think this is a non-issue.

23         THE COURT:  Well, so for now, unless you're

24  identifying something where she's disavowing the substance, I'm

25  going to let her proceed.  But when it happens, if it happens,

1  that you think she is deviating from the substance, then I

2  think you have a good point.

3          MR. TOSCHER:  Thank you, Your Honor.

4          THE COURT:  Okay.  So that's how we're going to

5  proceed on that issue.

6          Now, on your second issue you think you get to ask

7  her what she assumed, if anything, about Mr. Hee's mind-set.

8          MR. TOSCHER:  Right.

9          THE COURT:  That's -- I mean, I think he could ask

10  her if she made an assumption and on what basis.  If the basis

11  is the attorney told me to assume that, then I don't know where

12  you go from there.  But I don't know why he couldn't ask her

13  those things.

14          MR. HARRINGTON:  Well, Your Honor, the concern is --

15          THE COURT:  I know.  I know.  You're worried about

16  our motion set for tomorrow morning.  I know.

17          MR. HARRINGTON:  That's part of it, but it's

18  also just --

19          THE COURT:  Except that he probably didn't direct his

20  expert to assume that, you know, mind-set.  I'm guessing.

21          MR. HARRINGTON:  Well, and I don't think we asked our

22  expert to assume a willful intent either.

23          THE COURT:  Oh, you didn't.  Okay.

24          MR. HARRINGTON:  Yeah, so I mean --

25          MR. TOSCHER:  Sorry.

1              THE COURT:  So --

2              MR. HARRINGTON:  At least I didn't.  I can represent

3    to the Court I did not.

4              THE COURT:  So your point is that she --

5              MR. HARRINGTON:  She's looking --

6              THE COURT:  She's looking at whether something was

7    wrongly treated.

8              MR. HARRINGTON:  Exactly.  How it was treated on the

9    tax return and what the tax consequences are.  Whether the

10   defendant was or was not willful isn't part of her opinion

11   because that doesn't actually affect the tax computations.

12   There's no penalties that are at issue which may have a

13   state-of-mind aspect to it.  It's just straight tax

14   computations.

15             MR. TOSCHER:  Your Honor, I commend the Court to look

16   at the disclosure, which is the basis, and --

17             THE COURT:  I don't have it.

18             MR. TOSCHER:  It's Exhibit X.  I will get the Court a

19   copy.  In fact, I'll hand up an extra copy.  And all of these

20   things were part of her disclosure and her testimony.

21             THE COURT:  Well, something being "false," if that's

22   the word, I don't know that that necessarily means she thought

23   it was some willful, you know, deceptive or, you know,

24   misleading kind of thing because it could be mistaken, I guess.

25             But, you know, I think you can inquire whether she

1   made any assumption about his mind-set.  If she says, Yes, I

2   did, then I think he can ask:  What did you assume?  I don't

3   know that that necessarily -- I know you folks are worried

4   about his expert coming up, but I don't know that that's the

5   same thing.  She's -- I mean, you can come back on redirect.

6   Did the mind-set affect your computation?  You know, I mean --

7            MR. HARRINGTON:  It's just -- it's sort of a

8   concerning line of questioning, too.

9            THE COURT:  I know.

10           MR. HARRINGTON:  I mean, it's -- I don't know what

11  her basis -- I guess you're saying "assumption," which is --

12           THE COURT:  Yeah, yeah.  I mean, I think he's allowed

13  to do that; so depending on her answers, I don't know how much

14  into it he'll go.  But I'm going to let him ask what

15  assumptions she made, if any, about her mind-set, and we'll go

16  from there.  About his -- I'm sorry, about Mr. Hee's mind-set.

17           MR. TOSCHER:  And I assume -- I'm sorry.  I didn't

18  want to cut you off.

19           THE COURT:  But it's not a ruling that your experts,

20  therefore, can testify as to what Mr. Hee's mind-set actually

21  was because, in fact, you've agreed that that's not something

22  that they should be allowed to testify to.

23           MR. TOSCHER:  We state -- not the ultimate decision,

24  but that's the subject -- not the ultimate, you know,

25  determination, but I think there are the areas which I think

1    the case law has clearly allowed the testimony, which reflects

2    on the reasonableness of the -- I don't want to get into

3    arguing the motion.

