```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3                              )
     UNITED STATES OF AMERICA,  )  CR 14-00826 SOM
 4                              )
              Plaintiff,        )  Honolulu, Hawaii
 5         vs.                  )  July 1, 2015
                               )  8:30 A.M.
 6   ALBERT S. N. HEE,          )
                               )
 7              Defendant.      )
                               )
 8   _____)

 9              TRANSCRIPT OF JURY TRIAL (DAY 6)
            BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10              UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:        LAWRENCE L. TONG
                                Office of the U.S. Attorney
13                              PJKK Federal Bldg.
                                300 Ala Moana Blvd. Ste. 6100
14                              Honolulu, HI 96850

15                              QUINN P. HARRINGTON
                                U.S. Dept. of Justice
16                              Tax Division
                                601 D St., N.W. Room 7029
17                              Washington, DC 20004

18   For the Defendant:         STEVEN TOSCHER
                                KURT K. KAWAFUCHI
19                              LACEY STRACHAN
                                Hochman salkin Rettig Toscher
20                                & Perez
                                9150 Wilshire Blvd., Ste. 300
21                              Beverly Hills, CA 90212

22   Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
                                United States District Court
23                              300 Ala Moana Blvd. Ste. C285
                                Honolulu, HI 96850
24                              (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).
```

1                              INDEX

2

3     EXAMINATION

4     Witness Name                                        Page

5     Susan Mitsuyoshi

6         Voir Dire By Mr. Toscher ..............................   24

7         Cross By Mr. Toscher..................................   26

8         Re-Direct By Mr. Harrington..........................   83

9         Re-Cross By Mr. Toscher .............................   88

10    Lindsey Kimura

11        Direct By Mr. Toscher................................  103

12        Cross By Mr. Tong....................................  113

13    James Ventura

14        Direct By Mr. Toscher................................  118

15        Cross By Mr. Tong....................................  140

16    Adrianne Hee

17        Direct By Mr. Toscher................................  144

18        Cross By Mr. Tong....................................  155

19        Re-Direct By Mr. Toscher ...........................  161

20    Charles Au

21        Direct By Mr. Toscher................................  163

22        Cross By Mr. Harrington .............................  173

23

24

25    EXHIBITS

| | Exhibit | Page |
|---|---|---|
| 1 | | |
| 2 | 50-2 Entered into Evidence | 152 |

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, JULY 1, 2015                    8:30 O'CLOCK A.M.

 2       (In open court without the jury:)

 3           THE CLERK:  Criminal 14-826 SOM, United States of

 4   America versus Albert Hee.  This case has been called to

 5   Discuss Government's Motion in Limine to Exclude Expert Witness

 6   Testimony.

 7           Counsel, please make your appearances for the record.

 8           MR. TONG:  Good morning, Your Honor.  Larry Tong,

 9   Quinn Harrington, Christina Sorely, and Special Agent Greg

10   Miki, appearing for the United States.

11           MR. TOSCHER:  Good morning, Your Honor.  Steven

12   Toscher, appearing for defendant Albert Hee, who is present

13   with me in court, together with Lacey Strachan and Kurt

14   Kawafuchi.

15           THE COURT:  Okay.  Good morning.

16           Okay.  We're here on the government's motion in

17   limine regarding the defense witnesses.  I have a memo

18   accompanying the motion from the government.  I have the

19   defense opposition memo filed two days ago.  Why don't I start

20   by inviting the government's argument since this is their only

21   opportunity, or their first opportunity anyway, to respond to

22   what's in the opposition memo.

23           Who is arguing for the government?

24           MR. HARRINGTON:  I'll argue.  Would you like me to

25   take the podium?
```

1          THE COURT:  Yes, please.

2          MR. HARRINGTON:  Thank you, Your Honor.  I reviewed

3    the response from defense counsel.  It seemed like a lot of it

4    may not have been directed at what we were trying to exclude.

5    What we're trying to exclude is particularly what's excludable

6    under 704(b), which is a statement on the ultimate state of

7    mind of the defendant, which isn't proper expert testimony.

8          One of the things that was listed as an expert

9    subject of testimony was the reasonableness of the defendant's

10   belief in the correctness of his tax returns.  And now there

11   may be a fine line, but we filed the motion because we want to

12   make sure that none of the experts are going to actually

13   testify that he was acting in good faith or that he wasn't

14   willful or anything else that crosses into that line about

15   testifying about the state of mind.  Now, in their response

16   they talk about summary witnesses and other aspects like that.

17   That's not what we were actually concerned about.  What we're

18   concerned about is the state of mind.

19         The other aspect that was a specific disclosure that

20   we were concerned about was about the vagaries of the tax law.

21   And I think a lot of that is going to come down to what the

22   actual testimony is, but again we were concerned about it on

23   two points.  First, we're not really sure if it's something

24   that's really the subject of expert testimony.  They're going

25   to hear what the law is, the jury is.  You're going to instruct

1    them on what the law is, and they're going to be able to make
2    the determination based on the evidence.
3           THE COURT:  What happens when their experts say
4    something, in fact, is properly deductible?
5           MR. HARRINGTON:  So like, for example, one of the
6    charges at issue?  Like for, like, massage payments or
7    something like that?
8           THE COURT:  Yeah.
9           MR. HARRINGTON:  That I don't think we would have a
10   concern about because that's --
11          THE COURT:  Why not, though?  Why isn't that a
12   subject a matter of law?  What's the difference between experts
13   opining that the massages are deductible versus experts opining
14   that, Well, the tax preparers disagree.  I mean, what's the
15   difference, and why is whether something is deductible allowed
16   as expert testimony when one could argue it's a matter of law.
17   Although, the thought that I would be instructing the jury what
18   is and is not deductible specifically in this case or on an
19   individual tax return seems a little more than most judges do.
20   So what's the governing principle that you think needs to be
21   applied, keeping in mind that Miss Mitsuyoshi did testify such
22   and such is not properly deductible.
23          MR. HARRINGTON:  Right.  And so that type of
24   testimony -- that's how the Tax Code works based on facts and
25   circumstances that are in the record and what the tax effects

1   are -- is different than somebody coming in and saying that the

2   defendant reasonably believed the tax law was actually

3   something else.  And that's really where we're concerned about

4   the line.

5            And I agree with you that we're not going to -- your

6   instructions -- I don't think anybody's proposed instructions

7   that go to fringe benefits and that sort of thing, but, you

8   know, there are parts of the instructions that will be about

9   acting willfully, and I think both parties have proposed

10   instructions on whether something's a bona fide loan and that

11   sort of thing.  So I think the line is really about from what

12   Miss Mitsuyoshi testified about, which is applying the facts

13   and circumstances of the evidence, and the opinion on whether

14   that is a deductible item.  By the line is about the state of

15   mind of the defendant.

16            THE COURT:  Okay.  Anything else?

17            MR. HARRINGTON:  Yes.  I wanted to address

18   Mr. Speier.

19            THE COURT:  Yes.  Is that how you pronounce his name?

20   Speier?

21            MR. HARRINGTON:  I believe so.  That's what I've been

22   told.

23            MR. TOSCHER:  Yes, Your Honor.

24            THE COURT:  Thank you.

25            MR. HARRINGTON:  So Mr. Speier's testimony, I think,

1    is in a different category.  And Mr. Speier's testimony, from

2    what we can tell, is essentially that this -- it seems to be

3    part of the defense's line of argument about this should have

4    been a civil case; this isn't really a criminal case.  But

5    Mr. Speier's testimony just simply isn't relevant.  A grand

6    jury already indicted this case.  Decisions about whether to

7    bring the case were made at the tax division level.

8    Mr. Speier's opinion about whether it should or should not have

9    been brought isn't relevant.  And it also again infringes on

10   what the jury's role is.  If he's providing testimony on

11   whether this meets the elements of the offense, he's,

12   basically, telling the jury whether he's guilty or not guilty,

13   and he shouldn't be able to offer an opinion on that.

14           THE COURT:  Okay.

15           MR. HARRINGTON:  Thank you, Your Honor.

16           MR. TOSCHER:  May it please the Court.  Good morning.

17           Your Honor, if I will address the first issue that

18   Mr. Harrington -- I think I agree with the Court there is a

19   line, and we do not plan on having, nor have we said in our

20   disclosure, that the defendant was not willful or that he acted

21   in good faith.  The area we pointed to on that clause or that

22   part was being able to evaluate the objective evidence and that

23   the reasonableness of it, given all the facts, given the law,

24   and it has to do with -- because if a defendant has a belief

25   that what they did was right, what the Supreme Court has said,

```
 1    it's a good-faith, subjective test.  But if it's so
 2    unreasonable, that may undercut good faith.  And setting forth
 3    the reasonableness of it where there's debate among tax
 4    practitioners and the complexity of the law is highly relevant
 5    to that issue.
 6             THE COURT:  What do I do, though, with the Ninth
 7    Circuit decision in Scholl, which says:  Furthermore, testimony
 8    concerning the reasonableness of Scholl's belief --
 9    S-c-h-o-l-l -- Scholl's belief that he could -- in this case it
10    was gambling wins and losses -- that he could net out wins and
11    losses calls for a legal conclusion.  As such, it is
12    inappropriate matter for expert testimony.
13             I mean, there I have it from the Ninth Circuit.  I
14    understand that not all the circuits agree with this, and you
15    rely most heavily on the Eleventh Circuit's Langford
16    decision.
17             MR. TOSCHER:  That's correct, Your Honor.
18             THE COURT:  I live in the Ninth Circuit; so how do
19    you propose to get around Scholl?
20             MR. TOSCHER:  I think Scholl was more narrow, 704
21    state of mind.
22             THE COURT:  But I have these sentences that I just
23    read.
24             MR. TOSCHER:  Yes.  I understand that.  But I think
25    it is a different circumstance when we're talking about
```

1    evaluating the reasonableness of the good-faith position.

2              THE COURT:  Okay.  I don't think I can get around

3    *Scholl*.  And I grant you that there are all manner of things

4    going on in this case, and, you know, you might ask why --

5              MR. TOSCHER:  We think it's different, Your Honor.

6    And I will -- we focused on *Scholl,* and I appreciate the

7    Court's -- I won't be so presumptuous to say it's wrong or --

8    I'm not permitted to do that, and I know that, but it just

9    didn't seem to cover our factual situation.  It was more 704(b)

10   state of mind.  We're not testifying about the state of mind,

11   and I think that's where the line is drawn.

12             THE COURT:  Okay.  I hear you, and I think we're all

13   in agreement that lines have to be drawn and might not draw

14   them all in the same place, but I think, given *Scholl,* I need

15   to exclude any expert testimony on the reasonableness of

16   Mr. Hee's belief that he could treat things the way they were

17   treated.  That has nothing to do with his subjective belief,

18   which I understand is totally, you know, things -- something

19   that the jury does need to consider.

20             MR. TOSCHER:  Right.  And here's the irony, Your

21   Honor.  The test is subjective belief, but objective facts,

22   other people doing the same thing, supports that somebody would

23   have a good-faith belief.

24             THE COURT:  No, no, but he can testify to that.  He

25   could, for example, say "I really believed I could do this, and

1    the reason I believed it was, you know, my friend so-and-so,

2    who's an accountant, or my friends, you know, X, Y, and Z said

3    their accountants told them these things," which doesn't go to

4    the truth of whether those things are okay or not, but goes to

5    his state of mind.

6            MR. TOSCHER:  State of mind.

7            THE COURT:  He could do something like that.

8    "Everybody I know is doing this," you know, whatever.  So

9    that's how it could come in, but not as expert testimony.

10           MR. TOSCHER:  Okay.  And, Your Honor, we -- I

11   appreciate what the Court is saying, but we want to be able to

12   get that evidence in and still have -- if we -- if Mr. Hee and

13   I decide to adhere to his constitutional rights not to do that.

14           THE COURT:  I totally understand.  And I'm not

15   suggesting, by any means, that he should not exercise his right

16   in that regard.  It's just that is a means by which that could

17   come in.  And I have this directive, it seems to me,

18   long-standing from the Ninth Circuit in the *Scholl* case.  And

19   this case is from 1999; so, you know, there have been lots of

20   tax cases, criminal cases, that have gone through the district

21   courts, including in front of me, and gone through the Ninth

22   Circuit since then, and this is still law.  So I feel bound by

23   this.

24           MR. TOSCHER:  Okay.

25           THE COURT:  But that's not the end of the motion

1  because, as you noted, there are some other things raised in

2  the motion.

3          So they did -- they were concerned about testimony

4  about the reasonableness, and I think under *Scholl* that is not

5  admissible.  They were concerned that experts not opine that

6  the law was confusing, and I think that also is not a proper

7  subject for expert testimony under the *Scholl* case.  You wanted

8  to say that there are parts of the Tax Code that are unclear or

9  unsettled.  Why isn't that a matter of law as opposed to a

10  matter of expert testimony?

11          MR. TOSCHER:  Well, as the Court pointed out, the

12  government's expert is testifying as to a matter of tax, and

13  there is a -- when you talk about tax issues, you're talking

14  about tax law.  And as the Court sort of said, certain amounts

15  of the tax law and the technical issues are committed to the

16  tax experts so the Court doesn't have to instruct on

17  everything.  I can see it moving back and forth.

18          And the complexity of a particular provision, as we

19  get in and we develop the various issues, I think the Court is

20  already seeing, well, there will be stark disagreement on

21  certain things, and in other ones the technical reason for the

22  adjustment is so imbedded into the code that -- and it's so

23  complex to figure it out, how would anyone know about that?

24  And having an expert explain these provisions will be of

25  assistance to the jury as to why, why are these adjustments?

1          THE COURT:  I don't think *Scholl* let's you get there.

2     The same case says that the confusing state of tax and

3     accounting law is not a proper subject of expert testimony

4     because that's really commenting on the law.  So that really

5     the experts are supposed to interpret and analyze the facts

6     that have been presented, and just to say "Here's this code

7     provision, and, you know, it's so complex and not tied to the

8     facts," I don't see how that can be admissible.

9          MR. TOSCHER:  Okay.  Your Honor, while I understood

10    the Court's position on *Scholl* regarding the first one, I don't

11    think *Scholl,* with all due respect, goes as far as the Court is

12    saying on the second issue.

13         THE COURT:  Okay.  But it does say that it's really

14    the judge's job to instruct the jury on the law.  It

15    specifically does reject the idea that there could be expert

16    testimony on whether something was complex and confusing.  So

17    if I look at -- hold on.  Page 973.  Mr. Scholl proposed to

18    have expert witnesses that would have testified that his belief

19    that he could net out his gambling wins and losses was

20    reasonable because the law was confusing.  And Scholl's -- so

21    the Ninth Circuit says that Scholl's experts were to testify

22    regarding the confusing state of tax and accounting law, not as

23    to Scholl's individual confusion, and that was not a proper

24    subject of the expert testimony.  So I think under *Scholl* I

25    again need to exclude any such expert testimony; so that's what

1    I'm doing.

2              I think that leaves me only with whether Mr. Speier

3    can testify.  And let's go through all the things that you

4    wanted to offer Mr. Speier for.  So, first, he is prepared to

5    testify about the differences between criminal tax loss numbers

6    used in criminal tax cases and civil tax determinations.

7              MR. TOSCHER:  Correct.

8              THE COURT:  I think it's irrelevant.

9              MR. TOSCHER:  Your Honor --

10             THE COURT:  We're only concerned here with criminal

11   law, and I think this civil matter is irrelevant.

12             MR. TOSCHER:  Your Honor --

13             THE COURT:  Or the difference between criminal and

14   civil.

15             MR. TOSCHER:  Right.  And the differences highlight

16   what a criminal case is, and I think it's important background

17   for the jury.  This is a case where not only is the government

18   saying the defendant is wrong, is that he is willfully wrong.

19   And it's a different -- it is a different nature.  And having

20   an expert in the area explain that would be useful, helpful,

21   and appropriate.

22             THE COURT:  I think it's irrelevant; so I'm not going

23   to allow that.

24             Then the second category is whether evidence

25   presented reflects acts of concealment and other badges of

1    fraud typically associated with a tax scheme as asserted by the

2    government.  Why does it matter what's typical?

3            MR. TOSCHER:  Well, we -- "typical" may not have been

4    the best word there, but this is an expert in tax fraud, and he

5    can point out to the jury the lack of any evidence of badges of

6    fraud and concealment in this case.  He's an expert in that.

7    That's what he does.  And that's -- I think that's

8    well-supported by the case law, Your Honor.  Government's been

9    doing it for years.

10           THE COURT:  I don't know the government has experts

11   come on and say whenever we see this kind of thing, it reflects

12   fraud.  You think --

13           MR. TOSCHER:  No, not whenever.  But looking at the

14   evidence.  You know, if we saw yesterday the -- we corrected it

15   on the demonstrative exhibits, "disguised" loan or this or

16   that.  That's what they are saying.  And what we want to be

17   able to show is somebody who has the experience here says,

18   Look, I've looked at the government's case, the evidence in the

19   case, the testimony of the witnesses, and everything is here in

20   plain view.  That there's no concealment.  There's no badges

21   of -- typical badges of fraud that happened.

22           THE COURT:  Okay.  I hear you.  I'll let them respond

23   on number 2.  But let's -- I want to get through these.

24           Number 3 and 4 are the things I just ruled on:  the

25   reasonableness of the defendant's belief, whether the tax

1    provisions are unclear or uncertain.  I'm not going to allow

2    any expert testimony on that.

3           Items 5, 6, 7, and 8 go to whether the government's

4    case satisfies the elements of the crimes charged.  I think you

5    can definitely argue that.  I don't think that's a subject for

6    expert testimony.  So I'm going to exclude that.

7           So let me hear from the government on your second

8    item, the typical acts of concealment or badges of fraud, and

9    then we'll figure this out.

10          MR. HARRINGTON:  Thank you, Your Honor.  And we're

11   talking about number 2?

12          THE COURT:  Number 2.

13          MR. HARRINGTON:  So number 2 we think falls in the

14   same category.  It's, basically, for the jury to determine

15   whether there's a willful intent, and one of the things they're

16   going to look at are is if there's concealment, badges of

17   fraud, and that kind of stuff.  From what I've heard from

18   Mr. Toscher, that's all great closing argument, but I don't

19   really think it's a subject of expert testimony about whether

20   badges of fraud existed.  It's not relevant whether he believed

21   there were badges of fraud.  We have a case, and the jury's

22   going to determine the case on the evidence and determine

23   whether there was a willful intent based on the indicators that

24   are in the evidence.

25          THE COURT:  Okay.

1              MR. TOSCHER:  And I would just add, Your Honor, this

2      is the type of testimony that an expert who is used to

3      evaluating facts in these types of situation can assist the

4      jury in that, and it can be very helpful.  We're talking just

5      that point the Court --

6              THE COURT:  Okay.  I think it's irrelevant to whether

7      Mr. Hee is or is not guilty of the charges in this case.

8      Certainly, alternative reasons -- that is, reasons other than

9      an attempt to conceal or an attempt to defraud -- might attach

10     to Mr. Hee's acts.  I don't know why an expert should come in

11     and say, Well, usually, when somebody does X, Y, and Z, it's

12     because of some reason other than an intent to conceal.  I

13     don't see the relevance of that.

14             MR. TOSCHER:  And here's why it's been allowed is

15     that a lay juror doesn't do what we all do every day and needs

16     assistance in evaluating that.  That's why it's relevant, Your

17     Honor.

18             THE COURT:  But because they have to be concerned

19     with Mr. Hee's subjective state of mind, why does it matter if

20     10 other people had other reasons?

21             MR. TOSCHER:  Okay.  Well, no 10 other people.  But

22     let's say the expert says concealment is a important badge of

23     fraud that you tried to hide something.  Because why?  It's an

24     objective fact which shows state of mind.  How do we look into

25     somebody's state of mind?  It's really through their conduct,

1   various conducts:  what they did during the time, what they did

2   after.  Granted, it can be what comes from the mouth, "I meant

3   to do this."  But it's in large part evaluated on objective

4   facts.  And if one looks at again the normal government case,

5   there's hiding of things, there's misrepresentations of things.

6   This is all in plain sight.  And I think an expert can assist

7   the jury in pointing that out.

8        THE COURT:  I think you're giving me your closing

9   argument; so I'm not convinced that this is the subject of

10  proper expert testimony in this case.  I could see how, you

11  know, if this were so atypical, you might be wanting to make

12  sure I understood that.  If you were bringing a motion saying

13  that the government had some improper motive in prosecuting

14  Mr. Hee, there was some kind of misconduct and, gee, they would

15  never go after anybody for this, they're only going after

16  Mr. Hee because they don't like Mr. Hee for some reason

17  unrelated to his tax behavior, okay, I can see the relevance of

18  that -- of what you're arguing to me to that kind of a motion.

19  But this is a jury trial now; so they're not going to be

20  determining anything like that.

21       MR. TOSCHER:  No, not that.  And not to concede the

22  point, I mean, I will just say, Your Honor, that I agree what

23  we'd want to present to the Court may be -- on certain issues

24  may be different than what we present to the jury.  But helping

25  the jury understand what a criminal tax case is and where the

1    evidence is on concealment I think is very helpful and

2    important and relevant.  But I will rest on that.

3              THE COURT:  Okay.

4              MR. TOSCHER:  Your Honor, I don't want to -- let me

5    just add because I don't want it to go unsaid -- and I'm not

6    going to get into closing argument -- this case is highly

7    unusual.  And I'm not going to belabor the point --

8              THE COURT:  No, that may be.

9              MR. TOSCHER:  -- waste the Court's time.  I don't --

10   so but let me, if we're done, I do have another matter that I

11   have to raise.

12             THE COURT:  So let me rule because my courtroom

13   manager needs to have this in the minutes.

14             I am granting the government's motion, and no defense

15   expert can testify about the reasonableness of any belief that

16   Mr. Hee had or did not have about how to treat certain items on

17   tax returns.  No expert witness can testify that provisions of

18   the Tax Code are unclear, confusing, or the subject of debate

19   among tax experts.  And Mr. Speier's testimony, as listed in

20   the eight areas of his expert witness disclosure, is excluded.

21             Okay.  Did I miss any matter raised in the motion?

22   Either side need me to rule on anything?

23             MR. HARRINGTON:  No, Your Honor.

24             THE COURT:  Then you had another matter,

25   Mr. Toscher.

1          MR. TOSCHER:  Yes, Your Honor.  After reviewing the

2    events with the expert yesterday, I'm still left very concerned

3    as to whether -- what was the circumstance of that disclosure,

4    whether it's hers.  And I think it might -- what I would

5    suggest is let's find out, without the presence of the jury,

6    whether it's her disclosure or not.  I don't want to belabor it

7    in front of the jury, but we were told this is her disclosure,

8    and we were told -- and we asked the government specifically,

9    Put her name on it, and then we never got a response.  And this

10   is her disclosure, and I want to find out what her involvement

11   was and is she going -- the way I look at it, with all due

12   respect, Your Honor, if she's going to back off that

13   disclosure, then I'm entitled to bring that out.  Okay.  And if

14   it's not her disclosure, they didn't comply with Rule 16.

15         THE COURT:  So wait, now.  I just want to make sure.

16   You're not bothered by the fact that the government put

17   somebody else's name on an expert witness disclosure and then

18   had Miss Mitsuyoshi come as the expert witness if

19   Miss Mitsuyoshi adopts what's in the disclosure.

20         MR. TOSCHER:  They told us that was hers, yes.

21         THE COURT:  But the fact that it wasn't -- okay.  If

22   she testifies that this was written without her in mind, and

23   maybe she would have used different words, if the words are

24   substantively the same, you're not bothered by that; am I

25   correct?

1          MR. TOSCHER:  No, I think she has to be held to the

2     words.

3          THE COURT:  Yeah, yeah.  But if the word is "people"

4     and she would have used "taxpayers," you're not going to be

5     bothered by something like that.

6          MR. TOSCHER:  No, of course not, Your Honor.

7          THE COURT:  I just want to understand.  It's the

8     substance of the opinion.

9          MR. TOSCHER:  The substance of what was said in that

10    opinion.

11         THE COURT:  Okay.  Do you want to be heard on his

12    request?  He wants an out-of-the-presence-of-the-jury

13    discussion with Miss Mitsuyoshi, I guess, is what you want.

14         MR. TOSCHER:  Correct, Your Honor.

15         MR. HARRINGTON:  Well, I just wanted to point out

16    that the e-mail that we sent about the disclosures, what we

17    said was we plan to use Miss Mann as our expert witness and

18    Miss Mitsuyoshi as our summary witness.  However, if

19    Miss Mitsuyoshi is required to testify as an expert, the

20    substance of her testimony would be the same as set forth on

21    Miss Mann's statement.  And that was our disclosure, and our

22    position is the substance is the same; so this is really a

23    non-issue.

24         THE COURT:  Well, let me ask this of both sides.  If

25    the expert disclosure had 10 items of expert witness testimony

1   on it, and Miss Mitsuyoshi only testified as to five of those

2   10, that's not a problem for either side, assuming the five she

3   testified to coincide with the discussion in the disclosure on

4   those five points; correct?

5           MR. TOSCHER:  Subject to appropriate impeachment for

6   those other items.

7           THE COURT:  No, but --

8           MR. TOSCHER:  Well, if there were other items in

9   there which bore upon the testimony she gave.

10          THE COURT:  Yeah, but if she confined her testimony

11  to five things out of the 10, why does she get hit on five that

12  she --

13          MR. TOSCHER:  I guess it would -- you're right.

14  Right.  It would have to be relevant to what she testified to.

15  But it may very well be because I don't --

16          THE COURT:  Did that occur?

17          MR. TOSCHER:  We don't know yet.

18          THE COURT:  No, no, no, no, no.  You heard her

19  testimony.  Is it your position that she left out --

20          MR. TOSCHER:  No, I don't believe so.  I'm not --

21  leaving aside the disclosure that was made regarding the Board

22  of Water Supply that was dismissed, I'm talking about the

23  disclosure they made regarding the personal expenses and the

24  other issues.

25          THE COURT:  So you're not saying she failed to

     1    testify on things -- on subject matters in the disclosure.

     2              MR. TOSCHER:  No, Your Honor.

     3              THE COURT:  Okay.  Okay.  Then what's the problem

     4    with having this happen?

     5              MR. HARRINGTON:  Oh, without the jury present, we can

     6    go over it.

     7              THE COURT:  Can I get a copy of this thing that's

     8    being talked about so much and I have never seen it?

     9              MR. TOSCHER:  Did we leave it as Exhibit X.

    10              THE COURT:  Yes, you did, but you gave it to her.

    11              MR. TOSCHER:  Okay.  I'm sorry, Your Honor.  I will

    12    get one.

    13              Toni, is that one over there?  I will get one if --

    14              MR. HARRINGTON:  I have a copy, Your Honor.

    15              THE COURT:  Okay.  Thank you.

    16              Okay.  Let's call her in.  And I'm going to ask the

    17    courtroom manager to let the jury pool clerk know that we're

    18    going to be delayed.

    19         (Witness enters.)

    20              THE COURT:  Okay.  So, Miss Mitsuyoshi, we're having

    21    a little hearing where you're the star, and no jury is present.

    22              If you can come on up.  You're still under oath.

    23         (Previously sworn.)

    24              THE WITNESS:  Okay.

    25              THE COURT:  Do you have Exhibit X there with you?

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Okay.  Mr. Toscher, I'm going to let you
 3    begin, I guess.
 4                   VOIR DIRE EXAMINATION
 5    BY MR. TOSCHER:
 6    Q    May it please the Court.  Good morning, Miss Mitsuyoshi.
 7    Sorry.
 8    A    Good morning.
 9    Q    The -- you have what's in front of you as what's been
10    marked as exhibit X; is that correct?
11    A    Yes.
12    Q    Okay.  And you've had a chance to review it?
13    A    Yes.
14    Q    Okay.  Did you work with Revenue Agent Selina Mann in
15    preparing this?
16    A    No.
17    Q    Did you go through it with her before this was disclosed
18    by the government?
19    A    No.
20    Q    Okay.  Have you reviewed it since?
21    A    Yes.
22    Q    Are you adopting this as the disclosure of your testimony?
23    A    Yes.
24    Q    Do you agree with what is said in this disclosure?
25    A    Yes.
```

1    Q    And you agree that the basis for the disallowance of the

2    deductions or assigning income to Mr. Hee, that's your

3    reasoning for doing it in Exhibit X.

