```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                       FOR THE DISTRICT OF HAWAII

 3                                   )
      UNITED STATES OF AMERICA,      )  CR 14-00826 SOM
 4                                   )
              Plaintiff,             )  Honolulu, Hawaii
 5         vs.                       )  June 23, 2015
                                     )  9:00 A.M.
 6    ALBERT S. N. HEE,              )
                                     )  (Jury Selection proceedings
 7            Defendant.             )  under separate cover)
                                     )
 8    _____)

 9                  TRANSCRIPT OF JURY TRIAL (DAY 1)
                  BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                   UNITED STATES DISTRICT JUDGE

11    APPEARANCES:

12    For the Government:        LAWRENCE L. TONG
                                 Office of the U.S. Attorney
13                               PJKK Federal Bldg.
                                 300 Ala Moana Blvd. Ste. 6100
14                               Honolulu, HI 96850

15                               QUINN P. HARRINGTON
                                 U.S. Dept. of Justice
16                               Tax Division
                                 601 D St., N.W. Room 7029
17                               Washington, DC 20004

18    For the Defendant:         STEVEN TOSCHER
                                 KURT K. KAWAFUCHI
19                               LACEY STRACHAN
                                 Hochman salkin Rettig Toscher
20                                 & Perez
                                 9150 Wilshire Blvd., Ste. 300
21                               Beverly Hills, CA 90212

22    Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
                                 United States District Court
23                               300 Ala Moana Blvd. Ste. C285
                                 Honolulu, HI 96850
24                               (808) 541-2061

25    Proceedings recorded by mechanical stenography, transcript
      produced with computer-aided transcription (CAT).
```

1    TUESDAY, JUNE 23, 2015                    2:44 O'CLOCK P.M.

2        (Jury selection proceedings under separate cover.)

3        THE COURT:  Okay.  At this time we're going to have

4    the jurors sworn by the courtroom manager.

5        THE CLERK:  Please stand and raise your right hand.

6        (Jury sworn.)

7        THE CLERK:  Thank you.  Please be seated.

8        THE COURT:  Okay.  I think we are going to pass out

9    the notebooks and pens.

10       Okay.  So I am going to be giving you preliminary

11   jury instructions.  This will take about 10 minutes.

12       Ladies and gentlemen, you now are the jury in this

13   case, and I want to take a few minutes to tell you something

14   about your duties as jurors and to give you some instruction.

15   At the end of the trial, I will give you more detailed

16   instructions.  Those instructions will control your

17   deliberations.

18       This is a criminal case brought by the United States

19   government.  The charge against the defendant is contained in

20   the indictment.  The indictment is simply the description of

21   the charge made by the government against the defendant.  It is

22   not evidence of anything.

23       The defendant has pled not guilty to the indictment

24   and is presumed innocent, unless and until proved guilty beyond

25   a reasonable doubt.  It will be your duty to decide from the

1   evidence to be presented whether the defendant is guilty or not

2   guilty of the crimes charged.  You will decide from the

3   evidence what the facts are, and your verdict will be based on

4   those facts.

5            You are the sole judges of the facts.  You must then

6   apply those facts to the law that I shall give you, and in that

7   way reach your verdict.

8            You must follow the law whether you agree with it or

9   not.  You should not take anything I may say or do during the

10  trial as indicating what I think of the evidence or what your

11  verdict should be.

12           The indictment in this case reads as follows:

13           Count 1.  The grand jury charges from in or about

14  March 2002 and continuing to the date of this indictment, which

15  was March 25, 2015, in the District of Hawai'i and elsewhere,

16  defendant Albert S.N. Hee did corruptly endeavor to obstruct

17  and impede the due administration of the internal revenue laws

18  through the design and execution of a plan that included the

19  filing of corporate tax returns that falsely claimed the

20  payment of defendant's personal expenses as business expenses

21  and the filing of personal income tax returns that failed to

22  report as income the receipt of payments of personal expenses.

23           Count 2.  On or about October 1, 2008, in the

24  District of Hawai'i, defendant Albert S.N. Hee, a resident of

25  Honolulu, Hawai'i, did willfully make and subscribe a Form 1040

1  U.S. Individual Income Tax Return for the calendar year 2007,

2  which was filed with the Internal Revenue Service and was false

3  as to a material matter and verified by a written declaration

4  that it was made under the penalties of perjury, which said

5  income tax return he did not believe to be true and correct as

6  to every material matter.

7          Counts 3 through 7 then have a charge of the same

8  nature with a different tax year.  Count 3 goes to 2008, Count

9  4 to 2009, Count 5 to 2010, Count 6 to 2011, and Count 7 to

10  2012.

11          Since this is a criminal case, there are two basic

12  rules you must keep in mind.  First, the defendant is presumed

13  innocent, unless and until proved guilty beyond a reasonable

14  doubt.  The indictment is only an accusation.  It does not

15  prove anything.  The defendant, therefore, starts out with a

16  clean slate.

17          Second, to convict, the government must prove beyond

18  a reasonable doubt that the defendant is guilty.  A defendant

19  has the right to remain silent and never has to prove innocence

20  or present any evidence.  That the defendant may not testify is

21  not to be held against the defendant.

22          You will decide what the facts are from the evidence

23  that will be presented.  That evidence will consist of the

24  testimony of witnesses, documents and other things received

25  into evidence as exhibits, and any facts on which the lawyers

1    agree or that I may instruct you to accept.

2           The following things are not evidence, and you must

3    not consider them as evidence in deciding the facts of this

4    case:

5               1.   Statements and arguments by the attorneys.

6               2.   Questions and objections by the attorneys.

7               3.   Testimony that I instruct you to disregard.

8               4.   Anything you may see or hear when the court is

9    not in session, even if what you see or hear is done or said by

10   one of the parties or by one of the witnesses.

11          There are two kind of evidence:  Direct and

12   circumstantial.  Direct evidence is testimony by a witness

13   about what that witness personally saw or heard or did.

14   Circumstantial evidence is indirect evidence; that is, it is

15   proof of one or more facts from which one can find another

16   fact.  You may consider both direct and circumstantial evidence

17   in deciding this case.  The law permits you to give equal

18   weight to both, but it is for you to decide how much weight to

19   give to any evidence.

20          Some evidence is admitted for a limited purpose only.

21   When I instruct you that an item of evidence has been admitted

22   for a limited purpose, you must consider it only for that

23   limited purpose and for no other.

