1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3                                    )
       UNITED STATES OF AMERICA,     )  CR 14-00826 SOM
4                                    )
               Plaintiff,            )  Honolulu, Hawaii
5          vs.                       )  July 2, 2015
                                     )  9:00 A.M.
6      ALBERT S. N. HEE,             )
                                     )
7              Defendant.            )
                                     )
8      _____)

9              TRANSCRIPT OF JURY TRIAL (DAY 7)
             BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10               UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     For the Government:          LAWRENCE L. TONG
                                    Office of the U.S. Attorney
13                                  PJKK Federal Bldg.
                                    300 Ala Moana Blvd. Ste. 6100
14                                  Honolulu, HI 96850

15                                  QUINN P. HARRINGTON
                                    U.S. Dept. of Justice
16                                  Tax Division
                                    601 D St., N.W. Room 7029
17                                  Washington, DC 20004

18     For the Defendant:           STEVEN TOSCHER
                                    KURT K. KAWAFUCHI
19                                  LACEY STRACHAN
                                    Hochman salkin Rettig Toscher
20                                    & Perez
                                    9150 Wilshire Blvd., Ste. 300
21                                  Beverly Hills, CA 90212

22     Official Court Reporter:     Debra Kekuna Chun, RPR, CRR
                                    United States District Court
23                                  300 Ala Moana Blvd. Ste. C285
                                    Honolulu, HI 96850
24                                  (808) 541-2061

25     Proceedings recorded by mechanical stenography, transcript
       produced with computer-aided transcription (CAT).

```
 1                              INDEX

 2

 3   EXAMINATION

 4   Witness Name                                    Page

 5   Lynn Tamanaha

 6       Direct By Mr. Toscher................................   4

 7       Cross By Mr. Harrington .............................   6

 8       Re-Direct By Mr. Toscher ...........................   8

 9   Gary Howard

10       Direct By Mr. Toscher...............................  10

11       Cross By Mr. Harrington ............................  91

12   Gilbert Tam

13       Direct By Mr. Toscher..............................  110

14       Cross By Mr. Tong..................................  131

15       Re-Direct By Mr. Toscher ..........................  137

16

17

18   EXHIBITS

19   Exhibit                                         Page

20   50-4 Entered into Evidence                        6

21   50-7 Entered into Evidence                      128

22

23

24

25
```

1  THURSDAY, JULY 2, 2015                    9:10 O'CLOCK A.M.

2          THE CLERK:  Criminal 14-826 SOM, United States of

3  America versus Albert Hee.  This case has been called for

4  Further Jury Trial.

5          Counsel, please make your appearances for the record.

6          MR. TONG:  Good morning, Your Honor.  Good morning,

7  ladies and gentlemen.  Larry Tong and Quinn Harrington for the

8  United States.  With us are Christina Sorely and Special Agent

9  Greg Miki.  Good morning.

10          MR. TOSCHER:  Good morning, Your Honor.  Good

11  morning, ladies and gentlemen.  Steven Toscher for Defendant

12  Albert Hee, who is present with me in court, together with

13  Lacey Strachan.  And Mr. Kawafuchi is probably checking on the

14  witness.

15          THE COURT:  Okay.  Good morning.  You can be seated.

16  Welcome back.

17          I am turning back to Mr. Toscher.  Who will the next

18  witness be?

19          MR. TOSCHER:  Miss Lynn Tamanaha.  Your Honor, just

20  to let you know, she was a witness earlier.

21          THE COURT:  Yes.  So she's still under oath.

22          So you folks already have a sticker with

23  Miss Tamanaha's picture; so we're not going to take her picture

24  again.

25          Come on up.  Good morning.  So you are still under

1    oath as you were before.

2         Okay.  So this is a witness you've seen before:  Lynn

3    Tamanaha.

4         Counsel, go ahead.

5                      DIRECT EXAMINATION

6    BY MR. TOSCHER:

7    Q    May it please the Court.  Ladies and gentlemen.

8         Good morning, Miss Tamanaha.

9    A    Good morning.

10   Q    Miss Tamanaha, you testified before, and I had the chance

11   to question you as well as Mr. Tong.  Just to refresh the

12   recollection of the jurors, you were an accountant during the

13   period 2000 through 2012 with Chinaka & Siu?

14   A    8 -- oh, as an accountant?  Yes.

15   Q    Yes.  And you are a certified public accountant?

16   A    Yes.

17   Q    And one of your primary responsibilities there was the

18   preparation of the -- or the preparation of the Waimana

19   corporate tax returns.

20   A    Yes.

21   Q    And was it your procedure as you received information, if

22   questions came about, to request additional information from

23   Waimana?

24   A    Yes.

25   Q    Now, previously, you had testified that you asked

1    Miss Henderson what the payments to Diane Doll were, and you

2    testified she told you they were for health consulting; is that

3    correct?

4    A    Yes, correct.

5    Q    I'd like to ask you to look at Exhibit 50-4 in your book

6    there.

7    A    Okay.

8    Q    Would you look at that.  And do you recognize this as a

9    memo you received from Nancy Henderson on or about

10   January 20th, 2003?

11   A    Yes.

12   Q    And did you receive these types of information from the

13   client in the ordinary course of your business of preparing the

14   returns?

15   A    Yes.

16   Q    Now, if you go down and look at -- and you recall

17   receiving this from Miss Henderson; is that correct?

18   A    Yes.

19        MR. TOSCHER:  Your Honor, I would offer 50-4 into

20   evidence.

21        MR. HARRINGTON:  Your Honor, I object on hearsay

22   grounds, and also this is cumulative of her earlier

23   testimony.

24        MR. TOSCHER:  It's not hearsay, Your Honor.  It's a

25   business record offered for the truth -- I mean, offered for

1  the fact that it was sent to her.  And Mr. Harrington is right

2  it's been testified to, but we would like to have a document in

3  the record.

4          THE COURT:  Objection's overruled.  I'm receiving

5  50-4.

6  BY MR. TOSCHER:

7  Q    Miss Tamanaha, this is 50-4 that you have in front of you.

8  Would you look -- focus on it says:  "Hi, Lynn.  Here's the

9  information requested."

10          Thank you.  I apologize.

11          "Here is the information requested."  And number 3,

12  she is telling you payments to Diane Doll are for health

13  consultant services; is that correct?

14  A    Yes.

15          MR. TOSCHER:  I have no further questions, Your

16  Honor.

17          THE COURT:  Okay.  Mr. Harrington, do you have any

18  cross-examination?

19          MR. HARRINGTON:  I do.

20                      CROSS-EXAMINATION

21  BY MR. HARRINGTON:

22  Q    Good morning, Miss Tamanaha.

23  A    Good morning.

24  Q    I hope you had a more relaxing weekend than all of us did.

25          Let me just touch on a few quick points here.  You

1   were shown a document.  And, actually, if we could get that

2   document back on the screen.

3         And now you testified before that you didn't know

4   that Diane Doll was a personal massage --

5   A    Correct.

6   Q    -- services; right?

7   A    Yes.

8         THE COURT:  Counsel, you can make that bigger by

9   adjusting the height of the light.

10        MR. HARRINGTON:  Thank you.

11        THE COURT:  There's a -- this Elmo, yeah.

12        MR. HARRINGTON:  There we go.  Thank you.

13        THE COURT:  You might -- because people get kind of

14  seasick when it's crooked.  Mr. Tong, can you straighten that

15  out?

16        Thank you very much.  Thank you.

17        MR. TONG:  Is that big enough?

18  BY MR. HARRINGTON:

19  Q    And so also just so the jury remembers, you stopped

20  working on the Waimana corporate returns in 2008; is that

21  right?

22  A    Yes.

23  Q    And then you found out what Diane Doll's services were as

24  a personal masseuse in 2011.

25  A    Yes.

1    Q    And you found out from the IRS?

2    A    Yes.

3    Q    Okay.  And if we look at this document here, it says

4    payments to Diane Doll are for health consultant.

5    A    Uh-huh.

6    Q    But it doesn't say for massage purposes.

7    A    Yes.

8    Q    And it doesn't say for Albert Hee either, does it.

9    A    No, it doesn't.

10         MR. HARRINGTON:  I don't have any further

11   questions.

12         THE COURT:  Okay.

13                    RE-DIRECT EXAMINATION

14   BY MR. TOSCHER:

15   Q    Just briefly, Miss Tamanaha.  The -- when you were told

16   they were for health consulting services, you didn't raise that

17   to the partner level with Mr. Siu, did you.

18   A    I didn't tell him.

19   Q    You didn't raise it to -- when you saw health consulting

20   services, you didn't think it was an issue that you needed to

21   raise with the partners?

22   A    Yes, that's correct.

23   Q    And you didn't raise it with them, did you.

24   A    No, I didn't.

25         MR. TOSCHER:  No further questions, Your Honor.

 1                MR. HARRINGTON:  Nothing further.

 2                THE COURT:  Then the witness is excused.  You can

 3     leave the courtroom.  Thank you.

 4         (Witness excused.)

 5                MR. TOSCHER:  Your Honor, the defense calls Mr. Gary

 6     Howard.

 7                THE COURT:  Okay.

 8                MR. TOSCHER:  Your Honor, we have -- Mr. Howard is

 9     an -- I have some notebooks for counsel, the Court, and the

10     jury.  Can I start handing those out?

11                THE COURT:  Have you seen these, counsel?

12                MR. HARRINGTON:  We have not seen them, Your Honor.

13                THE COURT:  Show it to them and make sure this is

14     okay, I think the same as when you were wanting to check the

15     schedules before they were passed out.

16                In the meantime, why doesn't the witness come up so

17     we can at least take the photograph while you're taking care of

18     that.

19                MR. TOSCHER:  Your Honor, I'll pass these up.  Here's

20     the Court's copy.

21                THE COURT:  My law clerk can help you with this.

22                MR. TOSCHER:  I think the witness has a copy, Your

23     Honor.

24                THE COURT:  This is mine.

25                MR. TOSCHER:  That's for you, yes, Your Honor.

1          Your Honor we have copies of the small notebook for

2    the jurors to Mr. -- once the government looks at them.

3          THE COURT:  Okay.  So let's -- yeah, let's swear him

4    in.

5        (Witness photographed.)

6          THE CLERK:  Please raise your right hand.

7        (Witness sworn.)

8          THE CLERK:  Thank you.  Please be seated.

9          Please state your name and spell your last name.

10          THE WITNESS:  Gary L. Howard, H-o-w-a-r-d.

11          THE COURT:  I think there might be a little

12   questioning before we get to this.

13          Okay.  Go ahead.

14                      DIRECT EXAMINATION

15   BY MR. TOSCHER:

16   Q    May it please the Court.  Ladies and gentlemen.

17          Good morning, Mr. Howard.

18   A    Good morning.

19   Q    Will you please state your business address for the

20   record.

21   A    My business address is 10417 Los Alamitos Boulevard, Los

22   Alamitos, California 90720.

23   Q    And what is your occupation?

24   A    I am a certified public accountant.

25   Q    And how long have you practiced as a certified public

1  accountant?

2  A    I have practiced as a certified public accountant since

3  1981.

4  Q    Okay.  And who are you certified by as a certified public

5  accountant?

6  A    I am licensed by the State of California and also the

7  State of Nevada.

8  Q    And tell us briefly -- well, before you were certified,

9  tell us a little bit about your educational experience.

10  A    I have my Bachelor's of -- I have my Bachelor of Arts,

11  major in accounting and economics from Cal State Fullerton, and

12  I have a master's in taxation from Golden Gate University.

13  Q    I don't think we've -- the jury has heard some testimony

14  regarding you're -- about undergraduate degrees in accounting.

15  Tell us about your course -- what kind of courses did you have

16  to take to get your undergraduate degree in accounting?

17  A    In undergraduate accounting you're required a minimum of

18  24 semester hours of accounting to obtain a degree.  In order

19  to become a certified public accountant, you must -- for the

20  State of California -- work a minimum of two years for another

21  certified public accountant that certifies that you have been

22  trained by that professional, plus pass a lengthy examination.

23  Q    Okay.  And you've been certified.  I assume you took the

24  examination?

25  A    I did take the examination, and I was certified in 1984.

1    Q    Okay.  And you obtained the practical experience which

2    also was a component to be certified?

3    A    Yes.

4    Q    Let me ask you a little bit about you mentioned a master's

5    degree in taxation.  Explain that to the jury.

6    A    I obtained an additional degree.  After practicing for

7    approximately 10 years in the field of public accounting I

8    continued my education and received a degree from Golden Gate

9    University in taxation, which is a master's program

10   specifically studying the areas of tax, both individual,

11   corporate, and other business entities.

12   Q    Okay.  Can you tell us a bit about your professional

13   experience after you left college in the accounting field.

14   A    Yes.  I worked for two firms.  One firm was a small

15   practitioner in the Southern California area, specifically Long

16   Beach.  That individual specialized not only in taxation but

17   also in the accounting and auditing of closely-held

18   corporations, meaning a few number of shareholders and

19   controlled by either a family or a specific shareholder.

20           Then the -- subsequent to working for the firm in

21   Long Beach, which was titled The Accounting Firm of Clement W.

22   Morin, I went to work in Los Angeles for a firm that was

23   approximately 24 to 30 people, five partners.  And they were --

24   their name was Levine, Cooper, Spiegel & Company, and they

25   specialized also in closely-held corporations, shareholders,

1   tax prep, estate planning, a full-service accounting firm.

2   Q    When you said "tax prep," you meant preparation of tax

3   returns?

4   A    Yes, tax preparation.

5   Q    You mentioned closely-held corporation.  What is a

6   closely-held corporation?

7   A    What makes a closely-held corporation unique, and it's

8   referred to many times in our industry, there is what's called

9   the basis of accounting, which is Generally Accepted Accounting

10  Principles.  There is a common term used that refers to Big

11  GAAP and Little GAAP.  Big GAAP meaning still it's generally

12  accepted accounting principles, but those are the accounting

13  principles that apply to very, very large corporations, such as

14  GM, Exxon, et cetera.

15        Under the same umbrella there is generally accepted

16  accounting principles that apply to both types of businesses

17  but are more common to smaller businesses.  Smaller business is

18  defined as businesses that are owned by a specific shareholder,

19  a family, or a small group of individuals, related or

20  unrelated, that control and run the daily operations of a

21  business.  My experience has been primarily with what's called

22  Little GAAP or closely-held corporations with limited number of

23  shareholders.

24  Q    Okay.  Do you have your own certified public accounting

25  firm now?

1    A    Yes.   I started my own practice in May of 1986 by the name

2    of G.L. Howard, specifically my name.   Approximately, two years

3    ago I added a partner to my firm.   Now we are G.L. Howard &

4    Company.   We are approximately eight accountants and one

5    administrative staff at this time.

6    Q    Okay.   Could you tell us the type of work your company --

7    what you have engaged in since you formed the company, the type

8    of work you guys do.

9    A    It varies, but still we're relying on the roots where I

10   learned the specialty I have of dealing with closely-held

11   companies.   We take care of approximately 60 to 85 corporations

12   with revenues of anywhere from two to a hundred million

13   dollars, employees working for those companies, anywhere from

14   five to 200 employees.   That's our primarily what we call our

15   general practice.

16        We also assist taxpayers in the area of

17   representation when their corporation or them themselves

18   individually are selected for audit by the Internal Revenue

19   Service or a state or local authority.   We assist them in

20   representing them, accumulating documents, presenting those

21   documents, and ultimately coming to a result and settlement of

22   the issue at hand.

23   Q    You mentioned tax preparation.   How many -- you mentioned

24   a number of closely-held corporations.   How many tax returns

25   does your firm prepare a year?

1    A    We do approximately 450 to 500 individual tax returns.

2    Q    And that's a Form 1040?

3    A    Form 1040, yes.

4    Q    And how many business returns?

5    A    Approximately, 65 to 85, which I would call substantial

6    corporation corporations that have business activities and have

7    revenues, employees, and definite trades or businesses that the

8    actual entity is performing.

9    Q    Okay.  In addition to tax preparation, do you do any tax

10   planning services?

11   A    That is a standard area.  In today's environment it is

12   more likely than not as a CPA that you will not only be asked

13   to prepare returns but, more importantly, to assist the

14   taxpayer in determining proper tax strategies in order for them

15   to minimize their taxes and only pay what is the legally

16   minimum that they should be responsible for.

17   Q    Okay.  In addition to the tax services, what type of

18   accounting services does your company render?

19   A    We render all major forms of accounting services.  We do

20   perform certified financial audits.  Although, lately the

21   standards have been changing, they're very labor-intensive type

22   engagements, and so we don't perform as many audits as we used

23   to.  Although, we prepare what's called reviews, which,

24   basically, have the -- some of the standards similar to an

25   audit in preparing a financial statement.

1            We also assist taxpayers with compilations, which

2     from an accounting term is assisting the taxpayer of

3     accumulating their financial data, making sure that data is

4     posted correctly to their books and records, and ultimately

5     preparing a financial statement that can be used not only

6     internally, but for third parties.

7            And then a major part of our practice has grown

8     probably over the last 15 years.  We do a lot of forensic

9     accounting work where we --

10    Q    Explain what forensic accounting work is.

11    A    Forensic accounting work is reviewing transactions, what

12    we call drilling down.  "Drilling down" means reviewing

13    transactions, not only from the final payment via a check, but

14    actually looking at the supporting documentation, looking at

15    the flow of the information, determining that not only if the

16    flow or the information is being reported correctly, that

17    there's no improprieties in that information.  A forensic

18    engagement is an engagement where you're asked for a specific

19    or a specific purpose to look at something to see, for all

20    intents and purposes, that the transactions are being handled

21    correctly and there is not a problem.

22    Q    Do you have any experience teaching accounting?

23    A    Yes.  I'm currently a part-time professor at Cal State

24    Fullerton.  I am their forensic accounting instructor.  That is

25    a course not only in forensic accounting, it is a course that

1    is required by senior accounting students at the university if

2    they do not choose to go into the auditing field.

3           So I've been teaching for approximately a year, two

4    semesters, there.  I will be teaching again in the fall.  I

5    feel privileged to be able not only to teach at my alma mater,

6    but it keeps me very current in the forensic area and the

7    changes and different techniques that are used to analyze

8    transactions.

9    Q    You mentioned before you had a master's degree in

10   taxation.  What type of -- I don't think I asked you.  What

11   type of courses did you have to take and how many courses to

12   get that?

13   A    There was 10 courses, three semester hours, so

14   approximately 45 hours of study in each course or 450 hours of

15   required classroom and study for an entire degree.  The classes

16   in the taxation area dealt with -- start the individual

17   taxation, also the study of tax, how it applies to

18   corporations, how tax applies to corporation and their

19   shareholders, the basis of tax law, meaning the research that's

20   necessary and the foundation that is necessary in order to

21   analyze a transaction and make a good-faith determination on

22   its deductibility.

23   Q    Where are your clients located, your present practice?

24   A    My present practice I have clients recently all over the

25   country now, with the advent of our computers and our

1    telecommunication systems are so much different.  But my

2    practice is primarily in the State of California.  I do have

3    clients here in the State of Hawai'i and a few clients in the

4    State of Nevada.

5    Q    Have you ever been qualified as an expert in court?

6    A    Yes.

7    Q    Have you been qualified in a number of different courts?

8    A    Yes.  I've been qualified in -- not only federal court,

9    but district -- Superior Court or California state court.

10   That's where my primary experience comes from.

11   Q    Where have you been qualified in the federal District

12   Court?  What federal District Courts?

13   A    I've been qualified in the Los Angeles federal court and

14   also here in the State of Hawai'i in this court.

15   Q    Okay.  And you were qualified as an expert in tax matters

16   and tax accounting matters?

17   A    Yes.

18        MR. TOSCHER:  Your Honor, we would offer Mr. Howard

19   as an expert.

20        MR. HARRINGTON:  In what?

21        THE COURT:  In the fields of --

22        MR. TOSCHER:  As an expert in the field of tax and

23   tax accounting matters.

24        MR. HARRINGTON:  No objection.

25        THE COURT:  Okay.  Then he can give his opinions in

 1    those fields.

 2              MR. TOSCHER:  Your Honor, we would like to hand out

 3    the demonstrative exhibits.

 4              MR. HARRINGTON:  Your Honor, we've been given a lot

 5    here.  I think we'd like a little bit of time to review it.

 6              THE COURT:  Okay.

 7              MR. HARRINGTON:  And so --

 8              THE COURT:  Even though we've just begun --

 9              MR. HARRINGTON:  I understand.  This is the first

10    time we've seen any of these --

11              THE COURT:  Yes.  No, I know.  Are there other things

12    you can talk about before you get into those exhibits, or are

13    those exhibits --

14              MR. TOSCHER:  I think they're key to the overall

15    testimony.

16              THE COURT:  Okay.  We're going to take a little

17    break.  Don't go far because we'll resume as soon as we can,

18    okay?

19         (Jury excused.)

20              THE COURT:  Okay.  I hope it won't be a long break,

21    but let the courtroom manager know.  Okay?

22              So we're off the record.

23         (Court recessed at 9:40 A.M., until 10:25 A.M.)

24              THE COURT:  Okay.  I just wanted to ask both sides, I

25    know that, you know, you're probably not getting much sleep and

1   you're working late at night.  I need you, like, to get an hour

2   less sleep on both sides.

