```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF HAWAII

 3                                  )
     UNITED STATES OF AMERICA,      )  CR 14-00826 SOM
 4                                  )
              Plaintiff,            )  Honolulu, Hawaii
 5         vs.                      )  July 7, 2015
                                    )  8:15 A.M.
 6   ALBERT S. N. HEE,             )
                                    )
 7              Defendant.          )
                                    )
 8   _____)

 9               TRANSCRIPT OF JURY TRIAL (DAY 8)
              BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:        LAWRENCE L. TONG
                                Office of the U.S. Attorney
13                              PJKK Federal Bldg.
                                300 Ala Moana Blvd. Ste. 6100
14                              Honolulu, HI 96850

15                              QUINN P. HARRINGTON
                                U.S. Dept. of Justice
16                              Tax Division
                                601 D St., N.W. Room 7029
17                              Washington, DC 20004

18   For the Defendant:         STEVEN TOSCHER
                                KURT K. KAWAFUCHI
19                              LACEY STRACHAN
                                Hochman salkin Rettig Toscher
20                                & Perez
                                9150 Wilshire Blvd., Ste. 300
21                              Beverly Hills, CA 90212

22   Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
                                United States District Court
23                              300 Ala Moana Blvd. Ste. C285
                                Honolulu, HI 96850
24                              (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).
```

```
 1                              INDEX

 2

 3    EXAMINATION

 4    Witness Name                                    Page

 5    Steven Berman

 6         Direct By Mr. Toscher................................  28

 7    Raynard Soon

 8         Direct By Mr. Toscher................................  36

 9         Cross By Mr. Tong...................................  46

10    Edward Rockowitz

11         Direct By Mr. Toscher................................  47

12         Cross By Mr. Tong...................................  58

13         Re-Direct By Mr. Toscher ...........................  62

14    Alan Yee

15         Direct By Mr. Toscher................................  64

16         Voir Dire By Mr. Harrington.........................  88

17         Direct By Mr. Toscher................................  89

18         Cross By Mr. Harrington ............................  99

19         Re-Direct By Mr. Toscher ...........................  106

20    Michelle Kauhane

21         Direct By Mr. Toscher................................  107

22    Torkel Patterson

23         Direct By Mr. Toscher................................  118

24         Cross By Mr. Tong...................................  140

25    Wendy Hee
```

1        Direct By Mr. Toscher.................................. 145

2        Cross By Mr. Tong..................................... 184

3     Robert Kihune

4        Direct By Mr. Toscher.................................. 199

5

6

7     EXHIBITS

8     Exhibit                                              Page

9     60-1 Entered into Evidence                             71

10    60-2, 60-3, 60-4 Entered into Evidence                 89

11    50-5 Entered into Evidence                            174

12    50-3 Entered into Evidence                            177

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   TUESDAY, JULY 7, 2015               8:20 O'CLOCK A.M.

 2        (In open court without the jury:)

 3            THE CLERK:  Criminal 14-826 SOM, United States of

 4   America versus Albert Hee.  This case has been called to Settle

 5   Jury Instructions.

 6            Counsel, please make your appearances for the record.

 7            MR. TONG:  Good morning, Your Honor.  Larry Tong and

 8   Quinn Harrington for the United States.  With us is Special

 9   Agent Greg Miki.

10            MR. TOSCHER:  Good morning, Your Honor.  Steven

11   Toscher for defendant Albert Hee.  Mr. Hee, he's running late,

12   and his presence for now is waived.

13            THE COURT:  He might show up or --

14            MR. TOSCHER:  Oh, yeah, he will show up.  He's just

15   not here for 8:15.  And with me is Lacey Strachan.

16            THE COURT:  Okay.  His presence is waived for now.

17   It was so exciting yesterday that he didn't think he needed to

18   take the position that he couldn't miss a second of the

19   scintillating discussion.

20            Okay.  Let's look at defendant's proposed

21   instructions.  Okay.  So I'm passing on number 1 because this

22   is one that I think is going to take us some time to work on.

23   My thought is we're probably going to merge Defendant's 1 with

24   the Government's 1.

25            Okay.  Now, in Defendant's Proposed 2, isn't this
```

1    taken care of by Joint Proposed Number 1?  The Joint Proposed

2    Number 1 goes to the 7206(1) issue.

3              MR. TOSCHER:  Your Honor, the elements are in Joint

4    Proposed 1.  My typical practice, and what I'm used to, is

5    setting forward the code section as part of the instruction.

6              THE COURT:  You mean just the exact language?

7              MR. TOSCHER:  Yes, Your Honor.

8              THE COURT:  Okay.  But I don't know why we need it if

9    we put the elements in.  Is there some substantive issue that

10   you think is in your proposed 2 that isn't in Joint Proposed 1?

11             MR. TOSCHER:  Your Honor, I think all the elements

12   are covered.  The -- but again, the way I've always done it was

13   setting forth the statute as well, followed by the elements.

14             THE COURT:  Okay.  I'm not going to give it because

15   it doesn't add anything.  So is that an objection from you?

16             MR. TOSCHER:  Your Honor, we'll -- we don't have to

17   object.  We'll consent to that, if the Court prefers not.

18             THE COURT:  Okay.  So I'm refusing, without

19   objection, defense 2.

20             Defense 3 has been withdrawn.

21             Defense 4.  Okay.  Now, this is one -- hold on.  This

22   goes with the government's proposed 6.  So I passed on that,

23   and I'm going to work with defense 1 -- I mean, government 6

24   and defense 4 together.  Okay.  So I'm passing on this.

25             Defense 5.  Hold on.  Okay.  So there's -- this goes

1   with government's proposed 6 also, and the new instruction

2   which you submitted yesterday, the proposed additional -- is

3   that the one?  Is this a new one?  This is called "New

4   Instruction."  And whose is this?  I'm sorry?  Oh, this is just

5   from you.

6            You haven't seen this.

7            Okay.  So we're going to pass on this for now.

8            Okay.  Hold on.  I have to write all this down.

9            Defendant's proposed 6.  This is the subject of prior

10   discussion.  We have government's 7 that I think takes this

11   into account.

12            Is there something missing, Mr. Toscher, that is in

13   defendant's proposed 6?

14            MR. TOSCHER:  Your Honor, it's the formulation we

15   were discussing yesterday, and what we wanted as part of --

16   this is part of the very lengthy constructive dividend

17   instruction we were working on, and the language we have here

18   that's not in the instruction, which we think is supported by

19   the law and should be in there, it's at the bottom:  If you

20   find that a payment by a corporation served a legitimate

21   corporate purpose and the payment was not primarily for the

22   benefit of the shareholder -- if you find that the payment for

23   a corporation served a legitimate corporation, the payment is

24   not primarily for the benefit of the shareholder.  Any

25   expenditure made by a corporation that served a legitimate

1  corporate purpose is not income to the shareholder, even if it

2  did provide a personal benefit.

3          THE COURT:  Okay.  I think that's Fifth Circuit law,

4  but I don't think the Ninth Circuit has quite formulated it

5  that way, even though it cited a Fifth Circuit case.

6          MR. TOSCHER:  Your Honor is right on with the issue.

7  We think in *Palo Alto* they cited -- okay.

8          THE COURT:  Okay.  Refused over your objection.

9          MR. TOSCHER:  Thank you, Your Honor.

10          THE COURT:  Looking at defense 7, I think this is

11  taken care of by government's 8, which I amended a little bit

12  yesterday.  So I'm going to refuse this.  Is that over defense

13  objection?  I've taken some of your --

14          MR. TOSCHER:  Yes, Your Honor.  Based upon the

15  colloquy yesterday, we wanted it.

16          THE COURT:  Actually, I think you might have

17  withdrawn this.

18          MR. TOSCHER:  Not 7, your Honor.

19          THE COURT:  Not 7.  Okay.  So refused over objection?

20          MR. TOSCHER:  Yes, Your Honor.

21          THE COURT:  Then you did withdraw 8.

22          MR. TOSCHER:  Yes, Your Honor.

23          THE COURT:  Okay.  And 9 and 10, I think -- 9 is, I

24  think, already taken care of by my form instructions.  And 10,

25  the use of notes, is also taken care of by my earlier

1    instruction.  Do you need these?

2              MR. TOSCHER:  Your Honor, I agree with the Court that

3    they are duplicative of the Court's earlier instructions.  The

4    court covered notes, which is number 10, and the Court did

5    cover communications, press.  We would -- I think number 9 is

6    probably worth emphasizing.

7              THE COURT:  It is part of the -- isn't it part of

8    my --

9              MR. TOSCHER:  I don't know if it's part of the form

10   published on your site, Your Honor, but I do recall the Court

11   admonishing the jury and instructing on it.

12             THE COURT:  So what do you want now?  I'm sorry.

13   You -- I'm looking at my form.

14             MR. TOSCHER:  I think it would be appropriate.  It's

15   so important in this media age to -- you know, a reminder of

16   what the Court -- Your Honor, this is included because I don't

17   think this is in the Court's published standard instructions;

18   although, the Court did mention it at the beginning of trial,

19   my recollection.  I think this is worth re-emphasizing to the

20   jury.

21             THE COURT:  Okay.  Any objection by the government to

22   number 9?

23             MR. HARRINGTON:  No objection, Your Honor.

24             THE COURT:  Okay.  Then number 9 will be given by

25   agreement.

1           And number 10, I mean, I don't mind giving this

2    again.

3           MR. TOSCHER:  I leave it to the Court's discretion,

4    Your Honor.

5           THE COURT:  Government, any problem with giving this

6    model instruction 7.3?

7           MR. HARRINGTON:  No objection, Your Honor.

8           THE COURT:  Okay.  This will be given by agreement.

9           Number 11.  Government position on number 11?  In

10   order for you to convict on any count in the indictment, you

11   must unanimously find that the government has proven each

12   element beyond a reasonable doubt with respect to such count.

13          MR. HARRINGTON:  Your Honor, I thought that that was

14   already covered by the unanimity instruction.

15          THE COURT:  It probably is, but do you object to

16   saying this separately?

17          MR. HARRINGTON:  No.

18          THE COURT:  Okay.  I'll give it by agreement.

19          Okay.  Now, we have our heavy lifting to do.  So can

20   you look back at government's number 1.

21          You know, I know that defense 1 was trying to get rid

22   of legalese in the statute, but just the grammar of the first,

23   second, and third elements, as laid out in the defense

24   instruction, is really problematic to me.  It's just so broken

25   up, grammatically.  First, the defendant corruptly; second,

1    endeavored to; third, obstruct.  It's not going to make any

2    sense with first, second, and third inserted in those

3    particular places.

4            I just don't see how you can separate "endeavored to"

5    from the object of the preposition.  In fact, it's not even the

6    object of the preposition.  You're actually taking the "to,"

7    which is the infinitive "to obstruct"; so "endeavor to

8    obstruct," and you're saying the second element is "endeavored

9    to"; the third element is -- grammatically, it's really

10   problematic for me.  It ends up being nonsense.  It's like

11   saying, you know, I instruct you -- number 1, I instruct you

12   to, number 2, be on time.  It's kind of like that.  It just

13   doesn't make any sense.

14           MR. TOSCHER:  And, Your Honor, we're fine with

15   grammatical changes as long as we make sure the jury is

16   instructed that these are separate elements that require

17   certain findings.

18           THE COURT:  Okay.  So even though it has the

19   legalese -- I mean, I actually think government's proposed

20   number 1 makes sense, and I just can't understand how the

21   jury's going to make sense when you're cutting up the

22   infinitive between second and third elements, you know.

23           MR. TOSCHER:  Well, I'm happy to work with the

24   language, Your Honor, but I think we want to make sure we get

25   all the elements in there.  And I think --

 1               THE COURT:  So what's missing from the government?
 2               MR. TOSCHER:  Well, I think it's defendant corruptly
 3     endeavored.
 4               THE COURT:  So that's their first.  We can add the
 5     word "corruptly."
 6               MR. HARRINGTON:  Your Honor, "corruptly" is in the
 7     third element on our proposed instruction.
 8               THE COURT:  Okay.
 9               MR. HARRINGTON:  And the third element on ours also
10     has a definition for "corruptly" that comes from the Ninth
11     Circuit.
12               THE COURT:  So what's missing?
13               MR. TOSCHER:  It's where it is, Your Honor.  I think
14     we can solve the Court's grammatical concern.  I think if we
15     combine -- if we put in "corruptly," it combines the first
16     clause of the government's instruction.
17               THE COURT:  I'm sorry.  I'm not following you.  You
18     need to read me the language that you're proposing.
19               MR. TOSCHER:  Right.  I'm looking at the government's
20     instruction.  First, the defendant corruptly endeavored to
21     obstruct or impede the Internal Revenue Service's lawful
22     functions to assess and collect income tax and investigate
23     possible violations of the internal revenue laws.
24               That combines and, I think, solves the Court's
25     grammatical concern with my setting out one -- first, second,

1    and third.

2            THE COURT:  So where does the knowingly come in?  I

3    mean --

4            MR. TOSCHER:  On this clause on the first "corruptly

5    endeavored."  Okay.  And then we would suggest that we next go

6    to our clause:  to act corruptly.  I think "corruptly" needs to

7    be defined.

8            THE COURT:  Okay.  First, let's do the elements.

9    Okay?

10           MR. TOSCHER:  Okay.

11           THE COURT:  So what are the elements that you're

12   proposing?

13           MR. TOSCHER:  Okay.  Corruptly endeavored to obstruct

14   or impede.  Those are the three elements, and now those are

15   combined --

16           THE COURT:  I'm still not following you.  Pretend

17   you're the judge reading the instruction to the jury.  Tell me

18   exactly what words you're going to have.

19           MR. TOSCHER:  Right.  First, the defendant corruptly

20   endeavored to obstruct or impede the Internal Revenue Service's

21   lawful functions to assess and collect income tax and

22   investigate possible criminal violations of the internal

23   revenue laws.  Okay?

24           That contains all of the statutory elements, and now

25   we need to define those elements.

 1              THE COURT:  So you don't need second and third.

 2   You're reducing the government's burden to a single element?

 3              MR. TOSCHER:  No.

 4              THE COURT:  So read me the whole thing.  Forget about

 5   defining things right now.

 6              MR. TOSCHER:  Okay.  Well, I guess to be clear to the

 7   jury, after this is set out we want to set forth that there are

 8   three elements the government must demonstrate beyond a

 9   reasonable doubt.

10              THE COURT:  That's why I'm saying --

11              MR. TOSCHER:  Oh, okoay.  I'm sorry, Your Honor.

12              THE COURT:  -- read me the three elements that you're

13   going to charge the jury with.  I'm begging you 20 times give

14   me exactly the elements in the wording you would give the

15   jury.

16              MR. TOSCHER:  Okay.  The defendant acted corruptly.

17              THE COURT:  Second element.

18              MR. TOSCHER:  The defendant endeavored.  He did

19   something, and then we define what that means.

20              THE COURT:  Forget the definitions.  Just list me the

21   elements.

22              MR. TOSCHER:  Endeavor.  And then obstruct or

23   impede.

24              THE COURT:  Wait.  So you're not doing it the way I'm

25   asking you to.

 1              MR. TOSCHER:  Okay.

 2              THE COURT:  Because you're not going to say to the

 3    jury, "The defendant acted corruptly; Second, the defendant

 4    endeavored," and then he has to -- pretend you're the judge

 5    reading the elements -- all the elements of this particular

 6    charge, without explanation, without definition, just the

 7    elements.

 8              MR. TOSCHER:  Okay.  The defendant endeavored to

 9    obstruct or impede the due administration of Internal Revenue

10    laws.

11              THE COURT:  Okay.  So you don't care that -- in your

12    view an element of the offense is not that the defendant acted

13    knowingly.  Because I've just asked you to give me all the

14    elements, and you didn't include --

15              MR. TOSCHER:  Well, I think, yes, it is, Your Honor.

16    It has to do with -- it's within the definition of "corruptly."

17    And --

18              THE COURT:  So you're lowering the government's

19    burden.

20              MR. TOSCHER:  No, Your Honor.

21              THE COURT:  There's not a separate "knowing"

22    requirement.

23              MR. TOSCHER:  One second, Your Honor.

24              Your Honor, we will -- I'm just talking with

25    Miss Strachan.  Your Honor, we are okay with the government's

1    three elements.  We just want to make sure the definitions --

2    the terms of those elements are properly and adequately

3    defined.

4               THE COURT:  Okay.  Then wait.  I'm going to make sure

5    exactly what this language is.

6               So I am slightly rewriting just the statutory

7    reference, which we talked about before.

8               So the first sentence will read:  Defendant Albert

9    Hee is charged in Count 1 of the indictment with corruptly

10   endeavoring do impede the due administration -- no, that's not.

11   Wait.

12              Yeah, of the internal revenue laws in violation of

13   Section 7212(a) of Title 26 of the United States Code.  I'm

14   just moving it because that's how we've done it most of the

15   time.  And then I'm leaving the next sentence exactly as

16   proposed by the government.

17              So for my law clerk:  the capitalization is exactly

18   as in the government's proposed.

19              Okay.  Then we have the three elements.  Okay.  And

20   then we need definitions.

21              So proposed instruction number 1 is given as very

22   slightly modified by agreement.

23              And then we need to look to -- hold on.  Where's your

24   "corruptly"?

25              MR. TOSCHER:  It's on our proposed instruction number

1    1, Your Honor.

2              THE COURT:  And government doesn't have that?  I

3    thought Mr. Harrington said it does.

4              MR. HARRINGTON:  Oh, it's just not -- sorry.  It's

5    just in our third element.  It's saying that acting knowingly

6    and corruptly, that is, with the intention to obtain an

7    unlawful benefit for himself or someone else.  And it comes

8    from the Ninth Circuit case.  So we just included it with the

9    element.

10              THE COURT:  Okay.  Well, let's go in the order, then.

11              So let's look at your number 2, government's proposed

12    number 2.  Is there a problem with number -- government's

13    proposed number 2?  This is only "to endeavor."

14              MR. TOSCHER:  Your Honor, the -- our definition is

15    the same, except we don't see the need for the last sentence of

16    government's proposed 2.  Our definition of "endeavor"

17    contained in our number 1 says "endeavor" means to knowingly

18    and intentionally act or to knowingly and intentionally make

19    any effort which has a reasonable tendency to bring about a

20    desired result.  So it's very similar.

21              THE COURT:  So they just want to take out the last --

22    the second sentence?

23              MR. TOSCHER:  Yes, Your Honor.

24              THE COURT:  Okay.  First of all, I'm changing the

25    "which" to "that."  This is a restrictive clause here.

1              And what is the government's position?

2              MR. HARRINGTON:  Your Honor, we'd ask that it be

3     included.  It's a legally correct statement, and we think it

4     helps clarify that it's the effort that is at issue in the case

5     and not necessarily -- and that the government doesn't need to

6     show that there's actually a successful result.  The charge is

7     about the effort.

8              THE COURT:  Okay.  I'll take out that second

9     sentence.  I actually think you can argue that.  And even

10    though -- I mean, not everything in a case necessarily has to

11    go in here.  This is a pretty complex instruction, this complex

12    crimes.  I'm going to take that out.  And as modified, is there

13    still a defense objection?

14             MR. TOSCHER:  No, Your Honor.

15             THE COURT:  Okay.  Government objection?

16             MR. HARRINGTON:  No, Your Honor.

17             THE COURT:  Okay.  Then given by agreement as

18    modified.

19             And let's look at 3.  Going back to government's

20    proposed 3.  And the defense has a different definition.

21             THE COURT:  Okay.  Let me invite discussion of this.

22    I --

23             MR. TOSCHER:  Your Honor, we think ours -- the

24    obstruct or impede language is more directed toward what the

25    statute is focused on.  To obstruct or impede means to

1    knowingly engage in some act or to take some step in a

2    conscious attempt to hinder, delay, or prevent the proper

3    administration of the internal revenue laws.  The government's

4    is just a generic Black's Law Dictionary.

5         THE COURT:  I actually tend to agree.  What's the

6    objection to what the defense is suggesting?

7         MR. HARRINGTON:  Your Honor, the main objection would

8    be that it's adding another intent element when I think that

9    the element is more just about the act itself.  The intent

10   element is one of the other elements of "corruptly."  And so to

11   us it just seems to be adding -- it seems to be mostly about

12   what the intent of it is rather than the actual obstructive act

13   itself.

14        THE COURT:  Okay.  So suppose it read this way:  To

15   obstruct or impede means to engage in some act or to take some

16   step -- I'm taking out this comma -- to hinder, delay, or

17   prevent the proper administration of the Internal Revenue laws,

18   which we've put in lower case elsewhere; so we need to lower

19   case it here.

20        MR. HARRINGTON:  We have no objection to that, Your

21   Honor.

22        THE COURT:  Okay.  Mr. Toscher?

23        MR. TOSCHER:  And, Your Honor, the Court took out the

24   words "knowingly" and "conscious"?

25        THE COURT:  Yes, because we'll have -- we'll get to

1  "knowingly" shortly, but --

2        MR. TOSCHER:  I think that will be fine, Your Honor.

3  As long as we get --

4        THE COURT:  It reads:  To obstruct or impede means to

5  engage in some act or to take some step to hinder, delay, or

6  prevent the proper administration of the Internal Revenue laws.

7        Okay.  Then that will be given by agreement as

8  modified, which is based on defense 1.

9        Okay.  I think then I still have to look at 6,

10  Government 6.  So there's the defense 4 and 5 and Government 6

11  I think should all be looked at together.

12        Where's the "knowingly" instruction?

13        MR. HARRINGTON:  I'm sorry, Your Honor.  What was

14  that?

15        THE COURT:  Where's the "knowingly" instruction?  Is

16  that in the joint proposed?

17        MR. HARRINGTON:  No, Your Honor.  I don't think there

18  was a "knowingly" instruction proposed.  I think when we were

19  filing our objections and responses, I think the government's

20  position was we could use the "knowingly" instruction from the

21  Court's model.  And I think that defense counsel has a

22  definition of "knowingly" perhaps in instruction number 1.

23        MR. TOSCHER:  Right.

24        THE COURT:  Okay.  Let's first look at "willfully,"

25  and we'll get back to "knowingly."

1           So "willfully" is government's proposed number 6.

2     There's a counter in defense proposed number 4.

3           What's the problem?  So it's pretty much --

4     government proposed number 6 is the second paragraph of defense

5     instruction number 4.  I don't see why we need the first or

6     third paragraphs of defense 4.

7           MR. TOSCHER:  Your Honor, the first paragraph is just

8     to --

9           THE COURT:  I know.  But I'm going to order these --

10          MR. TOSCHER:  It's format, Your Honor.  I appreciate

11    that.  And the third paragraph is, basically --

12          THE COURT:  Repeating the second one in the context

13    of this case, and --

14          MR. TOSCHER:  Correct, Your Honor.

15          THE COURT:  -- I don't know why we need to do that.

16          So let's talk about the defense instruction number 4,

17    the fourth paragraph.  I actually am concerned that bringing in

18    the negligence discussion is going to be confusing.  There's

19    not any allegation that this was negligent.  You can argue

20    that, gee, it wasn't willful, he made a mistake, he should have

21    been more careful, what have you.  But for me to put in a

22    statement of law about "negligence" seems to me to be

23    introducing confusion.

24          MR. TOSCHER:  Your Honor, we would respectfully

25    disagree.  "Negligence" is not a criminal offense; and we think

1    the evidence, if anything, will demonstrate that.  And I think

2    the jury needs to have that comparison.

3           The Ninth Circuit law is full of statements that

4    "willfulness" does not include "negligence," and I think it's

5    important that the jury be -- know what is negligent.  The

6    government has objected to that, Well, that's just a civil

7    definition.  That's true.  That's the civil definition in the

8    Internal Revenue Code and the regulations.  And, Your Honor,

9    that's the point.  We need to be able to argue that to the

10   jury, and they need some background and context for it.

11          It's the heart of the defense case, Your Honor.

12   Non-willful, good faith.  The evidence demonstrates, at best,

13   negligence.

14          THE COURT:  Okay.  The most that I'm willing to give

15   is one sentence, and it would read as follows:  Conduct that is

16   only accidental, inadvertent, mistaken, or negligent does not

17   constitute willful conduct.

18          That's the most I'm willing to give of your fourth

19   paragraph.

20          MR. TOSCHER:  So the court doesn't want to give a

21   definition of "negligent conduct."

22          THE COURT:  No.

23          MR. TOSCHER:  Over our objection, then, Your Honor.

24          THE COURT:  Okay.

25          MR. HARRINGTON:  That's fine with us, Your Honor.

1          THE COURT:  So we're going to add a new paragraph to

2    government's proposed instruction number 6.  And it will read:

3    Conduct that is only accidental, inadvertent, mistaken, or

4    negligent does not constitute willful conduct.

5          As modified, given over the objection of the defense,

6    the defense wanting definitions of one or more of those terms,

7    specifically of "negligence."

8          MR. TOSCHER:  Correct, Your Honor.

9          THE COURT:  Which I think just will confuse the issue

10   more.  So, I mean, I might as well define "accidental," too,

11   you know.  And I just think it's going to confuse more; so I'm

12   not doing that.

13         But before we get to this good-faith issue, which is

14   number 5 -- and I know we still have the salary and all that

15   other stuff to look at -- can we figure out the "knowingly"

16   instruction?

17         MR. TOSCHER:  Your Honor, there are two -- there are

18   two parts of our proposed number 1, the 7212.  Knowingly --

19         THE COURT:  I only want to give it one time as

20   applicable to, you know, wherever "knowingly" appears.  I don't

21   know why I need to repeat it for each type of count.

22         So I see in your number 1 --

23         MR. TOSCHER:  I don't think the government has -- I

24   think they said they don't have --

25         THE COURT:  So you have one after your "endeavor" and

1  before your "obstruct or impede" definition.

2          MR. TOSCHER:  Correct, Your Honor.

3          THE COURT:  You have a paragraph in your proposed 1

4  about "knowingly."  We also have the Ninth Circuit form

5  instruction on "knowingly," I think.  What number is it?  What

6  should I look at?

7          MR. TONG:  Your Honor, the Court has a standard

8  instruction number 17.

9          THE COURT:  17.  Okay.

10          MR. TONG:  Your standard instruction.

11          THE COURT:  But this standard instruction is -- is

12  this the model, too?  No?

13          We can use the model, which is -- yeah, so the model,

14  I think, says:  An act is done knowingly if the defendant is

15  aware of the act and does not act or fail to act, whichever

16  applies, through ignorance, mistake, or accident.

17          There's bracketed language, which I don't think we

18  need here.  The bracket says, optionally:  The government is

19  not required to prove that the defendant knew that his acts or

20  omissions were unlawful.

21          There is an unbracketed sentence:  You may consider

22  evidence of the defendant's words, acts, or omissions along

23  with all the other evidence in deciding whether the defendant

24  acted knowingly.

25          I think we should just give the Ninth Circuit model.

1          MR. HARRINGTON:  That's fine, Your Honor.  Although,

2    we may want to think about where we want to give it just

3    because it's a little interesting with having it in the third

4    element; it says acted knowingly and corruptly.  And the intent

5    element is really more focused on "corruptly."  So I guess we

6    might want to think about where we would define "knowingly,"

7    but we don't have an objection to the instruction being

8    given.

9          THE COURT:  So, usually, I figure out what order to

10   put them in.

11         MR. HARRINGTON:  Yeah.

12         THE COURT:  Okay.  Is there an objection to using the

13   Ninth Circuit model?

14         MR. TOSCHER:  Your Honor, I think with appropriate

15   placement in the instruction, I think we're okay with the Ninth

16   Circuit's definition without the bracket --

17         THE COURT:  Okay.  Okay.  So in the brackets shall I

18   use "act" as opposed to "fail to act?"  Those are the bracketed

19   options.  An act is done knowingly if the defendant is aware of

20   the act and does not either act or fail to act -- or we can say

21   act or fail to act.  We can have both of them.  But it's

22   probably "act" here.

23         MR. HARRINGTON:  It should be "act," Your Honor.

24         MR. TOSCHER:  Yes.  I think "act," Your Honor.

25         THE COURT:  Okay.  And I'm not using the second

1   bracketed sentence.

2            MR. TOSCHER:  Correct.

3            THE COURT:  So it will read:  An act is done

4   knowingly if the defendant is aware of the act and does not act

5   through ignorance, mistake, or accident.  You may consider

6   evidence of the defendant's words, acts, or omissions along

7   with all of the other evidence in deciding whether the

8   defendant acted knowingly.

9            MR. TOSCHER:  That's fine, Your Honor.

10           THE COURT:  Okay.  Given as modified by agreement,

11   the parties are concerned about where this will be.  And you're

12   concerned because there's a "knowing" element in both the

13   "corrupt obstruction" and in the "false filing."  Is that what

14   it is?

15           MR. HARRINGTON:  The false filing, I think, gets at

16   willfully.  That's sort of the concern I'm having in my head is

17   that the element in the false return is "willfully" instead of

18   "knowingly."  So that's what's been going through my head.

19           THE COURT:  Okay.  Well, I'll figure it out.  You

20   guys can comment on the order.

21           Okay.  I think we still need to talk about the good

22   faith and the salaries and whatevers, but I think we should

23   just bring the jury in.  We need to figure out still --

24           MR. TOSCHER:  Your Honor, just for the record --

25           THE COURT:  -- defense 5, the good faith.

1              MR. TOSCHER:  When we continue in our number 1, we
2      still haven't talked about the definition of "corruptly."  We
3      haven't covered --
4              THE COURT:  I thought we talked about "corruptly."
5      We did talk about "corruptly."  No?
6              MR. TOSCHER:  I don't think we did.  I'm just putting
7      it down so when we reconvene --
8              THE COURT:  I thought we did.  But, okay, we can look
9      at it.
10             So we have that and we have the salary and massage
11     issue.  Okay.  So as I understand it, you're raising that your
12     number 1 "corruptly" still needs to be -- I think we dealt with
13     it.  We have your good-faith issue, and we have the salaries
14     and massage issue.  And I think that's pretty much what we
15     have -- hold on.
16             Okay.  So corruptly, good faith, salaries, and
17     massage, I think, are left.
18             Okay.  Let's call the jury in, and we'll figure out
19     when else we can finish these.
20             Let's just start at 9:15.
21         (Court recessed at 9:04 A.M., until 9:21 A.M.)
22         (Jury enters.)
23             THE CLERK:  Criminal 14-826 SOM, United States of
24     America versus Albert Hee.  This case has been called for
25     Further Jury Trial.

 1              Counsel, please make your appearances for the record.

 2              MR. TONG:  Good morning, Your Honor.  Good morning,

 3    ladies and gentlemen.  Larry Tong and Quinn Harrington for the

 4    United States.  With us is Christina Sorely, our litigation

 5    technology specialist, and Special Agent Greg Miki of the IRS.

 6    Good morning.

 7              MR. TOSCHER:  Good morning, Your Honor.  Good

 8    morning, ladies and gentlemen.  Steven Toscher for defendant

 9    Albert Hee, who is with me, together with Lacey Strachan and

10    Kurt Kawafuchi.

11              THE COURT:  Okay.  Good morning.  Welcome back.  I

12    hope you had a good 4th of July weekend.  I'm sorry that again

13    we're starting late, but again, it was because we were meeting

14    on issues from early in the morning.  So I hope we won't have

15    too many interruptions, and we're going to get started right

16    back again.

17              MR. TOSCHER:  Your Honor, we'd call Dr. Steven

18    Berman.

19              THE COURT:  Okay.  Thank you.

20         (Witness photographed.)

21              THE CLERK:  Please raise your right hand.

22         (Witness sworn.)

23              THE CLERK:  Thank you.  Please be seated.

24              Please state your name and spell your last name.

25              THE WITNESS:  Steven Berman, B-e-r-m-a-n.

