```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF HAWAII

 3                                )
       UNITED STATES OF AMERICA,  )  CR 14-00826 SOM
 4                                )
              Plaintiff,          )  Honolulu, Hawaii
 5          vs.                   )  July 8, 2015
                                  )  9:00 A.M.
 6     ALBERT S. N. HEE,          )
                                  )
 7              Defendant.        )
                                  )
 8     _____)

 9                  TRANSCRIPT OF JURY TRIAL (DAY 9)
                  BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                    UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     For the Government:        LAWRENCE L. TONG
                                  Office of the U.S. Attorney
13                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd. Ste. 6100
14                                Honolulu, HI 96850

15                                QUINN P. HARRINGTON
                                  U.S. Dept. of Justice
16                                Tax Division
                                  601 D St., N.W. Room 7029
17                                Washington, DC 20004

18     For the Defendant:         STEVEN TOSCHER
                                  KURT K. KAWAFUCHI
19                                LACEY STRACHAN
                                  Hochman salkin Rettig Toscher
20                                  & Perez
                                  9150 Wilshire Blvd., Ste. 300
21                                Beverly Hills, CA 90212

22     Official Court Reporter:   Debra Kekuna Chun, RPR, CRR
                                  United States District Court
23                                300 Ala Moana Blvd. Ste. C285
                                  Honolulu, HI 96850
24                                (808) 541-2061

25     Proceedings recorded by mechanical stenography, transcript
       produced with computer-aided transcription (CAT).
```

1                              INDEX

2

3    EXAMINATION

4    Witness Name                                      Page

5    Robert Kihune

6         Direct By Mr. Toscher................................  38

7         Cross By Mr. Tong...................................  39

8    Breanne Hee-Kahalewai

9         Direct By Mr. Toscher................................  42

10        Cross By Mr. Harrington .............................  68

11        Re-Direct By Mr. Toscher ............................  81

12   Albert Hee

13        Direct By Mr. Toscher................................  82

14        Cross By Mr. Tong...................................  135

15

16

17

18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, JULY 8, 2015                8:32 O'CLOCK A.M.

 2        (In open court without the jury:)

 3             THE CLERK:  Criminal 14-826 SOM, United States of

 4   America versus Albert Hee.  This case has been called to Settle

 5   Jury Instructions.

 6             Counsel, please make your appearances for the record.

 7             MR. TONG:  Good morning, Your Honor.  Larry Tong and

 8   Quinn Harrington for the United States.  With us are Christina

 9   Sorely and Special Agent Greg Miki.

10             MR. TOSCHER:  Good morning, Your Honor.  Steven

11   Toscher for defendant Albert Hee with Lacey Strachan and Kurt

12   Kawafuchi.  And Mr. Hee is on his way.  His presence is waived

13   for this.

14             THE COURT:  Okay.  Waived.

15             Give me one second.  Off the record.

16        (Discussion off the record.)

17             THE COURT:  Okay.  So let's see if we can resolve the

18   remaining issues.  I'm pretty sure we did the "corruptly" issue

19   that Mr. Toscher was worried we hadn't done.  So didn't we --

20   hold on.  Let me see if I can find it.

21             MR. TOSCHER:  Your Honor, tell me where we are, then.

22   Maybe we did.

23             THE COURT:  Right, right.  So hold on.

24             Is anybody able to help me in that regard?

25   Government's proposed 1.
```

 1            MR. TOSCHER:  Your Honor, if you want, I can point

 2    you to the defendant's proposed number 1.  After we had the

 3    elements, we defined "to act corruptly."  And then proposed

 4    number 1 of the government, their third element, the defendant

 5    acted knowingly and corruptly, that is, with the intent to

 6    obtain an unlawful benefit.

 7            What we want is we like -- we think "corruptly" needs

 8    to be defined, and it's not defined really in the government's

 9    instruction.  And that's what we do in our --

10            THE COURT:  You have a longer discussion about it.

11            Okay.  Does the government want to be heard on this?

12            MR. HARRINGTON:  Yes, Your Honor.  The Ninth Circuit

13    authority is very consistent and very clear on this point.

14    There's a 2005 decision *United States v. Massey.*  It's 419 F.3d

15    1008.  In that case it says specifically "With respect to the

16    Section 7212(a), the District Court correctly instructed the

17    jury that 'corruptly' means performed with the intent to secure

18    an unlawful benefit for oneself or another."

19            And that is the definition that's used by the Ninth

20    Circuit.  There are several cases on this point.  And so the

21    definition that's included in the government's proposed

22    instruction is sufficient, and it's the legally correct

23    definition of "corruptly."

24            MR. TOSCHER:  Your Honor, I don't think, one, it's

25    not defined.  It's just a tail-end clause.  And I think we have

1    to make clear that the defendant knew the advantage or benefit

2    was unlawful.  The way they have it phrased, it's not clear.

3              THE COURT:  Okay.  But in our -- in our -- let me

4    look at our knowingly -- knowingly and corruptly.

5              I think what you're adding in the defendant's

6    proposal is the sentence -- I mean, you want to say the

7    defendant knew the advantage or benefit was unlawful.  And yet

8    in the -- in the "knowingly" form instruction, the Ninth

9    Circuit model that we agreed on yesterday, we deliberately did

10   not include a sentence that is actually totally contrary to the

11   proposal by the defendant.

12             So the model instruction has in brackets a sentence

13   we didn't include here.  "The government is not required to

14   prove that the defendant knew that his acts or omissions were

15   unlawful."  You want to put in something contrary.  For this

16   element you must find that the defendant knew not that the

17   action but that the advantage or benefit was unlawful.

18             MR. TOSCHER:  That's correct, Your Honor.  And we

19   think where the government's theory is that he's trying to get

20   an unlawful benefit in filing these tax returns, and that's

21   what they articulated, that's essential in this case.  *Massey*

22   did not -- the theory in *Massey* -- I've not looked at it; I've

23   looked at it before -- had to do with obstructive conduct

24   during the audit, not regarding tax returns.  I'm speaking a

25   little out of school because it's been a while, but I'm

1   confident.

2          That's the difficulty with this statute.  It deals

3   with really two -- we talked about it at the beginning of the

4   case -- two types of prohibited conduct:  doing something to

5   impair and impede, which has nothing to do with filing tax

6   returns, but the government asserts that it can do with filing

7   tax returns and the courts have supported that.  So I think we

8   need to make clear that the defendant knew the advantage or

9   benefit was unlawful.

10          Right.  And Miss Strachan points out to me it's

11   important, in terms of laying it out, we want, as we've

12   requested, a separate definition of "corruptly."

13          THE COURT:  Well, I don't know why it needs to be

14   separate.  To me that is --

15          MR. TOSCHER:  Go ahead.  I'm sorry, Your Honor.

16          THE COURT:  It doesn't matter.  I mean, first of all,

17   I don't even have to give them a written copy.  I think it's

18   highly good practice to give them written copies, and I will

19   give every juror a copy, but I don't think that is a legal

20   requirement to do so.  Some judges just read the instructions

21   orally, in which case it doesn't matter whether corruptly

22   occurs on a separate page or not.  So to insist that the

23   corruptly definition be separate on a separate page would be

24   like trying to impose on the Court a condition that we give

25   them something in writing, which I don't think any Court of

1    Appeals has said.

2              MR. TOSCHER:  No, I'm not that it has to be on a

3    separate page.  I just want it defined in the instruction.

4    Right now the way we have it, we say "to act corruptly" means.

5    The government in their instruction just has a parenthetical

6    "that is."  I think we should -- and that's been consistent

7    with what we're doing:  defining for this purpose "corruptly"

8    means the intention to obtain an unlawful benefit for himself

9    or someone else, and we're saying that a benefit that he knew

10   was unlawful.

11             THE COURT:  So you just want to have a period.

12   "Third, the defendant acted knowingly and corruptly, period.

13   To act corruptly means -- and then whatever it is we agree

14   upon.

15             MR. TOSCHER:  Correct, Your Honor.

16             THE COURT:  Okay.  Well, why would you object to

17   that?

18             MR. HARRINGTON:  We don't object to adding a

19   period.

20             THE COURT:  Okay.  So period, new paragraph.

21             Okay.  To act, and then we'll put quotation marks,

22   corruptly, closed quotation marks, means -- this is a new

23   paragraph -- to act with the intent to obtain an unlawful

24   benefit for himself or someone else, period.

25             And then we have this issue about -- I mean, I

1    actually don't see the necessity for the example of, you know,

2    "For example, for you to find Mr. Hee acted corruptly with

3    respect to" such and such, I'm not going to do that.  So to me

4    the only issue is whether I need or do not need to include, or

5    should or should not include, the statement that the defendant

6    knew that the advantage or benefit was unlawful.

7         MR. HARRINGTON:  And, Your Honor, I think that that's

8    adding an element to the statute.  The case law again is

9    entirely clear and consistent of what "corruptly" is.  Another

10   case that I think is relevant on this point is *United States v.*

11   *Workinger,* which is a 1996 Ninth Circuit case, 90 F.3d 1409.

12   And in that case the court specifically rejected the idea that

13   you have to prove fraud as part of a 7212(a) charge.  And to me

14   that's sort of what this is doing is it's putting in an extra

15   element to the case about knowing that the benefit is unlawful

16   when the statute just requires an intentional act to obtain an

17   unlawful benefit.

18        MR. TOSCHER:  Your Honor, without this language I

19   think both of those cases have to do with not the type of

20   theory the government's proceeding on.  And where they're

21   attacking tax positions on the returns, they're leaving the

22   statute unconstitutionally vague.  All we want to make it

23   clear, and I think it is required, that he knew that the

24   benefit was unlawful.

25        THE COURT:  So tell me the Ninth Circuit case that

1   says that.

2          MR. TOSCHER:  Your Honor, I don't know if we found a

3   Ninth Circuit case which says it, but all the Ninth Circuit

4   cases have nothing to do with proceeding under 7212 in this

5   type of case.

6          Right.  Your Honor, what Miss Strachan points out to

7   me, there's nothing in the Ninth Circuit case law which says we

8   shouldn't do what we're asking for.  The cases the government's

9   relying upon are different types of cases.  And we've been

10  looking at the Seventh Circuit case, you know, which

11  incorporates specifically a good-faith defense, which is the

12  same thing:  you have to know the benefit was unlawful.

13  Otherwise, we're leaving it constitutionally vague.

14         THE COURT:  Okay.  We're going to look at your

15  good-faith issue, but unless I have a Ninth Circuit case that

16  gives me some support for putting in a knowledge element into

17  the elements of the 7212(a) charge, I'm not going to include

18  that.

19         So over your objection I'm refusing to include in the

20  definition of "corruptly" your language in your proposed number

21  1 that the jury must find that the defendant knew that the

22  advantage or benefit was unlawful.  We may reach a related

23  issue when we get to your number 5 proposed, which we are going

24  to right now.  And I know we still have the salary and massage

25  issue to address, and we need to look at some of the Court's

 1   form instructions that we passed on, not knowing what the proof

 2   would be, and maybe we have enough now, I don't know, to figure

 3   out whether some of those form instructions are applicable.

 4        Okay.  So let's look at defendant's 5, which is a

 5   good-faith defense instruction.

 6        Okay.  I'll take argument on this.  My understanding

 7   is that the government thinks that the willfully -- you have a

 8   proposed number 10.  Hold on.  Am I looking at the wrong thing?

 9        Didn't we put some things into the "willfully"

10   definition that take care of this?

11        MR. HARRINGTON:  Your Honor, I believe we added in

12   the "willfully" definition that it's not a mistake.  I think

13   there was language about that.

14        THE COURT:  Yeah, yeah.  So I think -- hold on.  I'm

15   so confused about what we've done.

16        MR. TOSCHER:  Your Honor, would you want me --

17        THE COURT:  So did I pass on the government's

18   proposed number 6, or did we --

19        MR. TOSCHER:  Government proposed -- I'm sorry.

20        MR. HARRINGTON:  Yes.

21        MR. TOSCHER:  Let me tell you what my recollection

22   is, Your Honor, if it will be of assistance to the Court.

23        I think we may have -- I have no notes on number 6

24   here, but I think what we did is we looked at government number

25   10, which is their good-faith instruction, and the government

1    agreed to strike the second paragraph.

2                THE COURT:  Yes.  Yes.

3                MR. TOSCHER:  And then we sort of put a placeholder

4    on their good faith and our good faith instruction.  That's my

5    recollection.

6                THE COURT:  Is that what we did?

7                MR. TONG:  Your Honor, I have a more specific

8    recollection because I'm a bystander here.  My recollection is

9    government's proposed number 6 was given over the objection of

10   the defendant, as modified.

11               THE COURT:  Right.

12               MR. TONG:  And the modification --

13               THE COURT:  And that included --

14               MR. TONG:  -- included a paragraph that, according to

15   my notes, says "Conduct that is only accidental, inadvertent,

16   mistaken, or negligent does not constitute willful conduct."

17               THE COURT:  I do recall that.

18               MR. TOSCHER:  Right.  And that related to the

19   "willfulness" instruction.  We did not deal with "good faith."

20   That's my recollection.

21               THE COURT:  Yes.  That was in the "willfully"

22   instruction, the government proposed number 6.

23               Okay.  So what did we do with government's proposed

24   number 10?

25               MR. TOSCHER:  Again, Your Honor, my --

```
 1              THE COURT:  We passed?

 2              MR. TOSCHER:  No.  We struck the last paragraph and

 3    reserved the first paragraph.

 4              THE COURT:  Okay.  So government's proposed number 10

 5    and defense proposed Number 5 are what we need to look at.

 6              MR. HARRINGTON:  And, Your Honor, just to note that

 7    we propose number 10 conditional on how the evidence came in;

 8    so that's going to be part of our discussion as well.

 9              THE COURT:  Okay.  So what are you saying about --

10              MR. HARRINGTON:  Well, Your Honor, the good faith --

11    well, there's two ways that good faith can come in.  The first

12    is that there's a reliance defense.  From what we understand

13    from the evidence we've seen, counsel is not asserting a

14    reliance defense.  Even if counsel was asserting a reliance

15    defense, a reliance defense requires evidence that there's full

16    disclosure of all relevant facts.  And the evidence has been

17    clear in this case that there was not full disclosure of all

18    the conduct occurring at Waimana Enterprises.

19              The case I'm referring to specifically is United

20    States v. Bishop.  It's 291 F.3d 1100.  It's a Ninth Circuit

21    case from 2002.  And it states specifically that a reliance

22    defense requires full disclosure of all relevant facts.

23              Now, the second way it can come in is if there's some

24    sort of testimony about the good-faith misunderstanding by the

25    defendant.  And without the defendant testifying there's been
```

1    no evidence at this point in the case of any good faith on his

2    part.  Given the fact that the "willfulness" instruction

3    includes the additional language, and given the fact that

4    there's Ninth Circuit authority saying that that specific

5    instruction with that amount of language is sufficient, we

6    don't think a separate good-faith instruction is necessary.

7         MR. TOSCHER:  Your Honor, one, I think counsel is

8    confusing reliance -- specific reliance on an accountant with

9    willfulness, or in this case good faith.  But I think there is

10   a record that how he relied for many of the issues on his

11   accountants.  The Chinaka & Siu testimony is absolutely clear.

12   So I think, one, he's narrowing it, but the record even

13   reflects it.

14        Two, the government proposed this because I think

15   they know in every tax case good faith is the corollary of

16   willfulness, and it's typically defined in every case, you

17   know, you need to give a good-faith instruction on that.  And

18   so I think the government is wrong on that.  Whether it goes --

19   where we place it, what we've done, Your Honor, is one -- and

20   the government has in their number 10, they say "A defendant

21   who acts in a good-faith misunderstanding of the requirements

22   of the law has not acted willfully," and then they go on their

23   instruction.

24        What our good-faith instruction defines good faith

25   based upon the case law, which we think is important.  There

1   may be some extra in there, but I think it would be clear error

2   in this case not to give a good-faith instruction.

3          THE COURT:  You want to respond?

4          MR. HARRINGTON:  I think on the reliance side of it,

5   again the *Bishop* case, I think, it's very clear.  It states,

6   and I quote, "We hold that *Cheek* does not change the rule that

7   a defendant claiming good-faith reliance on the advice of a tax

8   professional must have made full disclosure of all relevant

9   information to that professional."

10         THE COURT:  Isn't that argument you can make that,

11  you know, gee, there's no --

12         MR. HARRINGTON:  I would say it would be argument,

13  except for the fact that the testimony has been uniform.

14  There's no dispute that certain facts were not disclosed to the

15  accountants about what children did, about what the children

16  did for work, about what a property was used for.  I understand

17  why it may sound like argument, but in this case it's been a

18  hundred percent consistent.  There's simply no evidence that

19  there was full disclosure.

20         THE COURT:  I actually think it's along the lines of

21  argument.  He's not going to agree with you that there's no

22  evidence.  So I'm inclined to give some kind of good-faith

23  instruction.  The form of it now is what we need to resolve.

24         So I'm -- I don't know how to treat your proposed

25  instruction number 10.  Am I giving it over your objection, or

1    how would you like this recorded for the record?

2           MR. HARRINGTON:  I suppose over our objection, but we

3    did propose --

4           THE COURT:  Okay.  I'm giving your proposed

5    instruction over your objection.  It was a prophylactic

6    proposal.  I understand.

7           So let's work with number 10.  There may be some

8    additions from the defense number 5 that I should make.

9           I think it actually would be a clarifying thing to

10   include the first sentence of defense number 5:  "The good

11   faith of the defendant is a complete defense to all counts of

12   the indictment because good faith is inconsistent with

13   corruptly obstructing -- I'm a little worried about -- well,

14   okay.  "With corruptly obstructing the administration of --

15   we've been using lower case for "the internal revenue laws or

16   willfully filing false tax returns."  I'll lower case that.

17   But I propose to include that first sentence as the start of

18   this government number 10.

19          MR. HARRINGTON:  Your Honor, we don't object to

20   that.

21          THE COURT:  I mean, you are preserving your objection

22   to any good-faith defense, but in the hassling out of how it

23   should be given.

24          So, Mr. Toscher, I am adding your first sentence in

25   defense 5, and then it will go on with the government's

1    discussion.

2           And I think -- I think the only other thing that I

3    would add, I would add the next sentence, the first sentence of

4    the second paragraph, "While the term 'good faith' has no

5    precise definition, it means, among other things, an honest

6    belief, a lack of malice, and the intent to perform all lawful

7    obligations," before the "Nevertheless" sentence in

8    government's number 10.

9           MR. HARRINGTON:  No objection to that, Your Honor.

10          THE COURT:  So so far your first two sentences are

11   in.  I think everything else is taken care of, except the

12   fourth paragraph, I would put that first sentence in.  "The

13   burden of proving good faith does not rest with the defendant

14   because the defendant has no obligation to prove anything to

15   you," I would put that as the last thing in the instruction so

16   that -- let me make sure we're all on the same page.  So that

17   the revised instruction would read this way:

18          "The good faith of the defendant is a complete

19   defense to all counts of the indictment because good faith is

20   inconsistent with corruptly obstructing the administration of

21   the internal revenue laws or willfully filing false tax

22   returns.

23          "A defendant who acts on a good-faith

24   misunderstanding as to the requirements of the law does not act

25   willfully, even if his understanding of the law is wrong or

1   unreasonable.  While the term 'good faith' has no precise

2   definition, it means, among other things, an honest belief, a

3   lack of malice, and the intent to perform all lawful

4   obligations.  Nevertheless, merely disagreeing with the law

5   does not constitute a good-faith misunderstanding of the law

6   because all persons have a duty to obey the law, whether

7   they -- whether or not they agree with it.  Thus, in order to

8   prove that the defendant acted willfully, the government must

9   prove beyond a reasonable doubt that the defendant did not have

10  a good-faith belief that he was complying with the law.  The

11  burden of proving good faith does not rest with the defendant

12  because the defendant has no obligation to prove anything to

13  you."

14          And that would be the complete instruction.

15          MR. TOSCHER:  Your Honor, we prefer ours, but I think

16  you've reached the essential points.

17          THE COURT:  Okay.

18          MR. HARRINGTON:  Your Honor, that's fine with us.

19          THE COURT:  Then that's how I'm going to give.

20          So giving proposed instruction number 10 by the

21  government over the government's objection to the giving of any

22  good-faith instruction, but without government objection to the

23  modifications made, given my ruling that I will give a

24  good-faith instruction.

25          Have I correctly stated that rather complicated

1    position?

2              MR. HARRINGTON:  Yes, Your Honor.

3              THE COURT:  Okay.  And I'm refusing the defendant's

4    proposed number 5 over the defense objection, but without an

5    objection that an essential point in proposed number 5 has been

6    omitted from the revised government's proposed number 10.

7              Mr. Toscher, have I correctly stated your rather

8    complicated position, too?

9              MR. TOSCHER:  I believe that's correct, Your Honor.

10             THE COURT:  Okay.  Thank you.  Sorry.  It's a rather

11   jumbled thing.

12             I think that leaves us with the salary and massage

13   issue on the customized instructions, and then we have a few of

14   the Court's form instructions that we need to confirm apply or

15   don't apply.

16             So let's turn to the salary issue.  The last time I

17   know that was a newly drafted addition; so government wanted

18   some opportunity.  Let's stay on salary first.  And somebody

19   remind me, what government proposed instruction is this being

20   added to?

21             LAW CLERK:  7.

22             THE COURT:  7.

23             Okay.  So government's proposed 7 already had some

24   modifications, and the issue was whether to include after the

25   paragraph about a taxpayer's family members' expenses further

1    discussion about salary and/or massage.

2         So it's his proposal.  You folks wanted a chance to

3    look over what he was saying.

4         Mr. Harrington.

5         MR. HARRINGTON:  Yes, Your Honor.  We'd object to the

6    phrasing used in the proposal because we think it's

7    argumentative and comments on the evidence.  What we had

8    proposed is that we use the statutory language from 26 U.S.C.

9    162 which (a)(1) specifically says there's allowed as an

10   ordinary and necessary expenses a reasonable allowance for

11   salaries or other compensation for personal services actually

12   rendered.  And we would assert that is sufficient to describe

13   the law in that regard.

14        THE COURT:  So I'm not inclined to give the specific

15   examples, past services rendered, future employment,

16   inducement, away from the office, or representing company at

17   functions, that sort of thing.  I mean, those are kind of

18   examples, and I'm trying to cut out specific ones.  This is a

19   rather long discussion already.  What's wrong with what he's

20   saying, just to take the statutory language?

21        MR. TOSCHER:  Your Honor, yeah, I think it's

22   misleading without defining what the courts have said regarding

23   "actually rendered."  And if we're not going to define it

24   completely, then we'll stay with "ordinary and necessary."  And

25   I just think it would be misleading to the jury to do it

1    without giving a complete instruction.

2              THE COURT:  So if I'm not giving anything more than

3    that, you do not want --

4              MR. TOSCHER:  That's correct.

5              THE COURT:  -- the statutory instruction.

6              MR. TOSCHER:  That's correct.  It's incomplete.

7              THE COURT:  Okay.  Then he's -- because I'm not going

8    to give these specific examples, then how shall I --

9              MR. TOSCHER:  Your Honor --

10             THE COURT:  I'm refusing -- what am I calling this?

11   Proposed additional supplemental instruction on constructive

12   dividend submitted by the defense.  I'm refusing to give the

13   salaries proposal.  Did you file this?  Make sure it's in the

14   record?

15             MR. TOSCHER:  Yes, Your Honor.

16             THE COURT:  It can be filed later, if you haven't

17   done so already.  I just have an unfile-marked copy.  That's

18   why I'm worried.

19             MR. TOSCHER:  Okay.  Thank you.

20             THE COURT:  I'm refusing that over the defense

21   objection.  The government has offered to include the statutory

22   definition of "salary."  I'm willing to give that.  But the

23   defense is objecting to giving the statutory definition on the

24   ground that it's incomplete given that the government is

25   withdrawing its offered --

1           MR. HARRINGTON:  Your Honor --

2           THE COURT:  You want it in?

3           MR. HARRINGTON:  Yeah, because we've added other

4    language about travel.  We think it makes it more complete.

5           THE COURT:  Then I'm going to add it in.

6           Now, I think that gives you a lot of leeway to argue

7    what falls into services actually rendered, including attending

8    functions.  I think that gives you a lot of room to argue.

9           MR. TOSCHER:  Your Honor, we would request that the

10   Court add to that that "services rendered" has been defined to

11   include past services and future services because that's what

12   the case law is.  Now, there's -- it's not -- there's

13   conflicting case law, but I think we've got to give the

14   defendant the benefit of the doubt under the rule of lenity.

15   And it's misleading to put services actually rendered.  I mean,

16   so it would be over our objection.  We would ask if you could

17   say "services rendered" has been defined as past services and

18   services to be rendered in the future.

19          THE COURT:  Okay.  Now, help me understand this

20   because you're saying "actually rendered" means already

21   rendered or to be rendered --

22          MR. TOSCHER:  Correct, Your Honor.

23          THE COURT:  -- in other words.

24          MR. TOSCHER:  What the case --

25          THE COURT:  I mean, I guess -- okay.  Let me think

1    about this.  I guess, if you hire somebody and you pay their

2    salary in advance on the theory that they will be working, that

3    qualifies as "actually rendered" services.  Yes?

4              MR. HARRINGTON:  Well, Your Honor, I think what

5    counsel said is accurate, that the case law is split.  It

6    depends on the facts and circumstances.  So we don't think it's

7    necessary to add in examples because it ends up being a comment

8    on the evidence and ends up being misleading.

9              If anything, there's regulations that talk about

10   depends on facts and circumstances.  I guess if we wanted to

11   add that, but we think it's just further complicating matters.

12   And "actually rendered," again they can argue what that means.

13   And they've had expert testimony as well -- I think they

14   already had expert testimony talking about this very fact that

15   they can cite back to to the jury.  I think just using the

16   statutory language is the cleanest.

17             THE COURT:  Why can't we say whether services have

18   been actually rendered depends on the particular circumstances

19   of a case?  I think that would give you enough.

20             I don't want to rob you of the ability to argue from

21   the evidence, but I'm a little worried about putting in

22   specific things.  And I don't want to talk about inducement to

23   work 10 years from now because, actually, I don't think there's

24   evidence of that.  But I'm going to let you have a lot of

25   latitude in argument; so I don't mind saying whether services

1  have been actually rendered depends on the circumstances of a

2  case or depends on the particulars or something along those

3  lines.

4          MR. TOSCHER:  Okay.  That would help, Your Honor, but

5  we -- our preference is -- because the problem is,

6  Miss Strachan just pointed out to me, the reason services for

7  past or inducement in the future have been allowed because the

8  statutory basis of services actually rendered is sort of to

9  distinguish services from other things the corporation is

10  paying for.  That's sort of the history of that.

11          We just want to make sure that it's a -- you know, if

12  the court is going to insist on giving it, then you've softened

13  it by giving the facts and circumstances, you know.  Hold on

14  one second.

15      (Counsel conferring.)

16          MR. TOSCHER:  Thank you, Your Honor.  It's complex.

17          THE COURT:  It's important, yes.

18          MR. TOSCHER:  And I don't think the facts and

19  circumstances -- maybe Miss Strachan's suggestion -- our

20  suggestion is including -- facts and circumstances, including

21  past and future services.  Similar to what we did on the loan.

22  We listed all the circumstances, and, you know, the government

23  wanted it.  We want to inform this jury.

24          MR. HARRINGTON:  Your Honor, I think that's still

25  commenting on the evidence.

1          One possibility is there's a regulation that has a

2    little bit more language that I can read to you quickly.  It's

3    1.162-7.  And sub (3) of that says:  In any event, the

4    allowance for compensation paid may not exceed what is

5    reasonable under all the circumstances.  It is, in general,

6    just to assume that reasonable and true compensation is only

7    such amount as would ordinarily be paid for like services by

8    like enterprises under like circumstances.  The circumstances

9    to be taken into consideration are those existing at the date

10   when the contract for services was made, not those existing at

11   the date when the contract is questioned.

12          So some part of that or just under all the

13   circumstances.  But I think it's just too much going into

14   specific examples.

15          THE COURT:  Okay.  So you know what he wants.  He

16   wants something about, even though the term "actually rendered"

17   sounds like a past tense such that you only are backward

18   looking in salary, he wants to say notwithstanding the

19   grammatical construction, actually rendered -- a salary can be

20   a deductible business expense, even if it's for services to be

21   performed.  That's the basic idea --

22          MR. TOSCHER:  Correct, Your Honor.

23          THE COURT:  -- he wants to include.  I don't think

24   you're arguing with the premise that you can give somebody

25   payment for services to be performed as salary; right?

1           MR. HARRINGTON:  I think that's a legally correct

2    statement.

3           THE COURT:  Okay.  I'm not willing to talk about

4    inducing a person to return to the corporation for future

5    employment.  That seems to me to be commenting on the evidence.

6    But I think I probably could be convinced to say "payments for

7    services actually rendered include payments for past or future

8    services rendered," something like that.

9           MR. HARRINGTON:  Yeah, and I think it would depend on

10   the phrasing.  I think we'd prefer it to say "could include"

11   and "depending on the circumstances."

12          THE COURT:  Okay.  I'll go with that.

13          Okay.  So wait now.  Just so we get this right, read

14   me the statutory salaries definition.  I'm going to give that.

15   Okay.  And go slow.

16          MR. HARRINGTON:  Okay.  So I'm going to start from

17   the beginning part because it has ordinary and necessary, and

18   we can cross some things out.

19          So it starts saying:  There shall be allowed as a

20   deduction all the ordinary and necessary expenses paid or

21   incurred during the taxable year, including a reasonable

22   allowance for salaries or other compensation for personal

23   services actually rendered.

24          And I think we can cut out some of that --

25          THE COURT:  Yeah, okay.  So let's do it.

