```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3                                )
     UNITED STATES OF AMERICA,    )   CR 14-00826 SOM
 4                                )
             Plaintiff,           )   Honolulu, Hawaii
 5       vs.                      )   July 9, 2015
                                  )   9:30 A.M.
 6   ALBERT S. N. HEE,            )
                                  )
 7            Defendant.          )
                                  )
 8   _____)

 9              TRANSCRIPT OF JURY TRIAL (DAY 10)
               BEFORE THE HONORABLE SUSAN OKI MOLLWAY
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:          LAWRENCE L. TONG
                                  Office of the U.S. Attorney
13                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd. Ste. 6100
14                                Honolulu, HI 96850

15                                QUINN P. HARRINGTON
                                  U.S. Dept. of Justice
16                                Tax Division
                                  601 D St., N.W. Room 7029
17                                Washington, DC 20004

18   For the Defendant:          STEVEN TOSCHER
                                  KURT K. KAWAFUCHI
19                                LACEY STRACHAN
                                  Hochman salkin Rettig Toscher
20                                  & Perez
                                  9150 Wilshire Blvd., Ste. 300
21                                Beverly Hills, CA 90212

22   Official Court Reporter:     Debra Kekuna Chun, RPR, CRR
                                  United States District Court
23                                300 Ala Moana Blvd. Ste. C285
                                  Honolulu, HI 96850
24                                (808) 541-2061

25   Proceedings recorded by mechanical stenography, transcript
     produced with computer-aided transcription (CAT).
```

1                              INDEX

2

3      EXAMINATION

4      Witness Name                                      Page

5      Albert Hee

6          Cross By Mr. Tong.......................................   3

7          Re-Direct By Mr. Toscher ...........................   26

8          Re-Cross By Mr. Tong................................   35

9          Re-Direct By Mr. Toscher ...........................   38

10     David Gierlach

11         Direct By Mr. Toscher...............................   39

12         Cross By Mr. Harrington ............................   43

13     Curt Kekuna

14         Direct By Mr. Toscher...............................   44

15         Cross By Mr. Harrington ............................   50

16     James Duffy

17         Direct By Mr. Toscher...............................   51

18         Cross By Mr. Harrington ............................   55

19

20

21

22

23

24

25

1    THURSDAY, JULY 9, 2015                9:30 O'CLOCK A.M.

2         THE CLERK:  Criminal 14-826 SOM, United States of

3    America versus Albert Hee.  This case has been called for

4    Further Jury Trial.

5         Counsel, please make your appearances for the record.

6         MR. TONG:  Good morning, Your Honor.  Good morning,

7    ladies and gentlemen.  Larry Tong and Quinn Harrington for the

8    United States.  With us are Christina Sorely and Special Agent

9    Greg Miki of the IRS.  Good morning.

10        THE COURT:  Good morning.

11        MR. TOSCHER:  Good morning, Your Honor.  Good

12   morning, ladies and gentlemen.  Steven Toscher for defendant

13   Albert Hee, who is present and standing at the witness stand,

14   together with Lacey Strachan and Kurt Kawafuchi.  Good

15   morning.

16        THE COURT:  Good morning.  You can be seated.

17        The witness can be seated.

18        THE COURT:  Mr. Tong, let me invite you to continue

19   your cross-examination.

20        MR. TONG:  Thank you, Your Honor.

21                   CROSS-EXAMINATION (Resumed)

22   BY MR. TONG:

23   Q    Good morning, Mr. Hee.

24   A    Good morning, Mr. Tong.

25   Q    We left off yesterday after discussing a number of those

```
 1   reimbursement packages for credit card charges.  You remember

 2   that testimony?

 3   A    Yes.

 4   Q    And if I understood you correctly, your testimony was that

 5   you would establish the business purpose of something for your

 6   accountants; correct?

 7   A    Essentially, yes.

 8   Q    And you would leave it to others to decide whether an

 9   expense was deductible.

10   A    I would leave it to others to prepare the tax returns of

11   which that's part, yes.

12   Q    Okay.  Well, but there are a few intermediate steps

13   between declaring a business purpose and the preparation of a

14   tax return; right?

15   A    If you say so.

16   Q    Well, I'm not doing the testifying.  Let's talk through

17   that.

18        When you would get the monthly bill, you would sit

19   down with Nancy Henderson; right?

20   A    Yes.

21   Q    And you would tell her what the business purpose of

22   certain charges was; right?

23   A    Yes.

24   Q    And based on that, there would be a preparation of a

25   typewritten notation of your statement of the business purpose;
```

1   correct?

2   A     Yes.

3   Q     And then that would go into the books of Waimana; correct?

4   A     After I -- after I signed off on the typed records with my

5   meeting with Nancy Henderson, I am no longer involved in it; so

6   I don't know where it went.

7   Q     Okay.  But the typed records would be shown to you, and

8   you would sign off on them; is that correct?

9   A     The typed records was the -- that I would sign off on was,

10   basically, the handwritten notes that Nancy Henderson and I

11   talked about.

12   Q     Right.  Like the notes we all discussed yesterday;

13   correct?

14   A     Right.

15   Q     All right.  So then, based on the information in those

16   notes, Waimana would issue you a check; is that correct?

17   A     Yes.

18   Q     All right.

19   A     That and other notes.  Because you got to remember that,

20   when the statement came in and it was broken up, there are

21   certain sections of the statement that Nancy did not have to

22   verify.  Other people in the company verify.  So it's not just

23   the part about the typed records that she and I discussed.  It

24   was combined all together.

25   Q     Okay.  Fair enough.  So I want to show you a couple of

1    documents.  I'm not going to go over everything again, but

2    Exhibit 4-9 page 490, if we could see that, please.

3            And just so the jury can understand, if we look at

4    the top portion of this, this is the cover sheet of the package

5    that includes the different charges for that particular month;

6    is that correct?

7    A    I believe so, yes.

8    Q    I mean, you recognize the form at least; correct?

9    A    I recognize the form, yes.

10   Q    And the form always says reimbursement for Albert Hee, and

11   then it has a particular closing date; is that correct?

12   A    Yes.

13   Q    And it was done on a monthly basis; correct?

14   A    Yes.

15   Q    And it would be given to you for your approval; is that

16   correct?

17   A    Yes.

18   Q    And by the time you got the form, the different charges

19   had been broken down by category, and they would be allocated

20   to different companies; is that correct?

21   A    I don't see -- let's see.  Can you scroll up a little?

22   Q    I think we're at the top of the page.  Let's look at the

23   top section.  Maybe you can --

24   A    Okay.

25   Q    See the category:  meals, entertainment?

1    A    Yes.

2    Q    And the next category:  office expenses.  Correct?

3    A    Yes.

4    Q    And if we can go look at the bottom half of the document,

5    please.  Travel; correct?

6    A    Yes.

7    Q    Loan to stockholder; correct?

8    A    Yes.

9    Q    Artwork; correct?

10   A    Yes.

11   Q    And that's the kind of information that would be on the

12   form that you would sign; is that correct?

13   A    Yes.  But this form was created by the accountants, not by

14   Nancy or me.

15   Q    The template for the form was created by the accountants;

16   correct?

17   A    The template was created and also, other than the figures

18   that Nancy and I talked about, the rest of these figures, which

19   is the bulk of them, would be put in by others.

20   Q    Okay.  And it would be given to you for review after you

21   told Nancy how these things would be categorized; correct?

22   A    Yes.

23   Q    And let's look at page 2 of this document, page 2491.  Do

24   you see that there?

25        Let's look at the amount, please.  It says total

 1    reimbursement $28,894 and change; is that correct?

 2    A     Yes.

 3    Q     And there's a paid date of March the 5th; is that correct?

 4    A     Yes.

 5    Q     And let's take a look at the check, which is Exhibit 4-9A,

 6    as in alpha.  We can blow up that check.

 7          That's a check made payable to you for reimbursement

 8    for a bill that came out six days earlier; correct?

 9    A     Yes.  And that reimbursement is for everything, except

10    what was personal.  So on the other form it showed a personal

11    line.

12    Q     Right.

13    A     Right.

14    Q     So this reimbursement is, basically, what you categorized

15    as business-related expenses; correct?

16    A     Again, I did not make the categorized -- I did not put the

17    expenses in each category.  I explained the small section that

18    was brought up to me by Nancy and told her what companies were

19    responsible for it and what activities were done.  That

20    information she typed up, and I initialed that.  That went to

21    the accountants, as well as the other sections of the card that

22    others had control over, and then the accountants put this

23    together, and I initialed it, yes.

24    Q     So you're saying the accountants reviewed every single

25    credit card charge you ever submitted and turned it around

1    every month within five days for your review.

2    A    That was the process, yes.

3    Q    And you heard David Chinaka testify that he was not given

4    credit card receipts to review, didn't you.

5              MR. TOSCHER:  Objection.  I think that

6    mischaracterizes the testimony.

7              THE COURT:  I'm overruling that.

8              THE WITNESS:  I did.  I also heard him say that he

9    had full access to it, if he wanted.

10   BY MR. TONG:

11   Q    Yeah, but there's a difference between the two; isn't

12   there.

13   A    Not according to me.

14   Q    Because full access means that, if a question arises, you

15   would give them something; right?

16   A    He would be talking to the accounting staff and/or Nancy.

17   He wouldn't be talking to me about it.

18   Q    You're above all of this, I guess.

19   A    No, I'm not above all of it.  I just -- in the end I'm

20   accountable to it, but this process that you're taking me

21   through took 45 minutes every month of my day.  And so it was a

22   process that needed to be done, was really under the control of

23   the accountants, and I went on with trying to run the business,

24   which is where the bulk of my time -- the vast majority of my

25   time was spent.

1  Q    Well, you understood that this was an important process,
2  didn't you?
3  A    Yes.
4  Q    And you understood that you, as a corporation, had an
5  obligation to report your income fairly and completely, did you
6  not?
7  A    Yes.
8  Q    You understood that the law also requires you, as an
9  individual, to report your income fairly and completely;
10 correct?
11 A    Yes.
12 Q    And you understand every year that you would certify under
13 penalty of perjury that the information you gave was accurate;
14 correct?
15 A    Yes.
16 Q    So you knew all of that about your obligations; right?
17 A    Yes.
18 Q    Just so we're clear.  And you say this would be 45 minutes
19 out of a busy day once a month; correct?
20 A    To do that section that Nancy has, yes.
21 Q    And you would take the time to write justifications for a
22 Disney World trip, though; right?
23 A    That -- if the accountants requested it, Nancy would come
24 to me; she'd ask me for it.  We'd find the time to sit down.
25 I'd dictate what I knew about it.  She would type it up, and

1    I'd sign it.

2    Q    So it's your testimony that you would only do something

3    like that if the accountants, who prepare your tax returns,

4    requested it.

5    A    It doesn't have to be the accountants that prepare the tax

6    return.   It's the accountants that are responsible for the

7    books.   So when the time Chinaka & Siu were actually doing the

8    books as well as the tax returns, it would have been Chinaka &

9    Siu.   Once Chinaka & Siu turned the books over and we brought

10   it in-house, then it would be an accountant in-house.

11   Q    And you heard Lynn Tamanaha testify, did you not?

12   A    Yes, I did.

13   Q    And she was with Chinaka & Siu; is that correct?

14   A    Yes, she was.

15   Q    And she testified that she would just get the books with

16   all of the expenses and categories but not the supporting

17   documents.   You heard her say that.

18   A    I heard her say that, yes.

19   Q    So we're clear, on Exhibit 4-9 that we were looking at,

20   you signed on March the 5th for charges that went through the

21   end of the preceding month, and the check was issued on the

22   same date as you signed; correct?

23   A    If you put it up, I'll say whether it is.   Otherwise, I'll

24   take your word for it, yes.

25   Q    I don't want you to take my word for it, but let's look at

1     the cover page on Exhibit 4-9, the upper right-hand corner.

2              Do you see the approval date there?

3     A     Yes.

4     Q     And that's March 5, 2008; correct?

5     A     Yes.

6     Q     And it's for a bill that was issued on February the 29th

7     of 2008; correct?

8     A     Yes.

9     Q     And then let's look at Exhibit 4-10A -- I'm sorry, 4-9A.

10    And the date is highlighted:   March 5, '08; correct?

11    A     Yes.

12    Q     So you got the check on the same date that you approved

13    the reimbursement for yourself; correct?

14    A     They were prepared the same day.   Whether I got it that

15    day, I can't tell you, but they were prepared the same day,

16    yes.

17    Q     So your staff prepared both, and you signed -- and then

18    you signed the check once it was prepared and given to you;

19    correct?

20    A     Yes.

21    Q     And that check goes to you; right?

22    A     Yes.

23    Q     All right.   And that was generally the process, was it

24    not?

25    A     That was the process that was set up with Chinaka & Siu in

1  the '90s, yes.

2  Q    I understand your position, but what I'm getting at is you

3  would get paid the same day that you approved the charge;

4  right?

5  A    Generally, I believe so, yes.

6  Q    Okay.  And that would include the charges for the Disney

7  World trip; correct?

8  A    If it was included in that month, yes.

9  Q    As well as the trip to Tahiti; correct?

10  A    Again, if it was included in that month, yes.

11  Q    As well as the trip to Mauna Lani; correct?

12  A    The one that was four months after my heart attack?  Yes.

13  Q    Okay.  Well, thank you for volunteering that.  I

14  appreciate it.

15  A    I knew you would.

16  Q    I'm getting to the fact that, when you went to Mauna Lani,

17  you, basically, approved your own charges, and you got paid for

18  the charges on the same day; is that correct?

19  A    I approved the charges.  And like I say, if it was the

20  same day, it was the same day.

21  Q    All right.  Well, just to be clear, let's look at one

22  more.  Exhibit 4-42, top part of the document, please.

23        That's your signature approving a charge for the

24  month ending June the 28th of 2011; is that correct?

25  A    Yes.

1   Q    And it's July 5, 2011; correct?

2   A    Yes.

3   Q    And the total reimbursement appears on page 2.  It says

4   $36,560.  Do you see that?

5   A    Yes.

6   Q    And it was paid on July 5th, the same day you approved it;

7   is that correct?

8   A    Yes.

9   Q    And that was the month in which you went to Mauna Lani a

10  couple of weeks after you had the heart attack; correct?

11  A    Months, not weeks.

12  Q    To have the shareholders meeting; correct?

13  A    To have the shareholders meeting, yes.

14  Q    Thank you.

15        All right.  Now, we were talking yesterday about this

16  loan to shareholder idea and how it was first brought to your

17  attention when Chinaka & Siu noticed that you had deducted

18  educational expenses; correct?

19  A    It was brought to my attention when Chinaka & Siu noticed

20  that there were two checks from Waimana for educational

21  expenses.  I did not approve any deductions.

22  Q    Okay.  And that was, you said, in 2005; correct?

23  A    I believe so -- well, yes.

24  Q    Ho'o started in 2004; right?

25  A    She started at MIT in 2004.

1    Q    And the first year you agree those expenses were deducted

2    and, apparently, not caught by Chinaka & Siu; correct?

3    A    As I said, I agree with it because I've been sitting here

4    watching it, but I was unaware of it prior to this.

5    Q    And the following year you found out that was not

6    appropriate under the Tax Code; correct?

7    A    The following year Chinaka & Siu brought it to Nancy's

8    attention.  She brought it to my attention.  Carlton Siu

9    brought it to my attention that the -- it shouldn't be what

10   they categorize as a deductible; it should have been put in a

11   loan to shareholder.  Yes.

12   Q    Okay.  And you accepted that advice at that point;

13   correct?

14   A    I absolutely did.

15   Q    So let's look at Exhibit 4-14.  And let's take a look at

16   the top portion of this credit card statement, please.

17        This is a summary reimbursement sheet for the month

18   ending September 29, 2008; is that correct?

19   A    Yes.

20   Q    Approved by you on October the 7th; is that correct?

21   A    Yes.

22   Q    And again, it allocates different expenses to different

23   categories and also your various companies; is that correct?

24   A    Yes.

25   Q    And let's take a look at the bottom half of the document.

1           Do you see this code "educational," 64800?

2    A    I do.

3    Q    And there's a charge next to it $717.74; is that correct?

4    A    Yes.

5    Q    And if we can go up to the top of the page again.

6           This is in the second column; correct?  That's under

7    the category of "WEI," which is Waimana Enterprises; correct?

8    A    Can you blow up that top?

9    Q    Sure.  Let's try.

10   A    Yes.

11   Q    And part of this exhibit also includes the supporting

12   documentation.

13          I don't want you to take my word for it; so let's

14   look at it.  It's page 647.  And if we can look at the last

15   charge that appears here.

16          Santa Clara University bookstore.  No receipt.

17   $717.74.  Educational expense.  Waimana Enterprises.  You see

18   that entry?

19   A    Yes.

20   Q    And you would agree that was for some merchandise relative

21   to the education of one or both of your children; correct?

22   A    It could be, but it also could be that I was at Santa

23   Clara, there was something in the bookstore that I wanted to

24   have in the office, like books or some kind of merchandise or

25   whatever else that they sell up there, and I brought it home.

```
 1            So just based on that, I can't tell you if that was

 2    books for -- and I'm assuming you're saying it was for -- it

 3    was one of my daughter -- my daughter or my son.  Just what's

 4    on there, I can't tell.

 5    Q    Okay.  You can't tell that, but you do agree that

 6    September of 2008 was when the school year started; right?

 7    A    Yes.

 8    Q    And Liko was still at Santa Clara in 2008; correct?

 9    A    Yes.

10    Q    And Kupa'a had just started school there; correct?

11    A    Yes.

12    Q    So you're saying you agree that that was for a charge at

13    the Santa Clara bookstore, but it could have been something for

14    you.

15    A    Something for the office.  What I would do, normally, in

16    reviewing this is I'd look if I was on a trip at the same time.

17    I'd try to narrow it down to give me more information as to

18    what it is, or I'd ask Nancy to narrow it down.

19    Q    Now, if you made a charge of that sort, you normally kept

20    a receipt, didn't you?

21    A    No.  I considered this the receipts.  That's why I make

22    out the -- I do try to, but when I'm on trips, it's not unusual

23    for me to lose the receipt.

24    Q    Okay.

25            MR. TONG:  May I have one moment, Your Honor.
```

1          THE COURT:  Yes.

2          (Counsel conferring.)

3   BY MR. TONG:

4   Q    Mr. Hee, there was some discussion we just had about

5   keeping receipts.  Let me turn your attention to Exhibit 4-21

6   at page 669.  I'm sorry, 670, please.

7          I want to direct your attention to a particular

8   charge at Kincaid's.  That's July 27, 2009.  Do you see that

9   charge?

10         Let's blow it up so we can all see it a little

11  better.

12  A    Yes.

13  Q    And Kincaid's, of course, is a restaurant at the -- I

14  don't know, is it Ward Warehouse still?  But in the Ward

15  Center; is that correct?

16  A    Yes.

17  Q    And this is something that was booked as meals and

18  entertainment with a receipt attached; correct?

19  A    Yes.

20  Q    And the people there were yourself; your wife; Liko, your

21  daughter; Kupa'a, your son.  Correct?

22  A    Yes.

23  Q    And you characterized it as "management and ownership

24  training"; correct?

25  A    Yes.

```
 1   Q    For the four of you; correct?

 2   A    Yes.

 3   Q    All right.  And then if we can turn to the receipt that

 4   you say is attached, and that's page 916.  If we can blow up

 5   the right side, if we can look at the top half.

 6         This actually says there were seven guests; right?

 7   A    If that's what it says, yes.  If that's what GST stands

 8   for, yes.

 9   Q    Well, maybe we can focus on what was ordered.  I want to

10   make sure you're comfortable with that.

11         You can count the entrees.  There's certainly more

12   than four entrees; right?

13   A    That would not be unusual.

14   Q    One ribs, two prime ribs, one opah, one prawns, chicken

15   Caesar salad; correct?

16   A    Yes.

17   Q    And your receipt says it was for management and ownership

18   training for four of you; correct?

19   A    Yes.

20   Q    So having looked at that, does that refresh your memory of

21   where there's -- three other people were also present?

22   A    No, it doesn't.  That was six years ago.  Sorry.

23   Q    No.  Fair enough.  But you kept the receipt to document

24   the charge; correct?

25   A    Apparently so.
```

1    Q     Now, there was some talk by your wife.  I'm a little

2    curious about it.  She said she had to attend certain functions

3    because you had food allergies.  You heard that testimony?

4    A     Yes.

5    Q     And are you suggesting that that made it difficult for you

6    to attend functions at restaurants or elsewhere?

7    A     Yes.

8    Q     All right.  Let's take a look at Exhibit 4-21, page 669,

9    please.  Maybe the top half, please.

10             You recognize the form.  This is another monthly

11   reimbursement charge broken down by nature of the event as well

12   as how it was categorized; right?

13   A     Yes.

14   Q     There's a charge on July the 7th at Hukilau; is that

15   correct?

16   A     Yes.

17   Q     And you were present.

18   A     Yes.

19   Q     There's a charge at -- by the way, that's a restaurant in

20   downtown Honolulu; right?

21   A     At the Executive Center.

22   Q     Right.  On Bishop Street?

23   A     Yes.

24   Q     And then there's another charge for $382 at Hukilau with a

25   group of you, including yourself; correct?

1   A    Yes.

2   Q    And then there's another charge at Hukilau on the same

3   date for an additional $50, saying same as above; is that

4   correct?

5   A    Yes.

6   Q    And then there's another charge one day later at John

7   Dominis restaurant for $295 with the same attendees; correct?

8   A    Yes.

9   Q    And then there's another charge at the Hilton Tapa Bar --

10  two charges, actually -- with different attendees, including

11  you and your wife, for about $190; correct?

12  A    Yes.

13  Q    And, by the way, I see that there's a charge at Ross's

14  store for family clothing:  office expenses?

15  A    I see it, yes.

16  Q    Any idea what that was for?

17  A    Probably something that was needed for the office.  Ross

18  is right across the street next to Hukilau.

19  Q    Okay.  So -- and this is the same month, by the way, as

20  Kincaid's.  Let's go to the next page.

21  A    Busy month.

22  Q    I would agree.  But what I'm trying to get at is you were

23  able to go to different restaurants and eat, were you not?

24  A    As long as I was controlling the food that was being

25  ordered.  And if you look at it, it's all with restaurants that

1   are familiar to me.

2           As you can see, I carry.  So, yes, I would go out,

3   and when I have to entertain people, I would go to restaurants

4   that I'm familiar with, that I understand what the food is, and

5   that I am very sure that there is not nothing in there that

6   will put me into anaphylaxis.  And even then I carry this.

7   Q    Okay.  And Zippy's is one of those restaurants; is that

8   right?

9   A    Zippy's is a favorite of mine.

10  Q    So without going through all of them, let's just look at

11  one.  Exhibit 4-21, page 669.  We were just there.

12          Bottom third, if we could, please.

13          And I want to point you to a charge at Zippy's for

14  yourself, your wife, and your son; correct?

15  A    Yes.

16  Q    So I assume that means the three of you went and ate

17  there; right?

18  A    Yes.

19  Q    And you characterize that as management and ownership

20  training.  A deductible expense; correct?

21  A    Yes.

22  Q    By the way, what are these two charges for, Aaron's Dive

23  Shop and Sports Authority, on the same day as an offense

24  expense for Waimana Enterprises?

25  A    Well, judging from what I see there where you have

1   Hardware Hawai'i, Home Depot, Aaron's Dive Shop, and Sports

2   Authority, I must have been working on something in the office.

3   One of the stress reducers that I -- that works for me is I am,

4   I would guess I would say, handy with my hands.  I change

5   toilets.  I install sinks.  I install floors.  So when I find

6   something that is useful, whether it's at Home Depot or

7   Hardware Hawai'i or Aaron's Dive Shop, I will pick it up and

8   bring it and use it in the office.

9   Q    Do you recall what you bought at Aaron's Dive Shop for

10  Waimana?

11  A    Not in '09.  That's six years ago.  But at the time this

12  was done I'm sure I recalled it because it would be at the end

13  of the month.

14  Q    Okay.  So that's actually -- thank you for clarifying

15  that.

16        At the time you would go through these charges you

17  would have a clear recall of what each charge is for.

18  A    I'd have a better recall.  There were times when I didn't

19  have the recall I needed, and I would ask Nancy to get ahold of

20  American Express, and they would call the vendor to find out

21  what it was and they'd get back to me.

22        But for the most part that's partly why this process

23  worked all these years is that it was -- the American Express

24  card has to be paid off every month; so the charges were -- and

25  the charges are recorded pretty quickly; so I had the best shot

1   at recalling what it was.

2   Q    Okay.  Which explains why Nancy Henderson wanted to

3   download the bill to get a head start on talking with you about

4   each of the charges.

5   A    Nancy wanted to download the bill because it had to be

6   turned around quickly, and she wanted to get it separated and

7   sent out -- the other sections sent out to the office people

8   that were responsible for it.

9   Q    Now, we talked about this loan to shareholder.  You repaid

10  the loan at the end of 2012; is that correct?

11  A    Yes.  I think there were some partial payments prior to

12  that but.

13  Q    And in order to get the money, you basically declared a

14  dividend from one of your companies; is that correct?

15  A    Yes.

16  Q    And you had your company pay you a million dollars;

17  correct?

18  A    And I paid the taxes, yes.

19  Q    Well, let's break it down.  You did declare a dividend,

20  and they gave you $1 million; correct?

21  A    Yes.

22  Q    You then paid those taxes on the $1 million as if it were

23  a dividend; correct?

24  A    Yes.

25  Q    And then you used the after-tax portion of that to pay off

1   the loan; correct?

2   A    I used the portion -- the after-tax portion that was now

3   personal funds to me, and I paid off the loan, yes.

4   Q    And you talked yesterday a bit about your vision and what

5   created the company that you run; correct?

6   A    Yes.

7   Q    And, in fact, you've been interviewed by various media

8   people about your business philosophy; is that correct?

9   A    Unfortunately, yes, they were able to get to me.

10  Q    I'm not sure what you mean by that.

11  A    I normally don't give interviews.  That's not something

12  that I have the time or the inclination to do.  But every once

13  in a while a reporter is able to, for whatever reason, get to

14  me.

15  Q    And you told the reporter that your philosophy was, quote,

16  I dream up something and then scheme and scheme until I find a

17  way to make it happen, closed quote.

18  A    That's a one sentence of an article that the reporter from

19  *Forbes* -- because I recognize that -- had been writing for four

20  years.  I was putting her off for four years.  She told me she

21  was going to run the story.  And that portion of the quote that

22  you just gave was about the -- actually, the whole quote is "I

23  dream about what Hawai'i can be, and then I find a way to make

24  it happen."

25            And she said, "So you scheme a way to make it

1    happen?"  And I said, "I dream a way of what Hawai'i should be,

2    and I find a way to make it happen.  And if you believe it's

3    scheme, then you can write 'scheme.'"  But the whole quote is I

4    dream a way of how Hawai'i should be, and then I find a way to

5    make it happen, yes.

6    Q    Okay.  Thanks for the clarification, but the way it read

7    in the article is "I dream up something and then scheme and

8    scheme until I find a way to make it happen."  That's how it

9    appeared in print; correct?

10   A    If you say so, or you can put it up on the screen.  I'll

11   look at it.