4            THE COURT:  You're threading that, but, you know,

5    there's -- you can't ask him -- you can't ask your expert, for

6    example, do you think Mr. Hee really knew what he was doing and

7    wrongly claiming blah, blah, blah?  I mean, you know you can't

8    do that.

9            MR. TOSCHER:  Not that, but -- well, I think the

10   evidence is, you know, this case is -- I don't want -- we'll

11   deal with it on cross-examination tomorrow.  Everything is in

12   Waimana's books.  Where's the concealment?  Criminal cases are

13   about concealment.  And that's, in my humble opinion, Your

14   Honor, fair development of the record here.  And I think -- I

15   appreciate the Court's caution regarding the experts, and we're

16   prepared to address all those issues tomorrow.  And -- but --

17   and, you know.

18           THE COURT:  Okay.  But I'm going to let him ask if

19   she made any assumptions and, if so, what they were and whether

20   those affected.  I mean, some of it he might decide not to ask,

21   but you might want to come back and ask.  I don't know.  But I

22   think that's fair for him to ask what assumptions she made.

23   And we'll go from there.

24           Okay.  8:30 tomorrow to talk about the motion about

25   their experts.  I got your memo, and we'll go over that and

1    figure out what's going on.

2              What's the schedule?  Is this the last witness?

3              MR. HARRINGTON:  Yes, Your Honor.  The only thing

4    that would be -- maybe we can address this in the morning --

5    there's a few housekeeping exhibit issues that we've gone

6    across before with swapping some pages out.

7              THE COURT:  Okay.  And you can --

8              MR. HARRINGTON:  Yeah.

9              THE COURT:  -- work with the courtroom manager.

10             MR. HARRINGTON:  But other than that, we'll be ready

11   to close -- rest.  Excuse me.

12             THE COURT:  You'll be ready to rest.

13             MR. HARRINGTON:  Rest.  Precisely.

14             THE COURT:  You don't want to go anymore.

15             Okay.  So, you know, you know better than they do how

16   long your cross-examination of this witness will take, and then

17   it's likely that you would -- we wouldn't take the whole day,

18   and so --

19             MR. TOSCHER:  I don't anticipate that, Your Honor.

20             THE COURT:  -- so you may well need to have witnesses

21   prepared to go.

22             MR. TOSCHER:  Okay.

23             THE COURT:  Okay.

24             MR. TOSCHER:  Just, Your Honor, for the scheduling,

25   we would anticipate that after the government rests that we

1    will make a Rule 29 motion.

2              THE COURT:  Okay.

3              MR. TOSCHER:  Just to let the Court know.

4              THE COURT:  Okay.  And just because, you know, I

5    don't want to keep the jury waiting really a long time,

6    tomorrow I will say that, you know, I envision that we'll all

7    be on the edge of our seats as you --

8              MR. TOSCHER:  Are we talking about my

9    cross-examination?

10             THE COURT:  No, no, no, not your cross-examination.

11   In your case in chief with your experts.  But you don't need to

12   tell me now -- and, certainly, Mr. Hee has every right to stand

13   on his right to be silent -- but it does seem to me that, if

14   you want expert testimony on whether a belief on the part of

15   Mr. Hee was a reasonable belief, I think the foundation has to

16   be laid that Mr. Hee had the belief that an expert is opining

17   was reasonable.  So I just put that out there.

18             MR. TOSCHER:  (Nods head.)

19             THE COURT:  That to put an expert on without that

20   foundation seems to me putting the cart before the horse.  But

21   we can have a fuller discussion about this tomorrow, but that

22   is just something that I think you might want to address.

23             MR. TOSCHER:  Thank you, Your Honor.

24             THE COURT:  Okay.  So I'll see everybody 8:30

25   tomorrow.

1          (Court adjourned at 4:14 P.M.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2              I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9              DATED at Honolulu, Hawaii, August 3, 2015.

10

11                                    /s/ Debra Chun
                                      _____

12                                    DEBRA KEKUNA CHUN

13                                    RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25