4    A    Based on the code -- the codes, Internal Revenue Codes,

5    yes.

6    Q    Right.  But the reasoning is set forth in Exhibit X.  This

7    is your disclosure and your reasoning for the disallowance of

8    the deductions?

9    A    Yes.

10         MR. TOSCHER:  Your Honor, with that, if she's adopted

11   this disclosure and the words, and it has been given to us; so

12   now that we've established that it's hers, she's adopted it, I

13   think that satisfies it, and it's fair cross-examination of

14   her.

15         THE COURT:  Okay.  Then let's have the jury come in.

16         You know, why don't I give everybody five minutes.

17   So we'll have the jury here at maybe until 9:20 so the

18   courtroom manager can take a few minutes, too.  9:20 we'll be

19   back in here.  Okay.

20    (Court recessed at 9:08 A.M., until 9:26 A.M.)

21         THE CLERK:  Criminal 14-826 SOM, United States of

22   America versus Albert Hee.  This case has been called for

23   Further Jury Trial.

24         Counsel, please make your appearances for the record.

25         MR. TONG:  Good morning, Your Honor.  Good morning,

1   ladies and gentlemen.  Larry Tong and Quinn Harrington for the

2   United States.  With us are Christina Sorely and Special Agent

3   Greg Miki of the IRS.

4            MR. TOSCHER:  Good morning, Your Honor.  Good

5   morning, ladies and gentlemen.  Steven Toscher for defendant

6   Albert Hee, who is present with me in court, together with

7   Lacey Strachan and Kurt Kawafuchi.  Good morning.

8            THE COURT:  Okay.  Good morning.

9            Thank you for your patience, ladies and gentlemen.  I

10  know we're starting a little later than I said we would start

11  yesterday.  It is not because the attorneys went out to some

12  fancy breakfast and just showed up late.  They were here an

13  hour ago working with me to try to take care of some matters so

14  we don't interrupt the proceedings.  Thank you very much for

15  your patience.

16           Okay.  Counsel, we still have Miss Mitsuyoshi on the

17  stand.

18                  CROSS-EXAMINATION (Resumed)

19  BY MR. TOSCHER:

20  Q    May it please the Court.  Ladies and gentlemen.  Good

21  morning.

22           Good morning, Miss Mitsuyoshi.

23  A    Good morning.

24  Q    We have -- the jury has the schedules.  You have a copy of

25  the schedules that have been marked as Exhibit 18?

6-27

1    A    Yes, I do.

2    Q    Okay.  Now, did you prepare these schedules?

3    A    Yes.

4    Q    Okay.  Did you have assistance of anybody helping you in

5    preparing those?

6    A    No.

7    Q    You did them all by yourself?

8    A    Yes.

9    Q    Now, let's turn to Schedule 2, tab 2.  Do you have it in

10   front of you?

11   A    Yes.

12   Q    Okay.  I just want to make sure I'm understanding.  This

13   is your computation of additional tax due, and you computed the

14   additional tax due over a 10-year period of 259,632?

15   A    Yes.

16   Q    It's rare that you've probably been called upon to prepare

17   calculations over a 10-year period, isn't it, Miss Mitsuyoshi?

18   A    No.

19   Q    You've done a 10-year calculation in a criminal case

20   before?

21   A    I believe so.

22   Q    The -- now, I noticed on 2003, based upon the adjustments,

23   there's actually a refund due; is that correct?

24   A    Yes.

25   Q    So the defendant overpaid his tax in 2003.

1   A     Yes.

2   Q     The -- you testified earlier, and I think it relates to

3   the computation, that when the government is asserting that

4   Mr. Hee had a dividend, it's taxed at a preferential rate; is

5   that correct?

6   A     Yes.

7   Q     Taxed at a lower rate than just ordinary income like

8   wages; is that right?

9   A     That's correct.

10  Q     So paying wages to Mrs. Hee, Mr. and Mrs. Hee -- because

11  they file a joint return; correct?

12  A     Correct.

13  Q     Would be paying a higher individual tax rate on those

14  wages.

15  A     Mrs. Hee's wages?

16  Q     On Mrs. Hee's wages.  They'd be a higher individual tax

17  rate.

18  A     Yes.

19  Q     And whatever the normal rates are, 25, 30 percent,

20  compared to the 15 percent dividend rate.

21  A     Yes.

22  Q     I think in your schedules, Miss Mitsuyoshi -- I apologize.

23  Can you turn to Schedule -- I apologize for not being familiar

24  enough with these.  I just got them yesterday.

25          Turn to Schedule 3A.  This is a list of all the

1   government's proposed adjustments over the 10-year period?

2   A    Yes.

3   Q    And these were based upon a review of the books and

4   records of Waimana, Sandwich Isles, and ClearCom for that

5   period?

6   A    Yes.

7   Q    And you realize, do you not, that during that same period

8   those three companies had levels of expenditures approximately

9   half a billion dollars or five hundred million dollars?

10  A    Perhaps.

11  Q    So I'm just trying to put some proportionality here.

12  We're looking at really less than half a percent of selected

13  items that the government is asserting is wrong after a 10-year

14  investigation; isn't that correct?

15  A    I'm not good at doing math in my head; so if it's -- if

16  you say it's half a percent?

17  Q    That's fair.  I have trouble, too.  Except I might guess

18  and get it wrong.  Yes, it is less than a half a percent.

19  A    Okay.

20  Q    The -- now, I want to turn to the topic of the loan to

21  shareholder.  And let me find the schedule for -- before we do

22  that, let's go to tab 5.

23           I'll wait for everybody.

24           You have it in front of you?

25  A    Yes.

1   Q   And this is the schedule of MIT tuition payments paid for

2   Adrianne Hee by Waimana; correct?

3   A   Yes.

4   Q   All right.  Now, and this $33,000, this is included in

5   your adjustments; correct?

6   A   Yes.

7   Q   Okay.  And just to review, you agree, do you not, based

8   upon your own schedule, that these expenses were clearly

9   properly categorized in Waimana's books and records as dorm

10  charges, spring tuition, and educational expenses.

11  A   The notation in QuickBooks?

12  Q   Yes.  Dorm charges?  Dining?

13  A   You know, there was just a check.  So if that's how they

14  knew about it, there's no memo on the check or anything; so --

15  Q   Well, you're saying that there's -- you're actually --

16  what you're saying here is that the memo on the QuickBooks

17  files, that's the one that went to the accountants, said dorm

18  charges, dining plan, and spring tuition.  That's what you're

19  saying:  it said that.  Right?  You summarized that.

20  A   Yes.

21  Q   Then based upon that, if we skip over, you're agreeing

22  that then it was booked by the preparer as "educational

23  expenses"; correct?  Or "travel" on those three.  That's based

24  upon your review of their ledgers.

25  A   Yes.

1    Q    Okay.  And but it ends up on the tax return as "office

2    expense"; is that correct?

3    A    Yes.

4    Q    That's what you're saying it is.  And you were testifying

5    before that you were here.  You heard all the testimony;

6    correct?

7    A    Yes.

8    Q    And did you not hear the two or maybe three of the CPAs or

9    from Chinaka & Siu, Lynn Tamanaha, say that this was their

10   error?

11   A    I think she did say that.  I'm not sure.

12   Q    Okay.  You don't -- okay.

13   A    I'm not sure.

14   Q    That Mr. Siu said it was their error?  They didn't catch

15   it?

16   A    I think the first year they said they didn't catch it.

17   Q    That's what we're talking about:  the first year.  Right?

18   A    Yes.

19   Q    Let me see.  Does that refresh your recollection?  They

20   said it was their error?  Their mistake?

21   A    They might have said it.  I know they said they didn't

22   catch it.

23   Q    Okay.  That sounds like it's their error; right?  They

24   didn't catch something?

25            MR. HARRINGTON:  Objection, Your Honor.

1   Argumentative.

2            THE COURT:   Sustained.

3   BY MR. TOSCHER:

4   Q    Now, in listening to all the evidence, or any part of the

5   investigation, you have no reason to believe, do you, that

6   other than the fact that it was the accountants who changed the

7   classification to "office expense"?   Not the client but the

8   accountants.

9   A    You know, I don't recall if that question was asked.

10  Q    Okay.   But there is no evidence other than the accountant

11  changing it on their tax return from their general ledger

12  "educational," and then it ends up on their tax return as an

13  "office expense."

14  A    That's what happened.

15  Q    That's what happened.   And in your experience, as a

16  revenue agent, looking at books and records, there are

17  instances when clients, taxpayers tell an accountant something,

18  and then the accountants have to categorize it and put it on a

19  return.   You've seen that before, haven't you?

20  A    Yes.

21  Q    This is clearly a case where, is it not, where they were

22  told it was "educational expense," they missed it, and they

23  characterize it as an "office expense"?

24            MR. HARRINGTON:   Objection.   Asked and answered.

25            THE COURT:   I'll allow her to answer.

1          Overruled.  You can answer.

2          THE WITNESS:  Again, I believe their testimony was

3   they missed it.

4   BY MR. TOSCHER:

5   Q    Okay.  Now, if that was their error, that's not an

6   intentional act by Mr. Hee, is it?

7          MR. HARRINGTON:  Objection.  Outside the scope and

8   also the ultimate issue.

9          MR. TOSCHER:  Your Honor, they're including it in

10  their computations.  Miss Mitsuyoshi said she was looking for

11  true items and including this.

12         THE COURT:  But I don't think she can testify as to

13  what Mr. Hee's mind-set was.  So if that's what you're asking

14  her to opine on, sustained.

15  BY MR. TOSCHER:

16  Q    Just to summarize that, you have no reason to believe,

17  concerning this 2004 tuition payment, that it was anything

18  other than a mistake on behalf of the accountants; correct?

19         MR. HARRINGTON:  Objection again, Your Honor.  This

20  has been asked and answered, and it's also going to

21  statement.

22         THE COURT:  I hear you.  You can answer yes or no.

23         THE WITNESS:  Their testimony was they missed it.

24  They didn't realize --

25         THE COURT:  It was actually a yes-or-no question.

1          THE WITNESS:  Can you ask it again?

2    BY MR. TOSCHER:

3    Q    I'll ask it again.  You have no reason to believe that the

4    deduction of this tuition payment in 2004 wasn't anything other

5    than just a mistake.

6    A    It's hard to answer yes or no.

7    Q    Really.

8          THE COURT:  Hold on.  Wait for the next question.

9          MR. TOSCHER:  All right.  Your Honor, I'm going to

10   move to another topic right now.  I don't want to belabor the

11   point.

12         THE COURT:  Okay.

13   BY MR. TOSCHER:

14   Q    Can we go to -- sorry it's taking so long -- tab 11.

15         Okay.  Now, this is one of the largest adjustments in

16   your computations, is it not?

17   A    That's correct.

18   Q    And it's approximately $718,000 over a six-year period; is

19   that right?

20   A    May I look at another schedule?

21   Q    Please go right ahead.

22   A    I think you said 716, but I have it as 816,000.  I'm

23   looking at Schedule 2A.

24   Q    Okay.  Thank you for correcting me.  Yes, you have it down

25   here as 816,102.

1          Now, this Schedule 11, these amounts were all

2    reflected on the books and records of Waimana as a loan to

3    Mr. Hee; is that correct?

4    A    Yes.

5    Q    And in your experience as a revenue agent you would often

6    see closely-held corporations treat the payment of personal

7    items to book them as a shareholder loan so as not to deduct

8    them?

9    A    Yes.

10   Q    And you heard the testimony the other day of I believe it

11   was CPA Carlton Siu, who said that when they found the error,

12   the mistake, he advised Mr. Hee to treat these types of

13   expenses, the tuition payments, as loans to shareholder.  Do

14   you recall that?

15   A    Yes.

16   Q    And it makes sense, does it not, to follow a CPA's advice?

17   A    Yes.

18   Q    Can we ask the publication of Government Exhibit 4-82.

19          Are you familiar with this exhibit?

20   A    Yes.

21   Q    Did you help prepare this exhibit?

22   A    No.

23   Q    And tell us what Exhibit 4-82 is.

24   A    This is Waimana's records of their account loan to

25   shareholder.

1   Q    Okay.  And could we -- it starts -- I think we have the

2   first page.  Okay.  Let's leave it there.

3           And you're familiar with this exhibit; correct?

4   A    Yes.

5   Q    Now, I believe that, when you were testifying yesterday

6   regarding this, you said, quote, "I saw no evidence of any kind

7   of repayments."  Do you recall testifying as to that yesterday?

8   A    Yes.

9   Q    And if we can go to -- back to 4-82 and an entry on

10  February 3d, 2011.  We'll have to go down a page or two.  Let

11  me try to find it.

12          There's going to be a credit here.  Go down a little,

13  please.  A little more down, please.  Sorry.  Thank you.

14          Now, we see the entry on February 3d, 2011?

15          THE COURT:  Are you able to see that?  Because we can

16  give you the letter-size exhibit.  Do you want that?

17          THE WITNESS:  I can kind of see it, but I'm so

18  familiar with that schedule, I think I'm okay.

19          THE COURT:  Okay.

20  BY MR. TOSCHER:

21  Q    Okay.  And you see it says to record transfer of CSD of

22  life insurance.  And that represents a credit -- I don't want

23  to get it wrong -- a reduction or a payment on the shareholder

24  loan account, does it not?

25  A    Yes.

1    Q    So your testimony yesterday that you didn't see any

2    evidence of repayments, that was an overstatement, I guess.

3    A    Yes.

4    Q    Now, we see it goes on.  There's -- some of the AmEx

5    reimbursements are being charged to his loan to shareholder

6    account.  It's increasing.

7         Can we go to the next page.  And we go down to

8    there's an entry on January 9th.  It says "Albert Hee Repayment

9    of Loan to Stockholder," and it shows a payment of $736,000.

10   Isn't that correct?

11   A    Yes.

12   Q    So again that was a bit of an overstatement on your part

13   when you said you saw no evidence of repayments; correct?

14   A    No.

15   Q    Well, did you not consider it because you were just

16   considering payments up through 2012?

17   A    No.  I understand that there was a check written on

18   December 31st, 2012.

19   Q    Okay.  So this is the government's exhibit.  It shows a

20   repayment of 736,000; correct?

21   A    I did not consider that as a repayment because I did not

22   consider all of these additions as a true loan.

23   Q    And I understand that, and you'll get a chance to explain,

24   but what you said before is that you didn't see any evidence of

25   a repayment.  That is evidence of repayment.  Regardless of

1    what you think it was, isn't that evidence of a repayment?

2    A    It reduced the balance to what Waimana had booked as a

3    loan to shareholder.

4    Q    Okay.  So will you concede for me that it is evidence of a

5    repayment?  If not --

6    A    It's a repayment, but not -- I didn't consider that a

7    repayment to the loan to shareholder because there was no

8    loans.

9    Q    Because there was no promissory note, is that it?

10   A    Yes.

11   Q    Okay.  Now, staying on this -- this schedule right here,

12   just indulge me for a little bit because with the view that

13   this was a repayment on the loan, it basically creates an

14   overpayment in that account, doesn't it?  Now there's a credit

15   balance of 73,000; is that correct?

16   A    From Waimana's standpoint --

17   Q    From Waimana's; right.

18   A    -- yeah.

19   Q    So this reflects that now Waimana owes money to Mr. Hee

20   after that payment of 736,000; correct?

21   A    Based on Waimana's books.

22   Q    Based on Waimana's books.  And the government -- this is

23   the government exhibit portraying what's on Waimana's books;

24   correct?

25   A    Yes.

1    Q    Now, did you, when you analyzed this, try to determine

2    whether because there was an overpayment that payment also

3    included some accrued interest?  Did you make any analysis on

4    that?

5    A    I noticed in the work papers that an accountant in Waimana

6    did make a computation of interest.

7    Q    Okay.  So -- and does that overpayment reflect the payment

8    of interest on that?

9    A    I believe that 700 what?  I can't read it.

10   Q    736,000.

11   A    I believe that includes some interest.

12   Q    Okay.  So your conclusion is there was a payment, and that

13   includes interest on that.

14   A    I looked at the document, and they didn't accrue interest

15   from 2005.

16   Q    Okay.

17   A    They just accrued it in 2012, I believe.

18   Q    Okay.  Well, we'll later on get into some documents there,

19   but you did see some effort to accrue interest in the work

20   papers you looked at; correct?

21   A    In 2012.

22   Q    And we do see that there was an overpayment at that time.

23   A    On Waimana's books.

24   Q    On Waimana's books; correct.

25   A    Correct.

1    Q     Now, are you familiar with Section 7872 of the Internal

2    Revenue Code?

3    A     No.

4    Q     You're not.  It wasn't one of the sections -- let me see

5    if I can refresh your recollection as to what it is, and maybe

6    you don't -- it's a provision which says that where there's a

7    loan between a stockholder and his or her company, if interest

8    isn't stated, that the law imputes an interest amount.  Are you

9    familiar with that provision at all?

10         MR. HARRINGTON:  Objection, Your Honor.  She already

11   answered that she wasn't familiar with the specific contents.

12   I'm not sure that was a question.

13         THE COURT:  Well, you can answer yes or no whether

14   you are familiar with this.

15         THE WITNESS:  I'm familiar with it.  It's just I

16   don't know the code section numbers.

17   BY MR. TOSCHER:

18   Q     Okay.  But you are familiar with the concept that where

19   there's a shareholder loan and no interest stated, the code and

20   regulations provide you just sort of impute, or the law tells

21   you how much interest you need to put on that loan; correct?

22   A     Yes.

23   Q     Okay.  And if it's just a -- let me test a little further.

24   If it's just sort of an open account demand loan, what the law

25   says is you have to have -- it's a minimal amount.  It's called

1    the AFR; isn't that correct?

2    A    That seems correct.

3    Q    Right.  It's a very -- the amount, it's a very small

4    interest rate, isn't it?  Very low interest rate in this

5    environment.

6    A    I think so.

7    Q    Okay.  All right.  But you didn't run any independent

8    interest calculations to see whether, over the course of the

9    loan, whether adequate interest was paid.

10   A    No, because I didn't consider this to be a loan.

11   Q    Okay.  Your opinion was you didn't consider it to be a

12   loan.  And that was because, simply stated, there was no

13   promissory note.  That's your position; correct?

14   A    There were other things I considered.

15   Q    Okay.  But you said before the reason you didn't think it

16   was a loan is because there's no note.

17   A    And other things that I considered.

18   Q    And other things.  Okay.

19        Now, you realize -- do you realize, Miss Mitsuyoshi,

20   that you can have a valid shareholder loan even if there's not

21   a promissory note?

22   A    No.

23   Q    Or do we disagree on that?

24   A    We disagree on that.

25   Q    Okay.  You're saying no note, no loan.

1    A    Among other factors, yes.

2    Q    Okay.  But if there is no note, you're saying there cannot

3    be a loan.  Isn't that your position?  That's what you just

4    said.

5    A    And there's other things that we consider at the IRS.

6    Q    I understand.  But if I don't have a note, you're saying

7    it can't be a loan; is that correct?

8    A    Yes.

9              MR. HARRINGTON:  Objection.  Argumentative.

10             THE COURT:  It's okay.  Overruled.

11   BY MR. TOSCHER:

12   Q    You just said yes; correct?

13   A    That is one of the factors, yes.

14   Q    It's just one of the factors.  But before you testified,

15   if there's no note, it can't be a loan.

16   A    Okay.

17   Q    And you agreed you testified to that.

18   A    If you say so.

19   Q    I don't want to put words in your mouth, and I don't want

20   to fight with you or argue with you.

21             Okay.  A family member -- this is hypothetical --

22   asks to borrow some money from you.  Okay.  And they need it,

23   you know them, and you loan them some money.  And they're going

24   to repay you.  No promissory note.

25   A    Okay.

1   Q    That's a loan, isn't it?

2   A    Yes.

3   Q    Okay.  And one of the reasons you would treat it as a loan

4   is because of the relationship between a family member;

5   correct?

6   A    Relationship between family members, yes.

7   Q    And that's similar or close enough to a relationship

8   between a shareholder and his closely-held corporation or

9   corporation he owned at the time?

10  A    No.

11  Q    Okay.  You think it's different, even though he owns the

12  corporation.

13  A    Yes.

14  Q    Okay.  But if it's a family member, you don't have to have

15  any paperwork; correct?

16  A    It would be a good idea to have paperwork.

17  Q    Good idea?  If it was a friend, it would be a loan; right?

18  Went from a family member to a friend.

19  A    It's a very informal loan.

20  Q    Okay.  But a loan.

21  A    If you take that word, you know, and generalize it, yes.

22  Q    Okay.  All right.

23       Let me turn to another topic, Miss Mitsuyoshi, and

24  let me find the schedule.  Well, maybe we don't need the

25  schedule to start.  You know your schedules better than me.

1           Another very large adjustment you have made, probably

2    the largest adjustment, or one of them, is the wages paid to

3    Mr. and Mrs. Hee's three children; correct?

4    A    Yes.

5    Q    And also the wages paid to Mrs. Hee, Wendy Hee; correct?

6    A    Yes.

7    Q    And just let's leave the -- Wendy Hee aside for a second,

8    other than the point I just want to be clear Mr. and Mrs. Hee

9    reported Wendy Hee's wages on their tax return; correct?

10   A    Yes.

11   Q    And paid tax.

12   A    Yes.

13   Q    And actually paid tax at a higher rate than what it would

14   be as a dividend --

15   A    Yes.

16   Q    -- correct?

17           Okay.  Now, focusing on the children, you were here

18   and you heard the testimony of two of the children, did you

19   not?

20   A    Yes.

21   Q    Kupa'a and Ho'o; correct?

22   A    Yes.

23   Q    Now, the -- you, basically, concluded based upon what

24   you've heard that they were doing no work.  That was the basis

25   of your disallowing.

1   A    Other than the work at the Mililani site.

2   Q    Okay.  You just -- you are in your adjustments are totally

3   disregarding the other evidence regarding that you heard from

4   the children, such as being on call.  You heard Charlton Kupa'a

5   said that he was on call; correct?

6   A    Yes.

7   Q    You also heard him say that he felt he had an obligation

8   to go back when he was called to go back; right?

9   A    Yes.

10  Q    Now, you'll agree with me, will you not, that there's no

11  requirement that services be performed at an office; correct?