24          There are rules of evidence that control what can be

25   received into evidence.  When a lawyer asks a question or

1    offers an exhibit into evidence and a lawyer on the other side

2    thinks that it is not permitted by the rules of evidence, that

3    lawyer may object.  If I overrule the question -- I'm sorry.

4    If I overrule the objection, the question may be answered or

5    the exhibit received.  If I sustain the objection, the question

6    cannot be answered and the exhibit cannot be received.

7            Whenever I sustain an objection to a question, ignore

8    the question and do not guess what the answer would have been.

9            Sometimes I may order that evidence be stricken from

10   the record and that you disregard or ignore the evidence.  That

11   means that when you are deciding the case, you must not

12   consider the evidence that I told you to disregard.

13           In deciding the facts of this case, you will have to

14   decide which witnesses to believe and which witnesses not to

15   believe.  You may believe everything a witness says or only

16   part of it or none of it.  In deciding what to believe, you may

17   consider a number of factors, including the following:

18           1.  The witness' ability to see or hear or know the

19   things the witness testifies to.

20           2.  The quality of the witness' memory.

21           3.  The witness' manner while testifying.

22           4.  Whether the witness has an interest in the

23   outcome of the case or any motive, bias, or prejudice.

24           5.  Whether the witness is contradicted by anything

25   the witness said or wrote before trial or by other evidence;

1    and

2             6.   How reasonable is the witness' testimony when

3    considered in the light of other evidence that you believe.

4             From time to time during the trial it may become

5    necessary for me to talk with the lawyers out of the hearing of

6    the jury, either by having a conference at the bench when the

7    jury is present in the courtroom or by calling a recess.

8    Please understand that while you are waiting we are working.

9    The purpose of these conferences is not to keep relevant

10   evidence from you, but to decide how certain evidence is to be

11   treated under the rules of evidence and to avoid confusion and

12   error.  We will, of course, do what we can to keep the number

13   and length of these conferences to a minimum.

14            I may not always grant an attorney's request for a

15   conference.  Do not consider my granting or denying a request

16   for a conference as any indication of my opinion of the case or

17   of what your verdict should be.

18            I will now say a few words about your conduct as

19   jurors.  First, do not talk to each other about this case or

20   about anyone who has anything to do with it until the end of

21   the case when you go to the jury room to decide on your

22   verdict.

23            Second, do not talk with anyone else about this case

24   or about anyone who has anything to do with it until the trial

25   has ended and you have been discharged as jurors.  "Anyone

1    else" includes members of your family and your friends.  You

2    may tell them that you are a juror in a criminal case, but

3    don't tell them anything else about it until after you have

4    been discharged by me.

5           Third, do not let anyone talk to you about the case

6    or about anyone who has anything to do with it.  If someone

7    should try to talk to you, please report it to me immediately.

8           Fourth, do not read any news stories or articles or

9    listen to any radio or television reports about the case or

10   about anyone who has anything to do with it.

11          Fifth, do not do any research or make any

12   investigation about the case on your own.

13          Sixth, do not make up your mind about what the

14   verdict should be until after you have gone to the jury room to

15   decide the case and you and the other jurors have discussed the

16   evidence.  Keep an open mind until then.

17          As I have just instructed you, during the trial you

18   must not conduct any independent research about this case, the

19   matters in the case, or the individuals or entities involved in

20   the case.  To be more specific, you should not consult

21   dictionaries or reference materials, search the internet,

22   websites, blogs, or use any other electronic tools to obtain

23   information about this case or to help you decide the case.

24   Please do not try to find out information from any source

25   outside the confines of this courtroom.

1              I repeat, that until you retire to deliberate, you

2      may not discuss this case with anyone, even the other jurors.

3              After you retire to deliberate, you may begin

4      discussing the case with the other jurors, but you cannot

5      discuss the case with anyone else until you have returned your

6      verdict and the case is at an end.

7              I hope that for all of you this case is interesting

8      and noteworthy.  I know that many of you use cell phones,

9      BlackBerries, the internet, and other tools of technology.  You

10     must not talk to anyone about this case or use these tools to

11     communicate electronically with anyone about the case.  This

12     includes your family and friends.  You may not communicate with

13     anyone about the case on your cell phone, through e-mail, text

14     messaging, on Twitter, through any blog or website or any

15     internet chat room or by any other social networking website,

16     including Facebook, or MySpace, LinkedIn, and YouTube.

17             At the end of the trial, you will have to make your

18     decision based on what you recall of the evidence.  You will

19     not have a written transcript to consult, and it is difficult

20     and time-consuming for the reporter to read back lengthy

21     testimony.  I urge you to pay close attention to the testimony

22     as it is given.

23             If you wish, you may take notes to help you remember

24     what witnesses said.  If you do take notes, please keep them to

25     yourself until you and the other jurors go to the jury room to

1    decide the case.  Do not let notetaking distract you so that

2    you do not hear other answers by witnesses.  When you leave at

3    night, your notes should be left in the jury room.  If you do

4    not take notes, you should rely on your own memory of what was

5    said and not be overly influenced by the notes of other jurors.

6          The trial will now begin.  First, the government

7    attorney will make an opening statement, which is simply an

8    outline to help you understand what the government expects to

9    prove.  Next, the defendant's attorney may but does not have to

10   make an opening statement.  Opening statements are like a road

11   map.  They are neither evidence nor argument.  The government

12   will then present its evidence, and counsel for the defendant

13   may cross-examine.  Following the government's case, the

14   defendant may present evidence, and the government's counsel

15   may cross-examine.  After all the evidence has been presented,

16   the attorneys will make their closing arguments to summarize

17   and interpret the evidence for you, and I will instruct you on

18   the law.  After that, you will retire to deliberate on your

19   verdict.

20          Mr. Tong, are you ready?

21          MR. TONG:  We are, Your Honor.  May we have one

22   moment with the Court at sidebar on an issue we both have?

23     (At sidebar on the record:)

24          THE COURT:  Okay.

25          MR. TONG:  Judge, we're ready to go, but I just

1    wanted to advise the Court that our opening statement is going

2    to be about half an hour, and Mr. Toscher says he will be close

3    to an hour.  So I just want to tell the Court that that's how

4    long it's going to take because I doubt that you will want to

5    split the two openings.

6                THE COURT:  I don't want to split.

7                MR. TONG:  And we will be guided accordingly.

8                THE COURT:  Well, I'll see if they can stay till

9    4:30.  If they can, my preference is to go today.