3           So I totally understand that, when you're making

4   these big exhibits for your summary or expert witnesses, that

5   you're reacting to late-breaking events in the trial; so you

6   didn't have everything you needed, either side, to do these

7   things, you know, a week earlier.  Do them an hour earlier.

8   Give it to the other side by eight o'clock in the morning on

9   the day the witness is coming in so we don't have to delay in

10  front of the jury.  So instead of either side giving these

11  dense exhibits as the witness takes the stand, exchange it at

12  8:00 in the morning so that, before the jury's here, people can

13  look it over.  That's what I'm asking.

14          So I know you're up till 3:30, now you got to stay up

15  till 4:30 in the morning so you give that hour earlier thing.

16  Both of you.  Please.  So they don't have to wait.

17          Okay.  Let's call the jurors.

18          MR. TOSCHER:  Your Honor, before they get here, I've

19  talked to Mr. Harrington regarding the books for the jurors,

20  and for the small book -- that's the only one we're passing

21  out -- they have no objection.  So do we want to wait for --

22          THE COURT:  Okay.  That's okay?

23          MR. HARRINGTON:  There's no objection to passing it

24  out.

25          THE COURT:  Okay.  Then why don't we just stick them

1   on their chairs.

2           MR. TOSCHER:  Okay.  That's what I'm asking.

3       (Jury enters.)

4           THE COURT:  Thank you to the jurors for their

5   patience.  Things have worked out so you have binders, and

6   we'll let you know when to open those binders and what to look

7   at in the binders.  Okay?

8           Mr. Toscher, you can proceed.

9           MR. TOSCHER:  May it please the Court.  Ladies and

10  gentlemen.

11  Q    Mr. Howard, do you have a small binder in front of you?

12  A    Yes, I do.

13  Q    This.  Could you briefly -- the first page is a Table of

14  Contents.  Would you just please describe what the Table Of

15  Contents is.  And maybe the jurors can turn to the Table of

16  Contents so they have reference.

17          THE COURT:  Okay.  It's really exciting, this Table

18  of Contents.  Go ahead and open the first page.

19          THE WITNESS:  All right.  On the upper, left-hand

20  corner lists an exhibit number.  The exhibit number is then

21  followed by a page number, which is the page number of the

22  descriptions, of the particular information that I will be

23  presenting to the Court as part of my analysis for the

24  foundation of the opinions that I'm going to present.

25  BY MR. TOSCHER:

1    Q    Okay.  Thank you.  Because we are going to be referring to

2    page numbers.

3             So the first page I would like you to turn to is page

4    18 dealing with the --

5             THE COURT:  Okay.  So the jurors should wait.  Okay.

6             You're only asking the witness to turn to page 18.

7             MR. TOSCHER:  That's correct.  I'm sorry, Your Honor.

8    Q    Mr. Howard, could you just tell us -- I asked you to

9    undertake a forensic accounting investigation regarding the

10   classification of the 2004 tuition expense; is that correct?

11   A    That's correct.

12   Q    Okay.  Would you tell us what page 18 reflects, and then

13   we'll ask the Court to allow it to be published.

14   A    Page 18 is a flow chart illustrating my analysis of the

15   information that I reviewed and my conclusions that I

16   determined regarding the tuition expense and the error that was

17   made in deducting that expense.

18             MR. TOSCHER:  Okay.  Your Honor, at this time I would

19   ask the jurors to be able to turn to page 18 of the book.

20             THE COURT:  Any problem?

21             MR. HARRINGTON:  No objection.

22             THE COURT:  All right.  Jurors, you can go ahead.

23   And at the bottom of the page you'll see it says page such and

24   such of 50; so you need to find the place that says page 18,

25   which has blue and green geometric shapes on it.

1          And once again you are not going to have these

2     binders in the deliberation room.  So if you are taking notes

3     to help you remember things, you need to put them into those

4     spiral notebooks.  Don't write your notes on the things in the

5     three-ring binders because then your notes won't be with you.

6     Okay?

7     BY MR. TOSCHER:

8     Q    Mr. Howard, before -- why don't you first describe what is

9     reflected on page 18.

10    A    Page 18 is a flow chart that analyzes the checks that were

11    written to MIT and their classification in the internal records

12    of Waimana Enterprises, their subsequent re-entry or

13    reproduction in the creation of the corporation's general

14    ledger by the -- by Waimana's independent certified public

15    accountants.  From that information, the information that was

16    entered, the analysis that was done with that information,

17    reflecting in a preparation of a financial statement and a

18    deduction on the 2004 Waimana tax return.

19    Q    Okay.  So we have a number of pages.  Let's -- the first

20    blue circle:  checks written payable to MIT.  Is there a page

21    number that we can refer the jurors to with the court's

22    permission after you describe it, and what page is that?

23    A    Yes, sir.  It would be page 19.

24          MR. TOSCHER:  And, Your Honor, can we have the jurors

25    go to page --

1          THE COURT:  Let me just check.  Mr. Harrington, are

2    you going to have any problem with the jurors referring to

3    anything in this notebook as the witness refers to those pages?

4          MR. HARRINGTON:  No, Your Honor.

5          THE COURT:  Okay.  Then when he asks the witness to

6    look at it, you can look at it, too.  Okay?  So page 19 is what

7    the witness is now looking at.

8    BY MR. TOSCHER:

9    Q    Mr. Howard, what does page 19 reflect?

10   A    It is a recap of the college tuition payments for the year

11   2004 that were written and dispersed by Waimana Enterprises to

12   the Massachusetts Institute of Technology.

13   Q    Okay.  And that recap, can you explain where in these --

14   what it is based upon and where you get that information?  I

15   believe pages 20, and you can maybe walk the jurors through

16   that, how we come up with those numbers.

17   A    Yes, yes.  On this recap the first column is work paper

18   reference.  That's our internal -- or my office's internal

19   referencing of the data.  The date is the date.  For instance,

20   the first date is 7/27/04.  That would represent the date that

21   the check was written.  Check number's the specific check

22   number.  The amount is the amount.  And name is the name that

23   was reflected in the books and records of Waimana.  And the

24   memo for this column to the right is the specific description

25   that is reflective in the books and records of Waimana.

1   Q    When you're referring to the books and records of Waimana,

2   are you referring to the Quicken or QuickBooks?

3   A    Yes.  If the Court could turn to page 20.

4           THE COURT:  Go ahead.

5           THE WITNESS:  Page 20 at the top indicates that

6   the -- at the top says Waimana.  It says General Ledger.  And

7   it says as of December 31, 2004.  That would reflect the

8   transactions for the entire calendar year beginning January 1

9   of 2004 and concluding on December 31, 2004.

10          If you look at the -- close to the middle of the

11  page, you should see a highlighted amount.  It says check

12  7/27/04, check 4081, MIT, amount $15,400.  If you look at that,

13  that is the information that I used in order to review and

14  recap the amount of payments that were paid to MIT as tuition

15  expense.  If we --

16  Q    Let me just interrupt you one second.  The -- to take you

17  through pages 21, 22, and 23, that is what you're referring to

18  as --

19  A    Yes.

20  Q    -- the backup for your summary schedule.

21  A    That is correct.

22  Q    And these pages, if you go to page 20 of 50, just so we're

23  clear, this is an excerpt of the Waimana Quicken or QuickBooks.

24  It says General Ledger.  This is excerpted from Government

25  Exhibit 4-1?

1    A     That is correct.

2    Q     And in looking at the first page, page 20 of 50, how is

3    the -- how is the payment to MIT categorized?

4    A     It's categorized, if we look at the sixth column, so type,

5    date, number, name, memo, and then what is the term split,

6    which "split" is a term that is characteristic of the

7    QuickBooks accounting program.  It means, specifically, that

8    the expenses may be split between two or three different

9    categories.

10          In this case, if we look at the check dated 7/27/2004

11   that's highlighted, we will see under the word "split" -- or

12   I'm sorry, the sixth column you will see a classification

13   indicating WEI.

14   Q     Do you know what that refers to?

15   A     Just the pronunciation.  It means WEI.

16   Q     But it stands for the company?

17   A     Yes.

18   Q     Which company?

19   A     Waimana.

20   Q     So on the Quicken the only characterization of this is

21   either describing that it's a payment for tuition and that it

22   relates to Waimana; is that correct?

23   A     That's correct.  And this -- so the Court understands,

24   this would be a characteristic that is not familiar to -- is

25   not common to a general ledger.  General ledger is specifically

1    an accumulation of the income and expenses classified by a

2    specific type of income and expense.  This I would describe, if

3    I could describe it, to a person that is not an accountant, I

4    would say this is similar to what would be a check register,

5    something you would keep in your checkbook in your wallet, a

6    checkbook in your purse or your checkbook.  It is,

7    specifically, just a listing of checks giving the description

8    and the amounts.

9    Q    Okay.  And going to page 21, the highlighted yellow.

10   A    Same thing.  21, page 22, and page 23 are all similar

11   characteristics to page 20.

12   Q    Okay.  So 20, 21, 22, and 23 are summarized on page 19 of

13   50, page 19, and tell us what box that fits into on your chart.

14   A    That would fit into checks written payable to MIT.

15   Q    Okay.  That is the -- okay.  And what about the second box

16   where you say -- what does the second box say?

17   A    The second box just is -- second box says check recorded

18   to account titled WEI; memo, tuition and related expenses.  So

19   that applies to our pages 20 through 24 is that is the -- the

20   memo is the memo, and the description is the description.

21   So -- and on page 20 simply the check 7/27/2004 to MIT, it says

22   Ho'o's fall 2005 tuition, and it's classified to WEI.

23   Q    Okay.  Going down now, let's go to page 18 of 20, the flow

24   chart.  What does the middle box refer to?

25   A    The middle box says QuickBooks Quicken accounting provided

1   to outside accountants.

2   Q    Okay.  And based upon your forensic analysis and review of

3   the records, your understanding is these QuickBooks were

4   provided to the outside accountants.

5            MR. HARRINGTON:  Objection.  Foundation.

6            MR. TOSCHER:  Based upon his review of --

7            THE COURT:  Okay.  Overruled.

8            What was your understanding about whether these

9   QuickBooks were provided to the outside accountants?

10           THE WITNESS:  My understanding is that the QuickBooks

11  information was provided to the outside accountants, and the

12  information that was provided that was prepared by the outside

13  accountants coincides with the information that is presented

14  here.

15  BY MR. TOSCHER:

16  Q    Okay.  Still focusing on pages 18 -- page 18 of 50, the

17  graphic, and when you said based upon the analysis they went to

18  the outside accountants, which outside accountants are you

19  referring to, Mr. Howard?

20  A    Chinaka & Siu.

21  Q    And if you go to the box at the bottom, the first green

22  circle, tell us what you're trying to talk about here and what

23  supporting documents you have for that.

24  A    Yes.  If you don't mind, Counselor, I wouldn't mind

25  completing the middle box here with the QuickBooks Quicken

1    accounting and just briefly talk about page 24 of 50.

2    Q    Okay.

3              THE COURT:  You can go ahead and look at page 24.

4              THE WITNESS:  If you look at page 24, you'll see at

5    the top Waimana Trial Balance as of December 31, 2004.

6              The amounts that are reflected, as far as the dollar

7    amounts, are the amounts that have accumulated in the specific

8    descriptions that are illustrated in the first column or the

9    first descriptions.  Example, WEI, first line HMB 120-02275.

10   The balance that would be reflective there would be 19,235.39.

11             The point of this document is that each of these

12   items, like, if you look at KBT, KCPK, Master Hong, MK Power,

13   those aren't specific expenses.  They're specific expenses, and

14   they may be specific expenses from these descriptions, but a

15   general ledger, basically, breaks down -- and not to be

16   redundant of previous testimony here.  A general ledger,

17   though, normally classifies expense by type of expense, whether

18   it's material, whether it's utilities, whether it's taxes.

19             So looking at this from an accounting perspective,

20   not only as a forensic accountant, that these expenses are not

21   specific to a general ledger, this, from 35 years of accounting

22   experience, tells me that the information here is being

23   presented to someone else to classify, to code, to categorize,

24   and to accumulate and review to make a determination on the

25   ultimate -- not only the ultimate deductibility of expenses,

1   but also the classification of expenses.

2           MR. HARRINGTON:   Objection on foundation on that

3   response.   I understand he's had 35 years of experience, but I

4   don't think there's a foundation for why this was presented in

5   the form it was.

6           THE COURT:   Okay.   I'll sustain.   You can get him to

7   explain how his experience makes him conclude that.

8   BY MR. TOSCHER:

9   Q    Mr. Howard, we're referring to page 24 of 50.   Are you

10  familiar with receiving from clients check registers or --

11  check registers based upon Quicken and QuickBooks?

12  A    Yes.   This is a very common practice between clients and

13  their -- ultimately, their CPAs or their accountants.   This is

14  a practice that is very common of receiving information in this

15  form -- quite frankly, in almost a junky form -- and, as an

16  accountant, being asked to review those records and classify

17  them and code them.

18  Q    If you were to receive something like this at the end of a

19  year for preparing taxes, would you believe that you, as an

20  accountant, would have a lot of work to do?

21  A    Yes.

22  Q    And that work would -- would that work include preparing a

23  real general ledger and characterizing these expenses?

24  A    Correct.

25          MR. TOSCHER:   Your Honor, I -- okay.   I think we got

1   in what we needed to.

2   Q    Okay.   The -- and again just for -- page 24 of 50 is an

3   excerpt printed from Government Exhibit 4.1, Mr. Howard?

4   A    Yes.

5   Q    So if we've completed your center box of the QuickBooks

6   going to the accountant, your first -- what do you try to tell

7   us on your first circle at the bottom, Mr. Howard?

8            THE COURT:   So now you're back on page 18.

9            MR. TOSCHER:   Yes.   Thank you, Your Honor.

10           THE WITNESS:   The first box on the left on page 18,

11  it says the checks are re-entered in the Chinaka & Siu and

12  Company accounting program to create a general ledger.

13  Q    And can you tell us how you went about determining that

14  with the exhibits.

15  A    Yes.

16  Q    And the page numbers.   Excuse me.

17  A    Yes.   On page 25 of 50, you see an excerpt from a general

18  ledger.   If you look at the top, it says Waimana Enterprises,

19  Inc. It says Year-to-date General Ledger.   On the left-hand --

20  furthest part of the left-hand, it says client 410.

21           My practice, meaning my practice and experience, it

22  appears to me that this is a client number that has been given

23  to Waimana Enterprises by Chinaka & Siu.

24           And if you look, starting with 64600, you see the --

25  account number 64600, which is the first to the left.   You see

1   a description:  Contributions.  It lists the names of those

2   contributions.  64700 says political contribution.  It actually

3   lists names.  64900 says educational, which I highlighted.  It

4   shows that these expenses were classified -- reclassified

5   by the company that prepared this general ledger, was

6   reclassified as educational expenses.

7           MR. HARRINGTON:  Objection again, Your Honor, to

8   foundation.  I don't think that's consistent with the testimony

9   in this case how these have been prepared.

10          THE COURT:  I'm sorry?

11          MR. HARRINGTON:  I'm objecting on foundation because

12  it's not consistent with the testimony that's been received in

13  this case about how --

14          THE COURT:  Okay.  Well, maybe -- but this is what

15  he's assuming.

16          THE WITNESS:  Yes.

17          MR. HARRINGTON:  So long as it's clear he's

18  assuming.

19          THE COURT:  You can cross-examine.

20          MR. HARRINGTON:  Thank you.

21          THE COURT:  Overruled.

22   BY MR. TOSCHER:

23  Q    In focusing on page 25 of 50, is it your understanding

24  that this was prepared by Chinaka & Siu?

25  A    Yes.

1    Q    Are there indications on this page that it was prepared by

2    Chinaka & Siu?

3    A    It appears maybe the Bates stamp at the bottom:  CHWA.

4         On page 31 of 50, there's a tax return that states at

5    the bottom the firm preparing the actual tax return was Chinaka

6    & Siu.

7    Q    Let me just ask it this way, Mr. Howard.  Based upon your

8    review of these records here, is there any doubt in your mind

9    that this general ledger was prepared by Chinaka & Siu?

10   A    No.

11   Q    Okay.  So we're talking about 25 of 50 where these

12   payments are characterized in account 64800 as educational

13   expenses.  So what's being done here is that big category of

14   WEI expenses that we saw on page 24 are being broken down by

15   the accountants; is that correct?

16   A    That is correct.

17   Q    So if you can walk us through 26.

18   A    26 in the -- towards the middle of the page, you'll see an

19   account described as Travel, and you'll see a disbursement to

20   MIT.

21   Q    And did you make a determination of -- same thing for page

22   26?  This was a categorization by Chinaka & Siu?

23   A    Yes.

24   Q    In a general ledger prepared by Chinaka & Siu?

25   A    Yes.

1    Q    Now, continuing with your forensic analysis here -- or

2    let's go back -- let's go back to the chart, page 18.

3    A    Yes.

4    Q    The second box.  The second box is a summary which,

5    basically, summarizes the last two exhibits we were talking

6    about.  And it says "Checks classified as educational and

7    travel expenses"; correct?

8    A    That's correct.

9    Q    So that's a summary of the Chinaka & Siu general ledger

10   information.

11   A    Correct.

12   Q    Okay.  Now, where do we go from there?

13   A    We go to the -- a financial statement that's prepared.

14   Q    Okay.  Is that --

15   A    And that would be page 27, 28, and most specifically page

16   29.

17   Q    Okay.  Again before we get to what's reflected on this,

18   tell the jury what this is here.  How does this document says

19   Waimana Enterprises -- page 27, ladies and gentlemen.

20           Waimana Enterprises Statement of Assets, Liabilities,

21   Stockholder Equity, Modified Cash Basis, December 31, 2004.

22   What is being done on these pages and how does it relate to

23   accounting practice?

24   A    These pages are a -- and it says See Accountant's Report.

25           These pages are the accumulation or a listing of the

1   final balances of each account that's reflected in the general

2   ledger.   These are the actual income, expenses, assets, and

3   liabilities of the corporation.

4   Q     Okay.

5   A     So this is the end product of taking data for which the

6   client recorded, similar to a checkbook.   That information

7   being provided to an independent person who reviewed the

8   information, classified the information, and prepared what is

9   called the general ledger, which, ultimately, when printed in

10  summary form, creates a financial statement.   And that

11  financial statement not only shows the assets, which is the

12  amounts of value; the liabilities, what we owe; and the income

13  for the current year, the amount of money we took in; and the

14  expense, the amount that we deducted.

15          Once these numbers have been recorded, then these

16  numbers are normally used in order to prepare the final

17  product, or one of the final products, depending on what the

18  need is, which is the tax return.   So all of it goes together.

19  Q     So looking at pages 27 and 28, what are these two pages

20  commonly referred to?

21  A     They're commonly referred to as the balance sheet.

22  Q     And a balance sheet, what does it show?

23  A     A balance sheet shows the assets, that's the thing of

24  value, what's owed against those assets, and whatever is the

25  difference between the assets and the liabilities is the

1    equity, or the worth of the company.

2    Q    Okay.  So the first two pages, Assets and Liabilities,

3    don't show Income and Expenses; correct?

4    A    That is correct.

5    Q    Could you tell the jury what part of the financial

6    statement shows Income and Expenses.  And I believe that's page

7    29?

8    A    Yes.  Page 29 is the -- what's called a Statement of

9    Revenue and Expenses on the top under Waimana Enterprises,

10   Inc., commonly referred to not only by accountants but in the

11   financial world as an income statement.  If you see total

12   revenues or revenues, which would be your first line in the

13   left-hand column, total revenues for the company for the year.

14   There's two columns.  There's a current period, which most

15   likely was for the period -- it says for the three -- at the

16   top title it says for three months and 12 months ending

17   December 31, 2004.

18            So the first column would probably be the income and

19   expense of the company for the periods of October through

20   December only, and then the final column, or the year-to-date,

21   is for the annual period, which would have been January 1

22   through December 31.

23   Q    Please.  I didn't want to interrupt you.  Go ahead.

24   A    Total revenues right-hand column would be $3,320,000.  And

25   if you look towards the bottom of the page, total expenses

1    would be 3,118,017.  And if you turn the page to page 30, the

2    final number is net income.  Final tally is $215,865 for which

3    revenue exceeded the expenses of the company.

4    Q    Okay.  Could I ask you and the jury to turn back to page

5    29.

6         The highlighted in yellow where it's highlighting

7    they've classified in the financial statement or the income

8    statement these expenses.  How do you know these expenses are

9    the educational expenses that were in the general ledger you

10   saw before?

11   A    If you turn back to page 25 of 50 and you look at the

12   yellow highlight area, if you look under the account

13   Educational and you see the highlighted area in yellow where

14   the education -- where MIT's expenses are classified, you will

15   see a total at the bottom of the underlying which is

16   $31,114.34.  That would be the total of all those amounts that

17   are there under Educational.

18        If you turn to the financial statement, page 29 of

19   50, you will see in the right-hand column $31,114.34.  It

20   agrees.