```
 1                         DIRECT EXAMINATION

 2    BY MR. TOSCHER:

 3    Q     Good morning, Dr. Berman.

 4    A     Good morning.

 5    Q     The -- what city do you reside in?

 6    A     Honolulu.

 7    Q     And what is your business address?

 8    A     1380 Lusitana Street.  That's the Queen's Physician -- POB

 9    1.

10    Q     And how long have you lived in Hawai'i?

11    A     I came here in 1971.

12    Q     And where were you before you came to Hawai'i?

13    A     I was in Seattle doing my residency.

14    Q     Okay.  Where did you grow up, sir?

15    A     St. Marys, Pennsylvania.

16    Q     Okay.  Did you go to college?

17    A     I did.

18    Q     And what undergraduate school did you go to?

19    A     Cornell University.

20    Q     And that is in New York?

21    A     In New York, Upstate New York, uh-huh.

22    Q     And do you remember the year you graduated?

23    A     I'm not that old now here.

24    Q     I have trouble remembering my year.

25    A     Now you got me confused.  I graduated in 1961.
```

1   Q     I apologize.  And did you get a degree?

2   A     I did.  An M.D. degree in 1965.

3   Q     An M.D. degree from Cornell?

4   A     No.  I'm sorry, from University of Buffalo.

5   Q     University of Buffalo in New York.

6   A     In New York State, yeah.

7   Q     Any other postcollege education?

8   A     Following my military service in Vietnam then I -- after I

9   graduated I did my internship.  Then I went to Seattle, did my

10  residency training in Seattle.

11  Q     And when did you serve in Vietnam, sir?

12  A     '60 -- I was '66 to '69.

13  Q     And where did that fit in in your college education?

14  A     Oh, I was a licensed -- you know, I was -- had done my

15  internship and, like everybody else, off we went.  And so I was

16  a ward -- medical officer and also did research when I was

17  there.

18  Q     Are you a licensed physician, sir?

19  A     I am.  In the State of Hawai'i.

20  Q     State of Hawai'i.  Any other states?

21  A     No.

22  Q     Any other specialties or certifications in the State of

23  Hawai'i?

24  A     National but not -- not in the state, I don't think.

25  Q     What are the national certifications?

1   A      I am certified in internal medicine and certified in

2   infectious diseases.

3   Q      Certified by a national organization?

4   A      Yes.  By national boards, I guess you'd say.

5   Q      Where did you start your medical career?

6   A      Well, after I did my internship, I was -- we all -- we all

7   had a deferment.  I mean, everybody went into the service in

8   those days, and so I -- after my deferment I was obligated to

9   go into the service.  So I -- and at that time we were all sent

10  to Vietnam.  So that was '66.  And then I extended for one more

11  year because of what I was doing.  And then '69 I did my

12  residency, finished that in '71, and was then recruited by the

13  medical school here, which was just starting up, to be on the

14  faculty.

15  Q      And your current practice -- medical practice, what does

16  it consist of?

17  A      Well, it's changed over the years as, you know, as I have.

18  When I was -- you know, for the first, gee whiz, let's say

19  until 2012 or somewhere, say the last five years, is that my

20  practice was I was a consultant for other doctors in the

21  hospital and in my office, and at the same time was building a

22  primary care practice.  But because I'm double boarded, I never

23  advertised myself, you know, to the -- as an internist because

24  many of the referrals would be from other internists or family

25  practitioners, and I never wanted to seem to be competing with

1    those folks.

2         But then so -- but, you know, when you've been at it

3    for so many years is that you gather a large group of people

4    who identify -- identify with me as a primary care physician.

5    And then about three years ago I stopped going to the hospital.

6    So now pretty much I do mostly general internal medicine.

7    Q    And did I hear you correct that you've been practicing in

8    Hawai'i since about 1971?

9    A    Yeah, I had a license in '71 for -- and I was at full time

10   to medical school.  I don't know if you remember, but it was a

11   two-year school at that time.  And then after a couple years I

12   realized that my yen, I mean, I had a need to take care of

13   patients; so I cut back my involvement with the medical school

14   to part-time and went into practice.

15   Q    Do you know the defendant Albert Hee, Dr. Berman?

16   A    I do.

17   Q    And do you recognize him here in court today?

18   A    I certainly do.

19        MR. TOSCHER:  Thank you.  Let the record reflect that

20   Dr. Berman identified him.

21        THE COURT:  It does so reflect.

22   BY MR. TOSCHER:

23   Q    Do you know other members of Mr. Hee's family?

24   A    I certainly do.

25   Q    And is Mr. Hee a patient of yours?

1    A    Yes.

2    Q    Are other members of his family patients of yours?

3    A    Yes.

4    Q    How long -- do you remember when you first started

5    treating Mr. Hee, how far back that goes?

6    A    When I first went into practice, my practice was at the

7    Young Hotel, for those of you that are old enough.  And his

8    mother was one of my first patients, and then his father became

9    a patient.  And somewhere along the line -- this would be,

10   excuse me, what he told me.  He says somewhere along the line

11   when he came back from the military, his mother says "That's

12   your doctor."  So I've been the family doctor for these folks I

13   would say going back in the '70s, and for Al maybe, I don't

14   know, say 1990s, you know, but a long time.

15   Q    How often do you see Mr. Hee in connection with your

16   medical practice?

17   A    I would say no -- about once a year, no more than that.

18   You know, if there's something acute going on, I might see him,

19   you know, three or four times.  But I was looking over his

20   records in preparation for today, and I saw him last year, and

21   then I saw him the year before.  Both times one time.  And in

22   the couple years before that, maybe one or two times.

23   Q    Okay.  And are you familiar with his medical history?

24        MR. TONG:  Your Honor, I object at this point.  He's

25   going into expert opinions without qualifying the witness.

1          THE COURT:  I don't think on this question.  He's

2    asking about whether he's familiar with his medical history.

3          MR. TONG:  Well, I'll raise the same objection on the

4    next question, then, Your Honor.

5          THE COURT:  Okay.  I can hardly wait.

6          You can answer.

7          THE WITNESS:  Yes.

8    BY MR. TOSCHER:

9    Q    Could you describe -- well, let me ask you this.  Are you

10   familiar with Mr. Hee's business and his job?

11   A    In broad strokes.

12   Q    And has he consulted with you about stress-related issues?

13          MR. TONG:  Well, Your Honor, now I object.

14          THE COURT:  Not yet.

15          MR. TONG:  All right.  Next question.

16          THE COURT:  Overruled.

17          So has he consulted with you about stress-related

18   issues?  It's really a yes or no.

19          THE WITNESS:  Yes.

20   BY MR. TOSCHER:

21   Q    Could you describe, let's say over the last five years,

22   the significant medical conditions you have treated him for?

23          MR. TONG:  Now I object, Your Honor.  This is calling

24   for expert opinion without first tendering the witness as an

25   expert.

1         THE COURT:  Overruled.  He can talk about what he's

2    done without being offered as an expert.  This is his firsthand

3    activity.

4         So go ahead.

5         THE WITNESS:  Over the last five years, I have seen

6    Mr. Hee following a myocardial infarction in 2011, he had

7    asthmatic bronchitis, and he had gout.

8    BY MR. TOSCHER:

9    Q    Okay.  Can you -- you said myocardial infarction.  What

10   does that mean?

11   A    It's a heart attack.

12        MR. TONG:  Now I object, Your Honor.  This is going

13   into an area of expert opinion.  There's significance to this,

14   Your Honor, because he has not been qualified, and there has

15   been no disclosure made, as required by the rules.

16        THE COURT:  I'm going to let him define that fairly

17   common term.

18        THE WITNESS:  I did not care for Mr. Hee during

19   his -- this heart attack.

20        THE COURT:  Okay.  So --

21        THE WITNESS:  That was all.  I mean, but he did,

22   according to the medical records, have one.

23        THE COURT:  Okay.

24   BY MR. TOSCHER:

25   Q    Did you understand, during the course of your treatments,

1    that Mr. Hee was going through massage therapy?

2    A    No.

3    Q    Did you ever have any discussions with Mr. Hee regarding

4    massage therapy?

5    A    No.

6    Q    Did you ever treat him -- if he were to come to you for a

7    treatment of stress, would you prescribe massage therapy for

8    him?

9              MR. TONG:  Your Honor, now --

10             THE COURT:  Yeah, sustained.

11   BY MR. TOSCHER:

12   Q    Are you familiar with the use of massage therapy for the

13   treatment of stress?

14   A    Yes.

15   Q    Do doctors generally prescribe massage therapy for stress?

16             MR. TONG:  Same objection.  I'm sorry.

17             THE COURT:  Sustained.  Objection sustained.

18   BY MR. TOSCHER:

19   Q    Normally, you, as his doctor, if there were -- and you

20   indicated before there were discussions with Mr. Hee about his

21   stress?

22   A    No, I did not.

23   Q    No.  Were there discussions -- did Mr. Hee raise with

24   you --

25   A    Yes.

1  Q    -- concerns regarding his stress?

2  A    Yes.

3  Q    And the normal medical response for stress would be a

4  prescription of drugs?

5            MR. TONG:  Objection.  Expert opinion.

6            THE COURT:  Yes.  Sustained.

7            MR. TOSCHER:  No further questions, Your Honor.

8            THE COURT:  Okay.

9            Any cross?

10           MR. TONG:  No questions, Your Honor.

11           THE COURT:  Okay.  Then thank you very much.  The

12  witness is excused.  You may step down and leave the courtroom.

13  And the next defense witness can be called.

14      (Witness excused.)

15           MR. TOSCHER:  Your Honor, we call Mr. Ray Soon.

16           THE COURT:  Okay.

17      (Witness photographed.)

18           THE CLERK:  Please raise your right hand.

19      (Witness sworn.)

20           THE CLERK:  Thank you.  Please be seated.

21           Please state your name and spell your last name.

22           THE WITNESS:  Raynard Soon, S-o-o-n.

23                         DIRECT EXAMINATION

24  BY MR. TOSCHER:

25  Q    May it please the Court.  Ladies and gentlemen.

1    Good morning, Mr. Soon.

2 A  Good morning.

3 Q  Could you tell us what city you reside in.

4 A  Here in Honolulu.  I live out in Hawai'i Kai.

5 Q  And where do you presently work?

6 A  I work for the City and County of Honolulu.  I'm the Chief

7 of Staff to the Mayor.

8 Q  Chief of Staff to the Mayor.  And how long have you lived

9 in Hawai'i, sir?

10 A  Born and raised here.  Off and on sojourns to the mainland

11 to go to school, spend some time, but permanent since about

12 1990 I've been home.

13 Q  Okay.  Could you briefly describe your educational

14 background.

15 A  Sure.  How far back you want me to go?

16 Q  High school.

17 A  Kalani High School.

18    THE COURT:  Yea, this is a great high school.

19    MR. TOSCHER:  No further questions.

20    THE WITNESS:  And Niu Valley just in case.

21    THE COURT:  Yes, me, too.  Hey, me, too.

22    THE WITNESS:  University of Hawai'i undergraduate

23 degree in City and Regional Planning, and then Harvard

24 University for my Master's in City Planning.

25 BY MR. TOSCHER:

1   Q     What year was the Harvard?

2   A     '76.  1976.

3   Q     So after you graduated in '76 could you briefly describe

4   your educational history to the present date.

5   A     Really no formal education after that.

6   Q     I'm sorry, your work history.  My mistake.

7   A     I'm kind of old; so a lot of things I've been doing.

8             I first came back, worked for the state for three

9   years, and then formed a research company.  And then in '86 my

10  wife and I -- I decided the company got so big that I just sold

11  my interest.  She was losing her job with the state.  She had

12  been working for the state.  We moved back -- she's from

13  Massachusetts.  We moved back there for five years.

14            And then in 1990 I -- Hoaliku Drake persuaded me to

15  come back to Hawai'i to work at Hawaiian Homelands, and so I

16  did.  I promised her three years.  I stayed for twelve.  And

17  after Hawaiian Homes, I worked for Kamehameha for a short time,

18  and then I went back to doing consulting work.  And then two

19  years ago I came over to the city.

20  Q     Okay.  Do you know the defendant Albert Hee, sir?

21  A     Yes, I do.

22  Q     And do you recognize him?

23  A     Yes, I do.  That's him standing there.

24            MR. TOSCHER:  Let the record reflect that Mr. Soon

25  recognized Mr. Hee.

1                THE COURT:  Yes.

2    BY MR. TOSCHER:

3    Q    Can you tell us how you first met Mr. Hee.

4    A    I -- as I think back -- I've thought about this a little

5    bit.  And the first time I met him was when he came in to

6    discuss the license with us.  I knew his wife from before that.

7    I knew Wendy.  She followed me at Harvard.  She was a couple

8    years behind.  So she had picked up the phone, called my

9    wife -- both my wife and I went to Harvard -- to just reflect

10   on what our experience had been and to ask us about the

11   program.  Same program.  She had the same degree.  And so I

12   knew her.  I didn't really know Al very well at all until he

13   came in for the license.

14   Q    So you said Al came in for the license.  Can you tell

15   us -- be a little more descriptive.  What do you mean by he

16   came in for the license?  What was -- at that point you were

17   with the Hawaiian Homelands?

18   A    Yes.  I was the Land Management Division administer, and

19   so licenses came through -- typically, not always, but

20   typically came through my division.  I mean, I don't remember

21   the exact what we did, but I do recall meeting with him and his

22   people, talking about it.  Then they made application for the

23   license.

24   Q    Okay.  To put it on a little context, tell us what the

25   Hawaiian Homelands Commission does.  And then you indicated you

1    were running the Land Management Division, and then we're going

2    to talk a little bit about the license and him coming in to see

3    you.

4    A    That's a big question.

5    Q    I'll start with the mission of the Hawaiian Homelands.

6    A    To rehabilitate native Hawaiians.  And the rehabilitation

7    is an all-encompassing word.  It's been defined over the years

8    as putting Hawaiians on the land.  Goes back again to our

9    history of why we were disenfranchised and how we lost our way,

10   in large part because we were removed from the land in a

11   variety of ways.

12          So what Kuhio did, in the early nineteen teens and

13   then culminating with the passage of the Homestead Act in '21,

14   was to lobby for land to allow Hawaiians to homestead that

15   land.  So that's the basic mission of the department.  It's

16   evolved over the years to the department really becoming quite

17   paternal and doing more than just providing homesteads.  It's

18   providing job opportunities.  It's providing education

19   specifically around how to be a property owner.  It's much more

20   encompassing today, but that's the original mission.

21   Q    You mention a name:  Kukio?

22   A    Kuhio.  Prince Kuhio.

23   Q    Kuhio.

24   A    Yes.

25   Q    So you're referring to Prince Kuhio.

```
 1   A    Prince Kuhio, yes.

 2   Q    Tell us what his involvement was.  I've seen the name

 3   before in the homelands.  What's his involvement or what was

 4   his --

 5            MR. TONG:  Your Honor, I object to the relevance of

 6   this.

 7            THE COURT:  Sustained.

 8            MR. TOSCHER:  Okay.  We'll move on, Your Honor.

 9   BY MR. TOSCHER:

10   Q    The -- could you tell us how the mission of the Hawaiian

11   Homelands evolved.  You talked about what it was from the

12   beginning, but how has it evolved?

13            MR. TONG:  Same objection, Your Honor.

14            THE COURT:  I think he's asking now -- are you asking

15   about the mission in general, or are you asking about this

16   witness' involvement?

17            MR. TOSCHER:  This witness' involvement.

18            THE COURT:  Okay.  You need to clarify that question

19   then.

20   BY MR. TOSCHER:

21   Q    Okay.  Leading up to the time period that you first met

22   Mr. Hee, what were -- how was the development changed for the

23   needs of the homelanders?

24            THE COURT:  Okay.  Wait a minute.

25            MR. TONG:  Objection.  Relevance, Your Honor.
```

```
 1                THE COURT:  Yeah, sustained.
 2   BY MR. TOSCHER:
 3   Q    All right.  Let's do it this way.
 4                You mentioned a -- you met with Mr. Hee regarding a
 5   license; correct?
 6   A    Correct.  Yes, sir.
 7   Q    What was that license for and what was -- why did the
 8   Hawaiian Homelands want to enter into this type of license
 9   arrangement?
10                MR. TONG:  Well, same objection, Your Honor.
11   Relevance.
12                MR. TOSCHER:  We're laying the predicate of his
13   meeting with Mr. Hee and the licensing arrangement.
14                THE COURT:  That you can ask about.  I'm sustaining
15   the objection to this particular question.
16   BY MR. TOSCHER:
17   Q    Okay.  Can you tell us what the purpose of the meeting
18   with Mr. Hee was.
19   A    Sure.  In the development of homestead areas you provide
20   all the infrastructure -- the department provides the
21   infrastructure.  The homesteader pays for the home.  Whether
22   they build it themselves or their own contractor or we build it
23   for them and they get a mortgage for it.
24                In the development of those homestead areas, again
25   you also provide infrastructure and utility services:  water,
```

1    electricity, telephone, et cetera.  Al came in to get a license

2    for the provision of telephone service on the homesteads -- on

3    all the homesteads, an exclusive license to provide telephone

4    service on the homesteads.

5    Q    Was it difficult for -- to obtain this type of

6    infrastructure, telephone for the homestead?

7              MR. TONG:  Objection.  Relevance.

8              THE COURT:  Sustained.

9    BY MR. TOSCHER:

10   Q    Can you tell us, did the homestead or Hawaiian Homelands

11   enter into a license arrangement with Mr. Hee?

12             MR. TONG:  Same objection.  Relevance.

13             THE COURT:  I'll let this be answered.  Go ahead.

14             THE WITNESS:  Can you ask me that again?

15   BY MR. TOSCHER:

16   Q    Did the Hawaiian Homelands Commission enter into a license

17   with Mr. Hee?

18   A    Yes, they did.

19   Q    And what was that license for?

20   A    It was for the provision of telephone service on homestead

21   areas.  Can I expand on that just a little bit?

22             THE COURT:  You have to wait for the question.  So

23   what happens is:  You sit in that chair; you only get to answer

24   the questions asked.

25             THE WITNESS:  Okay.

1            THE COURT:  Go ahead, Mr. Toscher.

2   BY MR. TOSCHER:

3   Q    Can you tell us why the Hawaiian Homelands needed or

4   wanted to enter into this type of license arrangement?

5            MR. TONG:  Objection.  Relevance, Your Honor.

6            MR. TOSCHER:  Trying to set the context.

7            THE COURT:  I know what you're trying to do, and I'm

8   threading my way through this.

9            I'm going to let him answer, but keep it short.

10           THE WITNESS:  The homestead areas are dispersed,

11  quite dispersed.  So the provision of available lands under the

12  law resulted in homestead areas being far from urban areas; so

13  difficult to service with infrastructure.

14           Telephone service was one of that infrastructure type

15  that we had a difficult time getting telephone service to areas

16  like Ka'u, Kahikinui, places that are really far away from

17  urban areas.  And if we got Hawaiian Tel to provide that, we,

18  in fact, would have to share costs.  I don't remember exactly

19  what the sharing formulas were, but we had to share costs.  So

20  that the provision of that service came, in part, out of the

21  meager infrastructure money that we had.

22           What was attractive about what Sandwich Isles

23  Communications promised was the delivery of that level of

24  infrastructure, at least at the quality of what Hawaiian Tel

25  would provide, but at no cost to the department.  So that was a

1    significant benefit.

2    Q    And this type of building out of infrastructure is a very

3    large cost?

4    A    Well, if you're talking about one project, depending on

5    how many homes in it, it could be, yes.  But when you summed

6    them all up statewide with all of the homestead areas, both

7    developed as well as yet to be developed, you're talking about

8    millions and millions of dollars, yes, sir.

9    Q    Did Mr. Hee and his companies perform their obligations

10   under the license?

11              MR. TONG:  Objection.  Relevance.

12              THE COURT:  I'll let him answer.  It's a yes or no,

13   though.

14              THE WITNESS:  Yes.

15   BY MR. TOSCHER:

16   Q    Has it provided a benefit to the Homelands Commission and

17   the homesteaders?

18              MR. TONG:  Same objection.

19              THE COURT:  Sustained on this one.

20   BY MR. TOSCHER:

21   Q    Mr. Soon, when the license was first entered into, were

22   you skeptical about the goal of connecting all the homelands

23   being achieved?

24              MR. TONG:  Objection.  Relevance.

25              THE COURT:  Sustained.

1           MR. TOSCHER:  No further questions, Your Honor.

2           THE COURT:  Okay.  Cross-examination.

3                        CROSS-EXAMINATION

4    BY MR. TONG:

5    Q    Good morning, Mr. Soon.

6    A    Good morning.

7    Q    So you dealt with Mr. Hee in his capacity as a

8    representative of Sandwich Isles Communications; is that

9    correct?

10   A    That's correct.

11   Q    You knew he was also the owner of Waimana Enterprises;

12   correct?

13   A    That's correct.

14   Q    And I gather you don't know anything about how Waimana

15   Enterprises prepared its tax returns; right?

16   A    No, I have no idea.

17   Q    And you have no personal knowledge about how Mr. Hee

18   prepared his personal income tax returns.

19           MR. TOSCHER:  Objection, Your Honor.

20           THE WITNESS:  No, I have no idea.

21           THE COURT:  I'm sorry?

22           MR. TOSCHER:  Beyond the scope of direct.

23           THE COURT:  I'm going to let him answer yes or no to

24   this one.

25           Do you have knowledge?

1           THE WITNESS:  No.  No.

2           THE COURT:  Okay.

3           MR. TONG:  Thank you.  I have nothing further.

4           MR. TOSCHER:  No further questions, Your Honor.

5           THE COURT:  Okay.  Then this Kalani High School

6    graduate is excused and can leave the courtroom.

7           THE WITNESS:  Thank you.

8           THE COURT:  Okay.  Mr. Toscher.

9           MR. TOSCHER:  Your Honor, we're calling Mr. Ed

10   Rockowitz.

11       (Witness photographed.)

12          THE CLERK:  Please raise your right hand.

13       (Witness sworn.)

14          THE CLERK:  Thank you.  Please be seated.

15          Please state your name and spell your last name.

16          THE WITNESS:  Edward J. Rockowitz.  That's

17   R-o-c-k-o-w-i-t-z.

18                     DIRECT EXAMINATION

19   BY MR. TOSCHER:

20   Q    May it please the Court.  Ladies and gentlemen of the

21   jury.

22          Good morning, Mr. Rockowitz.

23   A    Thank you.  Good morning.

24   Q    Could you state your business address for the record.

25   A    138 Georgia Way, San Leandro, California 94577.

1   Q     And state the city you live in presently.

2   A     I currently live in San Leandro as well.

3   Q     Could you tell the jury what your profession is.

4   A     It's almost twofold.  I started out as a massage

5   therapist; so I'm an orthopedic-certified massage therapist.

6   And when I got started with massage, I opened up a massage

7   company.  It's a corporate chair massage company, and we're a

8   nationally based massage company focusing on corporations and

9   employee appreciation events and wellness programs for

10  large-scale companies.

11  Q     Do you hold any certificates or licenses in connection

12  with your massage?

13  A     On both ends, yes.  Business license -- to be a massage

14  therapist you have to have multiple, you know, I have my

15  California certificate to practice.  And there are so many

16  certificates.  Depending on which styles of modalities, many

17  massage therapists will have multiple certificates for

18  different styles of massage.

19  Q     Let's talk -- are you what is referred to as a certified

20  massage therapist?

21  A     A CMT.

22  Q     And who are you certified by?

23  A     For me, specifically, through the State of California.

24  Q     Certified by the State of California.

25  A     Correct.

1   Q     Any other certifications from national organizations?

2   A     The NCBTMB, National Certification Therapeutic Body Work,

3   something like that, Board.  I teach continuing education as

4   well.  So a lot of massage therapists will get continuing

5   education certifications with workshops that I offer.

6   Q     You're certified by the NCBTMB to teach other massage

7   therapists --

8   A     Correct.

9   Q     -- in different massage techniques?

10  A     Correct.  National Certification Board for Therapeutic

11  Massage and Body Work.  I believe that's --

12  Q     That's correct.

13  A     Thank you.

14  Q     Any certification -- what is the ART designation?

15  A     Active release techniques.  It's a form of body work

16  primarily taught to chiropractors really.  It was created by a

17  chiropractor.  It's one of the few modalities that you'll see

18  massage therapists, chiropractors, physical therapists,

19  athletic trainers, all learning the same modality.  That is, as

20  I said, in addition to me running my massage company, doing the

21  corporate massage services, I have my private practice, and my

22  primary focus is ART, active release techniques.

23         I'm also brought on with the Oakland Raiders.  I'm

24  one of their contracted massage therapists to work on the

25  players weekly, and I do that with the ART.  That's a pretty

1   well-renown style of body work that's, you know, very specific

2   for injury treatments, breaking up nerve entrapments, breaking

3   up adhesions along muscle sites, very much muscular, skeletal,

4   functional, anatomy-based body work.

5   Q    Let me go back a little bit.  Did you go to college, sir?

6   A    Yes, I did.

7   Q    And where did you go to college?

8   A    Cal State Hayward.

9   Q    And where is that?

10  A    Hayward, California.

11  Q    California.  And the year you graduated?

12  A    1995.

13  Q    And could you tell us when you first started getting into

14  the massage business, the therapist business.

15  A    Okay.

16  Q    Take us through your work history, if you would.

17  A    Okay.  I started out -- I started out in corporate sales.

18  I worked in corporate radio, you know.  That was what I -- that

19  was my first corporate sales job after college.  And I just

20  realized I wanted to do something a little more spiritual, I

21  wanted to do something that had some more personal growth for

22  myself, and I got in -- I kind of took a dab at massage

23  therapy.  I went to the San Francisco School of Massage to

24  start out and kind of got my feet wet, and I realized it was a

25  passion for me and I really wanted to expand on that.

1          And, you know, one thing led to another, and through

2    other programs and schools -- after the San Francisco School of

3    Massage there's the Accupressure Institute.  I met a guy.  He's

4    a sports massage teacher.  He liked what I did, and he wanted

5    me to come with him on tour with the National Volleyball

6    Association.  He had a whole crew of athletic trainers.  So I

7    was on tour with the National Volleyball Association.

8          Then I got my orthopedic massage certification back

9    in '07.  All the while I was coming to Maui to get lomilomi

10   training.  So I trained with a very profound instructor on Maui

11   on and off for, gosh, even now I consider him like someone that

12   I'd look to for guidance.  He's -- I don't know if I should

13   name names.  Whatever.  Daniel Fowler on Maui.  But, yes, so I

14   really -- you know, the lomilomi was really a profound part of

15   my early massage training.

16   Q    You mentioned orthopedic massage training as well.

17   A    Yes.

18   Q    Any others you can think of now?

19   A    I also am into neurokinetic therapy.  That is a big one.

20   That's all muscle testing.  It's -- again, it goes along well

21   with ART body work.  It's a form of kinesiology that's really a

22   level of orthopedic -- I wouldn't even say orthopedic.

23   Physical therapy, you know, figuring out what muscles are

24   facilitated, what muscles are inhibited, you know, and working

25   with those to get the body back in balance, let's just say.

1  Q    The -- is -- let's turn for a second for your -- how

2  long -- tell us about your current corporate business, the name

3  Ahhh Massage.

4  A    Ahhh Massage is our corporate massage company.  It's

5  nationally based.  I've been running this business for close to

6  15 years now.  And in those 15 years -- I was just looking up

7  things last night -- we've had over a thousand corporate

8  clients.  We have close to 100 massage therapists on roster.

9         I could just rattle off some of our corporate

10 clients.  Back in the mainland, I mean, corporate massage is

11 really gaining in popularity.  When employees -- people are

12 working, you know, 10, even 12 plus hours a day, you know, on

13 their computer all day, there can be -- there's a need for

14 stress reduction, there's a need for breaking up repetitive

15 strain patterns that can lead to, like, you know, workers comp

16 claims.  So it's actually a benefit to the employees mostly,

17 you know, both on a physical and emotional level.

18         We're national based.  I work with companies like --

19 AOL is one of our largest clients.  We handle their 15 markets

20 between Chicago, Detroit, Atlanta, Baltimore, Washington, D.C.,

21 San Francisco, L.A.  I mean, that's a big one for us.

22         We work with Kaiser Permanente, Blue Shield,

23 start-ups.  We work with high tech, biotech companies.  And

24 many of these are ongoing programs.  Many of these are one-off

25 programs.  Sometimes people want to do an employee appreciation

1    event just to, you know, the whole company made their goals,

2    their budgets, let's provide a massage event.  But in many

3    cases, and what's becoming more and more popular, is companies

4    are seeing the true benefits of massage for ongoing

5    maintenance, and so they're having us come in there on a weekly

6    basis, every other week, and it's becoming a great way to

7    actually increase productivity.

8              It's a great way to increase -- to reduce stress

9    levels in the workplace.  Workers' compensation claims go down

10   when we're breaking up those repetitive stress patterns.  And

11   it's a nice way to boost morale and keep employees, keep people

12   motivated to work longer hours and to be sharp and focused.

13   Q    The services the company provide, you mentioned one

14   company, AOL.  Does it go across a broad array of industries

15   and businesses?

16   A    Across the board.  We've worked with, you know,

17   construction companies to accounting firms to law firms.  It's

18   just -- it's great because massage can help anyone.  You know,

19   the benefits of massage are across the board.  You know, it's

20   all about health and wellness in the workplace; so no matter

21   what company you're working for, it seems like there is a place

22   for it.

23   Q    Including government organizations?

24   A    We've worked with the City and County of San Francisco.

25   We've worked with the City of Oakland.  I mean, in both of

1    those situations -- I mean, we've been doing both the City and

2    County of San Francisco and City of Oakland for multiple

3    departments for, I'd say, over seven, eight years.

4    Q    What about telecommunications companies?

5    A    What have we done?  I think we did something with Verizon

6    at one time.  I think AOL -- not AOL.  AT&T we haven't.  I

7    can't think of too many offhand.  I should have looked that up

8    because we've been, you know.  Occasionally, there could be

9    one-off events, but I don't think we've worked with --

10   Q    Do you remember something with Virgin Mobile?

11   A    Virgin Mobile.  Okay.  That must have been about 10 plus

12   years ago.  We did work with Virgin Mobile for an employee

13   appreciation event, I believe.

14   Q    What about JDS Uniphase?

15   A    I didn't know they were a telecommunications company.

16        That would have been a long time as well.  I don't

17   really remember what we did with them offhand, but it wasn't an

18   ongoing program.

19   Q    Okay.  And these programs, you've been administering them

20   since 2001?

21   A    Yes.

22   Q    And through the present date.

23   A    Correct.

24        MR. TOSCHER:  Your Honor, at this time I would ask to

25   qualify Mr. Rockowitz as an expert regarding the practice in

1    the business community of using massage therapy for the

2    treatment of stress in the workplace and the business purpose

3    and benefits to employees and companies of such massage

4    services.

5              THE COURT:  Mr. Tong.

6              MR. TONG:  No objection, Your Honor.

7              THE COURT:  Okay.  Then in those areas you've just

8    listed he may go ahead and give his opinions under the rules of

9    evidence.

10             MR. TOSCHER:  And, Your Honor, just for completeness,

11   also as an expert in massage therapy, massage therapy used for

12   stress reduction.  Just so for completeness.

13             MR. TONG:  No objection, Your Honor.

14             THE COURT:  Okay.  Then we'll include that area in

15   what he can testify to under the rules of evidence with his

16   opinions.

17   BY MR. TOSCHER:

18   Q    Mr. Rockowitz, have you seen the practice of the business

19   community in providing massage services to -- for its employees

20   grow over the last 15 years?

21   A    Yes, I have.

22   Q    Describe what you view as the growth in that industry.

23   A    I mean, it's just really gaining popularity:  massages.

24   It's like we get calls all the time from different companies

25   wanting to create wellness programs.  It's the new thing.  It's

1    like the new trend.

2              So many companies are working their employees really

3    hard.  They're not hiring more people, and these employees are

4    working long hours, and they're trying to figure out what can

5    we do to keep these people happy?  What can we do to keep them

6    stress, what can we do to keep them injury-free?  And massage

7    has proven itself as a great tool for instant benefits.  It

8    helps ground people, helps them become, you know, sharper.

9    They can make sharper decisions.

10             It helps with sleep, you know.  If someone has a lot

11   of stress, boy, you can just tune out and go right to sleep.

12   So I think that's a big one.

13             MR. TONG:  Your Honor, I object.  It's a narrative at

14   this point.  Beyond the scope of the question.

15             THE COURT:  Okay.  Overruled.  What's the next

16   question?

17   BY MR. TOSCHER:

18   Q    Okay.  And I think you started on it, Mr. Rockowitz, and

19   you may have answered it, but I think you answered what are the

20   benefits to the individual person receiving massage.  What is

21   the benefit to the companies asking you to do this for the

22   employees?

23   A    Workers' compensation claims can be really high.  And just

24   the lost time.  If someone is absent for a long period of time

25   due to stress or due to an injury that's caused by these

1    repetitive strain patterns of being on the computer all day

2    long, that can cost the company a lot of money and also it's

3    going to equate to money if they're losing productivity time.

4    That's the primary.

5    Q    Do you have an opinion as to whether massage therapy

6    assists in employee productivity?

7    A    I do.  I think it does.

8    Q    And what do you base that on?

9    A    People -- I don't have any hard evidence.  There are a lot

10   of studies out there that do say that massage definitely does

11   help with productivity.  I know that companies continue to want

12   to have us on site.  They see the benefits.  I don't know what

13   their bottom line numbers are, but they're really happy with

14   the service, and they see that their employees are happy, are

15   working harder for them, but I don't have any actual hard

16   evidence.

17        They do say -- I've heard that 90 percent of

18   employees' sick leave is due to stress.  And, you know, there

19   are studies out there that say that massage definitely is

20   helpful with stress deduction.

21   Q    And as a general matter your company, Ahhh Massage, is

22   being retained by these corporations?

23   A    Correct.  They are.

24   Q    And the corporations are the ones paying for the massage

25   services?

1    A    Yes, they are.

2    Q    And is it fair to say that in your business it is a common

3    practice for these corporations to pay for these massage

4    services for its employees?

5    A    Yes.

6    Q    Now, do you have an opinion as to whether massage relieves

7    stress?

8              MR. TONG:  Objection.  Asked and answered several

9    times, Your Honor.

10             THE COURT:  I thought he did answer this.

11             MR. TOSCHER:  Your Honor, I think Mr. Tong is

12   probably right on that one.

13   Q    The -- in your experience, Mr. Rockowitz, on these -- the

14   corporate clients you talked with, it's probably in every

15   instance the massage is being paid for by the corporation;

16   isn't that correct?

17   A    That is correct.

18             MR. TOSCHER:  No further questions, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. TONG:

21   Q    Good morning, Mr. Rockowitz.

22   A    Good morning.

23   Q    The name of your company is Ahhh Massage?

24   A    Correct.

25   Q    As in relax.

1    A     Ahhh Massage.

2    Q     You do it much better than I do.  Thank you.

3    A     When people feel better, they work better.  Ahhh better.

4    Q     Let's talk about how you make people feel better.  You use

5    the term "corporate programs"; right?

6    A     Correct.

7    Q     In fact, your website, basically, says you specialize in

8    offering corporate chair massages; is that correct?

9    A     Correct.

10   Q     And that's, basically, a situation where you go to the

11   workplace and you bring a chair that employees sit in; correct?

12   A     That's correct.

13   Q     And then you give a massage -- or rather one of your

14   employees gives a massage to an employee; correct?

15   A     Correct.

16   Q     And the average length of each massage is about 10 to 30

17   minutes; is that right?

18   A     I'd say about 10 to 30 minutes, sometimes longer.

19   Q     So you, typically, send a massage therapist to a company,

20   and all of the employees come in, one after another, and you

21   spend 10 to 30 minutes on each employee.

22   A     Depending what we put together as a program; correct.

23   Q     That's to be negotiated with the company; right?

24   A     Correct.

25   Q     So I assume someone in the company, typically, comes to

1    your organization and says "I want to boost morale of my

2    employees"; right?

3    A    Sure.

4    Q    And morale is boosted in part by employees thinking that

5    their employer is taking care of them, giving them some

6    benefit; is that correct?

7    A    Sure.

8    Q    That's part of the mental as well as the physical process;

9    correct?

10   A    That's part of it.

11   Q    And that employees see their fellow employees getting this

12   service paid for by the company; correct?

13   A    Sure.

14   Q    That's part of the service that you offer; is that right?

15   A    That's part of it.

16   Q    That's why you call it a corporate wellness package;

17   correct?

18   A    Corporate wellness programs; correct.

19   Q    Right.  And you also, basically, on your website -- I took

20   a peek there -- say that the companies often pay you for the

21   service provided to their employees; correct?

22   A    Correct.

23   Q    Typically speaking, massage therapy is not covered by

24   health insurance programs; is that correct?

25   A    Not true.  "Typically" you're saying.  It just depends on

1    the program.  I mean, there are many, many people who ask all

2    the time can, you know, that they have massage coverage in

3    their programs.

4    Q    But the majority do not; is that right?

5    A    I don't know that.

6    Q    Okay.

7    A    For personal individual coverage, is that what you're

8    referring to?

9    Q    Let me ask it a different way.

10        The majority of the payments you receive are from the

11   companies, not the insurance companies; correct?

12   A    Correct.  I don't receive any -- any payments from an

13   insurance company, unless I'm working directly with an

14   insurance company as we have massage therapists doing on-site

15   services at an insurance company.  Follow me?

16   Q    Oh, let me make sure I understand that.  So,

17   hypothetically, if Blue Shield or some insurance company wanted

18   to offer its employees this company benefit, then you would get

19   paid by Blue Shield as an insurance company; correct?

20   A    Correct.  Which we're on site with them pretty much every

21   month.

22   Q    And "on site" means you go to them; right?

23   A    Correct.

24   Q    And so we're clear, like in your example of the Oakland

25   Raiders -- that's, of course, a professional football team;

1  right?

2  A    Correct.

3  Q    Their colors, maybe appropriately, are black and silver, I

4  guess.

5  A    Sure.

6  Q    And you go in and treat the football players after they

7  have work-related injuries; is that correct?

8  A    Correct.

9  Q    And the company pays you.

10  A    Correct.

11        MR. TONG:  May I have one moment, Your Honor?

12        THE COURT:  Yes.

13    (Counsel conferring.)

14        MR. TONG:  I have nothing further.

15                    RE-DIRECT EXAMINATION

16  BY MR. TOSCHER:

17  Q    May it please the Court.  Ladies and gentlemen.

18

19        MR. Rockowitz, Mr. Tong had you talk about the types

20  of massage services that Ahhh Massage applies or provides.  And

21  when I was questioning you, you were telling us and the jury

22  about the benefits of massages:  stress relief, et cetera.

23  Would those same type of benefits apply to someone who is

24  getting a full hour massage?

25  A    Yes, they would.  A lot of times we'll do anywhere from 10

1    to 30 minutes just because we might have a hundred employees to

2    work on.  We're bringing in multiple therapists.

3              But in some cases many of these corporations say,

4    "Hey, we want to have eight massage therapists.  We want

5    everyone to get full hours."  We've done that before.  It's not

6    often that we'll do hour-long sessions on each individual just

7    because, you know, that could take a long time to finish them

8    all.  However, the benefits whether someone's, you know,

9    getting a neck and shoulder massage in a chair or if they're

10   getting an hour-long session elsewhere, there's going to be

11   similar benefits, whether you're having the convenience, you

12   know, at the office or if you're being able to go to a spa

13   even, you know.  It really comes down to the practitioner and,

14   you know, thorough body work, you know.

15   Q    Is it fair to say the longer the massage, the more the

16   massage time, the greater the benefits to the employee?

17   A    Not necessarily.

18   Q    Okay.  But the same benefits you talked about before in

19   the chair massage would apply to a massage for an hour or two

20   hours?

21   A    I'm sorry.  Can you say that again?

22   Q    The same benefits we talked about before for stress

23   reduction, that's just not limited to a massage in a chair.  It

24   can be massage laying on a table and for a longer period of

25   time.