```
 1              MR. HARRINGTON:  Perhaps --

 2              THE COURT:  Salaries -- okay.  Start.

 3              MR. HARRINGTON:  I was thinking we could say

 4   "Ordinary and necessary expenses can include a reasonable

 5   allowance for salaries or other compensation --

 6              THE COURT:  Okay.  Slow down.  "A reasonable

 7   allowance for salaries --

 8              MR. HARRINGTON:  -- "or other compensation --

 9              THE COURT:  Okay.

10              MR. HARRINGTON:  -- "for personal services --

11              THE COURT:  Okay.

12              MR. HARRINGTON:  -- "actually rendered."

13              THE COURT:  Okay.  Hold on.  Let me make sure.

14              So I'm willing to give that.

15              MR. TOSCHER:  Your Honor, the only quibble I have,

16   and I'm trying not to --

17              THE COURT:  We're going to add the thing about --

18              MR. TOSCHER:  -- is the government's theory, they

19   talked about before a reasonable allowance.  This has to deal

20   with the whole reasonable compensation area, and there's

21   literally thousands of civil disputes as to what's reasonable.

22   That's never been the government's theory in this case, and I

23   don't think they should start arguing that now.  Their theory

24   is that they weren't employees and they did nothing.  I don't

25   think "reasonable" should be injected at this late stage of the
```

1   game.

2          THE COURT:  I don't think it's being injected at this

3   late stage of the game.  I think you're perfectly okay arguing

4   what's reasonable.

5          MR. TOSCHER:  Just stating my -- the thoughts, Judge.

6   I don't want to belabor --

7          THE COURT:  Okay.  I'm going to give this sentence:

8   "Ordinary and necessary expenses can include a reasonable

9   allowance for salaries or other compensation for personal

10  services actually rendered."

11         Okay.  Then I will say:  "Services actually rendered

12  can include past or future services rendered, depending on the

13  particular facts and circumstances of a situation."  That's

14  what I'm willing to give.

15         THE COURT:  Okay.

16         MR. TOSCHER:  Okay.  Here.

17         MR. HARRINGTON:  That's fine, Your Honor.

18         THE COURT:  Is there an objection?

19         MR. TONG:  Your Honor, I was just going to say that I

20  think that's fine, but I would change the word "can" to "may."

21  It's more neutral.

22         THE COURT:  Okay.  I'll do that.

23         MR. TOSCHER:  That's fine, Your Honor.

24         THE COURT:  Okay.  So no objection by either side to

25  the "salaries" paragraph.  Whatever your objections were to the

1   things we talked about yesterday, this "salaries" part is being

2   given by agreement, leaving only the massage part.

3          So right now what I have is a proposal from the

4   defense:  A deduction for massages for a key employee of a

5   corporation are deductible and not a constructive dividend if

6   the expenses are ordinary and necessary, meaning that they are

7   a legitimate corporate purpose and not primarily personal.

8          There's a citation to Section 162 of the Internal

9   Revenue Code, which just talks in general.  It's not a

10   massage-specific statute.

11          There is a citation to the *Hutchinson*, United States

12   Board of Tax Appeals decision from 1928, which spoke about

13   expenses for physical training incurred by the taxpayer being

14   deductible as business expenses.  This was an actor who did

15   stunts.  And I guess what it looks like is that there was a

16   claim of certain amount for training to keep in physical

17   condition, including payments for massage treatments, a

18   physical trainer, rent for handball court, and gymnasium

19   activities.  And the decision says the stunts that the taxpayer

20   performed would have been impossible, unless he was in

21   excellent physical condition.  And under these circumstances

22   these training expenses were an ordinary and necessary business

23   expense.

24          But this was -- am I reading -- I don't know if I'm

25   missing this, but it doesn't look like there was a corporate

1   deduction of the massage and other training expenses as an

2   ordinary and necessary business expense.

3            MR. TOSCHER:  Your Honor --

4            THE COURT:  This was just the individual deducting

5   this.  He's running himself -- he's a self-employed guy, in

6   other words.

7            MR. TOSCHER:  But it's the same thing.  If you

8   operate as a Schedule C without a corporation, the standard

9   is -- the main standard we're relying upon is 162, Ordinary and

10  Necessary.  So whether it's a Schedule C or it's an

11  incorporated business, like most are today, it's the exact same

12  standard.

13           We've looked very hard.  If it's ordinary and

14  necessary, we've had a lot of evidence.

15           THE COURT:  I don't know -- okay.  Maybe it's the

16  same.  Maybe I just don't understand this enough.  But here's

17  the problem I'm having, okay.  So Mr. Hee is one of a number of

18  employees of Waimana.

19           MR. TOSCHER:  Right.

20           THE COURT:  And only Mr. Hee is getting his four

21  hours a week of massage treatment treated as an ordinary and

22  necessary business expense by Waimana Enterprises.

23           MR. TOSCHER:  Correct.

24           THE COURT:  But there are, I don't know how many

25  other employees of Waimana Enterprises, none of whom gets any

1    massage treated as an ordinary and necessary business expense.

2    In this *Hutchinson* case, it looks like Mr. Hutchinson is a

3    one-man business, self-employed, and he is deducting massage

4    and other physical training things as his ordinary and

5    necessary business expense.  So because he's a one-man

6    business, all employees are having this treated as an ordinary

7    and necessary business expense when he treats it that way.

8              In the Waimana situation there's a selective -- only

9    one guy is getting it.  Doesn't that make a difference as to

10   whether this is an ordinary and necessary business expense?  I

11   don't see *Hutchinson* as talking about it's okay if it's a key

12   employee because in *Hutchinson* he was the sole employee; so

13   that just was not an issue.  Maybe I'm missing something.  Tell

14   me if I am.

15             MR. TOSCHER:  Right.  To address the Court's

16   question, *Hutchinson* is a sole proprietorship, but there is no

17   requirement that these massage services be offered to everybody

18   for it to be an ordinary and necessary business expense under

19   162.

20             THE COURT:  How is it -- I didn't get any testimony

21   so far -- maybe you're going to still put it on because you

22   haven't rested -- about ordinary and necessary being for one

23   person only.  All the testimony I have so far goes to having

24   massage therapists come in and offer this in general to all

25   comers in a multiperson company.  So I don't have anything

1    saying that it is an ordinary and necessary expense when only

2    one important person gets this; so how do I tie this to the

3    evidence?

4              MR. TOSCHER:  Your Honor, I think the evidence is

5    this is something -- I think Mr. Rockowitz' testimony.  The

6    same reason corporations provide this for all their employees

7    would apply to applying it to a single employee, especially a

8    CEO.

9              THE COURT:  It would apply to the benefit.  All he

10   testified to was the physical benefit --

11             MR. TOSCHER:  Right.

12             THE COURT:  -- of massage therapy would apply to one

13   person and to a hundred people.  He didn't testify at all that

14   this was an ordinary and necessary type of thing, whether it

15   applied to one person or a hundred people in any kind of

16   business.  So I'm making that distinction.

17             I just don't think *Hutchinson* gets you to my putting

18   in this statement as a statement of law.  And Section 162, it's

19   just a generic statement; so I'm going to refuse this --

20             MR. TOSCHER:  All right.

21             THE COURT:  -- over your objection.

22             MR. TOSCHER:  Right.

23             THE COURT:  Because I don't think it's supported by

24   the authorities you've given me or by my recollection of the

25   evidence.  I'm sure I'm going to hear wonderful, creative

1   argument, but I'm going to refuse the massage --

2              MR. TOSCHER:  Just for the record, Your Honor, we

3   have definitions in the instruction of what's ordinary and

4   necessary, helpful and appropriate, and we'll argue with the

5   general definition.  I appreciate the Court's -- and the answer

6   is we can't find any cases on it because maybe the government

7   doesn't challenge it.  We don't know.

8              THE COURT:  Or maybe it's not ordinary and necessary.

9   I don't know.  But I don't want to give this as a statement of

10  law.

11             MR. TOSCHER:  Understood, Your Honor.

12             THE COURT:  So refused over your objection.

13             And that leaves me only to resolve some of the form

14  instructions that we passed on.  So I think we passed on

15  reputation for truthfulness.  That is my Form 15.  There hasn't

16  been such so far.  Will there be or is that -- 13, I'm sorry.

17  Is that -- does anybody need that?

18             A witness may also be discredited or impeached by

19  evidence that the general reputation of the witness for truth

20  and veracity is bad in the community where the witness now

21  resides or has recently resided.  This was jointly requested

22  with the assumption it might be relevant, but I don't think

23  we've had any such --

24             MR. TOSCHER:  I'm sorry, Your Honor.  I was turning

25  to the Court's standard --

```
 1              THE COURT:  It's 13.  Sorry.  I gave the wrong

 2    number.

 3              MR. TOSCHER:  No, no, let me -- I apologize.

 4              Okay.  It's 13.  I'm sorry.  That's where I -- so we

 5    go back.  It's not listed.

 6              Your Honor, I think we're going to have some

 7    testimony on that; so I would leave it in for now.  We're going

 8    to have testimony.

 9              THE COURT:  That the general reputation of a witness

10    is bad.

11              MR. TOSCHER:  Well, no.  We'll have to see how the

12    evidence comes out, but there's two bases for, you know,

13    character evidence:  opinion or reputation.  And I can't say

14    now for sure it will be reputation; so I would just ask the

15    Court to hold this until we're finalized.

16              THE COURT:  Okay.  And are you ready or not ready to

17    tell me whether my form instruction number 4 on a defendant's

18    decision not to testify should be given or my form instruction

19    number 15 when a defendant does testify?

20              MR. TOSCHER:  It will be 15, Your Honor.

21              THE COURT:  Okay.  So hold on.

22              MR. TOSCHER:  15A.

23              THE COURT:  15A?

24              MR. TOSCHER:  Yeah, B is -- I don't think B is

25    applicable.
```

1          THE COURT:   Okay.   So you are withdrawing number 4.

2   That was jointly proposed.

3          MR. TOSCHER:   Correct.

4          THE COURT:   So 4 is withdrawn.

5          And you would like me to give 15A.  Did I really

6   state earlier the defendant has a right not to testify?  Hold

7   on.  I'm sure I did that.  Otherwise, I can just take out those

8   words as stated earlier and say a defendant has a right not to

9   testify.  Okay?

10          MR. TOSCHER:   You're taking out "as stated earlier."

11   That's fine.

12          THE COURT:   Okay.  I mean, I did state it in a

13   preliminary instruction.

14          MR. TOSCHER:   Right.  No, no.

15          THE COURT:   So it will be given, as modified, by

16   agreement my 15A.

17          So the only one that I now still have pending, I

18   think, is my number 13, which is on reputation for

19   truthfulness.  Is that right?  And I think I ruled on

20   everything else, but if counsel can recall that I still need to

21   rule on something, remind me; so I'll rule on it.

22          MR. HARRINGTON:   I think that's it, Your Honor.

23          MR. TOSCHER:   I believe that's correct, Your Honor,

24   and --

25          THE COURT:   So I'm holding on my number 13.  That's

 1     it.

 2               MR. TOSCHER:   That's correct.

 3               THE COURT:   I think we're okay, then.

 4               Then I'll give you five minutes so you can get

 5     refreshed, and then we'll call the jury in.

 6               MR. TOSCHER:   Thank you, Your Honor.

 7          (Court recessed at 9:30 A.M., until 9:38 A.M.)

 8               THE COURT:   Okay.   Thank you.

 9               I wanted just to use this period before the jury

10     comes back in to have a little colloquy with Mr. Hee, if he has

11     made a decision.

12               Okay.   So, Mr. Hee, I know that you've sat through

13     everything, and you've heard me say this already to the jurors,

14     and I have every confidence that your very experienced attorney

15     has advised you in this regard, but I'm going to repeat:   You

16     understand you have a right under our constitution to be

17     silent.   You do not have to testify in this trial.   Do you

18     understand?

19               THE DEFENDANT:   Yes, Your Honor.

20               THE COURT:   And at the same time you do have a right

21     to get on the witness stand and answer questions at this trial,

22     if you so choose.   Do you understand that?

23               THE DEFENDANT:   I do, Your Honor.

24               THE COURT:   Have you had a chance to discuss your

25     rights in this regard with your lawyer?

```
 1              THE DEFENDANT:  Yes, I have, Your Honor.

 2              THE COURT:  And have you made a decision on whether

 3   you will or will not testify in your own defense?

 4              THE DEFENDANT:  At this time I've decided to testify,

 5   Your Honor.

 6              THE COURT:  Has anyone done anything to try to force

 7   you to make that particular decision?

 8              THE DEFENDANT:  No, Your Honor.

 9              THE COURT:  No one, not even your lawyer, has

10   compelled you to testify; am I correct?

11              THE DEFENDANT:  Yes, you are, Your Honor.

12              THE COURT:  Do you have any questions at all about

13   your rights on this subject:  testifying or choosing not to

14   testify?

15              THE DEFENDANT:  No.  I'm fine with testifying, Your

16   Honor.

17              THE COURT:  And you've had ample opportunity to

18   discuss this with your attorney.

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  Okay.  Then thank you very much.

21              THE DEFENDANT:  Thank you.

22              THE COURT:  You may be seated.

23              MR. TOSCHER:  Thank you, Your Honor.

24              THE COURT:  Let me ask this.  This is a free and

25   voluntary choice you've made fully informed; is that right?
```

1            THE DEFENDANT:  Yes, it is, Your Honor.

2            THE COURT:  Okay.  Thank you.  Then I can have the

3    jury brought in.

4        (Jury enters.)

5            THE CLERK:  Criminal 14-826 SOM, United States of

6    America versus Albert Hee.  This case has been called for

7    Further Jury Trial.

8            Counsel, please make your appearances for the record.

9            MR. TONG:  Good morning, Your Honor.  Good morning,

10    ladies and gentlemen.  Larry Tong and Quinn Harrington for the

11    United States.  With us are Christina Sorely and Special Agent

12    Greg Miki.  Good morning.

13            THE COURT:  Good morning.

14            MR. TOSCHER:  Good morning, Your Honor.  Good

15    morning, ladies and gentlemen.  Steven Toscher for defendant

16    Albert Hee, who is present with me in court, together with

17    Lacey Strachan and Kurt Kawafuchi.  Good morning.

18            THE COURT:  Good morning.  You can be seated.

19            I know it begins to seem very insincere when every

20    morning I apologize for keeping you waiting.  You wonder, Well,

21    if you're so sorry, why do you keep doing it?  I know I told

22    you when this case started that this is really not the script

23    of a play where, you know, we're just all reading our little

24    prepared parts and I can tell you exactly when Act I will be

25    done.  And so I'm really sorry, but things come up, and we need

1   to discuss them.  So I really, really am grateful to you for

2   your patience.

3            I'm also going to remind you that tomorrow we're not

4   going to be starting at 9:00 anyway.  We'll be starting at

5   9:30.  Of course, what I really mean when I say 9:30 is 11:30.

6   Just kidding.  I hope very much to start at 9:30, but I know

7   for sure we will not start at 9:00 because I have to take care

8   of some other things earlier in the morning.

9            Okay.  Mr. Toscher.

10           MR. TOSCHER:  May it please the Court.  Ladies and

11  gentlemen.  Could you go get our witness that's on the stand.

12           THE COURT:  Okay.  Good morning.  I know you've been

13  patiently waiting.  Thank you.  Sorry for the delay.

14           Mr. Toscher, you can resume.

15       (Previously sworn.)

16           DIRECT EXAMINATION (Resumed)

17  BY MR. TOSCHER:

18  Q    Good morning, Admiral Kihune.

19  A    Good morning.

20  Q    Just a few questions from where we ended yesterday.  I

21  believe you testified that in the course of your time at the

22  companies you observed the children at the companies, on the

23  premises of the company?

24  A    Yes, I did.

25  Q    And you observed them both at the Network Operation Center

1    at Mililani?

2    A    That's correct.

3    Q    And did you also observe them at the office -- the other

4    offices of the companies?

5    A    That's correct.

6    Q    And of the three children, I think you testified you

7    observed all of them there.  Was there one that you saw more

8    often than the other at the offices?

9    A    I saw Liko a lot more often then because Ho'o, the oldest

10   one, sometimes had courses during the summer; so I think she

11   returned back to Massachusetts.

12   Q    So it was Liko you saw the most.

13   A    Liko, yes.

14   Q    Liko, yes.

15         MR. TOSCHER:  No further questions, Your Honor.

16         MR. TONG:  Okay.

17                    CROSS-EXAMINATION

18   BY MR. TONG:

19   Q    Good morning, Admiral Kihune.

20   A    Good morning.

21   Q    You just testified that Ho'o -- Ho'o's the oldest

22   daughter; is that correct?

23   A    That's the oldest, yes.

24   Q    She's the one that went to MIT; is that correct?

25   A    That's correct.

1    Q    You said you saw her less frequently because she had

2    courses over the summer on the mainland; is that correct?

3    A    That's correct.

4    Q    She also did graduate work; is that true?

5    A    That's correct.  Well, to the best of my knowledge because

6    I did not see her going through the schools, but I heard that

7    she was doing graduate work.

8    Q    You heard she was doing graduate work at the Rhode Island

9    School of Design; is that correct?

10   A    That's correct.

11   Q    All right.  And you talked yesterday about knowing that,

12   initially, the children worked summers at the NOC; is that

13   correct?

14   A    Yes.

15   Q    The Network Operating Center; correct?

16   A    That's correct.

17   Q    And the jobs, essentially, were cutting grass and doing

18   carpentry work; correct?

19   A    That's correct.

20   Q    And that was the nature of the employment that you

21   initially understood them to have; correct?

22   A    That's the initial work that I saw them doing; that's

23   correct.

24   Q    And you did not know that they were placed on salary until

25   a discussion about bonuses took place; correct?

1    A    That's correct.

2    Q    And you testified that they came and sat, observed, and

3    listened during some of your executive committee meetings;

4    correct?

5    A    That's correct.

6    Q    That was when they were home on spring break or Christmas

7    break or maybe over the summer; correct?

8    A    That's correct.

9    Q    Am I correct in assuming that you had executive committee

10   meetings throughout the year?

11   A    I had it every week.

12   Q    So 52 weeks a year.

13   A    Whenever they were available, they were allowed to come

14   in.

15   Q    Okay.  And by "they" you mean the children.

16   A    The children.

17   Q    But even when they were unavailable, you conducted your

18   executive committee meetings.

19   A    That's correct.

20   Q    So the meetings did not depend on their presence in order

21   to occur.

22   A    No, they did not.

23            MR. TONG:  Thank you.  I have nothing further.

24            MR. TOSCHER:  No further questions, Your Honor.

25            THE COURT:  Okay.  Then thank you very much.  You are

1   excused, and you may leave the courtroom.

2       (Witness excused.)

3           MR. TOSCHER:  Your Honor, we're bringing in -- we're

4   calling Liko Hee.

5           THE COURT:  Okay.

6           MR. TOSCHER:  Your Honor, the witness is using the

7   restroom.  She'll be in shortly.

8           THE COURT:  She didn't need to have that on the

9   record, did she?  Just kidding.

10          MR. TOSCHER:  I'm sorry.

11      (Witness photographed.)

12          THE CLERK:  Please raise your right hand.

13      (Witness sworn.)

14          THE CLERK:  Thank you.  Please be seated.

15          Please state your name and spell your last name.

16          THE WITNESS:  Breanne Ehu-kai-o-liko-i-ka-makani

17  Roylo Hee-Kahalewai.  My last name is H-e-e hyphen

18  K-a-h-a-l-e-w-a-i.

19          THE COURT:  I'm sorry.  Something was not good about

20  the mikes.  Can you say your whole name again.

21          THE WITNESS:  Breanne Ehu-kai-o-liko-i-ka-makani

22  Roylo Hee-Kahalewai.

23          THE COURT:  Thank you.

24                      <u>DIRECT EXAMINATION</u>

25  BY MR. TOSCHER:

```
 1   Q     May it please the Court.  Ladies and gentlemen.
 2               Good morning, Miss Hee.
 3   A     Good morning.
 4   Q     Do you go by the name of Liko?
 5   A     Yes.
 6   Q     Are you currently employed?
 7   A     Yes.
 8   Q     And where are you employed?
 9   A     Sandwich Isles, but I'm on a semi-maternity leave right
10   now.
11   Q     So when did you go on maternity leave?
12   A     Last week Monday I gave birth.
13   Q     To a baby boy?
14   A     Yes.
15   Q     Are you feeling okay?
16   A     Yeah.
17   Q     The -- before you went on maternity leave last week, I
18   know you said -- who are you employed with?
19   A     Sandwich Isles Communications.
20   Q     Now, are you also employed by Waimana?
21   A     Yes.
22   Q     Do you have a full-time position there?
23   A     Yes.
24   Q     Could you -- how long have you been there at the companies
25   in a full-time position?
```

1  A    With Waimana since --

2  Q    When you came back and you've been actually there with an

3  operational role.

4  A    Since 2012.

5  Q    Could you tell us, do you have a title?

6  A    Currently, I'm the director of corporate services at

7  Sandwich Isles.

8  Q    Have you been the director of corporate services since

9  2012?

10  A    No, since -- the end of 2013.

11  Q    Okay.  So tell us now what you do at Sandwich Isles and

12  Waimana.

13  A    For Waimana I sit on the Board of Directors.  I also help

14  oversee our biotech company, Black Ivory Biotech.  I also help

15  oversee the wireless portion of our companies, Sandwich Isles

16  Wireless.  And then with Sandwich Isles I oversee three

17  departments or three groups.  The first group is our project

18  manager, and he helps coordinate about 85 percent of all the

19  projects that go on within our companies.  I also oversee our

20  security.  They do physical security of our Network Operation

21  Center out in Mililani, and there's 10 people in that group.

22  And they also -- our manager also makes sure that we're OSHA

23  compliant.  And the third group is our business applications

24  group, and they coordinate with their third-party vendor who

25  does our billing.  They also build our customer profiles into

```
 1   our billing system.
 2   Q    Okay.  Let me take a step back a little bit.  You are the
 3   daughter of the defendant Albert Hee?
 4   A    Yes.
 5   Q    You recognize him today?
 6   A    Yep.
 7        MR. TOSCHER:  Let the record reflect that Miss Hee
 8   recognized her father.
 9        THE COURT:  It so reflects.
10   BY MR. TOSCHER:
11   Q    And who is your mother?
12   A    Wendy Roylo Hee.
13   Q    Do you have brothers and sisters?
14   A    Yes.
15   Q    Could you tell the jury the names of the brother and
16   sisters.
17   A    My brother's name is Charlton Kupa'a Hee.  We call him
18   Kupa'a.  My sister is Adrianne Ho'o Hee.  We call her Ho'o.
19   Q    Are you married?
20   A    Yes.
21   Q    Who are you married to?
22   A    Jonathan Kahalewai.
23   Q    Does he have a nickname or something you call him by?
24   A    He goes by Mika.
25   Q    When did you get married to Mika?
```

1    A    In 2010, in July.

2    Q    Okay.  You told us about your son that was born last week.

3    Do you have any other children?

4    A    I have an 11-month-old daughter.

5    Q    So you have total of two children?

6    A    Yes.

7    Q    So tell us -- I want to get into your educational

8    background.  Where did you go to high school?

9    A    I went to Kamehameha High School.

10   Q    Okay.  Did you go through Kamehameha even before high

11   school or just high school?

12   A    Since kindergarten.

13   Q    And the year you graduated?

14   A    I graduated in 2005.

15   Q    And after graduation did you attend college?

16   A    Yes.  I went to Santa Clara University.

17   Q    Did you get a degree there?

18   A    Yes.

19   Q    What was that degree?

20   A    In communication.  Bachelor of Arts, I'm sorry, in

21   Communication.

22   Q    Could you give the jury an overview of the types of

23   courses you took.

24   A    I took some technical communication courses; so it covered

25   things like fiber optics and wireless, the FCC, which regulates

1    one of our companies.  And I also took the mass communication,

2    like speech, media, PR.

3    Q    Did some of the courses you took there help prepare you

4    for your work with Waimana and Sandwich Isles?

5    A    Definitely.

6              MR. HARRINGTON:  Objection.  Leading.

7              THE COURT:  It's -- I'm going to let this one -- it

8    is leading, but such that I'm going to allow it.

9              Okay.  You can answer.

10             THE WITNESS:  It definitely helped me.

11   BY MR. TOSCHER:

12   Q    The -- how long were you attending -- how long did it take

13   you to get through your courses, or how many years were you

14   studying for your degree?

15   A    I graduated in four years, but I had started with a math

16   major, and then halfway through my junior year I switched to

17   communication.

18   Q    Where did you live when you first started attending Santa

19   Clara?

20   A    I lived in the dorms.

21   Q    And that would have been -- when did you start with Santa

22   Clara?  What year?

23   A    In 2005.

24   Q    And do you know who paid for your tuition?

25   A    My dad.