12        You know, Mr. Tong, I'm sure you have been misquoted

13   in the press many times.  That's one of the reasons I try very

14   hard not to speak to the press because they have a tendency to

15   take what they want and put it in and not present fairly what I

16   say.

17   Q    Fair enough.  Thank you very much.

18   A    Thank you.

19                    RE-DIRECT EXAMINATION

20   BY MR. TOSCHER:

21   Q    May it please the Court.  Ladies and gentlemen, good

22   morning.

23        Good morning, Mr. Hee.

24   A    Good morning.

25   Q    A few questions.  The -- Mr. Tong was questioning you

1   regarding the Mauna Lani trip.  And did you believe there was a

2   business purpose for the Mauna Lani trip?

3   A     Yes.

4   Q     Would you explain to the jury why there was a business

5   purpose for that trip.

6   A     In February of that year I suffered a heart attack.  It

7   is -- it was unexpected.  I was working with my father on the

8   weekend out at the Mililani property, and I started suffering

9   chest pains.  I went to the test house because I didn't want to

10  excite my father, and the chest pains disappeared.  I mean, it

11  was -- it was as sudden as it came:  just disappeared.

12          So we finished working, walked the dogs.  We went to

13  dinner at Zippy's because my father had -- works with me on the

14  weekends, Saturday and Sunday, and he doesn't get paid.  So I

15  bought him a meal.  Took him home.

16          My wife was -- I was -- my wife was in Japan; so when

17  I went home, I was home alone.  I took a shower, thought I

18  should take it easy, laid down in bed, and immediately started

19  having chest pains again.  I got up, jumped in the car, drove

20  to the hospital.  And they told me I was suffering a heart

21  attack.

22          Because there is no heart disease in my family, it

23  was very, very unsettling.  I knew that -- I knew that the

24  stress was -- would shorten my life.  Excuse me.  But I didn't

25  think that it would be what, 56.

1          So I started making immediate plans.  I drew up a

2    will, started moving on the succession planning.

3          You know, at that time the company was over a hundred

4    people.  There were -- it was important that the company

5    survive because they had a hundred employees.

6          So as soon as I could, I was able to get all the kids

7    together and took that time to explain to them why it's

8    important.  So that was the Mauna Lani trip.

9    Q     Okay.  I appreciate, Mr. Hee.

10         So you were concerned about the business and your

11   health, and I think you testified before this was one of the

12   few times you were able to get all the kids together?

13   A     Yes.  The only times that I could get the kids together

14   were on the summers, generally.  There were some times I could

15   get them together at one of the breaks.

16   Q     Right.  And did you have discussions with your children

17   during that weekend regarding the business?

18   A     Fairly serious discussions about it.  You know, one of the

19   things that I try to do in training my kids is to not impart a

20   heavy burden.  And so that -- you know, I sat there and

21   listened to my kids get called as witnesses against me.  And,

22   you know, it's -- it's interesting because they don't feel it's

23   a heavy burden, and that's exactly how I want them to

24   understand the company.  If I thought that my kids would have

25   to work the way I work, I would not pass this company on.

1          So, yeah, we took the time and we talked about it,

2    but it takes time when you try to impart this without making it

3    too heavy.  So that's why I took four days, five days, whatever

4    it was.

5    Q    Throughout all these years, Mr. Hee, starting when the

6    kids were in college or even before, were you trying to train

7    them to take over the company?

8    A    Yes.  They -- you know, as I said, they are the best shot

9    at being able to have this company remain mission-oriented

10   rather than bottom-line oriented.

11   Q    And have you -- what have you tried to do to help ensure

12   that they would come back to the company and do what you wanted

13   them to do?

14   A    You know, part of the reason that I gave them their

15   salaries, and their salaries, the reason that I came up with

16   that is because I was paid while I was at the Naval Academy.

17   And as Mr. Tong pointed out, I did not seek the advice on --

18   from my vice president of administration as far as setting that

19   salary because how do you set the salary on something that is

20   not normal when you talk about succession planning and

21   imparting the mission, imparting that this is something you

22   don't learn in MBA school.  This is something you learn because

23   you're Hawaiian or you're from Hawai'i.

24          So at the Naval Academy I received half of an

25   ensign's pay, and, when I graduated, that pay was doubled.  And

1    that's what I did with my kids.  It was in part to make sure

2    that they understood their obligations.  It was in part to

3    induce them to come back and accept the obligations and the

4    challenges of ownership and direction for a mission-oriented

5    company.

6    Q    The -- let's -- I want to ask you a few questions about

7    some of the other trips that Mr. Tong questioned you about.

8              The first one was the trip that Wendy and Liko and, I

9    believe, Mika, Liko's now husband, were on to go to the Alcatel

10   plant in Calais, France.  Could you tell us what was going on

11   with the company and Alcatel and why you thought it was

12   appropriate to send Wendy, Liko, et cetera.

13   A    At the time we had -- we were in the queue of getting the

14   cable manufactured.  As you heard from my wife, that is

15   something that takes years of planning, and we had to hang onto

16   that slot.  They were not -- I became aware a few months

17   earlier that the cable was not being manufactured to the

18   specifications I had laid out, and specifically because the

19   existing cables in Hawai'i had been cut, I had laid out

20   specifications that in less than 60 meters, or a hundred plus

21   feet, that the cable would be armored -- double armored, which

22   means it's encased in two steel cables so that, if it was

23   hooked by an anchor, as occurred off of Moloka'i on one of the

24   cables, that the cable would not break.

25             And it came to my attention, or actually came to the

1   project manager's attention, who brought it to me, that

2   Alcatel-Lucent was manufacturing it with single armor and not

3   double armor, as I had specified.  So we were in a contract

4   dispute.

5           I needed to know what kind of options I had as far as

6   resolving this contract dispute.  After my wife and my daughter

7   and my now son-in-law returned and told me that it was

8   impossible to get another slot to remanufacture the cable, it

9   would take years, I had to make a decision on how to resolve

10  this dispute because they could not -- the way the cable is

11  manufactured is each length between the islands, what they do

12  is because it's specified as double armor, single armor, no

13  armor, and then when it comes back closer to the next island,

14  it's single armor, double armor, and then up into the -- then

15  single armor again and up into the shore.  These sections have

16  to be done just like that, and then it's coiled and then they

17  move on to the next section, and they do it for the next

18  segment between -- the first one was Big Island to Maui.  Then

19  you have Maui to Moloka'i.

20          And so each segment had to be manufactured this way.

21  It's not like you manufacture one long cable and then you cut

22  it up.  It has to be manufactured exactly correct.  Otherwise,

23  when they lay it, it may not reach shore.

24          So when they returned and told me that I couldn't get

25  another slot, I had to find a different way to resolve the

 1    contract dispute with the shipping company, who was responsible
 2    for ordering the cable and loading it on and laying it.
 3    Q    So when you say another slot, are you talking about
 4    another slot or scheduling for the production of the cable?
 5    A    Yes.  There's only -- to my knowledge there are only -- at
 6    that time there were two factories that manufactured undersea
 7    cable.  And, you know, they -- you have to get in a slot years
 8    in advance.  And if you, for some reason, miss that slot or
 9    pull out of the slot, you're talking about another delay of a
10    couple years.
11    Q    All right.  I think there was testimony that -- and you
12    talked about on this trip, Liko's then boyfriend and now
13    husband, Mika, was with them.  Did you think that was an
14    appropriate business reason -- business purpose to include him?
15    A    It was absolutely important.  As you heard -- and, you
16    know, I've been dating and married my wife since high school.
17    Over the years it has become blatantly apparent to me that my
18    wife cannot travel well.  Many times I've gone to the airport,
19    prior to TSA and all of this when you could go to the gate, to
20    pick her up, and everybody would get off the plane, the
21    cleaners would go on the plane, the cleaners would come off the
22    plane, and I figured that she missed the plane.  And then she'd
23    come staggering out.  She was sick and was in the bathroom.
24           As you heard her testify, she was sick from the train
25    ride from Paris to Calais.  So when I send my wife on trips, I

1   want to have someone with her:  either my son, or in that case

2   my son-in-law.  And that's why my son-in-law accompanied them

3   to that trip in France.  That's why my son-in-law accompanied

4   them to the inauguration trip.  It's not -- if I'm not there, I

5   want somebody there that, if she gets sick, can take care of

6   her.

7   Q    All right.  The -- let me shift over to the trip to Disney

8   World or Epcot where I think it was Liko, I think maybe Mika

9   was there, and that Ho'o and a friend, where they went to --

10  saw the Raytheon ride or exhibit.  Could you tell us how that

11  trip came about.

12  A    Yes.  We were -- we were, I believe, already in the

13  partnership with Raytheon for the emergency network on the

14  neighbor islands.  The chairman of Raytheon made a special trip

15  out to Hawai'i to have lunch with me to talk about it.  He made

16  a personal request at the lunch that I go and look at this ride

17  and that -- or display that they had.  He felt it was very

18  important.  And as you heard from Mr. Patterson, that was his

19  pet project.  I told him that I could not make it, but I would

20  make sure that somebody would go there and look at it that I

21  could rely on.  And I thought it was appropriate, since it was

22  a personal request from the chairman of Raytheon, to send my

23  children.

24  Q    Now, the chairman of Raytheon was somebody different than

25  Torkel Patterson; is that correct?

 1   A     Yes.  It was Torkel Patterson's boss.

 2   Q     Do you remember the chairman's name, Mr. Hee?

 3   A     I'm sorry, I don't.

 4   Q     You mentioned on cross-examination your father.  Does your

 5   father do any work for the company now?

 6   A     My father, true to form, every weekend I pick him up and

 7   we go out to the Mililani property, and he cuts the grass:  160

 8   acres of grass.  It gives him something to do.  But, you know,

 9   when I was growing up and he was working for the Board of Water

10   Supply and he had control of operations and there would be a

11   water main leak on the weekends, he'd call me to go -- if he

12   couldn't get enough men, he'd call me to go run the machines.

13   And that's just the way my father is, and that's just the way I

14   am.  If it's daytime, it's work.

15   Q     Is he doing this currently now?

16   A     Yes.  Actually, I think the most upsetting thing about

17   this trial for him is that it's interrupted the schedule of me

18   being able to pick him up and take him out there Saturdays to

19   cut the grass.

20   Q     Has he done this for the last how many years can you tell

21   us?

22   A     15.

23   Q     Is he paid anything by Waimana or Sandwich Isles for doing

24   this work?

25   A     No.

1          MR. TOSCHER:  I have no further questions, Mr. Hee.

2                      RE-CROSS-EXAMINATION

3    BY MR. TONG:

4    Q    And so we're clear, when you go to Zippy's with your dad,

5    you tend to deduct it as a business expense; correct?

6    A    I put down that it is a meal with my father and what it's

7    for.  What the accountants do with it, the accountants do with

8    it.

9    Q    This France visit, you said that it was an important trip

10   because you were having these contract issues; correct?

11   A    Yes.

12   Q    And you did have the vice admiral of the United States

13   Navy on your staff at the time, did you not?

14   A    I believe he was still the head of SIC, but this was a

15   ClearCom project.

16   Q    And you didn't send Admiral Kihune to go inspect the

17   cables, did you.

18          That calls for a yes and no.  I see you winding up

19   for an explanation.  You didn't send him.

20   A    I think if you really want to know, it takes some

21   explanation.

22   Q    Well, I'd like to know first:  You didn't send Admiral

23   Kihune to deal with this fiber optic cable issue, did you.

24   A    No.

25   Q    And you did hear him say that one of his commands was over

1    the entire Pacific fleet, and that he was responsible for fiber

2    optic matters.

3    A    Those are two different commands.  He was -- he was third

4    fleet commander at one time, which is all of the ships in the

5    Pacific.  And at another time he was assigned to NATO staff and

6    was in charge of the communications in Europe.

7    Q    And while we're on the Navy, you said you got the idea of

8    paying your children a salary while they were in school based

9    on your experience as a student at the United States Naval

10   Academy; correct?

11   A    Yes.

12   Q    You're not equating yourself with the United States

13   government, are you?

14   A    I don't think that that's what I said, but --

15   Q    I don't think you did either.  I want to make sure.

16   A    But I will tell you that that's one of the more troubling

17   things about this is that you, representing the United States

18   government, thinks that I would cheat you.

19   Q    Well, ultimately, the jury's going to make that decision,

20   aren't they.

21   A    Yes, they are.

22   Q    All right.  And when you went as a student at the Naval

23   Academy, you mentioned you had to sign all kinds of contracts

24   about your service back to the country; correct?

25   A    It was just one piece of paper.

1   Q    And there was no written contract with any of your
2   children saying you have to come back to Waimana and work for
3   me, was there.
4   A    No, there wasn't.  But, you know, Mr. Tong, I don't know
5   if you have children, but anybody can ask my children:  I'm not
6   so sure that they wouldn't have liked to have another parent
7   because my children are being raised to understand their
8   obligations, and it's a lot more difficult the way they're
9   being raised than their friends are.  So I don't need something
10   written with my children, just like I don't need a promissory
11   note that I know I have to repay a loan.
12   Q    I gather you have ways of instilling obligations in them.
13   That's what you're saying; right?
14   A    That's part of the management and ownership training, yes.
15   Q    Right.  And while we're on that, I'm sorry for your heart
16   attack.
17   A    Oh, I bet you are.
18   Q    I actually am, Mr. Hee.
19   A    Well, thank you.
20   Q    And you raised it as a justification for a four-day trip
21   to Mauna Lani; is that correct?
22   A    I raised it as a justification for speeding up the
23   succession planning with my children, which occurred on the
24   four-day trip at Mauna Lani, yes.
25   Q    And I certainly gather from your testimony that those four

1   days must have been pretty emotional for you; is that correct?

2   A    No.  I try to keep it light in front of my children.  I

3   don't want them to be concerned about my health.

4   Q    But the focus of it was on succession planning; correct?

5   A    Which should not be emotional, yes.

6   Q    And you heard your daughter Ho'o say she did not recall

7   any discussion about succession planning during that trip;

8   correct?

9   A    Yes.  And I understand it to mean that I was pretty

10  successful that she wasn't bombarded by it and she felt this

11  was just another day with dad.

12  Q    Or perhaps that your words fell on deaf ears?

13  A    I don't think my words fell on deaf ears.  Perhaps you'd

14  like to think so, but they didn't.

15        MR. TONG:  Thank you very much.  I appreciate your

16  answers.

17        THE WITNESS:  Thank you.

18              FURTHER RE-DIRECT EXAMINATION

19  BY MR. TOSCHER:

20  Q    Just one final question, Mr. Hee, because Mr. Tong didn't

21  want you to give an explanation.  Why didn't you send Admiral

22  Kihune to France?

23  A    Bob's wife has very serious health issues.  He was cutting

24  back on his travel schedule.  It wasn't necessary for his

25  expertise to be used.  Originally, we were going to send the

1  project managers for ClearCom, but because they were in the

2  process of doing the cable landings on the shore on each island

3  and other construction matters, they felt that it wasn't

4  opportune.  The information I needed about the factory was very

5  capably handled by my wife and my daughter.  It was a matter of

6  scheduling.  And so they were very much qualified to bring back

7  that information to me.

8            MR. TOSCHER:  Thank you.  No further questions.

9            THE COURT:  Okay.  No further questions.

10           So, Mr. Hee, you can step down.

11      (Witness excused.)

12           MR. TOSCHER:  Your Honor, defense calls Mr. Dave

13  Gierlach, Father Dave Gierlach.

14      (Witness photographed.)

15           THE CLERK:  Please raise your right hand.

16      (Witness sworn.)

17           THE CLERK:  Thank you.  Please be seated.

18           Please state your name and spell your last name.

19           THE WITNESS:  David Gierlach, G-i-e-r-l-a-c-h.

20                      DIRECT EXAMINATION

21  BY MR. TOSCHER:

22  Q    May it please the Court, ladies and gentlemen.

23           Good morning, Mr. Gierlach.  What is your current

24  occupation?

25  A    I'm an Episcopal priest.

1    Q     And the proper salutation for you is Father Gierlach?

2    A     You can, yes.

3    Q     Okay.  Then I will, if that's the -- could you tell us

4    what you do as an Episcopal priest.  What parish?

5    A     I'm the rector, which means the priest in charge, of an

6    inner city parish in Palama:  St. Elizabeth's Episcopal Church.

7    Q     And where is it located?

8    A     In Palama.

9    Q     Where is that compared to where we are?

10   A     About two miles up the road.

11   Q     Just want to make sure we have the -- and how long have

12   you been doing that, sir?

13   A     I've been a priest since 2007.  I've been the rector at

14   St. Elizabeth's since 2009.

15   Q     And before you became a priest, did you have another

16   occupation?

17   A     I did.  I am still and was an attorney.

18   Q     Okay.  And do you still practice law now?

19   A     I have not since 2011.

20   Q     But you're still licensed as a lawyer?

21   A     I am; although, inactive.

22   Q     Okay.  Where were you born?

23   A     New York, Upstate New York.

24   Q     And when did you first come to Hawai'i?

25   A     In 1981.

1   Q    And what brought you to Hawai'i?

2   A    It wasn't Upstate New York.

3   Q    Were you just finishing law school, or where were you in

4   your college career at that time?

5   A    I had already completed my bachelor's degree from SUNY

6   Binghamton and was with the Maryknoll Fathers at the time,

7   studying to be a Roman Catholic priest.  And having finished my

8   theology education, I was sent to Latin America for language

9   studies, and it was there that I determined that being a Roman

10  Catholic priest, with its obligations of celibacy, was not

11  going to work for me.  I had a cousin here at the time who was

12  living here, and he invited me to stay.

13  Q    And where did you go to law school?

14  A    Here.

15  Q    Richardson?

16  A    Richardson, yes.

17  Q    What year did you graduate?

18  A    1989.

19  Q    1989.  So tell us, did you practice law from 1989 till

20  2011?

21  A    '11.  I did.

22  Q    Tell us the nature of your practice.

23  A    I had a general trial practice; so did just about

24  everything.  Practiced in this court and in our state courts.

25  Q    Okay.  Do you know the defendant Albert Hee, sir?

1    A    I do.

2    Q    Do you recognize him?

3    A    I do.

4    Q    Can you tell us how you came to know Mr. Hee.

5    A    I think it was about 20 years ago Al came and spoke to

6    myself and the lawyer with whom I shared offices about handling

7    an appeal of an issue that arose on the Big Island.  And we

8    took that case, and I did the appellate work.

9    Q    And how long did that representation last?

10   A    A couple of years, I think.

11   Q    And after that did you continue to have any relationship

12   with Mr. Hee?

13   A    Well, Al -- you know, you represent a lot of people as a

14   lawyer, and thankfully a few of them become friends.  And Al

15   was one of those few who just became a good friend.  I liked

16   him.  I admired him.  I thought he was a very smart guy,

17   creative, and a really nice guy.  So we became friends and have

18   been so for over these 20 years.

19   Q    Have you had any dealings with him in your current

20   capacity at the church?

21   A    I have.  Over the last number of years, we have a great

22   number of ministries.  We're surrounded by public housing, a

23   lot of new immigrants.  So we're always looking for help to

24   fund various ministries, and I've asked Al on more than one

25   occasion to do that, and he and his companies have quite

1    generously helped us from time to time.

2              MR. HARRINGTON:  Objection, Your Honor, to the extent

3    that we're getting into specific instances under 405 specific

4    acts.  I believe this is a character witness.

5              THE COURT:  Okay.  Well, he's answered.  I hear you.

6    We'll be paying attention, all of us, to this.

7              MR. TOSCHER:  Okay.

8              THE COURT:  It's a little late.

9    BY MR. TOSCHER:

10   Q    Father Gierlach, over the time of your legal

11   representation with him, your friendship with him, and the

12   dealings you've had through your current occupation in the

13   ministries, have you gotten to know Mr. Hee?

14   A    Yes.

15   Q    Are you able to form an opinion as to his character trait

16   for truthfulness?

17   A    Yes.

18   Q    Do you have an opinion?

19   A    I do.

20   Q    What is that opinion, sir?

21   A    That he is and has been in all of my dealings with him

22   truthful.

23             MR. TOSCHER:  No further questions, Your Honor.

24             THE COURT:  Any cross-examination?

25                             CROSS-EXAMINATION

1    BY MR. HARRINGTON:

2    Q    Good morning, Mr. Gierlach.

3    A    Good morning.

4    Q    So you said that you were an attorney up until 2011, or

5    you were actively practicing until 2011; right?

6    A    Actively practicing until 2011.

7    Q    And you did criminal defense work as well?

8    A    Among other things, yes.

9         MR. HARRINGTON:  Thank you.  I have no further

10   questions.

11        MR. TOSCHER:  No questions, Your Honor.

12        THE COURT:  Okay.  Then the witness is excused and

13   may step down and leave the courtroom.

14   (Witness excused.)

15   (Witness photographed.)

16        THE CLERK:  Please raise your right hand.

17   (Witness sworn.)

18        THE CLERK:  Thank you.  Please be seated.

19        Please state your name and spell your last name.

20        THE WITNESS:  Curt Pa'alua Kwai Fong Kekuna,

21   K-e-k-u-n-a.

22                    DIRECT EXAMINATION

23   BY MR. TOSCHER:

24   Q    May it please the Court.  Good morning.  Ladies and

25   gentlemen.

```
 1              Mr. Kekuna, what is your current occupation?
 2    A    I'm a pastor at a church.  Am I allowed to say the church?
 3    Q    Yes.  What church --
 4    A    Kawaiaha'o Church.  It's right downtown.
 5    Q    How long have you had that position?
 6    A    Eleven years.
 7    Q    And what did you do -- let me ask you this before I go on.
 8    What is the proper salutation for you?  Can I call you
 9    Mr. Kekuna or is there another one?  I just want to make
10    sure --
11    A    Oh, you're fine any way.  Curt is my preferred.
12    Q    Okay.  We'll go with Mr. Kekuna.
13    A    Mr. Kekuna?  Okay.
14    Q    Mr. Kekuna.
15    A    Yes, sir.
16    Q    I want to actually say it right, too.
17    A    Mr. Kekuna.  Yes, sir.
18    Q    Mr. Kekuna.  Now, prior to your current position at the
19    church, can you take us back.  What did you do before that?
20    A    I was a chaplain of Kamehameha Schools on the Big Island.
21    Q    And how long was that for?
22    A    A year.
23    Q    And before that?
24    A    I was a teacher at the Kamehameha Schools Middle School
25    Christian Education.
```

```
 1   Q    Okay.  For how long did you do that?

 2   A    Two years.

 3   Q    Let me go back a little bit.  Where were you born, sir?

 4   A    Kapiolani Hospital.

 5   Q    Okay.  And the year you were born?

 6   A    Oh, okay.  1948.

 7   Q    Okay.  Just wanted to set an age.

 8        All right.  Now we're going to start from the

 9   beginning.

10   A    Oh, please.

11   Q    No, no.  Okay.  Have you lived in Hawai'i your entire

12   life?

13   A    Pretty much.  Except for the time that I went away to

14   school, I've been in Hawai'i the rest of my life.

15   Q    And where did you go away to school?

16   A    I went to Whitworth University in Spokane, Washington, and

17   then to Fuller Theological Seminary in Pasadena, California.

18   Q    And what year did you graduate the seminary?

19   A    1973.

20   Q    And have you been since 1973 in the religious field or

21   religious business?

22   A    Yes, sir.

23   Q    Different ministries?

24   A    One.

25   Q    Same one.
```

1  A     Yes, the same one for 30 years, yes.

2  Q     And which one is that?

3  A     It's called Young Life Hawai'i.

4  Q     So tell us just very briefly what you do now in your

5  ministry.

6  A     I'm a pastor of Kawaiaha'o Church, and I'm tasked with

7  several things:  with doing the priestly functions, I serve in

8  communion doing prayers, counseling, doing the messages --

9  weekly messages, running Bible studies, and so forth.  And

10 then -- and other than that, it's the intangibles that every

11 occupation comes with, especially if you're a pastor, which

12 runs everything from washing dishes all the way to cleaning the

13 yard to picking up messes.  So that's what we do.

14 Q     Do you know the defendant Albert Hee?

15 A     Yes, I do.

16 Q     Do you recognize him in court today?

17 A     Yes, I do.  I don't usually see him in suits.  That's why

18 I hesitate.

19 Q     Can you tell us how you first met Mr. Hee.

20 A     As I recall -- it's been almost 40 some odd years -- a

21 mutual friend introduced us, and we had lunch.  And that's how

22 I met him.  It was almost after I first returned home in the

23 '70s sometime.

24 Q     And can you describe over the 40 years what kind of

25 interactions -- on what occasions have you had interactions

1    with him and in what circumstance?

2    A    I've been at different venues that he has been a part of,

3    and mostly in celebration of some kind of event raising up the

4    Hawaiian community, different events and so forth.  And that's

5    how we got to know each other because I like to support a lot

6    of those kind of events.  So we would see each other off and on

7    in those events.

8            And also had the privilege of having him assist us

9    at --

10            MR. HARRINGTON:  Objection, Your Honor, under 405.

11            THE COURT:  Sustained.

12            THE WITNESS:  What did I do?

13            THE COURT:  It's not your fault.  What happens is --

14    it's not your fault.

15            THE WITNESS:  Thank you, ma'am.

16            THE COURT:  It's -- the attorneys have rules of

17    evidence, and if they think something -- but it's not the

18    witness' problem to know all these rules.  It's really just

19    that they are concerned about the rules of evidence.

20    BY MR. TOSCHER:

21    Q    Okay.  Without describing specific instances, have you had

22    dealings with Mr. Hee through your current ministries?

23    A    Yes.

24    Q    Over the course of the years, would you say you've been

25    able to know Mr. Hee?

1    A    Yes.

2    Q    Are you a friend of Mr. Hee's?

3    A    I consider myself a friend of Mr. Hee's.  You'd have to

4    ask him if it's mutual.

5    Q    Have you had enough interactions with him over these years

6    to be able to form an opinion regarding his character?

7    A    Yes.

8    Q    And his character trait for truthfulness?

9    A    Yes.

10   Q    And do you have an opinion regarding his character trait

11   for truthful?

12   A    Yes.  In my dealings with him, absolutely.

13   Q    And what is that opinion?

14   A    Everything that we have done together, whatever he said he

15   is going to do, he has done.  I have found him to be -- no

16   matter what he represents, I found him to be straight on.  I

17   don't have to guess when I'm with him.  And that has to do with

18   several of the events that we've been a part of.

19             THE COURT:  I'm going to stop you there.

20   BY MR. TOSCHER:

21   Q    That's fine.  And just -- there's limitations --

22   A    Oh, really.

23   Q    -- Mr. Kekuna.  But that's fine.  It's not your fault.

24             THE COURT:  It's not your fault.

25             THE WITNESS:  I keep hearing that.  I'm feeling like

1   it's my fault.

2   BY MR. TOSCHER:

3   Q    Okay.   The -- and what is your opinion regarding Mr. Hee's

4   character for truthfulness?

5   A    It's excellent.   It's aboveboard.   I've never had reason

6   because of what he has done with us to question anything that

7   he's done or said.

8   Q    Okay.

9   A    It's been truthful.

10        MR. TOSCHER:   Thank you, Mr. Kekuna.   Pastor.   No

11  further questions.

12        THE COURT:   Wait, wait.   Hold on.   Sorry.   He's done.

13        Now the other side.

14        THE WITNESS:   Oh, my friend now.   Okay.

15                       CROSS-EXAMINATION

16  BY MR. HARRINGTON:

17  Q    Apologize for startling you earlier.

18  A    No problem, sir.

19  Q    I just want to clarify a few things.   You haven't been

20  sitting and watching this whole course of trial; right?