12  A    Yes.

13  Q    You don't have to have office space to do it; right?

14  A    Yes.

15  Q    In fact, Internal Revenue Agents are often out in the

16  field working.

17  A    Yes.

18  Q    They work from home.

19  A    Yes.

20  Q    Now, isn't it a fact that the Tax Code provides that

21  payments you make to someone as an inducement for them to come

22  back in the future can be a deductible expense?  Are you

23  familiar with that?

24  A    No.

25  Q    You're not.  Okay.  Are you familiar with a case, let me

1  just see if you recognize it, called *Ware Knitters v. The*

2  *United States*?

3  A    No.

4           THE COURT:  What was the name of it?

5           MR. TOSCHER:  Ware, W-a-r-e, Knitters,

6  K-n-i-t-t-e-r-s, v. United States, 144 Court of Claims 141,

7  1958.

8  Q    The court held that payments during a leave of absence to

9  induce the person to return to the company to perform services

10  in the future was deductible.

11           MR. HARRINGTON:  Objection, Your Honor.  She just

12  testified she's not familiar with the case.

13           THE COURT:  I think he's allowed to describe the case

14  in case she doesn't know it by name.  Overruled.

15  BY MR. TOSCHER:

16  Q    You're not familiar with that doctrine or that case;

17  correct?

18  A    Correct.

19  Q    And you didn't consider that in making your adjustments

20  here today.

21  A    Based upon what you've just stated regarding the case,

22  it's very different than what's the situation in this case.

23  Q    Okay.  What you're saying is you're distinguishing it, but

24  you haven't read the case, have you.

25  A    No.  Based upon what you've just said that there was a

1    leave of absence.

2    Q    Okay.

3    A    And, normally, a leave of absence means you're working and

4    then you leave.  And then I'm not familiar with the court case,

5    but it seems like the company wants you back; so they pay you.

6    Q    Right.  And there might be somewhat of a difference, but

7    we do know that the children were working.  You gave them

8    credit for the work at the Network Operation Center in

9    Mililani; correct?

10   A    Yes.

11   Q    And we -- and I appreciate that that we may parse various

12   lines, but the point I wanted to make that there's a doctrine,

13   and I don't want to argue with it, that even if they're not

14   there, a company can pay somebody to induce them to come back.

15   Do you agree with that concept?

16   A    No.

17   Q    Okay.  And that's fine.  We can disagree, and the IRS and

18   accountants and taxpayers disagree all the time.

19             Let me move to a different topic here.

20             You agree that training somebody to be able to take

21   over a family business is an important business purpose?

22   A    Yes.

23   Q    And you're also -- in terms of the concept of payment of

24   wages, that you're allowed to take into account not only what

25   we talked about, future services, that we disagree, but can we

1   agree that you're allowed to pay somebody for prior services?

2   Past services?

3            And if you're not familiar with that concept, that's

4   okay.  I'm just seeing what you --

5   A    I'm not familiar.

6   Q    Okay.  So I don't think we need to turn to the chart here,

7   but just so we're clear, the children reported all their salary

8   on their tax returns; correct?

9   A    Correct.

10  Q    And they paid tax on that salary; correct?

11  A    Correct.

12  Q    And they also paid social security and social security tax

13  on that, Medicare tax, did they not?

14  A    Well, Waimana paid for it.

15  Q    Okay.  Waimana paid some, but you know the employee pays

16  some and the company pays some; right?

17  A    Right.

18  Q    So when the wages -- the salary wages are paid to the

19  children, it's not only an income tax cost, they're paying the

20  tax, but there's also social security and Medicare tax;

21  correct?

22  A    Correct.

23  Q    Both Waimana and the individuals.

24  A    Yes.

25  Q    So if you assume that the children's income tax rate is 20

1  percent, I'm just going to use a hypothetical, and the social

2  security tax is 8 or 9 percent, the total of those two, that's

3  greater than the dividend tax rate; correct?

4  A     Yes.

5  Q     Now, as an Internal Revenue agent, when there's an

6  examination, you're also, when you're looking at a taxpayer,

7  also you want to look at any other types of returns the

8  taxpayer files.  In this case I see personal income tax returns

9  of Mr. and Mrs. Hee, personal income tax returns of the

10  children, corporate tax returns of the three corporations:

11  Waimana, ClearCom, and Sandwich Isles.  But what I haven't seen

12  anywhere is the employment tax returns.

13             MR. HARRINGTON:  Objection, Your Honor.  Is this a

14  question?

15             THE COURT:  What's the question?

16  BY MR. TOSCHER:

17  Q     And I'm just trying to lay a basis.  Have you reviewed

18  anywhere any of the employment tax returns in this case?

19  A     No.

20  Q     Okay.  Nobody gave them to you to review.

21  A     That's correct.

22  Q     And the children are reported and reflected on those

23  employment tax returns; correct?  You don't know because you

24  haven't looked maybe.

25  A     They probably will be reflected on the employment tax

1    returns.

2    Q    And the government hasn't asserted any adjustments to the

3    employment tax returns, have they.

4    A    No.

5    Q    The -- just taking it -- and I guess let me go back for a

6    second.

7         We've talked about corporate tax loss; right?  You

8    have a computation on Schedule 1, 2A, where you compute the

9    amount of alleged tax loss to Waimana; correct?

10   A    Probably Schedule 3, but, yes.

11   Q    Yes.  Thank you.  The government isn't claiming here in

12   this proceeding -- they haven't charged any false corporate tax

13   returns, have they.

14   A    No.

15   Q    Okay.  And they haven't proposed any civil adjustments to

16   the corporation for this tax due and owing.

17        MR. HARRINGTON:  Objection, Your Honor.  Relevance.

18        THE COURT:  I'll allow this.  You can answer.

19   Overruled.

20        THE WITNESS:  I think it's going to be considered

21   after the criminal aspects of this case is concluded.

22   BY MR. TOSCHER:

23   Q    Okay.  But it was never considered before.

24   A    I don't know.  Am I aware that --

25        THE COURT:  Hold on, now.  If you don't know, then I

 1   think that's your answer.  You need to wait for the next

 2   question.

 3               THE WITNESS:  Okay.

 4               MR. TOSCHER:  Thank you.

 5   Q    Now, have you had training in employment taxes?

 6   A    A little.

 7   Q    Okay.  And the IRS has in the common law a series of

 8   tests, do they not, as to whether somebody is an employee?

 9   A    Yes.

10   Q    And isn't it a fact that the most important test -- most

11   important factor is the employer's right to control what the

12   employee does; correct?

13   A    Yes.

14   Q    Okay.  That the employer can call the shots, pretty much

15   they're considered an employee.  Right?

16   A    What do you mean they can call the shots?

17   Q    Tell the employee what to do, where to be, and what to

18   perform.  Call the shots was a little colloquial.  I apologize.

19               They control what the employee does.

20   A    As long as it's related to the business.

21   Q    Exactly.  It has to relate to the business, I agree with

22   you, yes.

23   A    Yes.

24   Q    I want to turn to another topic now:  the payments to

25   Diane Doll.  Maybe we can turn to tab 4.

1          Does everybody have that?

2          Now, Miss Mitsuyoshi, this is your schedule of

3    payments to Diane Doll from the -- based upon the Waimana books

4    and records and how the accountants treated it, et cetera; is

5    that right?

6    A    Yes.

7    Q    So the -- we start off in 2002.  There really isn't any

8    memo for the first part of the column for 2003 for these

9    payments.  Memo in WEI QuickBooks doesn't really say anything;

10   right?

11   A    In 2003?

12   Q    Yeah, up to entry 8.  I think the first one on your

13   schedule, nothing's listed until the end of 2003.  It's written

14   and when it says "Services Rendered"; correct?

15   A    That's correct.

16   Q    Okay.  And then the -- you've traced through, and you --

17   here on the accountant's financial statements, and that was the

18   ones prepared in-house by Chinaka & Siu, if you recall the

19   testimony; correct?

20   A    Yes.

21   Q    Okay.  They characterize those payments as "Consulting

22   Fees" on their financial statements and their tax returns.

23   A    Yes.

24   Q    Then we go -- just looking one more example -- on the

25   second page, items 11 through 16.  That's page 23 of 07.  The

1  memo on WEI's QuickBooks file -- that's one that's being kept

2  in-house -- says "Services Rendered"; correct?

3  A    Yes.

4  Q    And the accountants are saying they're consulting fees.

5         And just for one more example, go to the next page,

6  page 24.  Now we're into 2005.  Again on WEI's books --

7  QuickBooks file that's done in-house, it says "Services

8  Rendered"; right?

9  A    Yes.

10 Q    Then on the preparer's financial statements, there's a

11 little different.  It says -- the first one, number 17, is

12 "Miscellaneous Operating Expenses."  And 18, "Miscellaneous

13 Operating Expenses."  And then it changes back on this entry to

14 be "Consulting," and then on number 20 it says "Miscellaneous

15 Operating Expenses."  Correct?

16 A    Yes.

17 Q    So it sounds like the accountants are changing things

18 around, doesn't it?

19 A    Yes.

20 Q    Okay.  Now, you heard the testimony from, I believe,

21 Miss Henderson, who said she told the accountants, Lynn

22 Tamanaha, that she told them it was for Health Consulting

23 Services.  Do you recall that?

24 A    Yes.

25 Q    And do you recall Lynn Tamanaha testifying, yes, that's

1   what she was told:  Health Consulting Services?

2   A    Yes.

3   Q    And you recall Carlton Siu, the CPA, saying that, if the

4   staff, Miss Tamanaha, would have told me it was Health

5   Consulting Services, I would have made an inquiry as to what it

6   was about.  You heard that, didn't you?

7   A    Yes.

8   Q    All right.

9        Now, in the prior disclosure that -- regarding the

10  substance of your testimony here today, you said you were

11  disallowing this because it was an entertainment expense.

12  A    Okay.

13  Q    Okay.  That is what is said in that disclosure.

14  A    Okay.  Yes.

15  Q    Now, if there was a business purpose for it -- you didn't

16  consider whether there was a business purpose for it.  You

17  just -- in your adjustments you assumed it was entertainment

18  expense.

19  A    I didn't make that assumption.  I knew what it was for.

20  It was for massages.

21  Q    Right.  But the reason you gave in your prior disclosure

22  that you told us was yours was that it was an entertainment

23  expense.  Is that a preconceived notion that you had?

24            MR. HARRINGTON:  Objection, Your Honor.

25  Argumentative.

 1               THE COURT:  Overruled.

 2               THE WITNESS:  Yes.

 3     BY MR. TOSCHER:

 4     Q    Okay.  And you made that assumption without hearing any of

 5     the evidence in this case; correct?

 6     A    Yes.  Because it was prepared prior to the beginning of

 7     the trial.

 8     Q    You just assumed it was for entertainment expenses.

 9     A    If you think about what a massage is --

10     Q    We can debate whether it's, you know, entertainment.  I

11     could understand, yeah, you could assume it was entertainment.

12     But I think there is testimony and will be testimony that there

13     is -- will you concede for me that there can be a business

14     purpose for an employer providing a massage to an employee

15     because it makes the employee a better worker?  Will you

16     concede that to me, or we're going to have to disagree?

17     A    Yes, but it wouldn't be a business expense.

18     Q    Okay.  Well, leaving aside technical issues of business

19     expense, would you concede that an employer would want to

20     provide for the health and welfare of an employee?

21     A    Yes.

22     Q    Especially, a chief executive of a company who works many

23     hours a day and is very important to the welfare of the company

24     and all of the employees?  You can see that; right?

25     A    Yes.

1   Q     But you didn't consider any of the possible business

2   purpose.  You just made an adjustment or your preconceived

3   thought that this was entertainment expenses.

4   A     I guess you have to look at it differently from a tax

5   standpoint.  Yes --

6   Q     Let's stay on -- I just want to stay on the entertainment.

7         You considered -- your preconceived notion was that

8   this was entertainment.  We can talk about whether or not --

9   A     Okay.  Yes, yes.

10  Q     Okay.  Now, there might also be bona fide health reasons

11  for a massage; correct?

12  A     Yes.

13  Q     Okay.  And you'll concede that there -- that massage can

14  provide a lot of health benefits; correct?

15  A     Yes.

16  Q     Okay.  And you didn't consider -- you were just focused on

17  entertainment, not whether the health benefits involved here;

18  correct?

19  A     If you look at it that narrowly, yes.

20  Q     Well, I'm just trying to figure out what you did, why it's

21  in your report.  And we might disagree on certain things, and I

22  don't want to be argumentative over it, but I just want to find

23  out why it was there.  And it was there because it says you

24  thought it was entertainment.

25              THE COURT:  Is that a question?

1           MR. HARRINGTON:  Objection, Your Honor.  Can we

2    strike that.  That wasn't a question.

3           MR. TOSCHER:  Struck.  Agreed, Your Honor.

4           THE COURT:  So disregard that last statement.

5    BY MR. TOSCHER:

6    Q    Can I ask the witness to turn to Schedule 6B and ladies

7    and gentlemen.

8              Do you have it in front of you?

9    A    Yes.

10   Q    This is a very -- a lot of -- a lot of pages here.  And

11   just to make sure I understand it, this is -- it's a schedule

12   of select expenses reimbursed to Albert Hee by Waimana.  This

13   goes from the period '07 through '012; correct?

14   A    No.  This one is for the trips to France, Disney World,

15   Tahiti, and --

16   Q    I'm sorry.  6B?

17   A    Yes.  That's the one you are referring to, yes.

18   Q    Right.  But this is a lot of very thick pages here.  It's

19   not my -- I think it's a different one.  Maybe I can ask

20   counsel if -- I have -- 6B is a very --

21              Your Honor, can I approach Counsel?

22              THE COURT:  Sure.

23         (Counsel conferring.)

24   BY MR. TOSCHER:

25   Q    Okay.  Mr. Harrington says I may not be clear enough.

1             6B, as in boy.

2    A    Oh, I'm sorry.  I heard 6D.

3    Q    No.  That's fair.

4             6B.  This, basically, summarizes all the expenses the

5    government is saying shouldn't have been deductible and should

6    have been income to Mr. Hee; correct?

7    A    Yes.

8    Q    Okay.  And it goes from the period '07 to through 2012;

9    correct?

10   A    Correct.

11   Q    So let's just look on 3508, item number 9.

12   A    Okay.

13   Q    Okay.  So the description on the -- is Hawaiian Airlines

14   ticket for Wendy to San Jose and back departure.  And then we

15   go over.  Let's go notation on the AmEx statement.  And what

16   was the notation on the AmEx statement?  Can you read that?

17   A    In this case it was actually a handwritten note attached

18   to the American Express statement.

19   Q    Okay.  And what did it say?  That it said in the records

20   of -- I guess this might have been the records of the company,

21   "Travel, CC Marine."  Do you know what that means "CC Marine"?

22   A    "CCI"?

23   Q    Yeah.

24   A    ClearCom.

25   Q    That it related to ClearCom business.  And it said "France

1  Inspection"; correct?

2  A    Yes.

3  Q    And then there's some -- and it, basically, talks about an

4  inspection trip to France; correct?

5  A    Yes.

6  Q    Now, are you aware that it's part of the investigation

7  that the company -- in this case it was ClearCom -- was

8  purchasing fiber cable from Alcatel, a French company?  Were

9  you aware of that?

10          MR. HARRINGTON:  Objection, Your Honor.  That's

11  outside of the record.

12          THE COURT:  I'm going to allow it.

13          THE WITNESS:  There was some testimony that they were

14  going to either France or Switzerland to look at a ship or

15  something like that.

16  BY MR. TOSCHER:

17  Q    Okay.  But that wasn't the question.  Were you -- as part

18  of your investigation, were you aware that ClearCom was buying

19  fiber cable from Alcatel?

20          If you don't know, you don't know.  I understand

21  that.

22  A    Okay.  The way you word it "as part of the investigation,"

23  I wasn't part of the investigation.

24  Q    Okay.  And that's why you may not know.  Okay.

25  A    (Nods head.)

1   Q     So your -- your, basically, challenging this expense, you

2   really don't have sort of any knowledge of -- let's say there

3   isn't -- you just don't know about that inspection trip, do

4   you.

5   A     What -- the reason why this particular expense is

6   considered a personal expense is this is an expense or Wendy

7   Hee.  Wendy Hee is not an employee.

8   Q     Well, the government's position is she's not an employee,

9   but we talked about she's on the employment tax returns;

10  correct?

11              MR. HARRINGTON:  Objection.  Can she finish answering

12  the questions, please.

13              MR. TOSCHER:  He can bring that out on redirect, Your

14  Honor.

15              THE COURT:  Okay.

16              MR. TOSCHER:  Can we take our break now?

17              THE COURT:  No.  I'm going to go until 10:45.

18              The objection's overruled.  You can go ahead and

19  answer.

20              THE WITNESS:  Oh, I can go ahead and answer?

21              THE COURT:  Well, you might need the question.

22  BY MR. TOSCHER:

23  Q     Yeah, let me -- okay.  So the -- were you aware that it

24  wasn't just Wendy Hee on this trip?  It was also Breanne or

25  Liko Hee?  Were you aware of that?

1    A    Yes.

2    Q    Now, are you familiar with a case that goes way back --

3    let me find it here, Your Honor.  It's *U.S. v. Disney*.  It's

4    the same Disney family that we talked about before, and I'm

5    going to find the cite for you.  But, basically, what it talks

6    about is the importance of a spouse traveling for business

7    purposes.

8              MR. HARRINGTON:  Objection, Your Honor.  Can we ask

9    whether she's heard of the case first.

10             THE COURT:  No, he is.  But I think it's fair --

11   objection's overruled -- for him to describe it in case she

12   doesn't know the name.

13             Are you familiar with the case?

14             THE WITNESS:  No.

15             THE COURT:  Okay.

16   BY MR. TOSCHER:

17   Q    Will you agree with me that -- well, let's take a step

18   back for a second.  If I'm doing business -- a company's doing

19   business buying millions of dollars of fiber cable, and it

20   makes sense, if the company invites you for an inspection of

21   the plant, to send a company representative, doesn't it?

22   A    Yes.

23   Q    Good business; right?

24   A    Yes.

25   Q    And if the company decides that it wants to send family

1   members because they're part of the company, even though the

2   government disagrees, doesn't that make sense to put a face on

3   the company for this manufacturer?

4   A    It would make more sense to send someone that has the

5   technical knowledge about what Waimana is going to be

6   purchasing, or in this case ClearCom.

7   Q    Okay.  It might make more sense, and that's a judgment as

8   to what we're trying -- what they're trying to achieve, and

9   there can be different purposes of that.  But then, basically,

10  more sense, that's just the IRS disagreeing with the company,

11  isn't it?

12          The IRS isn't supposed to be telling a company how to

13  run its business, is it?

14  A    No.

15  Q    Okay.  So I'm looking at again tab 6B, as in boy.  Many of

16  those expenses, if we go through, I'm looking, relate to France

17  Inspection Undersea Cable.  Let's just go through a few of

18  those.

19          Page 36.

20          THE COURT:  Counsel, can you get a little closer to

21  the mike.  Thank you.

22  BY MR. TOSCHER:

23  Q    Page 36.  You see most all of those, in fact, that you're

24  picking out there relate to -- it says Undersea France

25  Inspection of Cable; correct?

 1   A     Yes.

 2   Q     38, pretty much all those, too.  There are a couple in the

 3   middle that aren't.  Right?

 4   A     Yes.  Well, 38, not for two expenses, but --

 5   Q     Not for two; right.

 6   A     -- but the rest, yes.

 7   Q     Okay.  Then if we go to 39, 40, 41, 42 -- all the way

 8   through 42 or 43, most all of those relate to the France

 9   Inspection of the Undersea Cable trip; right?

10   A     Correct.

11   Q     Can you turn to page 48, please, entry number 141.  I

12   think you testified about that yesterday.

13   A     Yes.

14   Q     This is a meal expense under the ClearCom column for $67.

15   And what the notation says is "Al Hee, Charles Hee, and the

16   abandoned water mains."

17   A     Yes.

18   Q     Correct?

19         Now, I think you testified the reason this was -- you

20   adjusted this is because Charles Hee was not an employee of the

21   company; correct?  Isn't that what you said?

22   A     Yes.

23   Q     Mr. Hee was an employee of the company; correct?

24   A     Yes.

25   Q     And isn't it a fact that under all these technical rules

1    not everybody at a meal needs to be an employee of the company?

2    A    That's correct.

3    Q    Okay.  But you said yesterday that you disallowed it

4    because Charles Hee wasn't an employee.  So you're saying the

5    reason given yesterday was not correct.  That's what you just

6    said.

7           MR. HARRINGTON:  Objection, Your Honor.  It's -- he's

8    characterizing her prior testimony, and I'm not sure that's

9    exactly what her prior testimony was.

10          MR. TOSCHER:  I wouldn't have done it, Your Honor,

11   unless I thought that's what it was.

12          THE COURT:  I'm going to sustain this objection.

13   Although, I think the inquiry asking about prior testimony and

14   present testimony is a fine subject for cross-examination.  But

15   you're asking her whether she just said her reason given

16   yesterday was not correct, and I don't think that is what

17   happened.  But I'm not precluding the subject matter.

18          MR. TOSCHER:  I'll go on, Your Honor.  We'll go on.

19   Yes, okay.

20   Q    So we can agree, can we not, that even though Charles Hee

21   was not an employee of the company at this time, it still could

22   be a proper business meal; correct?

23   A    I said more than the fact that he was --

24   Q    Okay.  I didn't ask you what more you said.

25          MR. HARRINGTON:  Will you let her finish the answer.

```
 1              MR. TOSCHER:  No, I think --
 2              THE COURT:  Overruled.  Go ahead.
 3  BY MR. TOSCHER:
 4  Q     The -- okay.  Do you recall the testimony of who Charles
 5  Hee is?
 6  A     Yes.
 7  Q     And do you recall what his background was before he
 8  retired?
 9  A     Yes.
10  Q     And his background:  he worked for many, many years with
11  the Honolulu Board of Water Supply.  Isn't that correct?
12  A     Yes.
13  Q     And I think we heard testimony.
14              Now, there's a statement here regarding abandoned
15  water mains; correct?
16  A     Yes.
17  Q     And you understand how that fits in with the business of
18  Sandwich Isles and Waimana?  You do know how it fits in, don't
19  you?
20  A     Yes.
21  Q     It does fit in.  Isn't abandoned water mains an important
22  concept -- in fact, since you know about it, you knew that one
23  of the companies, I think it was ClearCom, arranged to jointly
24  use the abandoned water mains to run connections to the various
25  Hawaiian Homelands communities; isn't that correct?
```

1    A    I believe so.

2    Q    Okay.  And using the water mains, if you know, was -- I'm

3    going to ask you the extent of your knowledge.  It was an

4    important part of the company to save costs and disruption of

5    installing their connections.  You know that.

6    A    Yes.

7    Q    Okay.  And that sounds like a discussion with your father,

8    who has 40 years experience of an important aspect of the

9    business regarding abandoned water mains, that sounds like a

10   real business purpose, doesn't it?

11            MR. HARRINGTON:  Objection.  Speculation and facts

12   not in evidence.

13            THE COURT:  Overruled.

14            THE WITNESS:  All I know is that Charles Hee retired

15   from the Board of Water Supply.  I don't know what he did when

16   he was working at the Board of Water Supply.

17            MR. TOSCHER:  Okay.  So you just -- I think you said

18   yesterday, and maybe we can -- we're about to go into another

19   topic, and I think we can just leave it at that, Your Honor.

20   Ready for our break?

21            I'm running fast, Your Honor, just so you know.

22            THE COURT:  Keep going.

23   BY MR. TOSCHER:

24   Q    Now, I'm going to move off the schedules for a second.

25            I believe you testified yesterday that you had

1    reviewed the series 4 exhibits.  That's the Waimana exhibits

2    that the government put into evidence?

3    A    Yes.

4           THE COURT:  Not into evidence but referred.

5           MR. TOSCHER:  I'm sorry, Your Honor.  I misspoke.

6           THE COURT:  Oh, the four exhibits, not the 4

7    schedule.

8           I'm wrong.  I take it back.  Go ahead.  Thank you.

9    BY MR. TOSCHER:

10   Q    Okay.  The 4 series exhibits or the series 4 exhibits.

11          And you also said you reviewed the series 11 exhibits

12   that the government put in their case from Chinaka & Siu;

13   correct?

14   A    Yes.

15   Q    And you noted that you saw credit card statements in the

16   Waimana files.  The Waimana files were more complete than the

17   Chinaka & Siu files that you looked at, or at least in the two

18   sets of exhibits; correct?

19   A    Yes.

20   Q    And it was the government who decided what exhibits to put

21   in; isn't that correct?

22   A    Yes.

23   Q    Those were their exhibits.

24          Now, you don't know, sitting here today, whether the

25   government put into evidence all the Chinaka & Siu files they

1  received, do you?

2  A    I thought they did.

3  Q    Okay.  You thought they did.

4  A    (Nods head.)

5  Q    Okay.  And this -- you realize this case goes on for a

6  long period:  2002 to 2012.  And sometimes the accountants'

7  records may not be as good over that period of time.  You've

8  seen that before in your experience; right?

9  A    Yes.

10  Q    So we have -- your comparison was Waimana records were

11  better than the accountants'; correct?  More complete?