10               MR. TOSCHER:  Okay.  That's fine, Your Honor.

11               There's one other item.  We provided a graphic we

12   wanted to use in our opening to Mr. Tong.

13               MR. TONG:  Not the abandoned water main one.

14               MR. TOSCHER:  But the other one you're okay.

15               MR. TONG:  Yeah, that's fine.

16               THE COURT:  So there's an agreement on this.

17               MR. TONG:  Yes.

18               THE COURT:  Let me check with them.

19               MR. TOSCHER:  Your Honor, before we start could we

20   take -- may we have a break?

21               THE COURT:  Okay.

22               MR. TOSCHER:  Thanks.

23          (In open court on the record:)

24               THE COURT:  Can you all stay till about 4:30 today?

25               Is there anyone for whom that's a problem?

1            Okay.  Then we're going to take a five-minute break,

2    and then we'll have opening statements.

3        (Jury excused.)

4        (Court recessed at 3:02 P.M., until 3:14 P.M.)

5            THE COURT:  Okay.  Mr. Tong, your opening

6    statement.

7            MR. TONG:  Mr. Harrington will be giving the opening,

8    Your Honor.

9            THE COURT:  Sorry.  Mr. Harrington.

10           MR. HARRINGTON:  Good afternoon.  May it please the

11   Court.  Ladies and gentlemen of the jury.

12           You've heard by now that this case is a tax case and

13   is about obstructing and interfering with the IRS and about

14   filing false tax returns.  Well, what does that mean?

15           What this case is about is about defendant Albert Hee

16   using his business to pay for his personal expenses in the

17   amount of around $2 million, and it's about defendant falsely

18   claiming that those expenses were for business purposes.  And

19   by calling them business expenses, by putting those

20   representations on the records of the company, defendant's

21   companies took tax deductions, which lowered the amount of

22   taxes the companies would owe.  And by calling them business

23   expenses, defendant didn't report those amounts on his personal

24   tax returns, and by not putting the value of those payments on

25   his tax returns, defendant avoided having to pay any taxes on

1   that amount and, in doing so, filed a false tax return for the

2   years at issue.

3         So how did this happen?  Defendant owns a company

4   called Waimana Enterprises.  You heard about that this morning.

5   Waimana Enterprises is a telecommunications company, and

6   defendant at the time was the sole shareholder of that company.

7   Waimana Enterprises itself owned other companies.  Two

8   companies you may hear about are Sandwich Isles Communications

9   and ClearCom, Inc.  But the company that's really at issue in

10   this case is Waimana, Waimana Enterprises, because that's a

11   company the defendant used to pay for his personal expenses.

12         Now, you're going to hear about how Waimana

13   Enterprises operated.  You're going to hear from a longtime

14   office manager of Waimana Enterprises, Nancy Henderson.  Nancy

15   Henderson's going to tell you how the company was run.  It was

16   a fairly small operation.  And what she's going to tell you is

17   that defendant was at the top of the chain.  He was a hundred

18   percent shareholder.  He was the owner.  He was the president.

19   If there was a dispute, he would be the one who would provide

20   the final answer.  And most importantly, what defendant said is

21   what the company did.  If defendant asked for a check to be

22   issued, the company issued a check.  If defendant said it was a

23   business expense, it was reported as a business expense.

24         So you've heard me talking about these expenses.  So

25   what are we talking about here?  Well, defendant like anyone

1    else, has personal and family expenses.  What defendant did is
2    he had his company pay for those.  For example, defendant
3    received regular massages from a woman named Diane Doll.  And
4    you'll meet Diane Doll.  She'll testify in this trial.  And
5    what you'll hear is that defendant got massages twice a week
6    two hours at a time.  But defendant didn't write a personal
7    check or pay cash out of his own pocket.  Defendant ordered
8    that Waimana Enterprises pay for those massages, and defendant
9    had that written down in the records of the company as
10   "Consulting Fees."  He called his personal massages
11   "consulting" expenses.  We'll hear from Diane Doll that all she
12   did was provide massages.  She didn't know anything about the
13   telecommunications business.
14          Defendant also had family expenses, and you're going
15   to hear about how defendant used his company to pay for those
16   expenses as well.  Nancy Henderson is going to tell you about
17   how the credit card system worked at Waimana Enterprises.
18   Waimana Enterprises didn't actually have a credit card in its
19   name.  It didn't have a credit card that said "Waimana
20   Enterprises."  Instead, it used defendant's credit card.  And
21   what would happen at the end of each month is defendant would
22   sit down with Miss Henderson, and he would identify what was a
23   business expense and what was a personal expense.
24          And you're going to see these exhibits.  What you're
25   doing to see is what was categorized as business expenses:

1    family meals, flights for his family, airfare to the mainland.

2    Specifically, you're going to hear about family vacations that

3    were paid for by the business.  You're going to hear that

4    defendant's wife and children visited Tahiti to see a hula

5    festival, sort of like the Merry Monarch Festival here.  And

6    you'll hear from defendant's daughter that that was the purpose

7    of the visit.  But defendant had his company pay for it, about

8    $7,000 worth of expenses.  And defendant said it was a business

9    expense.  He even wrote on a piece of paper that you're going

10   to see with his signature on it, saying that the purpose of the

11   trip was to investigate an underwater cable.

12           You're going to hear about a family vacation to

13   Disney World that actually occurred the same month that the

14   family went to Tahiti.  Defendant's children went to Disney

15   World.  They stayed on property.  They bought dining tickets.

16   They bought theme park tickets.  And defendant had his company

17   pay for those expenses.  And defendant again wrote a memorandum

18   on a piece of paper, saying that it was a business expense with

19   his signature.

20           You're going to hear about a vacation to Switzerland

21   and to France.  The defendant's wife, one of defendant's

22   daughters, and the daughter's boyfriend took.  $20,000 worth of

23   expenses, everything from train tickets, opera tickets.  You'll

24   see them all on the statement, all marked as business expenses.

25           See about a vacation to the Big Island where his

1  family stayed at a resort.  $16,000 of expenses for a family

2  vacation, written off as a stockholder meeting, when at the

3  time defendant was the only stockholder of the company.

4         So each time these expenses were made, the company

5  took a business deduction.  For example, the Big Island trip:

6  took a $16,000 business deduction; and defendant on his

7  personal tax return didn't put down the $16,000 and didn't pay

8  any taxes on it.