21   Q    Okay.  Same number that was in the previous pages.

22   A    Yes.

23   Q    Now, there are a number of -- there's a lot of areas of

24   writing and checkmarks and ABCs and Ds.  Some of them are

25   highlighted, some of them are not.  But before I get to the

1   highlights, tell me what you in your experience recognize these

2   to be.

3           Let me ask you first, are these part of your forensic

4   analysis?

5   A    No.

6   Q    Okay.  The writing there is not yours.  Then what are

7   these?

8   A    These appear -- these would be common practice in the

9   accounting profession of using either letters or checkmarks or

10  numbers to indicate the combining of numbers in order for the

11  combination of those numbers to be classified under one

12  description to be entered into a tax return.

13          MR. HARRINGTON:  Your Honor, can I just state one

14  clarification.  There's a number written in red ink?  Is that

15  originally on there, or is that something that refers to

16  something else?

17          MR. TOSCHER:  That was going to be my next

18  question.

19          MR. HARRINGTON:  Sorry.

20          MR. TOSCHER:  No, that's fine, Counsel.

21          THE COURT:  So we're on page 29?

22          MR. TOSCHER:  Page 29.

23  Q    There's a number written 41D in red.  Is that something

24  you did in connection with your forensic analysis?

25  A    That would be my office's internal markings.

1    Q     And what is it trying to tell us here?  Why did you do

2    that?

3    A     Probably that we were -- if you look at page 25 of 50, at

4    the very bottom my office and myself indicated our reference

5    would be 41-1D.  You see that in red.  That agrees -- if you go

6    back to page 29, that's 41-1D, the same red.  That means that

7    that's where we'd look to see where the number came from.

8          It's our internal marking so that we can follow --

9    when we're analyzing something, we can follow the flow and be

10   able to recognize the foundation or the support of what we're

11   looking at quicker.

12   Q     Okay.  Let's turn back to page 18 again, the flow chart.

13         Page 18, the next to last box, it is a box.  What are

14   you trying to tell us with that box?  Page 18 of 20.

15   A     What I'm trying to tell you is that the check was -- the

16   last box, that total educational expense of 31,114 was combined

17   with other expenses from the financial statement, as indicated

18   by the letters or the checkmarks, other than my red checkmark.

19   But the checkmarks that were on the document, if you add up

20   those markings, you end up with a total of $175,383 classified

21   as office expense.  And if you look at the final column, which

22   agrees to the tax return, that there was a deduction for office

23   expense on the tax return for $175,383, which included the

24   mistake for educational expense.

25   Q     Okay.  Can you go -- I would like you to explain to the

1    jury how you determined that the educational expense was

2    combined with other expenses and put on the tax return as

3    office expense.

4    A    If you look at --

5    Q    You're on page 29, Mr. Howard?

6    A    I'm on page 29.

7         If you look at the bottom of the page, you see

8    highlighted the word "office" and a total of $175,383.38.  If

9    you look at the squiggly line and it appears to be "A" before

10   the word "office," that is the internal memo of the person that

11   used this report in order to combine numbers and place them or

12   prepare the tax return.  This is a common practice in

13   accounting.

14        So how I know that, if you look at the sum of A

15   office 175,383.38, you look at educational expense, which is

16   highlighted, which is 31,114.34, you see the letter A that is

17   placed next to it, I know that it's included there.  And also

18   we added up all the As with our calculator to make sure that

19   they added up correctly.

20        So we know that the number's included in this number

21   called Office.  And then when we looked at -- if you look at

22   page 32 of 30 -- well, let's look at 31 of 30 so I can make

23   sure that there is -- that the Court knows where the document

24   was obtained.

25        If you look at page 31 of 50 at the bottom -- and we

 1    are red.  We write in red.  We said Government Exhibit 1-15

 2    selected pages.  So this came from the government exhibit.  We

 3    highlighted the -- the line 26 we highlight, says See Statement

 4    3, 855,826, which means now we have to go to Statement 3, which

 5    is on page 32 of 50.  And you will see that highlighted once

 6    again is the word "Office Expense" 175,383.  That agrees with

 7    the financial statement groupings that are shown on page 29,

 8    which is all the As, which means education's included in that.

 9    And if we keep going backwards, we're able to see where the

10    31,114 came from, which is on page 25.  We can see where it's

11    listed in MIT, MIT.  And if we keep going backwards, we

12    ultimately end up back on page 23 of 50 and 22 of 50, the

13    original records where this whole process started.

14            So in forensic accounting they call that drilling

15    down on a transaction.

16    Q    Okay.  So you've stated that -- just to summarize your

17    last two boxes on page 18 of 50, based upon your forensic

18    analysis of the records, is it your opinion that the

19    educational expenses were combined with other expenses from the

20    financial statement and then characterized as "Office Expense"

21    on the tax return prepared by Chinaka & Siu?

22    A    Correct.

23    Q    Okay.  And do you have sufficient forensic evidence, based

24    upon your review of this, of who changed the characterization

25    from "Educational Expenses" to "Office Expenses"?

1    A     The evidence suggests to me that the accountants who

2    prepared the ultimate general ledger and the tax return for

3    this entity for 2004 were the folks that were responsible for

4    making these changes and classifying.

5    Q     The ones that characterized it as "Office Expense"?

6    A     Correct.

7    Q     And why do you come to that conclusion?

8    A     Because, when I look at the original Waimana -- what's

9    called a general ledger, which would be the internal records of

10   the company, I just see amounts written and classified to an

11   expense called WEI.  I see that information then

12   recharacterized, reclassified, and posted, as we use in the

13   word of accounting, to a general ledger that was created by an

14   independent accounting firm.  That independent accounting firm,

15   then the general ledger became a financial statement.  We're

16   able to trace the numbers to the financial statement back to

17   the general ledger.  We see groupings that are consistent and

18   characteristic of certified public accountants grouping

19   expenses by the letter A.  We see the letter A.  We see the

20   letter A totals $175,000.  And then, finally, we look at the

21   letter A and we're able to follow it all the way to the tax

22   return where it's coded as office expense.

23          So a transaction that started that should have been

24   for tuition --

25   Q     Go ahead.

1    A    -- and not deductible got classified as "Office Expense."

2    A plain mistake.

3    Q    And based upon the forensic evidence you've reviewed, do

4    you form an opinion as to whose mistake it was?

5    A    Yes.

6    Q    And whose mistake was it?

7    A    It would be the independent accountant Chinaka & Siu made

8    the error, made the mistake.

9    Q    And do you find in your practice that mistakes like this

10   are made?

11   A    They are.  And that doesn't -- that doesn't mean that

12   Chinaka & Siu are bad people.  We all make mistakes.  I've made

13   my share.  Mistakes happen.  There are a lot of transactions.

14   Accounting is tedious.  And things happen.  And sometimes

15   things are not classified correctly and mistakes occur that are

16   out of the control of the client.

17   Q    Okay.  Mr. Howard, I'd like you to turn to page 1 of 50,

18   the top of the chart, and ask the members of the jury -- we're

19   moving on to another topic entitled Recording of Payments to

20   Diane Doll 2003 to 2005.

21   A    Yes.

22   Q    Okay.  Can you just -- the form I'd like to -- tell the

23   jury an overview of what 1 of 50 is, and then we'll get into

24   some of the detail of it.

25   A    1 of 50 illustrates the checks that were written to Diane

 1    Doll, the process of reviewing those checks and determining a

 2    classification, those checks' ultimate recording in the

 3    company's general ledger, and the resulting financial statement

 4    and tax return summaries or amounts that were deducted for this

 5    expense.

 6    Q    Okay.  So let's start with the first box on top.

 7    QuickBooks, Quicken.  Checks written payable to Diane Doll 2003

 8    to 2005.  Can you walk us through the schedules as to how you

 9    come up with those determinations.

10    A    Yes.

11    Q    And give us -- when you -- give us the page number.  And

12    again we'll start with the checks written and the checks

13    recorded and the memo description.  So I think you can tell us

14    what page number it is.

15    A    Yes.  Checks written payable to Diane Doll, let's start

16    with page 8 of 50.  Once again, the same as with the -- the

17    same meaning, the same characteristics.  It's a different year.

18    And if you look at page 8 of 50, it's December of 2003.  But

19    the same characteristics.  We have what's called a trial

20    balance, and we have specific captions or descriptions of

21    amounts.  If we look all the way down at the bottom, we have

22    over $2,522,718.04 as uncategorized expenses.  We know that's

23    not an expense.  That's uncategorized expenses.  And once again

24    right above it we have in this account called WEI 3,794,270.21.

25    To me, very similar to the tuition issue, we are coding

1    expenses in account WEI or Waimana.

2    Q    And page 8 is an excerpt from Government Exhibit 4.1,

3    Mr. Howard?

4    A    Yes, it is.

5    Q    And when you, as an accountant, receive a page like this

6    from the accountant, what do you need to do with it?

7    A    A lot of work.

8    Q    Okay.  More specifically.

9    A    Specifically, if I received this or my staff received

10   this, most likely this would be inoperable.  You would not be

11   able to use this information in order to prepare a financial

12   statement or a tax return.  You would have to take the

13   information that's presented here and once again review it,

14   categorize it, and put it in an order -- some type of order in

15   order to properly reflect the information in the books and

16   records of the company.

17   Q    Okay.  So I think the next page would be --

18   A    The next page is critical from a standpoint -- it's page 9

19   of 50.  Once again, we see the information in the WEI account

20   that's -- that the payments -- once again you have the type,

21   the check, the date, starting with the first one, March 10 of

22   2003, a check number of 2803, a name Diane Doll, and an amount

23   for a thousand dollars.  That, on its face, would tell me, as

24   an accountant, if this was information that my office received,

25   or any accountant received, that this is information that

1    strictly says there's a check for 2803 made out to Diane Doll.

2    There would have to be further inquiry onto those amounts as

3    far as classification.

4    Q    Okay.  Now, going back to your page 1 of 50, in the middle

5    box on top, the circle, you say check recorded to account title

6    WEI.  I think that's what you just --

7    A    That's just what I pointed out on page 9.  It says WEI in

8    the corner there.  So that -- from the Government Exhibit 4.1.

9            So that indicates that number.  And then the memo

10   description, as I just pointed out, Services Rendered.  You can

11   see that in the middle of the page.  But that's the information

12   that is being provided, which is indicated in my middle box

13   here where it says "Data provided to outside accountants to

14   prepare Waimana general ledger."

15           So this is the information that's going to the

16   accountants, and it's now their turn to review the work from a

17   standpoint of this is -- I don't want -- it's not a good

18   medical analogy, but this is inoperable.  This is, basically,

19   information that -- no better than your check register, and

20   you're giving this to an accountant and saying fix this or put

21   this in some type of order for me.

22   Q    Okay.  Now, staying on page 1 of 50, you have a line down,

23   and now you have two gray boxes which outline some

24   communications between Nancy Henderson of Waimana and --

25   A    And Chinaka & Siu.

1    Q    -- and Chinaka & Siu.  Can you please tell us what you're

2    telling us here and what the basis of that is.

3    A    Well, when we look at that box -- if I could turn the

4    jury's attention to page 10 of 50.

5         MR. TOSCHER:  For the record, Your Honor, that's what

6    was just admitted as Exhibit 50-4.

7         Sorry, Mr. Howard.

8         THE WITNESS:  If you look at the top date, it says

9    January 20th of 2003.  If you look at the subject, it says 2002

10   Tax Return.  The date, January 20th of '03, coordinates with a

11   2002 tax information.  Everybody's normally worried about their

12   taxes in January of the subsequent year or the start of the

13   following year.  It's a memo from Lynn Tamanaha.

14   Q    Tamanaha.

15   A    Pardon me?

16   Q    You're referring to Lynn Tamanaha?

17   A    Yes.  And it's from Nancy Henderson.  So it's a response

18   by Nancy Henderson to Lynn.  If you look at number 3, it

19   appears that there's an explanation:  Payments to Diane Doll

20   were for health consultant services.

21   Q    Okay.  Now, that summarizes your gray box.

22        Take us down.  Now we're at -- on page 1 of 50 again,

23   the chart.  And you -- what are you trying to tell us with the

24   first circle here, Mr. Howard?  And then take us through the

25   exhibits, if you will.

1    A    Okay.  So the fax indicates that the amount is for health

2    consultant services.  And so there's all types of consultants

3    practicing in the world, but the bottom line is health

4    consulting services to me would indicate I don't -- I still

5    don't really know what it is, and I should make a further

6    inquiry of what that expense is.

7         And so if we look at the blue boxes, the checks are

8    re-entered into the accounting system by Chinaka & Siu creating

9    the general ledger, page 1 of 50.  The checks were classified

10   again by Chinaka & Siu as "Consulting Fees."

11   Q    Are you -- Mr. Howard, I may have misheard.  Did you say 1

12   of 50 or 11 of 50?

13   A    I think it's 1 of 50.

14   Q    You're looking at your chart you mean.

15   A    Yes.

16   Q    I'm sorry.  And after that you'll -- I want to make sure I

17   can follow you and the jury can follow you.

18         Okay.  Your chart is 1 of 50.  I'm sorry.  I

19   apologize.  Go ahead.

20   A    Looking at the chart, we're on page 1 of 50.  We're at the

21   bottom.  I guess we should start where we look at the -- let's

22   start with the first blue circle that the checks are re-entered

23   into the system.

24         If you look at page 11 of 50, and it says at the top

25   it's an excerpt from Waimana's 2003 General Ledger.  If you

1    look at the middle of the page, it says Consulting Fees Diane

2    Doll.  So once again, if we look at the top corner of the page,

3    it says client number 40018.  It appears that this is the

4    general ledger of the company, and this was prepared by the

5    external accountants.

6          So if you look at account number 67100, we see the

7    name Diane Doll, and we see the amount shown as consulting

8    fees.

9    Q    Okay.  And that's your second box on page 1 of 50:  Checks

10   classified by Chinaka & Siu as consulting fees; is that

11   correct?

12   A    Correct.

13   Q    Now you're taking us to the preparation of the financial

14   statement.

15   A    Correct.  Which if we look at page 14 of 50, once again

16   you see a yellow highlighted area.  The red is our -- my

17   accounting firm's internal markings for referencing, but if you

18   see Consulting Fees, you'll see Year-To-Date $6,000, and that

19   agrees -- if we look at the top, it says for the period ended

20   December 31, 2003.

21          If we go back to page 11 of 50, we see Waimana

22   Enterprises 2003.  We see that same amount:  $6,000.  It's the

23   general ledger.  Similar to the educational expense, we're

24   taking the -- 14 of 50 is the Statement of Income, which could

25   be called Statement of Revenue Less Expenses, Statement of

1    Profit and Loss, basically.  This statement is the income of

2    the company:  the gross receipts plus the expenses.  If we look

3    at this, $6,000 is being deducted as consulting fees and as

4    part of the financial statement.

5    Q     Okay.  And that's on page 14 of 50?

6    A     Yes.

7    Q     As Consulting Fees?

8    A     Yes.

9    Q     How does that tie in to the tax return which was filed,

10   Mr. Howard?

11   A     If we turn to page 16 of 50, you see -- and it's an

12   excerpt from Government Exhibit 1-12.  If we look at the bottom

13   of the page, highlighted is Consulting Fees, and there is the

14   $6,000 that is indicated in the books and records.

15         So once again we come to our end product.  We have

16   Consulting Fees of $6,000.  We look back at the financial

17   statement, which is the accumulation of expenses.  We have an

18   accumulation of expenses, something called Consulting Fees.  We

19   keep walking backwards.  We see that that agrees, not only the

20   general ledger, we walk back to that fax that says Health

21   Consulting.  Doesn't appear anybody made -- I'm not sure if

22   anybody made an inquiry, but it doesn't appear that anybody did

23   any further inquiry to something that is unusual, such as

24   health consulting expenses.

25         We keep backing in reverse, we see that we have money

1   listed similar to our checkbook, which is the WEI expenses.  So

2   once again it's the same process as educational expenses.  We

3   take data.  We pull it through to an end product.  We ended up

4   with the wrong answer.

5   Q    You have one more exhibit here in terms of your support,

6   17 of 50, which is a 1099.  Can you tell us --

7   A    Correct.  This is a 1099 indicating the -- a tax reporting

8   form that says that this individual was paid $6,000 for

9   nonemployee compensation.  It indicates that this data was

10  original -- was looked at again for tax reporting purposes.  A

11  lot of times people throw -- people, excuse me.  More specific,

12  accountants will include things in "consultant" or things that

13  make things easier so that they have -- they can complete or

14  correctly prepare a 1099 or a governmental form, but they could

15  miss the classification altogether.

16       The point being that in my office I'm not perfect.

17  We try -- when we prepare 1099s, we try to review the

18  information, not only what's been listed in the books and

19  records.  We take a second look at it.  We try to get the right

20  classification and make the necessary inquiries in order to do

21  our best to classify things correctly.

22  Q    Mr. Howard, based upon your review, were you able to form

23  an opinion, based upon the accounting and forensic evidence, as

24  to who was responsible for classifying this as just "Consulting

25  Fees"?

1    A    Yes.  For -- and this process occurs -- it starts in 2003.

2    It continues on through 2005.  I noticed that in 2006 that the

3    process that we now have a general ledger that seems to be

4    being created -- a true general ledger being created in

5    QuickBooks internally at the Waimana Enterprises level.  Still

6    the information is being presented to the accountants to

7    prepare the tax return to review the general ledger.

8         And so when we're looking at the process, I think you

9    have to look at, although the process is different between '03

10   and '05, '05 and -- somewhere around '05 to '08 and then

11   forward, the process indicates that, ultimately, that the folks

12   that are preparing the return are classifying things

13   incorrectly or carrying on from the original errors that

14   occurred in the earlier years.

15   Q    Okay.  Please, can everybody turn to page 2 of 50.  This

16   is very similar to 1 of 50.  And I think you just -- you talked

17   about it, and just quickly --

18   A    Yes.

19   Q    -- summarize --

20   A    Let me summarize.

21   Q    -- what 2 of 50 is.  I think you mentioned it, but I want

22   the jury to know what it is because it's sitting there.

23   A    2 of 50 is the -- once again, a flow chart.  Appears from

24   the years 2006 through 2008.  If we look at the top box, checks

25   were written payable to Diane Doll for the period '06 through

1  '012.  And that's true, but in this particular graph, from 2006

2  through 2008 checks were recorded in an account entitled

3  Consulting Fees, and the memo and the description was Services

4  Rendered.

5         That information was provided to the accountants.

6  The accountants -- and my foundation that the accountants

7  reviewed the QuickBooks posting is in my process of looking

8  through the information and drilling down, as I've demonstrated

9  to you, from the end of a transaction back to the starting of

10  the transaction.  I did notice some facts and inquiries from

11  Chinaka & Siu about classifications of other expenses or other

12  materials in the books and records, which gave me a sense that

13  on a monthly or quarterly basis the information was being

14  looked at by Chinaka & Siu.

15         There was no change -- once our process changed where

16  Chinaka & Siu was being more a reviewer of data, there was no

17  change ever made to the consulting fee classification of Diane

18  Doll, and the payments ultimately still were deducted as

19  consulting expense on the tax return.

20  Q    Okay.  In your experience have you run into other

21  situations where a mistake is made earlier on years before, and

22  it's just carried forward?

23  A    I don't want to use the word "common" because it's not

24  reflective of my profession.  But we all make mistakes, and we

25  are at times surprised not only of our mistakes, that the

1    mistake could impact or could have occurred for years before.

2    Hopefully, they're caught, but sometimes they're not.

3    Q    Mr. Howard, I want to turn to another chart and ask the

4    jury to turn to it, and that's 3 of 50.  And perhaps you can

5    as -- maybe you can just explain.  It's entitled Proper CPA

6    Professional Care When Recording Payments to Diane Doll 2003 to

7    2005.  Can you walk us through this.

8    A    Yes.  If we look at the -- and this is for the year 2003

9    through 2005.  I attempted to do a flow chart, similar to if I

10   was teaching class how I would demonstrate to students a more

11   sound way to prevent a problem like this from occurring.

12         So what I did is I looked at Waimana Enterprises, and

13   we look at the circle on the left.  If we look at the box below

14   Waimana Enterprises, it says check recorded to the account

15   entitled WEI.  That's similar to what I've represented to you

16   in my analysis when we looked at the trial balance, as we

17   talked about before.

18         The data was provided.  As we go to the right, you

19   see the arrow.  The data is provided to the CPAs.  The data is

20   posted to the general ledger created by Chinaka Siu & Company

21   CPAs.  Very common practice in public accounting that we

22   receive information, we look at it, we go, "Oh my God.  What

23   are we going to do with this?  Let's input it.  Let's review

24   it.  Let's determine the classification."

25         If we go down on the right-hand column to the second

1    triangular box, it says Data Reviewed During Creation of

2    General Ledger.  Obviously, the data is reviewed.  Why it's

3    obvious to me is we're creating the general ledger; so you had

4    to review it.  Someone's typing it in from point A to point B.

5    If you're handed information, you're creating a general ledger,

6    it's being reviewed by its input.

7            Something caused an inquiry on 12/23/02 -- well, not

8    the -- a response.  I saw the response.  I never saw the

9    original inquiry, but I assumed -- I assumed that a response on

10   12/23/02 of an inquiry that there must have been a response.