```
 1   A      Absolutely.

 2              MR. TOSCHER:  No further questions, Your Honor.

 3              MR. TONG:  Nothing further.

 4              THE COURT:  Okay.  Then the witness is excused.

 5   Thank you very much.  You can step down and leave the

 6   courtroom.

 7          (Witness excused.)

 8

 9              THE COURT:  And, Mr. Toscher, you can call your next

10   witness.

11          (Counsel conferring.)

12          (Witness photographed.)

13              THE CLERK:  Please raise your right hand.

14          (Witness sworn.)

15              THE CLERK:  Thank you.  Please be seated.

16              Please state your name and spell your last name.

17              THE WITNESS:  It's Alan Mun Leong Yee.  Last name

18   spelled Y-e-e.

19                          DIRECT EXAMINATION

20   BY MR. TOSCHER:

21   Q      May it please the Court.  Ladies and gentlemen.

22              Good morning, Mr. Yee.  Would you please give us your

23   business address, please.

24   A      My business address is 1003 Bishop Street, Suite 2400,

25   honolulu, Hawai'i 96813.
```

1    Q      And who are you employed by?

2    A      I'm employed by KMH, LLP.

3    Q      What is KMH, LLP?

4    A      It's a CPA firm.

5    Q      Where do you live, Mr. Yee?

6    A      My address?

7    Q      Don't give your address.  Just the city you live in.

8    A      Honolulu.

9    Q      Okay.  And how long have you lived in Honolulu?

10   A      Probably about 58 years.

11   Q      58 years?

12   A      Yes.

13   Q      Were you born here?

14   A      Yes.

15   Q      So you've lived here your entire life.

16   A      Yes.

17   Q      Now, could you tell us a little bit about your college

18   education.  Or did you go to high school here?

19   A      Yes.

20   Q      Let's see, what high school?

21   A      I graduated from Iolani High School.

22   Q      Iolani High School.  And did you get to go to college?

23   A      Yes.  I graduated from the University of Washington.

24   Q      In Washington state?

25   A      Yes.

1  Q    Okay.  And you're with a CPA firm right now, but before I

2  get there, what was your degree in at the University of

3  Washington?

4  A    Bachelor's in Business Administration.

5  Q    Okay.  And when did you get into the accounting field?

6  A    After I graduated from law school in 1980.

7  Q    Okay.  So after your -- you attended college you also

8  attended law school?

9  A    Yes, I did.

10  Q    And what law school was that?

11  A    Back then it was known as the University of Santa Clara.

12  Q    So you graduated law school in 1980?

13  A    Yes.

14  Q    And did you -- what was your next -- did you go to work

15  after that?

16  A    Yes.  I went to work for Alexander Grant in Honolulu.

17  Q    And what kind of firm was Alexander Grant?

18  A    That was a CPA firm.

19  Q    When you say "CPA," you mean certified --

20  A    Certified public accounting firm.

21  Q    And how long were you with Alexander Grant?

22  A    Well, I was there for nine years, I left for four years,

23  and then I returned for another, I think, seven years.

24  Q    And what type of work did you do at Alexander Grant?

25  A    I started off as a tax staff and then advanced.  And then,

1   ultimately, after my second stint I left as the managing

2   partner and head of their tax division.

3   Q    Do you recall what year you left Alexander Grant?

4   A    2002.

5   Q    2002.  And your position at the time you left was?

6   A    I was the managing partner and head of the tax division in

7   the Honolulu office.

8   Q    In the Honolulu office.  And where did you go after 2002?

9   A    To KMH.

10  Q    And tell us a little bit about KMH.

11  A    KMH was actually -- after Enron, essentially, blew up

12  Arthur Anderson, the Arthur Anderson Honolulu office spin off

13  from the national office to form KMH.  And during their

14  formation I started talking with the Honolulu partners to join

15  them as a tax partner because they didn't have a tax partner in

16  their office.

17  Q    Okay.  And you've been with KMH since what year?

18  A    2002.

19  Q    Okay.  So, basically, for the last 13 years.

20  A    Yes.

21  Q    How large is KMH, the accounting firm?

22  A    Right now we have a little under 70 people.

23  Q    And how many of those are certified public accountants?

24  A    Probably about 30.

25  Q    And the rest are --

1    A    They could either be in the process of taking the exam,

2    but we also have a consulting division within our firm that

3    doesn't require the people there to be certified public

4    accountants.

5    Q    Okay.  Now, tell us, briefly, are you -- you're certified

6    by which state?

7    A    Hawai'i.

8    Q    And what do you have to go through to become a certified

9    public accountant?

10   A    Back in my days -- because it's changed now -- basically,

11   I think we had to have about 120 hours of credits and so many

12   in business, and then we took -- was it a three-and-a-half-day

13   exam to get the certified public accounting license.  Then we

14   had to pass an ethics exam.

15   Q    Do you recall when you received your CPA certificate?

16   A    I think back in about 1979.

17   Q    Even before you graduated law school?

18   A    Yeah, because I could take the exam and get my license

19   prior.  I couldn't get my permit to practice without actual

20   experience, but I could get my -- back then I could get my

21   license by me passing the exam and the ethics exam.

22   Q    So in addition to taking the exam you talked about, is

23   there also another practical experience requirement to become a

24   CPA?

25   A    That's to get your permit to practice.  And what,

1   basically, a permit to practice allowed you to do was to sign

2   off on so-called attest statements, like audited financial

3   statements or review statements or compilation.

4   Q    Okay.  Can you -- KMH began to -- well, let me ask you

5   this.  Did there come a time when KMH was engaged to render

6   services to Waimana?

7   A    Yes.

8   Q    And can you tell the jury how that came about.

9   A    One of my -- well, one of my former partners knew people

10  there, and they started talking.  And then I think it was,

11  basically, to provide some tax planning services how it all

12  started.

13  Q    And who was that former partner of yours?

14  A    His name was Alfred Fernandez.

15  Q    Did there come a time when KMH became involved in the IRS

16  examination?

17  A    Yes.

18  Q    And did there come a time -- do you recall when that was?

19  A    No.  Because I got brought in after Mr. Fernandez passed

20  away.

21  Q    And did KMH also get involved in the tax preparation of

22  Waimana Enterprises?

23  A    Yes, we did.

24  Q    Now, focusing on the tax preparation of Waimana returns,

25  the Waimana -- I think KMH prepared the tax returns for Waimana

1    for the years 2009 through 2012?

2    A    Yes.

3    Q    And tell us the process of -- or let me ask you this.

4    What was your role in terms -- I believe, Mr. Yee, is it

5    correct that you signed the returns for those years?

6    A    Yes, I do -- I did.

7    Q    And tell us what your role was in terms of the preparation

8    of the returns.

9    A    What our general process is is we have certain levels of

10   review.  We have one staff assigned to review the client data

11   and prepare the tax return.  There may be a so-called senior or

12   supervisor, who then double-checks the staff work.  And then a

13   manager may also be assigned to do a third review.  And I come

14   in as the fourth so-called signature review where I look at the

15   final tax return that will be delivered to the client and filed

16   with the government agency and, essentially, go through that

17   return to make sure that overall it looks okay to release.  So

18   it's more of -- the levels are there for quality assurance.

19   Q    Can you turn to the white notebook in front of you.  I

20   believe it's the first tab 1.

21   A    Okay.

22   Q    There's a series of 9 or 10 invoices.  Would you please

23   take a look at those.

24   A    Okay.

25   Q    Are you familiar with these invoices, Mr. Yee?

1    A    Yes.

2    Q    Do you recognize these as coming from the files of KMH?

3    A    Yes, they are.

4    Q    And are these the types of billing invoices that KMH

5    issues to clients in the ordinary course of its business?

6    A    Yes, it is.

7         MR. TOSCHER:  Your Honor, at this point I would offer

8    what's the group of billings which has been marked as Exhibit

9    60-1.

10        MR. HARRINGTON:  No objection to 60-1.

11        THE COURT:  Then it is received.

12        MR. TOSCHER:  Thank you.

13   Q    If you could turn to the second page, I just want to

14   publish so the jury knows what we're talking about.

15        MR. TOSCHER:  I'm sorry.  I apologize, Your Honor.

16   Q    Okay.  Mr. Yee, I'm showing you the second page of 60-B.

17   I don't know if you can see it up there.

18        Just so the jury can see, this is the invoice for the

19   preparation of Waimana's tax return for the year-ended

20   December 31, 2010; correct?

21   A    Yes.

22   Q    And that reflects the charges for that particular year

23   were $17,850?

24   A    Yes.

25        THE COURT:  Mr. Toscher, can you get to the mike.

1              MR. TOSCHER:  Yes, Your Honor.  I apologize.

2    Q    And then there are some other taxes.  So the total amount

3    due upon receipt was $19,999, sir?

4    A    Yes.

5    Q    Just one more.  Go to the invoice for the year ending

6    December 31, 2012, which is about four pages down.

7              You have that in front of you, Mr. Yee?

8    A    I think so.  I can't see that far.

9              THE COURT:  There is a way to make it a little

10   larger.  You have to adjust the machine.  It has to do with the

11   height of the light.

12             MR. TONG:  Is it the seasickness thing?

13             THE COURT:  It's getting bigger.  Yea.  Thank you.

14             MR. TOSCHER:  Thank you, Mr. Tong.

15   Q    Mr. Yee, can you see that now?

16   A    Yes, I can.

17   Q    And this is the invoice for the tax year ending

18   December 31, 2012?

19   A    Yes, it is.

20   Q    And the total of that one is --

21   A    Oh, it's for -- it's for the 2011 return, and then the

22   estimates for 2012.

23   Q    Thank you.  I missed that.  Yes, I see the date is

24   October 15, 2012; so this is for the 2011 return.

25   A    Yes.

```
 1    Q     And the total bill is $21,950.50?

 2    A     Yes.

 3    Q     Plus charges for fees and excise taxes.

 4    A     Yes.

 5    Q     Okay.  I'm going to switch gears a little bit, Mr. Yee.

 6    And in addition to the tax preparation services we talked

 7    about, KMH was also involved in the IRS examination of Waimana?

 8    A     Yes, it is.  Yes.

 9    Q     And KMH took over as the outside CPAs from Chinaka & Siu?

10    A     Yes, we did.

11    Q     Now, did KMH personnel spend a lot of time on that IRS

12    examination?

13    A     Yes, they did.

14    Q     And that was in addition to any time spent by Waimana

15    accounting staff regarding the exam; correct?

16    A     That's correct.

17    Q     The -- could you tell us what the status of the

18    examination was when you were brought in and why you were

19    brought into it.

20              MR. HARRINGTON:  Objection, Your Honor.  Relevance.

21              THE COURT:  I'm going to let him answer.

22              THE WITNESS:  I specifically -- when you say it was

23    KMH being brought in, or specifically me being brought in?

24    BY MR. TOSCHER:

25    Q     Specifically you because I think you testified that --
```

1    well, there were others involved in the examination; correct?

2    A    Correct.  I was specifically brought in to help move the

3    audit along because it was dragging on.

4    Q    Okay.  And do you recall at the time you came in how much

5    information had already been requested by the Internal Revenue

6    Service?

7              MR. HARRINGTON:  Objection, Your Honor.  Relevance.

8              THE COURT:  Okay.  I also don't know since you

9    haven't established personal knowledge.  I will sustain the

10   objection.

11   BY MR. TOSCHER:

12   Q    Okay.  Mr. Yee, do you have personal knowledge of the

13   level of requests that had been made to the company and the

14   prior CPAs when the time you got on?

15   A    Yes.  Well, from the prior CPAs, we came in after over 60

16   information document requests from the IRS agent.  And I know

17   we also had responded to additional informational document

18   requests before I got involved.

19   Q    So you said 60 informational document requests.  What is

20   an "informational document request"?

21   A    That's a method that the Internal Revenue Service uses to

22   request information from the taxpayer regarding the tax return.

23   Q    And given your knowledge of the companies and the audit,

24   did that seem to you to be a very large number of IDRs?

25             MR. HARRINGTON:  Objection, Your Honor.

1    Speculation.

2            THE COURT:   Sustained.

3    BY MR. TOSCHER:

4    Q    In your practice is it -- do you normally see this level

5    of information document requests?

6            MR. HARRINGTON:   Objection, Your Honor, as calling

7    for an opinion.

8            MR. TOSCHER:   It's part of his business, Your Honor.

9            THE COURT:   I'm actually struggling with what is the

10    relevance of this?

11            MR. TOSCHER:   I'm trying to show the context.

12            THE COURT:   Okay.   I'll see you at the bench.   I'll

13    see you at the bench.

14        (At sidebar on the record:)

15            MR. TOSCHER:   Your Honor, I'm trying to show the

16    context of what was going on in the examination.   The

17    government has charged, with respect to the jury instructions,

18    that Mr. -- the client was impairing and impeding the due

19    administration and investigation, not just the tax returns but

20    all the way through.   And I'm trying to lay -- I want all the

21    circumstances as to what's been going on.

22            MR. HARRINGTON:   Your Honor, I don't think it's

23    relevant under 401, and, furthermore, it should be excluded

24    under 403.   There's really little to no prohibitive value of

25    what happened during the audit, as far as what KMH was turning

1  over as part of that process.  Unless there's additional

2  foundation laid, he's just asking what KMH was involved in.

3  KMH isn't the one that's on trial in this case.

4          THE COURT:  Is the corruptly obstructing, endeavoring

5  to obstruct and impede charge based in any part on what KMH --

6  after KMH came in as the accountant?

7          MR. HARRINGTON:  It hasn't been part of any of the

8  evidence we've presented in our case in chief.

9          THE COURT:  And you're not relying on it for that

10  count?

11          MR. HARRINGTON:  We're not relying on it for that

12  count.

13          THE COURT:  Okay.  So then --

14          MR. TOSCHER:  Your Honor, it's part of their charge

15  in their instructions, and we have to --

16          THE COURT:  But not for what KMH was involved with

17  he's saying.

18          MR. TOSCHER:  Well, KMH was part of the process, or

19  are they willing to concede now --

20          THE COURT:  I think he's saying they're -- the charge

21  they're not alleging; is that right?

22          MR. HARRINGTON:  Yeah, Your Honor, I mean, as we

23  presented in our case, our case is about what information

24  necessarily was provided by the client to KMH.  Our case in

25  chief did not include evidence of what was provided in IDR

1    requests and what else happened in the audit.  We just didn't

2    have any of that as part of our case in chief; so it's not

3    part of --

4              MR. TOSCHER:  This all goes to the circumstances as

5    to what was going on, Your Honor.

6              THE COURT:  But why is that relevant?  If he's

7    convicted, it won't be based on what happened involving KMH.

8              MR. TOSCHER:  Well, but I think the period of time,

9    Your Honor, covers all the way through 2012.

10             MR. HARRINGTON:  That's true.  It does -- the

11   indictment does go all the way through 2012.  But again, as

12   part of our case in chief, the testimony we were eliciting was

13   that information was not provided to the accountants.  For

14   example, when we had the staff accountants from this firm

15   testify, they weren't aware of certain expenses, and that was

16   the testimony we were giving out in our case.  We did not

17   elicit testimony about the audit -- about information not being

18   provided in the audit.  It was more about what the defendant

19   was providing to his accountant.

20             Again, we just haven't -- it hasn't been part of our

21   case in chief about information document requests.

22             THE COURT:  So they're maintaining the proof that

23   they're relying on --

24             MR. TOSCHER:  Right.  But the other point, Your

25   Honor, is the accountants have two sets of information:  stuff

1    they're learning during the audit, which is relevant to their

2    reporting positions; and the more narrow view that

3    Mr. Harrington is talking about:  what information they may

4    have gotten from the accountants.  They had information about

5    all these issues that they learned during the audit.  And --

6           THE COURT:  Okay.  So, I'm sorry, but I'm actually

7    not following what's going on here at all.  Because you're

8    saying you need this for the obstruct or impede defense.  He's

9    saying the obstruct and impede count is not relying on what was

10   occurring during this audit where KMH was responding to IRS

11   inquiries.  So there's, like, a disconnect here.  I'm sorry.

12          MR. TOSCHER:  Okay.  But if that's what they're going

13   to limit it to, then we need to make that clear in terms of

14   instructions.  It's never been clear before.  It's not in the

15   instructions.

16          THE COURT:  They rested without putting on evidence

17   of a problem involving KMH's responses.

18          MR. TOSCHER:  Right.  But I am entitled to establish

19   through them the level of knowledge they had that they acquired

20   during the -- they were involved in the audit, that they knew

21   when they were preparing these tax returns, as they continue to

22   prepare tax returns.

23          THE COURT:  So this is not going to obstruct or

24   impede anymore.  It's going to the filing of false tax return

25   counts?

1          MR. TOSCHER:  No.  Because the government is also --

2    he's saying, okay, we're not claiming an obstruction and

3    impeding regarding the conduct during the audit.  That's what I

4    hear him.

5          THE COURT:  Yeah.

6          MR. TOSCHER:  But they are claiming obstruction and

7    impeding regarding the filing of the tax returns.  They're

8    coming at it two ways, Your Honor.  And maybe Mr. Harrington

9    can explain it because it is odd that they would do that.  But

10   they're saying it both ways.

11         MR. HARRINGTON:  Well, I'm -- just maybe to clarify

12   what we're talking about, the 7206(1) counts are only about his

13   personal returns.  The 7212(a) includes both corporate and

14   personal as part of the indictment.  So is that what you're

15   referring to?

16         MR. TOSCHER:  That's correct.

17         MR. HARRINGTON:  So --

18         MR. TOSCHER:  They're charged, the filing of the

19   returns, as part of their 7212 charge.  They're not just

20   limiting it to -- the individual counts relate to the

21   individual returns.

22         MR. HARRINGTON:  I mean, it's the same position.

23   We're talking about two different things.  We're talking about

24   the audit versus the preparation of the tax return.  So, I

25   mean, I'm not really sure what else to add.

1          THE COURT:  On the audit you're not relying on

2   anything for KMH's involvement responding to requests; correct?

3          MR. HARRINGTON:  Correct.  That was not part of our

4   case in chief.  Correct.

5          THE COURT:  So on the audit part.  Weren't you asking

6   him about audit issues?

7          MR. TOSCHER:  Right.  But the level -- right.  And I

8   was asking -- but the level of information they obtain in the

9   audit and their involvement in the audit is substantial for

10  their knowledge and what they knew about other issues in the

11  case.  The accountants learned things, not only in the

12  preparation of returns, but they're learning things during the

13  examination.

14         THE COURT:  Okay.  But why do you need to know what

15  they learned in the examination --

16         MR. TOSCHER:  Because --

17         THE COURT:  -- when they were audit-related

18  inquiries?

19         MR. TOSCHER:  Because their knowledge that they

20  obtained during the audit is directly relevant to what their

21  knowledge during the preparation of the tax returns.

22         Your Honor --

23         MR. HARRINGTON:  If I can add --

24         THE COURT:  I'm going to excuse them.

25      (In open court on the record:)

1          THE COURT:  I'm going to give you a break.  This

2     might be a while; so wait till Miss Fujinaga comes to get you.

3     It will be at least 15 minutes.  Okay?

4          And the witness can step down and leave the courtroom

5     for now, but don't go too far.

6          THE WITNESS:  Okay.

7        (Jury and witness excused.)

8          THE COURT:  Okay, Mr. Toscher.  Sorry you need to

9     walk me through this.

10          Yeah, please.

11          MR. TOSCHER:  May it please the Court.  I'm trying to

12     establish through the witness their involvement in the IRS

13     audit, which we will see was substantial.  We've seen some

14     evidence.  Because it shows their level of knowledge regarding

15     a lot of these issues which end up appearing or still that

16     appear on the tax returns which the government has charged in

17     the returns that they prepared for '9, '10, '11, and '12.  And

18     their knowledge regarding -- that's the level of activity.  The

19     government has tried to claim we just get this much information

20     30 days before the filing, and we're going to talk about that a

21     little bit, but -- and that is their case in chief, but we want

22     to bring out the other side.  They were involved in the

23     examination.

24          THE COURT:  Wait, now.  So KMH was involved in the

25     audit conducted of Waimana Enterprises.

1            MR. TOSCHER:  Correct.

2            THE COURT:  Okay.  And the IRS was sending all of

3    these requests for information in connection with Waimana

4    Enterprises.

5            MR. TOSCHER:  Correct.

6            THE COURT:  And the government is saying none of the

7    obstruct or impede count relates to KMH's involvement with the

8    IRS's inquiries.  So you're saying that KMH's involvement with

9    these inquiries affected the preparation of the individual tax

10   returns; is that what you're saying?

11           MR. TOSCHER:  It certainly bears on the level of

12   knowledge that KMH acquired and knew.

13           THE COURT:  Knowledge about --

14           MR. TOSCHER:  The tax affairs of Waimana and all the

15   issues we're talking about here.

16           In other words, many of these issues that the

17   government has charged, the issue of a loan which is continued

18   on throughout the years, that these accountants have stayed

19   with that, you know, reporting it, these all -- these came up

20   during the examination.  60 IDRs, these questions come up.  And

21   their level of knowledge is relevant to -- if we recall, we

22   went through some of the engagement letters.  It's what is

23   provided to them and what they know.

24           I think I can connect up, Your Honor, with some other

25   questions because we'll see some evidence regarding issues