```
 1   Q    And do you know who paid for your rent when you were
 2   living off campus?
 3   A    My dad paid.
 4   Q    Now, did there come a time when you moved from the dorm to
 5   another location?
 6   A    I moved my sophomore year into an apartment.
 7   Q    Okay.  Into an apartment.
 8   A    Yes.
 9   Q    And did -- and what year was your sophomore year?
10   A    2006 to 2007.
11   Q    Okay.  And did there come a time you moved out of the
12   apartment into another location?
13   A    Yeah, my junior year I moved into a house.
14   Q    And do you recall the address of the house?
15   A    1191 Monroe Street.
16   Q    And do you know who owned that house?
17   A    I don't recall his name.
18   Q    Okay.  Did there come a time you moved to another location
19   when you were there?
20   A    Yes.
21   Q    And this is another house?
22   A    Yes.
23   Q    Okay.  So this is now, I guess, the fourth location.  And
24   do you know what the address was?
25   A    386 Monroe Street.
```

1    Q    And do you know who owns that house?

2    A    Waimana Enterprises.

3    Q    Now, while you were attending school at Santa Clara, you

4    were a full-time student?

5    A    Yes.

6    Q    And you were receiving a salary from Waimana?

7    A    Correct.

8    Q    Do you recall what that salary was?

9    A    I believe it was 24,000.

10   Q    Tell us why you were receiving a salary when you were a

11   full-time student.

12             MR. HARRINGTON:  Objection to the extent it calls for

13   hearsay.

14             THE COURT:  I'm sorry.  I couldn't quite hear the

15   objection.

16             MR. HARRINGTON:  Objection to the extent it calls for

17   hearsay.

18             THE COURT:  Okay.  Sustained.  You would need to lay

19   a foundation as to the source of her knowledge.

20   BY MR. TOSCHER:

21   Q    Okay.  Did you have an understanding -- did you have an

22   understanding as to why you were receiving a salary?

23             THE COURT:  I'm going to allow a yes or no.

24             MR. TOSCHER:  That's what I was trying to tell her,

25   Your Honor.

1            THE WITNESS:  Yes.

2    BY MR. TOSCHER:

3    Q    And was that understanding based upon a discussion with

4    your father?  Yes or no.

5    A    Yes.

6            MR. TOSCHER:  And, Your Honor, for the record I would

7    ask her about the discussion, but the Court -- wait for the --

8            THE COURT:  I'm not going to allow her to answer such

9    a question; so you have your intent on the record.

10           MR. TOSCHER:  Okay.  I just want to be clear.  I

11   don't want to be disruptive.

12           THE COURT:  Yes.

13           MR. TOSCHER:  Okay.

14   Q    When you were attending school, were you doing things

15   related to your employment at the company?

16   A    Yes.

17   Q    Could you tell us what things you were doing.

18   A    I was learning about the company to one day come back and

19   work there.  I was also being educated, and I was having

20   discussions with my father.

21   Q    Okay.  Anything else?

22   A    I attended several meetings.  I sat in on some of the

23   conference calls he had, if I was home.

24   Q    Let me -- I want to focus on the Santa Clara house that --

25   when you moved to -- that was owned by Waimana.  Okay?

1          When you first moved in there, that would have been I

2   think you said 2008?

3   A     Yes.

4   Q     That was your junior year?

5   A     No, that was my senior year.

6   Q     It was your senior year.  Okay.  So your final year of

7   Santa Clara?

8   A     Correct.

9   Q     Who else lived with you in the house your senior year?

10  A     My brother, and we had two roommates or tenants.

11  Q     Okay.  And your brother is?

12  A     Kupa'a.

13  Q     Okay.  Did you pay rent when you were there?

14  A     No.

15  Q     Okay.  Did the two roommates that you just mentioned, do

16  you remember their names?

17  A     Yeah.  One was Noelani Ho'opi'i and the other was Emily

18  Brac.

19  Q     Did they pay rent?

20  A     Yes.

21  Q     And who was in charge of collecting the rent and getting

22  them as renters?

23  A     I collected the rent and paid the bills.

24  Q     All right.  What did you do with the rent money that you

25  received?

1    A    I would pay the bills.  We also would go together to

2    Costco and get food for all of us.

3    Q    Okay.  So the rent also included there would be food

4    around the house for the students?

5    A    Yeah, and I furnished the house with the money so they

6    didn't need to buy anything.

7    Q    The -- now, to the extent there was any excess money in

8    what you spent, did you ever return or give that money back to

9    Waimana or give it to Waimana?

10   A    No.

11   Q    Can you explain to the jury why you didn't do that?

12   A    I was instructed to take care of the house.

13           MR. HARRINGTON:  Objection.  Hearsay.

14           THE COURT:  Okay.  Sustained.

15   BY MR. TOSCHER:

16   Q    Okay.  Did anybody give you guidance as to what you were

17   supposed to do with the rental activity, the rental money?

18           THE COURT:  This is a yes or no.

19           THE WITNESS:  No.

20   BY MR. TOSCHER:

21   Q    Were you instructed to -- was it your -- were you

22   instructed to take care of any of the rental activity?

23   A    I was to pay the bills, the utilities, the cable, sewage,

24   and the property taxes.

25   Q    Okay.  The -- did you keep records of the rents you

1   received?

2   A    Yes.

3   Q    And the bills you paid?

4   A    Yes.

5   Q    Did you send those records to anyone at Waimana?

6   A    No.

7   Q    Could you tell us why you didn't send those records?

8   A    I didn't know I needed to send it to anyone.

9   Q    Did your father ever visit the house?

10  A    Yes.

11  Q    Was there an area of the house, at least at the beginning,

12  at the start, that he would stay at?

13  A    Yes.

14  Q    And what part of the house would he stay at?

15  A    There's a small cottage in the back of the house that was

16  for him.

17  Q    Okay.  And when he first -- and did he visit you up there?

18  A    Yes.

19  Q    And is that where he first stayed when he came to visit?

20  A    Yes.

21  Q    Do you recall how often he visited you up in Santa Clara?

22  A    Oh, maybe three or four times a year he would stop in.

23  Q    Did you observe him working while he was up there?

24  A    Yes.

25  Q    Now, when you were a student -- let me go back a little

1    bit, back in history a little bit.

2            Before Santa Clara when you were still living here in

3    high school and -- did you work out at the Mililani property,

4    what's called the Network Operations Center?

5    A    Yes.

6    Q    Was that during high school?

7    A    Yep.

8    Q    Could you tell the jury what you did when you were out

9    there -- or how long a period was it?  Was it throughout all

10   high school or a few of the years?  Tell us what you did.

11   A    During the summer I would work at the NOC and do manual

12   labor; so I would cut grass, we built a bull corral, sort

13   pipes, those kind of things.

14   Q    Did there come a time when you did more than just manual

15   labor out there?

16   A    In 2007 I -- while doing manual labor I also supervised

17   the summer hires.

18   Q    Now, we talked about the summer.  Did you also work out at

19   the Network Operation Center during the school year on

20   weekends?

21   A    No.  During high school I worked in the office.

22   Q    You worked -- and which office did you work in?

23   A    At Bishop Street for --

24   Q    Okay.  And that was the offices of what companies?

25   A    Waimana, Sandwich Isles, and ClearCom.

1    Q    So the Network Operations Center work was, basically,

2    during the summers.  During the school year you worked at the

3    business offices on Bishop Street.

4    A    Yeah, for a little while.

5           THE COURT:  Can I ask something.  Okay.  You said

6    during the summers you sorted pipes and built a what?

7           THE WITNESS:  A bull corral.

8           THE COURT:  A what?

9           THE WITNESS:  A bull corral.

10          THE COURT:  A bull corral.  I'm sorry.  I just didn't

11   catch that.

12   BY MR. TOSCHER:

13   Q    Now, fast-forwarding back again to when you were in

14   college, did you return home for the summers?

15   A    Yes.

16   Q    And did you do any work out at the Network Operation

17   Center during summers while you were in college?

18   A    Yeah.

19   Q    And can you tell us, generally, the nature of the work

20   that you did during your college years.

21   A    Manual labor.

22   Q    The -- now, do you live out on the Mililani property right

23   now?

24   A    Yes.

25   Q    So there's -- it's a house?

1   A    It's a test home, yeah.

2   Q    What do you mean "a test home"?

3   A    The house out there, Sandwich Isles runs their

4   infrastructure to it, and they test the different products that

5   we provide to our customers.

6   Q    Okay.  So describe a couple of those products for the jury

7   just so they -- I know you understand, but I want them to

8   understand.

9   A    So we provide the telecommunications for Department of

10  Hawaiian Home Lands.  So they run fiber optic to that house,

11  and we partner with Oceanic; so it was a test to see if we

12  could run Oceanic's signals through our fiber to provide to our

13  customers.  They also have -- I probably have six phone lines

14  out there, and they test different devices.  And we also test

15  different ways of getting the internet to the house.  So we

16  tested wireless for a while.  We have a fiber going to the

17  house.  And so every once in a while I would check the speed

18  and report it back.

19  Q    Okay.  Now, do you pay rent for where you're living on the

20  Mililani property?

21  A    Yes.

22  Q    How much rent do you pay?

23  A    A thousand dollars.

24  Q    And how large is the house?

25  A    It's four bedrooms, but I have access to two of them.

1   Q    And why don't you have access to the other bedrooms?

2   A    The other bedrooms have company equipment in them.

3   Q    Used as part of --

4   A    Testing.

5   Q    Testing.  And -- all right.  So let me go back to -- you

6   said you were able to do Santa Clara or graduate in four years;

7   so 2009 graduated.

8   A    Correct.

9   Q    Did you return to Hawai'i after you graduated?

10  A    No.

11  Q    And why didn't you return to Hawai'i?

12  A    I was waiting for my then boyfriend, now husband, to

13  finish his schooling.

14  Q    And where was he going to school?

15  A    He was at UC Berkeley.

16  Q    While you were in California, before you returned to

17  Hawai'i, did you seek some employment opportunities there?

18  A    Yes.

19  Q    And could you tell us what you did.

20  A    In 2009 after I graduated I worked at Enterprise

21  Rent-a-car.

22  Q    The -- and what did you do there?

23  A    I rented cars out.  I -- they had a program that I went

24  through that I felt would help me learn more about business.

25  Q    And how long did you work for Enterprise?

```
 1   A    About five, six months.

 2   Q    And was there a reason you left Enterprise?

 3   A    It ended up being a lot of sales, and that wasn't what I

 4   was looking for to learn.

 5   Q    Okay.  Did you do anything on the mainland, work anywhere

 6   else?

 7   A    I worked at a Hyatt part-time.

 8   Q    And what did you do?

 9   A    I was a front desk agent.

10   Q    Okay.  When did you move back to Hawai'i?

11   A    In 2012.

12   Q    And when you came back, did you start working full time

13   for Waimana or Sandwich Isles?

14   A    Yes.

15   Q    Both or --

16   A    For Waimana.

17   Q    And what were you doing when you first came back?

18   A    I was shadowing the different departments.  I also wrote

19   up some applications for grants.  I wrote up, I guess you can

20   say, a production report for one of the departments within

21   Sandwich Isles.

22   Q    Okay.  So you talked about your current position a little

23   bit.  And you mentioned, I think, the biotech area.

24   A    Correct.

25   Q    Could you describe that a little in more detail.  What is
```

1    going on regarding that function at the company?

2                    MR. HARRINGTON:  Objection.  Relevance.

3                    THE COURT:  I'll allow her to do this.  Go ahead and

4    answer.

5                    THE WITNESS:  Black Ivory Biotech is our biotech

6    company that we brought back from California.  Waimana had

7    invested in Siometrix, which is a biotech company in

8    California.  And when they couldn't uphold their part of the

9    agreement, Black Ivory was created because we took over the

10   licensing of the technology.  And so Black Ivory, its

11   technology, tests for anthrax.

12   BY MR. TOSCHER:

13   Q    Okay.  And let me take you back when you were in Santa

14   Clara.  Did you ever go visit the lab -- the Siometrix lab?

15   A    Yes.

16   Q    And where -- do you recall where it was located?

17   A    In Menlo Park.

18   Q    And do you recall how many times you visited it?

19   A    Probably about twice.

20   Q    Okay.  And who did you go with?

21   A    My father.

22   Q    Okay.  And did you go on a tour of the lab?

23   A    Yeah.

24   Q    Was it a big building?

25   A    No.  It was a small, small lab.

1   Q     Okay.  The -- now, while you were in Santa Clara did you

2   attend any other business meetings or any other meetings

3   relating to Waimana business when you were there?

4   A     Yes.

5   Q     Okay.  Do you recall what those were?  Did you -- go

6   ahead.  Do you recall what those meetings were about?

7   A     I met -- I went with my father to meet with the bank about

8   a Paniolo project, which Paniolo owns the undersea fiber part

9   of our network.

10  Q     Let's stay on that for a second.  Where was that meeting?

11  A     In San Francisco.

12  Q     Okay.  And you met with, you said, the bankers?

13  A     Yeah, Deutsche Bank.

14  Q     Okay.  Do you recall other meetings that you went with --

15  that you went to?  If you don't, that's okay.

16  A     Yeah.

17  Q     Do you recall ever a trip to Arizona?

18  A     Oh, yeah.

19  Q     And tell us -- and this was when you were living in Santa

20  Clara?

21  A     Yes.

22  Q     Tell us -- does that refresh your recollection?

23  A     Yeah.

24  Q     Tell us why you went to Arizona or what you did -- tell us

25  why and what you did when you went to Arizona.

1    A    We went there to meet with a NECA representative.   NECA is

2    one of the companies that regulates Sandwich Isles.   So we went

3    there to meet with him to discuss the Paniolo network.

4    Q    Okay.   Now, while you were attending school at Santa Clara

5    did you have conversations with your father?

6    A    Yes.

7    Q    Okay.   And how often would you have those conversations?

8    A    Three to four times a week.

9    Q    Okay.   Did your father call you at a specific time

10   usually?

11   A    Usually in the morning on his way into the office.

12   Q    Okay.   And how long would those calls generally last?

13   A    45 minutes.

14   Q    And during those calls -- let's see.

15        MR. TOSCHER:   Your Honor -- wait for the Judge

16   here.

17   Q    Were business matters discussed?

18   A    Yes.

19   Q    Okay.   And was this, you said, three to four times a week.

20   Did this happen throughout the time you were at Santa Clara?

21   A    Yes.

22   Q    Now, I think you said during the summers you were out at

23   the Network Operation Center working; correct?

24   A    Yes.

25   Q    And that would have been primarily -- well, that would

```
 1    have been during the summers of both high school and college?
 2    A    Right after high school.
 3    Q    Right after high school.
 4    A    Through college.
 5    Q    Now, did you ever observe your grandfather or grandmother
 6    working at the NOC?
 7    A    On the weekends, yeah.
 8    Q    And what were they doing?
 9    A    My grandfather would cut the grass, and he still does
10    today.  My tutu would trim the hedges.
11    Q    Okay.  Now, I want to talk to you about some other trips
12    you went on.  Do you recall a trip to France with your
13    husband -- now husband and your mother?
14    A    Yes.
15    Q    Tell us what you did on that trip.
16    A    We went to the Alcatel fiber factory.  We got -- we took a
17    tour of it, and then we had lunch with the managers.
18    Q    And how long was the tour, approximately?
19    A    It was an all-day event.
20    Q    Okay.  And do you know where in France was the Alcatel
21    plant?
22    A    In Calais.
23    Q    And how did you get there, physically?
24    A    We took -- well, we flew to France, and then we took a
25    train out to Calais.
```

1   Q    A train from where to Calais?

2   A    From Paris.

3   Q    And tell the jury what you observed there during your

4   tour.

5   A    I got to see the fiber being pulled.  So fiber actually

6   starts as glass.  It's heated and it's pulled.  And then they

7   bundle a bunch of the fibers together and they wrap it up in

8   shielding to protect it.  Then they wrap those bundles into big

9   tanks, and then they send them out on the ships.

10  Q    The -- let me go to another trip.  Did you take a trip to

11  Tahiti?

12  A    Yes.

13  Q    And do you recall who was on that trip with you?

14  A    My brother, my sister, and my mom.

15  Q    And could you tell the jury what you did there when you

16  went to Tahiti?

17  A    We went and looked for Honotua, which is a company that

18  has fiber running from French Polynesia up to South Point on

19  the Big Island.  And we went to look for their headquarters and

20  their cable landing site.

21  Q    Now, on both these trips, the France trip, you described

22  what you did regarding the Alcatel tour; and the Tahiti trip,

23  you just described you were looking for Honotua and the cable.

24  In both these trips did you engage in other activities as well?

25  A    Yeah.

1    Q     Now, do you recall going on some trips to Orlando?

2    A     Yes.

3    Q     Okay.  Do you recall -- so there are two separate trips.

4    Do you recall -- describe what you did on each trip.  Pick

5    either one you want to go with.

6    A     Okay.  One of the Orlando trips I went to a Fiber to the

7    Home Conference.

8    Q     Okay.  And tell us what that Fiber to the Home -- what is

9    a Fiber to the Home conference?

10   A     The Fiber to the Home Conference had a -- there was an

11   Expo; so it had a bunch of vendors with their products,

12   anywhere from technology, to equipment, to fiber.  They were

13   all there.  And then there was also sessions that we could sit

14   in and learn about the newest and latest and greatest

15   technology, also the capabilities of fiber.  It's much faster

16   and more reliable than copper.

17   Q     Okay.  Were you still living in Santa Clara when you went

18   to this conference?

19   A     Yes.

20   Q     And why is the conference -- the fiber conference -- how

21   is it related to the business of Sandwich Isles and Waimana?

22   A     Sandwich Isles provides fiber to the home.  So it's

23   important to know what we can offer and its capabilities.

24   Q     Did you go on another trip to Orlando?

25   A     Yes.

1   Q     And what did you do when you were on that trip?

2   A     We went to visit the Raytheon ride.

3   Q     Okay.  And can you tell us -- you engaged in other

4   activities in addition to visiting the Raytheon ride?

5   A     Yes.

6   Q     Now, did there come a time -- well, let me just ask you

7   this.  Did you attend President Obama's first inauguration?

8   A     Yes.

9   Q     And that would have been in January 2009.  Where were you

10  living at the time?

11  A     In Santa Clara.

12  Q     Okay.  Can you tell us what you did when you went on that

13  trip.

14  A     We went to former or the late Senator Inouye's office, as

15  well as Senator Akaka's office.  We tried to go to the

16  inauguration, but somebody had broke into the gate that we were

17  supposed to go in; so they shut it down.  So instead of going

18  there we went up to a lawyer's office to watch the, I guess,

19  the march when he walks to the White House.  And then we

20  attended the Hawai'i Ball.

21  Q     Did you go there on the request of Waimana?

22  A     Yes.

23  Q     Who else was on that trip on the inauguration?

24  A     My mom, my sister, and my husband.

25  Q     Do you recall attending a trip to the Big Island in 2011?

```
 1   A     Yes.

 2   Q     Okay.  You were still living in Santa Clara, though, at

 3   this time; correct?

 4   A     Correct.

 5   Q     Do you recall what you did when you went over to the Big

 6   Island?

 7   A     We attended a Hawaiian Homes Commission meeting in Hilo.

 8   Then we drove over from Hilo, stopped in Waimana to meet with

 9   Uncle Riley, who used to be a ClearCom employee.  Then we

10   continued on to Kona.  And in Kona we stayed --

11   Q     Where did you stay in Kona?

12   A     At Mauna Lani.

13   Q     Tell us what you observed at the Hawaiian Home Lands

14   Commission meeting.

15   A     My dad gave a presentation.  And after it one of the

16   beneficiaries came up to him and wanted to ask about our

17   services.

18   Q     Who else was present at the commission meeting, Miss Hee?

19   Who else in your siblings or family members?

20   A     My brother, my sister were there.

21   Q     Okay.  And were you introduced at the commission meeting?

22   A     Yes.

23   Q     And you were there and you were observing the commission

24   meeting.

25   A     Yes.
```

1  Q     You guys didn't speak or make any presentation.

2  A     No.

3           MR. TOSCHER:  One moment, Your Honor.

4  Q     Just a couple of further questions, Miss Hee.  You

5  mentioned before biotech Black Ivory and the technology which

6  came out of Siometrix.  Can you tell the jury the current

7  status of the development of that technology?

8           MR. HARRINGTON:  Objection.  Relevance.

9           THE COURT:  Sustained.

10 BY MR. TOSCHER:

11 Q     Are you currently, in the course of your duties, working

12 on the development of that technology?

13 A     Yes.

14 Q     And what is the current status of that?

15           MR. HARRINGTON:  Same objection.

16           THE COURT:  Yeah, sustained.

17           MR. TOSCHER:  Can I get a basis for the objection,

18 Your Honor, from counsel.

19           THE COURT:  I think he said relevance.

20           MR. HARRINGTON:  The objection is relevance.

21           MR. TOSCHER:  It has to do with her duties at the

22 company.

23           THE COURT:  Right now.

24           MR. TOSCHER:  Well, I'm not going to get into a

25 colloquy.

1         THE COURT:  I think you're asking about right now.

2         MR. TOSCHER:  That's correct.

3         THE COURT:  So sustained.

4         MR. TOSCHER:  Okay.  No further questions, Your

5    Honor.

6                        CROSS-EXAMINATION

7    BY MR. HARRINGTON:

8    Q    Good morning, Miss Hee.

9    A    Good morning.

10   Q    So I want to start first on the Orlando trips.  I believe

11   you said there were two trips to Orlando; is that right?

12   A    Correct.

13   Q    And the first trip, when was that first trip, the one

14   about the Fiber to the Home Conference?

15   A    I don't remember.  It might have been 2011.

16   Q    So it was the second trip then?

17   A    Yeah.

18   Q    Because the earlier trip, the other trip where you said

19   you wanted to see the Raytheon ride, that was in 2010; right?

20   A    Yeah, when we were invited.

21   Q    Okay.  And you said that you wanted to check out this

22   Raytheon ride.  That's a thing where kids of all ages can get

23   in the ride and see what it does?

24   A    It's a ride that used cutting-edge technology where you

25   could create your own roller coaster.  And you get into a pod,

```
 1   and it would take you through your roller coaster that you

 2   created.

 3   Q    And so this would be for ages six and up?  I mean, what

 4   age range are we looking at?

 5   A    I'm not sure if there was a height requirement or an age;

 6   but, yeah, anyone if you met the requirement.

 7   Q    And this was at Epcot Center; is that right?

 8   A    Yeah, I believe so.

 9   Q    And Epcot Center wasn't the only park you visited on that

10   trip, was it?

11   A    No.

12   Q    Now, how long was that trip that you took to Disney World?

13   A    I think it was a week long.

14   Q    A week long?

15   A    Yes.

16   Q    And you took the Raytheon ride one time?

17   A    Yes.  I went on it once.

18   Q    Now, who was all on this trip when you went on the

19   Raytheon ride?  Was your brother with you?

20   A    No.

21   Q    So your sister was with you?

22   A    My sister, yes.

23   Q    And who else?

24   A    My husband, and my sister had a friend with her.

25   Q    And what was her friend's name?
```

1    A    Amy?

2    Q    Okay.  Was she one of your sister's friends from college?

3    A    Yes.

4    Q    Does she work at Waimana?

5    A    No.

6    Q    Does she work at Sandwich Isles?

7    A    No.

8    Q    So she doesn't work for any of the companies?

9    A    No.

10   Q    But she went on the trip with all of you.

11   A    Correct.

12   Q    Now, I want to show you an exhibit, see if this will help

13   your memory.  If we could turn to 4-34 and the last four page

14   numbers would be 3781.  And if we could zoom up on the bottom

15   half, please.

16        Okay.  And do you see there's a charge August 2d.  It

17   says Front De Lake Buena Vista.  That's in Orlando; right?

18   A    I don't know where it is.

19   Q    You don't know where Lake Buena Vista is?

20   A    No.

21   Q    Okay.  Well, it says See Attachment 2, AmEx ending 729.

22   And we can look at that real quick to see if that will refresh

23   your memory.

24        If you turn to, please, exhibit 4-33, the first page.

25   And if we could zoom up on the top half, please.

1              So this is dates of travel, travelers:  Adrianne Hee,

2   Breanne Hee, for Orlando, Florida, 7/29 to 8/5/2010.  Do you

3   see that?

4   A    Yes.

5   Q    This is the trip you took to Orlando; is that right?

6   A    Yes.

7   Q    So the only travelers that are listed are you and your

8   sister; right?

9   A    Yeah.

10  Q    But there were more travelers on the trip; correct?

11  A    Correct.  Yes.

12  Q    So now if we could go back to the page we were just on,

13  please, which was 4-34, and zoom up on the bottom, please.

14              And so it's connected to that.  Does this refresh

15  your memory of whether Lake Buena Vista -- De Lake Buena Vista

16  was a charge in Orlando for that Disney World stay?

17  A    No.

18  Q    You don't know?

19  A    No.

20  Q    Does AKL refer to the Animal Kingdom Lodge?

21  A    I'm not sure.

22  Q    Did you stay at the Animal Kingdom Lodge?

23  A    Yes.

24  Q    It says that your brother was on the trip, but he wasn't

25  with you on the trip; right?

1    A    It has his name there.

2    Q    But he wasn't actually on the trip; is that right?

3    A    No.

4    Q    I'm sorry.  He --

5    A    I'm sorry.  You're right.  He was not on the trip.

6    Q    Okay.  Thank you.

7         And if we could turn to 4-33 WEI 053798, please.  And

8    if we could zoom up on the middle part of the page, please, the

9    middle third.

10        Now, you see there's a charge on July 4th, 2010, for

11   Walt Disney World amusement ride tickets.  Do you see that?

12   A    Yes.

13   Q    July 4th, 2010, was the day you got married; isn't that

14   right?

15   A    Correct.

16   Q    So on the day you got married there were tickets purchased

17   for you and your husband and your sister and her friend to go

18   to Disney World; is that right?

19   A    I don't know.  I didn't make the purchase.

20   Q    The timing sounds about right, doesn't it?

21   A    That's my wedding date.

22   Q    Now, when you were in Santa Clara, you lived at the house

23   during starting your senior year that your father's company

24   purchased; right?

25   A    Correct.

1   Q     And you also had use of a car as well; is that right?

2   A     I had my own vehicle.

3   Q     What was -- what make and model was that vehicle?

4   A     I had a Honda Ridgeline.

5   Q     Was there also another vehicle that was used at that house

6   perhaps by your brother?

7   A     Yes.

8   Q     And what vehicle was that?

9   A     A Buick Enclave.

10  Q     And that vehicle was purchased by Waimana Enterprises; is

11  that right?

12  A     It was purchased by my father.

13  Q     Okay.  Now, you talked a little bit about that you

14  collected rent while you were living at Santa Clara; right?

15  A     Yes.

16  Q     And the rent was $650 per tenant?

17  A     No.

18  Q     How much was the rent?

19  A     My senior year it was $600 for the two tenants each.

20  Yeah, the year after that there was two tenants, and it was

21  $600.  And they didn't pay during summers, and it was prorated

22  during Christmas.

23          After that it was -- I believe it was still 600, and

24  two people shared a room, and their rent was 350.  And the year

25  after that it might have gone to 650, but I believe it was

1    still 600, and the two who shared a room was 350 each.

2    Q    Okay.  Just so we have the numbers right, when you started

3    in your senior year, there were two renters besides you and

4    your brother; right?

5    A    Correct.

6    Q    But after that there were more renters; is that right?

7    A    No.  The year after that there were still two renters.

8    Q    The year after that were there more renters?

9    A    Yes.

10   Q    And it got to the point where there were nine additional

11   renters; is that right?

12   A    No.

13   Q    So how many renters were there, then?

14   A    There were six.

15   Q    Six renters.

16   A    Correct.

17   Q    So each one was paying $600?

18   A    No.

19   Q    Okay.  So how much would each renter pay -- let me ask it

20   this way.  Let me withdraw that question.

21          How much money were you collecting in rent by the

22   time you left Santa Clara each month?

23   A    I can't recall that, but they paid 600, and the two that

24   shared a room paid 350.

25   Q    Would it be fair to say it was a minimum of 1200 a month

1    and then it went up from there; is that right?

2    A    Correct.

3    Q    And none of that money was turned over to Waimana

4    Enterprises; right?

5    A    No.

6    Q    You kept the money to use for your expenses, you said, at

7    the house, such as buying groceries; right?

8    A    And I paid the bills with them.

9    Q    Isn't it true that, when your father would come visit, he

10   would also take you to Costco, and you would buy groceries

11   there as well, except he would pay for it; right?

12   A    Correct.

13   Q    Now, you graduated from Santa Clara in 2009; right?

14   A    Yep.

15   Q    Immediately afterward you worked for Enterprise Rental Car

16   Company; is that right?

17   A    Yeah, a couple months after.

18   Q    Okay.  Your first job after graduation was at Enterprise?

19   A    Uh-huh.

20   Q    And your title there was management trainee; is that

21   right?

22   A    Correct.

23   Q    Now, when you're working at Enterprise, your dad told you

24   it was fine if you worked there; right?

25   A    Yes.

1    Q     So he had no opposition to you taking a job at a different

2    company?

3    A     No.

4    Q     And after that job, excuse me, you worked for Hyatt?

5    A     Correct.

6    Q     And you were a front desk clerk at Hyatt?

7    A     Yes.

8    Q     Now, both those jobs, were they full-time jobs?

9    A     No.

10   Q     How many hours a week did you work on average?  At

11   Enterprise first.

12   A     At Enterprise I worked -- I think it was 45 hours a week.

13   Q     So 45 hours a week at Enterprise.  And how many hours did

14   you work a week at Hyatt?

15   A     Less than 20.

16   Q     And while you were working for both companies you were

17   still receiving a salary from Waimana; is that right?

18   A     Yes.

19   Q     Now, you came back to Hawai'i in 2012; right?

20   A     Yes.

21   Q     Okay.  And, actually, let me back up for a second.  What

22   was your salary when you were in college?  It was $24,000;

23   right?

24   A     Yes.

25   Q     And then it went up to $50,000 after college; right?

1   A      Uh-huh, yes.

2   Q      And then when you came back in 2012, what was your salary?

3   A      I believe it was 80.

4   Q      80,000?

5   A      Yep.

6   Q      Per year.

7   A      Yes.

8   Q      Now, you talked a little bit about traveling to Tahiti;

9   right?

10  A      Yes.

11  Q      You said you were looking for a cable while you were

12  there?

13  A      A cable landing.

14  Q      Cable landing?

15  A      Correct.

16  Q      And you were there for a full week; right?

17  A      Yes.

18  Q      And you only devoted one day to actually looking for this

19  cable landing; is that right?

20  A      Yes.

21  Q      During the rest of the time you engaged in other personal

22  activities?

23  A      Yeah.

24  Q      And you talked about a trip in Switzerland, too; right?

25  A      Yes.

1   Q     I'm sorry, you talked about a trip in France.

2   A     France.

3   Q     So when you were in France, you went and visited a

4   factory; is that right?

5   A     Yes.

6   Q     After that trip you went to Switzerland; right?

7   A     Correct.

8   Q     And you stayed at a nice resort in Switzerland?

9   A     No.  We stayed at a hotel.

10  Q     Okay.  So you stayed at a hotel in Switzerland?

11  A     Yes.

12  Q     And you went skiing?

13  A     Correct.

14  Q     And you had some personal activities, enjoyed yourself in

15  Switzerland?

16  A     Correct.

17  Q     And you spent one day touring the factory in France; is

18  that right?

19  A     Yes.

20  Q     Now, this trip, this was during your spring break; right?

21  A     I don't recall.

22  Q     Okay.  Let me see if I can refresh your memory.

23        May I approach, Your Honor?

24        THE COURT:  Okay.  What's the exhibit number?

25        MR. HARRINGTON:  It's Exhibit 38-1.  It's just being

1    used to refresh recollection.

2                THE COURT:   Okay.

3                THE WITNESS:   Thank you.

4    BY MR. HARRINGTON:

5    Q    And if you could please turn to Bates number SC and

6    there's the last digits are 11 at the bottom.  And I will

7    direct your attention -- I'll direct your attention to each

8    semester and the dates above each semester showing the

9    beginning and ending.  Let me know if that refreshes your

10   recollection of when your spring break was in 2008.

11               Does that refresh your recollection?

12   A    It says that -- no.  I mean, the dates are here.

13   Q    So the dates are there.  Was your spring break at the end

14   of March?

15               Let me back up for a second.  Spring break at Santa

16   Clara is between the winter and the spring terms; right?

17   Because it's on a trimester system?

18   A    Correct.

19   Q    So when would spring break typically start?  Was it at the

20   end of March?

21   A    Yes.

22   Q    Okay.  So that's when you went to France and Switzerland;

23   right?

24   A    I don't know.  I don't remember what dates I went to

25   France.

1   Q    Okay.  Let me see if I can refresh your memory on that

2   point.

3            If we could turn to Exhibit 4-9, page 2499.  And if

4   we could zoom up on the top portion, please.

5            And there is a plane ticket for Breanne Hee between

6   Switzerland and Paris, and the date of departure is March 23d.

7   Do you see that?

8   A    Yes.

9   Q    So that's when the trip took place; right?

10  A    Yes.

11  Q    And it was during your spring break?

12  A    Yes.

13            MR. HARRINGTON:  Just a moment, Your Honor.

14  Q    Could we please turn to Exhibit 4-107 and page 3138.  And

15  if we could zoom up on the top third, please.  And there's an

16  entry on March 26th, the Hotel Eden Garni.  Could you highlight

17  that, please.  Thank you.

18            So this is a hotel charge.  That's the hotel you

19  stayed at in Switzerland?

20  A    Correct.

21  Q    And it cost $1100?

22  A    Yes.

23  Q    And if you look up on 3/29, if we could highlight that.

24  It's a Hotel Continental in Zermatt.  And that's a $700 hotel

25  charge.  That was also in Switzerland; right?

1    A    Yes.

2    Q    And there's also a Sierrasnowboard.com charge.  Do you see

3    that?  That was for some snowboarding you did in Switzerland?

4    A    I'm not sure.

5         MR. HARRINGTON:  No further questions.

6                    <u>RE-DIRECT EXAMINATION</u>

7    BY MR. TOSCHER:

8    Q    Briefly, Miss Hee.  Mr. Harrington questioned you

9    regarding your management training program or management

10   training at Enterprise Rent-A-Car; correct?

11   A    Yes.

12   Q    Now, have you ever participated in any other management

13   training program?

14   A    Yes.

15   Q    And what company were you participating in?

16   A    Waimana Enterprises.

17   Q    Okay.  Going forward to when you went to Hilo and the

18   commission and you stayed at the Mauna Lani --

19        MR. HARRINGTON:  Objection.  Outside the scope.

20        THE COURT:  Okay.  Did he question about that trip on

21   cross?

22        MR. TOSCHER:  I don't believe so, Your Honor.

23        THE COURT:  Okay.  Then sustained.

24        MR. TOSCHER:  Okay.  Thank you, Your Honor.  No

25   further questions.

1           MR. HARRINGTON:  Nothing further.

2           THE COURT:  Then you are excused.  You can step down

3  and leave the courtroom.

4           And you can call your next witness.

5           MR. TOSCHER:  Your Honor, the defense calls Albert

6  Hee.

7           THE COURT:  Okay.

8           MR. TOSCHER:  Your Honor, could we -- I inquire as to

9  the break?

10           THE COURT:  I'm going to take a break in about 10

11  minutes, but I'd like to go ahead and use this time now, and

12  then we'll go till maybe a little after noon from then.

13       (Witness photographed.)

14           THE CLERK:  Please raise your right hand.

15       (Witness sworn.)

16           THE CLERK:  Thank you.  Please be seated.

17           Please state your name and spell your last name.

18           THE WITNESS:  Albert S., like Sam, N., like Navy,

19  Hee, H-e-e.

20                      DIRECT EXAMINATION

21  BY MR. TOSCHER:

22  Q   Mr. Hee, good morning.  May it please the Court.  Ladies

23  and gentlemen.

24           Would you tell the jury where you live, not giving

25  your home address.