21  A    No.

22  Q    So you haven't seen the testimony that's been presented?

23  A    No.   I haven't seen anything.   No, sir.

24        MR. HARRINGTON:   Okay.   I have no further questions.

25        THE COURT:   Mr. Toscher, anything more?

1          MR. TOSCHER:  Nothing, Your Honor.

2          THE COURT:  Okay.  Then the witness is excused.

3          Thank you very much.  You can step down and leave the

4    courtroom.  Thank you.

5       (Witness excused.)

6          MR. TOSCHER:  We have one more quick witness, Your

7    Honor.

8          THE COURT:  Okay.

9       (Witness photographed.)

10         THE CLERK:  Please raise your right hand.

11      (Witness sworn.)

12         THE CLERK:  Thank you.  Please be seated.

13         Please state your name and spell your last name.

14         THE WITNESS:  Jim Duffy, D-u-f-f-y.

15                     <u>DIRECT EXAMINATION</u>

16   BY MR. TOSCHER:

17   Q    May it please the Court.  Ladies and gentlemen.

18         Good morning, Mr. Duffy.

19   A    (Nods head.)

20   Q    Could you tell us your present occupation.

21   A    I'm a lawyer by training.  For the last three years I

22   served as a mediator and an arbitrator, and I teach part-time

23   at the U.H. Richardson School of Law and serve as a mentor to

24   students there.  Before that I served as a justice on the

25   Hawai'i Supreme Court for nine years before I reached the

1    mandatory retirement age of 70.  And before that I served as a

2    trial lawyer for 35 years with the firm of Fujiyama, Duffy &

3    Fujiyama in private practice.

4    Q    Where did you grow up, Mr. Duffy?

5    A    I grew up in a little town in Minnesota, Rosemount,

6    Minnesota, which is right outside of St. Paul.

7    Q    And when did you first come to Hawai'i?

8    A    I first came to Hawai'i in 1968 right after I graduated

9    from law school.  I was recruited out here at that time, and I

10   was very happy to come and very happy to marry and make a

11   family out here and to live here.

12   Q    And where did you go to law school, sir?

13   A    I went to Marquette Law School, which is in Milwaukee,

14   Wisconsin.

15   Q    You've indicated you served nine years on the Supreme

16   Court of the State of Hawai'i?

17   A    That is correct, sir.

18   Q    Could you tell the jury what the Supreme Court of the

19   State of Hawai'i is.

20   A    Well, it's a court made up of five individuals, and that

21   is the highest appellate court in the State of Hawai'i.  And

22   what we do, primarily, was reviewing trial court decisions to

23   make sure that there was no error involved and that everybody

24   got a fair trial.  There were some other instances where there

25   might be election contests or something like that where we

1    might have original jurisdiction, but, primarily, it was

2    reviewing what happened down below to make sure everybody got a

3    fair shake.

4    Q    Do you know the defendant Albert Hee, sir?

5    A    I know him very well.

6    Q    Can you recognize him?

7    A    I do.

8              MR. TOSCHER:  Let the record reflect the witness

9    recognized him.

10              THE COURT:  It so reflects.

11   BY MR. TOSCHER:

12   Q    Can you tell us when you first met him.

13   A    Right.  I first met him in 1989.  His brother Clay is a

14   good friend of mine from the riding.  We're both cowboys in our

15   off hours.  Clay and I were putting on a rodeo in Waimanalo in

16   1989, and that's when I first met Clay.

17              And then it turned out that Al had offices in the

18   same building that I had offices in.  That's Pauahi Tower right

19   downtown here.  And so I would see Al in the elevator in the

20   years '90 to '95 fairly often.

21              And then in 1995, a year after my senior partner,

22   Wally Fujiyama, died, we decided to downsize our firm.  And

23   about that time Al was looking for more space for his company

24   and that; so he came up to our floor and we shared office space

25   on the 27th floor from 1995 until the time I was appointed to

1    the Hawai'i Supreme Court in 2003.  And during much of that

2    time Al's office was right adjoining to mine; so I got to know

3    him very well during that time.  I'd see him almost on a daily

4    basis.

5            And then after that appointment to the Court, I

6    wouldn't see Al on a daily basis, but we would meet for

7    breakfast or lunch on a regular basis.  So I feel that I know

8    Al Hee very well.

9    Q    During the time before you went on the Supreme Court when

10   you were a lawyer, did you have any legal representation with

11   Mr. Hee?

12   A    The only one I can recall is I believe I represented him

13   in one PUC hearing on a very last-minute type of basis.  But I

14   didn't do Public Utility Commission work on a regular basis; so

15   that was the only time that I recall I represented him.

16   Q    Did you ever have any business or contractual dealings

17   with him?

18   A    No.  Everything I had with Al Hee was on a handshake

19   basis.  In fact, when -- actually, I got nominated to the

20   United States Court of Appeals for the Ninth Circuit by

21   President Clinton in 1999, and the problem was I had two years

22   left on my lease and that.  And Al Hee came forward and said

23   I'll pick up the lease for you, and on a handshake basis he

24   went ahead and negotiated with the landlord and got me off of

25   the lease so I would be eligible for that appointment.

 1          The appointment didn't come through for political

 2   reasons and that.  There was -- a new president was elected of

 3   the opposing party; so my nomination was, you know, didn't go

 4   forward.  But Al came through, and all of that was on a

 5   handshake basis.

 6   Q    Would you consider Mr. Hee a friend of yours?

 7   A    Very much so.

 8   Q    Over the course of the years -- and it sounds like a long

 9   period of time -- have you had enough interactions with him to

10   form an opinion regarding his character for truthfulness?

11   A    I have.

12   Q    And what is that opinion, sir?

13   A    That opinion is excellent.  His word is golden.  He's

14   never gone back on anything that I have ever seen in all of my

15   over 25 years with him.  He's very upfront.  He tells it like

16   it is, whether it's politically correct or whatever.  I think

17   sometimes he could work on his tact and diplomacy a little bit,

18   but as far as telling the truth, there's no problem with that.

19          MR. TOSCHER:  No further questions, Your Honor.

20                        CROSS-EXAMINATION

21   BY MR. HARRINGTON:

22   Q    Good morning, Mr. Duffy.

23   A    Good morning.

24   Q    So just to get the time frame correct, I think you said

25   that you were appointed to the State Supreme Court in 2003?

1    A    That's correct, sir.

2    Q    So at that point you weren't sharing office space or next

3    door to Mr. Hee's firm anymore?

4    A    That's correct.

5    Q    So would it be fair to say that from 2003 and on you

6    weren't aware of what was happening in his business or even

7    running into him in the hall or anything like that; right?

8    A    I don't that's quite fair.  I certainly wouldn't be

9    running into him in the hall, but we would meet for breakfast

10   or for lunch, and I would ask him how is the business going,

11   and he would tell me about his vision.

12   Q    Sure.  Okay.  Okay.  So you would have breakfast with him,

13   but you wouldn't be seeing him every day at the office; right?

14   A    That's correct.

15   Q    Okay.  And as a former justice of the Hawai'i Supreme

16   Court, you'd agree that the jury's the one who is going to

17   determine the facts of this case; right?

18   A    Absolutely.

19   Q    And you haven't been sitting during the trial and

20   observing all the evidence that's come in; right?

21   A    That's correct.

22   Q    And the jury is going to be the ultimate deciders, taking

23   all the evidence and all the testimony, to decide whether a

24   crime was committed; is that right?

25   A    That's correct.  And let me say I tried cases for 35

1   years, and I had great faith in the jury system.  I think they

2   get it right.

3              MR. HARRINGTON:  Thank you.  I have no further

4   questions.

5              MR. TOSCHER:  No further questions, Your Honor.

6              THE WITNESS:  Thank you.

7              THE COURT:  Then thank you very much.  You're

8   excused.  Thank you.

9         (Witness excused.)

10             THE COURT:  Shall we take a break now?

11             MR. TOSCHER:  Yes, Your Honor.

12             THE COURT:  You're looking at me like -- okay.  We're

13   going to take a 10-minute break.  Okay?

14        (Jury excused.)

15             THE COURT:  Okay.  How many more witnesses?

16             MR. TOSCHER:  Your Honor, I want to talk to my

17   client, but I believe we are ready to rest.

18             THE COURT:  Okay.  You want a minute now to talk to

19   him?

20             MR. TOSCHER:  I thought we're going to take a break

21   to do it, but if the court --

22             THE COURT:  Okay.  Okay.  When I come back, you're

23   going to tell me.

24             MR. TOSCHER:  Yes, Your Honor.

25             THE COURT:  Okay.

 1            (Court recessed at 11:00 A.M., until 11:15 A.M.)

 2            (In open court without the jury:)

 3                 THE COURT:  Okay.  Mr. Toscher.

 4                 MR. TOSCHER:  Yes, Your Honor.  The defense rests.

 5                 THE COURT:  Okay.  Is there rebuttal?  Did you have

 6       something more?

 7                 MR. TOSCHER:  No, Your Honor.  I was just checking to

 8       make sure Mr. Hee was here.

 9                 MR. TONG:  No rebuttal, Your Honor.

10                 THE COURT:  Okay.  So evidence is closed.

11                 MR. TOSCHER:  That's correct, Your Honor.

12                 THE COURT:  Okay.

13                 MR. TOSCHER:  I do have a motion.

14                 THE COURT:  Okay.

15                 MR. TOSCHER:  Your Honor, we would respectfully move

16       for a motion under Rule 29 to dismiss all charges.  We think

17       there is not sufficient evidence of willful intent, corrupt

18       motive, and intentional conduct here.  We think even under the

19       very generous standard that the government has at this point

20       there is insufficient evidence for it to go to the jury.  And

21       we respectfully request, for the reasons we said when we moved

22       for a directed verdict after the government's case in chief, we

23       think the evidence is stronger now that there isn't sufficient

24       evidence for the core elements of these crimes:  willful

25       intent, lack of good faith, corrupt motive to obtain unlawful

1    benefits, and we respectfully move for a directed verdict under

2    Rule 29.

3             MR. HARRINGTON:  Your Honor, the government's

4    position the only thing that's changed since the earlier

5    motions, we've had additional testimony, but it's for the jury

6    to decide what weight to give that testimony and the

7    credibility of the witnesses who have testified.  There's still

8    evidence, just as there was in our case in chief, to support

9    the charges and to survive a Rule 29 motion.  There's evidence,

10   both direct and circumstantial, defendant's involvement in the

11   enterprise to take these certain business deductions, how that

12   went through the CPAs, and again, the only thing that's changed

13   is defendant's taken the stand.  It's for the jury to decide

14   whether they are going to believe his testimony or not.  And

15   that's the jury's decision on credibility issues.

16            THE COURT:  Okay.  You'll get the last word.

17            MR. TOSCHER:  Nothing further, Your Honor.

18            THE COURT:  The motion is denied.  I think that

19   there's enough for the jury to make its decision as to whether

20   or not Mr. Hee is not guilty or guilty.  Motion is denied.

21            Now, I did have my law clerk give you folks copies of

22   the instructions, and looks to me like I can use the first

23   page, take out the second page.  I can, in other words,

24   instruct before closing.

25            With respect to the proposed instruction after what

```
 1    is numbered page 12 -- that was the one that was held in
 2    abeyance.  Wait.  Hold on.  What page is it?  Is it right
 3    before page 12?  Yeah, right before page 12.
 4              So I don't think any of this applied.
 5              MR. TOSCHER:  Agreed, Your Honor.
 6              THE COURT:  So the one about a witness being
 7    discredited by evidence of the general reputation of the
 8    witness is withdrawn; is that correct?  I think it was.
 9              Is anybody requesting that?
10              MR. TONG:  No, Your Honor.
11              THE COURT:  No?  Okay.  Then I'm not going to give
12    it.
13              And with that I think the instructions are in order,
14    unless anybody had any comment on the instructions.
15              MR. TOSCHER:  Your Honor, I'm just reading them right
16    now.  What is the Court's preference regarding what she would
17    like to do in terms of --
18              THE COURT:  Well, okay.  I'm trying to think whether
19    we could actually do instructions and closing.  And I think if
20    they came back at 12:30 -- okay.  They're out now.  If they
21    came back at 12:15, we might be able to do it.  It's a
22    little -- I'm trying to work in the breaks.  So if they came
23    back at noon -- I think we should tell them to come back at
24    noon, take a really short lunch, and then I think I can
25    instruct and you can complete your closings today, and then
```

1    they'll have all day tomorrow to deliberate.  So that's my

2    proposal.

3              Is there agreement on the verdict form?

4              MR. TOSCHER:  Your Honor, we exchanged.  We

5    haven't -- no, we haven't yet.  We haven't had a chance to talk

6    about -- we sent them -- they gave us theirs.  We sent them our

7    proposal.  But we'll talk about that.

8              THE COURT:  Okay.  Do it fast.

9              And what did you folks talk about in terms of an

10   indictment?

11             MR. TOSCHER:  We didn't get a chance to talk.  But

12   given the fact that the indictment has been substantially

13   changed, we don't think it's appropriate to go to the jury.

14             THE COURT:  I'm thinking just don't send it in.

15             MR. HARRINGTON:  Agreed, Your Honor.

16             THE COURT:  Okay.  So you folks need to figure out

17   what you're doing with the verdict form.  You definitely want

18   to know what's in the verdict form before you do your closing

19   argument.

20             So counsel come back ten to 12:00, and I'll have the

21   jury come back at noon, and then my hope is that I can instruct

22   them right at noon, and then we'll go right into closing

23   arguments.

24             MR. TOSCHER:  Your Honor, can we stay in the

25   courtroom now?

1          THE COURT:  Yeah.  I mean, now?  Right now?

2          MR. TOSCHER:  So we don't have to leave and -- in

3    other words, we can stay and work here in the courtroom.

4          THE COURT:  I think they're going to want to --

5          MR. TOSCHER:  Well, it's up -- that's what I'm

6    asking.

7          THE COURT:  She's going to let you do that.  Okay.

8    But the public can't stay while we're on the lunch break.

9          Okay.  You got to work that out with the courtroom

10   manager.

11         MR. TOSCHER:  Thank you, Your Honor.

12         THE COURT:  So we're going to tell the jury to come

13   back at noon.  I'll see counsel at ten to noon.  Thank you.

14        (Court recessed at 11:21 A.M., until 11:54 A.M.)

15        (In open court without the jury:)

16         THE COURT:  Okay.  Is this an agreed-upon verdict

17   form that I have now?  We're not putting in the indictment; so

18   it may be that we need to do it count by count, especially for

19   Counts 2 through 7, which have the tax years.

20         MR. HARRINGTON:  So which one are you looking at?

21         THE COURT:  I'm looking -- so what I got from the

22   government was Count 1, not guilty/guilty; Count 2, not

23   guilty/guilty.  But, remember, they're not going to have the

24   indictment.  So now what I have, which I assume is the defense

25   format --

1          MR. TOSCHER:  Correct, Your Honor.

2          THE COURT:  -- is a little description of each count.

3    So keeping in mind that we're not sending in the indictment,

4    what is your position on this?

5          MR. HARRINGTON:  The jury will be getting a copy of

6    the jury instructions?

7          THE COURT:  Yes.  But -- I don't think it goes Counts

8    2 through 7 and puts each year down.

9          MR. HARRINGTON:  And I think that's what's missing;

10   so I think what we propose is just adding the year to each of

11   those counts, and I think that will clear up any potential

12   confusion.

13         So it's -- Count 1 I don't think needs any additional

14   description because Count 1 is a separate instruction.  Then it

15   would be Count 2 for the 2007 year, Count 3 for the 2008 year,

16   and so on.

17         THE COURT:  To me the less substance the better, but

18   I do understand that, without the indictment, we need to put

19   some I.D. in per count.

20         Okay.  So Count 1 can just be Count 1, can't it?

21         MR. TOSCHER:  You know, Your Honor, I think just

22   minimal description to help the jury just put -- it covers many

23   years.  You know, I thought this was pretty vanilla, what we've

24   proposed here, so they know what count it relates to.  We

25   think -- you know, Your Honor, I will go -- you know, the Court

1   has a way of doing things, and everybody does it a little

2   differently, but we thought this was, under the

3   circumstances -- all it does is say the code sections, guilty

4   or not guilty.

5           MR. TONG:  Your Honor, their verdict form is fine,

6   except they talk about tax returns in the plural.  They should

7   be singular.  Counts 2 through 7.

8           MR. TOSCHER:  Typo.  Thank you, Mr. Tong.

9           THE COURT:  So government's going to agree?

10          MR. TONG:  With that modification.

11          THE COURT:  With that modification?

12          Okay.  Then you need to do that right away so that

13  the jury --

14          MR. TOSCHER:  Right.  Can we get the electronic copy?

15          We will make the change and then e-mail it to the

16  court administrator, Your Honor.

17          THE COURT:  You can, yeah, if you e-mail it to my law

18  clerk, she can print it up.

19          MR. TOSCHER:  Thank you, Your Honor.

20          THE COURT:  Then agreed upon with the correction of

21  the word "returns," plural, to "return," singular, for each of

22  Counts 2 through 7.  And then we can have the jury.

23          Off the record.

24      (Discussion off the record.)

25      (Jury enters.)

1          THE COURT:  I know the jurors had to have a very

2    rushed lunch, but our goal today is to finish courtroom

3    proceedings.

4          So let me invite, in front of the jurors, Mr. Toscher

5    to repeat what was said when the jurors weren't here about

6    whether you have any more evidence to present in your case.

7          MR. TOSCHER:  May it please the Court.  Ladies and

8    gentlemen.  We have no further evidence.  The defense rests.

9          THE COURT:  And any rebuttal?

10          MR. TONG:  We have no rebuttal, Your Honor.

11          THE COURT:  Okay.  Thank you very much.

12          So the evidence is closed, and it is now my turn to

13    instruct you on the law.  Each of you has a copy of the

14    instructions.  I'm going to read them out loud.  You're free to

15    follow along.  This is your copy.  You can write on it, and you

16    can take it into the deliberation room with you.

17          Members of the jury:  You have now heard all of the

18    evidence in the case and will hear the final arguments of the

19    lawyers for the parties.  It becomes my duty, therefore, to

20    instruct you on the rules of law that you must follow and apply

21    in arriving at your decision in the case.

22          In any jury trial there are, in effect, two judges.

23    I am one of the judges; you, the jurors, are the other.  It has

24    been my duty to preside over the trial and to determine what

25    testimony and evidence is relevant under the law for your

1    consideration.  It is now my duty to instruct you on the law

2    applicable to the case.

3          You, as jurors, are the judges of the facts.  But in

4    determining what happened in this case -- that is, in reaching

5    your decision as to the facts -- it is your sworn duty to

6    follow the law that I am now defining for you.

7          You must follow all of my instructions as a whole.

8    You have no right to disregard or give special attention to any

9    one instruction or to question the wisdom or correctness of any

10   rule I may state to you.  That is, you must not substitute or

11   follow your own notion or opinion as to what the law is or

12   ought to be.  It is your duty to apply the law as I give it to

13   you, regardless of the consequences.

14         It is also your duty to base your verdict solely upon

15   the testimony and evidence in the case without sympathy, bias,

16   or prejudice.  That was the promise you made and the oath you

17   took before being accepted by the parties as jurors in this

18   case, and they have the right to expect nothing less.

19         The indictment or formal charge against a defendant

20   is not evidence of guilt.  Indeed, the defendant is presumed to

21   be innocent and does not have to present any evidence to prove

22   innocence.  The government has the burden of proving every

23   element of the charge beyond a reasonable doubt.  If it fails

24   to do so, you must return a verdict of not guilty.

25         While the government's burden of proof is a strict or

1   heavy burden, it is not necessary that the defendant's guilt be

2   proved beyond all possible doubt.  It is only required that the

3   government's proof exclude any "reasonable doubt" concerning

4   the defendant's guilt.

5          A reasonable doubt is a doubt based upon reason and

6   common sense and may arise from a careful and impartial

7   consideration of all the evidence, or from lack of evidence.

8   Proof beyond a reasonable doubt is proof that leaves you firmly

9   convinced that the defendant is guilty.

10          If, after a careful and impartial consideration with

11   the other jurors of all the evidence, you are not convinced

12   beyond a reasonable doubt that the defendant is guilty, it is

13   your duty to find the defendant not guilty.  On the other hand,

14   if, after a careful and impartial consideration with the other

15   jurors of all the evidence, you are convinced beyond a

16   reasonable doubt that the defendant is guilty, it is your duty

17   to find the defendant guilty.

18          As stated earlier, it is your duty to determine the

19   facts, and in so doing, you must consider only the evidence I

20   have admitted in the case.  The term "evidence" includes

21   (1) the sworn testimony of the witnesses; and (2) the exhibits

22   admitted in the record.

23          Remember that any statements, objections, or

24   arguments made by the lawyers are not evidence in the case.

25   The function of each lawyer is to point out those things that

1    are most significant or most helpful to that lawyer's side of

2    the case and, in so doing, to call your attention to certain

3    facts or inferences that might otherwise escape your notice.

4          In the final analysis, however, it is your own

5    recollection and interpretation of the evidence that controls

6    in the case.  What the lawyers say is not binding upon you.

7          There are rules of evidence that control what can be

8    received into evidence.  When a lawyer asks a question or

9    offers an exhibit into evidence and a lawyer on the other side

10   thinks that it is not permitted by the rules of evidence, that

11   lawyer may object.  If I overrule the objection, the question

12   may be answered or the exhibit received.  If I sustain the

13   objection, the question cannot be answered or the exhibit

14   cannot be received, and you must not speculate as to what the

15   answer might have been or what the exhibit might have shown.

16   Nor should you speculate as to the reason for any objection.

17   You must not consider for any purpose any offer of evidence

18   that was rejected, or any evidence that was stricken from the

19   record.  Such matter is to be treated as though you had never

20   known of it.

21         During the course of a trial I occasionally make

22   comments to the lawyers, or ask questions of a witness, or

23   admonish a witness concerning the manner in which he or she

24   should respond to the questions of counsel.  Do not assume from

25   anything I may have said that I have any opinion concerning any

1   of the issues in this case.  Except from my instructions to you

2   on the law, you should disregard anything I may have said

3   during the trial in arriving at your own findings as to the

4   facts.

5           Evidence may be direct or circumstantial.  Direct

6   evidence is direct proof of a fact, such as testimony of an

7   eyewitness.  Circumstantial evidence is indirect evidence; that

8   is, proof of a chain of facts from which you could find that

9   another fact exists, even though it has not been proved

10  directly.

11          While you should consider only the evidence in the

12  case, you are permitted to draw such reasonable inferences from

13  the testimony and exhibits as you feel are justified in the

14  light of common experience.  In other words, you may make

15  deductions and reach conclusions that reason and common sense

16  lead you to draw from the facts that have been established by

17  the testimony and evidence in the case.

18          You are to consider both direct and circumstantial

19  evidence.  The law permits you to give equal weight to both,

20  but it is for you to decide how much weight to give to any

21  evidence.

22          I have said that you must consider all of the

23  evidence.  This does not mean, however, that you must accept

24  all of the evidence as true or accurate.

25          You are the sole judges of the credibility or

1    believability of each witness and the weight to be given to his

2    or her testimony.   In weighing the testimony of a witness, you

3    should consider the witness' relationship to the government or

4    the defendant; the witness' interest, if any, in the outcome of

5    the case; the witness' manner of testifying; the witness'

6    opportunity to observe or acquire knowledge concerning the

7    facts about which the witness testified; the witness' candor,

8    fairness, and intelligence; and the extent to which the witness

9    has been supported or contradicted by other credible evidence.

10   You may, in short, accept or reject the testimony of any

11   witness in whole or in part.

12          Also, the weight of the evidence is not necessarily

13   determined by the number of witnesses testifying as to the

14   existence or nonexistence of any fact.   You may find that the

15   testimony of a smaller number of witnesses as to any fact is

16   more credible than the testimony of a larger number of

17   witnesses to the contrary.

18          The rules of evidence provide that, if scientific,

19   technical, or other specialized knowledge might assist the jury

20   in understanding the evidence or in determining a fact in

21   issue, a witness qualified as an expert by knowledge, skill,

22   experience, training, or education may testify and state an

23   opinion or opinions concerning such matters.

24          You should consider each expert opinion received in

25   evidence in this case and give it such weight as you may think

1    it deserves.  If you decide that the opinion of an expert

2    witness is not based upon sufficient education and/or

3    experience, or if you conclude that the reasons given in

4    support of the opinion are not sound, or that the opinion is

5    outweighed by other evidence, then you may disregard the

6    opinion entirely.

7         A witness may be discredited or impeached by

8    contradictory evidence, by a showing that the witness testified

9    falsely concerning a material matter, or by evidence that at

10   some other time the witness said or did something that is

11   inconsistent with the witness' present testimony or failed to

12   say or do something that would be consistent with the present

13   testimony had it been said or done.

14        If you believe that any witness has been so

15   impeached, then it is your exclusive province to give the

16   testimony of that witness such credibility or weight, if any,

17   as you may think it deserves.

18        You have heard the testimony of Internal Revenue

19   Service agents.  The fact that a witness is employed as an

20   Internal Revenue Service agent does not mean that his or her

21   testimony necessarily deserves more or less consideration or

22   greater or lesser weight than that of any other witness.  At

23   the same time, it is quite legitimate for defense counsel to

24   try to attack the believability of an Internal Revenue Service

25   agent on the ground that his or her testimony may be colored by

1    a personal or professional interest in the outcome of the case.

2              A defendant has a right not to testify.  If a

3    defendant does testify, however, the defendant's testimony

4    should be weighed and considered, and the defendant's

5    credibility determined, in the same way as that of any other

6    witness.

7              You have heard testimony that the defendant made

8    certain statements.  It is for you to decide (1) whether the

9    defendant made the statements; and (2) if so, how much weight

10   to give to them.  In making those decisions, you should

11   consider all of the evidence about the statements, including

12   the circumstances under which the defendant may have made such

13   statements.

14             Defendant Albert Hee is charged in Count 1 of the

15   indictment with corruptly endeavoring to impede the due

16   administration of the internal revenue laws in violation of

17   Section 7212(a) of Title 26 of the United States Code.  In

18   order for you to find the defendant guilty of this charge, the

19   government must prove each of the three following elements

20   beyond a reasonable doubt:

21             First, the defendant endeavored to obstruct or impede

22   the Internal Revenue Service's lawful functions to assess and

23   collect income taxes and investigate possible criminal

24   violations of the internal revenue laws; and

25             Second, the defendant's effort had a reasonable

1    tendency to obstruct or impede the due administration of the

2    internal revenue laws; and

3              Third, the defendant acted knowingly and corruptly.

4              "Corruptly" means to act with the intent to obtain an

5    unlawful benefit for himself or someone else.

6              To "endeavor" as used in Count 1, means to knowingly

7    and intentionally act or to knowingly and intentionally make

8    any effort that has a reasonable tendency to bring about the

9    desired result.

10             To "obstruct or impede" means to engage in some act

11   or to take some step to hinder, delay, or prevent the proper

12   administration of the internal revenue laws.