12  A    Depends what items you're talking about.

13  Q    Well, I think we were -- or it depends on what items you

14  were talking about, but I think we're talking about the credit

15  card statements.

16  A    Okay.  Yes.  If you're talking about the credit card

17  statements, yes.

18  Q    But you compared Waimana's complete records with records

19  selected by the government for the Chinaka; correct?  They

20  selected those.

21  A    I thought they put everything into --

22  Q    Okay.  That's a separate issue.  But it's what they

23  selected to put in, and you assumed that they put in all the

24  Chinaka records.

25            MR. HARRINGTON:  Objection, Your Honor.  Asked and

1    answered.

2              THE COURT:  Overruled.

3    BY MR. TOSCHER:

4    Q    You assumed, you just said, that they put all the Chinaka

5    records into their evidence.

6    A    Yes.

7              THE COURT:  You want to stop now?  We can take a

8    break now.

9              MR. TOSCHER:  Yeah, I think it's a good time.

10             THE COURT:  So we'll come back at 11:00, and then

11   we'll go until 12:00.  Okay.

12        (Jury excused.)

13        (Court recessed at 10:45 A.M., until 11:03 A.M.)

14             MR. TOSCHER:  May it please the Court.  Ladies and

15   gentlemen.

16   Q    Can we turn to tab 7, please.

17             Okay.  Tab 7 is -- it's a schedule of selected cash

18   withdrawals by Albert Hee reimbursed by Waimana Enterprises;

19   correct?

20   A    Yes.

21   Q    Okay.  And this is a schedule that goes from 2007 through

22   2012.

23   A    It doesn't have anything for 2008.

24   Q    2008 is missing?

25   A    Not missing, but there were no documents for 2008.

1   Q     Okay.  So it includes all those years but nothing for

2   2008.

3   A     Correct.

4   Q     Now, am I correct, am I not, that these are ATM

5   withdrawals made by Mr. Hee on his Optima card that he asked

6   Waimana to reimburse him for?

7   A     Yes.

8   Q     And -- okay.  And on the notations on the reimbursement

9   requests -- that's the middle column, if everybody can see

10  "notation" -- it's, basically, cash withdrawals, and it relates

11  to specified travel; isn't that correct?

12  A     The receipts that were --

13  Q     Could you please -- I'm just asking on the question here.

14          It says "Notation on request for reimbursement."

15  Let's just look at the first one.  Travel dates 1/4/07 to 1/20,

16  New York City, Washington, D.C., and it goes ahead and repeats

17  all those.

18  A     Yes.

19  Q     And let's just go to the next page, and I won't -- just to

20  highlight a few.

21          Let's go to number 9 on the next page 81.  Travel

22  dates, San Francisco, Washington, D.C., meetings with Deutsche

23  Bank and RUS.  Do you see that?

24  A     Yes.

25  Q     And you know a meeting with Deutsche Bank -- you know the

1    business purpose of that, don't you?  You know where Deutsche

2    Bank fits in with the overall things.  Or I'll ask you.  Do

3    you?  Maybe you don't know.

4    A    No, I don't.

5    Q    Okay.  Well, let me see if I can refresh your

6    recollection.  Deutsche Bank was the lender to Paniolo Cable.

7            MR. HARRINGTON:  Objection, Your Honor, as to

8    foundation.

9            THE COURT:  Okay.  She doesn't know.  You can ask a

10   hypothetical, if something, but I'm not going to let you

11   testify.

12           MR. TOSCHER:  That's fair, Your Honor.  I just wanted

13   to see if I could refresh her recollection.

14           THE COURT:  Okay.

15   BY MR. TOSCHER:

16   Q    Well, if the company -- if somebody was traveling to go

17   have meetings with a lender of the company, that's a business

18   purpose, isn't it?

19   A    Yes.

20   Q    And do you know who RUS is?

21   A    Yes.

22   Q    Okay.  And RUS is the Rural Utility Service?

23   A    Yes.

24   Q    And that is an organization that Sandwich Isles does

25   business with; correct?

1    A    Yes.

2    Q    Okay.  So as we go through all of those, we have travel

3    dates and what appears to me to be business-related travel;

4    isn't that correct?

5    A    Well, the notation on the reimbursement sheets states

6    where the travel occurred.

7    Q    Okay.  I'm just saying, I'm going from what here -- if the

8    government is saying it has evidence to say that didn't happen,

9    well, then I'll hear it, but I don't see anything.  I see

10    statements here based upon Waimana's records that this appears

11    to be business-related travel, does it not?

12           MR. HARRINGTON:  Objection, Your Honor.  That's a lot

13    of statement there.  Can we get to the actual question, please.

14           THE COURT:  No, that was a question.  You can

15    answer.

16           THE WITNESS:  Based upon the notation, it appears to

17    be business-related.

18    BY MR. TOSCHER:

19    Q    And I'm looking at this, and these are your schedules.  So

20    it looks pretty much throughout the entire schedules on

21    notation, some detailed information as to dates and what

22    appears to be related to the Sandwich Isles and Waimana

23    business.  If there's one that's not, I'm not going -- I don't

24    want to take too much time and -- but let me -- let me go back

25    over to the other column.

1            And that's -- you, basically, in addition to the

2    notation on the reimbursement as part of Waimana records, on

3    the -- it says notation on cash withdrawal ATM receipt.  Okay.

4    One can -- the evidence you looked at, basically, every one of

5    these cash withdrawals was outside of Hawai'i when Mr. Hee was

6    traveling; isn't that the fact?

7    A    I would say not every single one, but majority of them,

8    yes.

9    Q    Vast majority.

10   A    Yes.

11   Q    And maybe if there was one in Honolulu, it was at the

12   airport, wasn't it.

13   A    Yes.

14   Q    Okay.  So it all looks like he was traveling on business,

15   doesn't it?

16   A    Yes.

17   Q    Okay.  Now, let me go back to your disclosure statement we

18   talked about before.  What you said in that disclosure

19   statement was it appears to be for personal expenses rather

20   than business expenses.  That's what you said in the

21   disclosure; correct?

22   A    Okay.

23   Q    And that's different than what you just testified to,

24   isn't it.

25   A    What did I say?

1   Q     Okay.  I think you just said, based on this -- and I'm not

2   trying to trick you, and I apologize -- is that, based upon

3   what we have here, it's business.  And what you said before

4   when you were -- in that disclosure was it appeared personal.

5   Okay.

6   A     I didn't say it was for business.  It appears that he was

7   traveling for business.

8   Q     Okay.  That's -- I think that's the point we'd make.

9          Now, I think maybe what you're saying is you've

10  decided to -- you've disallowed these expenses to the

11  corporation?

12  A     Yes.

13  Q     And you're attempting to tax Mr. Hee on these?

14  A     Yes.

15  Q     Even though it appears that this relates to business,

16  based upon your own schedules?

17  A     May I explain why I did this?

18  Q     Your counsel will be able to --

19  A     Okay.

20  Q     I'll ask you, are you doing this because the ATM receipts

21  attached to these was not good enough for you?  Is that it?

22  A     There is a requirement any time you take travel expenses,

23  Code Section 274 clearly states that you need to provide

24  receipts to show business purposes for any expenses.  And an

25  ATM receipt is not sufficient, even though on your

1    reimbursement statement you're traveling.  We don't -- I don't

2    know what the money was used for.

3    Q    Okay.  But you do know he was traveling during that period

4    of time; correct?

5    A    Based upon the reimbursement sheets, yes.

6    Q    Okay.  And you do know that travel related to business, do

7    you not?

8    A    For the majority of them because sometimes there was no

9    notations, but, yes.

10   Q    Okay.  But maybe it was on the credit card statement where

11   it was.

12   A    No.  Because if you look sometimes in the column Notation

13   on Request for Reimbursement, it's blank.  But we know the

14   withdrawals were made while he was not in Hawai'i.

15   Q    Right.  While he was traveling on business.  Well --

16   A    Well, sometimes --

17   Q    You have no evidence to believe that he wasn't traveling

18   on business, do you?

19   A    No, but there's -- like I said, there's no notation, but,

20   yes.

21   Q    Now, so, basically, you're saying the level of -- in your

22   view the level of documentation should have been more.  That if

23   he spent $20 on a taxi on that cash, is that what you're

24   looking for?

25   A    Yes.

1    Q     Now, you do know in business -- you're probably familiar

2    with this -- that employers give employees money to travel,

3    called per diem rates, that you don't have to account for?

4    A     Yes.

5    Q     In fact, IRS employees, when they travel, they get per

6    diem.  They can get per diem; right?

7    A     Yes.

8    Q     And you don't have to keep track of all the little

9    expenses; correct?

10   A     Certain ones we do, yes.

11   Q     But you don't have to keep track of every one.  You get a

12   per diem allowance.

13   A     The per diem allowance is for meals, yes.

14   Q     And you will agree with me that, when you're traveling,

15   it's a good idea to have cash with you for taxis?

16   A     Yes.  Yes.

17   Q     So your adjustment here really has to do with you think

18   the recordkeeping just wasn't what you wanted under 274; is

19   that really the nub of your issue?

20   A     The code section is very clear regarding travel expenses,

21   and Code 274 is very clear what's required.

22   Q     Notwithstanding even though you agree with me that there

23   was a business purpose for these withdrawals.

24   A     Yes.  Well, it appears to be because -- sorry.

25   Q     All right.  It's hard maybe to accept that it is.  You're

1    just saying it appears.  I understand.  Your counsel will be

2    able to question you on that a little more.

3    A    Okay.

4    Q    Now, let me just go back a little bit just really for the

5    record.

6         I asked you about your familiarity with a case.  Now

7    I'm going to give you the citation because I couldn't find it

8    before.  *U.S. v. Disney*, 413 F.2d 783, Ninth Circuit 1969.  I

9    think you said before that you weren't aware of that case; is

10   that correct?

11   A    That's correct.

12   Q    And let me just give you the substance of the case.  And

13   the case law provides that having a spouse attend a corporate

14   function to enhance a corporation's image is a bona fide

15   business purpose.

16        Are you aware of that concept?

17   A    No.

18   Q    Now, let me turn to another topic here, and that is -- let

19   me get a schedule here.

20        Schedule 12.  Do you have that?

21   A    Yes.

22   Q    This is the schedule setting forth fair market value rent

23   of the Santa Clara house?

24   A    That's correct.

25   Q    Now, were you aware that at the time Waimana purchased

1    this house that Waimana had made and was making a very large

2    investment in a company called Siometrix?

3    A    Yes.

4    Q    Do you recall the size of that investment?

5    A    No.

6    Q    Millions of dollars; correct?  Do you remember that or no?

7    A    Yes.

8    Q    Now, if I understand this schedule correctly, this is

9    based upon Mr. Molinari's testimony concerning what he believed

10   to be the fair rental value of the house; is that correct?

11   A    Yes.

12   Q    And if you recall his testimony, if you were here, he did

13   not give us a fair market value of what one room would be.  Do

14   you remember that?

15   A    Yes.

16   Q    Okay.  But he did say it would be substantially less?

17   A    Yes.

18   Q    Okay.  Now, the -- I'm just trying to understand your

19   rationale here.  So for the later years 2011 and 2012 -- you're

20   starting with Mr. Molinari's opined rate; correct?  What he

21   opined as to the value.  And then you're reducing as to the

22   amounts which were reported on Waimana Enterprises' returns for

23   '11 and '12; correct?

24   A    Yes.

25   Q    Now, did you take into account at all that during this

1    period of time, for instance, Charlton, or Kupa'a, was charged

2    with taking care of that house and performed a lot of work on

3    the house?

4    A    Yes, I'm aware of that.

5    Q    Did you take it into account in your computations at all?

6    A    No.

7    Q    Okay.  He was using a room when his father wasn't there.

8    Okay.  But he had -- you know the evidence was he had an

9    obligation:  he had to take care of that house.  Correct?

10   A    Yes.

11   Q    Now, you have experience in IRS examinations you talked

12   about.  And in this case most all of your adjustments -- your

13   schedules here are based totally on the books and records of

14   Waimana; isn't that a fact?

15   A    Yes.

16   Q    In other words, everything you wanted to see, the IRS

17   wanted to see, that supports this was in plain sight in

18   Waimana's books and records; correct?

19   A    Yes.

20   Q    And provided to the IRS during the course of the audit and

21   investigation?

22           MR. HARRINGTON:  Objection, Your Honor.  It's outside

23   the scope.  She's a summary witness testifying to produce these

24   calculations based on the exhibits in evidence.

25           THE COURT:  Okay.  Sustained.  You can inquire about

1   what it was she understood herself to get to review for her

2   testimony.

3   BY MR. TOSCHER:

4   Q    Okay.  The -- all of the adjustments that you reviewed,

5   all the records reviewed, in other words, that formed the basis

6   of your schedules, the business purpose, how it was

7   characterized -- and they're very detailed -- that was all in

8   Waimana's books and records, was it not?

9   A    Waimana's and the accountants'.

10  Q    Waimana's and the accountants'.  Okay.  Fair.

11  A    Yeah.

12  Q    Now, are you familiar with concepts of reporting positions

13  that a taxpayer or a tax preparer needs to adhere to?  Are you

14  familiar with Circular 230?

15  A    Yes.

16  Q    You were here and watching the testimony in one of the

17  engagement agreements where it talked about that in order to

18  take a position on the return there just had to be a 33 percent

19  chance of prevailing.  You saw that?

20  A    I saw that.

21  Q    Okay.  And if you know the positions, that a taxpayer is

22  allowed to take a position even if there's just a third chance

23  of prevailing: a reasonable basis.  Isn't that right?

24  A    I'm not familiar with that concept.

25  Q    Okay.  But you saw the preparer.  That's all the standard

1    the preparer has to follow.

2    A    Well, that was represented on a preparer's engagement

3    letter.

4    Q    So you're not familiar with it.  But the point I want to

5    make, you do understand that -- and we started this way -- the

6    taxpayer doesn't have to be a hundred percent right or even 50

7    percent right.  It's just having -- even if you have a

8    reasonable basis for what you're doing, you don't even --

9    you're not even subject to civil penalties; isn't that correct?

10   A    You're referring to what we call a statutory disclosure

11   whereby you disclose in a tax return what position you're

12   taking.

13   Q    Right.  But even without a disclosure, even without a

14   disclosure -- now, you're not -- you know, you have limited

15   knowledge on that.

16         Now, you also know the difference, do you not -- and

17   it's laid out differently in the Internal Revenue manual -- the

18   difference between taxpayer negligence and taxpayer fraud?

19   A    Yes.

20   Q    And there's clear lines of distinction, aren't there.

21   A    Yes.

22         MR. HARRINGTON:  Objection, Your Honor.  Relevance.

23         THE COURT:  So did she opine on this?  I mean, I

24   don't recall it being --

25         MR. TOSCHER:  Your Honor, I will tie it up.

1              THE COURT:  Okay.  I'm going to sustain that

2    objection.  You can walk it back a little and tie it to her

3    opinion.

4    BY MR. TOSCHER:

5    Q    Well, is it fair to say that in your disclosure -- I'm

6    trying to find the example, Your Honor.

7              Okay.  I'm going to move on, Your Honor.

8              One last topic, and that has to do with training of

9    employees.  I know the IRS puts a lot of stock in training its

10   employees; isn't that correct?

11   A    Yes.

12   Q    And sometimes -- and training an employee is important;

13   you'll agree with that?

14   A    Yes.

15   Q    And sometimes whether somebody -- a trainee is

16   contributing to something, speaking at a meeting, that's really

17   not -- that really isn't what's important.  What's important is

18   the trainee learning.  Isn't that right?

19   A    It's a combination, yes.

20   Q    Okay.  But when -- you were a trainee at one time; right?

21   A    Yes.

22   Q    And you were at a meeting, and you were expected to listen

23   and learn; right?

24   A    At a meeting?

25   Q    Listen and learn.

1    A    During my training?

2    Q    Yeah, when you were a young revenue agent, you went out

3    with a senior person.  Isn't that what a trainee does:  listen

4    and learn?

5    A    I didn't go out with a senior person.  But I understand

6    what you're saying, yes.

7    Q    And you agree.

8            MR. TOSCHER:  I have no further questions, Your

9    Honor?

10            THE COURT:  Okay.  Redirect.

11                    RE-DIRECT EXAMINATION

12   BY MR. HARRINGTON:

13   Q    Good morning.

14   A    Good morning.

15   Q    Let's just touch on a few issues.  The first would be if

16   we could turn to tab 3A, please.

17            Now, you were asked on cross-examination about the

18   wages that were paid to the children; do you remember that?

19   A    Yes.

20   Q    And you were -- talked a little bit about how those wages

21   were reported on the children's tax returns.  Do you remember

22   that?

23   A    Yes.

24   Q    Okay.  There were also employee benefits that were paid to

25   the children; right?

1    A    Yes.

2    Q    Okay.  And looking at this again, line 7, could you

3    explain what those employee benefits were, who paid them, and

4    how they're reflected on tax returns.

5    A    The employee benefits included a profit-sharing program,

6    various insurance programs, such as long-term care, disability,

7    critical illness.  There was also a matching 401(k) program.

8    Q    And what was the total value that you calculated of those

9    benefits that were paid?

10   A    $404,327.

11   Q    And who paid those amounts?

12   A    Waimana.

13   Q    And did Waimana take a tax deduction for those amounts?

14   A    Yes, they did.

15   Q    And did the children have to pay any taxes on that amount

16   of money?

17   A    No, they did not.

18   Q    And also speaking of the children, I think you were asked

19   on cross-examination about whether they were performing any

20   services.  Where were the children located during the majority

21   of the time for the years at issue?

22   A    They were full-time students going to school on the

23   mainland.

24   Q    And was that part of the considerations you took in

25   determining whether their wages were ordinary and necessary

1   business expenses?

2   A    Yes.

3   Q    You were also asked a little bit about the purported loan

4   to shareholder.  Do you remember those questions?

5   A    Yes.

6   Q    Okay.  And I think you were asked a few questions about

7   it, and you used the word "narrowly" in your answers.  Could

8   you just describe for the jury what factors you would consider

9   in determining whether there's a bona fide loan.

10  A    I would consider, first of all, whether or not there was a

11  loan document, a promissory note.  On the promissory note there

12  would be interest charged, also a payment plan and how long the

13  loan was going to be.  So we consider that all factors, not

14  just the fact that there's no promissory note.

15  Q    And you looked at Exhibit 4-82, and that was a record from

16  Waimana; is that right?

17  A    Yes.

18  Q    And you were asked a little bit about whether there were

19  any payments.  And so if you could elaborate a little bit what

20  payments were reflected on that chart.  I can pull it up, if

21  you like, but if you remember, feel free to answer.

22  A    There were some entries -- some adjusting journal entries,

23  I guess they put down, that reduced the balance of the loan to

24  shareholder on Waimana's records.  And in the very ending -- as

25  I said, the booking shows, I think, January of 2013, but I know

 1   that the check was written December 31st, 2012.  And they

 2   reflect it as, I guess, a repayment to the loans.

 3   Q    And so the first transactions on this loan to shareholder

 4   balance start in 2005; is that right?

 5   A    Yes.

 6   Q    And in your review of the records was there any evidence

 7   of a promissory note or repayment schedule or anything like

 8   that about this shareholder loan?

 9   A    There was none.

10   Q    You're also asked a little bit about payments to Diane

11   Doll and about massage payments and questions about that.

12   Could you talk a little bit about the payments to Diane Doll in

13   this case and why they appeared on your schedule.

14   A    The payments to Diane Doll were for massages, and that is

15   not an ordinary and necessary business expense.

16   Q    And in your review of the records did any other employees

17   of Waimana receive massages?

18   A    There were no other employees receiving massages.

19   Q    And that's from your review of the records and the

20   evidence in this case so far?

21   A    Yes.

22   Q    And you were asked about a couple different court opinions

23   from the 1960s.  Do you remember that?

24   A    Yes.

25   Q    And would it be fair to say that there's been other

1  decisions, other revenue rulings, statutory changes since that

2  time?

3  A    I'm sure there were.

4  Q    And those changes may reflect the current state of the

5  law; is that right?

6  A    Yes.

7  Q    And if we could turn to 6B, as in boy, and page 35,

8  please.

9           And on line entry 14 you were asked a lot of

10  questions about this trip to Switzerland.  And again line 14

11  has a ticket for Jonathan Kane.  Could you talk about how the

12  purchase of that ticket reflected into your inclusion of these

13  expenses on this schedule.

14  A    Jonathan Kane at the time was the boyfriend of Breanne

15  Hee.  And again he's not an employee of Waimana, he did not

16  provide any services to Waimana; so, therefore, this would

17  be -- it would not be a business expense to Waimana.

18  Q    And you were also asked about the ATM receipts.  Do you

19  remember that?

20  A    Yes.

21  Q    Okay.  And in your review of those records did you ever

22  find that there were meals expensed on this AmEx card during

23  the same period of time that Mr. Hee was pulling out cash --

24           MR. TOSCHER:  Objection.  Characterization to real

25  expenses.  He's leading the witness.

1          THE COURT:  Okay.  Sustained.

2     BY MR. HARRINGTON:

3     Q     What I meant to say was when you were reviewing the credit

4     card -- so there were credit card statements about the cash

5     withdrawals; right?

6     A     Yes.

7     Q     There were credit card statements on this AmEx card that's

8     at 6B; is that right?

9     A     Yes.

10    Q     So I guess the question is was there overlap on the

11    months?  Like, was there a statement from January '07 and then

12    also credit card withdrawals from January '07?

13    A     Yes.

14    Q     So in the statements on the AmEx on this charge in January

15    of '07, were there meals that were put on the credit card for

16    those same trips that were on the ATM receipts?

17    A     Yes.

18          MR. HARRINGTON:  Just one moment, Your Honor.

19          No further questions, Your Honor.

20          THE COURT:  Is there any re-cross?

21          MR. TOSCHER:  May it please the Court, I'm not going

22    to say "briefly," but it will be.

23          THE COURT:  Okay.  Good.

24                    RE-CROSS-EXAMINATION

25    BY MR. TOSCHER:

1   Q    The -- Mr. Harrington referred to the schedule you did

2   concerning employee benefits.  I just want to make sure it's

3   clear.  Those employee benefits which you included relating to

4   the children and Wendy Hee, those are benefits which are

5   provided to all employees of Waimana and Sandwich Isles and

6   ClearCom; isn't that correct

7   A    Yes.

8   Q    Okay.  So they're being treated like all the other

9   employees; correct?

10  A    Yes.

11  Q    And Mr. Harrington asked you regarding the state of the

12  law, and they were older cases.  The *Ditting* case and the

13  *Disney*.  I remember *Disney*.  But I commend you -- that's why I

14  gave you the citations -- they're still good law, and you

15  should go ahead and look at them.

16           THE COURT:  Okay.  Is that a question?  That didn't

17  sound at all like a question to me.

18           MR. TOSCHER:  That's true, Your Honor.  Okay.  You're

19  right.

20           THE COURT:  Okay.  Ignore it.  I'm striking that

21  statement.

22           MR. TOSCHER:  Okay.  No further questions, Your

23  Honor.

24           THE COURT:  Anything more?

25           MR. HARRINGTON:  Nothing, Your Honor.

1          THE COURT:  Okay.  Then the witness is excused and

2    may step down.

3          (Witness excused.)

4          MR. TONG:  May we have one moment, Your Honor?

5          THE COURT:  Yes.

6          (Counsel conferring.)

7          MR. TONG:  The government rests, Your Honor.

8          THE COURT:  Okay.  Then this is a landmark in any

9    case, and I frequently have things to talk to the attorneys

10   about.  So I am going to excuse you until 1:15, and come back

11   from lunch then.  Okay?

12         (Jury excused.)

13         THE COURT:  Okay.  Any matters I need to address?

14         MR. TOSCHER:  Your Honor, the defense would like to

15   make a motion under Rule 29, but can I have a little time to

16   prepare for that?

17         THE COURT:  Oh.

18         MR. TOSCHER:  Even five minutes, 10 minutes, or I'll

19   come back early before lunch or --

20         THE COURT:  Okay.  I'll see you at -- how about 10 to

21   1:00, okay?  12:50.

22         MR. TONG:  12:50, Your Honor?

23         THE COURT:  12:50.

24         MR. TONG:  12:50.  Thank you.

25         MR. TOSCHER:  Thank you.  I appreciate the time, Your

1   Honor.

2          THE COURT:  I'll see you then.

3      (Court recessed at 11:41 A.M., until 12:54 P.M.)

4      (In open court without the jury:)

5          MR. TOSCHER:  Your Honor, we split up at lunch, and

6   we're prepared to go forward on the Rule 29 with a waiver of

7   Mr. Hee's presence, if that's acceptable to the Court.

8          THE COURT:  Waived.

9          MR. TOSCHER:  Thank you, Your Honor.

10          THE COURT:  Okay.  Turning this over to you.

11          MR. TOSCHER:  May it please the Court.

12          THE COURT:  Yes.

13          MR. TOSCHER:  Your Honor, the defendant respectfully

14   moves for judgment of acquittal under Rule 29 following the

15   close of the government's case.  The Court is familiar with the

16   standard, and it's a tough one, but I think if we view the

17   evidence in light most favorable to the government and there's

18   a theory that equally supports innocence as guilt, the Court

19   should enter the Rule 29 motion.  And we think that's the case

20   here.