9         Defendant also has three children that he provides

10  for.  One thing that's not going to be in dispute in this case

11  is that those three children are very impressive, accomplished

12  individuals.  All attended prestigious private schools on the

13  mainland.  Defendant's eldest daughter is Adrianne Hee.  And

14  she got into the Massachusetts Institute of Technology in

15  Boston, MIT, very prestigious school.  And when she went there,

16  defendant didn't write a check to pay the tuition.  The

17  defendant ordered that his company pay for her tuition, and he

18  had it listed as an educational expense.  And again, the

19  company took a deduction, and he didn't report that amount on

20  his tax return.

21         Now, what you will hear is one of his accountants

22  actually noticed this, told him he couldn't do it.  But

23  defendant kept having his company pay for the expenses.

24  Instead, he said it was a loan.  What you'll see is there

25  wasn't any paperwork associated with the loan.  You'll see like

1    when you take out a mortgage on your house, you sign what we

2    call a promissory note or a written agreement setting out the

3    terms of repayment, the interest rate, all of that sort of

4    stuff that you would see.  There was not such paperwork.  And

5    defendant continued to have his company pay for her tuition and

6    her living expenses.

7              Defendant's next daughter, Breanne Hee, she went to

8    Santa Clara University.  And when she went to Santa Clara

9    University, again defendant had his company write the checks

10   and had his company pay for those expenses and said it was a

11   loan.

12             Now, at this time defendant had two children

13   attending private schools on the mainland, and presumably,

14   those children had their own expenses.  And so in February when

15   defendant's children were full-time students on the mainland

16   attending college, defendant started having Waimana Enterprises

17   pay them a salary as if they were full-time employees at the

18   company.  And that salary included a generous benefits package,

19   a retirement account, 401(k) distributions, everything else

20   you'd see as a full-time employee.  But defendant's children

21   were attending school full time on the mainland.

22             Defendant has one other child:  Charlton Hee, his

23   son.  Charlton Hee followed his big sister to Santa Clara

24   University.  And again, defendant had the company pay for his

25   tuition.  And he put his son on the payroll as a full-time

1    employee, even though he was attending school full time in the

2    mainland.  And what you'll see is that defendant called those a

3    loan, but defendant didn't make any payments on the loan.  And

4    then the IRS started looking into it.  And it wasn't until the

5    IRS started looking into it and opened a criminal investigation

6    that defendant then paid off the loan.

7            You're also going to hear that when defendant had two

8    children at Santa Clara University, he decided to buy a house

9    for them, a $1.3 million house just a few blocks from Santa

10   Clara University.  And defendant's children lived there

11   rent-free.  And defendant had his company buy that house, and

12   he said it was a corporate retreat.  But what the house really

13   was was college housing for his children.  Again, they got to

14   live there rent-free.

15           Now, this is a tax case, and because it's a tax case,

16   and you probably already heard from some of the questions

17   during the jury selection process, you're going to hear from

18   some accountants in this case.  Defendant had accountants that

19   worked at his business and that he also used to help him

20   prepare his tax returns.  What you're doing to hear from those

21   accountants is that accountants rely on truthful

22   representations from their clients.  In fact, this is usually

23   part of a written agreement that you're going to see, and it

24   says that the client agrees to provide truthful information.

25   And so at the very beginning, what I was talking about,

1    defendant called these business expenses, and the accountants

2    saw them as business expenses and put them on the tax returns

3    as such because again the accountant relies on what their

4    client tells them.

5         Now, one thing you also want to focus on in this

6    case, when you're hearing from accountants and you're hearing

7    from all these witnesses, is I want you to focus on defendant's

8    acts because that's what's at issue in this case:  what

9    defendant said; the paperwork he signed.  You're going to see

10   his signature on practically every relevant document in this

11   case, on practically every check that was issued.  I want you

12   to pay close attention to that.

13        Now, there's one other thing I want to talk about.  I

14   hope that you're going to enjoy watching this case, and,

15   hopefully, you're going to learn something, but at times in

16   this case the testimony may be a little tedious.  We're going

17   to see a lot of documents.  They're going to be up on this

18   screen up here.  We're going to be zooming in, pointing things

19   out, and at times it may feel a little slow and a little

20   tedious.  But what we're going to assure you is that it's all

21   for the purpose of putting on our case, and we ask your

22   patience in listening.  We ask your patience in listening to

23   the testimony and the consideration of the evidence.

24        And at the close of the case we're going to ask that

25   you find defendant guilty of obstructing and interfering with

1    the IRS by using his company to pay his personal expenses and

2    claiming they were business expenses and guilty of filing false

3    tax returns for not reporting the value of all those payments

4    that were made on his behalf.  Thank you.

5             MR. TOSCHER:  Good afternoon.  I know it's late.  I

6    will try to not keep you too long.

7             Mr. Kawafuchi, my associate, partner, grab the easel

8    over there for me.  We're going to use that just for some

9    background.

10            Let me again formally thank you for being here.  May

11   it please the Court.  I think I may have already introduced my

12   client, Mr. Al Hee.

13            Mr. Hee, stand up.

14            We appreciate your service as a juror.  You've been

15   here all day.  But as the Judge said, our system of justice

16   depends upon it.

17            You've heard the government's statement.  And as the

18   Court said, our statements are just what we believe the

19   evidence will show.  You're going to get to hear the witnesses

20   and see the evidence.  And now I'm going to tell you a little

21   bit about what our side of the story is.  And when you listen

22   to it, I think it will explain why Mr. Hee is not guilty as

23   alleged by the government.

24            Now, I'm going to start by talking about why this

25   case really isn't about tax crimes.  It's not about

1    obstruction.  It's not about knowing falsities.  It's about a

2    dispute, a good-faith dispute between Mr. Hee on one side and

3    his accountants and the IRS.

4           The -- as the Court will instruct you, and as the

5    Court, we're talking about willful violations.  And the

6    government will not be able to prove willful violations in this

7    case.  They may talk about certain types of expenses -- and

8    I'll deal in more detail with it later -- that this is not a

9    business expense, but as I will get into more detail later and

10   outline in the evidence, we will show you a business purpose

11   and why the defendant believed there was adequate business

12   justification for these expenses.

13          After we review the evidence, we'll talk about

14   Mr. Hee's background and his building -- the government is

15   right:  Mr. Hee created, he's the visionary, and was the owner

16   of Waimana Enterprises, Sandwich Isles Communications, and

17   ClearCom.  Those are the three main entities that we're dealing

18   with.