11   What is this?

12           Waimana Enterprises responds.  Says response received

13   via 1/20/03 fax.  It says description:  Health consultant

14   services.  And all of a sudden health consultant services, if

15   we look at that final green box, payments deducted is called

16   Consulting Fees.  Somehow we ended up health consultant

17   services, let's just throw it into consulting.  I don't see an

18   inquiry.  I don't see an additional inquiry.  It should have

19   triggered something by that response for an additional inquiry.

20           So if we look at -- if it's all right, Counsel, to

21   continue.

22   Q    Yes.  Go ahead.

23   A    Okay.  So if we look at the -- I have a triangular gray

24   box:  CPA Should Have.  If we look to the right, it says Review

25   Response.  They should have made a further inquiry to Waimana.

1    That's the yellow box on the left.  The response should have

2    been Massage Therapy.

3            If we look at the final box on the right-hand side,

4    massage therapy should have triggered all types of questions.

5    The massage therapy:  Who's the massage therapy for?  Is it a

6    taxable fringe benefit?  Is it deductible to the corporation?

7            If you look at Code Section 162A, fringe benefits are

8    deductible.  Normally, unless they're an athletic club -- and

9    this is my research.  I researched it as if I was doing this.

10   If I was talking to my class.  I'm researching this.

11           I got a response Massage Therapy.  We cannot know

12   everything.  Some things we know from experience.  But we do

13   know that, if we don't know the answer, we should make further

14   inquiries.  And, hopefully, as our experience grows, we know

15   how to look things up, we're able to review the information

16   that comes to not only our attention that our research brings

17   to us, and we try to make a proper decision on that.

18           But if I were to receive the response of Massage

19   Therapy, I would have said, is that the proper classification?

20   Should we call it health consulting?  Shall we call it massage

21   therapy?  It isn't what we call it.  It's a taxable benefit

22   deductible to the corporation, but the person receiving that

23   benefit should have -- should be advised that they should

24   report it as income.  If the massage therapy is for many people

25   or it's just not often, de minimis -- everybody's been --

1    worked at the office or been somewhere where there's free

2    coffee, snacks.  What does "de minimis" mean?

3    Q    What does "de minimis" mean?

4    A    "De minimis" can mean many things.  It can mean its

5    relevance.  Is two massages a year -- I don't know what the

6    cost is.  $50 a piece?  $100, is that de minimis?  Yes, to me

7    that's de minimis.

8    Q    What you mean by "de minimis"?  Small.

9    A    Small.  Doesn't result in any great tax.  The

10   administration of the tax associated with that, the accounting,

11   the document filing, is so small that the cost exceeds

12   everyone's benefit.  The government's benefit:  they don't want

13   to process this.  And the clients or the taxpayer doesn't want

14   to process this.  It's no good to all.  But when you get more

15   than de minimis, then you have to look at the taxability of it.

16        My point being that, as we look at page 3 of 50 and

17   move on to the next page, is these are the questions that

18   should be triggered.  These are what clients rely on us as

19   professionals to advise them.  These are things that, when we

20   discover them, we don't turn our head and say "Not our

21   responsibility."  We look at them.  We think about them.  And

22   we discuss it with the client, and we try to come up with a

23   proper determination of it.

24   Q    Okay.  Sorry.  Go ahead, Mr. Howard.  I -- were you ready

25   to move on to 4-50 and 5-50?  Or am I --

1   A     Yes.  If we look at 4-50, if we look at the top, it says

2   Waimana Enterprises is Preparing the General Ledger.  I'm under

3   the -- I will call it more than an assumption.  I believe I'm

4   correct that Waimana prepared their general ledger in 2006

5   through '8, and Chinaka & Siu reviewed the general ledger and

6   prepared the necessary -- if we look at the third -- I'm sorry,

7   the second triangular box on the right, green:  Provides just

8   the entries, corrections, periodically to Waimana Enterprises.

9         I saw facts.  I know that someone was looking at

10   this.  Someone was -- I don't want to use the word "monitor."

11   The accountant's not the keeper.  But as a professional, you

12   have a duty to your client to, if you see something that isn't

13   proper, you should discuss it, or you should -- it should

14   formulate an inquiry.

15         And then if we look at the final box:  Prepares Tax

16   Returns Last Minute.  I looked at 2006, 2007, 2008.  The

17   returns were all signed.  For the 2006 corporate return, it was

18   signed 9/13 of '07.  If I look at the 2007 return, the return

19   was signed 3/10 of '09.  That return would have been due no

20   later, with extension, than September 15th of '08.  And the '08

21   return was signed 9/14/09.

22         So what that tells me as a forensic accountant, that

23   these returns that -- and I'm not here -- I don't have enough

24   evidence to tell you why they were late, but I can tell you

25   from the signature that these things are being done at the last

1    minute.  And when people rush, mistakes are made.  And that's

2    the point of 4-50.

3    Q    Of page 4 of 50.

4         Okay.  Now, we have a second chart, 4 of 50,

5    different because the flow of accounting information is a

6    little --

7    A    Correct.

8    Q    -- different.  Is that why you've done that?

9    A    Yes.

10   Q    Okay.  Can you -- we have another, 5 of 50.  Why is

11   that -- what are you trying to tell us there, Mr. Howard?

12   A    That's a subsequent period:  Proper CPA Professional Care

13   When Recording Payments to Diane Doll September 9th -- not

14   September.  I'm sorry.  2009 through 2012.  Once again, nothing

15   has changed.  Waimana Enterprises is preparing a general

16   ledger.  The data's provided to the CPA, and a new firm, KMH,

17   LLP, prepares consolidated amounts.

18        Now, what consolidated amounts is, if corporations

19   are related, in other words common ownership, you can

20   combine -- they may have different functions and different

21   business purposes or even handle different segments of a

22   business, but those businesses are commonly owned by one

23   person.  And if they're commonly owned, the tax law allows you

24   to take them and combine them or smash them up into one bundle.

25        What appears to me is that the KMH was preparing

1     consolidated tax returns because there was another corporation,

2     SIC, there's ClearCom, there's Waimana.  But anyway, all the

3     data still -- although, it gets bigger because, if you have

4     more than one company and you have more activity, it gets

5     bigger.  The numbers get bigger.  The transactions get bigger.

6     The accounting gets bigger.  It gets difficult to monitor all

7     this.

8              And so what KMH -- from the forensic information what

9     I'm relying on is I know that I did see some more papers

10    consolidating the company's amounts, but I do see tax returns.

11    And once again, when we look at the consolidated return -- I'm

12    sorry, 2009 return was filed September 15th of '10.  The 2000

13    return was filed September 15 of '11.  2011 the return was

14    filed 9/7/12.  And, finally, 2012 the return was signed

15    9/16/13.

16             And even in the returns, when I was looking through

17    the returns, there's a disclosure from the accountants that

18    says "We don't know if this is right."  And sometimes the

19    disclosures, there's nothing wrong with the disclosure.  But

20    all that tells me:  that the returns were being filed late.

21    There were some concerns with the returns.  And they may not

22    have been nothing to be concerned about.  I don't know.  But

23    once again we're rushing around, we're not focused, there's too

24    much to focus on, and mistakes happen.  That's my point of

25    this.

1    Q    Okay.  Thank you, Mr. Howard.

2         There was just one -- for completeness, I'm not

3    sure -- page 6 and 7, just some schedules of the --

4    A    Yes.  We may want to just quickly look at page 7.

5    Q    Yes.  Just very quickly, just so the jury knows what they

6    are for completeness.

7    A    Page 7 is just a -- payments to Diane Doll and the

8    classification.  I call this the formative years, meaning that

9    this is the start of this process.  And if during the formative

10   years, if the process would have been handled correctly, the

11   process may not have ever ended up that this particular item

12   was deducted for the period that it was deducted for.  Or if it

13   was deducted, proper tax treatment to the person receiving the

14   benefit would have occurred.

15        But this is the formative years.  And if you look --

16   in the second column it says the date, which we have in the

17   first box:  3/10 of '03.  We drop down in the middle of the

18   page:  2/20/04.  And we go down to the third area, which is

19   2/18/05.  If we look at those three years, we see that it

20   starts out in year one, meaning year three, Services Rendered.

21   The accountants classify it as consulting fees.

22        In 2004, once again we look at not only the

23   classification.  We see that it's in all the years by the

24   internal accounting staff -- we look at the top where it says

25   Internal Accounting Staff -- it's all coded to WEI.  The

1   accountants over that three-year period classify it as

2   Consulting, Consulting, and then Miscellaneous Operating

3   Expenses.  So we're just not getting it right.  And that was

4   the point of this schedule.

5   Q    Okay.  That is referring to page 7; is that correct?

6   A    That's correct.

7   Q    Okay.  Mr. Howard, I'd like to turn to another topic.

8        THE COURT:  Then why don't we take our lunch break

9   now and come back at 1:00.  Okay?

10        MR. TOSCHER:  Yes, Your Honor.

11        (Court recessed at 11:45 A.M., until 1:07 P.M.)

12        THE COURT:  My plan is to go to 2:30, take a break.

13   When we come back from the break, then we'll go till 4:00.

14        MR. TOSCHER:  Thank you, Your Honor.

15        May it please the Court.  Ladies and gentlemen.  Good

16   afternoon.

17   Q    Good afternoon, Mr. Howard.

18        Mr. Howard, could I get you to turn, and ask the jury

19   to turn, to page number 33.

20        Mr. Howard, we're on page -- can you tell -- pages

21   33, 34 through 36, will you describe to the jury what you've

22   done here on these pages, sir.

23   A    These pages represent the cash advances or cash

24   withdrawals that Mr. Hee made from the period of 2/8 of '07

25   through -- through the end of -- I'm sorry, through 11/9 of

1    '12.  These payments were cash advances, these amounts were

2    denied as deductible, and they total approximately -- exactLY

3    $26,708.50, the actual cash advance, and there's some

4    additional banking fees involved.

5    Q    Okay.  Just going -- we're looking on page 33, just so we

6    understand it.  The first column you have the year involved;

7    correct?

8    A    Correct.

9    Q    And then the next column you're referring to the

10   government exhibit numbers; is that correct?

11   A    Correct.

12   Q    And then the next column on the date, that is the -- those

13   are the dates that the cash is being withdrawn.

14   A    Yes.  Specifically, the transaction date.

15   Q    Transaction date.  Okay.

16         Now, going down where it says -- the middle column --

17   Destination Purpose Per Reimbursement.  First, tell me -- it

18   says Location, and then we have various indications here.  The

19   first one says Honolulu Airport; Los Angeles; Flushing, New

20   York; San Francisco; and then there's some finance charges.

21         What is that information based upon?  What is that

22   information?

23   A    The information is based upon the location.  If we look at

24   the first line, New York City and Washington, D.C., should

25   agree to the reimbursement reported on the Government Exhibit

1    459 as the -- Mr. Hee's description of the trip and the period

2    for which the trip occurred.

3    Q    Okay.  So to make sure I understand, on the reimbursement

4    on the Waimana business records, the first one, it basically

5    says New York City and Washington, D.C.?

6    A    Yes.

7    Q    Okay.  And then the unbolded items here relate to the

8    location.

9    A    Right.  That's the location that we observed by reviewing,

10   when possible, and for the most part there was actual ATM

11   receipts or receipts which listed the location of these

12   withdrawals.

13   Q    Okay.  Based upon your review of this, is it fair to say

14   that substantially most every one of the withdrawals is when

15   Mr. Hee is out of town?

16   A    Yes.

17   Q    And the descriptions, the bolded ones -- and we're not

18   going to go through every one, but the next one from Government

19   Exhibit 460, San Francisco and Washington, D.C. meetings with

20   Deutsche Bank and RUS.

21   A    Yes.

22   Q    And that's based upon the Waimana business reimbursement

23   forms.

24   A    Correct.

25   Q    So where it's bolded, that's the reimbursements forms, and

1    where the -- where it's not bolded, that's the location of the

2    withdrawal itself.

3    A     Yes, when identifiable.

4    Q     When identifiable.  The -- now are these numbers very

5    similar to the government's numbers?  Have you compared these

6    to the government's numbers?

7    A     Yes.  I believe they're the same or agree to the criminal

8    complaint.

9    Q     If -- looking at this information, let's assume that there

10   is a lack of a description as to what the actual cash was used

11   for, okay, on these withdrawals.  As an accountant, with the

12   information you see here that's based upon the records, how

13   would you deal with that and advise the client?

14   A     I would advise the client that -- the first question I

15   would ask the client is did the expense occur and do they

16   recall what it's for.  The second thing that I would ask the

17   client is what substantiation do you have?

18            This particular case we have a description of a

19   location, and in several of them it says specifically a

20   business or a purpose, i.e., example Exhibit 461 it says

21   Washington, D.C., and New York meetings with Deutsche Bank and

22   U.S. congressional members.  I think that gives a purpose.  I

23   think the taxpayer, I would tell them to be prepared, if

24   questioned regarding that particular meeting, be able to

25   discuss not only the purpose of why you went and, within the

1    confidentiality boundaries, be able to discuss what business --

2    what business was discussed and what maybe was accomplished or

3    not accomplished.

4           The second thing that I would ask a client to do, if

5    they could, is to provide a receipt or some type of written

6    record to not only identify how the money was used but identify

7    what the expense was for.

8           If we look at a concrete example, a concrete

9    situation where every expense has a receipt and there's no bend

10   in that analysis, sure, without a receipt there is a portion of

11   this expense that isn't substantiated, and there is a

12   possibility that it would not be allowed.  But as I tell

13   taxpayers, in not every instance do we get a receipt for

14   everything we do.  There are certain expenses whether when

15   you're traveling, sometimes it's very difficult if you have to

16   tip or thank a bellman, or sometimes you'll hop into a taxi and

17   things will be rushed.  Now they have the credit card swipe.

18   But even now it's difficult sometimes, especially when you're

19   rushed or you have a situation where your mind is on other

20   things.

21          There's a lot of times that a receipt just isn't

22   obtainable, or you make a mistake and you don't have a receipt.

23   For me, myself, I left a parking structure last night, and I

24   was so tired I forgot to get the receipt.  It doesn't mean that

25   I wasn't parked for a business purpose and the event didn't

1    occur.

2            So to answer your question, the more information that

3    a taxpayer can obtain, the easier it is to verify and

4    substantiate it, but it doesn't necessarily mean the expense

5    didn't occur.

6    Q    Is there anything you've seen in the review of the --

7    these are the cash reimbursements -- that suggests at all that

8    this was not for business purposes?

9    A    I've seen nothing that indicates to me, from reviewing

10   this, that would lead me to be absolutely certain that these

11   expenses were not for business purposes.  The preponderance to

12   me, as an accountant and representing taxpayers, is it appears

13   to me that these were for travel expenses or money to be used

14   while traveling.

15   Q    So if the taxpayer did not have the taxi receipt or the

16   meal backing up the ATM, would you feel comfortable advising

17   the client that they could deduct them on their tax return?

18   A    I would tell them that I believe it is a deduction.  I

19   believe the expense occurred.  I believe that, if they are

20   confident, after inquiring from them what the money was used

21   for, that it appears reasonable that the money was used for the

22   purposes indicated to me by the taxpayer, I would advise them

23   that I would take the deduction but also keep in mind that I

24   would like them, at least on a memo or some type of pad -- some

25   type of writing, to do their best to at least list the reason

1    why they don't have a receipt or substantiate the actual

2    specific expense better.

3    Q    Now, you testified before.  Do you have experience

4    handling IRS audits?

5    A    Yes.

6    Q    And there are times when the IRS asks for a lot of

7    detailed substantiation; isn't that correct?

8    A    Yes.

9    Q    Let's say the IRS came in, was auditing, and asked for

10   detailed substantiation.  They said we want the taxi receipt

11   when you were in Washington, D.C.  Tell the jury how that

12   normally would play out in an audit.

13              MR. HARRINGTON:  Objection.  Relevance.

14              THE COURT:  I'll let him answer.  Overruled.

15              THE WITNESS:  I would have discussions with the

16   revenue agent regarding the expense.  I would explain to the

17   IRS agent what the business purpose of the trip was for, why

18   the expense incurred, what was incurred.  I'd discuss the issue

19   with them.  And probably from mutual agreement, although not

20   absolutely every time, there would be a situation where we

21   would either agree that the expense was allowable, and if we

22   didn't agree, we would agree to disagree, and it would be just

23   an adjustment for which wouldn't be allowed as a deduction.

24   BY MR. TOSCHER:

25   Q    I would like you to turn now to page 48 marked as Exhibit

1    46A.  If we could follow the same procedure, Mr. Howard, as we

2    did last time.  Can you explain what page 48 is, and then we'll

3    go through the backup of page 48, what you did.

4    A    Yes.  Page 48 is a graph.  And what I have graphed in the

5    bar -- in the bar chart, the blue bars represent the -- if you

6    look at the bottom of the chart, we have dates from the period

7    of October 30th, 2007, through October 3 of 2008.  And it is my

8    understanding, plus verification from the books and records of

9    Waimana Enterprises, specifically the general ledger, that

10   there were investments of substantial amounts into a

11   corporation by the name of Siometrix in the Santa Clara area by

12   Waimana Enterprises, Inc.  The actual amounts totaled, in

13   aggregate, over the period of October 30th, 2007, through

14   October 3d of 2008, totaled close to $4 million.

15          I'm also -- was advised that there was a purchase of

16   a Santa Clara real property, which is also in Norton

17   California, and within proximity also of Siometrix, in June 16

18   of '08 for approximately a million three hundred thousand

19   dollars.  So what this graph attempts to do is in the blue

20   --with the blue bars, I've graphed the amount of investment in

21   the Siometrix asset, which totals up over 4 million dollars

22   into October of '08, and I also have graphed the investments in

23   the Santa Clara real property as of October 3, '08, totaling

24   over a million -- probably about a million three.

25          So what this graph shows is that Waimana has

1    substantial investments totaling in the aggregate of close to

2    $5.8 million in Santa Clara.

3    Q    Could you describe for the jury there's pages 49 and 50,

4    how they relate to the chart.

5    A    Page 49 there is an account, if we look at it, says

6    Waimana transactions by account as of December 31, '08.  If we

7    look at the left column, account number 19020, it says

8    Investment in Siometrix.  This to me indicates that this

9    account, being at the 1900 level, indicates to me that it is an

10   asset of the corporation.  It's shown as an asset and not

11   deducted.  The check column just indicates that checks were

12   written.  The date is the date.  The number column indicates

13   the check number, or if there is no number, some other method

14   of transfer of money occurred.  The name is the name of the --

15   who the payee was from the check.  The memo talks about whether

16   the money was a wire transfer or investment.

17           But this is a listing in the books and records of

18   Waimea --

19   Q    Waimana.

20   A    Waimana, excuse me.  Shown as an investment of 4.165

21   thousand dollars.

22   Q    Okay.  Were you provided information -- I'm referring to

23   the Santa Clara property, that Mr. -- two of Mr. Hee's children

24   lived there during the time or at the time while they were in

25   school in Santa Clara?

1    A    Yes.

2    Q    And were you also provided information that the children

3    rented out some rooms to other Santa Clara students?

4    A    Yes.

5    Q    Now, with those factual background could you give us --

6    were you able to form an opinion as to whether the house

7    investment was handled properly on the books and records and

8    tax returns of Waimana?

9    A    If we turn to page 50 of 50, or the last page in this

10   binder, once again we see an account called 19200 investment

11   property in California.  Shows the entry is not only a general

12   journal, but a check.  And the amount or the purchase of the

13   home was listed as an investment or an investment property of

14   the corporation.

15         So in my opinion the reporting of the investment as

16   an asset of the corporation was a proper reporting of that

17   asset for the corporation.

18   Q    What about the children residing in a couple of rooms

19   and renting --

20   A    Well, the children resided -- my understanding the

21   children did go to school up there, did reside in a couple of

22   rooms.  My opinion, and through forensically looking at the

23   postings of the information to the books and records, it

24   appears that this asset -- not only was the asset posted to an

25   investment account, it was very consistent in showing the asset

1    as an investment.

2           So the corporation is the owner of the asset.  The

3    corporation stands to benefit by the ownership of the asset.  I

4    would take the position that most likely any rental income from

5    the children or the children living in the property would be

6    ancillary to the purpose of holding this asset, and that the --

7    I would not -- I would strictly treat it the way it was

8    treated:  as an investment.

9           Let me follow just one thing, if you don't mind.

10   Also the investment -- as part of keeping the investment, I

11   think a property is probably better cared for if someone's in

12   it or someone's using it and caring for it than sitting vacate

13   or alone.  I just think it's good practice.

14   Q    Did you do any analysis of what the tax impact would be on

15   the corporation if it was accounted for as a rental and not an

16   investment property?

17   A    Well, when a property is treated as a rental property,

18   then it has -- then you're able to depreciate the building

19   portion of the building.  Depreciation is a noncash expense,

20   but it is a real expense.  It's an allowable deduction.

21          So my analysis is analyzing the amount of rent, I

22   guess the word would be "imputed," versus or less the

23   depreciation expenses to care for the property, my analysis led

24   me to believe there would not be a corporate tax.

25   Q    Talking about this imputed income for Mr. Hee's children

1    living there, did you form an opinion as to whether that should

2    be taxable to Mr. Hee?