```
 1    they've spotted and thought were wrong and they were going to
 2    be makes corrections of those and issues in which, you know,
 3    they were not ready to agree with the IRS yet on.  But their
 4    level of knowledge of these things bears on this charge of
 5    these continuing -- not only the false returns, okay, the
 6    allegation on the individual returns, but also the government
 7    has charged the core -- in fact, now the government is saying
 8    the only allegation why Mr. Hee is charged with a violation of
 9    7212 is because of -- well, in part the reporting on Waimana's
10    tax returns.
11             THE COURT:  Okay.  And so, basically, you're saying
12    the level of knowledge of KMH is relevant because --
13             MR. TOSCHER:  Because the government.
14             THE COURT:  -- KMH should have done things
15    differently, and it's KMH's fault, not Mr. Hee's?
16             MR. TOSCHER:  No.
17             THE COURT:  I'm still having a hard time following.
18             MR. TOSCHER:  It's not a matter of blaming.  The
19    government has made a big deal is that KMH only had limited
20    information.  They had a lot more information regarding many of
21    these issues in connection --
22             THE COURT:  So that's my point.  Is it that, gee, KMH
23    should have picked up on things and handled things differently?
24    Is that the gist?
25             MR. TOSCHER:  We're going to hear why they handled
```

1   the things the way they did from Mr. Yee.

2            THE COURT:  But none of what they did -- so that's

3   why I'm pressing you.  Is the relevance that they should have

4   done things differently so that whatever Mr. Hee is charged

5   with falsely filing is the accountants' fault?  Is that the

6   basic point?

7            MR. TOSCHER:  Not their fault, but the relevance is

8   based upon what they had they did not see fit to change the

9   positions being taken.  And these are professionals.

10            THE COURT:  Okay.

11            MR. TOSCHER:  And he'll tell you why they didn't

12   change these positions.

13            THE COURT:  Which positions?

14            MR. TOSCHER:  Well, I think the shareholder loan is

15   one of them.  You know, there may be the -- Mr. Kawafuchi says

16   the 2004 MIT tuition.  What I want to establish, Your Honor, is

17   that they spent a lot of time in the examination, and they knew

18   about these issues.  And their practice is, if they see an

19   issue which is wrong, they will go ahead and recommend that we

20   change it.  If they see an issue which there is a dispute, they

21   wait for -- to deal with the IRS to do it.  And that's what I

22   want to bring out, and I think that's relevant in this case in

23   terms of the taxpayer's -- he's being charged with corruptly

24   obstructing and impairing, and this is a man and Waimana is

25   doing what the accountants are telling him to do, and I'm

1    entitled to bring that out.

2          THE COURT:  Okay.  Mr. Harrington, what's your

3    response?

4          MR. HARRINGTON:  I guess I'm a little confused.

5    Originally, it wasn't a reliance defense, but now it sounds

6    like it is a reliance defense, and that's kind of the confusion

7    I'm having.  I guess the main issue we have is that this whole

8    context of the audit, how many information document requests,

9    all of that is not material to anything in the case.  I suppose

10   what could be material is what they knew and when they knew it.

11   But if it's not a reliance defense, I'm not sure why it matters

12   what KMH's practice is as far as how they would respond.

13         THE COURT:  Well, that's why I'm pressing on that.

14   I'm still a little hazy.

15         MR. TOSCHER:  He's very narrowly calling a reliance

16   defense.  I'm looking at the totality and facts and

17   circumstances of what was done here.

18         There were issues raised, and KMH continued to take

19   the positions on the returns, making disclosures, you know,

20   that there are issues, waiting for the audit to get complete,

21   and then it got switched over to the Criminal Investigation

22   Division.  This shows the taxpayer's good faith or shows how

23   these things operate and what was being done here.  The

24   government takes a too far narrow view, Your Honor.

25         THE COURT:  Well, I'm going to let him go some ways

1    with this because it does sound like -- although, the defense
2    is hedging a little bit -- it does sound like that this is, you
3    know, gee, the accountants didn't do things; so how is Mr. Hee
4    supposed to know he should do things differently?  I think
5    that's the gist of it, and for that he gets to ask what the
6    accountants did.  If that's --
7              MR. TOSCHER:  That's it, Your Honor.
8              THE COURT:  If I'm correctly understanding this.
9              Can you pull your mike closer, Mr. Harrington.
10             MR. HARRINGTON:  Just the other part that I'd like a
11   little clarification on is I heard a little bit about what his
12   usual practice would be.  I think the testimony should be
13   limited to what actually he did since he's not being offered as
14   an expert.  So as far as usual practice and what you would do
15   in a typical audit I don't think is appropriate testimony.
16             THE COURT:  I think that's fair.  If he's the
17   percipient witness category, you can ask --
18             MR. TOSCHER:  I can ask him what he did and ask him
19   if it's consistent with his normal practice, though, can't I,
20   Your Honor?  I'm not asking for an opinion in a vacuum.  I'm
21   trying to establish what he did, and that's the way they do
22   it.
23             THE COURT:  I think he can do that.
24             MR. HARRINGTON:  As long as it's connected to what he
25   actually did.

```
 1            THE COURT:  Okay.  Well, let's take a 10-minute break
 2   ourselves, and then we'll have the jury come back.
 3            MR. TOSCHER:  Thank you, Your Honor.
 4       (Court recessed at 10:52 A.M., until 11:11 A.M.)
 5            THE COURT:  The witness can get back on the stand.
 6            Okay, Mr. Toscher.  Do you remember where you were?
 7            MR. TOSCHER:  Not really, but I'll figure it out.
 8            THE COURT:  Are you okay?
 9            MR. TOSCHER:  I'm fine, Your Honor.  Yes.  Thank you.
10            Just joking a little.
11   Q    Mr. Yee, could you look at the white notebook in front of
12   you and look at tabs 2, 3, and 4.
13   A    Okay.
14   Q    Have you had a chance to look at them?
15   A    Yes, I have.
16   Q    I'm going to ask you the first question with tab 2, which
17   has been marked for identification as defense Exhibit 60-2.  Do
18   you recognize this as coming from the files of KMH?
19   A    Yes, I do recognize it.
20   Q    A document that's prepared in the ordinary course of KMH's
21   business?
22   A    Yes, it is.
23   Q    And what about 60-3?  The same?
24   A    Yes.
25   Q    And 60-4?
```

1    A    Yes.

2            MR. TOSCHER:  Your Honor, at this point I would offer

3    60-2, 60-3, and 60-4 into evidence before I question the

4    witness about it.

5            MR. HARRINGTON:  Your Honor, may I voir dire?  I

6    don't think there's been enough foundation.

7            THE COURT:  Okay.

8            MR. HARRINGTON:  Do you want me to do it from here?

9            THE COURT:  You can.

10                     VOIR-DIRE EXAMINATION

11   BY MR. HARRINGTON:

12   Q    When was this document prepared, the one in tab 2 through

13   4?  When were those prepared?

14   A    I don't recollect when my staff started the actual

15   preparation of the amended returns.

16   Q    And these documents are unsigned?

17   A    These are all drafts.  They were never finalized.

18   Q    Okay.  So they have no signatures on them?

19   A    No.

20   Q    And they've never been filed with the IRS?

21   A    They have not been filed.

22            MR. HARRINGTON:  I would object to the documents on

23   both relevance and under 403 for confusion of the jury.

24            THE COURT:  Are these different from what we're --

25            MR. TOSCHER:  Your Honor, these are draft amended

1   returns which were never filed but shows what KMH was doing at

2   the time during --

3           THE COURT:  And were returns actually filed?

4           MR. TOSCHER:  Oh, yes.  But these are --

5           THE COURT:  Amended returns for these periods?

6           MR. TOSCHER:  No, Your Honor, I do not believe so.

7           THE COURT:  I see.  Well, overruled.  I'm going to

8   receive 2, 3, and 4.  They do have the draft stamp on every

9   page; so I'm not too worried about the confusion.  Received.

10                  DIRECT EXAMINATION (Resumed)

11  BY MR. TOSCHER:

12  Q   Mr. Yee, let's turn to defense exhibit 60-2.  I'm going to

13  ask you to go to the second page.

14          Now, this is a -- tell us what this is.  This is a

15  draft amended corporate tax return for what company?

16  A   This is for Waimana Enterprises.

17  Q   And can you tell us the circumstance of why KMH prepared a

18  draft amended tax return?

19          MR. HARRINGTON:  Objection on foundation.  He said he

20  doesn't even know who prepared the document.

21          THE COURT:  Sustained.

22  BY MR. TOSCHER:

23  Q   Mr. Yee, did KMH prepare this document?

24  A   Yes.  We did.

25  Q   And do you recognize this as coming from the files of KMH?

1    A    Yes.

2    Q    And this would have been prepared by your staff working

3    under your supervision?

4    A    Yes.

5    Q    Do you know the circumstances of why this amended draft

6    tax return was being prepared?

7    A    Well, at the time period two things would have caused the

8    amended return being prepared.  One is, when we prepare the

9    original return, subsequent to the filing there may be changes

10   in the information that was previously provided to us; so we

11   would go back and amend the original return filed.  And the

12   other circumstance would be, if something came out of the IRS

13   audit that we felt was an error on the original return, we

14   would have also prepared or added that to the amended return

15   Q    Okay.  And is that a typical practice you do in your field

16   at KMH?

17   A    Yes.  We do amend quite a few returns.

18   Q    And so this is the -- I'm going with exhibit -- exhibit

19   60-2, which is the amended return for the year 2008.  I'm

20   publishing the first page.

21        Can you walk us through what the first page is

22   telling us on this amended return just so the jury has an

23   understanding.

24        MR. HARRINGTON:  Objection again to foundation.  He

25   hasn't testified he's the one who prepared it, he doesn't know

1   who prepared the form.

2          THE COURT:  He's just asking to describe what's

3   there.  It's in evidence.  Overruled.

4          THE WITNESS:  Okay.  Column A shows what the amounts

5   were for major subtotal lines or total lines that were shown on

6   the original return.  Column B shows changes to those numbers

7   reported on the original return, and then Column C is the

8   corrected amounts.

9   BY MR. TOSCHER:

10  Q    And if we go down to the bottom, there's a recomputation

11  of tax.  And at this point the determination on this draft is

12  even with these changes there is no additional tax due; is that

13  correct?

14  A    That's correct.

15  Q    I'm going to ask you to turn to the second page of the

16  exhibit.

17         Describe what this is.  Is this where the -- you give

18  a reason for the changes that were on the first page?

19  A    Yes.

20  Q    Now, I'm going to ask you a question.  Now, there are a

21  number of issues here.

22         Total income increase.  You say increase to total

23  income is due to 8400 of gross rents received.

24         Do you know, does that relate to the Santa Clara

25  property?

1    A    Yes, it does.

2    Q    And even with the change that KMH was considering at the

3    time, when we looked at the first page, there was no additional

4    tax due; is that correct?

5    A    That's correct.

6    Q    Now, you testified a few minutes ago as to what you would

7    put on a draft amended return and what you would not put on a

8    draft amended return.  But before I get to that, this draft

9    amended return was never filed, was it not?

10   A    To my knowledge it has not been filed.

11   Q    And why wasn't it filed?

12   A    We were waiting for the conclusion of the IRS audit in

13   case additional adjustments had to be included on the amended

14   returns.

15   Q    And why do you wait?

16   A    Because we don't want to continually file amended returns,

17   and then another amended return, which would just drive up the

18   cost of -- to the taxpayer to prepare these.  Plus, with

19   numerous amended returns going in, it does confuse the IRS.

20   Q    Okay.  And at this point in the amended returns in these

21   exhibits, this is at the stage of the issues that you, as the

22   accountants, agree should be adjusted; correct?

23   A    Correct.

24   Q    And doesn't include any of the other issues that have been

25   raised by the IRS.

1    A    No, not in these specific drafts.

2    Q    Just quickly, Mr. Yee, if you could turn to 60-3.  And

3    we -- I don't think we need to publish it.

4         The second page.  This is the amended -- draft

5    amended tax return for Waimana for the year 2009, sir?

6    A    Yes.

7    Q    And here, we'll just -- since we're here.

8         And it shows a total of net changes $36,000 of

9    additional income, increasing total income to sixty-four

10   million two hundred one.  And with the changes we're going to

11   look at in a second -- with the changes we're going to look at

12   in a second -- apologize, Your Honor.

13        With all the changes you're considering at this point

14   that KMH is in agreement with, you show a tax overpayment of

15   11,223; is that correct?

16   A    Yes.

17   Q    Now, I'm going to show -- turn to the second page.

18        The second page lists that the $36,000 is a

19   culmination of a lot of all of these adjustments to come to

20   that 36,000; is that correct?

21   A    Yes.  That's correct.

22   Q    If you can go to the fourth tab, that's an amended tax

23   return for what year, Mr. Yee?

24   A    It's for the tax year December 2010.

25   Q    This same methodology:  income is reported; the net

1   adjustments that you came up with; and then you come up with a

2   new number.   And in this one on your draft on the issues you're

3   in agreement with, you believe there could be 37,579 of

4   additional tax due; is that correct?

5   A     That's correct.

6   Q     I'm going to turn topics, Mr. Yee.   You can put the book

7   away.

8            Can I ask the government to publish exhibit 12-2,

9   pages 590 to 594.   Could we blow it up just a little bit so

10  Mr. Yee can see it.

11           Can we go -- Mr. Yee, do you recognize this as a

12  standard KMH engagement letter?

13  A     Yes, it is.

14  Q     And you've seen this before?

15  A     Yes, I have.

16  Q     Can you scroll down to the signature page first.   I think

17  maybe he signed it.

18           This is the signature page of the engagement

19  agreement.   And that's your signature, sir?

20  A     Yes, it is.

21  Q     Can we go up to the -- I think the third page, 3 of 7.

22           I'm sorry, the second page, Standards for Return

23  Preparers.   Can you blow that up and highlight it, please.

24  There we go.   That's fine.

25           Mr. Yee, is it fair to say that you probably had a

1   hand in drafting the standard engagement letter?

2   A    We -- we're a so-called subscription firm for a national

3   firm, and they provide us with best practice type templates.

4   So we take their template, which this is where it's from, and

5   then we review it to customize it for our firm.

6   Q    And this is saying that a tax preparer needs to believe

7   there is a 33 percent chance of success to be able to sign a

8   tax return without additional disclosure.

9   A    Yes.

10  Q    And that reflects the law in this area; is that correct?

11  A    That's correct.

12  Q    And the -- so a preparer doesn't have to be a hundred

13  percent correct, do they?

14  A    No, we don't.

15  Q    50 percent; correct?

16  A    Not in the context of that particular sentence, no.

17  Q    But just 33 percent:  one out of three chances.

18  A    Yes.

19  Q    Now, are you familiar with the standards governing -- the

20  standards governing taxpayers are very similar to this, are

21  they not?

22  A    Actually, at one point taxpayers had a lower standard than

23  preparers.

24  Q    A lower standard.

25  A    Yes.  And then --

1    Q    Go ahead.

2    A    Because practitioners felt that was unfair, I think in '08

3    they changed the law or amended the law to make it roughly the

4    same.

5    Q    And do you have an understanding as to why this is part of

6    your practice and engagement?  Why is it that you can file a

7    tax return only believing that you're 33 percent correct:  1

8    out of 3?

9    A    Because if you look at what we're actually responsible

10   for, preparing the return, we're not responsible for what is

11   provided to the client in terms of the overall accuracy of the

12   information, meaning that the information is a hundred percent

13   correct.  If there's something that we see or reasonably should

14   have looked at, then we do inquire as to what a particular item

15   might be.  So we're not there to give a hundred percent

16   guarantee that all the information is 100 percent correct.

17   We're only there for 33 percent.

18   Q    Right.  And is it also due because of complexity of the

19   law?

20   A    Yes.

21   Q    Okay.  Now, I think we've received some -- you can take

22   that down.  Thank you.

23          There has been some testimony about the timing of

24   receiving information -- KMH'S receipt of information for the

25   purposes of preparation of these corporate returns.  That

1    information was coming in in the last 30 days.  Is that a

2    normal problem among clients and accountants getting the

3    accountants all the information they need to timely prepare the

4    returns?

5    A    Yes.

6    Q    And if you felt a client was not being cooperative with

7    you, delaying giving you information, what would you do

8    regarding a client like that?

9    A    We would look at terminating the client.

10   Q    And you've never terminated Waimana, have you?

11   A    No, we have not.

12   Q    Have you always felt that Waimana fully and completely

13   cooperated with KMH?

14   A    Yes.

15   Q    Now, if you believe, during the course of your engagement,

16   that you learned information that they were engaging in

17   improper or fraudulent activities, what would you do?

18   A    Well, if you said we clearly knew -- if we somehow clearly

19   had knowledge that something was fraudulent?

20   Q    Right.

21   A    We would disengage.

22   Q    And you've not disengaged Waimana, have you?

23   A    No.

24           MR. TOSCHER:  I'm going to ask that the government --

25   or let's see.  Government to publish exhibit 12-3, Bates 938 to

1    1009.

2              It's a very long exhibit; so -- government exhibit.

3              Can you go to page 1009.  I'm sorry.  I apologize,

4    12-4.

5              THE COURT:  12-4, what page?

6              MR. TOSCHER:  12-4 Bates 938 and then we'll go to

7    1009.  There are two pages I'd like to publish.

8              THE COURT:  So first 938?

9              MR. TOSCHER:  Right.

10   Q    This is already in evidence, Mr. Yee.  Can you tell us

11   what this is?  It looks like a Form 2011 1120.  Is that your

12   signature at the bottom, sir?

13   A    Yes, it is.

14   Q    Okay.  And is this a copy of the tax return prepared and

15   filed by KMH on behalf of Waimana for the year 2011?

16   A    Yes.

17   Q    Okay.  Can I ask you to go to page 1009.  And can you blow

18   that up a little bit?

19              This is a disclosure statement that was attached to

20   the return which was filed?

21   A    Yes.

22   Q    And did you attach this -- and you filed this with this

23   return.  Can you tell the jury why you use disclosures like

24   this in tax returns you file.

25   A    Well, in the normal course of business, when taxpayers

1    bring their information in, it's brought to our knowledge that

2    the information is either estimated or not complete.  So in the

3    spirit of full disclosure we insert those statements to alert

4    the Internal Revenue Service that once the information -- or

5    the actual information is provided is that we would amend the

6    tax returns.

7    Q    And you did this in connection with Waimana's 2011 return.

8    And is this part of your standard practice, sir?

9    A    Yes.

10             MR. TOSCHER:  Can I ask the government to bring up

11   12-5, starting with page 384.  Government 12-5.

12   Q    Could you tell us what this page represents, Mr. Yee.

13   A    Similar to 2011, this is the 2012 corporate tax return for

14   Waimana and its subsidiaries.

15   Q    And did you sign this tax return, Mr. Yee?

16   A    Yes, I did.

17   Q    Can I ask that we go to page 450, please.  If we can blow

18   it up.

19             This is a similar or the same type of disclosure that

20   was made in the 2011 return?

21   A    Yes.

22   Q    And for the same reasons?

23   A    Yes.

24             MR. TOSCHER:  I have no further questions.

25                              CROSS-EXAMINATION

1    BY MR. HARRINGTON:

2    Q    Good morning, Mr. Yee.

3    A    Good morning.

4    Q    Could we please pull up the signature page of the last tax

5    return we were shown.  And if we could blow up the bottom where

6    it says "Sign Here."  So this says:  Under penalties of perjury

7    I declare that I examined the return, including the

8    accompanying schedules and statements.  To the best of my

9    knowledge and belief, it is true and correct and complete.

10            Do you see that?

11   A    Yes.

12   Q    So this is signed under penalty of perjury; right?

13   A    Correct.

14   Q    And that it's a correct statement; is that right?

15   A    Correct.

16   Q    And you had the authority of the defendant Albert Hee to

17   file this return; is that right?

18   A    When you said we -- I mean, when you say authority to

19   file, we can't sign another tax -- a taxpayer's return.

20   Q    He signed the return.

21   A    He signs the tax return.

22   Q    That allowed you to file the return; right?

23   A    If we are so instructed to.

24   Q    Were you instructed to file the return after he signed it?

25   A    Yes.

1    Q    Okay.  Now, this is the -- could we blow up to the top.

2    It's a 2012 return.

3              You didn't prepare the 2008 return for Waimana; is

4    that correct?

5    A    Yes.

6    Q    But you did prepare the 2009 return?

7    A    Yes, we did.

8    Q    And you were shown an amended tax return; is that right?

9    A    For 2009.

10   Q    Right.

11   A    Yes.

12   Q    And you didn't prepare this amended tax return?

13   A    Our firm did.

14   Q    But you did not personally prepare it.

15   A    No.

16   Q    And you don't know who actually prepared it?

17   A    Not the exact staff assigned, no.

18   Q    So you don't know the details of how the information got

19   put in or where the numbers came from?

20   A    Well, the numbers come from the client.

21   Q    Okay.  So the numbers came from the client.

22   A    (Nods head.)

23   Q    Sorry.  You got to answer verbally.

24              The numbers came from the client?

25   A    Right.  Yes, the numbers came from the client.

1    Q    But you didn't have anything to do with actually inputting

2    the numbers into the form itself.

3    A    Quite honestly, that's not what I -- my position.

4    Q    Sure.  So it would be fair to say that your review is at

5    the highest level; right?

6    A    Yes, I am.

7    Q    Okay.  And it would be fair to say that maybe when you're

8    reviewing a return that's actually going to be filed, you spend

9    15 to 30 minutes reviewing it?

10   A    Yes.

11   Q    So the people who actually prepared it would be the ones

12   who would be able to tell us where all this information came

13   from?

14   A    Yes.

15   Q    Now, we also looked at an amended return for 2008.  Do you

16   remember that?  It was defense exhibit 60-2.

17   A    Yes.

18   Q    So this amended return was prepared because information

19   was incorrect on the 2008 return?

20   A    Yes.

21   Q    And that would be the same for all the different amended

22   drafts that we saw?

23   A    Yes.

24   Q    And so, specifically, I think you were asked about that

25   2008 had to do with the Santa Clara property; is that right?

 1   A     Yes.

 2   Q     And now that's because nobody told KMH what the Santa

 3   Clara property was being used for; right?

 4   A     Well, we didn't prepare the original return.  We

 5   discovered it after and went back to amend.

 6   Q     But you didn't know about the use of the Santa Clara

 7   property in 2009 either; right?

 8   A     Oh, no, we did not.

 9   Q     Or in 2010?

10   A     Or 2010.

11   Q     Or in 2011.

12   A     I don't think in 2011.

13   Q     You don't think that you knew what the use of the Santa

14   Clara property was?

15   A     Right.

16   Q     And it wasn't until later -- and it wasn't even the client

17   who told you what the use of the Santa Clara property was;

18   right?

19   A     Well -- well, we talked with counsel.

20   Q     Okay.  And counsel from where?  From the client or your

21   own counsel?

22   A     Our own counsel.

23   Q     Now, if we could pull up exhibit 9-3, please, which is

24   already in evidence.

25         Now, you may not have seen this before.  If we could

1    zoom up to the top.  And so this is a report about the purchase

2    of the Santa Clara property.

3              And again, in 2008 you had an amended return that you

4    prepared or that your firm prepared, and it was to include the

5    use of the Santa Clara property; right?

6    A    Right.

7    Q    Okay.  If we could go to the second page, please.  And if

8    we could blow up the bottom half, please.

9              And so you'll see that's -- you recognize that as

10   defendant Albert Hee's signature?

11   A    I cannot confirm that that's his signature.

12   Q    So you don't know what his signature looks like?

13   A    No.

14   Q    Okay.  So if we look at on here it has a line at E, and

15   there's question.  It says:  Does the property produce income?

16   And it says:  No.  Do you see that?

17   A    Yes.

18   Q    And so that means that whoever signed this form here was

19   saying that there was no rental income from the property; is

20   that right?

21   A    I -- I'm not sure what that question pertains to.  I'm not

22   familiar with the form.

23   Q    Okay.  But now we know that in 2008 there actually was

24   rental income from the property; right?

25   A    Yes.

1    Q     Now, we talked a little bit about the Santa Clara

2    property, but that wasn't the only thing that KMH was unaware

3    of when it was preparing the 2009, 2010, and 2011 returns.  In

4    fact, specifically, KMH wasn't aware that Mr. Hee's wife and

5    his children were receiving a salary; is that right?

6    A     We were not aware of that.

7    Q     And you didn't even find that out until 2013; is that

8    right?

9    A     I'm not sure exactly when we discovered it.

10   Q     Okay.  But later than --

11   A     But later after the return was filed, yes.

12   Q     And we looked at the engagement letter.  And I think one

13   of the things you emphasized was that you were asked about

14   percentages that a tax preparer needs to have in mind when

15   they're filing a return.  But what's very clear is that the

16   client is under an obligation to give you honest and accurate

17   information; is that right?

18   A     That's correct.

19         MR. HARRINGTON:  Just one moment, please.

20         (Counsel conferring.)

21   BY MR. HARRINGTON:

22   Q     Okay.  Just backing up for one second.  You said you found

23   out about the Santa Clara purchase -- I believe it was the

24   Santa Clara purchase -- from your counsel?

25   A     Yes.

1   Q     And so that was an attorney.

2   A     Yes.

3   Q     So who was that attorney?

4   A     From my knowledge Howard Chang.

5   Q     Okay.  And was that an attorney that your firm hired?

6   A     Yes.

7              MR. HARRINGTON:  No further questions.

8              MR. TOSCHER:  Your Honor, could I have just one

9   minute here.

10             THE COURT:  Okay.

11         (Counsel conferring.)

12                        RE-DIRECT EXAMINATION

13  BY MR. TOSCHER:

14  Q     Can I ask you to republish 9-3.  Can you go to the top

15  part of it, please.  Can you get up here?

16             Let me ask you this, Mr. Yee.  Do you know what a

17  preliminary change of ownership report is?

18  A     I'm not familiar with that specific form.

19  Q     Okay.  It's a -- okay.  So can you go to page 283 -- or go

20  to the bottom of this form, please, first, where the signature

21  page is.  There was -- okay.  There is no date of when it's

22  signed; is that correct?

23  A     Yes.

24  Q     Okay.  Can you go to page 283, please.  Can we blow this

25  area up here?  There's a fax date on here.

1            So this form appears to have been filled out or faxed

2    at or about June 12, 2008; is that correct?

3    A     Yes.

4            MR. TOSCHER:  No further questions, Your Honor.

5            MR. HARRINGTON:  Nothing further, Your Honor.

6            THE COURT:  Okay.  Then the witness is excused.  You

7    may step down and leave the courtroom.

8       (Witness excused.)

9            THE COURT:  And, Mr. Toscher, who's your next

10   witness?

11           Who's your next witness?

12           MR. TOSCHER:  I'm sorry.  Michelle Kauhane.

13           THE COURT:  Okay.

14      (Witness photographed.)

15           THE CLERK:  Please raise your right hand.

16           Please stand and raise your right hand.

17      (Witness sworn.)

18           THE CLERK:  Thank you.  Please be seated.

19           Please state your name and spell your last name.

20           THE WITNESS:  My name is Michelle Kauhane,

21   K-a-u-h-a-n-e.

22                      DIRECT EXAMINATION

23   BY MR. TOSCHER:

24   Q     May it please the Court.  Ladies and gentlemen.

25           Where do you reside?

1   A    I reside --

2   Q    Without -- just give a general location, not your personal

3   address.

4   A    In Kapolei on Kaupe'a Homestead.

5   Q    And when you say a homestead, is that residing on a

6   Hawaiian Homelands homestead?

7   A    Yes.

8   Q    And how long have you lived in Hawai'i?

9   A    I've lived in Hawai'i all my life.

10  Q    Okay.  What part of Hawai'i were you born in?

11  A    Born and raised in Kane'ohe.

12  Q    Okay.  Did you go to high school here?

13  A    Yes, I did.

14  Q    And what high school did you go to?

15  A    To Kamehameha Schools.

16  Q    And do you recall the year you graduated?

17  A    1986.

18  Q    Okay.  Did you go to college?

19  A    Yes, I did.

20  Q    And what college did you graduate?

21  A    Gonzaga University.

22  Q    What was your degree in?

23  A    In public relations.

24  Q    Have you had any other postcollege education?

25  A    No.

1    Q    Now, I want to ask you a few questions about your work

2    history.  Tell us what you did when you first got out of

3    school.

4    A    When I first got out of college, I worked in the hotel

5    industry in hotel sales.

6    Q    Okay.  And how long did you do that?

7    A    For about 8 to 10 years.

8    Q    Okay.  The -- and then what did you do after you were in

9    the hotel sales?

10   A    After that I got into the nonprofit sector, and for about

11   eight years I worked as the executive director for Hawaiian

12   Community Assets, serving native Hawaiian beneficiaries who

13   were on the wait list for Hawaiian Homelands.

14   Q    Okay.  So this is a separate nonprofit that helps serve

15   the homeland community?

16   A    Correct.

17   Q    And could you just briefly describe what your position was

18   there and what you did.  And how many years were you there?

19   A    I was there for eight years.  I started there as a -- to

20   support families with financial education and accessing loans

21   to purchase their home on Hawaiian Homelands.  Then I was

22   promoted to be the organization's executive director where I

23   was responsible for oversight of the program, again financial

24   education, home buyer programs, helping folks who were on the

25   wait list waiting to get their allotment through the Department

1    of Homelands.

2    Q    And how long did you do that for?

3    A    Total at Hawaiian Community Assets for about eight years.

4    Q    Until what year?

5    A    Until 2010.

6    Q    Okay.  And would you tell the jury what you did after that

7    in 2010.

8    A    In 2010 I was appointed by Governor Abercrombie to be the

9    Deputy Director at the State Department of Hawaiian Home Lands.

10   Q    And can you tell us -- just give us a brief overview.

11   What is the Department of Hawaiian Home Lands?

12   A    The Department of Hawaiian Home Lands is a state agency

13   responsible for oversight of a 200,000 acre trust for the

14   settlement of native Hawaiians.  Their mission is to provide

15   lands for residential, pastoral, and agricultural lease of

16   lands to eligible beneficiaries.

17   Q    Okay.  What about assisting the homelanders in business or

18   mercantile function?

19   A    Yes.  There is a section specifically in the Hawaiian Home

20   Lands that gives preference to beneficiaries for mercantile

21   licenses.

22   Q    And tell us, you, as deputy director, what did you do?

23   Who did you oversee?

24   A    My responsibility was to ensure that the department

25   fulfilled its mission to fulfill the purposes of the act.  And

1    I had direct oversight of the Homestead Services Division,

2    which administered loans to families, and we did direct

3    services for successorship, transfer of leases, and that type

4    of thing, the day-to-day operation of the department.

5    Q    And how many employees worked under you?

6    A    Homestead Services Division is probably the largest

7    department within the Department of Hawaiian Home Lands.  Out

8    of a total of about 170 employees, maybe 80, 85 of them are

9    housed in Homestead Services Division.

10   Q    The -- did -- in the course of your duties did you get to

11   know Mr. Albert Hee?

12   A    Yes.

13   Q    And can you tell us the context of how you met Mr. Hee.

14   A    Shortly after I was appointed as the deputy, I met Mr. Hee

15   in a meeting to understand the agreement between the Department

16   of Hawaiian Home Lands and Sandwich Isles Communications.

17   Q    And when you say "the agreement," what was that agreement?

18        MR. TONG:  Objection.  Relevance, Your Honor.  Also

19   cumulative.

20        MR. TOSCHER:  Your Honor, I don't want to interrupt.

21        THE COURT:  You can answer, but can you keep it very

22   brief.

23        THE WITNESS:  Sure.  The agreement was for Sandwich

24   Isles Communications to provide telephone service.  They

25   were -- provided infrastructure to the residential subdivisions

1    being built by the State Department of Hawaiian Home Lands.

2    BY MR. TOSCHER:

3    Q    And could you briefly describe what the purpose of that

4    meeting was.  How did that meeting come about?

5              MR. TONG:  Objection.  Relevance.

6              THE COURT:  Okay.  Was Mr. Soon at this meeting?

7              THE WITNESS:  No.  Mr. Soon was not at the department

8    when I was there.

9              THE COURT:  Okay.  I'll allow it.  We've had some

10   testimony on this; so I need you to keep it short.

11             THE WITNESS:  Okay.

12             Can you repeat your question?

13   BY MR. TOSCHER:

14   Q    Sure.  What was the purpose of the meeting with Mr. Hee?

15   A    The purpose of that meeting was for myself, as the deputy,

16   to understand the agreement between the Department of Hawaiian

17   Home Lands and Sandwich Isles Communications.

18   Q    And that was because you were the newly appointed deputy?

19   A    Correct.

20   Q    The -- and that would have been around 2010.

21   A    Yes.

22   Q    Okay.  Did you have interactions with Mr. Hee after that?

23   A    After the initial meeting?

24   Q    After 2010 were there other interactions or meetings with

25   Mr. Hee?

1    A     There were periodic interactions with Mr. Hee.  Sandwich

2    Isles Communications would come to report to the Hawaiian Homes

3    Commission when there were various projects and at different

4    stages of progress through projects; so there was interaction

5    at Hawaiian Homes Commission meetings that took place monthly.

6    Not that they would be at every one, but I did see him from

7    time to time following that initial meeting.

8    Q     Now, are you familiar with the company Waimana

9    Enterprises?

10   A     Yes.

11   Q     And you mentioned Sandwich Isles.  What about ClearCom

12   Communications?

13   A     Yes.

14   Q     And did you deal with other employees or representatives

15   of those companies as well in addition to Mr. Hee?

16   A     Somewhat but not directly.  As the deputy our -- there was

17   a division that specifically worked directly with employees of

18   those organizations; so I didn't have much direct communication

19   with them, but, yes, I am aware of some of their staff there.

20   Q     Okay.  All right.  But, basically, your dealings would

21   have been with Mr. Hee.

22   A     Correct.

23   Q     Now, could you describe what your understanding is, just

24   so the jury understands, I assume the Department of Hawaiian

25   Home Lands is always in the process of creating new

1   subdivisions on Homelands' land?

2           MR. TONG:  Objection to the relevance.  And it's also

3   leading, Your Honor.

4           THE COURT:  It's a little leading, but I'm going to

5   allow you to answer.

6           THE WITNESS:  So the Department of Hawaiian Home

7   Lands is tasked, like said earlier, with issuing residential,

8   pastoral, or agriculture lands; so, yes, they are in the

9   business of developing subdivisions.  They are responsible for

10  the development of infrastructure that would include

11  electricity, telecommunications, water.  They subdivide those

12  lots.  They contract a developer for homes, and then families

13  would select homes based on what they're qualified for to pick

14  a home and a lot in that particular subdivision.

15  BY MR. TOSCHER:

16  Q    So where does Waimana and Sandwich Isles fit into that

17  development?

18  A    The agreement that DHHL had with Mr. Hee's organization

19  was that they were responsible for the infrastructure on

20  telecommunications.  So Sandwich Isles Communications would lay

21  the infrastructure and worked closely with our land development

22  division at various stages of the development for that specific

23  service.

24  Q    Did Mr. Hee's companies and organizations fulfill all

25  their obligations?