```
 1   A    I currently live in Kailua.

 2   Q    Okay.  And where were you born, sir?

 3   A    I was born in -- at Kapiolani Hospital in Honolulu.

 4   Q    How old are you?

 5   A    I am 60, going to be 61 in another week.

 6   Q    Are you married?

 7   A    Yes, I am.

 8   Q    And who are you married to?

 9   A    My wife's name is Wendy Roylo Hee.

10   Q    And do you have children?

11   A    Yes, we do.

12   Q    Will you name the three children.

13   A    The oldest is Ho'o.  The second is Liko, who was just up

14   here.  And our son is Kupa'a.

15   Q    And what about your parents?  Who are your parents?

16   A    My parents were -- my father is Charles Hee.  My mother,

17   who passed away recently, was Roselani Hee.

18   Q    What's your nationality, sir?

19   A    I am Hawaiian Chinese.

20   Q    What area of O'ahu did you grow up on?

21   A    Up until the third grade, we lived in Kaimuki.  And maybe

22   it was a little earlier.  Then we subsequently moved to

23   Kane'ohe.  And my parents -- or my father still lives at that

24   house in Kane'ohe.

25   Q    And can you describe generally your family life growing
```

1   up.

2   A    I think it was pretty typical of working-class families.

3   My father worked for 45 years at the Board of Water Supply.  He

4   started out as a pipe fitter/ditch digger.  He ended up as the

5   construction supervisor for the Honolulu District of O'ahu, and

6   then eventually the Windward District of O'ahu.  My mother

7   worked for, I believe, 25 plus years at Sheraton Hotel.  She

8   started out as a front office cashier and ended up as the -- as

9   a controller in the food and beverage department.

10  Q    What values did your parents teach you, sir?

11  A    My parents instilled in my brother and I a lot of things,

12  but three things:  loyalty to family, loyalty to country, hard

13  work.  They believed and they epitomized the work ethic that

14  you can get anything -- you can get anywhere.  As long as you

15  work hard, you don't have to come from money to do significant

16  things.  And they emphasized that we should utilize whatever

17  talents we have to make Hawai'i a better place to live.

18  Q    Specifically, what did they -- and I think you touched

19  upon it -- what did they teach you about how to treat other

20  people?

21  A    They taught us that it's important to treat people how you

22  want to be treated.  This was the post-statehood or statehood

23  and then just after statehood; so there was a lot of economic

24  activity going on.  And what we were seeing was that some of

25  the unintended consequences of all of this economic activity

1    was that the local people were having a harder and harder time

2    to be able to stay in Hawai'i, to find a job that would allow

3    them to buy a house, and to find the -- and to educate their

4    children so that they could stay in Hawai'i.

5    Q    Where did you go to school, Mr. Hee?

6    A    I went to Kamehameha.

7    Q    And what grades did you go to Kamehameha?

8    A    I was one of those fortunate ones that started in

9    kindergarten and graduated.

10   Q    Tell us a little bit about your experience at Kamehameha,

11   please.

12   A    At that time Kamehameha was a Junior ROTC program.  So you

13   wore uniforms from kindergarten up until we graduated.  It

14   was -- the JROTC program was designed to instill discipline, to

15   give us a introduction to military, and to instill love of

16   country.

17   Q    What does JROTC stand for?

18   A    JROTC stands for Junior Reserve Officer Training Corps.

19   Q    Did you play sports when you were at Kamehameha?

20   A    Yes.  I was fortunate enough to play sports.

21   Q    Which sports did you play?

22   A    I participated year round in high school.  There was an

23   intramural program in intermediate which we participated in.

24   But I played football, I played water polo, I wrestled, and I

25   participated in track.

1    Q     While you were attending Kamehameha, did you have plans to

2    go to college?

3    A     Yes.  Our parents, without saying, or at least I can't

4    remember them saying, made it very clear that both my brother

5    and I were expected to go to college and complete college.

6    Q     Did you, when you were in college, a senior, did you have

7    ideas of the types of course of studies you wanted to

8    undertake?

9    A     Yes.  Throughout my high school years, I found out that I

10   had some talent, I guess, for math.  And because it was clear

11   that, during this period of time, I needed to come back and get

12   a job, and there was so much building going on, I was looking

13   at getting an engineering degree.  So I thought that would give

14   me the best chance of being able to return to Hawai'i and make

15   a living wage; so I was looking at engineering schools.

16   Q     Did you discuss that with -- did you have a college

17   counselor at Kamehameha or helped you in terms of your college

18   choice?

19   A     We had a class counselor and a separate college counselor.

20   The class counselor is the initial counselor that you talk to

21   about your plans.  He was also my line coach in football.

22   Q     And what was his name?

23   A     His name was Willy Chai.

24   Q     And did you talk to him about a choice of school you

25   wanted to go to?

1  A    Yes.  I had occasion.  Unexpected.  I ran into him -- I

2  was with a couple of my friends and ran into him.  And he

3  stopped us.  We were on a field.  He stopped us, and he asked

4  each of us what we were planning to do.  I said I wanted to

5  become an engineer, go to college.  He asked me what kind of

6  school I wanted to go to.  And I said, Well, if I'm going to

7  take the time to get a college degree, I want to make sure that

8  it is something that is well-recognized.  One of my uncles had

9  gotten an engineering degree, and it wasn't recognized in

10  Hawai'i; so he didn't -- it didn't do him much good.  So I

11  mentioned to Coach Chai that I thought MIT was a pretty good

12  engineering school, and I'd like to go there.

13  Q    And what was his response to that?

14  A    He almost fell on the ground laughing.  Almost but not

15  quite.  He looked at me and he -- and he was also a graduate of

16  Kamehameha, quite a few years earlier.  But he looked at me and

17  he said, "What's the matter with you?  Hawaiians don't go to

18  MIT."

19  Q    So did you start applying for college?

20  A    Yes.  I applied to several schools.  I didn't apply to MIT

21  because of that.  I applied to Northwestern; Case Western;

22  University of Hawai'i; and West Point, the U.S. Naval

23  Academy -- U.S. Military Academy at West Point; U.S. Naval

24  Academy at Annapolis; U.S. Merchant Marine Academy at Kings

25  Point; and U.S. Coast Guard Academy in New London.

1    Q    Did you end up attending the Naval Academy at Annapolis,

2    sir?

3    A    Yes.  I was accepted to all of the schools that I applied

4    to and had received full rides at Northwestern and Case

5    Western.  I ended up accepting the appointment to the Naval

6    Academy because of a conversation I had with my father just

7    prior to making the acceptance.

8    Q    Okay.  So tell us why you chose the Naval Academy and --

9    tell us about why you chose the Naval Academy.

10   A    I chose the Naval Academy because, of the four academies

11   that I applied to and were accepted to, the Naval Academy was

12   the only one that had a teaching staff of half were civilians

13   and half were military officers.  And when I looked at it, I

14   was not sure, or I wasn't -- at that time I wasn't dedicated to

15   making a career; so I felt having teachers that were civilian

16   in the mix would help me make that decision.  Also, the Navy,

17   obviously, has a very big presence in Hawai'i, and I wanted to

18   be near the water.  I felt if I ran into difficulties, being

19   able to be near the water would have a calming effect on me

20   since I grew up in Hawai'i.

21              THE COURT:  Counsel, why don't we take a break now,

22   and then we'll go till maybe -- when we come back we'll go to

23   some short time after noon and take a lunch break then.

24        (Court recessed at 11:02 A.M., until 11:14 A.M.)

25              THE COURT:  Let me take -- go ahead and sit down.

1    Let me take one second -- you can sit down -- on an

2    administrative matter with the jurors.  Okay.

3              So you have those little calendars.  And next week

4    was not a trial week.  And, in fact, the week after that was

5    only a partial trial week.  So you would be justified if you

6    made plans that would prevent you from attending court.  I

7    don't know whether this will or will not occur, but, possibly,

8    if all courtroom proceedings conclude on or before this Friday,

9    which may or may not happen, I cannot tell, you might have

10   reached the point where your deliberations would be occurring.

11   If that were to happen, then you could, from the Court's point

12   of view, be in deliberations next week.  I don't know whether

13   that fits in with your plans because, as I say, I know I gave

14   you this calendar, and you may have made plans you cannot

15   change.

16             Is there anyone for whom it would be a problem to be

17   in deliberations next week?  Or if we're at that stage, and I

18   don't know we will be, could you all come to deliberate next

19   week?

20             Yes?  Nobody has a problem?

21             Okay.  Then stay tuned.  We'll figure out what stage

22   we're at as the week progresses this week.  Okay?  Thank you.

23             Okay.  Sorry.

24   BY MR. TOSCHER:

25   Q    May it please the Court.  Ladies and gentlemen.

1           When we took our break, Mr. Hee, I believe I asked

2    you why you had chose the Naval Academy; so I think I covered

3    that.  What year did you graduate Kamehameha?

4    A    I graduated from Kamehameha in 1972.

5    Q    Okay.  So at the time you chose the Naval Academy were

6    there any significant military activities going on in the

7    country at that time?

8    A    The Vietnam War was still going on.  That partly

9    influenced my decision to attend an academy.  I wanted an

10   opportunity to serve my country.

11   Q    Could you tell the jury what was required for you to

12   attend the Naval Academy?

13   A    At the time, and I believe it was because the Vietnam War

14   was going on, on the first day that you are -- they call it

15   induction day, they give you -- well, they give you a lot of

16   papers to sign, but they give you this piece of paper that you

17   sign, and it's an agreement to serve at the leisure of the

18   President.  I was taken aback when I first saw it because what

19   it meant is it was an open-ended commitment.  However long the

20   President wanted you to serve, you were it.

21   Q    And you did move to the East Coast and attend the Naval

22   Academy, Mr. Hee?

23   A    Yes.  That was -- the plane that took me to Washington,

24   D.C., and then subsequently to Annapolis was the first time I

25   left the State of Hawai'i.

1   Q     Okay.  And Annapolis is the location of the Naval Academy?

2   A     Yes.  Annapolis is about 50 miles east of Washington, D.C.

3   Q     Okay.  And you stated that was the first time you ever

4   left the State of Hawai'i?

5   A     Yes.

6   Q     What was your tuition at the Naval Academy?

7   A     The Naval Academy, the government pays for all schooling.

8   It also pays each midshipman, while attending the Naval

9   Academy -- and all academies, actually -- half of an Ensign's

10  pay, which -- or half of an O-1's pay, the Navy being the

11  Ensign.

12  Q     What did you study at the Naval Academy?

13  A     We have a fairly heavy core course of engineering and

14  military science, but they also offered undergraduate degrees.

15  I ended up choosing operations analysis.  I had never heard of

16  it before.  I was thinking about being an engineer.  But

17  operations analysis is a problem-solving method using math; so

18  I chose and received a Bachelor of Science in Operations

19  Analysis.

20  Q     So the year you graduated, sir?

21  A     1976.

22  Q     The -- when you graduated, what was the status of your

23  commitment to the Navy?

24  A     I actually -- during the precommissioning physical I was

25  found not physically qualified.  The Navy offered me my degree

1    and no obligation.

2    Q    And what was your response to that, sir?

3    A    I did not feel that that was in keeping with the

4    commitment that I had made.  I asked, and was granted, a waiver

5    so I could serve in the Navy.  The Navy had put me through

6    school, it had given me a good education, and I felt like I

7    owed the country some service.  So to the extent that my health

8    would allow it, I chose to, and I requested, and they granted

9    me, an opportunity to serve in the Navy.

10   Q    So I guess we're talking about 1976 now?

11   A    Yes.

12   Q    And so tell us what you did for the Navy after you

13   graduated from the academy.

14   A    Because I was still considered not physically qualified,

15   they did not allow me to go into the line corps, which is --

16   they allowed me to go into the staff corps.  So I chose the

17   supply corps.

18   Q    And did you have any training for that?

19   A    No.  The way the academies work is after you choose the

20   service, or whether it's ships or air or Marine Corps, you then

21   go out further for some training in that particular field.

22   Q    And where were you stationed after you left the academy?

23   A    Immediately after leaving the academy, I went to supply

24   school, which was located in Athens, Georgia, for six months.

25   Then I came up to Brooklyn and went to Navy Exchange School for

1    a couple months, and then was stationed in Bayonne, New Jersey.

2    Q     Until how long?

3    A     I -- my commitment to the Navy, they granted, was three

4    years, plus or minus, at which time they wanted to re-evaluate

5    me.  They re-evaluated me in '79, asked if I would -- asked if

6    I would consider going -- continuing my active service.  I

7    asked them can I get stationed off of the East Coast because

8    the East Coast was where my health problems developed.  And

9    they had stationed me -- after Annapolis, they stationed me in

10   Bayonne, New Jersey; so my health didn't get any better.

11          The Navy told me that the needs of the Navy outweigh

12   any of my requests, and so they would not guarantee that I

13   would be off the East Coast.  So I felt like the war had been

14   over, I had served my country, and I felt like I needed to take

15   care of my health; so I ended up leaving the Navy and returning

16   to Hawai'i -- well, returning to Hawai'i and then leaving the

17   Navy.

18   Q     After you left active service did you continue in the

19   naval reserve?

20   A     Yes.  It was an inactive.  I was not on active reserves.

21   When you get commissioned as an officer in the military, you

22   actually have to resign your commission.  And I did not resign

23   my commission.  I believe sometime in the '90s -- early '90s,

24   late '80s, I resigned my commission, and I was discharged

25   honorably.

1    Q    During this period of time you were at the Naval Academy

2    and then stationed in New Jersey, were you continuing to see

3    your -- I guess I'll call her your girlfriend then, future

4    wife, Wendy Hee?

5    A    Yes.  Sometimes the needs of the Navy work out well for

6    you.  It did for me.  My then girlfriend, now wife was at

7    graduate school at Harvard in Cambridge; so we continued to see

8    each other.

9    Q    After you left active duty in the Navy, I think we're in

10   1979 now, please tell the jury what you did next.

11   A    It was actually probably beginning of 1980.  I returned to

12   Hawai'i in the end of 1979 and finished up my -- what they call

13   separation leave from the military here.  But when I did come

14   home, I applied for a job, applied for a lot of jobs.  But I

15   did get a job with Theo Davies in their executive management

16   training program.

17   Q    And how long were you with Theo Davies?

18   A    About three years.

19   Q    So can you tell us what you did for Theo Davies.

20   A    Theo Davies had started an executive management program.

21   There were five of us.  I was the only Hawaiian in it.  We were

22   assigned to senior management.  I was assigned to the group

23   vice president of marketing.  And we were to work with those

24   senior management, senior executives, carrying out whatever

25   functions they deemed necessary.

1  Q    Can you give us one or two examples of the types of

2  functions or projects you worked on.

3  A    Sure.  The group vice president of marketing had the

4  subsidiaries that were -- it wasn't sugar.  It wasn't the

5  traditional plantation.  So they had -- at the time Theo Davies

6  had the Caterpillar dealership, the John Deere dealership, the

7  Mercedes Benz dealership, Hilo Ironworks -- let's see, Hilo

8  Building Materials, Hawaiian Fluid Power, which is a hydraulic

9  company.  These were under the group vice president that I was

10  working for.

11       And each one of these companies had various

12  consulting reports that were done the previous year to solve

13  some of their problems, and none of them could implement those

14  reports.  And so because I had a background in problem-solving

15  with operations analysis, he asked me to take these studies and

16  see if I could implement the recommendations at each of these

17  subsidiaries.  So I went from subsidiary to subsidiary and

18  implemented these studies, or actually in some cases threw them

19  away because they weren't worth the paper they were written on.

20  And in some cases I took management positions in these

21  subsidiaries.  In other cases I just remained at the corporate

22  office and moved on.  They had a nickname for me.  It was

23  called "the axe man."

24  Q    And why did they give you that nickname?

25  A    Well, unfortunately, as I learned while at Theo Davies,

1    the Big Five had a -- the easy way to fix a problem was to fire

2    people.  And they expected me to do that.  I did not do it.

3    And I had long discussions with my supervisor.  I would go out

4    there.  I'd see the problem.  If I could solve it without

5    eliminating jobs, I would do it.  If -- and all they're

6    interested in is the bottom line.  So I was able to improve the

7    bottom line on each of these.  In some cases where I had to

8    make personnel changes, I did it reluctantly, and I made sure

9    that we were able to place the employees before I made the

10   personnel change.

11          So it was -- I was nicknamed "the axe man" because

12   that's usually what happened when you got sent out of the

13   corporate office to the subsidiary.  The subsidiary, all they

14   expected was just to get cut, but I was able to solve most of

15   the problems without the personnel changes.

16   Q    Now, you use the term "Big Five."  What do you mean by

17   "Big Five"?

18   A    During the territorial days and immediately after

19   statehood, five large corporations controlled every aspect of

20   the economy in Hawai'i.  And Theo Davies was one of them, along

21   with C. Brewer, Alexander Baldwin, et cetera.

22   Q    Okay.  During the course of your three years there, did

23   you have the opportunity to observe the managers you worked

24   for, the executives you worked for?

25   A    Oh, very closely.

1    Q    And were you able to observe, and you may have touched on

2    this before, how they treated employees and local people?

3    A    Well, the managers -- the executives at that level were --

4    they managed by financial statements.  They had -- each

5    subsidiary had a general manager.  So at the executive level

6    all they did was look at financial statements.  And if the

7    company made money, they were happy.  If the company didn't

8    make money, they weren't happy.  And so they had a very cold

9    approach to business.

10            I really got to see how they thought about local --

11   about their employees when I assumed a position at the -- at

12   Pacific Machinery, which was a Caterpillar dealership.  It's

13   since been sold.  It's now Hawthorne Machinery.  But I had

14   assumed the position of Service Manager there, and I had headed

15   up union negotiations.  And during the course of the union

16   negotiations, I had occasion to have my group vice president

17   come down and talk to me.  And what he told me was that it's

18   very easy to do business in Hawai'i, which was a shock to me.

19   And when I asked him why, he told me because you can do

20   anything to your employees and they won't quit.  And that was

21   the beginning of the end of my tenure at Theo Davies.

22   Q    So you left after three years, approximately?

23   A    Yes.

24   Q    And did you just describe the reason you left, or were

25   there other reasons?

```
1    A     I mean, you know, the Big Five did a lot of good things.

2    Don't get me wrong.  They did a lot of good things.  But they

3    are bottom-line oriented, and it is profit at all costs.  That

4    was not how I was raised.  That was not how I would, if

5    possible, like to conduct my life.  And so I, you know, I

6    thought it was time to move on.

7    Q     Okay.  So now we're probably into 1983; correct?

8    A     Thereabouts, yes.

9    Q     And just so -- by this time -- when were you married to

10   Mrs. Hee?

11   A     1980.  And I'm glad that she testified before me.

12   Q     You don't want to get that wrong.

13         The -- okay.  So you were married to Mrs. Hee during

14   the period you were working at Theo Davies.

15   A     Yes.

16   Q     That's just what I wanted to make clear.

17         So after you left Theo Davies what did you do next

18   for your employment?

19   A     Well, we had -- we had a mortgage by then.  We had

20   purchased the house that we still live in in 1980.  I was not

21   about to let her pay the bills, I had money saved, but I needed

22   to -- I needed to find another job, partly to pay the bills,

23   but also I needed to -- that was a time when I had to figure

24   out if I was going to launch off into a business for myself or

25   if I was going to go back to the corporate world and work for
```

1    corporations.  So I got a newspaper distributorship and did

2    that for a couple years.

3    Q    Can you briefly describe what you did as the distributor

4    business or paper distribution?

5    A    You pick up the papers in the morning about 3:00, four

6    o'clock in the morning, count them out and deliver them to

7    newspaper boys that deliver them -- or newspaper boys or girls

8    that would deliver them to the homes, and then you account for

9    the money and give it to the company.  So it was a distribution

10   system.

11   Q    Did Mrs. Hee assist you in that business?

12   A    Yes.  She used to get up with me and go down to the

13   newspaper printing down here on -- I guess that's South Street.

14   Anyway, it's gone now.  Pick up the papers, help me count them,

15   deliver them.

16   Q    You said you did that maybe for a couple of years.  I'm

17   just trying to keep track of the time so I don't get confused.

18        So maybe we're into -- I think around 1985.  Because

19   I want to point -- what was your next business venture that you

20   got into?

21   A    I started looking -- somewhere in there I also did

22   consulting for a construction company that I knew, but it was

23   nothing of great consequence.  But I started looking at again

24   am I going to form my own business, or am I going to go back

25   and work for somebody else?  And this was the mid '80s.  The --

1    I had occasion to meet with some people to assess what was

2    going on in Hawai'i.  One of the people I met with because I --

3    at that time I signed up for a home on Hawaiian Home Lands.

4    I'm a beneficiary of Hawaiian Home lands.  And so I met with

5    the chair there, and she expressed -- at the time it was

6    Georgianna Padiken.  She expressed her frustration about being

7    able to get enough money to build infrastructure.

8              Hawai'i had been a state for then 25 years.  The

9    infrastructure -- all infrastructure was being taxed.  I was

10   familiar with it when I used to go out with my father.  And the

11   federal regulations were changing to allow the building of

12   privately owned power plants.  So I started to get into

13   developing privately owned power plants, primarily renewable

14   energy.

15   Q    Can you tell us about the first project you were involved

16   with, the first significant project, where it was and what you

17   did.

18   A    Yeah, the first significant project I was involved was

19   trying to build a hydroelectric plant on the Honoli'i Stream on

20   the Big Island.  And in the course of that and going through

21   the permitting processes we -- I got together with a classmate

22   from Annapolis, and he was building hydroelectric plants across

23   the country.  And we started looking at another hydroelectric

24   plant that was being proposed on the Wailuku River in Hilo.

25   Q    And the classmate from Annapolis, do you recall his name?

```
 1   A    Yes.  It's Wayne Rogers.

 2   Q    The -- tell me what stage these power generation plants

 3   went to.  Were you able to complete a plant?

 4   A    We were able to complete the Wailuku River Hydroelectric

 5   Plant.  It's the largest hydroelectric plant ever built in

 6   Hawai'i.  Hawai'i actually has the oldest hydroelectric plant

 7   west of the Mississippi, and that's the Wainiha up in Kauai.

 8   So hydroelectric plants are actually not that new to Hawai'i.

 9   It's just not the type that we all associate with like the

10   Hoover Dam.  It's not that type of hydroelectric plant.  But

11   there are a few.  And this one here was the largest.  It was 10

12   megawatts.

13   Q    Okay.  In your -- do you recall the year Waimana was

14   formed?  Was it around this time?

15   A    I believe Waimana was formed right around this time.  I

16   think it was about 1988 or around then.

17   Q    Okay.  Now, the hydroelectric power generation, those

18   activities you were involved, did Mrs. Hee assist you in those?

19   A    Yes, she did.  She has -- she used to write EISs.  All of

20   these activities required EISs.  EISs cost about half a million

21   dollars to write.  They're the foundation to get your permits.

22   She was free, and so assisted me greatly in getting these EISs

23   done.  Even though we hired people to -- consultants to do the

24   bulk of the work, she was able to review them and talk to me

25   about what -- how to -- as she says, if engineers could write,
```

1    she didn't need a job.  She was able to do that.

2    Q    You said EIS.  I just want to make sure, what is an EIS?

3    A    An Environmental Impact Statement.

4    Q    Those are required by regulations when you do significant

5    construction development; correct?

6    A    Yes.  Whenever you do something that may have a

7    significant impact on the environment.  Power plants certainly

8    fit that.

9    Q    Okay.  So do you recall how many hours a week you worked

10   during this period of time?

11   A    I was probably working a little over a hundred.  I'd go to

12   work seven days a week.  I'd work 12 -- 12 to, I don't know, 15

13   hours a day.

14   Q    Now, tell the jury how your business went from power

15   generation to telecommunications.

16   A    As I was building and proposing to build power plants,

17   excuse me, there was an occasion to propose a significant power

18   plant on Hawaiian Home Lands at Kawaihae.  It was an area that

19   had been designated by the community.  I looked at it.

20   Hawaiian Electric was offering Hawaiian Home Lands a dollar a

21   year and love to get that site.  I put together a proposal that

22   would offer Hawaiian Home Lands the market value for that site,

23   which is five million a year, and with my other classmate, who

24   testified earlier, was able to secure a partnership with

25   Mitsubishi Corp., and we started to move on that project,

1   proposed project.

2          In the course of this Hawaiian Home Lands undertook a

3   fairly exhaustive research or background check on me to make

4   sure I could do this.  And they -- when they understood I could

5   do it, I was approached with another problem they had of

6   infrastructure, and that was communications.  They couldn't get

7   communications into these areas.

8   Q    And do you recall the person who approached you at the

9   time?

10  A    Yes.  At the time it was -- in the land management

11  division it was former Senator Mike Crozier, who I knew, and he

12  worked for Ray Soon, who was one of the witnesses here.

13  Q    So what I'd like you to do is -- what was the Home Lands

14  problem with communications?  What were the challenges?  And

15  then I'm going to ask you what you did to try to address that.

16  A    Sure.  This went back to my meeting with Georgianna

17  Padiken in '85 or so when I put my name on the list.  And she

18  had expressed a frustration of not having enough money to put

19  in infrastructure to build homes.  And this is infrastructure:

20  electricity, communications.  The -- I understand it well.  And

21  really the whole key to infrastructure is to find a way to make

22  it affordable.

23         Hawaiian Home Lands was -- when they wanted to build

24  something, they went to the utilities, the monopolies here, and

25  the monopolies would tell them how much money it would cost,

1   how much land they had to give up, and ask for that money

2   up-front before they would put in the electricity or the

3   telephone lines.  So they were looking at two things.  One is

4   the incumbent phone company on the neighbor islands was

5   offering party line service at the time.  And party line

6   service does not allow you to have a fax machine or an

7   answering machine because your neighbors -- it's, essentially,

8   an extension with your neighbors.  And they didn't -- this was

9   in the early '90s.  And that wasn't sufficient.  The -- so they

10  were asking for a lot of money and very -- and a lower quality

11  of service than they would normally put in.

12          So Hawaiian Home Lands came to me, and they didn't

13  know if I could do it; I didn't know if I could do it.  But

14  they expressed the problem of money and the level of service.

15  Q    And did you come up with a proposed solution for the

16  problem you just described?

17  A    Yes.

18  Q    So tell us how you went about coming up with that

19  solution, what the proposal was.

20  A    It's the same way I approach building power plants.  It

21  begins and it ends with affordability.  And so I had to find a

22  way to be able to finance this communications in an affordable

23  way, and I was able to do it.

24  Q    And how were you able to do it in an affordable way?

25  A    The congress had passed a Rural Utilities Act.  And the

 1    genesis before that Rural Utilities Act was the Rural

 2    Electrification Act.  And what congress would do is the

 3    Department of Agriculture would lend money to these rural areas

 4    to get infrastructure out there.  In the case of

 5    communications, the FCC set up a Universal Service Fund, which

 6    is a user fee on each of our bills.  And since the 1940s the

 7    residents of Hawai'i had been paying into this Universal

 8    Service Fund to put infrastructure in the rural areas

 9    throughout the country.  When I found this program and put

10    Sandwich Isles into it, it was the first time that the

11    residents of Hawai'i started to see a benefit for this user fee

12    that they had been paying since the 40s.

13    Q    So you mentioned Sandwich Isles.  I think that takes us

14    to -- you recall the year it was formed?

15    A    I think it was 1995, thereabouts.

16    Q    So prior to the formation of Sandwich Isles, was a lot of

17    this development, the discussions with the Home Lands and the

18    research you're talking about doing, that was done before

19    Sandwich Isles was actually formed; correct?

20    A    Yes.  It took five years to get Sandwich Isles through the

21    regulatory hoops.

22    Q    And all that time all this work is being done through what

23    corporation?

24    A    Through Waimana.

25    Q    So could you describe for us what -- you know, you were

1    the leader and owner of the company, what your vision of

2    Waimana and Sandwich Isles?  What were you trying to achieve?

3    A    Waimana morphed into a holding company.  And what I was

4    looking at was privatized utilities for Hawai'i beginning with

5    Hawaiian Home Lands.  And privatized utilities is simply

6    privately funded.  And so Waimana became the holding company

7    for this.  Its mission is to ensure that the people of Hawai'i,

8    and in particular the people living on Hawaiian Home Lands,

9    have the best utilities that are available definitely in the

10   state, and possibly anywhere in the world.

11   Q    Now, how long did you believe it was going to take to

12   bring this vision to fruition?  Was it a 10-year project or how

13   long would it take?

14   A    The utilities are multigenerational.  I think any

15   successful utility really doesn't know if it's successful until

16   it's made the 50-year anniversary.  If it is successful, I

17   would expect a utility to be around for centuries.

18   Q    Was it important to you that your children be involved and

19   eventually take over the company?

20   A    Yes.  It was clear that this mission was going to outlive

21   me by a few years at least; so I needed somebody that I could

22   instill the values that I thought were necessary.  And not so

23   much to run the business.  You can always get engineers and

24   business people, MBAs.  You can always get that.  But what it

25   is is you need to instill a commitment, a commitment to finish