13             Whenever in any of these instructions on the law,

14   reference is made to a requirement that the government prove

15   that the defendant acted knowingly, an act was done knowingly

16   if the defendant was aware of the act and did not act through

17   ignorance, mistake, or accident.  You may consider evidence of

18   the defendant's words, acts, or omissions, along with all the

19   other evidence, in deciding whether the defendant acted

20   knowingly.

21             Defendant Albert Hee is charged in Counts 2, 3, 4, 5,

22   6, and 7 of the indictment with filing false tax returns in

23   violation of Section 7206(1) of Title 26 of the United States

24   Code.  In order for the defendant to be found guilty of any

25   such charge, the government must prove each of the following

1   elements beyond a reasonable doubt:

2           First, the defendant made and signed a tax return for

3   the year charged that he knew contained false information as a

4   to a material matter;

5           Second, the return contained a written declaration

6   that it was being signed subject to the penalties of perjury;

7   and

8           Third, in filing the false tax return the defendant

9   acted willfully.

10          A matter is material if it had a natural tendency to

11  influence or was capable of influencing the decisions or

12  activities of the Internal Revenue Service.

13          In order to prove that the defendant acted

14  "willfully," the government must prove beyond a reasonable

15  doubt that the defendant knew federal tax law imposed a duty on

16  him, and the defendant intentionally and voluntarily violated

17  that duty.

18          Conduct that is only accidental, inadvertent,

19  mistaken, or negligent does not constitute willful conduct.

20          The government has alleged that the defendant

21  received unreported income in the form of constructive

22  dividends.  A "dividend," generally, is a distribution of money

23  or property made by a corporation to its shareholders or for

24  its shareholders' benefit out of its earnings and profits of

25  the taxable year.  A constructive dividend exists when the

1    corporation has conferred a benefit on a shareholder without

2    declaring a dividend and without any expectation that benefit

3    will be repaid by that shareholder.  In the case of expenses

4    deducted by a corporation as ordinary and necessary business

5    expenses, a constructive dividend will be found when (1) the

6    deductions were improper; and (2) the expense conferred some

7    economic gain, benefit, or income to the shareholder.

8         A business deduction is improper when the expense is

9    not made in the ordinary and necessary course of business.

10        "Ordinary" refers to whether an expense is common or

11   frequent in the type of business involved.  The expense need

12   not be habitual such that the same taxpayer will incur the

13   expense often.  An expense may be ordinary even though it

14   occurs once in a taxpayer's lifetime.

15        "Necessary" refers to whether an expense is connected

16   to and beneficial to the business.

17        Personal, living, and family expenses are not

18   ordinary and necessary business expenses.

19        Travel, meals, entertainment, amusement, or

20   recreation expenses are not deductible unless the item was

21   directly related to or, in the case of an item directly

22   preceding or following a substantial and bona fide business

23   discussion, was associated with the active conduct of the

24   taxpayer's trade or business.

25        Travel expenses are deductible only if the trip is

1   related primarily to the taxpayer's trade or business.  If the

2   trip is primarily personal in nature, the travel expenses are

3   not deductible, even though the taxpayer engages in business

4   activities while traveling.

5          When a taxpayer's family member accompanies the

6   taxpayer on a trip, the family member's expenses are not

7   deductible.

8          Can I see counsel at the bench?  I thought we had

9   changed that.  Sorry.

10   (At sidebar on the record:)

11          THE COURT:  I thought we took out this "accompanies

12   the taxpayer," but I may have neglected to make that change.

13          MR. TOSCHER:  What page?

14          THE COURT:  22.  Because some of the trips there was

15   not an accompaniment of Mr. Hee.

16          MR. TOSCHER:  That's correct, Your Honor.  I missed

17   that, too.

18          THE COURT:  I'm sorry if I missed that.

19          MR. TOSCHER:  We missed it, too, Your Honor.

20          THE COURT:  When a taxpayer's family member travels I

21   think was what we had agreed upon.  Is that -- do you remember?

22   I can look it up.

23          MR. TOSCHER:  That's my recollection.  I missed it

24   going through it.

25          THE COURT:  Shall I look it up?  Do you remember?

1          Are you okay if I just say "When a taxpayer's family

2    member travels, comma, the family member's expenses --

3          MR. HARRINGTON:  On a trip.

4          THE COURT:  You want to say "travels on a trip"?  I

5    think "travels" is okay.  I don't know you can travel and not

6    be on a trip.

7          MR. TOSCHER:  Well, I have a couple of suggestions on

8    that, but I'll get in trouble if I explain that.

9          THE COURT:  Okay.  So "travels"?

10         Okay.  I'm going to make them correct it.  Sorry

11   about that.

12       (In open court on the record:)

13         THE COURT:  Okay.  I need to make a correction on

14   page 22.  In the paragraph that begins "When a taxpayer's

15   family member," can you please cross out the words "accompanies

16   the taxpayer on a trip" and insert after "When a taxpayer's

17   family member" the word "travels."  Sorry.

18         Okay?  So now I'm going to read that paragraph:

19         When a taxpayer's family member travels, the family

20   member's expenses are not deductible unless the family member's

21   presence has a bona fide business purpose.  The family member's

22   performance of some incidental service does not render the

23   family member's expenses deductible business expenses.

24         Ordinary and necessary expenses can include a

25   reasonable allowance for salaries or other compensation for

1  personal services actually rendered.  Services actually

2  rendered may include past or future services rendered,

3  depending on the particular facts and circumstances of a

4  situation.

5           The government contends that certain payments made by

6  Waimana Enterprises, Inc., were falsely characterized as loans

7  to the defendant.

8           In determining whether a particular transaction is a

9  loan versus income to the shareholder, you should examine the

10 transaction as a whole.  The question is whether at the time

11 that funds were advanced the parties intended that the funds

12 would be repaid.

13          In determining whether there was intent to make a

14 loan, you may consider factors such as: (1) whether the promise

15 to repay is evidenced by a note or other instrument;

16 (2) whether the promise to repay is otherwise reflected in

17 corporate books and records; (3) whether interest was charged;

18 (4) whether a fixed schedule for repayments was established;

19 (5) whether collateral was given to secure payment; (6) whether

20 repayments were made; (7) whether the borrower had a reasonable

21 prospect of repaying the loan and whether the lender had

22 sufficient funds to advance the loan; and (8) whether the

23 parties conducted themselves as if the transaction were a loan.

24 This is not an exhaustive or exclusive list of factors, and no

25 single factor is necessarily determinative.  Whether a

1   transaction is a loan is determined by a consideration of all

2   the circumstances in a particular case.

3         The good faith of the defendant is a complete defense

4   to all counts of the indictment because good faith is

5   inconsistent with corruptly obstructing the administration of

6   the internal revenue laws or willfully filing false tax

7   returns.

8         A defendant who acts on a good-faith misunderstanding

9   as to the requirements of the law does not act willfully, even

10  if his understanding of the law is wrong or unreasonable.

11  While the term "good faith" has no precise definition, it

12  means, among other things, an honest belief, a lack of malice,

13  and the intent to perform all lawful obligations.

14  Nevertheless, merely disagreeing with the law does not

15  constitute a good-faith misunderstanding of the law because all

16  persons have a duty to obey the law whether or not they agree

17  with it.  Thus, in order to prove that the defendant acted

18  willfully, the government must prove beyond a reasonable doubt

19  that the defendant did not have a good-faith belief that he was

20  complying with the law.  The burden of proving good faith does

21  not rest with the defendant because the defendant has no

22  obligation to prove anything to you.

23         In order for you to convict on any count in the

24  indictment, you must unanimously find that the government has

25  proven each element beyond a reasonable doubt with respect to

1    such count.

2           You will note that the indictment charges that

3    offenses were committed "on or about" or "in or about" certain

4    dates.  The proof need not establish with certainty the exact

5    date of an alleged offense.  It is sufficient if the evidence

6    in the case establishes beyond a reasonable doubt that the

7    offense was committed on a date reasonably near the date

8    alleged.

9           Certain charts and summaries have been admitted in

10   evidence.  Charts and summaries are only as good as the

11   underlying supporting material.  You should, therefore, give

12   them only such weight as you think the underlying material

13   deserves.

14          During the trial certain charts and summaries were

15   shown to you in order to help explain the evidence in the case.

16   These charts and summaries were not admitted in evidence and

17   will not go into the jury room with you.  They are not,

18   themselves, evidence or proof of any facts.  If they do not

19   correctly reflect the facts or figures shown by the evidence in

20   the case, you should disregard these charts and summaries and

21   determine the facts from the underlying evidence.

22          Because you must base your verdict only on the

23   evidence received in the case and on these instructions, I

24   remind you that you must not be exposed to any other

25   information about the case or to the issues it involves.

1    Except for discussing the case with the other jurors during

2    your deliberation:

3                1.  Do not communicate with anyone in any way and do

4    not let anyone else communicate with you in any way about the

5    merits of the case or anything to do with it.  This includes

6    discussing the case in person, in writing, by phone or

7    electronic means, via e-mail, text messaging, or any internet

8    chat room, blog, website, or other feature.  This applies to

9    communicating with your family members, your employer, the

10   media or press, and the people involved in the trial.  If you

11   are asked or approached in any way about your jury service or

12   about anything about this case, you must respond that you have

13   been ordered not to discuss the matter and to report the

14   contact to the court.

15               2.  Do not read, watch, or listen to any news or

16   media accounts or commentary about the case or anything to do

17   with it; do not do any research, such as consulting

18   dictionaries, searching the internet, or using other reference

19   materials; and do not make any investigation or in any other

20   way try to learn about the case on your own.

21               The law requires these restrictions to ensure the

22   parties have a fair trial based on the same evidence that each

23   party has had an opportunity to address.  A juror who violates

24   these restrictions jeopardizes the fairness of these

25   proceedings.  If any juror is exposed to any outside

1     information, please notify the court immediately.

2            Some of you have taken notes during the trial.

3     Whether or not you took notes, you should rely on your own

4     memory of what was said.  Notes are only to assist your memory.

5     You should not be overly influenced by your notes or those of

6     the other jurors.

7            A separate crime or offense is charged in each count

8     of the indictment.  Each charge, and the evidence pertaining to

9     it, should be considered separately.  The fact that you may

10    find the defendant guilty or not guilty as to one of the

11    offenses charged should not control your verdict as to any

12    other offense charged.

13           I caution you, members of the jury, that you are here

14    to determine from the evidence in this case whether the

15    defendant is guilty or not guilty.  The defendant is not on

16    trial for any act or conduct or offense not alleged in the

17    indictment.  Nor are you called upon to return a verdict as to

18    whether any other person or persons not on trial as defendants

19    in this case are guilty or not guilty.

20           Also, the punishment provided by law for the offense

21    charged in the indictment is a matter exclusively within the

22    province of the court or judge and should never be considered

23    by the jury in any way in arriving at an impartial verdict.

24           Any verdict must represent the considered judgment of

25    each juror.  In order to return a verdict, it is necessary that

1    each juror agree thereto.  In other words, your verdict must be

2    unanimous.

3            It is your duty, as jurors, to consult with one

4    another and to deliberate in an effort to reach an agreement,

5    if you can do so without violence to individual judgment.  Each

6    of you must decide the case for yourself, but only after an

7    impartial consideration of the evidence in the case with the

8    other jurors.  In the course of your deliberations, do not

9    hesitate to re-examine your own views and change your opinion

10   if convinced it is erroneous.  But do not surrender your honest

11   conviction as to the weight or effect of the evidence solely

12   because of the opinion of the other jurors or solely for the

13   purpose of returning a verdict.

14           Remember at all times that you are not partisans.

15   You are judges -- judges of the facts.  Your sole interest is

16   to seek the truth from the evidence in the case.

17           Upon retiring to the jury room, you should first

18   select one of your number to act as your foreperson.  The

19   foreperson will preside over your deliberations and will be

20   your spokesperson here in court.  A form of verdict has been

21   prepared for your convenience.

22           There are seven questions on the verdict form, one

23   for each count.  There's a very short little description of the

24   count, and then the jurors are asked to check "not guilty" or

25   "guilty" for each of Counts 1 through 7.

1            You will take the verdict form to the jury room, and

2    when you have reached unanimous agreement as to your verdict,

3    you will have your foreperson fill it in, then date and sign

4    it.  You will then return to the courtroom.

5            If during your deliberations you desire to

6    communicate with the court, please reduce your message or

7    question to writing signed by the foreperson and pass the note

8    to the marshal, who will bring it to my attention.  I will then

9    respond as promptly as possible, either in writing or by having

10   you return to the courtroom so that I can address you orally.

11   I caution you, however, with regard to any message or question

12   you might send that you should never state or specify your

13   numerical division at the time.

14            Could I see counsel at the bench?

15       (At sidebar on the record:)

16            THE COURT:  All objections previously on the record

17   are incorporated here.  Are there any objections to the manner

18   and order or anything else of these instructions -- relating to

19   these instructions?

20            Mr. Toscher?

21            MR. TOSCHER:  Not from the defense, Your Honor.

22            MR. HARRINGTON:  Not from the government.

23            THE COURT:  Okay.  Then I think I'll take a

24   five-minute break, really short.  We need to keep these breaks

25   short so that we can finish everything today in case people

1    need to rearrange, go to the bathroom, whatever.

2         (In open court on the record:)

3              THE COURT:  We are going to try to finish all

4    courtroom proceedings.  To accomplish that, the breaks have to

5    be really, really short.  I know your lunch was short already,

6    but these are going to be, like, five or 10 minute breaks,

7    really, really, and then back in your seats.  Okay?  So right

8    now we're only going to take a five-minute break and then come

9    back and begin closing argument.

10        (Jury excused.)

11             THE COURT:  We're going to take a five-minute break.

12   The concern is that the court staff -- there was a delay in

13   court staff telling the jurors to be back here at noon; so they

14   didn't have the 40 minutes or so we thought they had for lunch.

15   They thought, you know, it was a regular break; so they didn't

16   all eat until the last few minutes.  So they might all be

17   running back to try and eat something right now.  But I would

18   like to resume in five minutes.

19             Counsel, can I say one more thing?  Counsel, can I

20   say one more thing?

21             One of the instructions was the one about "in or

22   about," "on or about" in the indictment but they don't have the

23   indictment.  I'm kind of inclined just to let it go but --

24             MR. TONG:  That's fine, Your Honor.

25             MR. TOSCHER:  We're fine, Your Honor.

1            THE COURT:  Okay.

2        (Court recessed at 12:40 P.M., until 12:49 P.M.)

3            THE COURT:  Okay.  Mr. Tong.

4            MR. TONG:  Thank you, Your Honor.

5            May it please the Court.  Counsel.  Ladies and

6    gentlemen.  Good afternoon.

7            You've heard Judge Mollway tell you what the

8    defendant is charged with.  He's charged with corruptly

9    interfering with the IRS in its calculation, assessment, and

10   collection of taxes, and with filing six false income tax

11   returns that willfully failed to report income or benefits that

12   he had received for six separate years.

13           Those are the charges that you are going to be asked

14   to consider, but what this case really is about is greed and

15   deception.  Greed in the sense that the defendant used his

16   company, Waimana Enterprises, to pay over $2.3 million in

17   personal expenses for himself and his family members.

18   Deception because the defendant wrote different things and put

19   different things on the books to make it appear as if those

20   expenses were genuine, ordinary, and necessary business

21   expenses of the company when, in fact, they were personal

22   expenses.  Deception also because, as to some of the payments

23   which he received for his family members, he mischaracterized

24   them as loans which he intended to repay when, in fact, he had

25   no intent to repay the money

1           What was the net effect of all of this conduct?  You

2    heard Susan Mitsuyoshi testify about that.  By deducting

3    personal expenses as if they were legitimate business expenses,

4    Waimana, the defendant's company, avoided the payment of its

5    income taxes.  By not declaring the receipt of the value of

6    those same benefits on his personal income tax returns, the

7    defendant also avoided the payment of income taxes.  You heard

8    Miss Mitsuyoshi testify that after all the calculations were

9    done, he avoided payment of a total of about $540,000 in taxes.

10          I'm going to go into the nuts and bolts of our

11    evidence.  I think you've seen a lot of it over the last couple

12    of days.  But before I do that and launch into more slides, I

13    want to thank you for your attention during the trial.  It's

14    been a long trial.  I know it's been tedious for you.  It's

15    certainly been boring.  My partner, Mr. Harrington, I think

16    told you in opening statement that there would be times where

17    it would be very, very boring, and he was absolutely right.  We

18    had to bring witness after witness to identify different

19    documents that sit in multiple binders that you're going to

20    have the pleasure of going through as you deliberate over this

21    case.  But all of that was important.  Because just as a mason

22    builds a wall brick by brick, in this case we had to build our

23    case exhibit by exhibit.  And we're now bringing to you a wall

24    of exhibits for your consideration and for your determination

25    of what that wall all means.

1          We submit to you that, as you look at our wall of
2    evidence, you are going to determine a couple of things.
3    Primarily, you're going to find that the defendant used his own
4    company as if it were his own checkbook.  Whenever he had an
5    expense to pay, instead of using what he calls his funds, his
6    after-tax dollars after the removal of taxes that all taxpayers
7    pay, he had his company pay for it.  And by doing that, he
8    saved taxes on his own.  We also are going to show from those
9    exhibits that he engaged in a pattern of conduct that was
10   designed to avoid the payment of taxes.
11          Now, what personal expenses were involved?  Let's
12   take a look at a chart of some of the expenses that Waimana
13   deducted over a 10-year period of time just to sort of put this
14   all in context.
15          You have on the board behind you a chart entitled
16   Waimana deductions for the defendant's personal expenses
17   totaling about $276,000.  And you can see from the chart that
18   they fall into different categories.  The category on the far
19   left is the MIT educational expenses.  That represents the
20   amounts that were initially paid for the tuition and living
21   costs for his eldest daughter Adrianne Ho'o:  $33,523.  Next to
22   that is a larger blue graph entitled Diane Doll massage
23   payments, totaling $96,000 for personal massages that the
24   defendant received from Diane Doll.  Next to that is credit
25   card charges over that 10-year period of time, totaling almost

1   $120,000, which we have shown were charges that were made for

2   personal expenses and then deducted as if they were business

3   expenses, ordinary and necessary to the business.  And the

4   final bar on the right is twenty-six thousand and change in

5   cash withdrawals that were deducted when the defendant went

6   somewhere and used his credit card or his debit card to pull

7   money out of ATMs without any justification.

8           We have another chart.  That's one of it.  That's

9   $276,000.  The second chart, which is behind me, represents the

10  deductions that Waimana took for the payment of wages, in other

11  words salary or money, and fringe benefits paid to the

12  defendant's family.  And that particular chart is color-coded

13  so you can see that the wages are in blue and the fringe

14  benefits are in red.  And you can see there are wages and

15  fringe benefits totaling $1.67 million deducted by Waimana as

16  if they were business expenses for legitimate salary and work

17  done for Waimana by the defendant's wife and his three

18  children, who were largely in college at the time.  Those are

19  the expenses that were deducted.

20          You heard that Susan Mitsuyoshi told you that a

21  business can deduct an expense only if it is ordinary and

22  necessary to the business.  Judge Mollway just told you, in

23  clarification, that a personal expense or the living and family

24  expenses of a person are not ordinary and necessary expenses

25  deductible to a business.  So as you go through the evidence,

1    ask yourself the question was the particular deduction for an

2    expense for Waimana or, as we contend, was it an expense for

3    the defendant or his family?

4            Let's go through some of the categories.  First

5    category is personal massages.  You've heard the evidence.

6    I'll try not to belabor it.  Diane Doll was his personal

7    masseuse.  You heard that she gave him two-hour massages twice

8    a week for many years.  Yesterday or today he even told you

9    that they started at an earlier point in time when he paid out

10   of his own personal funds.  There were no bills.  Unlike the

11   typical client that Diane Doll had, she didn't get a check at

12   the conclusion.  There was no bill.  She would just basically

13   get a check about every two months when the defendant cut one.

14   It came from Waimana Enterprises.  The checks typically were

15   about $2,000 each.  If you want to see them, please take a look

16   at the series of checks in Exhibit 3-2 in the binders.

17           And a word on the exhibits.  If anything I say or

18   Mr. Toscher says about an exhibit is interesting to you or you

19   think is important, you're obviously free -- you're not

20   required to -- but you're free to write down the exhibit number

21   so that you can locate it in the binders later.  And I ask that

22   you look at the Exhibit 3-2 series and see the various checks

23   that total $96,000 indisputably for personal massages for the

24   defendant during the time period.  It works out to about $130 a

25   massage or $260 a week in massages.

1           And how did the defendant treat those massages?  You
2     heard Nancy Henderson testify.  Nancy Henderson is his
3     assistant, office manager, and worked for Waimana for a long
4     period of time.  She, basically, told you he had these massages
5     twice a week.  He told me to characterize them as consulting
6     expenses (indicating).  Nancy Henderson told you that.
7           So right from the start she puts them down as
8     consulting fees.  You heard from some of the accountants, David
9     Chinaka and Lynn Tamanaha of his office, that when they would
10    do a tax return, they would get information from Waimana
11    initially in a check register format with a description of what
12    it was for, and later in a format which was like a ledger, with
13    a description of what it was for.  And when they got those
14    expenses, they basically said "consulting fees."  In fact, when
15    they got the word that this was a consulting fee, Lynn Tamanaha
16    called Nancy Henderson and said What is it for?  The response
17    was not it's a massage therapist, a masseuse; it was a health
18    consultant.  And you heard, ultimately, that that
19    mischaracterization followed for years, causing the
20    accountants, Chinaka & Siu and later KMH, to deduct those
21    expenses as if they were ordinary and necessary business
22    expenses for the company rather than personal massages for the
23    defendant.
24          How did that benefit the company?  They reduced their
25    taxes.  How did it benefit the defendant?  Well, he no longer

1    had to pay out of his own funds as he had before.  He had

2    Waimana pay for it.  Did he know that the payments were being

3    made?  Of course.  If you look at the checks, you'll see that

4    he requested every one, he approved every one, and he signed

5    every one.

6            Now, what does the defense say about this?  Well,

7    they hired a gentleman name Gary Howard, the CPA from Southern

8    California.  That individual charged $350 an hour to evaluate

9    and reconstruct everything years after the fact.  And 200

10   hours, or about $70,000 later, he too concluded that these

11   expenses were improperly deducted.  But he goes further and

12   says "I blame the accountants."  I blame them because they did

13   not drill down, as he did, to find out that this was actually a

14   personal masseuse.

15           Now, ask yourself, what information did Mr. Howard

16   have?  You'll remember Mr. Harrington cross-examined him and

17   says, Well, did you know this evidence or that evidence?  Did

18   you know that?  And he says, No, I wasn't here at the trial.  I

19   did not know that.

20           Ladies and gentlemen, he didn't know that it was the

21   defendant who first characterized this as consulting fees.  He

22   didn't know that it wasn't the accountants who characterized

23   them as accounting fees.  He didn't know that, when the

24   expenses went to the accountants, they were already

25   characterized, as Lynn Tamanaha and David Chinaka told you.  He

 1   didn't know any of that.  Nor did Mr. Howard know that this was

 2   a big secret from everyone in the accounting world that helped

 3   him and that it wasn't made known to anyone until the IRS

 4   started an audit years later.  You remember that testimony?  We

 5   only found out for the first time it was massage therapy when

 6   the IRS was auditing the company.  And again, even without

 7   knowing that, Mr. Howard says these expenses were improperly

 8   deducted.

 9            Now, the defendant put on some evidence, through

10   Mr. Howard, suggesting, Well, maybe the accountants should have

11   asked was it part of a bigger program?  Was it a fringe

12   benefit?  In which case it would still be taxable to the

13   recipient, but he says, you know, there might be some

14   circumstances, depending on the facts, if the company had a

15   program.

16            And then the defendant put on evidence that some

17   corporations on the mainland have programs for massages.  Well,

18   ask yourself.  The gentleman who came here, basically, is hired

19   by corporations.  His name was Rockowitz, and he runs the Ahhh

20   Massage place.  And he, basically, told you that it's common on

21   the mainland for a corporation to say:  I want to improve the

22   morale of all of my employees; so I want people to come into my

23   office, bring a chair, give everybody 10- to 30-minute

24   massages.  The morale goes up because they see their fellow

25   employees being massaged.  It relieves stress.  It has a lot of

1    benefits.  That's what Mr. Rockowitz told you.

2              Is there any evidence that Waimana had a program of

3    that sort?  Of course not.  You saw that during the entire time

4    the defendant was getting $96,000 in massages, they had one --

5    count them -- one corporate wellness day.  They brought in two

6    masseuses for I think it was four or six hours, six hours, and

7    the bill is Exhibit 50-7, if we could take a look at that.  And

8    if we could blow that up.

9              Island Wellness was the vendor.  And if we could see

10   the next page, please.  One more page.

11             This is for the Wellness Day on October 20, 2008,

12   $180 authorized by Mr. Hee.

13             And if we can see the next page, please.  One more

14   page, please.

15             And here's a description of the services:  two

16   therapists, three hours each, total of six hours, $30 an hour,

17   $180.  Bill went to Gil Tam, whose idea it was to offer this

18   benefit program to the company.

19             Now, you may remember Mr. Tam got up and said "We're

20   a forward-thinking company, and we try to take care of our

21   employees.  And I had this idea, and I went to Al Hee, and I

22   asked for approval to do this."  And I asked Mr. Tam, I said,

23   Well, did you have any kind of company-wide program where every

24   employee could get two hours of massages twice a week

25   indefinitely?  And you remember Mr. Tam's response?  He not

1    only said no; he actually laughed.

2          So I submit to you, ladies and gentlemen, that as you

3    consider these massages, consider the fact that the defendant

4    was the only one getting them; that there's no evidence that

5    it's ordinary and necessary for just one individual in a

6    company to get personal massages twice a week, two hours each

7    time, totaling $96,000, and he then called them consulting fees

8    and never told his accountants that they were for massages and

9    caused the company to deduct all of those expenses, and also

10   did not report them as income to himself.  That's one category.

11         Next category is credit card charges.  You've seen a

12   lot of credit card charges over the last day and a half.  I'll

13   try not to go through each one because I'm sure they're fresh

14   in your mind.  Let me just remind you that there's one person

15   at Waimana who controlled all of the reimbursements, and that's

16   the defendant, Albert Hee.  You saw that Robert Kihune, the

17   vice admiral of the Navy, had to submit a detailed

18   reimbursement request just to get a couple of thousand dollars

19   back for a legitimate trip in February of 2003.  That's Exhibit

20   4-122.  Let's just take a quick look at it.  If you want to

21   review it, it's 4-122.

22         Look at the type of information that is being offered

23   in support of a request for reimbursement.  You have the date

24   of the trip, you have the purpose of the trip, you have the

25   amounts, and you have the receipts.  And Admiral Kihune

1    requested it, and Al Hee, the defendant, paid it.

2              And let's look at the last page of that exhibit.

3              Again, here is a memorandum describing exactly what

4    it's for, even down to identifying that it was a hotel

5    restaurant where the charges were incurred, and also even

6    explaining why he had to have room service while conducting

7    business.

8              Is that an appropriate reimbursement?  You bet it is.

9    Is that how business is supposed to work?  You bet it is.  It

10   explains exactly why the expense is ordinary.  He's traveling.

11   He's taking cabs.  He's staying at a hotel.  He's, basically,

12   incurring an expense to discuss business.  Who is present.  Why

13   he's there.  That's ordinary and necessary.