21          There are two separate charges, but both come down

22   pretty much to the same thing.  Under the 7212 charge, the

23   government has to prove beyond a reasonable doubt that Mr. Hee

24   corruptly endeavored to obstruct or impede the administration

25   of the Internal Revenue laws.  It requires knowing and

1    dishonest behavior.  Basically, what it comes down to, where

2    the government's theory is really a tax theory, which it is --

3    there's been no other evidence of other type of obstructive

4    behavior -- that he was intending to obtain an unlawful tax

5    benefit that he knew was unlawful.  We think on the intent

6    element the government -- no evidence that Mr. Hee was aware

7    that the positions taken on his return were unlawful causing

8    him to underpay the taxes.

9           The same theory regarding the false tax returns.  The

10   government needs to show that Mr. Hee knowingly failed to -- or

11   knowingly filed false tax returns.  While he did sign them

12   under penalty of perjury, there's no evidence that he knew that

13   the returns were incorrect.  There are many issues we've talked

14   about here, but -- and there are some technical issues, but

15   there is no evidence to show that he knew what he was doing was

16   incorrect.

17          Now, as a technical matter, our review of the record

18   suggests that for 2007, Count 2, the government has failed in

19   its burden on a technical reason because it hasn't proved that

20   there was a subscription or a signing of the return.  There's

21   no Form 8879 in the record which authorizes the electronic

22   filing of the return, and there's no evidence that Mr. Hee

23   assigned the pin that was used to sign his return under penalty

24   of perjury.  So it's technical, but we think the government

25   failed in its proof there.

1          Now, let me just address, briefly, what I view as the

2  critical evidence, and to offer to the Court why really what

3  the evidence suggests, even looking at it most favorably, is

4  that more actions should have been taken by Mr. Hee, but it's

5  negligence, not willful conduct.  No evidence of concealment of

6  any issues.  Everything was on the books of Waimana and

7  provided to the accountants when requested.

8          In earlier years the accountants were, for most of

9  the years, preparing the general ledgers.  The accountants

10  testified they performed certified audits and went into

11  detailed work.

12          In dealing with the specific issues, the government's

13  theory is, if there is no promissory note, it can't be a loan,

14  and that's a legally insufficient standard.  But -- and we'll

15  see that all the accountants knew the status of the shareholder

16  loan.  He was recommended to treat those expenses, not deduct

17  them, when the error was caught, and not treat it as a

18  shareholder loan, and that's the way it was treated.  So the

19  government hasn't proved there was anything -- not only wasn't

20  there anything wrong with that, there was certainly nothing

21  intentionally wrong.

22          The wages, I think we heard the testimony today.  The

23  accountants knew that the children were employed.  We've heard

24  why the children were employed.  The taxes were reported by the

25  children.  We even heard testimony that in certain

1    circumstances the personal taxes, it was more expensive for him
2    to pay the children than take it as a dividend under the
3    government's theory.  And there could be some issues, dispute
4    with the government, future services not good enough.  But
5    there's no evidence that he was not in good faith, that he was
6    willful, and that's the standard.
7         You've heard the evidence on the massages.  The
8    government disagrees or -- to asserts that whether they can be
9    deductible.  We've heard evidence that they could be.  But what
10   we haven't heard is that Mr. Hee knew they weren't deductible.
11   We saw that there was a -- sort of a, you know, error in the
12   communications.  They were told they were Health Consulting
13   expenses, and they got translated to just Consulting expenses.
14   And we saw another incident of that with the college tuition.
15   They told them it was college tuition.  They missed it.  That's
16   when they picked it up the other year.  But if the Court
17   recalls, they were told it was tuition, and the accountants
18   changed it.
19        On the personal credit card charges, what it seems to
20   me that on the ones we've discussed there is plausible business
21   purpose, nothing to show that these were intentionally wrong.
22   The approach seems to have been, taken by the evidence by the
23   accountant -- by the government in their computations, is
24   "Prove it to me.  We're not going to accept what it says here."
25   That improperly shifts the burden.  They need to prove there

1    were willful understatements.

2          The -- you know, we saw -- I think, the last issue is

3    the Santa Clara house, a valid business purpose, investment

4    purpose, to purchase it.  There's just nothing to show that

5    what he did was improper.  Again, there may be some technical

6    tax issues.  I think that can be fairly disputed.  But there's

7    nothing -- I will concede for the Court today that, if you put

8    all the accountants together, some may come up with some

9    adjustments, this adjustments, but there's nothing to suggest

10   that these were willful violations.

11         Thank you, Your Honor.

12         THE COURT:  Okay.  Who's arguing for the government?

13         MR. TONG:  I will, Your Honor.

14         I don't intend to go through all of the evidence in

15   detail.  I just would remind the Court of the standard, which I

16   think Mr. Toscher understates.  The issue at this point is just

17   whether, viewing the case in the light most favorable to the

18   government, any rational jury could conclude that the defendant

19   was guilty.

20         And he's correctly pointed out that we have a corrupt

21   interference charge, which is an all-encompassing charge, under

22   Section 7212 that, essentially, encompasses the receipt of all

23   the benefits that he benefited from and the improper deductions

24   on the part of the corporation, together with the failure to

25   record the value of the benefits on his individual tax returns,

1   which we've shown had a resulting tax liability of over half a

2   million dollars.

3            Counts 2 through 7 are the willful subscription to

4   false income tax returns.  Again, Your Honor, viewed in the

5   light most favorable to the government, we have shown that he

6   received multiple benefits that were not recorded on his tax

7   returns.  With regard to the 2007 tax return, Mr. Chinaka, the

8   preparer for that year, did say that prior to electronically

9   filing anything he would regularly obtain the authorization

10  from his client, Mr. Hee in this case.

11           I don't really want to go through each and every

12  category, unless the Court wishes me to.

13           THE COURT:  I think you should address Mr. Toscher's

14  argument that he didn't see evidence of willfulness.

15           MR. TONG:  Okay.  Well, Mr. Toscher seems to be

16  suggesting that this is a small amount of expenses relative to

17  the overall expenses claimed as deductions by the company and

18  that this could be characterized as either a failure to follow

19  through on the part of Mr. Hee or negligence on his part or

20  something short of criminal intent.

21           Suffice it to say, Your Honor, that the defendant was

22  involved in each activity and each transaction that is involved

23  in this case.  You've already heard that the defendant was the

24  sole shareholder of the company.  He had sole authority to

25  direct that payments be made.  He used that authority in this

1    instance to direct that his company pay for college expenses

2    for his children, the tuition.  He directed that the house be

3    bought, which, ultimately, was used as college housing by his

4    children.  None of that appeared on any of the tax returns in

5    terms of the value of the income that he was receiving by not

6    having to pay for their benefits.

7            With regard to his children and his wife, he directed

8    that all of them be put on payroll, even the evidence viewed

9    under any standard was that they weren't doing anything for the

10   company.  You have three full-time students, two of whom have

11   testified they were full-time students, yet getting benefits

12   and pay that I think exceeded fifty to $70,000 in many years.

13           With regard to the credit card charges, there we have

14   Mr. Hee's fingerprints on each and every charge.  Nancy

15   Henderson testified that on a monthly basis she would pull out

16   the credit card statement.  She would sit down on a one-on-one

17   with Mr. Hee.  They would go through the charges.  He would

18   tell her how to categorize each one for purposes of taxes,

19   whether it be business, personal, or otherwise.  We even have

20   him writing memoranda with regard to the Disneyland trip

21   specifically trying to say this is why a trip shortly after the

22   wedding of one of my daughters is a deductible expense for four

23   people, saying that visiting Disney World somehow benefits the

24   company.

25           There's no mistake here.  He authorized each and

1    every entry.  He told the Diane Doll entries to be categorized

2    as consulting expenses, never told anyone outside of Nancy

3    Henderson that it was for massage therapy.  We heard all that

4    evidence.  I think that negates any suggestion that any of this

5    happened by accident.

6              THE COURT:  I don't think that was Mr. Toscher's

7    argument, though.

8              MR. TONG:  I think that was part of his argument.

9    And, ultimately --

10             THE COURT:  I think he thought -- I thought he was

11   arguing that these things were indeed done on purpose not by

12   accident, but they were not willful falsehoods with -- knowing

13   falsehoods.  That even though they were knowingly done, they

14   were not knowingly false.

15             MR. TONG:  Right.

16             THE COURT:  Even though they were -- things were

17   knowingly done, it wasn't a willful attempt to impede or

18   obstruct the IRS investigation and so forth.  I thought that's

19   what he was arguing.  He's not saying it wasn't deliberately

20   done.

21             MR. TONG:  Okay.  Well, I understood him to say it

22   might not be deliberately done because of his argument

23   earlier.

24             THE COURT:  Sometimes, yes.  Sometimes the accountant

25   might have done it.  Okay.

1            MR. TONG:  So willful is quintessentially a factual

2    issue for the jury to determine, and we submit that the false

3    characterization of many of the expenses, such as a trip to

4    Disney World, such as a shareholder's meeting where he's the

5    sole shareholder where he spends four days at Mauna Lani with

6    his entire family and deducts I think it was sixteen or

7    $20,000, the jury could conclude from that that those entries

8    were made knowingly and willfully, and that he acted with the

9    requisite intent to avoid an obligation of which he knew, which

10   is to report income properly on his tax returns.  And I think

11   that's a quintessential jury question.

12            As Your Honor knows, we're not going to be submitting

13   to the jury a special verdict form asking them to go category

14   by category.  It is instead the elements of each particular

15   offense.  Assuming the jury finds guilt, the issues of the

16   other categories may become an issue for the Court to decide at

17   some point.  But at this point, viewing the evidence in the

18   light most favorable to the government, a rational jury plainly

19   could conclude that he acted deliberately, not by mistake, and

20   with the requisite criminal intent, which is a willful state of

21   mind.

22            Count 1, the corrupt interference, it's

23   all-encompassing.  It talks about seeking an unlawful financial

24   benefit.  We've seen some evidence that he was knowledgeable

25   about the Tax Code.  There was an e-mail with David Chinaka

1   where he talks specifically about why certain things should be

2   categorized a certain way.  He was also told that he needed a

3   loan to be documented by a promissory note.  There was no such

4   evidence that there was a promissory note, even though we do

5   have evidence that he knows what a promissory note is and drew

6   up notes whenever Harold Johnston sought to borrow money from

7   his company.

8          So when you look at the totality on a Rule 29, it may

9   be that he can argue things to the jury, but for purposes of

10  this motion, it should be denied

11         THE COURT:  Okay.  Mr. Toscher.

12         MR. TOSCHER:  Just very briefly, Your Honor, I think

13  the Court interpreted my argument correctly, and I think the

14  government has not pointed out where there were knowing

15  violations.  I think there are business justifications for the

16  Disney World trip in the evidence.  The government hasn't

17  proven that -- or any evidence at all that that wasn't the

18  purpose of the trip or a business purpose there.  And I believe

19  there was evidence of why there was a trip to the Big Island

20  and Mauna Lani.  There was testimony regarding the Hawaiian

21  Homelands Commission meeting.

22         The other things pointed out by Mr. Tong, I think the

23  e-mail with David Chinaka shows Mr. Hee questioning him or

24  asking about an issue and following Mr. Chinaka's advice, which

25  is consistent through everything we see here.  Every time if an

1    issue comes up, he relies upon the tax people, and he follows

2    their advice.

3         No, he didn't document the loan, but he treated it as

4    a loan.  It was documented on the books and records as a loan.

5    I think the loan payments were made.  It's just not evidence

6    that he was willfully violating the law.  We can debate forever

7    whether this technical requirement or that.  But I think the

8    government has fallen short, with all due respect, Your Honor,

9    of demonstrating that whatever adjustments there are were

10   intentional violations on both counts.  Thank you.

11        THE COURT:  Do you want to address the 2007 response

12   by Mr. Tong on Mr. Chinaka's testimony?

13        MR. TOSCHER:  Yes.  I don't have the testimony.  I

14   don't think, you know, his general that he would have

15   obtained -- I think the government needs to prove with

16   evidence -- with a document that this was authorized, or with

17   the form 8879.

18        THE COURT:  Why does the government need to have the

19   document?

20        MR. TOSCHER:  Okay.  Because I think that is the

21   procedure, what the accountants are required to file.

22        THE COURT:  Okay.  That wasn't what I was aiming at.

23   But if there's testimony as to the procedure being followed,

24   the absence of the document in evidence -- why is the absence

25   of the document in evidence fatal?

1          MR. TOSCHER:  Your Honor, this electronic filing is

2     sort of new.  I've always been of the view that in order for

3     the government to prove a false subscription they need to prove

4     that it was authorized on their authorized form.  And if there

5     was testimony by Mr. Chinaka that I would have not filed the

6     return without the form, I don't know if that's adequate.  It's

7     not there.

8          THE COURT:  Okay.  But you're not telling me there's

9     some authority saying in the absence of the e-filing document

10    in evidence, that a false -- the filing of a false return count

11    fails.  There's --

12         MR. TOSCHER:  Your Honor, we've looked, and I'm not

13    telling you there is, but we'll continue to look.  But, no,

14    I'm --

15         THE COURT:  Okay.  Thank you.

16         MR. TOSCHER:  Thank you, Your Honor.

17         THE COURT:  I'm denying the Rule 29 motion.  I think

18    that, as in all matters, the jury can consider both direct and

19    circumstantial evidence.  And whether this jury will or will

20    not or should or should not find that the government has

21    prevailed, I cannot say that no jury would find that the

22    government has failed to provide sufficient evidence on which

23    to base a conviction.  So taking that into account -- by "that"

24    I mean the right of the jury to consider circumstantial

25    evidence and draw reasonable inferences from that -- I am

1    denying the motion, and we'll proceed and see what happens.

2         So we can start at 1:15; so we can go and get the

3    jury now.

4         (Jury enters.)

5         THE COURT:  Okay.  Welcome back from lunch.  We're

6    now beginning the defense case.

7         Mr. Toscher, who is your first witness?

8         MR. TOSCHER:  May it please the Court, we would like

9    to call Dr. Lindsey Kimura, please.

10        THE COURT:  Okay.

11        (Witness photographed.)

12        THE CLERK:  Please raise your right hand.

13        (Witness sworn.)

14        THE CLERK:  Thank you.  Please be seated.

15        Please state your name and spell your last name.

16        THE WITNESS:  Lindsey John Kimura, K-i-m-u-r-a.

17                        DIRECT EXAMINATION

18   BY MR. TOSCHER:

19   Q    Could you give us your business address, Dr. Kimura.

20   A    Yes.  98-1247 Ka'ahumanu Street, Suite 215, 'Aiea, Hawai'i

21   96701.

22   Q    You also personally reside in 'Aiea?

23   A    I do.

24   Q    How long have you lived in Hawai'i?

25   A    My whole life, outside of the years of my education on the

1    mainland.

2    Q    You went to high school here?

3    A    Yes.

4    Q    And what school did you go to?

5    A    Kamehameha.

6    Q    I addressed you as Dr. Kimura.   What is your doctor

7    credentials?

8    A    Doctor of Chiropractic.

9    Q    And where did you attend college?

10   A    Started here at the University of Hawai'i at the Honolulu

11   Community College, and then I went on to Washington State

12   University, majoring in chemistry.   I was then accepted into

13   Western States Chiropractic College.

14   Q    Where is Western States Chiropractic College?

15   A    Portland, Oregon.

16   Q    Is that where you received your Doctorate in Chiropractic?

17   A    Yes.

18   Q    Do you hold professional licenses?

19   A    I do.

20   Q    What is that professional license?

21   A    Doctor of Chiropractic in the state of Hawai'i.

22   Q    Any other states?

23   A    No other states.

24   Q    What do you have to do to qualify for that professional

25   license?

1   A   There's a premed curriculum of three years, a minimum of

2   three years, if you complete all your courses within that time.

3   Otherwise, it takes four years.  And then the chiropractic

4   program is a four-year program.

5   Q   And do you have to take a test?

6   A   Yes.  National board exams along the way as you're going

7   through chiropractic college and then the state board exam

8   after completing my education.

9   Q   How long have you been in business licensed as a

10  chiropractor?

11  A   Since may of 1983.

12  Q   All in --

13  A   All in Hawai'i.

14  Q   All in Hawai'i.  Describe, generally, the type of health

15  issues a chiropractor treats.

16  A   Okay.  Obviously, what we do is we work primarily with the

17  spine.  Many of my patients come in with symptoms related to

18  the neck, back, upper back, lower back, pelvis.  But it goes

19  beyond that because the nervous system is housed directly in

20  the spine, and many times with either bad posture or injuries

21  the spine can be misaligned, thereby causing pressure on the

22  nervous system, which is again housed in the spine.

23          Those nerves then travel to different parts and

24  regions of the body.  For example, a condition called sciatica.

25  Sciatica starts in the lower back because the sciatic nerve is

1   in the lower back, and a lower back injury will irritate that

2   region, that nerve, and then pain will be exhibited in the

3   legs.  It can also happen in the upper extremities, the arms.

4   Someone may have a whiplash injury.

5          But it can happen anywhere in the spine.  There are

6   24 vertebrae and corresponding nerves that exit from the spine

7   along each of these 24 vertebrae, causing multiple types of

8   symptoms.  So not specifically just back pain but other

9   symptoms that may relate to a nerve being irritated, or the

10  more common term is pinched nerve.

11  Q    In other words, the nerves run through the spinal cord,

12  and if there's a problem in the spinal cord, it can impact

13  other parts of the body.

14  A    Correct.

15  Q    Now, could you tell the jury how you use or how is massage

16  therapy used in the chiropracty practice?

17  A    Again my specialty is in chiropractic.  I use massage

18  therapists, their specialty being that.

19          Many times after an injury or just what we call

20  repetitive stress injuries, doing same thing over and over

21  again, and even after a traumatic injury, a slip and fall, a

22  lifting injury, an outdoor injury, surfing, football, whatever

23  it might be, it isn't just the nerves that are irritated.  The

24  spine is made up of the nervous system, the vertebrae,

25  cartilage, ligaments, disks, as well as muscles and tendons.

1    And massage therapists are excellent at working on the muscular

2    component of injuries.  I do a good job with the spine, but

3    they do an excellent job with the muscular system.

4    Q    Do you know Mr. Albert Hee?

5    A    I do.

6    Q    Do you recognize Mr. Hee here?

7    A    I do.

8    Q    Now, was Mr. Hee a patient of yours?

9    A    Yes.

10   Q    Now, even prior to the time he was a patient -- and that's

11   what we're going to talk about -- did you know Mr. Hee?

12   A    Yes.

13   Q    And when did you first meet Mr. Hee?

14   A    We went to high school together.

15   Q    Let's forward to the time when -- do you recall when you

16   first started treating him?

17   A    Yes.

18   Q    Will you tell the jury when.

19   A    It was -- I apologize.  It was in the late '80s.  The only

20   reason I have to do that is we had a computer system, and

21   updates didn't always keep records beyond a certain point.  But

22   it was in the late '80s.

23   Q    And for how long a period did you treat Mr. Hee?

24   A    Off and on through 2003.

25   Q    Okay.  Could you describe the nature of the treatments you

1    provided to Mr. Hee.

2    A    Okay.  Basically, what we call a chiropractic adjustment.

3         The diagnostic process is we take an X-ray, and the

4    X-ray will give evidence as to whether there is a misalignment

5    within the spine.  We compare that with what a normal spine

6    would look like.  Many times these misalignments will be in the

7    area that someone is feeling symptoms.  As an example, if they

8    are coming in with leg pain and we take an X-ray, we will often

9    see misalignment in the lower back, which affects the nerve

10   that goes down into the legs.

11   Q    Do you recall the types of medical ailments you were

12   treating Mr. Hee for?

13   A    Well, I wasn't treating him for any medical ailments, but

14   he, obviously, came in for asthma, respiratory distress.  Today

15   they use the term COPD, Chronic Obstructive Pulmonary Disease.

16   So it's related to all of those.

17   Q    You were treating him for those conditions.

18   A    I was treating his spine to help alleviate those

19   conditions, yes.

20   Q    Understood.  I understand the technicality.

21        Did you -- in the course of your treatment of the

22   spine did you ever suggest or prescribe a massage therapy for

23   him?

24   A    Absolutely.

25   Q    And why did you prescribe that for him?

1   A     For someone with respiratory problems, just to breath --

2   most of us breath only at about 30- to 40-percent capacity.

3   And we can sit here, and the muscles just barely work.  We

4   don't breathe very deeply.  As an example, if I may

5   demonstrate, we don't breathe like this (indicating) and exhale

6   like this all day.  We just breathe very shallowly.

7            With someone with a respiratory problem and a

8   misalignment problem, they tend to take deeper breaths all day

9   long, and that causes tremendous stress on the joints, on the

10  nerves, but also the muscles because the muscles are working

11  constantly.  And the muscles that we're dealing with are your

12  diaphragm, which is in your mid torso, all the chest wall

13  muscles which help expand your chest so, when we take a deep

14  breath, your lung capacity is increased because your chest

15  expands.  And the muscles have to do that.  They have to

16  constantly work.

17           And when you have a respiratory type condition,

18  asthma or COPD, they are working overboard, overtime, if you

19  will, just 24/7 whenever you have an attack.  It's a common

20  situation.  And the muscles start to fatigue, like any muscle,

21  and they start to go into what we call muscular spasm.  They

22  can even get to the point where they start to cramp.  Whenever

23  they go into muscular spasm or cramping, you don't have that

24  capacity to inhale as well as exhale.  You start to breathe a

25  lot more shallow.  You start to go through respiratory distress

1    because you're not getting enough oxygen into your tissues.

2    And it causes just an overall chronic breakdown of not just the

3    respiratory site but the rest of the body as well.

4    Q    And I think you testified before you were suggesting

5    massage therapy for his respiratory ailments.

6    A    Absolutely.

7    Q    And what about -- tell us how the -- if you know, how the

8    massage therapy treats the condition you prescribe it for.

9    A    Absolutely.  Well, if I can share an example, if we just

10   squeezed our hand all day long, by the end of the day we would

11   have so much cramping we wouldn't be able to open our hand, we

12   wouldn't be able to move our joints because the muscles just

13   contract and they stay tight.  And it could be anywhere.  It

14   could be if I was squeezing my hand, or it could be in your

15   legs standing all day getting cramps in your calves.

16           For someone with a respiratory problem, those muscles

17   tighten up.  Massage therapy helps to stretch, to elongate the

18   muscle.  It helps to reduce other things that happen.  When a

19   muscle is constantly in spasm, constantly tight, it builds up

20   its own set of toxins called lactic acid.  Massage has a great

21   way of opening the blood vessels to help drain lactic acid.

22   Lactic acid leads to more chronic spasm, more chronic cramping.

23           So massage therapy has many therapeutic effects not

24   only to reduce pain, increasing vascularization, which helps

25   clear the toxins.  It helps the person to just feel looser so

1    they can start to breathe again in this case.

2    Q    Did you observe in treating Mr. Hee that the massage

3    therapy had a positive effect?

4    A    It did, yes, absolutely.

5    Q    What about massage therapy for the treatment of stress?

6    A    Well, stress is also --

7              MR. TONG:  Your Honor, now I object as beyond his

8    area of expertise.  No foundation.

9    BY MR. TOSCHER:

10   Q    Okay.  Let me --

11   A    Okay.

12   Q    Did you observe in treating Mr. Hee that he had stressful

13   type conditions?

14   A    Yes.  And may I define stress.  There's also psychological

15   stress, and then there's a physical stress on the body.

16   Q    Yes.  Define both and tell us what you observed.

17             MR. TONG:  I object to the psychological.  He's not a

18   psychologist, much less a medical doctor.

19             THE COURT:  Sustained.  But he can talk about his

20   treatment, if he did so treat, for physical stress.

21             THE WITNESS:  Well, it's clinically -- thank you.

22             It's clinically known that there are many different

23   types of reflexes.  One of them is what we call a psychosomatic

24   reflex.  I am not a psychologist.  But anytime you're under

25   chronic stress, whether its deadlines, stressful relationships,

1    whatever that might be, there is a reflex, and that reflex
2    generally will attack the soma.   The "soma" means the muscular
3    system.
4            Oftentimes anyone who is under chronic stress will
5    develop headaches.   They may have a reflex from just emotional
6    stress, psychological stress that will then affect the body.
7    It can cause an ulcer.   It can raise your heart rate.   Stress
8    does a lot of different things.
9            When you reduce -- when the stress is high, it
10   obviously causes more muscular contraction.   It causes
11   tightness.   So the massage helps with that component.   It
12   doesn't reduce the stress, but it reduces the effect of stress,
13   helping someone to cope, helping someone to be physically
14   healthier.
15   BY MR. TOSCHER:
16   Q    So just one follow-up question, and you may have said it.
17   You said the massage therapy helps.   Physically, how does it
18   help?
19   A    Again, it helps to reduce the muscular spasm.   It helps to
20   stretch the muscle, helps vascularization, improving blood
21   flow, it helps in removing toxins, just to name a few.
22   Q    Your observation in treating Mr. Hee, the massage therapy
23   that you prescribed was of assistance to him?
24   A    Yes.
25   Q    What were the manifestations of that?   How did it improve

1    it in terms of his breathing or whatever items -- the

2    conditions you were treating.