19          But before we get into that, and I think we heard

20   about it during jury voir dire today, again you'll hear about

21   the various issues the government says, and there is a

22   disagreement with the government as to whether they're right or

23   we're right.  We think we're right on a lot of the issues.

24          Now, the evidence will show this case just didn't

25   start a year ago or two years ago.  The examination of

1    Mr. Hee's businesses started in 2006.  It's 2015 today.  Nine

2    years it's been going on.  And what you will see throughout

3    that long audit process, investigation:  cooperation with the

4    government, no concealment.

5              You'll hear evidence that an examination period or

6    the charged period, you recall the Court, from 2002 to 2012,

7    you'll hear evidence that's very unusual.  Some audits take a

8    year, some less, maybe two years.  You determine what the

9    issues are, you resolve it, maybe go to the U.S. tax court to

10   vindicate your rights.  But that never happened in this case

11   because the government felt, and I think the evidence will show

12   you they jumped to the gun, and they never proposed any

13   additional adjustments to Mr. Hee.  Instead, they referred it

14   for a criminal investigation, saying and alleging what he did

15   was willful.  And the evidence will show you that's not the

16   case.

17             Now, Mr. Hee is not a tax or accounting expert, and

18   like many heads of companies, he employed many accountants,

19   inside and out, to keep the books.  And when an issue was

20   raised with him, he followed their advice.  And that's what

21   you'll hear from the accountants.

22             I want to try to just give you a road map and not

23   argue, but I need to say this now.  The government claims it

24   was -- the payments were falsely characterized as loans.  These

25   were loans, and that's what the accountants -- that's how the

1      accountants told him to treat them.

2            I'm getting ahead of myself, though.

3            You're going to hear some evidence as to the duties

4      and responsibilities of an accountant.  You're going to hear a

5      lot of evidence about how tax is complex.  We all know it's not

6      black and white.  It's difficult.  It's difficult for

7      accountants.  It's difficult for everybody.  It's becoming more

8      complex.  And it grows -- the Tax Code grows more complex every

9      day.  You're going to hear independent evidence, not only from

10     Mr. Hee's accountants regarding these issues, but from outside

11     accountants as to how they would treat the various issues

12     involved.

13            You may feel maybe the IRS has the better argument on

14     some of the issues.  But I submit to you the evidence will show

15     they were not intentional, there was no concealment, it was not

16     willful by Mr. Hee and not willful by his accountants as to

17     what was done.  Even if Mr. Hee was wrong, if he made a

18     mistake, if he was negligent, he's not guilty of the tax

19     crimes, if he didn't intentionally do it, and he was not.

20            And that sort of gets to what this case is about:

21     whether the government will demonstrate -- and we submit they

22     will not -- that Mr. Hee knew and intentionally violated the

23     tax laws.  They cannot because he did not.

24            Criminal tax cases are about money.  Why do people

25     do, you know, false things?  You will see this wasn't about

1  money.  This was about a man who thought what he was doing was

2  right.  And you're going to get to hear the evidence and

3  evaluate that.  No concealment.  No hiding of things.

4       Now, before I explain what this is -- I'm going to

5  move it back a little bit -- just a little bit about Mr. Hee.

6  He was born and raised in Hawai'i on O'ahu.  His dad worked for

7  the Board of Water Supply, his mom for the Sheraton Hotels.  He

8  learned early on -- and you'll see why this is so important --

9  loyalty to family, country, and the people of Hawai'i.  He

10  learned that that could be accomplished through education and

11  hard work and ingenuity, and you didn't need to come from money

12  to be successful.

13       You may have heard the word and you will hear

14  evidence of Mr. Hee's *kuleana*.  *Kuleana*, Hawaiian term, hope

15  I'm pronouncing it right.  Forgive me if I pronounce the words

16  wrong.  I'm working very hard to get all the words right.  My

17  wife told me I must.

18       Obligation.  And the *kuleana* here was Mr. Hee helping

19  the beneficiaries of the Hawaiian Home Lands, the native

20  Hawaiians, by building a high-speed telecommunications

21  state-of-the-art network.  We all know how important high-speed

22  telecommunications, the internet, is today.  Go back to 1990.

23  I don't think many people were thinking as in the future as

24  Mr. Hee was.  And he was.

25       Now, if we think high-speed telecommunications is

 1   important to us living in a city like Honolulu, what about

 2   people in the remote areas?  And there are a lot of remote

 3   areas where homelanders -- Hawaiian Homelanders live.

 4            Now, you'll hear testimony about the Hawaiian Home

 5   Lands and that the core mission is returning native Hawaiians

 6   to their land.  Mr. Hee was trying to develop, and did develop,

 7   a telecommunications network, which I'm going to talk about in

 8   a little bit.  I'm going to have to move this so I can get over

 9   there.

10            Just a little bit about Mr. Hee.  He was born in 1954

11   before statehood when the Aloha Tower was the tallest building

12   here.  He witnessed the benefits of statehood with the

13   difficulties and the benefits on the local people who tried to

14   stay in Hawai'i.  And that's important.  Graduated from

15   Kamehameha, and he chose to attend the United States Naval

16   Academy in Annapolis in 1972.  Remember what was going on in

17   1972?  The end -- we didn't know it was the end, but the

18   Vietnam War.  At the time the Naval Academy required you to

19   sign at the leisure of the president.

20            You'll hear evidence that Mr. Hee was released of his

21   obligation because of health issues he developed while at the

22   Naval Academy.  But he didn't want to be released, and he asked

23   to stay with them, and he served another four years in the Navy

24   on the mainland.

25            Now, his health issues are relevant and will be

1    important because Mr. Hee was the executive officer of running

2    this very major enterprise, and he had health issues.  And we

3    will be showing you evidence that massages are key therapeutic

4    treatment for stress and workplace stress, and there was a

5    business purpose for it.

6              You'll hear evidence of how the companies grew from

7    1990 to maybe five employees to over a hundred employees.

8              Now, let me just back this up one second.  That way I

9    won't hurt anything.  I'll stay close to the microphone, Your

10   Honor.

11             THE COURT:  Okay.  We can give you either a hand-held

12   mike --

13             MR. TOSCHER:  If you have it now, that would be very

14   appreciated, Your Honor.