3    A    When I give it -- when I think through it, the corporation

4    owns this investment; it gains by the appreciation of the

5    property.  It's my understanding that the children lived in the

6    property, not children, small children, but children over the

7    age of 18.  I would say if we had to impute income, I would say

8    it would be the children's income, if we went that far.

9    Q    I'd like you to turn to page 37.  I'll get there soon.

10          Could you tell us what the chart on page 37

11   represents, Mr. Howard.

12   A    As part of any forensic study, or even if there was a

13   certified audit of the financial statement, accountants like to

14   know -- like to do statistical analysis or scope the issue at

15   hand to get a relationship of what the possible issues may be

16   occurring to the total of all the expenses or all the income.

17   It's, basically, analytical review.  We call it analytical

18   review because we look at statistics, and we try to make

19   determinations of what those statistics might imply.  Although

20   the implication may not be always absolute or perfect or

21   correct, it leads us into theory of correctness and

22   completeness and is just a starting point to the additional

23   analysis that needs to be done.

24          So this particular chart, what I did was I graphed --

25   there are expenses that bring us here today that are being

1    challenged, and I compared those expenses to the total expenses

2    for the period of 2002 through 2012 to get a percentage of the

3    challenged expenses to the total.

4    Q    And what is that percentage, Mr. Howard?

5    A    The percentage of challenged expenses to the total was .39

6    percent or almost -- it's less than one half of one percent, or

7    just more than one quarter of one percent.  So it's a very

8    small amount.

9    Q    Could you describe the ensuing pages 38 through --

10   A    38 through --

11   Q    Take us through them briefly just how it relates to your

12   chart so the jury understands your methodology.

13   A    38 through -- 38, 39, and 40 is just a recap or a adding

14   of the income -- total income that was reported per the

15   returns, the actual tax returns, to the total deductions that

16   were deducted on the returns for the period of '02 through '08.

17   That would be page 38.

18        Page 39 would be the total income less the total

19   deductions that was reported on the returns, the tax returns,

20   the consolidated returns, from the period 2009 through 2012.

21        Page 40 is specific detail.  Actually, what it is is

22   what we talked about earlier in my testimony of drilling down

23   deeper.  Where are the numbers being provided from?  What is

24   the underlying source of them?  How do we come to our

25   conclusion?  These are the income and deductions for the

1    consolidated amounts for the period '03 through '08.

2              41 of 50 is '02 through '04.

3              And, most importantly, at the end of the day, after

4    analyzing everything, if we could turn to page 47 of 50.  When

5    we look at this, and this is what the chart or the pie chart

6    that I provided for you that began this conversation, if we

7    look at the period of 2002 through 2012, if we look at the

8    bottom, the original amounts or deductions on the return

9    totaled $496,410,356.  If we look at -- if we continue to the

10   next column, if we look at the challenges by the government,

11   that being wages, benefits, consulting, travel, office, meals

12   and entertainment, other, the total is $1,941,950.

13             In other words, if the government's allegations or

14   challenges are 100 percent accurate, then we're, at most, a .39

15   percent deviation.

16   Q    Okay.  And looking at 47 of 50, that same .39 percent is

17   the same reflected on your chart, page 37; is that correct?

18   A    That is correct.

19   Q    And all this information is based upon tax returns and/or

20   government exhibits, Mr. Howard?

21   A    Yes.

22   Q    Okay.  I'd like to move on to another topic, Mr. Howard.

23             And if I can ask for the publication of Exhibit 4-82,

24   Government Exhibit 4-82.

25             Mr. Howard, have you had the opportunity to see

1    before today Exhibit 4-82?

2    A    Yes.

3    Q    Have you had the opportunity to review the books and

4    records of Waimana concerning the transactions which were

5    treated as "loans to stockholder"?

6    A    Yes.

7    Q    Were you able to come to an opinion as to whether the loan

8    characterization was proper?

9    A    I believe it was proper.

10   Q    Could you tell us what your opinion was and your reasoning

11   for it.

12   A    Well, when I reviewed the schedule, it appeared that those

13   expenses were not business-related.  They appear to be expenses

14   that most likely were attributable to Mr. Hee or his family.

15   It appears that they were paid by -- or funds were paid -- or

16   the expenses were paid by using funds of the corporation.  And

17   the actual payment of these expenses did not have an ordinary

18   and necessary business purpose to the corporation; so,

19   therefore, it appears that they would have been funds that were

20   being advanced to Mr. Hee or monies that he was borrowing in

21   order to pay those expenses.

22   Q    The -- in your experience is it common practice for

23   closely-held corporations to characterize payments made on

24   behalf of their shareholders as a loan to shareholder?

25   A    Yes.

1    Q    And how often does that occur in your practice?

2    A    I cannot empirically tell you that 8.2 clients out of

3    every 10 that this is a common occurrence, but I can tell you

4    that it occurs extremely often.

5    Q    Now, if this advances or this loan to shareholder was

6    never documented as a promissory note, how does that affect

7    your opinion, if any?

8    A    Well, it's always -- it is better to have a promissory

9    note than not because a promissory note is going to document,

10   in writing, intentions.  However, my experience with

11   closely-held shareholders, and as we've talked about before,

12   Little GAAP, Little General Accepted Accounting Principles, it

13   is quite often that a promissory note is not prepared.  Quite

14   simply, normally, the shareholder is not concerned about

15   securing the note with himself because it's himself that needs

16   to pay it.  It is not something that, at first light, although

17   the intention may be to repay it, I don't think an intention is

18   someone not to pay themself money that they feel that they're

19   owed to themself.

20         So it is quite common that, unfortunately, that there

21   aren't promissory notes in every instance drawn up.  It doesn't

22   neglect the point that the money was advanced, that the money

23   was borrowed, and someday it's going to be repaid.

24   Q    Is it important that it's reflected on the books and

25   records of the company as a loan?

1 A    Yes.  Because it is an asset of the corporation.  It is a

2 liability -- it is a liability of the shareholder, and it needs

3 to be reflected on the books and records so that there is

4 evidence that it occurred and that, when it is repaid, there is

5 a basis for repaying the amounts that are due.

6 Q    Does the Tax Code provide for rules concerning what's

7 referred to as the imputation of interest if there's no note

8 and no stated interest in a note?

9 A    Yes.  Normally, the rule is -- is for demand notes -- and

10 that's normally the case of advances to shareholders of

11 closely-held companies -- normally, the rate is the applicable

12 federal rate on a short-term basis.  And that is published

13 monthly by the government and can be found in various sources

14 on the internet, a very common percentage.

15 Q    Have you had a chance -- can we go to the final page of

16 the Exhibit 4-82.  Have you had a chance to review this exhibit

17 and calculate what the AFR would have been on these payments

18 over this period of time?  And did you have enough data to

19 formulate whether the payment of $736,000 included all the

20 accrued interest during the period of time?

21 A    I had enough data from a standpoint of I had amounts,

22 check numbers, dates, and a repayment date.  I was able to --

23 or my staff was able to find, through reliable sources, what

24 the APR rate on a short-term basis was for the period -- I'm

25 sorry, I can't see that far, but I think it was '07 to '013.

1          But we were able to find the rate on a monthly basis,

2     and we calculated on a month-by-month basis, imputed the

3     interest.  And when we completed our analysis at the point when

4     the 713,000 payment -- that $713,000 approximate repayment

5     occurred -- and I say "approximate" because I can't see -- we

6     were very close to paying off the note, or I think we may have

7     even paid a little in excess of the note.

8     Q     Right.  The $736,000, it shows right now a credit balance

9     of 73.  I apologize that we can't see it that good.  But do you

10    recall when you calculated the interest, that that payment of

11    736,000 fully paid the loan and all the interest?

12    A     Yes.

13    Q     Now, were you able to -- did you analyze and consider

14    whether these loan advances should be considered income to

15    Mr. Hee?

16    A     A loan is a loan.  So the loan was repaid.  It was repaid

17    at or in excess of an imputed interest rate.  And so I would

18    consider it a loan and not income to Mr. Hee.

19    Q     So you have formed an opinion that these loan advances are

20    not income to Mr. Hee.

21    A     Correct.

22    Q     Now, I think we also, but just for the record what I'm

23    clear, concerning the cash withdrawals we talked about.  I

24    think I asked you, Did you form an opinion as to whether those

25    cash withdrawals on the Optima card should be considered income

1   to Mr. Hee?

2   A    I believe that the recordkeeping should have been a little

3   bit better, but I would not have included it as income to

4   Mr. Hee.

5   Q    And that's your opinion, sir.

6   A    That's my opinion.

7   Q    Okay.  Let's -- you're familiar with -- I guess you

8   recently received, as we did, the government's schedules.  I

9   think you have a copy of what's been marked as Exhibit 18

10  overall.

11  A    Yes.  Yes.

12  Q    Let's -- I'd like to discuss with you the adjustments for

13  wages to both Mrs. Hee, Wendy Hee, and the wages to the

14  children and also the associated benefits.  You've had a chance

15  to review the government's schedules on these?

16  A    Yes.

17  Q    Now, let's focus on Mrs. Hee for a moment.  Could you tell

18  us why you believe it was reasonable, or do you believe it was

19  reasonable for the company to pay Mrs. Hee a salary?

20         MR. HARRINGTON:  Objection, Your Honor.  To the

21  extent he's asking is it reasonable, this relates back to our

22  earlier hearing.

23         THE COURT:  He's rephrasing.

24         MR. TOSCHER:  Yes.  Let me rephrase.

25  Q    Have you reviewed the various facts regarding the payments

1    to Mrs. Wendy Hee, her salary payments?

2    A    Yes.

3    Q    And have you -- do you believe that the amounts paid to

4    her are deductible for tax purposes?

5    A    I believe that they are.

6    Q    And could you tell your reasoning to the jury, please.

7    A    My reasoning is is that it is my understanding that

8    Mr. Hee has a -- not only a high-profile job that he is -- his

9    companies are very, very interconnected and related to the

10   homelands of the Hawaiian Islands.  I'm also of the

11   understanding that he provides telecommunication cabling and

12   services to restricted areas within these islands.

13           I also know that he's called upon to be in not only

14   business settings -- business can be social.  It can be also

15   critical business situations for which it is proper to have not

16   only your spouse with you, but it's also considered part of

17   your overall -- I don't want to use the word "reputation," but

18   your overall presence to the islands and to the businesses that

19   he's in.

20           I also know that Mrs. Hee is extremely educated.  I

21   know that she went to an Ivy League school.  I've read that she

22   has a degree in planning, in community planning.  I also know

23   that it is a long-term relationship; that it started, I

24   believe, when they were in high school.  I understand that she

25   is a confidant of his.

1            MR. HARRINGTON:  Objection, Your Honor.  This is all

2       outside of the record.  It's not in evidence.  There's no

3       foundation.

4            THE COURT:  Well, he's saying that he presumably

5       reviewed some materials.  It doesn't have to be admitted into

6       the record.  He's an a expert.  So overruled.

7            THE WITNESS:  I know, as I was saying, that she's --

8       it's my understanding that she's been with him since the

9       inception of these companies and before that.  Long-term

10      marriage, long-term confidant, extremely educated.

11            I was looking -- it was kind of interesting, and as

12      part of my answer here, I was looking at a court case that

13      occurred in the Ninth Circuit, which is the area that handles

14      the western United States, back in 1964, of all things.  But

15      very relevant today.  Because when I thought about it, it was

16      the -- it was the *U.S. v. Disney,* and it was Walt Disney.  And

17      we all know that Disney is very, very concerned --

18            MR. HARRINGTON:  Objection, Your Honor, to the extent

19      that he's giving legal instructions and summarizing the law.

20            THE COURT:  Well, I'm more worried about getting away

21      from the original question.  So I need a question.

22      BY MR. TOSCHER:

23      Q    Okay.  We'll stop that.

24            Mr. Howard, in your experience is past services to a

25      company a relevant factor in determining whether compensation

1    is allowed to be paid?

2    A    Yes.

3    Q    And is there any requirement that somebody have an office

4    at the company?

5    A    A physical presence, in my opinion -- physical presence,

6    although it may be an added condition, is not a requirement in

7    order for an expense to be deductible or a person to be

8    employed by a company.

9    Q    Okay.  Now, based upon your review of everything, have you

10   been able to form an opinion as to whether the wages paid to

11   Mrs. Hee should be considered a constructive dividend to

12   Mr. Hee?

13   A    I believe that the wages should be treated as wages and

14   taxed how they were taxed with the original filing of the

15   return as taxable income and tax owed on them.

16   Q    So do you have an opinion -- okay.  You don't believe they

17   should be treated as constructive dividends to Mr. Hee.

18   A    No.  I believe they're income of Mrs. Hee.

19   Q    And were those properly reported on the joint income tax

20   returns filed by Mr. and Mrs. Hee?

21   A    Yes.

22   Q    Now, let's turn to the payments made -- the salaries to

23   the children.

24   A    Yes.

25   Q    Were you able to form an opinion, a judgment, as to

1    whether those salaries to the children could be paid and

2    properly deductible?

3    A     Salaries for the children.  The salaries paid for the

4    children, the children were employed at one time, employed

5    working -- working in the business, working actually physical

6    labor.  They were preparing to -- Mr. Hee was preparing them to

7    eventually at some point be the future of the corporation.  And

8    there is case law.  I did find one case -- I think it's

9    *Kitner* -- that said that wages for -- as an inducement for

10   someone to return to their employment in the future can be

11   deductible as current wages.

12          I think in this issue -- I think that in light of the

13   circumstance here, I know from my forensic work that there were

14   returns filed for the children.  That those returns were filed

15   by the same firm that filed Mr. and Mrs. Hee's return.  I know

16   that probably this issue should have been addressed sooner than

17   later or before it came to this point as where we're at today,

18   but there may be a basis to take this deduction.  But I --

19   Q     Go ahead.

20   A     But I would caution, when taking this deduction, I

21   probably would have wanted to address the situation with the

22   client, or with Mr. Hee if I was his accountant.  I would have

23   liked to get the facts and circumstances.  Once the facts and

24   circumstances were determined, if we decided to take a position

25   for not future services but services to entice or to ask for

1    the return of our family members to carry on the family

2    business.  And I know -- I'll say from hearsay, but I know

3    Mr. Hee is very concerned about his business being carried on

4    by his Hawaiian culture and his Hawaiian roots.

5              I think I would have filed with the return -- if we

6    decided to take that position, I would have filed what's called

7    a Form 8275, which is a form that is a disclosure form.

8    Although it was very open, as far as the accountants were

9    well-aware that wages were being paid, and that the children

10   were receiving payment from the corporation, I think I would

11   have taken the added measure to file this form with the tax

12   return just as a precautionary factor.  Because if this

13   deduction turned out that we couldn't -- that there was a

14   disagreement, or we ended up in a situation here today where

15   the expense is being challenged, at least with that form it

16   would reduce the -- not only the penalties but would reduce the

17   nature of the issue at hand regarding that deduction.

18   Q    All right.  So let me ask you a hypothetical.  If you were

19   the preparer of the return, and you were doing the children's

20   returns, and you knew they were full-time students in college,

21   and they were getting substantial salaries during this period

22   of time, and you were also the preparer of the corporation

23   returns, in this situation Waimana, is what you're telling us:

24   that you, as a CPA, should have inquired further with the

25   client?

1    A    I think it's good, professional care.  I think you can't

2    just -- the problem with accountants is that we're -- I'm sure

3    like all of us and attorneys -- we're all overworked and we're

4    always behind and we're all working into the middle of the

5    night.  Things get out of -- things get too much, and it

6    becomes just get the product -- get the return out the door.

7    Get it filed.

8              But there has to be some standard of care, some

9    thought process.  There comes a time when you have to have your

10   eyes open.  You have to see the whole picture.  If you see the

11   picture and you have concern, then I definitely think you have

12   a duty to talk to your client, sit down with your client and

13   discuss the issues, and work it through the thought process as

14   we're doing here today.

15   Q    So let me ask you a question.  We saw up on the screen --

16   I'm not going to -- I don't think we need to bring those up

17   right now.  I can't remember the exhibit number -- but

18   engagement agreements with the accountants.  Okay.  And are you

19   saying notwithstanding -- how do those engagement agreements

20   fit in with your statement as to the CPA's obligations?

21   A    It's interesting because I talk quite extensively about

22   this to my students.  You have a letter.  It says that it is

23   the -- it is yours, meaning the client, responsibility for

24   everything, and all I'm going to do is put that information

25   into a form and hand you a return, and it's your return, and

1    you're responsible for it.

2         And the question is, you can't duck your

3    responsibility as a taxpayer, without a doubt.  But as a

4    professional, when you're preparing a return, if you see

5    something that doesn't appear correct or something troubles

6    you, you have a duty to bring that question up to the client.

7         For 35 years I've represented clients, and it's a

8    very scary thought that I've handed them their tax return, and

9    they sign it like this.  They say "I don't know what I'm

10   signing" or they don't care what they're signing.  They trust

11   me.  So there's a level of trust.

12        In these engagement letters it says we have no

13   responsibility to find -- I think it says irregularities or

14   fraud.  But I think that statement is more for not the fraud --

15   not fraud of you, the taxpayer, it's the fraud that's out there

16   that you could be getting ripped off.  I think they're standard

17   letters.  They're generic.  I think accountants rely on them.

18   They're a standard starting point, but I certainly don't feel

19   they're the end point in professional diligence.

20   Q    Okay.  You gave us your opinions regarding the wages paid

21   to Mrs. Hee and the wages paid to the children and your

22   reasoning.  Does the same apply to the benefits that they were

23   receiving under the company benefits policies?  I think that's

24   item 7 on chart Schedule 2A.  Is there any difference in your

25   analysis?

1    A    Well, the benefits are a relationship or a functional

2    variable of the wages.  If you don't have the wages, then you

3    don't have the benefits.  If you believe the wages are

4    deductible and proper, then you have the benefits.  They're

5    not -- they doesn't stand alone.  They're in conjunction with

6    the wages; so my reasoning would stand the same.

7    Q    And your opinions are the same -- or opinion the same as

8    to whether -- regarding deductibility by the corporation?

9    A    Yes.

10   Q    And whether it should be a income to Mr. Hee.

11   A    Correct.

12   Q    Now, I want to ask you to turn to Schedule 6 of what's

13   been marked as Exhibit 18 for identification -- or 6B.  6 and

14   6 -- 6B, Mr. Howard.

15        Have you had a chance to review the schedule?

16   A    More than briefly.  I haven't had a chance to verify the

17   schedule; I just received it a day ago.  But at face I've

18   looked at it, yes.

19   Q    Okay.  Let's just look these notations.  If you look at

20   the column -- the notations on the AmEx statement or

21   reimbursements, did you get a chance to look at those and the

22   justifications for these expenses?

23   A    I'm able to look at the description and the statements.

24   Example, I think number 9 on the first page, it says Hawaiian

25   Airline ticket for Wendy Hee, Honolulu, Hawai'i, to San Jose

1    and back.  Date of departure.  It says Travel CC Marine France

2    Inspection.  Attach personal travel 5-8 charge to CC Inspection

3    Trip to France.

4           I would say that at face I don't see a problem with

5    it, but I would certainly need more information before I make

6    that determination.

7    Q    So you haven't had time to go through and look at this in

8    detail or get -- you haven't seen any backup for any of this,

9    have you.

10   A    No.  I'd like -- yeah, I'd like to see -- I have not seen

11   backup.  I'd like to see it.  I'd like to hear what the

12   explanation is for the travel along with the backup and then be

13   able to make a determination.

14   Q    Okay.  So at this point, based upon your limited review,

15   do you have any opinion as to whether these expenses should be

16   considered income to Mr. Hee?

17          MR. HARRINGTON:  Objection, Your Honor.  Foundation.

18   He just said he hasn't had any time to review it.

19          MR. TOSCHER:  Limited.  As a practical matter, how

20   could he ever review this just getting the schedule yesterday,

21   Your Honor?

22          THE COURT:  So the question is you want to know if he

23   has an opinion.

24          MR. TOSCHER:  I'll rephrase.

25          THE COURT:  Okay.

1  BY MR. TOSCHER:

2  Q    In reviewing it, is there anything in the schedule which

3  suggests to you that these amounts should be income to Mr. Hee?

4  A    There are so many items and they are very, very small,

5  some of them $30 or less.  I can't tell.  On face value what

6  I'm reading, they appear that they could be business.  I would

7  want to have more information.

8  Q    Fair.

9         Now, of all the claimed government assertions of

10 nondeductibility regarding the corporation or income to

11 Mr. Hee, I think based upon what we talked about before that

12 the only two items that you felt were nondeductible were the

13 MIT tuition, one; correct?

14 A    Correct.

15 Q    That was in 2004 for approximately $34,000?

16 A    Correct.

17 Q    And your conclusion, after your forensic analysis, is that

18 that was an error on behalf of the accountants; is that

19 correct?

20 A    That's correct.

21 Q    And the other item that was in your chart regarding

22 payments to Diane Doll, you felt that there should be further

23 analysis regarding who the benefits were provided to, whether

24 it was incidental, to make that determination; correct?

25 A    Correct.

1    Q    And you also concluded with respect to those there was an

2    error by the accountant, or a failure by the accountant, to

3    properly inquire as to those; is that correct?