```
 1   A    Yes.
 2              MR. TONG:  Objection.  Relevance.
 3              THE COURT:  Overruled.
 4              MR. TOSCHER:  Okay.  The answer is yes.
 5   Q    Was Mr. Hee and his organization able to bring
 6   communications to homesteaders that they would never have been
 7   able to receive?
 8              MR. TONG:  Objection.  Relevance.  Also leading.
 9              THE COURT:  Sustained.
10   BY MR. TOSCHER:
11   Q    Okay.  Were the services of Mr. Hee and his companies and
12   the contract you referred to able to make it possible for
13   homesteaders to receive modern, high-speed telecommunications
14   that, but for Mr. Hee and his companies, they would have never
15   received?
16              MR. TONG:  Same objection.  Also compound.
17              THE COURT:  Sustained.
18   BY MR. TOSCHER:
19   Q    Okay.  Can you give us an example of the type of
20   infrastructure provided by Mr. Hee and his companies to --
21              MR. TONG:  Object.  I'm sorry.  Object.  Relevance.
22              MR. TOSCHER:  It's context, Your Honor.
23              THE COURT:  I'll let you give an example.
24   BY MR. TOSCHER:
25   Q    Give an example of providing the infrastructure and the
```

1    telecommunications, please.

2    A    The best example I could give you about what Sandwich

3    Isles Communications did, the first subdivision that comes to

4    mind is Kahikinui.  Kahikinui is a very remote subdivision up

5    mauka in Maui.  There are about no more than two dozen families

6    who reside in Kahikinui.  You need a four-wheel-drive truck to

7    even access your lot.  No utilities, no water, no

8    communication, not even a road, until Sandwich Isles

9    Communications put telecommunications in that subdivision.

10          So I give you that example because these were very

11   remote areas that would be difficult for families to be

12   connected elsewhere.  Because of the work of Sandwich Isles in

13   that particular community, families could pick up a telephone,

14   dial 911, and have basic phone service.  It is the only service

15   that is actually up in that particular subdivision.

16   Q    None of the other commercial carriers have service in that

17   area?

18   A    No.

19   Q    And why not?

20          MR. TONG:  Objection.  Relevance, Your Honor.

21          THE WITNESS:  Nobody wants to go --

22          THE COURT:  Sustained.  Sustained.  So you can't

23   answer.

24   BY MR. TOSCHER:

25   Q    Has the services provided by Mr. Hee and his companies --

1    you're a homesteader, aren't you?

2    A    Yes.

3    Q    Have the services provided by Mr. Hee and his companies

4    changed the lives of homesteaders?

5             MR. TONG:  Object.  Relevance.

6             THE COURT:  Sustained.

7             MR. TOSCHER:  No further questions, Your Honor.

8             MR. TONG:  No questions, Your Honor.

9             THE COURT:  Okay.  Thank you very much.  You are

10    excused.

11            THE WITNESS:  Thank you.

12            THE COURT:  And you can leave the courtroom.

13        (Witness excused.)

14            THE COURT:  And why don't we take our lunch break.

15    Come back at 1:15.

16        (Jury excused.)

17            THE COURT:  Okay.  Did counsel need to raise any

18    matter with me?

19            Or just come back at 1:15.  Next witness.  Yes?

20            MR. TOSCHER:  Yes, that's --

21            THE COURT:  Okay.  Thank you.

22        (Court recessed at 11:59 A.M., until 1:21 P.M.)

23            THE COURT:  Okay.  Because you're all fortified with

24    lunch, a new witness is going to come into the courtroom;

25    right?

```
 1              Okay.  Who is it going to be?
 2              MR. TOSCHER:  Your Honor, the defense calls
 3  Mr. Torkel Patterson.
 4              THE COURT:  Okay.
 5         (Witness photographed.)
 6              THE CLERK:  Please raise your right hand.
 7         (Witness sworn.)
 8              THE CLERK:  Thank you.  Please be seated.
 9              Please state your name and spell your last name.
10              THE WITNESS:  My name is Torkel Patterson.  My last
11  name is P-a-t-t-e-r-s-o-n.
12                       DIRECT EXAMINATION
13  BY MR. TOSCHER:
14  Q    Good afternoon, Mr. Patterson.  May it please the Court.
15  Ladies and gentlemen of the jury.
16              Could you tell us your current business address,
17  Mr. Patterson.
18  A    My office is in Shinagawa-ku in Tokyo.
19  Q    Okay.  Where do you reside?  Not the address but the city
20  or cities.
21  A    I have a business residence in Tokyo, and I have my U.S.
22  residence in Queen Street in Honolulu.
23  Q    And how long have you been residing in Tokyo, and how long
24  have you been -- you're residing in both places?
25  A    For the last several years I've been based in Washington,
```

1    D.C., and I spent most of my time going back and forth to Tokyo

2    with frequent stops in Hawai'i.  And I spend so much time there

3    I decided to move my residence -- U.S. residence from

4    Washington, D.C., to Honolulu.  But I have spent a lot of time

5    in Tokyo; so I also have a place in Tokyo.

6              So from July 1st I moved into a permanent quasi-year

7    lease in an apartment in Tokyo, but I come to Honolulu every

8    month.

9    Q    So, basically, you split your time now between Tokyo and

10   Honolulu?

11   A    That's correct.  And I also go to third countries for my

12   work.  I go to Australia, and I go to Malaysia, Singapore, and

13   India and Washington every quarter.

14   Q    All right.  Could you tell us a little bit about your

15   educational background.  Where did you grow up, first of all?

16   A    I was born in San Diego, grew up in Southern California,

17   went to Huntington Beach High School.  Never flew in an

18   airplane till I flew to the Naval Academy.  On July 4th, 1792,

19   went to the Naval Academy for four years, and then I was --

20   received a scholarship while I was at the Naval Academy, went

21   to graduate School at University of Tsukuba.

22   Q    I'm sorry?

23   A    Graduate school at the University of Tsukuba in Ibaraki

24   Prefecture about two hours north of Tokyo.

25   Q    Okay.  What period were you at the Naval Academy?  What

1    years?

2    A    1972 to 1976.

3    Q    After you graduated in the Naval Academy, you said you

4    took some -- a graduate course of some --

5    A    No.  After I graduated from the Naval Academy, I

6    went to -- I was a weapons officer.  I was an antisubmarine

7    warfare officer on a destroyer based out of San Diego.  We

8    traveled around, did that for three years.  Then I was assigned

9    as an admiral's aide to the Commander, U.S. Naval Forces, in

10   Japan.  I was in Japan.  Then I received a scholarship; so I

11   studied -- went to Japanese language graduate school in Japan.

12   Then I went back to the Navy and progressed through Navy

13   career.

14   Q    Okay.  So you took the course of studies in Japan while

15   you were in the Navy?

16   A    That's correct.

17   Q    Okay.  So after you left Annapolis, and leaving out the

18   graduate studies, tell us briefly about -- how long were you in

19   the Navy -- did you serve in the Navy after that?

20   A    Sure.  After the Naval Academy, after graduate school I

21   went back to ships.  I was department head executive officer.

22   Then I was chosen to go be a special assistant to the Secretary

23   of Defense responsible for issues related to Japan and spent

24   three years in the Pentagon doing that.  Then I had -- then I

25   was asked to go to the National Security Council staff under

1    Brent Scowcroft.  I was two years as the Japan and Korea

2    director for the National Security Council staff.

3              And then I went back to the Navy, was commanding

4    officer of a ship, and then retired in 1994.  They were letting

5    people out and could retire early because they had too many

6    people in, and I wanted to pursue different things; so I set

7    up -- I retired in '94, and I set up -- my kids were at 'Iolani

8    here, and so I couldn't afford to have them at 'Iolani without

9    creating some work to do.  I couldn't do it on my retirement.

10   So I started a little consulting business and -- so they could

11   finish high school here.

12   Q    In addition, okay, to the consulting business, the jobs

13   you described before at the Pentagon or special advisor,

14   military type jobs, you were still in the Navy at the time.

15   A    I was still in the Navy.  That's correct.

16              At the White House I had a civilian role.  I never

17   wore a uniform, and I was considered a civilian there.

18   Q    But you were still in the Navy --

19   A    But I was still in the Navy.

20   Q    -- just to be clear.

21              Did you take any other -- the job progression -- any

22   other government roles after you had left --

23   A    After I did the consulting here for a little while, then I

24   was recruited by a large corporation.  I was their country

25   manager in Japan and Taiwan.  Raytheon Company.  Then I was

1   asked by Condoleezza Rice to be the special assistant to the

2   President for Asia; so I went back to the NSC staff and was --

3   as a political appointee, was special assistant to President

4   Bush.

5           Then Howard Baker was at that time ambassador to

6   Japan, and they asked me to go and be a senior advisor to

7   Ambassador Baker, which I did for two years.  And then I was

8   asked by the State Department to come and work on Afghanistan

9   and Pakistan as a deputy assistant secretary of state.  And

10  then I retired from the government service of five years.  My

11  political mentor there was Colin Powell, and when he left the

12  government, I left.

13  Q    That was your last government service.

14  A    That was my last government service.  Then I went back to

15  Raytheon Company.

16  Q    Let me -- you mentioned before when you left the Navy you

17  did some consulting.  What type of -- and do you continue to do

18  consulting to this day?  Tell us a little bit about your

19  consulting.

20  A    At the time when I set that up in here, I was a senior

21  associate of Pacific Forum CSIS, which is a think tank in

22  Bishop Tower working on security issues.  So as a segue, I set

23  up a program on U.S./Japan national security issues that lasted

24  for 20 years while I was there, formed -- had a client with

25  Mitsubishi Corp. to help them -- advise them on routing through

1    Honolulu to send supplies to Kiribati, which was a base that

2    they were trying to set up as a space shuttle location for the

3    then-planned Japanese space shuttle.  Also worked with a

4    company called SAIC on the mainland, which was a -- trying to

5    do demobilization of Japanese chemical weapons left in China.

6    And then I had a contract -- my partner and I had a contract

7    with IBM Asia Pacific to help manage the CEO chairman of IBM's

8    visits to Asia.

9    Q    So, basically, you advise companies on various business --

10   international business development?

11   A    Right.  Mitsubishi Corp., some part of it was logistics,

12   and some part of it was U.S. national security policy.  SAIC

13   was working with the Japanese government to try to figure out

14   the way the Japanese government intended to fund their projects

15   for the demobilization of these chemical weapons.  And then the

16   relationship with IBM was because I'd had experience managing

17   presidential trips at the White House, they treated their

18   chairman Lou Gerstner as a president; so they wanted it done in

19   a professional way.  So we ran it like a president's trip.

20   Q    Okay.  Can you tell us the nature of what your business

21   activities have been for the last five years.

22   A    So I was -- after I left Raytheon Corporation, I was the

23   head of international business development for Raytheon as --

24   in charge of all their international business development

25   around the world.  But then five years ago -- that company,