```
 1   the job.  And especially when you're talking about a -- serving
 2   an area that is uneconomical.  That's why the big companies
 3   don't go in.  If you don't instill that commitment in the
 4   owners, it won't last and it will soon dissolve.
 5   Q    It just wasn't for profit.  Is that what you're saying?
 6   A    Well, it's -- you know, the program that was set up to
 7   loan us the money, they loan it to nonprofits, co-ops, and
 8   for-profits.  The vast majority of them are co-ops and
 9   nonprofits.  These areas are not inherently profitable to
10   serve.
11   Q    Okay.  I would like to get why you believed establishing a
12   modern telecommunication network, how is that going to benefit
13   the homesteaders on the Home Lands?
14   A    Oh, you know, when modern telecommunications first got
15   introduced, you might recall it being called the information
16   super highway.  You don't hear that that much now.  But the
17   reality is that fiber optics, when you connect Hawaiian Home
18   Lands to the world, the opportunities that it provides is just
19   like building a superhighway in there.  They get health
20   benefits.  They get education benefits.  They get economic
21   opportunities.  And all of these things are able to be
22   delivered right to where they are.  They don't have to leave.
23   It's -- whether they use it or not, the opportunity to do this
24   is available, and that's what's important is just making the
25   opportunity available.
```

1  Q     Right.  And this was your missions and goals back in the

2  1990 to 1995 era.  That's where it started; right?

3  A     It started -- in particular for communications it started

4  in the '90s.  You know, we were looking at a form of this

5  mission when we were doing power plants.

6  Q     The -- tell us a little bit, and we may know, how does a

7  high-speed network help them for health or medical issues?

8  A     You know, the -- first you have to have the connections.

9  Once you have the connections, you start seeing the

10  applications get developed.

11         The simplest example is you look at all the games

12  that are now available.  The reason people are making money

13  doing games is because they can reach people.  The information

14  can get out to the masses.  And so that's occurring in the

15  health field.

16         You know, we constantly have vendors come to us with

17  potential health devices that they'd like to test on our

18  network, whether it's for diabetes -- and diabetes, actually,

19  can be monitored by looking at the eye.  And so there's cameras

20  that you would put and the doctor could see it.  We get

21  proposals to use these bed pads that monitor blood pressure

22  temperature.  So, I mean, the health field is rapidly changing,

23  like other fields.  This information age that we're in, we're

24  in the beginnings of it, is going to change society.  And if

25  Hawaiian Home Lands was left out of this, they'd be in a world

1   of hurt in another 30 years.

2   Q    The -- we talked about Waimana during the development

3   period '90 to '95 this was all being developed.  And then in

4   1995 Sandwich Isles Corporation was formed.  Why is it that

5   Sandwich Isles -- why did you form a separate corporation to be

6   owned by Waimana?

7   A    My experience at Theo Davies and building power plants,

8   lenders, whether they're the government or whether they're

9   private lenders or commercial lenders, want to have what's

10  known as a special-purpose company that is only doing what they

11  are lending money for.  So it was important to set up a

12  separate company to receive the funds from the Rural Utilities

13  Service under the Department of Agriculture.

14  Q    So take us to 1995 when Sandwich Isles was first formed.

15  How many employees were there?

16  A    Sandwich Isles, I don't know if you want to say one or two

17  or five.  As you heard, all of the employees were actually

18  employees of Waimana initially because Sandwich Isles could not

19  get operating funds.  The monies that the Department of

20  Agriculture lends are to build facilities.  They're not to pay

21  for personnel.  And so Waimana bore the brunt of having people

22  on its payroll but working to develop Sandwich Isles.  It took

23  about six months, and then Sandwich Isles started getting more

24  and more operating funds, and I could transfer the people over

25  to Sandwich Isles.

1   Q    Okay.  But right at the beginning what were -- how many

2   total employees:  Sandwich Isles and Waimana?

3   A    Four, five.

4   Q    Okay.  And what did they, combined, grow to in its peak?

5   A    At its peak Waimana and subsidiaries had about 120

6   employees.

7   Q    And what is it presently today?

8   A    Probably less than a hundred, somewhere around the high

9   80s, low 90s.

10  Q    I think you mentioned that many of -- or let me ask you

11  this.  Are the top executives of all the companies -- I'm

12  saying Sandwich Isles, and there's been some testimonial

13  regarding ClearCom -- are they employed by Waimana?

14  A    It depends.  The -- if the company -- if the subsidiary

15  can afford them, then I put them into the subsidiary.  If it

16  can't, then they stay in the holding company, Waimana.

17  Q    Can you tell us the current status of the Sandwich Isles

18  network that's been built out?  We're at 2015.

19  A    Sandwich Isles has presently built out probably 50 to 60

20  percent of the network that it needs eventually for all of

21  Hawaiian Home Lands.  And the network connects each of the

22  areas of Hawaiian Home Lands, and this network eventually will

23  be used for those areas, or can be used, to improve the service

24  between those areas of Hawaiian Home Lands also.  So it's about

25  50 to 60 percent built out.

1  Q    And how many lines or how many homes is it currently

2  serving?

3  A    On Hawaiian Home Lands it has about 3500 customers or

4  individual lines.

5  Q    And are there other non-HomeLands customers?

6  A    We have just started to -- in fact, it's last week they

7  had the ground -- the dedication of a facility in Kalaeloa at

8  the old Barbers Point which is off of Hawaiian Home Lands,

9  which we are serving.

10  Q    So just so we can put it in context, from the time you

11  first put a shovel in the ground, building out, starting the

12  network, how long did it take, you know, the part of the

13  network -- I guess we'll call it terrestrial, on the ground,

14  and the underseas -- how long did it take to get the current

15  network up and running?

16  A    It took to today; so it took what, 20 years.

17  Q    Now, your degree from the Naval Academy was in operations?

18  A    It's operations analysis.  It's problem-solving with heavy

19  emphasis on math.

20  Q    Did you take any accounting courses while you were at

21  Annapolis?

22  A    No.

23  Q    Any tax courses?

24  A    No.

25  Q    Have you ever taken any accounting courses?

1    A    No.

2    Q    Have you ever taken any tax courses?

3    A    No.

4    Q    Have you ever prepared any of your own income tax returns?

5    A    There was a short period where I attempted to 25 years ago

6    or -- but I don't presently.

7    Q    Okay.  That was -- have you ever attempted to prepare or

8    have you prepared any of the tax returns for any of your

9    corporations?

10   A    No, I don't believe so.  That would have been -- that

11   would have been ludicrous.

12   Q    Okay.  Mr. Hee, let's go back to the '90s starting.  Have

13   you always used certified public accountants to prepare your

14   tax returns?

15   A    Yes.

16   Q    What about the returns of your companies?

17   A    Yes.

18   Q    Why did you hire CPAs to assist you in preparing the tax

19   returns?

20   A    That is an area that I am woefully unqualified to keep up

21   with or even attempt to keep up with.  It is also an area that

22   I felt could be given to qualified CPAs while I concentrated on

23   trying to grow the businesses so we actually had something to

24   pay taxes on.

25   Q    As the companies grew, did you also hire CPAs within the

```
 1  companies to assist in your accounting and tax matters?
 2  A    Yes.  I think presently we have -- I believe it's four
 3  CPAs inside the company.
 4  Q    Okay.  And over the course of this period of time did
 5  there come a time when you actually hired CPAs to do certified
 6  audits of the companies?
 7  A    Yes.  Sandwich Isles gets audited independently every year
 8  because of the federal funds.  Waimana, I felt, needed to be
 9  audited also and was audited, I think, for three years.
10  Q    Did you believe that the accounting systems in place at
11  all the companies were sufficient for the tax preparers to
12  prepare proper returns for you?
13  A    Yes.  The key to it, as we put it forward, is whatever --
14  whatever the accountants or the CPAs want to know, it's open.
15  We don't hide anything.  This is not something -- you know,
16  there's so many things going on at any given day because we
17  have so many projects going on, not only Sandwich Isles but
18  proposed projects that constantly I either dream up or somebody
19  approaches me with, that I'm not the one to look at the
20  accounting functions.  But I hired internal accountants.  My
21  CFO and my CEOs of the companies, we all understand we don't
22  hide anything.
23  Q    Okay.  Now, the government is alleging or charging you
24  that certain reimbursements you received or certain matters
25  that were paid by Waimana were not business expenses.  Now,
```

1    when you paid for these expenses or sought reimbursement, did

2    you believe they were business expenses?

3    A    Yes.

4    Q    I'm going to talk to you about some of the specific issues

5    the government's raised.  I believe in 2004 Waimana paid for

6    the college tuition of your oldest daughter, Ho'o.  Do you

7    recall the testimony regarding that?

8    A    Yes.

9    Q    And can you tell the jury why you thought it was

10    appropriate to pay for her tuition for that year.

11    A    I thought it was appropriate for Waimana to pay the

12    educational expenses for all of my children because they were

13    an integral part of the company and its ability to be

14    successful going forward.  And in my experience with Theo

15    Davies and other large companies that I've read about, it was

16    not unusual for education expenses to be paid by the company.

17    Q    Did the information you provided to the accountants that

18    year disclose this was tuition for MIT for Ho'o?

19    A    Yes.

20    Q    The -- at the time the accountants prepared the 2004

21    return for Waimana did they ever raise a question with you that

22    this is a problem; you can't have Waimana pay this?

23    A    Not for that first year, no.

24    Q    So no discussions that first year.

25    A    No discussions.

1  Q    The -- was anything ever concealed from the accountants

2  regarding the payment of this tuition?

3  A    No.

4  Q    Was anything ever concealed to the IRS regarding the

5  payment of this tuition?

6  A    No.

7  Q    So let's go forward to the next year.  I think you told

8  the jury you thought it was appropriate to be paying the

9  tuition for your children.  And I think the next year not only

10  were you paying the tuition for Ho'o, you were paying the

11  tuition for Liko as well.

12  A    Yes.

13  Q    And all the information was sent over to the accountants

14  the same way?

15  A    Yes.

16  Q    Disclosed that this was for tuition for the kids?

17  A    Yes.

18  Q    And at that time the accountants, did they raise an issue

19  with you regarding it?

20  A    First they raised the issue with Nancy Henderson, my

21  assistant, and then it was brought to my attention.

22  Q    And what did the accountants advise you regarding the

23  payment of tuition?

24  A    They felt that the payment of the tuition should be

25  handled as a loan to stockholder.

1    Q    That it shouldn't be handled just as an expense.

2    A    Yes.

3    Q    And did you follow their advice?

4    A    Yes.

5    Q    Did you understand what it meant to have a loan to

6    stockholder?

7    A    Yes.  It meant that I was going to pay for it personally.

8    Q    Now, you felt before you had this discussion that it was

9    okay for Waimana to pay for those expenses.

10   A    Yes.

11   Q    What changed?

12   A    The CPAs, who are the ones that are charged with

13   understanding the tax laws, advised me it was wrong, or it

14   wasn't okay.

15   Q    And you followed their advice.

16   A    Yes.

17   Q    Now, we've seen an exhibit, I'm not going to go through

18   it, it's -- where it shows for the next five or six years

19   tuition and related expenses are being paid by Waimana and

20   they're being treated as a shareholder loan.  You recall seeing

21   that exhibit a number of times?

22   A    Yes.

23   Q    And was that loan repaid, Mr. Hee?

24   A    Yes.

25   Q    And was it repaid with interest?

1    A    Yes.

2    Q    Now, was this loan ever documented with a promissory note?

3    A    No.

4    Q    Do you recall the accountants ever advising you that it

5    had to be documented with a promissory note?

6    A    Not specifically.  But I got to tell you sitting here for

7    three weeks listening to my life unfold, I came to understand

8    that I'd forgotten quite a bit of things, but not specifically

9    a promissory note.

10    Q    The accountants were aware you never documented it with a

11    promissory note, weren't they?

12    A    Yes.

13    Q    Now, was anything ever concealed from the accountants

14    regarding these payments?

15    A    No.  You know, initially, the system for payment was set

16    up by the accountants.  Waimana was a small company, Waimana,

17    Sandwich Isles, and everything else was a small company.  And

18    so while I made the decisions as to what expenses would be paid

19    by what company, all of that was sent to the accountants, who

20    actually made -- kept the books.  We didn't do our books.  We

21    didn't have the staff to do it.  So it was sent out in a form

22    of a check register or something along those lines to the

23    accountants, and they were charged with categorizing them

24    properly and dealing with them the way their professional

25    trained them to deal with it.

1  Q    And nothing was ever concealed from these accountants.

2  A    No.  They had full access to anything they wanted.

3  Q    And just to be clear, it was -- it was their

4  recommendation, they advised you, to treat these tuition and

5  related payments as a loan to shareholder.

6  A    Yes.

7  Q    And during the course of the IRS examination was anything

8  concealed from the IRS regarding these payments?

9  A    No.  It's been an interest -- as I said, it's been

10  interesting sitting here for three weeks listening to this

11  because everything that the IRS is charging me with was in

12  plain sight and given to them.  They didn't uncover anything.

13  Q    All right.

14        THE COURT:  Mr. Toscher, why don't we take our lunch

15  break, and we'll come back at 1:30.

16        (Jury excused.)

17        (Court recessed at 12:13 P.M., until 1:37 P.M.)

18        THE COURT:  Okay.  Mr. Toscher.

19  BY MR. TOSCHER:

20  Q    May it please the Court.  Ladies and gentlemen.

21        Good afternoon, Mr. Hee.

22  A    Good afternoon.

23  Q    I'm going to ask you some questions regarding the

24  employment of your wife Wendy at Waimana.  Did there come a

25  time when you put her on salary at Waimana, sir?

1   A    Yes.

2   Q    Will you tell the jury why you put Wendy on salary.

3   A    Wendy has been an integral part of Waimana from the very

4   beginning.  Actually, even before Waimana.  She's been an

5   integral part of everything that I have been doing, which led

6   up to Waimana and to all of the companies that were formed

7   after Waimana.  So when Waimana had the ability to actually pay

8   her, I believed it was very appropriate to pay her.

9   Q    Do you believe she provides value to Waimana?

10  A    She continues to provide services to Waimana much in the

11  same way she did before.

12  Q    And you thought it was an appropriate business expense of

13  Waimana.

14  A    Yes.

15  Q    Were the accountants, David Chinaka and Carlton Siu, aware

16  that Wendy was on the payroll?

17  A    Yes.

18  Q    And tell the jury, how do you know they were aware?

19  A    Well, they were responsible for keeping the books of

20  Waimana, for filing the payroll taxes for Waimana, for

21  preparing the corporate tax returns for Waimana, as well as

22  preparing the individual joint tax return of Wendy and myself.

23  Q    Did Chinaka or Siu ever tell you that it was not

24  appropriate to pay Wendy?

25  A    No.

1  Q    And to your knowledge was Wendy's salary from Waimana

2  included on your tax returns?

3  A    Yes.

4  Q    And tax paid on that salary?

5  A    Yes.

6  Q    And do you recall who prepared your joint income tax

7  returns for those years?

8  A    Chinaka & Siu.

9  Q    And they're the same accountants that prepared the payroll

10  tax returns for Waimana?

11  A    Yes.

12  Q    And did they ever raise an issue with you regarding paying

13  the salary?

14  A    No.

15  Q    Did they ever tell you that Wendy's salary should be

16  considered a dividend to you?

17  A    No.

18  Q    Was anything concealed from the accountants regarding the

19  payments to Wendy for salary?

20  A    No.

21  Q    Was anything ever concealed to the IRS regarding the

22  payments of salary to Wendy?

23  A    No.

24  Q    Let me switch over to your three children.  Did there come

25  a time when you put the children on the payroll?

1    A    Yes.

2    Q    Would you tell the jury why you put the jury on the

3    payroll.

4            THE COURT:  The jury is not on any payroll.

5            THE WITNESS:  Haven't quite put the jury.

6            I don't think that's deductible.

7            MR. TOSCHER:  I guess you already know by now I'm not

8    perfect; so -- okay.  I apologize.

9    Q    Will you tell the jury why you put the children on the

10   payroll.

11   A    Yes.  I believe that the children had -- the children --

12   my three kids had shown enough interest and enough

13   intelligence, I guess, to -- that they could eventually

14   successfully succeed me and carry on the business and what the

15   mission of the businesses were.

16   Q    Now, at what point do you recall that you actually put

17   them on the payroll?

18   A    I believe it was about 2006.

19   Q    And was there events happening at that time with their

20   schooling, or was there an event you could point to?

21   A    Actually, let me correct that.  I believe in 2006 I had

22   put Ho'o and Liko on the payroll.

23   Q    Okay.

24   A    Ho'o was in her second year or third year at MIT.  Liko

25   had just started her first year at Santa Clara.  And I -- when

1    Kupa'a started his first year at Santa Clara, I put him on the
2    payroll.
3    Q     And this was after -- had the children worked at the
4    Network Operation Center for a number of years part time?
5    A     Yes.  And they have endured my lectures during high school
6    years about the business and the importance of it.
7    Q     Would you -- did you believe there was an appropriate
8    business purpose for employing them?
9    A     Absolutely.  You know, by 2006 I had had several serious
10   health issues.  In the late '90s I had anaphylactic shock and
11   was intubated and put in a coma, induced coma, for, I think, 48
12   hours.  I had had at least one sinus surgery, several bouts of
13   kidney stones.  I had some questions as to how long I'd live.
14   Q     Why was it important that they, the children, take over
15   the company and not some third party?
16   A     It's important because, you know, what I learned when I
17   was at Theo Davies and subsequent to that working with other
18   companies, you know, in this society most companies are run
19   bottom-line oriented.  And I did not want and did not set up
20   the companies to be bottom-line oriented.  They're
21   mission-oriented.  And I needed to -- you can always get
22   somebody to run a bottom-line company.  That's what the
23   business schools teach.  I'm not so sure who teaches
24   mission-oriented companies that also pay attention to the
25   bottom line.

1    Q    Were you trying to install a commitment -- instill a

2    commitment into the children?

3    A    Yes.

4    Q    Now, were the accountants Chinaka & Siu aware that the

5    children were on payroll?

6    A    Yes.

7    Q    And they were aware that they were full-time students at

8    the time?

9    A    Yes.

10   Q    How did they know this?

11   A    Chinaka & Siu was still doing the tax -- the payroll tax

12   returns -- payroll tax reports, the corporate tax reports for

13   Waimana, as well as Wendy and my tax returns, as well as each

14   of the individual kids' -- children, their individual tax

15   returns.

16   Q    So the same accountants were preparing all the returns.

17   A    Yes.

18   Q    Did Mr. Chinaka or Mr. Siu ever advise you that the salary

19   paid to the kids should be reported on your tax returns?

20   A    No.

21   Q    Was anything ever concealed from them regarding the

22   payments -- salary payments to the children?

23   A    No.

24   Q    Was anything ever concealed to the Internal Revenue

25   Service?

1    A    No.

2    Q    Let me turn your attention to the purchase of the real

3    property of Santa Clara.  Can you tell the jury why Waimana

4    purchased the real property, Mr. Hee.

5    A    Yes.  We had -- Waimana had made some substantial

6    investments in a company called Siometrix.  It was out of our

7    normal business, but it was an opportunity that I believe would

8    lead to more jobs in Hawai'i; so I had directed Waimana to make

9    some sizeable investments in this technology.

10         The lab was located in Menlo Park, and we -- it

11   became fairly obvious to me, as you heard with Mr. Ventura,

12   toward the '08 time frame we were finding that both of us were

13   concerned about the future of Siometrix.  We had both made some

14   fairly substantial investments.  I felt the best way to protect

15   that investment was to make frequent trips to the Siometrix lab

16   and offices in Menlo Park.

17         I do not travel well, and so I thought it would be a

18   good idea, since I was going to be spending so much time up

19   there that I -- Waimana make an investment in a house in Santa

20   Clara next to the airport.

21   Q    Do you recall approximately how much money Waimana had

22   invested in the Siometrix matter?

23   A    Over four million.

24   Q    Now, did your daughter Liko and son Kupa'a live in the

25   house in Santa Clara?

 1   A     Yes.

 2   Q     You're aware today the allegations by the government that

 3   you should have reported some imputed income on your tax return

 4   regarding the house?

 5   A     Yes, I am.

 6   Q     You heard that in court.

 7   A     Yes.

 8   Q     At the time you filed your tax returns did you believe you

 9   were required to report anything regarding the house?

10   A     No.  That house was bought as an investment for Waimana.

11   Q     Okay.  Did there come a time when you knew Liko was

12   renting rooms to other students there?

13   A     It was brought to my attention.  She talked to me soon

14   after it was becoming apparent that the best way to deal with

15   Siometrix was to bring it back to Hawai'i, to shut it down up

16   in Menlo and to bring it back to Hawai'i.  So she did talk to

17   me about it.

18   Q     Did you believe that Liko was handling the matter

19   regarding the property and the rental?

20   A     Yes.

21   Q     Did you ask her to just take care of the rental property?

22   A     Yes.

23   Q     Did you ever attempt to conceal anything from your

24   accountants regarding the investment in the property?

25   A     No.

1   Q    Did you ever attempt to conceal anything from the Internal
2   Revenue Service regarding the property?
3   A    No.
4   Q    Did you ever believe that you had to report anything
5   regarding that property on your own tax returns?
6   A    No.
7   Q    Can you tell the jury what the current -- what is the
8   current status of the Siometrix technology?  You said you
9   brought it back to Hawai'i.
10  A    The Siometrix technology, we brought the -- we brought it
11  back to Hawai'i.  Siometrix has been dissolved.  Mr. Ventura
12  and I created a company, Red Ivory, that now owns the
13  intellectual property rights and the patents that Siometrix
14  had.  Black Ivory has successfully had the technology tested by
15  an independent lab to detect anthrax.  It has proven
16  successful.  It is awaiting further developments as far as what
17  we do with it.
18  Q    Is this one of the projects or matters that Liko works on
19  at the company?
20  A    Yes.
21  Q    Does Waimana still own the house in Santa Clara?
22  A    Yes.
23  Q    And could you tell the jury why Waimana still owns the
24  house?
25  A    The same reason that Siometrix ran into financial

1    problems, which is the recession -- the economic recession,

2    also created a housing market collapse, and the house in Santa

3    Clara lost about five to $600,000 in value.  I just received

4    the 2014 tax-assessed value, and it is now not only recovered

5    that amount, but it is higher than when Waimana made the

6    initial investment.  So I hung on to it because I believed that

7    the housing market would recover, and at the appropriate time

8    Liko will make the decision to sell it.

9    Q    I want to turn to another topic, Mr. Hee, the matter --

10   that is the massages that you received.  The government's

11   alleged that from 2002 to 2012, over a 10-year period, Waimana

12   paid Diane Doll for massages on your behalf.  Did you believe

13   there was a business purpose for having Waimana pay for those

14   massages?

15   A    Absolutely.

16   Q    Tell the jury what the business purpose you thought.

17   A    Well, as has been put into evidence previously, I had

18   some -- I have some fairly serious health issues.  It requires

19   me to take a daily regime of drugs.  In the early '90s to the

20   mid '90s, in the course of trying to build the businesses and

21   working the long hours, the stress was getting to be

22   debilitating.  My doctors started to prescribe tranquilizers.

23   And tranquilizers and business don't go together.  You cannot

24   function on tranquilizers.

25            So I started to look for alternative ways of

1    maintaining the stress levels at a -- stress levels so I could

2    continue to work.  I tried acupuncture.  I tried chiropracty.

3    I tried massage.  And I paid for all of that personally until I

4    found out -- until I found Diane Doll, who is a masseuse.

5    Between the exercise regimen that I had instituted at work and

6    getting a massage from Diane, I was able to maintain the stress

7    levels without drugs.  And at that point I believed that it was

8    a business purpose because it allowed me to function as CEO;

9    whereas, the alternative was tranquilizers, and I could not

10   function.

11   Q    Did you and your staff tell the accountants that the

12   payments to Diane Doll, when they asked, were for health

13   consulting services?

14   A    Yes, but, you know, Diane Doll was -- I was going to her

15   from the early '90s and probably had the company start paying

16   for it in at least the mid '90s when I was convinced that it

17   was a good solution.  So by the time this particular incident

18   you're talking about with health consulting services, the

19   classification, that was, I believe, in 2002 or 2003, and by

20   then I actually questioned Nancy why we were dealing with

21   something that had been going on for several years.  And she

22   told me that Chinaka & Siu were instituting a new software, and

23   they were trying to recode a lot of things and so they wanted

24   us to help them with several services.  And they asked me

25   what -- so I asked her what they were looking at, and they were

1    looking at some sort of consulting.  So I told her, if that's

2    what they want to do it, it has to be health consulting

3    services.

4            Another one they wanted to reclassify was a

5    government consulting services.  I gave it to them as that.

6    Q    Did you ever attempt to conceal anything from the

7    accountants regarding the massage payments to Diane Doll?

8    A    Absolutely not.

9    Q    Did you ever attempt to conceal anything from the IRS

10   regarding the payments to Diane Doll?

11   A    No.  In fact, I distinctly remember in the initial

12   interview with the IRS telling the agent, when she asked me who

13   Diane Doll was, telling her that she was my masseuse.

14   Q    Let me turn to another topic.  Well, let me ask before we

15   leave that.  Did you believe you were required to report the

16   payments to Diane Doll on your own income tax return?

17   A    No.

18   Q    Let me turn to another topic.  We've seen some evidence

19   regarding cash withdrawals on your Optima card that you sought

20   reimbursement for.  I believe it was approximately twenty some

21   odd thousand over a -- I'm not even sure I know the period now,

22   seven years.  Tell the jury what you used those cash

23   withdrawals for.

24   A    All of those cash withdrawals were made while I was on a

25   business trip.  When you go on a business trip, and the type of

1   people I deal with and have meetings with, it requires me to

2   take taxis, to have drinks, incidentals, as well as tipping

3   people properly.  I believe in tipping, especially hotel

4   people, because my mother worked there, properly.  And so I

5   needed cash.  So while I was on these trips, I would use my

6   Optima card to draw cash from the ATMs.

7   Q    And do you ever attempt to conceal the purpose of these

8   cash withdrawals from your accountant?

9   A    No.

10  Q    Did you ever attempt to conceal these cash withdrawals

11  from the IRS?

12  A    No.

13  Q    Did you believe that you had to report these cash

14  withdrawals on your own income tax return?

15  A    No.

16  Q    Did you believe these were valid business expenses of

17  Waimana?

18  A    Yes.

19  Q    Now, Mr. Hee the government is alleging that approximately

20  $117,000 of your credit card reimbursements for the years 2007

21  through 2012 were not business expenses and were income to you.

22  Did you believe that these credit card charges that you

23  submitted for reimbursement were proper expenses of the

24  companies?

25  A    Yes.

1    Q    And did you believe that you had to report any of those

2    reimbursements on your personal income tax return?

3    A    No.

4    Q    Did you ever conceal any of the purposes for these

5    expenses to the accountants?

6    A    No.

7    Q    The purposes are set out in the records of Waimana and the

8    other companies, aren't they.

9    A    Yes.

10   Q    Do you ever attempt to conceal the purpose of any of these

11   trips -- I'm sorry, any of these expenses from the Internal

12   Revenue Service?

13   A    No.

14   Q    Everything was there for the IRS to look at.

15   A    Yes.

16   Q    Now, a few more questions, Mr. Hee.  If Miss Strachan

17   could pull up Exhibit 1.6.

18          Mr. Hee, this is a copy of -- it's the electronic

19   copy of your 2007 tax return.  And if you can go to the -- and

20   this is in evidence already, exhibit 1.6.  If you go to the --

21   well, we don't even need to go to a signature because it's

22   not -- this is just a copy.  You can just stay on the first

23   page.

24          Did you believe your 2007 income tax return was true

25   and correct?

1   A     Yes.

2   Q     Did you believe that there was any additional income that

3   you had to report on that turn?

4   A     No.

5   Q     Did anybody ever advise you there was additional income

6   that you had to report on that return?

7   A     No.

8   Q     Let's just -- let's turn to the 2008 return.  I don't

9   think we need to show it.

10          When you signed and filed that return, did you

11  believe the return was true and correct?

12  A     Yes.

13  Q     And let me go back, I'm not sure I asked it the right way.

14          For 2007, when you signed that return, did you

15  believe it was true and correct?

16  A     Yes.

17  Q     And you signed both of these returns under penalty of

18  perjury, sir; correct?

19  A     Yes.

20  Q     I don't think we need to show the rest.

21          But for now in 2008 did you believe you had to report

22  any additional income?

23  A     No.

24  Q     I'm going to take you through all the returns.  We're

25  almost done.