14             The defendant knew that because he's approving these.

15   This is in 2003.  Nothing wrong with that expense whatsoever.

16   I just want you to keep that in mind as you review the

17   reimbursement process by which he got money.

18             Let's talk about how the defendant got his money.

19   That process was very, very different.  You heard that Waimana

20   Enterprises did not have -- can we have the lights again.

21             Waimana Enterprises did not have a corporate credit

22   card.  They ran it through the defendant's card with his name

23   at the top and with the three different cards available:  one

24   to his wife, one generally for business, and a third.  And you

25   saw that every month there was a reimbursement process

1    involving the defendant and Nancy Henderson.

2          And if you want to review some of those documents, I

3    invite you, when you deliberate, to go to the series that

4    starts at Exhibit 4-2 through Exhibit 4-58.  That's 58.  Each

5    one covers a different month, but the process was the same

6    every month.  And you saw some of those documents.

7          Basically, because the bill came out at the end of

8    the month and there was a quick turnaround, Nancy Henderson

9    would download it.  She would sit down one on one with Mr. Hee.

10   Mr. Hee would then tell her what each expense was for.  Nancy

11   Henderson told you that he would tell her how to categorize

12   that:  This is this company.  It's that expense.  It's meals.

13   It's travel.  It's management.  It's ownership training.

14   Whatever it was.  She would then handwrite it, and then, for

15   sake of clarity, typewrite it on the later version of the bill,

16   and then put it all together in a package with a cover sheet

17   itemizing each of those expenses, allocating them to the

18   different companies, and then asking for approval.

19         Who did she go to approval for?  Mr. Hee.  Because

20   the buck stops there.  He is the boss, and he is the one who

21   approves things.  And did she really have a role in the process

22   other than to be the scribe to write down what he said?  I

23   submit not.  I mean, you heard at one point my partner,

24   Mr. Harrington, asked her, "Why did you write that down?"  And

25   she said "Because Mr. Hee told me to."  And he said, "Well, why

1    didn't you ask him what it was for?"  And she said words to the
2    effect of "It's not my job.  Why would I?"
3              And you've seen Mr. Hee testify.  You saw
4    Miss Henderson testify.  Does that make sense to you?  Of
5    course.  He's sitting there telling her exactly what to do, she
6    characterizes it exactly the way he wants it characterized, and
7    then the money gets allocated exactly as he tells her to do.
8              And when the money was allocated, you'll see that,
9    more often than not, almost always, the same day that Mr. Hee
10   signed off on that a check was issued.  If you want to see the
11   checks, and there's a lot of them, they're right behind the
12   exhibit that is the credit card statement, only with the letter
13   A afterwards.
14             So, for example, if you looked at Exhibit 4-2, the
15   cover page will say this is what Al Hee wants and approves, and
16   Exhibit 4-2A will be the check that is given to him, signed by
17   him, going back to him.  This was the process by which Al Hee,
18   the defendant, essentially, got reimbursed for whatever he said
19   he should be reimbursed for.
20             Now, you heard a lot about the trips.  There are
21   several trips that you heard about.  And I won't go into great
22   detail of all of them, but let's just touch on a couple.
23             France and Switzerland, March of 2008.  That's the
24   trip that Mr. Hee today said he sent his wife to go on.  He did
25   it during spring break with Breanne Hee, who was then a student

1   at Santa Clara University, and with Mika, who was then her

2   boyfriend, a stranger to the company at that point in time.

3   They flew into Paris.  They got their bearings.  They then went

4   to the one day of business at the French factory and took the

5   train there, and they, basically, took a picture that you saw

6   and looked around.

7           None of the participants had a formal position within

8   the company.  Two participants were a college student and her

9   boyfriend.  His role, apparently, according to Mr. Hee's

10  testimony, was actually to take care of the wife because she

11  doesn't travel well.

12          When they were done, they all went to Switzerland.

13  You heard that Liko, the daughter, agreed that there was no

14  business in Switzerland.  They went to Zermatt, a small village

15  that I guess is most famous for having the Matterhorn.

16  Breanne, or Liko, told you they went skiing.

17          You saw the charges that were incurred.  Let's just

18  take a look at a couple of them.  Exhibit 4-10, page 2519.  And

19  this is actually two different pages:  2519 and 2520.  If you

20  could show us that slide, please.

21          The top -- the top two are for travel.  Basically,

22  Wendy Roylo Hee, about $1100, and then a train ticket, Rail

23  Europe.  You heard that they took the train to Switzerland

24  after their one-day visit to France was completed, and $2600 at

25  the Grand Hotel in Paris.  And again, you see how it was

1    written up by Nancy Henderson, at the direction of the

2    defendant:  travel to CCI, inspection of cable.

3            Remember also that, if this was such an important

4    trip that was so significant to his business, he did have

5    Admiral Kihune on his staff, who at one point was in charge of

6    fiber optics for the entire United States Navy.  In fact, one

7    of the funnier moments, I think, perhaps -- maybe I have a

8    strange sense of humor -- was when Mr. Toscher said something

9    to Mr. Kihune, "I understand you don't know much about fiber

10   optics."  And Mr. Kihune sort of stopped and said, "I actually

11   know quite a bit about it because that was my business when I

12   was an admiral with the Navy."

13           Now, if there was a problem with a fiber optic cable,

14   why wouldn't somebody who knew about it go?  If it were a

15   legitimate business trip, why wouldn't somebody who knew about

16   it go?  Why would you send your daughter, a college student;

17   and her boyfriend; and your wife, who apparently doesn't travel

18   well, but apparently well enough to go to Switzerland after the

19   trip was done.

20           Now, Judge Mollway told you that a travel expense is

21   deductible only if the trip relates primarily to the taxpayer's

22   trade or business.  Does this fit that bill?  Of course not.

23           Judge Mollway also told you that, if a trip is

24   personal, travel expenses are not deductible, even though the

25   traveler does some business activities.  It doesn't become

1    deductible even if the traveler performs an incidental service.

2    Using that law, was this a travel -- a deductible business

3    expense?  Of course not.

4            But more importantly, the defendant himself knew it

5    was personal travel.  Let's take a look at his note, which is

6    Exhibit 4-9, page 2504.  4-9, page 2504.

7            You've seen this note before.  He testified about it.

8    The "N" stands for Nancy.  The defendant tells Miss Henderson,

9    according to the attached schedule, personal travel should be

10   charged to CC and WEI.  That's ClearCom and Waimana

11   Enterprises.  His own note shows that he knew that was personal

12   travel, yet he explicitly directed her to charge it to the

13   company.  You know from the instructions, as well as from the

14   evidence, that this was not a valid business trip.  Just

15   because you visited a factory for one day doesn't turn a Swiss

16   vacation into a business trip.  That's an example of one that

17   was deducted at the defendant's direction.

18           July 2010.  Busy month.  Wedding July the 5th, 2010,

19   Kamehameha Schools, Breanne and Mika.  Same month, two trips,

20   virtually back to back, family members.  First trip is to

21   Tahiti.  Next trip is to Disney World.  The Tahiti trip was

22   eight days.  You heard that Adrianne; Breanne; the defendant's

23   wife, Wendy; and Kupa'a, the son, went.  So the defendant's

24   family without him.

25           Adrianne, Ho'o, told you why they went on that trip

1    to Tahiti.  She said, "Oh, I wanted to go see the Heiva," which

2    is, I guess, their version of the Merry Monarch Hula Festival.

3    "And I wanted to see the craft fairs.  And after I told my dad

4    that I wanted to go, he said, 'Oh, why don't you go look at

5    this undersea cable landing because it's important.'"

6              They didn't make any plans to meet anyone at the

7    company.  They didn't make any plans to have a guide to take

8    them to the landing.  They didn't make any plans at all.  Even

9    Mrs. Hee said that.  What kind of business trip is it if you

10   have business purpose A but don't even plan to do it before you

11   go?  Ask yourself that question.

12             And what happened once they got there?  You heard

13   Adrianne tell you and Mrs. Hee tell you.  They drove around in

14   their rental car and couldn't find the landing.  It was covered

15   by something, and they couldn't find it.  And Mrs. Hee tried to

16   put a gloss on it, saying, Well, the trip was still useful

17   because I did a study as a planner to see whether it's

18   worthwhile to do business in Tahiti.  But they didn't go --

19   they didn't find the landing.  Even she admits that.  She says

20   all they tried to do was to find an uncle of Liko's classmate

21   and ask him whether he could help set up a meeting.  Again, if

22   that was the purpose of the trip, why wouldn't they have set it

23   up in the first place?

24             All they got out of that trip is Defense Exhibit

25   50-6, if we could see that.  A picture of the building where

1    the business Mr. Hee wanted them to see was supposed to be.

2    There's no evidence of what OPT is, but clearly it's unrelated

3    to anything that Waimana does or ClearCom or SIC.

4         And if we could see the next page of that picture.

5    One more, please.  Could we try -- excuse me one second.

6         All right.  I don't have that slide available.  But,

7    ladies and gentlemen, you can look at the defense exhibits.  I

8    believe it is 50-6.  There's, basically, a picture of that

9    building with someone's hand hanging out of the window of a car

10   taking the picture with their smartphone.  And I submit to you

11   that's what the trip was about.  Somebody did a drive-by and

12   stuck their camera phone out and took a picture of the

13   building, and that was the business.  Seven-day trip.

14        What happened when that bill came in?  Let's look at

15   Exhibit 4-33, page 3801.  There were a bunch of charges.

16        And if you have the split screen on 3800 and 3801,

17   please.  Can we blow that up a little, please.

18        Okay.  This may not be the most legible, ladies and

19   gentlemen.  But if you look at 4-33 at those two pages, you

20   will see that there are charges for grocery stores and lodging

21   of $4,863 at the Le Meridien Hotel in Tahiti -- that's this one

22   here -- characterized as travel CCI U.S. because of the note

23   and because of the direction given to the defendant -- given by

24   the defendant to Nancy Henderson.

25        You may recall there's another charge there for

1    women's accessories.  And I asked Mrs. Hee what was that for

2    and how did that relate to the business, and she said she had

3    no recollection.

4           Now, what happened when that bill came in?  Well, you

5    know from this sheet that I'm showing you that it got

6    characterized as a travel expense for the company, a one-week

7    trip for a site investigation.  And ask yourself, What did they

8    investigate?

9           Look at what the defendant wrote.  It's 4-33 exhibit,

10   page 3832.

11          This is the defendant's justification for the

12   business expense incurred during that trip.  It's a one-week

13   trip.  He lists the right people.  And he says the purpose is

14   site investigation of Honotua cable system and amount of

15   traffic being serviced.  A total of $279 were billed to

16   ClearCom as a result of this memo.

17          And look at the date:  August the 5th.  That occurred

18   after the travelers returned.  You remember the defendant says,

19   "Well, I don't really know if I got a report."  But ask

20   yourself, why would he write this memo, unless it were to make

21   the charge, which is blatantly personal, appear to be

22   business-related.

23          And what is the net effect of that?  The net effect

24   is instead of having to pay that amount of money out of his

25   personal funds after taxes are taken out, he had the company

1    pay it.  And he had the company also then deduct it so that

2    they didn't have to pay taxes on that amount as well.

3            Was that a business trip?  Of course not.  It was a

4    family vacation.

5            Disney World.  A few days later, five days later,

6    Adrianne, Breanne, and Mika, who were then newlyweds of a few

7    weeks, went to Disney World with Adrianne's friend.  You saw a

8    bunch of those charges, too.  Let's look at Exhibit 4-33, page

9    3812 to 13.

10           This one is interesting, I suggest to you, because if

11   you use your common sense, which you are encouraged to do,

12   which Judge Mollway said you should do, you don't have to dig

13   too far to figure out that a trip to Disney World is probably

14   personal.  And that's what appeared on the rough draft of the

15   bill.  The highlighted reds are personal.  And why wouldn't

16   they be personal?  They're for reservations for lodging, for

17   lodging, for amusement tickets, and for dining tickets.

18           And what happens after those bills come in?  They got

19   charged to Waimana expenses.  And how did that happen?  Take a

20   look at Exhibit 4-33 at pages 3797, 98.  You can see that what

21   was previously personal got changed to travel for Waimana based

22   on attachment number 2.

23           So if we go to attachment 2, that's Exhibit 4-33, the

24   cover page.  You'll see the defendant's memorandum.  If we can

25   see the top third, please.

```
 1            This is from the defendant with his initials to Nancy
 2   Henderson, who is characterizing this expense now as a travel
 3   expense for Waimana rather than personal, as initially
 4   appeared.  It shows the dates of the travel.  It talks about
 5   two of the travelers but not the two others whose expenses are
 6   being covered.  And now the purpose is not to have fun but to
 7   see how federal funds have been used to develop Disney World.
 8            And if you go down to the next part of the
 9   memorandum, it talks about a discussion about the circumstances
10   surrounding the development of what was once swampland into a
11   great amusement park and the usage of federal funds along those
12   lines.
13            Now, what did Mr. Hee tell you about that?  He says
14   "Those are the words that I dictated.  I don't know that they
15   did anything there other than go to the Raytheon visit that was
16   business-related.  But the reason that this had a business
17   purpose is because I told them everything that is in this
18   memorandum."  Does that seem legitimate to you?  Does that seem
19   like an a ordinary and necessary business expense that you can
20   tell someone, "Oh, Disneyland's a great place.  They used
21   federal funding.  Now, why don't you go for a week and have
22   some dine tickets, some amusement tickets, stay at the Animal
23   Kingdom Lodge, and then it will be deductible."  Does that
24   sound ordinary and necessary to you?
25            When he testified, he then tried to put a different
```

1    gloss on it.  He says, "Well, I got a personal invitation from

2    the chairman of Raytheon, a very important client, who wanted

3    me to go to Disneyland -- Disney World, rather, I'm sorry --

4    "and ride the Raytheon ride," which the kids did once.  If it

5    was so important, chairman to chairman at the C-suite level,

6    why didn't Mr. Hee go?  Why would he send two kids, her new

7    husband, and one of the kids' children?  How does that make it

8    business?  Plainly, it doesn't.  Use your common sense.

9         But as a result of that, you saw that that trip was

10   paid by Waimana and not out of his personal funds.

11        Mauna Lani, June 2011.  17,000 plus in charges for a

12   shareholders meeting with the family.  I'm going to put

13   shareholders meeting in quotes.

14        You heard already all about it.  The defendant and

15   his children went to the Hilo side for a meeting with the

16   Department of Hawaiian Home Lands.  The meeting ended.  They

17   drove from Hilo to Kona where they united with Mrs. Hee and had

18   four days at the Mauna Lani Resort.

19        Exhibit 4-42 shows you some of those charges.  We

20   traced some of them on a hotel rental.  You can see that there

21   are three different charges on this particular exhibit that

22   total a little more than $16,000, all characterized as a

23   stockholders meeting.

24        Now, the first question I suggest you ask yourself is

25   what happened at the meeting?  Mr. Hee told you, "Well, I was

1   trying to give my kids some sense about why it was so important
2   that they become owners of the company."  Adrianne Ho'o Hee
3   said she recalled no discussion whatsoever about the business
4   or about succession planning.
5           And by the way, who's the stockholder at this point
6   in time?  Who's the person who is having this four-day meeting
7   that starts in Hilo, goes to restaurants at Panda, at Monstera,
8   and then sixteen, $17,000 in charges at Mauna Lani?  The sole
9   stockholder:  Mr. Hee.
10          You can see that from his tax return, which is
11  Exhibit 1-22, page 101.  Albert Hee, December 2011, after the
12  Mauna Lani trip, 100 percent stockholder, who was being
13  compensated to the tune of $300,000 a year.  Ask yourself, what
14  does a person talk to himself about for four days at the Mauna
15  Lani?
16          It's probably the same amount of discussion that took
17  place when he decided to buy the house.  You saw how he needed
18  a resolution.  He drafted a resolution.  He was the only person
19  present.  He made the motion.  He then seconded his own motion.
20  There was a discussion.  I think he said that was an enticing
21  conversation.  And then the motion carried.  Is that a
22  stockholders meeting, or is that a vacation?  Is that
23  succession planning when the person who is supposed to be
24  planned for doesn't even recall it happening?  Of course not.
25          And by the way, I have no malice against Mr. Hee.

1    I'm sure he suffered a heart attack shortly before that trip.

2    I'm sure that shook him up.  I'm sure that gave him reason to

3    reflect on life.  I'm sure that gave him reason to spend time

4    with the family.  I give him all of that.  But that doesn't

5    mean that the taxpayers should subsidize those charges.

6              Other credit card charges.  I'm not going to show you

7    a lot of them, but I invite you, I invite you, to go through

8    those exhibits that I mentioned earlier, the exhibits starting

9    with 4.  And look at the monthly reimbursement charges.  You'll

10   see a whole bunch of charges that will be blatantly obvious as

11   personal charges that will be characterized as stockholders

12   meeting, ownership training.  Anything to  have to do with the

13   family will be characterized as something business-related.

14             You saw the Kincaid's charge we went through earlier

15   today.  The charge, basically, listed only those people who

16   were in his family.  There's four of them.  Yet there were

17   seven guests.  I think it was a charge for $290.  Write it off.

18   Stockholders meeting, ownership training.  Anybody within my

19   ambit, like maybe the boyfriend, becomes part of the ownership

20   team.  Write it off.  Deduct it.  Have taxpayers pay for it.

21             Ladies and gentlemen, with regard to the credit card

22   charges, the scheme was very clear.  The scheme is he

23   characterizes them.  It gets characterized by Nancy per his

24   direction.  It goes to the accountants with that

25   characterization.  They don't drill down and look at the source

1   documents.  They accept the word of the client just the way

2   their engagement letters say.  "We rely on you to give us

3   truthful information."  If they call it business, they deduct

4   it.  That's how those charges found their way into the

5   corporate deductions in each of the years involved.  And each

6   of the years spanned all of the years that Mr. Hee filed his

7   tax returns, and you heard he did not declare the receipt of

8   any of that money as income on his tax returns.

9           What about the educational charges?  You heard how

10   that started.  Adrianne was at MIT.  Great school.  Also

11   expensive.  You heard the defendant told Nancy Henderson have

12   Waimana pay.  And you probably remember that he also told her

13   book it as educational expenses.  What else did he say about

14   that?  He said, "Nancy, we can do this because we're paying for

15   Ho'o just like we paid for Judy Ushio's college expenses."

16           Remember Judy Ushio?  She was one of the first

17   employees with SIC.  She had two years of college under her

18   belt, was rising up through the ranks.  She came here and

19   testified.  Very articulate woman, who has moved up and done

20   well for herself.  And she says, "I need to complete my degree.

21   For my professional development, I need that degree."  And she

22   was going to University of Phoenix and she got a degree.  And

23   do you remember that she testified, "I was paying for that.

24   And I went to Al Hee and said, 'Wouldn't it be nice if we had a

25   program where you could pay for the educational expenses

1    because maybe it would help the company?'"  And Al Hee never

2    really responded other than to chuckle, I think Judy Ushio

3    said, but he didn't pay a penny.  Waimana, Sandwich Isles did

4    not pay a penny.  Judy Ushio remembers this because while she's

5    been successful, she said from the witness stand to you that

6    she's still paying off her student loans for her education.

7            So we know the evidence shows that, basically, what

8    Mr. Hee told to Nancy Henderson to justify what was blatantly a

9    personal expense was false.  He didn't pay for Judy Ushio's

10   expense.  But nonetheless, it's not Nancy Henderson's job, nor

11   is it her position, nor does she have the ability to speak back

12   to Mr. Hee.  I suggest very few people do.  She just booked it

13   as an educational expense.  It got booked that way, and the

14   first year it went through.  The accountants missed it.  They

15   missed the educational expense categorized by him as business

16   expense, and it got deducted, resulting in a financial benefit.

17           Now what happened later?  The accountants caught it.

18   Carlton Siu told the defendant, "Hey, you can't do that unless

19   you have an employee benefit plan that offers expenses to all

20   employees," which they clearly did not.  He then told them

21   let's start this loan to shareholder that you've heard so much

22   about:  this account where, if Waimana pays any expense for you

23   that's personal, we put it in this account called loan to

24   shareholder.

25           What else did Carlton Siu tell him?  Carlton Siu told

1     him:  "And you should have a promissory note because that shows

2     you have the intent to repay.  That memorializes the obligation

3     to pay.  It memorializes the amounts that are going to be

4     repaid.  It memorializes the terms of repayment.  It

5     memorializes the interest that will be charged.  And, by the

6     way, you should probably, as a best practice, even do it at the

7     end of every year so that you have a tally of what is owed and

8     what is accruing."  That's what Carlton Siu testified to.

9          The defendant heard that, but it went in one ear and

10    out the other.  He already knew how to do promissory notes.  I

11    won't show them to you, but you saw the notes that he drafted

12    for Harold Johnston.  Those are in the Exhibit 15 series, if

13    you want to see them.

14         Harold Johnston wanted a little bit of money to

15    sustain him.  There was a big one, 450,000, but then there were

16    some $5,000 loans.  And what happened when he asked for those

17    loans?  The defendant said yes, but he drafted a promissory

18    note, saying, you, Harold Johnston, promise to pay to Waimana

19    this amount of money at this interest rate at this time.  And,

20    you know, it even went a step further.  It said, "And if you

21    don't do it, here's what's going to happen:  One, you have a

22    life insurance policy that pays us; or two, you pledge your

23    salary if it has not been repaid within 90 days."  Those are

24    the kinds of notes Carlton Siu was talking about.  The

25    defendant, a sophisticated man running a multimillion-dollar

1     business, knew what a promissory note was.

2          When he testified I asked him, What about the

3     promissory notes?  What did he say about that?  "Sure.  I knew

4     what a note was, but it's a lawyer's job of doing that."  And

5     can you believe that he then said, "Well, gee, the accountants

6     should have given me one.  They had their own lawyers."  It's

7     his business, not the accountants' business.

8          Now, why does that matter?  Well, because a good

9     portion of the personal expenses were paid without a promissory

10    note, and just shoehorned into this loan to shareholder

11    account.  Let's take a look at the chart we have on that.

12         Ladies and gentlemen, this chart basically represents

13    many of the payments that were made and put in the loan to

14    shareholder category.  And you can see that these are the

15    tuition, room, and board payments for a seven-year period of

16    time for the three children.  And, of course, the column on the

17    left, MIT, would be for living expenses of Ho'o.  The second

18    column, Santa Clara University, of about a quarter million

19    dollars, would represent the tuition and living expenses of the

20    two other children, Breanne and Kupa'a.  And then Arizona State

21    University and WoodenBoat School and Rhode Island School of

22    Design would represent the further higher education of Ho'o.

23    Then there's rent of $115,000 on the right.  All of that is in

24    the loan to shareholder account.  There's no dispute about

25    that.  These are all payments made by Waimana, at the direction

1    of the defendant, for what are educational and personal

2    expenses for the children.   No dispute whatsoever about that.

3           The government contends that that is income to

4    Mr. Hee.   And Judge Mollway has instructed you that the

5    critical issue for you to decide with regard to the loan to

6    shareholder (indicating) is whether Mr. Hee had the intention

7    of repaying the money when the monies were advanced for these

8    expenses.   The ultimate question for you to decide is was there

9    an intent to repay?

10          And Judge Mollway is going to tell you that, in

11   considering that, you should look at whether the parties

12   conducted themselves as if there was a loan and look at various

13   factors or indicators that might help demonstrate whether there

14   was an intent to repay.   Some of those factors include the ones

15   we talked about, the ones that Carlton Siu told you about:   Was

16   there a note?   Was interest stated and charged?   Was there a

17   repayment schedule?   Were payments made?   Well, as you look at

18   that, you'll see that the amounts grew and grew over a

19   seven-year period of time.

20          Take a look, not now, but you can look in the jury

21   room, if you're interested, at Exhibit 4-82.   That's a list of

22   all of the payments.   And the right-hand columns show the

23   balance that is still owed.   And you'll see that for about a

24   seven-year period there it just gets bigger and bigger, and

25   there are no payments of these expenses.   Those payments --

excuse me.  Those amounts continued to grow until the end of
2012 when the defendant was facing an IRS audit and questions
were being asked about all of his books.  And what happened
then?  They were repaid.  But not before.  And what does that
tell you?  Did the defendant intend to repay them?  We suggest
to you that he did not.  There were no payments for years.
There was no promissory note.  There was no interest.  People
couldn't tell what was owed, when it was owed.

          And by the way, in assessing whether he intended to
repay, ask yourself what his present attitude toward that is.
You saw how adamant he became on the stand, not only about many
things, but about this.  He says that to this day, in spite of
what his accountant experts tell him, he is firmly convinced
that those educational expenses should be borne by Waimana
because it's his right to have his children educated by his
company.  That's what he told you.  In spite of his
prosecution, in spite of an audit, in spite of paying under the
threat of that audit, he tells you now, "I don't care.  I'm
telling you that that's what should happen.  Waimana should be
able to pay."

          With that attitude, do you think he had an intent to
repay those amounts when they were advanced on his behalf?  Of
course not.  I suggest to you that it shows a lack of an intent
to repay and a complete arrogance to his obligations, as
Mr. Siu told him, and an indifference to any obligation to pay.

1          And when it came time when he was being audited, of

2   course he did pay.  You heard that what he did is he declared a

3   dividend.  So he said I owe $700,000; so I'll have my company

4   pay me $1 million.  I have to then pay some taxes on the

5   million, and then I'll use that money to pay back.  So he

6   didn't even use his personal funds in that regard.

7          Now, the Santa Clara house is another area that I

8   want to discuss about -- I'm sorry.  The loan to shareholder is

9   significant in another aspect.  You'll see that it goes from

10  2005 to 2012, and in each year amounts were being advanced on

11  behalf of the defendant.  If, in fact, you find there was no

12  intention to repay, Judge Mollway has told you that it would be

13  considered a dividend to him, if there's no benefit to the

14  corporation and it benefits only him.  And if you find that it

15  was a dividend, then that means that each of the tax returns

16  that he filed in those years were false because there's no

17  dispute they did not include the receipt of any of the money

18  that was advanced or paid on his behalf as a loan to

19  shareholder.

20          Santa Clara house.  June 2008 bought for $1.3

21  million.  What was happening at that time?  Well, Breanne was

22  finishing her third year at Santa Clara.  Kupa'a was about to

23  start.  The defendant had been paying Breanne's expenses, Liko.

24          Let's take a look at Exhibit 82F, as in Frank, page

25  816.  E-mail chain you'll probably remember.  The bottom half

1    is Liko to Dad saying, "Hey, I'm wondering when you're going to

2    send me the rent.  I need to get the checks by a certain time

3    because of my roommate situation."  And the defendant just

4    forwards it to Nancy and says pay it and arrange for automatic

5    payment, $750 a month.  Waimana paid that.  That's an expense

6    that he knew that he was going to pay as long as Breanne was

7    there.  And in June of 2008 now he knew that Kupa'a was joining

8    Breanne there.  Two kids in the same place, double tuition,

9    double rent.

10          So what does the defendant do?  He buys a house.

11   It's a 3,000 square foot house with a guest cottage in back.

12   It's very close to the school, within skate-boarding distance

13   to the school.  In fact, that's how Kupa'a would get to school.

14   What's the net effect of that?  Well, Waimana pays, not out of

15   personal funds.  The defendant then is relieved of the

16   obligation of paying for housing for his two children.