3    A    Posture improvements.  When you're constantly tight, you

4    tend to hunch.  It helps him to open up.  That helps with the

5    breathing.  Pain and discomfort.  A lot of times muscles that

6    are chronically tight just give off pain just because of the

7    lactic acid build-up.  Flexibility improves.  Your ability to

8    rest and sleep instead of constantly being sore all the time.

9    It just has a general wellness effect in all aspects of life.

10           MR. TOSCHER:  I have no further questions, Your

11   Honor.

12           THE COURT:  Okay.

13                     CROSS-EXAMINATION

14   BY MR. TONG:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    Dr. Kimura, you're called doctor because you have a degree

18   in chiropractic; is that correct?

19   A    Yes.

20   Q    And you said that you went through some premed training;

21   is that correct?

22   A    Correct.

23   Q    I think you mentioned a whole bunch of medical conditions.

24   Asthma; correct?

25   A    Yes.

1    Q    Chronic Obstructive Pulmonary Disease; correct?

2    A    Correct.

3    Q    Ulcers?

4    A    Yes.

5    Q    Heart rates?

6    A    Yes.

7    Q    And you don't directly treat those conditions as a

8    chiropractor, do you.

9    A    Not at all.

10   Q    So you're telling the jury about conditions that you don't

11   directly treat; correct?

12   A    Correct.

13   Q    And, in fact, I think you drew the distinction by

14   correcting Mr. Toscher in saying "I didn't deal with the

15   medical ailments"; correct?

16   A    Correct.

17   Q    I'm just trying to get some clarity here because a

18   chiropractor really works primarily on the spine, the muscles,

19   and the joints; is that correct?

20   A    Correct.

21   Q    And I believe you used the term "misalignment of the

22   spine"; correct?

23   A    Correct.

24   Q    And I'm going to put it in lay terms, but as I understand

25   it, that would mean you look at whether the spine is correctly

1   aligned so that there's blood flow to the extremities; correct?

2   A    Nerve flow, blood flow, other things.

3   Q    And if there's a misalignment, you, as a chiropractor,

4   might do what we call adjustments; correct?

5   A    Correct.

6   Q    Some people even call it cracking the back; correct?

7   A    "Cracking" means to break.

8   Q    Well, hopefully, you adjust but not break; is that fair?

9   A    Yes.

10   Q    And the idea is really to put it in proper alignment;

11   correct?

12   A    Yes.

13   Q    And allow the spaces between the vertebra -- those are

14   called --

15   A    Disks.

16   Q    -- disks, the sort of shock absorbers in the spine;

17   correct?

18   A    Correct.

19   Q    To have more space; correct?

20   A    They help to give more space to the nerves.

21   Q    So we're clear, I want to see the distinction between a

22   medical doctor and a chiropractic doctor.  A chiropractic

23   doctor does the adjustments; correct?

24   A    Correct.

25   Q    Now, there are medical doctors that work on the same areas

1    of the body, are there not?

2    A    Yes.

3    Q    For example, if you had a bone problem, you would go to a

4    medical doctor called an orthopedic surgeon; correct?

5    A    Correct.

6    Q    If you had a nerve problem, you might go to a medical

7    doctor who was a neurologist; correct?

8    A    Correct.

9    Q    If you had problems with other areas of your body, such as

10   asthma, you might go to a medical doctor who treats asthma

11   specifically; correct?

12   A    Correct.

13   Q    So the chiropractor does not purport to do everything with

14   regard to those conditions; is that correct?

15   A    Not at all.

16   Q    Chiropractors also sometimes run into conditions that they

17   can't treat directly; correct?

18   A    Yes.

19   Q    And you don't, as a course of your practice, prescribe

20   medication; is that correct?

21   A    Correct.

22   Q    And you would need a medical doctor's license to do that.

23   A    Yes.

24   Q    Okay.  And the treatment you were talking about was,

25   basically, for the conditions you referenced; namely, the

1    misalignment of the spine; is that correct?

2    A    Correct.  And the muscular spasm and the other things that

3    are aligned with the misalignments.  So we treat what's called

4    neuromusculoskeletal conditions, meaning nerve, muscle, and

5    joint problems.

6    Q    Fair enough, in the manner that we've been discussing.

7    A    Yes.

8    Q    And chiropractors can become participating providers with

9    some health plans; is that correct?

10   A    Correct.

11   Q    That's sort of a mouthful, but that means, if you have

12   health insurance coverage, the insurance company may pay a

13   provider to give a service; correct?

14   A    Correct.

15   Q    So you would see a patient, and your insurance company --

16   the patient's insurance company would pay you as a provider;

17   correct?

18   A    Correct.

19   Q    And that's not generally the case with massage therapists;

20   is it.

21   A    No.

22   Q    In fact, when you have to pay for massage therapy,

23   normally the patient pays out of his own pocket; correct?

24   A    There are some plans that do cover, but as a rule, yes.

25   Q    In general, they do not; is that correct?

1    A    Yes.

2    Q    You say that -- would you describe yourself as a friend of

3    Mr. Hee's?

4    A    Absolutely.

5    Q    You haven't treated him professionally since 2003, though;

6    is that correct?

7    A    Yes.

8              MR. TONG:  Thank you.  I have nothing further.

9              MR. TOSCHER:  No further questions, Your Honor.

10             THE COURT:  Okay.  Then the witness is excused and

11   may step down and leave the courtroom.

12             Who is the next witness?

13             MR. TOSCHER:  We're calling Mr. James Ventura.

14        (Witness photographed.)

15             THE CLERK:  Please raise your right hand.

16        (Witness sworn.)

17             THE CLERK:  Thank you.  Please be seated.

18             Please state your name and spell your last name.

19             THE WITNESS:  My name is James -- excuse me.

20   Ventura, V-e-n-t-u-r-a.

21                    <u>DIRECT EXAMINATION</u>

22   BY MR. TOSCHER:

23   Q    Good afternoon, Mr. Ventura.  Could you give us your

24   business address.

25   A    I don't have a business address.  I'm retired.

 1   Q    Okay.  Do you live in Hawai'i?

 2   A    Yes.  I live in Kailua, 421 --

 3              THE COURT:  Oh, no, wait.  We have a rule not to put

 4   people's home addresses.

 5              THE WITNESS:  Oh, okay.

 6              MR. TOSCHER:  So -- thanks.

 7              THE WITNESS:  I live in Kailua.

 8   BY MR. TOSCHER:

 9   Q    Okay.  Close enough.  And you said you were retired?

10   A    Yes.

11   Q    And when did you retire, sir?

12   A    Actually, I retired -- I was a lawyer.  I retired in 1990.

13   And then I was Of Counsel for a couple years.  And then after

14   that I tried cases for another three years.  And since 1996 I

15   have not represented anybody, but I have done mediation and

16   arbitration.  And in the last couple of years, I play golf,

17   tennis, and go swimming, which is pretty much all I do.

18   Q    Okay.  That constitutes -- I'm going to ask you a few

19   background questions.  Where did you grow up?

20   A    I grew up on Kauai.

21   Q    And were you born in Hawai'i?

22   A    Yes, born on Kauai.

23   Q    And where did you go to high school, sir?

24   A    I went to the high school at St. Stephens Seminary in

25   Honolulu for four years of high school and one year of college.

1    Q    Okay.  And where did you attend college?

2    A    I attended my second year of college at Chaminade

3    University, and my third year of college at the University of

4    San Francisco.

5    Q    Did you graduate from the University of San Francisco?

6    A    No, I did not.

7    Q    Where did you graduate from?

8    A    Finally, I graduated from the University of San Francisco

9    Law School.  They admitted me into law school after three years

10   of college because I had a lot of different credits that we

11   took in the seminary.

12   Q    Okay.  So you did receive a law degree from the University

13   of --

14   A    I finally got a law degree, yes.  That was my first

15   degree.

16   Q    Okay.  The -- talking a little bit about -- we started the

17   more recent years.  After you got your law degree, did you

18   become a lawyer?

19   A    Yes.  In 1964 I graduated from the University of San

20   Francisco Law School, came back to Hawai'i, spent time on

21   Kauai, studying for the bar.  And in October of 1964 I passed

22   the Hawai'i State Bar.

23   Q    Okay.  And then did you go to work as a lawyer?

24   A    Yes.  And about September of 1964 I was a clerk in the

25   Supreme Court for Justice Rhoda Lewis.  She was a Supreme Court

1    Justice.

2    Q    That's in the State of Hawai'i?

3    A    Yes.

4    Q    And after you left that position, what did you do?

5    A    In 1965, approximately June, I applied for and received a

6    position in the United States Attorney's Office in Honolulu

7    where these guys -- (indicating).  And I remained as Assistant

8    United States Attorney for three years.  There were only three

9    of us:  Herman Lum was the U.S. Attorney, Yoshimi Hayashi was

10   the First Assistant, and myself.

11   Q    Okay.

12   A    So Herman Lum became a judge and finally a Chief Justice

13   of the Hawai'i Supreme Court.  Hayashi became the U.S.

14   Attorney.  And I tried for a year and a half -- I tried all the

15   cases that the U.S. Attorney tried in federal court in Hawai'i.

16   Q    In Hawai'i.  And did you say you were with the U.S.

17   Attorney's Office for three years?

18   A    Three years.  I was the First Assistant for a year and a

19   half, the only assistant.  And then in 1968 -- May 1968 I left

20   to go to the law firm of Ronald Libkuman and Shimabukuro.

21   Q    Okay.  And can you tell us what the nature of your

22   practice was from the time you went into private practice, I

23   guess, until the time you were going to retire?

24   A    Yes.  We were, basically, insurance defense.  So if you

25   got in an automobile accident, your insurance company would

1    provide an attorney for you, and we were the attorneys that you

2    would provide.

3            I did other things, like products liability.  I

4    represented Ford or Jeep or General Motors anytime they were

5    sued in the State of Hawai'i for product defects, things like

6    that.  I did some medical malpractice defense, some architects

7    defense.  But I did most -- in the last couple years of my

8    practice, in the last 20 years, I did most of the legal

9    malpractice defense in the State of Hawai'i.  In other words,

10   if attorneys got sued, I would -- for their insurance company I

11   would represent them.

12           I also did aircraft litigation.  Do you remember when

13   the Aloha Airlines, the roof of the plane came off?  I was

14   appointed by Boeing and Aloha Airlines to defend them, which,

15   basically, involved settling all the cases.

16   Q    Are you a member of the Hawai'i State Bar?

17   A    Yes.  Well, yes, I've been a member for many years, but

18   since I turned 70, I have gone inactive.  So I am an inactive

19   member of the Hawai'i State Bar.

20   Q    When you were practicing, were you active in the state

21   bar?

22   A    Yes.  In -- I was on the disciplinary counsel as the vice

23   chairman, or whatever you call it, for about 10 years.  And in

24   1981 I was the Hawai'i State Bar President in the State of

25   Hawai'i.

1    Q    Okay.  And what were your duties?

2    A    As the President?

3    Q    Yes, sir.

4    A    To run the bar for one year.

5    Q    Okay.  Do you know Mr. Albert Hee?

6    A    Yes.

7    Q    Can you recognize him?

8    A    Oh, yes, certainly.  (Indicating.)  Yes.

9    Q    Can you tell us when you first met Mr. Hee?

10   A    I think I met Mr. Hee -- although, I had talked to him on

11   the phone previously.  But the first person-to-person meeting

12   was in about May of 2008.

13   Q    Okay.  And what were the circumstances of your meeting

14   him?

15   A    I'm sorry.  I have to give some background.  Can I --

16   Q    Yes.  You can.

17   A    Okay.  In about 2006 -- about the summer of 2006, I belong

18   to the Kailua Racket Club, and a whole bunch of us from Kailua,

19   we got into an investment called Antara.  And that involved an

20   investment in which -- the company of Antara had heavy ties to

21   Japan, and there were a lot of Japanese investors, and they had

22   a few local investors.  Antara was a company that had entered

23   into a joint venture with Toshiba to use a Toshiba patent for

24   the -- and I'm sorry, I have a liberal education.  I don't know

25   much about science.  But it was to do electrochemical detection

1    of substances.

2            Let me give you an example to make it easy, which

3    where we went finally.  If you get a piece of powder and you

4    want to find out if anthrax is in there, you would use this

5    system that Antara had developed.  They had a machine, and they

6    were using the Toshiba patents.  So they would use that to

7    determine what was in this powder and how much of it was in

8    there.  And that would apply to DNA, and the projection was for

9    cancer detection.  One of the members on the board was from

10   Japan.  In Japan it makes a difference what sort of chicken you

11   have.  And so this could detect the DNA of the chicken to find

12   out if it's the more expensive chicken or the cheaper

13   chicken.

14           THE COURT:  I'm so sorry.  Can I ask you to spell

15   Antara.

16           THE WITNESS:  Antara is A-n-t-a-r-a.

17           THE COURT:  Thank you.

18           THE WITNESS:  So we invested in that because we

19   thought we would kind of be on the ground floor, and we

20   thought -- a whole bunch of us and my friends and myself.  And

21   we thought this was going to be a great investment.  That

22   Toshiba was involved, and so we figured it was great.

23           The CEO of Antara was an attorney by the name of Mark

24   Labgold, L-a-b-g-o-l-d.  Mark Labgold had been a patent

25   litigation attorney at Patton Boggs, P-a-t-t-o-n, Boggs -- I'm

1    sorry, I talk too fast, B-o-g-g-s, in Washington D.C.  And he

2    had left Patton Boggs to become the CEO of Antara.  And in

3    fact, he had negotiated the joint venture agreement with

4    Toshiba.  So there were, I don't know, maybe about a hundred

5    Hawai'i investors.  A lot of them put in small amounts.  They

6    were friends of Danny Lee and his son Toby Lee, who had been

7    involved with Antara with the prior, and he had died in a

8    tragedy accident.

9          So I invested $212,000, or maybe it was $212,500,

10   something like that, in Antara.  And the projection was that

11   Antara was going to be a short-term investment.  That it was

12   going to be sold -- since it had such great technology, it was

13   going to be sold, and it was going to turn over three or four

14   times in a year or so, at least we thought that when we went

15   into it.  So that was in about September of 2006 that we went

16   into that.

17         There were very rosy meetings -- oh, Antara had their

18   main offices and lab at Menlo Park, California.  And they had

19   chemists and all the other guys that you need to run one of

20   these things.  And Mark Labgold had a biology degree and a

21   chemistry degree, and he was a very successful Washington D.C.

22   attorney.  He was making like three million bucks a year as an

23   attorney there.  And he had been involved in the patent field

24   for a long time.  Now, what was really important was they were

25   able to buy up Toshiba's patent, and they developed their own

1    patents in the laboratory up in Menlo Park.  So we got many

2    rosy reports throughout the rest of 2006.

3            And starting in 2007, about February or March, they

4    started to talk about a sale of Antara.  And at around May of

5    2007 we were told, yes, there had been a sale, and we were

6    going to have a big meeting.  Now, I was away for about a month

7    in June of 2007, and in July of 2007 I became aware that since

8    Antara had been sold they now had newer and better technology,

9    a technology that was not based on the Toshiba patent or under

10   the other RFID.  RFID is like you go to Safeway, the bars, you

11   read the bars on the thing.  It was not based on that.  It was

12   based on this novel patent that they had to detect

13   electrical -- electrochemical detection of DNA and anthrax or

14   whatever.  And I became interested in that.  And what I liked

15   about that, it was a Delaware corporation, and you didn't have

16   all the Japanese investors involved.

17           MR. TONG:  Mr. Ventura, I'm sorry.

18           Your Honor, I've always enjoyed hearing Mr. Ventura

19   talk, but this is really a narrative at this point

20           THE COURT:  Yes.  Yes  Very interesting.

21           Okay.  So I'm --

22           MR. TOSCHER:  Okay.  And I appreciate that.  I didn't

23   want to be rude and interrupt.

24           THE WITNESS:  I have to give the background to get to

25   Siometrix.

```
 1              THE COURT:  He's going to, I think, ask a question.
 2              THE WITNESS:  Sure.
 3    BY MR. TOSCHER:
 4    Q    So I appreciate, Mr. Ventura.  Can you sort of summarize
 5    the background and tell us what is -- how does this get us to
 6    Siometrix or --
 7    A    So we came to Siometrix, and it was just going to be a
 8    limited amount of investors.  You didn't have all these other
 9    investors.  So Mark Labgold was the chief, the CEO, and the
10    same lab was going to be involved and --
11    Q    Just so we're clear, there was a change in the pool of
12    investors, and the technology went into a company by the name
13    of Siometrix?
14    A    Yes.  Purportedly Antara had been sold to MBH.  Now, they
15    wouldn't -- they said for confidential purposes they couldn't
16    tell us who MBH was, but they let drop that M stood for Mitsui
17    in Japan; so that's Mitsui Bank.
18              So this looked like a great opportunity to invest
19    in., And it was at this occasion when I checked it out, I did
20    my due diligence, investigated it, I met with Mark Labgold.
21    And I had -- I talked to him on the phone previously, but I
22    hadn't met him.  So I met him and I, you know, talked about the
23    investment.  And we thought we were going to get all this money
24    from the sale of MBH.
25              So at that point I found out that Al Hee or his
```

```
 1   company was investing in MBH -- excuse me.  Strike that.  In
 2   Siometrix.  And Al had put up 500,000, had put up another
 3   million, and he was a big investor.  So I talked to -- we have
 4   many acquaintances.  Honolulu is a small town.  You know pretty
 5   much who the businessmen are and everything, and you know who
 6   you can trust and not trust.  So I called Al because, you know,
 7   I didn't know -- I didn't know Mark Labgold that well, but I
 8   knew Al Hee, and Al's former --
 9   Q    I don't me to interrupt you.  Just so I understand.  You
10   were an investor in Siometrix?
11   A    I was going to be.
12   Q    You were going to be.  And at that time Mr. Hee and/or his
13   companies were an investor.
14   A    Yes.
15   Q    Okay.  Go ahead.
16   A    That was the attraction because I knew that Al was an
17   electrical engineer or something.  He was a very successful
18   businessman.  So I said, Let me talk to Al.  And I talked to
19   him on the phone.  And talked to him about it, and it seemed
20   great.  The projections worked at that time.
21          We had supposedly sold Antara for so much money that
22   I figured, you know, this is great.  Now we have an even better
23   one.  It could detect lower amounts of a substance,
24   substantially lower than anybody else on the market.  And its
25   accuracy was better than the rest of them.
```

1        So the talk was, if I put in this money, I could get

2   maybe an 8, 10 percent share of Siometrix, that with the

3   rollover, which I don't know if I want to explain that.   But

4   any event, so I invested -- after talking to Al and everything

5   I invested 300,000 of my money in July, and then in September I

6   put in another 200,000.   And around there I also put in

7   250,000.   I had an irrevocable trust for my kids.   I have five

8   kids.   So I invested another 250,000.   So all together,

9   whatever.

10  Q    And this is -- you refer to July.   This is 2007?

11  A    2007, July and September of that.

12        Now, the sale to MBH, what they told us was, look, if

13  you -- you can get at least what -- your money back that you

14  put in and up to three times as much.   Or what you can do, you

15  can rollover your investment in MBH -- Antara to Siometrix so

16  that you will have a greater interest in Siometrix based on how

17  much you rolled over.   So my 212,500 was rolled over.   And the

18  idea was the money that MBH paid for my shares, since I was

19  getting an interest in Siometrix, was going to be used in

20  Siometrix to develop the product.

21        There also was talk that they had a $1 million

22  contract or nearly got a $1 million contract with a Korean

23  cosmetic company that, apparently, can -- this device or this

24  patent, they could determine exactly what your skin spores were

25  like so that in these very expensive Korean spas where they

1    would spend a hundred thousand a month or something like, that

2    they could tailor the treatment exactly to your skin

3    composition.  So those were the projections that were going in.

4    Q    Okay.  That device you mentioned or the detection on the

5    spores, that was being developed by Siometrix?

6    A    Well, our technology could be used to do that.

7    Q    Could be used to do that.

8    A    Now, that never came through finally, but that was the

9    talk at the time.  At the time, based on Mark Labgold, who had

10   had a lot of experience in patent litigation, represented a lot

11   of companies, was talking of a valuation of 75 to $100 million

12   for the company.

13   Q    And when you say "the company," you mean --

14   A    Siometrix.

15   Q    Siometrix.  Did you have any official position with

16   Siometrix?

17   A    At first, no.  The different investors in Siometrix were

18   Prestige Capital, were the rollover people.  Other than that

19   the people who put new money into Siometrix -- I guess I put

20   the most of the new investors.  And so Mark Labgold asked me to

21   be the managing partner of a limited liability partnership, I

22   think it was, through which they invested.  In other words,

23   Sunset Plaza.  That was how I put my money in.

24        So that included all the people, except one or two

25   other small investors that Mark Labgold knew personally.  And

1    the other big investor was Black Ivory, which I think was Al's

2    company or -- I don't know exactly what name his company came

3    in.  So at that time in September 2007 the only position I had

4    with Siometrix was I was a managing partner for Sunset Plaza to

5    handle our investment.  Al's investments were separate.  They

6    weren't part of Sunset Plaza.

7    Q    Understood.  Do you know -- did you know what the

8    magnitude of Mr. Hee's company investments were in Siometrix?

9    A    Yes.

10   Q    And how much was it; do you know?

11   A    Mr. Hee invested 500,000, like I said, early on and then a

12   million early on.  And then at about the beginning of the year,

13   I guess, he committed to a $2 million investment.  But I should

14   explain.

15   Q    Please.

16           MR. TONG:  Your Honor, it's a narrative at this

17   point.

18   BY MR. TOSCHER:

19   Q    Okay.  Beginning of the year 2008 you testified that he

20   committed to putting in, I think, $2 million.  What was the

21   circumstance that he was going to put in the $2 million?  How

22   did that come about?

23   A    He committed to put in the two million, which was paid

24   250,000 a month.  One million was attributed for the exclusive

25   rights to any Department of Defense use of this technology.

```
 1   The second million was exclusive rights to the Homeland

 2   Security use of this thing where -- that's where the anthrax

 3   really came in.  So Al Hee -- oh.

 4   Q    Go ahead.

 5   A    I'm volunteering.

 6   Q    I don't want to cut you off.  Go ahead.

 7   A    Al Hee, his company, BlackBerry, had a grant from -- it

 8   was either Department of Defense or Homeland Security to do

 9   testing on our patent, on our technology.  And because of that

10   he got the exclusive for Department of Defense and Homeland

11   Security.

12   Q    So let me focus you on the beginning of 2008.  You

13   testified about the commitment that Mr. Hee's company was going

14   to make into Siometrix.  Can you tell us what the status --

15   what was the status of the company at that time, Siometrix?

16   Where were they located?

17   A    Siometrix was at the same laboratory -- because they

18   bought all of the equipment from Antara -- at the same

19   laboratory as in Menlo Park they were located.

20   Q    Okay.  And can you just -- have you been to the

21   laboratory?

22   A    Yes.

23   Q    Could you describe it for us, please.

24   A    There were a lot of people walking around.  We had

25   mechanical engineers, electrical engineers, a whole bunch of
```

1    chemists, biologists.  It was -- I don't know about square

2    footage -- about the size of a football field.

3    Q    Was it a -- sorry.

4    A    There were different divisions, and they had all sorts of

5    computer equipment.  And they were -- see, the way this thing

6    works is the technology works through a box.  They were

7    developing a box that they could take out in the field for the

8    very fast discovery of what was in anything, any chemical, any

9    powder or substance that you wanted to check.

10   Q    Okay.

11   A    That's what they were doing.

12   Q    To clarify that a little bit, you said to put in a box.

13   Was what Siometrix was working on was a more portable detection

14   device?

15   A    Yes.

16   Q    And what type of detection devices -- how was things like

17   anthrax otherwise being detected at that time in 2008?

18   A    Well, the standard is ELISA.  I think that's what it is.

19   E-L-I-S-A.  And that's a laboratory testing, which is very

20   reliable, which takes some time to do.  You know, if you've got

21   live anthrax spores, it took longer to do it.

22         Now, we weren't working with live anthrax spores

23   because that wasn't allowed at the time.  Later on we did.

24   Q    Right.

25   A    But this one was supposed to be -- we could detect to much

```
 1    lower limits, more than 10 or 20 times lower than -- maybe it's
 2    a hundred -- I never knew my math -- than the ELISA.  And it
 3    had some benefits that the other systems of detection did not,
 4    and one of them was speed.
 5    Q    "Speed" you said?
 6    A    Speed.
 7    Q    And portability?
 8    A    Portability, hopefully.
 9    Q    Understood.  Did you ever visit the lab with Mr. Hee?
10    A    Not with Mr. Hee.  I went up there -- after making my
11    investment, I went up in November of 2007.  My daughter
12    lives -- my daughter went to Santa Clara.  My daughter lives in
13    San Jose.  She got a master's from San Jose State.  So I was
14    going up to San Jose on a very frequent basis, and one of
15    those, at Thanksgiving at 2007, I went up and took a look at
16    the laboratory.
17    Q    Do you know whether Mr. Hee ever went up and looked at the
18    laboratory?
19    A    I'm sure he did.  Much more than I did, but I didn't go
20    with him.  The other time I went was in January of 2009.  We
21    had a board meeting.  In May of 2008 I became on the board with
22    Al Hee.
23    Q    The board of --
24    A    The board of Siometrix.  Excuse me.
25    Q    And --
```

1    A     And we went to the board meeting.

2             Your Honor, could I just pour some water, please?

3             THE COURT:  Of course.  Water is there and feel free.

4    Yes.

5             THE WITNESS:  Usually, I'm on the other side.

6             THE COURT:  I know.  We're very conscious of that

7    here.