15             THE COURT:  There's always the lavaliere, too.

16             MR. TOSCHER:  Sorry.  Thank you.

17             Ladies and gentlemen, what we have here is a map of

18   the Hawaiian Islands.  And we have the locations -- and we're

19   going to have more testimony of this, but I want to set the

20   context for you.  You see the Big Island, Maui, Moloka'i,

21   Lana'i, O'ahu where we are, Kaua'i, some of the other smaller

22   islands.

23             Now, what we have, the Hawaiian Home Lands are spread

24   throughout the islands.  Not only are they spread throughout

25   the islands, they're in very remote areas.  When Mr. Hee was

1    first approached -- and you will hear evidence of it -- about

2    bringing communications, not necessarily high-speed

3    telecommunications, but just communications, there wasn't

4    communications in many of these places.  There certainly wasn't

5    modern-day communications.  The type of communications that was

6    available was either none or -- I've heard the words; you may

7    hear it -- party lines.  Now, not everybody knows what a party

8    line is.  It goes way back.  It's where you pick up a phone,

9    and your neighbor down the street or down the road may be on

10   it.  So it was very not sophisticated.

11          Mr. Hee felt that by engaging in that, taking on the

12   obligation, the Department of the Home Lands -- Department of

13   Hawaiian Home Lands, that he could bring high-speed

14   communications, potential of small businesses, telemedicine,

15   all these things we see today.  And you'll see that he was

16   successful in doing it.

17          As I said before, if you live in a city like

18   Honolulu, or any city, you take it for granted.  But when

19   you're out in a remote area, to be able to have high-speed

20   communications and communicate, that's an important thing.

21          Now, I've talked about before the companies, and I

22   think we have a good understanding of what the companies are.

23   You have Waimana Enterprises, which is the parent company,

24   which was owned by Mr. Hee; Sandwich Isles Corporation, which

25   is a regulated utility, bringing the high-speed communications;

1    and Clearcom Corporation.  You may not hear a lot about that,

2    but it was one of the entities that ran -- was responsible for

3    some of the undersea cable.

4            And let me just point out now there were challenges

5    in not only connecting various remote homeland areas, but how

6    do you connect the various islands?  And you'll see that was

7    done.  The blue lines here reflect the underseas cable.

8            And it's important, and the reason we raise it -- you

9    might be asking why am I talking about this -- is that one of

10   the trips that was taken, a couple of the trips, related to the

11   underseas cables, the inspection of the plant -- or excuse me,

12   the inspection of the manufacturing plant in France you heard

13   that was manufacturing it.  And a related issue:  the Tahiti

14   trip.  You'll hear from people knowledgeable about the

15   homelands and how this brought change to their lives.

16           Now, this was a really big task.  Some people would

17   say impossible.  Other types of, you know, for-profit

18   utilities, it's not profitable.  We want to stay in O'ahu.  But

19   Mr. Hee had a vision and a *kuleana*, and that's important as to

20   a lot of things he did here.  And this tells you something

21   about him.  He wants to do things, accomplish good things, but

22   he doesn't violate the law.

23           Now, we're going to get you out of here in time, but

24   I want to -- I want to go through the various issues because

25   the government -- I want to give our side of the story.

1          Now, one of the issues was Mr. Hee decided to employ

2    his wife and children at the company.  And let me name his

3    children for you:  Adrianne Ho'o Hee, Breanne Liko Hee, and

4    Charles Kupa'a Hee.  You're going to hear all of them testify.

5    Mr. Hee knew you can't build a telecommunications company,

6    okay, that's going to be owned by Hawaiians, run by Hawaiians,

7    and service Hawaiians in his lifetime.  It takes a long time.

8    And what he wanted was to train -- to induce his children to

9    become a part of the company.  He wanted to start training

10   them.  And you're going to hear testimony there were

11   discussions early on about the children being part of the

12   company.  He wanted them, not to help them -- he did want to

13   help them; he's their father -- but as the future of the

14   company:  to take over.

15          You're also going to hear evidence -- so it may not

16   be just a boring tax case -- about how children don't always

17   agree with their parents as to -- we know what Mr. Hee wanted

18   to accomplish, and I think you'll find, when you'll hear the

19   children -- they're not such children anymore, and they are

20   accomplished, as the government said -- that they all had

21   different ideas as to when they would have to come back.  Okay.

22   One is already back, Liko, and you'll hear from her.  The other

23   two, Kupa'a and Ho'o, they're not back yet.

24          Now, the evidence will show that Mr. Hee believed to

25   train his children to be executives to take over this company,

1    what's a good starting point?  What's the best starting point?

2    We all know it.  A solid college education.  Working with

3    Sandwich Isles and the related companies, it's just not

4    telecommunications.  It's construction.  It's regulatory

5    issues.  It's financing.  It's everything.  And he knew that

6    they needed to have a good educational base.

7            Now, he also understood the importance of bringing

8    his wife into the business.  Wendy Roylo -- I'm sorry.  Again,

9    I pronounced the name wrong -- Hee.

10           Now, Wendy is from a plantation town of Waialua.  You

11   may be familiar with it.  She also graduated from Kamehameha

12   and attended college at Wesleyan and Harvard.  Expertise in

13   Hawaiian cultural matters and knew about the importance of

14   serving the Hawaiian Home Lands.  What you'll see evidence is

15   Wendy became part of the public face of the businesses because

16   Mr. Hee, he doesn't want to be part of the public face.  He

17   wants to stay in the background.  You'll hear many of these

18   trips that were talked about, Mr. Hee didn't go on those trips.

19   Okay.  They weren't family vacations.  They were

20   business-related.

21           Now, he decided it made good sense to not only employ

22   Wendy and the children.  You'll hear evidence Wendy started

23   when she was his partner not only in life, but in business when

24   this was starting out.

25           Now, the government says because Wendy didn't go into

1    the office every day, the kids -- the kids were in Santa Clara

2    or MIT.  "Why were you paying them a full-time salary?"  Okay.

3    There was good reason for it because it was part of what he

4    viewed as their training program.  And what you'll hear the

5    evidence is that the salaries were recorded, they were reported

6    by the children on their tax return.  The accountants knew that

7    they were paying these salaries when they were full-time

8    students.  Nobody ever said a word.  They thought it was okay.

9         Could they have scrutinized a little more how much

10   work they were doing?  Yeah, maybe.  But again, this is one of

11   those technical tax issues.  Nobody was hiding anything.  And

12   the accountants never told him you can't do this, you shouldn't

13   be doing this.  And there was good reason for doing it.