4    A    That's correct.

5    Q    So it's fair to say, Mr. Howard, the only two -- after

6    reviewing all this information the only two -- there's only two

7    adjustments that you would agree with with the government.

8    That's the MIT tuition; correct?

9    A    Correct.

10   Q    And the Diane Doll.

11   A    Correct.

12   Q    And you believe both of those were errors by the

13   accountant.

14   A    That's correct.

15          MR. TOSCHER:   I have no further questions, Your

16   Honor.

17          THE COURT:   Okay.  Cross-examination.

18                    CROSS-EXAMINATION

19   BY MR. HARRINGTON:

20   Q    Good afternoon, Mr. Howard.

21   A    Good afternoon.

22   Q    So you testified that you did a forensic accounting of the

23   treatment of expenses in this case?

24   A    Forensic analysis.

25   Q    Forensic analysis.  And that involves drilling down and

1    tearing through all the books and records.  And you talked

2    about that process?

3    A    I think that is an overstatement.  Forensic analysis is

4    subject to my -- what I felt was necessary to come to the

5    conclusions that I drew in my opinion.  I didn't tear books

6    apart and --

7    Q    Okay.  You used the phrase "drilling down" several times?

8    A    Yes.

9    Q    And was that process -- that process would be more

10   detailed than what an ordinary tax return preparer would do,

11   isn't it?

12   A    That's correct.

13   Q    And are you being compensated for your testimony today?

14   A    I am.

15   Q    And how much are you being compensated?

16   A    I'm getting compensated $350 per hour.

17   Q    And how many hours have you put into this?

18   A    Probably close to 150 or 200 hours.

19   Q    And have you been paid yet?

20   A    Yes.  For -- partially, yes.

21   Q    And are you going to submit an invoice for the payment?

22   A    Yes.

23   Q    Now, let's be clear about a couple things.  The payments

24   to Diane Doll were deducted as business expenses by Waimana;

25   right?

1    A    Correct.

2    Q    And you agree that that wasn't a proper business

3    deduction.

4    A    Correct.

5    Q    And the payments to MIT were also deducted as a business

6    expense, and you agree that those were not a proper business

7    deduction; right?

8    A    Correct.

9    Q    Okay.  In looking at the Diane Doll payments, if we could

10   turn to page 10 in your book, I think you referred to a 2002

11   memo; is that right?  Or excuse me, a 2003 memo about the 2002

12   tax information.

13   A    Yes.

14   Q    And so if you look on either side of that page, the

15   payments are dated 2003.  Do you see that?

16   A    Yes.

17   Q    So the memo at page 10 wasn't what was used to

18   characterize the payments in 2003?

19   A    Not sure.

20   Q    Okay.  Now, you also testified that in looking through the

21   Diane Doll records, it was your determination that the

22   accountants made an error?

23   A    Yes.

24   Q    And you said you thought that the accountants were the

25   ones who were classifying expenses?

1   A    Correct.

2   Q    Now, were you aware that Nancy Henderson testified that

3   Albert Hee directed her to classify those expenses as

4   consulting fees?

5           MR. TOSCHER:  Objection, Your Honor.

6   Mischaracterization.

7           THE COURT:  Well, I remember her saying that she sat

8   down with Mr. Hee.  Overruled.

9           THE WITNESS:  The answer is, no, I wasn't aware of

10  it.  But I, however, would say that a client sitting with their

11  assistant going through deductions and classifying them, those

12  deductions still came to the attention at least in 2003 by the

13  accountants, and further inquiry should have been done by

14  them.

15  BY MR. HARRINGTON:

16  Q    Okay.  But you weren't aware that Albert Hee is the one

17  who directed that it be deducted as a consulting fee.  You

18  weren't aware of that?

19  A    I don't know who directed it to be a consulting fee.  I

20  only have the information I have here.

21  Q    Okay.  So you didn't hear any of the testimony in this

22  case?

23  A    No.

24  Q    Okay.  So you also weren't aware that Lynn Tamanaha at

25  Chinaka & Siu also testified that the various business expenses

1    were already categorized by the time those records came to her

2    firm?

3    A    She may have testified that, but the information that I

4    reviewed appear that they weren't.

5    Q    Okay.  That's what you saw from the papers, but her

6    testimony was the opposite.  Are you aware of that?

7    A    I haven't -- I didn't pay any attention.  I rely on

8    written documents.  They tend to document the past better than

9    people's memories.

10   Q    So you haven't reviewed any of the testimony in this case.

11   A    I've read depositions, but I don't remember specifically

12   what you're stating there.

13   Q    Depositions --

14   A    I misspoke.  Court testimony.

15   Q    Okay.  Thank you.

16            So you also weren't aware then that Mr. Chinaka

17   testified as well that the expenses were already categorized by

18   Waimana when they came to his firm.

19   A    I don't recall that, no.

20   Q    And turning to the MIT expenses, I assume you also weren't

21   aware that Nancy Henderson testified that Albert Hee told her

22   to classify those payments as educational expenses.

23   A    What I would state to that is I have --

24   Q    Could you please answer the question first.  Were you

25   aware that that was her testimony?

1  A    No.

2  Q    Now, you talked a little bit about the returns being filed

3  close to the deadline by Chinaka & Siu and by KMH, LLP; do you

4  remember that testimony?

5  A    Yes.

6  Q    And so were you aware that the testimony from the folks at

7  KMH was that they were getting all the information from Waimana

8  at the very last second?  Were you aware of that testimony?

9  A    That would further my opinion that things were being

10  extremely rushed and not enough time to pay attention to

11  detail.

12  Q    And you'd agree that the taxpayer has a responsibility to

13  timely provide information to an accountant; right?

14  A    I would agree with that, but I also would answer with the

15  fact that whoever's responsibility it is, if things are rushed,

16  things can be -- accounting can be prepared incorrectly.

17  Q    Sure.  And the rush could be responsible -- the

18  responsibility of the client for providing information too

19  late; right?

20  A    Could be.

21  Q    And we talked a little bit about the house in Santa Clara?

22  A    Yes.

23  Q    And I think you said you were aware that defendant's two

24  children lived in that property?

25  A    Yes.

1  Q     Now, were you aware that nine other college students lived

2  with his children?

3  A     Yes.

4  Q     And so correct me if I'm wrong, but having 11 college

5  students might not be the best way to take care of an

6  investment property, would it?

7  A     Maybe not, maybe so.

8  Q     And are you also aware that the accountants weren't told

9  what -- the accountants at Chinaka & Siu and at KMH were not

10  told initially what the property was being used for?

11  A     I'm not aware of that.  I don't know if that would change

12  my opinion.

13  Q     Okay.  And so you're not aware that the folks at KMH

14  testified that they found out in 2012 about how the property is

15  actually being used and had to perform computations to change

16  the treatment?  You're not aware of any of that?

17  A     I'm aware -- I saw the computations in my forensic

18  analysis.  However, my opinion was due -- in light of the

19  situation that brings us here all day could have had an impact

20  of why the property's classification was changed.

21  Q     Now, would you agree that Mr. Hee was obtaining a benefit

22  from the use of the property by having his children live there

23  rent-free?

24  A     Why is it Mr. Hee's benefit?  I would call it the children

25  receiving a benefit.

1    Q     Well, we saw the loan to shareholder record, and there

2    were many payments that Mr. Hee was paying for his children to

3    live on the mainland, and he didn't have to pay that anymore

4    once they lived in the house.  Would you agree with that?

5    A     I could agree with that.  I don't know whose benefit it

6    was.  It's not clear.

7    Q     And I wanted to look at the dollar figures on page 37.

8    I'm sorry, it's not dollar figures.  I guess it's percentages.

9    And if you look at page 37, you've created a pie chart.  So

10   what's the actual dollar figure for .39 percent?

11   A     In my testimony I said the dollar figure was or is

12   1,941,950 over a 10-year period.

13   Q     Now, you may not have reviewed the testimony, but the

14   jury's heard that the government's calculations are slightly

15   higher.  Would you agree with that?  About 2.4 million?

16   A     I think a lot of the government's -- "higher," meaning I

17   think that may be from the shareholder loan issue.  I'm not

18   sure.

19   Q     Okay.  But there's just a difference in numbers there.

20   But in calculating .39 percent, you used a different number

21   than what the government did?

22   A     I believe we used the number that -- from your exhibit

23   that came out a day ago.  I'm not sure.

24   Q     Okay.  And so .39 percent represents about $2 million,

25   though.

1    A    Correct.

2    Q    And I guess this chart is illustrating that it's a small

3    percentage of the expenses.  Would you agree that that would be

4    a good way to hide what you're doing with certain payments?

5    A    I wouldn't call it a good way to hide anything.  It's just

6    a fact.  It's a statistical fact.

7    Q    Sure.  And it may not appear at first blush; right?  If

8    it's that small of a percentage, you may not notice it.

9    A    I can't get there with that question.

10   Q    Now I want to turn your attention to the ATM receipts

11   briefly.

12   A    Yes.

13   Q    And I believe that's on page 33.  And I think your

14   testimony was that you -- on surface value you didn't really

15   see -- I mean, hold on.  Let me rephrase that.

16            You thought that these could be a justifiable

17   business deduction.  Would that be accurate for what your

18   testimony was on the ATM?

19   A    Yes.

20   Q    So I want to direct your attention to 4-61, which is maybe

21   about a third of the way of the page down.  And it has a travel

22   date ending on March 11th.  Do you see that?  On the dates of

23   the trip?

24   A    Yes.

25   Q    And so then there's withdrawals dated March 22d or March

1   24th totaling about a thousand dollars.  Do you see that?

2   A   Yes.

3   Q   So that would be after the trip took place?

4   A   Could have been.  I don't know.

5   Q   Now, we talked a little bit about the wages that were paid

6   to the children.  Were you aware that Mr. Siu actually

7   testified that he told defendant that the children needed to

8   work in order to earn a salary?

9   A   I'm not aware that that was his specific testimony, but

10  that would be one opinion, yes.

11  Q   Okay.

12  A   I'm not going to disagree with that as a possible

13  variable.

14  Q   So you weren't aware that that advice was given to

15  defendant?

16  A   No.

17           MR. HARRINGTON:  Just one moment, Your Honor.

18           No further questions, Your Honor.

19           THE COURT:  Okay.

20           MR. TOSCHER:  No questions, Your Honor.

21           THE COURT:  All right.  Then the witness is excused.

22  You may step down and leave the courtroom.

23      (Witness excused.)

24           THE COURT:  Who's your next witness?

25           MR. TOSCHER:  Morgan Banks.

1          MR. TONG:  Your Honor, may we have a sidebar before

2    she testifies?

3          THE COURT:  All right.

4       (At sidebar on the record:)

5          MR. TONG:  Your Honor, I would like an offer of proof

6    on this witness because, from what he briefly described this

7    morning, I think her testimony is entirely irrelevant and

8    should be excluded under 403.

9          MR. TOSCHER:  Okay.  I'm happy to do that.

10         What I told Mr. Tong this morning, Morgan Banks was a

11   former employee of the Internal Revenue Service.  She ran the

12   San Jose Fitness Center, which was a roll-out program by the

13   IRS, I believe, in 1989 designed to provide fitness and massage

14   services.  It was part of the overall fitness program.  And she

15   was there for four years.  They rolled the program out to --

16   she was a test, but they rolled it all out for the purpose of

17   providing health and welfare benefits to the employees.  This

18   goes right to the heart of ordinary and necessary, common,

19   accepted, and the IRS is doing it for their own employees.

20         THE COURT:  Was it offering it to everyone?

21         MR. TOSCHER:  It was offering it to everyone.  It was

22   a facility.  They built the facility for the employees.  And

23   it's different, and I think the government has a technical

24   argument here, you know.  Oh, please.  That's not appropriate

25   to smirk at me.

1          MR. TONG:  I'm not smirking.  I'm smiling.

2          THE COURT:  Okay.  Okay.

3          MR. TOSCHER:  And what the Court is talking about,

4    that's an appropriate subject of cross-examination.  But the

5    government's challenging "Nobody does this."  You heard it.

6    And we're entitled to put it on.

7          MR. TONG:  First off, we never said nobody does this.

8    There's no evidence that Waimana had any kind of program which

9    would offer massages to employees across the board; so we're

10   talking apples and oranges.  And the fact that the IRS may have

11   paid, with its own funds, to provide services to employees at

12   some other location is not relevant to whether or not his

13   deduction of not consulting fees, massage therapy payments,

14   were deductible under the Internal Revenue Code, I mean, it's

15   apples and oranges.  It's 403.

16         He's trying to get in the fact because he wants to

17   say the IRS recognizes the value of the services, but it's a

18   different program.  IRS is not a tax-paying entity either; so

19   they're not deducting those expenses as ordinary and necessary

20   business expenses.

21         Finally, more fundamentally, we have no evidence

22   whatsoever that the defendant knew about any other programs and

23   their deductibility at the time that he was deducting these

24   Diane Doll payments as consulting fees.  So it's irrelevant,

25   403, and it can't be relevant to his state of mind unless --

1    unless and until he testifies.

2           MR. TOSCHER:  I respectfully disagree.  This gets to

3    the government's primary attack that it wasn't ordinary and

4    necessary and it wasn't common, and that's an important

5    threshold question that we're entitled to provide evidence on.

6    And the government doesn't want to hear it because the IRS were

7    being hypocrites.  That's what they're saying.

8           This was happening.  It was Corporate America

9    recognized it.  You will hear testimony that the reason the

10   national office rolled out this program was because all of

11   Corporate America was doing it.  And this was -- in all

12   fairness, Your Honor, this was the fitness facility, and

13   massage was just a part of it.  Okay.  And I'm going -- go

14   ahead.

15          THE COURT:  Did Mr. Hee know about this?

16          MR. TOSCHER:  Nobody knew about it, Your Honor, until

17   the *Wall Street Journal* found out about it.

18          THE COURT:  Okay.  So did Mr. Hee read the *Wall*

19   *Street Journal*?

20          MR. TOSCHER:  No.  I'm not going to proffer that, no,

21   Your Honor.  But that had -- there's two components here.

22   There's whether it's ordinary and necessary.  Then even if it's

23   ordinary and necessary, is it some sort of taxable fringe

24   benefit?  And then it gets to, you know, what is the common

25   understanding?  It's going on.  Whether he knew about it or

 1   not, it's part -- it supports his good-faith belief that he

 2   wasn't doing anything wrong.

 3          THE COURT:  But if he didn't know about it, I don't

 4   see how it could support his belief.  Plus, I don't have

 5   evidence of his belief; so --

 6          MR. TOSCHER:  Doesn't --

 7          THE COURT:  To the extent you're bolstering it, it's

 8   kind of just sitting out there.

 9          MR. TOSCHER:  It's all the basic facts and

10   circumstances.  And this -- we're going to have expert

11   testimony on Tuesday.  She's not an expert.  She's a fact

12   witness on it.  I think it goes -- even leaving aside state of

13   mind, it goes to the heart of whether something is ordinary and

14   necessary when other business entities are doing it.  Now, you

15   can parse it and say the IRS is different.  It's close enough,

16   Your Honor.

17          THE COURT:  Okay.  I'm having a hard time, though,

18   equating it to what's a deductible expense if this would never

19   be deductible because the IRS doesn't file an IRS tax return.

20   It may well be that you can get your expert to say all kinds of

21   things are common, ordinary expenses.  I don't know why an

22   IRS -- I mean, I understand that they've attacked the Diane

23   Doll payments and deductions as just like really so obviously

24   improper, and you want to undermine them and say, "Hey, you

25   hypocrites."

1          MR. TOSCHER:  I wouldn't say that, but they are.

2          THE COURT:  "You had business -- your business paying

3    for these things."  But since they're not a taxpayer, I am kind

4    of concerned about the 403 issue.  There may be some other way,

5    but unless there's a better direct tie.  If they were allowing

6    other businesses to do it and you want to talk about that,

7    that's one thing.  But for them to do it when they're not a

8    taxpayer, you're just trying to make them look bad.

9          MR. TOSCHER:  Not just.

10         THE COURT:  And I don't see the relevance of that,

11   okay.  First of all, IRS looks bad to everybody anyway; so, you

12   know, I don't think you need this but --

13         MR. TONG:  I'm smiling at that comment, too; so let

14   the record reflect that.

15         MR. TOSCHER:  You're just not mocking me this time.

16         THE COURT:  They're not taxpayers.  I guess that's a

17   lot of my concern.  So I'm not going to let this person testify

18   about that.  Was she going to testify about anything else?

19         MR. TOSCHER:  Well, I think she would testify about

20   her role and her employment as to providing these services and

21   the benefits of massage and those services.

22         THE COURT:  That's the same thing.

23         MR. TOSCHER:  No, no, I'm just telling you.  Where

24   she was doing it is, you know, I don't know how I'm going to be

25   able to keep that quiet.

1          So what I'd ask, Judge, so the Court is ruling that I

2     can't put her on.

3          THE COURT:  Not for what's been identified so far.

4     That's why I'm asking is there something else.

5          MR. TOSCHER:  Can I -- I think we're about to take

6     our break.

7          THE COURT:  Yes.  Okay.  Let's take a break.  And we

8     may need another discussion without the jury.  Okay.

9          MR. TONG:  Thank you, Your Honor.

10     (In open court on the record:)

11          THE COURT:  We're close enough to when I said we're

12     going to take a break that we might as well take it instead of

13     making you folks sit here.  So we'll come back in about 15

14     minutes, and then we'll go until 4:00.

15     (Jury excused.)

16          THE COURT:  Okay.  So counsel, how about we come back

17     in 10 minutes.  We can resolve this one way or another.  Then

18     the jury can come back in 15 minutes.

19          MR. TOSCHER:  Thank you, Your Honor.

20     (Court recessed at 2:27 P.M., until 2:42 P.M.)

21     (In open court without the jury:)

22          THE COURT:  Okay.  What's happening with this next

23     witness?

24          MR. TOSCHER:  Your Honor, we respectfully submit that

25     it goes to the question of whether it's ordinary, whether it's

1    common.  The fact that it's a -- it is a -- the IRS is a

2    business entity.  The fact that they don't file tax returns I

3    think really is beside our main point.  And I think the

4    standard is substantially prejudicial.  As the Court noted --

5            THE COURT:  Okay.  But when we talk about -- you

6    know, I clearly recall that Miss Mitsuyoshi did testify --

7            MR. TOSCHER:  Right.

8            THE COURT:  -- about what is an ordinary and common

9    expense for a business.  But that was in the context of looking

10   at what could be deducted.  And so when you're talking about

11   whether something that is not going to show up as a deduction

12   at all because it's not being done by a taxpayer, I don't know

13   that it goes to what is an ordinary and common business expense

14   that, therefore, can -- unless there's some other problem -- be

15   deducted.  I mean, that's the leap that I'm -- it's not just

16   what's ordinary and common.  The testimony in the government's

17   case in chief went to what can be properly deducted.

18           MR. TOSCHER:  Right.  And the starting point is

19   ordinary, and the starting point is common.  And the fact

20   that --

21           THE COURT:  Right.  But it is for a tax-paying

22   business.  I mean, in other words, you know, it just can't be

23   that whatever is ordinary and common, period, can come in.  I

24   mean, it's probably the case that professional athletes go to

25   get massages all the time.  That doesn't mean that I'm going to

1    let somebody come in and say such-and-such professional athlete

2    gets these massages and -- because that actually has nothing to

3    do with what is ordinary and common for Mr. Hee's business.

4         And that's sort of the same mind-set I have about

5    what is ordinary and common for a non-tax-paying government

6    entity.  If this Court, for example, said all employees can go

7    to our free, you know, such-and-such thing, taxpayers might

8    grumble, but I don't know why that would be relevant to whether

9    a particular taxpayer's deduction of it should be deemed to be

10   appropriate under the "This is ordinary and common for

11   businesses" rubric.  That's the concern I have.

12        MR. TOSCHER:  I understand, Your Honor.  I'm not

13   going to belabor the point any further.

14        THE COURT:  Okay.

15        MR. TOSCHER:  I don't see how I can -- I mean, we

16   could consider, and I'll have to spend some time.  I mean, she

17   has some expert qualifications in the area, but we are bringing

18   Mr. Rockowitz in on Tuesday; so I don't -- I really can't

19   salvage her right now and do that in the interest --

20        THE COURT:  Okay.  Well, there may be a problem with

21   disclosures.

22        MR. TOSCHER:  That's exactly right.

23        MR. TONG:  There's an issue with the disclosure.  And

24   with regard to the other expert -- what is his last name again?

25        MR. TOSCHER:  Rockowitz.

```
 1              MR. TONG:  Rockowitz.  We have the issue that the

 2   Court flagged earlier, which is his testimony is largely

 3   irrelevant, unless it goes to the state of mind of the

 4   defendant.  And there is no evidence of the state of mind of

 5   the defendant; so I don't think he should be called to talk

 6   about what the industry generally does if that was not part of

 7   the mental state when the deductions were taken.

 8              THE COURT:  Okay.  But you guys are ahead of me

 9   now.

10              MR. TOSCHER:  He's way ahead of me, too, every

11   opportunity he can get.

12              THE COURT:  Who's the next witness?

13              MR. TOSCHER:  Mr. Gil Tam.

14              THE COURT:  Okay.  So let's just go to that witness.

15   Okay.

16         (Jury enters.)

17              THE COURT:  Mr. Toscher.

18              MR. TOSCHER:  Your Honor, we would like to call Gil

19   Tam.

20         (Witness photographed.)

21              THE CLERK:  Please raise your right hand.

22         (Witness sworn.)

23              THE CLERK:  Thank you.  Please be seated.

24              Please state your name and spell your last name.

25              THE WITNESS:  My name is Gilbert Kwai Tun Tam.  My
```

1    last name is Tam, T-a-m.