```
 1   Raytheon, makes Patriot and Tomahawk, a very great, fantastic
 2   company based out of Massachusetts.  But I felt that they --
 3   you can build a weapon and you shoot it, and it's gone.  I
 4   wanted to work on lasting infrastructure.  So I started
 5   supporting the efforts of Japan Central Railroad to promote
 6   high-speed bullet trains in the United States and
 7   superconducting maglev technology, floating trains technology,
 8   in the U.S.  So I've been associated for the last five years
 9   with this company in Japan.  And then I'm also the vice
10   chairman of the International High-Speed Rail Association,
11   which promotes Japanese type safety standards to companies that
12   are considering doing high-speed rail.  These are for trains
13   that go over 220 miles per hour.
14   Q    Let me take you back.  I think you said you did two
15   employment times or you were employed twice with Raytheon?
16   A    Yes.  That's correct.
17   Q    Let's go back to the first one, what the period was.
18   A    That was '98 to 2000.
19   Q    And tell us what your role at Raytheon was.
20   A    I was country manager for Japan and Taiwan.  After six
21   months I was additionally the country manager for -- the
22   regional executive for northeast Asia based out of Tokyo.  I
23   would travel to Taipei once a month, but -- and I traveled to
24   Korean and Beijing.  We had business there.  I looked over the
25   business development opportunities responsible for topline
```

 1  growth in the company.

 2  Q    Okay.  And, basically, what was your main focus as country

 3  manager?

 4  A    Relationships with the host government, relationships with

 5  the representatives that the company had in those countries,

 6  which were companies like Mitsubishi Corp., Sumitomo Corp.,

 7  Nissho Iwai.  All the major Japanese trading houses were our

 8  partners -- business partners.  And with Mitsubishi Heavy

 9  Industries, Mitsubishi Electric.  And in Taiwan it was

10  supervising the country manager there and relationship with the

11  host government.  I had relationships with the government

12  officials there.  And then in China we had a commercial

13  aircraft company there, and it was -- we had been black-listed

14  by the Chinese government.  My effort was to remove us from the

15  black list of the Chinese government.

16  Q    Okay.  Then you left Raytheon and then you returned in

17  2000 --

18  A    2005.

19  Q    2005.  How long were you there?

20  A    Five years.

21  Q    2005 to --

22  A    Four and a half.

23  Q    -- to 2010.  So tell us what your title was.

24  A    I was the president of Raytheon International, Inc., and

25  also vice president for international business development for

1    Raytheon Company and headquartered -- the Raytheon

2    International, Inc., RII, is headquartered in Arlington,

3    Virginia, in Roslyn; and Raytheon Company is headquartered in

4    Waltham, Massachusetts, near Boston.

5    Q    That was up through 2010.

6    A    2005 to about 2010; that's correct.

7    Q    And, generally, you told us -- what were your general

8    duties as in charge of --

9    A    I had 10 country managers, three regional executives:

10   Europe, Middle East, and Asia.  They reported to me.  I had a

11   lawyer.  I had an HR person.  I had regional executives.  I had

12   nine direct reports and a hundred people in my organization.

13   Q    So the country managers that reported to you in your

14   second stint was --

15   A    The country manager reported to regional executives.  The

16   regional executives reported to me.

17   Q    Those country managers was the position you had when you

18   were with Raytheon --

19   A    The first time.

20   Q    That's just what I wanted to make clear.

21        Now, do you know Mr. Albert Hee?

22   A    I do.

23   Q    Can you identify him.

24   A    Yes.  Mr. Hee.

25        MR. TOSCHER:  Let the record reflect Mr. Patterson

1    identified Mr. Hee.

2              THE COURT:  It so reflects.

3    BY MR. TOSCHER:

4    Q    Can you tell us when you first met Mr. Hee.

5    A    Yes.  I remember quite well.  It was July -- it was

6    July 6th, 1972.  I remember that because that's the day we got

7    sworn in as midshipmen at the Naval Academy.  And we were in

8    the same company together.  And the way they set up -- at that

9    time they called it a platoon.  We were in the 19th platoon

10   together.  At that time everybody that was in the same platoon,

11   you did everything together.  You ate together.  They divided

12   you up.  And we had five people in a room, and Al was my

13   roommate at the time.  So my first experience of meeting Al was

14   in plebe summer at the Naval Academy.  "Plebe" means freshman

15   summer.

16   Q    "Plebe" means freshman.  Okay.

17             And did you continue to have a friendship

18   relationship throughout your time?

19   A    Yeah, the second and third year we were able to have

20   two-men rooms, and we had different roommates, but our senior

21   year we had a three-man room, and I was roommates with Al then.

22             One of the first ways I got introduced to Hawai'i was

23   the midshipman cruise immediately following the freshman year.

24   And we started in San Diego.  We came to Honolulu.  And Al took

25   me to meet his parents in Kaneohe.  And it was the first time

1    that I had to take my shoes off to go in someone's house.  And

2    also -- it's so ironic given my time in Japan now.  And also

3    the first time I had to sleep on futon.  And then Al's dad

4    would -- he'd turn on KCCN Aloha, which that time was on the AM

5    dial.  That's a local radio station.  And the Hawaiian music

6    was playing and the birds were chirping, and there's mist and a

7    rainbow, and I woke up and I thought, "I'm in heaven.  This is

8    paradise."  So that's how I fell in love with Hawai'i and why I

9    kept coming back.

10   Q    That was after the first year of the Naval Academy?

11   A    Yes.  That was in the summer of 1973.

12   Q    What about after you graduated the Naval Academy in '76?

13   A    '76.  So I went to sea.  As I mentioned before, I was on a

14   ship.  Al was not qualified to go to sea because he had asthma

15   issues and was not qualified for sea duty.  They called it NPQ,

16   not physically qualified, for sea duty.  But he volunteered to

17   serve as a Supply Corps Officer and was sent to Athens,

18   Georgia, for supply school, and then he went to -- was

19   stationed in Staten Island at the PX there.  I didn't see him

20   during that time, but then, when he came back to Hawai'i and my

21   ships would come through Hawai'i, I would always go and visit

22   with Al.

23   Q    So you continued your relationship with him.

24   A    Friendship with him.

25   Q    Friendship.

 1   A     Over the years, yes.

 2   Q     So can you tell us over the next years, did you often

 3   have -- you were never retained by Mr. Hee as a business

 4   consultant.

 5   A     No, never.  I've never had a business relationship with

 6   Al, but as a --

 7              MR. HARRINGTON:  Your Honor, I object to the

 8   narrative at this point.

 9              THE COURT:  Okay.  So the way this works is you just

10   have to restrict yourself to the question asked.

11              So you did not have a business relationship.

12              THE WITNESS:  I did not.

13   BY MR. TOSCHER:

14   Q     Okay.  Were you ever -- did you have -- were you in a --

15   serve as a role to Mr. Hee as an informal business advisor?

16   A     Yes.

17   Q     And can you describe some examples over the years --

18   A     When he first came to Hawai'i, he went back and worked for

19   Theo Davies, and Theo Davies asked him to manage labor issues.

20   And Al got tired of that.  So we talked about that.

21              He told me about --

22              MR. TONG:  I object to hearsay, Your Honor.

23              THE COURT:  Okay.  So hold on.  You can describe --

24              THE WITNESS:  What I observed.

25              THE COURT:  -- the work you did without saying what

1    he told you.

2              THE WITNESS:  Okay.  So the --

3    BY MR. TOSCHER:

4    Q    Let's take it one at a time.

5    A    Yes.

6    Q    At Theo Davies there was -- you had -- you consulted with

7    him regarding labor issues?

8    A    I'm not qualified to give advice on labor issues, but I

9    was aware of those issues.  But I did advise on the next steps

10   after that, which was to get involved with utilities.  And when

11   I -- the reason that Mr. Hee wanted to get involved with

12   utilities --

13             MR. TONG:  Your Honor, I object to hearsay.  It's

14   again a narrative.  Non-responsive to the question.

15             THE COURT:  Right.  So even if you're not saying he

16   told me this, if your information is based on what he told you,

17   that is not allowed.  And so the way to do this, keep your

18   answers short.  Answer only exactly what is asked and wait for

19   the next question because, if you don't do that and you just

20   blurt out something, you're robbing Mr. Tong of an opportunity

21   to raise an objection.

22             THE WITNESS:  Okay.

23             THE COURT:  Okay?

24             THE WITNESS:  Thank you, ma'am.

25             THE COURT:  Go ahead.

1  BY MR. TOSCHER:

2  Q    Did you consult with Mr. Hee regarding an energy project?

3  A    Yes, I did.

4  Q    And could you tell us what that energy project was.

5  A    It was a power plant development on the Big Island.  It

6  was -- there was an opportunity there because of their need for

7  power on the Big Island to build a power plant.  And I provided

8  strategic advice with investment opportunities.  I took Mr. Hee

9  with me to meet the trading companies in Japan, and one of

10 those trading companies later entered into an investment

11 arrangement for that with him.

12 Q    Do you recall the year of this project?

13 A    I do not.  I do not.

14 Q    Okay.  That's fine.  And you were not compensated for

15 that.

16 A    I was not.

17 Q    Do you recall any other projects you consulted on for

18 Mr. Hee or helped him out on?

19 A    There were issues related to that contract later on that I

20 provided my advice on.  There were also when -- the major

21 strategic discussion we had involved the utilities in Hawai'i

22 and the fact that the utilities in Hawai'i were a monopoly.  So

23 the long-term, strategic business opportunity in Hawai'i was in

24 utilities, and, eventually, the utilities would have to

25 deregulate.  So what were the opportunities, based on what he

 1   had in his strategic opportunity, which was his relationship as

 2   a native Hawaiian with Hawaiian Homelands, how to use that to

 3   approach others on these strategic areas, which would include

 4   telecom and then his, you know, subsequent efforts on telecom.

 5   Q    How frequent are your business-related discussions with

 6   Mr. Hee?  Let's take, you know, after you got out of the Navy,

 7   or let's just say over the last 20 years?

 8   A    I would say they would be every couple months.

 9   Q    Okay.

10   A    And when I would visit Hawai'i, or when -- if I was in

11   Washington and Mr. Hee would come to Washington, we always met.

12   Q    So this is ongoing, continuous discussion -- friendship

13   but discussion of business-related matters.

14   A    Correct.

15   Q    Now, during the course of this 20-year period did you get

16   to know who Wendy Hee was?

17   A    Yes, I did.

18   Q    And who is Wendy Hee?

19   A    Wendy Hee -- the first time I met Wendy, she was --

20        MR. TONG:  I object, Your Honor.  That's

21   non-responsive.

22        THE COURT:  So it was who is Wendy Hee, not when was

23   the first time --

24        THE WITNESS:  Wendy Hee is currently the wife, but

25   that wasn't what she was when I first met her.

BY MR. TOSCHER:

Q     When did you first meet Wendy Hee?

A     I first met Wendy Hee at the 1974 Second Class Ring Dance, which is a junior-year dance, and she was Al's guest at the dance.

Q     That was when you were at the Naval Academy?

A     Naval Academy junior year; that's correct.

Q     Over the course of this 20-year period have you had the opportunity to meet with Wendy Hee?

A     Frequently, yes.

Q     And have you had the opportunity to observe what, if any, role she had in Mr. Hee's business affairs?

A     Yes.

Q     Could you describe what your observation of those roles are.

A     Yes.  Wendy is his counselor, advisor, and better half in terms of what I mean by that is that she's able to smooth relationships with community groups and areas and give him advice in those areas that he might otherwise not best know how to manage.

Q     Okay.  The -- have you had a chance to interact with her in any social or business-related functions?

A     Frequently, yes.

Q     Frequently.  And can you describe the types of social functions.

1   A    I attended the --

2           MR. TONG:  Object to the relevance of that, Your

3   Honor.

4           MR. TOSCHER:  Well, if the government doesn't want --

5   I don't have to go through it, if he doesn't want it.  I just

6   was trying to be complete, Your Honor.

7           THE COURT:  Okay.  Sustained.

8   BY MR. TOSCHER:

9   Q    What about business-related functions?

10  Q    There was -- when I was with Raytheon Company, Al had

11  asked me to provide opportunities for his family to be exposed

12  to bigger things.  And one of the opportunities I had with

13  Wendy was to invite her to the Paris Air Show, to the

14  Raytheon -- we have a very large exhibition there.  And Ho'o

15  was there.  And I brought them both there and toured them

16  around the facility, the site.  I didn't give them a tour of

17  the air show, but just of the site, introduced them to people,

18  showed them what our product line was, and explained to them

19  how an air show works and why people would spend all the money

20  they're spending at the air show to put on such an extravagant

21  thing and how that works.

22  Q    Over the course of these years did you have a chance to

23  observe any of the children's role in the business?

24  A    I observed Ho'o and Liko.

25  Q    Could you tell us what your observations were regarding

1    Ho'o's involvement in the business.

2    A     Yes.  I always knew that --

3          MR. TONG:  Your Honor, that calls for speculation

4    based on statements made to him.  He can testify to what he

5    saw.

6          THE COURT:  Okay.  Sustained.

7          You want to redo the question?

8          MR. TOSCHER:  Yes.

9    Q     Tell us regarding what you saw and did regarding Adrianne

10   Ho'o Hee.

11   A     I observed that Ho'o is a very intelligent, smart,

12   aggressive person, and that she would be -- I knew from my

13   observation that she was the leader of her siblings and that

14   she would inherit the leadership of the company, which I knew

15   to be privately held and closely controlled.  And with that in

16   mind I would include her in -- while she was at MIT, I would

17   include her in opportunities to broaden her experience.

18   Q     Can you tell us, if you recall, what type of opportunities

19   you included her in.

20   A     There was a business development meeting regarding a

21   Homeland Security project opportunity that -- for the neighbor

22   islands where Sandwich Isles was being evaluated as a partner

23   for Raytheon Company in a bid proposal for that contract.  And

24   Mr. Hee and Ho'o came to Waltham and the headquarters of

25   Raytheon, the big headquarters in Waltham, Massachusetts, and

1    attended the meeting and sat in the discussions that we held

2    with the executives of Raytheon as we went -- walked through

3    the business development aspects of the project.

4            I also included her in meetings with the senior

5    advisor to the mayor of Boston, and also he was also an advisor

6    to the Red Socks and to the Hartford Insurance Company and was

7    also a consultant to Raytheon, and his perspective on the

8    interaction between politics and government, which was sort of

9    the nexus of the area in which Sandwich Isles operated.  And

10   there were several meetings with him and opportunities to

11   discuss these sorts of things.

12   Q    Okay.  And could you tell us, as a business consultant,

13   somebody who served advising businesses, what is the importance

14   of making these personal relationships, personal acquaintances,

15   with these people?

16   A    Well, having -- there's two things.  These are not people

17   that are necessarily going to be Ho'o's peer relationships.

18   These are people -- she needs to see how things work.  She

19   needs to understand how things work.  But as you get older and

20   you mature and you understand how things work, then it's the

21   relationships that you have that make the difference in

22   business completely.  And it's these relationships that enable

23   you to progress, and you rely and you build relationships and

24   move forward.

25   Q    You mentioned you also observed Breanne Liko Hee in terms

1    of a role in the business.  What were your observations?  What

2    did you see?

3    A     When I would visit when I would come to Hawai'i, I would

4    visit the office of Waimana every visit.  And those -- while I

5    was visiting those offices, I got to know several of the

6    employees in the office.  And I frequently saw, when Liko was

7    back, saw Liko engaged in the office, and she was there and she

8    was taking an active role in the company's activities.

9    Q     And did you set up any meetings with Liko with third

10   parties?

11   A     I did not.

12   Q     And that's -- Ho'o was on the East Coast, and that's why

13   you had the opportunity to set up meetings for her?

14   A     That's correct.  She also joined in Washington.  In

15   addition to Boston, she'd come to Washington.  When Mr. Hee was

16   in town, she would come to Washington, and I'd meet with them

17   there.  We'd discuss the business situation there.

18   Q     What about any observations regarding Mr. Hee's son,

19   Charlton Kupa'a Hee?

20   A     Kupa'a I have not seen in any -- in a business-related

21   activity.  I always felt he's not quite ready.

22          MR. TONG:  Your Honor, I object.  That goes beyond

23   the scope of the question.

24          THE COURT:  Okay.  Well, overruled.  Okay.  But it's

25   answered now that he had not seen him a business-related

1    activity.

2    BY MR. TOSCHER:

3    Q    Okay.  Mr. Patterson, you mentioned before you were

4    consulting with Mr. Hee regarding a joint venture between

5    Waimana and Sandwich Isles and Raytheon regarding -- I think it

6    was outer islands or some sort of security network.

7    A    That is correct.

8    Q    Could you describe that a little more.  What was the

9    nature of that project?

10   A    It was not -- it was not involving Waimana.  It was

11   involving Sandwich Isles.  Sandwich Isles has cell towers or

12   has access to networks on all of the neighbor islands, has

13   infrastructure on all the neighbor islands.  And the project,

14   as outlined in the requirement as was outlined, was for

15   emergency communications towers, ability to set up.

16          So Al had that basic infrastructure -- Sandwich Isles

17   had the basic infrastructure, and Raytheon had the software and

18   the know-how, the system integration and the customer face and

19   the marketing ability.  And that was the general idea, a

20   marriage of Raytheon and Sandwich Isles in a project.

21   Q    Do you recall meeting with Mr. Hee and Ho'o regarding that

22   project?

23   A    Yes.  This is the -- I mentioned already the meeting.

24   Q    That was the meeting in Waltham, Massachusetts?

25   A    Waltham; that's correct.

1    Q    The headquarters of Raytheon.

2    A    That's correct.

3    Q    Can you tell us who else was at that meeting?

4    A    It would have been the business development lead for that

5    business unit, which was Integrated Information Systems, I

6    believe.  And also the -- it wasn't the C-suite sort of people,

7    but it was -- and I was the senior international BD, but I'm

8    not -- Hawai'i is not international, even though some people

9    think it is.  So it was with the domestic business development

10   people, and I was facilitating the meeting.

11   Q    Now, while at Raytheon did you become familiar with a

12   high-tech ride that Raytheon developed?

13   A    Well, Raytheon was very --

14   Q    Let me finish the question.  Let me finish the question.

15   Just let me -- I'm sorry.

16              A Raytheon ride in Disney World?

17   A    Raytheon -- yes, yes.

18   Q    Okay.  And tell us what your -- what you know about that.

19   A    Raytheon is committed to STEM, which is science,

20   technology, education, math, for young people and trying to

21   motivate them for STEM.  And it was a contribution of Raytheon

22   Company to STEM research by developing a ride at Epcot.  It's

23   more than a ride.  You actually design the ride; so you have a

24   chance to input and make design permissions and design

25   decisions, and then you go to ride -- then you input what you

1    design and then you get to ride it.

2              And the -- there's also a website, mathmovesyou.com,

3    mathmovesyou.com, which provides awards to teachers for

4    teaching math.  And that -- that was a very important project

5    of the chairman and CEO's, and he was very proud of that

6    project.

7    Q    So if you're a company were doing business with Raytheon

8    and the chairman invited you to come see that STEM ride, what

9    would be the appropriate business response?

10             MR. TONG:  Object.  Calls for speculation.  No

11   foundation.

12             THE COURT:  Sustained.

13   BY MR. TOSCHER:

14   Q    Are you aware of whether the chairman invited Mr. Hee to

15   come observe that ride?

16   A    Yes, I am.

17   Q    And do you believe -- well, let me ask this.  What was

18   Raytheon's purpose in creating that ride?

19   A    The purpose was to promote awareness of math and science

20   for younger people so that they would be more committed to a

21   study or a field in STEM, science, technology, engineering,

22   math.

23             MR. TOSCHER:  No further questions, Your Honor.

24                         CROSS-EXAMINATION

25   BY MR. TONG:

1   Q    Good afternoon, Mr. Patterson.

2   A    Good afternoon, sir.

3   Q    You've just been giving testimony about a ride.  It's

4   actually called Sum of All Thrills; is it not?

5   A    I knew it as Math Moves You exhibit, but that could be the

6   name.  I have not been there myself.

7   Q    You've never been to the Raytheon exhibit at Disney World?

8   A    I have not.

9   Q    And you say that it's, basically, a ride that people can

10  design their own experience and then see how it works out;

11  correct?

12  A    That's correct.

13  Q    And this is part of the Epcot Center?

14  A    Yes.

15  Q    That's a center that anybody can buy a ticket to and go

16  look at the Raytheon ride; is that correct?

17  A    That's correct.

18  Q    You mention Raytheon also has this website called Math

19  Moves You; correct?

20  A    That's correct.

21  Q    I assume because it's a website anyone with access to the

22  internet can go on that website, too; correct?

23  A    That's correct.

24  Q    Now, you mentioned that there was a time when SIC, that

25  would be Sandwich Isles Communications --

1   A   No.  I'm sorry.  SAIC.

2   Q   Say that again?

3   A   SAIC.  The company that I was a consultant for?  That's

4   Science Applications International Corporation.

5   Q   Actually, I'm getting to the meeting that Adrianne Hee

6   attended in Waltham, Massachusetts, with the defendant Albert

7   Hee.

8   A   Oh, yes.

9   Q   That was a meeting in Waltham, Massachusetts, with

10  Raytheon; correct?

11  A   That's correct.

12  Q   And Mr. Hee was representing Sandwich Isles

13  Communications; correct?

14  A   Correct.

15  Q   And you referenced that this meeting was at a high level,

16  not at a peer group of Miss Hee; is that correct?

17  A   No.  What I said was it was not at a senior executive

18  level.  It was not the C-suite.

19  Q   C-suite being like chief --

20  A   It was not at the CEO, CFO, CMO level.  It was at the

21  business development lead level below that.

22  Q   But it was at an executive level, was it not?

23  A   That's correct.

24  Q   You say that SIC was being considered as a potential

25  partner with Raytheon; is that correct?

1   A     That's correct.

2   Q     I assume the meetings included some kind of presentation

3   about SIC's capabilities; is that correct?

4   A     That's correct.

5   Q     Mr. Hee gave that presentation; is that correct?

6   A     To the best of my memory, yes, but it was many years ago.

7   Q     Well, it was Mr. Hee or some other executive with SIC; is

8   that correct?

9   A     The only two people that were there from there would have

10  been Mr. Hee and her.  So I don't remember him giving the

11  presentation, but I remember that he was there discussing this

12  with him.

13  Q     You said that her role was, basically -- or let me

14  withdraw that.

15          You're a longtime friend of Mr. Hee; correct?

16  A     Correct.

17  Q     And you're trying to give your longtime friend the

18  opportunity of introducing his daughter to certain

19  opportunities; is that correct?

20  A     Trying to broaden her exposure; that's correct.

21  Q     Right.  So by broadening her exposure you're giving her

22  access to opportunities; correct?

23  A     Not -- if you mean business opportunities, I don't mean

24  business opportunities.  I mean exposure:  opportunities to

25  grow; opportunities to learn.

1    Q    Okay.  So this was, basically, for her personal growth and

2    not for business opportunities; right?

3    A    Well, they're one and the same.  In my view -- in my

4    perspective they're one and the same because, if she -- it's a

5    privately held company.  She's going to take over the company

6    in the future.  The sum of her experience is going to be

7    important when she takes over this company.

8    Q    Okay.  And you testified earlier that it was important for

9    her to see how things worked; correct?

10   A    Correct.

11   Q    And at this meeting she, basically, got to observe her

12   father do the business; correct?

13   A    Correct.

14              MR. TONG:  Thank you.  I have nothing further.

15              MR. TOSCHER:  No further questions, Your Honor.

16              THE COURT:  Okay.  Then the witness is excused.  You

17   may step down and leave the courtroom.  Thank you very much.

18   (Witness excused.)

19   (Witness photographed.)

20              THE CLERK:  Please raise your right hand.

21   (Witness sworn.)

22              THE CLERK:  Thank you.  Please be seated.

23              Please state your name and spell your last name.

24              THE WITNESS:  My name is Wendy Roylo Hee.  The last

25   name is H-e-e.

```
 1                       DIRECT EXAMINATION
 2   BY MR. TOSCHER:
 3   Q    May it please the Court.  Ladies and gentlemen.
 4        Good afternoon, Mrs. Hee.  You're married to Albert
 5   Hee?
 6   A    That's correct.
 7   Q    And I think you can identify him in the courtroom?
 8   A    Yes.  That's him.
 9        MR. TOSCHER:  Okay.  Let the record reflect Mrs. Hee
10   identified him.
11        THE COURT:  I hope so.
12        MR. TOSCHER:  Worse things have happened, Your
13   Honor.
14        THE COURT:  Okay.
15        MR. TOSCHER:  I was counting on it, though.
16   Q    Where were you born, Mrs. Hee?
17   A    I was born in Honolulu.
18   Q    And where did you grow up?
19   A    I grew up in Waialua, O'ahu.  That's the hometown of my
20   parents.
21   Q    Okay.  And what did your parents do?
22   A    My father, Bonifacio Roylo, was a carpenter; and my
23   mother, Winona Okamoto, was a homemaker.
24   Q    Could you tell us where you attended school.
25   A    Sure.  When we lived in Honolulu, I went to Maryknoll.
```

1    When we moved out to Waialua, I went to St. Michael's.  And

2    then I was a border at Kamehameha from seventh grade and

3    graduated from Kamehameha in 1973.

4    Q    Okay.  And is that where you met Mr. Hee at Kamehameha?

5    A    Yes.  We were in the same physics class.  I was a

6    sophomore, and he was a junior.

7    Q    But it was the same physics class.

8    A    Yes, yes.  We were in the same physics class.

9    Q    I won't ask you who got the better grade.

10   A    Well, actually, I did because I studied more, but I think

11   he understood the practicalities of physics much better than I

12   did.

13   Q    How long have you been married?

14   A    35 years.

15   Q    And do you have children?

16   A    Yes.

17   Q    And can you name those children for us.

18   A    Sure.  I have Ho'o is the oldest, then Liko, and Kupa'a.

19   So it's two girls and a boy.

20   Q    Any grandchildren?

21   A    Yes.  I just got my first grandson a week ago.  I have a

22   granddaughter -- I don't mean to, you know, not count her.  But

23   my granddaughter is about a year old, and the grandson I'm

24   just -- I guess I'm just really excited because he's just a

25   week old.

1    Q    A week old.

2    A    Yeah.

3    Q    Who is the mother of the two grandchildren?

4    A    Liko.

5    Q    Liko, okay.  So let's take us through your educational

6    experience.

7              After you graduated at Kamehameha did you go to

8    college?

9    A    Yes, I did.

10   Q    And where did you go to college?

11   A    I went to Wesleyan University.

12   Q    And what did you study there?

13   A    Government.  I got my bachelor's degree in government in

14   1977.

15   Q    Okay.  Was there a reason you chose to go to the East

16   Coast?

17   A    Yes.  My boyfriend at the time, Albert, was at the Naval

18   Academy.  And I applied to schools on the East Coast, and

19   Wesleyan was the best school that accepted me, and it was also

20   the one that gave me the most financial aid.  My parents

21   couldn't afford to send me on their own.  So it just was a good

22   school for me to go to.  And it was also, you know, at least in

23   the same area as Albert.  It wasn't quite close but --

24   Q    Okay.  So did you during the four years -- how long were

25   you at Wesleyan college?

1    A    Four years.

2    Q    And did you continue to see Mr. Hee during that period of

3    time?

4    A    Yes.  I would catch a ride down to the Washington, D.C.,

5    area with students from my university who lived in that area,

6    and Albert would also, when he could, hitchhike up to where I

7    was.  He wasn't allowed to have a car until, like, maybe his

8    junior or senior year.

9    Q    So I think -- what did you study at Wesleyan?

10   A    It was government.

11   Q    And what was your degree in?

12   A    It was a Bachelor of Arts, and I majored in government.

13   Q    And do you recall the year you graduated?

14   A    Yes.  1977.

15   Q    And do you have any postgraduate education after you

16   graduated?

17   A    Yes.

18   Q    Tell us about that.

19   A    Okay.  After I graduated from Wesleyan, I went to Harvard,

20   and I got my master's in city and regional planning.  And that

21   was a two-year program; so I graduated from there in 1979.

22   Q    Tell us a little bit about what the courses for city and

23   regional planning involved.  What do you learn from that?

24   A    Sure.  Traditionally, planning was in the School of

25   Design; so it was a lot of urban design kind of things.  But by

```
 1   the time I went to study in that field, it was more
 2   policy-oriented; so we did a lot of, I guess, looking at
 3   environmental studies, because at that time environmental
 4   impact statements were important.  We looked at transportation.
 5   We had transportation, housing kinds of programs and courses.
 6   Q    While you were at Harvard, that was in Cambridge,
 7   Massachusetts?
 8   A    Correct.
 9   Q    And did you continue to see Mr. Hee?
10   A    Yes.
11   Q    And at that point was he still in the academy or was he --
12   did he move --
13   A    I was at -- I was in Cambridge from 1977 to '79.  He
14   graduated from the Naval Academy in 1976.  So he'd already been
15   out of -- out of school, and he was assigned to the military
16   sealift command in Bayonne, New Jersey, as a supply corps
17   officer.
18   Q    Okay.  And you graduated Harvard in '79?
19   A    1979; that's correct.
20   Q    And what did you do after that?
21   A    Well, since Albert was through with his commitment to the
22   Navy at the same time in 1979, we both returned home to
23   Hawai'i.
24   Q    Okay.  And can you tell us when -- is that when you got
25   married?
```

1    A      No.  No.  We wanted to, you know, get established.  He got

2    a job.  I got a job.  And we didn't get married until 1980.

3    Q      So you waited a year.

4    A      Yeah.

5    Q      Then got married in 1980.

6            I want to talk to you a little bit about your work

7    experience after you came back to Hawai'i.  And do you recall

8    what you first did when you came back?

9    A      Sure, sure.  I chose to go to the Chamber of Commerce of

10   Hawai'i.  I was lucky enough when I came home, I had several

11   job offers.  But the Chamber of Commerce job I thought was the

12   best because it gave me -- it could give me a good overview of

13   what was happening in the state, and it also was a good

14   opportunity to meet a lot of business people.  So I -- there,

15   when I was there, I wrote position statements for various

16   committees of the Chamber, and we used those position

17   statements to write testimony on proposed legislation at the

18   city and state levels.

19   Q      And that was for how long were you at the --

20   A      I was there for two years because, quite fortunately, I

21   got an unsolicited job offer from one of the members of the

22   Chamber, a woman who ran a planning firm.  She offered me a

23   planning job.  It was with a firm called EDAW.  It sounds

24   weird, but it's E-D-A-W.  And it stood for the name of the men

25   who started the company.  It was Eckbo, Dean, Austin, and

1    Williams.  It was a San Francisco-based company, but they had a

2    branch office here in Honolulu.

3    Q    Tell us the type of work you did when you were with EDAW.

4    A    Sure.  I did -- I wrote planning documents.  So a lot of

5    that was applications for government processing -- government

6    permit processing.  So we did things like -- or I did things

7    like rezoning applications, cluster development applications,

8    conservation district use applications.  I wrote environmental

9    impact statements.  We did community planning as well.  And

10   while I was there, we tried to carve out a niche in hospital

11   planning.  So I did certificate-of-need applications as well.

12   Q    Tell us what an environmental impact study is.

13   A    Sure.  Anytime there's a major development being proposed,

14   any kind of major project, an environmental impact statement is

15   required, and that helps -- that document helps the

16   decision-makers in their deliberations on whether to allow a

17   permit or not.  But the things that they look at or that we

18   have to research and illustrate in the Environmental Impact

19   Statement are things like how is the project going to affect

20   anything in the environment:  the soil, the water, the air.

21   How does it affect traffic?  How does it affect social

22   services, if that's applicable?

23            So it's a fairly comprehensive document.  And I work

24   with -- obviously, I'm not an expert in all of these fields; so

25   I gather the information -- I do the research, and I gather the

1    information from the experts and write that up in the

2    environmental impact statement.

3    Q    Okay.  Thank you.  How long were you with EDAW?

4    A    I was there for two years because again I got an

5    unsolicited job offer.  The administrator of the Office of

6    Hawaiian Affairs asked me to come and head up the planning

7    division at OHA.  It was a very new organization at the time.

8    This was back in 1983 that this job offer came to me.

9    Q    Okay.  And tell us what your role at OHA was during this

10   period.  You were there for five years; so if it changed, give

11   us an overview of what you did for that five years there.

12   A    Sure.  Yes.  I was there from 1983 to 1988.  And the

13   official title, I guess, was Policy Planning Research Officer.

14   And as the title indicates, I worked on policy issues and,

15   basically, helped revise the master plan for the organization.

16   So it was policy planning.  Sorry.  And also looking at

17   legislation.  That was part of policy.  Policy planning and

18   research.

19         We gathered research specifically on native Hawaiians

20   so that we could go after grants.  That was part of our -- or

21   my division as well.  We went after grants, especially from the

22   Administration for Native Americans, federal grants.

23   Q    I didn't ask you.  Maybe it's known.  It was -- you refer

24   to it as the Office of Hawaiian Affairs, OHA.

25   A    Right.

```
 1   Q    What did OHA do?  What was its purpose?

 2   A    It was set up from a constitutional amendment, and it was

 3   to take revenues from ceded lands funds and use those monies to

 4   help improve the conditions for native Hawaiians.  And it was

 5   not restricted to any one area; so it involved looking at

 6   housing, health, education, and so it had a very broad purview.

 7   And the master plan, I thought, was important because like any

 8   organization you don't have unlimited funds to try to make

 9   differences or impacts on those different areas.  So it's

10   important to not only develop the goals for each of those

11   areas, but also to help prioritize so that there was a real --

12   hopefully, a real movement towards improvement.