```
 1                    2009.  Signed it under penalty of perjury?
 2   A    Yes.
 3   Q    Did you believe it was true and correct?
 4   A    Yes.
 5   Q    When you signed the return and had it filed?
 6   A    Yes.
 7   Q    Did you believe there was any additional income that you
 8   had to report on that return?
 9   A    No.
10   Q    Same questions for the 2010 return.  Signed under penalty
11   of perjury?
12   A    Yes.
13   Q    When you signed and filed it, did you believe it to be
14   true and correct?
15   A    Yes.
16   Q    Did you believe that additional income needed to be
17   reported on that return in that year?
18   A    No.
19   Q    Did anybody ever tell you that additional income needed to
20   be reported that year?
21   A    No.
22   Q    2011 return, Mr. Hee.  That too was signed under penalty
23   of perjury?
24   A    Yes.
25   Q    When you signed and filed that return, did you believe it
```

1    to be true and correct?

2    A    Yes.

3    Q    Did you believe that any additional income needed to be

4    reported on your return for that year?

5    A    No.

6    Q    Last one, sir.  2012 return.  Again, signed under penalty

7    of perjury?

8    A    Yes.

9    Q    When you signed and filed that return, did you believe it

10   to be true and correct?

11   A    Yes.

12   Q    Did you believe that there was any additional income that

13   you were required to report on that return?

14   A    No.

15   Q    Let me turn to the other charge the government has made.

16        7212 of the Internal Revenue Code relates to

17   corruptly impairing and impeding the lawful functions of the

18   Internal Revenue Service for over the period 2002 to 2012.  Did

19   you ever intentionally attempt to impede or impair the

20   functions of the Internal Revenue Service?

21   A    No.

22   Q    Did you ever attempt to obtain any sort of unlawful

23   benefit in connection with the filing of any of your tax

24   returns?

25   A    No.

1   Q    For any of this period of time?

2   A    No.

3   Q    Did you ever attempt to obtain an unlawful benefit with

4   respect to the tax returns of any of the other -- of any of the

5   corporations?

6   A    No.

7   Q    Waimana Corporation.

8   A    No.

9   Q    Clearcom Corporation.

10  A    No.

11  Q    Sandwich Isles Corporation.

12  A    No.

13          MR. TOSCHER:  No further questions, Your Honor.

14          THE COURT:  Okay.

15                     CROSS-EXAMINATION

16  BY MR. TONG:

17  Q    Good afternoon, Mr. Hee.

18  A    Good afternoon, Mr. Tong.

19  Q    I didn't quite get the date on which you established

20  Waimana.  Was that the late '80s?

21  A    Sometime in the late '80s, I believe.

22  Q    Eventually, you became the sole shareholder of the

23  company; is that correct?

24  A    I think when I first formed it I was the sole shareholder.

25  There was a short period when I wasn't, and then I became once

1   again.

2   Q    And for the majority of the time covered by the charges

3   here, you were the sole shareholder; correct?

4   A    For the -- let's see.  You ended in 2012.  Yes.

5   Q    And, in fact, the only time you transferred ownership of

6   the company was at the end of 2012; is that right?

7   A    Yes.

8   Q    And that went to your three children with you retaining a

9   10 percent interest; correct?

10  A    Yes.

11  Q    So just so we're clear, you were also the CEO of Waimana;

12  correct?

13  A    Yes.

14  Q    And you paid yourself a salary?

15  A    Yes, I did.

16  Q    And like most people that earn a salary, taxes were

17  deducted; right?

18  A    Yes, they were.

19  Q    So if you had a salary of "X" dollars, your take-home pay

20  was less than that; right?

21  A    Yes.

22  Q    Now, let's talk a little bit about the reimbursement

23  process.  We heard some testimony here about Waimana would have

24  employees incur business expenses; correct?

25  A    I'm sorry.  Can you say that again?

1   Q     Let's talk about the reimbursement process.

2   A     Okay.

3   Q     You were involved in that process, were you not?

4   A     Yes.

5   Q     There were times when employees would incur expenses on

6   behalf of your companies; correct?

7   A     Yes.

8   Q     And, basically, that can include travel, meals, and

9   entertainment; correct?

10   A     Amongst other things, yes.

11   Q     And there was a standard reimbursement form; correct?

12   A     Yes.

13   Q     An employee would fill out a form and indicate the purpose

14   of the expense and submit it to his or her supervisor; correct?

15   A     No -- well, not all the time.  That is correct for most

16   expenses.  There were times when all of the travel expenses

17   were lumped together and not on the reimbursement form.  And I

18   would approve it.

19   Q     And, in fact, as CEO, you had ultimate authority on

20   approving expenses; correct?

21   A     Yes.

22   Q     Including your own; is that correct?

23   A     Yes.

24   Q     And you approved requests for expenses from Robert Kihune;

25   is that correct?

1  A    That was -- I did, but I believe it was very rare that he

2  would actually incur expenses for Waimana.

3  Q    Can I show you an example?  Let's turn to Exhibit 4-122

4  and see if that's one of the rare examples.

5  A    Okay.  Do you have something here?

6  Q    I'll put it on the screen here, if you can turn to your

7  right.  Is your eyesight good enough if we blow that up?

8  A    I can see that one.

9  Q    Okay.  So this is a request for reimbursement as early as

10  March of 2003 with the traveler indicated as Robert Kihune; is

11  that correct?

12  A    Yes.

13  Q    And there is an indication that the travel dates were for

14  a roughly four-day trip to Washington, D.C.; is that correct?

15  A    Yes.

16  Q    And it indicates that it's for meetings with RUS, which

17  you described earlier is the Rural Utility Service; correct?

18  A    Yes.

19  Q    And if we can see the bottom of the form, please.  It

20  looks like there are various amounts indicated for lodging,

21  transportation, meetings, and meals; is that correct?

22  A    Yes.

23  Q    With a total at the bottom of $1138.25; correct?

24  A    Yes.

25  Q    And the signature that appears to the right of the word

1   "signature" is that of Admiral Kihune; is it not?

2   A    It is.

3   Q    And the approving official below is you; is that right?

4   A    Yes.  But as you can see, that is a SIC reimbursement.

5   Q    That's fine.  It's an SIC reimbursement, but even the CEO

6   of SIC had to come to you, as the owner of Waimana, to get

7   reimbursed; is that right?

8   A    Yes.

9   Q    And, basically, you approved this particular request; is

10  that correct?

11  A    Yes.

12  Q    And this document has supporting receipts, does it not?

13  A    I do not know.

14  Q    May we go to the next page, please.  If we can blow up the

15  top half.

16            There's a taxicab receipt on the upper left; is that

17  correct?

18  A    Yes.

19  Q    Indicating the date and the time of the travel and the

20  destination; is that correct?

21  A    Yes.

22  Q    There's also a guest receipt for a luncheon for a hundred

23  dollars; is there not?

24  A    Yes.

25  Q    And in the bottom there's another taxicab receipt for $20

1    for travel from the Marriott Hotel to the airport; is that

2    correct?

3    A    Yes.

4    Q    May we see the next page, please.  And if we can look at

5    the top half, this is a hotel bill for Admiral Kihune,

6    specifying all the charges that he incurred; is that correct?

7    A    Yes.

8    Q    And if we can go to the last page, please.  If we can take

9    a look at the top half.

10         This is actually a memorandum that Admiral Kihune

11   prepared to Nancy.  Do you know who Nancy is?

12   A    Yes, I do.

13   Q    Nancy would be Nancy Henderson; correct?

14   A    Yes.

15   Q    She was your office assistant and at times your office

16   manager?

17   A    Yes.

18   Q    She had considerable authority, I assume.

19   A    I wouldn't say she had authority.  She had considerable

20   responsibility.

21   Q    Thank you for correcting me.  Actually, you were the one

22   with the considerable authority, but she, as your assistant,

23   had quite a bit of responsibility; is that correct?

24   A    She had quite a bit of responsibility, yes.

25   Q    And she reported to you; correct?

1    A    Yes.

2    Q    And you had the ultimate authority, did you not?

3    A    Yes, I did.

4    Q    Okay.  And this memorandum from Admiral Kihune went to

5    Nancy for reimbursement; correct?

6    A    Yes.

7    Q    And it explains what each charge is, even identifying the

8    hotel and the meal that he had; correct?

9    A    Yes.

10   Q    And you reviewed this, and, ultimately, you approved the

11   reimbursement; is that correct?

12   A    I saw the reimbursement and I approved it.  I didn't

13   review that.  I didn't need to.  I know that Bob is very good

14   about what he does.  So I don't recall seeing this until you

15   just put it up on the screen.

16   Q    Okay.  So the point, though, Mr. Hee, is that Admiral

17   Kihune, who ran SIC, basically, had to go to you for

18   reimbursements; correct?

19   A    Yes.

20   Q    And you would see reimbursement requests of this sort,

21   would you not?

22   A    From?

23   Q    Anyone.  Admiral Kihune.  Were there other employees at

24   Waimana for whom you approved reimbursement?

25   A    Yes.  Very rarely because very few employees reported

1    directly to me.

2    Q     There are layers of people underneath you.

3    A     Yes.

4    Q     The point is you would get requests that would indicate

5    the purpose of the expense, the date, and other supporting

6    information; is that true?

7    A     Yes.

8    Q     And you would review it and then you would approve it;

9    correct?

10   A     Yes.

11   Q     All right.  Now, there were times when your credit card

12   was used for various expenses; is that correct?

13   A     Yes.  Most expenses were on my credit card.

14   Q     And Waimana, as a company, did not have a corporate credit

15   card; is that correct?

16   A     Waimana did not have a corporate credit card.

17   Q     Waimana employees used your card; is that correct?

18   A     Yes.

19   Q     And that was an American Express Centurion card; is that

20   right?

21   A     The Centurion card is a card I carry.  There are, I

22   believe, two or three cards that are in the same account, but

23   they are not Centurions.  And then there is also a Visa card

24   that was used for business.

25   Q     And one of those cards was one carried by your wife Wendy;

1   correct?

2   A    That was a -- that card was not considered really a

3   business card, but it was tied to this account.

4   Q    So when a statement would come in, there would be a

5   segment of the statement for your wife's charges; correct?

6   A    Yes.

7   Q    And then there would be a segment of the statement that

8   would be, basically, the company charges; correct?

9   A    Yes.

10  Q    And you heard Nancy Henderson testify about the process

11  that was followed in going through those charges; correct?

12  A    Yes.

13  Q    Basically, Miss Henderson would go online, download a

14  bill, and print it out; correct?

15  A    She would download the statement.

16  Q    Download an electronic statement, print it in hard copy,

17  and review it; correct?

18  A    She would download it, print it, and then try to schedule

19  time with me to review it, yes.

20  Q    When she was able to get your ear, the two of you would

21  sit down and discuss the charges; correct?

22  A    Yes.

23  Q    And, basically, you would have one copy; she would have

24  another.  Right?

25  A    No.

1   Q     One copy only?

2   A     Yes.

3   Q     And there would be a discussion of what the charge was,

4   the amount, and you would tell her what it was for; correct?

5   A     She would ask me about -- you know what, let me back up

6   here.

7         When she downloaded the statement, a section of the

8   statement was actually sent over to Joycelyn Costa to review

9   the company travel charges, which they were authorized to use.

10  And then the other section that we would review was -- well,

11  there were two more sections.  One section was my wife's, and

12  that, unless there was something unusual, was always personal.

13  And the one -- then the other section Nancy and I would review,

14  yes.

15  Q     Okay.  So let's take this section on your wife.

16        You say unless there was something unusual that would

17  be deemed personal; correct?

18  A     Yes.

19  Q     And that's because, by and large, she wasn't working for

20  the company; right?

21  A     No, she was working for the company.

22  Q     But she didn't incur business expenses on your credit

23  card; is that correct?

24  A     That's correct.

25  Q     So the default is it was a personal charge; correct?

1   A     Yes.

2   Q     Then there was this big section that would be the bulk of

3   the charges; correct?   The company charges?

4   A     I wouldn't quite say it was the bulk of the charges.   The

5   bulk of the charges really were, as I recall, the travel side.

6   But, you know, it was -- depending on -- depending on what I

7   was doing, it could be a fair amount.

8   Q     Well, you saw the exhibits in evidence.   That's the

9   Exhibit 4-1 through 4-whatever series; right?   I mean, the

10  packages of charges that we put in evidence, you've seen them;

11  right?

12  A     I saw the ones that you put up on the screen.

13  Q     Right.   And often there are charges -- total charges of

14  thirty or $40,000 a month; correct?

15  A     Yes.

16  Q     And you would go through those, as needed, with Nancy

17  Henderson; is that correct?

18  A     Yes.

19  Q     And, basically, you would tell her what they were for and

20  which company to charge; is that right?

21  A     I would tell her what occurred and then which company was

22  responsible for it.

23  Q     Okay.   So you would allocate it to a particular company;

24  correct?

25  A     Yes.

1   Q    And when you did this Nancy Henderson would write it down

2   in handwritten notes, talk to you, and then ultimately type in

3   the margin the purpose of a particular charge; correct?

4   A    She would type up what she wrote.

5   Q    Well, what she wrote was based on what you told her,

6   wasn't it?

7   A    Yes.

8   Q    Okay.  I just want to make sure.

9   A    Well --

10   Q    She may have written it, but you told her to write it.

11   A    Yeah, I just want to make sure I answer your question.

12   Q    Okay.  I appreciate that.

13   A    I'm sorry I misunderstood your question.

14   Q    I appreciate that.

15        Now, when you were going through this process, you

16   knew that there were some charges that were personal and some

17   that were business; correct?

18   A    Yes.

19   Q    And you knew how to distinguish the two, didn't you.

20   A    Yes.

21   Q    And if I can show you a couple of examples, you knew that

22   your company was not supposed to pay personal expenses, didn't

23   you.

24   A    Yes.

25   Q    All right.  Let's take a look at Exhibit 4-9, page 2499,

1    please.  And if we can take a look at the middle of the page

2    and maybe blow it up.

3              I want to take a look at this charge on February 26

4    of 2008 for a Hawaiian Airlines ticket for Robert Kihune.  Do

5    you see that charge there, Mr. Hee?

6    A    Yes.

7    Q    And the right-hand column, basically, has the typewritten

8    notations that Nancy Henderson put in as a result of the

9    process that you described; correct?

10   A    This particular -- this particular charge and those --

11   that notation did not come from me.  That would have came from

12   a conversation with Mr. Kihune's assistant, Joycelyn Costa, and

13   Nancy.

14   Q    Well, you understand, though, the notation "personal

15   travel reimburse"; do you not?

16   A    Yes.

17   Q    That means that the trip or the ticket was not for

18   business purposes; so Mr. Kihune would have to reimburse the

19   company the $406.23; is that correct?

20   A    Yes.

21   Q    And let's take a look at another example, Exhibit 4-11,

22   page 119, please.  If we could look at the top third.

23             Do you see this charge on April the 3d of 2008 for a

24   hotel in Napa, California, Mr. Hee?

25   A    I do.

1    Q    And do you see the notation that Judy Ushio would

2    reimburse $602.13 of that charge because it was personal?

3    A    I do.

4    Q    And again, you understood that to mean that personal

5    expenses should not be paid by the company; is that correct?

6    A    I never saw this before now.  This would have been the

7    section of the credit card bill that would have been given to

8    Miss Costa because she was the one that handled these types of

9    travels for these employees.

10   Q    All right.  May I show the cover page of Exhibit 4-11,

11   please.

12        The charge we just looked at was for Miss Ushio, and

13   this is the cover page of the same exhibit.  And can we go to

14   the top, please.

15        I don't know if we can catch the top, but can you see

16   enough to know that you signed this document?

17   A    Yes, that's my initials.

18   Q    So we're clear, what you're saying is you would be given a

19   package of a list of all charges, some of which you reviewed,

20   some of which someone else reviewed, and you ultimately would

21   approve it; is that correct?

22   A    Yes.

23   Q    And one more example, Exhibit 4-33, page 803, please.

24        And if we can look at the second charge, please,

25   Mr. Hee.  Again, this is for Rodney Kaulupali?  That was one of

1    your employees?

2    A    Kaulupali.

3    Q    Excuse me.  But that was one of your employees; correct?

4    A    Yes.

5    Q    And it appears that the company collected a portion of the

6    fee, or the charge rather, because he deviated to Fresno for a

7    personal reason; correct?

8    A    That's what the note says.

9    Q    And again, that's because there was a segregation of

10   personal versus business expenses; correct?

11   A    That's what the note says.

12   Q    Okay.  Well, these are your records, are they not?

13   A    Yes, they are.

14   Q    Now, let's talk about some of the trips that involved your

15   family.  There was a trip in March of 2008 involving France and

16   Switzerland; correct?

17   A    Yes.

18   Q    And who are the travelers on that trip?

19   A    They were, let's see, my wife, Liko, Mika.  I believe that

20   was it.

21   Q    And Liko is Breanne; correct?

22   A    Yes.

23   Q    And this was March of 2008; so I think we heard her

24   testify that it was during her spring break while she was a

25   full-time student at Santa Clara University; correct?

1   A    Yes.  We tried to schedule this so she wouldn't miss

2   school.

3   Q    And Mika at the time was her boyfriend; correct?

4   A    Yes.

5   Q    He was not employed by Waimana; correct?

6   A    He had done some hourly work for us, but at the time of

7   this trip he was not an employee.

8   Q    And he was not being paid salary either, was he.

9   A    No.

10  Q    And I believe you'll agree that they flew into Paris and,

11  ultimately, took a train to Calais to go to the fiber optic

12  cable company; correct?

13  A    Yes.

14  Q    And just so we're clear, you were not part of that trip;

15  right?

16  A    I did not go on that trip.

17  Q    And when that trip was done -- well, the trip took one

18  day; right?

19  A    The trip to the factory?

20  Q    Yes.

21  A    Yes, they spent the day at the factory.

22  Q    And you heard that they went to Switzerland; is that

23  correct?

24  A    Yes.

25  Q    To a small village called Zermatt?

1    A    Zermatt, yes.

2    Q    Zermatt.  And that's where the Matterhorn is located;

3    correct?

4    A    I have no idea.  I've never been to Europe.

5    Q    And, ultimately, the charges incurred on that trip came to

6    you for review, did they not?

7    A    Yes.

8    Q    All right.  Let's look at Exhibit 4-10, page 2519, please.

9    And if we can focus on the section that starts March 27th.

10            Now, Mr. Hee, if we can look at the charges starting

11    on March the 27th --

12    A    Can you blow it up a little bit more?

13    Q    Let's see if we can do half of that, please.

14            Can you see that?

15    A    I can.

16    Q    And these are all charges incurred in Switzerland;

17    correct?

18    A    Yes.

19    Q    And yet they are allocated as charges -- travel expenses

20    for the inspection of a cable in France; is that correct?

21    A    Yes.

22    Q    And if we can look at Exhibit 4-107, page 3138, please.

23            And if we can look at a charge at the Hotel Eden, St.

24    Moritz.  There's a charge that is highlighted for March the

25    26th, and this also was a charge in Switzerland, was it not?

 1    A    I'm not sure where that hotel is.

 2    Q    And there's also a charge in Zermatt for $712; correct?

 3    A    Yes.

 4    Q    And those charges were incurred after the one-day trip to

 5    the factory in France; is that correct?

 6    A    I believe so, yes.

 7    Q    And you heard Nancy Henderson testify that the CC -- first

 8    off, you know what "CC" stands for; correct?

 9    A    Yes.

10    Q    What does it stands for?

11    A    ClearCom.

12    Q    And the CC handwriting in the margin is yours.  You heard

13    that testimony.

14    A    Well, I didn't hear it, but that is mine.

15    Q    You looked at these charges.  I assume from the fact that

16    you wrote "CC" in the margin that you reviewed them.

17    A    Yes.

18    Q    And you ultimately said that they should be charged to

19    CCI; correct?

20    A    Yes.

21    Q    In fact, if we look at Exhibit 4-9, page 2504, I think

22    we'll see a handwritten note.  Can we blow that up, please?

23         Mr. Hee, that's your handwriting; is it not?

24    A    It is.

25    Q    And the letter "N" stands for Nancy Henderson; correct?

1    A    Yes.

2    Q    And you sort of have some shorthand there; so let me see

3    if I interpret it correctly.  Are you saying:  "Nancy,

4    according to the attached schedule, personal travel should be

5    charged to ClearCom inspection"?

6    A    Yes.  Trip to France, and then -- right.

7    Q    Trip to France.  Thank you.  I want to be complete.

8    A    And then "Waimana computer," I guess.

9    Q    Waimana --

10   A    I believe that's "computer."

11   Q    But ClearCom was one of your businesses; right?

12   A    Yes.

13   Q    I think you testified Waimana's the holding company.

14   Sandwich Isles and ClearCom were two wholly-owned subsidiaries;

15   correct?

16   A    Yes.

17   Q    And if we can now turn to Exhibit 4-107, page 3134.  And

18   this is a request for reimbursement.  The format appears to be

19   the same format as the one we saw Admiral Kihune use; correct?

20   A    Yes.

21   Q    And, basically, this shows you as the person requesting

22   reimbursement; correct?

23   A    Yes.

24   Q    And it's for charges on your personal Visa; is that

25   correct?

```
 1   A     Yes.

 2   Q     And you allocated the charges $4,528 to travel for the

 3   inspection of an undersea cable; is that correct?

 4   A     Yes.  Can I see the bottom to make sure I signed it?

 5   Q     Yes, please.

 6   A     Yes.

 7   Q     You recognize your signature in the lower left as --

 8   A     Yes.

 9   Q     Actually, there's just one signature that sort of

10   transcends both the request and the approval; is that correct?

11   A     Yes.

12   Q     Because you had authority to approve your own request.

13   A     Well, the buck has to stop somewhere.

14   Q     Indeed it does.

15   A     And it stops with me.

16   Q     Indeed it does.

17   A     Yes.

18   Q     Now, let's talk about a couple of trips in July of 2010.

19   That was a pretty big month for the Hee family, I assume.

20   A     I'm sure you'll refresh my memory, but right now I

21   can't -- I don't know.

22   Q     July 4, 2010 wedding, Breanne Hee?

23   A     Oh.

24   Q     Is your memory refreshed?

25   A     Yes, that was a very big month.
```

1   Q    And it didn't stop there because there were a couple of

2   trips after that; right?

3   A    I believe there were.

4   Q    Right.  And the wedding was here on O'ahu at Kamehameha

5   Schools?

6   A    Yes, it was.

7   Q    And your family members then made two trips in the same

8   month:  one to Tahiti and one to Disney World.  Correct?

9   A    I believe you showed some exhibits about it, but, yes.

10  Q    Well, are you saying that having sat here for three weeks

11  you don't have an independent recollection of a trip that your

12  family members made to Tahiti?

13  A    Oh, I have an independent recollection.  I am not very

14  good at dates.  I mean, if you ask me about something that

15  happened last year, you're not going to get a date out of me.

16  I just --

17  Q    I get that feeling.

18  A    I just am not that attuned, I guess.

19  Q    Okay.  Well, let's talk about Tahiti.  That was a trip,

20  I'll represent to you, in July of 2010.

21  A    Okay.

22  Q    Okay?  And you heard testimony that it was an eight-day

23  trip.  Does that sounds right to you?

24  A    Sounds right.

25  Q    And the travelers were your daughter Adrianne, Ho'o;

1   Breanne, Liko; your wife Wendy; and Kupa'a, your son.   Correct?

2   A    Yes.

3   Q    Your family other than you.

4   A    Yes.  Well, I guess my son-in-law was also part of the

5   family now, and he wasn't there.

6   Q    Fair enough.  I stand corrected.

7        And you heard Adrianne testify that the origin of the

8   trip was that she wanted to see the Heiva; is that correct?

9   A    I heard her say something about wanting to see the Heiva.

10  Q    And that is a Tahitian hula festival sort of like the

11  Merry Monarch; is that correct?

12  A    That's what I heard it described as.  I have no knowledge

13  of it.

14  Q    You didn't know what the Heiva was prior to that.

15  A    No.

16  Q    I didn't either, but I was educated as well as you.

17       She said it was her idea to go to the trip and you

18  responded by saying, Well, there's a cable landing out there

19  that you should go inspect.   Correct?

20  A    Yes.

21  Q    And that's your recollection of how it happened; correct?

22  A    Yes.

23  Q    And you agree that the people who went, your family

24  members, never saw the Honotua cable landing.

25  A    I agree that they looked for it, and they could not find

1     it.

2     Q     Fair enough.  So they spent one day looking for it and

3     they couldn't find it; so they didn't have a chance to visually

4     see it.  Is that correct?

5     A     That's my understanding, yes.

6     Q     And you also agree that none of the family members or you

7     made any plans prior to the trip to get directions to the cable

8     landing.

9     A     That I'm not sure of.

10    Q     Okay.  And you would agree that they never made any plans

11    to make an appointment or to meet with anyone concerning the

12    cable facility that you wanted to have inspected.

13    A     That I agree.

14    Q     In fact, your wife testified that they tried to find out

15    where the company was by talking to, I think, an uncle of one

16    of Liko's classmates; correct?

17    A     Yes, she did.

18    Q     But that didn't work out.

19    A     My understanding is it did not.

20    Q     As a result, when they came back, what you got was a

21    report that they couldn't find the cable landing; correct?  You

22    were told that.

23    A     They could not find the cable landing, nor could they find

24    the building.

25    Q     Well, actually, they did go to the address and they found

1  a building there --

2  A    Yes.

3  Q    -- but it wasn't the company that you were interested in;

4  is that correct?

5  A    Yes.

6  Q    I don't know if we have that.  Can we show that exhibit,

7  please.

8         And this is the picture of the building that was

9  generated out of this eight-day trip to Tahiti; correct?

10  A    Yes.

11  Q    And that was at the physical location of the company you

12  were interested in but not the company; correct?

13  A    Yes.

14  Q    And when they came back, you, basically, got an American

15  Express bill for the charges that were incurred; correct?

16  A    Yes.

17  Q    And you reviewed them with Nancy Henderson, the way you

18  review all the bills; correct?

19  A    Yes.

20  Q    And if we can take a look at Exhibit 4-33.  Let's look at

21  page 3801.

22         And in the middle of the bill right above the break

23  where your name appears, if we could blow that up, please.

24  There are two charges here for an automobile rental of $816;

25  correct?

```
 1   A    Yes.

 2   Q    And then a charge above it for Le Meridien in Tahiti,

 3   which you recognize as a hotel, I assume.

 4   A    It says "lodging"; so, yes.

 5   Q    And that charge is for $4,863; correct?

 6   A    Yes.

 7   Q    And that was charged to CCI as a travel expense; correct?

 8   A    It was charged to ClearCom U.S. operations.

 9   Q    As a travel expense; correct?

10   A    Yes.

11   Q    And let's back up for one second.  When it's charged as a

12   travel expense, that means that the company pays the expense,

13   as opposed to you or your family members individually; correct?

14   A    The way that the system was set up by the accountants,

15   because this is personal credit cards, I actually would pay the

16   entire bill, and the company would reimburse me for whatever

17   parts of the bill were company business -- had a business

18   purpose.

19   Q    Okay.  So because this was allocated as a travel expense,

20   the company Waimana would cut you a check for the amounts that

21   appear there; correct?

22   A    The check would include those, yes.

23   Q    Right.  And then you would pay whatever the company did

24   not pay to you out of your own pocket; correct?