17          Now, I asked him about that.  And you remember he

18   started laughing and said, "Gee, that never even crossed my

19   mind."  Does that ring true to you?

20          When you look at the Santa Clara house, ask yourself,

21   was this really something that was intended as a business

22   purpose, or was it yet another way in which the defendant was

23   having Waimana cover his personal expenses?  I submit that it

24   was the latter.  His explanation that this was originally

25   intended as an investment or as use for me when I'm traveling

1   just doesn't make any sense.  He says I have this investment

2   with Siometrix.  It's 17 miles away from the Santa Clara house.

3   So instead of renting a hotel room or a car when I would visit

4   my investment, I basically bought a $1.3 million house and

5   bought a $43,000 SUV.  And that way I would have comfort

6   because I don't travel well.  Does that make sense?  Of course

7   it doesn't.

8            Another interesting aspect about the Santa Clara

9   house.  The accountants were confused because nobody could get

10  a straight answer about what it was for.  Let's take a look --

11  my timing is perfect.  Let's take a look at Exhibit 11-58, page

12  9646, please.

13           Remember how the defendant keeps laying it all off on

14  "It's my inside accountant" or "It's my outside accountant."

15  "It's all them.  I'm just the vision guy.  What happens after I

16  have the vision, I don't know."

17           Well, here's an example of what's going on with the

18  Santa Clara house.  You remember Lynn Tamanaha worked at

19  Chinaka & Company by this time.  This is an e-mail from Sang

20  Song Sumida at Sandwich Isles.  And, basically, Lynn Tamanaha

21  has asked, "What's with the Santa Clara house?"  And this is

22  after they've had it for a year.  And what Sumida says is "The

23  purpose of the house is to be used for employees to come to

24  California for business purpose."

25           Is that accurate?  You heard how the house was used.

1    You heard that the defendant went a couple times, maybe four

2    times a year, and found that the house was being rented out --

3    you heard that the house at one point got so packed with nine

4    to 11 roommates that when the defendant came, he had to kick

5    his own son out of the bedroom, and the son would have to go to

6    the couch.  Is that a true statement?  And if you find that

7    that's not a true statement, ask yourself, is that reflective

8    of the way in which he deceived his own accountants, giving

9    them misinformation so that it would get translated into the

10   books as if it were one thing when, in fact, it was another?

11         You also heard that later on, only a couple years

12   later, KMT -- or KMH found out that the house was being rented.

13   And that's what caused them to do all this work in trying to

14   amend returns and calculate what the effect of that was because

15   nobody was forthright in telling them that the Santa Clara

16   house is bought by the company and being used primarily as

17   college housing for my two children who are also authorized to

18   rent out rooms, collect money, keep the money, use the money to

19   subsidize their own personal expenses.

20         Is that a personal expense to the defendant or

21   personal benefit, rather, to the defendant, or is that

22   something else?  Of course it's a benefit.  He had a place to

23   house his kids now.  He had a mechanism for getting money to

24   feed them from others.  That's money on top of the salaries he

25   was paying them as full-time students, $24,000 a year paying

1    them as Waimana employees.  Is that a benefit to the defendant?

2    Of course it is.  Any father loves their children.  Any father

3    wants to support their children.  But the legitimate, lawful

4    way to do that is to take your wages, pay your taxes, and use

5    your after-tax dollars to do so, not to have other taxpayers

6    subsidize it.

7           Again, as you look at the charges on the false income

8    tax returns, there's no dispute that none of the value of the

9    rental of the Santa Clara house appears on any individual tax

10   return that the defendant filed.

11          Next topic.  Salaries and benefits.  If we can see a

12   chart of those benefits, please.

13          I showed you this earlier in the beginning.  And

14   remember, these are all items that were deducted by Waimana as

15   an ordinary and necessary business expense.

16          The total was $1.67 million and change.  And you can

17   see that it was comprised or made up of different amounts for

18   different people:  $703,000 in salary and payments to Wendy

19   Hee; $391,000 in salary and payments to Adrianne Ho'o Hee, who

20   is on the mainland; $346,000 in salary and payments to Breanne

21   Hee.  And by the way, that does not include the amounts she has

22   earned since she returned to Hawai'i and started working there.

23   You heard Susan Mitsuyoshi say, "Hey, if she's doing work,

24   that's valid.  I'm not going to quarrel with that."  These are

25   only the amounts when she was a student and not performing work

1    for Waimana.  Charlton Hee $234,821.

2              Now, if you want to get a sense of how those numbers

3    broke out, lets just take a look at Mrs. Hee's statement, which

4    is Exhibit 4-121, page 493.  If we can blow up the top half.

5              These are Waimana records of the benefits that are

6    paid.  And you'll see that she was hired in 2000, which roughly

7    coincides with the time that the children said she became a

8    full-time mother, housewife, homemaker, person who kept the

9    entire home together.  I don't know the politically correct

10   word for it, but what I'm saying is she didn't work outside of

11   the home.  She took care of her family like a competent

12   businesswoman and loving mother would.

13             And that's about the time she also went on salary

14   with Waimana and stayed on that salary to the present.  And you

15   can see that, initially, although she was at home, she was paid

16   for 2708 hours of work and paid a bonus of $15,000 and a

17   holiday pay of $2,500.  Total compensation about $80,000, a

18   little less.

19             If we look at the bottom, please.

20             You can see there's a breakout of the benefits.  And

21   many of the benefits are of the sort that employees have

22   deducted from their paychecks because they're essential for

23   medical care, for retirement, for other such things.  And the

24   value of the benefits was another $31,000 and change.  So

25   Waimana paid $111,353 in that particular year and deducted it

1   as a business expense.

2          You may recall when Adrianne Hee testified we went

3   through a similar statement for her, and you saw that she was

4   being richly compensated while she was a student at MIT and

5   working all of these other different jobs.

6          The question when it comes to this salary issue for

7   you to decide is whether those amounts were reasonable.

8          You heard Susan Mitsuyoshi tell you that a business

9   can deduct, as an ordinary and necessary business expense, the

10  salaries paid to individuals for work.

11         You heard that when Mr. Siu, the accountant, first

12  heard that the children were going on salary, he told the

13  defendant, "They got to work."  It may have been Chinaka.  It's

14  one of them.  I can't recall who, to be honest.  They got to

15  work.  And he didn't inquire further about what work they were

16  doing, but I submit to you, seeing Mr. Hee's demeanor, that

17  even Mr. Siu and Mr. Chinaka probably were not inclined to ask

18  a lot of questions, given the nature of the responses they

19  probably got.  But he was told, Mr. Hee was told, they've got

20  to work in order for you to deduct the amounts.

21         Judge Mollway will tell you that under the law a

22  business can only deduct the reasonable -- reasonable allowance

23  for compensation paid for services rendered either in the past

24  or in the future.  So the question for you is are the amounts

25  on that chart reasonable.  If they're reasonable, well, then

1      the defendant was right.  If they are unreasonable, as we

2      suggest, well, then they could not be deducted as a business

3      expense and reduced Waimana's income.

4              Ask yourself, what did the people do?  Look at the

5      children.  All of them worked during high school in the summers

6      at the Network Operation Center.  They cut grass.  They did

7      carpentry work.  They did labor.  Those wages are not included

8      here.  The only wages that are included here are the times when

9      they were on salary when they were full-time students away from

10     Hawai'i or after they remained on the mainland.

11             In deciding whether the amounts picked were

12     reasonable, ask yourself about the process by which the amounts

13     were set, too.  Remember Gilbert Tam, the defendant's personnel

14     head, came in.  And he told you about how thoughtful Waimana

15     and Sandwich Isles Communications is in the setting of

16     compensation.  He described this process where they would go

17     out and survey the community, try to pay good pay but not so

18     much that they couldn't keep the company going because they

19     didn't want to lay anybody off.  And they would do surveys of

20     what the appropriate fringe benefits were, and they wanted to

21     be, I think, generous yet sustainable.  Well, Mr. Tam wasn't

22     consulted about the salaries paid to the children.  In fact, he

23     said he didn't even know they were on salary.

24             So the defendant did this all on his own, put them on

25     salary, didn't consult with the very person that he had running

1    those types of affairs, didn't ask him what was reasonable.  I

2    submit to you the amounts that he picked were unreasonable, and

3    the deductions were inappropriate.

4            And the defendant's only justification, basically, is

5    at one point he says, "Well, they endured all my lectures."

6    Maybe that's worth something, but not the amount that was paid.

7            And, obviously, the kids didn't seem to get the

8    message.  Ho'o knows she ultimately has an obligation, but

9    she's been gone since 2004, hasn't come back, says Hawai'i is

10   too slow.  Maybe she'll come back in 10 years.  Charlton, the

11   son, he told you an interesting story about how one time he was

12   called to work pulling cable with a crew, and he didn't like it

13   because the foreman didn't take any guff.  And I think he used

14   colorful words describing it, but he, basically, says "He

15   didn't want to hear anything about how I was the boss's son.

16   He just made it very, very clear that I didn't know anything

17   about what I was doing.  And I didn't like it because it didn't

18   feel like a very genuine work experience."

19           No truer words could be said.  This wasn't a genuine

20   work experience.  This is Dad using his company to give his

21   kids payola for no work.  This is Dad unilaterally, on his own,

22   deciding that I want to use my company to give them benefits.

23   This was Dad saying that this company is their birthright.  And

24   because it's their birthright, I'm just going to pay them

25   whatever I want.  Never mind that Siu says they have to work.

1    I'm going to pay them whatever I want.

2            Ladies and gentlemen, we suggest to you that when you

3    look at the salaries, they were not legitimate deductible

4    expenses.  And, essentially, by deducting them, Waimana saved

5    money.  And by paying his family, the defendant himself

6    benefited because he did not have to incur some of those

7    expenses.

8            Now, the charges in the case again, Count 1 is

9    corruptly interfering with the IRS in the calculation and

10   computation and collection of taxes.  It runs a 10-year period

11   of time.  Judge Mollway already told you that we need to prove

12   that the defendant tried to interfere and acted corruptly with

13   the intent of obtaining an unlawful financial benefit.

14   Clearly, the defendant knew, he admitted it today, that he had

15   an obligation to report all of his income accurately on both

16   his business and his personal income tax returns.  Clearly, the

17   conduct here benefited him financially.  Clearly, for 10 years

18   he used his company to pay expenses and minimized both his

19   corporate and his personal income taxes.  Clearly, he even

20   continued with that conduct after the audit began in 2008.

21           Counts 2 through 7 talk about willfully subscribing

22   to a false tax return.  Each count relates to a particular

23   year.  When you get the verdict form, you will see the year.

24   The years are 2007 through 2012, the same years that are within

25   the time when he engaged in this conduct.  We have to prove as

1   to each year that the defendant knew the returns were false as

2   to a material matter, which means something that matters.

3   Income matters because that's what taxes are calculated on.

4   And that the false statements could reasonably influence or

5   affect the IRS.  We don't have to show that it actually did,

6   but that it reasonably could.  And we have to show that he

7   acted willfully; in other words, that he was violating a legal

8   duty that he knew, which he admitted he knew, to file correct

9   tax returns.  We submit that we have done that.

10          When the defense gets up, I believe they will argue

11   that it's not willful because he acted in good faith.  I

12   believe the defense will argue that he had an honest belief

13   that what he was doing was right; and that even if that belief

14   was wrong, so long as it was sincerely held, that that's a

15   defense to the charges.

16          Ladies and gentlemen, when you go back and consider

17   the defendant's good faith, ask yourself about his level of

18   sophistication.  He's run multiple businesses for many, many

19   years.  Ask yourself whether he just has a disagreement with

20   how things should be.  Because Judge Mollway will tell you that

21   a disagreement with the law does not constitute good faith.

22   You've seen he disagrees with a lot of things, including the

23   fact that his company can't pay the educational expenses of his

24   children.

25          And ask yourself also whether his dealings with the

1   accountants suggest that he knows what he's doing.  You know

2   that Chinaka or Siu -- Mr. Chinaka or Mr. Siu told you that the

3   defendant would regularly meet with both of them over a period

4   of years and have discussions.  Mr. Siu told you that his

5   knowledge of taxes is above average.  That assessment is surely

6   borne out by the e-mail that we asked the defendant about.

7           Could we see that?  That's Exhibit 11-57, page 7531.

8           I invite you, if you find this e-mail interesting, to

9   write it down.  It's 11-57, page 7531.  Because I suggest that

10  it really illustrates, one, the defendant's knowledge of his

11  obligations, his sophistication; and, two, the tenor of the

12  relationship with the accountants.

13          Basically, on this e-mail his in-house accountant --

14  or excuse me, Chinaka, is asking the in-house accountant:

15  "We're waiting for Al to call us regarding his wanting to

16  categorize jewelry as artwork."  You heard the reason that was

17  significant.  It had a tax benefit if jewelry that somebody

18  bought was called artwork as opposed to jewelry because jewelry

19  is like a personal item; whereas, artwork could be an

20  investment.  And Mr. Hee's inside accountant asked him to call

21  David Chinaka.  But Mr. Hee then responds.

22          If we could blow up that top part, please.

23          Mr. Hee says the jewelry should be classified because

24  "They are primarily historical preban ivory pieces manufactured

25  in Hawai'i."  I'm not going to read the whole thing to you.

1           All I suggest to you is when you examine that, does
2    that suggest to you that this is somebody who is some kind of
3    country bumpkin when it comes to taxes, or does it suggest to
4    you that this is someone who is sophisticated, who acts
5    knowingly, who is very intent on what he is doing,
6    knowledgeable, and who also directs his accountant on what to
7    do?  He's telling the accountant "This is how you categorize
8    it."  He's not asking the accountant a single thing.  Ask
9    yourself, is there a question in that statement?  No.  It's all
10   one way, showing Mr. Hee's knowledge.
11          And if we can look at the very top of the e-mail,
12   please.
13          All I'm trying to suggest is it was printed out by
14   Lynn Tamanaha and put in the accountant's file.  There is no
15   response.  She just sends it to David Chinaka, says, "This is
16   what the client is telling us.  We're going to book it that
17   way."  No response.  No questioning.  No nothing.
18          You've seen Mr. Hee.  I submit to you that his
19   demeanor in court reflects the manner in which he deals with
20   his accountants.  I suggest to you that he wasn't confused.  He
21   told them what to do.  He categorized everything.  They
22   followed his directions.  It resulted in a benefit for him.
23          The defendant acted corruptly.  He acted with the
24   intent of avoiding his taxes.  He acted willfully, knowing that
25   he had an obligation to pay his fair share, and he didn't.  We

1    ask that you find him guilty of all counts of the indictment.

2    Thank you.

3              THE COURT:  Okay.  We're going take a 10-minute

4    break.  Okay.

5         (Court recessed at 2:06 P.M., until 2:19 P.M.)

6         (Jury enters.)

7              MR. TOSCHER:  May it please the Court.  Ladies and

8    gentlemen of the jury.  Good afternoon.

9              Before I start, let me just thank you again.  You've

10   been here with us from the beginning paying close attention,

11   and we can't do this without you, and we appreciate your

12   service as a juror.

13             You just heard the government's closing argument and

14   now it's our turn.  You've heard the adage there's always two

15   sides to every story.  We're going to review the evidence and

16   discuss why you should and must find Mr. Hee not guilty of the

17   charges.

18             This is a criminal tax case.  It's not about just

19   whether Mr. Hee and the companies might owe additional taxes.

20   I said in the opening, and I'll say it again, if you look at

21   any company over a period of 10 years, you're going to find

22   some disagreements, good-faith disagreements.

23             Mr. Tong said you can't disagree with the law.  We're

24   not talking about that.  We're talking about a good-faith

25   dispute between Mr. Hee and his accountants on the one side and

1    the IRS on the other.

2           Now, there are a lot of technical tax issues.  We're

3    going to have to touch upon those and talk about those.  But at

4    the end of the day, even if there were some errors or disputes,

5    the real question here is whether Mr. Hee, in filing his

6    returns, filing the returns for Waimana, corruptly,

7    intentionally, willfully violated the tax laws.  The government

8    told you they characterize it as a scheme.  We don't think the

9    government demonstrated a scheme at all.  There was no scheme

10   here.  They've fallen far short of their burden.

11          Now, the Court instructed you earlier that the

12   government needs to prove these charges, prove Mr. Hee was

13   willful, prove Mr. Hee was not in good faith beyond a

14   reasonable doubt.

15          Now, I think it might be helpful to -- let's look at

16   some key instructions as we go in because I don't think the

17   government really covered those adequately.

18          Could we look at the "willfulness" instruction.

19          You'll have copies of these, but I want to go through

20   them, and we'll just go through a few.

21          In order to prove the defendant acted "willfully,"

22   the government must prove beyond a reasonable doubt the

23   defendant knew federal tax law imposed a duty on him, and the

24   defendant intentionally and voluntarily violated that duty.

25          Conduct that is only accidental, inadvertent,

1    mistaken, or negligent does not constitute willful conduct.

2            Now, let's look at the other side of willful conduct,

3    and that is good faith.  Because what the Judge instructed you,

4    not only does the government have to prove Mr. Hee was willful,

5    they have to prove to you beyond a reasonable doubt that he was

6    not in good faith.

7            Can you make it just a little smaller.

8            There are a number of different charges here, but the

9    instruction applies to all the counts.

10           The good faith of the defendant is a complete defense

11   to all the counts in the indictment because good faith is

12   inconsistent with corruptly obstructing the administration of

13   the internal revenue laws or willfully filing false tax

14   returns.

15           A defendant who acts on a good-faith misunderstanding

16   as to the requirements of the law does not act willfully, even

17   if his understanding of the law is wrong or even unreasonable.

18   While the term "good faith" has no precise definition, it

19   means, among other things, an honest belief, a lack of malice,

20   and intent to perform legal obligations.  Nevertheless, merely

21   disagreeing with the law does not constitute a good-faith

22   misunderstanding of the law because all persons have a duty to

23   obey the law, whether or not they agree with it.  Thus, in

24   order to prove that the defendant acted willfully, the

25   government must prove beyond a reasonable doubt that the

1    defendant did not have a good-faith belief that he was

2    complying with the law.  Here, the tax laws.  The burden of

3    proving good faith does not rest with the defendant because the

4    defendant has no obligation to prove anything to you.

5              Can you go to the "corruptly" instruction.

6              We're going to go through -- we're going to go

7    through the whole 7212 instruction just for continuity here.

8              Mr. Hee is charged with Count 1 of the indictment

9    with corruptly endeavoring to impede the due administration of

10   the internal revenue laws in violation of Section 7212 of Title

11   26 of the United States Code.  In order for you to find the

12   defendant guilty of this charge, the government must prove each

13   of the following elements beyond a reasonable doubt.

14             First, the defendant endeavored to obstruct or impede

15   the internal revenue service's lawful function to assess and

16   collect income taxes and investigate possible violations of the

17   internal revenue laws; and

18             Second, the defendant's efforts had a reasonable

19   tendency to obstruct or impede the due administration of the

20   internal revenue laws.

21             Third, the defendant acted knowingly and corruptly.

22             "Corruptly" means to act with the intent to obtain an

23   unlawful benefit for himself or someone else.

24             Can we go to the next page?

25             To "endeavor" means to knowingly and intentionally

1    act or to knowingly and intentionally make an effort that has a

2    reasonable tendency to bring about the result.

3           With that base, let's start with -- I'd like to talk

4    about the government's opening statement in this case because

5    the government I don't believe in the opening statement told

6    you a complete story.  And that's, I believe, very telling.

7    They didn't tell you all the facts either because they didn't

8    know them, or they didn't want you to know all the facts.

9    Either way, we should be concerned.  I think if you think

10   back -- and I'm going to walk through this with you -- and see

11   what they told you on the opening and then look at what the

12   evidence showed in the case, it's a far different story.

13          These are serious criminal charges, and you would

14   expect a thorough investigation by the government and the

15   government to know all the facts.  If you recall the evidence,

16   the IRS has been auditing Mr. Hee and his companies since 2006.

17   You heard the testimony of Alan Yee the other day.  When his

18   accounting firm took over the IRS audit from Chinaka & Siu, the

19   IRS had already issued 60 information document requests.  It

20   was a very extensive examination.

21          You heard that all the CPAs and Mr. Hee's companies

22   cooperated with the IRS and provided a lot of information.  So

23   you have to ask yourself, all the testimony we've heard over

24   the last three or four days regarding the reasons -- the

25   business reasons for these deductions or trips or whatever it

 1   was, or the loans, you didn't hear that story on the

 2   government's opening.

 3          We know the IRS audit ended without ever proposing

 4   any additional tax due, and instead they referred the matter;

 5   it became a criminal investigation.  It's now 2015.  More years

 6   of investigation.  And the government, in their opening, still

 7   didn't tell you all the facts.

 8          So let me review what they told you and what the

 9   facts in evidence turned out to be.  And we're going to go

10   through it in my detail, I realize there's a lot to digest, and

11   I'm going to try to help go through it with you.

12          Let's start with the massages.  The government told

13   you that Mr. Hee had expensed -- had characterized these as

14   consulting fees.  And I think you heard Mr. Tong say that again

15   today, notwithstanding the evidence.  What the government did

16   not tell you was that the accountants were told that the

17   payments to Diane Doll were for health consulting services, and

18   the government did not tell you anything about that or

19   Mr. Hee's health-related issues.  I think you need to ask

20   yourself why.

21          We're going to get into more detail because I think

22   Mr. Tong and I have a little different recollection as to how

23   consulting services were first -- when they were first

24   characterized by the accountants.

25          Let's go to another topic:  the 2004 tuition and

1    later the loans for tuition.  The government didn't tell you

2    that the 2004 tuition was a mistake by the accountants.  You

3    heard CPA Lynn Tamanaha and Dave Chinaka tell you it was their

4    mistake.  You watched, if you recall, Gary Howard from Southern

5    California -- and we're going to review this in more detail.

6    He traced through how that mistake happened.  And we're going

7    to go through that in more detail.  If you recall, Chinaka &

8    Siu were told MIT tuition, and they just booked it first as

9    educational, and then it ended up in office expenses.  But the

10   fact of the matter is both Lynn Tamanaha, David Chinaka, and I

11   think Carlton Siu was asked, they all acknowledged, "Hey, we

12   missed it.  It was our mistake."  The government didn't mention

13   anything about that.

14         You were told I think in the opening statement that

15   Mr. Hee never made any payments on the loan.  Okay.  What

16   you'll see in review later, that in 2011 he made a substantial

17   payment.  In 2012 he paid it off with interest.

18         The government told you in their opening that he

19   characterized the tuition payments as a loan against his

20   accountant's advice, and the evidence was exactly the opposite.

21   Just recall that the accountants did say, "Whoa, we missed this

22   the first year," and there was a discussion, and they said,

23   "You can't characterize -- I mean, you can't deduct it.  It's

24   not a deductible item.  You need to treat it as a shareholder

25   loan."  And what did Mr. Hee do?  Followed the advice and

1    started treating it as a shareholder loan.  And that's a

2    fundamental point here because, when a tax issue comes up and

3    he's dealing with the accountants and they tell him how to

4    treat it for tax purposes, he follows that advice.  And the

5    government really has not proven -- have any evidence to the

6    contrary on that.  Their opening didn't tell you about that.

7           Children's salary and benefits.  Never told you that

8    they worked in high school.  Never told you what Mr. Hee was

9    trying to accomplish by putting them on salary when they went

10   to college.  Didn't mention it.

11          Employing Wendy Hee, never even mentioned it.

12          Cash withdrawals, never told you anything about it.

13          Santa Clara house.  You heard the evidence.  There

14   was a real good business reason for Waimana to make a real

15   property investment:  Siometrix.  The company already had

16   approximately four to five million in a very important

17   investment, and you didn't hear anything about that.

18          The credit card expenses.  Okay.  Government calls it

19   family vacations.  We're going to talk about it, the business

20   reasons and Mr. Hee's reasons why he thought there was an

21   adequate business purpose for this.  But family vacations?

22   When I'm used to going on family vacations, I, as the father,

23   usually go on the family vacations.  Here there was only one of

24   the trips that Mr. Hee went on, and that was the Mauna Lani.

25   And I think we'll talk about that a little later.

1           Now, we could argue about this, but -- and there

2     might be different views, but you have to ask, why didn't all

3     this come out at the beginning?  Why did it have to come out

4     throughout the case?  And what happens is the government makes

5     up its mind, and it's just like a speeding train:  it's very

6     hard to stop.  Scary proposition:  deciding to prosecute a case

7     either ignoring the facts or not knowing all the facts.

8           If you disagree with the IRS, if your accountant

9     disagrees with the IRS, rather than saying we disagree what you

10    think you owe, let's just end the discussion and prosecute you.

11    It's a very scary and real possibility to prosecute a taxpayer

12    without having all the facts.  We end up here today 10 days

13    later.

14          Fortunately, the law does not allow that to happen.

15    You, as jurors, are here to make sure it doesn't happen.  You

16    get to consider all the facts, what Mr. Hee did and why he did

17    it, and not just an incomplete or partial story.

18          Now, we started the case, I think, in opening, I

19    don't know if you remember, talking about obligations,

20    responsibilities.  Everybody's got obligations and

21    responsibilities in this case.  You've heard about Mr. Hee's

22    obligation, what he other undertook to the Hawaiian Home Lands

23    community to bring them high-speed telecommunications.  He

24    undertook and feels an obligation to them, and to complete that

25    vision, to provide that to the community, he needed to bring

1   his children into the business because it was going to be a

2   long-term proposition.  He knew a utility telecommunications

3   company does not get built in 10 years or 20 years.  It's a

4   lifetime.

5          But there are other responsibilities.  First one we

6   can start with, and let's be right upfront, is Mr. Hee's

7   responsibility to be truthful and honest on his taxes.  And I

8   submit to you he was.  He believed what he was doing was

9   proper, he considered the payments made by Waimana for business

10  purposes, and he saw a benefit to his corporation.

11         The accountants also had responsibilities here to

12  take the information they received from the accountants,

13  determine how it should be treated for tax purposes, to follow

14  up if they needed more information.  And on some occasions we

15  saw maybe they could have been more diligent.  Maybe they could

16  have done a better job.  But -- they were doing their best.

17  But as Mr. Tong said and the Judge said, use your common sense.

18  Has anybody here never made a mistake?  You've witnessed a

19  number of mistakes of me already over the last 10 days.

20  Everybody makes a mistake.

21         Now, the other obligation is the obligation of the

22  government to tell you the whole story.  Now, they're advocates

23  here.  They're arguing for their side, as I'm arguing for my

24  side.  But, you know, there's an expression in the law, and I

25  don't want to bore you with that:  the government should be

1    fair, okay, and they need to tell you the whole story.  That

2    was their responsibility.

3           One final set of responsibilities, and that's to you,

4    the jurors, to follow the law and hold the government to the

5    very high burden of proof that Judge Mollway instructed you

6    about.

7           If you recall at the beginning, Judge Mollway

8    utilized the visual analogy of the scales of justice.  Not just

9    the scales of justice tipping a little bit in favor of the

10   government, but tipping way in favor of the government.  It's

11   because this case is just not about money.  It's a criminal

12   case, and all of its consequences.

13          Based upon the evidence, in order for you to find

14   Mr. Hee guilty, the scales of justice must tip very heavily in

15   favor of his guilt.  Why?  Because they start out way in his

16   favor because of the presumption of innocence Judge Mollway

17   talked to you about.  The government needs to provide evidence

18   beyond a reasonable doubt that Mr. Hee corruptly, knowingly,

19   intentionally, and willfully committed these very serious

20   crimes he's charged with.  We're going to go through the

21   evidence, and I submit the government has failed to do so.