8    BY MR. TOSCHER:

9    Q     Did you get a drink, Mr. Ventura?

10            Okay.  We were focusing on May 2008, a Siometrix

11   board meeting.  Let me ask you a question.  Mr. Hee was a

12   member of the board?

13   A     Mr. Hee and I became members of the board on May of 2008.

14   Q     Okay.

15   A     There were five members:  Mark Labgold; Mark Sandground,

16   who was his friend from Virginia; Hiroshi Mizushima, who was a

17   chemist from Japan that I mentioned earlier; Patrick Chun, a

18   local guy from Kailua; and Randy Ho.  They were the directors.

19   And in May of 2008 Al and I replaced Pat Chun and Randy Ho as

20   directors.

21   Q     And where was that board meeting?

22   A     That board meeting was in Honolulu.

23   Q     Okay.  The -- and could you --

24   A     I think it was at Al Hee's office, by the way.

25   Q     Could you describe for us what the outlook was for the

1    business at that time, what the plans were for the next ensuing

2    years?

3    A    In May it was excellent.  We were -- we had never gotten

4    any money from MBH, which is another story.  I don't know if I

5    can tell it.  Because there was no MBH.  It turned out to be a

6    fraud:  the sale to MBH.

7              So there was never any money that came in; so we lost

8    that operating money.  So in May of 2008 the money that had

9    been invested was about -- under my group was about two

10   million.  And we had Al's two -- 3-5 million.  He paid

11   something else for some -- some of the patents, which is

12   another subject.  But, actually, I think what he invested in --

13   and don't hold me to it -- but what he invested in Siometrix

14   was about three and a half million as of that point.

15   Q    So May of 2008.

16   A    May of 2008.  We could tell we were running low on money

17   already because Mark Labgold was taking 50 thousand a month as

18   his salary, which the prior directors had agreed to.  And Al

19   and I were trying to establish some common sense into this

20   thing.

21             And so it was looking good until then.  They were

22   looking for an investor and venture capitalist investors.  And

23   as you know, in May of 2008 the recession hadn't hit yet, which

24   I'm going to kill the story.  That's what happened to us

25   eventually.  By October of 2008 the recession came up, and you

1    couldn't get investors.  But in May of 2008 things looked good,

2    I thought, until I became on the board of directors.  And being

3    an old trial attorney and on the disciplinary counsel and

4    everything, I raised a lot of questions with Mark Labgold, and

5    I think I asked him some questions maybe I shouldn't have

6    asked, but I was -- became very skeptical of the MBH.  I began

7    to think there's a fraud going on here, something like that.

8              So from May to October Al and I were actively

9    involved.

10   Q    Okay.  And what happened after October of 2008 or up

11   until -- what were the events in 2009, if you recall them?

12   A    Well, in October of 2008 Mark Labgold reported at the

13   meeting, which was, I think, at Al Hee's office, too.  The

14   October 2008 board meeting of Siometrix he reported that, you

15   know, they were running out of money, he had some real good

16   prospects to sell an interest in the technology to, but they

17   were running out of money; so they were cutting back on the

18   employees.  We cut his salary way back.  And he was going to go

19   out for a loan because he felt that, if he could have a million

20   dollars to go from -- to carry him six months, that he could

21   close the deal with these investors that were supposedly very

22   close.

23             So at this meeting Al and I said, we tell you what,

24   we will put up the million dollars between us, but we want as

25   security the patents, the intellectual property.  So I put up

1   500,000 and Al put up 500,000.  Now, I put up mine through 300

2   personally and 200 through the -- my trust, and I don't know

3   how Al put his 500 up, but we formed a company called Red

4   Ivory.  Al seems to like ivory in his companies.  And since his

5   attorney was doing the work, you know, we just took his

6   company's name.  We then loaned the one million dollars to

7   Siometrix and took, as security, the patent.

8           Well, all of the deals fell through; so, eventually,

9   in May Al and I became the owners of the patent, and Siometrix

10  was closed up.

11  Q     In May of what year?

12  A     May of 2009.

13  Q     Okay.

14  A     In January -- I think this is important to know.  In

15  January of 2000 and -- I'm Portuguese.  I talk with my hands.

16  January of 2009 I went up to the board meeting, which was held

17  at the lab in Menlo Park.  At that meeting -- before that

18  meeting I wrote a letter -- I wrote several bad letters.  But I

19  wrote one strong letter to Mark Labgold saying that I demanded

20  to have a copy of the sale to MBH given to me at that meeting.

21  Supposedly that had been sealed.  He gave it to me at that

22  meeting.  I read it.  And first thing I put in the minutes was

23  we are going to file suit against MBH immediately because all

24  of this money that was supposed to be invested is not being

25  invested.

1            We came home and we got an attorney to prepare a
2    demand letter, and they sent it out, and lo and behold when we
3    came to the end, which I never noticed before, the end of the
4    letter the address for MBH was in Shanghai.  Upon some
5    investigation we found out it was a housing area in Shanghai.
6    No one could find MBH.

7            That being the case, there was no money coming in
8    from MBH.  We finally went through the million dollars, and so
9    we closed up Siometrix.  We didn't close it up right away
10   because Al had a grant that I talked to you about from the
11   Department of Defense to do an independent study.  All studies
12   of this technology had been done in-house.  This was even done
13   in-house by Siometrix.  They did an independent -- supposedly
14   independent study, and then that was it.  Closed them up after
15   that.

16           And Al then started -- at that point in 2009 or 2010,
17   Al had a further grant from the Department of Defense, Al's
18   company, for $2.4 million to do -- develop this technology and
19   to do independent study.  And that's been going on.  It just
20   finished recently.  So that's what's going on.

21           Red Ivory owns the patents and the intellectual
22   property.  That's Al and I.  Al has exclusives, you know,
23   Department of Defense, and we've gone through that grant.  And
24   we've had an independent study out of North Carolina that
25   proved the technology.

1  Q    That's what I was going to ask you about.  What is the

2  state of the technology and the marketing of the product?

3  A    We haven't gotten to marketing.  We just finished the

4  proof that the technology works.  There's some bugs in it, but

5  we've closed up the lab because, you know, there's no more

6  money right now.

7  Q    Okay.  When you would fly up to visit the lab, where did

8  you fly into, sir?

9  A    As I told you, my daughter lives in San Jose so I would

10 fly to San Jose.  It's about -- I went to University of San

11 Francisco; so I know the whole area like my hand.  It's about

12 30, 40 minutes from San Jose airport, where my daughter lived,

13 to Menlo Park.

14 Q    And how -- you mentioned Santa Clara University.  How

15 close is it to Santa Clara University?

16 A    What is?

17 Q    San Jose airport?

18 A    15 minutes.

19          MR. TOSCHER:  Okay.  All right.  I have no further

20 questions, Your Honor.

21          THE COURT:  Okay.

22                    CROSS-EXAMINATION

23 BY MR. TONG:

24 Q    Good afternoon, Mr. Ventura.

25 A    Good afternoon, Mr. Tong.

1    Q    Long time no see.

2    A    That's right.

3    Q    You know, you look more relaxed now than 10 years ago.

4    A    I've been retired over 20 years.

5    Q    Well, maybe it was 20 years.

6    A    Yes, I am.

7    Q    Congratulations.  We all aspire to that.

8    A    Thank you.

9    Q    I just want to see if I can get a couple of things.

10        First off, on Santa Clara and San Jose airport, you

11   went to Santa Clara University; right?

12   A    No.  I went University of San Francisco.

13   Q    Your daughter went to Santa Clara University; right?

14   A    My daughter went.

15   Q    Actually, at one point when you stand by the football

16   stadium at Santa Clara University, you can see the airport next

17   door; right?

18   A    Yeah.

19   Q    So it's next door to the University.

20   A    Remember the highway came right through Santa Clara

21   University?

22   Q    Right.

23   A    It's actually closer than 15 minutes.

24   Q    That's my point.  I was doing my Portuguese version of

25   getting at it as you used it.

1    A      I appreciate that, sir.

2    Q      Always try to emulate you.

3           So let me see if I can get the story straight.  You

4    invested in Siometrix; is that correct?

5    A      Yes, sir.

6    Q      And after that the investment didn't go quite the way that

7    you wanted it to go; is that correct?

8    A      You can say that again.

9    Q      In fact, you thought you had been defrauded; correct?

10   A      I know I had been defrauded.  Twice.  In Antara because

11   Toshiba had canceled out of this agreement before they even

12   came to us, and the MBH was a ploy to get us to invest in

13   Siometrix.  We still think Siometrix was good, but, yes, I had

14   been defrauded, and I had an attorney.  And I would have sued

15   them, except there was nobody to collect money from.

16   Q      And you put more money into the company trying to save it;

17   is that correct?

18   A      Well, we put more money into Red Ivory, yes, but we took

19   as security the intellectual property because we still believed

20   it was a worthwhile thing.

21   Q      And, ultimately, that company Siometrix has not turned a

22   profit; is that correct?

23   A      Siometrix was dissolved.  In fact, I'm the trustee in

24   dissolution.

25   Q      So it didn't make any money.

1   A    No.

2                MR. TONG:  Thank you.  I have nothing more.

3                MR. TOSCHER:  Nothing further, Your Honor.

4                THE COURT:  Okay.  Thank you very much, Mr. Ventura.

5   You are excused, and you may leave the courtroom.  Thank you.

6                THE WITNESS:  Thank you.

7          (Witness excused.)

8                THE COURT:  And, Mr. Toscher, could I ask who your

9   next witness is?

10               MR. TOSCHER:  Ho'o Hee.

11               THE COURT:  So, ladies and gentlemen, you can tell

12   that the witness that you just heard from is very comfortable

13   in a courtroom.

14               Come on up.  Yes, we already took your photo.  The

15   jurors have seen this witness before, and you are still under

16   oath.  Okay?  So the same oath applies.

17          (Previously sworn.)

18               MR. TOSCHER:  Your Honor, may I hand some exhibits I

19   previously --

20               THE COURT:  Yes.

21               MR. TOSCHER:  May I approach the witness, Your Honor?

22               THE COURT:  Yes.

23               MR. TOSCHER:  May it please the Court.  Ladies and

24   gentlemen of the jury.

25               THE COURT:  Okay.

1                          DIRECT EXAMINATION

2    BY MR. TOSCHER:

3    Q    Miss Hee, good afternoon.

4    A    Good afternoon.

5    Q    Welcome back.

6    A    Thank you.

7    Q    Yesterday we were talking about trips you had taken while

8    you were on the East Coast, trips with your father while you

9    were either attending MIT or the Rhode Island School of Design.

10   And I want to ask you a little bit about some of those trips

11   today.

12         Now, I think we testified or you testified yesterday

13   regarding a Connecticut trip but during the course when you

14   were at school, did you attend trips with your father to

15   Washington, D.C.?

16   A    Yes, I did.

17   Q    Okay.  Could you tell the jury what you did on those

18   trips.

19   A    On those trips we would go down to visit the FCC, to visit

20   the senators at the time, Inouye and Akaka, at their offices.

21   We'd also meet with different lobbyists and lawyers.

22   Q    Tell us how -- why would you be meeting with the FCC?

23         MR. TONG:  Objection, Your Honor.  That calls for a

24   hearsay response.

25         THE COURT:  Sustained.  You can ask what happened or

1    something else but not the particular question.

2    BY MR. TOSCHER:

3    Q     Tell us about meetings you had with the FCC, what you

4    observed.

5    A     The FCC, it stands for the Federal Communications

6    Commission.  And so they regulate Waimana -- or Sandwich Isles,

7    and so we would go and discuss the program that Sandwich Isles

8    is in and makes it possible for us to provide services to these

9    areas that would be uneconomical otherwise.  And the program is

10   the Universal Service Fund.

11   Q     Okay.  Tell us about what you would have observed with

12   meetings with the senators.

13   A     With the senators we'd go and pay just greeting calls to

14   them sometimes at their office, just as a courtesy.  And we

15   would also sometimes go, and I'd watch my father testify to the

16   Senate.

17   Q     Okay.  And, generally, what was that testimony about that

18   you heard?

19   A     The testimony was about the FCC changing the way that they

20   funded programs, the Universal Service Fund program.  They,

21   basically, wanted to change it to a flat rate instead of taking

22   into account the individual circumstances that surrounded the

23   funding.

24           For instance, in Hawai'i, because we live on the

25   islands, the land is not continuous; so it's much harder and

1    much more costly to install cables between each island and link

2    them together, as opposed to somewhere on the mainland where

3    it's all land, it's easy, you use the same method for laying

4    the cables to get from point A to point B.  While here we have

5    to go from the land to the sea, back to the land again.

6    Q    Are you familiar with a company by the name of Paniolo

7    Cable?

8    A    I am.

9    Q    And tell us what that company does.

10   A    Paniolo owns the fiber optic cables that are underseas; so

11   it connects different islands.

12   Q    And do you have any direct or indirect ownership in

13   Paniolo Cable?

14   A    I do.  It's held in a trust that my siblings and I own.

15   Q    Okay.  And are you and your siblings the only owners of

16   the trust or beneficiaries of the trust?

17   A    Yes, we are.

18   Q    And it owns a hundred percent of Paniolo.

19   A    I believe so.  It's -- we have a loan out from Deutsche

20   Bank on it, but once that note is paid off, essentially, yes.

21   Q    Okay.  And Paniolo owns the cables that run between the

22   islands in the SIC network?

23   A    Yes, the undersea portions.

24   Q    The undersea portion of the cables.

25        And they're the owners of the cables, but do you know

1    the company who contracted and actually built the cable, the

2    undersea cables, while the network was being developed?

3    A     No.  I know we purchased it later, but, yeah.

4    Q     Now, did you ever attend any meetings with Deutsche Bank

5    regarding the matter?

6    A     I have.

7    Q     Okay.  And did you attend a meeting in New York with your

8    father?

9    A     I did.

10   Q     And what did you observe at that meeting?  What occurred

11   there?

12   A     They were discussing the loan payments.  When the FCC

13   changed the rules on how they were to fund this program, it

14   severely cut the amount of funding that Sandwich Isles got.

15   And Sandwich Isles leases these cables from Paniolo; so,

16   basically, the money that Sandwich Isles pays to Paniolo,

17   that's used to pay off the note -- or the loan to Deutsche

18   Bank.  And because the FCC changed the amount of funding they

19   gave Sandwich Isles, Paniolo couldn't pay the note, and so we

20   were in discussions about what was to happen next and how the

21   note was going to be paid off.

22   Q     Do you recall ever taking a trip to Boston with your

23   father?

24   A     I do.

25   Q     And what did you do on that trip to Boston with your

1    father?

2    A    We drove out to one of Raytheon's facilities in -- it's

3    just outside of Boston.

4    Q    Okay.  And did you go meet with anybody there?

5    A    We did.  We went in and there was the -- Torkel Patterson.

6    He's the president of their international branch, and several

7    of his higher-up colleagues were there.

8    Q    These meetings we talked about before -- let's take the

9    Washington, D.C., meetings.  The -- how long would they

10   normally last?  I'm sorry.  Let me rephrase it.  The trips to

11   D.C.

12   A    The trips to D.C. would last anywhere from two to five

13   days.

14   Q    Okay.  And when you went to D.C., where would you stay?

15   A    I stayed with my father.

16   Q    In a hotel.

17   A    In his hotel, yes.

18   Q    Now, did these trips assist you, the various ones we

19   talked about, in understanding the nature of the Waimana and

20   Sandwich Isles business?

21   A    Yes.

22   Q    Could you tell the jury how they assisted you.

23   A    Well, to hear somebody talk about something, it's very

24   remote.  And when you actually get to see the people involved,

25   it kind of puts a face to these things that are being talked

1    about, and you get a better understanding of what's going on

2    and the people involved and the players and how things are

3    done.

4    Q    Miss Hee, did you ever attend any presidential

5    inaugurations?

6    A    I have.

7    Q    Was that on behalf of yourself or on behalf of the

8    company?

9    A    The company was invited; so I went, yes.

10   Q    So how did your trip come about?  Did somebody tell you?

11   Did somebody send you an invitation?

12   A    I believe the invitation was sent to my father's office,

13   and he told me about them, yes.

14   Q    And did you go to the first inauguration of President

15   Obama?

16   A    I did.

17   Q    Okay.  Were any other -- did you travel with anybody else

18   there?

19   A    I met my mother and my sister and my brother-in-law there

20   (nodding).

21   Q    And were all of you going as representatives of the

22   company?

23   A    Yes.

24   Q    Okay.  Can you tell us what you -- what activities you

25   engaged in there when you attended the 2009 inauguration?

1    A    We tried to go and see him be sworn in and give a speech,

2    but we were unsuccessful because of the crowd and some

3    unruliness that happened, and so they shut our security line

4    down.  So instead we walked up to an associate's office and saw

5    the parade.

6            We also attended a ball that was given by people here

7    in Hawai'i there and said hi to the Senators Akaka and Inouye

8    at the time there.

9    Q    Did you also attend President Obama's second inauguration

10   in 2013, four years later?

11   A    I did.

12   Q    And did you attend personally or as a representative of

13   the company?

14   A    The company.

15   Q    And how did your attendance come about?  Did somebody ask

16   you to go?

17   A    My father said that he was invited again.  Well, he

18   doesn't like to travel; so I went in his place.

19   Q    Did any other representatives of the company go on that

20   trip?

21   A    It was just me.

22   Q    It was just you.  You were living on the East Coast at the

23   time?

24   A    Yes.

25   Q    And you went down to the inauguration by yourself.

```
1    A    I met a friend there, yes.

2    Q    I'm going to focus on another trip.  In 2011 did you go to

3    the Big Island for a business-related meeting?

4    A    Yes.  The Hawaiian Homelands Commission meeting.

5    Q    Okay.  Can you tell us about that meeting and what

6    occurred there.

7    A    It took place in Keaukaha.  And all the commission members

8    were there, and various people gave presentations, including my

9    father.  My siblings were also there, my brother and my sister,

10   and some other staff members of my father's company.  And he,

11   basically, talked to the Hawaiian Homes Commission about why he

12   started the company and the importance of providing the

13   communications services to these homelands and how it would

14   impact the area.

15   Q    Okay.  And after that meeting you went up to and you

16   stayed at the Mauna Lani?

17   A    We did.  We drove across the island and stayed there.

18   Q    You said your siblings were with you at the Hawaiian

19   Homelands Commission meeting?

20   A    They were.

21   Q    And that was Kupa'a?

22   A    Yes.  Kupa'a and Liko.

23   Q    And were all of you -- were you introduced at the meeting

24   to the attendants?

25   A    Yes.  My father got up, introduced himself, and he
```

1    introduced us as his children.

2    Q    Okay.

3    A    Yes.

4    Q    Okay.  I'm going to ask you to look at the witness book

5    you have in front of you.  Turn to what's been marked as

6    Defense Exhibit 50-2.

7           If you look at both of those pages --

8    A    Yeah.

9    Q    -- do you recognize those as pictures that were taken of

10   buildings you were looking for when you were in Tahiti?

11   A    Yes.  This was where we were told that the Honotua

12   headquarters was.

13   Q    And are these pictures accurate portrayals of what you

14   observed when you were in Tahiti?

15   A    Yes.

16           MR. TOSCHER:  Okay.  Your Honor, we would offer 50-2,

17   which consists of two pictures.

18           MR. TONG:  No objection.

19           THE COURT:  50-2 is received.

20           MR. TOSCHER:  So now that -- I'm going to ask to

21   publish this.  Can we turn on the Elmo?

22           THE COURT:  I think you need to shift -- your

23   colleague is calling you.

24           MR. TOSCHER:  I'm blocking you.

25   Q    Miss Hee, you have a copy of 50-2 in front of you, and you

1    can see a picture up there.

2              THE COURT:  We're going to give you a hand-held mike;

3    so if you wanted to stand by the Elmo.

4              MR. TOSCHER:  Thank you, Your Honor.

5    Q    Miss Hee, was -- tell us why you took that picture -- or

6    I'm sorry, I don't think -- who took that picture?

7    A    I believe I did, yes.

8    Q    Okay.  Was this the building you were looking for, or why

9    did you take a picture of that building?

10   A    Because we were looking for the Honotua headquarters, and

11   this was the building.

12   Q    This was the address that --

13   A    Yes, this was the address.  We were looking for the

14   building for Honotua, but instead we found a company called

15   OPT.

16   Q    So I'm going to put up the other picture.  And this is of

17   the same building?

18   A    It is.

19   Q    And there was a sign there OPT.  There was no sign of

20   Honotua?

21   A    No, there wasn't.

22   Q    Okay.  Now, you testified before you spent about a day

23   searching for the cable landing when you were in Tahiti.

24   A    Yes.

25   Q    And you also searched for the locations of Honotua;

1   correct?

2   A    Yes.

3   Q    You were there for a week.  Was there a reason that you

4   went for a whole week?

5   A    Hawaiian Airlines flies there once a week; so that's kind

6   of when you get to leave.

7   Q    Going back to the Hawaiian Homelands meeting and the Mauna

8   Lani, how long were you at the Mauna Lani for?

9   A    I think I was there for a week, too.

10  Q    Were there other representatives of the company there?

11  A    It was my family:  my father, my mother, my sister, I

12  think -- I don't know if Mika went.

13  Q    Were there business discussions?  Did you discuss business

14  when you were there?

15  A    We talked about the Hawaiian Homes meeting and --

16  Q    Anything regarding business succession?

17  A    I'm sorry?

18  Q    Anything regarding business succession?

19  A    Succession?

20  Q    Yeah, taking over as owners of the company?

21  A    Not that I recall.

22  Q    Okay.  Anything regarding -- okay.  Anything regarding

23  Paniolo Cable?

24  A    No.

25  Q    Okay.  You mentioned something when you testified

1  yesterday regarding you observed your father blurs personal and

2  business.

3  A     Yes, he does.

4  Q     And is he, basically, all business all the time?

5  A     More or less (nodding).  Whenever I have a phone

6  conversation with him, it always weaves in and out of business

7  and family, business and family.  It's never purely one thing

8  or the other.

9          MR. TOSCHER:  Okay.  Just check my notes.

10         I have no further questions, Your Honor.

11         THE COURT:  Okay.

12         MR. TOSCHER:  Your Honor, before I -- I can't

13  remember, did I move 50 -- I did over non-objection.

14         THE COURT:  It was received.  50-2 was received.

15                    CROSS-EXAMINATION

16  BY MR. TONG:

17  Q     Good afternoon, Miss Hee.

18  A     Good afternoon.

19  Q     So today you talked about three trips.  One to D.C.;

20  correct?

21  A     Yes.

22  Q     One to New York for the Deutsche Bank meeting; correct?

23  A     Yes.

24  Q     And one to Boston; is that correct?

25  A     Yes.

1    Q    And those three trips occurred while you were at MIT;

2    correct?

3    A    I believe two while I was at MIT and one later.

4    Q    Okay.

5    A    Yeah.

6    Q    So those trips occurred between 2004 and the present; is

7    that correct?

8    A    Yes.

9    Q    So three trips over a period of about 10 years; correct?

10   A    Yes.  But -- sorry, can I clarify something?

11   Q    Well, your lawyer can ask you clarifying questions.

12   A    Oh, sorry.

13   Q    The three that we're talking about were over that period

14   of time; correct?

15   A    When he mentioned D.C., those were multiple trips.  It

16   wasn't one that I talked about.  Sorry.

17   Q    Okay.  And you would go to the meetings and you would

18   observe what your father did; is that correct?

19   A    Yes.

20   Q    For example, you talked about testimony that he gave in

21   front of some committee; correct?

22   A    Yes.

23   Q    You did not personally give testimony before the

24   committee, did you?

25   A    No, I did not.

1   Q    So you were there to observe and see how things were done;

2   is that correct?

3   A    Yes, I was.

4   Q    Sort of the way that some parents might bring their

5   children to -- excuse me.  Some children might bring their

6   parents to their school classes to introduce them and see how

7   things are done; correct?

8   A    Sure.

9   Q    Okay.  And you testified about the inauguration.  I

10  assume -- well, wait a minute.  Let me not leave the first

11  subject.

12         I assume that the expenses you incurred going to

13  these different meetings were paid by Waimana; is that

14  correct?

15  A    I believe so.

16  Q    And you would stay with your father in his room; correct?

17  A    Yes.

18  Q    And each trip would last about three to five days you

19  said; correct?

20  A    Roughly.

21  Q    And not all of that time was spent giving testimony or

22  doing other things, meeting with senators and the like; is that

23  correct?

24  A    No.

25  Q    Part of that was also you catching up with your dad

 1  because he's here in Hawai'i and you were on the East Coast;

 2  correct?

 3          THE COURT:  Before she answers, you might want to

 4  clarify because her answer was "no" when you asked not all of

 5  that time was spent giving testimony and meeting with

 6  senators.

 7  BY MR. TONG:

 8  Q    Did you spend all of your time on those trips in meetings

 9  related to the company?

10  A    No.

11  Q    And you also testified that you attended President Obama's

12  first inauguration; correct?

13  A    I did.

14  Q    You tried to him -- see the inaugural stage; is that

15  correct?