14        That's what the case is about.  There may be a

15   technical tax dispute, but if Mr. Hee was not willful, and the

16   evidence will show he was not, these are not crimes.

17        Now, I'm going to go through the rest of the issues

18   because the government opened them up in opening.  And

19   massages.  Okay.  It's true Mr. Hee received massages

20   frequently over the years, legitimate massages for his stress

21   and medical conditions.  The evidence will show many people in

22   the company knew he was going for his massage.  You can't go

23   somewhere twice a week for two hours.  This wasn't concealed.

24        Now, you're going to hear evidence from a third-party

25   expert of how important -- how good massage therapy can be to

1  relieve stress in the workplace.  Okay.  Businesses do it all

2  the time.  Government entities do it all the time.  And Mr. Hee

3  properly thought, "I'm the chief executive of the company.

4  Massage therapy is helping me.  Why not have the company pay

5  for it?"  Not an issue.

6        Now, you may -- there may be a technical tax dispute,

7  "Was it being offered to everybody?," this or that, yes.  But

8  nobody ever told him.

9        Now, the government is claiming, asserted here today,

10 that these were falsely characterized as consulting expenses.

11 What Mr. Hee and his administrative assistant told the

12 accountants was it was "health consulting."  Okay.  And the

13 accountants just changed it when they put things in categories

14 to just straight "consulting."  There's a big difference

15 between the two, and it's just sort of one of the errors that

16 the government -- you know, if the government looks at anybody

17 for 10 years with a microscope, they're going to find these

18 issues.  But you're going to hear evidence as to what the

19 accountants were told was "health consulting" and further

20 evidence that they should have inquired further.  What does

21 this relate to?  But they did not, and you'll hear why they did

22 not, how it got changed around.

23        Now, I'm going to try to straighten out a few things

24 now just so you're not left with a misimpression, but again all

25 this is just the road map.  You're going to hear the evidence.

1    Okay.

2           The government is right.  In 2004 Mr. Hee thought he
3    would be able to deduct tuition for MIT for Ho'o.  Put it in
4    the books, education expense, send it to the accountants.  No
5    concealment.  He thought it was part -- I could do it.
6    Businesses do pay for education expenses.

7           Now, there are technical rules.  Okay.  So the
8    accountants, when they do their review -- and these
9    accountants, you'll see, did review.  The accountants David
10   Chinaka and Carlton Siu and their staff, they will tell you
11   they missed it.  They didn't see it.  And that's why they
12   deducted it.  It was a mistake.  And they'll tell you it was
13   their mistake.  Nothing intentional.  It was an error, but
14   nothing intentional by Mr. Hee or the accountants.  They just
15   missed it.

16          But here's what happened.  The following year they're
17   looking a little closer at the books, and they say tuition to
18   MIT, Santa, Clara.  Nothing is hidden.  And, finally, the
19   accountants say, "Whoa, wait a second."  They notice it.  What
20   is it?  They talk to Mr. Hee.  They conclude, No, you can't
21   deduct the tuition.  And they said the way you should treat it,
22   treat it as a shareholder loan because that's the way
23   accountants routinely treat, when a company is paying personal
24   expenses for a business, an owner, treat it as a shareholder
25   loan.  It's the way they do it.  While it did start out as a

1    deduction, it changed to a shareholder loan based upon what the

2    accountants thought was right, and that's what Mr. Hee did.

3    Nothing concealed.

4            Now, the government says, well, there's no promissory

5    note.  Well, if you look at the books and records of the

6    company, it was a loan.  There was no note.  Do you need a note

7    when you loan money to a friend?  Do you document everything in

8    life?  You don't need -- the question is what in substance was

9    it, and it was a loan, not just being called a loan.  It was a

10   loan and done based upon the advice of the accountants.

11           Now, what you'll find is, yes, sometimes the IRS

12   comes in and challenges it, says, "Well, we want to tax that.

13   We don't think it's a loan."  But what you'll see is these

14   accountants, day in and day out, treated it as a loan, and

15   that's what people do.

16           And the government is right it was paid back later,

17   but I would just suggest when the government looks at an

18   examination or investigation period that goes from 2002 and

19   goes on to 2015, certain actions are going to happen after the

20   investigation starts.  So you'll get to evaluate whether it was

21   a loan.  We think it clearly was.  The accountants told him to

22   treat it as a loan, and the experts will say that's what's

23   done.

24           The Santa Clara house.  Yeah, there's a lot of issues

25   here.  We're going to talk about all of them.

1            Yes, they purchased a house in Santa Clara.  Waimana

2    purchased the house.  Mr. Hee didn't purchase the house;

3    Waimana purchased the house.  One child, Breanne, was already

4    in school in Santa Clara, and Kupa'a was going to be going to

5    school there.  But what the government didn't mention is

6    Waimana had a very big investment in a company called Siometrix

7    in the Santa Clara area, which was developing a more modern,

8    more sophisticated, more sensitive, and more portable, anthrax

9    detection device.  And you'll see -- the accountants will

10   present the schedules -- I think Waimana had an investment by

11   about $5 million at the time, maybe three to five.  I don't

12   recall right now.

13           Now, Mr. Hee thought, "We're going to be up there

14   watching our investment.  We're going to be going to the lab."

15   You're going to hear evidence about Mr. Hee going to the lab,

16   about Liko, the middle daughter, going to the lab, and thought,

17   you know, the kids could live there, take care of the property.

18   Not a big deal.

19           The technology ended up not being as promising, and

20   the lab work all moved back to Honolulu later on.  And you'll

21   hear evidence about how the research continues, the progress,

22   and, hopefully, that will be a successful investment.

23           Now, you're going to hear testimony that the

24   government's going to claim it wasn't used enough for

25   investment, Santa Clara, and the kids lived there, and Liko

1    later rented some of the rooms.  And she was told, "You're

2    managing.  You're taking care of it.  Learn how to manage

3    property."  And Liko probably did not do all -- send all the

4    information to the accounting department to do that properly.

5    Okay?  It happens.  It's a -- the government is going to assert

6    that Mr. Hee should pay the fair rental value as income for

7    their kids' use of the property, and that's not the case.  And

8    even if there is some technical issue, how would he know that?