2                          DIRECT EXAMINATION

3    BY MR. TOSCHER:

4    Q    May it please the Court, ladies and gentlemen.  Good

5    afternoon, Mr. Tam.

6    A    Good afternoon.

7    Q    Could you tell us just where you reside, without giving

8    the address.

9    A    I live in Kaimuki.

10   Q    Okay.

11   A    I recently moved to Kaimuki.  I was in 'Aiea prior to

12   that.

13   Q    Okay.  How long have you lived in Hawai'i, sir?

14   A    Seventeen years growing up, 11 years college and service

15   in the Army, and back here 38 years.  So 17 plus 38.

16   Q    Okay.  So you went to high school here?

17   A    Yes, sir.

18   Q    And what school did you go to?

19   A    I went to Kamehameha.

20   Q    All right.  You remember the year you graduated?

21   A    1966.

22   Q    Were you able to go to college?

23   A    Yes, sir.

24   Q    And where did you go?

25   A    I went to the U.S. Military Academy at West Point,

1    graduated in 1970.

2    Q    1970.  And did you get a -- what kind of a degree did you

3    get from West Point?

4    A    In those years we had a bachelor's degree, no major.

5    However, it was heavy engineering.

6    Q    Heavy engineering.  Did you have any postcollege

7    education?

8    A    Yes, sir.  I have a Master's in Public Administration with

9    an emphasis on Human Resources from Pepperdine University,

10   graduated in 1977.

11   Q    Any other postgraduate degrees?

12   A    If you consider the Army Command and General Staff

13   College, I graduated in 1990.

14   Q    After graduating from West Point, how long did you serve

15   in the Army?

16   A    I served actively for seven years.  And at that time I

17   wanted to come home.  I wanted my children to come home, meet

18   their grandparents, great-grandparents.  So I left in 1977 and

19   came home.  So after seven years.

20   Q    Can you tell us where you served and what functions you

21   did when you were with the Army.

22   A    I was an infantryman, infantry officer, commissioned as a

23   second lieutenant in the infantry.  Went through a lot of

24   schooling:  infantry basic, airborne ranger, jump master.  Went

25   to helicopter school, flew helicopters in the Army.  Stationed

1    in Germany; Texas; Fort Rucker, Alabama; Korea; White Sands

2    Missile Range; and left after White Sands Missile Range.

3    Q    After you left the Army and came back to Hawai'i, what was

4    your occupation?

5    A    I was a banker.  I went to work for Bank of Hawai'i.

6    Q    And how long were you a banker with the Bank of Hawai'i?

7    A    I spent five and a half years:  from 1977 to 1983.

8    Q    And can you tell us your title or titles and what you did

9    when you were with the Bank of Hawai'i?

10   A    I was at the bank twice.  So the first time I was kind of

11   a senior management trainee.  I was 29 years old then.  And I

12   was in their program for operations, but then moved into the HR

13   department as a staff development manager doing training and

14   development, recruiting a lot of the young people going into

15   management at Bank of Hawai'i.  So I recruited management

16   trainees.  I was also the employment manager for the bank

17   before leaving.

18   Q    Okay.  You mentioned HR department.  What does "HR" stand

19   for?

20   A    I'm sorry.  It's Human Resources.  In those days it was

21   still called Personnel.

22   Q    And how long were you with the bank?

23   A    Five and a half years; so 1977 to 1983.

24   Q    What about -- where did you go after you left the bank?

25   A    I went to the gas company.

1    Q    And what did you do there?

2    A    I was the propane division manager, the non-utility side

3    of the company -- of the gas company, and I managed the O'ahu

4    branch as well as the Moloka'i and Lana'i branches.

5    Q    Okay.  And how long did you hold that position for?

6    A    I held it for about two years.

7    Q    And after that?

8    A    After that I went to Kamehameha Schools.  I was hired as

9    the personnel director for the first five years and actually

10   sent in my resignation at that time.  But then I was asked to

11   stay, and I handled the administration group for Kamehameha

12   Schools.  So it did the administration for both the school and

13   in those days they called it the estate; so the business side

14   versus the education side.

15   Q    And how long were those combined?

16   A    10 years.

17   Q    10 years.  So that brings us up to 19 -- mid 1990s?

18   A    1994.

19   Q    Okay.  Close.  Did you go to work after you left the

20   Kamehameha Schools?

21   A    I went back to Bank of Hawai'i.

22   Q    Okay.

23   A    I was asked -- I actually talked to Larry Johnson.  At

24   that time they were going through a management change.  One of

25   the individuals that was departing, they had asked me to fill

1    that role, which was the director of governmental affairs.

2    Q    Okay.  It sounds like thus far in your employment you have

3    quite a bit of experience in personnel, Human Resources, and

4    managing employees.  Other than the work experience, any other

5    courses or training that you can recall?

6    A    Much of it was military-related.  I was -- stayed in the

7    guard and also in the reserves.  I retired after 25 years.  But

8    a lot of schooling in just forums, sessions, seminars,

9    workshops having to do with HR governance, nonprofits.  Spent a

10   lot of time working and helping out as much as I could in the

11   community.

12   Q    Okay.  And during the course of these various employment

13   endeavors you described, did you become familiar with types of

14   benefit packages to employees?

15   A    Yes, sir.

16   Q    Do you know Mr. Albert Hee?

17   A    Yes, sir.

18   Q    Can you identify him?

19   A    Yes.  That is Mr. Hee.

20   Q    Okay.  Can you tell us how you know Mr. Hee.

21   A    Mr. Hee is a naval academy grad.  I don't hold that

22   against him.  But many of the graduates of all of the different

23   academies, we tend to get together.  But I knew Albert as a

24   businessman.  And from time to time we would just talk about

25   issues relative to Hawai'i, people, families.

1          Some of the things that he knew -- one of my passions

2     is to help native Hawaiians.  Another is to help veterans,

3     especially disabled veterans.  And a lot of our discussions

4     centered around those as well as family, as how do we take care

5     of family?

6     Q     Did there come a time -- and this is -- did there come a

7     time when you started working for one of Mr. Hee's companies?

8     A     Yes.  It was after my second tour with Bank of Hawai'i

9     that -- Bank of Hawai'i was going through reorganizing itself.

10    We went from 3,000 staff down to 2,000.  We actually eliminated

11    about a thousand jobs.  And at that time I raised my hand and

12    volunteered as well just because I thought it was time for me

13    to move on.

14          And in my discussions with Albert, he said, you know,

15    why don't you come and help us.  The things that I have done in

16    the past, we could probably use it as -- at that time it was

17    2000 -- let's see, it was 2000 that a lot of the programs that

18    he had envisioned were probably coming to fruition, and he felt

19    that it was time that we needed to bring staff on, look at

20    programs, and look at how we move forward -- how we'd like to

21    move forward with the company in building the network for

22    Hawaiian Homelands.

23    Q     So prior to the -- I'm going to ask you some questions

24    when you started working.  But could you describe -- you said

25    you had interactions with him and discussions.  Where would

1    those occur?  What types of meeting locations?

2    A    We'd have lunch.  I'd go to his office.  He'd come to my

3    office.  We'd play golf.  These would be a lot of just informal

4    discussions.  So different places.

5    Q    And over what period of time was that before you joined

6    the company in 2000, I think you said?

7    A    I'd say probably 10 to 15 years.

8    Q    So Mr. Hee offered you a position at one of his companies?

9    A    Yes.

10   Q    And could you tell us what position you took?

11   A    He offered me a position at Waimana Enterprises, Inc.

12   However, he indicated to me that I would be, through a

13   management agreement, work for Sandwich Isles Communications

14   because, basically, that's where all the people were going to

15   be.  So that was in 2000.

16   Q    So you were employed by Waimana, which -- do you

17   understand Waimana to be the parent company of Sandwich Isles?

18   A    Yes, sir.

19   Q    But you were rendering services, through a management

20   arrangement, to Sandwich Isles.

21   A    Correct.

22   Q    And that's because that's where the bulk of the employees

23   were?

24   A    Yes.

25   Q    And what was your position going to be?  Title?

1    A    Vice president and administration manager or vice

2    president for administration, essentially.

3    Q    Vice president of administration.

4    A    Yes.

5    Q    Can you tell us starting what your duties were.

6    A    Essentially, was to oversee what I consider to be the back

7    office:  the human resource function.  Part of it would be

8    policies, policies and procedures, putting together policies

9    for the company as well as for the HR or human resource

10   programs, putting together programs, training, a lot of benefit

11   as well as the salaried administration program out of the Human

12   Resources side.

13   Q    How would you describe the mission of Waimana and Sandwich

14   Isles?

15   A    The mission to me is noble.  That we were going to be

16   building a state-of-the-art network to help native Hawaiians,

17   to connect up the Hawaiian Homelands.  To me it was an

18   opportunity to allow native Hawaiians to get into the 21st

19   century, to be able to work from home, not only have -- in

20   areas that there are no infrastructure.  When you look at

21   Hawaiian Homelands, where -- areas in the state where they have

22   no water, no power, no telephone.  But what Albert did was put

23   telephones so that they could call.  There are still areas

24   where -- in Hawai'i where they still have no power and they

25   have no water.  They truck the water to their site.  They have

1   generators.  But he's put in the infrastructure for telephones

2   and internet.

3   Q    So you said you joined the company in 2000.  Could you

4   briefly describe how the company -- where it is today.  Are

5   you -- excuse me, sorry.

6          Are you still with the company, Mr. Tam?

7   A    No, I'm not.  I left in 2011.

8   Q    Okay.  So you were there from 2000 to 2011?

9   A    Correct.

10  Q    Could you describe, since you were talking about the

11  build-out of the network, what occurred over that 10-year

12  period.

13  A    A lot occurred.  When you look at the program that Mr. Hee

14  put together -- and part of that was Hawaiian Homelands, one of

15  the smallest departments in the state and at that time before

16  they had the claims that -- monies that were -- came from

17  claims, they had the smallest budget.  And I know back then at

18  that time the chair of Hawaiian Homelands had come to him to

19  ask about how do you help me build infrastructure at no cost to

20  the department and at no cost to the residents.  And he looked

21  it up, and it was through the rural development program out of

22  the USDA where it's a program that would allow for the

23  build-out of infrastructure on the native Hawaiian or the

24  Hawaiian Homelands.  And it's a program that is available to

25  anyone.  You know, it was available to our phone company here,

 1   but they chose not to use it to be able to get out to rural

 2   areas to help rural residents in the State of Hawai'i.

 3        So we went from getting the first, I think it was

 4   something like $27 million, to build out new communities, new

 5   subdivisions, one of them being Waimanalo, putting in a central

 6   office -- that's where you tie all of the switches together --

 7   and to put all of the infrastructure underground.  So he built

 8   out all of these, I guess, new subdivisions in Hawaiian

 9   Homelands on Oahu.  And then the next phase was to go to the

10   neighbor islands, and that was about, if I remember correctly,

11   probably 40 million to build out other subdivisions on the

12   neighbor islands:  Maui, Big Island, and Moloka'i.

13   Q    Could you tell us, when you say "build out" the

14   infrastructure, what is actually being done?

15        MR. TONG:  Your Honor, while interesting, I think

16   this is not relevant to the charges in the case.

17        THE COURT:  Overruled.

18        THE WITNESS:  It's, basically, providing phone

19   service to new residents of new subdivisions.  So it's,

20   actually, laying the fiber and the copper to the different

21   residents, trenching and getting them the infrastructure that

22   they need so that they would be able to hook up and have

23   telephone and internet.

24   BY MR. TOSCHER:

25   Q    Okay.  So you described a number of build-outs on O'ahu

1   and the neighboring islands.  Tell us the status of the

2   network, where it was, or the build-out when you left in 2011.

3   And if there's anything material between that that you want to

4   mention, that's fine, but --

5   A    So the build-out, the first two were to take care of

6   subdivisions.  And then the next piece, which was fairly large,

7   was to start to connect all of the Hawaiian Homeland properties

8   and within each island.  And then before I left, Sandwich Isles

9   actually went and connected all of the islands undersea.  So it

10  was underground to the point of where it could be launched off

11  of the island undersea to connect all of the Hawaiian Homeland

12  properties.

13  Q    And do you know what company of Mr. Hee's company was

14  involved with building out the underseas cable?

15  A    It was the company called ClearCom.

16  Q    Were you employed with ClearCom at all?

17  A    No, sir.

18  Q    Did you have any management personnel activities regarding

19  ClearCom?

20  A    No, sir.

21  Q    Now, if you can, tell us what your duties were as vice

22  president of admini--- vice president of administration working

23  for Waimana and Sandwich Isles.

24  A    Well, beyond the Human Resources and working on policies,

25  I also did community relations and community affairs.  We

1    looked at how we can help the native Hawaiian communities.  And

2    there were four areas -- I was the community affairs guy, and

3    there were four areas where, if you understand where native

4    Hawaiians are as a people, from health, where we have the

5    highest incidence of everything that's bad; to education scores

6    being the lowest; economic development; incarcerations.  I

7    mean, all of these things that we've talked about over the

8    years.  So we look at being able to help the native Hawaiian

9    communities in four areas:  education, health care, economic

10   development, and cultural preservation.  So those are areas

11   that we wanted to fund to be able to support and to be able to

12   help native Hawaiians.

13   Q    Okay.  As part of your duties as Human Resources or

14   personnel, were you familiar with the employment policies at

15   Waimana and Sandwich Isles?

16   A    Yes, sir.

17   Q    And were you familiar with the employee benefits that were

18   provided?

19   A    Yes, sir.

20   Q    Now, we're going to talk about during the period you were

21   there up to 2011.  Could you describe what the employee

22   benefits were.

23   A    The employee benefits -- Al gave me a lot of freedom to do

24   some designing, but I'd like to start with, I think, the salary

25   side because that's important with regard to his philosophy of

1    taking care of the rank and file but wanting to take monies in

2    such a way that people can live, but also take care of the back

3    end so that they don't have to worry about their benefits,

4    their medical, their retirement, those kinds of things.

5              So I think one of the things that for me growing up

6    in this business community of Corporate America, Corporate

7    Hawai'i where you take salaries and you add three percent, you

8    add five percent, you keep compounding, and benefits continue

9    or become exponential when you do these kinds of things with

10   salary.  So one of the things that we talked about was, okay,

11   what if we just did base -- a base pay.  And we looked at the

12   market, and we tried to understand where the market was so

13   that, if a seasoned worker did their job and did exactly what

14   they're supposed to do, what did the market pay?  And that's

15   generally at the midpoint of a market survey.  That's where we

16   wanted to get people to.  But we wanted to make sure that they

17   get paid at such a level and they wouldn't move in their base

18   unless they got promoted.

19             So then we took monies to be able to say let's take

20   care of making sure that they keep up with the economy.  So the

21   first thing he did was, okay, we're going to provide for a

22   cost-of-living adjustment, which is a lump sum at the end of

23   the year based upon what the economy did, CPI, Bureau of Labor

24   Statistics, a lot of things that we looked at.  That was the

25   first thing.

1          Secondly, if we had more monies, we would look at the
2    401(k).  One of the things that he wanted to make sure that
3    people took care of their retirement.  And that's why it was a
4    very good program if we could afford it.  Everything was
5    predicated on our ability to pay.  So if we had monies, we
6    would announce at the beginning -- at the end of the year for
7    the next year what our match would be.  And one of the programs
8    for the 401(k) is a hundred percent of the first 12 and a half
9    percent match, which is excellent.  I mean, you're not going to
10   find that.  Took care of long-term care.  Took care of our
11   medical.
12          Let me give you an example.  Companies, you're lucky
13   today if you're an employee and you're single you'll get
14   covered for your single, but everything else you're paying 50
15   whatever percentage.  Before I left we were paying $20, $40,
16   $60 for single, two-party, and family for medical.  And for
17   dental it was two, four, six.  And always the idea that it's
18   based upon the ability to pay.  So if we couldn't afford it,
19   we'd have to do what everybody else does.
20          But the fact that he did what he did on the base
21   pay -- because we talked about it because when companies get
22   into tough straits and budgets become a problem, the first
23   thing that goes is the cost -- the most costly part of your
24   business, and it's people.  And one of the things that Al
25   didn't want to do ever, if he could, was not to jettison people

1    when times are tough.  And I think he's done a great job to do

2    that.

3    Q    So starting in 2000 through 2011, when were those programs

4    implemented?

5    A    I think it was 2003 that the 401(k) -- he had already had

6    a 401(k) program, but when I came on board, I did some

7    analysis, and the 401(k) was being administered on the

8    mainland, was also -- the investments were done on the

9    mainland.  While the investments still were done on the

10   mainland, we brought it home and with another company so that

11   people were working with individuals who could sit down with

12   them, they can call them, and so forth.  So from 2000, 2003, I

13   think, is when the 401(k) plan.  But we had developed a lot of

14   programs within that time frame.

15   Q    Within that period of time.

16   A    Yes.

17   Q    You mentioned long-term care.  Could you describe that for

18   us a little bit.

19   A    Long-term care, in Hawai'i it's tough.  It's just -- I was

20   the caregiver for my mom for the last five years, primary.  And

21   the cost is astronomical.  We put in a program of long-term

22   care.  It's a 10-year premium pay.  That means that in 10

23   years, all of the premiums that we pay, after 10 years it's all

24   paid up.  What Mr. Hee provided for was for staff member and

25   spouse or significant other.

1            One of the things that I always remember, I've always

2    been concerned, you know, because the spike of -- and sometimes

3    abuse or so when people actually leave.  And if the monies

4    itself isn't put to productive use.  But when you look at

5    long-term care, some providers only provide it, and then if you

6    leave, that's it; you don't get anything.  So we made a change

7    to have another provider so that any monies in there, you would

8    have that benefit.  But, essentially, the benefit was for 6,000

9    per month for five years with an escalation clause of five

10   percent per year.  Which, you know, even 6,000, you know, it's

11   tough.  So any kind of supplemental long-term-care funding that

12   you can provide for your family is great.

13           I left.  And you have an option when you leave -- I

14   didn't have the 10 years; so it wasn't paid up.  So I had an

15   option to continue, and I personally couldn't do it.  But I had

16   asked the company if I could reduce my benefit and pay over the

17   life, which I am.  So I went from a 6,000 down to a 3,000,

18   which was affordable for me over a lifetime; so --

19   Q    Now, were all employees of Waimana eligible for all the

20   benefits you described?

21   A    Yes, sir.

22   Q    Now, were you aware as -- in your HR function that

23   Mr. Hee's wife was on salary?

24   A    I was -- I knew she was on salary, and I also knew at

25   times the children were on salary, especially during the

1    summer.  But again some of the things that we had talked about
2    over the years was to be able to --
3              THE COURT:  Hold on.
4              MR. TONG:  I object at this point, Your Honor.
5              THE COURT:  Because now you're going beyond the
6    question.  I need him to ask questions.
7              MR. TOSCHER:  Yes, Your Honor.
8    Q    The -- you're aware that the children were put on salary.
9    A    Yes, sir.
10   Q    And the -- did you have an understanding -- did you know
11   they were on salary when they were attending college on the
12   mainland?
13   A    I did not know that.
14   Q    Did you know -- did you have any understanding regarding
15   Mr. Hee's plans for the future of the company and the children?
16             THE COURT:  Hold on.
17             MR. TONG:  I object.  That calls for a recitation of
18   a hearsay statement.
19             THE COURT:  Sustained.
20   BY MR. TOSCHER:
21   Q    Okay.  Now, Mr. Tam, as part of your involvement with the
22   company in administering benefits, was there ever a time that
23   the company instituted a program regarding massages for their
24   employees?
25   A    There was a time that I think I was the one that brought

1    it to Mr. Hee.  We had a day.  It was billed as a wellness day.

2    And there was several masseuse who volunteered their time at

3    fundraisers at golf tournaments.  And when I met them, I

4    thought it would be something that would be good for the staff

5    as a morale boost.  So they brought, like, three chairs, and I

6    think we paid them $30 or something per hour.  I recall being

7    able to do that, and people being able to -- staff being able

8    to come and get a 10-minute, 20-minute massage as part of that.

9            Some of the things that we wanted to do is a little

10   more in-depth, you know, like --

11           MR. TONG:  Your Honor, I object to the narrative.  It

12   goes beyond the scope of the question.

13           MR. TOSCHER:  Your Honor, may I approach the witness?

14           THE COURT:  You're going to give him an exhibit?

15           MR. TOSCHER:  A document.  Counsel have been given a

16   copy of the document.

17           THE COURT:  Okay.

18   BY MR. TOSCHER:

19   Q   Mr. Tam, will you please take a look at the document and

20   familiarize yourself with it.