13   Q    So we've heard some testimony about the Department of

14   Hawaiian Home Lands?

15   A    Uh-huh.

16   Q    What was the relationship of the Office of Hawaiian

17   Affairs?  How does that fit in with the Home Lands?

18   A    Yes.

19             MR. TONG:  Objection.  Relevance, Your Honor.

20             THE COURT:  Sustained.

21             MR. TOSCHER:  Okay.

22             THE WITNESS:  Oh, well, at OHA --

23             THE COURT:  Hold on.  That means you can't answer.

24             THE WITNESS:  Oh, okay.

25             MR. TOSCHER:  Okay.  Thank you.
```

1    Q    All right.  So when did you leave OHA, Miss Hee?

2    A    Let's see, 1983 -- at OHA, you know, I did want to just

3    also say that while I was there --

4              THE COURT:  Sorry.  The way this works is you have to

5    wait and answer only questions, not just talk.

6              THE WITNESS:  Oh, okay.  Sorry.

7              THE COURT:  What's the next question, Mr. Toscher?

8    BY MR. TOSCHER:

9    Q    When did you leave OHA?

10   A    1988.

11   Q    We just described -- went through some of your work

12   experience for, I guess, the Chamber of Commerce through OHA.

13   Can you tell us -- I want to ask you some questions about your

14   husband's work during this time.  I assume he was working

15   during this time?

16   A    Yes.

17   Q    And could you tell us do you know the first position he

18   had when he came back to Hawai'i?

19   A    Yes.  He was at Theo H. Davies.

20   Q    And do you know how long he was there?

21   A    For about three years.

22   Q    And do you know what type of work he did for Theo Davies?

23   A    Yes.  I didn't know the exact title, but the kind of work

24   he did was a troubleshooter.  He went to some of their

25   subsidiaries to look at their operations to find ways to

1    improve it and to improve efficiencies, to enhance

2    efficiencies.  And so he not only worked out at the main office

3    downtown, but then he also went to some subsidiaries, like

4    Caterpillar and Theo Davies Home Improvement in Hilo, to just

5    do an overview and make recommendations on improving their

6    operations.

7    Q    Okay.  He left -- I think you said he was there for three

8    years.  Do you know why he left Theo Davies?

9    A    I think that they were --

10             MR. TONG:  Your Honor, I object to the speculation.

11             MR. TOSCHER:  Okay.

12             THE COURT:  It does sound like she's launching into

13   speculation.  Sustained.

14   BY MR. TOSCHER:

15   Q    Okay.  Let me ask you, after Mr. Hee left Theo Davies,

16   what did Mr. Hee do?

17   A    For a very short time he was with a construction company.

18   Q    And what about after that?

19   A    After that he had a contract with the newspapers.  He was

20   the distributor for part of Kailua where we live.  He would

21   get -- he would pick up the newspapers at the main office in

22   Honolulu, bring it over to the Kailua side, and count them out

23   in piles or packets and have them -- and deliver them to the

24   individual newspaper carriers.

25   Q    And did you have a role in that business?

1    A    Yes.

2    Q    Can you tell us what you did in that business.

3    A    So early in the morning you get up and you go and you pile

4    all the newspapers in the back of a van, and you count them out

5    and you -- and he was the -- I mean, he drove the van.  And

6    then when we'd get to the place where the individual newspaper

7    carrier was or the delivery person was, I would jump out and,

8    you know, plop it there by their house, and we'd go on and

9    deliver all of those.

10             And it was -- on Sundays it was especially tedious

11   because they had inserts, like ads and things, and we had to do

12   all that before counting them out and delivering them.  And

13   it's -- yeah.

14   Q    What time of the day did you have to do this?

15   A    Early in the morning and before I went to work.

16   Q    All right.  You said -- how long did the newspaper --

17   A    About two years.

18   Q    Do you know what Mr. -- what did Mr. Hee do after that?

19   A    Well, in that time, '83, '84, I was at the Office of

20   Hawaiian Affairs.  And I helped with his business development

21   or whatever by introducing Albert to an OHA contact that I had

22   that was an expert in the 8(a) program.  It's a federal

23   program.  And he and Albert got together.  And when Albert saw

24   these business opportunities that were available, he let go of

25   his contract with the newspaper, and he opened up his first

1    office that I helped him establish in our house.

2    Q    That's what I was going to ask you.  Where was his first

3    office, Mrs. Hee?

4    A    In a spare bedroom in our house.

5    Q    And do you recall what the nature of the projects he was

6    engaged in?

7    A    In the beginning the office in the house, he was in the

8    home from '85 to '88.  And at the beginning he did consulting

9    work, and especially with the Ushios.  David and his wife Judy

10   Ushio had an 8(a) company, and Albert would help them with

11   that.  But then later on he wanted to do projects on his own,

12   and the first one was -- or that I remember anyway -- is the

13   Honoli'i Hydroelectric Power Project.

14   Q    Did you have any involvement in assisting him in that

15   project?

16   A    Yes.

17   Q    And can you tell the jury what that involvement was.

18   A    Sure.  Although, I was working full time; so I didn't -- I

19   wasn't able to help him actually do a lot of the writing, but I

20   did help with reviewing and editing the documents.  I don't

21   remember the Environmental Impact Statement for that particular

22   project, but I do know that there were documents that needed to

23   be done for the Water Commission.  That project needed approval

24   of the Water Commission.

25   Q    So you would come home at night after your job and --

1  A     Yes.  Yeah.  But it was, you know, stuff that I was used

2  to doing, reviewing, you know, reading and reviewing documents

3  and editing them.

4  Q     The -- you mentioned the hydroelectric power plant.

5  A     Right.

6  Q     Was there another project that you can recall back in this

7  early time?

8  A     Yes.  And that one I did -- I didn't write the EIS, I

9  didn't write the Environmental Impact Statement, but I remember

10  reviewing it.  And I also remember helping him find the vendor,

11  the consultant, to actually do that.  It was the Kawaihae -- it

12  was a power plant.

13  Q     Over the years and we're going to -- could you -- what

14  type of other work did you -- I asked you some specific

15  instance, but what type of other work -- how did you assist

16  Mr. Hee in his businesses?

17  A     Well, general -- I guess I can sort of -- I think four

18  categories of the type of work that I did.  The one that I

19  talked about early on was the editing -- reviewing and editing

20  documents.  Later on I think I did a little more research for

21  him, gathering information.  I -- throughout from the beginning

22  I served as a sounding board for him.  He bounced ideas off of

23  me.  I was able to, you know, have discussions with him and

24  give him advice.  And later on, as his company was more

25  established, I attended functions for him.

1    Q    Okay.  Was there a reason you attended functions on his

2    behalf?

3                MR. TONG:  I object.  That calls for hearsay.

4                THE COURT:  Sustained.

5    BY MR. TOSCHER:

6    Q    These functions that you attended, you said, for him, is

7    that because Mr. Hee did not attend the functions?

8                MR. TONG:  Objection, Your Honor.  That's leading and

9    also no foundation for it.

10               THE COURT:  Sustained.  It is leading.

11   BY MR. TOSCHER:

12   Q    Okay.  Did you attend functions on behalf of the companies

13   with Mr. Hee not present?

14   A    Yes.  Often.

15   Q    Okay.  Can you tell us, from your own personal

16   observations, not what just somebody told you, why Mr. Hee did

17   not attend.

18   A    Sure.  Yeah.

19   Q    Tell us.

20   A    Many of those functions involved meals, and my husband has

21   a lot of food allergies.  And sometimes we would go to these

22   functions, and at the end after everybody has eaten and, you

23   know, he couldn't figure out what was safe for him to eat, we'd

24   end up at Zippy's because he couldn't get eat a meal that he

25   had sponsored or, you know, helped sponsor.

1   Q    Let me go back a bit to your employment history.  I think

2   we left off when you -- in 1988 when you worked for OHA.

3   A    Right.

4   Q    The Office of Hawaiian Affairs.  What did you do after

5   that, Miss Hee?

6   A    Okay.  1988, yeah.  I actually applied for a position to

7   head up the planning department at Queen's, the Queen's Medical

8   Center.  I -- interesting, I didn't get the job, but the

9   president of Queen's met with me and said that he wanted me to

10  come on board anyway to work there because he wanted to have

11  specific -- a couple of specific things done.  One was he

12  wanted me to produce a weekly report specifically for him that

13  would highlight activities that were related to -- and current

14  activities that were related to the health care field.

15          For example, he wanted to know the status of

16  construction on other physician buildings in the city.  He

17  wanted to know the status of projects that were before the

18  State Health Planning and Development Agency.  So that kind of

19  research and presentation of information in a concise manner so

20  that he could review that.  He also wanted more outreach to the

21  native Hawaiian community.

22          So it sounded great to me; so I took the job.  And

23  while I was there I organized a group of Hawaiian employees at

24  Queen's.  We called ourselves 'Ahahui Emmalani.  And we did

25  free health fairs up at Papakolea, which is a Hawaiian

1   homestead area and close to the hospital.  So we were able to

2   expand the services to the native Hawaiian communities.

3   Q    Services of Queen's Hospital.

4   A    Right.  Right.

5   Q    How long were you with Queen's Hospital?

6   A    From -- let's see.  I started there in '88 till '91.

7   Q    And what did you do after you left Queen's Hospital?

8   A    Again I got an unsolicited job offer from this time the

9   University of Hawai'i.  The vice president for university

10  relations was Rockne Freitas, and he wanted me to come on board

11  and join his staff.  He had been a trustee at the Office of

12  Hawaiian Affairs when I was the planning officer there.

13        So while I was at the university I worked on the

14  marketing plan for the university system, and I also attended

15  events for the vice president.  I attended community meetings,

16  political functions, native Hawaiian events.

17  Q    Okay.  And how long were you with the University of

18  Hawai'i, Mrs. Hee?

19  A    '91 to '96.

20  Q    And what did you do after you left the University of

21  Hawai'i?

22  A    Well, at that time by '96 I had three kids.  They were, I

23  guess, 10, 9, and 7.  And by then Albert's company had grown

24  and stabilized.  It had stabilized enough that he had medical

25  coverage.  And previous to that it was really important for me

1    to stay in a full-time position, not only for the income

2    because there were years when he wasn't drawing -- he didn't

3    have any income, and it was, you know, unstable up and down.

4    So just as importantly, I needed the full-time job before that

5    for the medical insurance.  So by '96 his company had medical

6    insurance.  So he was also traveling a lot at that time.  It

7    just made a lot of sense for me to cut back; so I looked for a

8    part-time job, part-time work.

9    Q    And what did you do?

10   A    In '97 -- '96, '97, '98, that time period, I worked

11   part-time at the state legislature for State Representative

12   Hermina Morita, who is a representative from Kauai.  And during

13   that period the state -- the legislative session runs usually

14   January through about May.  So for the first half of the year I

15   would work for her part-time, and then for the second half of

16   the year I wrote grants for the biology department at the

17   University of Hawai'i.

18   Q    We talked before -- I asked you one of the reasons you

19   attended some of the business events without Mr. Hee, and you

20   said you referenced his food allergies.  Were there other

21   reasons that you would go and he would not?

22             MR. TONG:  Again, I object to the extent it calls for

23   hearsay.

24             MR. TOSCHER:  Observation.  She lived this.

25             THE COURT:  So I'm going to sustain the objection.

1    You can clarify your question to ensure that it's going to be

2    relying on what she saw, not what she was told.

3            MR. TOSCHER:  Okay.  What she saw or observed.

4            THE COURT:  I don't know the difference between

5    seeing and observing.  Maybe there's something that escapes me.

6            MR. TOSCHER:  Well, okay.

7            THE COURT:  Not what she heard.

8            THE WITNESS:  Yes.  Okay.

9            MR. TOSCHER:  Not what you heard.

10           THE WITNESS:  Not what I heard, okay.

11           THE COURT:  Hold on.  What's the question?

12   BY MR. TOSCHER:

13   Q    The question is -- well, I'll just ask this.  In addition

14   to the food allergies, were there other reasons that you went

15   to these functions without Mr. Hee?  And don't rely upon what

16   he told you.

17           Is that the way I can do it, Your Honor?

18           THE COURT:  Or what anybody else told her.

19   BY MR. TOSCHER:

20   Q    Or what anybody else told you.

21   A    Yes.  There were a couple of things I saw and observed,

22   and one was that I was more comfortable in social situations

23   with strangers.  Albert -- it was not something that he enjoyed

24   much.  And the other thing that I observed was that he was --

25   he was tired.  I mean, he spent long hours at his job, and it

1    was difficult for him to spend all that time at work and then

2    go to a function that was taxing for him.  It was not a

3    pleasant -- it wasn't pleasant.

4    Q    You talked about Mr. Hee's business office was originally

5    in your home; is that correct?

6    A    Correct.

7    Q    Spare bedroom.

8    A    Right.

9    Q    Now, did there come a time when the business moved out of

10   your home?

11   A    Yes.

12   Q    Okay.  It's okay.  And where did the -- when -- did it

13   move -- you said it moved.  Where did it move to and when --

14   what time period are we talking about approximately?

15   A    Yes.  It moved to Grosvenor Center.  And I can tell you

16   specifically it was August 1988 because it was Liko's first

17   birthday.  So August of 1988 he moved from our home off --

18   yeah, an office in our home to an office in Grosvenor Center.

19   Q    Okay.  And what was your involvement or role in the move

20   in setting up the office?

21   A    I was there with him.  We painted the walls of the office.

22   I helped him move his things in there.  I even helped him find

23   his first two secretaries.  And his first professional staff

24   was a co-worker of mine from OHA, a former colleague of mine.

25   So I helped him find staff as well.

1  Q    His employees.

2  A    Right.

3  Q    Later on, as the business was growing, did you continue to

4  have the role of helping the business recruit other employees?

5  A    Yes.  Especially in the '90s.  I can't remember the exact

6  year, but in the '90s when he was expanding, there were --

7  there was a very key personnel that he needed.  He was a

8  telecommunications expert.  His name was Al Peterson.  His

9  expertise was critical to Albert's company.  And I believe

10  Albert had already met with him and -- but there seemed to be

11  some reluctance.  And we found that his wife was not quite

12  comfortable with coming.

13        So Albert set up -- he asked me to come with him to

14  business dinners, business meetings with Mr. and Mrs. Peterson

15  to, I guess, dispel any of her fears and to try to make sure

16  that Mrs. Peterson was comfortable in relocating to Hawai'i.

17  Q    And how did that recruitment effort work out?

18  A    It worked out very well.  The Petersons decided to

19  relocate to Hawai'i, and I made sure that I made myself

20  available as a resource to Mrs. Peterson to help her -- to help

21  the transition when she moved here.  She didn't know, you know,

22  either what communities she wanted to look at for housing.

23  When she did find a nice house that she liked, she would call

24  me to say, well, what do you feel about, like, La'ie Point?    I

25  was like, kind of nice but really far.  And if you think your

1   husband's going to drive from there to Honolulu every day and,

2   you know, I don't think he'd be very happy.  So, you know,

3   those kind of things she would call and try to -- I would try

4   to help her.  And, eventually, I guess, when she found her

5   niche and whatever, she wasn't calling as much.

6   Q    Do you know how long Mr. Peterson was with the company?

7   A    Yeah, he stayed for over 10 years.

8   Q    And do you know what his role in the company was, his

9   expertise?

10  A    Yes.  He was an expert in the federal program that Albert

11  was involved in, I think, is RUS.

12  Q    Did there come a time that you traveled on behalf of the

13  company, Mrs. Hee?

14  A    Yes.

15  Q    Did there come a time when you made a visit to the

16  Alcatel-Lucent plant in France?

17  A    Yes.  That was in 2008, I believe.  Yes, 2008.  Can I --

18  Q    I'll ask you a question.

19  A    Oh, okay.

20  Q    2008.  I believe that is correct.  Can you tell us the

21  circumstances of why you went on that trip.

22       MR. TONG:  I object to the extent it relies on what

23  someone else told her.

24       THE COURT:  It's a pretty vague question.  Do you

25  think you can clarify this?

1           MR. TOSCHER:  I will try.

2    Q    What was the purpose of your trip, Mrs. Hee?

3    A    I was to witness the manufacturing processing of the fiber

4    optic cables.

5    Q    Okay.  And was there a contract going on with one of the

6    companies and Alcatel-Lucent?

7    A    Yes.

8           MR. TONG:  I object.  No foundation.

9           THE COURT:  Okay.  Yeah.  I'm going to strike that

10   answer, instruct the jurors to disregard it.  I'm sustaining

11   the objection.

12          MR. TOSCHER:  Okay.  Thank you.

13   Q    Were you aware that one of the Waimana companies was

14   engaged in a contract with Alcatel?

15          MR. TONG:  Objection based on hearsay.

16          THE COURT:  Well, it's also leading her.

17   Sustained.

18   BY MR. TOSCHER:

19   Q    Okay.  Were you aware of negotiations -- were you aware of

20   business that one of the Waimana companies was engaged in with

21   Alcatel-Lucent?

22          MR. TONG:  Objection.  Leading and hearsay.

23          THE COURT:  Sustained.

24   BY MR. TOSCHER:

25   Q    Okay.  Mrs. Hee, you traveled to -- did you travel to

1    France?

2    A    Yes.

3    Q    And who else went on that trip with you?

4    A    Liko, my second daughter, and her fiancee.

5    Q    And his name is?

6    A    Oh, Mika.

7    Q    Does he have another name that he goes by?

8    A    Jonathan.

9    Q    Is Liko now married to Jonathan?

10   A    Yes.  He's the father of my two grandkids.

11   Q    That makes him important, I agree.

12        MR. TONG:  Your Honor, I think I move to strike his

13   comment.

14        MR. TOSCHER:  I apologize.  I was just being --

15        THE COURT:  I didn't hear his --

16        MR. TOSCHER:  I whispered to myself that makes him

17   important.  He's the father of her grandchildren.

18        THE COURT:  Okay.  Disregard that little comment.

19        MR. TOSCHER:  I apologize for that.

20   Q    Tell us what you did.  Did you visit the Alcatel plant?

21   A    Yes.

22   Q    And where is the Alcatel plant located?

23   A    It's in Calais, France.  It's a two-hour train ride out of

24   Paris.

25   Q    So you flew to Paris?

1    A    Right.

2    Q    And you took a train to Calais?

3    A    Correct.  It's a two-hour train ride.

4    Q    Tell us about what you did when you visited the Alcatel

5    plant at Calais.

6    A    Sure.

7    Q    Start from the morning when you left Paris and take us

8    through the day, if you will, please.

9    A    Sure.  We caught an early morning train from Paris to

10   Calais.  I don't -- sometimes don't travel well.  So the person

11   who came and got us at the train station was an agent of

12   Alcatel-Lucent, who was actually from Montreal.  So he spoke

13   English.  And the people at the plant had a whole day scheduled

14   for us.  Unfortunately, it was delayed a little bit because I

15   didn't do very well on the train ride.  So I had to stop and

16   get, like, crackers or something to settle my stomach.  When we

17   got to the manufacturing plant, the managers were there.  There

18   were three or four of them, and they were quite anxious to get

19   through this whole day.

20         They -- we first started off watching a video in

21   English about their company, where their fiber optic cables

22   were placed throughout the world, and a little bit about their

23   manufacturing in the video.  After the video they actually took

24   us on a tour of the manufacturing plant so that we could see

25   how it was done.

1          We went into the area where the fiber optic is made.

2     And it's a very sterile area.  You have to wear, like, a gown.

3     It's like you're going into a surgical suite.  You've got, you

4     know, paper booties.  You've got a paper hat.  We got in there,

5     and it was clear it's because they're taking the glass and

6     they're stretching it.  And they need to do a continuous

7     stretch of the glass, and they don't want any dust on it to

8     contaminate it.  And it goes to another section where it's

9     encased in steel and rubber, and then the final area was where

10    they would spool -- they would wind it onto these huge spools.

11    So it was really clear that the process was such that it took

12    months to complete a single job order.  That's because they're

13    making these fiber optic lines in one continuous creation.

14          And it was important for me to see that so that I

15    could report back to Albert about the process because there was

16    a dispute over the production of the materials or the product

17    that they had for him.  He had ordered the --

18          MR. TONG:  Your Honor, now --

19          THE COURT:  Okay.  Sustained.

20          And we're going to take a break now and come back at

21    three o'clock, and we'll go till 4:00.

22       (Jury excused.)

23          THE COURT:  Okay.  Counsel.

24          MR. TOSCHER:  Your Honor, I appreciate the objection

25    and the Court's concern, and I'm familiar with the hearsay

1    rule.  And how else can someone who goes on an activity tell a

2    reason why they're going or a discussion they had?

3          These discussions aren't offered, you know, for the

4    truth of what they were said, just the fact they were said and

5    why she was going.  We all learn things.  We observe.  We hear.

6    And I think I'm entitled to inquire as to why she went, what

7    her understanding was.  And it could be the subject of

8    cross-examination.  So I'm not trying to get in somebody else's

9    testimony.  I'm trying to get in context as to why -- what her

10   understanding as to why she went.  She's trying to explain, you

11   know, and I can ask her when she comes back, what did you

12   report back?  But it's half of a conversation.

13         So I'm just making the pitch to the Court.  I

14   respectfully, you know, want to submit that.

15         THE COURT:  Okay.

16         MR. TOSCHER:  Thank you.

17         MR. TONG:  Your Honor, it is being offered for the

18   truth of the matter asserted.  The whole point is to,

19   basically, give a business reason for it coming from the mouth

20   of the taxpayer, who has not yet explained to the jury what his

21   purpose in any of this was, and he wants to bootstrap that into

22   arguing to the jury that these were business trips.  So I have

23   no problem with her describing what she did, but I don't think

24   she should be permitted to say "I was told to do this because

25   there was a business negotiation between the company and the

1    vendor, and I needed to do X, Y, and Z."

2         THE COURT:  I understand that you're saying, "Well,

3    gee, you know, what was her understanding."  But it really

4    isn't relevant what her understanding is.  I'm really concerned

5    that you are trying to get in what her husband thought was

6    important as opposed to what she thought was important because

7    really it's what he did that's in issue in this case.

8         MR. TOSCHER:  Right.  And I fully respect the

9    Court's, and I'm not going to belabor it.

10        THE COURT:  No, but you can make your record.

11        MR. TOSCHER:  But it's not the fact -- it's the fact

12   that he said it is an independent act -- he doesn't have to

13   be -- the fact that it was said lays the foundation of why

14   she's there.

15        THE COURT:  Sometimes statements are allowed because,

16   as we all know, they're not offered for the truth.  "I'm cold.

17   Can I use your jacket?"  Okay.  You know what, maybe I'm not

18   really cold; I just really think that jacket is cool, and I

19   want to wear it.  Okay.  So whether I'm really cold or not may

20   possibly not be offered for the truth.  But in this case, you

21   know, she wants to say, "Well, it was really important for me

22   to go there and watch this process because my husband had a

23   dispute about some fiber optic cables," presumably claiming

24   they were defective or whatever.  I think that's offered for

25   the truth.

```
 1          MR. TOSCHER:  Well, I think there's no dispute that
 2   there was -- this is a company that she works for.  The
 3   government says it's not real work.  They can have their
 4   position.  She's working for, she's going as a representative,
 5   and --
 6          THE COURT:  But the hearsay rule's the same whether
 7   she's an employee or a nonemployee who's married to the owner
 8   of the company.  So I hear you.  I'm going to let you make your
 9   record.
10          MR. TOSCHER:  I won't belabor the point.  I
11   appreciate the Court's time.  I know -- okay.  Thank you, Your
12   Honor.
13          THE COURT:  Okay.  So see you at three o'clock.
14      (Court recessed at 2:50 P.M., until 3:06 P.M.)
15          THE COURT:  Okay.  The witness can be back on the
16   stand so we can pick right up.
17          MR. TOSCHER:  I apologize, Your Honor.  I thought she
18   was here.
19          THE COURT:  Okay.  Mr. Toscher.
20          MR. TOSCHER:  May it please the Court.  Ladies and
21   gentlemen.
22   Q    Mrs. Hee, when we were talking before, you were telling us
23   about the tour of the Alcatel factory.  You told us about you
24   were in a sterile environment where they were manufacturing the
25   glass cable?
```

1    A    Right.

2    Q    After you were done with the sterile environment did they

3    take you elsewhere in the factory?

4    A    Right.  Yes.  As I explained, we went through the whole

5    process.  The second part was when they encased the glass in

6    the steel and the rubber.  Then the final was to wind all of

7    that on these huge spools, and it was just one continuous

8    winding.

9    Q    And that wasn't in the sterile environment.

10   A    No, no.  Yeah, yeah.  From the second phase on, it was out

11   in another area.

12   Q    Could you look at the small notebook.  Not the white one

13   but the one next to it.  Yes.  Look at -- I think it's 50-5,

14   what's been marked as 50-5.

15   A    Yeah.

16   Q    Do you recognize that as a picture taken of you at the

17   Alcatel factory, Mrs. Hee?

18   A    Yes, it is.

19   Q    And you believe that to be an accurate portrayal of you

20   and the people in there and the factory where it was taken?

21   A    Correct.

22        MR. TOSCHER:  Your Honor, at this point I would offer

23   exhibit 50-5 into evidence.

24        MR. TONG:  No objection.

25        THE COURT:  Okay.  50-5 is received.

```
 1              MR. TOSCHER:  I apologize, Your Honor.  My audio tech
 2    specialist -- maybe Christina.  Which one is it?  E?
 3              THE COURT:  B.
 4              MR. KAWAFUCHI:  B, as in boy.
 5    BY MR. TOSCHER:
 6    Q    Miss Hee, this is exhibit 50-5, 50-5, which was just
 7    admitted into evidence.  I'm going to ask you if you can
 8    identify -- I know the picture is not that good, especially
 9    when it's on the screen.  Can you identify the people in the
10    picture, starting with the lady on the left with the blue hat.
11    A    Sure, yes.
12    Q    Who is that person?
13    A    I don't remember her name, but she was the assistant who
14    gave us the tour of the facility.  Next to her is the
15    Alcatel-Lucent agent who was from Montreal, who picked us up at
16    the train station.  Next to him is my daughter Liko.  And next
17    to her is her fiancee Mika or Jonathan.  And then at the end,
18    that's me.
19    Q    Okay.  And Jonathan was Liko's fiancee at the time?
20    A    Correct.
21    Q    Now, he's married; is that correct?
22    A    Yes.
23    Q    To Liko.  Thank you.
24              When you returned from the trip, did you talk to your
25    husband and tell him what you observed?
```

1    A    Yes, I did.

2    Q    And what did you tell him?

3    A    I told him about the manufacturing process and how it was

4    important for the creation of the fiber optic to be a

5    continuous -- continuous line, and that it was -- because of

6    that it took so long for a single job to be completed.  And

7    that the Alcatel-Lucent plant had already scheduled and had all

8    of their jobs lined up so that, if there was a reorder or a --

9    it would disrupt their schedule and would be very costly for

10   the person to have a line redone.

11   Q    Okay.  Was there a time you also attended a presidential

12   inauguration in Washington, D.C.?

13   A    Yes.

14   Q    Did you attend the 2009 Presidential Inauguration of

15   President Obama?

16   A    Yes.

17   Q    Who attended that with you, Mrs. Hee?

18   A    My daughter Ho'o, my oldest; Liko; again Mika, her

19   fiancee; and myself.

20   Q    And were you attending the inauguration on behalf of

21   Waimana?

22   A    Yes.

23        MR. TOSCHER:  Your Honor, I believe with the -- we

24   have a stipulation with the government on 50-3 as to being able

25   to be admitted as a authentic business record of Waimana.

1          MR. TONG:  No objection to the admission of 50-3.

2          THE COURT:  Okay.  Received in evidence.

3          MR. TOSCHER:  Thank you, Your Honor.

4    Q    Will you tell the jury why you -- you can look at it,

5    Mrs. Hee.  I wasn't asking yet, but go ahead.

6          Okay.  Why did you attend the inauguration on behalf

7    of Waimana, Mrs. Hee?

8          MR. TONG:  Objection.  Hearsay.

9          THE COURT:  Sustained.

10   BY MR. TOSCHER:

11   Q    Miss Hee, look at exhibit 50-3.  Waimana had a

12   sponsorship, did it not, of the Hawai'i Inaugural Ball?

13   A    Yes, it did.

14   Q    And did you -- tell us what activities you did when you

15   attended the presidential inauguration.

16   A    We tried to -- before the inaugural ball, which Waimana

17   helped sponsor, we tried to go and -- onto the Washington Mall

18   to watch the actual inauguration.  I was -- I was with a friend

19   who was in a wheelchair, and it was a very difficult process

20   for us.  It was very crowded.  I was pushing her.  And we were

21   originally planning to catch the subway to get to a spot where

22   we were going to watch everything.  The subway was closed.

23   They closed it for security reasons.  So I pushed my friend on

24   the Mall.  There was no place for us to go across.  We just

25   walked and spent our time trying to get to actually an office

1  where we were supposed to gather, and it just didn't happen.

2  So we turned back and we just got ready for the ball, which was

3  sponsored by the Hawai'i State Society of Washington, D.C.

4  Q    And did you attend the ball?

5  A    Yes.

6  Q    Did you visit any of the Hawaiian congressional

7  delegation?

8  A    Yes.

9  Q    Tell us about that.

10 A    Senator Inouye, who actually was one of the honorary

11 sponsors as well, we made sure that we did a courtesy call and

12 visited with him.

13 Q    And who was on that visit when you visited the senator or

14 made the courtesy call?

15 A    Pardon?

16 Q    Were your daughters with you?

17 A    They were -- let's see, they were with me, but they didn't

18 come in.  I mean, they didn't talk to the senator.

19 Q    Okay.  But you did talk to the senator.

20 A    Yes, I did.

21 Q    And based upon your education and experience and all the

22 various roles you've talked about, was there an important

23 business reason that you had a meeting or greeted the senator?

24        MR. TONG:  Objection, Your Honor, to the extent it

25 calls for hearsay.

```
 1              MR. TOSCHER:  I asked --
 2              THE COURT:  I guess I don't understand the question.
 3   Based on her education, was there an important business reason?
 4              MR. TOSCHER:  Education and work experience.  She's
 5   in the business community, and I'm trying to -- if I asked her
 6   why she met with the senator, I would have drawn a hearsay
 7   objection, I think.
 8              THE COURT:  I think it's the same problem; so I'm
 9   sustaining the objection.
10              MR. TOSCHER:  Thank you, Your Honor.
11   Q    Do you recall what you discussed with the senator,
12   Mrs. Hee?
13   A    Yes.  It was, basically, a courtesy call.  And we -- I
14   just wanted to make sure that the senator knew that Waimana was
15   being represented and that we were there to help support the --
16   this Hawai'i State Society of Washington, D.C., because it was
17   their first -- the very first time that they sponsored an
18   inaugural ball.  And it was -- as I say, it was just a courtesy
19   call so that he knew we were there and to further good
20   relations with the senator.
21   Q    Okay.  Any other Waimana-related meetings you had when you
22   were in Washington, D.C., on this trip, do you recall?
23   A    Again just courtesy calls to -- we met with the president
24   of Raytheon International, Torkel Patterson.
25   Q    Okay.  Now, you testified before Liko and Ho'o were with
```

1   you; is that correct?

2   A     Yes.

3   Q     Was Mr. Hee with you?

4   A     No.

5   Q     And he didn't attend this presidential inauguration.

6   A     No.

7   Q     Now, did there come a time when you took a trip to Tahiti?

8   A     Yes.

9   Q     I believe in 2010.

10  A     Yes.

11  Q     And could you tell us what business -- or tell us what you

12  did when you went there.

13  A     Sure.  We stayed -- we landed in Papeete, the capital of

14  French Polynesia on the island of Tahiti.  And there were a

15  couple things that we wanted to do.  One was to check out the

16  landing site for the Honotua cable.  There was a fiber optic

17  cable that had just been laid that connected Tahiti to Hawai'i.

18  There was that.  And the other thing that we wanted to

19  accomplish was to just check out the business climate to see

20  what kind of business possibilities were there.

21  Q     And --

22  A     In so doing, we went through Papeete, and that was not

23  very long or difficult to do because it was kind of like

24  Wahiawa.  I mean, it was just very low -- low-rise, not very

25  developed.  So then we drove around the island, and that was

1    like Moloka'i:  very rural, very undeveloped.  We went to -- I

2    wanted to try the super ferry because I never got to do it here

3    in Hawai'i.  So there was a super ferry from Tahiti to Mo'orea.

4    We did that.  We went around there.  And that was very

5    undeveloped.  And that was like Lana'i:  very undeveloped.

6           We met with a fellow who was actually an uncle of one

7    of Liko's classmates, and he was a administrator for a church

8    at -- on Tahiti in Papeete.  And we got to discussing, you

9    know, just -- well, a couple of things.  One, he was going to

10   try to get us to meet with someone he knew at Honotua, and he

11   wasn't able to do that.  The other thing was that we just

12   discussed Tahiti generally.

13          And I was interested in their education because one

14   of the things that I thought was interesting about the fiber

15   optics, it's -- I think it's good for business, but it's also

16   good for education.  And from what I learned is that, if people

17   are serious about education in Tahiti, they send their kids to

18   France, and it's not something that -- I mean, the education

19   system and the education resources in Tahiti are just not

20   there.  So it was a -- I thought it was not a good place to do

21   business.

22   Q    And did you report your observations and conclusions to

23   your husband?

24   A    Yes, I did.

25   Q    Let me fast-forward to 2011.  You took a trip with other

```
 1    members of the family and stayed at the Mauna Lani; do you
 2    recall that?
 3    A    Yes.
 4    Q    Now, I think the evidence was there was a Hawaiian Home
 5    Lands Commission meeting in Hilo before that.  Did you attend
 6    that meeting?
 7    A    No, I did not.
 8    Q    And you know who attended that meeting?
 9    A    Yes.  My husband and the three children.
10    Q    Could you tell the jury what you did on that trip.
11    A    Yes.  I met -- I went directly to Mauna Lani, and my
12    husband and the three children drove there.  We met with the
13    Waimana Enterprises General Counsel, who also happened to be
14    the trustee of the children's trust.
15    Q    And who is that General Counsel?
16    A    Janeen Olds.
17    Q    Does she now have another position with the company?
18    A    Yes.  She's the CEO of Sandwich Isles.
19    Q    Now, did there come a time when you started receiving a
20    salary from Waimana Enterprises?
21    A    Yes.  I had been working part-time until 2000 -- yeah,
22    2000, and then I got another unsolicited job offer.  And this
23    time it was from my husband.  He offered to actually start
24    paying me for things that I had been doing for him from 1985.
25    Generally, it was still things like reviewing and editing
```

1   documents, doing any research that he needed, just serving as a

2   sounding board and advising him and attending events.

3   Q    So the difference now is you were getting paid for it.

4   A    Yes.

5   Q    Now, during this period of time post-2000 did you have

6   other jobs you were -- outside of Waimana that you were being

7   compensated for?

8   A    Yes.  In 2001 I did a small contract with a -- sorry, with

9   a nonprofit that I had done work for previously, and that's

10  Pacific Islanders in Communications.  In about 1998 or so I

11  helped them develop their master plan, and then in 2001 they

12  approached me to help them conduct a series of focus group

13  sessions so that they could identify areas where they could

14  improve access to their services.  So I did that.  That was a

15  small contract that I did in 2001.

16         Then in 2012 I, you know, after many years of helping

17  the Hawaiian community through my husband's company, I wanted

18  to do more.  So there was a position as the executive director

19  of the Native Hawaiian Education Council that I was able to get

20  and did that for a couple of years.

21  Q    Okay.  Now, I think -- let me just be clear.  When you

22  were put on salary in 2000, did your duties for Waimana change

23  at all?

24  A    No.

25  Q    Now, are you --

1          I have no further questions, Your Honor.

2          THE COURT:  Okay.

3          MR. TOSCHER:  Thank you.

4                    CROSS-EXAMINATION

5    BY MR. TONG:

6    Q    Good afternoon, Mrs. Hee.

7    A    Good afternoon.

8    Q    Let's start with your relationship to Waimana from 2000 to

9    the present.  As I understand it, you say your duties remained

10   the same as they were previous to that; is that correct?

11   A    Right.

12   Q    Just so we're clear, you're not a shareholder of Waimana;

13   is that correct?

14   A    That's correct.  I believe -- I don't -- actually, I don't

15   know.

16   Q    Well, your husband was the sole shareholder for many

17   years; correct?

18   A    I believe so.  Again, I don't know for sure.

19   Q    So you don't know too much about the corporate ownership

20   of the company; correct?

21   A    Finances, I don't know.

22   Q    And so we're clear, when it comes to finances, you had

23   nothing to do with the bookkeeping of Waimana; correct?

24   A    No.

25   Q    Or the reimbursement of expenses for business or other

1    purposes; correct?

2              THE COURT:  Can this be clarified?  You said you had

3    nothing to do with bookkeeping; correct?  Her answer was "No."

4    BY MR. TONG:

5    Q    Did you have any -- I'm sorry.  Did you have anything to

6    do with the bookkeeping of Waimana?

7    A    No.

8    Q    Did you have anything to do with Waimana's processing of

9    reimbursements of business expenses?

10   A    No.

11   Q    Did you have anything to do with Waimana's processing of

12   personal expenses charged to your husband's credit card?

13   A    No.

14   Q    And during the time that you performed these duties for

15   Waimana, is it true that you had no work space at the business

16   office?

17   A    That is correct.

18   Q    Nor did you have a -- an office of any sort at the

19   workplace.

20   A    Okay.

21   Q    You didn't have an office.  You didn't have a desk.  You

22   didn't have a place to go to work at Waimana.  Correct?

23   A    At Waimana.

24   Q    Yes.

25   A    Correct.