25   A    It would have been paid already.  I pay the whole bill;
```

1    then the company Waimana cuts a check for those charges that

2    have business purpose, and then the business purposes are

3    divided up between whatever company it is, ClearCom, Sandwich

4    Isles, Black Ivory, and those companies would then reimburse

5    Waimana for their portion.

6    Q     Okay.  But in lay terms you, basically, front the entire

7    amount of the bill, you pay it, and then you get money back for

8    anything that is deemed to be a business expense; correct?

9    A     Anything that is deemed to have a business purpose, yes.

10   Q     And the person deeming it to have such a purpose would be

11   you.

12   A     In certain cases like this, yes.

13   Q     Well, the buck stops there on this charge; right?

14   A     On this charge, yes.

15   Q     All right.  Now, when you reviewed this, you actually

16   wrote an explanation of what the charges were for; correct?

17   A     I don't know, and I'm assuming you're going to show me

18   something.

19   Q     I sure will.  Exhibit 4-33, page 32, please.

20            Before we blow it up -- perfect.  You recognize your

21   initials; correct?

22   A     Yes.

23   Q     And the date of this is August the 5th of 2010, and it

24   relates to travel that occurred in a period of July; correct?

25   A     Yes.

1    Q    So I'm assuming that at the time you wrote this memorandum

2    and signed it, you already knew what happened on the trip, did

3    you not?

4    A    Yes.  This was probably dictated to Nancy, and she typed

5    it in.  I didn't write it.  I dictate it.

6    Q    But I mean, the words that appear on this page came from

7    you, did they not?

8    A    Yes.

9    Q    And you said the purpose of the trip was site

10   investigation of the cable system and amount of traffic being

11   serviced; correct?

12   A    Yes.

13   Q    And you dictated those words even after knowing that all

14   four travelers weren't able to find the cable landing; correct?

15   A    Yeah, I don't think that changes the purpose of the trip.

16   The fact that they couldn't find it doesn't change the purpose.

17   Q    You can go ahead and explain if your lawyer wants to ask

18   you to explain.  The question is you wrote this after you heard

19   what had happened on the trip; correct?

20   A    I can't answer that because I don't know when my children

21   and my wife came back and told me what happened on the trip.

22   So they may have told -- because you're looking at a trip that

23   was -- that ended on the 24th, and, you know, I don't know when

24   they came back and told me about it, but -- so I can't really

25   answer your question.

1   Q    Okay.  Let's look at the next trip.  This one would be to

2   Disney World.

3           You remember evidence about a trip to Disney World;

4   correct?

5   A    Yes.

6   Q    And that trip was in late July through early August of

7   2010; correct?

8   A    Again, I'm not sure which one of the Orlando trips you're

9   speaking about, but I'm sure you can show me something.

10  Q    I will.  Let's look at Exhibit 4-33, page 3812.  And let's

11  look at the bottom half of that page, please.

12          Can you read that from there, Mr. Hee?

13  A    Yes, I can.

14  Q    All right.  So the first charge is for $4,789.44.  Do you

15  see that?

16  A    Yes, I do.

17  Q    And it is incurred on June the 29th for an arrival of July

18  29th, about a month later; is that correct?

19  A    Yes.

20  Q    And the third charge is another charge incurred on the

21  same date for the same arrival date but in the amount of

22  $2,369.66; correct?

23  A    Yes.

24  Q    Now, these charges appeared on another statement that came

25  to you and Nancy Henderson; correct?

1   A     I believe Nancy downloaded this statement, yes.

2   Q     And the word "personal" appears on each of those charges,

3   does it not?

4   A     Yes, it does.

5   Q     And is that your handwriting?

6   A     No, it's not.

7   Q     So that's Nancy's handwriting.

8   A     I believe so.

9   Q     And then to the right of it the letters "WEI" appear;

10  correct?

11  A     Yes.

12  Q     That would be Waimana Enterprises, Incorporated; correct?

13  A     Yes.

14  Q     So would it be fair to assume that Nancy wrote "personal,"

15  and then after talking to you it became a charge to Waimana?

16  A     Based on this, I don't believe that would be a good

17  assumption.  I think, if you go to the one that she actually

18  typed up and I initialed, we'd be able to resolve it.

19  Q     Okay.  And just so we're clear, the people that

20  essentially went on this trip were Ho'o, your oldest daughter;

21  correct?

22  A     Yes.

23  Q     Liko and Mika, who had been married for a few weeks;

24  correct?

25  A     Yes.

1   Q    And Ho'o's friend.

2   A    I've heard evidence of that, yes.

3   Q    Are you saying you didn't know who went on the trip at the

4   time you reviewed these charges?

5   A    No, I'm saying that -- I'm sure I knew at the time I

6   reviewed the charges, but you're talking about five years ago.

7   Q    And, basically, if you could look at the following page,

8   page 3813, and if we could start on the July 4th charge, there

9   are a couple more charges that fit into the same category.  One

10  is July the 4th, a charge of $516.20 for Disney tickets to the

11  amusement park; correct?  Do you see that?

12  A    I see what it says, yes.

13  Q    And you see that, like the other one, Nancy wrote

14  "personal," and it got changed to "WEI"; correct?

15  A    You know, I don't know how you get to it being changed.  I

16  just -- if I see the next where it's typed up, I'd be able to

17  tell you.

18  Q    Okay.  We'll get there in one second.  You mean the

19  memorandum where you discuss the reason why it should be

20  deductible; correct?

21  A    No.  I'm talking about the same statement where Nancy has

22  typed it up, and I initial it.

23  Q    Okay.  Before we get there, Mr. Hee, let's just make sure

24  we look at the other one, too.  And here we have dine tickets,

25  also at Walt Disney World, for $271; correct?

1    A    Yes.

2    Q    And you heard Ho'o testify that that was for, basically, a

3    package that they were buying; correct?

4    A    Yes.

5    Q    Now, let's take a look at Exhibit 4-33, page 3797, which

6    is, I think, the document you want to see.

7    A    Okay.

8    Q    These are the same charges, the first and third charges,

9    that appear on June 29th of 2010, are they not?

10   A    Yes.

11   Q    And this is a typewritten version that must have been

12   prepared after the handwritten version indicating those charges

13   were personal; correct?

14   A    It appears so, yes.

15   Q    And it references "See Attachment 2"; correct?

16   A    Yes.

17   Q    And let's take a look at -- before we go to Attachment 2,

18   let's take a look at one more charge:  Exhibit 4-33 -- I'm

19   sorry.  4-34, page 3781.

20            And there's a charge in the middle of the page on

21   August the 2d for $1415.81; correct?

22   A    Yes.

23   Q    And this is characterized as a travel expense, management

24   and ownership training, for Adrianne, Breanne, and Charlton.

25   A    That's what it says, yes.

1   Q    And it, too, references "Attachment 2"; correct?

2   A    Yes.

3   Q    And you heard from your daughter Liko, Breanne, that "AKL"

4   is Animal Kingdom Lodge where they stayed.

5   A    Yes.

6   Q    And you have no reason to have a different memory of that;

7   right?

8   A    I have no reason to know what AKL is.

9   Q    Okay.  Fair enough.

10        So let's go to Attachment 2, which is Exhibit 4-33,

11   page 792.  And if we can look at the top third first.

12        Mr. Hee, this is the attachment that you prepared to

13   set forth the purpose of the trip to Disney World; is that

14   correct?

15   A    It appears that it is the statement that I dictated to

16   Nancy to memorialize or whatever that trip.

17   Q    So "memorialize" that trip?  I'm not sure I'm following

18   you.

19   A    To explain the trip?

20   Q    Okay.  Fair enough.  I mean, I'm curious because it seems

21   like all of these other charges we just see travel, meals,

22   whatever, but here we have a whole memorandum on it.  I mean,

23   is it that the nature of the trip was so obviously personal

24   that you felt you had to write something to justify it?

25   A    Not at all.  What was going on was we had brought the

1   accounting function for Waimana -- we had already brought the

2   accounting function for ClearCom in house, and it was being

3   handled by our accounting staff.  And the accounting staff has

4   a procedure that they're implementing for the charges, and this

5   is part of their procedure.

6   Q    To justify the charge.

7   A    To explain the charge.

8   Q    Okay.  And so we're clear, if this were a personal charge,

9   there would be no need to explain it; right?

10  A    No.

11  Q    Maybe I asked a bad question.

12       If this were a personal charge, would there be a need

13  to explain it to anyone?

14  A    No.

15  Q    Because you would pay it out of your own after-tax

16  dollars; correct?

17  A    It would have already been paid.

18  Q    Out of your after-tax dollars.

19  A    Out of my funds, yes.

20  Q    Okay.  I'm not trying to quibble with you.  I'm just

21  trying to make sure I understand.

22  A    I'm just trying to make sure I answer your question,

23  Mr. Tong.

24  Q    I appreciate that, Mr. Hee.

25       So this memorandum talks about the Disney World trip;

1  correct?

2  A    It talks about a travel to Orlando, yes.

3  Q    And, in fact, the charges were for Disney World, though;

4  correct?

5  A    I believe that that's where the display that I sent them

6  to was located.

7  Q    Okay.  And the display that you sent them to was the

8  Raytheon thrill ride that Liko testified they rode once;

9  correct?

10  A    It was that display, yes.

11  Q    And I'm curious.  Travelers, you list Adrianne and

12  Breanne, who were receiving a salary from Waimana, and who, in

13  your mind, were going to take over the company.  Correct?

14  A    Yes.

15  Q    You didn't list the other two travelers, did you.

16  A    No, I did not.

17  Q    And the memorandum, if we can have a different view of

18  this, please, starting with "Purpose" and going lower.

19        Can the jury see way back there?  Okay.  I'm seeing

20  some negatives.  Let's just do maybe through item 6, if we

21  could.

22        So, Mr. Hee, you said the purpose of this trip was to

23  see how federal funds, including RUS funds, have been used to

24  develop Disney World; correct?

25  A    Yes.

1  Q    And this discussion about how the infrastructure

2  development funds have been used to benefit society, those

3  words are all yours?

4  A    Yes.

5  Q    You dictated them?

6  A    Yes.

7  Q    And you created those or did you get them off an article,

8  or where did they come from?

9  A    I'm not sure.

10 Q    I mean, you're smiling.  I mean, I'm not trying to be

11 funny.  I'm trying to understand the source of --

12 A    I mean, you're asking me if I dictated them.  I dictated

13 them.  Where I got the particular words, you're asking me if I

14 was reading something, I may have been.  I don't know.  I do

15 know that what is described there is, to the best of my

16 knowledge, what happened at Disney World, and that's from

17 personal experience.

18          In the 1970s in the -- after graduating from

19 Annapolis, I -- as part of supply corps training, I made a trip

20 to Orlando.  There was the Navy nuclear power school there.

21 Disney World was not built; it was orange -- not even orange

22 groves.  It had some.  But most of it was, essentially, swamp

23 land.  They were in the active throes of developing Disney

24 World.  I found it fascinating.  I investigated it, found out

25 that Walt Disney had, in fact, carved out this area for Disney

1    World and made it a separate county.  By making a separate

2    county, he made it eligible for federal funds, and he used

3    federal funds to develop this swamp land into what is now

4    Disney World.

5            So where I got those words I'm not sure because this

6    is something that I know about from my own experience beginning

7    in the mid-'70s when I was in Orlando and Disney World didn't

8    exist.

9    Q    Okay.  I think Judge Mollway's --

10           THE COURT:  I wanted to take a break around now.  But

11   if you're going to finish up this topic in a minute or so, we

12   can wait a minute or so.

13           MR. TONG:  I think a little more than a minute.

14           THE COURT:  Then why don't we take a break now.

15   Okay?

16           We'll come back at 3:00, and we'll go until 4:00.

17       (Jury excused.)

18       (Court recessed at 2:49 P.M., until 3:06 P.M.)

19           THE COURT:  Mr. Tong.

20           MR. TONG:  Your Honor, can I give them one moment?

21   We have a contagious coughing spell here.

22           THE COURT:  Take your time.  Take your time.

23   BY MR. TONG:

24   Q    Mr. Hee, good afternoon.

25   A    Good afternoon, Mr. Tong.

1   Q    We were talking a little bit about Disney World and the

2   justification that was written.  May we see the exhibit again,

3   please.

4            And you described where you got the information that

5   went into this memorandum; correct?

6   A    Yes.

7   Q    Okay.  Let's look at the bottom portion of the memorandum

8   after item 6.  And you, essentially, said that because Adrianne

9   and Breanne were going to become owners of the Waimana group

10  this trip would assist them in understanding how federal

11  funding could be used to develop Disney World; correct?

12  A    How federal funds were used.

13  Q    How they were used.  I stand corrected.  Past tense.

14  A    Yes.

15  Q    And you also mentioned development and business

16  opportunities, cost of construction, business and social

17  responsibility; correct?

18  A    Yes.

19  Q    To your knowledge the travelers on this trip to Disney

20  World did not have meetings with government officials to

21  discuss any of these items, did they.

22  A    No.  All of those items that you're talking about on that

23  memo were discussed with me.

24  Q    Oh, so let me understand this.  The kids went to Disney

25  World and did what anybody who goes to Disney World does:  they

1   bought tickets, they had meals, they went on rides, they had

2   fun.  Correct?

3   A    Yes.  This wasn't their --

4   Q    Well, wait, Mr. Hee.  You'll get a chance to explain when

5   your attorney asks you questions.

6          But you're saying that by having the virtue of

7   discussing Disney World with you, somehow it became a business

8   trip.

9   A    I can answer that.  It requires some explanation.  Would

10  you like the explanation, or do you want a just a yes or no?

11  Q    Give me a yes or no, and then we'll see.

12  A    Yes.

13  Q    So this memorandum is, essentially, saying I discussed all

14  of these items with my children, and that's why it becomes a

15  business expense.

16          MR. TOSCHER:  Objection.  Mischaracterization and

17  argumentative by this point, Your Honor.

18          THE COURT:  Well, this is cross-examination.  You can

19  answer yes or no.

20          THE WITNESS:  This is part of the rationale --

21          THE COURT:  No, no, no.  You can answer yes or no.

22  That objection was overruled.

23          THE WITNESS:  Okay.  Sorry.  Can you re-ask the

24  question.

25          MR. TONG:  I'm not sure I can do it justice again.

1          THE COURT:  Do you want me to see what it was?

2          THE WITNESS:  Sure.

3          THE COURT:  Okay.  Well, he was asking you whether

4    this memorandum was saying that because you discussed all of

5    these items with your children this became a business expense.

6          THE WITNESS:  No.  I characterize it as a business

7    purpose.

8    BY MR. TONG:

9    Q    And the reason you characterize it as a business purpose

10   is to make it a deductible business expense; right?

11   A    No.

12   Q    Well, it became a deductible business expense; right?

13   A    That, I believe, is -- no, that is the purview of the

14   CPAs, who review what I designate as business purpose.  They

15   make the determinations as to what is deductible and what is

16   not.

17   Q    Okay.  Fair enough.  And what happens is this memorandum

18   goes into your file; correct?

19   A    It goes into Waimana's file, I guess.

20   Q    I meant Waimana's file.  Your company's file; correct?

21   A    Yes.

22   Q    Nancy Henderson had the software to categorize expenses

23   into different groups; correct?

24   A    I believe in 2010 the characterization was no longer --

25   I'm not sure if it was being done by Nancy or if it was being

1    done by other accounting staff.

2    Q    In Waimana; correct?

3    A    They actually work for Sandwich Isles, but they do work

4    for Waimana when they're doing this.  It gets charged out to

5    Waimana, yes.

6    Q    Okay.  But people in your companies; correct?

7    A    Yes.

8    Q    Your group of companies.

9    A    Yes.

10   Q    And, basically, there would be different code numbers that

11   had accounting meaning in terms of -- we've been through some

12   of those -- consulting expenses, travel, meals, and

13   entertainment.  Correct?

14   A    You know, Mr. Tong, I'm not trying to be argumentative,

15   but accounting is not something that I do.  It's not something

16   I have any desire to do.  So I'm not sure I'm qualified to

17   answer what's in accounting.

18   Q    Okay.  But you do have some familiarity with how taxes

19   work; correct?

20   A    Very basic.

21   Q    You've been using outside accountants for a number of

22   years; correct?

23   A    Yes.

24   Q    And you heard Carlton Siu say that your knowledge of tax

25   was above average; correct?

1    A    Yes, I did.

2    Q    And I'm going to depart from this trip for a moment.

3    Let's go to -- if you'll give me one moment.

4              May we see 11-57, page 7531, please.

5              Mr. Hee, I'll start at the bottom because it's an

6    e-mail chain; so let's look at the originating.  Fair enough?

7              Okay.  This is January 30, 2009.  Okay?  And it

8    starts with an e-mail from Abby T at Sandwich Isles.  You

9    recognize who that is; correct?

10   A    Yes.

11   Q    That's Abigail Tawarahara of Sandwich Isles; correct?

12   A    Yes.

13   Q    She was one of your in-house accountants; correct?

14   A    She's the controller.

15   Q    And she has some role in the accounting function, too,

16   though; correct?

17   A    Yes.

18   Q    And, basically, there is an e-mail from Chinaka & Company,

19   which you recognize as your outside accountants at the time;

20   correct?

21   A    Yes.

22   Q    To the controller of Sandwich Isles; correct?

23   A    Yes.

24   Q    And the topic is "We are still waiting for Al -- that

25   would be you; correct?

1    A    Yes.

2    Q    -- "to call us regarding his wanting to categorize jewelry

3    as artwork."  Do you see that statement?

4    A    Yes.

5    Q    And your response -- or let me rephrase that.

6         Abby of Sandwich Isles sends the e-mail to you,

7    saying they need to follow up with you on the jewelry before

8    they can release financial statements; correct?

9    A    Can you make that a little -- I'm trying to see what's

10   right under "Al."

11   Q    It says "HNB," if that helps you out.

12        Do you remember getting a line of credit from Hawaii

13   National Bank?

14   A    Okay.  I just needed to jog my memory.  But, yes, that's

15   fine.

16   Q    Let's put it in context.  I mean, the subject line says

17   "Hawaii National Bank needs consolidated financials"; correct?

18   A    Yes.

19   Q    And this was so that your company could maintain a

20   multimillion dollar line of credit; correct?

21   A    I don't know what line of credit that is, but it's for a

22   line of credit, yes.  It's actually not for a line of credit.

23   It's for a loan.

24   Q    A loan to your company.

25   A    Yes.  Which they did not make, I believe.

1   Q    All right.  And this is an e-mail to you and your

2   assistant Nancy Henderson, basically, saying please give David

3   Chinaka a call; correct?

4   A    Yes.

5   Q    And your response appears on top of that, does it not?

6   A    Yes.

7   Q    And this e-mail that's being displayed January 30, 2009,

8   is from you to your outside accountant, the CPA; correct?

9   A    Yes.

10  Q    And you tell him the jewelry should be classified as art

11  as they are primarily, quote, "historical preban ivory pieces

12  manufactured in Hawai'i"; right?

13  A    Yes.

14  Q    And you go on to explain that they've been featured in

15  museum exhibits and in books dealing with Hawaii's history and

16  you're purchasing them with the intent of displaying them in

17  the offices or wearing them to functions; correct?

18  A    Yes.

19  Q    And a good example was the presidential inauguration at

20  which Wendy and my daughters wore some of this, quote, "art";

21  correct?

22  A    Yes.

23  Q    And what I'm getting at is you say you don't know much

24  about taxes, but this e-mail is from you telling your outside

25  expert how to classify something and why.

1  A    I don't see anything up there for taxes.  I'm telling him

2  the proper -- how to describe these pieces.  I have no idea how

3  jewelry is classified in tax.  I have no idea how art is

4  classified in tax.  I was asked to describe what this was, and

5  I was trying to give him an accurate description.

6         I don't see anywhere up there that I'm making an

7  opinion on the tax treatment.

8  Q    Well, let's take a look at the second e-mail down from

9  Chinaka to Abby:  "We are waiting on Al to call us regarding

10 his wanting to categorize jewelry."

11        That's what the request was; right?

12 A    Yes.

13 Q    And you understood that it could be categorized as art

14 only if it were something that might appreciate in value;

15 correct?

16 A    No.

17 Q    You didn't know that.

18 A    No.

19 Q    So what went into this e-mail that you wrote?

20 A    It was a description of the jewelry and why I believed it

21 was art because it was historical pieces.

22 Q    May I see the top again?

23        I want you to see your own words; so -- I'm sorry.

24 A    No.  That's fine.  I think you've gone over it.

25 Q    Okay.  So your position is that this e-mail to your

1   accountant had nothing to do with tax categorization.

2   A    My position is that my description had nothing to do with

3   tax categorization.

4   Q    Okay.  His request was for categorization, but your

5   description was on something else.

6           MR. TOSCHER:  Objection, Your Honor.

7           THE WITNESS:  I understood --

8           MR. TOSCHER:  Mischaracterization.

9           THE COURT:  Okay.  Sustained.

10   BY MR. TONG:

11   Q    The request to you was concerning the categorization of

12   jewelry for purposes of your accountant; is that correct?

13   A    Yes.

14   Q    But your response had to do with just a lay description of

15   what it was.

16   A    My response had to do with how I interpreted

17   categorization in this case.

18   Q    All right.  So before the break we were still in Disney

19   World, and we were at the Animal Kingdom Lodge.  And I believe

20   your response was you had no idea what AKL was; correct?

21   A    Other than what you told Liko and Liko confirmed, yes.

22   Q    Well, Liko testified.  I'm not doing the testifying;

23   right?

24   A    I believe you told her -- you told her it was Animal

25   Kingdom Lodge, and she said yes.

1    Q    Okay.  So Liko testified from the stand, where you are,

2    that they stayed at the Animal Kingdom Lodge, and that's what

3    the charge was for; correct?

4    A    Yes.

5    Q    Prior to hearing that from your daughter on the stand, you

6    had no idea what the charge was for?

7    A    No, I knew it was for some sort of lodging.  I didn't know

8    what "AKL" was.

9    Q    Okay.  Fair enough.  So you knew it was for lodging in

10   connection with the visit to Disney World when you categorized

11   it as a business expense.

12   A    As a business purpose, yes.

13   Q    Now, we've also heard about this trip to Mauna Lani in

14   June of 2011.  Do you recall that testimony?

15   A    Yes.

16   Q    And you would agree that you went to Hilo side with your

17   three children for a meeting with the Department of Hawaiian

18   Home Lands; correct?

19   A    Yes.

20   Q    And your wife Wendy did not accompany you to that

21   particular meeting; correct?

22   A    Yes.

23   Q    And you then -- the meeting ended, and you drove from Hilo

24   down to Kona; correct?

25   A    With a stop in Waimea, yes.

1   Q    Let's take a look at Exhibit 4-42, page, 406 and see if we

2   can follow your trip.

3            Let's take a look at the top portion, please.

4            And if we look at the second charge first, this is on

5   June the 20th of 2011; is that correct?

6   A    Yes.

7   Q    And you see that it was categorized as meals and

8   entertainment for Waimana; correct?

9   A    Yes.

10   Q    As a stockholders meeting; correct?

11   A    Yes.

12   Q    And it looks, from this bill, that the charge was for a

13   meal at Panda Express in Hilo; correct?

14   A    Yes.

15   Q    So that would have been the time when you were finishing

16   the DHHL meeting on that side of the island; correct?

17   A    I think this particular meal was before the meeting.

18   Q    Okay.  But it was at or about the time of the meeting;

19   right?

20   A    Yes.

21   Q    That would have been lunch, I guess?

22   A    I'm not sure.

23   Q    Okay.  Well, the reason I ask is because you said you then

24   drove to the other side, I think you said Waimea, but the

25   charge here is for Kamuela.  Correct?

1    A    Yes.

2    Q    If we can highlight that charge.  Same day, June the 20th,

3    $564.48; correct?

4    A    Yes.

5    Q    Categorized as meals and entertainment for Waimana;

6    correct?

7    A    Yes.

8    Q    And again it's a stockholders meeting?

9    A    It was part of -- the reason for the trip to Mauna Lani

10   was stockholders meeting, yes.

11   Q    Okay.  So the meeting continued from lunch at Panda to

12   dinner at Monstera.

13   A    Yes.

14   Q    And I think we heard someone testify, I believe it was

15   Liko, that you ran into an uncle -- was it Riley?

16   A    It's a classmate of mine from Kamehameha is Riley Smith;

17   so it's Liko's uncle.  He was the project manager for the

18   Paniolo Cable and worked for me under ClearCom, yes.

19   Q    And that was past tense; right?

20   A    Yes.  That was prior to this, yes.

21   Q    He actually had no connection with the company -- no

22   employment with the company as of the date of that charge;

23   correct?

24   A    Yes.

25   Q    And he was also part of this meal; is that correct?

1    A    I'm not sure if he joined us.  I really don't remember.

2    Sorry.

3    Q    Okay.  And after -- after the Hilo visit, or meeting,

4    rather, you went to the Mauna Lani Bay; is that correct?

5    A    Yes.

6    Q    And so we're clear, let's look at Exhibit 4-42, page 406,

7    please.  I guess we're on the same page.

8              June the 27th there's a charge processed after a stay

9    at the Mauna Lani; correct?

10   A    Yes.

11   Q    And it looks like we have an arrival date of the 20th and

12   a departure of the 24th; correct?

13   A    Yes.

14   Q    So that's four nights; correct?

15   A    Yes.  Three nights, I think.

16   Q    Well, the 20th is night one --

17   A    20, 21, 22 -- four nights.  I stand corrected.

18   Q    I defer to you because you have the stronger math

19   background, as you testified.  I'm not a math guy.

20   A    Well, I defer to you because you know how to ask the

21   questions.

22   Q    Well, there's a lot of deference here, then.

23              So we have a four-night stay in Mauna Lani Bay Hotel

24   of $10,413 and change; is that correct, Mr. Hee?

25   A    Yes.

1    Q    And there were other charges on that same trip; correct?

2              If we can look at the same exhibit, 4-42, page 405.

3              And if we can look at these two charges on June the

4    15th.  Do you see those charges Mr. Hee?

5    A    Yes.

6    Q    And the lower of the two charges is for $5,280, again for

7    the stockholders meeting; correct?

8    A    Yes.

9    Q    And the one above it is for $390, again for a stockholders

10   meeting; is that correct?

11   A    Yes.

12   Q    And those are all charges that were deducted by Waimana as

13   an ordinary and necessary business expense; is that correct?

14   A    That is something you need to take up with the CPAs.

15   Q    But they got characterized in this manner after you sat

16   down with Nancy Henderson and told her what the trip was for;

17   is that correct?

18   A    Yes.

19   Q    And at the time of this June 2011 stockholders meeting you

20   were actually the only stockholder of Waimana; true?

21   A    Yes.

22   Q    In fact, if we can look at Exhibit 1-22, page 101, if we

23   can blow that up, please.

24              This is a portion of your 2011 tax return, December

25   2011.  I'm highlighting the upper left.  And it indicates that

1    you owned 100 percent of Waimana stock; correct?

2    A    Yes.

3    Q    And were paid $300,000 a year as salary; correct?

4    A    Yes.

5    Q    Now, Mr. Hee, you have had occasion to make a variety of

6    decisions on behalf of Waimana; is that right?

7    A    Yes.

8    Q    And I think you said you had ultimate authority; right?

9    A    Yes.

10   Q    And sometimes people would ask for proof of your authority

11   to act on behalf of the company; is that correct?

12   A    Can you give me an example of what you're talking about?

13   Q    Well, I'll give you an example.  Do you remember when you

14   decided to buy the Santa Clara residence for $1.3 million?

15   A    Yes.

16   Q    And the title company actually asked for some corporate

17   resolution showing that your company had authorized the

18   purchase of that property; right?

19   A    Sounds right.

20   Q    And that may not be surprising because you're a telephone

21   company in Hawai'i, and this is a house in Santa Clara; right?

22   A    Waimana isn't a telephone company.

23   Q    Telecommunications; right?

24   A    Waimana is not a telecommunications company.

25   Q    All right.  Well, let me get to the point that I want to

1  discuss, and then you can discuss that with Mr. Toscher.

2          They asked for proof that Waimana authorized the

3  purchase of the house, did they not?

4  A    Like I said, if you show me something, I'll be able to

5  give you a definite yes or no.

6  Q    I look forward to it.  Let's look at Exhibit 9-2, please.

7  And before we -- perfect.

8          You recognize your signature on the bottom; is that

9  correct?

10 A    Yes, I do.

11 Q    And this is the minutes of an annual Board of Directors

12 meeting of Waimana Enterprises, Incorporated; correct?

13 A    Yes.

14 Q    And it recites that a meeting of the board was held at

15 1003 Bishop Street, Pauahi Tower, Suite 2700, on May 28, 2008.

16          I think that's a typo.  Would you agree with that?

17 A    I can't see it.  Sorry.  But if you say so, that's fine.

18 Q    Well, I don't want you to take my word for it.  Let's blow

19 it up.

20          Can you read that?  That helps me, too.

21 A    Yeah, I believe that's a typo.

22 Q    It should actually be May 2008; correct?

23          MR. TOSCHER:  Objection, Your Honor.  I think there's

24 mischaracterization of what this document says.

25          MR. TONG:  I haven't said anything about it yet.

1        MR. TOSCHER:  I think you have.

2        THE COURT:  Well, there's something clearly --

3        MR. TOSCHER:  I just want to make sure.

4        THE COURT:   -- needing explanation because it does

5   say on the 28th of May 2008, comma, 2005; so I'm going to let

6   Mr. Tong follow up on what year are we talking about.

7   BY MR. TONG:

8   Q    All right.  Let's -- Mr. Hee, let's clarify.

9   A    Okay.

10  Q    I'm sorry.  It's going to take a little longer, but please

11  let me do this.

12       Exhibit 9-2, page 269.  And if we could -- can you

13  read that or should we blow it up a little more?

14  A    I think I can read this.

15  Q    First off, it's your letterhead, is it not?

16  A    Yes.

17  Q    It's from you to Old Republic Title Company; correct?

18  A    Yes.

19  Q    And it's dated June 13th of 2008; is that correct?

20  A    Yes.

21  Q    And the item being sent is Waimana Enterprises Board of

22  Directors Resolution Authorizing Purchase of Subject Property;

23  correct?

24  A    Yes.

25  Q    And that property indicated there is the house that

1    Waimana bought in Santa Clara; correct?

2    A    Yes.

3    Q    Now, having seen this fax, does it refresh your memory as

4    to when that Board of Directors resolution was prepared?

5    A    Yes.

6    Q    And was that 2008?

7    A    Yes.

8    Q    Now, let's go back to the Board of Directors resolution,

9    please:  9-2, 268.  And it recites that there was a meeting of

10   the Board of Directors and it says you were present; correct?

11   A    Yes.

12   Q    No one else was present.

13   A    Yes.