22          Let me -- one other point on this.  There's a reason

23   for this very high burden the government must meet:  because

24   it's a criminal stake and what -- it's a criminal case, and

25   what's at stake.  We have a very powerful government, and we

1   need to make sure we put proper checks and balances on the

2   government.  That's why the government can't just accuse; they

3   have to prove beyond a reasonable doubt that there was a

4   willful violation of the tax laws.  Our constitution requires

5   it.

6          And there's another protection:  the jurors.  Our

7   constitution gives the right to all citizens to have citizens

8   like you independently consider the evidence.  It's not just

9   what the IRS says.  The constitution puts you, the jurors,

10   between the IRS's allegation -- the government's allegations

11   and what we consider to be that runaway train and a citizen.

12   That is your responsibility, and I'm confident you're going to

13   carefully weigh the evidence and be fair and come to the right

14   conclusion in this case that Mr. Hee is not guilty and the

15   government hasn't come close to proving it.

16          Now, this case will not come down to the burden of

17   proof because, as I said, I don't think the government has even

18   come close to this.  The IRS never completed their audit and

19   just launched a criminal investigation, and that's the

20   fundamental problem:  they didn't have all the facts; they

21   didn't have the reasons for these expenses; they just made a

22   lot of assumptions and drew conclusions and brought the case

23   publicly charging Mr. Hee with a crime, requiring us to come

24   here and defend the case.

25          Now, let me start with some of the issues that we

 1   talked about.  The education expense to MIT in 2004.  Mr. Hee
 2   did think it was appropriate to have Waimana pay for the 2004
 3   MIT tuition.  He was training her to be a future leader of the
 4   company.  He thought it would be good for the business.
 5        You heard testimony of how the military paid for his
 6   education, and he had to give a commitment to the future
 7   services.  And I think it's pretty clear he wanted that
 8   commitment from his children.  They may have not wanted to have
 9   an immediate commitment to him to come back, but he wanted that
10   commitment, and that is what is important here.
11        Nothing was concealed.  Everything was clear on the
12   books.  If you recall, MIT tuition -- and we're going to go
13   through a little chart in a little bit -- he told his
14   accountants everything about it so the accountants could
15   determine whether it was deductible.  And as I said at the
16   beginning, there is no question that this was a mistake in
17   characterization and reporting it and deducting it by the
18   accountants.
19        Now, Mr. Hee did say, "I thought it should be an
20   expense of Waimana," and he has good business reason for it.
21   But when the accountants looked at this and caught it the next
22   year and said, "Whoa.  We see these expenses.  Mr. Hee, or Al,
23   we don't think they're deductible."  And what did they tell
24   him?  If you're going to be paying personal expenses from the
25   corporation, do what everyone of -- we tell our clients to do:

1   don't deduct them; treat them as a shareholder loan.

2           Now, let's turn to what we showed you as part of Gary

3   Howard's testimony, demonstrative exhibit 41.

4           Now, just to review with you quickly because I know

5   there's a lot to remember, what we saw was -- well, I'm having

6   a little trouble with my pointer here.

7           MR. TONG:  Mr. Toscher.

8           MR. TOSCHER:  Thank you.

9           Okay.  Let's just review this because this is

10  important because I think Mr. Tong and I disagree as to what

11  the evidence was.  Okay?

12          Error in classification of the 2004 tuition expenses.

13  Checks written payable to MIT.  Checks recorded to the account

14  entitled MIT.

15          Thank you.  Thank you, Your Honor.

16          Checks recorded to MIT.  Memo:  tuition and related

17  expenses.  Put in the QuickBooks or Quicken accounting;

18  provided to the outside accountants.

19          Remember?  It was Chinaka & Siu doing the general

20  ledger.  They created the general ledger and classified as

21  educational and travel expense because that's what the client

22  had told them.  Financial statement prepared.  Total

23  educational expenses of 31,000 combined with other expenses

24  from financial statement and put in a category of "office

25  expenses" and deducted as office expense on the tax return

1    among other office expenses of 175,000.

2              No question about what happened here.

3              I'll just set it right here.

4              And it just wasn't Mr. Howard's forensic analysis

5    going through that.  You heard the testimony of Lynn Tamanaha.

6    It was their error, a good-faith mistake.  They just didn't

7    see.  They had a look at the information coming through.  They

8    just didn't catch it.  Okay?

9              And as the Judge instructed you, regardless of whose

10   error it was, the accounting firm's or Mr. Hee's, an error or

11   mistake is not criminal.  Mistakes are not willful.  They're

12   not knowing or intentional conduct.  And it's absolutely clear

13   that this was a good-faith error.

14             Now, the government told you you would hear evidence

15   about how the accountant told Mr. Hee he could not deduct the

16   tuition.  And that's true.  But I think the government said,

17   Well, Mr. Hee continued to do it anyway.  That's not what

18   happened.  And we're sitting here.  We know that's not what

19   happened.

20             You heard the testimony of Carlton Siu that they told

21   Mr. Hee, "Needs to be treated as a loan.  Continue to pay the

22   expenses.  Treat it as a loan, and you'll have to pay it back

23   to the company."  That's what they -- and they told you that's

24   what they do routinely in every closely-held corporation case.

25   And it wasn't just Chinaka & Siu who told you that.  There were

1    independent experts who testified as to that as well.

2           Do you recall Mr. Au, a local CPA for approximately

3    30 years?  He had looked at how these payments were made, and

4    he told you:  This is the way we do it.  We record them.  We

5    don't allow the clients to deduct personal expenses if we think

6    they're personal and shouldn't be deducted, but we record it as

7    a shareholder loan.  And that's the way it's done.  And it's

8    got to be repaid, and there should be accrued interest on it.

9           They told you, there doesn't have to be a promissory

10   note.  And there doesn't have to be a promissory note.  When we

11   go into the Judge's instruction, and we may do that a little

12   bit later, you will see that a promissory note is just one

13   factor.  The question is did Mr. Hee intend to repay it?  It

14   was his company.  I think he did intend to repay it, and I

15   think his conduct demonstrated he intended to repay it.

16          Mr. Hee -- and this is the important point here,

17   among others.  When an issue came up regarding a tax matter,

18   Mr. Hee's not an expert in tax matters, and he may still feel

19   today that "My company should be able to pay the educational

20   expenses of my children because I want them in the company.

21   They're the future.  They're going to take over this company

22   when I'm no longer here."  But when the accountants tell him,

23   you can't deduct it, what did Mr. Hee do?  He didn't deduct it.

24   He didn't fight with them.  He followed their advice and

25   treated it as a shareholder loan.

1          Now, as I mentioned, the government's complaining

2     about some formalities.  They want to see a promissory note.

3     But as I said, there is no legal requirement.

4          I think I may have asked the question -- and again

5     this is part of your common sense -- if you borrowed money from

6     a friend or a family member, would you need a promissory note

7     to feel an obligation to pay them back?  It's your handshake.

8     You would pay them back.  You don't need a note.  Now, that's a

9     family member, that may be a friend, but I submit to you, not a

10    lot of difference when you're borrowing money from, or loaning

11    money to, your corporation.  The formalities aren't required by

12    the law.

13         Now, we talked before it's the government's burden to

14    prove Mr. Hee did not intend to repay the loan, and there is no

15    evidence whatsoever that he did not intend to repay the loan.

16    You have a loan recorded on the books of your company that you

17    owe the company.  You put it on financial statements.  You have

18    certified audits that we'll talk about in a little bit that

19    reflect those obligations.  That is -- shows an intent to

20    repay.  And also, the fact that it was repaid.

21         Now, we're going to put up -- put up Exhibit 4-82,

22    please.

23         Now, the government's argument is it was paid too

24    late.  Okay?  There's nothing to that argument.  All right.

25    Mr. Hee -- I'm going to stay here Your Honor.

1          Mr. Hee accounted for all the expenses properly.

2     They were all recorded as loans.  And this is the final page,

3     and the government is right the balance did go up.  And I

4     commend you to this, Government Exhibit 4-82.  And the balance

5     went up, they were recorded as the accountants advised "loan to

6     stockholder," and it went up, up, and then, I believe, there

7     was a -- I think it's on the prior page, Lacey.  Can you go

8     back one?

9          Okay.  Here.  This is what year?  2011.  Okay?

10    There's a large payment of 298,000 paying down the loan.

11         And then let's go to the next page.

12         At the end of 2012 -- it's recorded as the beginning

13    of 2013, but I don't think that really makes a difference -- he

14    paid it off:  736,000.

15         And you heard the testimony.  That was -- he overpaid

16    the balance of 662, leaving a credit balance of 73, and that

17    more than adequately accounted for all the interest.  That was

18    Gary Howard's testimony because he ran those numbers.

19         The government hasn't put in any evidence on that

20    point.  And again, it's the government's burden to prove to you

21    that he did not intend to repay it.  He did repay it with

22    interest.

23         You know, we could have a technical disagreement with

24    the government:  how should this loan be characterized.  We

25    think it was properly characterized, and all the evidence

1    suggests it was.  But the ultimate question:  Was there

2    intentional and willful conduct here on Mr. Hee to violate the

3    laws?  There's no evidence of that.  Just use your common

4    sense.

5           Let's turn to another issue:  the children's salaries

6    and benefits.  I think in the opening statement they never

7    talked about how the children were involved with the

8    corporation when they were in high school working at the

9    Network Operation Center.  They didn't talk about what they did

10   when they were full-time students.  They didn't talk about how

11   they spoke with their father.  They didn't -- government didn't

12   tell you about the business meetings that Liko went to, that

13   Ho'o went to.  They just ignored everything.

14          But let's talk about why did Mr. Hee do this?  You

15   heard him.  You got to see him on the stand.  He was

16   concerned -- like any father, let's face it, he loves his

17   children; he wants them to do good.  But he was also concerned

18   with the mission, the future of the company, and making sure

19   this company was going to be a success in the future to carry

20   on its mission to the homelands, a project not yet complete.

21          And you heard this from multiple witnesses, inside

22   and outside the company.  Large corporations, they're not

23   interested in providing services to the Hawaiian Home Lands

24   communities.  Why?  Not enough money in it.

25          You heard from Michelle Kauhane, Ray Soon, outside

1    the company, both former officials with the Department of

2    Hawaiian Home Lands.  And you heard from somebody in the

3    company, Gil Tam, who talked about the mission.  You heard from

4    Mr. Hee's -- all their three children about the mission and the

5    importance of it.  And you heard from Mr. Hee himself how he

6    undertook that commitment, and he's going to see that

7    commitment through.

8           Now, the government may disagree:  salaries aren't

9    reasonable.  But come on.  Isn't that for Mr. Hee to determine

10   what he thinks is an appropriate salary for them?  The

11   government really shouldn't be second-guessing what's

12   reasonable.

13          You heard the testimony of the three children.

14   They're all different.  Okay.  Ho'o described by Torkel

15   Patterson.  He thinks she's going to be the leader, take over

16   the company.  She's not come back yet.  Kupa'a -- and we're

17   going talk about that a little more -- he came back, and he's

18   on call, and he had good reasons.  Liko has come back in 2012

19   and took over as the Director of Corporate Services, I think

20   that was the title, with many, many significant functions.  At

21   this point all of you who are parents, one out of three so far

22   isn't bad.

23          Let's talk about Kupa'a for a second.  I think he was

24   the first of the children for you to hear.  And you remember he

25   told you he was on call.  I have to disagree, respectfully,

1   with Mr. Tong's characterization of Kupa'a's experience when he
2   went back to the company.  He was asked, and he went back, and
3   the people he was working with knew he was the boss's son.  He
4   felt he couldn't get a really good work experience doing that.
5   I think that was a fair and honest characterization, and I
6   think that is commendable.  And I think it's good that he gets
7   experience elsewhere.  You don't want to be known as the boss's
8   child or son in a business environment.
9           You evaluate yourself.  You heard Mr. Hee talk about
10  the obligation he was trying to instill in his clients, and you
11  got to observe the children.  I think they know their
12  obligation.  They understand why they have to have that
13  obligation.  And they told you it's important.  The mission's
14  important.
15          Now, both Liko and Ho'o testified about numerous
16  meetings and business trips they attended with their father
17  during their time in college, or perhaps with Ho'o after she
18  was done with college.  And recall Torkel Patterson's
19  testimony.  You remember Mr. Patterson.  Mr. Patterson is a
20  long-time friend and business advisor of Mr. Hee, had a lot of
21  chance to observe the dealings with the children.  You heard
22  Admiral Kihune testify that he was asked and allowed them to
23  attend executive management meetings of the corporation.  And
24  Mr. Patterson, who's quite a savvy business person, told you
25  the importance of this type of experience to training future

1    leaders of the company, to learn how things work, and to

2    establish business relationships.

3            Now, the government says, well, they had no offices

4    while they were in school and there's no formal training

5    manual.  That's not how you train future leaders of a company

6    that will be able to complete Mr. Hee's vision.  I just submit

7    to you on the technical issue here -- and you'll get to decide

8    some of this -- the IRS takes a far-too-narrow view of what a

9    business should do.

10           You need a deep understanding of what a business is,

11   what it's trying to accomplish, and how you accomplish that.

12   You need to understand contacts fundamental to the business,

13   political areas.  They were learning all of this from their

14   father firsthand:  business decision he made, issues would come

15   up, and how he handled them.  He was taking them to business

16   meetings with his associates, to hearings where he was

17   testifying at, to hearings in Washington, D.C., and meetings at

18   the Hawaiian Home Lands.  I don't think we should discount

19   that.  I don't think the government should ignore that.  This

20   is very significant.  This was core as to the training of a

21   future leader of the company.  The government, I submit, is

22   just simply missing the point.  This is the way you train a

23   future leader of the company.

24           If you remember what Torkel Patterson said,

25   Mr. Patterson had the very extensive resume:  in and out of

1    government; a couple of stints with Raytheon, the big defense

2    contractor.  And he pointed out that his observation, he

3    thought Ho'o was going to be the one to take over the company.

4    He explained -- I'm quoting, I think, accurately -- "The sum of

5    her experience is going to be important when she takes over the

6    company."

7         Now, I could understand how the government could say,

8    not enough work, not reasonable.  They can dispute that.  But

9    this was Mr. Hee's business judgment, and there was a business

10   purpose to paying these salaries and benefits.

11        And let me just segue a little bit because I think it

12   is important.  The children, when they were employed and

13   received a salary, did receive the same benefits that every

14   other employee received.  They weren't singled out.  Nothing

15   special.  Yes, they did get the benefits.  But these were

16   benefits -- you heard the testimony of Gil Tam.  These were

17   benefits designed to take care of the employees of Sandwich

18   Isles in Waimana, the approximate peak 100 employees.  I think

19   it's a little lower now.  Okay?  This wasn't designed to

20   necessarily benefit the children.  Did they participate in the

21   benefits?  Well, they had to because all employees participate

22   in the benefits.

23        The -- but again, even if there is a dispute, the

24   testimony was, I think, very clear.  They were -- Mr. Chinaka &

25   Siu, the accountants, they knew that these salaries were being

 1    paid to the children when they were full-time students.   How

 2    did they know?   Well, they did the books and records of

 3    Waimana.   They did the payroll tax returns of Waimana.   They

 4    did the tax returns for the children.   You can look at the

 5    evidence:   the tax returns.   It shows they're full-time

 6    students.   Both Mr. Chinaka & Siu told you, Yeah, we knew they

 7    were full-time students.   Never told Mr. Hee, "Stop.  You can't

 8    do this."

 9            Yes, there may be testimony they have to work.   They

10    were working.   Okay?   The government can dispute it wasn't

11    enough work, they didn't have an office, but they were working,

12    and, certainly, they were doing exactly what Mr. Hee wanted

13    them to do:   and that was be trained to be a future leader to

14    take over this company.

15            There was no inquiry, and maybe the accountant should

16    have said, "Well, too much -- too much salary.  Don't do it."

17    But they never did it.   It was okay with them.   Nobody ever

18    raised an issue.

19            And that's what's important because it's not just

20    sort of IRS says this, the accountants say this, we say that.

21    The question is was Mr. Hee in good faith?   And the question is

22    did -- has the government proven beyond a reasonable doubt that

23    Mr. Hee is not in good faith in employing his children?   I

24    submit to you it's not even close, ladies and gentlemen.

25            Now, the -- can I ask you to put up the instruction

1    on the deduction for salaries.

2           This is part of the instruction that the Court's

3    going to give you on a lot of different expenses, but this is

4    the specific instruction on the law regarding salaries.  And

5    what it says is:  Ordinary and necessary expenses can include a

6    reasonable allowance for salaries or other compensation for

7    personal services actually rendered.  Services actually

8    rendered may include past or future services rendered,

9    depending upon the particular facts and circumstances of the

10   situation.

11          When you're evaluating the issue of ordinary and

12   necessary, but even more importantly, when you're evaluating

13   Mr. Hee's intent and good faith, please keep in mind that

14   instruction because this is exactly what Mr. Hee was trying to

15   do:  train them so they would be ready to continue the mission

16   of the company.

17          Now, let's talk about Mrs. Hee's salary and benefits.

18   I think Revenue Agent Mitsuyoshi told you that they were

19   adjusting her salaries because she performed no services for

20   the corporation.  They didn't know.  They didn't do a thorough

21   investigation.  She thought Wendy was just staying at home.

22   The government didn't get all the facts.

23          Let's review what Torkel Patterson, close family

24   friend, who's been observing the family and the businesses for

25   years:  Wendy is his counselor, advisor, and better half.  In

1    terms of what I mean by that is that she's able to smooth

2    relationships with community groups and areas and give him

3    advice in those areas that he might otherwise not best know how

4    to manage.

5             We all have our strengths and weaknesses.  Mr. Hee

6    has his.  Wendy Hee has hers.

7             Mrs. Hee explained her work history, which predates

8    her ever receiving a salary.  She helped in the early days

9    paint the office, deliver newspapers, recruit employees,

10   whatever was needed to be done.  She did it unpaid for a number

11   of years up until the time she was put on salary.  And it was

12   only when Waimana was in a financial position to start paying

13   her she was able to get compensation for her services.

14   Admittedly, some of it past services.  The -- I think one way

15   to describe it is, you know, she's been working to support the

16   business for many years but only got starting paid later on

17   when the company could afford it.

18            Mrs. Hee discussed the types of work she was doing.

19   If you recall her background:  policy, planning, research,

20   doing environmental impact studies.  And if you recall the

21   early projects of Mr. Hee, which was included with Waimana,

22   they were doing some very major energy projects, hydroelectric

23   projects, and Wendy was integral on that in helping him with

24   filings, reviewing information.  She was always, as

25   Mr. Patterson said, his sounding board, bounced off ideas,

1    discussions with him.  And later on she told you she was the

2    one who attended a lot of the public events without her

3    husband.

4            Now, the government has really discounted that, and I

5    think that's wrong.

6            There were some questions about Mr. Hee's allergies

7    and food allergies, but let's just sort of review what Mrs. Hee

8    told you, okay?  "Yes.  There were a couple of things I saw and

9    observed, and one was that I was more comfortable in social

10   situations with strangers.  Albert -- it was not something that

11   he enjoyed much.  And the other thing that I observed was that

12   he was tired.  I mean, he spent long hours at his job, and it

13   was difficult for him to spend all that time at work and then

14   go to a function that was taxing for him.  It was not

15   pleasant."

16           Now, the government can discount that and dispute

17   that.  I submit to you that's extraordinarily valuable to a

18   company.  You saw she was intelligent, accomplished.  I think

19   we could all agree she would make a great addition to any

20   company, and her job experience demonstrates that.

21           Now, one of the things she told you about is

22   assisting Mr. Hee in recruiting personnel:  got his initial

23   administrative support staff; and later was able to help

24   Waimana and Mr. Hee recruit a very significant executive, if

25   you recall, the gentleman by the name of Al Peterson, who had a

1    particular expertise and experience in a rural telephone

2    program, which is a key to the success of Sandwich Isles.

3              I think you also heard the testimony of CPA Gary

4    Howard about the importance of the type of services like the

5    ones Mrs. Hee described.

6              Government:  their focus has been services performed

7    in an office setting.  But the government is wrong as to what

8    constitutes "services."  They seem to be obsessed with a

9    physical office just like with a physical training manual and

10   with a need for a promissory note.  I submit to you that's far

11   too narrow for the way things work in the real world.  Just use

12   your common sense.

13             The government has just ignored Mrs. Hee's

14   contributions.

15             But there's more.  Mrs. Hee's salary was reported on

16   their tax returns.  It doesn't sound -- that doesn't sound like

17   there was any tax motivation here whatsoever.

18             But importantly, just to review again, did the

19   accountants know Mrs. Hee was a full-time employee?  No

20   question about it.  And we know how they knew because they did

21   all the returns:  Mr. and Mrs. Hee's return, the payroll tax

22   returns, the corporate returns.  There was no question.  This

23   was all done in good faith.  No concealment.  The accountants

24   knew everything.  Nobody raised it with Mr. Hee you shouldn't

25   be doing that.  I submit to you he had a good reason for

1    employing both Mrs. Hee and the children, and nobody told him

2    it wasn't right.

3         That, ladies and gentlemen, if you remember the chart

4    of the numbers -- and I admit it's hard to follow -- the lion's

5    share of the amount the government is disputing are the

6    salaries and benefits to Mrs. Hee and the children.  And we'll

7    break it down a little bit.  In fact, now that I'm talking

8    about it, and, hopefully, you'll be able to see, if you look

9    at -- and what is the other big number?  The other big number

10   is the loan to shareholder, which he repaid back.  I think

11   between those two, it accounts for 90 percent of what the

12   government is complaining about here.

13        Now, let's talk about some other issues.

14        Let's talk about the Santa Clara house.  The

15   government told you during opening that he bought the house for

16   the children, and that's why he did it.  Well, the government

17   never mentioned anything about the Siometrix investment, or at

18   least my notes reflect they didn't.  I don't believe they did.

19        And you heard evidence from testimony by Jimmy

20   Ventura because he was a co-investor in the Siometrix project.

21   You heard testimony by Liko that she attended -- she went to

22   visit the lab in Menlo Park.  And you heard testimony by

23   Mr. Hee as to why he purchased the house:  a convenience.  At

24   this point -- this is June 2008 -- the company already had a

25   substantial investment in Siometrix.

1            Can we get Exhibit 46A, please.

2            You see this was the chart that was done by CPA Gary

3    Howard.  And we're going to go to the second page in a second,

4    which is based upon the books and records, but you can see by

5    the time they bought the Santa Clara house in June of 2008

6    Waimana had an investment in Siometrix going up over $3

7    million, eventually went up to over $4 million.

8            Now, I think you heard testimony from Mr. Ventura

9    that at that time, June, the investment was looking okay, but

10   they think they should be start looking at this a little

11   closer.  More time was going to have to be spent.  Mr. Hee's

12   children were going to be going to school up there, but he was

13   going to have to be up there to watch this investment.

14           Now, I think Mr. Tong made a argument to you that

15   Mr. Hee bought the house to avoid paying a $750-a-month charge

16   for housing for his kids.  I think that runs counter to common

17   sense, ladies and gentlemen.  This is a man who has paid

18   hundreds of thousands of dollars for his children, as reflected

19   in the shareholder loan account.  That's coming out of his

20   pocket.  He's not trying to get Waimana to pay it.  I don't

21   think he would make a $1.3 million investment to not pay $750 a

22   month in rent.

23           And, no, Liko was probably going to have one more

24   year left.  Yes, Kupa'a was going to be there.  But it just

25   doesn't make any sense.

1          What makes sense is there's a significant investment

2     in Siometrix.  What makes sense is things are really looking

3     good in Northern California in this area.  What makes sense is

4     that the Santa Clara house is very close to the San Jose

5     airport.  And what makes sense is that this is going to be a

6     good investment.

7          Now, we know what happened.  We heard it from

8     Mr. Ventura.  I think most of us know it by common sense.  The

9     stock market crash, followed by the real property crash.

10    Siometrix couldn't survive anymore.  The housing market, you

11    heard the testimony, I think, of the government's expert.  I

12    don't want to get his name pronounced wrong.  The government's

13    IRS engineer, he told you prices plummeted 50 percent -- there

14    is no question about this -- so it made sense for the company

15    to continue to hold the property even after the Siometrix

16    investment, the technology, the lab closed, and they had to

17    move it back to California.

18         Now, Liko did rent out rooms to other students.  And

19    Mr. Hee told Liko "Take care of it."  It didn't get reported to

20    the company.  Okay.  Things happen.  I think the testimony was

21    the evidence -- there was little or no tax impact on the

22    company in this.  This was an investment.  It could have been

23    done better, but I don't think we can -- I think it's just not

24    significant, and I don't think we can attribute that to

25    Mr. Hee.

1         You heard Gary Howard.  His view was the use of the

2    house by the children, Mr. Hee's children, was incidental.  He

3    said, primarily, What I'm looking at, this is an investment

4    property, and I don't think it's income to Mr. Hee.

5         But I think the important issue here -- they're all

6    important, but the bottom line is the government -- I think if

7    you heard -- remembered the Revenue Agent Miss Mitsuyoshi's

8    testimony, they're what is referred to as imputing certain

9    income to Mr. Hee.  Mr. Hee didn't receive any income.  They're

10   trying to charge him with the fair rental value of that house.

11   Mr. Hee had no clue that he might have to report the income on

12   that house.  The -- and that, at bottom line, is what it comes

13   down to:  Did Mr. Hee know that he was required to report that

14   imputed rental income on his tax returns?  There is no evidence

15   to suggest that.  There's nothing in common sense which

16   suggests that.  And the government really hasn't demonstrated

17   any evidence of it.

18        Let's talk about the credit cards -- the credit card

19   reimbursements.  And this relates to a number of the alleged

20   personal expenses that the government has a dispute with.

21        The question is the technical tax question:  Were

22   these ordinary and necessary expenses for a company like

23   Waimana?

24        You're going to get a definition of ordinary and

25   necessary.  You can look at it.  It's a very technical tax

 1    term.  Anybody who studied tax learned this.  It's been around,

 2    you know, and causing issues for a while.

 3          What does it mean?  Appropriate or helpful to the

 4    business.  You know, who -- in whose eyes is something an

 5    ordinary and necessary business expense?  In whose eyes is an

 6    expense appropriate to a business?

 7          But I think the government, they picked out a couple

 8    of the specific trips, which we're going to talk about, but I

 9    think they've just assumed everything was personal without

10    doing an investigation, without asking the right questions.

11    They just assume it.  And I think a good example, it's a small

12    one, but let's talk about -- maybe if you can put it on the

13    screen -- the expense claimed for Mr. Hee's father.

14          There's a couple here, but I want to -- look at this

15    one.  It's $67, meals, entertainment, CCI, charged to ClearCom

16    and maybe and Waimana.  Al Hee, Charles Hee, his father.