16  A    I did, yes.

17  Q    And that didn't work out, did it.

18  A    No, it didn't.

19  Q    Kind of like the failed trip to see the cable landing in

20  Tahiti; is that correct?

21  A    Sure.

22  Q    And your role at that or rather your -- what you did

23  during that time is you saw the parade, you attended a ball,

24  and you said hi to the senators; correct?

25  A    Yes.

1    Q    Now, this Big Island trip you testified about in 2011, it

2    began with a meeting with the Hawaiian Homelands Commissioners.

3    Is that what you said?

4    A    Yes.

5    Q    And where was that meeting?

6    A    It was in Keaukaha.

7    Q    And that is not where Mauna Lani is located; correct?

8    A    No.  It's on the other side of the island.

9    Q    So the meeting that you had with commissioners you were

10   introduced as a family member; correct?

11   A    Yes, a family member and a successor, yes.

12   Q    That meeting then concluded; right?

13   A    It did.

14   Q    You then drove across the Big island to go to Mauna Lani;

15   is that correct?

16   A    We did.

17   Q    And you folks stayed there for a period of about four or

18   five days; is that correct?

19   A    Yes, we did.

20   Q    And how many rooms did you have?

21   A    Two, I believe.

22   Q    And that was -- I forget who was on that trip.  You were

23   on the trip.  Your father was on the trip.  Correct?

24   A    Correct.

25   Q    Was your mother there?

1    A      She was there.  She met us there.  So it was my sister and

2    my brother and a friend of mine.

3    Q      And all of you were in those two rooms; correct?

4    A      Yes.

5    Q      And Waimana paid those expenses; correct?

6    A      I don't know.

7    Q      But those were -- the meetings you had with the Hawaiian

8    Homeland Commissioners did not take place at the Mauna Lani; is

9    that correct?

10   A      No, it didn't.

11   Q      And the picture that you just displayed of your Tahiti

12   trip, that was when you were looking for the headquarters of

13   the Honotua company; is that right?

14   A      It was.

15   Q      And what was the OPT company?

16   A      We're not sure.

17   Q      So you just took a picture to say I looked for a company

18   but couldn't find it; here's what's at that location.

19   A      I think we asked somebody, but I don't remember what the

20   response was.  It was not Honotua.  That's all that I remember.

21   Q      And as I recall, your testimony was that you spent a week

22   on Tahiti because that's the frequency of the flights that

23   Hawaiian Airlines had; is that right?

24   A      That is the frequency.

25   Q      But yesterday or the day before I believe you testified

1   that the Tahiti trip was your idea originally; is that right?

2   A    Yes.

3   Q    And it was not to go see the cable, was it.

4   A    No.

5   Q    It was to go see the festival; right?

6   A    It was.

7   Q    And in inspecting the cable you did not make any

8   particular plans to meet anyone and have them guide you there,

9   did you.

10  A    No.

11       MR. TONG:  May I have one moment?

12       THE COURT:  Yes.

13       MR. TONG:  I have nothing further.

14              RE-DIRECT EXAMINATION

15  BY MR. TOSCHER:

16  Q    Now, Mr. Tong just questioned you, and you wanted to

17  clarify.  Were there multiple trips to Washington, D.C.?

18  A    Yes.

19  Q    Okay.  Can you recall how many different trips there were,

20  Miss Hee?

21  A    No.  They are too numerous.

22  Q    Okay.  Did you ever attend trips on the East Coast without

23  your father to go on Waimana-related business?

24       MR. TONG:  Objection.  Beyond the scope of

25  cross-examination.

1              THE COURT:  You can answer yes or no, and then we'll

2    go from there, depending.

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  How much longer do you have

5    because really it's about time for a break.

6              MR. TOSCHER:  Not -- very short, Your Honor.

7              THE COURT:  Very short.

8              MR. TOSCHER:  Less than a minute.  I'm just about

9    done.

10             THE COURT:  Okay.  Go ahead.  Go ahead.

11   BY MR. TOSCHER:

12   Q    The -- okay.  Did you ever have meetings on your own with

13   representatives of Raytheon?

14             MR. TONG:  Objection.  Beyond the scope.

15             THE COURT:  I'm going to let her answer.

16             THE WITNESS:  Yes.

17   BY MR. TOSCHER:

18   Q    Mr. Tong questioned you regarding what your role was at

19   these various meetings you went to, and I think your role, you

20   said, or -- was to observe what was going on?

21   A    Yes.

22   Q    Okay.  And did you learn about the business attending all

23   these meetings?

24   A    Yes.

25             MR. TOSCHER:  I have no further questions, Your

1    Honor.

2              THE COURT:  Okay.  Mr. Tong, anything more?

3              MR. TONG:  No, Your Honor.

4              THE COURT:  Okay.  Then the witness is excused, and

5    you can step down and leave the courtroom.

6         (Witness excused.)

7              THE COURT:  And we'll take a break, come back at

8    about 3:00, and we'll go until 4:00 today.

9         (Court recessed at 2:49 P.M., until 3:07 P.M.)

10             THE COURT:  Okay.  Who's the next witness?

11             MR. TOSCHER:  Your Honor, we would like to call

12   Charles Au.

13        (Witness photographed.)

14             THE CLERK:  Can you stand and raise your right hand.

15        (Witness sworn.)

16             THE CLERK:  Thank you.  Please be seated.

17             Please state your name and spell your last name.

18             THE WITNESS:  My name is Charles Kwai Hoi Au.  Last

19   name is spelled A-u.

20                        DIRECT EXAMINATION

21   BY MR. TOSCHER:

22   Q    Good afternoon, Mr. Au.  Could you give us your business

23   address, please.

24   A    It's 598 Halekauwila, Honolulu, Hawai'i 96813.

25   Q    And how long have you lived in Hawai'i?

1    A    49 years.

2    Q    49 years?

3    A    Yes.

4    Q    Were you born here?

5    A    Born in Fairfax, Virginia.  My father was working for the

6    government, moved back here when I was one.

7    Q    So, basically, your entire life here.

8    A    Yes.

9    Q    Did you attend high school here?

10   A    Yes.  I went to St. Louis High School.

11   Q    What about college?

12   A    University of Hawai'i.

13   Q    And did you receive a degree from the University of

14   Hawai'i?

15   A    Yes, I did.  Bachelor of Business Administration in

16   Accounting.

17   Q    The -- after you graduated college with a degree in

18   accounting tell us about your work experience.

19   A    Yes.  I joined an international CPA firm based here in

20   Honolulu, Arthur Anderson, and I worked there for five years.

21   I then moved on and joined a local firm and have been there the

22   last 20 years.

23   Q    And what is the name of the local firm?

24   A    It's ECA, LLP.

25   Q    And can you tell us what your relationship -- you said you

 1    joined the firm.  Are you an owner?  Are you a partner?  Or how

 2    does that work?

 3    A    Thank you.  I'm currently the managing partner of the

 4    firm.  I am an owner and the managing partner.  I've been that

 5    for the last eight years.  So I joined them as a senior manager

 6    for about two years and then made partner 18 years ago.

 7    Q    So you've been with the same firm for approximately 20

 8    years.

 9    A    Yes.

10    Q    And before we talk about what your firm does, do you hold

11    any licenses or certifications?

12    A    Yes.  I'm a certified public accountant licensed to

13    practice in the State of Hawai'i.

14    Q    And when did you become a certified public accountant?

15    A    That was almost 20 years ago.  That was 20 years ago.

16    Q    Tell the jury what you had to do to be -- qualify or get

17    licensed as a certified public accountant.

18    A    Well, there's a Uniform CPA Exam, Certified Public

19    Accounting Exam.  At the time it was over two and a half days,

20    and you needed to pass all four parts for Hawai'i in order to

21    get your license.  After that -- so I did pass that in my first

22    year.  And then I needed to practice or work for a CPA firm for

23    three and a half more years before I could attain my license.

24    Q    So you passed the test and then got the work-related

25    experience?

1    A    Yes.

2    Q    And got certified as a certified public accountant.

3    A    I did.

4    Q    Does your position as a certified public accountant, do

5    you have to take ongoing continuing professional education?

6    A    State of Hawai'i requires us to have 80 hours of

7    continuing education every two years; so that breaks down to

8    about 40 hours per year.

9    Q    And how many hours do you normally participate in every

10   year?

11   A    Probably more than that.  On average it's 50 to 60 hours

12   of continuing education every year.

13   Q    And can you describe to the jury the types of courses you

14   take in terms of continuing professional education.

15   A    Well, there's a variety that's offered for me in

16   particular because my emphasis for the practice is on the tax

17   side.  Much of my studies relate to tax -- tax-related work

18   studies, business planning, succession planning, income tax

19   planning for individuals and for businesses.

20   Q    So a variety of courses, but the emphasis is in tax.

21   A    That's correct.

22   Q    Are you a member of any other professional organizations

23   relating to your role as a certified public accountant?

24   A    I am a member of the American Institute of Certified

25   Public Accountants, the ICPA, and also the Hawai'i State

1   Society of CPAs.

2   Q    And tell us what those -- how those organizations relate

3   to your practice in business.

4   A    Well, they provide -- I think they offer support and

5   guidance for practitioners, things for us both professionally

6   with regard to coursework and also as a technical support to

7   the extent that we have issues that we want to have a second

8   opinion on.  We're able to reach out to both the ICPA and

9   HSCPA, and they've got professionals in the various industries

10  and fields that help us to answer technical issues.

11  Q    Now, your current practice at ECA, LLP, is it a -- tell us

12  the types of services that you and your firm render to clients.

13  A    I've got two partners, and, collectively, we provide audit

14  and review -- reviews of financial statements.  We prepare tax

15  returns, and we do tax planning.  We do business succession

16  planning.  And we also provide outsource accounting where

17  clients who need bookkeeping support, we're able to keep their

18  books and records for them.

19  Q    In the course of a year -- let's say the last year -- how

20  many tax returns are you involved with the preparation of?

21  A    On the business side, more than 150 returns on average on

22  the business, and then probably another hundred or hundred

23  fifty individual returns as well for the business owners.  As a

24  firm, we probably prepare more somewheres around 600 returns

25  for the year.

1    Q    When you say "business returns," are you referring to like

2    a Form 1120?

3    A    Corporate returns 1120, 1120S, which is an S corporation,

4    partnership returns, fiduciary trust returns.

5    Q    What about on the individual side?  What type of returns?

6    A    1040 on the federal side and 11 for Hawai'i.  We do have

7    clients in other states; so we also prepare the income tax

8    returns for the other states.

9    Q    And what is your role in these approximate 600 returns a

10   year?  What is your involvement?

11   A    Well, it's split amongst the three partners.  For me it's

12   primarily as a reviewer.  So my responsibility is to maintain

13   the client relationship, make sure things are filed on time,

14   and that the returns themselves are accurate.

15   Q    Now, you mentioned approximately 600 returns currently.

16   Is that a fair estimate of what's -- what the business has been

17   over the last 10 years, or has it fluctuated?

18   A    It's pretty consistent.  We do gain some additional

19   clients, we do have clients that sell or otherwise move on, but

20   I think that would be appropriate:  approximately the same for

21   every year.

22           MR. TOSCHER:  Your Honor, at this time I would offer

23   Mr. Au as an expert in tax accounting.

24           MR. HARRINGTON:  Tax planning?  No objection.

25           THE COURT:  I thought he said "tax accounting."

1          MR. HARRINGTON:  I'm sorry, you said tax accounting?

2          No objection, then.

3          THE COURT:  Okay.  Then he may give his opinions in

4    the area of tax accounting.

5    BY MR. TOSCHER:

6    Q    Now, Mr. Au, do you know the term "closely held

7    corporation"?

8    A    Yes.

9    Q    Would you describe for the jury what that means in your

10   business.

11   A    In our business it's when a corporation or a partnership

12   is held by five or fewer individuals.  That's our view of it.

13   Q    Family owned company?

14   A    That would certainly be a closely-held business, yes.

15   Q    In your experience in dealing with these closely-held

16   companies, are corporation shareholder loans a common practice?

17   A    We see it on a regular basis, yes.

18   Q    The -- and when personal expenses are being paid out of

19   the corporation, is it typical advice of an accountant to

20   advise the corporation and the shareholder to treat those as a

21   corporation shareholder loan?

22          MR. HARRINGTON:  Objection.  Leading.

23          THE COURT:  This is a pretty foundational preliminary

24   thing.  I'll allow it.

25   BY MR. TOSCHER:

1   Q    You can answer the question.

2   A    Thank you.  Yes.

3   Q    Okay.  So it's -- is it a normal and customary practice

4   for -- in the context of your tax return preparation to

5   categorize payments out of a corporation as a shareholder loan?

6   A    To the extent that the client -- normally, the books are

7   actually kept by someone within the company, and so those

8   entries are typically booked in that way.  If we do find

9   expenses that we believe to otherwise be personal in nature, we

10  do recommend that they be treated as a shareholder loan.

11  Q    So we start out -- and that is a typical situation where

12  the client is keeping, let's say, a general ledger.

13  A    (Nods head.)

14  Q    And if you were to see, when you got that information,

15  personal expenses, you might -- you would raise an issue with

16  the client?

17  A    Yes.

18  Q    And would your normal advice be, if you thought they were

19  personal and nondeductible, to not deduct them but to treat it

20  as a shareholder loan?

21           MR. HARRINGTON:  Objection.  Leading.

22           THE COURT:  Leading.  Sustained.

23           MR. TOSCHER:  I'm sorry.

24  Q    If you were reviewing the general ledger and observed what

25  you thought were nondeductible expenses, what would your advice

1    be?

2    A    We would advise them that those expenses are not otherwise

3    deductible and, therefore, needed to be treated as a loan or

4    advance to the shareholder.

5    Q    I'm going to ask you some questions regarding the use of

6    promissory notes.  In the course of your practice with -- you

7    talked about many closely-held corporations have shareholder

8    loans.  Are promissory notes used all the time?

9    A    Not all the time, no.

10   Q    Are they probably -- are they used less frequently than

11   not?

12   A    Our experience has been that the number of clients that

13   have the requisite promissory notes are less than half.  Fewer

14   do.

15   Q    Do you require a promissory note for you to treat the loan

16   as a valid shareholder loan?

17   A    No.

18   Q    And do you understand that there's a requirement to be --

19   that you have to have a promissory note for it to be treated as

20   a shareholder loan?

21   A    No, it's not a requirement.

22   Q    Okay.  Now, if a client has a shareholder loan and it's

23   not documented with a promissory note, do you have to deal with

24   the issue concerning interest on that loan?

25   A    We do recommend that interest be accrued on those

1    receivables, yes.

2    Q    And is that based upon a provision of the Tax Code?

3    A    There is a specific code within the Internal Revenue Code

4    that states that, to the extent that an advance or receivable

5    has no stated rate of interest, that an interest rate be

6    applied.  It's called the Applicable Federal Rate, and the code

7    section is 7872.

8    Q    So if there's just an open account obligation on the books

9    and records of the corporation, the Internal Revenue Code

10   itself provides for a certain code section where interest has

11   to be imputed, whether it's stated or not anywhere.

12   A    To the extent it's not stated, you are required -- they do

13   provide for the rate, which is the Applicable Federal Rate,

14   which is published monthly by the government.

15   Q    Have you had a chance to review various trial exhibits in

16   this case, Mr. Au?

17   A    Yes.  I've seen the corporate income tax returns as well

18   as the schedule of events.

19         MR. TOSCHER:  Can I ask you to publish 4-82.

20   Q    Mr. Au, was this one of the documents you reviewed?

21   A    Yes, it is.

22   Q    And you also reviewed the various tax returns?

23   A    Yes.  I did.

24   Q    And you understood 4-82 to be a summary of what was

25   reflected in Waimana's books and records?

1    A    Yes, that's my understanding.

2    Q    Now, you see the flow of payments, booking a shareholder

3    loan, various personal items.  Let's just go through this.

4         We see a payment to Massachusetts Institute of

5    Technology for tuition, loan to shareholder, adding to the

6    shareholder loan.  We see part of a AmEx reimbursement, again

7    adding to the shareholder loan.

8         Now, is this the type of loan activity you often see

9    in the books and records of a closely-held corporation?

10   A    Those types, yes.

11   Q    Now, if your client had provided you, hypothetically,

12   books and records that looked like this, knowing this was over

13   a number of years and this is sort of a compilation, would you

14   be treating it as a shareholder loan on the tax returns of the

15   client?

16   A    Yes.  They're accumulated and then reflected on the

17   financial statements as a receivable, an asset amount due from

18   the shareholder, then we would treat it as a shareholder loan,

19   yes.

20   Q    So even if there's no promissory note, do you have an

21   opinion as to whether it's a valid obligation?

22   A    I believe it to be a valid obligation because it's stated

23   and it's recorded as a receivable on the books of record, yes.

24         MR. TOSCHER:  No further questions, Your Honor.

25                        CROSS-EXAMINATION

1  BY MR. HARRINGTON:

2  Q    Good afternoon, Mr. Au.

3  A    Good afternoon.

4  Q    So you were looking at document 4-82, and then I think you

5  also said that you reviewed the corporate tax returns, but you

6  didn't review any other exhibits?

7  A    No, I did not.

8  Q    And you didn't hear any of the testimony that's taken

9  place?

10  A    I have not.

11  Q    So you talked about what you would interpret that form to

12  mean.  Now, as an accountant, you rely on what your client

13  tells you; is that right?

14  A    Yes.

15  Q    And you rely on the fact that your client is giving you

16  accurate information?

17  A    Yes.

18  Q    And so if your client tells you "a loan," you rely on the

19  fact that your client's telling you that it's a loan.

20  A    I believe the fact that it's recorded on the books of

21  record as a receivable, it is validated as a receivable, yes.

22  Q    And that's recorded by the clients; right?

23  A    Recorded by the accountant there, yes.

24  Q    Accountant.  And you said "accountant," but you mean from

25  the client.  Not an accountant at your shop.

1   A     I'm not sure who was the preparer of the financial

2   statements, but to the extent that it was someone working

3   within the company to record the books of record, I mean that

4   person, yes.

5   Q     So you're familiar with the test of what makes something a

6   loan; right?

7   A     I believe so, yes.

8   Q     And the test is whether there's an intent at the time the

9   payment is made to pay it back; right?

10   A     At the time the expenditure is incurred to repay, yes.

11   Q     Yeah, so at the time the expenditure is made, the intent

12   to pay back at that time.

13   A     Is there an intent at the time that the money is advanced

14   that the shareholder is meant to repay, yes.

15   Q     So the best evidence of that intent would be a promissory

16   note, wouldn't it?

17   A     That would be one form of assurance, yes.

18   Q     And other forms of assurance might be if the client has a

19   stated rate of interest?

20   A     I'm not sure that that would be a driver of the intent to

21   repay.

22   Q     What about a repayment schedule?

23   A     Repayment schedule would go along with -- if there were a

24   schedule of repayment, yes, there would be, yes.

25   Q     And then perhaps if there was some sort of collateral

1    involved, that would be another indicator of whether it's a

2    loan; right?

3    A     In a commercial setting, yes.  I think when you -- in

4    closely-held businesses, that's not typically what happens.

5    The owner is so embedded in the business that there's little

6    chance of there being a default in our experience because that

7    person is generally so -- so much committed to his financial

8    situation, so much committed to what's going on there, that the

9    possibility of that person walking away, the collateral is the

10   fact that he's there is our experience.

11   Q     Okay.  But if you're looking at a loan just in a vacuum,

12   one of the things you'd look at is whether there's collateral.

13   Would you agree with that?

14   A     If there are unrelated parties, then the collateral would

15   be an indication of the ability to repay or the ability to go

16   after something in the event of nonpayment.  I would say that's

17   true, yes.

18              MR. HARRINGTON:  Just one moment, please.

19              No further questions.

20              THE COURT:  Okay.  Is there re-direct?

21              MR. TOSCHER:  Your Honor, I have no further

22   questions.

23              THE COURT:  Okay.  Then the witness is excused.  You

24   can leave the courtroom.  Thank you very much.

25              (Witness excused.)

1           MR. TOSCHER:  May we approach?

2           THE COURT:  Okay.

3       (At sidebar on the record:)

4           MR. TOSCHER:  Your Honor, since we found out the

5   government's case was terminated, I've been diligently working

6   on getting all of our witnesses.  Some are actually flying in

7   today.  And we've been trying to get all the local ones, and

8   I'm out of witnesses now, and I would ask the Court's

9   indulgence.  I know the Court wants to get this done, and I --

10          THE COURT:  Well, it happened to them and they didn't

11  get their heads chopped off; so I guess I have to not chop off

12  your head either.

13          MR. TONG:  I felt the wind through my hair, just so

14  we're clear.

15          THE COURT:  I don't like it from either side --

16          MR. TOSCHER:  I appreciate.

17          THE COURT:  -- because the jurors are here.  But in

18  fairness, I don't see how I can react any differently from the

19  way I reacted with them.

20          MR. TOSCHER:  I'm trying.

21          THE COURT:  Okay.

22          MR. KAWAFUCHI:  Thank you.

23          THE COURT:  So who's going to be the first witness

24  tomorrow?

25          MR. TOSCHER:  You know, I've got to see -- make sure

1    they've landed, and I will -- I let counsel know last night

2    when we had the lineup, and we followed the lineup.  And we'll

3    let them know.  We had to fly two in today.

4            So I will let you know.  I'm trying.

5            THE COURT:  Well, you need to know right away so you

6    guys can prepare.

7            MR. TOSCHER:  They know who is left.  But I will let

8    you know.  It will probably be -- well, I will tell them, Your

9    Honor.

10           THE COURT:  Okay.  I'll leave it to --

11           MR. TONG:  Do we have enough to go through the end of

12   tomorrow?

13           MR. TOSCHER:  You know --

14           THE COURT:  Are you going to rest tomorrow?

15           MR. TOSCHER:  No.

16           THE COURT:  You're not going to rest tomorrow?

17           MR. TOSCHER:  No, I don't think so.  I think we'll be

18   going through.

19           THE COURT:  Okay.  Well, then he has enough.

20           MR. TONG:  I think so.

21           MR. TOSCHER:  Thank you, Your Honor.

22           THE COURT:  Okay.

23       (In open court on the record:)

24           THE COURT:  It's really a sad task I have now to tell

25   you that we need to adjourn.  So -- a little early.  I know

1    you're totally devastated by this information, but I will see

2    you tomorrow, nine o'clock.

3          (Jury excused.)

4          THE COURT:   Counsel, can we just talk schedule a

5    little bit.

6          So is there any chance that at least the courtroom

7    proceedings can be concluded and this case can go to the jury

8    sometime next week?

9          MR. TOSCHER:   I would think that's very potential,

10   Your Honor.  You said "any chance," and we're going to try to

11   figure it all out; but, yeah, I think, yes, Your Honor.

12         THE COURT:   Well, do you think you might rest, say,

13   the next trial day after tomorrow; so two more trial days?

14         MR. TOSCHER:   I'd probably say longer.  Three.

15   Because I just don't know, Your Honor.  Government's ended so

16   quickly.

17         THE COURT:   I know.  So then there might be some

18   rebuttal, and then we have instructions and closing.  I'm just

19   trying to figure out when it is that we're going to resolve any

20   disputes about jury instructions.

21         You know, I'm going to talk about this with counsel a

22   little more tomorrow.  The reason I say that is I actually have

23   about two billion motions in a trial that comes after yours,

24   and they're all set to be heard on Monday.  But maybe that case

25   will go away, at least they tell me that from time to time.

1          MR. TONG:  I thought it was two billion and one

2     motions.

3          THE COURT:  Something.  I may have miscounted.

4          But if that occurs, then I would like to suggest that

5     the time I was going to spend on those billions and billions of

6     motions on July 6th, Monday, might be a time we could meet to

7     resolve any jury instruction disputes.  So I think they're set

8     for -- is it 2:15?

9          MR. TONG:  2:15, your Honor.

10         THE COURT:  Would that be workable?  Will you be

11    here?

12         MR. TOSCHER:  Yes, Your Honor.  2:15 on --

13         THE COURT:  Monday.  But, you know, it's not carved

14    in stone.  I will check with the attorneys again in that other

15    case tomorrow.  Of course, every time I check with those

16    attorneys, 13 attorneys want to weigh in; so, you know, it's a

17    little complicated, but I'll do my best to --

18         MR. TOSCHER:  We're here at the Court's convenience,

19    Your Honor.

20         THE COURT:  I'll do my best to confirm that, but I am

21    at the mercy of those 13 attorneys in that other case.  But

22    it's possible that we could look to Monday afternoon for that.

23    If not, then we need to work out some other time which,

24    depending how the courtroom proceedings go, might end up being

25    an evening.

 1          So this is just -- you must all keep your evening

 2   calendars free for some time -- some number of days next week

 3   because I won't know.  But if we can do it in the normal

 4   working day on Monday, that's probably easier on everybody, and

 5   we'll try for that.  I'll let you know more as I am able to.

 6          Does either side need to have me address anything

 7   else?

 8          MR. TOSCHER:  Nothing further, Your Honor.

 9          MR. TONG:  No, Your Honor.

10          THE COURT:  Then nine o'clock tomorrow.  Thank you.

11      (Court adjourned at 3:34 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9          DATED at Honolulu, Hawaii, August 5, 2015.

10

11                                    /s/ Debra Chun

12                                    DEBRA KEKUNA CHUN

13                                    RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25