9            Now, just a couple more.  The government -- and I'm

10   basing this on what their allegations -- over a five or

11   six-year period Mr. Hee took cash withdrawals when he would

12   travel, and the government is saying that's not a legitimate

13   business expense.  28,000 over a five-year period.  It's about

14   $5,000 a year.  But what you'll see is evidence that each of

15   these withdrawals is tied into one of his many business trips

16   that he was doing.

17           Now, finally, the government is asserting -- not

18   finally, a more -- another one -- asserting that over I think

19   it's a 10-year period, that the government has selected, after

20   scrutinizing, you're going to see millions of transactions,

21   millions of dollars, a hundred twenty thousand -- 121,000 in

22   personal expenses.  And what you'll see, that in large part,

23   those which they have picked out were business-related.  Okay.

24   There was a business purpose.  There may be some technical

25   rules, that did you keep all the paperwork to do it, but they

1    were business-related.

2           You heard about the Tahiti trip.  Yeah, I can see an

3    IRS agent say, "Hey, whoa, what about this?"  Okay.  But they

4    didn't complete the audit to really get into the facts of it.

5    What you'll hear is evidence is that Sandwich Isles and Waimana

6    were thinking of doing business with a Tahitian cable company

7    called Hanatoa.  And Mr. Hee thought it would be okay to send

8    his kids and Wendy to kick the tires, check out.  Okay.  Not a

9    formal thing, but go look, see what's going on.

10          Now, I don't doubt for a second that one of the

11   daughters, Ho'o, it's a vacation.  But the important point is

12   what you'll find out from the experts:  Well, if there's a

13   business purpose, it's not clear that you can't do what you're

14   saying.  And there was a business purpose.  Hanatoa was a

15   Tahitian cable company, and I believe what the evidence will

16   show is they were looking to maybe do business with Sandwich

17   Isles to land a cable here from Tahiti.

18          There are some other trips.  And I think what you'll

19   find is that there was a business purpose for most of them,

20   most all of them.  I don't necessarily have all the detail yet.

21   The government will present its case.  But I think you'll see

22   there was a reason.  Mr. Hee had a reason, the evidence will

23   show, to do what he did, and it was a reason in good faith.

24   Okay.

25          You're going to hear evidence of, basically, the

1    government picks out 121,000 of expenses.  I'm just looking at

2    that one.  Over a company during the same period of time

3    Sandwich Isles, Waimana, did six hundred million dollars,

4    approximately, of gross income.  These grew into -- small

5    companies, before there was any of this, into large companies.

6            And as I mentioned before, you can't look at anybody

7    under a microscope without coming up with issues as to

8    disagreements.  But what you'll see, you'll be convinced that

9    Mr. Hee was in good faith in what he did, and he was not

10   willful.

11           At the end of all the evidence, I'm going to

12   respectfully ask you to acquit him of all the charges, and

13   let's end this nine years.

14           Now, one more thing, and it's worth saying again, we

15   know you're coming here, you're away from work, your family,

16   and we appreciate that because that's the way this system

17   works.  But one other thing that's really important and I want

18   to thank you for:  We want to follow the rules, and your

19   commitment as jurors is very important.  Holding the

20   prosecution, the government, to its burden of proof, as the

21   Judge talked about, which the Judge said is a very high burden

22   of proof, and it stays with them throughout the entire trial.

23   Mr. Hee does not have to prove anything, but we will prove a

24   lot of things.

25           Now, the other thing -- and I really appreciate your

 1    attention at the end of the day -- is you've heard a lot of

 2    things from me that you didn't hear in the government's

 3    opening, and the government gets to go first.  Okay.  And

 4    that's how it's going to happen during the trial.  So I ask

 5    you, I know you will, keep an open mind and wait to hear all

 6    the evidence before making up your mind.

 7              With that in mind, I want to thank you for your

 8    attention, for your service as jurors, and I look forward to

 9    presenting the evidence and being here with you for the next

10    few weeks.  Thank you.

11              THE COURT:  Okay.  Ladies and gentlemen, I'm going to

12    excuse you for the day.  Can you leave your notebooks on your

13    chairs.  Nobody will look inside of them.  And remember that

14    you cannot do any research about this matter, and also you

15    cannot hear or read or listen to any news reports.  I'm sure

16    many of you have a routine where you read the morning paper,

17    you watch the evening news.  Can you switch while you're jurors

18    in this trial to watching the cable news, national news

19    channels, instead of the local news.  And for the newspaper, if

20    you have someone who can read the paper first and take out any

21    articles about a federal trial going on -- let me check with my

22    courtroom manager.

23              Are we the only trial today?

24              THE CLERK:  Next week there's another one.

25              THE COURT:  I think we are the only trial in this

1    building today; so any news story -- that may not be for the

2    rest of the trial.  But right now any news article about a

3    federal ongoing trial in Hawai'i, they need to clip that out.

4    And then you can read the newspaper with holes in it.  Read

5    around it.  Okay.  I thank you.  I know it's a nuisance, but

6    this is part of the system.  You need to focus not on what a

7    reporter may put into an article, but on the evidence in this

8    case.

9              Okay.  So I thank you, and I'm going to excuse you

10   for the day.

11             Tomorrow morning we will begin at nine o'clock; so

12   you should be here a little before then.  If you are in the

13   first floor juror lounge a little before 9:00, then

14   Miss Fujinaga will come down and get you and bring you up to

15   this courtroom so we can begin with the first witness at nine

16   o'clock tomorrow morning.  Thank you very much.

17             So when we rise, we rise for you.  So go ahead.

18         (Jury excused.)

19             THE COURT:  Okay.  So I will see counsel tomorrow.

20             Tomorrow, if you have some issue you need me to

21   address before the jurors come in, I'm arranging right now to

22   have an 8:30 telephone conference in another case; so you need

23   to let Miss Fujinaga know before 8:30.  I can meet with you at

24   eight o'clock, for example, but I do not want to delay the

25   jurors; so I want to start on the dot at 9:00.  So if something

1    arises, let her know early.  We can talk about it earlier than

2    8:30.

3              Okay.  Thank you.  I'll see you tomorrow, nine

4    o'clock.

5              MR. TOSCHER:  Thank you, Your Honor.

6         (Court adjourned at 4:09 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1               COURT REPORTER'S CERTIFICATE

 2          I, Debra Kekuna Chun, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript of the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9          DATED at Honolulu, Hawaii, August 13, 2015.

10

11                                   /s/ Debra Chun

12                                   DEBRA KEKUNA CHUN

13                                   RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25
```