21           Have you taken a look at the document, Mr. Tam?

22   A   Yes, sir.

23   Q   Do you recognize it?

24   A   Yes.  I recognize the invoice.  It's to my attention.

25           THE COURT:  Hold on.  Hold on.  It was just a yes or

1    no.

2              THE WITNESS:  Okay.

3              THE COURT:  Now he needs to ask a question.

4    BY MR. TOSCHER:

5    Q    You recognize the invoice.  Do you recognize the check

6    request?

7    A    Yes, I do.

8    Q    And there's another document called Vendor Payment

9    Authorization.  Does that look familiar to you?  It's the

10   second page.

11   A    Yes, sir.

12   Q    And the first page is a copy of a check.

13   A    Yes.

14   Q    Or a copy of evidence of a check being paid.

15              Do you recognize this package of documents as records

16   kept in the ordinary business of Sandwich Isles?

17   A    Yes, sir.

18   Q    The type of business documents you saw when you were

19   there?

20   A    Yes.

21              MR. TOSCHER:  Your Honor, I would offer 50-7.

22              MR. TONG:  No objection.

23              THE COURT:  Okay.  50-7 is received in evidence.

24   BY MR. TOSCHER:

25   Q    Now, Mr. Tam, you were talking a little bit -- let me ask

1   you about -- this is an invoice for Island Wellness, Attention

2   Gil Tam.  Tell us again what program you were trying to

3   implement and how this fit with the overall benefits program.

4   A    One of the things that we wanted to be able to do is to

5   have health fair days and so forth.  One of the things that was

6   a little difficult for me, sometimes when you try to get --

7   whether it's the insurance carrier, we used HMAA.  But

8   sometimes it's a little more difficult just getting medical

9   support to come and do things for wellness, i.e., blood

10  pressure, weight, whatever.  So this was one way of being able

11  to help with staff relief, you know, for a 10-minute

12  rejuvenation or whatever.  So that was part of, I think, some

13  of the things that we wanted to do.

14  Q    When you implemented this, did you seek anybody's

15  authorization or speak with anybody about it?

16  A    I spoke to Al about being able to do this.

17  Q    And what did you tell him?

18  A    That, you know, it would be an opportunity for our staff

19  to not only experience this as one of the wellness components,

20  and then be able to allow people to come for 10 minutes or 20

21  minutes, whatever.  And he approved it.

22  Q    He did approve it.

23  A    Yes, sir.

24         MR. TOSCHER:  One second, Your Honor.

25  Q    Mr. Tam, you talked about the benefit package for

1    employees of Waimana and SIC.  Were you familiar with benefit

2    packages for other companies in Hawai'i?

3    A    Yes, sir.

4    Q    And how did SIC's and Waimana's package compare to other

5    companies that you were familiar with?

6    A    They were high on the totem pole as to its -- the programs

7    that were there were very -- I would consider it to be high.

8    You get high, medium, and low.  Most companies are between --

9    and you normally put your programs together as a statement of

10   your value.  So when you look at the market, if you're

11   performing at the average, you should have your programs at the

12   average.  If you're performing higher, that you should have it

13   a little higher as well.

14   Q    You left the company in 2011?

15   A    Yes, sir.

16   Q    Could you tell us the circumstances of your leaving the

17   company.

18   A    Mr. Hee, as part of, I guess, trying to help native

19   Hawaiians, Mr. Hee had seen different company -- native

20   Hawaiian organization companies that were -- that perhaps

21   needed help.  He understood my background in administration in

22   a lot of those programs.  And there were some native Hawaiian

23   organization companies.  These are companies that are certified

24   as native Hawaiian organizations, small businesses.  In the

25   case of several of them, they're small, disadvantaged

1   businesses.

2           We talked about perhaps one company that I could go

3   to to give them a hand with their administrative

4   infrastructure, and a second company we talked about they

5   needed the help.  And that's where I moved:  to a native

6   Hawaiian-owned organization, small, disadvantaged company, that

7   was working on defense contracts.  And I've been there since

8   for five years, and most recently left on June 2d to create my

9   own company.  But I moved to that company and helped them put

10  together the administrative infrastructure and to put together

11  their compensation and benefit programs.

12  Q    Thank you, Mr. Tam.

13          MR. TOSCHER:  No further questions, Your Honor.

14          THE COURT:  Okay.

15                    CROSS-EXAMINATION

16  BY MR. TONG:

17  Q    Good afternoon, Mr. Tam.

18  A    Good afternoon.

19  Q    Just so we're clear, during your time at Waimana you had

20  nothing to do with the accounting department; is that correct?

21  A    That's correct.

22  Q    So you did not approve reimbursements; correct?

23  A    It depends.  If I was a supervisor and there were

24  reimbursements that came through people that reported to me, I

25  approved them.

1    Q    And then after you approved them, they would go to the

2    next higher level; is that correct?

3    A    Yes.

4    Q    Ultimately, someone with ultimate authority would say,

5    yes, issue a check; correct?

6    A    Yes.

7    Q    And the person with ultimate authority within Waimana was

8    Mr. Hee; is that correct?

9    A    Yes.

10   Q    And he had an office manager or assistant named Nancy

11   Henderson; is that correct?

12   A    That's correct.

13   Q    When people needed approval, they typically would go to

14   Nancy Henderson and Al Hee; is that correct?

15   A    We also had Bob Kihune, who was CEO of Sandwich Isles.   So

16   depending upon if it's Sandwich Isles versus Waimana.

17   Q    Okay.   And Bob Kihune was actually the CEO of Sandwich

18   Isles; correct?

19   A    Correct.

20   Q    And when he needed his expenses approved, he would go to

21   Mr. Hee; is that correct?

22   A    Correct.

23   Q    Now, you mentioned that part of your job was to go through

24   a -- it sounded like a fairly thoughtful analysis of the market

25   conditions; is that correct?

1    A    That's correct.

2    Q    Both to determine what the market was paying people for

3    certain positions; correct?

4    A    That's correct.

5    Q    Because the goal was to compensate people fairly in a way

6    that was both generous but sustainable; is that correct?

7    A    Correct.

8    Q    And I believe you testified that you knew that Mr. Hee's

9    children had worked at times over the summers; is that correct?

10   A    That's correct.

11   Q    But you did not know that they had been placed on salary

12   while in college; correct?

13   A    Right.

14   Q    And I gather, since you didn't know, that Mr. Hee did not

15   consult with you in setting the terms of their employment, did

16   he.

17   A    No.  Actually --

18   Q    That calls for a yes-or-no answer.

19   A    Repeat the question, please.

20   Q    He did not consult with you on the amount of their pay,

21   did he.

22   A    No.

23   Q    Now, you mentioned about this massage day at Waimana.

24   Remember that testimony?

25   A    Yes, sir.

1    Q    And if I understood you correctly, you said that it was
2    your idea to bring in a couple of massage therapists; correct?
3    A    Yes, sir.
4    Q    As a morale booster.
5    A    Correct.
6    Q    Let me to ask you to look at that document, which is
7    Defense Exhibit 50-7.  And turn to the last page, if you would,
8    please.
9              Try to avoid seasickness.
10             THE COURT:  Please.
11   BY MR. TONG:
12   Q    Mr. Tam, can you see that document on the screen?
13   A    Yes, sir.
14   Q    That's the same event that you were talking about; is that
15   correct?
16   A    Yes.
17   Q    And I believe you had testified that you recognize the
18   bill partly because it was addressed to you; is that correct?
19   A    Yes.
20   Q    And so we're clear, the event occurred on October 20th of
21   2008; is that correct?
22   A    Yes.
23   Q    And, in essence, the company brought in representatives of
24   Island Wellness; is that right?
25   A    Yes.

1    Q     And there's a description of what the company was paying

2    for, is there not?

3    A     Yes.

4    Q     And that, essentially, was two therapists for three hours

5    each; correct?

6    A     Yes.

7    Q     And the rate of pay was $30 per hour; correct?

8    A     Correct.

9    Q     And the services were as you described:  massage therapy.

10   Right?

11   A     Yes.

12   Q     So the total payment was $180; is that right?

13   A     Correct.

14   Q     Now, the document in front of you also has a check request

15   form, which I believe is the second page; is that correct?

16   A     Yes.

17   Q     I'm sorry.  It's the third page.  Let me see if I can

18   display that here.

19          Do you see that document there, Mr. Tam?

20   A     Yes, I do.

21   Q     And a couple of things.  This is the company's request for

22   a check to pay for the massage therapy services; is that

23   correct?

24   A     Yes.

25   Q     And the purpose indicated was wellness day; is that right?

1    A    Yes.

2    Q    So this event took place over three hours on that one day;

3    is that correct?

4    A    Yes.

5    Q    And the idea was two therapists came in, and employees

6    could, basically, have 10-minute massages; is that correct?

7    A    Yes.

8    Q    They weren't two-hour massages for each employee, were

9    they?

10   A    No.

11   Q    I see you making a face.

12   A    No.

13   Q    It was more like 10 minutes --

14   A    10 minutes, yes.

15   Q    And people could do that and take advantage of it as a

16   morale booster as you had said --

17   A    Right.

18   Q    -- is that correct?

19            And it appears on this section that it asks for the

20   address of the vendor.  Do you see that?

21   A    Yes.

22   Q    And that's only if it's a new vendor; correct?

23   A    Yes.

24   Q    So the vendor providing the massage therapy was a new

25   vendor to Sandwich Isles Communications; is that correct?

1    A    Yes.

2    Q    And there never was a program at Sandwich Isles or Waimana

3    during your time there where all employees could go in and have

4    two-hour massages twice a week paid for by the company.

5    A    No.

6    Q    No such program existed.

7    A    No.

8           MR. TONG:  Thank you.  I have nothing further.

9                       RE-DIRECT EXAMINATION

10   BY MR. TOSCHER:

11   Q    Mr. Tam, briefly.  Why did you, as the member -- or

12   supervising HR, why did you propose to have a wellness day or a

13   massage therapy program?  How does that -- why did you do that

14   for the employees?

15   A    Because I think it's important from an HR standpoint that

16   you have opportunities for wellness.  And again we were looking

17   to also do other things, to have providers come in, especially

18   if it's with an insurance carrier -- medical insurance carrier,

19   to come in and do these kind of things.  Again, like I said,

20   blood pressure readings and so forth.

21           A lot of it, you know, I just wanted to kind of put

22   in people's minds that we need to take care of our staff, and

23   then turned over a lot of things over to HR as part of the

24   staff development or staff relations program and so forth.

25   Q    Did you have an understanding how massage therapy helped

1    the employees?

2          MR. TONG:  Well, I think that's beyond the scope of

3    cross-examination.

4          MR. TOSCHER:  No.  Sorry, Your Honor.

5          THE COURT:  I think it is, too.  Sustained.

6          MR. TOSCHER:  Okay.

7    Q    The -- okay.  I guess I'm going to draw the same

8    objection, but I'm going to try because it was on direct.

9          THE COURT:  I'm sorry?  I didn't quite hear you.

10          MR. TOSCHER:  I was talking to myself, Your Honor.  I

11    apologize.

12          MR. TONG:  He was saying I'm going to object before

13    he asks the question.

14          MR. TOSCHER:  Right.  I have to watch behind me and

15    watch the microphone.

16          THE COURT:  You're hemmed in.

17    BY MR. TOSCHER:

18    Q    Mr. Tam, did you ever have any discussions with Mr. Hee,

19    without talking about the discussions, but any discussions

20    regarding succession planning for his company?

21          MR. TONG:  That's beyond the scope, Your Honor.

22          MR. TOSCHER:  It's re-direct.

23          THE COURT:  Sustained.

24          MR. TOSCHER:  Sustained.  Okay.

25          No further questions, Your Honor.

1          MR. TONG:  Nothing further, Your Honor.

2          THE COURT:  Okay.  Then you can step down and leave

3    the courtroom.  You're excused.

4          Did you have another one?

5          MR. TOSCHER:  Your Honor, we couldn't get a

6    replacement and --

7          THE COURT:  Okay.  So happy 4th of July to the

8    jurors.  I'll see you on Tuesday July 7 at nine o'clock.  No

9    trial on Monday.

10          Okay.  So Tuesday July 7, nine o'clock.

11        (Jury excused.)

12          THE COURT:  Okay.  We need to talk about the

13    schedule.

14          Okay.  How much longer should I be anticipating the

15    evidence will go?

16          MR. TOSCHER:  I think two days will do it, Your

17    Honor.

18          THE COURT:  So you think you have witnesses lined up

19    for Tuesday and Wednesday.

20          MR. TOSCHER:  It may spill over.  I'm not really good

21    at estimating.  I was pretty good today, off a little bit.  I

22    think Tuesday.  I will try to do it Tuesday, Wednesday.  I will

23    let the Court better know if we're here back on Monday for

24    jury --

25          THE COURT:  Well, okay.  So that's another issue.

1    But if you go into Wednesday, if the government has a rebuttal

2    case and then we have instructions and closings, the jury might

3    get some time to deliberate on Friday, might not.  But if it

4    doesn't, then there's a long break.  Well, I mean, it would be

5    good if the case went to the jury so that even during that

6    break they can deliberate.  We just have to wait and see.

7           Right now I'm still on for another criminal case with

8    a hearing on Tuesday -- I'm sorry, Monday afternoon, the 6th;

9    so I can't give you that time right now.  I'm not really sure

10   how we should arrange this.  I think we should just assume that

11   we have to stay after the jury goes home on the 7th, which is

12   Tuesday, for now.  I don't know how flexible counsel is

13   because, if on Monday it turns out the afternoon is freed up,

14   can counsel then come to court to resolve jury instructions, or

15   is that not workable?

16           MR. TOSCHER:  We're flexible, Your Honor.

17           THE COURT:  Okay.  That would be great.

18           What about you folks?

19           MR. TOSCHER:  The administrator can just send us an

20   e-mail.

21           MR. TONG:  We would be available, Your Honor.

22           THE COURT:  So for now I can't schedule you for

23   Monday, but if it turns out I can, my preference would be to

24   resolve jury instructions Monday afternoon because I think you

25   folks have enough to do in the evenings when the jury goes home

1    without spending a couple hours with me.  So I'll aim for that,

2    but it's really out of my control.  I'm not party to whatever

3    is going on among the attorneys in that case that is now on my

4    calendar for Monday afternoon.  Every time my courtroom manager

5    gets some notice that she has a telephone message, she gets all

6    excited, but so far the news has not been what she's been

7    waiting for.  So we're still on in the other case, but whenever

8    we hear, we'll let you know.

9              Thank you very much.  Have a good holiday.

10             MR. TONG:  Your Honor, one last thing.  I just want

11   to give the Court notice that I'm giving counsel notice that I

12   will object to the calling of the massage therapy expert,

13   unless the defendant testifies such that it becomes part of his

14   state of mind.

15             THE COURT:  So this is the one that I so far have

16   excluded.

17             MR. TONG:  Right.

18             MR. TOSCHER:  No.

19             THE COURT:  There's another person?

20             MR. TOSCHER:  I'm sorry.  I didn't mean to interrupt

21   you.

22             THE COURT:  No, no, it's okay.  I'm obviously

23   misinformed.

24             MR. TOSCHER:  No, no.  We filed --

25             THE COURT:  Can you talk into a mike.  I'm so

 1    sorry.

 2              MR. TOSCHER:  We filed an expert or gave an expert

 3    disclosure to the government a week or two ago for

 4    Mr. Rockowitz, and he does work for a private company.

 5              THE COURT:  So that's the other person that you were

 6    talking about.

 7              MR. TOSCHER:  That's correct, Your Honor.

 8              THE COURT:  Okay.  Well, we'll --

 9              MR. TONG:  Your Honor, I wasn't asking for a ruling.

10    I just don't want to be in a position of looking like I'm

11    delaying things if Monday morning or Tuesday morning he calls

12    this individual, and then I object.  I'm just giving him

13    notice --

14              MR. TOSCHER:  Well, we plan -- I'm sorry.

15              MR. TONG:  I'm sorry.  Please.

16              MR. TOSCHER:  No.  I'm sorry.  I interrupted you.

17              We're so polite interrupting each other.

18              THE COURT:  Yes.

19              MR. TONG:  I beg your pardon.  You accused me of

20    smirking earlier; so --

21              THE COURT:  So you're going to call somebody to say

22    that what?

23              MR. TOSCHER:  Basically, Mr. Rockowitz has a business

24    which provides massage services to Corporate America.  Okay.

25              THE COURT:  So that for businesses --

1          MR. TOSCHER:  Correct.

2          THE COURT:  -- he routinely goes around and offers

3     massage services.

4          MR. TOSCHER:  Right.

5          THE COURT:  And you're offering this because you want

6     to establish that this is an ordinary --

7          MR. TOSCHER:  Ordinary and necessary business

8     expense.

9          MR. TONG:  I think the Court's familiar with my

10    argument.  There's no evidence here that there was any similar

11    program in effect at Waimana or Sandwich Isles during the

12    relevant years.  We've had Susan Mitsuyoshi testify as to the

13    requirement that there be a program available to all employees

14    as a fringe benefit in order for the company to deduct the

15    expense.  There is no such evidence.  So what different does it

16    make whether or not there are vendors out there in the

17    community that could provide that service when this company

18    never did?  And, more fundamentally, there is no predicate for

19    it because, to the extent it goes to any good-faith

20    misunderstanding of the law, that would require that there be

21    evidence that the taxpayer, in this case the defendant, have

22    such a misunderstanding.

23         THE COURT:  Okay.  So with respect to his good-faith

24    belief issue, I need to understand:  Is there a dispute about

25    whether massage therapy offered only to the shareholder is

1    deductible?  Because if there is no such dispute, if everybody

2    is in agreement that, when it is offered to one person only

3    that it is not a deductible expense, then I don't see the

4    relevance of putting on evidence that, when it's offered to

5    employees in general, it can be deducted.  So I first want to

6    understand whether there is or is not a dispute between the

7    parties about whether the Diane Doll sessions were

8    deductible.

9            MR. TOSCHER:  I think there are -- the first question

10   is is it ordinary and necessary, and that's the first hurdle.

11   The government needs to establish it's not.  And the second one

12   is how does it get treated as a fringe benefit.  The

13   government's position is it has to be offered to everybody.

14   And there's an argument that it should be, but the first basic

15   is whether it's ordinary and necessary, whether it's common.

16           You had Susan Mitsuyoshi testify it's not common.

17   And that evidence needs to be rebutted, Your Honor.  They can

18   argue that, well, even if it's ordinary and necessary, it was a

19   fringe not offered to everybody, and let them make that

20   technical argument to the jury.  But with all due respect, Your

21   Honor, I think we're allowed to present contrary evidence to

22   Miss Mitsuyoshi.

23           THE COURT:  Okay.  And, you know, I don't necessarily

24   think that the defense is restricted to whether -- it certainly

25   would be helpful to the defense if, you know, it put on

1   evidence that Mr. Hee believed this, and in good faith.  But

2   that can't be the only way to defend.  I mean, if, in fact, it

3   could be deducted, then whether he believed it or not, I mean,

4   that would be a defense; right?  I mean, this is a deductible

5   expense.  So whether he believed it or not, if he deducted it

6   and it is deductible, that would be a defense to the charge.

7          MR. TONG:  Their expert today said it was

8   nondeductible.

9          THE COURT:  So how are you going to do that?

10          MR. TOSCHER:  No, I don't think he -- I think he said

11   it had to be ordinary and necessary, and then you would

12   consider whether it was a taxable fringe or whether it was de

13   minimis.

14          Let me take a step back, Your Honor.  I don't believe

15   we need to make a decision regarding Mr. Hee testifying to

16   present objective facts and evidence reflecting on willfulness

17   and good faith.

18          THE COURT:  No, no, no.  So -- I mean, that may be,

19   but quite apart from that, this evidence could go to whether

20   something was deductible, I think, is what you're saying.

21          MR. TOSCHER:  That's correct.

22          THE COURT:  And I don't think that we need to have

23   Mr. Hee's belief in evidence for you to put on your case that

24   this was, in fact, deductible.  I mean, I don't know if you're

25   making that argument.  It's still not clear to me whether

1   you're making that argument.

2          MR. TOSCHER:  I understand it's complex.  But I guess

3   the point is it's the government's burden to prove beyond a

4   reasonable doubt that he was not in good faith, that this was

5   willful and intentional acts, and these are highly relevant.

6          THE COURT:  Okay.  Well, I remember clearly that

7   Miss Mitsuyoshi did say that it didn't fit into that.  She said

8   it's not common, it's not ordinary and necessary; so I don't

9   know why he doesn't get to rebut at least that part.  So that's

10  my thought.

11         You folks can think about it over the weekend.  And

12  maybe you can help me again when we meet with more wonderful

13  expositions of this topic, but right now I'm inclined to let

14  him do it.

15         MR. TOSCHER:  Happy 4th of July, Your Honor.

16         THE COURT:  Have a good 4th of July.

17      (Court adjourned at 3:53 P.M.)

18

19

20

21

22

23

24

25

1                   COURT REPORTER'S CERTIFICATE

2          I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9          DATED at Honolulu, Hawaii, August 6, 2015.

10

11                                      /s/ Debra Chun

12                                      DEBRA KEKUNA CHUN

13                                      RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25