```
 1   Q    Yes.  Now, you mentioned that you went on this trip to

 2   Tahiti, and I think you said it was in July of 2010; is that

 3   correct?

 4   A    Correct.

 5   Q    And is it not true that the trip originated with the idea

 6   that Ho'o wanted to visit the Heiva?

 7   A    Not that I know of.

 8   Q    You did visit the Tahitian hula festival, did you not?

 9   A    On the way to the airport we stopped.

10   Q    And that was the Heiva; correct?

11   A    Yes.

12   Q    And how did you pay for that trip?

13   A    I don't know.

14   Q    Did anyone have a credit card on that trip?

15   A    Oh, yeah, on the trip.  Are you asking how was the trip

16   paid for or how did we cover expenses on the trip?

17   Q    Well, let's break it down.  Let's do the latter question

18   first.  How did you cover expenses on the trip?

19   A    We paid with a credit card.

20   Q    And is that the credit card that was maintained by your

21   husband Al Hee?

22   A    I had a personal credit card and a card that he has.

23   Q    Okay.  And you used both of those; is that correct?

24   A    I believe so.

25   Q    And so we're clear, you say that you went there with the
```

1   purpose of seeing the Honotua cable landing; is that correct?

2   A    That was one of the purposes.

3   Q    And you tried to see the cable landing, did you not?

4   A    Right.

5   Q    You drove around for one day; correct?

6   A    Yes.

7   Q    And you weren't able to find it, were you.

8   A    My recollection is that the area that we were told it was

9   in there was road construction; so it was difficult to maneuver

10  in that area.

11  Q    So given the difficulty in maneuvering in that area, you

12  never actually saw the cable landing; correct?

13  A    Correct.

14  Q    And you mentioned that you also attempted to have the

15  uncle of your daughter Liko's classmate assist you in that

16  endeavor; is that correct?

17  A    Correct.

18  Q    But that person was unable to set up any kind of meeting

19  with the Honotua people; correct?

20  A    Correct.

21  Q    Or to assist you in finding the cable landing; correct?

22  A    Correct.

23  Q    So I gather from that that before going to Tahiti you had

24  not made any arrangements to actually visit Honotua; is that

25  true?

 1   A     My recollection was that it was a quick -- a quick trip.

 2   Q     So by that you mean it was a spur-of-the-moment thing to

 3   go; so you didn't have time to make arrangements to visit the

 4   cable before you went.

 5   A     My recollection, yeah.

 6   Q     You're agreeing with that?

 7   A     I think so, yes.  I'm thinking that that's probably what

 8   happened.

 9   Q     So what probably happened is you didn't have time to make

10   those arrangements.

11   A     (Nods head.)

12             MR. TONG:  You have to answer out loud.

13             THE WITNESS:  Pardon?

14             THE COURT:  Can you answer out loud instead of

15   nodding your head.

16             THE WITNESS:  I'm sorry.  Okay.

17             THE COURT:  So what was your answer?

18             THE WITNESS:  I'm sorry.  Can you say the question

19   again so I can --

20   BY MR. TONG:

21   Q     Yeah, Mrs. Hee, I'm just trying to get you to tell us that

22   you did not make arrangements to visit the cable before you

23   actually went to Tahiti; correct?

24   A     Correct.

25   Q     Now, you say that you covered your expenses with some

1    credit cards; is that right?

2    A    Yes.  That's what I recollect.

3    Q    All right.  Let's see if we can help your recollection.

4         May we see exhibit 4-33, page 3801, please.

5         Mrs. Hee --

6    A    Is that in here?

7    Q    -- we're going to put a document up on the board, and I'll

8    try to make it big enough so that both you and I can actually

9    see it, and the jurors, of course.

10        Exhibit 4-33, page 3801, please.

11        Okay.  If we can focus on the top half of the

12   document, please.  Actually, if we could look at the very top

13   just for a minute.

14        Can you see that from there, Mrs. Hee?

15   A    No.

16   Q    Can we focus on the top?

17        You see the American Express Centurion card with your

18   husband's name?

19   A    Yes.

20   Q    And that's a card that you carried; is that correct?

21   A    I don't know.

22   Q    You mentioned that you have credit cards yourself; right?

23   A    Right.

24   Q    Isn't one of them the American Express Centurion card?

25   A    Correct.  But I don't know if that's my account.

1   Q    All right.  And if we look down at the charges down here,

2   July the 23d of 2010 -- if we can highlight this one, please.

3           One of them is for lodging at Le Meridien in Tahiti;

4   correct?

5   A    Yes.

6   Q    You remember staying at that hotel; is that correct?

7   A    Yes.

8   Q    And the charge was for $4,863 U.S.; is that correct?

9   A    That's what it says there.  I didn't know what the charge

10  was.  I can't remember.

11  Q    You weren't concerned about what the charge was.

12  A    I can't remember.

13  Q    Okay.  That's fair.  I'm just asking whether it was a

14  failure to remember, or whether you weren't concerned with the

15  charge.  You just don't remember now.

16  A    I don't remember what the charge was.

17  Q    All right.  And you remember renting a car, do you not?

18  A    Yes.

19  Q    And there's a charge there for $816; is that correct?

20  A    That's what it says there, yes.

21  Q    And you have no independent memory of whether that's about

22  what you paid for a car rental.

23  A    I don't remember what it was.

24  Q    And we have another charge highlighted here that,

25  essentially, talks about a restaurant charge; correct?

1    A    Yes.  That's what it says there.

2    Q    I'm not going to go through each one of those, but would

3    it be fair to say that you used the credit card to pay for your

4    meals and other expenses while you were on this Tahiti trip?

5    A    Yes, that's (nodding).

6    Q    And again to clarify, the participants on the trip were

7    yourself, your daughter Ho'o, your younger daughter Liko, and

8    your son Kupa'a; is that correct?

9    A    Correct.

10   Q    And you four were the only participants on the trip;

11   correct?

12   A    Correct.

13   Q    And I assume you bought some personal items while you were

14   on that trip, too.  Is that a fair statement?

15   A    Probably.

16   Q    All right.  Could we look at the same exhibit, please,

17   only page 3815.  And if we could look at the bottom part of the

18   document, please.

19        So, for example, Mrs. Hee, you see a charge here in

20   Papeete for women's accessories in the amount of $92; correct?

21   A    Yes.  I see that.

22   Q    And do you recall what that charge was for?

23   A    Not at all.

24   Q    And do you recall what business purpose that charge

25   served?

1   A    I don't even know what it is; so I can't say.

2   Q    And you remember, of course, making charges for groceries;

3   is that correct?

4   A    Yes, I remember buying food.

5   Q    Now, you mentioned this other trip to France, which

6   occurred in March of 2008; correct?

7   A    Yes.

8   Q    And that's the one you described in some detail where you

9   went to Calais and visited the manufacturing plant of one of

10  the companies; correct?

11  A    Yes.

12  Q    And so we're clear, the participants included yourself,

13  your daughter Liko, and her then fiancee Jonathan Mika Kane;

14  correct?

15  A    Correct.

16  Q    So we're clear, at the time it was March of 2008.  Liko,

17  or Breanne, was a student at Santa Clara University; right?

18  A    Yes, she was.

19  Q    And, in fact, it was spring break, was it not, when you

20  went to this trip?

21  A    I don't recall.

22  Q    Well, you, as a parent who's highly educated, I assume,

23  would not let your college-age daughter leave during classes;

24  right?

25  A    Not without a very good excuse.

1    Q    Okay.  And Jonathan Kane or Mika, he was actually a

2    student at U.C. Berkeley; was he not?

3    A    Correct.

4    Q    He was a football player there; right?

5    A    Yes.

6    Q    So he was not married to your daughter at the time;

7    correct?

8    A    Correct.

9    Q    He also was a student; correct?

10   A    Yes.

11   Q    In fact, he later went to play some professional football;

12   is that not correct?

13   A    Arena football, yes.

14   Q    Arena football.  And you are the people that collectively

15   went to this France trip; right?

16   A    Yes.

17   Q    And you said that you took -- you flew to France?

18   A    Yes.

19   Q    Took an early morning train to Calais.

20   A    Not immediately after we landed, no.

21   Q    How long did you stay in Paris before you went to Calais?

22   A    I think we stayed about a day or so just to -- because of

23   the time difference and stuff we stayed and then took the

24   train.  So it's not as if we flew in and then immediately

25   went --

1    Q    And then you did the tour of the factory; correct?

2    A    Yes.

3    Q    Did you go back to France that very day?

4    A    Well, we were in France, yeah.

5    Q    Bad question.  Did you go back to Paris that very day?

6    A    Yes, in the evening.

7    Q    So it was, basically, a one-day trip.

8    A    Right.

9    Q    And what did you do after the one-day trip?

10   A    The next day we took a flight to Switzerland.

11   Q    And your trip to Switzerland did not relate to the visit

12   to the Paris manufacturing plant, did it.

13   A    No.

14   Q    And, in fact, you stayed several days in Switzerland, did

15   you not?

16   A    I think maybe I remember two, two days maybe.

17   Q    You went to a place called Zermatt; is that correct?

18   A    Correct.

19   Q    That's a small Swiss village famous for the Matterhorn; is

20   that right?

21   A    Yes, the Matterhorn is there.

22   Q    And did all four of you go to Switzerland on that side

23   trip?

24   A    Well, I count three.

25   Q    Okay.

 1   A    The three of us flew to Switzerland.

 2   Q    I stand corrected.  So you, Liko, and Mika; correct?

 3   A    Correct.

 4   Q    Now, this trip to Mauna Lani, June of 2011, just to be

 5   clear you did not go to the meeting with the Department of

 6   Hawaiian Home Lands on the Hilo side of the island; correct?

 7   A    Correct.

 8   Q    And that was just your husband and the three children;

 9   correct?

10   A    Correct.

11   Q    But the four of you were reunited at Mauna Lani; correct?

12   A    Five of us?

13   Q    Five of you.  Excuse me.  Five of you went to Mauna Lani;

14   correct?

15   A    Yes.

16   Q    And you spent several days at Mauna Lani, did you not?

17   A    Yes.

18   Q    And how did you pay for those charges?

19   A    I have no idea.  I don't do the finances.

20   Q    So it's a fair statement that your husband takes care of

21   the finances?

22   A    Correct.

23   Q    And he's the one who makes the determination of how to

24   file your taxes?

25   A    How to file our taxes?

1   Q     Yes.

2   A     I don't understand.  We file jointly.

3   Q     Right.

4   A     Yes, we file jointly.

5   Q     But as far as the finances go, that's his area of

6   responsibility, not yours.

7   A     Yes.

8   Q     And Mauna Lani was in June of 2011; correct?

9   A     Yes.

10   Q     And let me show you exhibit 4-42, page 405.

11          Actually, let's start at page 408, please.  If we can

12   look at the top.

13          You see the charge here for a car rental with a

14   rental on June the 20th in Hilo and a return to the Kailua

15   side -- Kona side on June the 24th?  Do you see that charge?

16   A     I see it.

17   Q     And that corresponds with your recollection of when your

18   trip to Mauna Lani occurred; is that right?

19   A     It seems like it's in that area -- I mean, that time

20   period.

21   Q     And if we can go to page 405, the middle of the document,

22   please.  You see there's a charge dated June the 15th for an

23   arrival at Mauna Lani on June the 20th and a departure of June

24   the 24th.

25   A     Okay.  I can't really see the numbers, but I'm assuming

1    that you're saying the right numbers, yeah.

2    Q    Okay.  It references a four-day stay at a Mauna Lani in

3    June of 2011.  Is that consistent with your recollection of

4    when it took place?

5    A    Yes.

6    Q    And the charge -- the initial charge was $5,280.  Does

7    that sound about right to you?

8    A    I don't know.

9    Q    You have no idea about what it costs.

10   A    I have no idea how much the thing costs, yeah.

11   Q    And, Mrs. Hee, you say that during that trip you and your

12   husband and the three children met with Janeen Olds; is that

13   correct?

14   A    Correct.

15   Q    And she was not a stockholder of the company, was she.

16   A    No.  She was the trustee for the children's trust.

17   Q    And the children didn't own any portion of the company

18   until 2012; is that correct?

19   A    I don't know.

20         MR. TONG:  May I have a moment?

21         (Counsel conferring.)

22   BY MR. TONG:

23   Q    Just a few questions about the inauguration January of

24   2009.  We're talking about the inauguration of President Obama;

25   correct?

1   A    Correct.

2   Q    You went there, you said, as a representative of Waimana;

3   correct?

4   A    Correct.

5   Q    And paid a courtesy call, to use your phrase, on the

6   senator; correct?

7   A    Yes.

8   Q    And I gather Senator Inouye must have been a pretty busy

9   man at the time.

10  A    Yes.

11  Q    I mean, this is the first president from Hawai'i; right?

12  And he was a Senior Senator; right?

13  A    Yes.

14  Q    How long did that meeting last?

15  A    Not very.

16  Q    Like minutes?

17  A    Yes.

18  Q    Probably like "Hello, Senator, how are you?"  You're,

19  basically, showing face; is that correct?

20  A    Yeah, I guess that's what you call it.

21          MR. TONG:  Thank you very much.  I have nothing

22  further.

23          MR. TOSCHER:  No further questions, Your Honor.

24          THE COURT:  Okay.  Then the witness is excused.  You

25  can step down and leave the courtroom.

 1          (Witness excused.)

 2               THE COURT:  Your next witness.

 3               MR. TOSCHER:  Your Honor, we'd call, if the Court

 4     wants to proceed --

 5               THE COURT:  Yes.

 6               MR. TOSCHER:  -- Admiral Kihune, please.

 7               THE COURT:  So you're recalling.

 8               MR. TOSCHER:  Yes, Your Honor.

 9          (Previously sworn.)

10               THE COURT:  Hold on.

11               Okay.  So you remain under oath.

12                        DIRECT EXAMINATION

13     BY MR. TOSCHER:

14     Q    May it please the Court.  Ladies and gentlemen of the

15     jury.

16               Good afternoon, Admiral Kihune.  You testified

17     earlier during the government's case.  And just for -- very

18     quickly, tell us just for -- what your position was.  You're no

19     longer with Sandwich Isles, are you, sir?

20     A    I still sit on the board --

21     Q    You sit on the board?

22     A    -- of Sandwich Isles, yes.

23     Q    And tell us just the period that you worked there and what

24     your title was.

25     A    When I was not there?

1    Q     No.  I'm sorry.  I'll speak up a little.

2          The period you worked there and what your title was.

3    A     I started out -- Al recruited me to work on a power plant

4    that was going to be built in Kawaihae on the Big Island, and

5    so I was the principal negotiator with Hawaiian Electric to try

6    to get a power purchase agreement before we could build the

7    power plant.  After that -- since that one did not fly, for

8    various reasons, I was about ready to leave, when Al asked me

9    to take over Sandwich Isles Communications.  There was another

10   person that had started the paperwork to try to get approval

11   through the federal -- the feds to establish his company.

12   Q     Okay.  And then at that point you became -- what was your

13   title at Sandwich Isles?

14   A     I became the CEO of Sandwich Isles Communications.

15   Q     You were -- during that time you were also an employee of

16   Waimana Enterprises?

17   A     Yes.

18   Q     Okay.  And is it your understanding that all of the senior

19   staff of Sandwich Isles, the officers, were actually employees

20   of Waimana Enterprises?

21   A     At that point, yes.

22   Q     Okay.  Now, in the course -- so the period of time -- what

23   were the years that you were the chief executive officer of

24   Sandwich Isles?

25   A     I was the -- about 1968, and there was a break --

1    Q     1968?

2    A     I'm sorry.  1998.

3    Q     Thank you.

4    A     And there was a break in the year when I left the company

5    to take over -- the USS Missouri was in trouble.  The CEO had

6    resigned, and I was on the board.  And somebody had to renovate

7    the ship so that we could open the ship up for visitors in the

8    first of January in 1999.  So I had a six-month period to get

9    the ship going.

10          We couldn't find a CEO for the company; so the board

11   asked me, since I had experience in repairing ships and so on,

12   to take over the CEO.  So I went to Al and told Al that I

13   needed to do this because they were in trouble, and so I

14   left -- I left to go do this job on the 1st of January of

15   1999 -- or summer of 1998.

16   Q     How long were you gone for doing this other job?

17   A     I was gone for until approximately the year 2001 because

18   another thing happened while I was the CEO of the USS Missouri.

19   The Circuit Court had appointed me as an interim trustee for

20   Kamehameha Schools during the controversy with the IRS.  So I

21   went over as a temporary person -- I was told by the courts

22   that this is just going to be a part-time thing that to get

23   this resolved.  So I started off as a part-time, but then I had

24   to stop being the CEO of Missouri and go full time because the

25   hours we're spending in this case was from five o'clock in the

1   morning until about eight o'clock at night.  And so I stayed

2   there until about -- until after I was appointed a full-time

3   trustee in January 1st of 2001.

4           And then Al came to see me and said, "Hey, you know,

5   now that you guys are part-time trustees, would you want to

6   come back and work with me again?"  So I thought about it, and

7   I said, yeah, I'd be glad to come back.  And I returned to the

8   company sometime in 2001.

9   Q    2001.  And how long were you with the company before you

10  retired, sir?

11  A    From 2001 until 2013.

12  Q    Okay.  Now, during your position at the company, during

13  this period of time with the breaks, did you -- did you know

14  Mr. Hee's children?

15  A    Oh, yes.

16  Q    And do you know their names?

17  A    Yes.

18  Q    Can you tell us what their names are.

19  A    Ho'o, Kupa'a, and Liko.  And I know them by the Hawaiian

20  names, but to tell you the truth, I think I know their

21  American -- English names, but I'm going to have to guess.

22  Q    Okay.  That's fine.  I just want to make sure they're

23  identified, and I think that's adequate.

24          Now, do you recall observing them working at the

25  companies?

1  A    When they were in high school, they came and worked

2  part-time, yeah, worked full time in the summer months in the

3  company, and were paid as workers during the summer months

4  while they were in high school.

5  Q    Where did you observe them work?

6  A    During those early years they were primarily at the

7  Network Operation Center, which is out in Mililani.  And the

8  property was still with a lot of sugar cane on it or these

9  giant grass out there; so they were working to cut down the

10 grass.  They were also working as carpenters for some of the

11 storage sheds that we were building out there.

12 Q    Now, did Waimana and SIC have regular executive management

13 meetings?

14 A    Yes.

15 Q    And how often did they occur?

16 A    This happened when they started to go to college.  And so

17 Al approached me one time and said that, if he could -- if his

18 children could join the executive committee meetings that I

19 had, and I said that would be no problem.  So they came during

20 those breaks, the summer breaks, the spring breaks, and the

21 Christmas breaks, and they sat in on my meetings.

22 Q    Do you recall which children sat in?  Was it all of them?

23 One or two?

24 A    In some meetings all of them when they were in town.  And

25 some meetings there were one or two.  And, basically, they sat

1    down, observed, and listened.

2    Q    Okay.  Could you tell us the types of matters or issues

3    that were discussed at these executive meetings.

4    A    The executive meetings had two parts to it.  It started

5    with our consultants coming in, basically, Midstates

6    Engineering and SS -- SSFM International, who were engineers

7    that were getting the permits for us to build the

8    infrastructure through -- on O'ahu.  And so they came then and

9    gave their presentation about their status and, you know, what

10   they completed and what was outstanding, but, basically, it was

11   a weekly meeting to give me a good feel on how the construction

12   was coming.

13          And then after they gave their presentations, they

14   left, and we sat, as the executive committee, to discuss other

15   matters.  And the way it happened was I went around the room

16   and each department head gave their presentation about what was

17   happening in their -- what had happened and what is going to

18   happen for the week.  And so it was a very complete picture of

19   what was happening within the company.

20   Q    And how long did these meetings generally last?

21   A    I know they never finished in one hour.  They normally

22   went longer.  And it depended upon who came to the meeting, and

23   each department head was allowed to bring a subordinate who was

24   competent on a certain subject that we're going to discuss that

25   day.  So if they brought in a supervisor or technician to

1    discuss certain aspects of the network, it may have lasted even

2    longer.  In some of these things we even talked about strategic

3    planning.

4    Q    And these meetings where you had consultants present

5    things, the department heads talked, maybe even strategic

6    planning, these were the meetings you talked about that the

7    children attended?

8    A    They were in some of those meetings.  Like I said, summer

9    months, spring breaks, and Christmas.

10   Q    Did you ever see any of the Hee children at the office

11   other than at these executive meetings?

12   A    Oh, yes.  Whenever they were in town, they frequented the

13   office.  And whenever they were in talking to Al, I just said

14   hello to them, and then left and told Al that I'll come back in

15   about 10, 15 minutes so that they could complete their

16   discussions.

17   Q    And you weren't a party to those discussions.  You just

18   observed Al talking to the children.

19   A    I observed them.  And most of the time I did not stay in

20   because I thought that was personal business that they were

21   doing.  But I overheard a lot of the business discussions going

22   on about the company and so on.  So I just wanted him to let --

23   you know, because Waimana and Sandwich Isles were two different

24   companies; so I don't want to get into his business.

25   Q    The -- do you recall having business discussions with

1    Mr. Hee's children?

2    A    I had discussions with them about -- I wouldn't call it

3    business, but I would call it to update them on certain things

4    that were happening.  Like I said, they frequented the office,

5    and sometimes they'd end up close to my office, and I'd see

6    them walking by; so I'd say "Come on in."  And we'd talk about

7    things.  We'd talk social things, but once in a while I'll talk

8    to them about what was going to happen.

9    Q    About a business matter.

10   A    About a business matter; right.

11   Q    Now, did you -- were you aware -- did you learn that the

12   children were on salary at Waimana?

13   A    Yes, I did.

14   Q    And how did you learn about that?

15   A    The vice president for administration had come to me with

16   a proposal for a Christmas bonus.  And this was really early

17   when we were working it.  And so I went through the whole list

18   because he had a formula how each one of the workers would get

19   a bonus, and I noticed that Al's children were on the list.  So

20   I asked him, I said, I thought these -- they were part-time

21   workers only for summer.  And he said, no, they're full-time

22   workers, and it's okay.

23   Q    Based on your observations, were Mr. Hee's children being

24   groomed to take over the business?

25              MR. TONG:  Objection.  Calls for hearsay.  No

1    foundation.

2              THE COURT:  Okay.  Sustained.  And we're going to

3    pick it up tomorrow at nine o'clock.

4        (Jury excused.)

5              THE COURT:  Okay.  Counsel, I want to know something

6    about the schedule for the rest of the week.  Is evidence going

7    to close tomorrow, for example, in which case we need to figure

8    out the jury instructions tonight, or is evidence going to take

9    the whole day and we might go into Thursday with evidence?

10             MR. TOSCHER:  Your Honor, I think we would likely

11   complete tomorrow.  It would depend upon whether we decide to

12   call certain witnesses and the length of the government's

13   cross-examination.  The government has indicated to me that, if

14   I call certain witnesses, their cross-examination may be

15   lengthy, and, therefore, we would not complete our case

16   tomorrow.  But I think we could, but that's -- I'm giving you

17   real best estimate on that.

18             THE COURT:  I mean, they need to know if they need to

19   have their rebuttal witnesses, if any, here for tomorrow.

20             MR. TOSCHER:  Yes.  And I will give them a lineup of

21   the witnesses like I did last night.  And so, yeah, I think

22   there's a reasonable prospect that we can complete our case

23   tomorrow, depending on the length of the cross-examination.

24             THE COURT:  Okay.

25             MR. TOSCHER:  And it could -- that's the best I can

1    say.

2          THE COURT:  Well, I need to figure out what to do

3    about the completed jury instructions because, you know, we

4    could do it tomorrow, for example.

5          MR. TOSCHER:  Your Honor, we'd be happy to start when

6    the Court wants to start to finish it up.  I think there is

7    just four items.  And I think -- well, I --

8          THE COURT:  Okay.  Well, you want to do it at 8:30

9    tomorrow?

10         MR. TOSCHER:  I'll take the extra 15 minutes in the

11   morning, Your Honor.

12         THE COURT:  I'll see you at 8:30 tomorrow, then.

13   We'll see if we can wrap those up.

14         As you know, next week there isn't trial scheduled;

15   so I'm just trying to figure out the likelihood that everything

16   might be done by Friday before we have a break of seven working

17   days.

18         MR. TOSCHER:  Right.  I don't want to speak with the

19   government, but they've told me what they think rebuttal or not

20   rebuttal, but I don't want to be -- we'll let -- if Mr. Tong

21   wants to address it.  I'm --

22         MR. TONG:  I'm not sure what he's asking me to

23   address.  I don't see any reason why we couldn't be done by

24   Friday.  I mean, I think we're going to be done sooner than

25   Friday.

1          And I know the Court doesn't want to get involved in

2     it, but we'd like to know who the witnesses are for tomorrow

3     because we might have to present a rebuttal case.

4          THE COURT:  Right.  What I don't want to have happen

5     is for them to have a list of five witnesses and look at them

6     and say, wow, these people will take the whole day, and then

7     you conclude at a 10:30 in the morning.  We have neither

8     completed jury instructions nor do they have their rebuttal

9     witnesses; so then we let them go home -- the jurors go home,

10    and then that probably ensures that we cannot conclude before

11    the big break starting next Monday.

12         MR. TOSCHER:  I think the government -- I will

13    communicate with the government later tonight and tell them.  I

14    don't think there's going to be any surprises to the

15    government.

16         MR. TONG:  That may be, Your Honor.  We'd just like

17    notice because --

18         THE COURT:  You have to tell witnesses.

19         MR. TONG:  Well, we have to tell witnesses.  He

20    normally e-mails us at around 10:30 at night, which at my

21    advanced age is a little late.

22         THE COURT:  Well, on the witnesses, I mean, what are

23    they supposed to do, like wait till midnight to figure out if

24    they're going to be called to be here tomorrow?

25         MR. TOSCHER:  My witnesses, Your Honor?

1           THE COURT:  No.

2           MR. TOSCHER:  No.

3           THE COURT:  His witnesses.

4           MR. TOSCHER:  Your Honor, just so we're clear, I've

5    been very diligent communicating the witnesses to the

6    government, I believe as diligent as the government was with me

7    in communicating the witnesses.  So I don't want an inference

8    that -- and I appreciate the Court's schedule and the

9    convenience of the jurors, and I'll let him know.  I don't want

10   that to happen, what the Court said about needing time, and

11   we'll try to keep the process moving.

12          MR. TONG:  No, there are no inferences to be drawn.

13   I'm just suggesting, if this might be the last night, we need

14   more notice to assure that we have or do not have a rebuttal

15   case.  That's all I'm suggesting.

16          THE COURT:  Because, otherwise, somebody's head will

17   be chopped off if we have yet another big break.  So we've had

18   two breaks where witnesses were not available, and I had to let

19   the jurors go home.  But we're now, you know, I'm worried that

20   if there's a break, that we risk telling the jurors --

21   everything's not done on Friday -- there will be a week and a

22   half break, you know.

23          MR. TOSCHER:  I appreciate --

24          THE COURT:  And then you come back.

25          MR. TOSCHER:  I appreciate that, Your Honor.

1          THE COURT:  I would rather avoid that.  And if it's

2    caused by an absence of witnesses taking up the whole day, what

3    shall I promise you I'll do?  I don't know.

4          MR. TOSCHER:  Just so we know the ground rules.  In

5    terms of the breaks, do we go by the number of breaks or the

6    amount of time that the government -- because the government,

7    basically, had to end a whole half day early.  I think the

8    defense has only asked for one 15-minute and one 30-minute.

9          THE COURT:  I actually just get equally distressed

10   regardless of the length of the break.

11         MR. TOSCHER:  Judge, I didn't want to ask when I did

12   what I did.  I will assure the Court I will do everything in my

13   power not to let it happen, and I don't believe it will happen.

14         I understand.  I want to keep my head.

15         THE COURT:  But every time there's a, you know, the

16   resting of something, then the other side always has to be

17   prepared, as you did when the government rested, and now the

18   government will have to do that when you rest.  I'm just

19   worried because this is Tuesday.  Friday's not too far.  And so

20   it becomes more critical to me as we come up to a big break.

21   The schedule just becomes increasingly critical for -- I think

22   for your client, too.

23         MR. TOSCHER:  Your Honor, I agree.

24         THE COURT:  Because it's not good for your client

25   either to have this big break.

```
 1              MR. TOSCHER:  I agree, Your Honor.  And I --
 2              THE COURT:  Okay.  Okay.  So I'll see everybody at
 3   8:30 tomorrow morning.
 4              MR. TOSCHER:  Thank you, Your Honor.
 5          (Court recessed at 4:08 P.M.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    COURT REPORTER'S CERTIFICATE

 2            I, Debra Kekuna Chun, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9            DATED at Honolulu, Hawaii, August 8, 2015.

10

11                                     /s/ Debra Chun

12                                     DEBRA KEKUNA CHUN

13                                     RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25
```