14   Q    And you were selected as the temporary recorder of the

15   meeting; correct?

16   A    Yes.

17   Q    I assume that since you were the only one present, you

18   selected yourself to be the recorder?

19   A    I would assume that, too.

20   Q    And if we can go to the next paragraph, please.

21         It says:  Upon motion duly made, seconded, and

22   carried, the following resolution was adopted.  Resolve that

23   the Board of Directors authorizes the expenditure of

24   $1,249,608.16 to buy that house.  Correct?

25   A    Yes.

1    Q    And then there being no further business, the meeting was,

2    on motion, duly adjourned; correct?

3    A    Yes.

4    Q    And you signed it.

5    A    Yes.

6    Q    And I just want to understand.  I mean, the point is that

7    you had authority to act on behalf of the company; right?

8    A    The point of this document is to authorize the purchase.

9    Waimana was formed and in complete compliance with all DCCA

10   requirements regarding how many directors are needed to be a

11   legitimate business in Hawai'i.

12   Q    I am not suggesting otherwise.  I'm just saying that, when

13   you needed the resolution, you got together with yourself and

14   drafted a resolution; right?

15   A    Yes.

16   Q    And when it says there was a motion that was made and

17   there was a motion that was seconded and there was a motion

18   that was carried, I mean, that was all you; right?

19   A    It was a very enticing conversation.

20   Q    I can imagine.  I can imagine it lasted quite some time.

21         And this was at a time when you were the sole

22   shareholder; right?

23   A    Yes.

24   Q    And we've just looked at charges at the Mauna Lani that I

25   think came out to $17,000 of four days of shareholders

1    meetings.

2    A    Stockholders meeting, yes.

3    Q    I'm going to shift to this educational expenses situation.

4         Remember Mr. Toscher asking you about the payments to

5    MIT for your daughter Ho'o's tuition.

6    A    Yes.

7    Q    And I believe you agreed that initially you had Waimana

8    pay tuition on behalf of Ho'o and booked it as educational

9    expenses; correct?

10   A    We had -- I had Waimana pay for the tuition.  And I'm not

11   sure who did the books at that point in time, but whoever -- I

12   don't know if it was Chinaka & Siu or if it was in-house, but

13   it was booked as educational expenses, yes.

14   Q    Okay.  And let's make sure we're talking about the same

15   payments.  Let's see Exhibit 3-103, please.

16        This check dated July of 2004 is one of the checks

17   that was paid; correct?

18   A    Yes.

19   Q    And $15,400; correct?

20   A    Yes.

21   Q    So we're clear, a check of this sort would be issued only

22   if you told Nancy Henderson to issue one; right?

23   A    No.  She could prepare this check based on an invoice, but

24   I'm the only -- well, I'm not the only authorized signer.  She

25   doesn't have the authority to sign it.  But she could do this

1    on her own.

2    Q    But you signed it; correct?

3    A    Yes.

4    Q    Because you are an authorized signer on behalf of the

5    company.

6    A    Yes.

7    Q    And there's another one, Exhibit 3-104.  It's another

8    check to MIT that you reviewed and signed; correct?

9    A    Yes.

10   Q    And then one more, Exhibit 3-106, another check which you

11   signed to MIT in calendar year 2004; correct?  For $15,406?

12   A    Yes.

13   Q    And those are the checks that you testified about that

14   caused Chinaka & Siu to come back to you and say, "Hey, we

15   can't do it that way"; right?

16            MR. TOSCHER:  Objection.  Mischaracterization.

17            THE WITNESS:  No.

18            THE COURT:  Okay.  Well, objection's been mooted out

19   by the answer.

20   BY MR. TONG:

21   Q    Those three checks were paid in 2004; correct?

22   A    Yes.

23   Q    And Chinaka & Siu told you it can't be deducted as an

24   educational expense; correct?

25   A    No.

1   Q    Well, my recollection this morning you said that you made

2   payments, and then they came back and said that wasn't right;

3   and then you started carrying it as a loan to shareholder.  Is

4   that correct?

5   A    That was for 2005, I believe.

6   Q    So by 2005 you definitely knew that educational expenses

7   were not deductible as a business charge; is that correct?

8   A    By 2005 Chinaka & Siu had made the decision that

9   educational expenses were not deductible, and they told me that

10  it would be treated as a shareholder loan.  I did not make that

11  decision; they did.

12  Q    Okay.  But you followed it.

13  A    Yes, I did.

14  Q    And you created an account that said shareholder loan, and

15  you started putting everything that related to the kids'

16  educational expenses in that account; correct?

17  A    They created the account and they started putting

18  everything in there, yes.

19  Q    Well, Nancy Henderson cut the checks; right?

20  A    Yes.

21  Q    You signed the checks.

22  A    Yes.

23  Q    She would book the checks on the account in Waimana's

24  books; correct?

25  A    Again, I'm not sure when the books came in-house.  That

1   was right about the transition.  But whenever it did come

2   in-house, she followed the directions of Chinaka & Siu and

3   booked it wherever they told her to book it.

4   Q    As did you.

5   A    I don't book it.

6   Q    You followed the instructions of Chinaka & Siu; right?

7   A    Chinaka & Siu came to me and told me that in their opinion

8   the educational expenses were not deductible.

9   Q    Okay.

10  A    And they were going to categorize it or book it or code it

11  as loan to shareholder.  I said, Fine.  That's what I pay them

12  for.  And after that I left it to whoever was supposed to, as

13  you say book it, to book it because I don't book it.

14  Q    So you followed their advice.  That's all I'm asking.

15  A    Yes.  I followed their advice.

16  Q    And you got that advice in 2005; correct?

17  A    I believe so, yes.

18  Q    All right.  Let's take a look at Exhibit 4-9, page 3136.

19       MR. TONG:  I'm sorry.  It may be 4-109.

20       MR. HARRINGTON:  Larry, page?

21       MR. TONG:  3136.

22       Excuse me, Your Honor.  May I have one moment?

23       THE COURT:  Yes.

24       MR. TONG:  I stand corrected.  It's Exhibit 4-107,

25  page 3136.  And if we can blow up the middle of those charges.

1    Q    First off, this statement is dated April 14 of 2008.  Can

2    you see that?

3    A    I can't see it.

4    Q    All right.  Let's blow it up a little more, please.

5         Can you see that, Mr. Hee?

6    A    April 14, 2000 -- is that '6 or '8?

7    Q    I'll represent to you it's an 8, but I want to make

8    sure --

9    A    Okay.  Then it's an '8.  There I go:  '8.

10   Q    So this is after you knew that educational expenses had to

11   be loans to shareholder as opposed to business expenses;

12   correct?

13   A    It was after I was told it would be booked as loan to

14   shareholders, yes.

15   Q    And you knew that they were not deductible expenses

16   anymore; is that correct?

17   A    I don't make that decision.

18   Q    I know you don't make that decision.  But you make it

19   sound like this is a one-way street:  they tell you everything,

20   and you hear it but don't do anything about it.  Is that what

21   you're saying?

22   A    No, I hear it; I take the appropriate action.  But I don't

23   delve down into the level of accounting that you think I'm

24   delving down into.  I make a decision on what charges go to

25   what company, whether there's a business purpose, and then it's

1    dealt with by the accountants, whether they're internal or

2    external.

3    Q    Okay.  And on this statement, which is in April of 2008 --

4    let's go look at some of the middle charges.

5              You see a charge for Santa Clara University

6    bookstore?

7    A    Yes.

8    Q    $244?

9    A    Yes.

10   Q    And you see the handwriting characterizing that as a

11   Waimana expense.

12   A    Yes.

13   Q    And you see the charge Santa Clara bookstore for 87.36?

14   A    Yes.

15   Q    Also characterized as a Waimana expense.

16   A    Yes.

17   Q    So those characterizations were done after you had been

18   told by Chinaka & Siu that educational expenses could not be

19   charged to Waimana; correct?

20   A    That indication of a Waimana expense doesn't say anything

21   other than it is a business purpose of Waimana.  I would expect

22   that Chinaka & Siu or whatever accountants are dealing with it

23   would then take that expense and book it in the Waimana loan to

24   shareholder.

25   Q    All right.  Now, while we're on the topic of Santa Clara,

1    you testified that Waimana bought that house in June of 2008;

2    is that correct?

3    A    Yes.

4    Q    And at the time Breanne had completed two years of school

5    at Santa Clara; is that right?

6    A    I believe three; three years, yes.

7    Q    And you had been -- "you," meaning Waimana, had been

8    paying all of her expenses; correct?

9    A    Waimana -- it had been booked as Waimana loan to

10   shareholders, yes.

11   Q    Right.  But the physical checks that paid all her expenses

12   were drawn on the Waimana account; is that correct?

13   A    Yes.

14   Q    And those expenses had included her rent; is that correct?

15   A    Yes.

16   Q    And if we could look at Exhibit 4-82F, as in Frank, page

17   816, please.  And if we could zoom in on it, please.

18            Are you able to read that, Mr. Hee?

19   A    Yes.

20   Q    Let's start at the bottom.  It's from Liko, your daughter,

21   to you; correct?

22   A    Yes.

23   Q    And the date is 2007; correct?

24   A    Yes.

25   Q    And I'm just going to paraphrase.  Basically, she's saying

1   when are you going to send me my rent check and explains how

2   she needs to process her rent; correct?

3   A    Yes.

4   Q    And you forwarded this to Nancy Henderson; correct?

5   Saying -- I'm sorry.  Go ahead.

6   A    Yes.

7   Q    Please pay for September and arrange for automatic

8   payments; correct?

9   A    Yes.

10   Q    Of $750 a month.

11   A    That's Nancy's handwriting, but it must be from something,

12   but, yes.

13   Q    So for the year before you purchased the Santa Clara house

14   you were paying $750 a month for Liko's housing in Santa Clara;

15   is that correct?

16   A    I think the year before -- I think Liko testified the year

17   before we purchased the Santa Clara house she actually had

18   moved from an apartment into a house; so -- I'm not sure when

19   that occurred; so -- and I also am not sure what or if there

20   was a difference between the monthly amount.

21   Q    Okay.  Fair enough.  But you were paying a monthly amount

22   on her behalf; correct?

23   A    Yes.

24   Q    And starting in the fall of 2008 you understood that you

25   would have two children going to the same school; correct?

1   A    Yes.  And I want to make sure I understand you, Mr. Tong.

2        When you say I was paying it, it was a Waimana check

3   that was being booked as a loan to shareholder.

4   Q    Oh, I completely accept your assertion that Waimana was

5   making a check in payment.

6   A    Okay.  I just want to make sure -- you're saying "you."  I

7   wanted to make sure I understood who you were talking about.

8   Q    Thank you.  Thank you for your clarification.  And I also

9   understand that you're saying it was put on the books as a loan

10  made from Waimana to you; correct?

11  A    Yes.

12  Q    So we've got a complete picture of that.

13  A    I hope so.

14  Q    And Charlton Kupa'a was going to start school at the same

15  school in the fall of 2008; correct?

16  A    I believe so.

17  Q    So you knew that you would have double tuition and double

18  housing; right?

19  A    Yes, I would have two children there.

20  Q    And you then did the authorization to have Waimana buy the

21  house; correct?

22  A    Yes.

23  Q    And if I recall correctly, that was a skateboard ride away

24  from the University?

25  A    My son used to skateboard, yes.

1    Q    And, in fact, he testified that's about how he got to

2    work -- not work, how he got to school every day; correct?

3    A    He testified that he could skateboard to school, yes.

4    Q    All right.  And as part of that transaction, you were

5    required to -- wait a minute.  Let me withdraw that.

6         Once you bought the house, both Kupa'a and Liko lived

7    there; right?

8    A    Yes.

9    Q    And neither of them paid rent to you or to Waimana; is

10   that correct?

11   A    Yes.

12   Q    So you then were relieved of the obligation of paying

13   their housing costs that you otherwise would have had to pay.

14   A    Never thought about it that way, but I guess I'd agree

15   with that.

16   Q    Well, you know, I'm curious.  You seem to find it funny.

17   I'm just wondering why you're reacting --

18         MR. TOSCHER:  Objection, Your Honor.  That's

19   argumentative.

20         THE COURT:  I'm asking him.

21         THE WITNESS:  I never thought of it that way.

22         THE COURT:  Hold on.  I need to rule.

23         I'm overruling the objection.  You can answer.

24         THE WITNESS:  I never thought of it that way.

25   BY MR. TONG:

1    Q    You thought instead you would just buy a $1.3 million
2    house so that you would have a room to stay in when you went up
3    there to visit Siometrix to check on your investment.
4    A    That is the reason I bought that house.  If I was worried
5    about my children having housing, it never entered into my
6    thought process or my decision process to buy that house.
7    Q    So you bought a house that is about 17, 18 miles away from
8    Menlo Park, but a skateboard ride away from Santa Clara
9    University, and you never thought about the fact that it would
10   provide housing for your kids.
11   A    And a skateboard ride away from San Jose airport.
12   Q    All right.  And so we're clear, you also bought a Buick
13   Enclave; is that right?
14   A    Yes, I did.
15   Q    And your children had free use of that vehicle while they
16   lived in Santa Clara; correct?
17   A    When they're not riding their skateboards, yes.
18   Q    And by that, I mean they had the key; right?
19   A    Yes.  The car was bought for me to use to get to Menlo
20   Park when I flew in; so, obviously, I left the keys there as
21   well as the keys to the house.  I can see myself getting on the
22   plane and forgetting the keys, and getting up there and not
23   having keys for it.
24   Q    And so we're clear, your thought process was it was better
25   to buy a $1.3 million house and a $43,000 SUV rather than

1    renting a hotel room and a car when you had business there.

2    A    Yes.

3    Q    And the business was with Siometrix, and you invested over

4    $4 million; is that correct?

5    A    Yes.

6    Q    And if I understood Jim Ventura's testimony, that

7    investment didn't go too well.

8    A    It hasn't gone well, but it still may.  But up to now --

9    well, Siometrix -- Jim -- Jim had a lot of his money in

10   Siometrix, and Siometrix has since dissolved.  The amount of

11   money that I put in -- that we put into Siometrix, we ended up

12   with licenses and, eventually, all of the intellectual property

13   and patents.  So based on the latest independent lab results,

14   we have some hope that we can resurrect that investment, yes.

15   Q    But Mr. Ventura testified that he lost his shirt in the

16   investment; correct?

17   A    I think Mr. Ventura testified that he was not happy with

18   the investment, yes.

19   Q    I agree.  Neither you nor I can do his testimony and style

20   justice.  I think that's one thing we can both agree on.

21   A    We both can agree on that, Mr. Tong.

22   Q    Now, let's talk about your children momentarily.  You

23   testified that you put them on salary even though they were

24   full-time students; correct?

25   A    Yes.

1    Q    And my recollection is Mr. Toscher asked you why, and you

2    said because they had shown enough interest in the company to

3    justify it; correct?

4    A    Partly, yes.  That was part of my answer, yes.

5    Q    And the other part was capability.

6    A    And that was another part.  I think there was a little bit

7    more, but, yes.

8    Q    And just so we're clear, Ho'o went away in 2004; correct?

9    A    Yes.

10   Q    And she hasn't moved back in the last 11 years; correct?

11   A    Yes.

12   Q    And she's pursued a -- quite an interest in furniture

13   design and architectural studies; correct?

14   A    Yes.

15   Q    And she indicated that in her grand scheme of things she

16   doesn't want to be here for another 10 years because Hawai'i is

17   too slow; correct?

18   A    I think she -- that comment was made partly in jest, but,

19   yes, I heard her say that.

20   Q    Well, in jest or not, that's what she testified; right?

21   A    Yes.

22   Q    I'm sure you, as a father, agree that parents can't always

23   control their children.

24   A    Absolutely.

25   Q    And Kupa'a also came forward, and you heard him testify

1   that he is on call to help you when necessary; correct?

2   A    Yes.

3   Q    But when he was called back for I think it was a month, he

4   got a lot of grief -- I think he used a more colorful word -- a

5   lot of grief from one of your foremen; correct?

6   A    That's part of life, yes.

7   Q    Didn't want to take anything from the boss's son.  And in

8   Kupa'a's words, he said it wasn't a very genuine work

9   experience; right?

10  A    I don't recall the "genuine work experience" part, but I

11  recall the rest of it.

12  Q    And he took another job because he wants to find his own

13  way, too; correct?

14  A    For right now, yes.

15  Q    And he said that he never has considered himself to be one

16  of your management trainees; correct?

17  A    I don't recall that.

18  Q    You don't recall that testimony.

19  A    No, I don't.

20  Q    On the topic of paying the children and your wife Wendy

21  you will agree that Charlton Siu and David Chinaka told you

22  they had to do work in order to be paid.

23  A    Yes, I will agree to that.

24  Q    We also heard from Mr. Tam, who I believe was your vice

25  president of administration; is that correct?

1    A    Yes.

2    Q    And my recollection is he gave us good information about

3    the process by which you would set salaries, find appropriate

4    candidates, make sure that they were compensated fairly.  You

5    remember that testimony?

6    A    Yes.

7    Q    And he testified that he never knew that your children

8    were put on salary.  You heard that testimony?

9    A    Yes, I did.

10   Q    So I gather, when you put them on salary, you didn't

11   consult with your vice president of administration, who was in

12   charge of personnel matters; is that correct?

13   A    I did not consult with him on what you just testified he

14   said, yes.

15   Q    Now, this loan to shareholder topic, you've said that

16   various payments made on your behalf by Waimana were

17   characterized as a loan to shareholder; right?

18   A    Yes.

19   Q    And that was at the advice of the accountants; correct?

20   A    Yes.

21   Q    And just so we can see if there's agreement, you agree

22   that those particular payments were for your personal expenses;

23   correct?

24   A    No.

25   Q    So you do not agree that the loan to shareholder payments

1    were for you or your family's expenses?

2    A    I believe that there was a legitimate business purpose for

3    Waimana to pay the educational expenses of my children.  The

4    CPAs made the decision that it was not a deductible expense and

5    that I should repay it and put it on the books as a loan to

6    shareholder.  However, I maintain today that it is still a

7    legitimate business purpose, even though it's not a deductible

8    one.

9    Q    And so we're clear, the payment of educational expenses

10   applied only to your children and not to the children of other

11   employees; correct?

12   A    Yes.  They -- and they applied to my children because my

13   children were employees.

14   Q    But you didn't have a program where anybody who wanted to

15   go to college could have Waimana pay their college expenses.

16   A    We didn't have a program where anyone could, but I didn't

17   think there were anyone that would be owners of the company

18   beside my children.  So that program would have had three

19   eligible people:  my children, who are also employees of the

20   company.

21   Q    All right.  Now, you testified that you were told that

22   this had to be carried as a loan to shareholder, and you

23   explained why; correct?

24   A    Yes.

25   Q    And Charlton Siu actually told you a little more.  He said

1  you need a promissory note, didn't he.

2  A    He made that suggestion.  At the same time he told me that

3  other small companies, closely-held companies, don't have

4  promissory notes.

5  Q    But he made the suggestion to you that it was a good

6  practice to have a note to show what you owed, how it would be

7  repaid, what the interest rate was; correct?

8  A    He did make that suggestion.  And I felt, if he was

9  serious about it, he would have wrote the note.

10  Q    He's not a lawyer, is he?

11  A    Neither am I.

12  Q    But you had access to lawyers, didn't you.

13  A    So does he.

14  Q    In fact, when you loaned money to other people, you

15  created promissory notes, didn't you.

16  A    The lawyers created notes for loans to other employees

17  because other employees did not have the security that I had,

18  which is the stock of the company.  So it was something that

19  seemed appropriate to me.

20  Q    Okay.  Just so we're clear, one of the employees who

21  borrowed money and signed promissory notes was Harold Johnston;

22  correct?

23  A    Yes.

24  Q    And when he wanted a short-term loan of $20,000, you gave

25  it to him; right?

 1   A    Yes.

 2   Q    But he didn't get the money until there was a promissory

 3   note evidencing the loan; correct?

 4   A    I don't know what the timing of it was.  The note is

 5   written by somebody else, not me.

 6   Q    All right.  Well, since you don't know the timing, let's

 7   take a look at Exhibit 15-4, see if we can help.

 8            Mr. Hee, this is a note signed by Harold Johnston

 9   September 3, 1998; correct?

10   A    Yes.

11   Q    And it, basically, talks about his request to get $20,000

12   as a loan from Waimana Enterprises; is that correct?

13   A    Yes.

14   Q    And you agreed to lend him the money; correct?

15   A    Yes.

16   Q    And that's your signature on the bottom; is that correct?

17   A    Yes.

18   Q    And I notice here it talks about the total amount of the

19   loan and the interest rate to be charged and how long the loan

20   was for; correct?

21   A    Yes.

22   Q    And, in fact, it also recites the fact that Mr. Johnston

23   says he pledges his salary following the loan period, if there

24   is any remaining amount; correct?

25   A    Yes.

1    Q    So that's dated September the 3d of 1998; correct?

2    A    And that's a note that was given to me from Mr. Johnston,

3    yes.

4    Q    And the next page, which is page 17, that's a check;

5    correct?

6    A    Yes.

7    Q    And the date is September the 3d of 1998; correct?

8    A    Yes.

9    Q    Same date as the loan.

10   A    Yes.

11             THE COURT:  You mean same date as the note.

12             MR. TONG:  Promissory note.  Thank you, Your Honor.

13             THE COURT:  Well, I think we're going to stop there.

14   It's four o'clock.  And I will see everyone tomorrow.

15             And we're not starting at 9:00.  I'll do my best to

16   start on time at 9:30.

17        (Jury excused.)

18             THE COURT:  Counsel, can I take just a minute to

19   review a few things.

20             On the jury instructions there are a number of places

21   where Internal Revenue Service appears, and sometimes internal

22   revenue laws.  So unless there's an objection, I'm going to

23   make those as consistent as possible.  I'll put Internal

24   Revenue Service, initial caps.  Internal revenue laws, I'll put

25   that in lower case.  Without objection.

1              And then there are two places I think -- hold on.  I

2    can tell you where they are.

3              One is the one about jurors not discussing the case,

4    communicating on social media, and so forth.  That was

5    submitted by the defense and agreed to.  And there's a

6    reference to not discussing the case with your fellow jurors,

7    except during deliberations.  I tend to change those forms to

8    say with the "other" jurors instead of with your "fellow"

9    jurors.  It's a little less male-oriented.  So unless there's

10   an objection, I'm going to change it to the "other" jurors.

11             The same wording occurs in the one about having taken

12   notes and don't be overinfluenced.  When I read that in the

13   preliminary instructions, I referred to not being overly

14   influenced by your notes or those of the "other" jurors.

15             So unless there's an objection, I'm going to change

16   both those to -- the "fellow" jurors to the "other" jurors.

17             Objection?

18             MR. HARRINGTON:  No.  No objection.

19             MR. TOSCHER:  No objection, Your Honor.

20             THE COURT:  Okay.  There's one substantive issue, and

21   that has to do with Mr. Harrington's concern about where the

22   "knowingly" instruction would appear.

23             So this is what I propose to do with it.  Right now

24   the instruction just says:  An act is done knowingly if the

25   defendant was aware of the act and did not act through

1  ignorance, mistake, or accident.  You may consider evidence of

2  the defendant's words, acts, or omissions along with all the

3  other evidence in deciding whether the defendant acted

4  knowingly.

5           I'm proposing some introductory language, and here is

6  what I'm proposing:  Whenever in any of these instructions on

7  the law reference is made to a requirement that the government

8  prove that the defendant acted knowingly, an act was done

9  knowingly if the defendant was aware of the act and did not act

10  through ignorance, mistake, or accident.  You may consider

11  evidence of the defendant's words, acts, or omissions along

12  with all the other evidence in deciding whether the defendant

13  acted knowingly.

14           Then you don't have to worry so much about where I

15  put this.

16           MR. TOSCHER:  That's fine, Your Honor.

17           MR. HARRINGTON:  Agreed.

18           THE COURT:  Okay.  I will try to get you some final

19  form of the instructions.

20           The verdict form.

21           MR. TONG:  Oh -- I think I have it, Your Honor.

22           THE COURT:  Oh, good.  Have you looked at this?

23           MR. TOSCHER:  No.  They haven't shown me yet.

24           THE COURT:  Overnight, look at it, and we'll see -- I

25  need to know tomorrow morning whether there's an agreed-upon

1    verdict form.

2              And then, Mr. Tong --

3              MR. TONG:  May I, Your Honor?

4              THE COURT:  Please.  If you can give it to the law

5    clerk.  And if you could send an electronic version, too, in

6    case there are objections and we need to make any

7    adjustments.

8              MR. TONG:  Your orders box or Toni -- Miss Fujinaga?

9              THE COURT:  She can give you the address later.

10             Do the parties want a form of indictment to go to the

11   jury or not?  Remember, now, that the --

12             MR. TOSCHER:  Yeah, it's got to be changed.

13             THE COURT:  Yeah, there are things in there.  So if

14   you do want a form of indictment to go in with the jury, can

15   the two sides work on such a form.  It is not a requirement

16   that any form of indictment be submitted; so there may be

17   reasons to do so or not to do so.  I'm going to ask you folks

18   to first discuss it between yourselves.  You can let me know if

19   there's a disagreement.  I'll make a ruling.  If there's an

20   agreement, I would like to review it.  Okay?

21             So anything else either side needs me to take up

22   right now?

23             MR. TONG:  Your Honor, briefly.  I think the Court

24   had raised earlier how the jury was to see the exhibits.

25             THE COURT:  Yes.  What do you think?

1            MR. TONG:  We have not discussed -- unless I've

2       forgotten our discussion.  But it would be our position that

3       they should just get the hard copies and the Elmo.

4            THE COURT:  Okay.  That's fine, too.

5            MR. TOSCHER:  We have not discussed it, Your Honor.

6       And at this point we don't have an alternative to that; so that

7       will be fine.

8            THE COURT:  That's fine.  We can just do the

9       old-fashioned paper.  But, you know, both of you may appear in

10      other paper-intensive cases, maybe even before me before I die,

11      and just in case you might think about --

12           MR. TONG:  If this case doesn't kill anyone.

13           THE COURT:  I know.  I didn't want to say.  So you

14      might consider in advance -- I realize I raised it.  You know,

15      in the course of the trial it's a little hard to adjust, I

16      understand that.  But should this reoccur, you might think

17      about it in advance because it might be a helpful thing for the

18      jurors.

19           MR. TONG:  I have one other request, Your Honor.

20      Because it is paper-intensive, I can't remember Your Honor's

21      protocol on whether the jurors can take notes during closing

22      argument.

23           THE COURT:  They can take notes.

24           MR. TONG:  Okay.  That's fine.

25           THE COURT:  Is there someone who says no notes during

1    closing?

2              MR. TONG:  You know, I think somebody has somewhere.

3    I can't recall who.

4              THE COURT:  Oh, no, that was never me.

5              MR. TONG:  And in paper-intensive cases it's hard

6    that if you want to give them exhibit numbers.

7              THE COURT:  I've never been concerned about the

8    taking of notes during closing; so they're welcome to.

9              So, you know, as I said earlier, depending when it is

10   and the time of day when closings are to be given, I'll adjust,

11   but my preference is always to instruct earlier.  So, for

12   example, there is an instruction about things that were used

13   only as demonstrative aids, and that might be helpful to the

14   attorneys if I told them ahead so that the parties know and the

15   jurors know, like, I'm not going to have this kind of helpful

16   whatever you folks are going to show.  So I'll do my best to

17   instruct them before, but my overriding concern is to have as

18   few big breaks in the course of the closings as possible; so

19   that will trump whatever else happens.  Okay?

20             MR. TOSCHER:  Your Honor, just so I understand, your

21   preference is to instruct them --

22             THE COURT:  Before --

23             MR. TOSCHER:  -- before argument.

24             THE COURT:  -- closing; right.  Before closing

25   argument.  But I sometimes put it after closing argument.  The

 1   only determining thing there is that I'm looking at the

 2   clock.

 3          MR. TOSCHER:  You want the closing arguments of both

 4   to be uninterrupted.

 5          THE COURT:  I would like them to be in a chunk of

 6   time as uninterrupted as possible.  So if I can tell that, if I

 7   instruct the next morning, all closings will be concluded the

 8   same day, I'm going to instruct the next morning because I will

 9   know that it's going to take me more than half an hour to read

10   the instructions to them, and I don't want to go over the day,

11   for example.  And I'm going to do the same thing if I think,

12   okay, you folks are going to finish it in the morning without a

13   lunch break, if I instruct after lunch.

14          Speaking of which, I don't know if you can tell me

15   now, can you give me any approximation of how much time you

16   think you need for closing?  Or you want to wait?  I mean,

17   there's something between an hour and a day.  You can at least

18   tell me that.

19          MR. TONG:  It's closer to the hour.  I would say

20   probably for the government 90 minutes.

21          THE COURT:  Okay.

22          MR. TOSCHER:  I think that's fair for the defense,

23   too, Your Honor.

24          THE COURT:  Okay.  So if it's going to be 90 and

25   90 -- and you can break yours up, Mr. Tong, if you want -- then

1   it seems to me we could, with some adjustment to their

2   schedule, do it all before lunch or all after lunch.  We'll try

3   to arrange it that way.

4           Okay.  I'll see you folks tomorrow for more exciting

5   testimony.

6      (Court adjourned at 4:10 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    COURT REPORTER'S CERTIFICATE

2            I, Debra Kekuna Chun, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9            DATED at Honolulu, Hawaii, August 9, 2015.

10

11                                    /s/ Debra Chun

12                                    DEBRA KEKUNA CHUN

13                                    RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25
```