17    Abandoned water mains.

18          You heard a lot of evidence about Mr. Hee, and there

19    was evidence concerning Mr. Hee's -- Mr. Charles Hee's history

20    at the Board of Water Supply.  And I think you've heard

21    evidence that -- in fact, I know you've heard evidence that the

22    abandoned water mains are part of an integral -- that Sandwich

23    Isles uses the abandoned water mains as part of their network.

24    So there was clearly a business purpose here.

25          And there's another example let's go to.

1           Where is this one here?

2           Thank you.  Down here.

3           Okay.  Zippy's.  You heard it.  Mr. Hee's favorite

4    restaurant.  Al Hee, Charles Hee, NOC projects.  Okay.  Network

5    Operation Center.  You heard evidence Mr. Hee -- Mr. Charles

6    Hee still works there.  He's retired but works there every

7    weekends, does work cutting the grass.

8           So these, ladies and gentlemen, were expenses with

9    business purposes.  But the government, they're either ignoring

10   the facts or just don't want to know the facts.  And this is

11   just one example.  But it's not our burden at this stage in

12   this proceeding or criminal proceeding to go through and

13   justify.  It's the government's burden to demonstrate to you,

14   not only that these expenses were wrong, but that Mr. Hee

15   willfully knew they were wrong, and they have fallen far short.

16          You heard Gary Howard's testimony.  He reviewed the

17   chart that Miss Mitsuyoshi did.  And he testified he didn't

18   have any reason to believe, based upon the information, that

19   these were not proper expenses.  And again, this is a lack of

20   proof on the government's part.  I think in all the expenses

21   that the government has raised, and we're going to talk about

22   this, Mr. Hee has told you the business purpose for it, and I

23   submit to you there was a good business purpose for it.

24          Now, can the government dispute that?  We disagree.

25   We don't think you should have sent -- you should have sent

1    somebody else.  I'm just going to give an example before I go
2    in there.  The government is quibbling, saying, "Well, we don't
3    think you should have sent Wendy Hee to France.  We think --
4    we're the government, and we think you should have sent Admiral
5    Kihune."  It's not the government's position to tell you who to
6    send, ladies and gentlemen.  Okay?  And you heard when he was
7    asked, the issue came up, "Well, why didn't you send -- I asked
8    Mr. Hee on redirect, "Why didn't you send Admiral Kihune?"
9    Mr. Hee explained Admiral Kihune wasn't able to travel because
10   of family circumstances at the time.  But besides all that, I
11   submit to you it's not the government's role to second-guess
12   business judgments.
13           If you go through and you look at a lot of these
14   expenses, and we could go through a lot of them, but I'm going
15   to try to deal with the ones the government has dealt with, and
16   those are the trips.  You heard testimony, of all the four
17   trips we're going to talk about, Mr. Hee was only on when they
18   went to the Big Island, the Home Lands, and the Mauna Lani.  He
19   didn't go on any of these trips.  And I said it before.  Family
20   vacations?  Doesn't everybody go on a family vacation?  If you
21   can, you usually include the whole family.  Doesn't sound like
22   a family vacation if Dad never goes, at least that's my
23   experience.
24           Now, the government went through a lot of expenses.
25   These credit card statements with business purposes set forth,

1    everything -- nothing was concealed from the accountants.

2    Nothing was concealed from the IRS.  They could go in, they

3    could ask the questions:  Explain to us why this is

4    business-related.  There is statements as to why, and they

5    could ask further questions.  But, apparently, they didn't

6    because the government, until this case, we didn't talk about

7    what the business purposes were.

8           We think -- I know the evidence shows that there was

9    a valid and good-faith business purpose for each of these trips

10   that we are going to talk about.

11          But before I go into that, I want to emphasize one

12   thing that we talked about a couple times during the case, and

13   that was the accountants' engagement letter.  I don't know if

14   we have it available to put it up on the screen, but I don't

15   think we need to, Lacey.

16          You heard both the testimony when the government put

17   on one of the KMH CPAs, and then Mr. Yee came back in the

18   defense case to explain a little more his role in the audit.

19   But I asked Mr. Yee again about the issue of positions taken on

20   tax returns, and you remember he explained what was in their

21   engagement agreement:  that we're okay as preparers as long as

22   there's only one-out-of-three chance that we're correct.  And

23   that recognizes these issues are complex.  Okay.  People,

24   accountants, and the IRS disagree all the time.

25          And Mr. Yee also stated he thought the standard for

1    the taxpayer was even lower.  Okay.  But I think you need to

2    know that when you're evaluating not only -- ordinary and

3    necessary is something different, but evaluating whether

4    Mr. Hee -- Mr. Tong said this was a scheme; he was trying to

5    cheat.  And I think the evidence is the exact opposite.  He was

6    doing what he thought he needed to do in good faith for his

7    company.

8              Now, let's talk about some of the charges here.

9              The trip to France.  The government told you it was

10   just a vacation; no business purpose.  But that's not what the

11   evidence showed.  If you recall on the credit card statements

12   they were classified:  CCI undersea France inspection of cable.

13   Government didn't inquire further, just assumed, because it was

14   the taxpayer's wife Wendy, Liko, and Mika, it had to be

15   personal.

16             Now, I think we all know about the trip and why they

17   went and why they went and inspected the Alcatel plant.  And I

18   think Mr. Hee explained today -- Mrs. Hee wasn't allowed to --

19   as to what was going on with the company at the time.  You

20   recall a core part of Sandwich Isles', ClearCom's, Waimana's

21   business is connecting the homelands.  And the homelands are on

22   different islands, and they have to connect the different

23   islands through undersea cable.  And it was Alcatel who was

24   manufacturing the undersea cable.

25             There was an issue of production schedules, as

1   Mr. Hee said, error or disagreement as to the proper shielding

2   of it.  And the question was can we or should we start over or

3   not.  And I think Mrs. Hee told you about what she did when she

4   went there.  She witnessed the manufacturing process and came

5   back and reported to Mr. Hee.  That is a business purpose.

6              Now, can the government disagree?  Yes.  Were some of

7   the expenses related to -- I think they took a trip, you know,

8   when they were there to Switzerland.  Yeah, that probably

9   shouldn't have been in there.  But remember, how much time is

10  spent, Mr. Hee's busy day, going through and characterizing

11  these things?  There are going to be maybe a few errors, but I

12  submit to you he was in good faith on all of it.  There would

13  be no reason for him to sneak in another expense.  That's not

14  in that man's character, and I think you heard that today from

15  all the evidence, including the character witnesses we held.

16  There's no reason for him to do that.  Everything -- I remind

17  you, there's not secret testimony of what really went on.

18  Everything was plain as day for the accountants and the IRS to

19  know.  If there was an issue, it could have been raised.

20             Now, there was another issue that Miss Mitsuyoshi

21  talked about, and that was the attendance of Wendy Hee and Liko

22  at the inauguration.  And maybe we can put the exhibit up.

23             Now, I think the government just assumed another

24  family vacation.  This is exhibit -- do you have the exhibit

25  number, Miss Strachan?

1          Exhibit 50-3.  This was an invitation to Mr. Hee and
2   Waimana to come to the Inauguration of President Obama, I guess
3   the first President of the United States to actually have roots
4   in Hawai'i.  We also know that Waimana or Sandwich Isles, but
5   the business is a heavily regulated company, regulated by the
6   Federal Communications Commission, by -- you've heard the name
7   RUS, the Rural Utility Service, part of the Department of
8   Agriculture.  It's important that this company have good
9   relations with the government.  There's no question about it.
10  And they get an invitation to -- and I believe there was
11  testimony this was the first Hawai'i State Society Inaugural
12  Ball, the first President from Hawai'i, and Waimana sponsored
13  tickets to the Inaugural Ball.  It wasn't cheap, but there was
14  definitely a proper business purpose for it.

15          Now, did Mr. Hee go?  No.  I think it's pretty clear
16  Mr. Hee doesn't like to attend these types of functions.  Who
17  did he send?  He sent, I'll say it, his better half, Wendy Hee.
18  And Liko went.  I can't even remember who else was there.  No,
19  Ho'o joined them.  I think it was those three.  I don't think
20  Kupa'a was there.

21          And Mrs. Hee talked about -- she told you what she
22  did when she was there.  And she told you she paid a courtesy
23  call on the senator and met with Torkel Patterson.  And I don't
24  know, I think -- I think the government devalues that or
25  undervalues the importance of that to the administration.

1          They talked about how long you met.  It wasn't about
2     how long she met with the Senator Inouye.  It was about him
3     knowing that this company was supporting the Hawaiian
4     delegation.  That's what was important.
5          Now, I think there's something else that's very
6     telling here.  Do you recall the testimony, the 2013
7     Inauguration, the second term of President Obama, only Ho'o
8     went.  Okay.  We don't have any documents on that right now.
9     But it wasn't a vacation.  It was important, you heard the
10    testimony, that a face, a representative of the company, show
11    up.  Ho'o was on the East Coast.  She was the likely candidate.
12    If it was a vacation, why didn't we all go?  The reason, it
13    wasn't a vacation.  It was part of business.
14         Let me talk about Tahiti.  Now, I think Ho'o, the
15    oldest daughter, had a desire to go to Tahiti for the Heiva
16    Festival.  Okay.  But that's not why Mr. Hee decided that
17    Waimana or ClearCom -- I think it was a ClearCom expense -- it
18    was appropriate for them to pay those expenses.  Mr. Hee's
19    company was going to be doing business, potentially, with a
20    company from Tahiti, Honotua, I think the name was.  The
21    government didn't mention that in opening at all.  They didn't
22    mention any of the things that Mrs. Hee, Liko, Ho'o, and Kupa'a
23    did when they were there.  What you heard was they did two
24    things:  they went to search for the cable site; they didn't
25    find it; and they went to search for the location of the

1    company.  And they took a picture of the building they thought

2    the company should be in, and they didn't do anything else in

3    locating the company.

4            Mr. Hee thought that was enough to, you know, include

5    it.  There was a business purpose for it.  He was considering

6    doing business with this company, and he wanted to know

7    something about them.  He trusts Wendy.  He also -- Wendy was

8    looking out -- you know, this is a company which just

9    completed, or was in the process of completing, a, you know,

10   the island chain network of connections.  Were there business

11   opportunities in Tahiti?  Wendy had her eyes open for that,

12   too.

13           There may be some technical issues here.  What was

14   the primary reason -- and I think maybe one of the

15   instructions, What was the primary reason they went?  Okay.

16   Well, from Mr. Hee's point of view, he was interested in

17   getting information as to what was going on regarding this

18   cable company.

19           But the more important thing, he didn't know anything

20   about this primary technical tax test.  He just thought

21   business purpose.  He stated -- I think we saw a memo in the

22   file -- what his reasoning was.  Nobody questioned it.  It was

23   there.  The government disagrees.  For somebody to say, no, we

24   don't think that's appropriate, but the real issue is what did

25   Mr. Hee think?  Did he think there was a proper purpose?  And I

1    submit to you there was.

2            If you recall, Mrs. Hee explained her findings.  She

3    spoke with Mr. Hee when she returned.  And she said, "The other

4    thing that was -- we discussed Tahiti generally.  And I was

5    interested in their education because one of the things I

6    thought was interesting about the fiber optics is it's good for

7    business, but it's also good for education.  And from what I

8    learned is that the people are serious about education in

9    Tahiti -- the people that are serious send their kids to

10   France, and that's not something that -- I mean, the education

11   system, the education resources in Tahiti just are not there.

12   So it was -- I thought it was not a good place to do business.

13           "And did you report that to your husband?

14           "Yes, I did."

15           Okay.  Disney World.  We've talked about that quite a

16   bit.  You heard the testimony from Torkel Patterson about the

17   ride, about the display, and you heard Mr. Hee's reasoning why

18   he thought it was an appropriate business expense.  He

19   explained that the chairman of Raytheon invited him to come see

20   it, a company which Sandwich Isles and Waimana were joint

21   venturing to provide services on the outer islands.  When a

22   chairman of a large company invites you to come visit one of

23   their displays, I think it's good business sense to send a

24   representative there.

25           Now, let's talk about the Mauna Lani.  Okay?  Mr. Hee

1  testified today, got a little choked up talking about the

2  meeting.  And remember the evidence was this was after the

3  attendance at the Hawaiian Home Lands Commission with the three

4  children and Mr. Hee.  Then they met Wendy and Janeen Olds up

5  at the Mauna Lani.

6         And Mr. Hee told you, and he put down "stockholders

7  meeting."  Well, it's true he was the only stockholder at the

8  time, but he told you what the purpose of that meeting was.

9  This was shortly after he had his health issue, the heart

10  attack, and he was starting to accelerate the succession plans

11  for the kids.  This was the only trip that Mr. Hee went on, and

12  there was good purpose for it.

13         I'm just going to cover some of the last issues so

14  I'm complete.  The cash withdrawals.  The government's also

15  charging that Mr. Hee -- these cash withdrawals should be

16  income to him.

17         Can we put the exhibit?

18         Now, this was one of the exhibits that Mr. Howard

19  prepared, and I think it's very similar to what the government

20  prepared, their summary exhibits.  But I think the important

21  thing, on every withdrawal, if you remember, most everyone

22  except one was when Mr. Hee was traveling outside of Honolulu.

23  I think there was one at the Honolulu Airport.  But all of

24  those reflect that he -- the business he was on -- this is

25  based upon the receipts -- what he was doing.  Washington,

1   D.C., New York, meetings with Deutsche Bank and U.S.

2   Congressional members.  San Francisco, meetings with Paniolo.

3          The government's argument here is he didn't keep a

4   receipt.  Are we going to be prosecuted because we don't have a

5   receipt?  I don't think so.  And remember, the evidence is,

6   basically, undisputed that these are valid business purposes.

7   The government's got to prove they're not.  They just

8   disallowed them because we want to see receipts.  We have the

9   ATM receipts, but we want to see a taxi receipt.  We want to

10  see a receipt for a tip.  You don't get receipts for tips.

11  Mr. Hee told you he uses the cash.  And I think, if you look at

12  the expenses, and again use your common sense, that these all

13  relate to business trips.

14         You can -- scroll to the next page.

15         More, Washington, D.C., meetings with RUS;

16  Washington, D.C., meetings with FCC Venable.  So I don't think

17  there's any question that the government hasn't even come close

18  to proving that these are not allowable expenses and income to

19  Mr. Hee.

20         The massages with Diane Doll.  Again, I don't think

21  the government told the complete story in their opening, and I

22  think, you know, we disagree with the government as to the

23  state of the record on certain things here.

24         The -- one of the core issues here is was there a

25  business purpose for Waimana paying for the massage payments?

1    And I think that there clearly was.  If you were a shareholder

2    of a company and you were relying upon -- or you were an

3    employee of a company and you wanted your chief executive to be

4    healthy, successful, and massage therapy helped that executive,

5    do you think that advances the mission of the company?  There's

6    no question that it does.  And I think you've heard a lot of

7    evidence that there's no question Mr. Hee had issues with his

8    health, that massage therapy helped, that massage therapy helps

9    stress, and massage therapy helped him.  That's why he thought

10   it was an appropriate expense for Waimana to pay.  So I don't

11   think there's any question here.

12          I think you heard the question of -- or you heard the

13   testimony of the expert, Mr. Rockowitz, who does corporate

14   massages for a living.  Is there a difference between the

15   massages he does and the massages Mr. Hee?  Well, in terms of

16   its effect and the business purpose for it, no.  Are they

17   different?  Yeah, but it's a difference -- it's a distinction

18   with really no substantive difference.

19          One could argue, technically, should they or should

20   they not, but there is no question that Mr. Hee validly thought

21   there was a business purpose for it.  And you heard all the

22   different accountants give their views as to whether it was

23   deductible or not a deductible.  It's really not clear.  I

24   think Mr. Chinaka said it was deductible.  Carlton Siu said

25   "I'd have to research it."  Gary Howard, I think, the expert,

1    he really wasn't, you know, I think he said maybe not

2    deductible, but whether it would be income, he -- I think he

3    felt maybe it shouldn't be deducted, but he clearly said it was

4    the accountant's error which misclassified it.

5              So let's talk about that for a second because that's

6    really important because that's where we disagree.

7              Can we put up Exhibit 50-4?

8              Now, the government in their opening -- can we scroll

9    down a little bit?  Perfect.

10             The government in their opening never mentioned

11   anything about payments to Diane Doll are for health consultant

12   services.  This is Exhibit Number 50-4.

13             Now, the government just talked about consulting

14   services.  And the government tried to say this -- I think they

15   tried to argue to you this is really not important because it

16   was characterized as consulting services before this ever

17   happened.  And we're going to show you an exhibit, based upon

18   the government's own exhibits, it wasn't characterized as

19   consulting services before that.  We'll see the

20   characterization.  It was either as "services rendered" or

21   "professional fees."

22             This came up -- there's no evidence in the record --

23   and we're going to find the evidence in the record which proves

24   the contrary -- no evidence in the record that it was

25   characterized by the company or Mr. Hee as consulting services

 1  before this happened.  What happened is there was a request --
 2  "Here is the information requested in your fax.  It should be
 3  given to Lynn Y" and said "I appreciate it."  This is Nancy
 4  Henderson responding to Lynn Tamanaha.  Okay?  "Enclosed,"
 5  because the accountants are asking questions on various things.
 6  "Payments to Diane Doll are for health consultant services.
 7  The retainer payment to Torkel Patterson is for government
 8  consulting services."
 9          You've heard testimony that there were a number of
10  transitions of Chinaka & Siu, the types of records they were
11  doing, the accounting records.  And at this time this was the
12  first evidence we have of them asking for information.  And
13  what they were told is they were for "health consulting
14  services."  Now, the government just wants to ignore that, but
15  that is very, very important here.
16          Now, let's go back -- do we have the Government's
17  Exhibit 70-3?  7-3.
18          Okay.  This is one of the summary sheets that the
19  government put in.  This is WEI, Waimana, printout of general
20  ledger showing how payments to Diane Doll were booked.  This is
21  the government's exhibit.  This is when -- this is the early
22  days.  This is 2003.
23          Do we have anything before 2003, or is this the
24  earliest?  Earliest, okay.
25          So here we go.  At this stage it's just Diane Doll,

1    either no memo or "services rendered."  The government has

2    produced no evidence contrary to what the argument was that

3    these were characterized as "consulting services" beforehand.

4         The question came up -- go back to 7-3 -- not 7-3.

5    50-4.  And Waimana and Mr. Hee told the accountants "health

6    consulting services," and something got lost in translation.

7         If we could go to Mr. Howard's chart 40-1, which sort

8    of explains his view from a forensic evidentiary point of view

9    how it happened.

10        Okay.  This is the early years.  We see checks

11   written payable to Diane Doll, recorded in account WEI,

12   "services rendered."  Data provided to the accountants.  He's

13   talking about the memo.  We just saw it and the fax response:

14   health consulting services.

15        Check reentered into Chinaka & Siu accounting program

16   general ledger.  Remember, they were doing the general ledger

17   at the time.  Checks classified by Chinaka & Siu as "consulting

18   fees."  Financial statement prepared, deducted as a

19   "consulting" expense.  Something got lost in the translation

20   here, and it was the accountants who did it.

21        Now, let's go back, and remember the testimony of

22   what Lynn Tamanaha said and, I think, Lynn Yasaka, the other

23   CPA support staff at Chinaka & Siu.  Their job was, and they

24   told you, that "If we spotted an issue that we thought was a

25   question, then we were to raise it to a partner level:  either

1   Mr. Chinaka or Mr. Siu."  And Lynn Tamanaha never raised this

2   with either one of them.  Okay.  She just changed -- she didn't

3   see -- she just changed it from "health consulting services" to

4   "consulting services."

5            And you heard the testimony of Mr. Siu.  Do you

6   recall it?  Mr. Siu told you that, "Well, if I would have seen

7   something on 'health consulting services,' I would have made a

8   further inquiry."  Okay.  "I would have done it."  But it never

9   got to him because it didn't get raised.  So it just got booked

10  as "consulting" expenses, and that is the way it got reported

11  throughout.

12           I don't think really there is any dispute that that

13  is what happened here.  And they could have looked at it, they

14  could have spotted it, but it was an accountant error in

15  reporting it.

16           The government's argument here is that it's all they

17  say:  consulting services.  They want to ignore the exhibit we

18  talked about health consulting services.  They should have

19  known that before they brought the case, ladies and gentlemen.

20           THE COURT:  Mr. Toscher, they've been sitting here

21  for an hour and a half; so I'm a little worried.  Are you

22  wrapping up?

23           MR. TOSCHER:  Yes.  I will -- Your Honor, I do

24  have -- I probably have another 20 minutes.  Can we continue?

25           THE COURT:  I thought you had told me that you would

1    take 90 minutes maximum; so --

2              MR. TOSCHER:  Yes.  Yes.  You want me to finish.

3              THE COURT:  -- this is something different now.

4              MR. TOSCHER:  I didn't do it as fast as I --

5              THE COURT:  Can you -- we have three neighbor island

6    jurors who are going to have planes to catch; and so I'm a

7    little worried.  Do you folks need to leave at 4:00?

8    Everybody?

9              THE COURT:  Yeah, so can you conclude by 4:00?  We're

10   going have to break because I can't make them miss their

11   planes, and we'll have Mr. Tong's rebuttal tomorrow.  Can you

12   do that?

13             MR. TOSCHER:  I will do the best I can, Your Honor.

14             THE COURT:  Okay.  Please.

15             MR. TOSCHER:  A lot of ground to cover.

16             I'm almost there.  I want to get you out of here in

17   time.  I apologize.

18             I think you go through all the issues:  no

19   concealment, all in plain view, nothing hidden from anybody.

20   And there may be some disputes as to technical issues, but

21   nothing cuts against Mr. Hee's good faith.  He thought these

22   expenses were good for the business, he was building the

23   business, and he knew he needed to do this for the, you know,

24   to create the lifetime on the business.  That was always his

25   focus.  His focus wasn't on accounting.  He was trying to

1    implement his vision through a number of different sources.  He

2    built the company from one or two employees to over a hundred.

3           You saw he employed CPAs throughout his career to

4    prepare his tax returns, to audit the company.  There was no

5    hiding anything from any of the CPAs.  No concealment.

6           Now, one of the most important things I want to leave

7    you with is:  the same error that the accountants did in terms

8    of misclassifying the 2004 tuition expenses, it's the same

9    thing that happened on the consulting expenses.  And that's why

10   Gary Howard, the CPA, said the two things -- he might agree

11   with the government's adjustments on only two things.  He

12   thought they were CPA errors.

13          You've heard evidence of all the CPAs:  cooperation,

14   no concealment, always had all the information.  And all the

15   information the government's relied upon was always in their

16   books and records.

17          Now, you've heard from all the accountants.  They've

18   testified.  You heard from Mr. Yee.  He said, "If we thought

19   the taxpayer was uncooperative or if we thought he was engaging

20   in fraudulent activities, we would terminate him."  They didn't

21   terminate him.

22          You saw, if you remember -- maybe Miss Strachan could

23   put it up -- the Chinaka certified audit back in -- I think

24   this goes back to 2006 or 2007 where -- and we'll give you an

25   exhibit number -- where he said he checked off -- he did the

 1    audit.  We don't believe -- "Is management prone to taking

 2    unreasonable or unnecessary business risks, such as tax

 3    evasion?  Does the client insist on taking overly aggressive

 4    tax positions or otherwise increase the firm's liability

 5    exposure?

 6            "Answer:  No."

 7            So let's -- let me finish with the charges.  Okay?

 8            The charges are Mr. Hee corruptly and willfully tried

 9    to secure unlawful tax benefits and that he willfully filed his

10    tax returns knowing they were false.  The case here is about

11    whether he committed those crimes.

12            There's no -- there's been no concealment in this

13    case.  The government is required to prove -- as we went

14    through the instruction before, the government is required to

15    prove beyond a reasonable doubt that Mr. Hee was not in good

16    faith, that he was willful, that he was corruptly, that he knew

17    he was trying to seek an unlawful benefit.  If you remember the

18    instruction, good faith is a defense to all of these charges.

19            You heard from Mr. Hee himself.  Okay.  There's been

20    no evidence here that Mr. Hee was attempting intentionally to

21    secure an unlawful benefit.

22            The government promised in their opening that these

23    expenses were not connected to his business, but that's not

24    what the evidence showed.  There's either disagreements with

25    the IRS as to how they should be characterized or mistakes by

1    the accountant.

2            The evidence has consistently shown that Mr. Hee and

3    Waimana were always cooperative.

4            The case has been driven, excuse me, by IRS

5    assumptions, not by facts, not by evidence.  The IRS jumped

6    charging Mr. Hee publicly with a crime before it had all the

7    facts.  You've got to listen to all the facts.  They were just

8    allegations, and the presumption of innocence is with Mr. Hee.

9    I'm confident you'll carefully review the evidence.  You'll go

10   through the instructions carefully.

11           The government got to go first in the closing

12   argument, and I've got to finish quickly, and they get to say

13   another statement.  But remember, I don't get to respond to the

14   government's rebuttal to me.  So if they tell you something

15   they didn't raise initially, just remember I don't get a chance

16   to respond to it.

17           Ladies and gentlemen, I want to thank you for

18   listening to me.  I'm sorry if I ran a little over.  You've

19   been very patient.  At the end of the day, it can be difficult.

20   But based upon the evidence, we think -- I know you will agree

21   with me that the government has failed to prove beyond a

22   reasonable doubt that Mr. Hee committed these crimes.  The

23   government hasn't even come close, in my judgment, ladies and

24   gentlemen.  I ask you, as part of your sworn duty, to acquit

25   Mr. Hee, to find him not guilty of all charges.  And I thank

1    you.

2              THE COURT:  Okay.  Then I'm going to let everybody go

3    and see you for a short period tomorrow.  Mr. Tong has a time

4    limit on what he can do, and then I have about three minutes'

5    worth of stuff to tell you.

6              So right now we're going to adjourn.  And I'll see

7    you at nine o'clock tomorrow, and you will begin your

8    deliberations tomorrow.

9         (Jury excused.)

10             THE COURT:  Okay.  I'll see everybody at 9:00.  I

11   didn't achieve my goal of doing all this without a break.  It

12   was really, you know, in retrospect I could have charged them

13   tomorrow instead, and then it wouldn't be --

14             MR. TOSCHER:  We all try, Your Honor.

15             THE COURT:  -- this press of time.

16             I am going to order that, when they're deliberating,

17   the court provide juror meals.  We have this new procedure now.

18   It was automatic.  Now I have to do an order.

19             And so I'll see you folks tomorrow, nine o'clock.

20             Mr. Tong, by my calculation you're limited to 15

21   minutes.

22             MR. TONG:  That's plenty, Your Honor.

23             THE COURT:  And then I need to have the marshal come

24   forward, swear him in, charge them.  We need to collect their

25   cell phones.  I don't let them take those into the deliberation

1    room.   And then they'll start, and we'll see where it goes.

2                 Thank you very much.

3                 MR. TONG:   Thank you, Your Honor.

4                 MR. TOSCHER:   Thank you, Your Honor.

5          (Court adjourned at 4:01 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   COURT REPORTER'S CERTIFICATE

2            I, Debra Kekuna Chun, Official Court Reporter, United

3   States District Court, District of Hawaii, do hereby certify

4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5   true, and correct transcript of the stenographically reported

6   proceedings held in the above-entitled matter and that the

7   transcript page format is in conformance with the regulations

8   of the Judicial Conference of the United States.

9            DATED at Honolulu, Hawaii, August 12, 2015.

10

11                                   /s/ Debra Chun

12                                   DEBRA KEKUNA CHUN

13                                   RPR, CRR

14

15

16

17

18

19

20

21

22

23

24

25
```